**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SPORTS AUTHORITY HOLDINGS, INC., *et al.*,[1] | Case No. 16-_____ (___) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS**
**(A) AUTHORIZING PAYMENT OF CERTAIN PREPETITION WORKFORCE**
**CLAIMS, INCLUDING WAGES, SALARIES AND OTHER COMPENSATION;**
**(B) AUTHORIZING PAYMENT OF CERTAIN EMPLOYEE BENEFITS AND**
**CONFIRMING RIGHT TO CONTINUE EMPLOYEE BENEFITS ON POSTPETITION**
**BASIS, (C) AUTHORIZING PAYMENT OF REIMBURSEMENT TO EMPLOYEES**
**FOR EXPENSES INCURRED PREPETITION, (D) AUTHORIZING**
**PAYMENT OF WITHHOLDING AND PAYROLL-RELATED TAXES,**
**(E) AUTHORIZING PAYMENT OF WORKERS' COMPENSATION OBLIGATIONS,**
**AND (F) AUTHORIZING PAYMENT OF PREPETITION CLAIMS OWING**
**TO ADMINISTRATORS AND THIRD PARTY PROVIDERS**

Sports Authority Holdings, Inc. and its affiliated debtors and debtors in possession in the

above-captioned chapter 11 cases (collectively, the "Debtors") hereby move this Court (this

"Motion") for entry of interim and final orders, substantially in the forms annexed hereto as

Exhibit A and Exhibit B, respectively, pursuant to sections 105(a), 363(b), 507, 1107(a), and

1108 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 6003 and 6004 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9013-1 of the Local

Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

District of Delaware (the "Local Rules"), authorizing, but not directing, the Debtors to (a) pay

accrued prepetition wages, salaries and other compensation to their Workforce (as defined

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  Sports Authority Holdings, Inc. (9008); Slap Shot Holdings, Corp. (8209); The Sports Authority, Inc. (2802); TSA Stores, Inc. (1120); TSA Gift Card, Inc. (1918); TSA Ponce, Inc. (4817); and TSA Caribe, Inc. (5664).  The headquarters for the above-captioned Debtors is located at 1050 West Hampden Avenue, Englewood, Colorado 80110.

below); (b) honor any prepetition obligations in respect of, and continue in the ordinary course of business until further notice (but not assume), certain of the Debtors' paid time off policies, severance practices, and employee benefit plans and programs, as described below; (c) reimburse Employees (as defined below) for prepetition expenses that Employees incurred on behalf of the Debtors in the ordinary course of business on a prepetition basis; (d) pay all related prepetition payroll taxes and other deductions; (e) honor workers' compensation obligations; and (f) pay any prepetition claims of administrators and providers in the ordinary course of business to the extent that any of the foregoing programs are administered, insured or paid through a third-party administrator or provider. In support of the Motion, the Debtors rely upon and incorporate by reference the *Declaration of Jeremy Aguilar in Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief* (the "First Day Declaration"), which was filed with the Court concurrently herewith. In further support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b), and pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the

relief requested herein are sections 105(a), 363(b), and 507 of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and Local Rule 9013-1.

**BACKGROUND**

**A.     General Background**

2.     On the date hereof (the "Petition Date"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.  Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are continuing to manage their financial affairs as debtors in possession.

3.     Contemporaneously herewith, the Debtors filed a motion seeking joint administration of their chapter 11 cases (collectively, the "Chapter 11 Cases") pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.  No trustee, examiner, or official committee of unsecured creditors has been appointed in these Chapter 11 Cases.

4.     Information regarding the Debtors' history and business operations, capital structure and primary secured indebtedness, and the events leading up to the commencement of these Chapter 11 Cases, can be found in the First Day Declaration.

**B.     The Debtors' Workforce and Related Obligations**

5.     In connection with operating their businesses, the Debtors currently employ approximately 5,400 full-time employees, 9,100 part-time employees, 200 seasonal employees, and 125 employees who are currently on leave (collectively, the "Employees").  A majority of the Employees work in the Debtors' approximately 464 stores located in 40 states and Puerto Rico; other Employees work at the Debtors' headquarters in Englewood, Colorado, or at the Debtors' five distribution centers (collectively, the "DCs").

6.     The Employees are the lifeblood of the Debtors' business, and their value cannot be overstated.  The management, marketing, sales, distribution, and technical skills of the

Employees are essential to the Debtors' ability to source branded athletic goods and apparel, research customer preferences, develop high-quality and effective services and store layouts, bring those products and services to market, maintain a current inventory of in-season goods and apparel in line with customer expectations, timely deliver them to their customers, and provide customers with a high-quality in-store experience. To a significant extent, the Debtors' success depends upon their ability to attract and retain key personnel. If the Debtors cannot assure their Employees that they will promptly pay prepetition Employee Obligations (as defined below) to the extent allowed under the Bankruptcy Code, and continue to honor, as applicable, Employee Benefits Obligations (as defined below), certain Employees will likely seek employment elsewhere, potentially with the Debtors' competitors. The loss of Employees at this critical juncture would have a material adverse impact on the Debtors' business and ability to maximize value through the prosecution of these Chapter 11 Cases.

7.     The Debtors also regularly utilize the services of contract workers (collectively, the "Contract Workers", and, together with the Employees, the "Workforce") to provide a variety of sales, operations and other daily business services. The Contract Workers are provided by The Creative Group, Insight Global, XPED-IT, and several other staffing agencies, and the number of Contract Workers fluctuates depending on the Debtors' needs. At any given time, the Debtors may have approximately 83 Contract Workers engaged. In 2015, the Debtors spent approximately $4.6 million in connection with the engagement of Contract Workers.

8.     The Contract Workers fill certain critical and immediate business needs of the Debtors, and allow the Debtors to have a flexible workforce to meet the needs of their customers in a cost-effective way. In such capacity, the Contract Workers fill several types of roles for the Debtors, including providing accounting, information systems, and marketing services as needed.

The Contract Workers are a reliable and cost-efficient component of the Debtors' operations. Thus, as with the Debtors' regular Employees, if the Debtors fail to honor their prepetition compensation obligations to the Contract Workers, it is likely that the Debtors will lose such individuals' valuable services to the detriment of the Debtors' ongoing business operations.

9.      In the ordinary course of business, the Debtors incur payroll and other compensation obligations for their Workforce. The Debtors also provide other benefits to their Employees for the performance of services. These benefits and obligations are described in more detail below.

**(1)     Workforce Compensation Obligations**

**a.      Employee Compensation Obligations**

10.      In the ordinary course of business, the Debtors incur payroll obligations to their Employees, comprised generally of salaries and wages. Approximately 1,500 Employees are paid a fixed salary and approximately 13,000 Employees are paid on an hourly basis. The Debtors pay Employees on a bi-weekly basis (other than Employees working in the DCs, Maine, and Rhode Island, who are paid weekly), a week in arrears, on Fridays. The last date Employees were compensated prior to the Petition Date was February 26, 2016 for payroll group A[2] and March 1, 2016 for payroll groups B and W, with such Employees receiving payment primarily for wages and salaries earned for February 7 to 20, 2016 for payroll group A, February 14 to 27, 2016 for payroll group B and February 21 to 27, 2016 for payroll group W.[3]

---

[2]     Payroll group A are Employees paid on a bi-weekly basis, payroll group B are Employees paid on a bi-weekly basis, and payroll group W are Employees paid on a weekly basis.

[3]     Payroll for wages and salaries earned for February 14 to 27, 2016 for payroll group B and February 21 to 27, 2016 for payroll group W was due to be paid on March 4, 2016, but due to the imminent filing of these Chapter 11 Cases and the Debtors' desire to ensure all Employees received timely payment for wages earned prepetition, payroll for these periods was paid on March 1.

11.     Approximately 87% of the Employees elect to have their payroll administered via direct deposit, with the remainder of the Employees electing to receive a physical check.  The Debtors use Automatic Data Processing, Inc. ("ADP") to process their payroll and coordinate the payment of Withholding Obligations (as defined below) and obligations related to their flexible spending account plan.  In connection with each payroll cycle, the Debtors create certain interface reports which they submit to ADP along with a wire equal to the Debtors' Withholding Obligations, directing ADP to transfer the appropriate amounts to the various parties.

12.     The ongoing services of ADP are imperative to the smooth functioning of the Debtors' payroll system.  The Debtors pay ADP approximately $11,400 per month for its services, which include payroll processing, tax filing, time and attendance, self-service benefits administration, data processing services, and the provision of timekeeping software and hardware.  As of the Petition Date, the Debtors estimate that they owe ADP approximately $29,100 in outstanding fees in connection with its services (the "Payroll Administrator Obligations").

13.     The Debtors' bi-weekly gross payroll on account of the Employees averages approximately $6.5 million, with an additional $400,000 of weekly gross payroll.  The next scheduled payroll date for Employees in payroll groups A and W is March 11, 2016 and for payroll group B is March 18, 2016, and will include salaries and wages earned prepetition.  The Debtors estimate that, as of the Petition Date, they owe approximately $7.5 million on account of accrued and unpaid prepetition salaries and wages (the "Employee Compensation Obligations").  To the best of the Debtors' understanding, none of the Debtors' Employees are owed more than $12,475 in accrued and unpaid general prepetition wages or salaries.[4]

---

[4]     Although some Employees may have accrued Vacation Time and PTO (defined below), the value of which would cause the amount owed to such Employees to exceed $12,475, the Debtors do not believe such

01:18375374.1

14.     The Debtors seek authorization, but not direction, to pay any unpaid Employee Compensation Obligations, and any unpaid Payroll Administrator Obligations.  In addition, the Debtors seek authority to cause any prepetition checks or electronic payment requests that were given in payment of Employee Compensation Obligations and/or Payroll Administrator Obligations to be honored and to reissue any check or electronic payment request that is not cleared by the applicable bank or other financial institution, to the extent necessary.

