**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SPORTS AUTHORITY HOLDINGS, INC., *et al.*,[1] | Case No. 16-10527 (___) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF STEPHEN COULOMBE IN SUPPORT OF THE DEBTORS'
EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (A) AUTHORIZING
THE DEBTORS TO ASSUME THE CLOSING STORE AGREEMENT,
(B) AUTHORIZING AND APPROVING STORE CLOSING SALES FREE AND
CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES, (C) AUTHORIZING
THE IMPLEMENTATION OF CUSTOMARY EMPLOYEE BONUS PROGRAM
AND PAYMENTS TO NON-INSIDERS THEREUNDER, (D) APPROVING
DISPUTE RESOLUTION PROCEDURES, AND
(E) APPROVING THE DEBTORS' STORE CLOSING PLAN**

I, Stephen Coulombe, hereby declare under penalty of perjury, pursuant to section 1746

of title 28 of the United States Code, as follows:

1.      I am a Senior Managing Director at FTI Consulting, Inc. ("FTI").  As of

November 28, 2015, FTI was engaged by Sports Authority Holdings, Inc. ("Sports Authority

Holdings") and each of its subsidiaries, all of which are affiliated debtors and debtors in

possession in the above-captioned chapter 11 cases (collectively, the "Debtors") to serve as

financial advisor.

2.      Since joining FTI in 2002, I have been a Senior Managing Director in FTI's

Corporate Finance/Restructuring practice.  I have 18 years of experience serving as financial

---

[1]      The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  Sports Authority Holdings, Inc. (9008); Slap Shot Holdings, Corp. (8209); The Sports Authority, Inc. (2802); TSA Stores, Inc. (1120); TSA Gift Card, Inc. (1918); TSA Ponce, Inc. (4817); and TSA Caribe, Inc. (5664).  The headquarters for the above-captioned Debtors is located at 1050 West Hampden Avenue, Englewood, Colorado 80110.

advisor and providing performance improvement services to corporations, various creditor

classes, equity owners, and directors of underperforming companies

3.      I submit this declaration (this "Declaration") in support of the *Debtors'*

*Emergency Motion for Interim and Final Orders (A) Authorizing the Debtors to Assume the*

*Closing Store Agreement, (B) Authorizing and Approving Store Closing Sales Free and Clear of*

*All Liens, Claims and Encumbrances, (C) Authorizing the Implementation of Customary*

*Employee Bonus Program and Payments to Non-Insiders Thereunder, (D) Approving Dispute*

*Resolution Procedures, and (E) Approving the Debtors' Store Closing Plan* (the "Motion").

4.      Except as otherwise indicated herein, all facts set forth in this Declaration and the

Motion are based upon my personal knowledge of the Debtors' operations and financial

condition, information learned from my review of relevant documents, information supplied to

me by other members of the Debtors' management team and the Debtors' advisors, or my

opinion based upon my knowledge and experience or information I have reviewed concerning

the Debtors' operations and financial condition.  I am over eighteen (18) years of age and I am

authorized to submit this Declaration on behalf of the Debtors.  If called upon to testify, I could

and would competently testify to the facts set forth in this Declaration and the Motion based

upon my own personal knowledge, except as otherwise stated herein.

**A.      The Debtors' Store Closing Plan**

5.      As of January 30, 2016, the Debtors operated 464 stores in 40 states and Puerto

Rico, and five distribution centers[2] located in New Jersey, California, Colorado, Georgia, and

Illinois.  Prior to the Petition Date, the Debtors commenced a restructuring process to streamline

their operations and implement various cost savings and efficiency initiatives.  As part of this

---

[2]     The Debtors anticipate that they will close two of the distribution centers during the course of the Debtors'
chapter 11 cases.

process, I understand that the Debtors completed a comprehensive review of the performance of all of their retail stores to analyze, among other things, the profitability and viability of each store location and to determine the Debtors' optimal footprint.  The Debtors also engaged FTI to, among other things, assist with analyses around cost reduction including a headcount reduction that took place prior to the Petition Date.

6.      As a culmination of these efforts, the Debtors developed a strategic plan (the "Store Closing Plan"), which they continue to refine from time to time, in connection with the closure of certain retail locations, whereby they have planned an orderly exit from certain underperforming or unprofitable store locations (the "Closing Stores") in an effort to conserve resources and maximize utility.  FTI also advised the Debtors regarding an optimization of their store and distribution center footprint.  Pursuant to the Store Closing Plan, the Debtors have identified up to 200 underperforming and/or unprofitable store locations that may be designated as Closing Stores and, in consultation with FTI, determined that it is in the best interest of the Debtors' estates to immediately prepare for the closure of up to 200 stores and 2 of their 5 distribution centers.

**B.      Engagement of Liquidation Consultant; Closing Store Agreement**

7.      The Debtors retained Gordon Brothers Retail Partners, LLC ("GBRP") and Tiger Capital Group, LLC ("TCG" and collectively with GBRP, the "Liquidation Consultant") because of their combined extensive expertise in conducting store closing sales (collectively, the "Closing Sales") at the Closing Stores, including the orderly liquidation of the inventory (the "Merchandise") and certain furniture, fixtures, equipment and other assets that the Debtors do not wish to retain (collectively, the "Offered FF&E" and collectively with the Inventory and any other assets located in a Closing Store, the "Store Assets") at the respective Closing Stores, with an eye toward maximizing revenues and value for the Debtors and their creditors.  The Debtors

selected the Liquidation Consultant to conduct the Closing Sales at the Closing Stores, and

determined that engaging the Liquidation Consultant was in the best interest of the Debtors and

their stakeholders.  The Debtors negotiated in good faith and at arms' length the terms and

conditions of the agreement dated as of February 17, 2016 by and among the Liquidation Agent

and TSA Stores, Inc. (as amended, modified, or restated as of the date hereof, and together with

all exhibits thereto, the "Closing Store Agreement"), a copy of which is attached hereto as

