## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SPORTS AUTHORITY HOLDINGS, INC., *et al.*,[1] | Case No. 16-_____ (___) |
| Debtors. | (Joint Administration Requested) |

## DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING DEBTORS TO PAY CERTAIN PREPETITION CLAIMS OF CRITICAL VENDORS

Sports Authority Holdings, Inc. and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") hereby move this Court (this "Motion") for entry of an interim order (the "Interim Order") and a final order (the "Final Order"), substantially in the forms annexed hereto as Exhibit A and Exhibit B, respectively, pursuant to sections 105(a), 363, 546(h), 1107, and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), (a) authorizing, but not directing, the Debtors, in their sole discretion, to pay certain prepetition claims of critical vendors in accordance with the procedures proposed in this Motion, (b) authorizing banks and other financial institutions to honor and process related checks and transfers, and (c) granting related relief.  In support of this Motion, the Debtors rely upon and incorporate by reference the *Declaration of Jeremy Aguilar in Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief* (the "First Day Declaration"), which was filed

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  Sports Authority Holdings, Inc. (9008); Slap Shot Holdings, Corp. (8209); The Sports Authority, Inc. (2802); TSA Stores, Inc. (1120); TSA Gift Card, Inc. (1918); TSA Ponce, Inc. (4817); and TSA Caribe, Inc. (5664).  The headquarters for the above-captioned Debtors is located at 1050 West Hampden Avenue, Englewood, Colorado 80110.

with the Court concurrently herewith.  In further support of this Motion, the Debtors respectfully

represent as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and

157, and the *Amended Standing Order of Reference* from the United States District Court for the

District of Delaware dated as of February 29, 2012.  This is a core proceeding pursuant to 28

U.S.C. § 157(b), and pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final

order by the Court in connection with this Motion to the extent that it is later determined that the

Court, absent consent of the parties, cannot enter final orders or judgments in connection

herewith consistent with Article III of the United States Constitution.  Venue is proper before

this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the

relief requested herein are sections 105(a), 363, 546(h), 1107, and 1108 of the Bankruptcy Code,

Bankruptcy Rules 6003 and 6004, and Local Rule 9013-1.

## BACKGROUND

**A.      General Background**

2.      On the date hereof (the "Petition Date"), each of the Debtors commenced a

voluntary case under chapter 11 of the Bankruptcy Code.  Pursuant to sections 1107(a) and 1108

of the Bankruptcy Code, the Debtors are continuing to manage their financial affairs as debtors

in possession.

3.      Contemporaneously herewith, the Debtors filed a motion seeking joint

administration of their chapter 11 cases (collectively, the "Chapter 11 Cases") pursuant to

Bankruptcy Rule 1015(b) and Local Rule 1015-1.  No trustee, examiner, or official committee of

unsecured creditors has been appointed in these Chapter 11 Cases.

4.      Information regarding the Debtors' history and business operations, capital structure and primary secured indebtedness, and the events leading up to the commencement of these Chapter 11 Cases, can be found in the First Day Declaration.

**B.      The Debtors' Critical Vendors**

**(i)      Background on Critical Vendors**

5.      In the ordinary course of business, the Debtors make payments to certain essential trade vendors and service providers (collectively, the "Critical Vendors")[2] on a regular basis.  If the Critical Vendors are not paid, their resulting unwillingness to continue to provide inventory and services to the Debtors could cause an interruption of the Debtors' businesses and jeopardize the viability of the Debtors' restructuring.

6.      For example, branded goods provided by certain of the Critical Vendors constitute a substantial portion of the Debtors' sales; customers rely on the Debtors' stores or website to provide these goods, in many cases on an in-season basis.  In fact, the sale of certain branded goods is the lifeblood of the Debtors' business, and a significant portion of the Debtors' customers shop with the Debtors for the sole purpose of purchasing these branded goods.  Thus, to the extent that such Critical Vendors stopped supplying their branded goods, the Debtors would suffer both a significant decline in revenues and an erosion of their customer base.  Any such interruption could have drastic consequences for the operations of the Debtors' business due to the unique nature of certain branded goods, a lack of alternative suppliers or service providers in many situations, or the amount of time and resources needed to identify and transition to alternative suppliers.  Such a supply interruption would negatively affect the Debtors' revenue and further strain the Debtors' liquidity.  Thus, to ensure a seamless transition

---

[2]      The identities of the Critical Vendors will be provided to the Office of the United States Trustee and any official committee of unsecured creditors appointed in the Chapter 11 Cases on a confidential basis.

into Chapter 11 and prevent significant harm to these estates, the Debtors seek the relief requested herein.

7.     The Debtors, in consultation with their advisors, have thoroughly reviewed their business relationships and identified certain vendors, the loss of whose particular goods or services would cause immediate and irreparable harm to the Debtors' business.  In identifying Critical Vendors, the Debtors generally considered the following criteria: (a) whether sales of the branded goods of a particular vendor constitute a substantial portion of the Debtors' sales revenue; (b) whether the vendor would be prohibitively expensive or time-consuming to replace; and (c) whether the vendor is a sole-source or limited-source supplier of goods or services of the quality and quantity required by the Debtors in a particular market, without whom the Debtors could not continue to operate without disruption.

8.     The Debtors also considered the financial condition of their vendors and service providers to the extent such information was known, including each vendor's or supplier's level of dependence on the Debtors' continued business and whether such vendor or supplier is itself financially distressed.  In addition, the Debtors considered the extent to which a potential Critical Vendor has any existing assurance of payment.  For instance, some vendors have a letter of credit posted in their favor by the Debtors.  Accordingly, the Critical Vendors identified by the Debtors are vendors who ship merchandise on an "open account" basis and not under a contract through which the Debtors could otherwise seek to compel performance under section 362 of the Bankruptcy Code.  Finally, the Debtors also considered the need for a particular vendor's merchandise to be in stock during the applicable season because, as its customers know, Sports Authority's merchandise is in-season and it is imperative that the appropriate merchandise be

available during the correct season just as it is available in competitors' stores or on competitors' websites.

##### 2.    Categories of Critical Vendors

9.    The Debtors' Critical Vendors generally fall into one or more of the following categories.

10.    **Brand Name Providers**.  In-season brand-name merchandise is the lifeblood of the Debtors' business.  Accordingly, certain Critical Vendors are essential to the Debtors' day-to-day operations because they provide one-of-a-kind specialty brands whose products the Debtors' customers expect to be able purchase at the Debtors' stores or online and because obtaining a replacement source for the merchandise would be impossible or entail substantial delay or significantly increased costs.  Indeed, the sales of such Critical Vendors' branded goods comprise a substantial portion of the Debtors' revenues.  In 2015, branded goods of the Debtors' top ten vendors accounted for approximately 53% of total sales.  If the Debtors are unable to continue selling these brand name goods, they will suffer an extreme erosion in their customer base to the detriment of all parties in interest.

11.    **Private Label Suppliers**.  Certain of the Critical Vendors produce specialized sporting goods and apparel that the Debtors sell under their own private labels.  These Critical Vendors employ specialized processes, including for example, the use of custom-built molds for producing the Debtors' private label goods.  The private label suppliers are critical to the Debtors' success because the goods they produce are typically sold at a higher margin than other goods that are sold in the Debtors' stores.  And, they cannot be replaced in a timely fashion because any replacement vendor would take months to begin producing products.