### b.     Contract Workers Obligations

15.     As noted above, the Debtors also regularly utilize Contract Workers in the ordinary course of business.  The Contract Workers are skilled persons who provide the same types of services as regular Employees, but allow for a more flexible workforce to meet the business' fluctuating staffing needs.

16.     As of the Petition Date, the Debtors estimate that the aggregate amount owing to the several staffing agencies employed by the Debtors on account of the Contract Workers for services performed prior to the Petition Date is approximately $600,000 (the "Contract Workers Obligations" and collectively with the Employee Compensation Obligations the "Compensation Obligations").  The Debtors would be irreparably harmed without the services of the Contract Workers because such parties play a critical role in the Debtors' day-to-day operations, and, as such, the Debtors request authorization, but not direction, to honor and pay any unpaid Contract Workers Obligations.

---

Employees are owed the value of their Vacation Time and PTO in cash as the Debtors will continue the Vacation Time and PTO policies.

### c.    Deferred Compensation

17.     As of the Petition Date, the Debtors maintain a deferred compensation plan (the "Deferred Compensation Plan").[5]  The Deferred Compensation Plan has been frozen by the Debtors to disallow any additional deferrals of compensation.  No additional deferral elections have been allowed since December 18, 2015.  As of the Petition Date, the Deferred Compensation Plan has approximately 28 participants with a combined balance of approximately $675,000.

18.     The Deferred Compensation Plan is funded by certain of the Debtors' investments (the "Investments").  In connection with managing the Investments and the Deferred Compensation Plan, as well as the Health Plans (defined below), the Health Savings Plans (defined below) and the 401(k) Plan (defined below), the Debtors pay Aon Hewitt ("Aon") annual administrative fees of approximately $1,200,000.  As of the Petition Date, the Debtors owed Aon approximately $400,000 in administrative fees incurred prior to the Petition Date (the "Aon Administrative Fee Obligation").

19.     Many complex and material issues relate to and impact the Deferred Compensation Plans.  At this time the Debtors request authority, but not direction, to pay the Aon Administrative Fee Obligation as and when it comes due and in the ordinary course of business, in an amount not to exceed $400,000.  Payment of the Aon Administrative Fee Obligation will ensure that the value of the Investments is maintained.  The Debtors will, at the appropriate time, seek any additional relief they believe appropriate with respect to the Deferred Compensation Plans when such issues and developments can more fully be assessed.

---

[5]    Section 409A of the Internal Revenue Code was added in 2005.  In summary, before section 409A was added, Employees could seek to make certain withdrawals (with a penalty) from the Deferred Compensation Plan. After 2005, the ability to withdraw any funds was more limited.  The Deferred Compensation Plan accounts for this change in the law.

### d. Withholding Obligations

20.    For each applicable pay period, the Debtors routinely deduct certain amounts directly from Employees' paychecks, including, without limitation, (a) garnishments, child support and service charges, and similar deductions and (b) other pre- and after-tax deductions payable pursuant to certain of the Employees' benefit plans discussed herein (such as an Employee's share of health care benefits and insurance premiums and 401(k) contributions), legally-ordered deductions, and miscellaneous deductions (collectively, the "Deductions"). The Debtors withhold approximately $1.6 million per month on average from Employees' wages on account of Deductions, which the Debtors remit to the appropriate third-party recipients.

21.    In connection with the salaries and wages paid to Employees, the Debtors are required by law to withhold from their Employees' wages amounts related to federal, state, and local income taxes, as well as social security and Medicare taxes (collectively, the "Employee Withholding Taxes") and to remit the same to the applicable taxing authorities. In addition, the Debtors are required to make matching payments from their own funds for, among other things, social security and Medicare taxes and to pay, based on a percentage of gross payroll, state and federal unemployment insurance, employment training taxes, and state disability insurance contributions (the "Employer Payroll Tax Obligations," and together with Employee Withholding Taxes, the "Payroll Tax Obligations"). Each pay cycle, the Debtors withhold any applicable Employee Withholding Taxes from the Employees' wages, and ADP remits the same to the applicable taxing authorities. The Debtors withheld approximately $4.9 million in January 2016 Employee Withholding Taxes, and the Debtors' January 2016 monthly payment for Employer Payroll Tax Obligations is approximately $2.3 million. The amounts in satisfaction of

the Payroll Tax Obligations are transferred to ADP in advance of the relevant payroll processing day.

22.     The Debtors seek authorization, but not direction, to continue to make the Deductions and satisfy Payroll Tax Obligations (collectively, the "Withholding Obligations") and to remit amounts withheld on behalf of third parties post-petition in the ordinary course of business.

### (2)     Incentive Programs

23.     In the ordinary course of business, the Debtors have typically maintained discretionary incentive and bonus programs for their Employees (collectively, the "Incentive Programs").  The Incentive Programs under which amounts are owed to Employees as of the Petition Date are described below.

### a.     Bonuses

24.     The Debtors maintain a number of performance-based bonus programs for Employees in the store leadership, team sales, community marketing, DC leadership, and DC hourly groups (collectively, the "Bonus Programs").  Bonuses earned under the Bonus Programs (the "Bonuses") may be paid monthly or quarterly, depending on the Bonus Program.  When payable, Bonuses generally range from 5 % to 20% of an eligible Employee's annual earnings.[6] For all of the Employees who receive them, the Bonuses are an important aspect of their overall compensation.  Maintaining the historical prepetition practices with regard to the Bonuses is essential to ensuring that the Debtors can retain their Workforce and continue to operate their businesses and maximize value through the prosecution of these Chapter 11 Cases.

---

[6]     Hourly Employees at DCs may receive performance-based bonus payment in the form of gift cards redeemable at the Debtors' stores.

25.     As of the Petition Date, the Debtors estimate that approximately $650,000 has accrued under the Debtors' Bonus Programs.  The next payment under the Bonus Programs is scheduled to be made on March 18, 2016 and is estimated to be in the amount of approximately $80,000.  The Debtors do not believe that there are any Bonus Program payments owed to insiders.

26.     Therefore, the Debtors seek authority, but not direction, to honor their obligations under the applicable Bonus Programs and to maintain all Bonus Programs in the ordinary course of the Debtors' business.

### b.     Equity Incentive Plan

27.     The Debtors maintain an equity compensation plan (the "Equity Incentive Plan"). In the aggregate, as of the Petition Date, there were approximately 624,324 securities to be issued and/or vest upon exercise of outstanding options and rights issued pursuant to such Equity Incentive Plan.

28.     The Equity Incentive Plan is structured to incentivize award recipients to deliver superior corporate performance to the Debtors at no cost to the Debtors' creditors.  These non-cash awards align Employee and board member interests with the interests of the Debtors' financial stakeholders by linking compensation to the Debtors' corporate performance. Moreover, the awarded equity's ratable vesting schedule stresses long-term corporate growth and stability over short-term gains.  Employees are encouraged to take steps to improve the Debtors' long-term performance.  They receive little gain from a short-term bump in valuation.

29.     Accordingly, the Debtors request authority, but not direction, to continue the Equity Incentive Plan in the ordinary course after the Petition Date solely to provide for continued vesting and issuance of already outstanding options and rights.  The Equity Incentive

01:18375374.1

Plan is not a Key Executive Incentive Plan or a Key Employee Retention Plan and if authority to adopt such a plan is sought it will be by separate motion.

>    **(3)     PTO, Vacation Time and FTO**

30.     The Debtors offer their Employees paid days off and sick days ("PTO"), vacation time ("Vacation Time") or flexible time off ("FTO"), overtime pay, and holiday pay.   These programs are typical and customary, and continuing to offer them is necessary for the Debtors to retain Employees during the reorganization process.

31.     Non-exempt Employees in the U.S. are eligible for a certain amount of PTO per year for paid days off or sick days, as applicable.  Most Employees receive 10 days of PTO every calendar year, prorated based on the month of hire.[7]  PTO does not accrue, roll over or get paid out unless state or local law requires otherwise.

32.     Employees also receive Vacation Time.  The rate at which an Employee accrues Vacation Time varies depending on the Employee's length of employment.  In general, most Employees accrue 3.08 hours per pay period for zero through four years of service, 4.62 hours per pay period for five through nine years of service, 6.16 hours accrue per pay period for ten through nineteen years of service, and 7.69 hours accrue per pay period for twenty or more years of service.  Vacation Time may be accrued up to certain caps, which vary based on the applicable Employee's service time.  Employees may not elect to receive payment in lieu of taking Vacation Time.  In accordance with applicable law, Employees terminating employment for any reason are entitled to payment for all accrued but unused Vacation Time as of the date of termination of employment.

---

[7]     Employees in Rhode Island, Massachusetts, and hourly employees in Connecticut receive between four to five days of PTO per calendar year.  Employees in California and Illinois receive up to seven paid sick days per year; these sick days may not be carried over from year to year, and are not payable upon termination of employment.

33.     Beginning in 2016, certain Employees in the Debtors' corporate headquarters (director-level and above) no longer accrue Vacation Time, but instead are allowed to take time off under the Debtors' FTO program.  Prior to using FTO, eligible Employees must exhaust any Vacation Time accrued under previous programs.  There are no minimum or maximum allowances for FTO but all requests for FTO are subject to approval based on business needs. FTO does not accrue, roll over or get paid out upon termination of employment, regardless of the basis for an Employee's termination.