Exhibit A.  The material terms of the Closing Store Agreement[3] are summarized in the table

below:

| TERM | CLOSING STORE AGREEMENT |
|---|---|
| **Services Provided by Liquidation Consultant** | The Liquidation Consultant will be retained as the Debtors' exclusive, independent consultant to conduct the Closing Sales at the Closing Stores during the Sale Term to, among other things: (a) recommend appropriate discounts, advertising, and signage; (b) provide qualified supervisors to oversee the Closing Sales to maximize sales; (c) maintain communication with the Debtors' employees at the Closing Stores and monitor the progress of the Closing Sales; (d) recommend loss prevention initiatives; (e) advise the Debtors regarding legal requirements and applicable laws, rules, and regulations affecting liquidation sales (collectively, the "Liquidation Laws"); (f) develop and implement a Customer Transition Program to assist the Debtors in their efforts to transition their existing customers at the Closing Stores to the Debtors' ongoing store locations and ecommerce platform; and (g) assist the Debtors with the rebalancing and consolidation of inventory within and, if necessary, across markets. |
| **Closing Stores** | The Debtors will designate the Closing Stores on an ongoing basis. |
| **Term of Closing Sales** | The Closing Sales will commence on February 23, 2016 and will terminate on or before June 7, 2016.  The Debtors and the Liquidation Consultant may mutually agree to establish an earlier or later Sale Termination Date with respect to any one or more Closing Stores (on a per-store basis), and the Debtors may unilaterally establish an earlier Sale Termination Date for a reasonable number of Closing Stores if warranted by providing 5 days' prior notice thereof to the Liquidation Consultant. |

---

[3]  Capitalized terms used in the summary of the Closing Store Agreement, but not otherwise defined therein, shall have the meanings ascribed to such terms in the Closing Store Agreement.

| TERM | CLOSING STORE AGREEMENT |
|---|---|
| **Expenses of Liquidation Consultant** | The Debtors will pay for all expenses incident to the Closing Sales in accordance with a mutually agreed upon expense budget.  With respect to certain Consultant's Controlled Expenses, the Liquidation Consultant will advance funds for these expenses and the Debtors will thereafter reimburse the Liquidation Consultant for such expenses.  The Debtors will also reimburse the Liquidation Consultant for its reasonable expenses associated with the sale of the Offered FF&E. |
| **Compensation for Liquidation Consultant** | The Debtors will pay the Liquidation Consultant a First Quality Merchandise Incentive Fee that is between 0.75% and 1.75%, based on the total amount of First Quality Gross Proceeds, net of sales taxes.  The Debtors will pay the Liquidation Consultant a Clearance Merchandise Base Fee that is equal to 1.5% of the Clearance Gross Proceeds, net of sales taxes.  The Liquidation Consultant will also earn the FF&E Commission equal to 17.5% of the gross sales of the Offered FF&E, net of sales taxes. |
| **Special Purpose Payment** | The Debtors funded to the Liquidation Consultant $750,000 to be held by the Liquidation Consultant and to be applied towards any unpaid obligations of the Debtors pending the Final Reconciliation.  Any portion of the Special Purpose Payment not used to pay amounts explicitly contemplated by the Closing Store Agreement shall be returned to the Debtors within 3 days following the Final Reconciliation. |
| **Commission to Debtors for Sale of Non-Debtor Goods** | The Debtors are entitled to a commission equal to 5% of all non-Debtor goods sold during the Closing Sale at the Closing Stores. |
| **Insurance; Risk of Loss** | The Debtors will maintain insurance with respect to the Merchandise.  the Liquidation Consultant shall not be deemed to be in possession or control of the Closing Stores, the Merchandise, or the Offered FF&E. |
| **Indemnification by Liquidation Consultant** | The Liquidation Consultant will indemnify the Debtors from and against liabilities and attorneys' fees and expenses arising from or related to, among other things: (a) the Liquidation Consultant's material breach or failure to comply with the Closing Store Agreement; (b) harassment or other unlawful, tortious or otherwise actionable treatment of any of the Debtors' customers, employees or agents by the Liquidation Consultant; (c) certain claims by employees or independent contracts of the Liquidation Consultant; and (d) willful misconduct, gross negligence, or unlawful acts by the Liquidation Consultant. |

| TERM | CLOSING STORE AGREEMENT |
|------|------------------------|
| **Indemnification by Debtors** | The Debtors will indemnify the Liquidation Consultant from and against liabilities and attorneys' fees and expenses arising from or related to, among other things: (a) the Debtors' material breach or failure to comply with the Closing Store Agreement; (b) claims by the Debtors' employees and independent contractors; (c) any consumer warranty or products liability claims relating to any Merchandise (excluding GBPR Goods); (d) certain claims by employees or independent contracts of the Debtors; and (e) willful misconduct, negligence, or unlawful acts by the Debtors. |

**C.    Preparations for Store Closing Sales; Store Closing Sales**

8.    The Debtors have begun the process of preparing for the Closing Sales.  This process has included, among other things, the following preparations:

- Analyzing all inventory across all stores to determine which inventory should be classified as "liquidation inventory" and which inventory should be retained for ordinary course sales in going-forward stores;

- Reallocating and redistributing inventory across all stores with an eye toward aggregating liquidation inventory across Closing Stores;

- Relocating inventory by and among various stores across the country in approximately 800 trucks that have been deployed to transport such relocated inventory and most of which are either still in transit or have reached their destinations;

- Ordering customized specialty banners and signs announcing the Closing Sales at the Closing Stores;

- Informing and engaging with their employees at the Closing Stores about the impending Closing Sales; and

- Posting price markdowns throughout the Closing Stores and marking inventory at the Closing Stores to reflect the price markdowns.

9.    Overall, the Debtors' efforts amounted to a substantial investment of time and money by the Debtors in preparation for the impending Closing Sales.

10.    Additionally, prior to the execution of the Closing Store Agreement, but subject to the terms and conditions of a confidentiality agreement by and among the Liquidation Consultant

and the Debtors, the Liquidation Consultant began the process of familiarizing itself with the

Debtors' operations, the Closing Stores, the Merchandise, and other Store Assets.  To the end,

the Liquidation Consultant has spent a significant amount of time on site with the Debtors

11.     On February 23, 2016, following the execution of the Closing Store Agreement,

the Liquidation Consultant began preparations to officially launch the Closing Sales on March 4,

2016.