01:18375816.1

12.     **Foreign Vendors**.  Certain of the Debtors' Critical Vendors lack minimum
contacts with the United States and, thus, may not be subject to the jurisdiction of the Court.
Many of these vendors have long-standing relationships with the Debtors and provide unique or
customized goods and services that cannot be obtained from other sources without significant
delay and cost.  Based on the substantial experience of the Debtors' management in the industry
and their knowledge of the foreign vendors, the Debtors believe there is a significant risk that the
foreign vendors may consider themselves beyond the jurisdiction of this Court, disregard the
automatic stay, and engage in conduct that would disrupt the Debtors' operations.  Indeed,
among other things, foreign vendors may exercise self-help (if permitted under local law), which
could include reclaiming vital goods already in the Debtors' possession at foreign ports and
shutting down the Debtors' access to essential goods and services needed for the Debtors'
business.

13.     **Consignment Vendors**.  A number of the Debtors' Critical Vendors supply
inventory to the Debtors on consignment.  To the extent that these Critical Vendors have
properly filed U.C.C.-1 financing statements, their claims are likely secured by inventory in the
Debtors' possession and/or the proceeds generated by the sale thereof.  What's more, to the
extent that these Critical Vendors provided prior notice of their security interests in the
applicable inventory to the Debtors' other secured lenders, their security interests likely have
priority over all other security interests in the applicable inventory and/or the proceeds generated
by the sale thereof.  Thus, to the extent these consignment vendors are paid pursuant to the
authority requested in this Motion, the Debtors' unsecured creditors will not be further impaired.

14.     **Support Vendors**.  Certain of the Debtors' vendors produce and deliver essential
services related to the Debtors' advertising and promotional materials, provide certain services

related to the Debtors' e-commerce activities, or deliver services to the Debtors' store operations. Many of these vendors cannot be quickly or easily replaced and are therefore critical to the Debtors' operations.

**(iii)    Nature and Necessity of Relief**

15.    The Debtors seek authority to pay prepetition claims held by Critical Vendors (the "Critical Vendor Claims") in an amount up to $15 million on an interim basis and $30 million on a final basis.   In addition, the Debtors seek authority on an interim basis to return up to $11.4 million in merchandise that was supplied by certain Critical Vendors (the "RTVs").

16.    Prior to the Petition Date and in the ordinary course of business, the Debtors returned unsold goods to certain vendors in exchange for a credit of up to the amount that the Debtors paid for the goods in question.  The return-to-vendor program allows the Debtors to move unsold merchandise in order to clear space for new merchandise that is likely to be more appealing to their customers.  For example, in light of the unseasonably warm winter that much of the country experienced, the Debtors have a surplus of winter outerwear.  By effectuating the RTVs, the Debtors will be able to clear space for new merchandise, all consistent with that past practice.  What's more, the RTVs are a non-cash currency that can be used to secure critical postpetition goods and services on credit, without any immediate cash outlay, and thereby improve the Debtors' liquidity.  The credit that the Debtors receive for the RTVs will be as agreed between the Debtors and the applicable Critical Vendor.

17.    The Debtors are seeking authority to pay and/or send RTVs only to Critical Vendors that agree to supply goods or services to the Debtors on the most favorable terms and practices (including any pricing related terms such as allowances, rebates, or discounts) that

existed in the one (1) year period prior to the Petition Date between such Critical Vendor and the relevant Debtor, as determined by the Debtors (the "Customary Trade Terms").

18.     If any Critical Vendor accepts payment on account of a prepetition obligation of the Debtors (in cash or in kind via the RTVs) and thereafter does not continue to provide goods or services to the Debtors on Customary Trade Terms, any payments made will be deemed an avoidable postpetition transfer under section 549 of the Bankruptcy Code and, therefore, will be recoverable by the Debtors in cash upon written request.  Upon recovery by the Debtors, the claim will be reinstated as a prepetition claim in the amount so recovered.

19.     To ensure that the Critical Vendors understand the terms upon which they are accepting payment of their Critical Vendor Claims, and as a condition to receiving payment of any of their Critical Vendor Claims (in cash or in kind via the RTVs), the Debtors propose to send a Trade Agreement (as defined below) to each Critical Vendor, which will be countersigned by such Critical Vendor.  The Debtors will maintain a record of: (a) the name of each Critical Vendor paid on account of prepetition Critical Vendor Claims, (b) the amount paid to each Critical Vendor, and (c) the goods or services provided by such Critical Vendor.

20.     The continued availability of trade credit in amounts and on terms consistent with those that the Debtors enjoyed prepetition is essential for the Debtors to maintain liquidity for operations and preserve the customer base and vendor network that is essential to the Debtors' efforts to maximize the value of their estates.  The Debtors believe that preserving working capital through the retention or reinstatement of Customary Trade Terms will enable the Debtors to maintain their competitiveness and to maximize the value of their businesses.  Conversely, a deterioration of trade credit and disruption or cancellation of deliveries of goods and services

would hinder the Debtors' operations and undermine their ability to generate revenue and ultimately to maximize the value of these estates.

21.     Additionally, the relief requested herein also may help avoid the institution and prosecution of numerous reclamation claims, suits and motions that would disrupt and distract the Debtors' efforts to maximize the value of these estates.

22.     Simply put, failure to pay prepetition claims owed to Critical Vendors could irreparably damage the Debtors, their estates, their creditors and other parties in interest and undermine the prospects for a value maximizing process.  Without customary trade credit terms, the Debtors could lose an inexpensive and existing source of financing.  Indeed, failure to pay Critical Vendor Claims may result in Critical Vendors ceasing to do business with the Debtors altogether.

## RELIEF REQUESTED

23. The Debtors seek entry of the Interim Order and the Final Order authorizing the Debtors to pay, in their discretion, Critical Vendor Claims in the amount of up to $30 million in the aggregate.[3]  Specifically, the Debtors seek authority, (a) upon entry of the Interim Order, to (x) pay up to an aggregate amount of $15 million (the "Interim Claims Cap") on account of such Critical Vendor Claims and (y) return up to $11.4 million in merchandise that was supplied by certain Critical Vendors via the RTVs  and (b) upon entry of the Final Order, to pay up to the aggregate amount of $30 million (with the Interim Claims Cap, the "Vendor Claims Caps") on account of such Critical Vendor Claims.

---

[3]    The Debtors reserve the right to seek to increase the Vendor Claims Cap if necessary, subject to this Court's approval and the consent of Wilmington Savings Fund Society, FSB (the "Term Loan Agent") as Administrative Agent and Collateral Agent under the Amended and Restated Credit Agreement, dated as of May 3, 2006 and amended and restated as of November 16, 2010.   Any dispute among the Debtors and the Term Loan Agent with respect to increasing the Vendor Claims Cap prior to the final hearing on this Motion shall be resolved by order of this Court, subject to notice and hearing.