34.     Because PTO and Vacation Time are accrued and used by Employees on a continuous basis, it is difficult to precisely quantify the cost of accrued PTO and Vacation Time as of the Petition Date.  However, the Debtors estimate that as of the Petition Date the value of accrued and unused or unpaid PTO and Vacation Time is, respectively, approximately $6.72 million and $6.09 million.

35.     The Debtors request that they be authorized, but not directed, to continue to honor their PTO, Vacation Time and FTO policies going forward, and with regard to any PTO and Vacation Time that accrued prepetition, including to the extent that Employees may use prepetition PTO and Vacation Time throughout the administration of these cases in accordance with prepetition policies.

**(4)     Reimbursable Expense Obligations**

36.     Prior to the Petition Date, in the ordinary course of business, the Debtors reimbursed Employees for approved, legitimate expenses incurred on behalf of the Debtors in the scope of the Employee's employment ("Reimbursable Expense Obligations").  Reimbursable Expense Obligations typically include expenses for, among other things, air travel, meals, parking, mileage and certain other business related expenses.  All such expenses are incurred

with the applicable Employee's understanding that he or she will be reimbursed by the Debtors in accordance with the Debtors' reimbursement policy, as described in more detail below.  In all cases, reimbursement is contingent on the Debtors' determination that the charges are for legitimate, reimbursable business expenses.

37.     Most Employees incur expenses through the American Express® Corporate Card Program under which American Express® Corporate Cards ("Corporate Cards") have been issued to Employees pursuant to a Corporate Card Account Agreement ("CCA Agreement") between the Debtors and American Express.   Corporate Card account statements are sent directly from American Express to the Employee who holds the Corporate Card and the Employees are personally liable on the Corporate Cards.  The Debtors have policies whereby Employees seek reimbursement, or file expense reports for the Debtors' payment, of business related expenses.  The expenses are ordinary course expenses that the Company's employees incur in performing their job functions, including all expenses incurred on the Corporate Cards. It is essential to the continued operation of the Company's business that the Company be permitted to continue reimbursing, or making direct payments on behalf of, employees for such expenses.

38.     The Debtors process expense and reimbursement claims on a rolling basis.  It is difficult for the Debtors to determine the exact amount of Reimbursable Expense Obligations outstanding as of the Petition Date because, among other things, Employees may have expenses that they have yet to submit to the Debtors for reimbursement.  On average, over the past year, the Debtors have paid approximately $160,000 per month on account of Reimbursable Expense Obligations.  As of the Petition Date, the Debtors estimate that the total amount of unpaid prepetition Reimbursable Expense Obligations will not exceed $400,000.

39.     Employees incurred Reimbursable Expense Obligations as business expenses on the Debtors' behalf and with the understanding that they would be reimbursed.  To avoid harming Employees who incurred Reimbursable Expense Obligations, the Debtors request authority, but not direction, to satisfy all prepetition Reimbursable Expense Obligations to the extent Employees have paid for such expenses directly from their own funds or are otherwise personally liable for such expenses.  The Debtors also seek authority to continue their reimbursement policy in the ordinary course during the administration of the Chapter 11 Cases.

**(5)     Employee Benefit Programs**

40.     In the ordinary course of business, the Debtors implement various benefit plans and policies for their Employees that can be divided into the following categories, all as are described in more detail below: (a) prescription and medical benefits (collectively the "Medical Plans"), dental care (collectively the "Dental Plans"), vision care (collectively the "Vision Plans", and collectively with the Medical Plans and the Dental Plans, the "Health Plans"); (b) basic life and accidental death and dismemberment insurance, supplemental life insurance, short- and long-term disability insurance, and other voluntary insurance plans (collectively, the "Income Protection Plans"); (c) a retirement savings 401(k) plan ("401(k) Plan"); (d) a flexible spending account plan and health savings accounts ("Health Savings Plans"); (e) an employee assistance program ("EAP"); (f) the Car Allowance Program (as defined below), (g) the Mobile Device Stipend Program (as defined below), and (h) the Relocation Services Program (as defined below; and, collectively with the Health Plans, Income Protection Plans, 401(k) Plan, Health Savings Plans, EAP, the Car Allowance Program, the Mobile Device Stipend Program, and the Relocation Services Program, the "Employee Benefits Plans").  In certain instances, the Debtors deduct specified amounts from the participating Employees' wages in connection with the

Employee Benefits Plans.  All obligations with respect to the Employee Benefits Plans are hereinafter referred to as the "Employee Benefits Obligations."  There are no Employee Benefits Obligations owed by the Debtors to retired Employees.

### a.    Health Plans

41.    Employee contributions to the Health Plans have been and are collected through payroll deductions from participating Employees.  The Debtors believe that it is necessary and appropriate to continue to honor their obligations to current Employees under the Health Plans.  The Debtors request authority, but not direction, to pay all prepetition amounts due under the Health Plans.  The Debtors also request authority, but not direction, to continue to offer the Health Plans and honor their obligations thereunder in the ordinary course during the administration of the Chapter 11 Cases.

### (i)    Medical Plans

42.    Starting January 1, 2016, the Debtors' medical plan (the "2016 Plan"), administered by Aon, offers eligible Employees the ability to select a medical plan through the Aon Active Health Exchange for themselves and eligible dependents.  Employees may choose from one of six coverage tiers under the Medical Plan: Bronze, Bronze Plus, Silver, Gold, Gold II, and Platinum.  The 2016 Plan further allows Employees to choose from up to ten health care plan carriers (with availability varying regionally): Aetna, Anthem Blue Cross Blue Shield, Cigna Health and Life Insurance Co., Dean/Prevea360, Geisinger, Health Net, Kaiser Permanente, UnitedHealthcare, HMSA, and UPMC.  Employee contributions and the subsidies paid by the Debtors in connection with Employees' participation in the 2016 Plan vary based on the coverage tier selected, the geographic band in which the employee is located, and other factors.  Employees in Puerto Rico are offered insurance through MCS (the "Triple-S Plan").

01:18375374.1

43.    Approximately 4,000 Employees are enrolled in the 2016 Plan, which is fully insured and has a monthly premium of approximately $2.1 million.  Aon provides administrative services for which the Debtors pay Aon administrative fees of approximately $55,000 per month. Approximately 20 Employees in Puerto Rico are enrolled in the Triple-S Plan, which is fully insured and has a monthly premium of approximately $6,000.

44.    Prior to January 1, 2016, the Debtors offered eligible Employees and eligible dependents a defined benefit plan based on tier enrollment levels, which was self-insured by the Debtors and administered by United Health Care (the "Self-Insured Plan").  Employee contributions and subsidies paid by the Debtors in connection with Employees' participation in the Self-Insured Plan were generally consistent across geographic areas and employees.  The Self-Insured Plan was funded on a defined contribution basis.[8]  The Debtors remain liable for claims prior to January 1, 2016 under the Self-Insured Plan and estimate that $2,300,000 in claims will be made.

45.    As of the Petition Date, the Debtors owe approximately $2.6 million on account of the Medical Plans.  This figure includes both premiums and estimated claims under the fully insured and self-insured Medical Plans.

**(ii)    Dental Plan**

46.    Starting January 1, 2016, the Debtors also offer their Employees the ability to choose a dental plan through the Aon Active Health Exchange (the "2016 Dental Plan"). Approximately 3,800 Employees participate in the 2016 Dental Plan.  The 2016 Dental Plan is fully insured and has a monthly premium of approximately $170,000.  As of the Petition Date,

---

[8]    Hawaii Employees received the defined contribution amount contributed for Employees on the Self-Insured Plan but did not participate in the defined benefits plan.

approximately $17,000 remained outstanding in connection with the 2016 Dental Plan.  Prior to

January 1, 2016, the Debtors offered a defined contribution dental plan, which was fully insured.

**(iii)      Vision Plan**

47.      The Debtors offer a Vision Plan administered by Vision Service Plan.

Approximately 3,000 Employees participate in the Vision Plan.  The Debtors do not subsidize

Employees' participation in the Vision Plan.  The estimated monthly payment by the Debtors for

the Vision Plan is approximately $34,000.  The Debtors estimate that as of the Petition Date they

owe approximately $3,300 in connection with the Vision Plan.

**b.      Income Protection Plans:  Life and AD&D Insurance**

48.      The Debtors maintain certain Income Protection Plans including primary life and

accidental death and dismemberment insurance (the "Life and AD&D Insurance") through

Metlife.  All benefits-eligible Employees have Life and AD&D Insurance.  Life and AD&D

Insurance costs the Debtors approximately $31,000 per month.  The Debtors estimate that as of

the Petition Date they owe approximately $3,000 on account of Life and AD&D Insurance.  In

addition, certain of the Debtors' Employees choose elective coverage such as supplemental,

spousal and dependent life insurance.

49.      As part of the Income Protection Plans, the Debtors also offer benefits-eligible

Employees short and long term disability insurance ("Disability Insurance").  Disability

Insurance costs the Debtors approximately $45,000 per month.  The Debtors estimate that as of

the Petition Date they owe approximately $4,000 in connection with their Disability Insurance.

**c.      The 401(k) Plan**

50.      The Debtors maintain the 401(k) Plan, a retirement savings plans for eligible

Employees pursuant to section 401 of the Internal Revenue Code.  For the 401(k) Plan, Aon

serves as the trustee, and Mid-Atlantic Trust Company serves as the record keeper.  Employees

participating in the 401(k) Plan may contribute up to 90% of their pay or the federal statutory cap

of $18,000 per year.  Approximately 2,700 individuals, comprised of both Employees and former

Employees, currently participate in the 401(k) Plan, and the approximate amount withheld from

the participating Employees' January 2016 paychecks for 401(k) contributions is $520,000.