**D.     Assumption of the Store Closing Agreement on an Interim Basis is in the Best Interests of the Debtors**

12.     The Debtors, in conjunction with FTI, have determined that entering into the

Store Closing Agreement would provide the greatest return to the Debtors' estates for the Store

Assets.  I believe that the terms set forth in the Store Closing Agreement are the best alternative

for conducting the Closing Sales.  The terms of the Store Closing Agreement are the result of

arm's length bargaining, and I believe them to be the best terms available to the Debtors.

13.     I understand that the Liquidation Consultant has extensive experience in

conducting liquidation sales and can oversee and assist in the management and implementation

of the Closing Sales in an efficient and cost-effective manner.  Moreover, I understand that the

Liquidation Consultant is already familiar with the Debtors' business, given that it began

preparations for the Closing Sales well in advance of the Petition Date.

14.     If the Store Closing Agreement is not assumed, I believe there will be significant

harm to all stakeholders.  The Debtors' estates will lose the benefit of the Liquidation

Consultant's experience with the Debtors and its momentum with, preparation for, and

commencement of the Closing Sales.  As such, the Debtors would need to suspend the Closing

Sales, conduct a process to find a new Liquidation Consultant, and then recommence the Closing

Sales. I believe that the resulting disruption and delay would lead to a material loss of value and increased administrative expense.

**E.      The Closing Sales Should be Approved on an Interim Basis**

15.      The Debtors, in consultation with FTI, have determined that the Closing Sales represent the best alternative to maximize recoveries to the Debtors' estates with respect to the Closing Stores. I understand that there are meaningful Store Assets at the Closing Stores that that will be monetized most efficiently and quickly through an orderly process conducted in consultation with an experienced liquidation firm. Further, I believe that delaying the Closing Sales will diminish the recoveries on the Store Assets for several important reasons. First, I understand that many of the Closing Stores fail to generate positive cash flow and therefore are a significant drain on liquidity. As such, I believe that the Debtors will realize an immediate benefit in terms of financial liquidity upon the sale of the Store Assets and the termination of operations at the Closing Stores. Second, I understand that allowing the Closing Sales to be officially launched be will allow the Debtors to vacate the premises of the Closing Stores more quickly, reject the applicable leases, and therefore avoid the accrual of unnecessary administrative expenses.

16.      On the other hand, any disruption or delays of the Closing Sales, including delay in the Debtors' authorization to assume the Closing Store Agreement, will cause the Debtors' estates significant and irreparable harm. The Debtors are in a difficult financial situation; they need to maximize sources of liquidity and minimize expenses as much as possible and as quickly as possible. The Closing Sales will help the Debtors with both of these goals. With the cooperation of their employees and the services of the Liquidation Consultant, the Debtors will be able to liquidate inventory and assets at the Closing Stores so that they can exit the Closing Stores quickly and efficiently, thereby monetizing certain assets and eliminating certain

01:18375410.1

expenses.  Any delay in the Closing Sales will cause the Debtors to lose the momentum that they and the Liquidation Consultant have gained in preparation for the Closing Sales and to incur additional administrative expenses by prolonging the liquidation process and delay their exit from the underperforming and unprofitable store locations.

**F.      The Store Closing Bonus Program**

17.      To ensure maximum success of the Closing Sales, the Debtors seek authorization to implement a customary bonus program for certain non-insider personnel with responsibilities related to the Closing Stores (the "Bonus Program") and to fulfill their obligations thereunder to Bonus Program participants, all of whom are non-insiders.  Specifically, the Debtors request the authority to, at their discretion, provide additional compensation in the form of bonuses to (a) three district managers calculated based on a combination of sales revenues and retention of personnel (collectively, the "District Managers"); (b) the store manager at each Closing Store, the assistant store manager at each Closing Store, the two assistant sales managers at each Closing Store,  and five team sales people (collectively, the "Closing Store Management Team"), calculated based on a combination of sales revenues and shrink control, provided, however, that each member of the Closing Store Management Team is only eligible for a bonus if he or she remains employed by the Debtors through the termination of the Closing Sale at the respective Closing Store and does not resign or is terminated for cause; and (c) certain additional employees specifically charged with asset protection ("AP Personnel") to maximize loss prevention and minimize shrink levels (collectively, all bonuses to the District Managers, the Closing Store Management Team, and the AP Personnel, the "Closing Bonuses").

18.      I believe that allowing the District Managers and Closing Store Management Teams to earn Closing Bonuses at the Closing Stores will provide much-needed motivation for key personnel who are critical to the success of the Closing Sales.  Similarly, I believe that

awarding Closing Bonuses to the AP Personnel will enable the Debtors to combat loss

prevention and reduce shrink at the Closing Stores, and thereby maximize profits.  I believe that,

absent the Bonus Program, the Debtors are likely to lose such key personnel at the Closing

Stores at a time when the Debtors have few resources available to search for new employees,

which would unnecessarily delay or frustrate the Closing Sales and hamstring the Debtors'

efforts to maximize value.

19.     The Debtors request authority to determine the individual amounts of each

Closing Bonus, except that the total aggregate cost of the Bonus Program, in any event, will not

exceed 0.5% of the Debtors' overall gross payroll annual payroll and will not exceed 6.0% of the

Debtors' gross annual payroll for the Closing Stores.  For the avoidance of doubt, the Debtors do

not seek authority to pay any Closing Bonuses to insiders of the Debtors, and do not seek

authority to pay any Closing Bonuses until the conclusion of the Closing Sales pending entry of a

final order granting the relief requested in the Motion.  On balance, I believe that the costs to the

Debtors of the Closing Bonuses are far outweighed by the benefits such Closing Bonuses are

likely to produce in the form of maximum productivity and cooperation during the Closing Sales,

resulting in higher revenues in a shorter timeframe.

**G.    Proposed Postpetition Financing, Cash Flow Projections, and Sale Timeline**

20.     In consultation with their advisors, the Debtors negotiated with certain of their

lenders regarding potential debtor-in-possession postpetition financing to support the Debtors'

efforts in these Chapter 11 Cases.[4]  Certain ABL Lenders and FILO Lenders jointly agreed to

provide the Debtors with postpetition financing in the form of a senior secured, super-priority

asset based revolving credit facility of up to $500 million (the "Revolving DIP Loan") and a

---

[4]     As discussed in more detail in the [Augustine Declaration] (the "Augustine Declaration"), Rothschild also
        sought debtor-in-possession financing from a variety of third parties.

senior secured, super-priority first in last out term loan credit facility of up to $95 million in aggregate principal amount (the "FILO DIP Loan," and together with the Revolving DIP Loan, the "DIP Loans") pursuant to that certain Senior Secured Super Priority Revolving Debtor in Possession Credit Agreement (the "DIP Credit Agreement").  I understand that the financing provided by the DIP Loans will serve primarily as a bridge to the Debtors' proposed sale of their business operations.