24.     The Debtors propose to condition the payment of all Critical Vendor Claims and all RTVs on the agreement of each individual Critical Vendor to continue supplying goods and/or services to the Debtors on terms that are consistent with the Customary Trade Terms between the parties.  However, the Debtors reserve the right to negotiate different trade terms with any Critical Vendor, as a condition to payment of any Critical Vendor Claim, to the extent the Debtors determine that such trade terms are (a) necessary to procure essential goods and/or services or (b) otherwise in the best interests of the Debtors' estates.

25.     The Debtors propose to send a letter to the Critical Vendors, along with a copy of the Interim or Final Order, setting forth the following information and proposing the following terms as a basis for the parties' post-petition trade relationship (the "Trade Agreement"):

a.     The amount of the Critical Vendor Claims that the Debtors agree to pay and the dates when the Debtors shall make such payments, and the dollar amount of RTVs the Debtors propose to return to the Critical Vendor for a credit against the Critical Vendor Claims (including the amount of the credit) and the dates when such goods shall be shipped by the Debtors to the Critical Vendor.  In the event that the Debtors fail to make any of such payments when due, or fail to deliver to the Debtor the RTVs by the date specified for such shipment to the Critical Vendor, either because the Bankruptcy Court does not authorize the Debtor to make such payments or return such goods in a Final Order or for any other reason, the Critical Vendor shall have no further obligation to provide goods or services to the Debtors;

b.     The Critical Vendor's agreement to be bound by the Customary Trade Terms (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, return to vendor allowances, entitlements, rebates, coupon reconciliation, normal product mix and availability, and other applicable terms and programs) favorable to the Debtors and in effect between such Critical Vendor and the Debtors on a historical basis within one (1) year of the Petition Date, or such other trade terms as mutually agreed to by the Debtors and such Critical Vendor;

c.     The Critical Vendor's agreement to provide goods and/or services to the Debtors based upon Customary Trade Terms, and the Debtors' agreement to pay the Critical Vendor in accordance with such terms;

d.     The Critical Vendor agrees to permit the Debtors, in their sole discretion, to reduce the size of existing purchase orders, and to continue to provide such goods

and/or services to the Debtors based upon Customary Trade Terms notwithstanding any such reduction.

e.    The Critical Vendor's agreement not to file or otherwise assert against any of the Debtors, their estates, or any of their respective assets or property (real or personal) any lien (a "<u>Lien</u>") (regardless of the statute or other legal authority upon which such Lien is asserted) related in any way to any remaining prepetition amounts allegedly owed to the Critical Vendor by the Debtors arising from goods and/or services provided to the Debtors prior to the Petition Date.  To the extent the Critical Vendor has previously obtained such a Lien, the Critical Vendor shall immediately take all necessary actions to release such Lien;

f.    The Critical Vendor's acknowledgment that it has reviewed the terms and provisions of the Interim Order or, if entered, the Final Order, and consents to be bound thereby;

g.    The Critical Vendor's agreement that it will not separately assert or otherwise seek payment of any reclamation claims;

h.    The Critical Vendor's agreement that nothing in the Trade Agreement grants an allowed claim with respect to any unpaid amounts, and that the Critical Vendor retains responsibility to file a timely proof of claim with respect to any amounts that are alleged to remain unpaid;

i.    The Critical Vendor's acknowledgement that, if it subsequently refuses to supply goods and/or services to the Debtors on Customary Trade Terms, the Debtors reserve all rights to recover sums paid in excess of post-petition obligations in the event a Trade Agreement is terminated;

j.    The Debtors' acknowledgement that if the Debtors fail to pay for goods or services delivered postpetition according to Customary Trade Terms or on other terms agreed to by the Debtors and the Critical Vendor, and the Debtors fail to cure such default within ten (10) days after receiving notice of such default, the Critical Vendor shall have the right to terminate the Trade Agreement, in which event the Critical Vendor shall have no obligation to (i) continue to provide goods or services to the Debtors, or (ii) return to the Debtors amounts or RTV goods received from the Debtors in payment of the Critical Vendor Claims; and

k.    The Critical Vendor's agreement to keep the existence and terms of its Trade Agreement confidential and to not disclose either the existence of such Trade Agreement or the terms thereof to any person or entity, except to the extent required by applicable law or for financial reporting purposes, and except that the Critical Vendor may disclose such information to its employees, accountants, attorneys, advisors and other representatives as necessary in connection with the ordinary conduct of its business (so long as such employees, accountants, attorneys, advisors and other representatives agree to or are bound by contract to keep such information confidential).

01:18375816.1

Once agreed to and accepted by a Critical Vendor, the Trade Agreement shall govern the parties' post-petition trade relationship.

26.     The Debtors hereby seek authority to enter into Trade Agreements with the Critical Vendors to the extent that the Debtors determine, in their discretion, that such agreements are necessary to their postpetition operations.  In the event the Debtors do not or are unable to enter into a Trade Agreement with any Critical Vendor, however, the Debtors nevertheless seek authority to pay such vendor's Critical Vendor Claim or provide such vendor with RTVs if the Debtors determine, in their sole discretion, that such payment is necessary to prevent irreparable harm to the Debtors' business operations.  For those Critical Vendors that have agreed to provide goods and/or services to the Debtors on terms different from their Customary Trade Terms, the Debtors reserve the right to seek written acknowledgment of such terms on a case-by-case basis.

27.     Unless otherwise specified in a Trade Agreement, if a portion of a Critical Vendor's Claims are entitled to be treated as an administrative expense claim under section 503(b)(9) of the Bankruptcy Code, and a portion of the Critical Vendor's Claims are not entitled to such administrative expense treatment, all payments made by the Debtors and goods returned under the RTV program shall be applied first to reduce the portion of such Critical Vendor Claims that are not entitled to section 503(b)(9) priority.

28.     If a Critical Vendor fails to comply with any Trade Agreement, or, in the event that a Trade Agreement is terminated, the Debtors reserve all rights to recover sums paid in excess of post-petition obligations owing to the particular vendor.

29.     The Debtors also seek entry of an order authorizing banks and other financial institutions to receive, process, honor, and pay checks or electronic transfers used by the Debtors

01:18375816.1

to pay the foregoing and to rely on the representations of such Debtors as to which checks are issued and authorized to be paid in accordance with this Motion.

## BASIS FOR RELIEF REQUESTED

**A.      Payment of the Critical Vendor Claims is Warranted Pursuant to Sections 105(a) and 363 of the Bankruptcy Code**

30.      The Court may authorize payment of the Critical Vendor Claims pursuant to section 363 of the Bankruptcy Code.  Section 363(b)(1) of the Bankruptcy Code provides that a debtor may "after notice and a hearing, use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  A debtor's decision to use, sell, or lease assets outside the ordinary course of business must be based upon the sound business judgment of that debtor. *See Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. LTV Co. (In re Chateaugay Corp.)*, 973 F.2d 141, 143 (2d Cir. 1992) (holding that a court determining an application pursuant to section 363(b) must find from the evidence a good business reason to grant such application); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (standard for determining a section 363(b) motion is whether the debtor has a "good business reason" for the requested relief); *In re James A. Phillips, Inc.*, 29 B.R. 391, 397 (S.D.N.Y. 1983) (authorizing a contractor to pay prepetition claims of some suppliers who were potential lien claimants pursuant to section 363 because the payments were necessary for the general contractors to release funds owed to the debtors).  "Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

31.     Numerous courts have also used their section 105(a) equitable powers under the necessity of payment doctrine to authorize payment of a debtor's prepetition obligations where, as here, such payment is necessary to effectuate the "paramount purpose" of chapter 11 reorganization, which is to prevent the debtor from going into liquidation and to preserve the going concern value of the Debtors.  *See, e.g.*, *In re Lehigh Co. & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) ("[T]he necessity of payment doctrine . . . [permits] immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims shall have been paid." (citation omitted)).  This doctrine "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor," which is consistent with a paramount goal of chapter 11: "facilitating the continued operation and rehabilitation of the debtor."  *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989).  *See also In re Just For Feet, Inc.*, 242 B.R. 821, 825 (Bankr. D. Del. 1999) (collecting cases); *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 939 (Bankr. D. Del. 1992) (recognizing that "[i]f payment of a prepetition claim 'is essential to the continued operation of [the debtor], payment may be authorized").