51.     The annual administrative fee in connection with the 401(k) Plan is approximately

$293,000, which is paid from fees assessed against plan participants.  To the extent that assessed

fees are insufficient to cover administrative expenses in connection with the 401(k) Plan, the

Debtors may be liable for such expenses.  As of the Petition Date, the Debtors believe that they

owe approximately $72,500 in connection with the 401(k) Plan.

52.     Accordingly, the Debtors request authority, but not direction, to maintain the

401(k) Plan in the ordinary course during the administration of the Chapter 11 Cases.

### d.     The Health Savings Plans

53.     Under the Debtors' flexible spending account plan (the "FSA Plan"), the Debtors

offer their Employees the ability to contribute a portion of their pre-tax compensation to flexible

spending accounts to pay for health benefits and eligible out-of-pocket health care and dependent

care premiums and expenses.  The FSA Plan has two components: (1) a Healthcare Flexible

Spending Account that allows eligible Employees to elect to set aside up to $2,550 in pre-tax

contributions to be used for reimbursement of eligible medical expenses and (2) a Dependent

Care Spending Account that allows eligible Employees to elect to set aside up to $5,000 in pre-

tax contributions to be used for reimbursement of employment related expenses.

54.     Approximately 200 Employees participate in the FSA Plan with approximately

140 participating in the Healthcare Flexible Spending Account and approximately 60

participating in the Dependent Care Spending Account.  Employees participating in the FSA

Plan designate approximately $16,000 per month on account of health care, and approximately

$16,000 per month on account of dependent care.  These amounts are withheld through payroll

deductions.  Aon administers the FSA Plan.  Any unspent amounts in health care or dependent

care accounts at the end of the plan year do not roll over to the following year.  The plan ends on

March 31, 2016 and allows for claims for the 2015 calendar year to be submitted until June 30,

2016.

55.     The Debtors also offer their Employees the ability to contribute a portion of their

pre-tax compensation to a Health Savings Account (the "HSA") and/or a Health Roll-Over

Account ("HRA").  Any unspent amounts in an Employee's HRA at the end of the year will roll

over to the following year.  Approximately 440 Employees have an HSA and contributed

approximately $40,000 in January 2016.  Approximately 2,700 Employees have an HRA and the

balance of the HRAs as of February 5, 2016 is approximately $3.0 million.  The HRA plan will

end December 31, 2016.

56.     The Debtors seek authority, but not direction, to continue to pay all prepetition

amounts due under the Health Savings Plans as and when they come due and to continue to

honor their obligations thereunder in the ordinary course during the administration of the Chapter

11 Cases.

### e.     Employee Assistance Program

57.     The Debtors offer the EAP through GuidanceResources.  The EAP provides

Employees with assistance relating to a variety of issues including marital and family concerns,

work-life balance, substance abuse problems, and similar type supportive services.  The EAP

costs the Debtors approximately $13,000 per quarter.  The Debtors estimate that as of the

Petition Date no amounts are owed on account of the EAP.  The Debtors seek authority, but not direction, to continue the EAP in the ordinary course and honor any payments owed with respect to the EAP regardless of when such obligations arose.

### f. Car Allowance Program

58.     The Debtors provide approximately 21 Employees with a monthly car allowance for work and personal use, on which the Debtors expend approximately $30,000 per month in the aggregate (the "Car Allowance Program").  Payments under the Car Allowance Program are made on a bi-weekly basis through payroll.  As of the Petition Date, approximately $3,000 was outstanding in connection with the Car Allowance Program.  The Debtors seek authority, but not direction, to continue with the Car Allowance Program in place prior to the Petition Date in the ordinary course and honor any payments owed by the Debtors with respect to the Car Allowance Program, regardless of when they arose.

### g. Mobile Device Stipend Program

59.     The Debtors also provide a mobile device stipend program (the "Mobile Device Stipend Program") for Employees who are required to use cellular phones to perform their job functions outside normal business hours.  Employees who are determined eligible for the Mobile Stipend Program receive an annual stipend of $840, to be paid towards the wireless service plan business costs incurred by the team member.  This stipend is paid each pay period and is non-taxable to the applicable Employee.  In 2015, the Debtors spent approximately $320,000 on the Mobile Device Stipend Program.  As of the Petition Date, approximately $4,000 was outstanding in connection with the Mobile Device Stipend Program.  The Debtors seek authority, but not direction, to continue with the Mobile Device Stipend Program in place prior to the Petition Date

in the ordinary course and honor any payments owed by the Debtors with respect to the Mobile

Device Stipend Program, regardless of when they arose.

### h.    Relocation Services Program

60.    The Debtors also provide certain housing-related benefits to Employees who have

relocated on account of their employment with the Debtors under a relocation services program

(the "Relocation Services Program").  Approved payments under the Relocation Services

Program are made, at the Employee's election, either through a one-time, tax-assisted payment

or a lump sum, non-tax-assisted payment.  The benefits provided under the Relocation Services

Program vary based on whether the Employee is a renter or homeowner, and are also provided at

four different tiers, depending on the eligible Employee's position and time of service.  The

Debtors use Graebel Companies, Inc. to provide advice and assistance under the Relocation

Services Program.  In 2015, the Debtors spent approximately $430,000 in connection with the

Relocation Services Program.  As of the Petition Date, approximately $25,000 was outstanding

in connection with the Relocation Services Program.  The Debtors seek authority, but not

direction, to continue with the Relocation Services Program in place prior to the Petition Date in

the ordinary course and honor any payments owed by the Debtors with respect to the Relocation

Services Program, regardless of when they arose.

### (6)    Workers' Compensation Claims

61.    The Debtors maintain certain workers' compensation policies with Safety

National Casualty Corporation.[9]  The Debtors' deductible under the Safety National Casualty

Corporation policy is $500,000 per incident.  The Debtors are liable for all claim amounts below

---

[9]    Authority to continue the Workers' Compensation Policies is sought in the *Debtors' Motion for Order
(A) Authorizing Continuation of, and Payment of Prepetition Obligations Incurred in the Ordinary Course of
Business in Connection With, Various Insurance Policies, and (B) authorizing Banks to Honor and Process
Checks and Electronic Transfer Requests Related Thereto.*

the deductible on the Safety National Casualty Corporation policy and are also liable for similar claims under previous workers' compensation policies (collectively, the "Workers' Compensation Claims").  The Debtors estimate that they paid approximately $2.2 million in Workers' Compensation Claims in fiscal year 2015.  The Debtors' liability for Workers' Compensation Claims under previous policies is secured by letters of credit.

62.     As of the Petition Date, the Debtors estimate there are approximately $7.9 million in outstanding Workers' Compensation Claims for which the Debtors may be liable.  The Debtors seek authority, but not direction, to continue to pay the Workers' Compensation Claims in the ordinary course and honor any payments owed with respect to the Workers' Compensation Claims regardless of when such obligations arose.

## RELIEF REQUESTED

63.     By this Motion, the Debtors seek entry of an order authorizing, but not directing, the Debtors, in their sole discretion, to (a) pay prepetition claims and honor obligations incurred or related to the Compensation Obligations, the Withholding Obligations, the Incentive Programs, PTO and Vacation Time, Reimbursable Expense Obligations, the Employee Benefits Obligations, Workers' Compensation Claims and all fees and costs incident to the foregoing, including amounts owed to third-party administrators (including the Payroll Administrator Obligations and the Aon Administrative Fee Obligations) (collectively, the "Employee Obligations") and (b) maintain, continue and honor, in the ordinary course of business, the Incentive Programs, PTO, Vacation Time and FTO policies, postpetition Reimbursable Expense Obligations, the Employee Benefit Plans, and the Workers' Compensation Claims (collectively, the "Employee Plans and Programs").

01:18375374.1

64.     To enable the Debtors to carry out the relief requested, the Debtors also request that the Court authorize all applicable banks and financial institutions (collectively, the "Banks"), and ADP (together with the Banks, the "Processors"), to receive, process, honor, and pay all checks presented for payment and all electronic payment requests made by the Debtors relating to the Employee Obligations and the Employee Plans and Programs, whether such checks were presented or electronic-payment requests were submitted prior to or after the Petition Date.[10]

## BASIS FOR RELIEF REQUESTED

65.     The Debtors' ability to successfully operate is contingent on a reliable and loyal Workforce.  As stated above, competition for qualified employees is intense in the Debtors' industry.  Thus, it is essential to assure the Employees that the Debtors will honor the Employee Obligations and continue and maintain the Employee Plans and Programs in the ordinary course of business throughout the Chapter 11 Cases.  A failure to promptly do so will create concern and discontent among the Employees and could lead to resignations or, in the case of Contract Workers, the decision to not complete work for the Debtors or accept future hiring proposals. Loss of even a few key personnel would immediately and irreparably harm the Debtors' ability to maintain operations to the detriment of all interested parties.

66.     Therefore, pursuant to sections 507, 363, 1107(a), 1108, and 105(a) of the Bankruptcy Code, the Debtors seek authority to pay the Employee Obligations, in their sole discretion, and to maintain and continue the Employee Plans and Programs, in their sole discretion, and in the ordinary course of business, in the exercise of their business judgment. This relief is necessary to retain the Workforce, the loss of which would disable the Debtors' business operations.

---

[10]     Concurrently herewith, the Debtors have filed a motion for authority to, among other things, continue utilizing their cash management system (the "Cash Management Motion").