21.     I understand that the Closing Sales are included in the Debtors' DIP financing budget against which financial covenants are measured.  Moreover, the DIP Credit Agreement imposes an expeditious, but sustainable, timeline for the proposed sale of the Debtors' business operations, which is driven primarily by the risk of deteriorating asset value attendant to any delays in the sale of the Debtors' business, as well as other milestones in the Debtors' chapter 11 cases.  Specifically, in order to satisfy the requirements set forth in the DIP Credit Agreement, an interim order granting the relief sought in the Motion must be entered by March 16, 2016. Therefore, I believe that any delay in the approval of the Closing Sales could put pressure on the Debtors' ability to remain in compliance with its DIP financing covenants.

22.     Accordingly, for the reasons set forth herein and in the Motion, on behalf of the Debtors, I respectfully submit that the Debtors should be authorized to assume the Closing Store Agreement and to continue or launch their Closing Sales across the Closing Stores to significantly reduce their expenses and preserve value for their estates and other stakeholders.

23.     In conclusion, for the reasons stated herein and in the Motion, I respectfully request, on behalf of the Debtors, that the Motion be granted in its entirety, together with such other and further relief as the Court deems just and proper.

01:18375410.1

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  March 2, 2016

*/s/ Stephen Coulombe*
Stephen Coulombe

# EXHIBIT A

## STORE CLOSING AGREEMENT

*[See attached]*

February 17, 2016

TSA Stores, Inc.
1050 West Hampden Avenue
Englewood, Colorado, 80110

      Re:    Store Closing Program

Ladies and Gentlemen:

This letter shall serve as the agreement by and among (a) Gordon Brothers Retail Partners, LLC and Tiger Capital Group, LLC (together, "Consultant") and (b) TSA Stores, Inc. ("Merchant") pursuant to which Consultant shall serve as the exclusive consultant to Merchant to conduct a "store closing" or other mutually agreed upon themed sale ("Sale") at up to two  hundred (200) of Merchant's retail stores that are designated in writing by Merchant subsequent to the date hereof (each a "Store" and collectively, the "Stores"), subject to the terms and conditions set forth herein.

## 1.    **RETENTION**
(A)    Merchant hereby retains Consultant as its exclusive, independent consultant to conduct the Sale at the Stores during the Sale Term (as defined below), and in connection therewith, Consultant shall, throughout the Sale Term:

    (i)    Recommend appropriate discounting to effectively sell all of the Merchandise (as defined below) in accordance with a "store closing" or other mutually agreeable theme, and recommend appropriate point-of-purchase, point-of-sale, and other internal and external advertising in connection therewith.

    (ii)    Provide a sufficient number of qualified supervisors with respect to the Stores to oversee the conduct of the Sale and to oversee the Sale process in the Stores as may be required to maximize sales.  Such supervision shall consist of personnel engaged by Consultant, and mutually agreed upon regional/district managers employed by Merchant who are assigned by Merchant to serve as supervisors in connection with the Sale.

    (iii)    Maintain focused and constant communication with Store-level employees and managers to keep them abreast of strategy and timing and to properly effect Store-level communication by Merchant's employees to customers and others about the Sale.

    (iv)    Establish and monitor accounting functions for the Sale, including evaluation of sales of Merchandise by category, sales reporting and expense monitoring.

    (v)    Coordinate with Merchant so that the operation of the Stores is being properly maintained including ongoing customer service and housekeeping activities.

    (vi)    Recommend appropriate staffing levels for the Stores and appropriate bonus and/or incentive programs for Store employees.

    (vii)    Recommend loss prevention initiatives.

    (viii)    Advise Merchant with respect to the legal requirements of affecting the Sale as a "store closing" or other mutually agreed upon theme in compliance with applicable state and local "going out of business" laws.  In connection with such obligation, Consultant will (i) advise Merchant of the applicable waiting period under such laws, and/or (ii) prepare (in Merchant's

1

name and for Merchant's signature) all permitting paperwork as may be necessary under such laws, deliver all such paperwork to Merchant, and file, on behalf of Merchant, all such paperwork where necessary, and/or (iii) advise where permitting paperwork and/or waiting periods do not apply.

(ix)    Assist the Merchant with rebalancing and consolidation of inventory within and, if necessary, across markets.

(x)    Maintain confidentiality of all proprietary and non-public information regarding the Merchant.

(xi)    Provide such other related services in connection with the Sale as mutually agreed upon by the parties in writing.

Robert Grosskopf is leading the assignment and Mark Herbert will be the lead consultant interfacing with the Merchant on a day-to-day basis.

(B)    In addition to the services outlined in Section 1(A) above, Consultant shall, in close consultation with Merchant, develop, implement, monitor/benchmark, and refine a customized program ("Customer Transition Program") to assist Merchant in transitioning Store customers to Merchant's ongoing stores and ecommerce platforms.  The specific parameters of the Customer Transition Program will be mutually agreed by the parties based upon collaborative discussions and feedback among Consultant's merchants and operations staff, Merchant's Store-level personnel, and the various key departmental-designated representatives of Merchant's home office staff; and may include initiatives such as Consultant's:

(i)    Omnichannel customer experience program;
(ii)    Customer transition and retention program;
(iii)    Customer tailored rewards program;
(iv)    Supplemental gift card promotional program;
(v)    Internet-based customer location notification program; and
(vi)    Social media engagement and contest programs;

## 2.    SALE TERM; VACATING STORES

(A)    The term "Sale Term" with respect to each respective Store shall commence on or about February 23, 2016 ("Sale Commencement Date") and shall end on or about June 7, 2016 ("Sale Termination Date"). Notwithstanding the foregoing, Merchant and Consultant may establish an earlier or later "Sale Termination Date" with respect to any one or more Stores (on a per Store basis), and Merchant may unilaterally establish an earlier "Sale Termination Date" for a reasonable number of Stores where circumstances warrant by providing five days' prior notice thereof to Consultant.  In the event that a later "Sale Termination Date" is established, Merchant and Consultant shall mutually and in good faith review and revise the initial budget with respect to such store(s) to reflect the extended timeline.