32.     As discussed above, branded goods of the Debtors' top vendors are crucial to the Debtors' business, branded goods from the Debtors' top ten vendors accounting for approximately 53% of the Debtors' 2015 sales.  Where, as here, the continued ability of the Debtors to provide in-season brand name merchandise is critical to the viability of the enterprise, courts have readily granted relief similar to that sought by the Debtors through the instant motion. *See, e.g.*, *In re Just For Feet*, 242 B.R. at 825 ("Clearly, Just For Feet cannot survive unless it has name brand sneakers and athletic apparel to sell in its stores. The Debtors need a

continuous supply of inventory from [name-brand] athletic footwear and apparel vendors . . . .

Therefore, the court finds that payment of the prepetition claims of . . . the athletic footwear and

apparel vendors [] is essential to the survival of the debtor during the chapter 11

reorganization."); *In re Jeans.com, Inc.*, 502 B.R. 250 (Bankr. D.P.R. 2013) (citing *Just For Feet*

and granting a motion to pay critical vendors, acknowledging the importance to the debtors of

providing certain fashions and high-quality merchandise to the Puerto Rican market); *In re*

*Tropical Sportswear Int'l Corp.*, 320 B.R. 15, 18 (Bankr. M.D. Fla. 2005) (granting a motion to

pay the claims of several major suppliers who "provide[d] the Debtors with certain unique, high-

quality products and services.").

33.      The Debtors respectfully submit that similar relief is warranted in these Chapter

11 Cases.  As noted in the First Day Declaration, certain Critical Vendors have implicitly

informed the Debtors that they may cease doing business with the Debtors or fundamentally

change their terms of dealing with the Debtors if they are not granted Critical Vendor status to

assure that their prepetition claims will be paid.  Such a disruption could cripple the Debtors'

ability to successfully maximize value for all interested parties, particularly given the business's

dependency on maintaining a continuous supply of in-season brand name goods.

34.      As the foregoing authority provides, where the ability to promptly pay prepetition

claims of critical vendors is necessary to prevent disruption to a debtor's business operations,

courts are fully empowered to authorize such payments.  Further, the satisfaction of the

prepetition claims of the Critical Vendors will enable the Debtors to preserve the value of their

estates and safeguard the confidence and goodwill of their suppliers, service providers, and

customers.  Without the requested relief, which is based on a rational exercise of the Debtors'

business judgment, the Debtors' efforts to maximize the value of these estates will be

jeopardized.  The relief requested in this Motion contemplates the payment of Critical Vendor

Claims of those Critical Vendors who agree to provide postpetition goods to the Debtors on

Customary Trade Terms or other terms acceptable to the Debtors, and is therefore consistent

with and appropriate under sections 105 and 363 of the Bankruptcy Code.

35.    As detailed above, maintaining the goods and services provided by the Critical

Vendors is vital to the Debtors' continuing business operations and the success of these Chapter

11 Cases.  In addition, and as also detailed above, the Debtors have conducted an extensive

analysis and review of the Debtors immediate trade needs and supplier base and have concluded

that there is a significant risk that the Critical Vendors will cease doing business with the Debtors

unless their Critical Vendor Claims are paid.  Should any Critical Vendor stop supplying goods

or services to the Debtors, or choose to significantly downgrade the Debtors' trade terms, their

business would be adversely affected as a result of, among other things, an adverse impact on the

Debtors' ability to meet the demands of their customers which in turn, would result in customers

seeking products elsewhere and significant lost revenue.  As such, the Debtors submit that the

amount of the Vendor Claims Cap pales in comparison to the likely damage to the Debtors'

business and estates should the relief requested herein not be granted.  In light of the foregoing,

the Debtors submit that payment of the Critical Vendor Claims is plainly in the best interests of

their estates and creditors.

36.    Additionally, the Debtors' calculation of the Vendor Claims Cap is also

reasonable.  To determine the amount of the Vendor Claims Cap, the Debtors considered, among

other things, which vendors/service providers: (a) are absolutely needed to continue to operate

without disruption; (b) would be prohibitively expensive or difficult to replace under the

circumstances; and (c) would present an unacceptable risk to the Debtors' business should they

threaten to discontinue providing services or supplies postpetition.  The Debtors also considered

the financial condition of the vendors/service providers to the extent such information was

known, including each vendor's/supplier's level of dependence on the Debtors' continued

business and whether such vendor/supplier is itself financially distressed.  In addition, the

Debtors reviewed to what extent a vendor being considered for the status of a Critical Vendor

otherwise has an assurance of payment and ruled out vendors that are parties to merchandise

supply agreements.  Finally, the Debtors considered the need for a particular vendor's

merchandise to be in stock during the correct season.  Once the Debtors gathered this

information, they estimated the amounts that would be required to pay each Critical Vendor to

ensure the continued supply of goods and services.  The Vendor Claims Cap comprises this

estimated amount.  Therefore, the Debtors respectfully submit that payment of the Critical

Vendor Claims up to the Vendor Claims Cap and the other relief sought herein is fully justified

pursuant to sections 105 and 363 of the Bankruptcy Code as well as the "doctrine of necessity."

37.     The critical goods and services provided by the Critical Vendors are vital to the

Debtors' continuing business operations and ability to maximize estate assets.  If the relief

sought in this Motion is not granted, Critical Vendors may assert their considerable leverage and

deny the Debtors essential goods and services going forward.  Accordingly, in the Debtors'

business judgment, the payment of the Critical Vendor Claims as set forth herein is necessary to

prevent the immediate and irreparable harm that would arise from a disruption to the Debtors'

business operations.

**B.      The Court May Also Authorize Payment of the Critical Vendor Claims as a Valid
Exercise of the Debtors' Fiduciary Duties**

38.     The Debtors, operating their businesses as debtors in possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding the bankruptcy

estate[s] and operating the business for the benefit of [their] creditors and (if the value justifies)

equity owners." *In re CoServ*, 273 BR. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the duties

of a chapter 11 debtor in possession is the duty "to protect and preserve the estate, including

operating business's going-concern value." *Id.*

39.     It has been noted that there are instances in which a debtor in possession can

fulfill its fiduciary duty "only by the preplan satisfaction of a prepetition claim." The *CoServ*

court specifically noted that pre-plan of reorganization satisfaction of prepetition claims would

be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a

substantial enhancement of the estate" and also when the payment was to "sole suppliers of a

given product." *Id.* at 497-98. The court provided a three-pronged test for determining whether a

preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary

duty:

> First, it must be critical that the debtor deal with the claimant.
> Second, unless it deals with the claimant, the debtor risks the
> probability of harm, or, alternatively, loss of economic advantage
> to the estate or the debtor's going concern value, which is
> disproportionate to the amount of the claimant's prepetition claim.
> Third, there is no practical or legal alternative by which the debtor
> can deal with the claimant other than by payment of the claim.