01:18375374.1

**A.      A Significant Portion of the Employee Obligations is Entitled to Priority Treatment**

67.      Section 507(a)(4)(A) of the Bankruptcy Code grants priority status to up to

$12,475 for employee claims for "wages, salaries, or commission, including vacation, severance,

and sick leave pay" earned within 180 days before the Petition Date.  11 U.S.C. § 507(a)(4)(A).

Similarly, section 507(a)(5) of the Bankruptcy Code grants priority to contributions to employee

benefit plans, up to an aggregate amount of $12,475 multiplied by the number of employees

covered, less any amounts paid to such employees under section 507(a)(4) of the Bankruptcy

Code.

68.      Indeed, "[w]age priority has been a feature of the bankruptcy law since 1898."  *In

re Garden Ridge Corp.*, No. 04-10324 (KJC), 2006 WL 521914, at *2 (Bankr. D. Del. Mar. 2,

2006) (citing 4 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 507.05[1] (15th

ed. 2005)).  Its purpose is to "alleviate hardship on workers . . . who may have no other source of

income and "to encourage employees to stand by an employer in financial difficulty." *Id.* (citing

*Collier on Bankruptcy* ¶ 507.05[1]).  This priority extends to certain other "benefits that are

considered akin to compensation, such as vacation, severance and sick leave pay."  *Id.*

69.      The Debtors believe that a substantial portion of the Employee Obligations

relating to the period prior to the Petition Date constitutes priority claims under sections

507(a)(4) and (5) of the Bankruptcy Code.  Amounts that are paid on account of priority claims

for the majority of the Employee Obligations would not otherwise be available for distribution to

unsecured creditors.  Therefore, the Debtors' unsecured creditors will not be prejudiced by

permitting priority obligations to be satisfied in the ordinary course of business during the

Chapter 11 Cases rather than at the conclusion of the cases.  Indeed, the Debtors submit that

payment of Employee Obligations at this time enhances value for the benefit of the Debtors and

all interested parties by retaining the Workforce.  While not being paid to current Employees of

the Debtors, honoring the Severance Obligations is nonetheless important to sustain morale for the current Workforce and ensure their retention.

**B.      The Debtors Should be Authorized to Pay the Employee Obligations Under Sections 1107(a) and 1108 of the Bankruptcy Code**

70.      The Debtors, operating their businesses as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." *In re CoServ, LLC*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). "Implicit in the duties" of a chapter 11 debtor in possession is the duty "to protect and preserve the estate, including an operating business's going-concern value." *Id*.

71.      Courts have noted that there are instances in which a debtor in possession can fulfill its fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." *Id*. The *CoServ* court specifically noted that preplan satisfaction of prepetition claims is a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." *Id*. The court provided a three-pronged test for determining whether a preplan payment on account of a prepetition claim is a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*Id.* at 498.

72.      Payment of the Employee Obligations as set forth herein meets each element of the *CoServ* court's standard. The Debtors' operations are complex, and rely on the skill and expertise of their Employees. Many Employees possess unique knowledge regarding specific

aspects of the Debtors' operations, which would be virtually irreplaceable should such Employees be lost through a failure to pay their obligations.  In addition, any failure by the Debtors to pay the Employee Obligations as set forth herein would negatively impact the morale of the Workforce at a critical time for the Debtors and their businesses when the Workforce is most needed.  The Workforce is also critical to the Debtors' ability to maintain their operations consistent with past practices, which would be impossible without the continued efforts of the Workforce.  The damage to the value of the Debtors' business and, hence, the costs to creditors as a whole, would be immediate and irreparable if the Employee Obligations were not met.  In short, the potential harm and economic disadvantage that would stem from the failure to pay the Employee Obligations as set forth herein greatly outweighs the amount of any prepetition claims that the Debtors are seeking authorization to pay.

73.     After careful consideration in consultation with their advisors, the Debtors have determined in their business judgment that to avoid significant disruption to their business operations there exists no practical or legal alternative to the payment of the Employee Obligations as set forth herein.  Therefore, the Debtors can meet their fiduciary duties as debtors-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code only by payment of the Employee Obligations as set forth herein.

C.     **Payment of the Employee Obligations is Warranted Pursuant to Section 363 of the Bankruptcy Code**

74.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor may "after notice and a hearing, use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  A debtor's decision to use, sell, or lease assets outside the ordinary course of business must be based upon the sound business judgment of that debtor.  *See Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. LTV Co. (In re*

*Chateaugay Corp.)*, 973 F.2d 141, 143 (2d Cir. 1992) (holding that a court determining an

application pursuant to section 363(b) must find from the evidence a good business reason to

grant such application); *see also In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr.

S.D.N.Y. 1989) (standard for determining a section 363(b) motion is whether the debtor has a

"good business reason" for the requested relief).  "Where the debtor articulates a reasonable

basis for its business decisions (as distinct from a decision made arbitrarily or capriciously),

courts will generally not entertain objections to the debtor's conduct."  *Comm. of Asbestos-

Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60

B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  Consistent with a debtor's fiduciary duties, where there

is a sound business purpose for the payment of prepetition obligations, and where the debtor is

able to "articulate some business justification, other than the mere appeasement of major

creditors," courts have authorized debtors to make such payments under section 363(b) of the

Bankruptcy Code.  *See, e.g., In re Ionosphere Clubs*, 98 B.R. at 175 (accepting debtor's

argument that payment of employee wage claims was "critical . . . in order to preserve and

protect its business and ultimately reorganize, retain its currently working employees and

maintain positive employee morale," and finding that the debtor had "clearly demonstrated

sound business reasons to justify such payments.").

      75.     In addition, the Debtors pay the Employee Obligations in the ordinary course of

business, as permitted by section 363(c) of the Bankruptcy Code.  However, to the extent that the

Court finds that approval is necessary and in an abundance of caution, the Debtors request that

the Court grant the relief requested herein and enter an order authorizing them to pay the

Employee Obligations, consistent with their compensation, vacation, and other benefit policies

and plans, and to permit, but not require, the Debtors, in their discretion, to maintain and

continue the Employee Plans and Programs for their Employees as those practices, programs,

policies, and plans were in effect as of the Petition Date, as such may be modified, terminated,

amended, or supplemented from time to time hereafter.

**D.    Payment of Certain Withholding Obligations is Appropriate Under Section 541 of the Bankruptcy Code**

76.    The Debtors also seek authority to pay the Withholding Obligations to the

appropriate entities.  These amounts principally represent the Employees' earnings that

governments, the Employees, and the judicial authorities have designated for deduction from the

Employees' paychecks.  Indeed, certain Withholding Obligations are not property of the

Debtors' estates because the Debtors have withheld such amounts from Employees' paychecks

on another party's behalf.  *See* 11 U.S.C. § 541; *see also City of Farrell v. Sharon Steel Corp.*, 41

F.3d 92, 95 (3d Cir. 1994) (observing the "well-settled principle that debtors do 'not own an

equitable interest in property . . . [they] hold[] in trust for another,' and that therefore funds held

in trust are not 'property of the estate.'") (quoting *Begier v. IRS*, 496 U.S. 53, 59 (1990)).

77.    Further, federal and state laws require the Debtors to withhold certain tax

payments from Employees' paychecks and to pay such amounts to the appropriate taxing

authority.  *See* 26 U.S.C. §§ 6672 and 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41

F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold

city income tax from its employees' wages created a trust relationship between debtor and the

city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir.

1988) (noting that individual officers of a company may be held personally liable for failure to

pay trust fund taxes).  A failure to pay over these amounts could subject the Debtors and their

officers and directors to liability.  *See, e.g.*, John F. Olson, *et al.*, *Director & Officer Liability:

Indemnification and Insurance* § 3:21 (2003).  To avoid the potential of such liability, and

because the Withholding Obligations are not property of the Debtors' estates, the Debtors request

that the Court authorize them to remit these amounts to the appropriate parties in the ordinary

course of business.

**E.      Payment of the Employee Obligations is Warranted Pursuant to Section 105(a) of the Bankruptcy Code and Under the Doctrine of Necessity**

78.      Courts have also authorized payment of prepetition claims in appropriate

circumstances pursuant to section 105(a) of the Bankruptcy Code.  Section 105(a) of the

Bankruptcy Code, which codifies the inherent equitable powers of the bankruptcy court,

empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or

appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Under section 105(a),

courts may permit pre-plan payments of prepetition obligations when such payments are

essential to the continued operation of the debtor's business and, in particular, where

nonpayment of a prepetition obligation would trigger a withholding of goods or services

essential to the debtors' business reorganization plan.  *See, e.g.*, *In re Ionosphere Clubs*, 98 B.R.

at 177 (finding that section 105 empowers bankruptcy courts to authorize payment of prepetition

debt when such payment is needed to facilitate the rehabilitation of the debtor).

79.      Numerous courts have used their section 105(a) powers under the "doctrine of

necessity" to authorize payment of prepetition obligations where, as here, such payment is an

essential element of the preservation of the debtor-in-possession's potential for rehabilitation.

*See In re CoServ, L.L.C.,* 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (reasoning that because the

debtor-in-possession has fiduciary duties it must meet, it is logical that the bankruptcy court may

"use Section 105(a) of the [Bankruptcy] Code to authorize satisfaction of the prepetition claim in

aid of preservation or enhancement of the estate"); *In re Synteen Techs., Inc.,* No. 00-02203-W,

2000 WL 33709667, at *2 (Bankr. D.S.C. Apr. 14, 2000) (courts have permission to "allow

payment of a prepetition claim when essential to the continued operation of the debtor" (citation omitted)); *In re Just For Feet, Inc.,* 242 B.R. 821, 824 (D. Del. 1999) ("courts have used their equitable power under section 105(a) . . . to authorize the payment of pre-petition claims when such payment is deemed necessary to the survival of a debtor in a chapter 11 reorganization"); *In re NVR L.P.,* 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) ("Under [section 105] the court can permit pre-plan payment of a prepetition obligation when essential to the continued operation of the debtor"); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of tool makers as "necessary to avert a serious threat to the Chapter 11 process"); *In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment.").