(B)    Upon the conclusion of the Sale Term at each Store, Consultant shall leave such Store in broom clean condition, subject to Consultant's right pursuant to Section 6(D) below to abandon in a neat and orderly manner all unsold Offered FF&E and all Retained FF&E.

## 3.    EXPENSES

(A)    All expenses incident to the conduct of the Sale and the operation of the Stores during the Sale Term (including without limitation all Consultant Controlled Expenses and all other store-level and corporate expenses associated with the Sale) shall be borne by Merchant; except for any of the specifically enumerated "Consultant Controlled Expenses" that exceed the aggregate budgeted amount (as provided in Section 3(B) below) for such Consultant Controlled Expenses.

(B)    Attached hereto as Exhibit A is an initial expense budget for the "Consultant's Controlled Expenses" (consisting of supervision, advertising and Customer Transition Program expenses, and de minimis

miscellaneous expenses). The initial expense budget was developed based upon discussions between Merchant and Consultant regarding a likely group of stores that will close. The group of stores considered is subject to change, both in composition and number. To the extent that the Sale actually will be conducted at a different number of stores and/or at different stores than those considered, Merchant and Consultant shall mutually and in good faith equitably revise the budget for the Consultant's Controlled Expenses to reflect the differences between the actual circumstances and the assumed circumstances of the Sale. Consultant will advance funds for the Consultant's Controlled Expenses, and Merchant shall reimburse Consultant therefor (up to the aggregate budgeted amount) in connection with each weekly reconciliation contemplated by Section 5(B) upon presentation of reasonable documentation for such actually-incurred expenses. Merchant shall be obligated to reimburse Consultant for Consultant Controlled Expenses in addition to Merchant's other obligations under this Agreement (including without limitation the Fees and the FF&E Commission and reimbursement of FF&E Expenses). Consultant acknowledges that Merchant will place advertising directly.

### 4.  <u>CONSULTANT COMPENSATION</u>

(A)    As used in this Agreement, the following terms shall have the following meanings:

    (i)    "First Quality Gross Proceeds" shall mean the gross proceeds of all sales of First Quality Merchandise and service revenue made in the Stores during the Sale Term, net only of sales taxes.

    (ii)    "First Quality Merchandise" shall mean all first quality (non-clearance, non-firstmark, non-discontinued) merchandise which  was sold in the Stores during the Sale Term.

    (iii)    "Clearance Gross Proceeds" shall mean the gross proceeds of all sales of Clearance Merchandise made in the Stores during the Sale Term, net only of sales taxes.

    (iv)    "Clearance Merchandise" shall mean all hard marked or otherwise indicated clearance merchandise which was sold in the Stores during the Sale Term.

    (v)    "Merchandise" shall mean all First Quality Merchandise and all Clearance Merchandise sold in the Stores during the Sale Term.

    (vi)    "First Quality Merchandise Aggregate Cost Recovery Percentage" shall mean the First Quality Gross Proceeds divided by the Cost Value of the First Quality Merchandise.

    (vii)    "Cost Value" with respect to each item of Merchandise shall be determined with reference to the Merchant's books and records maintained in the ordinary course consistent with past periods and practices (and the aggregate body of Merchandise actually sold will be determined using the gross rings method).

(B)    <u>With respect solely to First Quality Merchandise</u>, Merchant shall pay Consultant a "First Quality Merchandise Incentive Fee" as <u>one</u> of the following (e.g., back to first dollar):

| <u>First Quality Merchandise Aggregate</u><br><u>Cost Recovery Percentage</u> | <u>First Quality Merchandise Incentive Fee</u> |
|---|---|
| Below 115.5% | 0.75% of First Quality Gross Proceeds |
| 115.6% - 119.9% | 1.00% of First Quality Gross Proceeds |
| 120.0% - 123.9% | 1.25% of First Quality Gross Proceeds |
| 124.0% - 128.0% | 1.50% of First Quality Gross Proceeds |
| 128.1 and Above % | 1.75% of First Quality Gross Proceeds |

Merchant's personnel will provide Consultant with reasonable and good faith cooperation and support throughout the Sale Term in connection with the conduct of the Sale.

(C)    <u>With respect solely to Clearance Merchandise</u>, Merchant shall pay Consultant a "Clearance Merchandise Base Fee" of one and a half percent (1.5%) of the Clearance Gross Proceeds.

(D)    The Merchant shall pay the Consultant both the First Quality Merchandise Incentive Fee and the Clearance Merchandise Base Fee (collectively the "Fees"). In connection, and concurrently, with each weekly reconciliation contemplated by Section 5(B) below (but subject to the Final Reconciliation), Merchant shall pay Consultant: (a) 1% of First Quality Gross Proceeds on account of the prior week's sales of First Quality

3

Merchandise and service revenue as an advance against the First Quality Merchandise Incentive Fee; plus (b) 1.5% of Clearance Gross Proceeds on account of the prior week's sales of Clearance Merchandise as an advance against the Clearance Merchandise Base Fee.  In connection with the Final Reconciliation the parties shall calculate the First Quality Merchandise Aggregate Recovery Percentage and determine if any additional First Quality Merchandise Incentive Fee is due (based upon the First Quality Merchandise Aggregate Recovery Percentage hurdles/formulations set forth in Section 4(B) above), and (x) if so, Merchant shall pay Consultant such additional amounts concurrently with the Final Reconciliation, and (y) if not, Consultant shall refund Merchant an amount equal to the amount by which the payments advanced pursuant to this section 4(D) exceed the total amount owed to Consultant under this Agreement.

(E)     The Fees represents consideration for the Sale (including without limitation the Customer Transition Program), but not including any fees due on account of FF&E-related services contemplated by Section 6 below.

## 5.     CONDUCT OF SALE; OTHER SALE MATTERS

(A)     Merchant shall have control over the personnel in the Stores and shall handle the cash, debit and charge card payments for all Merchandise sold during the Sale Term in accordance with Merchant's normal cash management procedures, subject to Consultant's right to audit any such items upon reasonable notice in conjunction with the calculation of its Fees.