*Id.* at 498.

40.     Payment of the Critical Vendor Claims meets the test set forth in *CoServ*. As

described above, the Debtors have narrowly tailored the Vendor Claims Cap to encompass only

those Critical Vendors which are essential to the business and operation of each of the Debtors'

businesses. Any interruption of the Debtors' operations could cost the Debtors' estates hundreds

of thousands of dollars in lost revenues, and could cause the Debtors to lose a significant amount

of customers. The harm that would stem from the failure to pay any of the Critical Vendors

greatly outweighs the amount of the prepetition claims that the Debtors are seeking to pay

hereunder.  Moreover, with respect to each Critical Vendor, the Debtors have examined other options short of payment of such Critical Vendor Claims and have determined that to avoid significant disruption of the Debtors' business operations, there exists no practical or legal alternative to payment of the Critical Vendor Claims.  Therefore, the Debtors can only meet their fiduciary duties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code by payment of the Critical Vendor Claims.  Accordingly, the Court should grant the relief requested herein.

**C.      The Debtors Should be Authorized to Effectuate the RTVs**

41.      Prior to the Petition Date and in the ordinary course of business, the Debtors returned unsold goods to certain vendors in exchange for a credit in an amount up to the amount that the Debtors paid for the goods in question.  The return-to-vendor program allows the Debtors to move unsold merchandise in order to clear space for new merchandise that is likely to be more appealing to their customers.  For example, in springtime the Debtors might return unsold winter coats and re-purchase running shorts.

42.      In addition to paying a portion of their prepetition claims in cash, the Debtors propose to satisfy a portion of the prepetition claims of certain Critical Vendors via the RTVs (*i.e.*, returning goods to the Critical Vendors).  This course of action is consistent with the Debtors' prepetition practice and will enable the Debtors to clear space for new merchandise consistent with that past practice.  What's more, the RTVs are a non-cash currency that can be used to secure critical postpetition goods and services on credit, without any immediate cash outlay, and thereby improve the Debtors' liquidity.

43.      Section 546(h) of the Bankruptcy Code explicitly authorizes a chapter 11 debtor to return goods that were shipped to the debtor prior to the commencement of the chapter 11 case.  Although section 546(h) contemplates that the return of goods should be subject to the

01:18375816.1

prior rights of holders of security interests in such goods, upon information and belief, each of

the Debtors' lenders with a security interest in the applicable goods has consented to the

Debtors' return of the applicable goods free and clear of their liens.  And, the Debtors will only

effectuate the RTVs where the applicable vendor consents to receive the RTV in satisfaction of

all or some of its prepetition claim.  Accordingly, the Debtors respectfully request that the Court

authorize the Debtors to effectuate the RTVs.

**D.      The Court Should Authorize Applicable Banks to Honor Checks and Electronic Fund Transfers in Accordance with the Motion**

44.      In connection with the foregoing, the Debtors respectfully request that the Court

(a) authorize all applicable banks and other financial institutions (collectively, the "Banks") to

receive, process, honor, and pay all checks and transfers issued by the Debtors in accordance

with this Motion, without regard to whether any checks or transfers were issued before or after

the Petition Date; (b) provide that all Banks may rely on the representations of the Debtors with

respect to whether any check or transfer issued or made by the Debtors before the Petition Date

should be honored pursuant to this Motion (such banks and other financial institutions having no

liability to any party for relying on such representations by the Debtors provided for herein); and

(c) authorize the Debtors to issue replacement checks or transfers to the extent any checks or

transfers that are issued and authorized to be paid in accordance with this Motion are dishonored

or rejected by the Banks.

**E.      Immediate Relief is Justified**

45.      Pursuant to Bankruptcy Rule 6003, the Court may grant relief within 21 days after

the filing of the petition regarding a motion to "use, sell, lease, or otherwise incur an obligation

regarding property of the estate" only if such relief is necessary to avoid immediate and

irreparable harm.  Fed. R. Bankr. P. 6003(b).  Immediate and irreparable harm exists where the

absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001).

46.     Moreover, Bankruptcy Rule 6003 authorizes the Court to grant the relief requested herein to avoid harm to the Debtors' customers and other third parties. Unlike Bankruptcy Rule 4001, Bankruptcy Rule 6003 does not condition relief on imminent or threatened harm to the estate alone. Rather, Bankruptcy Rule 6003 speaks of "immediate and irreparable harm" generally. *Cf.* Fed. R. Bankr. P. 4001(b)(2), (c)(2) (referring to "irreparable harm to the estate"). Indeed, the "irreparable harm" standard is analogous to the traditional standards governing the issuance of preliminary junctions. *See* 9 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 4001.07[b][3] (16th ed.) (discussing source of "irreparable harm" standard under Rule 4001(c)(2)). Courts will routinely consider third-party interests when granting such relief. *See, e.g., Capital Ventures Int'l v. Argentina*, 443 F.3d 214, 223 n.7 (2d Cir. 2006); *see also Linnemeir v. Bd. of Trs. of Purdue Univ.*, 260 F.3d 757, 761 (7th Cir. 2001).

47.     As described herein and in the First Day Declaration, the Debtors will suffer immediate and irreparable harm without Court authorization to pay the Critical Vendor Claims.

48.     Accordingly, Bankruptcy Rule 6003 has been satisfied and the relief requested herein should be granted.

## <u>REQUEST FOR WAIVER OF STAY</u>

49.     To implement the foregoing, the Debtors seek a waiver of any stay of the effectiveness of the order approving this Motion. Pursuant to Bankruptcy Rule 6004(h), any "order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." The Debtors

submit that the relief requested in this Motion is necessary to avoid immediate and irreparable

harm to the Debtors for the reasons set forth herein.  Accordingly, the Debtors submit that ample

cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h).

50.    To implement the foregoing immediately, the Debtors respectfully request a

waiver of the notice requirements of Bankruptcy Rule 6004(a) to the extent they are deemed to

apply.