80.     The "doctrine of necessity" is frequently invoked early in reorganization cases, during the so-called "breathing spell," when preservation of the estate is most critical and often extremely difficult. *See* 2 *Collier on Bankruptcy* ¶ 105.02[4][a] (16th ed.) (discussing cases in which courts have relied upon the "doctrine of necessity" or the "necessity of payment" rule to pay prepetition claims immediately). For example, in *In re Structurlite Plastics Corp.*, the court embraced "the principle that a bankruptcy court may exercise its equity powers under section 105(a) to authorize payment of prepetition claims where such payment is necessary to 'permit the greatest likelihood of survival of the debtor . . . .'" 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988) (quoting *In re Chateaugay Corp.*, 80 B.R. 279, 287 (S.D.N.Y. 1987). The court explained

that "a *per se* rule proscribing the payment of prepetition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code." *Id.* at 932.  Flexibility of payment is particularly critical when the prepetition creditor provides vital goods or services to the debtor.

81.    Here, the majority of the Employees rely on their compensation, benefits, and reimbursement of expenses to satisfy their daily living expenses and maintain their health and well-being.  Consequently, these Employees will be exposed to significant financial hardships if the Debtors are not permitted to honor the Employee Obligations.  If the Debtors are unable to satisfy such obligations, Employee morale and loyalty will suffer at a time when Employee support is critical.  Further, if the Court does not authorize the Debtors to honor their various obligations under the Employee Benefits Plans, the Employees' health coverage could be threatened, potentially burdening individual Employees with the costs of health care.  At a minimum, the loss of health care coverage, or uncertainty regarding coverage, would result in considerable anxiety for the Employees at a time when the Debtors need their Employees to perform their jobs at peak efficiency.  For all of the foregoing reasons, a sound business purpose exists to pay the Employee Obligations.

82.    In the absence of such payments, the Debtors believe that their Employees may seek alternative employment opportunities, perhaps with the Debtors' competitors.  Such a development would deplete the Workforce, hinder the Debtors' ability to service the needs of their customers, and likely diminish creditor and counterparty confidence in the Debtors.  Moreover, the loss of valuable Employees and the recruiting efforts that would be required to replace such Employees would be a substantial and costly distraction at a time when the Debtors must focus on sustaining their operations.  Accordingly, the Debtors must be able to pursue all

reasonable measures to retain the Employees by, among other things, continuing to honor wages, benefits, and related obligations, including those that accrued prior to the Petition Date, consistent with the terms set forth in the Interim Order and Final Order attached hereto.

83.     Taken together, the nature of the Employee Obligations, the substantial harm to the Debtors' businesses that would be caused if those obligations were not honored, the related potential for loss of value in the Debtors' estates, and the fact that a significant portion of the obligations in question relates to priority wage claims, lead to the conclusion that the Employee Obligations fall well within the scope of obligations whose payments may be authorized pursuant to the doctrine of necessity.

84.     The relief requested herein is commonly granted by bankruptcy courts in this District. *See, e.g.*, *In re Synagro Techs., Inc.*, Case No. 13-11041 (BLS) (Bankr. D. Del. Apr. 24, 2013); *In re Exide Techs.*, Case No. 13-11482 (KJC) (Bankr. D. Del. June 10, 2013); *In re Dendreon Corp.*, Case No. 14-12515 (LSS) (Bankr. D. Del. Nov. 10, 2014); *In re CHL, Ltd.*, Case No. 12-12437 (KJC) (Bankr. D. Del. Aug. 31, 2012) (granting interim relief) and (Bankr. D. Del. Sept. 24, 2012) (granting final relief for payments in excess of the section 504(a)(4) priority cap); *In re WP Steel Venture LLC*, Case No. 12-11661 (KJC) (Bankr. D. Del. June 1, 2012); *In re Contract Research Solutions, Inc. et al.*, Case No. 12-11004 (KG) (Bankr. D. Del. Mar. 27, 2012); *In re Friendly Ice Cream, Corp.*, No. 11-13167 (KG) (Bankr. D. Del. Oct. 6, 2011); *In re DSI Holdings, Inc. et al.*, Case No. 11-11941 (KJC) (Bankr. D. Del. June 28, 2011).

85.     Accordingly, for all of the foregoing reasons, the relief requested herein will benefit the Debtors' estates and creditors by allowing the Debtors' business operations to continue without interruption and should therefore be approved.

**F.      The Court Should Authorize Applicable Banks and Other Processors to Honor Checks and Electronic Fund Transfers in Accordance with the Motion**

86.      In connection with the foregoing, the Debtors respectfully request that the Court (a) authorize all applicable Processors to receive, process, honor, and pay all checks and transfers issued by the Debtors in accordance with this Motion, without regard to whether any checks or transfers were issued before or after the Petition Date; (b) provide that all Processors may rely on the representations of the Debtors with respect to whether any check or transfer issued or made by the Debtors before the Petition Date should be honored pursuant to this Motion (such Banks and other Processors having no liability to any party for relying on such representations by the Debtors provided for herein); and (c) authorize the Debtors to issue replacement checks or transfers to the extent any checks or transfers that are issued and authorized to be paid in accordance with this Motion are dishonored or rejected by the Processors.

**G.      Immediate Relief is Justified**

87.      Pursuant to Bankruptcy Rule 6003, the Court may grant relief within 21 days after the filing of the petition regarding a motion to "use, sell, lease, or otherwise incur an obligation regarding property of the estate" only if such relief is necessary to avoid immediate and irreparable harm.  Fed. R. Bankr. P. 6003(b).  Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001).

88.      Moreover, Bankruptcy Rule 6003 authorizes the Court to grant the relief requested herein to avoid harm to the Debtors' customers and other third parties.  Unlike Bankruptcy Rule 4001, Bankruptcy Rule 6003 does not condition relief on imminent or

threatened harm to the estate alone.  Rather, Bankruptcy Rule 6003 speaks of "immediate and irreparable harm" generally.  *Cf.* Fed. R. Bankr. P. 4001(b)(2), (c)(2) (referring to "irreparable harm to the estate").  Indeed, the "irreparable harm" standard is analogous to the traditional standards governing the issuance of preliminary junctions.  *See 9 Collier on Bankruptcy* ¶ 4001.07[b][3] (discussing source of "irreparable harm" standard under Rule 4001(c)(2)).  Courts will routinely consider third-party interests when granting such relief.  *See, e.g., Capital Ventures Int'l v. Argentina*, 443 F.3d 214, 223 n.7 (2d Cir. 2006); *see also Linnemeir v. Bd. of Trs. of Purdue Univ.*, 260 F.3d 757, 761 (7th Cir. 2001).

89.    As described herein and in the First Day Declaration, the Debtors will suffer immediate and irreparable harm without Court authorization to pay the Employee Obligations and other related relief requested herein.  Accordingly, Bankruptcy Rule 6003 has been satisfied and the relief requested herein should be granted.

## REQUEST FOR WAIVER OF STAY

90.    To implement the foregoing, the Debtors seek a waiver of any stay of the effectiveness of the order approving this Motion.  Pursuant to Bankruptcy Rule 6004(h), any "order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  The Debtors submit that the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein.  Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h).

91.    To implement the foregoing immediately, the Debtors respectfully request a waiver of the notice requirements of Bankruptcy Rule 6004(a) to the extent that they are deemed applicable.

01:18375374.1

## DEBTORS' RESERVATION OF RIGHTS

92.     Nothing contained herein is intended or should be construed as an admission as to

the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any

claim, or an approval or assumption of any agreement, contract, or lease under section 365 of the

Bankruptcy Code.  The Debtors expressly reserve their rights to dispute any claim asserted by a

member of the Workforce under applicable law and to assume or reject any Workforce

agreements in accordance with the applicable provisions of the Bankruptcy Code.  Likewise, if

this Court grants the relief sought herein, any payment made pursuant to the Court's order is not

intended and should not be construed as an admission as to the validity of any claim or a waiver

of the Debtors' rights to dispute such claim subsequently.

## NOTICE

93.     The Debtors have provided notice of this Motion to: (a) the Office of the United

States Trustee for the District of Delaware; (b) holders of the 50 largest unsecured claims on a

consolidated basis against the Debtors; (c) Riemer & Braunstein LLP (attn: Donald Rothman) as

counsel for (i) Bank of America, N.A., in its capacity as Administrative Agent and Collateral

Agent under the Second Amended and Restated Credit Agreement, dated as of May 17, 2012,

and (ii) certain DIP Lenders under the Debtors' proposed postpetition financing facility; (d)

Brown Rudnick LLP (attn.: Robert Stark and Bennett Silverberg) as counsel for (i) Wilmington

Savings Fund Society, FSB as Administrative Agent and Collateral Agent under the Amended

and Restated Credit Agreement, dated as of May 3, 2006 and amended and restated as of

November 16, 2010 and (ii) certain Term Lenders under the Amended and Restated Credit

Agreement, dated as of May 3, 2006 and amended and restated as of November 16, 2010; (e)

Choate, Hall & Stewart LLP (attn.: Kevin Simard) as counsel for (i) Wells Fargo Bank, National

Association, in its capacity as FILO Agent under the Second Amendment to Second Amended and Restated Credit Agreement, dated as of November 3, 2015, and (ii) certain DIP Lenders under the Debtors' proposed postpetition financing facility; (f) O'Melveny & Meyers LLP (attn: John Rapisardi) as counsel for certain holders of 11.5% Senior Subordinated Notes Due February 19, 2018 under the Securities Purchase Agreement, dated as of May 3, 2006; (g) all holders of 11.5% Senior Subordinated Notes Due February 19, 2018 under the Securities Purchase Agreement, dated as of May 3, 2006; (h) the Banks; and (i) all parties that have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.