(B)     The parties will meet on each Wednesday during the Sale Term to review any Sale matters reasonably requested by either party; and all amounts payable or reimbursable to Consultant for the prior week (or the partial week in the case of the first and last weeks) shall be reconciled and paid within two business days.  No later than thirty (30) days following the end of the Sale, the parties shall complete a final reconciliation and settlement of all amounts contemplated by this Agreement ("Final Reconciliation").  From time to time, upon reasonable notice, each party shall prepare and deliver to the other party such other reports as either party may reasonably request.  Each party to this Agreement shall, at all times during the Sale Term and during the three (3) month period thereafter, provide the other with reasonable access to all information, books and records relating to the Sale and to this Agreement.  All records and reports shall be made available to Consultant and Merchant during regular business hours at the inspected party's location upon reasonable notice; provided that any inspection of such records and reports shall not unreasonably interfere with the inspected party's regular business operations.

(C)     Merchant shall be solely responsible for the computing, collecting, holding, reporting, and paying all sales taxes associated with the sale of Merchandise during the Sale Term, and Consultant shall have absolutely no responsibilities or liabilities therefor.

(D)     Each of Consultant and Merchant shall comply with all federal, state and local laws, rules and regulations applicable to them in connection with their respective obligations as contemplated by this Agreement including, but not limited to with respect to the conduct of the Sale.

(E)     Although Consultant shall undertake its obligations under this Agreement in a manner designed to achieve the desired results of the Sale and to maximize the recovery to the Merchant, Merchant expressly acknowledges that Consultant is not guaranteeing the results of the Sale.

(F)     Merchant acknowledges that the parties are not conducting an inventory of the Merchandise and that Consultant has made no independent assessment of the beginning levels of Merchandise, and Consultant shall not bear any liability for shrink or other loss to the Merchandise.

(G)     All sales of Merchandise in the Stores during the Sale shall be made in the name, and on behalf, of Merchant.  All such sales shall be "final sales" and "as is," and all advertisements and sales receipts will reflect the same.  The Stores shall continue to honor returns and warranties with respect to items purchased prior to the Sale, in accordance with Merchant's policies and procedures pertaining thereto.  Returns and Merchant warranties will not be honored for items purchased as part of the Sale.

4

(H)    Subject to Consultant fulfilling its obligations as set forth in Section 1(A)(viii) above, Merchant shall take commercially reasonable steps to ensure that no third party (including without limitation Store landlords) will prevent or limit Merchant or Consultant from conducting the Sale as contemplated by this Agreement (including without limitation by promoting the Sale as a "store closing" or other mutually agreed upon handle) throughout the Sale Term.

(I)    During the Sale, Merchant's employees (in quantities consistent with historical periods), and all Store level and corporate level assets and services of the Merchant, shall be made available to the Sale (including without limitation customary central services, trade names, logos, social media sites, customer and email lists, and furniture, fixtures and equipment). Such customer information will only be used for purposes of the Sale in accordance with Merchant's existing policies communicated in writing to the Consultant regarding use thereof, and Merchant maintains ownership of all customer related information.

(J)    Concurrently with the execution of, and as a condition to Consultant's obligations under, this Agreement, Merchant shall fund to Consultant seven hundred-fifty thousand dollars ($750,000) (the "Special Purpose Payment") which shall be held by Consultant until the Final Reconciliation (and Merchant shall not apply the Special Purpose Payment to, or otherwise offset any portion of the Special Purpose Payment against, any weekly reimbursement, payment of Fees, or other amount owing to Consultant under this Agreement prior to the Final Reconciliation).  Without limiting any of Consultant's other rights, Consultant may apply the Special Purpose Payment to any unpaid obligation owing by Merchant to Consultant under this Agreement. Any portion of the Special Purpose Payment not used to pay amounts explicitly contemplated by this Agreement shall be returned to Merchant within three days following the Final Reconciliation.

(K)    Subject to (i) compliance with applicable laws; and (ii) the implementation of UCC-type security arrangements satisfactory to Consultant in Consultant's sole discretion; and (iii) the parties' subsequent mutual written agreement with respect to additional goods terms, conditions, and consideration, Consultant shall have the right (but not the obligation) to include additional non-Merchant goods into the Sale.  Merchant shall be entitled to a 5.0% commission on all non-Merchant goods included in the Sale.

## 6.    FF&E

(A)    Promptly following the Sale Commencement Date, Merchant shall inform Consultant of those items of furniture, fixtures, and equipment located at the Store which are not to be sold (because Merchant does not have the right to sell such items, because Merchant wishes to retain such items for itself, or otherwise) (collectively, "Retained FF&E").

(B)    With respect to all furniture, fixtures, and equipment located at the Store as of the Sale Commencement Date which is not Retained FF&E (collectively the "Offered FF&E"), Consultant shall have the right to sell such Offered FF&E during the Sale Term on a commission basis equal to seventeen and a half percent (17.5%) of the gross sales of Offered FF&E net only of sales tax ("FF&E Commission").

(C)    Merchant shall reimburse Consultant for its reasonable sale expenses associated with the sale of the Offered FF&E, not to exceed the amount shown on an FF&E expense budget (which shall be in addition to the Consultant Controlled Expenses budget), to be mutually and reasonably agreed to by the parties promptly after Merchant identifies/designates/distinguishes between the Offered FF&E and Retained FF&E ("FF&E Expenses").

(D)    Consultant shall have the right to abandon any unsold Offered FF&E (and all Retained FF&E) at the Store at the conclusion of the Sale Term without liability to Merchant or any third party.

## 7.    INSURANCE; RISK OF LOSS

During the Sale Term: (a) Merchant shall maintain (at its expense) insurance with respect to the Merchandise in amounts and on such terms and conditions as are consistent with Merchant's ordinary course operations, and (b)

5

each of Merchant and Consultant shall maintain (at each party's respective expense) comprehensive liability insurance covering injuries to persons and property in or in connection with the Stores, in such amounts as are reasonable and consistent with its ordinary practices, for bodily injury, personal injury and/or property damage. Each party shall use commercially reasonable efforts to have the other party added as an additional insured on all such insurance of the other party, and to provide the other party with certificates of all such insurance prior to the commencement of the Sale.