## DEBTORS' RESERVATION OF RIGHTS

51.    Nothing contained herein is intended or should be construed as an admission of

the validity of any claim against the Debtors; a waiver of the Debtors' rights to dispute any

claim; or an approval, assumption, or rejection of any agreement, contract, or lease under section

365 of the Bankruptcy Code.  The Debtors expressly reserve their rights to contest any invoice or

claim with respect to Critical Vendors in accordance with applicable law and to assume or reject

any agreements with such parties in accordance with the applicable provisions of the Bankruptcy

Code.  Likewise, if this Court grants the relief sought herein, any payment made pursuant to the

Court's order is not intended and should not be construed as an admission as to the validity of

any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## NOTICE

52.    The Debtors have provided notice of this Motion to: (a) the Office of the United

States Trustee for the District of Delaware; (b) holders of the 50 largest unsecured claims on a

consolidated basis against the Debtors; (c) Riemer & Braunstein LLP (attn: Donald Rothman) as

counsel for (i) Bank of America, N.A., in its capacity as Administrative Agent and Collateral

Agent under the Second Amended and Restated Credit Agreement, dated as of May 17, 2012,

and (ii) certain DIP Lenders under the Debtors' proposed postpetition financing facility; (d)

01:18375816.1

Brown Rudnick LLP (attn.: Robert Stark and Bennett Silverberg) as counsel for (i) Wilmington Savings Fund Society, FSB as Administrative Agent and Collateral Agent under the Amended and Restated Credit Agreement, dated as of May 3, 2006 and amended and restated as of November 16, 2010 and (ii) certain Term Lenders under the Amended and Restated Credit Agreement, dated as of May 3, 2006 and amended and restated as of November 16, 2010; (e) Choate, Hall & Stewart LLP (attn.: Kevin Simard) as counsel for (i) Wells Fargo Bank, National Association, in its capacity as FILO Agent under the Second Amendment to Second Amended and Restated Credit Agreement, dated as of November 3, 2015, and (ii) certain DIP Lenders under the Debtors' proposed postpetition financing facility; (f) O'Melveny & Meyers LLP (attn: John Rapisardi) as counsel for certain holders of 11.5% Senior Subordinated Notes Due February 19, 2018 under the Securities Purchase Agreement, dated as of May 3, 2006; (g) all holders of 11.5% Senior Subordinated Notes Due February 19, 2018 under the Securities Purchase Agreement, dated as of May 3, 2006; (h) the Banks; and (i) all parties that have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

*[Remainder of Page Intentionally Left Blank]*

01:18375816.1

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated:    March 2, 2016
          Wilmington, Delaware                 _/s/ Andrew L. Magaziner_____
                                               Michael R. Nestor (No. 3526)
                                               Kenneth J. Enos (No. 4544)
                                               Andrew L. Magaziner (No. 5426)
                                               YOUNG CONAWAY STARGATT & TAYLOR, LLP
                                               Rodney Square
                                               1000 North King Street
                                               Wilmington, Delaware 19801
                                               Telephone:  (302) 571-6600
                                               Facsimile:  (302) 571-1253
                                               mnestor@ycst.com
                                               kenos@ycst.com
                                               amagaziner@ycst.com

                                               -and-

                                               Robert A. Klyman (CA No. 142723)
                                               Matthew J. Williams (NY No. 3019106)
                                               Jeremy L. Graves (CO No. 45522)
                                               Sabina Jacobs (CA No. 274829)
                                               GIBSON, DUNN & CRUTCHER LLP
                                               333 South Grand Avenue
                                               Los Angeles, CA 90071-1512
                                               Telephone: (213) 229-7000
                                               Facsimile: (213) 229-7520
                                               rklyman@gibsondunn.com
                                               mjwilliams@gibsondunn.com
                                               jgraves@gibsondunn.com
                                               sjacobs@gibsondunn.com

                                               *Proposed Counsel to the Debtors and
                                               Debtors in Possession*

01:18375816.1

24

**EXHIBIT A**

**PROPOSED INTERIM ORDER**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SPORTS AUTHORITY HOLDINGS, INC., *et al.*,[1] | Case No. 16-_____ (___) |
| Debtors. | (Jointly Administered) |
| | Ref. Docket No. ____ |

## INTERIM ORDER AUTHORIZING DEBTORS TO
## PAY CERTAIN PREPETITION CLAIMS OF CRITICAL VENDORS

Upon the *Debtors' Motion for Interim and Final Orders Authorizing Debtors to Pay Certain Prepetition Claims of Critical Vendors* (the "Motion")[2] filed by the above-captioned debtors and debtors in possession (collectively, the "Debtors"); the Court having reviewed the Motion and having heard the statements of counsel regarding the relief requested in the Motion at a hearing before the Court (the "Hearing"); and the Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012; and the Court having found that venue of these cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); and the Court having found that notice of the Motion has been given as set forth in the Motion and that such notice is adequate and no other or further notice need be given; and the Court having determined that it may enter a final order consistent with Article III of the United States Constitution; and the Court having considered the

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  Sports Authority Holdings, Inc. (9008); Slap Shot Holdings, Corp. (8209); The Sports Authority, Inc. (2802); TSA Stores, Inc. (1120); TSA Gift Card, Inc. (1918); TSA Ponce, Inc. (4817); TSA Caribe, Inc. (5664).  The headquarters for the above-captioned Debtors is located at 1050 West Hampden Avenue, Englewood, Colorado 80110.

[2]    All capitalized terms used and not defined herein shall have the meanings ascribed to them in the Motion.

01:18375816.1

First Day Declaration; and the Court having found that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and the Court having found that the relief sought in the Motion is in the best interests of the Debtors, their estates, their creditors and all other parties in interest; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED as set forth herein on an interim basis until such time as the Court conducts a final hearing on this matter (the "Final Hearing").

2.      The Final Hearing shall take place on _____, 2016 at __:__ _.m. (prevailing Eastern Time).  Any objections or responses to the Motion shall be filed on or before 4:00 p.m. (prevailing Eastern Time) _____, 2016 and served on the parties required by Local Rule 2002-1(b).

3.      The Debtors are authorized, but not directed, in the exercise of their reasonable business judgment, to pay Critical Vendor Claims in an amount not to exceed $15 million during the interim period from the date of this Interim Order until the date that a final order is entered in this matter, unless otherwise ordered by the Court.

4.      The Debtors are authorized, but not directed, in the exercise of their reasonable business judgment, to effectuate RTVs with a value not to exceed $11.4 million during the interim period from the date of this Interim Order until the date that a final order is entered in this matter, unless otherwise ordered by the Court.  For the avoidance of doubt, the authority granted in this paragraph 4 does not otherwise modify or reduce the Debtors' authority to pay Critical Vendor Claims in an amount not to exceed $15 million during the interim period, as provided in paragraph 3 hereof.

5.      The Debtors are authorized to pay (a) upon the entry of this Order, Critical Vendor Claims that are past-due as of the date of the entry of this Order, and (b) Critical Vendor Claims that are not past-due as of the date of the entry of this Order in the ordinary course of business when due, not on an accelerated basis; *provided*, *however*, that any Critical Vendor that accepts payment or RTVs pursuant to the authority granted in this Interim Order must agree to supply goods and services to the Debtors post-petition on Customary Trade Terms (as defined below) or on such other terms as are acceptable to the Debtors.

6.      Any Critical Vendor that accepts payment or RTVs pursuant to the authority granted in this Interim Order shall be deemed to (a) agree to the terms and provisions of this Interim Order and (b) have waived, to the extent paid, applicable prepetition claims against the Debtors, their assets and their properties.  Unless otherwise specified in a Trade Agreement, if a portion of a Critical Vendor's Claims are entitled to be treated as an administrative expense claim under section 503(b)(9) of the Bankruptcy Code, and a portion of the Critical Vendor's Claims are not entitled to such administrative expense treatment, all payments made by the Debtors and goods returned under the RTV program shall be applied first to reduce the portion of such Critical Vendor Claims that are not entitled to section 503(b)(9) priority.