*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated:    March 2, 2016
          Wilmington, Delaware              _/s/ Andrew L. Magaziner_____
                                            Michael R. Nestor (No. 3526)
                                            Kenneth J. Enos (No. 4544)
                                            Andrew L. Magaziner (No. 5426)
                                            YOUNG CONAWAY STARGATT & TAYLOR, LLP
                                            Rodney Square
                                            1000 North King Street
                                            Wilmington, Delaware 19801
                                            Telephone:  (302) 571-6600
                                            Facsimile:  (302) 571-1253
                                            mnestor@ycst.com
                                            kenos@ycst.com
                                            amagaziner@ycst.com

                                            -and-

                                            Robert A. Klyman (CA No. 142723)
                                            Matthew J. Williams (NY No. 3019106)
                                            Jeremy L. Graves (CO No. 45522)
                                            Sabina Jacobs (CA No. 274829)
                                            GIBSON, DUNN & CRUTCHER LLP
                                            333 South Grand Avenue
                                            Los Angeles, CA 90071-1512
                                            Telephone: (213) 229-7000
                                            Facsimile: (213) 229-7520
                                            rklyman@gibsondunn.com
                                            mjwilliams@gibsondunn.com
                                            jgraves@gibsondunn.com
                                            sjacobs@gibsondunn.com

                                            *Proposed Counsel to the Debtors and
                                            Debtors in Possession*

**EXHIBIT A**

**PROPOSED INTERIM ORDER**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SPORTS AUTHORITY HOLDINGS, INC., *et al.*,[1] | Case No. 16-_____ (___) |
| Debtors. | (Jointly Administered) |
| | Ref. Docket No. ____ |

**INTERIM ORDER (A) AUTHORIZING PAYMENT OF CERTAIN PREPETITION
WORKFORCE CLAIMS, INCLUDING WAGES, SALARIES AND OTHER
COMPENSATION, (B) AUTHORIZING PAYMENT OF CERTAIN EMPLOYEE
BENEFITS AND CONFIRMING RIGHT TO CONTINUE EMPLOYEE BENEFITS ON
POSTPETITION BASIS, (C) AUTHORIZING PAYMENT OF REIMBURSEMENT
TO EMPLOYEES FOR PREPETITION EXPENSES, (D) AUTHORIZING
PAYMENT OF WITHHOLDING AND PAYROLL-RELATED TAXES,
(E) AUTHORIZING PAYMENT OF WORKERS' COMPENSATION OBLIGATIONS,
AND (F) AUTHORIZING PAYMENT OF PREPETITION CLAIMS OWING
TO ADMINISTRATORS AND THIRD PARTY PROVIDERS**

Upon the *Debtors' Motion for Entry of Interim and Final Orders (a) Authorizing*

*Payment of Certain Prepetition Workforce Claims, Including Wages, Salaries and Other*

*Compensation, (b) Authorizing Payment of Certain Employee Benefits and Confirming Right*

*to Continue Employee Benefits on Postpetition Basis, (c) Authorizing Payment of Reimbursement*

*to Employees for Expenses Incurred Prepetition, (d) Authorizing Payment of Withholding and*

*Payroll-Related Taxes, (e) Authorizing Payment of Workers' Compensation Obligations, and (f)*

*Authorizing Payment of Prepetition Claims Owing to Administrators and Third Party Providers*

(the "Motion")[2] filed by the above-captioned debtors and debtors in possession (collectively, the

"Debtors"); and the Court having found that it has jurisdiction over this matter pursuant to 28

---

[1]  The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  Sports Authority Holdings, Inc. (9008); Slap Shot Holdings, Corp. (8209); The Sports Authority, Inc. (2802); TSA Stores, Inc. (1120); TSA Gift Card, Inc. (1918); TSA Ponce, Inc. (4817); and TSA Caribe, Inc. (5664).  The headquarters for the above-captioned Debtors is located at 1050 West Hampden Avenue, Englewood, Colorado 80110.

[2]  All capitalized terms used and not defined herein shall have the meanings ascribed to them in the Motion.

01:18375374.1

U.S.C. §§ 1334(b) and 157 and the *Amended Standing Order of Reference* from the United States

District Court for the District of Delaware dated as of February 29, 2012; and the Court having

found that venue of these cases and the Motion in this district is proper pursuant to 28 U.S.C.

§§ 1408 and 1409; and the Court having found that this matter is a core proceeding pursuant to

28 U.S.C. § 157(b); and the Court having determined that it may enter a final order consistent

with Article III of the United States Constitution; and in consideration of the First Day

Declaration; and it appearing that notice of the Motion has been given as set forth in the Motion

and that such notice is adequate and no other or further notice need be given; and a hearing

having been held to consider the relief requested in the Motion; and upon the record of the

hearing on the Motion and all of the proceedings had before the Court; and the Court having

found and determined that the relief sought in the Motion is in the best interests of the Debtors,

their estates, their creditors and all other parties in interest; and that the legal and factual bases

set forth in the Motion establish just cause for the relief granted herein; and after due deliberation

and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1.     The Motion is granted on an interim basis as set forth herein.

2.     A final hearing (the "Final Hearing") on the Motion shall be held on

_____, 2016 at __:__ __.m (prevailing Eastern Time).  Any objections or responses

to the Motion shall be filed on or before 4:00 p.m. (prevailing Eastern Time) on _____,

2016 and served on the parties required by Local Rule 2002-1(b).

3.     Except as otherwise set forth herein, the Debtors are authorized, pursuant to

sections 105(a) and 363(b) of the Bankruptcy Code, but not obligated or directed, in the

reasonable exercise of their business judgment and in the ordinary course of business, to pay and

honor amounts on account of Employee Compensation Obligations and Contract Workers

Obligations (exclusive of Withholding Obligations); *provided*, *however*, that without prejudice to

the Debtors' right to seek additional payments at the Final Hearing or any other time subsequent

thereto, (a) the Debtors shall not make any payments in excess of $12,475 on account of

prepetition Employee Compensation Obligations or Contract Workers Obligations to any one

Employee, respectively, absent further order of the Court, and (b) the aggregate amount of such

payments on account of Employee Compensation Obligations and Contract Workers Obligations

(exclusive of Withholding Obligations) shall not exceed $8.1 million unless further ordered by

the Court.

4.      The Debtors and any applicable third parties are authorized to continue to allocate

and distribute Withholding Obligations to the appropriate third-party recipients or taxing

authorities in accordance with the Debtors' stated policies and prepetition practices.

5.      The Debtors are authorized, but not directed, to make payments under the Bonus

Programs to non-insiders in an aggregate amount not to exceed $650,000.  The Debtors are

further authorized, but not directed, to maintain the Bonus Programs in the ordinary course of

business.

6.      The Debtors are authorized, but not directed, (a) to continue the Debtors' PTO

Vacation Time, and FTO policies in the ordinary course of business and (b) to honor all

obligations under the Debtors' PTO and Vacation Time policies, including payout of accrued

PTO and Vacation Time upon termination in accordance with the Debtors' prepetition practice

and applicable law; *provided*, *however*, that payments to any terminated Employee on account of

PTO and Vacation Time shall not exceed $12,475.

7.      The Debtors are authorized, but not directed, to continue to honor their

Reimbursable Expense Obligations, including under the CCA Agreement, and including any

prepetition obligations, in accordance with the Debtors' stated policies and prepetition practices,

and are authorized to satisfy such Reimbursable Expense Obligations in an amount not to exceed

$400,000; *provided*, *however*, that satisfaction of prepetition Reimbursable Expense Obligations

shall only be allowed to the extent Employees have paid for such expenses directly from their

own funds or are otherwise personally liable for such expenses.

8.      The Debtors are authorized, but not directed, to honor the Employee Benefit Plans

in the ordinary course of business and in accordance with the Debtors' prepetition policies and

programs, and to make any necessary contributions to such programs and pay any unpaid

premium, claim, or amount owed as of the Petition Date with respect thereto; *provided*, *however*,

that the Debtors may not pay in excess of $3.3 million in the aggregate on account of Employee

Benefit Plans and the Employee Benefits Obligations, exclusive of Withholding Obligations.

9.      The Debtors are authorized, but not directed, to pay Workers 'Compensation

Claims in an aggregate amount not to exceed $7.9 million.

10.     The Debtors are authorized, but not directed, to pay all processing and

administrative fees associated with and all costs and expenses incidental to payment of the

Compensation Obligations or the Employee Benefits Obligations, including the Payroll

Administrator Obligations and the Aon Administrative Fee Obligations; *provided*, *however*, that

the Debtors may not pay in excess of $400,000 on account of the Aon Administrative Fee

Obligations.

11.     Nothing in the Motion or this Interim Order, nor as a result of any payment made

pursuant to this Interim Order, shall be deemed or construed as an admission as to the validity or

priority of any claim against the Debtors, an approval or assumption of any agreement, contract or lease pursuant to section 365 of the Bankruptcy Code, or a waiver of the right of the Debtors, or shall impair the ability of the Debtors, or any other party in interest, to the extent applicable, to contest the validity and amount of any payment made pursuant to this Interim Order.