Notwithstanding any other provision of this Agreement, Merchant and Consultant agree that Consultant shall not be deemed to be in possession or control of the Stores, or the Merchandise or other assets located therein or associated therewith, or of Merchant's employees located at the Stores; and Consultant does not assume any of Merchant's obligations or liabilities with respect thereto.

Notwithstanding any other provision of this Agreement, Merchant and Consultant agree that Merchant shall bear all responsibility for liability claims (product liability and otherwise) of customers, employees and other persons arising from events occurring at the Stores, and Merchandise sold in the Stores (excluding any non-Merchant goods included in the Sale pursuant to paragraph 5(K) hereof), before, during and after the Sale Term (except to the extent that any such claim arises from the gross negligence, willful misconduct, or unlawful acts of Consultant).

## 8.    **INDEMNIFICATION**

(A)    Consultant shall indemnify and hold Merchant and its affiliates, and their respective officers, directors, employees, consultants, and independent contractors (collectively, "Merchant Indemnified Parties") harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to:

   (i)    Consultant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained herein or in any written agreement entered into in connection herewith;

   (ii)    any harassment or any other unlawful, tortious or otherwise actionable treatment of any customers, employees or agents of Merchant by Consultant, its affiliates or their respective officers, directors, employees, agents, independent contractors or representatives (including without limitation any supervisors);

   (iii)    any claims by any party engaged by Consultant as an employee or independent contractor (including without limitation any non-Merchant employee supervisor) arising out of such employment or engagement, except where due to the gross negligence, willful misconduct or unlawful acts of Merchant, its affiliates or their respective officers, directors, employees, agents, independent contractors or representatives; or

   (iv)    the gross negligence, willful misconduct or unlawful acts of Consultant, its affiliates or their respective officers, directors, employees, Consultants, independent contractors or representatives.

(B)    Merchant shall indemnify and hold Consultant, its affiliates and their respective officers, directors, employees, consultants, and independent contractors (collectively, "Consultant Indemnified Parties") harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to:

   (i)    Merchant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained herein or in any written agreement entered into in connection herewith;

   (ii)    any harassment or any other unlawful, tortious or otherwise actionable treatment of any customers, employees or agents of Consultant by Merchant, its affiliates or their respective officers, directors, employees, agents, independent contractors or representatives;

   (ii)    any claims by any party engaged by Merchant as an employee or independent contractor arising out of such engagement, except where due to the gross negligence, willful misconduct or

6

           unlawful acts of Consultant, its affiliates or their respective officers, directors, employees, agents, independent contractors or representatives;

(iii)      any consumer warranty or products liability claims relating to any Merchandise (excluding any non-Merchant goods included in the Sale pursuant to paragraph 5(K) hereof); and/or

(iv)      the gross negligence, willful misconduct or unlawful acts of Merchant, its affiliates or their respective officers, directors, employees, agents, independent contractors or representatives.

## 9. <u>TERMINATION</u>

Consultant or Merchant's failure to perform any of their respective material obligations hereunder, which failure shall continue uncured for five days after receipt of written notice thereof to the defaulting party, shall constitute a "Termination Event" hereunder. If a Termination Event occurs, the non-defaulting party may, in its discretion, elect to terminate this agreement by providing seven business days' written notice thereof to the other party and, in addition to terminating this agreement, pursue any and all rights and remedies and damages resulting from such default; provided, that in no event shall either party be liable to the other for any punitive, exemplary, consequential, incidental, indirect or special damages, including, without limitation, lost profits.

## 10. <u>GOVERNING LAW, VENUE, JURISDICTION AND JURY WAIVER</u>

*THIS AGREEMENT HAS BEEN NEGOTIATED, EXECUTED AND DELIVERED AT AND SHALL BE DEEMED TO HAVE BEEN MADE IN DENVER, COLORADO. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF COLORADO, WITHOUT GIVING EFFECT TO SUCH STATE'S PRINCIPLES OF CONFLICTS OF LAWS. REGARDLESS OF ANY PRESENT OR FUTURE DOMICILE OR PRINCIPAL PLACE OF BUSINESS OF THE PARTIES HERETO, EACH SUCH PARTY HEREBY IRREVOCABLY CONSENTS AND AGREES THAT ANY AND ALL CLAIMS OR DISPUTES BETWEEN THE PARTIES HERETO PERTAINING TO THIS AGREEMENT OR TO ANY MATTER ARISING OUT OF OR RELATED TO THIS AGREEMENT SHALL BE BROUGHT IN (A) ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE OF COLORADO OR (B) ANY UNITED STATES BANKRUPTCY COURT WITH JURISDICTION OVER MERCHANT (THE "BANKRUPTCY COURT") OR ANY COURT HAVING APPELLATE JURISDICTION OVER THE BANKRUPTCY COURT. BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY SUBMITS AND CONSENTS IN ADVANCE TO SUCH EXCLUSIVE JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT. EACH PARTY HERETO HEREBY WAIVES ANY OBJECTION WHICH IT MAY HAVE BASED ON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT.*

*EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY CLAIM UPON, ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT. EACH OF THE PARTIES HERETO HEREBY CERTIFIES THAT NO REPRESENTATIVE OR AGENT OF ANY OTHER PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH PARTY WOULD NOT SEEK TO ENFORCE THE PROVISIONS OF THIS WAIVER. EACH OF THE PARTIES HERETO HEREBY ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY AND IN RELIANCE UPON, AMONG OTHER THINGS, THE PROVISIONS OF THIS PARAGRAPH.*

## 11.    <u>MISCELLANEOUS</u>

(A)    In the event Merchant becomes subject to the jurisdiction of any United States Bankruptcy Court, Merchant shall promptly seek to have this Agreement, and the transactions contemplated by this Agreement assumed/approved by such Bankruptcy Court pursuant to an order reasonably acceptable to Merchant and Consultant.  Consultant hereby discloses to Merchant that an affiliate of Gordon Brothers Retail Partners, LLC (a member of Consultant) serves as an appraiser with respect to certain assets of Merchant (including without limitation merchandise), for certain of Merchant's secured lenders; and Consultant and Merchant hereby agree to cooperate to ensure that appropriate formal disclosures thereof (and of any other required disclosure matters involving the members of Consultant) are timely made in connection with any such Bankruptcy Court proceedings.