7.      The Debtors may, in the exercise of their business judgment and after consultation with the Term Loan Agent,  enter into a Trade Agreement with an individual Critical Vendor on the terms other than those set forth in the Motion.

8.      The Debtors shall condition the payment of Critical Vendor Claims and the sending of RTVs on the agreement of the individual Critical Vendor to continue supplying goods and services to the Debtors on terms that are as or more favorable to the Debtors as the most favorable trade terms, practices, and programs in effect between the Critical Vendor and the

Debtors in the one (1) year period preceding the Petition Date (the "Customary Trade Terms"), or such other trade terms as are agreed to by the Debtors and the Critical Vendor.

9.      The Debtors may, in their sole discretion, declare a Trade Agreement with an individual Critical Vendor terminated, together with the other benefits to the Critical Vendor as contained in this Interim Order, on the date the Debtors deliver notice to the Critical Vendor that the Critical Vendor (a) has not complied with the terms and provisions of the Trade Agreement or (b) has failed to continue to provide Customary Trade Terms to the Debtors.

10.     If a Trade Agreement is terminated as set forth above or a Critical Vendor who has received payment of a prepetition claim later refuses to continue to supply goods and/or services to the Debtors on Customary Trade Terms during the pendency of these Chapter 11 Cases, the Debtors may then take any and all appropriate steps to cause such Critical Vendor to repay payments made to it on account of its pre-petition Trade Claim to the extent that such payments exceed the post-petition amounts then owing to such Critical Vendor.

11.     If the Debtors fail to pay for goods or services delivered postpetition according to Customary Trade Terms or on other terms agreed to by the Debtors and the Critical Vendor, and the Debtors fail to cure such default within ten (10) days after receiving notice of such default, the Critical Vendor shall have the right to terminate the applicable Trade Agreement, in which event the Critical Vendor shall have no obligation to (a) continue to provide goods or services to the Debtors, or (b) return to the Debtors amounts or RTV goods received from the Debtors in payment of the Critical Vendor Claims.

12.     The execution of a Trade Agreement by the Debtors shall not constitute a waiver of any cause of action, including any avoidance action that may be held by the Debtors.

13.     Nothing herein shall prejudice the Debtors' rights to request additional authority to pay Critical Vendor Claims in excess of $30 million in cash (plus the RTVs described in the Motion)  prior to or in connection with the Final Hearing; *provided*, *however*, that if the Term Loan Agent does not consent to such request, the Debtors shall file a motion seeking such request subject to notice and hearing .

14.     Each of the Banks is authorized to honor checks presented for payment and all fund transfer requests made by the Debtors, to the extent that sufficient funds are on deposit in the applicable accounts, in accordance with this Order and any other order of this Court.

15.     The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests in connection with any Critical Vendor Claims that are dishonored or rejected.

16.     Notwithstanding anything to the contrary contained herein, any payment to be made, or authorization contained, hereunder shall be subject to the requirements imposed on the Debtors under any approved order regarding post-petition financing and any budget in connection therewith.

17.     Nothing in the Motion or this Interim Order, or the Debtors' payment of any claims pursuant to this Interim Order, shall be deemed or construed as:  (a) an admission as to the validity of any claim or Lien against the Debtors or their estates; (b) a waiver of the Debtors' right to dispute any claim or Lien; (c) an approval or assumption of any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (d) an admission of the priority status of any claim, whether under section 503(b)(9) of the Bankruptcy Code or otherwise; or (e) a modification of the Debtors' rights to seek relief under any section of the Bankruptcy Code on account of any amounts owed or paid to any Critical Vendor.

01:18375816.1

18.     The Debtors shall maintain a matrix summarizing (a) the name of each Critical Vendor paid; (b) the amount paid to each Critical Vendor; (c) the type of goods or services provided by each Critical Vendor; and (d) other pertinent information.  The Debtors will provide a periodic reconciliation of the foregoing matrix to the Term Loan Agent.

19.     The Debtors shall not seek affirmative relief to pay any claim under section 503(b)(9) of the Bankruptcy Code without the consent of (a) Bank of America, N.A., as agent under that certain Second Amended and Restated Credit Agreement, dated as of May 17, 2012 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "ABL Credit Agreement") by and among The Sports Authority, Inc. and TSA Stores, Inc., as borrowers, Slap Shot Holdings Corp. and TSA Gift Card, Inc., as guarantors, Bank of America, N.A., as administrative agent, and the lenders party thereto, which provides up to $650 million in aggregate loans in the form of an asset-based revolving credit facility and matures on May 17, 2017; (b) Wells Fargo Bank, National Association, as FILO Agent under that certain Second Amendment to the ABL Credit Agreement by and among The Sports Authority, Inc. and TSA Stores, Inc. as borrowers, Slap Shot Holdings Corp. and TSA Gift Card, Inc., as guarantors, Bank of America, N.A. as administrative agent, Wells Fargo Bank, National Association, as FILO agent, the lenders under the ABL Credit Agreement, and the additional lenders party thereto, which provided for the addition to the ABL Credit Agreement of a $95 million first-in, last-out term loan tranche; (c) the Term Loan Agent; (d) Bank of America, N.A. as Administrative Agent and Collateral Agent (in such capacity, the "DIP Agent") under that certain Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "DIP Credit Agreement") by and among The Sports Authority, Inc. and TSA Stores, Inc., as borrowers,

Sports Authority Holdings, Inc., Slap Shot Holdings Corp., TSA Gift Card, Inc., TSA Ponce, Inc., and TSA Caribe, Inc., as guarantors, the DIP Agent, Wells Fargo Bank, National Association as FILO Agent, the revolving lender parties thereto, and the FILO lender parties thereto; and (e) Wells Fargo Bank, National Association, as FILO Agent under the DIP Credit Agreement.

20.     The requirements set forth in Bankruptcy Rule 6003(b) are satisfied.

21.     Notice of the Motion as provided therein shall be deemed good and sufficient and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

22.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order shall be immediately effective and enforceable upon its entry.

23.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Interim Order in accordance with the Motion.

24.     This Court shall retain jurisdiction over all matters arising from or related to the interpretation, implementation and enforcement of this Interim Order.

Dated: _____, 2016
      Wilmington, Delaware


                        _____
                        UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT B**

**PROPOSED FINAL ORDER**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SPORTS AUTHORITY HOLDINGS, INC., *et al.*,[1] | Case No. 16-_____ (___) |
| Debtors. | (Jointly Administered) |
| | Ref. Docket Nos. ___ & ___ |

**FINAL ORDER AUTHORIZING DEBTORS TO
PAY CERTAIN PREPETITION CLAIMS OF CRITICAL VENDORS**

Upon the *Debtors' Motion for Interim and Final Orders Authorizing Debtors to Pay Certain Prepetition Claims of Critical Vendors* (the "Motion")[2] filed by the above-captioned debtors and debtors in possession (collectively, the "Debtors"); the Court having reviewed the Motion and having heard the statements of counsel regarding the relief requested in the Motion at a hearing before the Court (the "Hearing"); and the Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated as of February 29, 2012; and the Court having found that venue of these cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); and the Court having found that notice of the Motion has been given as set forth in the Motion and that such notice is adequate and no other or further notice need be given; and the Court having determined that it may enter a final order consistent with Article III of the United States Constitution; and the Court having considered the

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  Sports Authority Holdings, Inc. (9008); Slap Shot Holdings, Corp. (8209); The Sports Authority, Inc. (2802); TSA Stores, Inc. (1120); TSA Gift Card, Inc. (1918); TSA Ponce, Inc. (4817); TSA Caribe, Inc. (5664).  The headquarters for the above-captioned Debtors is located at 1050 West Hampden Avenue, Englewood, Colorado 80110.