12.     Each of the Processors is authorized to receive, process, honor, and pay all checks and transfers issued or requested by the Debtors, to the extent that sufficient funds are on deposit in the applicable accounts, in accordance with this Final Order and any other order of this Court.

13.     The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests in connection with any Employee Obligations that are dishonored or rejected.

14.     Nothing in the Motion or this Interim Order shall be construed to authorize any payments governed by section 503(c)(3) of the Bankruptcy Code or any severance payments to insiders in excess of the limits set forth in section 503(c)(2) of the Bankruptcy Code.

15.     The requirements set forth in Bankruptcy Rule 6003(b) are satisfied.

16.     The requirements set forth in Bankruptcy Rule 6004(a) are satisfied by the contents of the Motion.

17.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order shall be immediately effective and enforceable upon its entry.

18.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Interim Order in accordance with the Motion.

01:18375374.1

19.    This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated:  March ___, 2016
             Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT B**

**PROPOSED FINAL ORDER**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SPORTS AUTHORITY HOLDINGS, INC., *et al.*,[1] | Case No. 16-_____ (___) |
| Debtors. | (Jointly Administered) |
| | Ref. Docket Nos. ___ & ___ |

**FINAL ORDER (A) AUTHORIZING PAYMENT OF CERTAIN PREPETITION
WORKFORCE CLAIMS, INCLUDING WAGES, SALARIES AND OTHER
COMPENSATION, (B) AUTHORIZING PAYMENT OF CERTAIN EMPLOYEE
BENEFITS AND CONFIRMING RIGHT TO CONTINUE EMPLOYEE BENEFITS ON
POSTPETITION BASIS, (C) AUTHORIZING PAYMENT OF REIMBURSEMENT
TO EMPLOYEES FOR PREPETITION EXPENSES, (D) AUTHORIZING
PAYMENT OF WITHHOLDING AND PAYROLL-RELATED TAXES,
(E) AUTHORIZING PAYMENT OF WORKERS' COMPENSATION OBLIGATIONS,
AND (F) AUTHORIZING PAYMENT OF PREPETITION CLAIMS OWING
TO ADMINISTRATORS AND THIRD PARTY PROVIDERS**

Upon the *Debtors' Motion for Entry of Interim and Final Orders (a) Authorizing
Payment of Certain Prepetition Workforce Claims, Including Wages, Salaries and Other
Compensation, (b) Authorizing Payment of Certain Employee Benefits and Confirming Right
to Continue Employee Benefits on Postpetition Basis, (c) Authorizing Payment of Reimbursement
to Employees for Expenses Incurred Prepetition, (d) Authorizing Payment of Withholding and
Payroll-Related Taxes, (e) Authorizing Payment of Workers' Compensation Obligations, and
(f) Authorizing Payment of Prepetition Claims Owing to Administrators and Third Party
Providers* (the "Motion")[2] filed by the above-captioned debtors and debtors in possession
(collectively, the "Debtors"); and the Court having found that it has jurisdiction over this matter

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  Sports
Authority Holdings, Inc. (9008); Slap Shot Holdings, Corp. (8209); The Sports Authority, Inc. (2802); TSA
Stores, Inc. (1120); TSA Gift Card, Inc. (1918); TSA Ponce, Inc. (4817); and TSA Caribe, Inc. (5664).  The
headquarters for the above-captioned Debtors is located at 1050 West Hampden Avenue, Englewood, Colorado
80110.

[2]    All capitalized terms used and not defined herein shall have the meanings ascribed to them in the Motion.

pursuant to 28 U.S.C. §§ 1334(b) and 157 and the *Amended Standing Order of Reference* from

the United States District Court for the District of Delaware dated as of February 29, 2012; and

the Court having found that venue of these cases and the Motion in this district is proper

pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that this matter is a core

proceeding pursuant to 28 U.S.C. § 157(b); and the Court having determined that it may enter a

final order consistent with Article III of the United States Constitution; and in consideration of

the First Day Declaration; and it appearing that notice of the Motion has been given as set forth

in the Motion and that such notice is adequate and no other or further notice need be given; and

the Court having entered that certain *Interim Order (A) Authorizing Payment of Certain*

*Prepetition Workforce Claims, Including Wages, Salaries and Other Compensation,*

*(B) Authorizing Payment of Certain Employee Benefits and Confirming Right to Continue*

*Employee Benefits on Postpetition Basis, (C) Authorizing Payment of Reimbursement to*

*Employees for Prepetition Expenses, (D) Authorizing Payment of Withholding and Payroll-*

*Related Taxes, (E) Authorizing Payment of Workers' Compensation Obligations, and*

*(F)  Authorizing Payment of Prepetition Claims Owing to Administrators or Third Party*

*Providers* [Docket No. ___] (the "Interim Order"); and a hearing or hearings having been held to

consider the relief requested in the Motion; and upon the record of such hearing or hearings, and

all of the proceedings had before the Court; and the Court having found and determined that the

relief sought in the Motion is in the best interests of the Debtors, their estates, their creditors and

all other parties in interest; and that the legal and factual bases set forth in the Motion establish

just cause for the relief granted herein; and after due deliberation and sufficient cause appearing

therefor,

**IT IS HEREBY ORDERED THAT**:

1.      The Motion is GRANTED as set forth herein on a final basis.

2.      Except as otherwise set forth herein, the Debtors are authorized, pursuant to

sections 105(a) and 363(b) of the Bankruptcy Code, but not obligated or directed, in the

reasonable exercise of their business judgment and in the ordinary course of business, to pay and

honor amounts on account of Employee Compensation Obligations and Contract Workers

Obligations (exclusive of Withholding Obligations); *provided*, *however*, that without prejudice to

the Debtors' right to seek additional payments at any time subsequent hereto, the aggregate

amount of such payments on account of Employee Compensation Obligations and Contract

Workers Obligations (exclusive of Withholding Obligations) shall not exceed $8.1 million unless

further ordered by the Court.

3.      The Debtors and any applicable third parties are authorized to continue to allocate

and distribute Withholding Obligations to the appropriate third-party recipients or taxing

authorities in accordance with the Debtors' stated policies and prepetition practices.

4.      The Debtors are authorized, but not directed, to make payments under the Bonus

Programs to non-insiders in an aggregate amount not to exceed $650,000.  The Debtors are

further authorized, but not directed, to maintain the Bonus Programs in the ordinary course of

business.

5.      The Debtors are authorized, but not directed, to continue to honor their

Reimbursable Expense Obligations, including under the CCA Agreement, and including any

prepetition obligations, to Employees in accordance with the Debtors' stated policies and

prepetition practices, and are authorized to satisfy such Reimbursable Expense Obligations in an

amount not to exceed $400,000; *provided*, *however*, that satisfaction of prepetition Reimbursable

Expense Obligations shall only be allowed to the extent Employees have paid for such expenses directly from their own funds or are otherwise personally liable for such expenses.

6.      The Debtors are authorized, but not directed, to honor the Employee Benefit Plans in the ordinary course of business and in accordance with the Debtors' prepetition policies and programs, and to make any necessary contributions to such programs and pay any unpaid premium, claim, or amount owed as of the Petition Date with respect thereto; *provided*, *however*, that the Debtors may not pay in excess of $3.3 million in the aggregate on account of Employee Benefit Plans and the Employee Benefits Obligations, exclusive of Withholding Obligations.

7.      The Debtors are authorized to continue the Equity Incentive Plan in the ordinary course of business, and the Equity Incentive Plan shall be limited to the vesting or issuance of securities authorized prior to the Petition Date and no other compensation shall be made thereunder.

8.      The Debtors are authorized, but not directed, (a) to continue the Debtors' PTO Vacation Time, and FTO policies in the ordinary course of business and (b) to honor all obligations under the Debtors' PTO and Vacation Time policies, including payout of accrued PTO and Vacation Time upon termination in accordance with the Debtors' prepetition practice and applicable law; *provided*, *however*, that payments to any terminated Employee on account of PTO and Vacation Time shall not exceed $12,475.

9.      The Debtors are authorized, but not directed, to pay Workers' Compensation Claims in an aggregate amount not to exceed $7.9 million.

10.     The Debtors are authorized, but not directed, to pay all processing and administrative fees associated with and all costs and expenses incidental to payment of the Compensation Obligations and the Employee Benefits Obligations, including the Payroll

Administrator Obligations and the Aon Administrative Fee Obligations; *provided*, *however*, that the Debtors may not pay in excess of $400,000 on account of the Aon Administrative Fee Obligations.

11.      Nothing in the Motion, the Interim Order, or this Final Order, nor as a result of any payment made pursuant to this Final Order, shall be deemed or construed as an admission as to the validity or priority of any claim against the Debtors, an approval or assumption of any agreement, contract or lease pursuant to section 365 of the Bankruptcy Code, or a waiver of the right of the Debtors, or shall impair the ability of the Debtors, or any other party in interest, to the extent applicable, to contest the validity and amount of any payment made pursuant to this Final Order.

12.      Each of the Processors is authorized to receive, process, honor, and pay all checks and transfers issued or requested by the Debtors, to the extent that sufficient funds are on deposit in the applicable accounts, in accordance with this Final Order and any other order of this Court.

13.      The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests in connection with any Employee Obligations that are dishonored or rejected.

14.      Nothing in the Motion or this Final Order shall be deemed to permit a violation of section 503(c) of the Bankruptcy Code.

15.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order shall be immediately effective and enforceable upon its entry.

16.      The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Final Order in accordance with the Motion.

17.    This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Final Order.

Dated: _____, 2016
          Wilmington, Delaware


_____
UNITED STATES BANKRUPTCY JUDGE