[Remainder of Page 8 Intentionally Left Blank]

(B)      This Agreement constitutes the entire agreement between the parties with respect to the matters contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect thereto.  This Agreement may not be modified except in a written instrument executed by each of the parties hereto.  No consent or waiver by any party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party.  The failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.  Nothing contained in this Agreement shall be deemed to create any relationship between Merchant and Consultant other than that of Consultant as an independent contractor of Merchant, and it is stipulated that the parties are not partners or joint venturers in any way.  Consultant assumes full responsibility for the payment of all compensation (including, if applicable, withholding of income taxes and the payment and withholding of social security and other payroll taxes), workers' compensation, disability benefits and the like of its personnel to the extent applicable to the personnel involved. Consultant represents and warrants that it is in full compliance with all immigration laws, including but not limited to the Immigration Reform and Control Act of 1986 ("IRAC"). Unless expressly set forth herein to the contrary, to the extent that either party's consent is required/requested hereunder, such consent shall not be unreasonably withheld or delayed.  This Agreement shall inure to the benefit of and be binding upon the parties and their respective successors and assigns; provided however, that this Agreement may not be assigned by either party without the prior written consent of the other. Written notices contemplated by this Agreement shall be sent (i) if to Merchant, in person, or by certified or registered U.S. mail, or by nationally recognized overnight delivery service, postage prepaid, such notice being deemed to have been given three (3) business days after the date of mailing, or one (1) business day after the date of mailing if sent via overnight delivery, to Attn: SVP Store Operations, TSA Stores, Inc., 1050 W. Hampden Ave., Englewood, Colorado 80110, with a copy to Attn: Legal Department at the same address, or by email to Douglas Garrett at dgarrett@sportsauthority.com, Brian Martin at blmartin@sportsauthority.com, Jeremy Graves at jgraves@gibsondunn.com, and Adrian Frankum at adrian.frankum@fticonsulting.com ; and (ii) if to Consultant, by email  to Michael Chartock at mchartock@gordonbrothers.com *and* to Daniel Kane at dkane@TigerGroupLLC.com.

Very truly yours,
**Gordon Brothers Retail Partners, LLC**

By:  _____

Print Name and Title: _____


**Tiger Capital Group, LLC**

By:  _____

Print Name and Title:

                                          Agreed and Accepted:
                                          **TSA Stores, Inc.**

                                          By:  _____
                                          Print Name and Title:

Exhibits:
A          Initial Budget of Consultant Controlled Expenses

9

(B)    This Agreement constitutes the entire agreement between the parties with respect to the matters contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect thereto.  This Agreement may not be modified except in a written instrument executed by each of the parties hereto.  No consent or waiver by any party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party.  The failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.  Nothing contained in this Agreement shall be deemed to create any relationship between Merchant and Consultant other than that of Consultant as an independent contractor of Merchant, and it is stipulated that the parties are not partners or joint venturers in any way.  Consultant assumes full responsibility for the payment of all compensation (including, if applicable, withholding of income taxes and the payment and withholding of social security and other payroll taxes), workers' compensation, disability benefits and the like of its personnel to the extent applicable to the personnel involved. Consultant represents and warrants that it is in full compliance with all immigration laws, including but not limited to the Immigration Reform and Control Act of 1986 ("IRAC"). Unless expressly set forth herein to the contrary, to the extent that either party's consent is required/requested hereunder, such consent shall not be unreasonably withheld or delayed.  This Agreement shall inure to the benefit of and be binding upon the parties and their respective successors and assigns; provided however, that this Agreement may not be assigned by either party without the prior written consent of the other.  Written notices contemplated by this Agreement shall be sent (i) if to Merchant, in person, or by certified or registered U.S. mail, or by nationally recognized overnight delivery service, postage prepaid, such notice being deemed to have been given three (3) business days after the date of mailing, or one (1) business day after the date of mailing if sent via overnight delivery, to Attn: SVP Store Operations, TSA Stores, Inc., 1050 W. Hampden Ave., Englewood, Colorado 80110, with a copy to Attn: Legal Department at the same address, or by email to Douglas Garrett at dgarrett@sportsauthority.com, Brian Martin at blmartin@sportsauthority.com, Jeremy Graves at jgraves@gibsondunn.com, and Adrian Frankum at adrian.frankum@fticonsulting.com ; and (ii) if to Consultant, by email to Michael Chartock at mchartock@gordonbrothers.com *and* to Daniel Kane at dkane@TigerGroupLLC.com.

Very truly yours,
**Gordon Brothers Retail Partners, LLC**

By: _____

Print Name and Title:


**Tiger Capital Group, LLC**

By: ___ Daniel McCane _____

Print Name and Title: Daniel Kane


Agreed and Accepted:
**TSA Stores, Inc.**


By: _____
Print Name and Title:


Exhibits:
A        Initial Budget of Consultant Controlled Expenses

**Tiger Capital Group, LLC**

By: _____

Print Name and Title:


Agreed and Accepted:
**TSA Stores, Inc.**

By: _____

Print Name and Title:

Jeremy Aguilar - CFO      Michael Foss. CEO

Exhibits:

A        Initial Budget of Consultant Controlled Expenses

# The Sports Authority, Inc.
## Initial Budget of Consultant Controlled Expenses
### Exhibit A

| | |
|---|---|
| Est. Start Date | 2/22/2016 |
| Est. End Date | 6/6/2016 |
| # of Weeks | 15.0 |

| | |
|---|---|
| Total Est. Inv - Original Retail | 465,687,596 |
| Total Est. Inv - Current Retail | 349,473,015 |
| Total Est. Inv - Cost | 197,300,000 |

| $ |
|---|

**GB Expenses**

| | |
|---|---|
| Advertising | 4,800,000 |
| Supervision | 2,092,021 |
| Misc/Legal | 422,750 |
| **Total Expenses** | **7,314,771** |

**Notes:**
*Changes in inventory levels, sale term or other factors may affect the above expense budget.
* Advertising includes all in-store signage, media and other advertising necessary to conduct the sales, as well as customer transition materials.