[2]    All capitalized terms used and not defined herein shall have the meanings ascribed to them in the Motion.

First Day Declaration; and the Court having previously entered the *Interim Order Authorizing Debtors to Pay Certain Prepetition Claims of Critical Vendors* [Docket No. ___] (the "Interim Order"); and the Court having found that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and the Court having found that the relief sought in the Motion is in the best interests of the Debtors, their estates, their creditors and all other parties in interest; and after due deliberation and sufficient cause appearing therefore,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED as set forth herein on a final basis.

2.      The Debtors are authorized, but not directed, in the exercise of their reasonable business judgment, to pay Critical Vendor Claims in an amount not to exceed $30 million in the aggregate (including amounts paid pursuant to the Interim Order), unless otherwise ordered by the Court; *provided*, *however*, that to the extent that the Debtors' aggregate cash payment of Critical Vendor Claims exceeds $15 million (or will exceed $15 million by virtue of a payment), the Debtors shall not pay any additional Critical Vendor Claims without the consent of the Term Loan Agent.

3.      The Debtors are authorized, but not directed, in the exercise of their reasonable business judgment, to effectuate RTVs with a value not to exceed $11.4 million in the aggregate (including amounts paid pursuant to the Interim Order), unless otherwise ordered by the Court. For the avoidance of doubt, the authority granted in this paragraph 3 does not otherwise modify or reduce the Debtors' authority to pay Critical Vendor Claims in an amount not to exceed $30 million during the pendency of the Chapter 11 Cases, as provided in paragraph 2 hereof.

4.      The Debtors are authorized to pay (a) upon the entry of this Order, Critical Vendor Claims that are past-due as of the date of the entry of this Order, and (b) Critical Vendor

Claims that are not past-due as of the date of the entry of this Order in the ordinary course of business when due, not on an accelerated basis; *provided*, *however*, that any Critical Vendor that accepts payment or RTVs pursuant to the authority granted in this Final Order must agree to supply goods and services to the Debtors post-petition on Customary Trade Terms (as defined below) or on such other terms as are acceptable to the Debtors.

5.      Any Critical Vendor that accepts payment or RTVs pursuant to the authority granted in this Final Order shall be deemed to (a) agree to the terms and provisions of this Final Order and (b) have waived, to the extent paid, applicable prepetition claims against the Debtors, their assets and their properties.  Unless otherwise specified in a Trade Agreement, if a portion of a Critical Vendor's Claims are entitled to be treated as an administrative expense claim under section 503(b)(9) of the Bankruptcy Code, and a portion of the Critical Vendor's Claims are not entitled to such administrative expense treatment, all payments made by the Debtors and goods returned under the RTV program shall be applied first to reduce the portion of such Critical Vendor Claims that are not entitled to section 503(b)(9) priority.

6.      The Debtors may, in their discretion and after consultation with the Term Loan Agent, enter into a Trade Agreement with an individual Critical Vendor on the terms set forth in the Motion and hereby incorporated by reference.

7.      The Debtors shall condition the payment of Critical Vendor Claims and the sending of RTVs on the agreement of the individual Critical Vendor to continue supplying goods and services to the Debtors on terms that are as or more favorable to the Debtors as the most favorable trade terms, practices, and programs in effect between the Critical Vendor and the Debtors in the one (1) year period preceding the Petition Date (the "Customary Trade Terms"), or such other trade terms as are agreed to by the Debtors and the Critical Vendor.

8.      The Debtors may, in their sole discretion, declare a Trade Agreement with an individual Critical Vendor terminated, together with the other benefits to the Critical Vendor as contained in this Final Order, on the date the Debtors deliver notice to the Critical Vendor that the Critical Vendor (a) has not complied with the terms and provisions of the Trade Agreement or (b) has failed to continue to provide Customary Trade Terms to the Debtors.

9.      If a Trade Agreement is terminated as set forth above or a Critical Vendor who has received payment of a prepetition claim later refuses to continue to supply goods and/or services to the Debtors on Customary Trade Terms during the pendency of these Chapter 11 Cases, the Debtors may then take any and all appropriate steps to cause such Critical Vendor to repay payments made to it on account of its pre-petition Trade Claim to the extent that such payments exceed the post-petition amounts then owing to such Critical Vendor.

10.      If the Debtors fail to pay for goods or services delivered postpetition according to Customary Trade Terms or on other terms agreed to by the Debtors and the Critical Vendor, and the Debtors fail to cure such default within ten (10) days after receiving notice of such default, the Critical Vendor shall have the right to terminate the applicable Trade Agreement, in which event the Critical Vendor shall have no obligation to (a) continue to provide goods or services to the Debtors, or (b) return to the Debtors amounts or RTV goods received from the Debtors in payment of the Critical Vendor Claims.

11.      The execution of a Trade Agreement by the Debtors shall not constitute a waiver of any cause of action, including any avoidance action that may be held by the Debtors.

12.      Nothing herein shall prejudice the Debtors' rights to request additional authority to pay Critical Vendor Claims.

13.     Each of the Banks is authorized to honor checks presented for payment and all fund transfer requests made by the Debtors, to the extent that sufficient funds are on deposit in the applicable accounts, in accordance with this Order and any other order of this Court.

14.     The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests in connection with any Critical Vendor Claims that are dishonored or rejected.

15.     Notwithstanding anything to the contrary contained herein, any payment to be made, or authorization contained, hereunder shall be subject to the requirements imposed on the Debtors under any approved order regarding post-petition financing and any budget in connection therewith.

16.     Nothing in the Motion or this Final Order, or the Debtors' payment of any claims pursuant to this Final Order, shall be deemed or construed as:  (a) an admission as to the validity of any claim or Lien against the Debtors or their estates; (b) a waiver of the Debtors' right to dispute any claim or Lien; (c) an approval or assumption of any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (d) an admission of the priority status of any claim, whether under section 503(b)(9) of the Bankruptcy Code or otherwise; or (e) a modification any of the Debtors' rights to seek relief under any section of the Bankruptcy Code on account of any amounts owed or paid to any Critical Vendor.

17.     The Debtors shall maintain a matrix summarizing (a) the name of each Critical Vendor paid; (b) the amount paid to each Critical Vendor; (c) the type of goods or services provided by each Critical Vendor; and (d) other pertinent information.  The Debtors will provide a periodic reconciliation of the foregoing matrix to the Term Loan Agent.

18.     Notice of the Motion as provided therein shall be deemed good and sufficient and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

19.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order shall be immediately effective and enforceable upon its entry.

20.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Final Order in accordance with the Motion.

21.     This Court shall retain jurisdiction over all matters arising from or related to the interpretation, implementation and enforcement of this Final Order.

Dated: _____, 2016
      Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

01:18375816.1