## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SPORTS AUTHORITY HOLDINGS, INC., *et al.*,[1] | Case No. 16-_____ (___) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION SECURED FINANCING PURSUANT TO 11 U.S.C. §§ 105, 362, 363, AND 364; (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS TO POST-PETITION LENDERS PURSUANT TO 11 U.S.C. §§ 364 AND 507; (III) AUTHORIZING THE USE OF CASH COLLATERAL AND PROVIDING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES AND MODIFYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. §§ 361, 362, 363, AND 364; AND (IV) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(B) AND (C) AND LOCAL RULE 4001-2**

Sports Authority Holdings, Inc. ("Sports Authority Holdings") and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") hereby move this court (this "Motion") for entry of an interim order, substantially in the form annexed hereto as Exhibit A (the "Interim Order"), and a final order (the "Final Order"), pursuant to sections 105, 361, 362, 363, 364, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") that, among other things:

      i.      authorizes The Sports Authority, Inc. ("TSA") and TSA Stores, Inc. ("TSA Stores," and together with TSA, the "Borrowers") to obtain, and each of Sports Authority

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Sports Authority Holdings, Inc. (9008); Slap Shot Holdings, Corp. (8209); The Sports Authority, Inc. (2802); TSA Stores, Inc. (1120); TSA Gift Card, Inc. (1918); TSA Ponce, Inc. (4817); and TSA Caribe, Inc. (5664). The headquarters for the above-captioned Debtors is located at 1050 West Hampden Avenue, Englewood, Colorado 80110.

Holdings, Inc. ("Holdings"), Slap Shot Holdings Corp. ("Slap Shot"), TSA Gift Card, Inc.

("Gift Card"),  TSA Ponce, Inc. ("Ponce") and TSA Caribe, Inc. ("Caribe," and together with

Holdings, Gift Card and Ponce, the "Guarantors") to guarantee, jointly and severally, the

Borrowers' obligations in respect of a senior secured, super-priority asset based revolving credit

facility of up to $500 million ($275 million on an interim basis) in aggregate principal amount

(the "Revolving DIP Facility") pursuant to the terms of that certain *Senior Secured, Super-*

*Priority Debtor-in-Possession Credit Agreement* in substantially the form attached hereto as

Exhibit B (as the same may be amended, restated, supplemented or otherwise modified from

time to time, the "DIP Credit Agreement") among (a) the Borrowers, (b) the Guarantors,

(c) Bank of America, N.A. ("BofA") as Administrative Agent and Collateral Agent (in such

capacity, the "DIP Agent"), (d) Wells Fargo Bank, National Association ("Wells Fargo") as

FILO Agent (the "DIP FILO Agent"), (e) the revolving lenders parties thereto (the "Revolving

DIP Lenders"), and (f) the FILO lenders parties thereto (the "FILO DIP Lenders," and together

with the Revolving DIP Lenders, the "DIP Lenders");

        ii.        subject to entry of the Final Order, authorizes the Borrowers to obtain, and

each of the Guarantors to guarantee, jointly and severally, the Borrowers' obligations in respect

of a senior secured, super-priority first in last out term loan credit facility of up to $95,285,000 in

aggregate principal amount (the "FILO DIP Facility," and together with the Revolving DIP

Facility, the "DIP Facility") pursuant to the terms of the DIP Credit Agreement;

        iii.        approves the terms of, and authorizes the Debtors to execute and deliver,

and perform under, the DIP Credit Agreement and to perform such other and further acts as may

be required in connection with the DIP Credit Agreement;

iv.        authorizes each Debtor to grant, in accordance with the relative priorities

set forth herein (a) to the DIP Agent (for the benefit of itself and the DIP Lenders) liens on all of

the DIP Collateral (as defined below) pursuant to sections 364(c) and (d) of the Bankruptcy

Code, which liens shall be senior to the Primed Liens (as defined below) but shall be junior to

the Permitted Prior Liens (as defined in the DIP Credit Agreement), the liens of the Prepetition

Term Loan Agent (for the benefit of the Prepetition Term Loan Lenders) on the Term Priority

Collateral (each as defined below), and the Carve Out (as defined below) and (b) to the DIP

Agent and DIP Lenders, super-priority administrative expense claims having recourse to all

prepetition and post-petition property of the Debtors' estates, now owned or hereafter acquired

(provided, however, that such super-priority administrative expenses claims shall not have

recourse to any Avoidance Actions or the proceeds thereof, other than, upon entry of the Final

Order, Specified Bankruptcy Recoveries (each as defined below));

v.        authorizes the Debtors to use "cash collateral," as such term is defined in

section 363 of the Bankruptcy Code (the "Cash Collateral"), including, without limitation, Cash

Collateral in which the Prepetition Agents and Prepetition Secured Lenders (each as defined

below) and/or the DIP Agent and DIP Lenders have a lien or other interest, in each case whether

existing on the Petition Date (as defined below), arising pursuant to the Interim Order or

otherwise;

vi.        grants, as of the Petition Date and in accordance with the relative priorities

set forth herein, certain adequate protection to the Prepetition Agents and Prepetition Secured

Lenders, consisting of, among other things, (a) Adequate Protection Liens (as defined below),

(b) Adequate Protection Super-Priority Claims (as defined below), (c) current cash payment of

accrued and unpaid interest at the applicable default interest rate arising under the Prepetition

ABL Credit Agreement, (d) current payment of the reasonable and documented out-of-pocket

costs and expenses of the attorneys and financial advisors to certain Prepetition Agents and

Prepetition Secured Lenders (as defined below) in the manner set forth below, (e) a funded

escrow account in the sum of $250,000 to secure any contingent indemnification obligations

arising under the Prepetition ABL Credit Agreement, and (f) an entitlement of certain Prepetition

Secured Parties to receive ongoing financial and other information from the Debtors;

      vii.      vacates the automatic stay imposed by section 362 of the Bankruptcy

Code in accordance with Paragraphs 21, 25 and 38 of the Interim Order (and, upon its entry, the

relevant Paragraphs of the Final Order) to the extent necessary to implement and effectuate the

terms and provisions of the DIP Credit Agreement and the Interim Order (and, upon its entry, the

Final Order); and

      viii.      schedules and establishes deadlines related to a final hearing (the "Final

Hearing") and entry of the Final Order.

In support of this Motion, the Debtors rely upon and incorporate by reference the

*Declaration of Jeremy Aguilar in Support of the Debtors' Chapter 11 Petitions and Requests for*

*First Day Relief* (the "First Day Declaration") and the *Declaration of Bernard Douton in*

*Support of Debtors' Motion for Interim and Final Orders (I) Authorizing Debtors to Obtain*

*Post-Petition Secured Financing Pursuant to 11 U.S.C. §§ 105, 362, 363, and 364; (II) Granting*

*Liens and Superpriority Claims to Post-Petition Lenders Pursuant to 11 U.S.C. §§ 364 and 507;*

*(III) Authorizing the Use of Cash Collateral and Providing Adequate Protection to Prepetition*

*Secured Parties and Modifying the Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, and*

*364; and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c) and*

*Local Rule 4001-2* (the "<u>Douton Declaration</u>"), each of which was filed concurrently herewith. In further support of this Motion, the Debtors respectfully represent:

## <u>JURISDICTION AND VENUE</u>

1.      The United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b), and the Amended Standing Order of Reference of the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief requested herein are sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, and 9014, and Local Rule 4001-2.

## <u>BACKGROUND</u>

### A.      General Background

2.      On the date hereof (the "<u>Petition Date</u>"), each of the Debtors commenced a voluntary case under chapter 11 of Bankruptcy Code with the Court.  Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are continuing to manage their financial affairs as debtors in possession.

3.      Contemporaneously herewith, the Debtors filed a motion seeking joint administration of their chapter 11 cases (collectively, the "<u>Chapter 11 Cases</u>") pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.  No trustee, examiner, or official committee of unsecured creditors (the "<u>Committee</u>") has been appointed in these Chapter 11 Cases.

4.      Information regarding the Debtors' history, business operations, capital structure and primary secured indebtedness, and the events leading up to the commencement of these Chapter 11 Cases can be found in the First Day Declaration.

## B.      The Debtors' Capital Structure

5.      As of the Petition Date, the Debtors owe approximately $1.1 billion in Prepetition Secured Debt Obligations and Prepetition Subordinated Debt (each as defined below).

### (i)      *Prepetition Revolving Loan*

6.      Certain of the Debtors are obligated on that certain Second Amended and Restated Credit Agreement, dated as of May 17, 2012 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Prepetition ABL Credit Agreement") by and among TSA and TSA Stores as borrowers, Slap Shot and Gift Card as guarantors, BofA as Administrative Agent and Collateral Agent (in such capacities, the "Prepetition ABL Administrative Agent"), and the revolving lenders party thereto (the "Prepetition ABL Revolving Lenders"), which provided for up to $650 million in aggregate loans in the form of an asset-based revolving credit facility (the "Prepetition Revolving Loan") that was scheduled to mature on May 17, 2017, subject to the conditions in the Prepetition ABL Credit Agreement.  The Prepetition ABL Credit Agreement provided for a varying interest rate based upon the excess availability under the Prepetition Revolving Loan, which varied from LIBOR plus 1.50% to LIBOR plus 2.00%, or from the prime rate plus 0.50% to the prime rate plus 1.00%.  Prior to the termination of the revolving commitments thereunder (as described further below) availability under the Prepetition Revolving Loan was limited by a borrowing base calculation.  The obligations of the Debtors constituting Loan Parties under the Prepetition ABL Credit Agreement are secured by a first-priority security interest in and lien on the ABL Priority Collateral (as defined in the Prepetition Intercreditor Agreement (as defined below)) and

by a second-priority interest in and lien on the Term Priority Collateral (as defined in the

Prepetition Intercreditor Agreement).

7.      On January 19, 2016, the Prepetition ABL Agent sent a notice of default and

reservation of rights to the borrowers under the Prepetition ABL Credit Agreement, citing the

existence of one or more purported Events of Default (as defined in the Prepetition ABL Credit

Agreement) thereunder (the "<u>Default Notice</u>").  On March 1, 2016, the Prepetition ABL Agent

sent a notice (the "<u>Termination Notice</u>") to the borrowers under the Prepetition ABL Credit

Agreement declaring that the Termination Date (as defined in the Prepetition ABL Credit

Agreement) had occurred and that, as a result thereof (i) the Revolving Commitments (as defined

under the Prepetition ABL Credit Agreement) were terminated, and (ii) the unpaid principal

amount of all obligations under the Prepetition ABL Credit Agreement was immediately due and

payable.

8.       As of the Petition Date, the aggregate outstanding obligations under the

Prepetition Revolving Loan are a principal amount of approximately $346 million, plus accrued

and unpaid interest, costs, expenses, fees and other charges (in each case, to the extent

reimbursable under the Prepetition ABL Credit Agreement).  In addition, as of the Petition Date

there were approximately $25.7 million in letters of credit issued and outstanding under the

Prepetition ABL Credit Agreement.

   *(ii)    Prepetition FILO Loan*

9.      On November 3, 2015, certain of the Debtors entered into that certain Second

Amendment to the Prepetition ABL Credit Agreement by and among TSA and TSA Stores, as

borrowers, Slap Shot and Gift Card, as guarantors, BofA, as administrative agent and collateral

agent, Wells Fargo as FILO agent (in such capacity, the "<u>FILO Agent</u>," and together with the

Prepetition ABL Administrative Agent, the "<u>Prepetition ABL Agents</u>"), the Prepetition ABL

Revolving Lenders, and the additional lenders party thereto (the "Prepetition FILO Lenders," and together with the Prepetition ABL Revolving Lenders, the "Prepetition ABL Lenders"), which provided for the addition to the Prepetition ABL Credit Agreement of a $95 million first-in, last-out term loan tranche (the "Prepetition FILO Loan") with an interest rate of LIBOR plus 6.40% and a maturity date of June 14, 2017.

10.    The Prepetition FILO Loan is secured by a last-out first-priority security interest in and lien on the ABL Priority Collateral and by a last-out second-priority security interest in and lien on the Term Priority Collateral, except that, as between the Prepetition Revolving Loan and the Prepetition FILO Loan, collateral proceeds are to be applied first to repay the Prepetition ABL Revolving Lenders and, only after the Prepetition ABL Revolving Lenders have been repaid in full, to repay the Prepetition FILO Lenders.

11.    Pursuant to that certain FILO Fee Letter dated as of November 3, 2015, the Prepetition FILO Lenders are entitled to a mandatory prepayment fee of 2.00% upon the passage of the Termination Date (the "FILO Make-Whole"). As described above, on March 1, 2016, the Prepetition ABL Agent delivered the Termination Notice which declared the passage of the Termination Date. Pursuant to the Termination Notice, the Prepetition ABL Agent informed the Debtors that the Prepetition FILO Lenders had elected to add the FILO Make-Whole to the principal amount of the Prepetition FILO Loan.

12.    As of the Petition Date, the aggregate outstanding obligations arising under the Prepetition FILO Loan are a principal amount of approximately $95,285,000 (which amount includes the capitalized FILO Make-Whole), plus accrued and unpaid interest, costs, expenses, fees and other charges (in each case, to the extent reimbursable under the Prepetition ABL Credit Agreement).

(iii)    <u>*Prepetition Term Loan and Prepetition Intercreditor Agreement*</u>

13.    Certain of the Debtors are obligated under that certain Amended and Restated Credit Agreement, dated as of November 16, 2010 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "<u>Prepetition Term Loan Credit Agreement</u>"), by and among TSA as borrower, Slap Shot, TSA Stores, and Gift Card as guarantors, Wilmington Savings Fund Society, FSB as successor Administrative Agent to BofA (in such capacity, the "<u>Prepetition Term Loan Agent</u>," and together with the Prepetition ABL Agents, the "<u>Prepetition Agents</u>"), and the lenders named therein (the "<u>Prepetition Term Loan Lenders</u>," and together with the Prepetition ABL Lenders, the "<u>Prepetition Secured Lenders</u>") whereby the Prepetition Term Loan Lenders extended to TSA a term loan in the original principal amount of approximately $300 million (the "<u>Prepetition Term Loan</u>") with a stated maturity date of November 16, 2017.  The Prepetition Term Loan is secured by a first priority security interest in and lien on the Term Priority Collateral (as defined in the Prepetition Intercreditor Agreement; the Term Priority Collateral together with the ABL Priority Collateral, collectively, the "<u>Prepetition Collateral</u>") and by a second priority interest in and lien on the ABL Priority Collateral.  As of the Petition Date, the aggregate outstanding obligations arising under the Prepetition Term Loan are a principal amount of approximately $276.7 million, plus accrued and unpaid interest, costs, expenses, fees and other charges (in each case, to the extent reimbursable under the Prepetition Term Loan Credit Agreement).

14.    The relative rights of the Prepetition ABL Agents and Prepetition ABL Lenders, on the one hand, and the Prepetition Term Loan Agent and Prepetition Term Loan Lenders, on the other, with respect to the ABL Priority Collateral and the Term Priority Collateral (in each case, whether constituting prepetition assets or post-petition assets) are governed by that certain Intercreditor Agreement, dated as of May 3, 2006 (as amended, amended and restated,

supplemented or otherwise modified from time to time, the "Prepetition Intercreditor Agreement") by and between BofA, as administrative agent under the Prepetition ABL Credit Agreement and BofA, as administrative agent under the Prepetition Term Loan Credit Agreement, as amended by those certain side letters to the Prepetition Intercreditor Agreement dated as of November 16, 2010 and May 17, 2012, respectively.

15.     The DIP Credit Agreement and the Interim Order (and upon its entry, the Final Order) generally preserve the respective rights of the Prepetition Agents with regard to the ABL Priority Collateral and the Term Priority Collateral; however, pursuant to an agreement set forth in the Interim Order (and described further below), the Prepetition Agents (on behalf of the Prepetition Secured Lenders) have consented to the categorization and payment of proceeds of certain assets that might otherwise conflict with the provisions of the Prepetition Intercreditor Agreement.

### (iv)     *Mezzanine Notes*

16.     Pursuant to that certain Securities Purchase Agreement, dated as of May 3, 2006 (as amended, the "Mezzanine Purchase Agreement"), TSA issued 11.5% Senior Subordinated Notes due May 3, 2016 (the "Mezzanine Notes") in the amount of $350 million to the purchasers party thereto (the "Mezzanine Holders").  On May 4, 2015, TSA and the Mezzanine Holders entered into an amendment to the Mezzanine Purchase Agreement to, *inter alia*, extend the maturity date of the Mezzanine Notes to February 19, 2018.  The Mezzanine Notes are unsecured and Slap Shot, TSA Stores, and Gift Card are guarantors of the Mezzanine Notes.  In order to preserve liquidity at this critical juncture, TSA opted to defer remitting the $18.9 million cash interest payment due on January 15, 2016 on account of the Mezzanine Notes.  As of the Petition Date, TSA owes approximately $365.7 million in principal plus accrued and unpaid interest on the Mezzanine Notes.

(v)    *Reference Notes*

17.    In consideration for the amendment of the Mezzanine Purchase Agreement to extend the maturity date of the Mezzanine Notes, Sports Authority Holdings entered into that certain Agreement to Issue Promissory Notes and Warrants, dated as of May 4, 2015 (the "Reference Notes Agreement") whereby Sports Authority Holdings issued to the Mezzanine Holders (a) promissory notes due February 19, 2018 (the "Reference Notes," and together with the Mezzanine Notes, the "Prepetition Subordinated Debt") by which Sports Authority Holdings agreed to make additional interest payments in respect of, and based upon, the principal amount of the Mezzanine Notes until the Mezzanine Notes were paid in full in cash and (b) warrants entitling the Mezzanine Holders to purchase shares of Sports Authority Holdings common stock. The Reference Notes provide for additional interest—an additional 1.5% on the outstanding principal amount of the Mezzanine Notes—with future interest rate increases as provided in the Reference Notes Agreement.  In order to preserve liquidity at this critical juncture, Sports Authority Holdings opted to defer remitting the $2.6 million cash interest payment due on January 15, 2016 on account of the Reference Notes.

(vi)    *Other Secured Debt*

18.    TSA is also obligated under that certain Loan Agreement dated as of February 2, 2005 (the "Paramus Loan") between TSA and Commercial Net Lease Realty, Inc., (the "Paramus Lenders") whereby TSA acquired certain real property in Paramus, New Jersey (the "Paramus Property").  TSA's obligations in respect of the Paramus Loan are secured by the Paramus Property, and the Paramus Lender's lien in respect thereof constitutes a Permitted Prior Lien as defined herein.  As of the Petition Date, approximately $3.3 million remains outstanding on the Paramus Loan.

19.    In addition, a substantial portion of the Debtors' business involves the sale of goods that are delivered to the Debtors on consignment by approximately 160 vendors and sold in the Debtors' stores and online.  The Debtors estimate that, as of the Petition Date, the Debtors possessed approximately 9.2 million units of consigned goods with an invoice cost to the Debtors of approximately $90 million in the aggregate (the "Consigned Goods").  The Debtors acknowledge that some consignment vendors may have security interests or liens in certain consigned inventory that was delivered to the Debtors prior to the Petition Date, while other consignment vendors may either have security interests that are not properly perfected or are otherwise avoidable or have no security interests in any inventory.   The Consigned Goods constitute ABL Priority Collateral; however, to the extent that a consignment vendor has a valid, enforceable, non-avoidable and perfected lien on any Consigned Goods as of the Petition Date (that, after giving effect to any intercreditor or subordination agreement, are senior in priority to the liens of the Prepetition Secured Parties), the liens of such consignment vendor would constitute Permitted Prior Liens (as defined below) and would be senior to the DIP Liens and the Adequate Protection Liens.

*(vii)*    _Trade Debt_

20.    In the ordinary course of business, the Debtors source, order, and purchase inventory from their preferred suppliers on credit based on standard industry terms.  As of the Petition Date, the Debtors owe approximately $211.6 million in trade debt.  Some of the Debtors' trade creditors are beneficiaries of letters of credit issued pursuant to the Prepetition ABL Credit Agreement.

## C.    **Pre-Petition Marketing Process**

21.    In late January 2015, the Debtors authorized Rothschild Inc. ("Rothschild") to initiate the process of securing debtor-in-possession ("DIP") financing.  As described further in

01:18374952.1

the Douton Declaration, following a robust marketing process, the Debtors ultimately determined that the indicative proposal submitted by the Prepetition ABL Agents and Prepetition ABL Lenders was the best proposal.  The Debtors took numerous considerations into account when making this determination, including the fact that all other proposals (a) would require the Debtors to engage in a contested priming fight with the Debtors' prepetition lenders (which would be costly and uncertain given the Debtors' overleveraged capital structure); (b) did not, in Rothschild's and the Debtors' view, provide the Debtors with sufficient liquidity to market their assets in chapter 11 to maximize value for creditors; (c) contained materially worse indicative economic terms; or (d) were uncertain to close given outstanding material terms and conditions. Even after making this determination, the Debtors and Rothschild continued to seek concessions in timing, structure, and economic terms.  The Debtors and the DIP Agent and DIP Lenders negotiated the DIP Credit Agreement in a good faith and arm's length manner, with the advice of sophisticated counsel and advisors.

22.     Concurrently with the efforts to obtain DIP financing, the Debtors and Rothschild began a process to pursue a chapter 11 exit strategy through a sale of the Debtors' businesses. Accordingly, the Debtors have filed a motion seeking to establish bidding procedures for the sale of substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code (the "Proposed Sale Transaction").  The proposed DIP Facility adequately addresses the Debtors' foreseeable liquidity needs and provides the necessary runway to complete the Proposed Sale Transaction.

**D.     Cash Collateral and the Need for Authorization of the DIP Facility**

23.     In the aggregate, the Debtors have approximately 21 bank accounts (collectively, the "Bank Accounts").  The daily ending cash balance in the Debtors' Bank Accounts is de minimis because excess funds are used to pay down the balance on the Prepetition Revolving

Loan.  However, the Debtors have a significant amount of cash in their stores and other liquid

assets in the form of credit card receivables.  For example, as of January 30, 2016, the Debtors'

balance sheet reflected $22.9 million in such assets.

24.    In general, the Debtors' cash is subject to security interests in favor of the

Prepetition Agents and the Prepetition Secured Lenders (collectively, the "Prepetition Secured

Parties").  All of this cash constitutes ABL Priority Collateral, meaning that the Prepetition ABL

Agents and the Prepetition ABL Lenders have the first priority right to payment from such cash

vis-à-vis the Prepetition Term Loan Agent and Prepetition Term Loan Lenders.  In addition, cash

receivables collected by the Debtors during these Chapter 11 Cases will constitute proceeds of

the Prepetition Collateral, and all or virtually all of that cash will constitute ABL Priority

Collateral.

25.    Subject to the terms and conditions of the Interim Order, the Prepetition Secured

Parties have consented to the Debtors' Use of Cash Collateral.  The Debtors have been informed

that the Prepetition Secured Parties would not consent to the Debtors' use of Cash Collateral

outside of the establishment of the DIP Facility.  The Debtors have determined, in consultation

with their advisors, that the expense and uncertainty attendant to a contested cash collateral

litigation with the Prepetition Secured Parties would adversely impact the Debtors' operations

and relationships with key vendors, would generate additional legal expenses and, if

unsuccessful, would force an immediate liquidation of the Debtors.

26.    The Debtors believe that use of Cash Collateral alone would not be sufficient to

fund their operations and pay all administrative expenses during these Chapter 11 Cases.  The

Debtors' business is reliant on critical trade vendors continuing to provide goods and favorable

trade credit terms post-petition.  As described in the Douton Declaration and the First Day

Declaration, the Debtors believe that the critical trade vendors will not provide post-petition delivery of goods and/or favorable trade terms absent the establishment of the DIP Facility. While the Debtors could theoretically finance their operations during the case using only the Cash Collateral of the Prepetition Secured Parties, the lack of DIP financing would likely result in vendors refusing to ship merchandise other than on a cash in advance basis or after a pay down of their prepetition exposure.  Without access to the funds proposed to be advanced under the DIP Facility, the Debtors' estates and creditors would suffer immediate harm, including a significant decrease in liquidity and/or merchandise available for sale.  Accordingly, absent the cash availability arising under the DIP Facility, the Debtors would be unable to finance these Chapter 11 Cases and maintain the going concern value necessary to maximize returns from the Proposed Sale Transaction.

**E.**     **Overview of Proposed DIP Financing**

   *(i)*     *General Terms of the DIP Facility*

27.     The DIP Credit Agreement contemplates an asset based revolving credit facility providing for up to $500 million aggregate principal amount of loans and other financial accommodations, the provision of which will be subject to compliance with the budget created in accordance with the terms of the DIP Credit Agreement (the "Approved Budget"), the short form of which is attached hereto as Exhibit C,[2] and the borrowing base formula set forth in the DIP Credit Agreement (the "Borrowing Base").  The Revolving DIP Facility contains a $100 million sublimit for the issuance of standby and documentary letters of credit (each a "Letter of Credit"), and features the provision of swingline loans to be made available by BofA on a same day basis.

---

[2]     All backup, schedules, and other detail contained in the Approved Budget is incorporated by reference, including accruals for professional monthly fee estimates.

28.     The Revolving DIP Facility will bear interest at LIBOR plus 3.25% per annum or, at the option of the Borrowers, the Base Rate plus 2.25% per annum.  Letter of Credit fees shall be payable on the maximum amount available to be drawn under each Letter of Credit at a rate equal to 3.25% per annum with respect to standby letters of credit and 1.625% per annum with respect to commercial letters of credit.

29.     The DIP Credit Agreement also contemplates the issuance of the FILO DIP Facility, which will not provide additional availability to the Debtors, but rather will serve as a post-petition refinancing of the Prepetition FILO Loan.  As described further below, upon entry of the Final Order, the sole use of the funds provided under the FILO DIP Facility will be to repay the Prepetition FILO Loan.  The FILO DIP Facility will bear interest at LIBOR plus 7.90% per annum, with a LIBOR floor of 1% per annum.

30.     Subject to the proviso below, the DIP Facility will be secured by liens (the "DIP Liens") on substantially all of the Debtors' prepetition and post-petition assets (the "DIP Collateral"), in the following priorities:

> (a) a first-priority senior priming lien on the ABL Priority Collateral;
>
> (b) a first-priority senior lien on the Debtors' unencumbered assets, *including* (i) all assets of  Holdings, Ponce, and Caribe (such assets the "New Loan Party Assets") (ii) the proceeds of the Debtors' leasehold interests ("Lease Proceeds") and (iii) upon entry of the Final Order, Specified Bankruptcy Recoveries; *but excluding* Avoidance Actions themselves, Bankruptcy Recoveries (defined below) other than Specified Bankruptcy Recoveries, and the Debtors' leasehold interests themselves (the "Leases"); and
>
> (c) a junior lien on the Term Priority Collateral, and all of the Debtors' other assets that are subject to (x) valid, enforceable, non-avoidable and perfected liens in existence on the Petition Date that, after giving effect to any intercreditor or subordination agreement, are senior in priority to the liens of the Prepetition Secured Parties, and (y) valid, enforceable and non-avoidable liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code and after giving effect to any

intercreditor or subordination agreement, are senior in priority to the liens of the Prepetition Secured Parties;

 provided, however, that in each case the DIP Liens shall be subject to the Carve Out (defined below.  The term "Specified Bankruptcy Recoveries" means (i) any proceeds of causes of action arising under section 549 of the Bankruptcy Code ("549 Actions"), and (ii) any proceeds of causes of action arising under chapter 5 of the Bankruptcy Code ("Avoidance Actions") other than 549 Actions, but solely to the extent necessary to reimburse the DIP Lenders for the amount of the Carve Out, if any, used to finance the pursuit of such Avoidance Actions.

31.     Subject to the Carve Out, the DIP Agent and DIP Lenders will also receive superpriority administrative expense claims (the "DIP Superpriority Claims") for any unpaid obligations under the DIP Facility, with such superpriority claims having recourse to all prepetition and post-petition property of the Debtors' estates, now owned or hereafter acquired; provided, however, that the DIP Superpriority Claims shall not have recourse to any Avoidance Actions or the proceeds thereof, other than Specified Bankruptcy Recoveries (upon entry of the Final Order).

32.     The Debtors have been informed that, subject to the terms and conditions of the Interim Order, the Prepetition Secured Parties have consented to the granting of the DIP Liens, including the DIP Liens on any previously unencumbered assets of the Debtors.

(ii)     *Use of Proceeds; Roll-Up*

33.     The DIP Credit Agreement provides that the cash availability under the Revolving DIP Facility may be used by the Debtors, subject to the Approved Budget, for payment of transaction expenses, payment of fees and expenses incurred by the Debtors during the pendency of the Chapter 11 Cases, the Adequate Protection Payments (defined below) and general working capital purposes.  In addition, the DIP Credit Agreement requires that availability under the

Revolving DIP Facility be used for payment of the outstanding principal, interest, costs, expenses, fees and other charges (in each case, to the extent reimbursable under the Prepetition ABL Credit Agreement) arising under the Prepetition Revolving Loan (the "Revolving Loan Roll-Up").

34.     Following the entry of the Interim Order, but prior to entry of the Final Order, the Revolving Loan Roll-Up will proceed in a "creeping" manner, such that post-petition collections of DIP Collateral (other than proceeds of Term Priority Collateral) shall be applied directly to pay-down the Prepetition Revolving Loan and, contemporaneously therewith, availability under the Revolving DIP Facility shall be increased by a corresponding amount.  In addition, upon entry of the Interim Order, all outstanding Letters of Credit issued under the Prepetition ABL Credit Agreement shall be deemed post-petition obligations issued under the DIP Credit Agreement.  Following the entry of the Final Order, availability under the Revolving DIP Facility will be used to repay the entire outstanding balance under the Prepetition Revolving Loan.

35.     The FILO DIP Facility will become available only upon entry of the Final Order and its use is restricted solely to the payment of the Prepetition FILO Loan, including the FILO Make-Whole (the "FILO Loan Roll-Up," and together with the Revolving Loan Roll-Up, the "Roll-Up").

36.     The Roll-Up will be without prejudice to the rights of any third party, including, without limitation, any Committee, to seek to claw-back such payment if that third party successfully challenges the validity of the liens securing the Prepetition Revolving Loan or the Prepetition FILO Loan.

37.     Following implementation of the Roll-Up, the relative rights of the Debtors' creditors will remain largely unchanged from their prepetition positions.  Subject to the Carve Out, the Prepetition ABL Agents and Prepetition ABL Lenders will continue to have a priority lien on the ABL Priority Collateral (and consequently most, if not all, of the Cash Collateral) and the Prepetition Term Loan Agent and Prepetition Term Loan Lenders will continue to have a priority lien on the Term Priority Collateral; provided, however, that for purposes of the DIP Facility and the Interim Order (and the Final Order, when entered), the Prepetition ABL Agent and Prepetition Term Loan Agent have agreed that the ABL Priority Collateral shall include Lease Proceeds and the Term Priority Collateral shall not include Lease Proceeds.

38.     Subject to the Carve Out and Permitted Prior Liens, the DIP Facility will initially be layered on top of the existing liens on the ABL Priority Collateral, with the DIP Lenders receiving (a) DIP Superpriority Claims, (b) a priming lien on the ABL Priority Collateral (including, for these purposes, Lease Proceeds), and (c) a junior lien on the Term Priority Collateral.  Once the Prepetition Revolving Loan and Prepetition FILO Loan are repaid following entry of the Final Order, the DIP Facility will effectively serve as simple replacements of the Prepetition Revolving Loan and Prepetition FILO Loan in the Debtors' capital structure (provided, however, that the DIP Facility will be secured by the New Loan Party Assets, the Lease Proceeds and the Specified Bankruptcy Recoveries (following entry of the Final Order)).

(iii)     *Maturity; Chapter 11 Case Timeline*

39.     Following extensive, arms' length negotiations, the Debtors and the DIP Lenders reached agreement on a case timeline that adequately balances the Debtors' need to execute a robust marketing process for their business, with the need of all stakeholders to realize asset

value on an expeditious basis.  Accordingly, the DIP Credit Agreement is conditioned on the

following case milestones[3]:

1. **Petition Date**:  Debtors must file (i) a motion seeking approval of the bidding procedures in connection with the Proposed Sale Transaction (the "<u>Bidding Procedures Motion</u>"), (ii) a motion seeking authority to close and liquidate up to 180 stores operated by the Debtors and to engage a liquidator in respect thereof (the "<u>Store Closing Motion</u>"), and (iii) a motion seeking to extend the time period to assume or reject leases to not less than 210 days from the Petition Date (the "<u>Lease Designation Extension Motion</u>").

2. **March 16, 2016**:  Debtors must have obtained an order approving the Store Closing Motion on an interim basis;

3. **April 1, 2016**:  Debtors must have obtained an order approving the Lease Designation Extension Motion;

4. **April 11, 2016**:  To the extent not previously delivered, the Debtors must deliver bid packages to any potential bidders for the Debtors' businesses or assets that are identified by the DIP Agent (provided such potential bidders have entered into confidentiality agreements reasonably acceptable to the Debtors);

5. **April 21, 2016**:  Deadline to receive/submit binding bids with respect to the Proposed Sale Transaction;

6. **April 25, 2016**:  Auction (if necessary);

7. **April 27, 2016**:  Hearing for the Proposed Sale Transaction; and

8. **April 28, 2016**:  Deadline to close Proposed Sale Transaction.

40.    The obligations arising under the DIP Credit Agreement are scheduled to mature

no later than June 30, 2016.  Accordingly, the Debtors intend to—and the Final Order will

provide the Debtors with authority to—utilize the proceeds of the Proposed Sale Transaction to

pay-off, in full, the DIP Facility at or prior to its scheduled maturity.

---

[3]    The DIP Credit Agreement contemplates that the Debtors are currently in discussions with certain parties for a potential $25 million junior debtor-in-possession loan (an "<u>Incremental DIP Loan</u>"), and expressly permits the incurrence of such junior DIP loan.  In the event that the Debtors are successful in obtaining the Incremental DIP Loan by March 15, 2016, the milestones set forth herein will be extended by approximately one month as set forth in the DIP Credit Agreement.  Any Incremental DIP Loan would be subject to the approval of the Court.

41.    Following the maturity and payment of the DIP Facility, the Debtors' only remaining Prepetition Secured Debt Obligations shall consist of the Prepetition Term Loan, the Paramus Loan and any debt obligations secured by Permitted Prior Liens.

**F.    Adequate Protection**

42.    Because the liens securing the DIP Facility will prime the security interests of (a) all of the Prepetition Secured Parties with respect to the ABL Priority Collateral, and (b) the Prepetition ABL Agents and Prepetition ABL Lenders with respect to the Term Priority Collateral (such primed security interests, the "Primed Liens"), the Prepetition Secured Parties have demanded adequate protection of their interests in the Prepetition Collateral to the extent of any diminution in the value of such Prepetition Collateral (the "Collateral Diminution").  The Debtors have agreed to provide the Prepetition Secured Parties with the following adequate protection, only to the extent of any Collateral Diminution, subject to the Carve Out:

(a)    Adequate Protection Applicable to Prepetition ABL Agents
and Prepetition ABL Lenders:

- ***Adequate Protection Liens***:  The Prepetition ABL Agents (for the benefit of the Prepetition ABL Lenders) shall be granted valid, perfected replacement security interests in and liens on all of the DIP Collateral (the "ABL Adequate Protection Liens").

  The ABL Adequate Protection Liens on ABL Priority Collateral (including, for these purposes, the Lease Proceeds and any unencumbered assets constituting DIP Collateral that would otherwise constitute ABL Priority Collateral) shall be junior and subordinate only to (in the following order):  (i) any Permitted Prior Liens, (ii) the Carve Out, and (iii) the DIP Liens.

  The ABL Adequate Protection Liens on Term Priority Collateral (including, for these purposes, any unencumbered assets constituting DIP Collateral that would otherwise constitute Term Priority Collateral) shall be junior and subordinate only to (in the following order): (i) any Permitted Prior Liens, (ii) the Carve Out, (iii) the liens of the Prepetition Term Loan Agent and Prepetition Term Loan Lenders arising under the Prepetition Term Loan Credit Agreement, (iv) the Term Loan Adequate Protection Liens (defined below), and (v) the DIP Liens.

- ***Adequate Protection Claims:***  The Prepetition ABL Agents and Prepetition ABL Lenders shall be granted superpriority claims under section 507(b) of the Bankruptcy Code with recourse to all prepetition and post-petition property of the Debtors' estates, now owned or hereafter acquired (excluding Avoidance Actions but, upon entry of the Final Order, including the proceeds of Avoidance Actions) which superpriority claims shall be junior and subordinate to (in the following order): (i) the Carve Out, and (ii) the DIP Superpriority Claims (the "ABL Superpriority Claims").

- ***Adequate Protection Interest Payments:***  The Prepetition ABL Agents (for the benefit of the Prepetition ABL Lenders) shall receive, on the last business day of each month, payment of all accrued and unpaid interest (at the default rate) and reimbursement of any costs due to the Prepetition ABL Agents or Prepetition ABL Lenders under the Prepetition ABL Credit Agreement (the "Adequate Protection Interest Payments").  The obligation to pay the Adequate Protection Interest Payments shall cease upon the repayment in full of the obligations under the Prepetition ABL Credit Agreement pursuant to the Roll-Up.

- ***Reimbursement of Expenses:***  The Prepetition ABL Agents and the Prepetition ABL Lenders shall be reimbursed, on a current basis, for all reasonable and documented out-of-pocket costs and expenses of the financial advisors and outside attorneys engaged by such parties (the "ABL Expense Payments"), solely to the extent permitted under the Prepetition ABL Credit Agreement.

- ***Funded Escrow Account:***  The Prepetition ABL Agents (for the benefit of the Prepetition ABL Lenders) shall be the beneficiary of a $250,000 funded escrow (the "Indemnity Account") account which shall secure the contingent indemnification obligations due to the Prepetition ABL Agents and Prepetition ABL Lenders under the Prepetition ABL Credit Agreement.[4]

(b)      Adequate Protection Applicable to Prepetition Term Loan Agent and Prepetition Term Loan Lenders:

- ***Adequate Protection Liens***:  The Prepetition Term Loan Agent (for the benefit of the Prepetition Term Loan Lenders) shall be granted valid, perfected replacement security interests in and liens on all of the DIP Collateral (the "Term Loan Adequate Protection Liens," and together with the ABL Adequate Protection Liens, the "Adequate Protection Liens").

---

[4]    The $250,000 deposited into the funded escrow account will serve as security for the payment of the reimbursement and indemnification obligations of the Debtors arising under the Prepetition ABL Credit Agreement, but shall not serve as a cap on the amount of any such obligations.

The Term Loan Adequate Protection Liens on ABL Priority Collateral (including, for these purposes, the Lease Proceeds and any unencumbered assets constituting DIP Collateral that would otherwise constitute ABL Priority Collateral) shall be junior and subordinate only to (in the following order):  (i) any Permitted Prior Liens, (ii) the Carve Out, (iii) DIP Liens, (iv) the liens of the Prepetition ABL Agent and Prepetition ABL Lenders arising under the Prepetition ABL Credit Agreement, and (v) the ABL Adequate Protection Liens.

The Term Loan Adequate Protection Liens on the Term Priority Collateral (including, for these purposes, any unencumbered assets constituting DIP Collateral that would otherwise constitute Term Priority Collateral) shall be junior and subordinate only to (in the following order):  (i) any Permitted Prior Liens, and (ii) the Carve Out.

- *Adequate Protection Claims:*  The Prepetition Term Loan Agent and the Prepetition Term Loan Lenders shall be granted superpriority claims under section 507(b) of the Bankruptcy Code with recourse to all prepetition and post-petition property of the Debtors' estates, now owned or hereafter acquired (excluding Avoidance Actions but, upon entry of the Final Order, including the proceeds of Avoidance Actions) which superpriority claims shall be junior and subordinate to (in the following order): (i) the Carve Out, (ii) the DIP Superpriority Claims, and (iii) the ABL Superpriority Claims (the "Term Loan Superpriority Claims," and together with the ABL Superpriority Claims, the "Adequate Protection Super-Priority Claims").

- *Reimbursement of Expenses:*  The Prepetition Term Loan Agent and the Prepetition Term Loan Lenders (including, without limitation, the Ad Hoc Group of Prepetition Term Loan Lenders (as defined in the Interim Order)) shall be reimbursed, on a current basis, for all reasonable and documented out-of-pocket costs and expenses of the financial advisors, appraisers and outside attorneys engaged by such parties, solely to the extent permitted under the Prepetition Term Loan Credit Agreement (together with the Adequate Protection Interest Payments and ABL Expense Payments, the "Adequate Protection Payments"); provided however, that all amounts paid to the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders from the proceeds of ABL Priority Collateral pursuant to this paragraph shall be promptly reimbursed to the Prepetition ABL Agent and/or the DIP Agent, as applicable (only to the extent necessary to pay the Prepetition ABL Debt and DIP Obligations in full in cash), out of the first proceeds of Term Priority Collateral received by the Debtors upon the sale or disposition of any Term Priority Collateral, including as part of any Store Closing Sale.

    (c)    <u>Adequate Protection Applicable to all Prepetition Secured Parties</u>:

- ***Store Closing Sales:*** The sale process to be implemented pursuant to the Store Closing Motion, including the timeline and milestones set forth therein, shall not be materially modified without the prior written consent of the Prepetition Agents or the DIP Agent, and the right of the Prepetition Agents to credit bid pursuant to section 363(k) of the Bankruptcy Code with respect to the Store Closing Sales shall not be abrogated. Proceeds of the Store Closing Sales shall be sold free and clear of liens, with the liens of the DIP Agent and Prepetition Agents attaching to the proceeds thereof in the manner set forth in the Interim Order; <u>provided</u>, <u>however</u>, that the proceeds of the Store Closing Sales (other than the proceeds of Term Priority Collateral) shall promptly be applied to the outstanding obligations under the Prepetition ABL Credit Agreement and DIP Credit Agreement.

- ***Reporting Obligations:*** The Prepetition Agents and the Prepetition Secured Lenders shall be entitled to receive periodic and other financial reports from the Debtors on an ongoing basis, including, without limitation, such reports, certificates, statements and documents to be delivered under Sections 6.01, 6.02, 6.03, 6.21 and 6.22(b) of the DIP Credit Agreement.

## G.    Modification of Prepetition Intercreditor Agreement Effected by Interim Order and Final Order

    43.    The DIP Credit Agreement and the Interim Order (and upon its entry, the Final Order) generally preserve the respective rights of the Prepetition Agents set forth in the Prepetition Intercreditor Agreement with regard to the ABL Priority Collateral and the Term Priority Collateral. However, as set forth in the Interim Order, the Prepetition Agents (on behalf of the Prepetition Secured Lenders) have agreed to the following terms, which would otherwise potentially conflict with the provisions of the Prepetition Intercreditor Agreement:

- <u>Lease Proceeds</u> – notwithstanding anything to the contrary in the Prepetition Intercreditor Agreement, Lease Proceeds shall be treated as ABL Priority Collateral and not Term Priority Collateral;

- <u>Reimbursement of Prepetition Term Loan Agent and the Prepetition Term Loan Lenders Expenses</u> – the Adequate Protection Payments due to the Prepetition Term Agent and Prepetition Term Loan Lenders as set forth herein and in the Interim Order shall be paid from the proceeds of Prepetition Collateral, regardless of whether the proceeds derived from ABL Priority Collateral or Term Priority Collateral; and

- Reallocation/Reimbursement – the Interim Order provides that all amounts paid to the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders from the proceeds of ABL Priority Collateral pursuant to this paragraph shall be promptly reimbursed to the Prepetition ABL Agent and/or the DIP Agent, as applicable (only to the extent necessary to pay the Prepetition ABL Debt and DIP Obligations in full in cash), out of the first proceeds of Term Priority Collateral received by the Debtors upon the sale or disposition of any Term Priority Collateral, including as part of any Store Closing Sale.

**H.    Description of DIP Facility Pursuant to Bankruptcy Rule 4001**

44.    Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2(a)(ii), the Debtors set forth significant elements of the DIP Facility, as follows:[5]

| Material Provision | Brief Summary |
| --- | --- |
| Borrowers | TSA and TSA Stores, as debtors and debtors-in possession.  *See* DIP Credit Agreement, Preamble. |
| Guarantors | Holdings, Slap Shot, Gift Card and Ponce.  *See* DIP Credit Agreement, definition of "Guarantors." |
| Administrative Agent/FILO Agent | BofA as Administrative Agent and Wells Fargo as FILO Agent.  *See* DIP Credit Agreement, Preamble. |
| DIP Lenders | BofA, Wells Fargo Bank, and a syndicate of other financial institutions.  *See* DIP Credit Agreement, Preamble. |

---

[5]    This summary is provided in accordance with Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2.  For a complete description of the terms and conditions of the DIP Facility, reference should be made to the DIP Credit Agreement and the Interim Order.  The summary herein is qualified in its entirety by reference to such document and such order.  Interested parties are strongly encouraged to read the operative documents and such order.  This is a summary only and the terms of the DIP Credit Agreement and the Interim Order, as applicable, shall control in all respects.

| Material Provision | Brief Summary |
|---|---|
| DIP Facility<br><br>Bankruptcy Rule 4001(c)(1)(B) | Post-petition financing in a total amount of $595,285,000 in the form of (i) a senior secured, super-priority asset based revolving credit facility of up to $500,000,000 in aggregate principal amount, and (ii) a senior secured, super-priority first in last out term loan credit facility of up to $95,285,000 in aggregate principal amount.<br><br>$275 million availability on an interim basis, subject to the Approved Budget and the Borrowing Base, and $595,285,000 on a final basis.<br><br>*See* DIP Credit Agreement, definitions of "Aggregate Revolving Commitments" and "FILO Loan"; Interim Order, Introduction ¶ I(A) and ¶ 3. |
| Interest Rate<br><br>Bankruptcy Rule 4001(c)(1)(B) | <u>Revolving DIP Facility</u>:  LIBOR plus 3.25% per annum or, at the option of the Borrowers, the Base Rate plus 2.25% per annum.<br><br><u>FILO DIP Facility</u>: LIBOR plus 7.90% per annum, with a LIBOR floor of 1% per annum.<br><br>*See* DIP Credit Agreement § 2.08. |

| Material Provision | Brief Summary |
|---|---|
| Fees And Expenses | Revolving Closing Fee:  $6,250,000 (1.25% of the amount of the aggregate Revolving Commitments (as defined in the DIP Credit Agreement)), payable on the effective date of the DIP Credit Facility.<br><br>FILO Closing Fee:  $1,191,062.50 (1.25% of the amount of the aggregate FILO DIP Facility), payable upon the effective date of the DIP Credit Facility.<br><br>DIP Agent Fee: $150,000, payable on the effective date of the DIP Credit Facility.<br><br>DIP FILO Agent Fee: $75,000, payable on the effective date of the DIP Credit Facility.<br><br>Commitment Fee:  0.375% per annum shall be payable on the actual daily unused portions of the Revolving DIP Facility.<br><br>Letter of Credit Fees:  Letter of Credit fees shall be payable on the maximum amount available to be drawn under each Letter of Credit at a rate equal to 3.25% per annum with respect to standby letters of credit and 1.625% per annum with respect to commercial letters of credit.<br><br>Borrowers to pay the reasonable and documented out-of-pocket costs and expenses of the DIP Agent and the DIP Lenders.<br><br>*See* DIP Credit Agreement §§ 2.03(i); 2.09. |
| DIP Maturity Event<br><br>Bankruptcy Rule 4001(c)(1)(B) | The earliest to occur of any of the following:<br><br>(a)    June 30, 2016;<br><br>(b)    The date of closing of a sale of all or substantially all of Debtors' assets pursuant to Section 363 of the Bankruptcy Code; and<br><br>(c)    The effective date of a plan of reorganization or liquidation is confirmed pursuant to an order entered by this Court.<br><br>*See* Interim Order ¶ 32. |

| Material Provision | Brief Summary |
|---|---|
| Liens, Collateral, and Priority<br><br>Bankruptcy Rule 4001(c)(1)(B)(i), (vii) & (xi) | Claims arising under the DIP Facility (the "DIP Claims") shall have priority and shall be secured by liens and collateral as set forth below:<br><br>(a) pursuant to section 364(c)(1) of the Bankruptcy Code and subject to the Carve Out, the DIP Claims will be entitled to super-priority administrative expense status in the Chapter 11 Cases;<br><br>(b) pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Facility will be secured by a first-priority perfected senior lien on the Debtors' unencumbered assets, *including* (i) all New Loan Party Assets, (ii) Lease Proceeds, and (iii) upon entry of the Final Order, Specified Bankruptcy Recoveries; *but excluding* Avoidance Actions themselves, Bankruptcy Recoveries other than Specified Bankruptcy Recoveries, and the Leases themselves;<br><br>(c) pursuant to section 364(c)(3) of the Bankruptcy Code, the DIP Facility will be secured by a perfected junior lien on all property and assets of the Debtors that are subject to Permitted Prior Liens and on the Term Priority Collateral; and<br><br>(d) pursuant to section 364(d)(1) of the Bankruptcy Code, the DIP Facility will be secured by a first priority perfected senior priming lien on the ABL Priority Collateral that is senior to and primes (i) the liens securing the Prepetition Revolving Loan and Prepetition FILO Loan and all liens junior thereto, and (ii) any adequate protection liens granted (x) to the Prepetition ABL Agents and Prepetition ABL Lenders after the commencement of the Chapter 11 Cases in respect of the obligations under the Prepetition ABL Credit Agreement (including any replacement liens), and (y) in respect of any liens junior to the liens securing the obligations under the Prepetition ABL Credit Agreement.<br><br>*See* DIP Credit Agreement §§ 2.15, 5.21; Interim Order ¶¶ 9, 12. The aforementioned provisions shall remain in effect if the Interim Order is entered but the Final Order is not. |
| Carve Out | "Carve Out" means a carve out in an amount equal to:<br><br>(a) allowed administrative expenses pursuant to 28 U.S.C. § 1930(a)(6) for fees required to be paid to the Clerk of the United States Bankruptcy Court and to the Office of the United States Trustee, plus<br><br>(b) all accrued and unpaid fees, disbursements, costs and expenses, allowed by the Court at any time and incurred by professionals or professional firms |

| Material Provision | Brief Summary |
|---|---|
| | retained by the Borrowers and Guarantors and of any Committee appointed in the Chapter 11 Cases (the "Case Professionals"), through the date of service of a Carve Out Trigger Notice (as defined below), up to and as limited by the respective Approved Budget[6] amounts for each Case Professional or category of Case Professional through the date of service of said Carve Out Trigger Notice (including partial amounts for any Carve Out Trigger Notice given other than at the end of a week, and after giving effect to all carryforwards and carrybacks from prior or subsequent favorable budget variances), less the amount of prepetition retainers received by such Case Professionals and not previously applied to fees and expenses; plus <br><br> (c) all accrued and unpaid fees, disbursements, costs and expenses incurred by the Case Professionals from and after the date of service of a Carve Out Trigger Notice, to the extent allowed at any time, in an aggregate amount not to exceed $3,000,000 (the "Carve Out Cap") ($2,750,000 of which shall be allocable to the Debtors' Case Professionals, and $250,000 of which shall be allocable to any Committee Case Professionals) less the amount of prepetition retainers received by such Case Professionals and not applied to the fees, disbursements, costs and expenses set forth in clause (b) above.  The Carve Out Cap shall be reduced on a dollar-for-dollar basis by any payments of fees or expenses of the Case Professionals made after delivery of the Carve Out Trigger Notice in respect of fees and expenses incurred after delivery of the Carve Out Trigger Notice.  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered (i) by the DIP Agent to the Debtors and their counsel, counsel to the Prepetition Term Loan Lenders, the United States Trustee, and lead counsel to any Committee, which notice may be delivered at any time by the DIP Agent following the occurrence and continuance of any DIP Order Event of Default (defined below) and shall specify that it is a "Carve Out Trigger Notice", or (ii) by the Prepetition Term Loan Agent to the Debtors and their counsel, the United States Trustee, and lead counsel to any Committee, which notice may be delivered at any time following the occurrence and continuance of a Cash Collateral Termination Event (as defined in the Interim Order). <br><br> *See* Interim Order ¶ 29. |

---

[6] For the avoidance of doubt, whether or not fees or expenses of any Case Professional have been incurred in accordance with the Approved Budget and entitled to the Carve Out shall be governed by the line items set forth in the Professional Monthly Fee Estimates contained in the Debtors' liquidity forecast provided to the DIP Agent.

| Material Provision | Brief Summary |
|---|---|
| Events of Default | Section 8.01 of the DIP Credit Agreement sets forth the Events of Default thereunder, including failure to comply with the Approved Budget (subject to the Permitted Variances thereunder) and failure to pay the balance due.<br><br>In addition to the "Events of Default" as defined in the DIP Credit Agreement, the Interim Order provides that the Debtors' failure to obtain entry of the Final Order on or before April 1, 2016 constitutes a default thereunder (collectively the "<u>DIP Order Events of Default</u>").  *See* Interim Order ¶ 37. |

| Material Provision | Brief Summary |
|---|---|
| Adequate Protection<br><br>Bankruptcy Rule 4001 (c)(1)(B) (ii) | In addition to certain reporting, access, consent and consultation rights to be provided by the Debtors, the Prepetition Secured Parties shall receive adequate protection as follows (solely to the extent of any Collateral Diminution):<br><br>• **Adequate Protection Liens**.  The Prepetition Agents and the Prepetition Secured Lenders shall receive Adequate Protection Liens which shall be (i) junior only to the Carve Out, the DIP Liens securing the DIP Facility, and Permitted Prior Liens, and (ii) in all instances, subject to the Prepetition Intercreditor Agreement.<br><br>• **Adequate Protection Superpriority Claim**.  The Prepetition Secured Lenders shall be granted Adequate Protection Superpriority Claims which shall have priority (except with respect to (i) the Carve Out and (ii) the DIP Superpriority Claims), in the Chapter 11 Cases under sections 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code, and upon entry of the Final Order, sections 506(c) and 552 of the Bankruptcy Code; ***provided, however***, that the Adequate Protection Superpriority Claims shall attach to all Bankruptcy Recoveries only after entry of the Final Order.<br><br>• **Adequate Protection Payments**.  Until the repayment in full of the obligations under the Prepetition ABL Credit Agreement (including pursuant to the Final Roll-Up), the Prepetition ABL Agent shall receive payment of all accrued and unpaid interest at the default rate set forth in the Prepetition ABL Credit Agreement.  The Prepetition Agents and the Prepetition Secured Lenders shall be reimbursed, on a current basis, for all reasonable and documented out-of-pocket costs and expenses of the financial advisors, appraisers and outside attorneys engaged by such parties, solely to the extent permitted under the Prepetition ABL Credit Agreement or Prepetition Term Loan Credit Agreement, as applicable (and subject to the reimbursement provisions set forth above with respect to Adequate Protection Payments to the Prepetition Term Loan Agent and Prepetition Term Loan Lenders).  In addition, the Prepetition ABL Lenders shall be the beneficiaries of a $250,000 segregated account established by the Debtors for the purposes of satisfying certain indemnification obligations.<br><br>*See* Interim Order ¶ 18. |

| Material Provision | Brief Summary |
|---|---|
| Automatic Stay<br><br>Bankruptcy Rule 4001 (c)(1)(B)(iv) | The automatic stay is terminated after 5 days' prior written notice to the Debtors, counsel to the Debtors, counsel to each of the Prepetition Agents, counsel for any Committee, and the United States Trustee if there is a declaration of a DIP Order Event of Default. *See* Interim Order at ¶¶ 38-41.<br><br>The aforementioned provision shall remain in effect if the Interim Order is entered but the Final Order is not. |
| Limitation On Challenges to the Amount of the Secured Debt Obligations and the Liens Securing Such Secured Debt Obligations<br><br>Bankruptcy Rule 4001(c)(1)(B)(iii), (viii) | The recitals in paragraphs E(1)- E(7) of the Interim Order provide stipulations by the Debtors to the validity and priority of the liens securing the Prepetition ABL Credit Agreement and the Prepetition Term Loan Credit Agreement and the outstanding amount of the Prepetition Revolving Loan, the Prepetition FILO Loan and the Prepetition Term Loan.  Paragraphs 26-28 of the Interim Order provide that these stipulations shall be binding on the Debtors' estates and all parties in interest, including, without limitation, all Committees, *unless* (a) any Committee, or another party in interest (other than the Debtors) with standing and requisite authority, commences a contested matter or adversary proceeding (a "Challenge") challenging the amount, validity or enforceability of the Prepetition Revolving Loan, the Prepetition FILO Loan or the Prepetition Term Loan, or the perfection or priority of the liens securing the Prepetition ABL Credit Agreement or Prepetition Term Loan Credit Agreement, no later than the earlier of the date that (i) in the case of a party in interest with requisite standing other than a Committee, 75 days after the Petition Date, and (ii) in the case of any Committee, 60 days after the filing of notice of appointment of a Committee (the "Challenge Period"), and (b) to the extent the Court rules in favor of the plaintiff in any such timely and properly filed Challenge.<br><br>The aforementioned provisions shall remain in effect if the Interim Order is entered but the Final Order is not. |

| Material Provision | Brief Summary |
|---|---|
| Limitation On Use of Proceeds<br><br>Bankruptcy Rule 4001 (c)(1)(B)(viii) | Pursuant to Section 6.11 of the DIP Credit Agreement, proceeds of the Revolving DIP Facility must be used (i) in accordance with the Approved Budget (subject to the Permitted Variance), or as otherwise set forth in such Section, or (ii) for purposes of funding the Revolving Loan Roll-Up.<br><br>Pursuant to Section 6.11 of the DIP Credit Agreement, proceeds of the FILO DIP Facility must be used for purposes of funding the FILO Loan Roll-Up.<br><br>Paragraph 30 of the Interim Order allows any official committee of unsecured creditors appointed in the Chapter 11 Cases to use $50,000 of cash to investigate claims against the Prepetition Secured Parties.  No collateral or loan proceeds can be used to prosecute any such claims.<br><br>The aforementioned provision shall remain in effect if the Interim Order is entered but the Final Order is not. |
| Conditions Precedent<br><br>Bankruptcy Rule 4001(c)(1)(B) | Conditions precedent include, without limitation: (i) execution and delivery of the DIP Credit Agreement and related loan documents; (ii) entry of the Interim Order in form and substance acceptable to the DIP Agent; (iii) minimum Excess Availability (as defined in the DIP Credit Agreement) of $50 million (after the first funding of loans under the DIP Credit Facility); (iv) DIP Agent's receipt of the Budget; and (v) payment of certain fees and expenses owing as of the closing date.<br><br>*See* DIP Credit Agreement § 4.01. |
| Section 506(c)/552(b) Waiver<br><br>Bankruptcy Rule 4001(c)(1)(B)(x) | In consideration of the Prepetition Secured Lenders' consent to the use of their Cash Collateral, upon entry of the Final Order, the Debtors (and any successors thereto or any representatives thereof, including any trustees appointed in the Chapter 11 Cases or any Successor Case (as defined in the Interim Order)) shall be deemed to have waived any rights or benefits of section 506(c) of the Bankruptcy Code with respect to the Prepetition Agents, the Prepetition Secured Lenders, the DIP Lenders, the Prepetition Collateral, and the DIP Collateral.<br><br>Solely upon entry of the Final Order, the DIP Liens securing the extensions of credit under the DIP Facility and the Interim Order shall not be subject to an assertion by the Debtors of the "equities of the case" exception of section 552 of the Bankruptcy Code.<br><br>*See* Interim Order ¶¶ 12, 44-45. |

| Material Provision | Brief Summary |
|---|---|
| Indemnification<br><br>Bankruptcy Rule 4001(c)(1)(B)(ix) | Each Borrower and Guarantor shall indemnify and hold harmless, and provide limitations of liability to the DIP Agent, the DIP FILO Agent, the Arranger (as defined in the DIP Credit Agreement), the DIP Lenders, the L/C Issuer (as defined in the DIP Credit Agreement), and their representatives and affiliates, subject to customary limitations for gross negligence and willful misconduct. *See* DIP Credit Agreement § 9.14.<br><br>The aforementioned provisions shall remain in effect if the Interim Order is entered but the Final Order is not. |

## I.    Local Rule 4001-2(a)(i) Statements

45.    In accordance with Local Rule 4001-2(a)(i), the following provisions of the DIP Credit Agreement are highlighted below:

a.    ***Provisions that grant cross-collateralization protection (other than replacement liens or other adequate protection) to the prepetition secured creditors.***

There is no cross-collateralization.  While the DIP Liens extend to certain previously unencumbered property of the Debtors (i.e. the New Loan Party Assets and the Lease Proceeds), such assets shall secure only the DIP Facility, and shall not otherwise constitute "Collateral" as defined under the Prepetition ABL Credit Agreement or the Prepetition Term Loan Agreement, and the DIP Liens on the New Loan Party Assets and the Lease Proceeds shall not be held by the DIP Agent for the benefit of the Prepetition Agents or the Prepetition Secured Lenders.  *See* Interim Order ¶ 10.

b.    ***Provisions or findings of fact that bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order and the creditors' committee, if formed, at least sixty (60) days from the date of its formation to investigate such matters.***

There are no such provisions.

c.    ***Provisions that seek to waive, without notice, whatever rights the Debtors' estates may have under 11 U.S.C. § 506(c).***

34

All rights of the Debtors' estates under section 506(c) of the Bankruptcy Code are waived with respect to the collateral of Prepetition Secured Parties, subject to entry of the Final Order.

d.     ***Provisions that immediately grant to the prepetition secured creditors liens on the Debtors' claims and causes of action arising under 11 U.S.C. §§ 544, 545, 547, 548 and 549.***

Liens will not be granted on Avoidance Actions.  Upon entry of the Final Order, liens will be granted to the DIP Agent (for the benefit of itself and the DIP Lenders) on (x) the proceeds of actions arising under section 549 of the Bankruptcy Code, and (y) the proceeds of other Avoidance Actions in the amounts necessary to reimburse the DIP Agent and the DIP Lenders for the amount of the Carve Out, if any, used to finance the pursuit of recovery or settlement of such other Avoidance Actions.

e.     ***Provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in 11 U.S.C. § 552(b).***

Prior to entry of the Final Order, all collections of DIP Collateral (other than proceeds of Term Priority Collateral) will be applied against the Prepetition Revolving Loan.  The Prepetition Revolving Loan will be paid in full in cash, or "rolled-up," promptly after entry of the Final Order from draws on the Revolving DIP Facility.  The Prepetition FILO Loan will be paid in full in cash, or "rolled-up," promptly after entry of the Final Order from the proceeds of the FILO DIP Facility.

The Roll-Up will be without prejudice to the rights of any third party, including, without limitation, any Committee, to seek to claw-back such payment if that third party successfully challenges the validity of the claims or liens securing the Prepetition Revolving Loan or the Prepetition FILO Loan.

f.     ***Provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve-out.***

Pursuant to paragraph 29 of the Interim Order, each professional employed by the Debtors and any Committee will be entitled to Carve Out protections that are commensurate with such professional's anticipated efforts in the Chapter 11 Cases; but, in recognition of the fact that the Debtors' professionals are expected to perform more work in connection with the Chapter 11 Cases, the dollar amounts of the Carve Out protections for the Debtors' professionals after delivery of a Carve Out

Trigger Notice are higher than the dollar amounts of the Carve Out protections afforded to the professionals retained by any Committee.

g. ***Provisions that prime any secured lien absent consent of the affected lienor.***

The liens securing the DIP Facility will prime certain of the Prepetition Secured Parties' pre-petition liens, but the Prepetition Secured Parties have consented to this priority.

h. ***Provisions that seek to affect the Court's power to consider the equities of the case under 11 U.S.C. § 552(b)(1).***

Upon the entry of the Final Order, the "equities of the case" exception set forth in section 552(b)(1) of the Bankruptcy Code shall not apply to the DIP Agent, DIP Lenders, or any of the Prepetition Secured Parties.

46.    In addition to the foregoing, the Debtors are requesting a finding in the Interim Order that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section.  The DIP Credit Agreement provides the Debtors with the financing necessary to maintain their operations and maximize estate value, and the provisions thereof were extensively negotiated, at arms' length and in good faith.  Accordingly, the requested finding pursuant to section 364(e) of the Bankruptcy Code is warranted.

## RELIEF REQUESTED

47.    The Debtors seek entry of an order (a) authorizing the Debtors (i) to obtain interim post-petition secured financing pursuant to the terms and conditions of the DIP Credit Agreement, and (ii) to use Cash Collateral, (b) granting adequate protection to the Prepetition Secured Parties, and (c) scheduling and establishing deadlines relating to a Final Hearing and proposed Final Order authorizing the Debtors to obtain post-petition financing on the terms and conditions set forth in the DIP Credit Agreement.

01:18374952.1

## BASIS FOR RELIEF REQUESTED

**A.      The DIP Credit Agreement Should be Approved**

48.      The Debtors propose to obtain financing under the DIP Credit Agreement by providing security interests and liens as set forth above pursuant to sections 364(c) and 364(d) of the Bankruptcy Code.  Section 364(c) provides:

> If the [debtor in possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt —
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

Section 364(d)(1) further provides:

> The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if —
>
> (A) the [debtor in possession] is unable to obtain such credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d).

Bankruptcy Rule 4001(c)(2) provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(c)(2).

49.    The DIP Credit Agreement satisfies applicable standards for approval under sections 364(c) and 364(d) of the Bankruptcy Code.

(i)    *The DIP Credit Agreement Satisfies Section 364(c) of the Bankruptcy Code*

50.    Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether: (a) the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim; (b) the credit transaction is necessary to preserve the assets of the estate; and (c) the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender.  *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990); *In re The Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987).  Section 364(c) of the Bankruptcy Code does not impose upon a debtor in possession the onerous duty to seek unsecured credit from every possible lender before concluding that such credit is unavailable.  *See Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co., Inc.)*, 789 F.2d 1085, 1088 (4th Cir. 1986).  This is true especially when time is of the essence.  *See e.g.*, *id.*; *In re Reading Tube Indus.*, 72 B.R. 329, 333 (Bankr. E.D. Pa. 1987); *In re Stacy Farms*, 78 B.R. 494, 498 (Bankr. S.D. Ohio 1987).  Rather, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by section 364(c) of the Bankruptcy Code.  *See In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).

51.    Inability to Obtain Credit on an Unsecured Basis.  As described in the Douton Declaration, the Debtors engaged in a robust marketing process designed to obtain debtor-in-possession financing on the most favorable terms.  The Debtors contacted numerous potential third party lenders who have historically been active in the debtor-in-possession financing

market.  While several of these third-parties expressed interest in providing a potential debtor-in-possession loan, performed diligence and even provided term sheets for such financing, none of these third-parties were willing to provide financing on an unsecured or junior basis.

52.     While certain third-party lenders may have been willing to provide debtor-in-possession financing on a senior priming basis, the Prepetition Secured Parties advised the Debtors that they would not consent to the granting of such liens to an unaffiliated third-party. Following consultation with their advisors, the Debtors determined that the expense and uncertainty attendant to a priming fight with the Prepetition Secured Parties would adversely impact the Debtors' operations and relationships with key vendors, generate additional legal expenses and, if unsuccessful, harm the Debtors' businesses.  In the absence of any viable outside financing source, the Debtors and their advisors engaged in negotiations with the DIP Lenders and certain of the Prepetition Term Loan Lenders.  This process helped the Debtors secure the most favorable financing available under the circumstances.

53.     <u>The DIP Facility is Necessary to Preserve Assets</u>.  The Debtors believe that use of Cash Collateral alone would not be sufficient to fund their operations and pay all administrative expenses during these Chapter 11 Cases.  The Debtors' business is reliant on critical trade vendors continuing to provide goods and favorable trade credit terms post-petition.  As described in the Douton Declaration and the First Day Declaration, the Debtors believe that the critical trade vendors will not provide post-petition delivery of goods and/or favorable trade terms absent the establishment of the DIP Facility.  Accordingly, absent the cash availability arising under the DIP Facility, the Debtors would be unable to finance these Chapter 11 Cases and maintain the going concern value necessary to maximize returns from the Proposed Sale Transaction.

54.    <u>The Terms of the Transaction are Fair, Reasonable and Adequate</u>.  The Debtors

negotiated the DIP Credit Agreement at arm's length and have determined, in the exercise of

their sound business judgment, that it is the best proposal under the circumstances and that its

terms are fair and reasonable.  The Debtors believe that the terms of the DIP Facility, including

the pricing, fees, term, and milestones, taken as a whole, are competitive.  Indeed, the posture of

the negotiations leading up to the commencement of these cases ensured that the terms of the

DIP Facility are the best available.  Moreover, the Debtors believe that the DIP Facility and the

Approved Budget will provide the Debtors with adequate liquidity to continue their operations

uninterrupted and preserve the value of the Debtors' businesses.

(ii)    *<u>The DIP Credit Agreement Satisfies Section 364(d) of the Bankruptcy Code</u>*

55.    The DIP Credit Agreement also includes priming liens on all ABL Priority

Collateral for the benefit of the DIP Lenders, and therefore is subject to approval under section

364(d) of the Bankruptcy Code.  Section 364(d)(1) of the Bankruptcy Code authorizes a debtor-

in-possession to incur superpriority senior secured priming liens if: (a) the debtor is unable to

obtain such credit otherwise, and (b) the interests of the secured creditors whose liens are being

primed by the post-petition financing are adequately protected.  *See* 11 U.S.C. §§ 364(d)(1).  As

described above, the Debtors are unable to obtain viable financing on terms more favorable than

the DIP Credit Agreement.  In addition, as described in section C below, the Interim Order

contemplates a fair adequate protection package which was consented to by the Prepetition

Secured Parties.  Accordingly the Debtors submit that the proposed DIP Facility satisfies the

requirements of section 364(d) of the Bankruptcy Code.

**B.    The Debtors' Use of Cash Collateral Should be Approved**

56.    The Debtors' use of property of their estates is governed by section 363 of the

Bankruptcy Code, which provides in pertinent part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

57.     Pursuant to section 363(c)(2) of the Bankruptcy Code, the Court may authorize the Debtors to use cash collateral as long as the applicable secured creditor consents or is adequately protected.  *See In re McCormick*, 354 B.R. 246, 251 (Bankr. C.D. Ill. 2006) (to use the cash collateral of a secured creditor, the debtor must have the consent of the secured creditor or must establish to that the secured creditor's interest in the cash collateral is adequately protected); *see also Matter of Pursuit Athletic Footwear, Inc*., 193 B.R. 713, 721 (Bankr. D. Del. 1996) (holding that creditors were adequately protected and allowing debtor to use cash collateral); *In re Atrium Corp*., 2010 WL 2822131, at *6 (Bankr. D. Del. Mar. 17, 2010) (authorizing debtor's use of cash collateral and granting creditor adequate protection).

58.     The Debtors have an urgent need for the immediate use of their Cash Collateral pending the Final Hearing and seek to use all Cash Collateral existing on or after the Petition Date.  The continued operation of the Debtors' businesses is the single most important factor in preserving the Debtors' going-concern value.  If the Debtors are not allowed to use Cash Collateral, the Debtors will not have sufficient funds to pay suppliers, employees, landlords, and the other costs of operations.  This scenario is not in the best interests of the Debtors or the other stakeholders in these Chapter 11 Cases.  *See In re Dynaco Corp.*, 162 B.R. 389, 395–96 (Bankr. D.N.H. 1983) (finding that the alternative to the debtor's use of cash collateral, termination of its business, would doom reorganization and any chance to maximize value for all creditors); *see*

*also In re Glob. Safety Textiles Holdings LLC,* 2009 WL 7834657, at *4 (Bankr. D. Del. July 30, 2009) *aff'd as modified*, 2009 WL 7834658 (Bankr. D. Del. Sept. 21, 2009) (finding good cause for the use of cash collateral because "Debtors ha[d] an immediate need to use the Cash Collateral . . . to permit . . . the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures and to satisfy other working capital and operational needs" and because cash collateral was "vital to the preservation and maintenance of the going concern values of the Debtors and to a successful reorganization of the Debtors or an orderly sale of the Debtors' assets"). The use of Cash Collateral, together with the availability under the DIP Facility, will enable the Debtors to preserve the going concern value of their businesses.

59.     Subject to the terms and conditions of the Interim Order, the Prepetition Secured Parties have consented to the Debtors' Use of Cash Collateral. In addition, to the extent any other prepetition secured creditor has a lien on the Debtors' Cash Collateral and does not consent to the Debtors' use of such Cash Collateral, such creditor will be adequately protected as described in section C below.[7]

60.     Based upon the foregoing, the Debtors request that the Court authorize the Debtors to use the Cash Collateral in accordance with the terms set forth in the Interim Order and the DIP Credit Agreement.

## C.     The Proposed Adequate Protection Should be Approved

61.     Section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property used . . . or proposed to be used . . . by [a debtor in possession], the

---

[7]     The Debtors do not believe that any such creditors exist.

court, with or without a hearing, shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

62.    The propriety of adequate protection is determined on a case-by-case basis.  *See Resolution Trust Corp. v. Swedeland Dev. Group (In re Swedeland Dev. Group)*, 16 F.3d 552, 564 (3d Cir. 1994) (*citing MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396-97 (10th Cir. 1987)); *In re Martin*, 761 F.2d 472, 474 (8th Cir. 1985); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); *In re Columbia Gas Sys., Inc.*, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *In re Beker Indus. Corp*., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).  Adequate protection shields a secured creditor from diminution in the value of its interest in the particular collateral during the period of use.  *See In re Continental Airlines, Inc.*, 154 B.R. 176, 180-81 (Bankr. D. Del. 1993); *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *Beker Indus.*, 58 B.R. at 736; *In re Ledgemere Land Corp.*, 116 B.R. 338, 343 (Bankr. D. Mass. 1990); *In re Kain*, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988).

63.    Adequate protection is not expressly defined in the Bankruptcy Code.  Rather, section 361 of the Bankruptcy Code provides a non-exclusive list of examples of adequate protection.  The flexibility provided by section 361 provides the Court with discretion in fashioning the protection provided to a secured party.  *See Swedeland*, 16 F.3d 552, 564 (3d Cir. 1994).  Adequate protection may be provided through a "replacement lien" or "other relief" resulting in the "indubitable equivalent" of the secured creditor's interest in such property.  *See* 11 U.S.C. § 361.

64.     The Debtors are providing the Prepetition Secured Parties with adequate protection for their consent to the priming liens[8] and use of Cash Collateral by the provision of: (a) the Adequate Protection Super-Priority Claims, (b) the Adequate Protection Liens, (c) the Adequate Protection Payments, (d) the Indemnity Account, and (e) certain reporting, access, consent and consultation rights, all as set forth in the Interim Order.  The Debtors believe that this form of adequate protection reasonably balances the Debtors' need to use the Prepetition Collateral and the Prepetition Secured Parties' rights to adequate protection under the Bankruptcy Code.

65.     To the extent any prepetition secured creditor has a lien on the Debtors' assets and does not consent to the Debtors' use of those assets, such creditor will be adequately protected.[9] The DIP Facility will provide the bridge funding needed to complete a robust marketing and auction process.  Without the DIP Facility, and the attendant loss of support from their critical vendors, the Debtors could be required to quickly terminate some or all of their operations, which would destroy at least a substantial portion of the going concern value of the Debtors' operations.

66.     Preservation of value generally constitutes the "adequate protection" needed to prime existing liens.  *See, e.g.*, Norton, et al., 2 *Norton Bankruptcy Law and Practice 2d.* § 38:7, p.38-17 (1994) (addressing the § 364(d) determination, "[f]actors influencing a court's decision will be the viability of the debtor's business and the need to protect assets against a sharp decline in value"); *Snowshoe*, 789 F.2d at 1087 (§ 364(d) order affirmed on appeal where "the trustee reported that the resort [the collateral] would lose from 50% to 90% of its fair market value if it

---

[8]     Section 364(d) of the Bankruptcy Code requires that adequate protection be provided where the liens of secured creditors are being primed to secure the obligations under a debtor-in-possession financing facility.  *See* 11 U.S.C. § 364(d).

[9]     The Debtors do not believe that any such creditors exist.

ceased operations"); *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992)

(funds from lender given "priming" lien used to improve collateral is transferred into value.

"This value will serve as adequate protection. . . ."); *In re Hubbard Power & Light*, 202 B.R.

680, 685 (Bankr. E.D.N.Y. 1996); *In re Devlin*, 185 B.R. 376, 378 (Bankr. M.D. Fla. 1995)

(chapter 11 debtor-motel operator authorized to incur debt with superpriority status to replace

air-conditioning unit, boiler, and hot water heaters because such expenses were necessary to

preserve value and maintain operations).

67.     Accordingly, the Debtors submit that the proposed terms of the Debtors' use of

Prepetition Collateral and proposed forms of adequate protection should be approved in their

entirety.

**D.     The Proposed Roll-Up Should be Approved**

68.     As discussed above, the DIP Credit Agreement requires that, upon entry of the

Interim Order but prior to entry of the Final Order, post-petition collections of all DIP Collateral

(other than Term Priority Collateral) shall be applied directly to pay-down the Prepetition

Revolving Loan and, contemporaneously therewith, availability under the Revolving DIP

Facility shall be increased by a corresponding amount (i.e. a "creeping" roll-up).  In addition,

upon entry of the Interim Order, all outstanding Letters of Credit issued under the Prepetition

ABL Credit Agreement shall be deemed post-petition obligations issued under the DIP Credit

Agreement.  Upon entry of the Final Order, availability under the Revolving DIP Facility will be

used to repay the entire outstanding balance under the Prepetition Revolving Loan, and

availability under the FILO DIP Facility will be used to repay the entire outstanding balance

under the Prepetition FILO Loan.

69.     Courts have permitted debtors to use post-petition financing to pay prepetition

claims of a lender where, as here, the loan cannot be obtained on any other basis and the claims

of the prepetition lender are fully secured.  As the United States District Court for the District of

Delaware recently observed:

> [P]repetition secured claims can be paid off through a "roll-up." Most simply, a
> [roll up] is the payment of a pre-petition debt with the proceeds of a post-petition
> loan. Roll-ups most commonly arise where a pre-petition secured creditor is also
> providing a post-petition DIP loan under section 364(c) and/or (d) of the
> Bankruptcy Code. The proceeds of the DIP loan are used to pay off or replace the
> pre-petition debt, resulting in a post-petition debt equal to the pre-petition debt
> plus any new money being lent to the debtor. As a result, the entirety of the pre-
> petition and post-petition debt enjoys the post-petition protection of section
> 364(c) and/or (d) as well as the terms of the DIP order. In both a refinancing and a
> roll-up, the pre-petition secured claim is paid through the issuance of new debt
> rather than from unencumbered cash.

*Del. Trust Co. v. Energy Future Intermediate Holdings, LLC (In re Energy Future Holding
Corp.)*, 2015 U.S. Dist. LEXIS 19684, 20-21 (D. Del. Feb. 9, 2015) (quoting *In re Capmark Fin.
Group, Inc.*, 438 B.R. 471, 511 (Bankr. D. Del. 2010)).  *See also*, *e.g.*, *In re UniTek Global
Servs., Inc.*, Case No. 14-12471 (PJW) (Bankr. D. Del. Dec. 2, 2014), *In re Coldwater Creek
Inc.*, Case No. 14-10867 (BLS) (Bankr. D. Del. June 12, 2014); *In re Quantum Foods, LLC*,
Case No. 14-10318 (KJC) (Bankr. D. Del. Mar. 20, 2014); *In re Tuscany Int'l Holdings (U.S.A.)
Ltd.*, Case No. 14-10193 (KG) (Bankr. D. Del. Feb. 4, 2014); *In re Southern Air Holdings, Inc.*,
Case No. 12-12690 (CSS) (Bankr. D. Del. Oct. 1, 2012); *In re Appleseed's Intermediate
Holdings LLC*, Case No. 11-10160 (KG) (Bankr. D. Del. Jan. 20, 2011).

70.    The Debtors believe that the proposed Roll-Up is appropriate under the

circumstances and will not prejudice the Debtors or their estates.  First, the Roll-Up is a

condition to the availability under the Revolving DIP Facility and, as noted above, the Debtors

were unable to obtain financing on more favorable terms.  Second, the Debtors believe that the

current amount outstanding under the Prepetition ABL Credit Agreement (*i.e.*, approximately

$447 million) is less than the value of the ABL Priority Collateral.  It is the view of the Debtors

and their professionals that the Prepetition Revolving Loans and Prepetition FILO Loan are oversecured by $80 million or more.  Third, the validity, enforceability, and priority of the liens granted by the Debtors under the Prepetition ABL Credit Agreement are subject to the "challenge" rights of third parties, including any Committee.  Thus, insofar as the satisfaction of the Prepetition Revolving Loan and Prepetition FILO Loan is premised upon the validity of the blanket liens granted by the Debtors thereunder, the Committee will have an opportunity to examine the propriety of such repayment, and to claw-back such repayment to the extent that the underlying liens are avoided.  Hence, there should be no prejudice from the proposed Roll-Up to other creditors of these estates because the Prepetition ABL Agents and Prepetition ABL Lenders already assert fully secured security interests in the assets that the Debtors propose to pledge to the DIP Lenders that are providing the funds to satisfy the Prepetition Revolving Loan and the Prepetition FILO Loan with the DIP Facility.  *See, e.g.*, *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 4-5 (2000) (recognizing that administrative expense claims allowable under section 503(b) of the Bankruptcy Code "do not have priority over secured claims").

71.    Accordingly, the Debtors submit that the proposed Roll-Up is appropriate under the circumstances and should be approved.

**E.    The DIP Lenders are Entitled to the Protections of Section 364(e) of the Bankruptcy Code**

72.    Section 364(e) of the Bankruptcy Code provides that the "reversal or modification on appeal of an authorization . . . to obtain credit or incur debt . . . does not affect the validity of any debt so incurred or any priority or lien so granted, to an entity that extended such credit in good faith."  11 U.S.C. § 364(e).  As previously discussed herein, the DIP Credit Agreement is the product of extensive arm's length, good faith negotiations between the Debtors and the DIP

Lenders.  Moreover, the terms and conditions of the DIP Facility are fair and reasonable, and the

Debtors' entry into the DIP Credit Agreement is in the best interests of their estates and

creditors.  Accordingly, the Debtors respectfully submit that the Court should find that the DIP

Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code,

and are entitled to all of the protections afforded thereby.

**F.      The Section 506(c) Waiver in the Final Order Should be Approved**

73.      Under the DIP Credit Agreement, the Debtors agree to waive any rights to charge

costs and expenses against the collateral of the Prepetition Secured Parties.  The Debtors request

that the Court approve the waiver, upon entry of the Final Order.  Such waivers and provisions

are standard under financings between sophisticated parties.  As one court noted, "the Trustee

and Debtors-in-Possession in this case had significant interests in asserting claims under § 506(c)

and have made use of their rights against the Lender under § 506(c) by waiving them in

exchange for concessions to the estates (including a substantial carve-out for the benefit of

administrative creditors)."  *In re Molten Metal Technology, Inc.*, 244 B.R. 515, 527 (Bankr. D.

Mass. 2000).  *See also In re Nutri/System of Florida Assocs.*, 178 B.R. 645, 650 (E.D. Pa. 1995)

(noting that debtor had waived § 506(c) rights in obtaining debtor in possession financing; *In re*

*Telesphere Communications, Inc.*, 179 B.R. 544, 549 (Bank. N.D. Ill. 1994) (approving

settlement between debtor and certain lenders wherein debtor waived certain rights (including

506(c) rights) against the lenders in exchange for valuable consideration).

74.      The waiver of surcharge rights is appropriate where, as here, the Prepetition

Secured Parties have consented to the Carve Out and to the continued use of Cash Collateral and

the proceeds of the Prepetition Collateral to fund the administration of the Debtors' estates in

accordance with the Approved Budget.

**G.      Modification of the Automatic Stay Should be Approved**

75.      The DIP Credit Agreement and Interim Order contemplate the modification of the automatic stay to the extent necessary to permit the Debtors, the DIP Agent and DIP Lenders to take all actions necessary to implement the DIP Credit Agreement and the Interim Order. However, the DIP Agent will provide five (5) days' notice to the Debtors, U.S. Trustee and the respective counsel to any Committee after an event of default before enforcing remedies under the DIP Credit Agreement.

76.      Stay modification provisions of this type are customary components of post-petition debtor-in-possession financing facilities and, in the Debtors' business judgment, are reasonable under the circumstances.  The provision provides the Debtors and other parties reasonable time to cure an event of default if possible and entitles the Debtors and any Committee to an emergency hearing before the Court.  Accordingly, the Debtors request that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the Interim Order.

**H.      Liens on the Proceeds of Avoidance Actions Should be Approved**

77.      The Final Order, if approved by the Court, will grant the DIP Agent (for the benefit of itself and the DIP Lenders) liens on (i) the proceeds of Avoidance Actions arising under section 549 of the Bankruptcy Code, and (ii) the proceeds of other Avoidance Actions in the amounts necessary to reimburse the DIP Agent and the DIP Lenders for the amount of the Carve Out, if any, used to finance the pursuit of recovery or settlement of such other Avoidance Actions.  The DIP Lenders required the granting of such liens as a necessary condition to extending financing under the DIP Credit Agreement.  The Debtors require the financing under the DIP Credit Agreement to ensure that their business operations are not interrupted. Accordingly, it is appropriate to grant the liens on the proceeds of Avoidance Actions arising

under section 549 of the Bankruptcy Code and other Avoidance Actions for the limited purposes set forth above.  Courts in this District have approved the granting of such liens under similar circumstances. *See, e.g., In re Bicent Holdings LLC*, Case No. 12-11304 (KG) (Bankr. D. Del. May 16, 2012); *In re Capitol Infrastructure, LLC*, Case No. 12-11362 (KG) (Bankr. D. Del. May 15, 2012); *In re Solar Trust of America, LLC*, Case No. 12-11136 (KG) (Bankr. D. Del. Apr. 26, 2012); *In re Delta Petroleum Corp.*, Case No. 11-14006 (KJC) (Bankr. D. Del. Jan. 11, 2012); *In re Townsends, Inc.*, Case No. 10-14092 (CSS) (Bankr. D. Del. Jan. 28, 2011).

**I.     Immediate Relief is Justified**

78.     Pursuant to Bankruptcy Rules 4001(b) and (c), a final hearing on a motion to use cash collateral or obtain post-petition financing may not be commenced earlier than 14 days after service of such motion.  The Court, however, is authorized to conduct an expedited hearing prior to the expiration of such 14-day period and to authorize the debtor to obtain credit to the extent necessary to avoid immediate and irreparable harm to the debtor's estate.  Pursuant to Bankruptcy Rules 4001(b) and (c), the Debtors therefore request that the Court (i) authorize the Debtors to obtain financing on an interim basis pursuant to the terms of the Interim Order and (ii) schedule a final hearing to consider approval of the Debtors' request to obtain financing through the DIP Facility on a final basis pursuant to the terms of the Final Order.

79.     As described above and in the Douton Declaration and the First Day Declaration, without access to the Revolving DIP Facility, the Debtors will lose vendor support and will thus have no ability to continue operating their businesses.  In light of the foregoing, the Debtors submit that they have satisfied the requirements of Bankruptcy Rules 4001(b) and (c) to support immediate availability from the Revolving DIP Facility pending the entry of the Final Order.  Accordingly, to forestall the immediate and irreparable harm that would inure to the Debtors'

estates, creditors and parties in interest absent Court approval of this Motion, the Debtors

respectfully request that the Court grant the relief requested herein.

**J.      Notice Procedures and the Final Hearing**

80.      Pursuant to Local Rule 4001-2(c), the Final Order may only be entered after

notice and a hearing and the Debtors may not schedule a hearing to consider the Final Order until

at least seven (7) days after the organizational meeting of the Committee contemplated by

section 1102 of the Bankruptcy Code.

81.      The Debtors shall, within three (3) business days of the entry of the Interim Order

by the Court, serve (A) the U.S. Trustee; (B) Riemer & Braunstein LLP (attn: Donald Rothman)

as counsel to (i) the DIP Agent, (ii) the Revolving DIP Lenders, and (iii) the Prepetition ABL

Administrative Agent; (C) holders of the 50 largest unsecured claims on a consolidated basis

against the Debtors; (D) Brown Rudnick LLP (attn: Robert Stark and Bennett Silverberg) as

counsel for (i) the Prepetition Term Loan Agent and (ii) certain Prepetition Term Loan Lenders;

(E) Choate, Hall & Stewart LLP (attn: Kevin Simard) as counsel for (i) the FILO Agent and (ii)

the FILO DIP Lenders; (F) O'Melveny & Meyers LLP (attn: John Rapisardi) as counsel for

certain holders of Mezzanine Notes; (G) all holders of Mezzanine Notes; (H) the Internal

Revenue Service; (I) all appropriate state taxing authorities; (J) all landlords, owners, and/or

operators of premises at which any of the Debtors' inventory and/or equipment is located; and

(K) any other party that files a request for notices with the Court as of the date of such service

(collectively, the "Notice Parties"), a copy of the Interim Order and a notice of the Final Hearing

(the "Final Hearing Notice") to consider entry of the Final Order on the date established by the

Court.

82.      The Final Hearing Notice will also inform recipients that any party in interest

objecting to the relief sought at the Final Hearing will be required to serve and file an objection,

which objection shall: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local

Rules; (iii) be filed with the Clerk of the United States Bankruptcy Court for the District of

Delaware by no later than 4 p.m. on the day that is not less than seven (7) calendar days before

the Final Hearing (the "Objection Deadline"); and (iv) be served upon the following parties so as

to be received by the Objection Deadline:  (A) the U.S. Trustee: 844 King Street, Suite 2207,

Lockbox 35, Wilmington, DE 19801; (B) co-counsel for the Debtors:  Gibson, Dunn & Crutcher

LLP, 333 South Grand Avenue, Los Angeles, California 90071 (Attn: Robert A. Klyman, Esq.

and Matthew J. Williams, Esq.) and Young Conaway Stargatt & Taylor, LLP, Rodney Square,

1000 North King Street, Wilmington, Delaware 19801 (Attn: Michael R. Nestor, Esq. and

Andrew L. Magaziner, Esq.); (C) counsel to the DIP Agent and Revolving DIP Lenders: Riemer

& Braunstein LLP, Three Center Plaza, Boston, Massachusetts 02108 (Attn: Donald E.

Rothman, Esq.) and Ashby & Geddes 500, Delaware Avenue, Wilmington, Delaware 19899

(Attn: Gregory A. Taylor, Esq.); (D) counsel for the FILO Agent and FILO DIP Lenders:

Choate, Hall & Stewart LLP, Two International Place, Boston Massachusetts 02110 (Attn: Kevin

J. Simard, Esq.) and Richards, Layton & Finger, PA, One Rodney Square, 920 North King

Street, Wilmington, DE 19899 (Attn: Mark Collins, Esq.); (E) counsel for the Prepetition Term

Loan Lenders: Brown Rudnick LLP (Attn: Robert Stark and Bennett Silverberg), and (F) counsel

to any Committee appointed in the Chapter 11 Cases.

83.     The Debtors respectfully request that the Court schedule the Final Hearing on this

Motion no later than thirty (30) days after the date of entry of the Interim Order.  Such relief is

necessary in order to maintain the value of the Debtors' assets and avoid immediate and

irreparable harm and prejudice to the Debtors' respective estates.

## REQUEST FOR WAIVER OF STAY

84.     To implement the foregoing, the Debtors seek a waiver of any stay of the effectiveness of the order approving this Motion.  Pursuant to Bankruptcy Rule 6004(h), any "order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  The relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein.  Accordingly, ample cause exists to justify a waiver of any 14-day stay imposed by Bankruptcy Rule 6004(h).

85.     To implement the foregoing immediately, the Debtors respectfully request a waiver of the notice requirements of Bankruptcy Rule 6004(a) to the extent deemed applicable.

## NOTICE

86.     The Debtors will provide notice of this Motion to the Notice Parties.

87.     Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).   In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.


*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated:    March 2, 2016
   Wilmington, Delaware   */s/ Andrew L. Magaziner*
             Michael R. Nestor (No. 3526)
             Kenneth J. Enos (No. 4454)
             Andrew L. Magaziner (No. 5426)
             YOUNG CONAWAY STARGATT & TAYLOR, LLP
             Rodney Square
             1000 North King Street
             Wilmington, Delaware 19801
             Telephone:  (302) 571-6600
             Facsimile:  (302) 571-1253
             mnestor@ycst.com
             kenos@ycst.com
             amagaziner@ycst.com

             -and-

             Robert A. Klyman (CA No. 142723)
             Matthew J. Williams (NY No. 3019106)
             Keith R. Martorana (NY No. 4576971)
             GIBSON, DUNN & CRUTCHER LLP
             333 South Grand Avenue
             Los Angeles, CA 90071-1512
             Telephone: (213) 229-7000
             Facsimile: (213) 229-7520
             rklyman@gibsondunn.com
             mjwilliams@gibsondunn.com
             kmartorana@gibsondunn.com

             *Proposed Counsel to the Debtors and Debtors in Possession*

**EXHIBIT A**

**PROPOSED INTERIM ORDER**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

```
------------------------------------------------------------- x
In re                                    :    Chapter 11
                                         :
The Sports Authority, Inc. , et al.,¹    :    Case No.  16-_____ (___)
                                         :
        Debtors.                         :    Jointly Administered
                                         :
                                         :    Ref. Docket No. __
------------------------------------------------------------- x
```

**INTERIM ORDER (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION
SECURED FINANCING PURSUANT TO 11 U.S.C. §§ 105, 362, 363, AND 364; (II)
GRANTING LIENS AND SUPERPRIORITY CLAIMS TO POST-PETITION LENDERS
PURSUANT TO 11 U.S.C. §§ 364 AND 507; (III) AUTHORIZING THE USE OF CASH
COLLATERAL AND PROVIDING ADEQUATE PROTECTION TO PREPETITION
SECURED PARTIES AND MODIFYING THE AUTOMATIC STAY PURSUANT TO 11
U.S.C. §§ 361, 362, 363, AND 364; AND (IV) SCHEDULING A FINAL HEARING
PURSUANT TO BANKRUPTCY RULES 4001(B) AND (C) AND LOCAL RULE 4001-2**

Upon the motion (the "***Motion***")² of The Sports Authority, Inc., on behalf of itself and its

affiliated debtors and debtors in possession in the above-captioned cases (collectively, the

"***Debtors***"), pursuant to sections 105, 361, 362, 363, 364, and 507 of title 11 of the United States

Code, 11 U.S.C. §§ 101 *et seq.* (the "***Bankruptcy Code***") and in accordance with Rules 2002, 4001

and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") and Rule

4001-2 of the Local Rules of Bankruptcy Practice and Procedure (the "***Local Rules***") of the United

States Bankruptcy Court for the District of Delaware (this "***Court***"), in these chapter 11 cases (the

"***Chapter 11 Cases***"), for entry of an interim order (this "***Interim Order***"), granting the following

---

¹    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  Sports
     Authority Holdings, Inc. (9008); Slap Shot Holdings, Corp. (8209); The Sports Authority, Inc. (2802); TSA
     Stores, Inc. (1120); TSA Gift Card, Inc. (1918); TSA Ponce, Inc. (4817); and TSA Caribe, Inc. (5664).  The
     headquarters for the above-captioned Debtors is located at 1050 West Hampden Avenue, Englewood, Colorado
     80110.

²    Capitalized terms used in this Interim Order but not defined herein shall have the meanings ascribed to such terms
     in the DIP Financing Agreements (as defined below).

relief on an interim basis until the date that a Final Order (as defined below) has been entered (the

"*Interim Period*"):

> **(I)    Interim DIP Financing**

>> (A)    Authorizing the Debtors to obtain up to $275,000,000 in post-petition financing (the "***DIP Facility***") during the Interim Period pursuant to (and in accordance with the terms of) that certain *Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement* (as may be amended, modified, or supplemented, the "***DIP Credit Agreement***"), substantially in the form as filed with the Court, by and among The Sports Authority, Inc. and TSA Stores, Inc., as borrowers, Sports Authority Holdings, Inc., Slap Shot Holdings Corp., TSA Gift Card, Inc., TSA Ponce, Inc., and TSA Caribe, Inc., as guarantors, Bank of America, N. A., as Administrative Agent and Collateral Agent (the "***DIP Agent***"), Wells Fargo Bank, National Association, as FILO Agent, and each Revolving Lender and each FILO Lender party thereto (collectively, the "***DIP Lenders***"), which may be used for the following in accordance with and as limited by the Approved Budget (as defined below) (subject to permitted variances) and subject to Paragraph 51 hereof (where applicable):

>>> (i)    to pay fees, costs, and expenses as provided in the DIP Financing Agreements (as defined below), including amounts incurred in connection with the preparation, negotiation, execution, and delivery of the DIP Credit Agreement and the other DIP Financing Agreements;

>>> (ii)    for general operating and working capital purposes, for the payment of transaction expenses, for the payment of fees, expenses, and costs incurred in connection with the Chapter 11 Cases, and other proper corporate purposes of the Debtors not otherwise prohibited by the terms hereof for working capital, and other lawful corporate purposes of the Debtors;

>>> (iii)    for making adequate protection payments and other payments as provided in this Interim Order;

>>> (iv)    to fund the Prepetition Indemnity Account (as defined below);

>>> (v)    for payment of the outstanding prepetition "Revolving Loans" constituting Prepetition ABL Debt in the manner set forth in Paragraph 6 hereof (the "***Interim Roll-Up***");

>>> (vi)    upon entry of a Final Order (as defined below), for the payment in full of all outstanding prepetition amounts under the Prepetition ABL Credit Agreement (as defined below) (the "***Final Roll-Up***");

and

(vii)    upon either (x) a DIP Maturity Event, so long as all Prepetition ABL Debt and all DIP Obligations have been paid in full in cash, or (y) after the occurrence of a DIP Order Event of Default (as defined below) as provided in Paragraph 37 below, to fund the Carve Out Account (as defined below).

(B)    Approval of the DIP Credit Agreement and all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of the DIP Agent and/or the DIP Lenders, including, without limitation, security agreements, pledge agreements, notes, guaranties, mortgages, and Uniform Commercial Code ("*UCC*") financing statements, and all other related agreements, documents, notes, certificates, and instruments executed, delivered, and/or ratified by the Debtors which comprised certain of the Prepetition ABL Financing Documents (as defined below) hereunder which in connection therewith or related thereto (collectively, as may be amended, modified, or supplemented and in effect from time to time, the "***DIP Financing Agreements***");

(C)    Approval of the Interim Roll-Up;

(D)    Granting the DIP Agent for the benefit of the DIP Lenders the following Liens (as defined in section 101(37) of the Bankruptcy Code) (the "***DIP Liens***") and claims:

(i)    first priority priming, valid, perfected, and enforceable Liens (as defined below), subject only to the Carve Out (as defined below) and the Permitted Prior Liens (as defined below), upon the ABL Priority Collateral (as defined below), as provided in and as contemplated by this Interim Order and the DIP Financing Agreements;

(ii)    a first-priority senior lien on the Debtors' unencumbered assets, including all assets of Sports Authority Holdings, Inc., TSA Ponce, Inc. and TSA Caribe, Inc. (such assets the "***New Loan Party Assets***"), but excluding leasehold interests of the Debtors ("***Leases***") and actions arising under chapter 5 of the Bankruptcy Code; provided, however, (A) the DIP Liens shall include first-priority senior liens on the proceeds of Leases (the "***Lease Proceeds***"), and (B) upon entry of the Final Order, the DIP Liens shall include first-priority senior liens on Specified Bankruptcy Recoveries;

(iii)    in accordance with the Prepetition Intercreditor Agreement (as defined below), second priority priming, valid, perfected, and enforceable Liens junior only to the Liens granted to the Prepetition

Term Loan Agent (as defined below) for the benefit of the Prepetition Term Loan Lenders (as defined below) upon the Term Priority Collateral (as defined below), subject only to the Carve Out and the Permitted Prior Liens (as defined below), as provided in and as contemplated by this Interim Order and the DIP Financing Agreements; and

(iv)   allowed superpriority administrative claim status in respect of all obligations under the DIP Financing Agreements (collectively, the "***DIP Obligations***"), subject to the Carve Out as provided herein;

**(II)**   **Interim Use of Cash Collateral** – Authorizing the Debtors' use of "cash collateral," as such term is defined in section 363 of the Bankruptcy Code ("***Cash Collateral***") during the Interim Period, in which the Prepetition ABL Agent (as defined below) and the Prepetition Term Loan Agent (as defined below) have an interest;

**(III)**   **Adequate Protection** – Granting certain adequate protection, including, among other things, Adequate Protection Liens and Adequate Protection Superpriority Claims (each as defined below) and certain other adequate protection as described in this Interim Order, to (A) Bank of America, N. A., as Administrative Agent and as Collateral Agent (the "***Prepetition ABL Agent***") under that certain Second Amended and Restated Credit Agreement dated May 17, 2012 (as amended and in effect, the "***Prepetition ABL Credit Agreement***") by among certain of the Debtors that comprised the "Loan Parties" thereunder, the Prepetition ABL Agent, Wells Fargo Bank, National Association, as FILO Agent (the "***FILO Agent***"), each Revolving Lender and each FILO Lender party thereto (the "***Prepetition ABL Lenders***"), and (B) Wilmington Savings Fund Society, FSB, as Administrative and Collateral Agent (the "***Prepetition Term Loan Agent***" and, together with the FILO Agent and the Prepetition ABL Agent, the "***Prepetition Agents***") for the benefit of the Term Lenders (the "***Prepetition Term Loan Lenders***" and, together with the Prepetition ABL Lenders, the "***Prepetition Secured Lenders***") under that certain Amended and Restated Credit Agreement dated as of November 16, 2010 (as amended and in effect, the "***Prepetition Term Loan Credit Agreement***") by and among certain of the Debtors that comprised the "Loan Parties" thereunder, the Prepetition Term Loan Agent, and the Prepetition Term Loan Lenders, in each case, to the extent of any diminution in the value of the Prepetition Agents' respective interests in the Prepetition Collateral (as defined below), having the priority set forth in this Interim Order, as adequate protection for the granting of the DIP Liens to the DIP Agent, the use of Cash Collateral, subordination to the Carve Out, and for the imposition of the automatic stay;

**(IV)**   **Modifying the Automatic Stay** – Modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Financing Agreements and this Interim Order;

4

(V)    **Waiving Any Applicable Stay** – Waiving any applicable stay (including under Bankruptcy Rule 6004) and provision for immediate effectiveness of this Interim Order; and

(VI)    **Final Hearing** – Scheduling a final hearing (the "***Final Hearing***") to consider entry of an order (the "***Final Order***") granting the relief requested in the DIP Motion on a final basis and approving the form of notice with respect to the Final Hearing.

and upon the *Declaration of Jeremy Aguilar in Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief* (the "***First Day Declaration***") and the *Declaration of Bernard Douton in Support of Debtors' Motion for Interim and Final Orders (I) Authorizing Debtors to Obtain Post-Petition Secured Financing Pursuant to 11 U.S.C. §§ 105, 362, 363, and 364; (II) Granting Liens and Superpriority Claims to Post-Petition Lenders Pursuant to 11 U.S.C. §§ 364 and 507; (III) Authorizing the Use of Cash Collateral and Providing Adequate Protection to Prepetition Secured Parties and Modifying the Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364; and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c) and Local Rule 4001-2* (the "***Douton Declaration***"), each of which was filed contemporaneously with the Motion; and this Court having reviewed the Motion and held a hearing with respect to the Motion (the "***Interim Hearing***"); and upon the Motion, the First Day Declaration, the Douton Declaration, and the record of the Interim Hearing and all objections, if any, to the entry of this Interim Order having been withdrawn, resolved, or overruled by this Court; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**THIS COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

## I.    Procedural Findings of Fact

A.    **Petition Date.** On March 2, 2016 (the "***Petition Date***"), each of the Debtors filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their business and manage their properties as debtors in

possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Cases.

B.     **Jurisdiction and Venue.**  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

C.     **Committee Formation.**  No official committee (a "*Committee*") of unsecured creditors, equity interest holders, or other parties-in-interest has been appointed in the Chapter 11 Cases.

D.     **Notice.**  The Interim Hearing is being held pursuant to the authorization of Bankruptcy Rule 2002, 4001(b), (c), and (d) and Rule 9014, and the Local Rules.  Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors, to certain parties-in-interest, including: (i) the Office of the United States Trustee; (ii) those creditors holding the 50 largest unsecured claims against the Debtors' estates, on a consolidated basis; (iii) counsel to the Prepetition ABL Agent and the DIP Agent; (iv) counsel to the FILO Agent, (v) counsel to the Prepetition Term Loan Agent; (vi) the holders of Mezzanine Notes (as defined in the Motion) and the counsel to certain holders of Mezzanine Notes, and (vii) all other secured creditors of record.  Under the circumstances, such notice of the Interim Hearing and the relief requested in the Motion is due, proper and sufficient notice, complies with Bankruptcy Rules 2002 and 4001 and Local Rule 4001-2 and no other or further notice need be given.

II.    **Debtors' Acknowledgements and Agreements**

E.    Without prejudice to the rights of parties-in-interest as set forth in

Paragraphs 26 - 28 below, each of the Debtors admits, stipulates, acknowledges, and agrees that

(collectively, Paragraphs E (1) through E (7) hereof shall be referred to herein as the "***Debtors'***

***Stipulations***"):

(1)    Prepetition ABL Financing Documents.  Prior to the commencement of the Chapter 11 Cases, Slap Shot Holdings, Corp., The Sports Authority, Inc., TSA Stores, Inc., and TSA Gift Card, Inc. (collectively, the "***Prepetition Loan Party Debtors***") were parties to (A) the Prepetition ABL Credit Agreement, (B) that certain Guaranty dated May 3, 2006, (C) that certain Security Agreement dated May 3, 2006, (D) that certain Intellectual Property Security Agreement dated May 3, 2006, and (E) all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of Prepetition ABL Agent or Prepetition ABL Lenders, including, without limitation, the Prepetition Intercreditor Agreement, control agreements, mortgages, security agreements, guaranties, and UCC financing statements and all other related agreements, documents, notes, certificates, and instruments executed and/or delivered in connection therewith or related thereto (as amended, modified or supplemented and in effect, collectively, the "***Prepetition ABL Financing Documents***").

(2)    Prepetition Term Loan Financing Documents.  Prior to the commencement of the Chapter 11 Cases, the Prepetition Loan Party Debtors were parties to (A) the Prepetition Term Loan Credit Agreement, (B) that certain Guaranty dated May 3, 2006, (C) that certain Security Agreement dated May 3, 2006, (D) that certain Intellectual Property Security Agreement dated May 3, 2006, and (E) all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of the Prepetition Term Loan Agent or the Prepetition Term Loan Lenders, including, without limitation, the Prepetition Intercreditor Agreement, control agreements, mortgages, security agreements, guaranties, and UCC financing statements and all other related agreements, documents, notes, certificates, and instruments executed and/or delivered in connection therewith or related thereto (as amended, modified or supplemented and in effect, collectively, the "***Prepetition Term Loan Financing Documents***" and, together with the Prepetition ABL Financing Documents, the "***Prepetition Financing Documents***").

(3)    Prepetition ABL Debt Amount.  As of the Petition Date, the Prepetition Loan Party Debtors were liable to the Prepetition ABL Lenders under the

Prepetition ABL Financing Documents, on account of "Revolving Loans" in the approximate principal amount of $346 million, on account of FILO Loans in the approximate principal amount of $95,285,000, plus letters of credit in the approximate stated amount of not less than $25.7 million, plus interest accrued and accruing at the default rate, costs, expenses, fees (including attorneys' fees and legal expenses) other charges and other obligations, including, without limitation, on account of cash management, credit card, depository, investment, hedging and other banking or financial services secured by the Prepetition ABL Financing Documents (collectively the "***Prepetition ABL Debt***").

(4)     Prepetition Term Loan Debt Amount.    As of the Petition Date, the Prepetition Loan Party Debtors were liable to the Prepetition Term Loan Lenders in the total aggregate principal amount of $276.7 million, plus interest accrued and accruing, costs, expenses, and fees (including attorneys' fees and legal expenses).  All obligations of the Prepetition Loan Party Debtors arising under the Prepetition Term Loan Credit Agreement or any other Prepetition Term Loan Financing Document, including all principal, accrued or hereafter accruing interest, fees, and costs, payable under the Prepetition Term Loan Credit Agreement shall hereinafter be referred to as the "***Prepetition Term Loan Debt***" and, together with the Prepetition ABL Debt, the "***Prepetition Secured Debt***."

(5)     Prepetition Collateral.    To secure the Prepetition Secured Debt, each of the Prepetition Loan Party Debtors granted continuing security interests and Liens (collectively, the "***Prepetition Liens***") to the Prepetition Agents and the Prepetition Secured Lenders upon substantially all of its property, real and personal, including the following (but excluding the "Excluded Collateral" (as defined in the Prepetition Financing Documents)), all as defined in the Prepetition Financing Documents (collectively, the "***Prepetition Collateral***"):

> All: (a) Accounts, (b) Chattel Paper, (c) Commercial Tort Claims (d) Deposit Accounts, (e) Documents, (f) Equipment, (g) Fixtures, (h) General Intangibles (including Payment Intangibles), (i) Goods, (j) Instruments, (k) Inventory, (l) Investment Property, (m) Letter-of-Credit Rights, (n) Software, (o) Supporting Obligations, (p) money, policies and certificates of insurance, deposits, cash, or other property, (q) all books, records, and information relating to any of the foregoing ((a) through (p)) and/or to the operation of any Debtor's business, and all rights of access to such books, records, and information, and all property in which such books, records, and information are stored, recorded and maintained, (r) all insurance proceeds, refunds, and premium rebates, including, without limitation, proceeds of fire and credit insurance, whether any of such proceeds, refunds, and premium rebates arise out of any of the

01:18374955.1

foregoing ((a) through (q)) or otherwise, (s) all rights of each Debtor under the Acquisition Documents, (t) all rights of each Debtor under the Purchasing Agreement, (u) all liens, guaranties, rights, remedies, and privileges pertaining to any of the foregoing ((a) through (t)), including the right of stoppage in transit, and (v) any of the foregoing, whether now owned or now due, or in which any Debtor has an interest, or hereafter acquired, arising, or to become due, or in which any Debtor obtains an interest, and all products, Proceeds, substitutions, and Accessions of or to any of the foregoing.

All Mortgaged Property, including the Land, Improvements, Leases, Rents, Permits, Contracts, Records and Proceeds as set forth in the Mortgages.

Pursuant to that certain Intercreditor Agreement (as amended, supplemented, and confirmed from time to time, and as currently in effect, the "***Prepetition Intercreditor Agreement***") dated as of May 3, 2006, the Prepetition ABL Agent and Prepetition Term Loan Agent have agreed to their respective rights and priorities with respect to the Prepetition Collateral and the DIP Collateral, including that (x) the Prepetition ABL Debt is secured by the first priority Lien upon the "ABL Priority Collateral" (as defined therein) and the Prepetition Term Loan Debt is secured by the first priority Lien on the "Term Priority Collateral" (as defined therein), and (y) the Prepetition ABL Debt is secured by the second priority Lien upon the Term Priority Collateral and the Prepetition Term Loan Debt is secured by the second priority Lien on the ABL Priority Collateral.

(6)     <u>Prepetition Liens</u>.  The Prepetition Liens of the Prepetition Agents and the Prepetition Secured Lenders have priority over all other Liens except (x) valid, enforceable, non-avoidable and perfected Liens in existence on the Petition Date that, after giving effect to any intercreditor or subordination agreement, are senior in priority to the Prepetition Liens, and (y) valid, enforceable and non-avoidable Liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code and after giving effect to any intercreditor or subordination agreement, are senior in priority to the Prepetition Liens (collectively, the "***Permitted Prior Liens***").

(a)     As of the Petition Date, (i) the Prepetition Liens are valid, binding, enforceable, and perfected first priority Liens, subject only to any Permitted Prior Liens, and are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, (ii) (a) the Prepetition Secured Debt constitutes legal, valid, and binding obligations of the Prepetition Loan Party Debtors, enforceable in accordance with the terms of the Prepetition Financing Documents (other than in respect

of the stay of enforcement arising from Section 362 of the Bankruptcy Code), (b) no offsets, defenses, or counterclaims to any of the Prepetition Secured Debt exists, and (c) no portion of the Prepetition Secured Debt is subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, (iii) the Debtors have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code) or causes of action against the Prepetition Agents or any Prepetition Secured Lender with respect to the Prepetition Financing Documents or otherwise, whether arising at law or at equity, including, without limitation, any recharacterization, subordination, disallowance, avoidance or other claims arising under or pursuant to sections 105, 510, 541 or 542 through 553, inclusive, of the Bankruptcy Code, and (iv) the Prepetition Secured Debt constitutes allowed secured claims.

(b)      On the date that this Interim Order is entered, each of the Debtors has waived, discharged, and released the Prepetition Agents and the Prepetition Secured Lenders, together with their respective successors, assigns, subsidiaries, parents, affiliates, agents, attorneys, officers, directors, and employees (collectively, the "***Released Parties***"), of any right the Debtors may have (i) to challenge or object to any of the Prepetition Secured Debt, (ii) to challenge or object to the Prepetition Liens or any other security for the Prepetition Secured Debt, and (iii) to bring or pursue any and all claims, objections, challenges, causes of action, and/or choses in action arising out of, based upon, or related to the Prepetition Financing Documents, or otherwise.

(c)      None of the Debtors possesses and will not assert any claim, counterclaim, setoff, or defense of any kind, nature, or description against any of the Released Parties, including anything which would in any way affect the validity, enforceability, priority, and non-avoidability of any of the Prepetition Financing Documents or the Prepetition Liens, or any claim of the Prepetition Secured Lenders pursuant to the Prepetition Financing Documents, or otherwise.

(7)      <u>Cash Collateral</u>. The Prepetition Agents have a continuing security interest in and Lien on all or substantially all of the Prepetition Loan Party Debtors' Cash Collateral, including all amounts on deposit in the Prepetition Loan Party Debtors' banking, checking, or other deposit accounts and all proceeds of the Prepetition Collateral, to secure the Prepetition Secured Debt.

III.    **Findings Regarding the Post-Petition Financing.**

F.    **Need for Post-Petition Financing**.  An immediate need exists for the Debtors to obtain funds from the DIP Facility in order to continue operations and to administer and preserve the value of their estates for the benefit of their stakeholders.  The ability of the Debtors to finance their operations, to preserve and maintain the value of the Debtors' assets, and to maximize a return for all creditors requires the availability of working capital from the DIP Facility, the absence of which would immediately and irreparably harm the Debtors, their estates and their stakeholders.

G.    **No Credit Available on More Favorable Terms**.  As discussed in the First Day Declaration and the Douton Declaration, the Debtors have been unable to obtain any of the following:

> (1)    unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense,
>
> (2)    credit for money borrowed with priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code,
>
> (3)    credit for money borrowed secured solely by a Lien on property of the estate that is not otherwise subject to a Lien, or
>
> (4)    credit for money borrowed secured by a junior Lien on property of the estate which is subject to a Lien,

in each case, on more favorable terms and conditions than those provided in the DIP Credit Agreement and this Interim Order.  The Debtors are unable to obtain credit from the DIP Lenders without granting to the DIP Lenders the DIP Protections (as defined below).

H.    **Prior Liens**.  Nothing herein shall constitute a finding or ruling by this Court that any Permitted Prior Liens or Prepetition Liens are valid, senior, perfected, or

11

unavoidable.  Moreover, except as provided in Paragraphs 26 – 28 below, nothing shall prejudice the following:

    (1)    the rights of any party-in-interest, including, but not limited to, the Debtors, the DIP Lenders, the Prepetition Agents, Prepetition Secured Lenders, and any Committee appointed pursuant to section 1102 of the Bankruptcy Code, to challenge the validity, priority, perfection, and extent of any such Permitted Prior Liens, or

    (2)    the rights of any Committee appointed pursuant to section 1102 of the Bankruptcy Code or any other party-in-interest to challenge the validity, priority, perfection, and extent of the Prepetition Liens as set forth in this Order.

    I.    **Adequate Protection for Prepetition Secured Lenders.**  As a result of the granting of the DIP Liens, subordination to the Carve Out, the use of Cash Collateral authorized herein, and the imposition of the automatic stay, the Prepetition Agents and Prepetition Secured Lenders are entitled to receive adequate protection pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code to the extent of any diminution in the value of their interests in the Prepetition Collateral (including Cash Collateral) during these Chapter 11 Cases.  As adequate protection, the Prepetition Secured Lenders will receive the Adequate Protection (as defined below) described in Paragraph 18 of this Interim Order.   In exchange for such Adequate Protection, the Prepetition Secured Lenders have agreed to the Debtors' use of Cash Collateral on the terms set forth in this Interim Order and to the imposition of the Carve Out as set forth herein.

    J.    **Prepetition Secured Lenders Governed By Prepetition Intercreditor Agreement**.  The Prepetition ABL Agent and Prepetition Term Loan Agent are parties to the Prepetition Intercreditor Agreement.  The Prepetition Intercreditor Agreement is a "subordination agreement" within the meaning of Section 510(a) of the Bankruptcy Code in the Chapter 11 Cases.  The Prepetition Agents and Prepetition Secured Lenders have stipulated that their respective

interests in the Prepetition Collateral and the DIP Collateral shall continue to be governed by the Prepetition Intercreditor Agreement (including, without limitation, (a) the Prepetition ABL Agent's and the DIP Agent's rights with respect to the ABL Priority Collateral and (b) the Prepetition Term Loan Agent's rights with respect to the Term Priority Collateral), except as expressly provided by this Interim Order, including as set forth below in Paragraph 10 with respect to Lease Proceeds.

        K.      **Prepetition Agents' and Prepetition Secured Lenders' Consent to Priming**. The Prepetition Agents and the Prepetition Secured Lenders have consented to the priming of the Prepetition Liens by the DIP Liens to the extent set forth herein.

        L.      **Adequacy of the Approved Budget.** The Prepetition Agents (including for the avoidance of doubt the Prepetition Term Loan Agent at the direction of the Required Lenders (as defined in the Prepetition Term Loan Credit Agreement)), the DIP Agent, and the Debtors have agreed that the budget, the short form of which is attached hereto as ***Exhibit "1"*** (as the same may be modified, supplemented, or updated from time to time consistent with the terms of the DIP Credit Agreement, this Interim Order, and upon its entry, the Final Order, the "***Approved Budget***")[3] is adequate, considering all the available assets, to pay the administrative expenses due and accruing during the Interim Period.

        M.      **Conditions Precedent to DIP Lenders' Extension of Financing.** The DIP Lenders have indicated a willingness to provide financing to the Debtors in accordance with the DIP Credit Agreement and the other DIP Financing Agreements, subject to the following:

        (1)      the entry of this Interim Order and the Final Order, and

---

[3] All backup, schedules, and other detail contained in the Approved Budget is incorporated by reference, including accruals for professional monthly fee estimates.

(2)    findings by this Court that such financing is essential to the Debtors' estates, that the DIP Lenders are good faith financiers, and that the DIP Lenders' claims, superpriority claims, security interests, and Liens and other protections granted pursuant to this Interim Order (and the Final Order) and the DIP Facility will not be affected by any subsequent reversal, modification, vacation, or amendment of this Interim Order (or the Final Order) or any other order, as provided in section 364(e) of the Bankruptcy Code.

N.    **Business Judgment and Good Faith Pursuant to Section 364(e) of the Bankruptcy Code.**  The extension of credit under the DIP Facility, the DIP Credit Agreement, and the other DIP Financing Agreements, and the fees paid and to be paid thereunder (i) are fair, reasonable, and the best available under the circumstances, (ii) reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and (iii) are supported by reasonably equivalent value and consideration.  The DIP Facility was negotiated in good faith and at arms' length between the Debtors and the DIP Agent, and the use of the proceeds to be extended under the DIP Facility will be so extended in good faith, and for valid business purposes and uses, as a consequence of which the DIP Lenders are entitled to the protections and benefits of section 364(e) of the Bankruptcy Code.

O.    **Relief Essential; Best Interest.**  The relief requested in the Motion (and as provided in this Interim Order) is necessary, essential and appropriate for the continued operation of the Debtors' business and the management and preservation of the Debtors' assets during the Interim Period.  It is in the best interest of the Debtors' estates that the Debtors be allowed to establish the DIP Facility contemplated by the DIP Credit Agreement and the other DIP Financing Agreements.  The Debtors have demonstrated good and sufficient cause for the relief granted herein.

14

**NOW, THEREFORE, IT IS HEREBY ORDERED AS FOLLOWS:**

1.    The Motion is granted as set forth herein.

I.    **DIP FINANCING.**

A.    **Approval of Entry into the DIP Financing Agreements**.

2.    The Debtors are expressly and immediately authorized and empowered to execute and deliver the DIP Financing Agreements and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Financing Agreements, and to execute and deliver all instruments, certificates, agreements, and documents which may be required or necessary for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens described in and provided for by this Interim Order and the DIP Financing Agreements.  The Debtors are hereby authorized to do and perform all acts, pay the principal, interest, fees, expenses, and other amounts described in the DIP Credit Agreement and all other DIP Financing Agreements as such become due, including, without limitation, the "Revolving Closing Fee", the "FILO Closing Fee", the "Administrative Agent Fee", and the "FILO Agent Fee" (as each of those terms is defined in the DIP Financing Agreements), and, subject to the provisions of Paragraph 51 below, reasonable attorneys', financial advisors', and accountants' fees and disbursements as provided for in the DIP Credit Agreement, which amounts shall not otherwise be subject to approval of this Court.  Upon the entry of this Interim Order, all letters of credit outstanding under the Prepetition ABL Financing Documents shall be deemed to have been issued pursuant to and shall be deemed to be outstanding under the DIP Credit Agreement.  Upon execution and delivery, the DIP Financing Agreements shall represent valid and binding obligations of the Debtors enforceable against the Debtors in accordance with their terms.

B.      **Authorization to Borrow**.

3.      In order to enable them to continue to operate their businesses during the Interim Period and subject to the terms and conditions of this Interim Order, the DIP Credit Agreement, the other DIP Financing Agreements, and the Approved Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Credit Agreement), the Debtors are hereby authorized under the DIP Facility to borrow an amount up to $275,000,000 in accordance with the terms and conditions of the DIP Credit Agreement.

4.      Following the entry of the Final Order, the Debtors' authority to borrow funds under the DIP Credit Agreement shall be governed by the terms of the Final Order.

C.      **Application of DIP Facility Proceeds**.

5.      The advances under the DIP Facility shall be used in each case in a manner consistent with the terms and conditions of the DIP Financing Agreements, and in accordance with and as may be limited by the Approved Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Credit Agreement), solely as follows, and subject to Paragraph 51 hereof (as applicable):

(a)      to pay fees, costs, and expenses as provided in the DIP Financing Agreements, including amounts incurred in connection with the preparation, negotiation, execution, and delivery of the DIP Credit Agreement and the other DIP Financing Agreements;

(b)      for general operating and working capital purposes, for the payment of transaction expenses, for the payment of fees, expenses, and costs incurred in connection with the Chapter 11 Cases, and other proper corporate purposes of the Debtors not otherwise prohibited by the terms hereof for working capital, and other lawful corporate purposes of the Debtors;

(c)      for making adequate protection payments and other payments as provided in this Interim Order and upon its entry, the Final Order;

(d)      to fund the Prepetition Indemnity Account (as defined below);

(e)      upon entry of a Final Order, for the payment of the Final Roll-Up; and

(f)        to fund the Carve Out Account (as defined below).

6.        <u>Interim Roll-Up</u>.  During the Interim Period, all cash, collections, and proceeds of the Prepetition Collateral and DIP Collateral (other than the identifiable proceeds of Term Priority Collateral which shall be remitted to the Term Priority Collateral Account in accordance with Paragraph 11 hereof), including all proceeds realized in connection with the "Closing Sales" (as defined in the *Debtors' Emergency Motion For Interim And Final Orders (A) Authorizing The Debtors To Assume The Closing Store Agreement, (B) Authorizing And Approving Store Closing Sales Free And Clear Of All Liens, Claims And Encumbrances, (C) Authorizing The Implementation Of Customary Employee Bonus Program And Payments To Non-Insiders Thereunder, (D) Approving Dispute Resolution Procedures, and (E) Approving the Debtors' Store Closing Plan*) (other than the identifiable proceeds of Term Priority Collateral which shall be remitted to the Term Priority Collateral Account in accordance with Paragraph 11 hereof), or proceeds realized in connection with the Store Closing Sale (as defined below) (other than the identifiable proceeds of Term Priority Collateral which shall be remitted to the Term Priority Collateral Account in accordance with Paragraph 11 hereof), shall be immediately paid to the Prepetition ABL Agent for application in reduction of the Revolving Loans outstanding under the Prepetition ABL Credit Agreement in accordance with the Prepetition ABL Financing Documents.

7.        <u>Final Roll-Up</u>.  Solely upon entry of the Final Order, and subject to the rights of parties set forth in Paragraphs 26 – 28 below, the Debtors shall use the proceeds of the next advance under the DIP Credit Agreement to satisfy all Prepetition ABL Debt in full in accordance with the terms of the Prepetition ABL Credit Agreement.

01:18374955.1

**D.      Conditions Precedent**.

8.      The DIP Lenders shall have no obligation to make any loan or advance under the DIP Credit Agreement during the Interim Period unless the conditions precedent to make such loan under the DIP Credit Agreement have been satisfied in full or waived in accordance with the DIP Credit Agreement.

**E.      The DIP Liens**.

9.      Subject to the limitations set forth in Paragraphs 10 and 12 below, effective immediately upon the entry of this Interim Order, the DIP Agent is hereby granted the DIP Liens (which Liens are subject to the Permitted Prior Liens and the Carve Out) for the ratable benefit of the DIP Lenders pursuant to sections 361, 362, 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, which constitute priming first priority, continuing, valid, binding, enforceable, non-avoidable, and automatically perfected postpetition security interests and Liens senior and superior in priority to all other secured and unsecured creditors of the Debtors' estates, and subject to the Intercreditor Agreement except as otherwise expressly provided in this Interim Order, upon and to all of the following (but excluding the "Excluded Collateral" (as defined in the DIP Credit Agreement)) (collectively, the "***DIP Collateral***"):

(a)  The Collateral, as defined in the DIP Financing Agreements, including:

all: (a) Accounts, (b) Chattel Paper, (c) Commercial Tort Claims (d) Deposit Accounts, (e) Documents, (f) Equipment, (g) Fixtures, (h) General Intangibles (including Payment Intangibles), (i) Goods, (j) Instruments, (k) Inventory, (l) Investment Property, (m) Letter-of-Credit Rights, (n) Software, (o) Supporting Obligations, (p) money, policies and certificates of insurance, deposits, cash, or other property, (q) all books, records, and information relating to any of the foregoing ((a) through (p)) and/or to the operation of any Debtor's business, and all rights of access to such books, records, and information, and all property in which such books, records, and information are stored, recorded and maintained, (r) all insurance proceeds, refunds, and premium rebates, including, without limitation, proceeds of fire and credit insurance, whether any of such proceeds, refunds, and premium rebates arise out of any of the foregoing ((a) through (q)) or otherwise, (s) all rights of each Debtor under the Acquisition Documents, (t) all rights of each

Debtor under the Purchasing Agreement, (u) all liens, guaranties, rights, remedies, and privileges pertaining to any of the foregoing ((a) through (t)), including the right of stoppage in transit, and (v) any of the foregoing, whether now owned or now due, or in which any Debtor has an interest, or hereafter acquired, arising, or to become due, or in which any Debtor obtains an interest, and all products, Proceeds, substitutions, and Accessions of or to any of the foregoing, and all Mortgaged Property, including the Land, Improvements, Rents, Permits, Contracts, Records and Proceeds as set forth in the Mortgages.

(b)     Subject to entry of the Final Order, the Bankruptcy Recoveries (as defined below), but only (A) with respect to Bankruptcy Recoveries arising under section 549 of the Bankruptcy Code, the full amount of any such recovery, and (B) with respect to Bankruptcy Recoveries arising under all other sections of chapter 5 of the Bankruptcy Code, only the amounts necessary to reimburse the DIP Lenders for the amount of the Carve Out, if any, used to finance the pursuit of such recovery (the foregoing Bankruptcy Recoveries in (A) and (B) being referred to collectively as the "*Specified Bankruptcy Recoveries*"); *provided however for the avoidance of doubt*, the Adequate Protection Superpriority Claim (as defined below) of the Prepetition Agents and the Prepetition Secured Lenders as provided in Paragraph 18(b) below shall be payable out of all Bankruptcy Recoveries.  As used herein, "*Bankruptcy Recoveries*" shall mean any recoveries of the Debtors, by settlement or otherwise, in respect of claims and causes of action to which the Debtors may be entitled to assert by reason of any avoidance or other power vested in or on behalf of the Debtors or the estates of the Debtors under chapter 5 of the Bankruptcy Code.

(c)     The Lease Proceeds, but not the Leases themselves, whether or not so perfected prior to the Petition Date.

10.     Notwithstanding anything to the contrary set forth in this Interim Order, the Final Order, the DIP Financing Agreements or the Prepetition Intercreditor Agreement, (i) the Prepetition ABL Agent and Prepetition Term Loan Agent have agreed that for purposes of the DIP Facility and in this Interim Order (and upon its entry, in the Final Order), the ABL Priority Collateral shall include Lease Proceeds and the Term Priority Collateral shall not include Lease Proceeds, and (ii) the New Loan Party Assets and the Lease Proceeds shall secure only the DIP Obligations, and shall not otherwise constitute "Collateral" as defined under the Prepetition ABL Credit Agreement (or the Prepetition ABL Financing Documents) or the Prepetition Term Loan Agreement (or the Prepetition Term Loan Financing Documents), and the DIP Liens on the New Loan Party Assets and the Lease Proceeds shall not be held by the DIP Agent for the benefit of the

Prepetition Agents or the Prepetition Lenders; *provided*, *however*, that the Adequate Protection Liens (as defined below) and the Adequate Protection Superpriority Claim shall be secured by and payable out of New Loan Party Assets and the Lease Proceeds.

**F.    Term Priority Collateral Account**

11.    Notwithstanding any other provisions set forth herein, all identifiable proceeds of the Term Priority Collateral derived from the Closing Stores and/or the Store Closing Sales shall be remitted to a deposit account of a Prepetition Loan Party Debtor (the "*Term Priority Collateral Account*") and shall be maintained in the Term Priority Collateral Account until the earlier to occur of (x) the Debtors and the Required Lenders (as defined in the Prepetition Term Loan Credit Agreement) agreeing to the release of such proceeds or (y) this Court ordering the release of such proceeds provided that, prior to such release of such proceeds from the Term Priority Collateral Account, such proceeds may be remitted to the Prepetition ABL Agent and/or the DIP Agent as reimbursement for amounts previously paid to the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders from advances under the DIP Facility or from proceeds of ABL Priority Collateral, in each case, pursuant to Paragraph 18(c)(iii) below.  The Prepetition Liens, Adequate Protection Liens, and DIP Liens shall attach to such proceeds (and shall remain perfected) in the same manner and priority as such liens attached to Term Priority Collateral.

**G.    DIP Lien Priority.**

12.    The DIP Liens to be created and granted to the DIP Agent and the DIP Lenders, as provided herein, are:

(a)    created pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code,

(b)    other than as set forth in (c) below, first, valid, prior, perfected, unavoidable, and superior to any security, mortgage, or collateral interest or Lien or claim to the DIP Collateral, and

(c)      subject only to (i) the Carve Out, (ii) the Permitted Prior Liens, and (iii) solely with respect to the Term Priority Collateral, the Liens of the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders.

The DIP Liens shall secure all DIP Obligations and the proceeds of the DIP Collateral shall be applied in the same order and priority set forth in the DIP Credit Agreement, subject to the Prepetition Intercreditor Agreement, the terms of this Interim Order, and upon its entry, the terms of the Final Order.  Other than as set forth in (c) immediately above, the DIP Liens shall not be made subject to or *pari passu* with any Lien or security interest by any court order heretofore or hereafter entered in the Chapter 11 Cases and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases, upon the conversion of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or in any other proceedings related to any of the foregoing (each a "***Successor Case***"), and/or upon the dismissal of the Chapter 11 Cases.  The DIP Liens shall not be subject to sections 510(c), 549, 550, or 551 of the Bankruptcy Code.  Solely upon entry of the Final Order, the DIP Liens securing the extensions of credit under the DIP Facility and this Interim Order shall not be subject to an assertion by the Debtors of the "equities of the case" exception of section 552 of the Bankruptcy Code, and shall not be subject to section 506(c) of the Bankruptcy Code.  Except as otherwise expressly set forth herein, including as set forth in Paragraph 10 with respect to Lease Proceeds, (x) the DIP Agent, the DIP Lenders, the Prepetition Agents, and the Prepetition Secured Lenders shall remain bound by the terms and conditions set forth in the Prepetition Intercreditor Agreement, including, without limitation, with respect to the Prepetition Collateral and the DIP Collateral, (y) nothing contained in this Interim Order shall be deemed to abrogate or limit  the respective, rights, claims and obligations of each of the DIP Agent, the DIP Lenders, the Prepetition Agents, and the Prepetition Secured Lenders under the Prepetition Intercreditor Agreement, and (z) the Prepetition Intercreditor Agreement shall apply and govern

21

the respective rights, obligations, and priorities of each of the DIP Agent, the DIP Lenders, the

Prepetition Agents, and the Prepetition Secured Parties in these Chapter 11 Cases.  All loans and

advances made by the DIP Agent and/or the DIP Lenders pursuant to and under the DIP Facility

and all other DIP Obligations outstanding thereunder shall be deemed to be "ABL Obligations"

under the Prepetition Intercreditor Agreement.

      **H.**     **Enforceable Obligations**.

      13.     The DIP Financing Agreements shall constitute and evidence the valid and

binding obligations of the Debtors, and shall be enforceable against the Debtors, their estates, and

any successors thereto, and their creditors in accordance with their terms.

      **I.**     **Protection of the DIP Lenders and Other Rights.**

      14.     From and after the Petition Date, the Debtors shall use the proceeds of the

extensions of credit under the DIP Facility only for the purposes specifically set forth in the DIP

Financing Agreements and this Interim Order, in compliance with and as limited by the Approved

Budget (subject to any variances thereto permitted under the terms and conditions of the DIP

Credit Agreement).

      **J.**     **Superpriority Administrative Claim Status.**

      15.     Subject to the Carve Out, all DIP Obligations shall be an allowed

superpriority administrative expense claim (the "***DIP Superpriority Claim***" and, together with the

DIP Liens, collectively, the "***DIP Protections***") with priority in the Chapter 11 Cases under

sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all

administrative expense claims and unsecured claims against the Debtors and their estates, now

existing or hereafter arising, of any kind or nature whatsoever including, without limitation,

administrative expenses of the kinds specified in, arising, or ordered pursuant to sections 105, 326,

328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code, and, upon entry of the Final Order, sections 506(c) and 552(b) of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy or attachment; *provided, however*, that the DIP Protections shall not attach to any Bankruptcy Recoveries other than the Specified Bankruptcy Recoveries.

16.     Other than the Carve Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in the Chapter 11 Cases, or in any Successor Case, and no priority claims are, or will be, senior to, prior to, or on a parity with the DIP Protections or the DIP Obligations or with any other claims of the DIP Lenders arising hereunder.

## II.     AUTHORIZATION FOR USE OF CASH COLLATERAL

17.     Pursuant to the terms and conditions of this Interim Order (but subject to Paragraph 11 with respect to Cash Collateral deposited into the Term Priority Collateral Account), the DIP Facility, the DIP Credit Agreement, and the other DIP Financing Agreements, and in accordance with and as may be limited by the Approved Budget (subject to permitted variances), the Debtors are authorized to use Cash Collateral and to use the advances under the DIP Facility during the Interim Period and terminating upon notice being provided by (i) the DIP Agent to the Debtors that a DIP Order Event of Default (as defined below) has occurred and is continuing, or (ii) the Prepetition Term Loan Agent that a Cash Collateral Termination Event (as defined below) has occurred and is continuing, in the manner set forth in Paragraph 34 below.

### III.  ADEQUATE PROTECTION FOR PREPETITION SECURED LENDERS.

18.    As adequate protection for the diminution in the value of the interests of the Prepetition Secured Lenders in the Prepetition Collateral (including Cash Collateral) on account of the granting of the DIP Liens, the subordination to the Carve Out, and the Debtors' use of Cash Collateral, and any other diminution in value arising out of the imposition of the automatic stay or the Debtors' use, sale, depreciation, or disposition of the Prepetition Collateral during the pendency of these Chapter 11 Cases, including the disposition of assets as contemplated by the Store Closing Sale Motion (as defined below) (collectively, "***Diminution in Value***"), the Prepetition Secured Lenders shall receive adequate protection as follows (collectively, "***Adequate Protection***"):

(a)    **Adequate Protection Liens**.  Solely to the extent of the Diminution in Value of the interests of the Prepetition Agents and the Prepetition Secured Lenders in the Prepetition Collateral, the Prepetition Secured Lenders shall have, subject to the terms and conditions set forth below, pursuant to sections 361 and 363(e) of the Bankruptcy Code, valid, perfected, and enforceable additional and replacement security interests and Liens in the DIP Collateral (the "***Adequate Protection Liens***") which shall be (i) junior only to the Carve Out, the DIP Liens securing the DIP Facility, and Permitted Prior Liens, and (ii) in all instances, subject to the Prepetition Intercreditor Agreement.

(b)    **Adequate Protection Superpriority Claim**.  Solely to the extent of the diminution in the value of the interests of the Prepetition Secured Lenders in the Prepetition Collateral, the Prepetition Secured Lenders shall have an allowed superpriority administrative expense claim (the "***Adequate Protection Superpriority Claim***") which shall have priority (except with respect to (i) the Carve Out and (ii) the DIP Superpriority Claim), in the Chapter 11 Cases under sections 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code, and upon entry of the Final Order, sections 506(c) and 552 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual

Lien, levy, or attachment; *provided, however*, that the Adequate Protection Superpriority Claim shall attach to all Bankruptcy Recoveries only after entry of the Final Order.

Other than the DIP Liens, the DIP Superpriority Claim, and the Carve Out, subject to entry of the Final Order, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330 and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in the Chapter 11 Cases, or in any Successor Case, will be senior to, prior to, or on parity with the Adequate Protection Superpriority Claim.

(c)     **Adequate Protection Payments**.

(i)     Until the repayment in full of the obligations under the Prepetition ABL Credit Agreement (including pursuant to the Final Roll-Up), on the last business day of each month, the Prepetition ABL Agent shall receive, for the benefit of the Prepetition ABL Lenders, payment of all accrued and unpaid interest at the default rate set forth in the Prepetition ABL Credit Agreement, and, subject to the provisions of Paragraph 51 hereto, reimbursement of any costs due to the Prepetition ABL Agent and Prepetition ABL Lenders under the Prepetition ABL Credit Agreement;

(ii)    Subject to the provisions of Paragraph 51 hereof, the Prepetition ABL Agent, the FILO Agent, the Prepetition ABL Lenders, and the Prepetition FILO Lenders shall be reimbursed, on a current basis, for all reasonable and documented out-of-pocket costs and expenses of the financial advisors and outside attorneys engaged by such parties, solely to the extent permitted under the Prepetition ABL Credit Agreement.

(iii)   Subject to the provisions of Paragraph 51 hereof, the Prepetition Term Loan Agent and Prepetition Term Loan Lenders (including without limitation the Prepetition Term Loan Lenders identified on the 2019 Statement to be filed with the Court (such Prepetition Term Loan Lenders, the "***Ad Hoc Group of Prepetition Term Loan Lenders***"), shall receive the current payment of the reasonable documented postpetition out-of-pocket fees, costs and expenses of its financial advisors, appraisers, and attorneys, solely to the extent permitted under the Prepetition Term Loan Credit Agreement; *provided however*, that if the claims of the Prepetition Term Loan Lenders are determined by this Court to have been undersecured as of the Petition Date, then any payments authorized pursuant to this provision shall be reallocated and applied to reduce the outstanding principal balance owed to the Prepetition Term Loan Lenders; ***and provided further***, that all amounts paid to the Prepetition Term Loan

Agent and the Prepetition Term Loan Lenders through advances under the DIP Facility or from proceeds of ABL Priority Collateral pursuant to this paragraph shall be promptly reimbursed to the Prepetition ABL Agent and/or the DIP Agent, as applicable, (only to the extent the Prepetition ABL Debt and DIP Obligations have not otherwise been paid in full in cash) out of the first proceeds of Term Priority Collateral received by the Debtors upon the sale or disposition of any Term Priority Collateral, including as part of any Store Closing Sale.

(d)     **Adequate Protection With Respect to Store Closing Order**.  The sale process to be implemented under Section 363 of the Bankruptcy Code as contemplated by the *Debtors' Emergency Motion for Interim and Final Orders (A) Authorizing the Debtors to Assume Closing Store Agreement; (B) Authorizing and Approving Closing Sales Free and Clear of All Liens, Claims and Encumbrances; (C) Authorizing the Implementation of Customary Employee Bonus Program and Payments to Non-Insiders Thereunder; (D) Approving Rejection Procedures; (E) Approving Dispute Resolution Procedures; and (F) Approving the Debtors' Store Closing Plan* (the "**Store Closing Motion**") including the timeline and milestones contained therein, shall not be materially modified without the prior written consent of the Prepetition Agents and the DIP Agent.  Upon the disposition of Prepetition Collateral as contemplated in the Store Closing Motion (the "**Store Closing Sale**"), any such Prepetition Collateral shall be sold free and clear of the Prepetition Liens, the Adequate Protection Liens, and the DIP Liens, *provided*, *however*, that such Prepetition Liens, Adequate Protection Liens, and DIP Liens shall attach to the proceeds of any such sale in the same manner and priority as such liens attached to the Prepetition Collateral and proceeds of DIP Collateral, including for the avoidance of doubt, proceeds of Term Priority Collateral, shall be promptly paid at closing on the Store Closing Sale to the DIP Agent for application to the Prepetition ABL Debt and the DIP Obligations in accordance with the terms of the DIP Credit Agreement (other than identifiable proceeds of Term Priority Collateral which shall be remitted to the Term Priority Collateral Account pursuant to Paragraph 11 hereof), and after payment in full of the DIP Obligations in the event the Final Roll-Up has not occurred to the Prepetition ABL Agent to be applied to the Prepetition ABL Debt in accordance with the Prepetition ABL Credit Agreement (other than identifiable proceeds of Term Priority Collateral which shall be remitted to the Term Priority Collateral Account pursuant to Paragraph 11 hereof).

The Debtors shall keep the Prepetition Term Loan Agent fully informed of the Debtors' efforts to consummate the Store Closing Sale and any other sales of equity interests and/or assets of the Debtors after the Petition Date, and without limiting the generality of the foregoing, the Debtors shall (A) promptly provide to the Prepetition Term Loan Agent copies of all offers

01:18374955.1

for the purchase of any asset(s) and/or equity interests of any of the Debtors and copies of all bids from liquidators, (B) provide, no less frequently than weekly, status updates on the Debtors' efforts to consummate the Store Closing Sale and/or any other sales, and (C) promptly advise the Prepetition Term Loan Agent of any expressions of interest in any or all of the Debtors' assets and/or equity interests.

In connection with the Store Closing Sale, the Prepetition Agents and Prepetition Secured Lenders may seek to credit bid some or all of their claims for their respective collateral (each a "*Credit Bid*") pursuant to Section 363(k) of the Bankruptcy Code.  A Credit Bid may be applied only to reduce the cash consideration with respect to those assets in which the party submitting such Credit Bid holds a security interest.  Each of the Prepetition Agents shall be considered a "Qualified Bidder" with respect to its right to acquire all or any of the assets by Credit Bid.

(e)     **Access to Records; Reporting**.  In addition to, and without limiting, whatever rights to access the Prepetition Secured Lenders have under the Prepetition Financing Documents, upon reasonable notice, at reasonable times during normal business hours, the Debtors shall permit representatives, agents, and employees of the Prepetition Secured Lenders (i) to have access to and inspect the Debtors' properties, (ii) to examine the Debtors' books and records, (iii) to discuss the Debtors' affairs, finances, and condition with the Debtors' officers and financial advisors, and (iv) otherwise to have the full cooperation of the Debtors.  In addition, the Debtors shall provide to the Prepetition Secured lenders all of the financial, collateral, and related reporting required under the DIP Financing Agreements as and when provided to the DIP Agent, including without limitation under Sections 6.01, 6.02, 6.03, 6.21, and 6.22(b) of the DIP Credit Agreement.

(f)     **Prepetition Indemnity Account.**  Upon entry of this Interim Order, the Debtors shall establish a segregated account in the control of the Prepetition ABL Agent (the "*Prepetition Indemnity Account*"), into which the sum of $250,000.00 of Cash Collateral shall be deposited as security for any reimbursement, indemnification, or similar continuing obligations of the Debtors in favor of the Prepetition ABL Lenders under the Prepetition ABL Financing Documents, including without limitation, the provisions of Section 10.04 of the Prepetition ABL Credit Agreement (the "*Prepetition Indemnity Obligations*").

(i)     The funds in the Prepetition Indemnity Account shall secure all costs, expenses, and other amounts (including reasonable and documented attorneys' fees) incurred by the Prepetition ABL Agent, the FILO Agent, and the Prepetition ABL Lenders in connection with or responding to (x) formal or informal inquiries and/or discovery requests, any adversary proceeding, cause of

action, objection, claim, defense, or other challenge as contemplated in Paragraph 26 hereof, or (y) any Challenge Proceeding (as defined below) against the Prepetition ABL Agent, the FILO Agent, or the Prepetition ABL Lenders related to the Prepetition ABL Financing Documents, the Prepetition Liens, or the Prepetition ABL Debt, whether in the Chapter 11 Cases or independently in another forum, court, or venue.

(ii)    The Prepetition Indemnity Obligations shall be secured by a first priority lien on the Prepetition Indemnity Account and the funds therein and by a lien on the Prepetition Collateral.

(iii)    The Prepetition ABL Lenders may apply amounts in the Prepetition Indemnity Account against the Prepetition Indemnity Obligations as and when they arise, without further notice to or consent from the Debtors, any Committee, or any other parties in interest and without further order of this Court, upon compliance with the provisions of Paragraph 51 below.

(iv)    In addition to the establishment and maintenance of the Prepetition Indemnity Account, until the Challenge Period Termination Date (as defined below) the Prepetition ABL Agent, for itself and on behalf of the Prepetition ABL Lenders, shall retain and maintain the Prepetition ABL Liens as security for any the amount of any Prepetition Indemnity Obligations not capable of being satisfied from application of the funds on deposit in the Prepetition Indemnity Account; provided, that the Prepetition ABL Lien retention herein shall in all respects remain subject to the terms of the Prepetition Intercreditor Agreement.

(g)    Budget.  The Debtors shall endeavor to consult with and provide prior notice to the Prepetition Term Loan Agent prior to agreeing to any of the following with respect to the Approved Budget and DIP Financing Agreements, as applicable: (a) material changes to the Approved Budget; and (b) extensions of the case and/or sale milestones set forth in the DIP Credit Agreement that would extend the sale closing deadline beyond April 28, 2016 (collectively, the "*Subject Amendments*"); provided, however, that the Debtors shall not incur any liability to the Prepetition Term Loan Agent, the Prepetition Term Loan Lenders or any other Person in consequence of its failure to make any consultation or provide such prior notice with respect to the Subject Amendments pursuant to the provisions hereof.  For the avoidance of doubt, nothing contained in this subsection (g) shall be deemed to limit, restrict, or constitute a waiver of any of the respective rights and remedies of the Debtors, Prepetition Term Loan Agent or Prepetition Term Loan Lenders under the Bankruptcy Code or other

applicable law, including, without limitation, any right of the Prepetition Term Loan Agent to file an objection or other appropriate pleading with the Court in the event that it does not agree with any amendment, change, or extension of any of the Subject Amendments to which the Debtors have consented or the Debtors' rights to contest such objection.

19.     Nothing herein shall impair or modify the Prepetition Agents' or the Prepetition Secured Lenders' rights under section 507(b) of the Bankruptcy Code in the event that the Adequate Protection provided to the Prepetition Secured Lenders hereunder is insufficient to compensate for the diminution in value of the interest of the Prepetition Secured Lenders in the Prepetition Collateral during the Chapter 11 Cases or any Successor Case; ***provided***, ***however***, that (a) nothing herein shall impair the Debtors' or any other party in interest's right to seek to contest any request for additional or different adequate protection, and (b) any section 507(b) claim granted in the Chapter 11 Cases to the Prepetition Secured Lenders shall be junior in right of payment to all DIP Obligations and subject to the Carve Out.

**IV.     P**OST-PETITION **L**IEN **P**ERFECTION**.**

20.     This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens and the Adequate Protection Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, security agreement, notice of Lien or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement or securities account control agreement) to validate or perfect the DIP Liens and the Adequate Protection Liens or to entitle the DIP Liens and the Adequate Protection Liens to the priorities granted herein.

21.     Notwithstanding the foregoing, the DIP Agent and/or the Prepetition Agents may, in their discretion, file such financing statements, deeds of trust, mortgages, security

agreements, notices of Liens, and other similar instruments and documents, and are hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, deeds of trust, mortgages, security agreements, notices of Liens and other similar instruments and documents shall be deemed to have been filed or recorded at the time and on the date of the commencement of the Chapter 11 Cases.

22.    The Debtors shall execute and deliver to the DIP Agent all such financing statements, deeds of trust, mortgages, security agreements, notices of Liens and other similar instruments and documents as the DIP Agent may reasonably request to evidence, confirm, validate, or perfect, or to ensure the contemplated priority of, the DIP Liens or the Adequate Protection Liens granted pursuant hereto.

23.    The DIP Agent and the Prepetition Agents, in their discretion, may file a photocopy of this Interim Order as a financing statement with any recording office designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any of the Debtors has real or personal property, and in such event, the subject filing or recording office shall be authorized to file or record such copy of this Interim Order.

24.    The DIP Agent shall, in addition to the rights granted to it under the DIP Financing Agreements, be deemed to be have co-equal rights with the Prepetition ABL Agent and succeed to the rights of the Prepetition ABL Agent with respect to all third party notifications in connection with the Prepetition ABL Financing Documents, all prepetition collateral access agreements, and all other agreements with third parties (including any agreement with a customs broker, freight forwarder, or credit card processor) relating to, or waiving claims against, any Prepetition Collateral, including without limitation, each collateral access agreement duly executed and delivered by any landlord of the Debtor and including, for the avoidance of doubt, all

30

deposit account control agreements, securities account control agreements, and credit card agreements.

25.     The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified pursuant to the terms of the DIP Financing Agreements as necessary to:

      (a)    permit the Debtors to grant the DIP Liens and the Adequate Protection Liens and to incur all liabilities and obligations to the DIP Lenders under the DIP Financing Agreements, the DIP Facility, and this Interim Order, and

      (b)    authorize the DIP Agent, the DIP Lenders, the Prepetition Agents, and the Prepetition Secured Lenders to retain and apply payments hereunder as provided by the DIP Financing Agreements and this Interim Order.

## V.     RESERVATION OF CERTAIN THIRD-PARTY RIGHTS AND BAR OF CHALLENGES AND CLAIMS.

26.     Nothing in this Interim Order or the DIP Credit Agreement or the other DIP Financing Agreements shall prejudice whatever rights any Committee or any other party-in-interest (other than the Debtors) with requisite standing that has been sought and granted by this Court may have to bring an adversary proceeding, cause of action, objection, claim, defense, or other challenge against the Prepetition Agents, the Prepetition Secured Lenders, the Prepetition Liens or the Prepetition Secured Debt (collectively, a "***Challenge Proceeding***"), including but not limited to any of the following:

      (a)    an objection to or challenge of the Debtors' Stipulations set forth in Paragraphs E (1) through E (7), including (i) the validity, extent, perfection, or priority of the security interests and Liens of the Prepetition Agents and Prepetition Secured Lenders in and to the Prepetition Collateral, or (ii) the validity, allowability, priority, status, or amount of the Prepetition Secured Debt, or

      (b)    a suit against the Prepetition Agents or Prepetition Secured Lenders in connection with or related to the Prepetition Secured Debt or the Prepetition Liens, or the actions or inactions of the Prepetition Agents or Prepetition Secured Lenders arising out of or related to the Prepetition Secured Debt or Prepetition Liens;

*provided*, *however*, that any Committee or any other party-in-interest with requisite standing that has been sought and granted by this Court must commence a Challenge Proceeding asserting such objection or challenge, including, without limitation, any claim against the Prepetition Agents or Prepetition Secured Lenders in the nature of a setoff, counterclaim, or defense to the Prepetition Secured Debt or Prepetition Liens (including but not limited to, those under sections 506, 544, 547, 548, 549, 550, and/or 552 of the Bankruptcy Code or by way of suit against the Prepetition Agents or Prepetition Secured Lenders), by the later of (x) for any Committee, sixty (60) days following the appointment of the first official Committee or (y) for any party-in-interest other than an official Committee, seventy-five (75) days following entry of this Interim Order (collectively, (x) and (y) shall be referred to as the "***Challenge Period***" and the date that is the next calendar day after the termination of the Challenge Period, in the event that no Challenge Proceeding has been commenced during the Challenge Period, shall be referred to as the "***Challenge Period Termination Date***").  The Challenge Period Termination Date may occur as to some, but not all, of the Prepetition Agents or Prepetition Secured Lenders, if a Challenge Proceeding is brought against one or more but not all of the Prepetition Agents and Prepetition Secured Lenders.  For the avoidance of doubt, in the event any of the Chapter 11 Cases is converted to a case under Chapter 7 or if a Chapter 11 trustee is appointed prior to expiration of the Challenge Period, then the Challenge Period shall not expire until sixty (60) days after the trustee's appointment.  In the event that the Committee or any other party in interest with requisite standing has commenced a Challenge Proceeding prior to the conversion to Chapter 7 or appointment of a Chapter 11 trustee, the trustee shall be entitled to assume the prosecution of any pending Challenge Proceeding.  In either event, until the later of the expiration of the Challenge Period without commencement of a Challenge Proceeding or the entry of a final, non-appealable order or judgment on account of any

Challenge Proceeding commenced within the Challenge Period, the trustee shall not be bound by the Debtors' Stipulations in this Order.

27.     Upon the Challenge Period Termination Date with respect to one or more or all of the Prepetition Agents and Prepetition Secured Lenders, as the case may be, any and all such challenges and objections by any party (including, without limitation, any Committee, any chapter 11 or chapter 7 trustee appointed herein or in any Successor Case, and any other party-in-interest) ***shall be deemed to be forever waived and barred*** with respect to the applicable Prepetition Agent(s) and Prepetition Secured Lender(s), and the Prepetition Secured Debt as to one or more or all of the Prepetition Secured Lenders, as the case may be, shall be deemed to be an allowed secured claim within the meaning of section 506 of the Bankruptcy Code for all purposes in connection with the Chapter 11 Cases and the Debtors' Stipulations as to one or more or all of the Prepetition Secured Lenders, as the case may be, shall be binding on all creditors, interest holders, and parties-in-interest.

28.     To the extent any such Challenge Proceeding is commenced, the Prepetition Secured Lenders, or any of them as the case may be, shall be entitled to include the costs and expenses, including but not limited to reasonable and documented attorneys' fees and disbursements, incurred in responding to any inquiry, producing documents and/or witnesses in response to formal or informal discovery requests, or otherwise defending the objection or complaint, as part of the Prepetition Secured Debt to the extent permitted pursuant to the relevant Prepetition Financing Documents.  To the extent any such inquiry or discovery is undertaken or any such objection or complaint is filed (or as part of any agreed upon resolution thereof), the Prepetition Agents and the Prepetition Secured Lenders, or any of them as the case may be, shall be entitled to include such costs and expenses, including but not limited to reasonable and

documented attorneys' fees incurred in responding to the inquiry or discovery or in defending the objection or complaint, as part of the Prepetition Secured Debt and as part of the Prepetition Indemnity Obligations which shall be reimbursed by the Debtors including (x) each month as provided for in Paragraph 51, below and (y) with respect to the Prepetition ABL Agent and the Prepetition ABL Lenders, out of the Prepetition Indemnity Account, and as one of the Adequate Protection Superpriority Claims, and the Prepetition Indemnity Account shall be maintained until the final resolution of all such objections or claims against the Prepetition ABL Agent and/or the Prepetition ABL Lenders.  The Debtors shall remain liable to the Prepetition Secured Lenders, or any of them as the case may be, for all unpaid Prepetition Indemnity Obligations to the extent that the funds in the Prepetition Indemnity Account are insufficient to satisfy them in full.

## VI.    CARVE OUT AND PAYMENT OF PROFESSIONALS.

29.    Subject to the terms and conditions contained in this Paragraph 29, the DIP Liens, DIP Superpriority Claim, the Prepetition Liens, the Adequate Protection Liens and the Adequate Protection Superpriority Claims are all subordinate to the following (collectively, the "*Carve Out*"):

(a)    allowed administrative expenses pursuant to 28 U.S.C. § 1930(a)(6) for fees payable to the Office of the United States Trustee, as determined by agreement of the U.S. Trustee or by final order of this Court and 28 U.S.C. § 156(c) for fees required to be paid to the Clerk of this Court;

(b)    all accrued and unpaid fees, disbursements, costs and expenses, allowed at any time by this Court and incurred by professionals retained by the Debtors or a Committee, if any, (the "*Case Professionals*"), through the date of service of a Carve Out Trigger Notice (as defined below), up to and as limited by the respective Approved Budget amounts for each Case Professional or category of Case Professional[4] through the date of service

---

[4] For the avoidance of doubt, whether or not fees or expenses of any Case Professional have been incurred in accordance with the Approved Budget and entitled to the Carve Out shall be governed by the line items set forth in the Professional Monthly Fee Estimates contained in the Debtors' liquidity forecast provided to the DIP Agent.

of said Carve Out Trigger Notice (including partial amounts for any Carve Out Trigger Notice given other than at the end of a week, and after giving effect to all carryforwards and carrybacks from prior or subsequent favorable budget variances),[5] less the amount of prepetition retainers received by such Case Professionals and not previously applied to fees and expenses; and

(c)     all accrued and unpaid fees, disbursements, costs and expenses incurred by the Case Professionals from and after the date of service of a Carve Out Trigger Notice, to the extent allowed at any time, in an aggregate amount not to exceed $3,000,000 (the "**Carve Out Cap**") ($2,750,000 of which shall be allocable to the Debtors' Case Professionals, and $250,000 of which shall be allocable to any Committee Case Professionals) less the amount of prepetition retainers received by such Case Professionals and not applied to the fees, disbursements, costs and expenses set forth in clause (b) above. The Carve Out Cap shall be reduced on a dollar-for-dollar basis by any payments of fees or expenses of the Case Professionals made after delivery of the Carve Out Trigger Notice in respect of fees and expenses incurred after delivery of the Carve Out Trigger Notice.   For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered (i) by the DIP Agent to the Debtors and their counsel, counsel to the Prepetition Term Loan Lenders, the United States Trustee, and lead counsel to any Committee, which notice may be delivered at any time by the DIP Agent following the occurrence and continuance of any DIP Order Event of Default and shall specify that it is a "Carve Out Trigger Notice", or (ii) by the Prepetition Term Loan Agent to the Debtors and their counsel, the United States Trustee, and lead counsel to any Committee, which notice may be delivered at any time following the occurrence and continuance of a Cash Collateral Termination Event (as defined below).

30.     For the avoidance of doubt, the Carve Out shall be senior to the DIP Liens, the DIP Superpriority Claim, the Adequate Protection Liens, and the Adequate Protection Superpriority Claims, and any and all other forms of adequate protection, Liens or claims securing the DIP Obligations and/or the Prepetition Secured Debt granted or recognized as valid.  Further, the Carve Out shall exclude and neither advances under the DIP Facility nor proceeds of the Prepetition Collateral and the DIP Collateral shall be used to pay any fees and expenses (x)

---

[5]  Accordingly, to the extent that a particular Case Professional is over budget during any measurement period, it shall be entitled to offset such budget overage with any amounts such Case Professional is under budget in prior or subsequent periods prior to the delivery of a Carve Out Trigger Notice.

01:18374955.1

incurred in connection with the assertion or joinder in any Challenge Proceeding or any other claim, counterclaim, action, proceeding, application, motion, objection, defenses or other contested matter, the purpose of which is to seek any order, judgment, determination or similar relief (A) invalidating, setting aside, avoiding, or subordinating, in whole or in part, (i) the DIP Obligations, (ii) the DIP Lenders' Liens in the DIP Collateral, (iii) the Prepetition Secured Debt, (iv) the Prepetition Agents' and the Prepetition Secured Lenders' Liens in the Prepetition Collateral, or (v) the Adequate Protection Liens or (B) preventing, hindering, or delaying, whether directly or indirectly, the DIP Lenders', the Prepetition Agents', or the Prepetition Secured Lenders' assertion or enforcement of their Liens and security interests, or their efforts to realize upon any DIP Collateral, Prepetition Collateral, the Adequate Protection Liens, or the Prepetition Indemnity Account; *provided*, *however*, that such exclusion does not encompass any investigative work conducted by the Case Professionals retained by any Committee, but, subject to entry of the Final Order, only up to $50,000.00 of the Carve Out may be used for such investigative work.

31.    Nothing herein, including the inclusion of line items in the Approved Budget for Case Professionals, shall be construed as consent to the allowance of any particular professional fees or expenses of the Debtors, of any Committee, or of any other person or shall affect the right of the DIP Agent, the Prepetition Agents, or the Prepetition Secured Lenders to object to the allowance and payment of such fees and expenses.

**VII.    MATURITY; DIP ORDER EVENTS OF DEFAULT; REMEDIES**

**A.    Maturity.**

32.    All DIP Obligations shall be due and payable on the date that is the earliest to occur of any of the following (each, a "*DIP Maturity Event*"):

(a)    June 30, 2016;

(b)     the closing of a sale of all or substantially all of the working capital assets of the Debtors pursuant to the provisions of section 363 of the Bankruptcy Code; or

(c)     the effective date of any chapter 11 plan for the Debtors.

33.     Following a DIP Maturity Event, so long as all Prepetition ABL Debt and all DIP Obligations have been paid in full in cash, the Debtors shall be required to transfer from its Cash Collateral account to a segregated account subject to the control of an escrow agent reasonably acceptable to the Debtors and the Prepetition Term Loan Agent (the "*Carve Out Account*"), an amount of Cash Collateral equal (i) to the Carve Out Cap, plus (ii) the then accrued and unpaid fees and expenses of the Case Professionals through the date on which a DIP Maturity Event first occurs, to the extent in compliance with the Approved Budget, which Carve Out Account shall be available only to satisfy obligations benefitting from the Carve Out.  All funds on deposit in the Carve Out Account, however funded and from whatever source derived, shall at all times continue to constitute Cash Collateral, subject to the prior payment of all amounts covered by the Carve Out.  Once the Carve Out Account has been funded, either by the Debtors as provided in this Paragraph 33 or by the DIP Agent as provided in Paragraph 41 below, none of the Prepetition Agents, the Prepetition Secured Lenders, the DIP Agent, nor the DIP Lenders shall have any further liability for nor responsibility with respect to the Carve Out, including any application or disbursement of funds in the Carve Out Account.

34.     In the event that (A) all Prepetition ABL Debt and DIP Obligations have been paid in full in cash and (B) the DIP Commitments have irrevocably terminated, the Debtors, in consultation with any Committee, the Prepetition ABL Agent, the FILO Agent, the Prepetition Term Loan Agent, and the Ad Hoc Group of Prepetition Term Loan Lenders shall consult with each other as to the terms and conditions of continued consensual use of Cash Collateral in light of

01:18374955.1

the then present circumstances of these Chapter 11 Cases.  If the Debtors, any Committee, the Prepetition ABL Agent, the FILO Agent, the Prepetition Term Loan Agent, and Prepetition Term Loan Lenders are not able to agree on such terms and conditions, the Prepetition Term Loan Agent shall be entitled to declare that the Debtors' rights to use Cash Collateral on the terms provided in this Interim Order are terminated (a "***Cash Collateral Termination Event***")  with such termination to take effect immediately upon delivery of notice (a "***Cash Collateral Termination Notice***") by the Prepetition Term Loan Agent to the Debtors and their counsel, the United States Trustee, and lead counsel to any Committee.  Following the delivery of the Cash Collateral Termination Notice, the Debtors, the Prepetition Term Loan Agent, and any Committee shall be entitled to an emergency hearing before this Court, upon appropriate notice to the Committee, the Prepetition ABL Agent, the FILO Agent, and the DIP Agent, including for the purposes of determining whether the use of Cash Collateral by the Debtors should be granted and on what terms and conditions, even if on a non-consensual basis.  In the event that the Debtors either accept the termination of use of Cash Collateral (by written correspondence to the Prepetition Term Loan Agent) or the Court determines that the Debtors are not permitted to use Cash Collateral, the delivery of the Cash Collateral Termination Notice shall automatically constitute delivery of a Carve Out Trigger Notice as set forth in Paragraph 29 hereof.

35.    Unless and until the Prepetition ABL Debt and the DIP Obligations have been irrevocably repaid in full in cash (or other arrangements for payment of (i) the Prepetition ABL Debt satisfactory to the Prepetition ABL Agent and the FILO Agent and (ii) the DIP Obligations satisfactory to the DIP Agent, in each case in their sole and exclusive discretion have been made) and all DIP Commitments have been irrevocably terminated, the protections afforded to the Prepetition ABL Agent, the Prepetition ABL Lenders, the DIP Agent, and the DIP Lenders

01:18374955.1

pursuant to this Interim Order and under the DIP Financing Agreements, and any actions taken pursuant thereto, shall survive the entry of any order confirming any Plan or converting the Chapter 11 Cases into a Successor Case, and the DIP Liens, the DIP Superpriority Claim, the Adequate Protection Liens, and the Adequate Protection Superpriority Claims shall continue in the Chapter 11 Cases and in any Successor Case, and such DIP Liens, DIP Superpriority Claim, Adequate Protection Liens, and Adequate Protection Superpriority Claims shall maintain their respective priorities as provided by this Interim Order.

36.    Unless and until the Prepetition Term Loan Debt has been irrevocably repaid in full in cash, the protections afforded to the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders pursuant to this Interim Order and any actions taken pursuant thereto shall survive the entry of any order confirming any Plan or converting the Chapter 11 Cases into a Successor Case, and the Adequate Protection Liens and the Adequate Protection Superpriority Claims shall continue in the Chapter 11 Cases and in any Successor Case, and such Adequate Protection Liens and Adequate Protection Superpriority Claims shall maintain their respective priorities as provided by this Interim Order.

**B.     DIP Order Events of Default.**

37.    All DIP Obligations shall be immediately due and payable and all authority to use the proceeds of the DIP Facility and to use Cash Collateral shall cease on the date that is the earliest to occur of any of the following (each, a "***DIP Order Event of Default***"):

(a)    the occurrence of an Event of Default (as defined in the DIP Credit Agreement) in accordance with the DIP Credit Agreement; or

(b)    the failure of the Debtors to obtain entry of the Final Order on or before April 1, 2016;

C.     **Rights and Remedies Upon DIP Order Event of Default.**

38.     Any automatic stay otherwise applicable to the DIP Agent and the DIP Lenders is hereby modified so that after the occurrence of any DIP Order Event of Default, upon five (5) days prior written notice (a "***Remedies Notice***") of such occurrence (the "***Remedies Notice Period***"), in each case given to each of (v) the Debtors, (w) counsel to the Debtors, (x) counsel to each of the Prepetition Agents, (y) counsel for any Committee, and (z) the Office of the United States Trustee, the DIP Agent and the DIP Lenders shall be entitled to exercise their rights and remedies in accordance with the DIP Financing Agreements.

39.     Upon the service of a Remedies Notice after the occurrence of a DIP Order Event of Default:

(a)     the Debtors shall continue to deliver and cause the delivery of the proceeds of the Prepetition Collateral to the Prepetition ABL Agent and the DIP Collateral to the DIP Agent as provided in this Interim Order and in the DIP Financing Agreements;

(b)     the Prepetition ABL Agent and the DIP Agent shall continue to apply such proceeds in accordance with the provisions of this Interim Order and the DIP Financing Agreements;

(c)     the Debtors shall have no right to use any of such proceeds, nor any other Cash Collateral, other than towards the satisfaction of the Prepetition ABL Debt, the DIP Obligations, and the Carve Out; and

(d)     any obligation otherwise imposed on the DIP Lenders to provide any loan or advance to the Debtors pursuant to the DIP Facility shall be suspended, and any loan or advance made thereafter shall be made by the DIP Lenders in their sole and exclusive discretion.

40.     Following the giving of a Remedies Notice by the DIP Agent of the occurrence of a DIP Order Event of Default, the Debtors, the DIP Agent, and any Committee appointed in the Chapter 11 Cases, if any, shall be entitled to an emergency hearing before this Court, including for the purpose of contesting whether a DIP Order Event of Default has occurred. If the Debtors or any such Committee do not contest the occurrence of a DIP Order Event of

Default and the right of the DIP Agent and the DIP Lenders to exercise their remedies, or if the

Debtors or any such Committee do timely contest the occurrence of a DIP Order Event of Default

and unless this Court, after notice and hearing prior to the expiry of the Remedies Notice Period

stays the enforcement thereof, the automatic stay, solely as to the DIP Agent and the DIP Lenders,

shall automatically terminate at the end of the Remedies Notice Period.

        41.     Subject to the provisions of Paragraphs 38, 39, and 40 above, upon the

occurrence of a DIP Order Event of Default, the DIP Agent and the DIP Lenders are authorized to

exercise their remedies and proceed under or pursuant to the DIP Financing Agreements; except

that, (A) with respect to any of the Debtors' leasehold locations, the DIP Agent's and the DIP

Lenders' rights shall be limited to such rights (i) as may be ordered by this Court upon motion and

notice to the applicable landlord with an opportunity to respond that is reasonable under the

circumstances; (ii) to which the applicable landlord agrees in writing with the DIP Agent; or (iii)

which the DIP Agent and the DIP Lenders have under applicable non-bankruptcy law, and (B)

prior to exercising any such remedies, the DIP Agent shall fund the Carve Out Account as set forth

in Paragraph 33 hereof (provided that such Carve Out Account shall be subject to the control of the

DIP Agent).

        42.     Nothing included herein shall prejudice, impair or otherwise affect the

Prepetition Agents or the DIP Agent's rights to seek any other or supplemental relief from the

Court in respect of the Debtors, nor the DIP Lenders' rights, as provided herein and in the DIP

Credit Agreement, to suspend or terminate the making of loans and granting financial

accommodations under the DIP Credit Agreement.

01:18374955.1

D. **No Waiver of Remedies**.

43. The delay in or the failure of the Prepetition Agents or the DIP Agent to seek relief or otherwise exercise their rights and remedies shall not constitute a waiver of any of the Prepetition Agents', the Prepetition Secured Lenders', or the DIP Agent's rights and remedies. Notwithstanding anything herein, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly or otherwise impair the rights and remedies of the Prepetition Agents, the Prepetition Secured Lenders, or the DIP Agent under the Bankruptcy Code or under non-bankruptcy law, including without limitation, the rights of the Prepetition Agents and the DIP Agent to (i) request conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, dismissal of the Chapter 11 Cases, or the appointment of a trustee in the Chapter 11 Cases; (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Plan; or (iii) subject to section 362 of the Bankruptcy Code exercise any of the rights, claims, or privileges (whether legal, equitable, or otherwise) the Prepetition Agents and the DIP Agent may have.

**VIII. CERTAIN LIMITING PROVISIONS**

A. **Section 506(c) Claims and Waiver.**

44. Nothing contained in this Interim Order shall be deemed a consent by the Prepetition Agents, the Prepetition Secured Lenders, or the DIP Agent to any charge, Lien, assessment, or claim against the DIP Collateral, the DIP Liens, the Prepetition Collateral, or the Adequate Protection Liens under section 506(c) of the Bankruptcy Code or otherwise; *provided*, *however*, that during the Interim Period there shall be no waiver of section 506(c) of the Bankruptcy Code.

45.     As a further condition of the DIP Facility and any obligation of the DIP Lenders to make credit extensions pursuant to the DIP Financing Agreements, and in consideration of the Prepetition Secured Lenders' consent to the use of their Cash Collateral, upon entry of the Final Order, the Debtors (and any successors thereto or any representatives thereof, including any trustees appointed in the Chapter 11 Cases or any Successor Case) shall be deemed to have waived any rights or benefits of section 506(c) of the Bankruptcy Code with respect to the Prepetition Agents, the Prepetition Secured Lenders, the DIP Lenders, the Prepetition Collateral, and the DIP Collateral.

**B.     Proceeds of Subsequent Financing.**

46.     If at any time prior to the irrevocable repayment in full in cash of all Prepetition Secured Debt and DIP Obligations and the termination of the DIP Lenders' obligations to make loans and advances under the DIP Facility, the Debtors, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed, shall obtain credit or incur debt pursuant to sections 364(c)(1) or 364(d) of the Bankruptcy Code in violation of the DIP Financing Agreements, then all of the cash proceeds derived from such credit or debt and all Cash Collateral shall immediately be turned over first, to the Prepetition ABL Agent to be applied in reduction of the Prepetition ABL Debt, second, to the DIP Agent to be applied in reduction of the DIP Obligations, and then to the Prepetition Term Loan Agent to be applied to the Prepetition Term Loan Debt.

**C.     Priming of DIP Facility.**

47.     In entering into the DIP Financing Agreements, and consenting to the use of Cash Collateral, and as consideration therefor, each of the Debtors hereby agrees that until such time as all Prepetition ABL Debt and all DIP Obligations have been irrevocably paid in full in cash

43

(or other arrangements for payment of the Prepetition ABL Debt and the DIP Obligations satisfactory to the Prepetition ABL Lenders and the DIP Lenders, as applicable, in their sole and exclusive discretion have been made) and the DIP Financing Agreements have been terminated in accordance with the terms thereof, the Debtors shall not (unless otherwise agreed to by the DIP Agent, DIP Lenders, Prepetition ABL Agent and Prepetition ABL Lenders, in their sole respective discretion) in any way prime or seek to prime the security interests and DIP Liens provided to the DIP Lenders or the Prepetition Liens or Adequate Protection Liens granted to the Prepetition ABL Agent or Prepetition ABL Lenders under this Interim Order by offering a subsequent lender or a party-in-interest a superior or pari passu Lien or claim pursuant to section 364(d) of the Bankruptcy Code or otherwise; *provided* that this Paragraph 47 shall not be deemed to amend the Intercreditor Agreement.

48.     In consenting to the use of Cash Collateral and the other provisions hereof, and as consideration therefor, each of the Debtors hereby agrees that until such time as all of the Prepetition Term Loan Debt has been irrevocably paid in full in cash (or other arrangements for payment of such obligations satisfactory to the Prepetition Term Loan Lenders, in their sole and exclusive discretion have been made) and the Prepetition Term Loan Credit Agreement and the Loan Documents (as defined in the Prepetition Term Loan Credit Agreement) have been terminated in accordance with the terms thereof, the Debtors shall not (unless otherwise agreed to by the Prepetition Term Loan Agent and Prepetition Term Loan Lenders, in their sole respective discretion) in any way prime or seek to prime the security interests and Prepetition Liens of the Prepetition Term Loan Agent or Adequate Protection Liens granted to the Prepetition Term Loan Agent or Prepetition Term Loan Lenders under this Interim Order on the Term Priority Collateral by offering a subsequent lender or a party-in-interest a superior or pari passu Lien or claim

pursuant to section 364(d) of the Bankruptcy Code or otherwise (other than as permitted under Paragraph 19 above).

## IX.    OTHER RIGHTS AND OBLIGATIONS

### A.    Good Faith Under Section 364(e) of the Bankruptcy Code.  No Modification or Stay of this Interim Order.

49.    Based on the findings set forth in this Interim Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility contemplated by this Interim Order, in the event any or all of the provisions of this Interim Order are hereafter modified, amended, or vacated by a subsequent order of this or any other court, the DIP Agent and the DIP Lenders are entitled to the protections provided in section 364(e) of the Bankruptcy Code and, no such appeal, modification, amendment, or vacation shall affect the validity and enforceability of any advances made hereunder or the Liens or priority authorized or created hereby.

50.    Notwithstanding any modification, amendment, or vacation of any or all of the provisions of this Interim Order, any claim or protection granted to the Prepetition Agents, the Prepetition Secured Lenders, or the DIP Lenders hereunder arising prior to the effective date of such modification, amendment, or vacation of any such claim or protection granted to the Prepetition Agents, the Prepetition Secured Lenders, or the DIP Lenders shall be governed in all respects by the original provisions of this Interim Order, and the Prepetition Agents, the Prepetition Secured Lenders, and the DIP Lenders shall be entitled to all of the rights, remedies, privileges, and benefits, including the Adequate Protection and the DIP Protections granted herein, with respect to any such claim, including those found under section 364(e) of the Bankruptcy Code.

01:18374955.1

### B.     Prepetition Agents', Prepetition Secured Lenders', DIP Agent's, and DIP Lenders' Expenses.

51.     Subject to Paragraph 18(c) above, as provided in the Prepetition Financing Documents and in the DIP Financing Agreements, all reasonable out-of-pocket costs and expenses of the Prepetition Agents, the Prepetition Secured Lenders (including the Ad Hoc Group of Prepetition Term Loan Lenders), the DIP Agent, and the DIP Lenders, including, without limitation, reasonable legal, accounting, collateral examination, monitoring and appraisal fees and disbursements, financial advisory fees, fees and expenses of other consultants, indemnification and reimbursement obligations with respect to fees and expenses, and other out of pocket expenses, whether or not contained in the Approved Budget and without limitation with respect to the dollar estimates contained in the Approved Budget (provided, however, that such overages shall not weigh against the Debtors in any testing related to compliance with the Approved Budget), will be paid by the Debtors.  Payment of such fees shall not be subject to allowance by this Court; *provided*, *however*, the Debtors, the U.S. Trustee or counsel for any Committee may seek a determination by this Court whether such fees and expenses are reasonable in the manner set forth below.  Under no circumstances shall professionals for the DIP Agent, the DIP Lenders, the Prepetition Agents, or the Prepetition Secured Lenders (including the Ad Hoc Group of Prepetition Term Loan Lenders) be required to comply with the United States Trustee fee guidelines; *provided*, *however*, the Debtors shall provide to the Office of the U.S. Trustee and any Committee a copy of any invoices received from the DIP Agent, the DIP Lenders, the Prepetition Agents, or the Prepetition Secured Lenders (including the Ad Hoc Group of Prepetition Term Loan Lenders) for professional fees and expenses during the pendency of the Chapter 11 Cases.  The invoices shall be sufficiently detailed to enable a determination as to the reasonableness of such fees and expenses (without limiting the right of the various professionals to redact privileged,

confidential, or sensitive information).  If the Debtors, U.S. Trustee or counsel for any Committee object to the reasonableness of the invoices submitted by the DIP Agent, the DIP Lenders, the Prepetition Agents, or the Prepetition Secured Lenders (including the Ad Hoc Group of Prepetition Term Loan Lenders), and the parties cannot resolve such objection within 10 days of receipt of such invoices, the Debtors, U.S. Trustee or the Committee, as the case may be, shall file with the Court and serve on the applicable DIP Agent, DIP Lender, Prepetition Agent, or Prepetition Secured Lender an objection (the "**Fee Objection**") limited to the issue of reasonableness of such fees and expenses.  The Debtors shall timely pay, and/or the DIP Agent is hereby authorized to make an advance under the DIP Facility to timely pay, the submitted invoices after the expiration of the ten (10) day notice period if no Fee Objection is received in such ten (10) day period.  If a Fee Objection is timely received, only the undisputed amount of the invoice shall be paid and the Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute.

C. **Binding Effect**.

52. The provisions of this Interim Order shall be binding upon and inure to the benefit of the DIP Agent, the DIP Lenders, the Prepetition Agents, the Prepetition Secured Lenders, the Debtors, and their respective successors and assigns (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtors), and any Committee (subject to the provisions of Paragraphs 26 - 28 above), whether in the Chapter 11 Cases, in any Successor Case, or upon dismissal of any such chapter 11 or chapter 7 case.

D.      **No Third Party Rights**.

53.      Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect or incidental beneficiary, other than the Debtors, the DIP Agent, the DIP Lenders, the Prepetition Agents, and the Prepetition Secured Lenders.

E.      **Prepetition Secured Lenders' and DIP Lenders' Rights Governed By Prepetition Intercreditor Agreement.**

54.      Notwithstanding anything to the contrary in the Prepetition Intercreditor Agreement, and notwithstanding the provisions of Paragraph 55 below, the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders (i) consent to the grant of claims to and Liens in the DIP Collateral to the DIP Agent, the DIP Lenders, the Prepetition ABL Agent, the FILO Agent, and the Prepetition ABL Lenders, and (ii) consent to the repayment of the Prepetition ABL Debt and the DIP Obligations from ABL Priority Collateral (and, after payment in full in cash of the Prepetition Term Loan Debt, the Term Priority Collateral), but only as expressly provided in, and as limited by, this Interim Order, and (iii) waive any right to require disgorgement of all or any portion of such repayment.   In the event of any inconsistency between the terms and conditions of the Prepetition Intercreditor Agreement and this Interim Order, the provisions of this Interim Order shall govern and control.  The Prepetition Agents and the Prepetition Secured Lenders each consent to the exclusive jurisdiction of this Court to address and resolve any and all issues arising under, and resolve any and all disputes between them arising out of, the Prepetition Intercreditor Agreement to the extent related to this Interim Order.

F.    **Reservation of Rights by Prepetition Term Loan Agent and Prepetition Term Loan Lenders.**

55.    Regardless of the actual source of proceeds of repayment of the Prepetition ABL Debt, the DIP Obligations, and/or payment of any administrative expenses in these Chapter 11 Cases, the Prepetition Term Loan Agent and Prepetition Term Loan Lenders each reserves all of their respective rights, claims, defenses, and arguments as to (i) what the proper source of repayment of the Prepetition ABL Debt and the DIP Obligations should have been under applicable law (but not any right to seek disgorgement of any such repayment) under applicable bankruptcy and non-bankruptcy law, and (ii) what the proper source of payment of any administrative expenses in these Chapter 11 Cases should have been.  Further, the foregoing shall not in any way diminish or abrogate the Adequate Protection Liens granted in all of the DIP Collateral and Adequate Protection Superpriority Claims granted pursuant to Paragraph 18 hereof, in each case for the benefit of the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders, or, upon entry of the Final Order, the waivers of the Debtors rights to assert section 506(c) or section 552(a) claims against the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders.

G.    **No Marshaling**.

56.    Except as provided in Paragraph 55, the DIP Agent, the DIP Lenders, the Prepetition Agents, and the Prepetition Secured Lenders shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or Prepetition Collateral, as applicable.

H.    **Section 552(b) of the Bankruptcy Code.**

57.    Upon entry of the Final Order, the DIP Agent, the DIP Lenders, the Prepetition Agents, and the Prepetition Secured Lenders shall each be entitled to all of the rights

and benefits of section 552(b) of the Bankruptcy Code and the Debtors shall not assert that the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall apply to the DIP Agent, the DIP Lenders, the Prepetition Agents, or the Prepetition Secured Lenders with respect to proceeds, product, offspring, or profits of any of the Prepetition Collateral or the DIP Collateral.

> **I.    Amendments**.

> 58.    The Debtors and the DIP Agent may amend, modify, supplement, or waive any provision of the DIP Financing Agreements without further approval of this Court, but only after notice to the Prepetition Term Loan Agent, the Prepetition Term Loan Lenders, and any Committee; provided, however that notice of any "material" amendment, modification, supplement, or waiver  shall be filed with this Court and the Prepetition Term Loan Agent, the Prepetition Term Loan Lenders, and any Committee shall have five (5) business days from the date of such filing within which to object in writing to such proposed amendment, modification, supplement, or waiver; provided further, that if the Prepetition Term Loan Agent, or Committee timely objects to any material amendment, modification, supplement, or waiver, then such amendment, modification, supplement, or waiver shall only be permitted pursuant to an order of this Court after notice and a hearing.  For purposes of this Paragraph 58, a "material" amendment shall include, but not be limited to, any amendment, modification, supplement, or waiver that (i) increases the interest rate (other than as a result of the imposition of the Default Rate), (ii) increases the DIP Commitments, (iii) changes the maturity date of the DIP Facility or any DIP Maturity Date, (iv) amends or waives any Event of Default under the DIP Credit Agreement, (v) revises any case or sale milestone set forth in the DIP Credit Agreement, or (vi) otherwise modifies the DIP Financing Agreements in a manner materially less favorable to the Debtors, the

Prepetition Term Loan Agent, or the Prepetition Term Loan Lenders.    All amendments, modifications, supplements, or waivers of any of the provisions hereof shall not be effective unless set forth in writing, signed by on behalf of the Debtors, the DIP Agent, the Prepetition Agents, and/or the Prepetition Secured Lenders, and, if required, approved by this Court.

### J.    Survival of Interim Order.

59.    The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered:

(a)    confirming any Plan in the Chapter 11 Cases,

(b)    converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code,

(c)    dismissing the Chapter 11 Cases,

(d)    withdrawing of the reference of the Chapter 11 Cases from this Court, or

(e)    providing for abstention from handling or retaining of jurisdiction of the Chapter 11 Cases in this Court.

60.    The terms and provisions of this Interim Order including the DIP Protections granted pursuant to this Interim Order and the DIP Financing Agreements and any protections granted the Prepetition Agents or the Prepetition Secured Lenders shall continue in full force and effect notwithstanding the entry of any order described in Paragraph 49, and such DIP Protections and protections for the Prepetition Secured Lenders shall maintain their priority as provided by this Interim Order until all of the DIP Obligations of the Debtors to the DIP Lenders pursuant to the DIP Financing Agreements and the Prepetition Secured Debt has been irrevocably paid in full in cash and discharged (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms).

**K.**    **Inconsistency**.

61.    In the event of any inconsistency between the terms and conditions of the DIP Credit Agreement, the DIP Financing Agreements, and this Interim Order, the provisions of this Interim Order shall govern and control.

**L.**    **Enforceability**.

62.    This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof.

**M.**    **Objections Overruled**.

63.    Notwithstanding any reservations of rights made on the record at the Interim Hearing with respect to this Interim Order, all objections to the Motion to the extent not withdrawn or resolved, are hereby overruled.

**N.**    **Waiver of Any Applicable Stay**.

64.    Any applicable stay (including, without limitation, under Bankruptcy Rule 6004(h)) is hereby waived and shall not apply to this Interim Order.

**O.**    **Proofs of Claim.**

65.    The Prepetition ABL Agent, the Prepetition Term Loan Agent, the Prepetition Secured Lenders, the DIP Agent, and the DIP Lenders will not be required to file proofs of claim in the Chapter 11 Cases or in any Successor Case.

**P.**    **Headings.**

66.    The headings in this Order are for purposes of reference only and shall not limit or otherwise affect the meaning of this Order.

**Q.** **Retention of Jurisdiction.**

67.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order.

**X.**     **FINAL HEARING.**

68.     **The Final Hearing on the Motion shall be held before this Court on March __, 2016, at _:00 a/p.m. (ET).**

69.     The Debtors shall, within three (3) business days of the entry of this Interim Order, serve (A) the U.S. Trustee; (B) Riemer & Braunstein LLP (attn: Donald Rothman) as counsel to (i) the DIP Agent, (ii) the Revolving DIP Lenders, and (iii) the Prepetition ABL Administrative Agent; (C) holders of the 50 largest unsecured claims on a consolidated basis against the Debtors; (D) Brown Rudnick LLP (attn: Robert Stark and Bennett Silverberg) as counsel for (i) the Prepetition Term Loan Agent and (ii) certain Prepetition Term Loan Lenders; (E) Choate, Hall & Stewart LLP (attn: Kevin Simard) as counsel for (i) the FILO Agent and (ii) the FILO DIP Lenders; (F) O'Melveny & Meyers LLP (attn: John Rapisardi) as counsel for certain holders of Mezzanine Notes; (G) all holders of Mezzanine Notes; (H) the Internal Revenue Service; (I) all appropriate state taxing authorities; (J) all landlords, owners, and/or operators of premises at which any of the Debtors' inventory and/or equipment is located; and (K) any other party that files a request for notices with the Court as of the date of such service, a copy of the Interim Order and a notice of the Final Hearing to consider entry of the Final Order.

70.     If no objections to the relief sought in the Motion are filed and served in accordance with this Interim Order, no Final Hearing shall be held, and a separate Final Order may be presented jointly by the Debtors and by the DIP Agent and entered by this Court upon certification of counsel by the Debtors.

01:18374955.1

71.     Any party in interest objecting to the relief sought in the Motion shall submit any such objection in writing and file same with this Court and serve such objection so as to be received no later than **March __, 2016 at _:00 a/p.m. (ET)** on the following parties:

| *Proposed Counsel for the Debtors* | *Office of the United States Trustee* |
|---|---|
| Gibson, Dunn & Crutcher LLP<br>333 South Grand Avenue<br>Los Angeles, California 90071<br>Attn: Robert A. Klyman, Esq. and<br>Matthew J. Williams, Esq.<br><br>and<br><br>Young Conaway Stargatt & Taylor, LLP<br>Rodney Square, 1000 North King Street<br>Wilmington, Delaware 19801<br>Attn: Michael R. Nestor, Esq. and<br>Andrew L. Magaziner, Esq. | Office of the United States Trustee for the District of Delaware<br>844 King Street, Suite 2207<br>Lockbox 35<br>Wilmington, Delaware 19801<br>Attn: Hannah McCollum, Esq.<br>Email: Hannah.mccollum@usdoj.gov |
| *Counsel for the DIP Agent*<br>Riemer & Braunstein LLP<br>Three Center Plaza,<br>Boston, Massachusetts 02108<br>Attn: Donald E. Rothman, Esq.<br>E-mail: drothman@riemerlaw.com<br><br>and<br><br>Ashby & Geddes<br>500 Delaware Avenue<br>Wilmington, Delaware  19899<br>Attn: Gregory A. Taylor, Esq.<br>E-mail: gtaylor@ashby-geddes.com | *Counsel for the Prepetition Term Loan Lenders*<br><br>and |
| *Counsel for the FILO Agent*<br>Choate, Hall & Stewart LLP<br>Two International Place<br>Boston Massachusetts 02110<br>Attn: Kevin J. Simard, Esq.<br>Email: ksimard@choate.com<br><br>and | |

| | |
|---|---|
| Richards, Layton & Finger, PA<br>One Rodney Square<br>920 North King Street<br>Wilmington, DE  19899<br>Attn: Mark Collins<br>Email: collins@rlf.com | |
| ***Counsel for the Prepetition Term Loan Agent***<br>Brown Rudnick LLP<br>Seven Times Square<br>New York, NY 10036<br>Attn: Robert J. Stark and Bennett S. Silverberg<br><br>Brown Rudnick, LLP<br>One Financial Center<br>Boston, MA  02111<br>Attn:  Andreas Andromalos, Esq. | |

Dated: March __, 2016
Wilmington, Delaware


_____

UNITED STATES BANKRUPTCY JUDGE

01:18374955.1

**<u>Exhibit "1"</u>**

**Approved Budget**

**The Sports Authority**
**Summary Approved Budget**
**($ in 000's)**

| 4-5-4 Month<br>Week Ending<br>Fiscal Week #<br>Store Count | Mar<br>3/5/16<br>1<br>462 | Mar<br>3/12/16<br>2<br>462 | Mar<br>3/19/16<br>3<br>462 | Mar<br>3/26/16<br>4<br>462 | Mar<br>4/2/16<br>5<br>462 | Apr<br>4/9/16<br>6<br>462 | Apr<br>4/16/16<br>7<br>462 | Apr<br>4/23/16<br>8<br>462 | Apr<br>4/30/16<br>9<br>462 | 9 Weeks<br>Total<br><br>462 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1) Cash Receipts | 47,285 | 53,766 | 56,849 | 57,323 | 57,435 | 56,269 | 58,581 | 55,455 | 52,432 | 495,395 |
| Cash Disbursements | | | | | | | | | | |
| 2)   Operating Disbursements | (28,391) | (47,903) | (62,304) | (57,227) | (53,399) | (32,687) | (41,704) | (34,850) | (55,354) | (413,820) |
| 3)   Financing Disbursements | (4,019) | (336) | (313) | (311) | (1,071) | (314) | (305) | (287) | (274) | (7,232) |
| 4)   Professional Fees | (3,000) | - | - | (1,250) | - | - | - | - | - | (4,250) |
| 5)   Bankruptcy Related Disbursements | (2,150) | (1,430) | - | - | - | - | - | - | - | (3,580) |
| 6) Total Cash Disbursements | (37,561) | (49,670) | (62,617) | (58,789) | (54,470) | (33,001) | (42,009) | (35,138) | (55,628) | (428,882) |
| 7) Net Cash Flow Before Revolver Borrowing / (Paydown) | 9,724 | 4,096 | (5,768) | (1,465) | 2,964 | 23,268 | 16,572 | 20,317 | (3,197) | 66,512 |
| 8)   Revolver Principal Borrowing / (Paydown) | (954) | (28,138) | (2,872) | 4,511 | (667) | (10,841) | (21,982) | (16,205) | (9,106) | (86,254) |
| 9) Net Cash Flow | 8,770 | (24,042) | (8,640) | 3,046 | 2,297 | 12,427 | (5,410) | 4,112 | (12,302) | (19,742) |
| 10) Beginning Book Available Cash | (12,470) | (3,700) | (27,742) | (36,382) | (33,336) | (31,040) | (18,612) | (24,022) | (19,910) | (12,470) |
| 11)   Net Cash Flow | 8,770 | (24,042) | (8,640) | 3,046 | 2,297 | 12,427 | (5,410) | 4,112 | (12,302) | (19,742) |
| 12) Ending Book Available Cash | (3,700) | (27,742) | (36,382) | (33,336) | (31,040) | (18,612) | (24,022) | (19,910) | (32,212) | (32,212) |
| 13) Add: Outstanding Checks | 4,700 | 28,742 | 37,382 | 34,336 | 32,040 | 19,612 | 25,022 | 20,910 | 33,212 | 33,212 |
| 14) Ending Bank Available Cash | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |

**The Sports Authority**
**Summary Approved Budget**
**($ in 000's)**

| 4-5-4 Month<br>Week Ending<br>Fiscal Week #<br>Store Count | May<br>5/7/16<br>10<br>462 | May<br>5/14/16<br>11<br>462 | May<br>5/21/16<br>12<br>462 | May<br>5/28/16<br>13<br>462 | Jun<br>6/4/16<br>14<br>321 | Jun<br>6/11/16<br>15<br>321 | Jun<br>6/18/16<br>16<br>321 | Jun<br>6/25/16<br>17<br>321 | Jun<br>7/2/16<br>18<br>321 | 9 Weeks<br>Total<br><br>321 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1) Cash Receipts | 51,057 | 47,069 | 43,597 | 46,623 | 42,022 | 39,884 | 47,284 | 46,079 | 40,106 | 403,721 |
| Cash Disbursements | | | | | | | | | | |
| 2) Operating Disbursements | (29,657) | (44,084) | (36,594) | (41,224) | (60,959) | (33,945) | (35,360) | (37,383) | (55,802) | (375,008) |
| 3) Financing Disbursements | (2,606) | (264) | (260) | (262) | (975) | (262) | (275) | (265) | (976) | (6,144) |
| 4) Professional Fees | - | (6,130) | - | - | - | (5,430) | - | - | - | (11,560) |
| 5) Bankruptcy Related Disbursements | - | - | (4,520) | - | - | - | - | - | - | (4,520) |
| 6) Total Cash Disbursements | (32,263) | (50,478) | (41,374) | (41,486) | (61,934) | (39,637) | (35,635) | (37,647) | (56,778) | (397,232) |
| 7) Net Cash Flow Before Revolver Borrowing / (Paydown) | 18,794 | (3,409) | 2,222 | 5,137 | (19,912) | 248 | 11,649 | 8,432 | (16,672) | 6,489 |
| 8) Revolver Principal Borrowing / (Paydown) | (3,376) | (5,247) | 2,271 | (7,915) | 8,071 | 15,961 | (12,498) | (9,645) | 5,620 | (6,758) |
| 9) Net Cash Flow | 15,418 | (8,656) | 4,494 | (2,778) | (11,841) | 16,209 | (849) | (1,214) | (11,051) | (269) |
| 10) Beginning Book Available Cash | (32,212) | (16,794) | (25,450) | (20,957) | (23,734) | (35,576) | (19,367) | (20,216) | (21,430) | (32,212) |
| 11) Net Cash Flow | 15,418 | (8,656) | 4,494 | (2,778) | (11,841) | 16,209 | (849) | (1,214) | (11,051) | (269) |
| 12) Ending Book Available Cash | (16,794) | (25,450) | (20,957) | (23,734) | (35,576) | (19,367) | (20,216) | (21,430) | (32,481) | (32,481) |
| 13) Add: Outstanding Checks | 17,794 | 26,450 | 21,957 | 24,734 | 36,576 | 20,367 | 21,216 | 22,430 | 33,481 | 33,481 |
| 14) Ending Bank Available Cash | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |

# EXHIBIT B

# DIP CREDIT AGREEMENT

SENIOR SECURED
SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT


Dated as of March [_____], 2016

among


THE SPORTS AUTHORITY, INC.
as Borrower Representative for:


THE SPORTS AUTHORITY, INC.
TSA STORES, INC.
as Borrowers

THE GUARANTORS PARTY HERETO


THE LENDERS PARTY HERETO


BANK OF AMERICA, N.A.,
as Administrative Agent and Collateral Agent

WELLS FARGO BANK, NATIONAL ASSOCIATION
as FILO Agent and as Syndication Agent,

JPMORGAN CHASE BANK, N.A.
SUNTRUST BANK
U.S. BANK NATIONAL ASSOCIATION
as Co-Documentation Agents

and

MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED
WELLS FARGO BANK, NATIONAL ASSOCIATION
as Joint Lead Arrangers and Joint Bookrunners

# TABLE OF CONTENTS

Section                                                                                                    Page

## ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

1.01.    Defined Terms ............................................................................................................. 2
1.02.    Other Interpretive Provisions. .................................................................................. 47
1.03.    Accounting Terms...................................................................................................... 47
1.04.    Rounding .................................................................................................................... 48
1.05.    Times of Day .............................................................................................................. 48
1.06.    Letter of Credit Amounts .......................................................................................... 48

## ARTICLE II
## THE COMMITMENTS AND CREDIT EXTENSIONS

2.01.    Committed Loans; FILO Loan; Reserves. ................................................................ 48
2.02.    Borrowings, Conversions and Continuations of Committed Loans. ......................... 49
2.03.    Letters of Credit. ....................................................................................................... 52
2.04.    Swing Line Loans. ..................................................................................................... 61
2.05.    Prepayments. .............................................................................................................. 65
2.06.    Termination or Reduction of Revolving Commitments. ........................................... 66
2.07.    Repayment of Loans. ................................................................................................. 67
2.08.    Interest........................................................................................................................ 68
2.09.    Fees ............................................................................................................................ 69
2.10.    Computation of Interest and Fees ............................................................................. 69
2.11.    Evidence of Debt........................................................................................................ 69
2.12.    Payments Generally; Administrative Agent's Clawback. ......................................... 70
2.13.    Sharing of Payments by Lenders .............................................................................. 73
2.14.    Settlement Amongst Revolving Lenders ................................................................... 73
2.15.    Certain Bankruptcy Matters....................................................................................... 74
2.16.    Defaulting Lenders..................................................................................................... 76

## ARTICLE III
## TAXES, YIELD PROTECTION AND ILLEGALITY

3.01.    Taxes........................................................................................................................... 78
3.02.    Illegality ..................................................................................................................... 83
3.03.    Inability to Determine Rates ..................................................................................... 83
3.04.    Increased Costs. ......................................................................................................... 84
3.05.    Compensation for Losses ........................................................................................... 85
3.06.    Mitigation Obligations; Replacement of Lenders...................................................... 86
3.07.    Survival ...................................................................................................................... 86
3.08.    Designation of Borrower Representative as Borrowers' Agent. ................................ 86

## ARTICLE IV
## CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

4.01.   Closing Date....................................................................................................... 87
4.02.   Conditions to all Credit Extensions ................................................................... 89

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

5.01.   Existence, Qualification and Power.................................................................... 90
5.02.   Authorization; No Contravention ....................................................................... 90
5.03.   Governmental Authorization; Other Consents................................................... 91
5.04.   Binding Effect.................................................................................................... 91
5.05.   Financial Statements; No Material Adverse Effect; No Internal Control
             Event. .......................................................................................................... 91
5.06.   Litigation............................................................................................................ 91
5.07.   No Default.......................................................................................................... 92
5.08.   Ownership of Property; Liens; Investments. ..................................................... 92
5.09.   Environmental Compliance. .............................................................................. 93
5.10.   Insurance ........................................................................................................... 94
5.11.   Taxes ................................................................................................................. 94
5.12.   ERISA Compliance. .......................................................................................... 94
5.13.   Subsidiaries; Equity Interests; Loan Parties ..................................................... 95
5.14.   Margin Regulations; Investment Company Act. ............................................... 95
5.15.   Disclosure .......................................................................................................... 95
5.16.   Compliance with Laws ...................................................................................... 95
5.17.   Intellectual Property; Licenses, Etc. ................................................................. 95
5.18.   [Reserved] ......................................................................................................... 96
5.19.   Casualty, Etc. .................................................................................................... 96
5.20.   Labor Matters .................................................................................................... 96
5.21.   Collateral Documents......................................................................................... 96
5.22.   Indebtedness and Liens ...................................................................................... 97
5.23.   Reserved. ........................................................................................................... 97
5.24.   Licenses and Permits......................................................................................... 97
5.25.   Affiliate Transactions. ...................................................................................... 97
5.26.   Deposit Accounts; Credit Card Arrangements. ................................................. 97
5.27.   [Reserved] ......................................................................................................... 98
5.28.   Brokers .............................................................................................................. 98
5.29.   Customer and Trade Relations ........................................................................... 98
5.30.   Anti-Corruption Laws and Sanctions................................................................. 98
5.31.   PATRIOT Act. ................................................................................................... 98
5.32.   Budget................................................................................................................. 98
5.33.   Orders................................................................................................................. 98

## ARTICLE VI
## AFFIRMATIVE COVENANTS

6.01. Financial Statements ................................................................................... 99
6.02. Certificates; Other Information .................................................................. 99
6.03. Notices ........................................................................................................ 101
6.04. Payment of Obligations.............................................................................. 102
6.05. Preservation of Existence, Etc. ................................................................. 102
6.06. Maintenance of Properties ......................................................................... 102
6.07. Maintenance of Insurance .......................................................................... 103
6.08. Compliance with Laws ............................................................................... 104
6.09. Books and Records ..................................................................................... 104
6.10. Inspection Rights ....................................................................................... 104
6.11. Use of Proceeds.......................................................................................... 105
6.12. Covenant to Guarantee Obligations and Give Security. .......................... 105
6.13. Cash Management....................................................................................... 107
6.14. [Reserved]. ................................................................................................. 108
6.15. Compliance with Environmental Laws ..................................................... 108
6.16. Preparation of Environmental Reports....................................................... 108
6.17. Further Assurances..................................................................................... 108
6.18. Compliance with Terms of Leaseholds...................................................... 109
6.19. Designation as Senior Debt........................................................................ 109
6.20. Anti-Corruption Laws, PATRIOT Act and Sanctions.............................. 109
6.21. Additional Information Obligations............................................................ 109
6.22. Retention of and Communication with Consultants and Financial Advisors. ............ 110
6.23. Performance Within Budget. ..................................................................... 111
6.24. Additional Bankruptcy Related Affirmative Covenants............................ 111

## ARTICLE VII
## NEGATIVE COVENANTS

7.01. Liens............................................................................................................ 113
7.02. Indebtedness................................................................................................ 115
7.03. Investments ................................................................................................. 116
7.04. Fundamental Changes.................................................................................. 117
7.05. Dispositions................................................................................................. 118
7.06. Restricted Payments.................................................................................... 118
7.07. Change in Nature of Business..................................................................... 119
7.08. Transactions with Affiliates........................................................................ 119
7.09. Burdensome Agreements ............................................................................ 119
7.10. Margin Stock............................................................................................... 120
7.11. Amendments of Organization Documents, Etc. ........................................ 120
7.12. Accounting Changes.................................................................................... 120
7.13. Prepayments, Etc. of Indebtedness ............................................................ 120
7.14. Amendment, Etc. of Related Documents and Indebtedness ...................... 120
7.15. Holding Company ....................................................................................... 121
7.16. Swap Contracts ........................................................................................... 121

7.17.   Deposit Accounts. ........................................................................................... 121
7.18.   Reserved. ......................................................................................................... 121
7.19.   Designation of Designated Senior Debt............................................................ 121
7.20.   Anti-Corruption Laws, PATRIOT Act and Sanctions. ...................................... 122
7.21.   Maintenance of FILO Reserve. ........................................................................ 122
7.22.   Chapter 11 Claims........................................................................................... 122
7.23.   Compliance with Budget.................................................................................. 122
7.24.   Use of Collateral. ............................................................................................ 123
7.25.   Bankruptcy Related Negative Covenants. ........................................................ 123

ARTICLE VIII
EVENTS OF DEFAULT AND REMEDIES

8.01.   Events of Default ............................................................................................ 124
8.02.   Remedies upon Event of Default ...................................................................... 129
8.03.   Application of Funds........................................................................................ 131

ARTICLE IX
ADMINISTRATIVE AGENT

9.01.   Appointment and Authority. ............................................................................. 133
9.02.   Rights as a Lender............................................................................................ 134
9.03.   Exculpatory Provisions .................................................................................... 134
9.04.   Reliance by Administrative Agent..................................................................... 135
9.05.   Delegation of Duties ........................................................................................ 136
9.06.   Resignation of Administrative Agent, Collateral Agent..................................... 136
9.07.   Non-Reliance on Administrative Agent, Collateral Agent, FILO Agent and
        Other Lenders .......................................................................................... 138
9.08.   No Other Duties, Etc........................................................................................ 138
9.09.   Reserved........................................................................................................... 138
9.10.   Collateral and Guaranty Matters ...................................................................... 138
9.11.   Notice of Transfer ........................................................................................... 139
9.12.   Reports and Financial Statements ..................................................................... 139
9.13.   Agency for Perfection ...................................................................................... 140
9.14.   Indemnification of Agents ................................................................................ 140
9.15.   Relation among Lenders ................................................................................... 140
9.16.   Reserves. ......................................................................................................... 140

ARTICLE X
MISCELLANEOUS

10.01.  Amendments, Etc.............................................................................................. 141
10.02.  Notices; Effectiveness; Electronic Communications.......................................... 143
10.03.  No Waiver; Cumulative Remedies .................................................................... 145
10.04.  Expenses; Indemnity; Damage Waiver.............................................................. 145
10.05.  Payments Set Aside.......................................................................................... 147
10.06.  Successors and Assigns..................................................................................... 147

10.07.   Treatment of Certain Information; Confidentiality.................................................... 152
10.08.   Right of Setoff.......................................................................................................... 153
10.09.   Interest Rate Limitation ........................................................................................... 153
10.10.   Counterparts; Integration; Effectiveness.................................................................. 154
10.11.   Survival of Representations and Warranties............................................................. 154
10.12.   Severability .............................................................................................................. 154
10.13.   Replacement of Lenders ........................................................................................... 155
10.14.   Governing Law; Jurisdiction; Etc. ........................................................................... 155
10.15.   WAIVER OF JURY TRIAL....................................................................................... 157
10.16.   No Advisory or Fiduciary Responsibility ................................................................ 157
10.17.   USA PATRIOT Act Notice ....................................................................................... 158
10.18.   Press Releases .......................................................................................................... 158
10.19.   No Strict Construction ............................................................................................. 158
10.20.   Attachments ............................................................................................................. 159
10.21.   Additional Rights of FILO Lenders. Notwithstanding anything herein to the
          contrary, .................................................................................................................. 159
10.22.   Intercreditor Agreement ........................................................................................... 161
10.23.   Reserved.................................................................................................................... 161
10.24.   Keepwell. .................................................................................................................. 161

SIGNATURES.............................................................................................................................S-1

SCHEDULES

| | |
|---|---|
| 1.01(a) | Existing Bank Products |
| 1.01(b) | Existing Letters of Credit |
| 1.01(c) | Equity Investors |
| 1.02 | Initial Budget |
| 2.01 | Commitments and Applicable Percentages |
| 4.01(a)(iii) | Additional Documents to be Delivered |
| 5.01 | Organization Information |
| 5.03 | Certain Authorizations |
| 5.06 | Litigation |
| 5.08(c) | Owned Real Estate; Mortgaged Properties |
| 5.08(d)(i) | Leased Real Estate (Lessee) |
| 5.08(d)(ii) | Leased Real Estate (Lessor) |
| 5.08(e) | Existing Investments |
| 5.10 | Insurance |
| 5.12 | ERISA Compliance |
| 5.13 | Subsidiaries and Other Equity Investments |
| 5.17 | Intellectual Property Rights |
| 5.20 | Collective Bargaining Agreements |
| 5.25 | Transactions with Affiliates |
| 5.26(a) | Deposit Accounts |
| 5.26(b) | Credit Card Arrangements |
| 6.12 | Guarantors |
| 7.01(b) | Existing Liens |
| 7.02 | Existing Indebtedness |
| 7.09 | Burdensome Agreements |
| 10.02 | Administrative Agent's Office, FILO Agent's Office, Certain Addresses for Notices |

EXHIBITS

*Form of*

| | |
|---|---|
| A-1 | Committed Loan Notice |
| A-2 | Conversion/Continuation Notice |
| B | Swing Line Loan Notice |
| C | Reserved |
| D-1 | Revolving Credit Note |
| D-2 | FILO Note |
| E | Assignment and Assumption |
| F | Customs Broker Agreement |
| G | Joinder Agreement |
| H | Perfection Certificate |
| H-1 | Perfection Certificate Supplement |
| I | Borrowing Base Certificate |

01:18374604.1

J            Interim Order
K            Collateral Access Agreement

L-1          Foreign Lender Exemption Certificate
L-2          Foreign Lender U.S. Tax Compliance Certificate
L-3          Alternative Form Foreign Lender U.S. Tax Compliance Certificate
L-4          Foreign Partnership U.S. Tax Compliance Certificate

01:18374604.1

SENIOR SECURED
SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT ("<u>Agreement</u>") is entered into as of March [____], 2016, among THE SPORTS AUTHORITY, INC., as Borrower Representative for THE SPORTS AUTHORITY, INC. a Delaware corporation, and TSA STORES INC., a Delaware corporation (individually, a "<u>Borrower</u>" and collectively, the "<u>Borrowers</u>"), the Guarantors party hereto, each Revolving Lender and each FILO Lender from time to time party hereto (collectively, the "<u>Lenders</u>" and individually, a "<u>Lender</u>"), BANK OF AMERICA, N.A., as Administrative Agent and Collateral Agent, Wells Fargo Bank, National Association, as FILO Agent and as Syndication Agent, JPMorgan Chase Bank, N.A., SunTrust Bank and U.S. Bank National Association, as Co-Documentation Agents, and Merrill Lynch, Pierce, Fenner & Smith Incorporated and Wells Fargo Bank, National Association, as Joint Lead Arrangers and Joint Bookrunners.

<u>W I T N E S S E T H</u>:

WHEREAS, the Borrowers, certain of the Guarantors, the Agents, the FILO Agent and the Lenders, among others, have previously entered into a Second Amended and Restated Credit Agreement dated as of May 17, 2012 (as amended from time to time and currently in effect immediately prior to the effectiveness of this Agreement, the "<u>Existing Credit Agreement</u>"); and

WHEREAS, on March 2, 2016 (the "<u>Petition Date</u>"), each of the Loan Parties (as defined herein, collectively, the "<u>Debtors</u>") filed a voluntary petition for relief (collectively, the "<u>Cases</u>") under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>").  The Debtors are continuing in the possession of their assets and continuing to operate their respective businesses and manage their respective properties as debtors and debtors in possession under Sections 1107(a) and 1108 of the Bankruptcy Code; and

WHEREAS, the Debtors have requested that the Lenders make available to the Borrowers, from and after the date of entry of the Interim Order (the "<u>Interim Order Date</u>"), a senior secured, super-priority debtor-in-possession revolving credit and first in, last out term loan facility; and

WHEREAS, to provide security for the repayment of all obligations of the Loan Parties hereunder and under the other Loan Documents, and in addition to all other property of any Loan Party that is subject to the Liens granted on the "Collateral" (as defined in the Existing Credit Agreement) in favor of any Agent securing the Existing Liabilities (as defined herein) (such Liens, the "<u>Existing Liens</u>"), each of the Debtors will provide to the Agent (for the benefit of the Credit Parties) the DIP Liens (as defined in the Orders).

NOW, THEREFORE, in consideration of the mutual agreements set forth in this Agreement, and for good and valuable consideration, the receipt of which is hereby acknowledged, the undersigned hereby agree as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

1.01.    Defined Terms.  As used in this Agreement, the following terms shall have the meanings set forth below:

"363 Sale" has the meaning specified in Section 6.24(c).

"ACH" means automated clearing house transfers.

"Acceptable Document of Title" means, with respect to any Inventory, a negotiable bill of lading or other Document (as defined in the UCC) that (a) is issued by a common carrier which is not an Affiliate of any Loan Party which is in actual possession of such Inventory, (b) reflects a Borrower as consignee or, if requested by the Collateral Agent after the occurrence and during the continuance of an Event of Default, names the Collateral Agent as consignee, and (c) is not subject to any Lien (other than Permitted Liens described in clauses (a), (d) and (o) of Section 7.01).

"Acceptable Liquidator" means Gordon Brothers Retail Partners, LLC, Tiger Capital Group, LLC (or any of their respective Affiliates) and any other liquidator approved by the Administrative Agent and the FILO Agent.

"Accounts" means "accounts" as defined in the UCC, and also means a right to payment of a monetary obligation, whether or not earned by performance, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (b) for services rendered or to be rendered, (c) for a policy of insurance issued or to be issued, or (d) for a secondary obligation incurred or to be incurred.

"Administrative Agent" means Bank of America in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent.

"Administrative Agent's Office" means the Administrative Agent's address and, as appropriate, account as set forth on Schedule 10.02, or such other address or account as the Administrative Agent may from time to time notify the Borrowers and the Lenders.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Affiliate" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Agency Agreement" means that certain letter agreement dated as of February 17, 2016 among the Borrowers and the Acceptable Liquidator relating to the Initial Store Closing Sale, as in effect on the Closing Date and as may be amended with the reasonable consent of the Administrative Agent and the FILO Agent.

"Agents" means, collectively, the Administrative Agent and the Collateral Agent.

"Aggregate Revolving Commitments" means, at any time, the sum of the Revolving Commitments at such time.  As of the Closing Date, the Aggregate Revolving Commitments are $500.0 million.

"Agreement" means this Credit Agreement.

"Anti-Corruption Laws" means all laws, rules and regulations of any jurisdiction applicable to the Borrowers or their Subsidiaries from time to time concerning or relating to bribery or corruption, including the United States Foreign Corrupt Practices Act of 1977, and other similar anti-corruption legislation in other jurisdictions applicable to any of the Loan Parties.

"Applicable Margin" means (i) with respect to LIBO Rate Loans, 3.25% per annum, and (ii) with respect to Base Rate Loans, 2.25% per annum.

"Applicable Percentage" means (a) with respect to any Revolving Lender at any time, the percentage (carried out to the fourth decimal place) of the Aggregate Revolving Commitments represented by such Revolving Lender's Revolving Commitment at such time, (b) with respect to any FILO Lender at any time, the percentage (carried out to the fourth decimal place) of the outstanding principal balance of the FILO Loan represented by such FILO Lender's outstanding FILO Loan at such time, and (c) with respect to all Lenders, a percentage (carried out to the fourth decimal place) equal to (x) (i) the sum of such Lender's Revolving Commitment plus such Lender's share of the outstanding principal amount of the FILO Loan as of such date, as applicable, divided by (ii) the sum of the Aggregate Revolving Commitments and the aggregate outstanding principal amount of the FILO Loan as of such date or (y) or, if the Revolving Commitment of each Revolving Lender to make Revolving Loans and the obligation of the L/C Issuer to make L/C Credit Extensions have been terminated pursuant to Section 8.02, (i) the sum of such Lender's share of the Total Revolving Outstandings plus such Lender's share of the outstanding principal amount of the FILO Loan as of such date, as applicable, divided by (ii) the sum of the Total Revolving Outstandings and the aggregate outstanding principal amount of the FILO Loan as of such date.  As to each Lender, if the commitment of each Lender to make Loans and the obligation of the L/C Issuer to make L/C Credit Extensions have been terminated pursuant to Section 8.02 or if the Aggregate Revolving Commitments have expired, then the Applicable Percentage of each Lender shall be determined based on the Applicable Percentage of such Lender most recently in effect, giving effect to any subsequent assignments.  The Applicable Percentages of each Lender as of the Closing Date are set forth opposite the name of such Lender on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"Appraised Value" means the net orderly liquidation value of the Borrowers' Inventory (expressed as a percentage of the Cost of such Inventory) as determined from time to time by an independent appraiser engaged by the Administrative Agent using a methodology mutually acceptable to the Administrative Agent and the FILO Agent.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Arranger" means Merrill Lynch, Pierce, Fenner & Smith Incorporated and Wells Fargo Bank, National Association, in their capacities as joint lead arrangers and joint bookrunners.

"Assignee Group" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.06(b)), and accepted by the Administrative Agent, in substantially the form of Exhibit E or any other form approved by the Administrative Agent.

"Attributable Indebtedness" means, on any date, (a) in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease or similar payments under the relevant lease or other applicable agreement or instrument that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease or other agreement or instrument were accounted for as a Capitalized Lease and (c) all Synthetic Debt of such Person.

"Availability Block" means an amount equal to ten (10%) of the Line Cap (as calculated without giving effect to the FILO Reserve).

"Availability Period" means the period from and including the Closing Date  to the earliest of (a) the Maturity Date, (b) the date of termination of the Aggregate Revolving Commitments pursuant to Section 2.06, and (c) the date of termination of the commitment of each Revolving Lender to make Revolving Loans and of the obligation of the L/C Issuer to make L/C Credit Extensions pursuant to Section 8.02.

"Availability Reserves" means, (1) the Carve Out Reserve, (2) the Initial Store Closing Sale Reserve, (3) prior to entry of the Final Order and the repayment in full of the "Revolving Loans" under the Existing Credit Agreement, a reserve equal to the "Revolving Loans" (but not, for the avoidance of doubt, Letters of Credit) outstanding under the Existing Credit Agreement, and (4) without duplication of any other Reserves or items that are otherwise addressed or excluded through eligibility criteria, such reserves, if any, as the Administrative Agent from time to time determines in its reasonable discretion as being reasonably required pursuant to this Agreement, equal to the sum of (a) the amount of all sales taxes that have been collected by the Borrowers and not remitted to any state taxing authority when due, (b) an amount equal to two (2) months gross rent for (i) each leased Store of the Borrowers located in a Landlord Lien State (consistent with the Administrative Agent's usual practices) other than those Stores with respect to which the Collateral Agent has received a Collateral Access Agreement, and (ii) each distribution center or other location at which Inventory is maintained (including, without limitation, GSI Commerce, Inc. and/or eBay Enterprises, Inc., but excluding any Store) other than those distribution centers and other locations with respect to which the Collateral Agent has received a Collateral Access Agreement, (c) Customer Credit Liabilities and customer deposits, (d) an amount based on rent which is past due for more than ten days for any of the Borrowers' leased locations, with the exception of past due rent that is the subject of a Permitted

Protest as determined by the Administrative Agent in its reasonable discretion, (e) such other reserves as the Administrative Agent from time to time determines in its reasonable discretion as being reasonably required pursuant to this Agreement, including, without limitation, reserves implemented in connection with Permitted Liens, Permitted Encumbrances, and Permitted Indebtedness, but in the case of each of the foregoing, only to the extent such Liens, encumbrances and Indebtedness relate or in any way affect the Borrowing Base, (f) Bank Product Reserves, (g) Cash Management Reserves, (h) reserves implemented in order to protect the Credit Parties from any Liens, encumbrances or claims that could, in the reasonable judgment of the Administrative Agent, take priority over the Liens of the Collateral Agent in the Collateral., and (i) to reflect the amount of any priority or administrative expense claims that, in the Administrative Agent's reasonable determination, require payment during the Cases.

"Avoidance Action" means any causes of action under chapter 5 of the Bankruptcy Code.

"Bank of America" means Bank of America, N.A. and its successors.

"Bank Products" means any services or facilities provided to any Loan Party by any Lender or any of its Affiliates (but excluding Cash Management Services) on account of (a) credit or debit cards, (b) Swap Contracts and foreign exchange facilities, (c) purchase cards, (d) merchant services constituting a line of credit, (e) leasing, (f) factoring, and (g) supply chain finance services (including, without limitation, trade payable services and supplier accounts receivable purchases).  "Bank Products" shall include, without limitation, Existing Bank Products.

"Bank Product Reserves" means such reserves as the Administrative Agent from time to time determines in its reasonable discretion (or as directed by the FILO Agent pursuant to Section 9.16(a) hereof) as being appropriate to reflect the liabilities and obligations of the Borrowers and their Subsidiaries with respect to Bank Products then provided or outstanding.

"Bankruptcy Code" means title 11 of the United States Code.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware or such other court having competent jurisdiction over the Cases.

"Base Rate Committed Loan" means a Committed Loan that is a Base Rate Loan.

"Base Rate Loan" means a Loan that bears interest based on the Prime Rate.

"Bidding Procedures Order" has the meaning specified in Section 6.24(c).

"Blocked Account Agreement" means with respect to an account established by a Loan Party, an agreement, in form and substance reasonably satisfactory to the Administrative Agent, establishing control, pursuant to Section 9-104 of the UCC or other applicable section of the UCC, of such account by the Administrative Agent and whereby the bank maintaining such account agrees to comply only with the instructions originated by the Administrative Agent without the further consent of any Loan Party.

"Blocked Account Bank" means each bank with whom deposit accounts are maintained in which (i) any funds of any of the Loan Parties from one or more DDAs are concentrated, or (ii) any funds of Holdings are deposited, and in each case, with whom a Blocked Account Agreement has been, or is required to be, executed in accordance with the terms hereof.

"Borrower" and "Borrowers" has the meaning specified in the introductory paragraph hereto.

"Borrower Representative" has the meaning specified in the introductory paragraph hereto.

"Borrowing" means a Committed Borrowing, a Swing Line Borrowing, or the borrowing of the FILO Loan, as the context may require.

"Borrowing Base" means, at any time of calculation, an amount equal to:

(a)     the Credit Card Receivables Component;

plus

(b)     the Inventory Component;

plus

(c)     the Letter of Credit Component;

minus

(d)     the then amount of all Availability Reserves;

minus

(e)     the FILO Reserve;

minus

(f)     the Availability Block.

"Borrowing Base Certificate" has the meaning provided in Section 6.02(c).

"Budget" means the financial projections for the Loan Parties covering the thirteen-week period commencing on the Petition Date on a weekly basis, which projections shall include, at a minimum, cash receipts, operating disbursements, payroll disbursements, a reasonably detailed professional fee budget, non-operating disbursements (including, for the avoidance of doubt, professional fees) and inventory for the period covered thereby, substantially in the form of the initial Budget annexed hereto as Schedule 1.02, and any subsequent projections furnished pursuant to Section 6.02 hereof, in each case, in form and substance reasonably satisfactory to the Administrative Agent and the FILO Agent. The Administrative Agent and the FILO Agent acknowledge and agree that the Budget attached hereto as Schedule

1.02 and in effect as of the date of this Agreement is in form and substance satisfactory to the Administrative Agent and the FILO Agent.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Administrative Agent's Office is located and, if such day relates to any LIBO Rate Loan, means any such day on which dealings in Dollar deposits are conducted by and between banks in the London interbank market.

"Capitalized Leases" means all leases that have been or should be, in accordance with GAAP, recorded as capitalized leases.

"Carve Out" has the meaning specified therefor in the Orders.

"Carve Out Reserve" means an Availability Reserve established by the Administrative Agent in the amount of the Carve Out.

"Case Professionals" has the meaning specified therefor in the Orders.

"Cases" has the meaning set forth in the recitals hereto.

"Cash Collateral Account" means a blocked non-interest bearing account established by one or more of the Loan Parties with, and in the name of, the Collateral Agent, for its own benefit and the ratable benefit of the other Credit Parties, under the sole and exclusive dominion and control of the Collateral Agent, in the name of the Collateral Agent or as the Collateral Agent shall otherwise direct, in which deposits are required to be made in accordance with Section 2.03(g) or Section 8.02(d).

"Cash Collateralize" has the meaning specified in Section 2.03(g).

"Cash Equivalents" means any of the following types of Investments, to the extent owned by Holdings or any of its Subsidiaries free and clear of all Liens (other than Liens created under the Collateral Documents and other Liens permitted hereunder):

(a)    readily marketable obligations issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof having maturities of not more than 360 days from the date of acquisition thereof; provided that the full faith and credit of the United States of America is pledged in support thereof;

(b)    time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) (A) is a Lender or (B) is organized under the laws of the United States of America, any state thereof or the District of Columbia or is the principal banking subsidiary of a bank holding company organized under the laws of the United States of America, any state thereof or the District of Columbia, and is a member of the Federal Reserve System, (ii) issues (or the parent of which issues) commercial paper rated as described in clause (c) of this definition and (iii) has combined capital and surplus of at least $1.0 billion, in each case with maturities of not more than 180 days from the date of acquisition thereof;

(c)　　　commercial paper issued by any Person organized under the laws of any state of the United States of America and rated at least "Prime-1" (or the then equivalent grade) by Moody's or at least "A-1" (or the then equivalent grade) by S&P, in each case with maturities of not more than 180 days from the date of acquisition thereof;

(d)　　　Investments, classified in accordance with GAAP as current assets of Holdings or any of its Subsidiaries, in money market investment programs registered under the Investment Company Act of 1940, which are administered by financial institutions that have the highest rating obtainable from either Moody's or S&P, and the portfolios of which are limited solely to Investments of the character, quality and maturity described in clauses (a), (b) and (c) of this definition; and

(e)　　　U.S. dollars and liquid investments (other than equity securities) with a remaining maturity not greater than three months from the date of acquisition that would be "cash equivalents" under FASB Accounting Standards Codification 305-10 or any successor provision that does not materially alter the standards for "cash equivalent" classification.

"Cash Management Order" means an order of the Bankruptcy Court, in form and substance reasonably satisfactory to the Administrative Agent and the FILO Agent, (i) approving and authorizing the Debtors to use existing cash management systems, (ii) authorizing and directing banks and financial institutions to honor and process checks and transfers, (iii) authorizing continued use of intercompany transactions, (iv) waiving requirements of Section 345(b) of the Bankruptcy Code and (v) authorizing the Debtors to use existing bank accounts and existing business forms, as such order may be amended or modified as may be consented to by the Administrative Agent and the FILO Agent..

"Cash Management Reserves" means such reserves as the Administrative Agent, from time to time, determines in its reasonable discretion as being appropriate to reflect the reasonably anticipated liabilities and obligations of the Borrowers and their Subsidiaries with respect to Cash Management Services then provided or outstanding.

"Cash Management Services" means any one or more of the following types or services or facilities provided to any Loan Party by any Lender or any of its Affiliates: (a) ACH transactions, (b) cash management services, including, without limitation, controlled disbursement services, treasury, depository, overdraft, and electronic funds transfer services, and (c) merchant services not constituting a Bank Product.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980.

"CERCLIS" means the Comprehensive Environmental Response, Compensation and Liability Information System maintained by the U.S. Environmental Protection Agency.

"CFC" means a Person that is a controlled foreign corporation under Section 957 of the Code.

"CFC Debt" means any Indebtedness or accounts receivable owed by any CFC to either of the Borrowers or treated as owed by any CFC to either of the Borrowers for U.S. federal income tax purposes.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all rules, guidelines or directives thereunder or issued in connection therewith and (y) all rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means an event or series of events by which:

(a)    at any time prior to the creation of a Public Market, the Equity Investors shall cease to own and control legally and beneficially, either directly or indirectly, equity securities in Slap Shot representing more than 50% of the combined voting power of all of equity securities entitled to vote for members of the board of directors or equivalent governing body of Slap Shot on a fully-diluted basis (and taking into account all such securities that the Equity Investors have the right to acquire pursuant to any option right (as defined in clause (b) below)); or

(b)    at any time after the creation of a Public Market, any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding any employee benefit plan of such Person or its subsidiaries, and any Person acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) other than the Equity Investors becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, except that a person or group shall be deemed to have "beneficial ownership" of all securities that such person or group has the right to acquire, whether such right is exercisable immediately or only after the passage of time (such right, an "option right")), directly or indirectly, of the greater of (x) 35% or more of the equity securities of Slap Shot entitled to vote for members of the board of directors or equivalent governing body of Slap Shot on a fully-diluted basis (and taking into account all such securities that such "person" or "group" has the right to acquire pursuant to any option right) or (y) a percentage that is greater than the percentage of the equity securities of Slap Shot entitled to vote for members of the board of directors or equivalent governing body of Slap Shot that is then beneficially owned by the Equity Investors; or

(c)    during any period of 12 consecutive months, a majority of the members of the board of directors or other equivalent governing body of Slap Shot cease to be composed of individuals (i) who were members of that board or equivalent governing

body on the first day of such period, (ii) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (i) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body or (iii) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (i) and (ii) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body; or

(d)    except as expressly permitted by Section 7.04 or 7.05, Slap Shot shall cease, directly or indirectly, to own and control legally and beneficially all of the Equity Interests in Holdings or any direct or indirect Subsidiary of Holdings constituting a Loan Party; or

(e)    a "change of control" or any comparable term under, and as defined in, the Term Loan Documents, the Mezzanine Documents or any other instrument, document or agreement governing Material Indebtedness shall have occurred, in any case that gives the holders thereof the right to require Holdings or any of its Subsidiaries to repurchase, offer to repurchase or immediately repay such Indebtedness.

"Closing Date" means March [_____], 2016.

"Code" means the Internal Revenue Code of 1986.

"Collateral" means all of the "Collateral" and "Mortgaged Property" referred to in the Collateral Documents and all of the other property that is or is intended under the terms of the Collateral Documents to be subject to Liens in favor of the Collateral Agent for the benefit of the Credit Parties, but shall not include Excluded Collateral.

"Collateral Access Agreement" means an agreement substantially in the form of Exhibit K.

"Collateral Agent" means Bank of America in its capacity as collateral agent under any of the Loan Documents, or any successor collateral agent as provided in Section 9.01(b).

"Collateral Documents" means, collectively, the Security Agreement, the Mortgages, the Blocked Account Agreements, the Intercreditor Agreement, each of the collateral assignments, security agreements, pledge agreements or other similar agreements delivered to the Collateral Agent pursuant to Sections 6.12 and 6.13, and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Collateral Agent for the benefit of the Credit Parties.

"Commercial Letter of Credit" means any Letter of Credit issued for the purpose of providing the primary payment mechanism in connection with the purchase of any materials, goods or services by any Borrower (other than Holdings) in the ordinary course of business of such Borrower.

"Commitments" means the Revolving Commitments and the FILO Commitments, as applicable.

"Commitment Fee Percentage" means 0.375% per annum.

"Committed Borrowing" means a borrowing consisting of simultaneous Committed Loans of the same Type and, in the case of LIBO Rate Loans, having the same Interest Period made by each of the Revolving Lenders pursuant to Section 2.01.

"Committed Loan" has the meaning specified in Section 2.01(a).

"Committed Loan Notice" means a notice of a Committed Borrowing, which, if in writing, shall be substantially in the form of Exhibit A-1.

"Committee" means an official committee of unsecured creditors appointed in the Case pursuant to Section 1102 of the Bankruptcy Code.

"Committee Investigation Budget" has the meaning specified in Section 7.24.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.).

"Consent" means actual written consent given by a Lender from whom such consent is sought; or the passage of ten (10) Business Days from receipt of written notice to a Lender from the Administrative Agent or Collateral Agent of a proposed course of action to be followed by the Administrative Agent or Collateral Agent without such Lender's giving the Administrative Agent or Collateral Agent written notice of that Lender's objection to such course of action.

"Consolidated" means, when used to modify a financial term, test, statement, or report of a Person, the application or preparation of such term, test, statement or report (as applicable) based upon the consolidation, in accordance with GAAP, of the financial condition or operating results of such Person and its Subsidiaries.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings correlative thereto.

"Conversion/Continuation Notice" means a notice of (a) a conversion of Revolving Loans from one Type to the other, or (b) a continuation of LIBO Rate Loans, pursuant to Section 2.02(b), which, if in writing, shall be substantially in the form of Exhibit A-2.

"Cost" means the calculated cost of purchases, based upon the Borrowers' accounting practices, known to the Administrative Agent, which practices are in effect on the Closing Date as such calculated cost is determined from invoices received by the Borrowers, the Borrowers' purchase journals or the Borrowers' stock ledger.  "Cost" does not include inventory capitalization costs or other non-purchase price charges (such as freight) used in the Borrowers' calculation of cost of goods sold.

"Credit Card Advance Rate" means 90%.

"Credit Card Receivables" means each "payment intangible" (as defined in the UCC) together with all income, payments and proceeds thereof, owed by a credit card issuer or credit card processor to a Borrower resulting from charges by a customer of a Borrower on credit or debit cards issued by such credit card issuer in connection with the sale of goods by a Borrower, or services performed by a Borrower, in each case in the ordinary course of its business.

"Credit Card Receivables Component" means the face amount of Eligible Credit Card Receivables multiplied by the Credit Card Advance Rate.

"Credit Extensions" mean each of the following: (a) a Borrowing and (b) an L/C Credit Extension.

"Credit Party" means, individually, and "Credit Parties" means collectively, the following: (a) the Lenders and their Affiliates, (b) the Agents, the FILO Agent, and each co-agent or sub-agent appointed by the Administrative Agent from time to time pursuant to Section 9.05, (c) the L/C Issuer, (d) the Arranger, (e) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document, (f) any other Person to whom Obligations under this Agreement and other Loan Documents are owing, and (g) the successors and assigns of each of the foregoing.

"Credit Party Expenses" means, without limitation, (a) all reasonable out-of-pocket expenses incurred by the Agents, the FILO Agent, the FILO Lenders and their respective Affiliates (including, without limitation, Merrill Lynch, Pierce, Fenner & Smith Incorporated), in connection with this Agreement and the other Loan Documents, including without limitation (i) the reasonable fees, charges and disbursements of (A) counsel for the Agents, the FILO Agent, the FILO Lenders and such Affiliates, including local bankruptcy counsel in the State of Delaware, (B) outside consultants for the Agents and the FILO Agent, (C) appraisers, (D) commercial finance examinations, and (E) all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of the Obligations, (ii) in connection with (A) the syndication of the credit facilities provided for herein, (B) the preparation, negotiation, administration, management, execution and delivery of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (C) the enforcement or protection of their rights in connection with this Agreement or the Loan Documents or efforts to preserve, protect, collect, or enforce the Collateral, or (D) any workout, restructuring or negotiations in respect of any Obligations, (b) with respect to the L/C Issuer, and its Affiliates, all reasonable out-of-pocket expenses incurred in connection with the issuance, amendment,

renewal or extension of any Letter of Credit or any demand for payment thereunder, (c) with respect to the FILO Agent in its capacity as such, all reasonable and documented out-of-pocket expenses incurred in connection with the preparation and negotiation, execution and delivery of this Agreement and the other Loan Documents, and (d) all reasonable out-of-pocket expenses incurred by the Credit Parties who are not the Agents, Merrill Lynch, Pierce, Fenner & Smith Incorporated, the L/C Issuer or any Affiliate of any of them, after the occurrence and during the continuance of an Event of Default, provided that such Credit Parties shall be entitled to reimbursement for (1) one primary counsel and one (1) local bankruptcy counsel representing the Administrative Agent for all such Credit Parties other than the FILO Agent and the FILO Lenders (absent a conflict of interest in which case the Credit Parties may engage and be reimbursed for an additional counsel), (2) one primary counsel and one (1) local bankruptcy counsel representing the FILO Agent and (3) one primary counsel and one (1) local bankruptcy counsel representing the other FILO Lenders.

"Customer Credit Liabilities" means at any time, the aggregate remaining value at such time of (a) outstanding gift certificates and gift cards sold by the Borrowers entitling the holder thereof to use all or a portion of the certificate or gift card to pay all or a portion of the purchase price for any Inventory, and (b) outstanding merchandise credits issued by the Borrowers.

"Customs Broker Agreement" means an agreement in substantially the form attached hereto as Exhibit F among a Borrower, a customs broker or other carrier, and the Collateral Agent, in which the customs broker or other carrier acknowledges that it has control over and holds the documents evidencing ownership of the subject Inventory for the benefit of the Collateral Agent and agrees, upon notice from the Collateral Agent, to hold and dispose of the subject Inventory solely as directed by the Collateral Agent.

"DDA" means each checking or other demand deposit account maintained by any of the Loan Parties.  All funds in each DDA shall be conclusively presumed to be Collateral and proceeds of Collateral and the Agents and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in any DDA.

"Debtor Relief Laws" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Debtors" has the meaning set forth in the recitals hereto.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" means: (a) when used with respect to Obligations other than Letter of Credit Fees and the FILO Liabilities, an interest rate equal to (i) the Prime Rate plus (ii) the Applicable Margin applicable to Base Rate Loans, plus (iii) 2% per annum; provided, however, that with respect to a LIBO Rate Loan, the Default Rate shall be an interest rate equal to the

interest rate (including any Applicable Margin) otherwise applicable to such Loan plus 2% per annum; (b) when used with respect to any FILO Liabilities, an interest rate equal to the interest rate (including any FILO Applicable Margin) otherwise applicable to such FILO Liabilities, plus 2% per annum; and (c) when used with respect to Letter of Credit Fees, a rate equal to the applicable percentage set forth in Section 2.03(i) for Standby Letters of Credit or Commercial Letters of Credit, as applicable, plus 2% per annum.

"Defaulting Lender" means, subject to Section 2.16(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder unless (after giving effect to the final clause of Section 4.02) such Lender notifies the Administrative Agent and the Borrower Representative in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) have not been satisfied, or (ii) pay to the Administrative Agent, the L/C Issuer, the Swing Line Lender or any other Lender any other amount required to be paid by it hereunder (including in respect of its participation in Letters of Credit or Swing Line Loans) within two Business Days of the date when due, (b) has notified the Borrower Representative, the Administrative Agent, the L/C Issuer or the Swing Line Lender in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect, (c) has failed, within three Business Days after written request by the Administrative Agent or the Borrower Representative, to confirm in writing to the Administrative Agent and the Borrower Representative that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower Representative), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above, and of the effective date of such status, shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.16(b)) as of the date established therefor by the Administrative Agent in a written notice of such determination, which shall be delivered by the Administrative Agent to the Borrower Representative, the L/C Issuer, the Swing Line Lender and each other Lender promptly following such determination.

"DIP Superpriority Claim" means the allowed superpriority administrative expense claim granted to the Credit Parties in the Cases and any Successor Cases pursuant to Section 364(c)(1) of the Bankruptcy Code for all of the Obligations with priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in the

Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including administrative expenses of the kinds specified in or ordered pursuant to Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b) (except as set forth in the Orders), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, which shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative; provided, however, that the DIP Superpriority Claim shall not have recourse to any Avoidance Actions or the proceeds thereof, other than (i) the proceeds of Avoidance Actions arising under Section 549 of the Bankruptcy Code and (ii) the proceeds of other Avoidance Actions in the amounts necessary to reimburse the Agents and the Lenders for the amount of the Carve Out, if any, used to finance the pursuit of recovery or settlement of such other Avoidance Actions; provided, further, that the DIP Superpriority Claim shall be subject to the Carve Out.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) of any property (including, without limitation, any Equity Interests of any other Person held by a specified Person) by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith, in each case, resulting in consideration to such Person (including assumption of liabilities) for any such transaction or series of related transactions in excess of $250,000.

"Disregarded Entity" means any entity treated as disregarded as an entity separate from its owner under Treasury Regulations Section 301.7701-3.

"Dollar" and "$" mean lawful money of the United States.

"Eligible Assignee" means (a) a Credit Party or any of its Affiliates; (b) a bank, insurance company, or company engaged in the business of making commercial loans, which Person, together with its Affiliates, has a combined capital and surplus in excess of $250.0 million; (c) an Approved Fund; (d) any Person to whom a Credit Party assigns its rights and obligations under this Agreement as part of an assignment and transfer of such Credit Party's rights in and to a material portion of such Credit Party's portfolio of asset based credit facilities, and (e) any other Person (other than a natural person) approved by (i) the Administrative Agent, and (ii) unless an Event of Default has occurred and is continuing, the Borrower Representative (each such approval not to be unreasonably withheld or delayed); provided that, notwithstanding the foregoing, "Eligible Assignee" shall not include a Loan Party or any of the Loan Parties' Affiliates or Subsidiaries.

"Eligible Credit Card Receivables" means Credit Card Receivables due to a Borrower on a non-recourse basis from Visa, MasterCard, American Express Company, Discover, and other major credit card processors, in each case acceptable to the Administrative Agent in its reasonable discretion, as arise in the ordinary course of business, which have been earned by performance, and are deemed by the Administrative Agent in its reasonable discretion to be eligible for inclusion in the calculation of the Borrowing Base. Without limiting the foregoing, none of the following shall be deemed to be Eligible Credit Card Receivables:

(a)       Credit Card Receivables due from major credit card processors that have been outstanding for more than five (5) Business Days from the date of sale;

(b)       Credit Card Receivables due from major credit card processors with respect to which a Borrower does not have good, valid and marketable title, free and clear of any Lien (other than Liens granted to the Collateral Agent for its own benefit and the ratable benefit of the other Credit Parties);

(c)       Credit Card Receivables due from major credit card processors that are not subject to a first priority security interest in favor of the Collateral Agent for its own benefit and the ratable benefit of the other Credit Parties (it being the intent that chargebacks in the ordinary course by the credit card processors shall not be deemed violative of this clause);

(d)       Credit Card Receivables due from major credit card processors which are disputed, are with recourse, or with respect to which a claim, counterclaim, offset or chargeback has been asserted (to the extent of such claim, counterclaim, offset or chargeback);

(e)       Credit Card Receivables due from major credit card processors as to which the credit card processor has the right under certain circumstances to require a Borrower to repurchase the Credit Card Receivables from such credit card processor;

(f)       Credit Card Receivables due from any Person on account of any private label credit card receivables of the Loan Parties in the name of such Person, (for clarity, amounts due from World Financial Network National Bank as processor thereof shall be deemed Eligible Credit Card Receivables if all of the other provisions of this definition are satisfied); or

(g)       Credit Card Receivables due from major credit card processors which the Administrative Agent determines in its reasonable discretion to be uncertain of collection.

"Eligible In-Transit Inventory" means, as of any date of determination thereof, without duplication of other Eligible Inventory, Inventory:

(a)       Which has been shipped (i) from a foreign location for receipt by a Borrower within sixty (60) days of the date of shipment, or (ii) from a domestic location for receipt by a Borrower within fifteen (15) days of the date of shipment, but, in either case, which has not yet been delivered to such Borrower;

(b)       For which the purchase order is in the name of a Borrower and title has passed to such Borrower;

(c)       For which an Acceptable Document of Title has been issued and, in the case of Inventory shipped from a foreign location, as to which the Collateral Agent has control over the documents of title which evidence ownership of the subject Inventory by virtue of either (i) the Collateral Agent's actual possession of such documents of title or

(ii) the receipt of a Customs Broker Agreement with each of such Borrower's customs brokers and freight forwarders;

(d)    Which is insured in accordance with the terms of this Agreement; and

(e)    Which otherwise would constitute Eligible Inventory;

provided that the Administrative Agent may, in its reasonable discretion, exclude any particular Inventory from the definition of "Eligible In-Transit Inventory" in the event the Administrative Agent determines that such Inventory is subject to any Lien (other than Permitted Liens described in clauses (a), (d) and (o) of Section 7.01).

"Eligible Inventory" means, as of the date of determination thereof, without duplication, (i) Eligible In-Transit Inventory and (ii) items of Inventory of a Borrower that are finished goods, merchantable and readily saleable to the public in the ordinary course deemed by the Administrative Agent in its reasonable discretion to be eligible for inclusion in the calculation of the Borrowing Base, in each case that, except as otherwise agreed by the Administrative Agent, complies with each of the representations and warranties respecting Inventory made by the Borrowers in the Loan Documents, and that is not excluded as ineligible by virtue of one or more of the criteria set forth below.  The following items of Inventory shall not be included in Eligible Inventory:

(a)    Inventory that is not solely owned by a Borrower;

(b)    Inventory that is leased by or is on consignment to a Borrower or a Borrower does not have good and valid title thereto;

(c)    Inventory (other than Eligible In-Transit Inventory or Inventory which is the subject of an Eligible Letter of Credit) that is not (i) located in the United States of America (excluding territories or possessions of the United States) or (ii) at a location that is owned or leased by a Borrower, except, with respect to this clause (ii) only, to the extent that the Borrowers have furnished the Administrative Agent with (A) any UCC financing statements or other documents that the Administrative Agent may determine to be necessary to perfect its security interest in such Inventory at such location, and (B) if the value of the Inventory at a location is greater than $10.0 million, a Collateral Access Agreement executed by the Person owning such location on terms reasonably acceptable to the Administrative Agent;

(d)    Inventory that is comprised of goods which (i) are damaged, defective, "seconds," or otherwise unmerchantable, (ii) are to be returned to the vendor or are in Locations 801, 844, 846, 880 or 882 in the stock ledger, (iii) are obsolete or slow moving, or custom items, work-in-process, raw materials, or that constitute spare parts, promotional, marketing, packaging and shipping materials or supplies used or consumed in a Borrower's business, (iv) are not in compliance with all standards imposed by any Governmental Authority having regulatory authority over such Inventory, its use or sale, (v) that is vendor serviced merchandise not reflected in the stock ledger, or (vi) are bill and hold goods;

01:18374604.1

-17-

(e)      Inventory that is not subject to a perfected first priority security interest in favor of the Collateral Agent for its own benefit and the ratable benefit of the other Credit Parties;

(f)      Inventory that consists of samples, labels, bags, packaging, and other similar non-merchandise categories;

(g)      Inventory that is not insured in compliance with the provisions of Section 6.07 hereof;

(h)      Inventory that has been sold but not yet delivered or as to which a Borrower has accepted a deposit;

(i)      Inventory that is subject to any licensing, patent, royalty, trademark, trade name or copyright agreement with any third party from which any Borrower or any of its Subsidiaries has received notice of a dispute in respect of any such agreement; or

(j)      Inventory acquired in an acquisition permitted under Section 7.03, unless and until the Collateral Agent has completed or received (A) an appraisal of such Inventory from appraisers satisfactory to the Collateral Agent, establishes an Inventory Advance Rate and Inventory Reserves (if applicable) therefor, and otherwise agrees that such Inventory shall be deemed Eligible Inventory, and (B) such other due diligence as the Agents may require, all of the results of the foregoing to be reasonably satisfactory to the Agents.

"Eligible Letter of Credit" means, as of any date of determination thereof, a Commercial Letter of Credit which supports the purchase of Inventory, (i) which Inventory does not constitute Eligible In-Transit Inventory and for which no documents of title have then been issued, (ii) which Inventory otherwise would constitute Eligible Inventory, (c) which Commercial Letter of Credit has an expiry within sixty (60) days of the date of initial issuance of such Commercial Letter of Credit, (iv) which Commercial Letter of Credit provides that it may be drawn only after the Inventory is completed and after an Acceptable Document of Title has been issued for such Inventory reflecting a Borrower or the Collateral Agent as consignee of such Inventory and (v) which will constitute Eligible In-Transit Inventory upon satisfaction of the requirements of clause (iv) hereof; provided that the Administrative Agent may, in its reasonable discretion, exclude any particular Inventory from the definition of "Eligible Letter of Credit" in the event the Administrative Agent determines that such Inventory is subject to any Lien (other than Permitted Liens described in clauses (a), (d) and (o) of Section 7.01).

"Environmental Laws" means any and all Federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution and the protection of the environment or the release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of

the Borrowers, any other Loan Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Environmental Permit" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"Equity Investors" means Leonard Green & Partners, L.P. ("LGP"), and the other investors in Slap Shot as of May 3, 2006 (including members of management of Slap Shot and the Borrower Representative who contributed cash, common stock or options to purchase common stock in the Borrower Representative to Slap Shot in exchange for capital stock or options to purchase common stock of Slap Shot), the general partner of LGP and any Affiliate of LGP or its general partner (other than portfolio companies of LGP) and any member of management of Slap Shot or the Borrower Representative that holds common stock of Slap Shot or the Borrower Representative as of May 3, 2006 or that has acquired or acquires common stock of Slap Shot or the Borrower Representative following May 3, 2006.  The Equity Investors existing as of May 3, 2006 and as of the Closing Date are set forth on Schedule 1.01(c) hereto.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with Holdings or any other Borrower within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by Holdings or any other Borrower or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by Holdings or the other Borrowers or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the

commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (f) the determination that any Pension Plan is considered an at-risk plan or a plan in endangered or critical status within the meaning of Sections 430, 431 and 432 of the Code or Sections 303, 304 and 305 of ERISA; or (g) the imposition of any liability that could reasonably be expected to have a Material Adverse Effect under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon Holdings, any other Borrower or any ERISA Affiliate.

"Event of Default" has the meaning specified in Section 8.01. An "Event of Default" shall be deemed to be continuing unless and until that Event of Default has been duly waived as provided in Section 10.01.

"Excess Availability" means, as of any date of determination thereof by the Administrative Agent, the result, if a positive number, of:

(a)    The Line Cap

minus

(b)    The aggregate amount of all outstanding Credit Extensions.

"Exchange and Registration Rights Agreement" means the Exchange and Registration Rights Agreement, dated May 3, 2006, among Holdings and certain of its subsidiaries and certain purchasers, as the same may be amended from time to time.

"Excluded Collateral" means, in addition to such assets as are excluded from the Collateral pursuant to the terms of the Collateral Documents, (a) Equity Interests constituting more than 65% of the total outstanding voting or nonvoting Equity Interests of any CFC or Foreign Holding Company, (b) Equity Interests constituting more than 65% of the total outstanding Equity Interests of any Disregarded Entity that owns an interest in a CFC or CFC Debt, (c) any property or assets of any CFC (whether held directly or indirectly) and CFC Debt, (d) leases (but not the proceeds of leases), and (e) Avoidance Actions and the proceeds of thereof; provided that, upon entry of the Final Order, the Obligations shall be secured by Avoidance Actions arising under Section 549 of the Bankruptcy Code and amounts necessary to reimburse the Agents and the Lenders for the amount of the Carve Out, if any, used to finance the pursuit of recovery or settlement of such other Avoidance Actions. For the sake of clarity, no Excluded Collateral shall be required to be pledged as collateral to secure any of the Loans.

"Excluded Subsidiary" means each (a) CFC, (b) Foreign Holding Company, (c) Disregarded Entity all or substantially all of the assets of which are comprised of Equity Interests in one or more CFCs and/or CFC Debt, and (d) Subsidiary that is owned directly or indirectly by a CFC.

"Excluded Swap Obligation" means, with respect to any Loan Party, any Swap Obligation if, and to the extent that, all or a portion of the guaranty of such Loan Party under the Guaranty of, or the grant under a Loan Document by such Loan Party of a security interest to

secure, such Swap Obligation (or any guaranty thereof) is or becomes illegal under the Commodity Exchange Act (or the application or official interpretation thereof) by virtue of such Loan Party's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act (determined after giving effect to Section 10.23 hereof and any and all guarantees of such Loan Party's Swap Obligations by other Loan Parties) at the time the guaranty of such Loan Party, or grant by such Loan Party of a security interest, becomes effective with respect to such Swap Obligation.  If a Swap Obligation arises under a Master Agreement governing more than one Swap Contract, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to Swap Contracts for which such guaranty or security interest becomes illegal.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to any Recipient  or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, United States withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower Representative under Section 10.13) or (ii) such Lender changes its Lending Office, except in each case to the extent that, pursuant to Section 3.01(a)(ii) or (c), amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its Lending Office, (c) Taxes attributable to such Recipient's failure to comply with Section 3.01(e) and (d) any U.S. federal withholding Taxes imposed pursuant to FATCA.

"Existing Bank Products" means those Bank Products described on Schedule 1.01(a) hereto.

"Existing Credit Agreement" has the meaning set forth in the recitals hereto.

"Existing Guaranty" means that certain Guaranty dated as of May 3, 2006 made by the Guarantors (as defined in the Existing Credit Agreement) in favor of the Agent (as defined in the Existing Credit Agreement) and the other Existing Loan Parties under the Existing Credit Agreement, in form reasonably satisfactory to the Agent (as defined in the Existing Credit Agreement), as the same now exists or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"Existing Letters of Credit" means those letters of credit described on Schedule 1.01(b) hereto.

"Existing Liabilities" means (i) the "Obligations" as defined in the Existing Credit Agreement, (ii) the "Secured Obligations", as defined in the security documents executed and delivered in connection with the Existing Credit Agreement, and (iii) the "Guaranteed Obligations", as defined in the Existing Guaranty.

01:18374604.1

"Existing Liens" has the meaning set forth in the recitals hereto.

"Existing Loan Documents" means the "Loan Documents" as defined in the Existing Credit Agreement.

"Existing Loan Parties" means the "Agent", the "L/C Issuer", the "Swing Line Lender" and the other "Credit Parties" under (and as defined in) the Existing Credit Agreement.

"Extraordinary Receipt" means any cash received by or paid to any Person in respect of pension plan reversions, proceeds of insurance (other than (i) proceeds of business interruption insurance to the extent such proceeds constitute compensation for lost earnings and (ii) in respect of any leased property (or assets (other than assets of the type included in the Borrowing Base) located on such leased property) to the extent that such proceeds are required to be paid to the landlord of such Person pursuant to the terms of the Lease for the leased property) and condemnation awards (and payments in lieu thereof), in each case, to the extent the amount of cash received by or paid to such person is at least $250,000.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to Bank of America on such day on such transactions as determined by the Administrative Agent.

"Fee Letter" means the letter agreement, dated March [____], 2016, among the Borrowers, the Administrative Agent and the FILO Agent.

"FILO Agent" means Wells Fargo Bank, National Association, in its capacity as agent for the FILO Lenders, together with any successor in such capacity.

"FILO Agent's Office" means the FILO Agent's address and, as appropriate, account as set forth on Schedule 10.02, or such other address or account as the FILO Agent may from time to time notify the Borrowers, the Administrative Agent and the Lenders.

"FILO Applicable Margin" means 7.90% per annum.

"FILO Borrowing Base" means (a) the Appraised Value of Eligible Inventory multiplied by (b) the lesser of (x) 105% minus the Inventory Advance Rate applicable to the

Borrowing Base, or (y) 15%, <u>multiplied</u> by the Cost of Eligible Inventory, in each case, net of Inventory Reserves, <u>minus</u> (c) the Initial Store Closing Sale Reserve.

"FILO Commitment" means, as to each FILO Lender, the obligation of such FILO Lender to make its portion of the FILO Loan on the FILO Funding Date in the amount set forth opposite such FILO Lender's name on Schedule 2.01.

"FILO Event of Default" means (i) an Event of Default under Section 8.01(a) with respect to the FILO Loan, (ii) an Event of Default under Section 8.01(a) with respect to the Obligations (other than the FILO Liabilities) as a result of failure of the Borrowers to pay all Obligations then due and owing due on the Maturity Date or the Termination Date, (ii) an Event of Default under Section 8.01(b) hereof, but only to the extent such Event of Default arises from the Loan Parties' failure to comply with the provisions of Sections 6.02(c) or 7.19 hereof, and (iii) the failure of the Loan Parties or the Administrative Agent to implement and maintain any applicable FILO Reserve as and to the extent required pursuant to this Agreement including, without limitation, a breach of Section 7.22.

"FILO Funding Date" means the date that is one Business Day following the entry of the Final Order and the conditions precedent set forth in Sections 4.01 and 4.02 hereof.

"FILO Lenders" means, collectively, any Persons party hereto as FILO Lenders as reflected on Schedule 2.01, and each Person holding a portion of the FILO Loan that shall become a party hereto pursuant to Section 10.06.

"FILO Liabilities" means all advances to, and debts (including principal, interest, fees, costs, and expenses), liabilities, obligations, covenants and indemnities of, any Loan Party arising under any Loan Document or otherwise with respect to the FILO Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising, and (b) any Other Liabilities due or to become due to the FILO Lenders.

"FILO Loan" means the term loan made by the FILO Lenders pursuant to Section 2.01(d) hereof on the FILO Funding Date in the original principal amount of $95,285,000.

"FILO Notes" means the promissory notes of the Borrowers substantially in the form of Exhibit D-2, each payable to the order of a FILO Lender, evidencing the portion of the FILO Loan made by the FILO Lenders.

"FILO Reserve" means an amount, at any time of calculation, equal to the excess of (i) on or before the FILO Funding Date the then outstanding amount of the Prepetition FILO Loan over the FILO Borrowing Base, or (ii) on any date after the FILO Funding Date, the then outstanding amount of the FILO Loan over the FILO Borrowing Base in each case as reflected in the most recent Borrowing Base Certificate furnished by the Borrowers; provided, however, that if the FILO Agent determines in good faith that there has been a mathematical error in calculating the FILO Reserve, the FILO Agent may notify the Administrative Agent, the Collateral Agent, and the Borrowers thereof, setting forth the amount of the FILO Reserve to be established as calculated by the FILO Agent and the basis for its determination, together with its detailed calculation. Within one Business Day after receipt of such notice from the FILO Agent,

the Administrative Agent shall establish a FILO Reserve in the amount requested by the FILO Agent (in the absence of manifest error). The Administrative Agent shall have no obligation to investigate the basis for the FILO Agent's dispute or calculation, may conclusively rely on the notice furnished by the FILO Agent with respect thereto, and shall have no liability to any Loan Party or Credit Party for following the instructions of the FILO Agent.

"FILO Standstill Period" means with respect to a FILO Event of Default, the period commencing on the date of the Administrative Agent's and the Borrower Representative's receipt of written notice from the FILO Agent that a FILO Event of Default has occurred and is continuing and that the FILO Agent (or at the direction of the Required FILO Lenders) is requesting the Agents to commence the enforcement of remedies, and ending on the date which is forty-five (45) days after receipt of such notice with respect to any FILO Event of Default.

"Final Order" means an order or judgment as entered on the docket of the Bankruptcy Court with respect to the Cases substantially in the form of the Interim Order, with only such modifications as are satisfactory in form and substance to the Administrative Agent and the FILO Agent, which order shall (x) have been entered on such prior notice to such parties as may be satisfactory to the Administrative Agent and the FILO Agent and (y) not have been vacated, reversed, modified, amended or stayed.

"Final Order Date" means the date of the entry of the Final Order.

"Financial Advisor" means The Rothschild Group (or another independent advisor reasonably acceptable to the Administrative Agent and the FILO Agent).

"Fiscal Month" means any fiscal month of any Fiscal Year.

"Fiscal Year" means any period of twelve consecutive months ending on the Saturday closest to January 31 of any calendar year.

"Foreign Holding Company" means any Subsidiary of the Borrower organized under the laws of the United States or a political subdivision thereof substantially all of the assets of which consist of Equity Interests or other securities of one or more CFCs. For the avoidance of doubt, TSA Ponce, Inc., a Delaware corporation, shall not be deemed a Foreign Holding Company under the Loan Documents.

"Foreign Lender" means any Lender that is organized under the laws of a jurisdiction other than that in which any Borrower is resident for tax purposes. For purposes of this definition, the United States, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Fronting Exposure" means, at any time there is a Defaulting Lender that is a Revolving Lender, (a) with respect to the L/C Issuer, such Defaulting Lender's Applicable Percentage of the outstanding L/C Obligations other than L/C Obligations as to which such Defaulting Lender's participation obligation has been reallocated to other Lenders or Cash

Collateralized in accordance with the terms hereof, and (b) with respect to the Swing Line Lender, such Defaulting Lender's Applicable Percentage of Swing Line Loans other than Swing Line Loans as to which such Defaulting Lender's participation obligation has been reallocated to other Lenders in accordance with the terms hereof.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien); provided, that the term Guarantee shall not include endorsements for collection or collections for deposit in either case in the ordinary course of business.  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.  The term "Guarantee" as a verb has a corresponding meaning.

"Guarantors" means, collectively, TSA Holdco, Slap Shot, Holdings, the Subsidiaries of Holdings listed on Schedule 6.12 and each other Subsidiary of Holdings that is required to execute and deliver a guaranty or guaranty supplement pursuant to Section 6.12. Notwithstanding the foregoing, no Excluded Subsidiary shall be a Guarantor.

"Guaranty" means that certain Guaranty dated as of the Closing Date made by the Guarantors in favor of the Administrative Agent and the other Credit Parties, in form reasonably satisfactory to the Administrative Agent and the FILO Agent, as the same now exists or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Holdings" means The Sports Authority, Inc., a Delaware corporation.

"Incremental DIP Loans" means additional loans provided on a junior and subordinate basis to the Borrowers by any Person (other than the Agents and the Lenders hereunder) in an amount of at least $25 million, upon terms and conditions reasonably acceptable to the Administrative Agent, the FILO Agent and the Lenders.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)     all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)     the maximum amount of all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial letters of credit), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)     net obligations of such Person under Swap Contracts;

(d)     all obligations of such Person to pay the deferred purchase price of property or services (other than (i) deferred compensation to employees, officers and directors of Slap Shot and its Subsidiaries and (ii) trade accounts payable in the ordinary course of business which are being disputed in good faith by appropriate proceedings or which are not past due for more than 120 days after the date on which such trade account was created);

(e)     indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

01:18374604.1

(f)　all Attributable Indebtedness in respect of Capitalized Leases and Synthetic Lease Obligations of such Person and all Synthetic Debt of such Person;

(g)　all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interest in such Person or any other Person, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; and

(h)　all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is non-recourse to such Person.  The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.  The amount of outstanding Indebtedness as of any date shall be the principal amount or accreted value thereof at such date.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitee" has the meaning specified in Section 10.04(b).

"Independent Consultant" means each of FTI Consulting, Inc. (or another independent third party consultant reasonably acceptable to the Administrative Agent and the FILO Agent).

"Information" has the meaning specified in Section 10.07.

"Initial Store Closing Sale" means the liquidation and closure of up to 180 stores (which number may be increased with the consent of the Administrative Agent and the FILO Agent, such consent not to be unreasonably withheld) of the Borrowers pursuant to the Agency Agreement.

"Initial Store Closing Sale Reserve" means an Availability Reserve applicable to both the Borrowing Base and the FILO Borrowing Base established by the Administrative Agent on or after Week 5 of the Initial Store Closing Sale as contemplated in the Agency Agreement to reflect the discounted selling price of Eligible Inventory which is subject to the Initial Store Closing Sale.

"Intellectual Property" means all present and future:  trade secrets, know-how and other proprietary information; trademarks, internet domain names, service marks, trade dress, trade names, business names, designs, logos, slogans (and all translations, adaptations, derivations and combinations of the foregoing) indicia and other source and/or business identifiers, and all registrations which have heretofore been or may hereafter be issued thereon throughout the world; copyrights and copyright applications; (including copyrights for computer programs) and all tangible and intangible property embodying the copyrights, unpatented

inventions (whether or not patentable); patents and patent applications; industrial design applications and registered industrial designs; license agreements related to any of the foregoing and income therefrom; books, records, writings, computer tapes or disks, flow diagrams, specification sheets, computer software, source codes, object codes, executable code, data, databases and other physical manifestations, embodiments or incorporations of any of the foregoing; all other intellectual property; and all common law and other rights throughout the world in and to all of the foregoing.

"Intercreditor Agreement" means the Intercreditor Agreement, dated as of May 3, 2006, by and among the Agents and Bank of America in its capacity as agent under the Term Facility, as acknowledged by the Borrowers and the Guarantors party to the Existing Credit Agreement, as amended, modified, restated, extended, renewed, replaced or supplemented in accordance with the terms of the Intercreditor Agreement and this Agreement and in effect from time to time.

"Interest Payment Date" means, (a) as to any Revolving Loan that is a LIBO Rate Loan, the last day of each Interest Period applicable to such Revolving Loan and the Maturity Date; provided, however, that if any Interest Period for a LIBO Rate Loan exceeds three months, the respective dates that fall every three months after the beginning of such Interest Period shall also be Interest Payment Dates; (b) as to any Base Rate Loan (including a Swing Line Loan), the first Business Day after the end of each calendar quarter and the Maturity Date; and (c) as to the FILO Loan, the first Business Day of each calendar month and the Maturity Date.

"Interest Period" means, (a) as to each Revolving Loan that is a LIBO Rate Loan, the period commencing on the date such LIBO Rate Loan is disbursed or converted to or continued as a LIBO Rate Loan and ending on the date one week or one, two or three months thereafter (or such other period agreed to by the Borrower Representative and all of the Lenders), as selected by the Borrower Representative in its Committed Loan Notice or Conversion/Continuation Notice, as the case may be, and (b) as to the FILO Loan, initially, the period commencing on the date the FILO Loan is disbursed and ending on the last day of the immediately succeeding month, and thereafter, the period commencing on the first day of each month and ending on the last day of each such month; provided that:

(a)     any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(b)     any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(c)     no Interest Period shall extend beyond the Maturity Date.

"Interim Order" means the order or judgment of the Bankruptcy Court as entered on the docket of the Bankruptcy Court with respect to the Cases substantially in the form of

Exhibit J hereto and otherwise acceptable to the Lenders, the Agents and the FILO Agent, approving, inter alia, this Agreement and the other Loan Documents, and (a) authorizing the incurrence by the Borrowers of interim secured indebtedness in accordance with this Agreement, (b) approving the Interim Roll-Up, and (c) subject to the terms thereof, approving the payment by the Borrowers of the fees and other amounts contemplated by this Agreement, which order shall not have been vacated, reversed, modified, amended or stayed.

"Interim Order Date" has the meaning set forth in the recitals hereto.

"Interim Order Period" means the period of time from the time at which the Bankruptcy Court enters the Interim Order until the time at which the Bankruptcy Court enters the Final Order.

"Interim Roll-Up" has the meaning set forth in the Interim Order.

"Internal Control Event" means fraud that involves management or other employees who have a significant role in, the Loan Parties' internal controls over financial reporting and which is material to Slap Shot and its Subsidiaries, taken as a whole.

"Inventory" has the meaning given that term in the UCC, and shall also include, without limitation, all: (a) goods which (i) are leased by a Person as lessor, (ii) are held by a Person for sale or lease or to be furnished under a contract of service, (iii) are furnished by a Person under a contract of service, or (iv) consist of raw materials, work in process, or materials used or consumed in a business; (b) goods of said description in transit; (c) goods of said description which are returned, repossessed or rejected; and (d) packaging, advertising, and shipping materials related to any of the foregoing.

"Inventory Advance Rate" means 90%.

"Inventory Component" means the Appraised Value of Eligible Inventory, multiplied by the Inventory Advance Rate applicable to the Borrowing Base, multiplied by the Cost of Eligible Inventory, net of Inventory Reserves.

"Inventory Reserves" means such reserves as may be established from time to time by the Administrative Agent in the Administrative Agent's reasonable discretion (exercised in a manner consistent with the Administrative Agent's practices with respect to other similarly situated customers of the Administrative Agent) which negatively affect the saleability, at retail, of the Eligible Inventory or which reflect such other factors as negatively affect the market value of the Eligible Inventory. Without limiting the generality of the foregoing, Inventory Reserves may include (but are not limited to) reserves based on:

(a)     Obsolescence;

(b)     Seasonality;

(c)     Shrink;

(d)     Imbalance;

(e)        Change in Inventory character;

(f)        Change in Inventory composition;

(g)        Change in Inventory mix;

(h)        Markdowns (both permanent and point of sale);

(i)        Retail markons and markups inconsistent with prior period practice and performance, industry standards, current business plans or advertising calendar and planned advertising events; and

(j)        Out-of-date and/or expired Inventory.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the assets of another Person or of the assets of another Person that constitute a discrete business unit.

"IRS" means the United States Internal Revenue Service.

"ISP" means, with respect to any Letter of Credit, the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice (or such later version thereof as may be in effect at the time of issuance).

"Issuer Documents" means with respect to any Letter of Credit, the Letter of Credit Application, and any other document, agreement and instrument entered into by the L/C Issuer and the Borrowers (or any Subsidiary) or in favor the L/C Issuer and relating to any such Letter of Credit.

"Joinder Agreement" means an agreement, in the form attached hereto as Exhibit G, pursuant to which, among other things, a Person becomes a party to, and bound by the terms of, this Agreement and/or the other Loan Documents in the same capacity and to the same extent as either a Borrower or a Guarantor, as the Administrative Agent may determine.

"Landlord Lien State" means such state(s) in which a landlord's claim for rent has priority over the lien of the Collateral Agent in any of the Collateral.

"Laws" means, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

01:18374604.1

"L/C Advance" means, with respect to each Revolving Lender, such Revolving Lender's funding of its participation in any L/C Borrowing in accordance with its Applicable Percentage.

"L/C Borrowing" means an extension of credit resulting from a drawing under any Letter of Credit which has not been reimbursed on the date when made or refinanced as a Committed Borrowing.

"L/C Credit Extension" means, with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the increase of the amount thereof.

"L/C Issuer" means Bank of America and Wells Fargo Bank, National Association in their respective capacities as issuer of Letters of Credit hereunder, or any successor issuer of Letters of Credit hereunder (which may only be a Revolving Lender selected by the Administrative Agent in its discretion and agreed by such Revolving Lender in its discretion). The L/C Issuer may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates of the L/C Issuer, in which case the term "L/C Issuer" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate.

"L/C Obligations" means, as at any date of determination, the aggregate undrawn amount available to be drawn under all outstanding Letters of Credit plus the aggregate of all Unreimbursed Amounts, including all L/C Borrowings. For purposes of computing the amounts available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with Section 1.06. For all purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"Lease" means any agreement, whether written or oral, no matter how styled or structured, pursuant to which a Loan Party is entitled to the use or occupancy of any space in a structure, land, improvements or premises for any period of time.

"Lender" has the meaning specified in the introductory paragraph hereto and, as the context requires, includes the Revolving Lenders, the FILO Lenders and the Swing Line Lender.

"Lender Group Consultant" has the meaning specified in Section 6.22(c).

"Lending Office" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower Representative and the Administrative Agent.

"Letter of Credit" means any letter of credit or banker's acceptance issued hereunder and shall include the Existing Letters of Credit.

01:18374604.1

"Letter of Credit Application" means an application and agreement for the issuance or amendment of a Letter of Credit in the form from time to time in use by the L/C Issuer.

"Letter of Credit Component" means, with respect to any Eligible Letter of Credit, the lesser of (i) the Inventory Advance Rate applicable to the Borrowing Base, multiplied by the Appraised Value of the Inventory supported by such Eligible Letter of Credit, multiplied by the Cost of such Inventory when completed, or (ii) the Stated Amount of such Eligible Letter of Credit, multiplied by the Inventory Advance Rate applicable to the Borrowing Base.

"Letter of Credit Expiration Date" means the day that is seven days prior to the Maturity Date then in effect (or, if such day is not a Business Day, the next preceding Business Day).

"Letter of Credit Fee" has the meaning specified in Section 2.03(i).

"Letter of Credit Sublimit" means an amount equal to $100 million.  The Letter of Credit Sublimit is part of, and not in addition to, the Aggregate Revolving Commitments.  A permanent reduction of the Aggregate Revolving Commitments shall not require a corresponding pro rata reduction in the Letter of Credit Sublimit; provided, however, that if the Aggregate Revolving Commitments are reduced to an amount less than the Letter of Credit Sublimit, then the Letter of Credit Sublimit shall be reduced to an amount equal to (or, at Borrower Representative's option, less than) the Aggregate Revolving Commitments.

"LIBO Rate" means:

(a) for any Interest Period with respect to a LIBO Rate Loan (other than the FILO Loan), the rate per annum equal to the London interbank offered rate administered by ICE Benchmark Administration Limited ("ICE LIBOR"), as published by Reuters (or other commercially available source providing quotations of ICE LIBOR as designated by the Administrative Agent from time to time) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, for Dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period. If such rate is not available at such time for any reason, then the "LIBO Rate" for such Interest Period shall be the rate per annum determined by the Administrative Agent to be the rate at which deposits in Dollars for delivery on the first day of such Interest Period in same day funds in the approximate amount of the LIBO Rate Loan being made, continued or converted by Bank of America and with a term equivalent to such Interest Period would be offered by Bank of America's London Branch to major banks in the London interbank eurodollar market at their request at approximately 11:00 a.m. (London time) two Business Days prior to the commencement of such Interest Period;

(b) for any interest calculation with respect to a Base Rate Loan on any date, the rate per annum equal to (i) ICE LIBOR, at approximately 11:00 a.m., London time determined two London Banking Days prior to such date for Dollar deposits being delivered in the London interbank market for a term of one month commencing that day or (ii) if such published rate is not available at such time for any reason, the rate per annum determined by the Administrative

Agent to be the rate at which deposits in Dollars for delivery on the date of determination in same day funds in the approximate amount of the Base Rate Loan being made or maintained and with a term equal to one month would be offered by Bank of America's London Branch to major banks in the London interbank Eurodollar market at their request at the date and time of determination; and

(c)      for any interest calculation with respect to the FILO Loan on any date, the rate per annum equal to (i) ICE LIBOR, at approximately 11:00 a.m., London time determined two London Banking Days prior to such date for Dollar deposits being delivered in the London interbank market for a term of one month commencing that day or (ii) if such published rate is not available at such time for any reason, the rate per annum determined by the FILO Agent to be the rate at which deposits in Dollars for delivery on the date of determination in same day funds in the approximate amount of the FILO Loan being made or maintained and with a term equal to one month would be offered by Bank of America's London Branch to major banks in the London interbank Eurodollar market at their request at the date and time of determination. The LIBO Rate with respect to the FILO Loan will be adjusted automatically on the first day of each calendar month to reflect the then current LIBO Rate calculated in accordance with this clause (c). For purposes of the FILO Loan only, the LIBO Rate shall not be less than 1.00% per annum.

In no event shall the LIBO Rate be less than zero.

"LIBO Rate Loan" means a Committed Loan that bears interest at a rate based on the LIBO Rate.

"Lien" means any mortgage, pledge, hypothecation, assignment, encumbrance, lien (statutory or other), charge, preference, or priority in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to Real Estate, and any financing lease having substantially the same economic effect as any of the foregoing).

"Line Cap" means, at any time of determination, (i) prior to the repayment in full of the FILO Loan, the lesser of (a) (x) the sum of the Aggregate Revolving Commitments plus (y) (A) the outstanding amount of the Prepetition FILO Loan until such time as the Prepetition FILO Loan has been paid in full, and (B) thereafter, the outstanding amount of the FILO Loan or (b) the sum of the Borrowing Base plus the FILO Borrowing Base, and (ii) after payment in full of the Prepetition FILO Loan and the FILO Loan, the lesser of (a) the Aggregate Revolving Commitments, or (b) the Borrowing Base.

"Liquidation" means the exercise by the Administrative Agent or Collateral Agent of those rights and remedies accorded to such Agents under the Loan Documents and applicable Law as a creditor of the Loan Parties with respect to the realization on the Collateral, including (after the occurrence and continuation of an Event of Default) the conduct by the Loan Parties acting with the consent of the Administrative Agent, of any public, private or going out of business sale or other disposition of the Collateral for the purpose of liquidating the Collateral. Derivations of the word "Liquidation" (such as "Liquidate") are used with like meaning in this Agreement.

"Loan" means an extension of credit by a Lender to the Borrowers under ARTICLE II in the form of a Committed Loan, a Swing Line Loan or the FILO Loan.

"Loan Account" has the meaning assigned to such term in Section 2.11(a).

"Loan Documents" means, collectively, (a) this Agreement, (b) the Notes, (c) the Guaranty, (d) the Collateral Documents and (e) the Fee Letter.

"Loan Parties" means, collectively, the Borrowers and each Guarantor.

"Management Agreement" means the Management Services Agreement dated as of May 3, 2006 between Leonard Green & Partners, L.P. and the Borrowers as in effect on May 3, 2006 or as amended in any manner not adverse to the Lenders, including to assign such agreement to any Affiliate of Leonard Green & Partners, L.P.

"Management Fees" means all fees and expense reimbursements payable to Leonard Green & Partners, L.P. or any of its controlled Affiliates pursuant to the Management Agreement.

"Material Adverse Effect" means (a) any change, circumstance, event or effect that would be materially adverse to the assets, liabilities, business, financial condition or results of operations of Holdings and its Subsidiaries taken as a whole; (b) a material impairment of the rights and remedies of the Administrative Agent, the Collateral Agent or any Lender under any Loan Document, or of the ability of Holdings, any other Borrowers or any Material Subsidiary to perform its obligations under any Loan Document to which it is a party; or (c) a material adverse effect upon the legality, validity, binding effect or enforceability against Holdings, any other Borrowers or any Material Subsidiary of any Loan Document to which it is a party. Notwithstanding anything herein to the contrary, the events leading up to and resulting from the commencement of the Cases, and the act of filing the Cases shall not in itself constitute a Material Adverse Effect.

"Material Indebtedness" means Indebtedness (other than the Obligations) of any of the Loan Parties in an aggregate principal amount exceeding $15,000,000.   For purposes of determining the amount of Material Indebtedness at any time, the amount of the obligations in respect of any Swap Contract at such time shall be calculated at the Swap Termination Value thereof.

"Material Subsidiary" means, at any date of determination, any Subsidiary or group of Subsidiaries with respect to which a specified condition applies (a) whose total assets at the last day of the most recently ended Measurement Period were equal to or greater than 5% of the consolidated total assets of Slap Shot and its consolidated Subsidiaries at such date, (b) whose gross revenues for such Measurement Period were equal to or greater than 5% of the consolidated gross revenues of Slap Shot and its consolidated Subsidiaries for such period, in each case determined in accordance with GAAP, or (c) who owns assets of the type included in the Borrowing Base.

"Maturity Date" means June 30, 2016.

"Maximum Rate" has the meaning specified in Section 10.09.

"Measurement Period" means, at any date of determination, the most recently completed twelve Fiscal Months of Slap Shot.

"Mezzanine Documents" means the Securities Purchase Agreement dated as of May 3, 2006 governing the Mezzanine Facility and the notes issued thereunder, any exchange notes issued in replacement therefore and any indenture pursuant to which any such exchange notes are issued.

"Mezzanine Facility" means $350.0 million in mezzanine notes issued pursuant to that certain Securities Purchase Agreement, dated as of May 3, 2006, among Slap Shot, Holdings, the Loan Parties and the Purchasers named therein.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Mortgage" means, collectively, those certain deeds of trust, trust deeds, deeds to secure debt and mortgages, covering the properties listed on Schedule 5.08(c) (together with the Assignments of Leases and Rents referred to therein and each other mortgage delivered pursuant to Section 6.12), in each case as amended, modified, restated, extended, renewed, replaced or supplemented from time to time.

"Mortgaged Property" shall mean (a) each Real Estate identified as a Mortgaged Property on Schedule 5.08(c), and (b) each Real Estate, if any, which shall be subject to a Mortgage delivered as required pursuant to Section 6.12.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which Holdings, any other Borrowers or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"Net Cash Proceeds" means:

(a)       with respect to any Disposition by Holdings or any of its Subsidiaries, or any Extraordinary Receipt received or paid to the account of Holdings or any of its Subsidiaries, the excess, if any, of (i) the sum of cash and Cash Equivalents received in connection with such transaction (including any cash or Cash Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (ii) the sum of the principal amount of any Indebtedness that is secured by the applicable asset and that is required to be repaid in connection with such transaction (other than Indebtedness under the Loan Documents), and

(b)       with respect to the sale or issuance of any Equity Interest by Slap Shot or any of its Subsidiaries, or the incurrence or issuance of any Indebtedness by Holdings or any of its Subsidiaries, the excess of (i) the sum of the cash and Cash Equivalents received in connection with such transaction over (ii) the underwriting discounts and

commissions incurred by Slap Shot or Holdings or such Subsidiary, as applicable, in connection therewith; and

(c)      with respect to the issuance by Holdings or any of its Subsidiaries of any Indebtedness (other than Indebtedness expressly permitted to be incurred or issued pursuant to <u>Section 7.02</u>), 100% of all net cash proceeds received therefrom.

"<u>Non-Defaulting Lender</u>" means, at any time, each Lender that is not a Defaulting Lender at such time.

"<u>Notes</u>" means, collectively, (i) Revolving Credit Notes, (ii) the Swingline Note, and (iii) the FILO Notes, as each may be amended, supplemented or modified from time to time.

"<u>NPL</u>" means the National Priorities List under CERCLA.

"<u>Obligations</u>" means (a) all debts (including principal, interest, fees, costs, and expenses), liabilities, obligations, covenants, indemnities, and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan or Letter of Credit (including payments in respect of reimbursement of disbursements, interest thereon and obligations to provide cash collateral therefor), whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising, and (b) any Other Liabilities; <u>provided</u> that Obligations of a Loan Party shall exclude any Excluded Swap Obligations with respect to such Loan Party.

"<u>Orders</u>" means, collectively, the Interim Order and Final Order.

"<u>Organization Documents</u>" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, limited partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"<u>Other Connection Taxes</u>" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"<u>Other Liabilities</u>" means amounts due on account of or arising from (a) any Cash Management Services furnished to any of the Loan Parties or any of their Subsidiaries and/or (b) any Bank Product entered into with any Loan Party and any such Person, as each may be amended from time to time.

01:18374604.1

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 3.06).

"Outstanding Amount" means (i) with respect to Committed Loans and Swing Line Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Committed Loans and Swing Line Loans, as the case may be, occurring on such date; (ii) with respect to any L/C Obligations on any date, the amount of such L/C Obligations on such date after giving effect to any L/C Credit Extension occurring on such date and any other changes in the aggregate amount of the L/C Obligations as of such date, including as a result of any reimbursements by the Borrowers of Unreimbursed Amounts; and (iii) with respect to the FILO Loan on any date, the amount of the aggregate outstanding principal amount thereof after giving effect to any prepayments or repayments of the FILO Loan occurring on such date.

"Overadvance" means a Credit Extension (other than the making of the FILO Loan) to the extent that, immediately after its having been made, Revolving Excess Availability is less than zero.

"Participant" has the meaning specified in Section 10.06(d).

"Participant Register" has the meaning provided therefor in Section 10.06(d)(ii).

"PATRIOT Act" means the Trading With the Enemy Act (50 U.S.C. §§ 1-44, as amended) and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107 56, signed into law October 26, 2001.

"PBGC" means the Pension Benefit Guaranty Corporation.

"PCAOB" means the Public Company Accounting Oversight Board.

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by Holdings, any other Borrowers or any ERISA Affiliate or to which Holdings, any other Borrowers or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"Perfection Certificate" means a certificate in the form of Exhibit H or any other form approved by the Collateral Agent, as the same shall be supplemented from time to time by a Perfection Certificate Supplement or otherwise.

"Perfection Certificate Supplement" shall mean a certificate supplement in the form of Exhibit H-1 or any other form approved by the Collateral Agent.

"Permitted Encumbrances" has the meaning specified in the Mortgages.

"Permitted Indebtedness" has the meaning specified in Section 7.02.

"Permitted Lien" has the meaning specified in Section 7.01.

"Permitted Overadvance" means an Overadvance made by the Administrative Agent, in its discretion, which:

(a)     Is made to maintain, protect or preserve the Collateral, the business of the Borrowers and/or the Credit Parties' rights under the Loan Documents or which is otherwise for the benefit of the Credit Parties; or

(b)     Is made to enhance the likelihood of, or to maximize the amount of, repayment of any Obligation;

(c)     Is made to pay any other amount chargeable to any Loan Party hereunder; and

(d)     Together with all other Permitted Overadvances then outstanding, shall not, at the time of making of such Permitted Overadvance, (i) exceed five percent (5%) of the Borrowing Base in the aggregate outstanding at any time or (ii) unless a Liquidation is taking place, remain outstanding for more than forty-five (45) consecutive Business Days, or (iii) be made on more than two occasions in any 180 day period;

provided, however, that the foregoing shall not (i) modify or abrogate any of the provisions of Section 2.03 regarding the Revolving Lenders' obligations with respect to L/C Disbursements, or (ii) result in any claim or liability against the Administrative Agent (regardless of the amount of any Overadvance) for "inadvertent Overadvances" (i.e. where an Overadvance results from changed circumstances beyond the control of the Administrative Agent (such as a reduction in the collateral value)), and such "inadvertent Overadvances" shall not reduce the amount of Permitted Overadvances allowed hereunder; and further provided that in no event shall the Administrative Agent make an Overadvance, if after giving effect thereto, the Total Revolving Outstandings would exceed the Aggregate Revolving Commitments (as in effect prior to any termination of the Revolving Commitments pursuant to Section 2.06 hereof).

"Permitted Prior Liens" has the meaning provided therefor in the Orders and includes, for the avoidance of doubt, liens on real property in Paramus, New Jersey securing obligations under the Loan Agreement dated as of February 2, 2005 between the Borrower Representative and Commercial Net Lease Realty, Inc.

"Permitted Protest" shall mean the right of the Borrowers to protest any Lien (other than any such Lien  that secures the Obligations), taxes, or rental payment, provided that (a) a reserve with respect to such obligation is established on the books and records in such amount (if any) to the extent required under GAAP, (b) any such protest is prosecuted diligently

by the Borrowers in good faith, by appropriate proceedings, (c) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation, and (d) the failure to make payment, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

"Permitted Refinancing Indebtedness" means, with respect to any Person, any modification, refinancing, refunding, renewal or extension of any Indebtedness of such Person (or any successor of such Person); provided, however, that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the sum of (i) the outstanding principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed or extended (except that any refinancing of the Term Facility may increase the principal amount of such Indebtedness to an amount not to exceed $700,000,000), plus (ii) prepayment premiums and other reasonable amounts paid, and fees and expenses reasonably incurred, in connection with such modification, refinancing, refunding, renewal or extension, (b) such modification, refinancing, refunding, renewal or extension has (i) a final maturity date equal to or later than the final maturity date of the Indebtedness being modified, refinanced, refunded, renewed or extended and (ii) a weighted average life to maturity equal to or greater than the weighted average life to maturity of the Indebtedness being modified, refinanced, refunded, renewed or extended, and (c) if the Indebtedness being modified, refinanced, refunded, renewed or extended is Subordinated Indebtedness, such modification, refinancing, refunding, renewal or extension (i) is subordinated in right of payment to the Obligations on terms at least as favorable, taken as a whole, to the Lenders as those contained in the documentation governing the Subordinated Indebtedness being modified, refinanced, refunded, renewed or extended, (ii) does not require payments of cash interest prior to the date that is six months following the maturity date of the Indebtedness being refinanced in amounts greater than was required by the Indebtedness being refinanced, and (iii) contains covenants and events of default that are not more restrictive taken as a whole than the covenants and events of default contained in the documentation governing the Indebtedness being refinanced (as determined in good faith by the Borrower Representative).

"Permitted Variances" has the meaning set forth in Section 6.23 hereof.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, limited partnership, Governmental Authority or other entity.

"Petition Date" has the meaning set forth in the recitals hereto.

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by Holdings, another Borrower or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate.

"Pledged Debt" means any debt instrument constituting Collateral under any of the Collateral Documents, but shall not include any Excluded Collateral.

"Pledged Equity" means any certificated equity securities constituting Collateral under any of the Collateral Documents (other than equity interests of any Person formed under

the laws of any jurisdiction outside of the United States), but shall not include any Excluded Collateral.

"Prepetition FILO Loan" means the "FILO Loan" as defined under the Existing Credit Agreement

"Prepetition Parties" means the Existing Loan Parties and the agent and lenders under the Term Facility.

"Prime Rate" means, for any day, the highest of: (a) the variable annual rate of interest then most recently announced by Bank of America, N.A. at its head office in Charlotte, North Carolina as its "prime rate"; (b) the Federal Funds Effective Rate in effect on such day plus one-half of one percent (0.50%) per annum; or (c) the LIBO Rate (calculated as set forth in clause (b) of the definition of "LIBO Rate") plus one percent (1.00%) per annum. The "prime rate" is a reference rate and does not necessarily represent the lowest or best rate being charged by Bank of America to any customer. If for any reason the Administrative Agent shall have determined (which determination shall be conclusive absent manifest error) that it is unable to ascertain the Federal Funds Effective Rate for any reason, including the inability or failure of the Administrative Agent to obtain sufficient quotations thereof in accordance with the terms hereof, the Prime Rate shall be determined without regard to clauses (b) or (c) of the first sentence of this definition, as applicable, until the circumstances giving rise to such inability no longer exist. Any change in the Prime Rate due to a change in Bank of America's "prime rate", the Federal Funds Effective Rate shall be effective on the effective date of such change in Bank of America's "prime rate", the Federal Funds Effective Rate. In no event shall the Prime Rate be less than zero

"Public Market" shall exist if (a) a Public Offering has been consummated and (b) any Equity Interests of Holdings have been distributed by means of an effective registration statement under the Securities Act of 1933.

"Public Offering" means a public offering of the Equity Interests of Holdings pursuant to an effective registration statement under the Securities Act of 1933.

"Qualified ECP Guarantor" means, at any time, each Loan Party with total assets exceeding $10,000,000 or that qualifies at such time as an "eligible contract participant" under the Commodity Exchange Act and can cause another Person to qualify as an "eligible contract participant" at such time under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Real Estate" means all Leases and all land, together with the buildings, structures, parking areas, and other improvements thereon, now or hereafter owned by any Loan Party, including all easements, rights-of-way, and similar rights relating thereto and all leases, tenancies, and occupancies thereof.

"Recipient" means any Agent, any Lender, the L/C Issuer or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder.

"Register" has the meaning specified in Section 10.06(c).

01:18374604.1

"Related Documents" means the Mezzanine Documents and the Term Loan Documents.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

"Reported Fee Accruals" means all accrued and unpaid fees, disbursements, costs and expenses, allowed by the Bankruptcy Court and incurred by the Case Professionals.

"Reports" has the meaning provided in Section 9.12(b).

"Request for Credit Extension" means (a) with respect to a Borrowing of Committed Loans, a Committed Loan Notice, (b) with respect to an L/C Credit Extension, a Letter of Credit Application, and (c) with respect to a Swing Line Loan, a Swing Line Loan Notice.

"Required FILO Lenders" means, as of any date of determination, FILO Lenders holding more than 50% of the then outstanding amount of the Prepetition FILO Loan, or if the Prepetition FILO Loan has been paid in full, FILO Lenders holding more than 50% of the Outstanding Amount of the FILO Loan; provided that if the Prepetition FILO Loan or the FILO Loan, as applicable, shall then be held by two or more Lenders, then Required FILO Lenders shall be at least two Lenders (treating for purposes of this proviso a Lender and all of its Affiliates and Approved Funds as a single Lender).

"Required Lenders" means, as of any date of determination, three (3) or more Lenders holding more than 50% of the Aggregate Revolving Commitments and the then outstanding amount of the Prepetition FILO Loan, or if the Prepetition FILO Loan has been paid in full, the Outstanding Amount of the FILO Loan or, if the Revolving Commitment of each Revolving Lender to make Revolving Loans and the obligation of the L/C Issuer to make L/C Credit Extensions have been terminated pursuant to Section 8.02, three (3) or more Lenders holding in the aggregate more than 50% of the Total Revolving Outstandings and the then outstanding amount of the Prepetition FILO Loan, or if the Prepetition FILO Loan has been paid in full, the Outstanding Amount of the FILO Loan (with the aggregate amount of each Lender's risk participation and funded participation in L/C Obligations and Swing Line Loans being deemed "held" by such Lender for purposes of this definition); provided that the Revolving Commitment of, and the portion of the Total Revolving Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"Required Revolving Lenders" means, as of any date of determination, three (3) or more Revolving Lenders holding more than 50% of the Aggregate Revolving Commitments or, if the Revolving Commitment of each Revolving Lender to make Revolving Loans and the obligation of the L/C Issuer to make L/C Credit Extensions have been terminated pursuant to Section 8.02, three (3) or more Lenders holding in the aggregate more than 50% of the Total

Revolving Outstandings (with the aggregate amount of each Lender's risk participation and funded participation in L/C Obligations and Swing Line Loans being deemed "held" by such Lender for purposes of this definition); provided that the Revolving Commitment of, and the portion of the Total Revolving Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"Reserves" means all (if any) Inventory Reserves and Availability Reserves.

"Responsible Officer" means the chief executive officer, president, chief financial officer, any executive or senior vice president, treasurer, assistant treasurer or controller of a Loan Party or any of the other individuals designated in writing to the Administrative Agent by an existing Responsible Officer of a Loan Party as an authorized signatory of any certificate or other document to be delivered hereunder.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) by a Borrower or any of its Subsidiaries with respect to any Equity Interest of such Person, or any payment by a Borrower or any of its Subsidiaries (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to a Borrower's or any of its Subsidiaries' direct or indirect stockholders, partners or members (or the equivalent of any thereof).

"Revolving Commitment" means, as to each Revolving Lender, its obligation as a Revolving Lender to (a) make Committed Loans to the Borrowers pursuant to Section 2.01, (b) purchase participations in L/C Obligations, and (c) purchase participations in Swing Line Loans, in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Revolving Lender's name on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Revolving Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"Revolving Credit Notes" means the promissory notes of the Borrowers substantially in the form of Exhibit D-1, each payable to the order of a Lender, evidencing the Loans made by the Lenders.

"Revolving Excess Availability" means, as of any date of determination thereof by the Administrative Agent, the result, if a positive number, of:

(a)     The Revolving Line Cap

        minus

(b)     The aggregate amount of the Total Revolving Outstandings.

"Revolving Lender" means each Lender holding a Revolving Commitment.

"Revolving Line Cap" means, at any time of determination, the lesser of (a) the Aggregate Revolving Commitments or (b) the Borrowing Base.

"Revolving Loan" means each Committed Loan or Swing Line Loan, as the context may require.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor thereto.

"Sale Motion" has the meaning specified in Section 6.24(c).

"Sale Process" has the meaning specified in Section 6.24(c).

"Sanctioned Country" means at any time, a country or territory which is itself the subject or target of any Sanctions.

"Sanctioned Person" means at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person owned or controlled by any such Person.

"Sanctions" means international economic sanctions or trade embargoes imposed, administered or enforced from time to time by the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State or any other relevant sanctions authority.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Securities Laws" means the Securities Act of 1933, the Securities Exchange Act of 1934, Sarbanes-Oxley, and the applicable accounting and auditing principles, rules, standards and practices promulgated, approved or incorporated by the SEC or the PCAOB.

"Security Agreement" means that certain Security Agreement dated as of the Closing Date  executed in favor of the Collateral Agent and the other Credit Parties by each of the Loan Parties, as amended, modified, restated, extended, renewed, replaced or supplemented from time to time.

"Settlement Date" has the meaning specified in Section 2.14(a).

"Shrink" means Inventory which has been lost, misplaced, stolen, or is otherwise unaccounted for.

"Slap Shot" means Slap Shot Holdings Corp., a Delaware corporation.

"Specified Loan Party" means any Loan Party that is not then an "eligible contract participant" under the Commodity Exchange Act (determined prior to giving effect to Section 10.23).

"Standby Letter of Credit" means any Letter of Credit that is not a Commercial Letter of Credit and that (a) is used in lieu or in support of performance guaranties or performance, surety or similar bonds (excluding appeal bonds) arising in the ordinary course of business, (b) is used in lieu or in support of stay or appeal bonds, (c) supports the payment of insurance premiums for reasonably necessary casualty insurance carried by any of the Loan Parties, or (d) supports payment or performance for identified purchases or exchanges of products or services in the ordinary course of business.

"Stated Amount" means at any time the maximum amount for which a Letter of Credit may be honored.

"Store" means any retail store operated, or to be operated, by any Loan Party.

"Subordinated Indebtedness" means Indebtedness under the Mezzanine Facility and all other Indebtedness of a Loan Party that is subordinate in right of payment to any or all of the Obligations and which provides, without limitation, (a) for a maturity after the Maturity Date, (b) that such Indebtedness is unsecured, (c) that no principal payments shall be required to be made until after the Maturity Date, and (d) interest shall accrue and be payable in cash at a market rate of interest, subject to the right of the Administrative Agent to impose a payment blockage period upon the occurrence and during the continuance of any Event of Default.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of Holdings.

"Successor Cases" means any case under Chapter 7 of the Bankruptcy Code upon the conversion of any the Cases, or in any proceedings superseding or related to any of the foregoing.

"Swap Contract" means any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement.

"Swap Obligations" means with respect to any Loan Party any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

01:18374604.1

-44-

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"Swing Line" means the revolving credit facility made available by the Swing Line Lender pursuant to Section 2.04.

"Swing Line Borrowing" means a borrowing of a Swing Line Loan pursuant to Section 2.04.

"Swing Line Lender" means Bank of America in its capacity as provider of Swing Line Loans, or any successor swing line lender hereunder.

"Swing Line Loan" has the meaning specified in Section 2.04(a).

"Swing Line Loan Notice" means a notice of a Swing Line Borrowing pursuant to Section 2.04(b), which, if in writing, shall be substantially in the form of Exhibit B.

"Swing Line Sublimit" means an amount equal to the lesser of (a) $75.0 million and (b) the Aggregate Revolving Commitments.  The Swing Line Sublimit is part of, and not in addition to, the Aggregate Revolving Commitments.

"Synthetic Debt" means, with respect to any Person as of any date of determination thereof, all obligations of such Person in respect of transactions entered into by such Person that are intended to function primarily as a borrowing of funds (including any minority interest transactions that function primarily as a borrowing) but are not otherwise included in the definition of "Indebtedness" or as a liability on the consolidated balance sheet of such Person and its Subsidiaries in accordance with GAAP.

"Synthetic Lease Obligation" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property (including sale and leaseback transactions), excluding operating leases entered into in the ordinary course of business, in each case, creating obligations that do not appear on the balance sheet of such Person but which, upon the application of any Debtor Relief Laws to such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Facility" means the $300 million senior secured term loan dated as of May 3, 2006, as amended and restated November 16, 2010, among Holdings, the lenders party thereto

01:18374604.1

and Wilmington Savings Fund Society, FSB (as successor in interest to Bank of America, N.A.), as administrative agent and collateral agent, as it may be amended or modified from time to time.

"Termination Date" means the earliest to occur of (i) the Maturity Date, (ii) the date on which the maturity of the Loans is accelerated and the Commitments are terminated in accordance with Section 8.02, (iii) the effective date of any plan in the Cases that has been confirmed by an order of the Bankruptcy Court, and (iv) a sale of all or substantially all of the working capital assets of the Borrowers under Section 363 of the Bankruptcy Code.

"Term Loan Documents" means the credit agreement governing the Term Facility, all mortgages and other security documents thereunder and the Notes issued thereunder.

"Term Priority Collateral" has the meaning set forth in the Intercreditor Agreement.

"Testing Period" has the meaning set forth in Section 6.23 hereof.

"Total Disbursements" means the sum of total operating disbursements, total non-operating disbursements and total bankruptcy disbursements as provided in the Budget.

"Total Revolving Outstandings" means the aggregate Outstanding Amount of all Committed Loans, Swing Line Loans and all L/C Obligations.

"TSA Holdco" means The Sports Authority Holdings, Inc., a Delaware corporation.

"Type" means, with respect to a Loan, its character as a Base Rate Loan or a LIBO Rate Loan.

"UCC" means the Uniform Commercial Code as in effect in the State of New York; provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral or the availability of any remedy under the Loan Documents  is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection, priority or availability of such remedy.

"Unfunded Pension Liability" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"United States" and "U.S." mean the United States of America.

"United States Trustee" means the Office of the United States Trustee.

"Unreimbursed Amount" has the meaning specified in Section 2.03(c)(i).

01:18374604.1

"Unused Fees" has the meaning provided in Section 2.09(a).

"U.S. Loan Party" means any Loan Party that is organized under the laws of one of the states of the United States of America and that is not a CFC.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"Variance Report" has the meaning set forth in Section 6.02(j).

1.02.    Other Interpretive Provisions.

With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Preliminary Statements, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Preliminary Statements, Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including."

(c)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

1.03.    Accounting Terms.

(a)    Generally.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, except as otherwise specifically prescribed herein.

(b)    Changes in GAAP.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower Representative or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Borrowers shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrowers shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

1.04.    Rounding.    Any financial ratios required to be maintained by the Borrowers pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

1.05.    Times of Day.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

1.06.    Letter of Credit Amounts.    Unless otherwise specified, all references herein to the amount of a Letter of Credit at any time shall be deemed to be the Stated Amount of such Letter of Credit in effect at such time; provided, however, that with respect to any Letter of Credit that, by its terms of any Issuer Documents related thereto, provides for one or more automatic increases in the Stated Amount thereof, the amount of such Letter of Credit shall be deemed to be the maximum Stated Amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum Stated Amount is in effect at such time.

ARTICLE II
THE COMMITMENTS AND CREDIT EXTENSIONS

2.01.    Committed Loans; FILO Loan; Reserves.

(a)    Subject to the terms and conditions set forth herein, each Revolving Lender severally agrees to make loans (each such loan, a "Committed Loan") to the Borrowers from time to time, on any Business Day during the Availability Period, subject in each case to the following limitations:

(i)    after giving effect to any Committed Borrowing, the Total Revolving Outstandings shall not exceed the Revolving Line Cap;

(ii)    after giving effect to any Committed Borrowing, the aggregate Outstanding Amount of the Committed Loans of any Revolving Lender, <u>plus</u> such Revolving Lender's Applicable Percentage of the Outstanding Amount of all L/C Obligations, <u>plus</u> such Revolving Lender's Applicable Percentage of the Outstanding Amount of all Swing Line Loans shall not exceed the lesser of (x) such Lender's Revolving Commitment, or (y) such Lender's Applicable Percentage of the Borrowing Base; and

(iii)    the Outstanding Amount of all L/C Obligations shall not at any time exceed the Letter of Credit Sublimit.

Within the limits of each Revolving Lender's Revolving Commitment, and subject to the other terms and conditions hereof, the Borrowers may borrow under this <u>Section 2.01</u>, prepay under <u>Section 2.05</u>, and, other than Holdings, reborrow under this <u>Section 2.01</u>. Committed Loans may be Base Rate Loans or LIBO Rate Loans, as further provided herein.

(b)    The Inventory Reserves and Availability Reserves as of the Closing Date are set forth in the Borrowing Base Certificate delivered pursuant to <u>Section 4.01(b)</u> hereof.

(c)    The Administrative Agent shall have the right, at any time and from time to time after the Closing Date in its reasonable discretion to establish, modify or eliminate Reserves, subject to the provisions of <u>Section 9.16</u> hereof.

(d)    Each FILO Lender severally agrees, on the terms and conditions hereinafter set forth, to make its portion of the FILO Loan to the Borrowers on the FILO Funding Date in a principal amount not to exceed the FILO Commitment of such FILO Lender. Amounts repaid in respect of the FILO Loan may not be reborrowed. Upon each applicable FILO Lender's making of its portion of the FILO Loan on the FILO Funding Date, the FILO Commitment of such FILO Lender shall be terminated. The FILO Loan shall be used to repay in full the amount of the "FILO Loan" (as defined in the Existing Credit Agreement) outstanding under the Existing Credit Agreement as of the FILO Funding Date.

2.02.    <u>Borrowings, Conversions and Continuations of Committed Loans.</u>

(a)    Committed Loans (other than Swing Line Loans) shall be either Base Rate Loans or LIBO Rate Loans as the Borrower Representative may request subject to and in accordance with this <u>Section 2.02</u>. All Swing Line Loans shall be only Base Rate Loans. Subject to the other provisions of this <u>Section 2.02</u>, Committed Borrowings of more than one Type may be incurred at the same time.

(b)    Each Committed Borrowing, each conversion of Committed Loans from one Type to the other, and each continuation of LIBO Rate Loans shall be made upon the Borrower Representative's irrevocable notice to the Administrative Agent, which may be given by telephone. Each such notice must be received by the Administrative Agent not later than 2:00 p.m. (i) three Business Days prior to the requested date of any Borrowing of, conversion to or continuation of LIBO Rate Loans or of any conversion of LIBO Rate Loans to Base Rate Loans, and (ii) one Business Day prior to the requested date of any Borrowing of Base Rate Loans. Each telephonic notice by the Borrower Representative pursuant to this <u>Section 2.02(b)</u> must be

confirmed promptly by delivery to the Administrative Agent of a written Committed Loan Notice or Conversion/Continuation Notice, as the case may be, appropriately completed and signed by a Responsible Officer of the Borrower Representative.  Each Borrowing of, conversion to or continuation of LIBO Rate Loans shall be in a principal amount of $5.0 million or a whole multiple of $1.0 million in excess thereof.  Except as provided in Sections 2.03(c) and 2.04(c), each Borrowing of or conversion to Base Rate Committed Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof.  Each Committed Loan Notice (whether telephonic or written) shall specify (i) the requested date of the Borrowing (which shall be a Business Day), (ii) the principal amount of Committed Loans to be borrowed, (iii) the Type of Committed Loans to be borrowed, and (iv) if applicable, the duration of the Interest Period with respect thereto.  Each Conversion/Continuation Notice (whether telephonic or written) shall specify (i) whether the Borrowers are requesting a conversion of Committed Loans from one Type to the other, or a continuation of LIBO Rate Loans, (ii) the requested date of the conversion or continuation (which shall be a Business Day), (iii) the principal amount of Committed Loans to be converted or continued, (iv) the Type of Committed Loans to which existing Committed Loans are to be converted, and (v) if applicable, the duration of the Interest Period with respect thereto.   If the Borrower Representative fails to specify a Type of Committed Loan in a Committed Loan Notice or if the Borrower Representative fails to give a timely notice of a conversion or continuation in a Conversion/Continuation Notice, then the applicable Committed Loans shall be made as, or converted to, Base Rate Loans.  Any such automatic conversion to Base Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable LIBO Rate Loans.   If the Borrower Representative requests a Borrowing of LIBO Rate Loans in any such Committed Loan Notice or a conversion to or continuation of LIBO Rate Loans in a Conversion/Continuation Notice, but fails to specify an Interest Period, they will be deemed to have specified an Interest Period of one month. Notwithstanding anything to the contrary herein, a Swing Line Loan may not be converted to a LIBO Rate Loan.

(c)    If less than a full Borrowing of Committed Loans is converted, such conversion shall be made pro rata among the Revolving Lenders based upon their aggregate Applicable Percentages.

(d)    Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each Revolving Lender of the amount of its Applicable Percentage of the applicable Committed Loans, and if no timely notice of a conversion or continuation in a Conversion/Continuation Notice is provided by the Borrower Representative, the Administrative Agent shall notify each Revolving Lender of the details of any automatic conversion to Base Rate Loans described in Section 2.02(b).  In the case of a Committed Borrowing, each Revolving Lender shall make the amount of its Committed Loan available to the Administrative Agent in immediately available funds at the Administrative Agent's Office not later than 1:00 p.m. on the Business Day specified in the applicable Committed Loan Notice.   Upon satisfaction of the applicable conditions set forth in Section 4.02, the Administrative Agent shall use reasonable efforts to make all funds so received available to the Borrowers in like funds by no later than 4:00 p.m. on the day of receipt by the Administrative Agent either by (i) crediting the account of the Borrowers on the books of Bank of America with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Borrower Representative; provided, however,

that if, on the date the Committed Loan Notice with respect to such Borrowing is given by the Borrower Representative, there are L/C Borrowings outstanding, then the proceeds of such Borrowing, first, shall be applied to the payment in full of any such L/C Borrowings, and second, shall be made available to the Borrowers as provided above.

(e)    Each Borrowing of Revolving Loans (other than Swing Line Loans) shall be made by the Revolving Lenders pro rata in accordance with their respective Applicable Percentage.  The failure of any Revolving Lender to make any Revolving Loan shall neither relieve any other Revolving Lender of its obligation to fund its Revolving Loan in accordance with the provisions of this Agreement nor increase the obligation of any such other Revolving Lender.

(f)    The Administrative Agent, without the request of the Borrowers, may advance any interest, fee, service charge, Credit Party Expenses, or other payment to which any Credit Party is entitled from the Loan Parties pursuant hereto or any other Loan Document and may charge the same to the Loan Account notwithstanding that an Overadvance may result thereby; provided that, prior to advancing any amounts for payment of Credit Party Expenses, the Administrative Agent shall furnish the Borrower Representative with five (5) Business Days advance notice thereof; provided further that in no event shall the Administrative Agent make an advance hereunder, if after giving effect thereto, the principal amount of the Credit Extensions (other than the FILO Loan) would exceed the Aggregate Revolving Commitments (as in effect prior to any termination of the Aggregate Revolving Commitments pursuant to Section 2.06 hereof).  The Administrative Agent shall deliver to the Borrower Representative a statement of any such advance or charge promptly after the making thereof (or in the case of Credit Party Expenses, at the time that the five (5) Business Days' notice is furnished) in reasonable detail sufficient to allow the Borrowers to verify such interest, fee, service charge, Credit Party Expenses or other payment.  Such action on the part of the Administrative Agent shall not constitute a waiver of the Administrative Agent's rights and the Borrowers' obligations under Section 2.05.  Any amount which is added to the principal balance of the Loan Account as provided in this Section 2.02(f) shall bear interest at the interest rate then and thereafter applicable to Base Rate Loans.

(g)    Except as otherwise provided herein, a LIBO Rate Loan may be continued or converted only on the last day of an Interest Period for such LIBO Rate Loan.  During the existence of an Event of Default, no Loans may be requested as, converted to or continued as LIBO Rate Loans without the Consent of the Required Revolving Lenders.

(h)    The Administrative Agent shall promptly notify the Borrower Representative and the Revolving Lenders of the interest rate applicable to any Interest Period for LIBO Rate Loans upon determination of such interest rate.  At any time that Base Rate Loans are outstanding, the Administrative Agent shall notify the Borrower Representative and the Revolving Lenders of any change in Bank of America's prime rate used in determining the Prime Rate promptly following the public announcement of such change.

(i)    After giving effect to all Committed Borrowings, all conversions of Committed Loans from one Type to the other, and all continuations of Committed Loans as the

01:18374604.1

-51-

same Type, there shall not be more than ten (10) Interest Periods in effect with respect to Committed Loans.

(j)      The Administrative Agent, the Revolving Lenders, the Swing Line Lender and the L/C Issuer shall have no obligation to make any Revolving Loan or to provide any Letter of Credit if an Overadvance would result.  The Administrative Agent may, in its discretion, make Permitted Overadvances without the consent of the Lenders, the Swing Line Lender and the L/C Issuer and each Lender shall be bound thereby.  Any Permitted Overadvance may constitute a Swing Line Loan. A Permitted Overadvance is for the account of the Borrowers and shall constitute a Revolving Loan and an Obligation.  The making of any such Permitted Overadvance on any one occasion shall not obligate the Administrative Agent or any Lender to make or permit any Permitted Overadvance on any other occasion or to permit such Permitted Overadvances to remain outstanding. The making by the Administrative Agent of a Permitted Overadvance shall not modify or abrogate any of the provisions of Section 2.03 regarding the Revolving Lenders' obligations to purchase participations with respect to Letters of Credit or of Section 2.04 regarding the Revolving Lenders' obligations to purchase participations with respect to Swingline Loans.  The Administrative Agent shall have no liability for, and no Loan Party or Credit Party shall have the right to, or shall, bring any claim of any kind whatsoever against the Administrative Agent with respect to "inadvertent Overadvances" (i.e. where an Overadvance results from changed circumstances beyond the control of the Administrative Agent (such as a reduction in the collateral value)) regardless of the amount of any such Overadvance(s).

(k)      Notwithstanding any other provision of this Agreement (including, without limitation, Section 2.02(b)), Holdings shall not be entitled to request a Loan for its own account and all Loans shall be made solely to and for the account of the other Borrowers.

2.03.    Letters of Credit.

(a)      The Letter of Credit Commitment.

(i)      Subject to the terms and conditions set forth herein, (A) the L/C Issuer agrees, in reliance upon the agreements of the Revolving Lenders set forth in this Section 2.03, (1) from time to time on any Business Day during the period from the Closing Date until the Letter of Credit Expiration Date, to issue Letters of Credit for the account of the Borrowers and their Subsidiaries (other than Holdings), and to amend or extend Letters of Credit previously issued by it, in accordance with Section 2.03(b) below, and (2) to honor drawings under the Letters of Credit; and (B) the Revolving Lenders severally agree to participate in Letters of Credit issued for the account of such Loan Parties and any drawings thereunder; provided that, after giving effect to any L/C Credit Extension with respect to any Letter of Credit, (x) the Total Revolving Outstandings shall not exceed the Revolving Line Cap, (y) the aggregate Outstanding Amount of the Committed Loans of any Revolving Lender, plus such Revolving Lender's Applicable Percentage of the Outstanding Amount of all L/C Obligations, plus such Revolving Lender's Applicable Percentage of the Outstanding Amount of all Swing Line Loans shall not exceed such Revolving Lender's Revolving Commitment, and (z) the Outstanding Amount of the L/C Obligations shall not exceed the Letter of Credit Sublimit.  Each request by the Borrower Representative for the issuance or amendment of a Letter of Credit shall be deemed to be

a representation by the Borrowers that the L/C Credit Extension so requested complies with the conditions set forth in the proviso to the preceding sentence. Within the foregoing limits, and subject to the terms and conditions hereof, the Borrowers' ability to obtain Letters of Credit shall be fully revolving, and accordingly the Borrowers (other than Holdings) may, during the foregoing period, obtain Letters of Credit to replace Letters of Credit that have expired or that have been drawn upon and reimbursed. All Existing Letters of Credit shall be deemed to have been issued pursuant hereto, and from and after the Closing Date shall be subject to and governed by the terms and conditions hereof.

(ii)    The L/C Issuer shall not issue any Letter of Credit, if:

(A)    subject to Section 2.03(b)(iii), the expiry date of such requested Standby Letter of Credit would occur more than twelve months after the date of issuance or last extension, unless the Required Revolving Lenders have approved such expiry date; or

(B)    subject to Section 2.03(b)(iii), the expiry date of such requested Commercial Letter of Credit would occur more than 120 days after the date of issuance, unless the Required Revolving Lenders have approved such expiry date; or

(C)    the expiry date of such requested Letter of Credit would occur after the Letter of Credit Expiration Date, unless cash collateralized or otherwise credit supported to the reasonable satisfaction of the Administrative Agent and the L/C Issuer on or before thirty (30) days prior to the Maturity Date.

(iii)    The L/C Issuer shall not be under any obligation to issue any Letter of Credit if:

(A)    any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain the L/C Issuer from issuing such Letter of Credit, or any Law applicable to the L/C Issuer or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over the L/C Issuer shall prohibit, or request that the L/C Issuer refrain from, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon the L/C Issuer with respect to such Letter of Credit any restriction, reserve or capital requirement (for which the L/C Issuer is not otherwise compensated hereunder) not in effect on the Closing Date, or shall impose upon the L/C Issuer any unreimbursed loss, cost or expense which was not applicable on the Closing Date and which the L/C Issuer in good faith deems material to it;

(B)    the issuance of such Letter of Credit would violate one or more policies of the L/C Issuer applicable to letters of credit generally;

(C)    such Letter of Credit is to be denominated in a currency other than Dollars;

01:18374604.1

-53-

(D)    such Letter of Credit contains any provisions for automatic reinstatement of the Stated Amount after any drawing thereunder; or

(E)    any Revolving Lender is at that time a Defaulting Lender, unless the L/C Issuer has entered into arrangements, including the delivery of Cash Collateral, satisfactory to the L/C Issuer (in its sole discretion) with the Borrowers or such Revolving Lender to eliminate the L/C Issuer's actual or potential Fronting Exposure (after giving effect to Section 2.16(a)(iv)) with respect to the Defaulting Lender arising from either the Letter of Credit then proposed to be issued or that Letter of Credit and all other L/C Obligations as to which the L/C Issuer has actual or potential Fronting Exposure, as it may elect in its sole discretion.

(iv)    The L/C Issuer shall not amend any Letter of Credit if the L/C Issuer would not be permitted at such time to issue such Letter of Credit in its amended form under the terms hereof.

(v)    The L/C Issuer shall act on behalf of the Revolving Lenders with respect to any Letters of Credit issued by it and the documents associated therewith, and the L/C Issuer shall have all of the benefits and immunities (A) provided to the Administrative Agent in <u>ARTICLE IX</u> with respect to any acts taken or omissions suffered by the L/C Issuer in connection with Letters of Credit issued by it or proposed to be issued by it and Issuer Documents pertaining to such Letters of Credit as fully as if the term "Administrative Agent" as used in <u>ARTICLE IX</u>, included the L/C Issuer with respect to such acts or omissions, and (B) as additionally provided herein with respect to the L/C Issuer.

(b)    <u>Procedures for Issuance and Amendment of Letters of Credit; Auto-Extension Letters of Credit.</u>

(i)    Each Letter of Credit shall be issued or amended, as the case may be, upon the request of the Borrower Representative delivered to the L/C Issuer (with a copy to the Administrative Agent) in the form of a Letter of Credit Application, appropriately completed and signed by a Responsible Officer of the Borrowers.  Such Letter of Credit Application must be received by the L/C Issuer and the Administrative Agent not later than 11:00 a.m. at least two Business Days (or such other date and time as the Administrative Agent and the L/C Issuer may agree in a particular instance in their sole discretion) prior to the proposed issuance date or date of amendment, as the case may be.  In the case of a request for an initial issuance of a Letter of Credit, such Letter of Credit Application shall specify in form and detail satisfactory to the L/C Issuer: (A) the proposed issuance date of the requested Letter of Credit (which shall be a Business Day); (B) the amount thereof; (C) the expiry date thereof; (D) the name and address of the beneficiary thereof; (E) the documents to be presented by such beneficiary in case of any drawing thereunder; (F) the full text of any certificate to be presented by such beneficiary in case of any drawing thereunder; and (G) such other matters as the L/C Issuer may require.  In the case of a request for an amendment of any outstanding Letter of Credit, such Letter of Credit Application shall specify in form and detail satisfactory to the L/C

Issuer (A) the Letter of Credit to be amended; (B) the proposed date of amendment thereof (which shall be a Business Day); (C) the nature of the proposed amendment; and (D) such other matters as the L/C Issuer may require.  Additionally, the Borrowers shall furnish to the L/C Issuer and the Administrative Agent such other documents and information pertaining to such requested Letter of Credit issuance or amendment, including any Issuer Documents, as the L/C Issuer or the Administrative Agent may require.

(ii)     Promptly after receipt of any Letter of Credit Application, the L/C Issuer will confirm with the Administrative Agent (by telephone or in writing) that the Administrative Agent has received a copy of such Letter of Credit Application from the Borrower Representative and, if not, the L/C Issuer will provide the Administrative Agent with a copy thereof.  Unless the L/C Issuer has received written notice from any Revolving Lender, the Administrative Agent or any Loan Party, at least one Business Day prior to the requested date of issuance or amendment of the applicable Letter of Credit, that one or more applicable conditions contained in ARTICLE IV, shall not then be satisfied, then, subject to the terms and conditions hereof, the L/C Issuer shall, on the requested date, issue a Letter of Credit for the account of the applicable Borrower (or the applicable Subsidiary) or enter into the applicable amendment, as the case may be, in each case in accordance with the L/C Issuer's usual and customary business practices.  Immediately upon the issuance or amendment of each Letter of Credit, each Revolving Lender shall be deemed to (without any further action), and hereby irrevocably and unconditionally agrees to, purchase from the L/C Issuer, without recourse or warranty, a risk participation in such Letter of Credit in an amount equal to the product of such Revolving Lender's Applicable Percentage times the amount of such Letter of Credit.  Upon any change in the Revolving Commitments under this Agreement, it is hereby agreed that with respect to all L/C Obligations, there shall be an automatic adjustment to the participations hereby created to reflect the new Applicable Percentages of the assigning and assignee Revolving Lenders.

(iii)     If the Borrower Representative so requests in any applicable Letter of Credit Application, the L/C Issuer may, in its sole and absolute discretion, agree to issue a Standby Letter of Credit that has automatic extension provisions (each, an "Auto-Extension Letter of Credit"); provided that any such Auto-Extension Letter of Credit must permit the L/C Issuer to prevent any such extension at least once in each twelve-month period (commencing with the date of issuance of such Letter of Credit) by giving prior notice to the beneficiary thereof not later than a day (the "Non-Extension Notice Date") in each such twelve-month period to be agreed upon at the time such Letter of Credit is issued.  Unless otherwise directed by the L/C Issuer, the Borrowers shall not be required to make a specific request to the L/C Issuer for any such extension.  Once an Auto-Extension Letter of Credit has been issued, the Revolving Lenders shall be deemed to have authorized (but may not require) the L/C Issuer to permit the extension of such Letter of Credit at any time to an expiry date not later than the Letter of Credit Expiration Date; provided, however, that the L/C Issuer shall not permit any such extension if (A) the L/C Issuer has determined that it would not be permitted, or would have no obligation, at such time to issue such Letter of Credit in its revised form (as extended) under the terms hereof (by reason of the provisions of clause (ii) or (iii) of Section

2.03(a) or otherwise), or (B) it has received notice (which may be by telephone or in writing) on or before the day that is five Business Days before the Non-Extension Notice Date (1) from the Administrative Agent that the Required Revolving Lenders have elected not to permit such extension or (2) from the Administrative Agent, any Revolving Lender or the Borrower Representative that one or more of the applicable conditions specified in Section 4.02 is not then satisfied, and in each such case directing the L/C Issuer not to permit such extension.

(iv)     Promptly after its delivery of any Letter of Credit or any amendment to a Letter of Credit to an advising bank with respect thereto or to the beneficiary thereof, the L/C Issuer will also deliver to the Borrower Representative and the Administrative Agent a true and complete copy of such Letter of Credit or amendment.

(c)     Drawings and Reimbursements; Funding of Participations.

(i)     Upon receipt from the beneficiary of any Letter of Credit of any notice of a drawing under such Letter of Credit, the L/C Issuer shall notify the Borrower Representative and the Administrative Agent thereof; provided, however, that any failure to give or delay in giving such notice shall not relieve the Borrowers of their obligation to reimburse the L/C Issuer and the Revolving Lenders with respect to any such payment. Not later than 11:00 a.m. on the date of any payment by the L/C Issuer under a Letter of Credit (each such date, an "Honor Date"), the Borrowers shall reimburse the L/C Issuer through the Administrative Agent in an amount equal to the amount of such drawing. If the Borrowers fail to so reimburse the L/C Issuer by such time, the Administrative Agent shall promptly notify each Revolving Lender of the Honor Date, the amount of the unreimbursed drawing (the "Unreimbursed Amount"), and the amount of such Revolving Lender's Applicable Percentage thereof. In such event, the Borrowers shall be deemed to have requested a Committed Borrowing of Base Rate Loans to be disbursed on the Honor Date in an amount equal to the Unreimbursed Amount, without regard to the minimum and multiples specified in Section 2.02 for the principal amount of Base Rate Loans, but subject to the amount of the unutilized portion of the Aggregate Revolving Commitments and the conditions set forth in Section 4.02 (other than the delivery of a Committed Loan Notice). Any notice given by the L/C Issuer or the Administrative Agent pursuant to this Section 2.03(c)(i) may be given by telephone if immediately confirmed in writing; provided that the lack of such an immediate confirmation shall not affect the conclusiveness or binding effect of such notice.

(ii)     Each Revolving Lender shall upon any notice pursuant to Section 2.03(c)(i) make funds available to the Administrative Agent for the account of the L/C Issuer at the Administrative Agent's Office in an amount equal to its Applicable Percentage of the Unreimbursed Amount not later than 1:00 p.m. on the Business Day specified in such notice by the Administrative Agent, whereupon, subject to the provisions of Section 2.03(c)(iii), each Revolving Lender that so makes funds available shall be deemed to have made a Base Rate Loan to the Borrowers in such amount. The Administrative Agent shall remit the funds so received to the L/C Issuer.

01:18374604.1

(iii)    With respect to any Unreimbursed Amount that is not fully refinanced by a Committed Borrowing of Base Rate Loans because the conditions set forth in <u>Section 4.02</u> cannot be satisfied or for any other reason, the Borrowers shall be deemed to have incurred from the L/C Issuer an L/C Borrowing in the amount of the Unreimbursed Amount that is not so refinanced, which L/C Borrowing shall be due and payable on demand (together with interest) and shall bear interest at the Default Rate.  In such event, each Revolving Lender's payment to the Administrative Agent for the account of the L/C Issuer pursuant to <u>Section 2.03(c)(ii)</u> shall be deemed payment in respect of its participation in such L/C Borrowing and shall constitute an L/C Advance from such Revolving Lender in satisfaction of its participation obligation under this <u>Section 2.03</u>.

(iv)    Until each Revolving Lender funds its Committed Loan or L/C Advance pursuant to this <u>Section 2.03(c)</u> to reimburse the L/C Issuer for any amount drawn under any Letter of Credit, interest in respect of such Revolving Lender's Applicable Percentage of such amount shall be solely for the account of the L/C Issuer.

(v)    Each Revolving Lender's obligation to make Committed Loans or L/C Advances to reimburse the L/C Issuer for amounts drawn under Letters of Credit, as contemplated by this <u>Section 2.03(c)</u>, shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right which such Revolving Lender may have against the L/C Issuer, any Borrower or any other Person for any reason whatsoever; (B) the occurrence or continuance of a Default, or (C) any other occurrence, event or condition, whether or not similar to any of the foregoing; <u>provided</u>, <u>however</u>, that each Revolving Lender's obligation to make Committed Loans pursuant to this <u>Section 2.03(c)</u> is subject to the conditions set forth in <u>Section 4.02</u> (other than delivery by the Borrower Representative of a Committed Loan Notice).  No such making of an L/C Advance shall relieve or otherwise impair the obligation of the Borrowers to reimburse the L/C Issuer for the amount of any payment made by the L/C Issuer under any Letter of Credit, together with interest as provided herein.

(vi)    If any Revolving Lender fails to make available to the Administrative Agent for the account of the L/C Issuer any amount required to be paid by such Revolving Lender pursuant to the foregoing provisions of this <u>Section 2.03(c)</u> by the time specified in <u>Section 2.03(c)(ii)</u>, the L/C Issuer shall be entitled to recover from such Revolving Lender (acting through the Administrative Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to the L/C Issuer at a rate per annum equal to the greater of the Federal Funds Rate and a rate determined by the L/C Issuer in accordance with banking industry rules on interbank compensation plus any administrative, processing or similar fees customarily charged by the L/C Issuer in connection with the foregoing.  If such Revolving Lender pays such amount (with interest and fees as aforesaid), the amount so paid shall constitute such Revolving Lender's Committed Loan included in the relevant Committed Borrowing or L/C Advance in respect of the relevant L/C Borrowing, as the case may be.  A certificate of the L/C Issuer submitted to any Revolving Lender (through the Administrative Agent) with respect to any amounts owing under this clause (vi) shall be conclusive absent manifest error.

01:18374604.1

(d)    Repayment of Participations.

(i)    At any time after the L/C Issuer has made a payment under any Letter of Credit and has received from any Revolving Lender such Revolving Lender's L/C Advance in respect of such payment in accordance with Section 2.03(c), if the Administrative Agent receives for the account of the L/C Issuer any payment in respect of the related Unreimbursed Amount or interest thereon (whether directly from the Borrowers or otherwise, including proceeds of Cash Collateral applied thereto by the Administrative Agent), the Administrative Agent will distribute to such Revolving Lender its Applicable Percentage thereof (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Revolving Lender's L/C Advance was outstanding) in the same funds as those received by the Administrative Agent.

(ii)    If any payment received by the Administrative Agent for the account of the L/C Issuer pursuant to Section 2.03(c)(i) is required to be returned under any of the circumstances described in Section 10.05 (including pursuant to any settlement entered into by the L/C Issuer in its discretion), each Revolving Lender shall pay to the Administrative Agent for the account of the L/C Issuer its Applicable Percentage thereof on demand of the Administrative Agent, plus interest thereon from the date of such demand to the date such amount is returned by such Revolving Lender, at a rate per annum equal to the Federal Funds Rate from time to time in effect.  The obligations of the Revolving Lenders under this clause shall survive the payment in full of the Obligations and the termination of this Agreement.

(e)    Obligations Absolute.  The obligation of the Borrowers to reimburse the L/C Issuer for each drawing under each Letter of Credit and to repay each L/C Borrowing shall be absolute, unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this Agreement under all circumstances, including the following:

(i)    any lack of validity or enforceability of such Letter of Credit, this Agreement, or any other Loan Document;

(ii)    the existence of any claim, counterclaim, setoff, defense or other right that the Borrowers or any Subsidiary may have at any time against any beneficiary or any transferee of such Letter of Credit (or any Person for whom any such beneficiary or any such transferee may be acting), the L/C Issuer or any other Person, whether in connection with this Agreement, the transactions contemplated hereby or by such Letter of Credit or any agreement or instrument relating thereto, or any unrelated transaction;

(iii)    any draft, demand, certificate or other document presented under such Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; or any loss or delay in the transmission or otherwise of any document required in order to make a drawing under such Letter of Credit;

(iv)    any payment by the L/C Issuer under such Letter of Credit against presentation of a draft or certificate that does not strictly comply with the terms of such Letter of Credit; or any payment made by the L/C Issuer under such Letter of Credit to any Person purporting to be a trustee in bankruptcy, debtor-in-possession, assignee for the benefit of creditors, liquidator, receiver or other representative of or successor to any beneficiary or any transferee of such Letter of Credit, including any arising in connection with any proceeding under any Debtor Relief Law;

(v)    any other circumstance or happening whatsoever, whether or not similar to any of the foregoing, including any other circumstance that might otherwise constitute a defense available to, or a discharge of, the Borrowers or any of their Subsidiaries; or

(vi)    the fact that any Event of Default shall have occurred and be continuing.

The Borrowers shall promptly examine a copy of each Letter of Credit and each amendment thereto that is delivered to it and, in the event of any claim of noncompliance with the Borrowers' instructions or other irregularity, the Borrowers will immediately notify the L/C Issuer.  The Borrowers shall be conclusively deemed to have waived any such claim against the L/C Issuer and its correspondents unless such notice is given as aforesaid.

(f)    Role of L/C Issuer.  Each Revolving Lender and the Borrowers agree that, in paying any drawing under a Letter of Credit, the L/C Issuer shall not have any responsibility to obtain any document (other than any sight draft, certificates and documents expressly required by the Letter of Credit) or to ascertain or inquire as to the validity or accuracy of any such document or the authority of the Person executing or delivering any such document.  None of the L/C Issuer, the Administrative Agent, any of their respective Related Parties nor any correspondent, participant or assignee of the L/C Issuer shall be liable to any Lender for (i) any action taken or omitted in connection herewith at the request or with the approval of the Revolving Lenders or the Required Lenders, as applicable; (ii) any action taken or omitted in the absence of gross negligence or willful misconduct; (iii) any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit or any error in interpretation of technical terms; or (iv) the due execution, effectiveness, validity or enforceability of any document or instrument related to any Letter of Credit or Issuer Document.  The Borrowers hereby assume all risks of the acts or omissions of any beneficiary or transferee with respect to its use of any Letter of Credit; provided, however, that this assumption is not intended to, and shall not, preclude the Borrowers' pursuing such rights and remedies as it may have against the beneficiary or transferee at law or under any other agreement.  None of the L/C Issuer, the Administrative Agent, any of their respective Related Parties nor any correspondent, participant or assignee of the L/C Issuer shall be liable or responsible for any of the matters described in clauses (i) through (v) of Section 2.03(e); provided, however, that anything in such clauses to the contrary notwithstanding, the Borrowers may have a claim against the L/C Issuer, and the L/C Issuer may be liable to the Borrowers, to the extent, but only to the extent, of any direct, as opposed to consequential or exemplary, damages suffered by the Borrowers which the Borrowers prove were caused by the L/C Issuer's willful misconduct or gross negligence or the L/C Issuer's willful failure to pay under any Letter of Credit after the presentation to it by the beneficiary of a sight draft and certificate(s) strictly complying with the terms and conditions of a Letter of Credit.  In furtherance and not in

limitation of the foregoing, the L/C Issuer may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary (or the L/C Issuer may refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit), and the L/C Issuer shall not be responsible for the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign a Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason.

(g)     Cash Collateral.  Upon the request of the Administrative Agent, (i) if the L/C Issuer has honored any full or partial drawing request under any Letter of Credit and such drawing has resulted in an L/C Borrowing, or (ii) if, as of the Letter of Credit Expiration Date, any L/C Obligation for any reason remains outstanding, the Borrowers shall, in each case, immediately Cash Collateralize the then Outstanding Amount of all L/C Obligations.  Sections 2.05 and 8.02(a)(iv) set forth certain additional requirements to deliver Cash Collateral hereunder.  For purposes of this Section 2.03, Section 2.05 and Section 8.02(a)(iv), "Cash Collateralize" means to pledge and deposit with or deliver to the Administrative Agent, for the benefit of the L/C Issuer and the Lenders, as collateral for the L/C Obligations, cash or deposit account balances in an amount equal to 105% of the Outstanding Amount of all L/C Obligations, pursuant to documentation in form and substance satisfactory to the Administrative Agent and the L/C Issuer (which documents are hereby consented to by the Lenders).  Derivatives of such term have corresponding meanings.  The Borrowers hereby grant to the Collateral Agent, for the benefit of the L/C Issuer and the Lenders, a security interest in all such cash, deposit accounts and all balances therein and all proceeds of the foregoing.  Cash Collateral shall be maintained in blocked, deposit accounts at Bank of America; interest or profits, if any, on such investments shall accumulate in such account.  If at any time the Administrative Agent determines that any funds held as Cash Collateral are subject to any right or claim of any Person other than the Administrative Agent or that the total amount of such funds is less than the aggregate Outstanding Amount of all L/C Obligations, the Borrowers will, forthwith upon demand by the Administrative Agent, pay to the Administrative Agent, as additional funds to be deposited as Cash Collateral, an amount equal to the excess of (x) such aggregate Outstanding Amount over (y) the total amount of funds, if any, then held as Cash Collateral that the Administrative Agent determines to be free and clear of any such right and claim.  Upon the drawing of any Letter of Credit for which funds are on deposit as Cash Collateral, such funds shall be applied, to the extent permitted under applicable Laws, to reimburse the L/C Issuer and, to the extent not so applied, shall thereafter (1) if an Event of Default then exists and is continuing, be applied  to satisfy other Obligations, or (2) otherwise remitted to the operating account of the Borrowers maintained with the Administrative Agent.

(h)     Applicability of ISP and UCP.  Unless otherwise expressly agreed by the L/C Issuer and the Borrowers when a Letter of Credit is issued (including any such agreement applicable to an Existing Letter of Credit), (i) the rules of the ISP shall apply to each Standby Letter of Credit, and (ii) the rules of the Uniform Customs and Practice for Documentary Credits, as most recently published by the International Chamber of Commerce at the time of issuance shall apply to each Commercial Letter of Credit.

(i)       Letter of Credit Fees.   The Borrowers shall pay to the Administrative Agent for the account of each Revolving Lender in accordance with its Applicable Percentage a Letter of Credit fee (the "Letter of Credit Fee") with respect to each Letter of Credit, equal to 3.25% per annum with respect to Standby Letters of Credit, and 1.625% per annum with respect to Commercial Letters of Credit, in each case, times the daily maximum amount available to be drawn under such Letter of Credit (whether or not such maximum amount is then in effect under such Letter of Credit).  For purposes of computing the daily amount available to be drawn under any Letter of Credit, the amount of the Letter of Credit shall be determined in accordance with Section 1.06.  Letter of Credit Fees shall be (i) due and payable on the first Business Day after the end of each month, commencing with the first such date to occur after the issuance of such Letter of Credit, on the Letter of Credit Expiration Date and thereafter on demand, and (ii) computed on a monthly basis in arrears.  Notwithstanding anything to the contrary contained herein, upon the request of the Required Revolving Lenders, while any Event of Default exists, all Letter of Credit Fees shall accrue at the Default Rate.

(j)       Fronting Fee and Documentary and Processing Charges Payable to L/C Issuer.  The Borrowers shall pay directly to the L/C Issuer for its own account a fronting fee (i) with respect to each Commercial Letter of Credit, at the rate per annum equal to one-eighth of one percent (0.125%), computed on the amount of such Letter of Credit, and payable upon the issuance thereof, (ii) with respect to any amendment of a Commercial Letter of Credit increasing the amount of such Letter of Credit, at a rate separately agreed between the Borrowers and the L/C Issuer, computed on the amount of such increase, and payable upon the effectiveness of such amendment, and (iii) with respect to each Standby Letter of Credit, at the rate per annum equal to one-eighth of one percent (0.125%), computed on the daily amount available to be drawn under such Letter of Credit and on a quarterly basis in arrears.  Such fronting fees shall be due and payable on the first Business Day after the end of each calendar quarter, commencing with the first such date to occur after the issuance of such Letter of Credit, on the Letter of Credit Expiration Date and thereafter on demand.   For purposes of computing the daily amount available to be drawn under any Letter of Credit, the amount of the Letter of Credit shall be determined in accordance with Section 1.06.  In addition, the Borrowers shall pay directly to the L/C Issuer for its own account the customary issuance, presentation, amendment and other processing fees, and other standard costs and charges, of the L/C Issuer relating to letters of credit as from time to time in effect.  Such customary fees and standard costs and charges are due and payable on demand and are nonrefundable.

(k)       Conflict with Issuer Documents.  In the event of any conflict between the terms hereof and the terms of any Issuer Document, the terms hereof shall control.

(l)       Letters of Credit Issued for Subsidiaries.  Notwithstanding that a Letter of Credit issued or outstanding hereunder is in support of any obligations of, or is for the account of, a Subsidiary, the Borrowers shall be obligated to reimburse the L/C Issuer hereunder for any and all drawings under such Letter of Credit.  The Borrowers hereby acknowledge that the issuance of Letters of Credit for the account of Subsidiaries inures to the benefit of the Borrowers, and that the Borrowers' business derives substantial benefits from the businesses of such Subsidiaries.

2.04.   Swing Line Loans.

(a)    The Swing Line.  Subject to the terms and conditions set forth herein, the Swing Line Lender agrees, in reliance upon the agreements of the other Revolving Lenders set forth in this Section 2.04, to make loans (each such loan, a "Swing Line Loan") to the Borrowers (other than Holdings) from time to time on any Business Day during the Availability Period in an aggregate amount not to exceed at any time outstanding the amount of the Swing Line Sublimit, notwithstanding the fact that such Swing Line Loans, when aggregated with the Applicable Percentage of the Outstanding Amount of Committed Loans and L/C Obligations of the Lender acting as Swing Line Lender, may exceed the amount of such Lender's Revolving Commitment; provided, however, that after giving effect to any Swing Line Loan, (i) the Total Revolving Outstandings shall not exceed the Revolving Line Cap, and (ii) the aggregate Outstanding Amount of the Committed Loans of any Lender at such time, plus such Lender's Applicable Percentage of the Outstanding Amount of all L/C Obligations at such time, plus such Lender's Applicable Percentage of the Outstanding Amount of all Swing Line Loans at such time shall not exceed such Lender's Revolving Commitment; provided that the Swing Line Lender shall not be obligated to make any Swing Line Loan if it shall determine (which determination shall be conclusive and binding absent manifest error) that it has, or by such Credit Extension may have, Fronting Exposure (unless the Swing Line Lender has entered into satisfactory arrangements with the Borrowers or such Defaulting Lender to eliminate the Swing Line Lender's actual or potential Fronting Exposure (after giving effect to Section 2.16(a)(iv))); and provided, further, that the Borrowers shall not use the proceeds of any Swing Line Loan to refinance any outstanding Swing Line Loan.  Within the foregoing limits, and subject to the other terms and conditions hereof, the Borrowers may borrow under this Section 2.04, prepay under Section 2.05, and reborrow under this Section 2.04.  Each Swing Line Loan shall bear interest only at a rate based on the Prime Rate.  Immediately upon the making of a Swing Line Loan, each Revolving Lender shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from the Swing Line Lender a risk participation in such Swing Line Loan in an amount equal to the product of such Revolving Lender's Applicable Percentage times the amount of such Swing Line Loan.

(b)    Borrowing Procedures.  Each Swing Line Borrowing shall be made upon the Borrower Representative's irrevocable notice to the Swing Line Lender and the Administrative Agent, which may be given by telephone.  Each such notice must be received by the Swing Line Lender and the Administrative Agent not later than 1:00 p.m. on the requested borrowing date, and shall specify (i) the amount to be borrowed, and (ii) the requested borrowing date, which shall be a Business Day.  Each such telephonic notice must be confirmed promptly by delivery to the Swing Line Lender and the Administrative Agent of a written Swing Line Loan Notice, appropriately completed and signed by a Responsible Officer of the Borrower Representative.  Promptly after receipt by the Swing Line Lender of any telephonic Swing Line Loan Notice, the Swing Line Lender will confirm with the Administrative Agent (by telephone or in writing) that the Administrative Agent has also received such Swing Line Loan Notice and, if not, the Swing Line Lender will notify the Administrative Agent (by telephone or in writing) of the contents thereof.  Unless the Swing Line Lender has received notice (by telephone or in writing) from the Administrative Agent at the request of the Required Revolving Lenders prior to 2:00 p.m. on the date of the proposed Swing Line Borrowing (A) directing the Swing Line Lender not to make such Swing Line Loan as a result of the limitations set forth in the proviso to the first sentence of Section 2.04(a), or (B) that one or more of the applicable conditions specified in ARTICLE IV is not then satisfied, then, subject to the terms and conditions hereof,

the Swing Line Lender will, not later than 3:00 p.m. on the borrowing date specified in such Swing Line Loan Notice, make the amount of its Swing Line Loan available to the Borrowers at its office by crediting the account of the Borrowers on the books of the Swing Line Lender in immediately available funds.

        (c)      <u>Refinancing of Swing Line Loans</u>.

        (i)      The Swing Line Lender at any time in its sole and absolute discretion may request (but, in any event shall weekly, as provided in <u>Section 2.14(a)</u>), on behalf of the Borrowers (which hereby irrevocably authorize the Swing Line Lender to so request on their behalf), that each Revolving Lender make a Base Rate Committed Loan in an amount equal to such Revolving Lender's Applicable Percentage of the amount of Swing Line Loans then outstanding. Such request shall be made in writing (which written request shall be deemed to be a Committed Loan Notice for purposes hereof) and in accordance with the requirements of <u>Section 2.02</u>, without regard to the minimum and multiples specified therein for the principal amount of Base Rate Loans, but subject to the unutilized portion of the Aggregate Revolving Commitments and the conditions set forth in <u>Section 4.02</u>. The Swing Line Lender shall furnish the Borrower Representative with a copy of the applicable Committed Loan Notice promptly after delivering such notice to the Administrative Agent. Each Revolving Lender shall make an amount equal to its Applicable Percentage of the amount specified in such Committed Loan Notice available to the Administrative Agent in immediately available funds for the account of the Swing Line Lender at the Administrative Agent's Office not later than 1:00 p.m. on the day specified in such Committed Loan Notice, whereupon, subject to <u>Section 2.04(c)(ii)</u>, each Revolving Lender that so makes funds available shall be deemed to have made a Base Rate Loan to the Borrowers in such amount. The Administrative Agent shall remit the funds so received to the Swing Line Lender.

        (ii)      If for any reason any Swing Line Loan cannot be refinanced by such a Committed Borrowing in accordance with <u>Section 2.04(c)(i)</u>, the request for Base Rate Committed Loans submitted by the Swing Line Lender as set forth herein shall be deemed to be a request by the Swing Line Lender that each of the Revolving Lenders fund its risk participation in the relevant Swing Line Loan and each Revolving Lender's payment to the Administrative Agent for the account of the Swing Line Lender pursuant to <u>Section 2.04(c)(i)</u> shall be deemed payment in respect of such participation.

        (iii)      If any Revolving Lender fails to make available to the Administrative Agent for the account of the Swing Line Lender any amount required to be paid by such Revolving Lender pursuant to the foregoing provisions of this <u>Section 2.04(c)</u> by the time specified in <u>Section 2.04(c)(i)</u>, the Swing Line Lender shall be entitled to recover from such Revolving Lender (acting through the Administrative Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to the Swing Line Lender at a rate per annum equal to the greater of the Federal Funds Rate and a rate determined by the Swing Line Lender in accordance with banking industry rules on interbank compensation plus any administrative, processing or similar fees customarily charged by the Swing Line Lender in connection with the foregoing. If such Revolving Lender pays such

01:18374604.1

amount (with interest and fees as aforesaid), the amount so paid shall constitute such Revolving Lender's Committed Loan included in the relevant Committed Borrowing or funded participation in the relevant Swing Line Loan, as the case may be.   A certificate of the Swing Line Lender submitted to any Revolving Lender (through the Administrative Agent) with respect to any amounts owing under this clause (iii) shall be conclusive absent manifest error.

(iv)    Each Revolving Lender's obligation to make Committed Loans or to purchase and fund risk participations in Swing Line Loans pursuant to this Section 2.04(c) shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right which such Revolving Lender may have against the Swing Line Lender, the Borrowers or any other Person for any reason whatsoever, (B) the occurrence or continuance of a Default, or (C) any other occurrence, event or condition, whether or not similar to any of the foregoing; provided, however, that each Revolving Lender's obligation to make Committed Loans pursuant to this Section 2.04(c) is subject to the conditions set forth in Section 4.02.  No such funding of risk participations shall relieve or otherwise impair the obligation of the Borrowers to repay Swing Line Loans, together with interest as provided herein.

(d)    Repayment of Participations.

(i)    At any time after any Revolving Lender has purchased and funded a risk participation in a Swing Line Loan, if the Swing Line Lender receives any payment on account of such Swing Line Loan, the Swing Line Lender will distribute to such Revolving Lender its Applicable Percentage of such payment (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Revolving Lender's risk participation was funded) in the same funds as those received by the Swing Line Lender.

(ii)    If any payment received by the Swing Line Lender in respect of principal or interest on any Swing Line Loan is required to be returned by the Swing Line Lender under any of the circumstances described in Section 10.05 (including pursuant to any settlement entered into by the Swing Line Lender in its discretion), each Revolving Lender shall pay to the Swing Line Lender its Applicable Percentage thereof on demand of the Administrative Agent, plus interest thereon from the date of such demand to the date such amount is returned, at a rate per annum equal to the Federal Funds Rate.  The Administrative Agent will make such demand upon the request of the Swing Line Lender.  The obligations of the Revolving Lenders under this clause shall survive the payment in full of the Obligations and the termination of this Agreement.

(e)    Interest for Account of Swing Line Lender.  The Swing Line Lender shall be responsible for invoicing the Borrowers for interest on the Swing Line Loans.  Until each Revolving Lender funds its Base Rate Loan or risk participation pursuant to this Section 2.04 to refinance such Revolving Lender's Applicable Percentage of any Swing Line Loan, interest in respect of such Applicable Percentage shall be solely for the account of the Swing Line Lender.

(f)    <u>Payments Directly to Swing Line Lender</u>.  The Borrowers shall make all payments of principal and interest in respect of the Swing Line Loans directly to the Swing Line Lender.

2.05.    <u>Prepayments.</u>

(a)    The Borrowers may, upon irrevocable notice from the Borrower Representative to the Administrative Agent, at any time or from time to time voluntarily prepay Committed Loans in whole or in part without premium or penalty; <u>provided</u> that (i) such notice must be received by the Administrative Agent not later than 2:00 p.m. (A) three Business Days prior to any date of prepayment of LIBO Rate Loans and (B) on the date of prepayment of Base Rate Loans;  and (ii) any prepayment of LIBO Rate Loans shall be in a principal amount of $10.0 million or a whole multiple of $1.0 million in excess thereof, or, if less, the entire principal amount thereof then outstanding.  Each such notice shall specify the date and amount of such prepayment and the Type(s) of Loans to be prepaid and, if LIBO Rate Loans, the Interest Period(s) of such Loans.  The Administrative Agent will promptly notify each Revolving Lender of its receipt of each such notice, and of the amount of such Revolving Lender's Applicable Percentage of such prepayment.  If such notice is given by the Borrower Representative, the Borrowers shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.  Any prepayment of a LIBO Rate Loan shall be accompanied by all accrued interest on the amount prepaid, together with any additional amounts required pursuant to <u>Section 3.05</u>.  Each such prepayment shall be applied to the Committed Loans of the Revolving Lenders in accordance with their respective Applicable Percentages.

(b)    The Borrowers may, upon irrevocable notice from the Borrower Representative to the Swing Line Lender (with a copy to the Administrative Agent), at any time or from time to time, voluntarily prepay Swing Line Loans in whole or in part without premium or penalty; <u>provided</u> that (i) such notice must be received by the Swing Line Lender and the Administrative Agent not later than 1:00 p.m. on the date of the prepayment, and (ii) any such prepayment shall be in a minimum principal amount of $100,000.  Each such notice shall specify the date and amount of such prepayment.  If such notice is given by the Borrower Representative, the Borrowers shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.

(c)    The FILO Loan may not be voluntarily prepaid in whole or in part until all other Obligations have been paid in full in cash other than unasserted indemnification claims and the L/C Obligations have been Cash Collateralized. Thereafter, each Borrower may, upon irrevocable notice to the Administrative Agent and the FILO Agent, at any time or from time to time voluntarily prepay all or any portion of the FILO Loan; <u>provided</u> that (x) such notice must be received by the Administrative Agent and the FILO Agent not later than 11:00 a.m. three Business Days prior to any date of prepayment; and (y) any voluntary prepayment shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof or, if less, the entire principal amount thereof then outstanding.  Each such notice shall specify the date and amount of such prepayment.  The FILO Agent will promptly notify each FILO Lender of its receipt of each such notice, and of the amount of such FILO Lender's Applicable Percentage of such prepayment.  If such notice is given by a Borrower, the Borrowers shall make such prepayment to the FILO Agent for the account of the FILO Lenders and the payment amount

specified in such notice shall be due and payable on the date specified therein. Any prepayment of the FILO Loan shall be accompanied by all accrued interest on the amount prepaid, together with any additional amounts required pursuant to Section 2.09(b). Each such prepayment shall be applied to the FILO Loan of the FILO Lenders in accordance with their respective Applicable Percentages.

(d)    If for any reason the Total Revolving Outstandings at any time exceed the Revolving Line Cap as then in effect, the Borrowers shall immediately prepay Committed Loans, Swing Line Loans and L/C Borrowings and/or Cash Collateralize the L/C Obligations (other than L/C Borrowings) in an aggregate amount equal to such excess; provided, however, that the Borrowers shall not be required to Cash Collateralize the L/C Obligations pursuant to this Section 2.05(d) unless after the prepayment in full of the Loans the Total Revolving Outstandings exceed the Revolving Line Cap as then in effect. If after giving effect to the payments required in this Section 2.05(d) an excess remains, the Borrowers shall prepay the FILO Loan in the amount of such excess.

(e)    The Borrowers shall prepay the Loans from the Net Cash Proceeds required to be delivered to the Administrative Agent in accordance with the provisions of Section 6.13 hereof.

(f)    Any Net Cash Proceeds (other than, (i) with respect only to the Term Priority Collateral, such portion of the Net Cash Proceeds that are then required to be paid to the lenders under the Term Facility, and (ii) any Disposition of any property permitted by Section 7.05(a), (b), (c) or (c), shall be paid over to the Administrative Agent on receipt by the Loan Parties and shall be utilized to prepay the Loans in the order of priority set forth in Section 2.05(g). The Agents shall not be obligated to release their Liens on any Collateral until such Net Cash Proceeds have been so received (to the extent required in this clause (f)). The application of such Net Cash Proceeds to the Loans shall not reduce the Revolving Commitments. If all Obligations then due are paid, any excess Net Cash Proceeds shall be remitted to the operating account of the Borrowers maintained with the Administrative Agent.

(g)    Prepayments made pursuant to Section 2.05(e) and (f) first, shall repay outstanding revolving loans under the Existing Credit Agreement and, upon repayment in full of the revolving loans under the Existing Credit Agreement, shall be applied ratably to the L/C Borrowings and the Swing Line Loans, second, shall be applied ratably to the outstanding Committed Loans, third, shall be used to Cash Collateralize the remaining L/C Obligations, fourth, shall be applied ratably to the Outstanding Amount of the FILO Loan; and the amount remaining, if any, after the prepayment in full of all L/C Borrowings, Swing Line Loans, Committed Loans and the FILO Loan outstanding at such time and the Cash Collateralization of the remaining L/C Obligations in full (the sum of such prepayment amounts, cash collateralization amounts and remaining amount being, collectively, the "Reduction Amount") may be retained by the Borrowers for use in the ordinary course of its business. Upon the drawing of any Letter of Credit that has been Cash Collateralized, the funds held as Cash Collateral shall be applied (without any further action by or notice to or from the Borrowers or any other Loan Party) to reimburse the L/C Issuer or the Lenders, as applicable.

2.06.    Termination or Reduction of Revolving Commitments.

(a)     The Borrowers may, upon notice from the Borrower Representative to the Administrative Agent, terminate the Revolving Commitments, the Letter of Credit Sublimit or the Swing Line Sublimit or from time to time permanently reduce the Revolving Commitments, the Letter of Credit Sublimit or the Swing Line Sublimit; provided that (i) any such notice shall be received by the Administrative Agent not later than 2:00 p.m. fifteen Business Days prior to the date of termination or five Business Days prior to the date of reduction, as the case may be, (ii) any such notice shall be irrevocable (except in the case of a termination, such notice shall be irrevocable only beginning three days prior to the date of the proposed termination), (iii) any such partial reduction shall be in an aggregate amount of $10.0 million or any whole multiple of $10.0 million in excess thereof, (iv) the Borrowers shall not terminate or reduce (A) the Revolving Commitments if, after giving effect thereto and to any concurrent prepayments hereunder, the Total Revolving Outstandings would exceed the Aggregate Revolving Commitments, (B) the Letter of Credit Sublimit if, after giving effect thereto, the Outstanding Amount of L/C Obligations not fully Cash Collateralized hereunder would exceed the Letter of Credit Sublimit, and (C) the Swing Line Sublimit if, after giving effect thereto, and to any concurrent payments hereunder, the Outstanding Amount of Swing Line Loans hereunder would exceed the Swing Line Sublimit. Each such reduction or termination shall be applied ratably to the Revolving Commitments of each Revolving Lender.

(b)     If, after giving effect to any reduction of the Aggregate Revolving Commitments, the Letter of Credit Sublimit or the Swing Line Sublimit exceeds the amount of the Aggregate Revolving Commitments, such Sublimit shall be automatically reduced by the amount of such excess.

(c)     Upon the Termination Date, the Revolving Commitments of the Revolving Lenders shall be terminated in full, and the Borrowers shall pay, in full and in cash, all outstanding Committed Loans then owing by them to the Revolving Lenders.

(d)     The Administrative Agent will promptly notify the Revolving Lenders of any termination or reduction of the Letter of Credit Sublimit, Swing Line Sublimit, or Revolving Commitments under this Section 2.06.  Upon any reduction of the Revolving Commitments, the Revolving Commitment of each Revolving Lender shall be reduced by such Revolving Lender's Applicable Percentage of such reduction amount.  All fees accrued until the effective date of any such termination shall be paid on the effective date of such termination.

2.07.    Repayment of Loans.

(a)     The Borrowers shall repay to the Revolving Lenders on the Maturity Date the aggregate principal amount of Obligations owed to the Revolving Lenders outstanding on such date.

(b)     The Borrowers shall repay each Swing Line Loan on the Maturity Date and in accordance with Section 2.04(c).

(c)     The Borrowers shall repay to the FILO Lenders on the Termination Date the aggregate principal amount of all FILO Liabilities owed to the FILO Lenders outstanding on such date.

2.08.    <u>Interest.</u>

(a)    Subject to the provisions of <u>Section 2.08(c)</u> below, (i) each Revolving Loan that is a LIBO Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the LIBO Rate for such Interest Period <u>plus</u> the Applicable Margin; (ii) each Revolving Loan that is a Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Prime Rate <u>plus</u> the Applicable Margin; and (iii) each Swing Line Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Prime Rate <u>plus</u> the Applicable Margin.

(b)    Subject to the provisions of <u>Section 2.08(c)</u> below, each FILO Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the LIBO Rate, applicable to the FILO Loan, plus the FILO Applicable Margin.

(c)    (i)    If any amount owed under this Agreement is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(ii)    If any other Event of Default exists, then (A) the Administrative Agent, upon the request of the Required Revolving Lenders, shall notify the Borrower Representative that the principal amount of all outstanding Obligations (other than the FILO Liabilities) shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws and such principal amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate unless and until such Event of Default is waived, and (B) the Administrative Agent shall, upon the request of the FILO Agent or the Required FILO Lenders, notify the Borrower Representative that all outstanding FILO Liabilities (including, for the avoidance of doubt, all unpaid principal, interest, fees and other amounts then due and owing on account of the FILO Liabilities) shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate and thereafter such FILO Liabilities shall bear interest at the Default Rate to the fullest extent permitted by applicable Laws unless and until such Event of Default is waived.

(iii)    Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(d)    Interest on each Loan (other than the FILO Loan) shall be due and payable to the Administrative Agent, for the account of the Revolving Lenders, in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  Interest on the FILO Loan shall be due and payable to the FILO Agent, for the account of the FILO Lenders, in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  All interest payable hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

01:18374604.1

(e)    Notwithstanding the foregoing provisions of this Section 2.08, any unpaid interest or fees due to the FILO Lenders which are not paid when due and payable hereunder may, at the election of the Required FILO Lenders, which election shall be made within five (5) Business Days following the date such payment is due, be added to the principal amount of the FILO Loan on the day such interest or fees should have been paid.  Upon such election by the Required FILO Lenders, no Default or Event of Default shall be deemed to have occurred and be continuing as a result of any failure to make such payment on the date when due.

2.09.    Fees.  In addition to certain fees described in subsections (i) and (j) of Section 2.03:

(a)    Commitment Fee.  The Borrowers shall pay to the Administrative Agent for the account of the Revolving Lenders (the "Unused Fees") a commitment fee equal to the Commitment Fee Percentage per annum (on the basis of actual days elapsed in a year of 360 days) times the actual daily amount by which the then Aggregate Revolving Commitments exceed the sum of (A) the principal amount of Committed Loans and Swing Line Loans, then outstanding, and (B) the then L/C Credit Extensions for each day commencing on and including the Closing Date and ending on but excluding the Termination Date.  The Unused Fees so accrued in any month shall be payable on the first Business Day of the immediately succeeding month, except that all Unused Fees so accrued as of the Termination Date shall be payable on the Termination Date.

(b)    Other Fees.  The Borrowers shall pay to the Administrative Agent and the FILO Agent for their own respective accounts or for the account of the applicable Lenders fees in the amounts and at the times specified in the Fee Letter.  All of the foregoing fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

2.10.    Computation of Interest and Fees.  All computations of interest for Base Rate Loans when the Prime Rate is determined by Bank of America's "prime rate" shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed.  All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year).  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one day.  Each determination by the Administrative Agent (or, with respect to the FILO Loan, the FILO Agent) of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

2.11.    Evidence of Debt.

(a)    The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by the Administrative Agent (the "Loan Account") in the ordinary course of business.  In addition, each Lender may record in such Lender's internal records, an appropriate notation evidencing the date and amount of each Loan from such Lender, each payment and prepayment of principal of any such Loan, and each payment of interest, fees and other amounts due in connection with the Obligations due to such Lender.  The accounts or

records maintained by the Administrative Agent and each Lender shall be conclusive absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrowers and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrowers hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.  Upon the request of any Lender made through the Administrative Agent, the Borrowers shall execute and deliver to such Lender (through the Administrative Agent) a Note, which shall evidence such Lender's Loans in addition to such accounts or records.  Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.  Upon receipt of an affidavit of a Lender as to the loss, theft, destruction or mutilation of such Lender's Note and upon cancellation of such Note, the Borrowers will issue, in lieu thereof, a replacement Note in favor of such Lender, in the same principal amount thereof and otherwise of like tenor.

(b)      In addition to the accounts and records referred to in <u>Section 2.11(a)</u>, each Lender and the Administrative Agent shall maintain in accordance with its usual practice accounts or records evidencing the purchases and sales by such Lender of participations in Letters of Credit and Swing Line Loans.  In the event of any conflict between the accounts and records maintained by the Administrative Agent and the accounts and records of any Lender in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.

2.12.    <u>Payments Generally; Administrative Agent's Clawback.</u>

(a)      <u>General</u>.

(i)      Except with respect to the FILO Loan or as otherwise expressly provided herein, all payments by the Borrowers hereunder shall be made to the Administrative Agent, for the account of the respective Revolving Lenders to which such payment is owed, at the Administrative Agent's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein.  The Administrative Agent will promptly distribute to each Revolving Lender its Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Revolving Lender's Lending Office.  All payments received by the Administrative Agent after 2:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

(ii)      All payments due on account of the FILO Loan hereunder shall be made to the FILO Agent, for the account of the FILO Lenders, at the FILO Agent's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein.  The FILO Agent will promptly distribute to each FILO Lender its Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such FILO Lender's Lending Office.  All payments received by the FILO Agent after 2:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

Notwithstanding the foregoing, in the event that any payment due on account of principal, interest, fees or any other Credit Party Expenses with respect to the FILO Liabilities is not made to the FILO Agent within the time periods required hereunder, and, with respect to payments of interest and fees, in the event that the FILO Lenders have not made any election available to them under Section 2.08(e) hereof, the FILO Agent may (and the Borrowers hereby authorize the FILO Agent to) direct the Administrative Agent to make a Committed Loan (which shall be a Base Rate Loan) to make any such payment, and, so long as the conditions set forth in Section 4.02(a) and (b) have been satisfied (other than any Default or Event of Default that would otherwise exist due to the failure of the Borrowers to pay such amount due to the FILO Lenders), the Administrative Agent shall make such Committed Loan and distribute the proceeds thereof (and the Borrowers hereby direct the Administrative Agent to deliver such proceeds) to the FILO Agent for distribution to the FILO Agent and the FILO Lenders, as applicable.  Upon the FILO Agent's receipt of such advance for the missed payment pursuant to the foregoing sentence, no Default or Event of Default shall be deemed to have occurred and be continuing as a result of any failure to make such payment on the date when due.

(iii)    All payments to be made by the Borrowers shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  If any payment to be made by the Borrowers shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)    (i)    Funding by Revolving Lenders; Presumption by Administrative Agent.  Unless the Administrative Agent shall have received notice from a Revolving Lender prior to the proposed date of any Borrowing of LIBO Rate Loans (or in the case of any Borrowing of Base Rate Loans, prior to 12:00 noon on the date of such Borrowing) that such Revolving Lender will not make available to the Administrative Agent such Revolving Lender's share of such Borrowing, the Administrative Agent may assume that such Revolving Lender has made such share available on such date in accordance with Section 2.02 (or in the case of a Borrowing of Base Rate Loans, that such Revolving Lender has made such share available in accordance with and at the time required by Section 2.02) and may, in reliance upon such assumption, make available to the Borrowers a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Committed Borrowing available to the Administrative Agent, then the applicable Revolving Lender and the Borrowers severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrowers to but excluding the date of payment to the Administrative Agent, at (A) in the case of a payment to be made by such Revolving Lender, the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation plus any administrative processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing, and (B) in the case of a payment to be made by the Borrowers, the interest rate applicable to Base Rate Loans.  If the Borrowers and such Revolving Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrowers the amount of such interest paid by the Borrowers

for such period.  If such Revolving Lender pays its share of the applicable Committed Borrowing to the Administrative Agent, then the amount so paid shall constitute such Revolving Lender's Committed Loan included in such Committed Borrowing.  Any payment by the Borrowers shall be without prejudice to any claim the Borrowers may have against a Revolving Lender that shall have failed to make such payment to the Administrative Agent.

(ii)    Payments by Borrowers; Presumptions by Administrative Agent.  Unless the Administrative Agent shall have received notice from the Borrower Representative prior to the time at which any payment is due to the Administrative Agent for the account of the Revolving Lenders or the L/C Issuer hereunder that the Borrowers will not make such payment, the Administrative Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Revolving Lenders or the L/C Issuer, as the case may be, the amount due.  In such event, if the Borrowers have not in fact made such payment, then each of the Revolving Lenders or the L/C Issuer, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Revolving Lender or the L/C Issuer, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

A notice of the Administrative Agent to any Revolving Lender or the Borrower Representative with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

(c)    Failure to Satisfy Conditions Precedent.  If any Revolving Lender makes available to the Administrative Agent funds for any Loan to be made by such Revolving Lender as provided in the foregoing provisions of this ARTICLE II, and such funds are not made available to the Borrowers by the Administrative Agent because the conditions to the applicable Credit Extension set forth in ARTICLE IV are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Revolving Lender, without interest.

(d)    Obligations of Lenders Several.  The obligations of the Lenders hereunder to make Committed Loans or the FILO Loan, as applicable, to fund participations in Letters of Credit and Swing Line Loans and to make payments pursuant to Section 10.04(c) are several and not joint.  The failure of any Lender to make any Committed Loan or the FILO Loan, as applicable, to fund any such participation or to make any payment under Section 10.04(c). on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Committed Loan or the FILO Loan, as applicable, to purchase its participation or to make its payment under Section 10.04(c).

(e)    Funding Source.  Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

2.13.    <u>Sharing of Payments by Lenders</u>.  If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of the Loans made by it, or the participations in L/C Obligations or in Swing Line Loans held by it resulting in such Lender's receiving payment of a proportion of the aggregate amount of such Loans or participations and accrued interest thereon greater than its <u>pro rata</u> share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) purchase (for cash at face value) participations in the applicable Loans and subparticipations in L/C Obligations and Swing Line Loans of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective applicable Loans and other amounts owing them, <u>provided</u> that:

(i)    if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)    the provisions of this Section shall not be construed to apply to (x) any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender) or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or subparticipations in L/C Obligations or Swing Line Loans to any assignee or participant, other than to the Borrowers or any Subsidiary thereof (as to which the provisions of this Section shall apply).

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

2.14.    <u>Settlement Amongst Revolving Lenders</u>

(a)    The amount of each Revolving Lender's Applicable Percentage of outstanding Revolving Loans (including outstanding Swing Line Loans shall be computed weekly (or more frequently in the Administrative Agent's discretion) and shall be adjusted upward or downward based on all Revolving Loans (including Swing Line Loans) and repayments of Revolving Loans (including Swingline Loans) received by the Administrative Agent as of 3:00 p.m. on the first Business Day (such date, the "<u>Settlement Date</u>") following the end of the period specified by the Administrative Agent.

(b)    The Administrative Agent shall deliver to each of the Revolving Lenders promptly after a Settlement Date a summary statement of the amount of outstanding Committed Loans for the period and the amount of repayments fees received for the period.  As reflected on the summary statement, (i) the Administrative Agent shall transfer to each Revolving Lender its

Applicable Percentage of repayments, and (ii) each Revolving Lender shall transfer to the Administrative Agent (as provided below) or the Administrative Agent shall transfer to each Revolving Lender, such amounts as are necessary to insure that, after giving effect to all such transfers, the amount of Committed Loans made by each Revolving Lender with respect to Committed Loans to the Borrowers shall be equal to such Revolving Lender's Applicable Percentage of Committed Loans outstanding as of such Settlement Date.   If the summary statement requires transfers to be made to the Administrative Agent by the Revolving Lenders and is received prior to 12:00 Noon on a Business Day, such transfers shall be made in immediately available funds no later than 3:00 p.m. that day; and, if received after 12:00 Noon, then no later than 3:00 p.m. on the next Business Day. The obligation of each Revolving Lender to transfer such funds is irrevocable, unconditional and without recourse to or warranty by the Administrative Agent.   If and to the extent any Revolving Lender shall not have so made its transfer to the Administrative Agent, such Revolving Lender agrees to pay to the Administrative Agent, forthwith on demand such amount, together with interest thereon, for each day from such date until the date such amount is paid to the Administrative Agent, equal to the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation plus any administrative, processing, or similar fees customarily charged by the Administrative Agent in connection with the foregoing.

(c)   The Administrative Agent shall deliver to the Revolving Lenders, and to the FILO Agent for the account of the FILO Lenders, promptly after the Administrative Agent's receipt thereof, all payments of interest, fees and Credit Party Expenses to which each such Lender is entitled.

2.15.   Certain Bankruptcy Matters.

(a)   Except to the extent expressly provided otherwise in an Order, the Loan Parties hereby agree that, subject only to the Carve Out, the Obligations shall be deemed to (i) constitute DIP Superpriority Claims over all administrative expense claims and claims against the Borrowers now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114 or any other provisions of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person the establishment of which super-priority shall have been approved and authorized by the Bankruptcy Court and (ii) be secured pursuant to Sections 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code and, to the extent provided in any of the Orders.

(b)   In the event of a conflict between, or inconsistency among, the Interim Order or the Final Order, on the one hand, and any Loan Document, on the other hand, the Interim Order or the Final Order, as the case may be, shall control.

(c)   Notwithstanding anything to the contrary contained herein or elsewhere:

(i)   the parties hereto agree, and the Orders shall provide, that the Credit Parties shall not be required to prepare, file, register or publish any financing statements, mortgages, account control agreements, notices of Lien or similar instruments in any

jurisdiction or filing or registration office, or to take possession of any Collateral or to take any other action in order to validate, render enforceable or perfect the Liens on the Collateral granted by or pursuant to this Agreement, the Orders or any other Loan Document.  If the Administrative Agent or the Collateral Agent (in its sole discretion), from time to time elects to prepare, file, register or publish any such financing statements, mortgages, account control agreements, notices of Lien or similar instruments, take possession of any Collateral, or take any other action to validate, render enforceable or perfect all or any portion of the Collateral Agent's Liens on the Collateral, (A) all such documents and actions shall be deemed to have been filed, registered, published or recorded or taken at the time and on the date that the Interim Order is entered, and (B) shall not negate or impair the validity or effectiveness of this Section 2.15(c) or of the perfection of any other Liens in favor of the Collateral Agent, for the benefit of the Lenders and the other Credit Parties, on the Collateral; and

(ii)     except as otherwise agreed to by the Lenders, the Liens, Lien priorities, DIP Superpriority Claims and other rights and remedies granted to the Credit Parties pursuant to this Agreement, the Orders or the other Loan Documents (specifically including, but not limited to, the existence, perfection, enforceability and priority of the Liens provided for herein and therein, and the DIP Superpriority Claims provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of indebtedness by any Borrower or any other Loan Party (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by dismissal or conversion of the Cases, or by any other act or omission whatsoever.

(d)     Without limiting the generality of the foregoing, notwithstanding any such financing, extension, incurrence, dismissal, conversion, act or omission:

(i)     subject only to the Carve Out and to the extent provided in any of the Orders and subject to the Orders, no costs or expenses of administration which have been or may be incurred in the Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of any Lender or the Agents or the FILO Agent against the Borrowers in respect of any Obligations;

(ii)     other than as provided in the Orders or the Loan Documents, the Collateral Agent's Liens on the Collateral shall constitute valid, enforceable and perfected Liens, and, except with respect to the Carve Out and Permitted Prior Liens (and as otherwise set forth in the Intercreditor Agreement and in the Orders), shall be prior to all other Liens now existing or hereafter arising, in favor of any other creditor or other Person; and

(iii)     the parties hereto agree, and the Orders shall provide, that the Collateral Agent's Liens on the Collateral shall continue to be valid, enforceable and perfected without the need for the Collateral Agent or any Lender to prepare, file, register or publish any financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments or to otherwise perfect the Collateral Agent's Liens under applicable non-bankruptcy law.

01:18374604.1

(e)     In connection with any sale or Disposition of all or any portion of the Collateral, including in each case pursuant to Sections 9-610 or 9-620 of the UCC, at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code or as part of restructuring plan subject to confirmation under Section 1129(b)(2)(A)(iii) of the Bankruptcy Code, or at any sale or foreclosure conducted by the Collateral Agent, in accordance with applicable law and, with respect to any credit bid, Section 363(k) of the Bankruptcy Code, each Borrower and each other Loan Party hereby gives the Collateral Agent (at the direction of the Required Revolving Lenders and the Required FILO Lenders) the power and right, without assent by such Loan Party, to "credit bid" the full amount of all Obligations and any Existing Liabilities then outstanding, in order to purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral.

2.16.    Defaulting Lenders.

(a)     Adjustments.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(i)     Waivers and Amendments.  Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "Required Lenders" and Section 10.01.

(ii)     Defaulting Lender Waterfall.  Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VIII or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 10.08 shall be applied at such time or times as may be determined by the Administrative Agent as follows: first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; second, to the payment on a pro rata basis of any amounts owing by such Defaulting Lender to the L/C Issuer or Swing Line Lender hereunder; third, to Cash Collateralize the L/C Issuer's Fronting Exposure with respect to such Defaulting Lender; fourth, as the Borrower Representative may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; fifth, if so determined by the Administrative Agent and the Borrower Representative, to be held in a deposit account and released pro rata in order to (x) satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement and (y) Cash Collateralize the L/C Issuer's future Fronting Exposure with respect to such Defaulting Lender with respect to future Letters of Credit issued under this Agreement; sixth, to the payment of any amounts owing to the Lenders, the L/C Issuer or Swing Line Lender as a result of any judgment of a court of competent jurisdiction obtained by any Lender, the L/C Issuer or the Swing Line Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; seventh, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrowers as a result of any judgment of a court of competent jurisdiction obtained by the Borrowers against such Defaulting Lender as a result of such Defaulting

Lender's breach of its obligations under this Agreement; and eighth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Loans or L/C Borrowings in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made or the related Letters of Credit were issued at a time when the conditions set forth in Section 4.02 were satisfied or waived, such payment shall be applied solely to pay the Loans of, and L/C Obligations owed to, all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of, or L/C Obligations owed to, such Defaulting Lender until such time as all Loans and funded and unfunded participations in L/C Obligations and Swing Line Loans are held by the Lenders pro rata in accordance with the Revolving Commitments hereunder without giving effect to Section 2.16(a)(iv). Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post Cash Collateral pursuant to this Section 2.16(a)(ii) shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)    Certain Fees.

(A)    No Defaulting Lender shall be entitled to receive any fee payable under Section 2.09(a) for any period during which that Lender is a Defaulting Lender (and the Borrowers shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

(B)    Each Defaulting Lender shall be entitled to receive Letter of Credit Fees for any period during which that Lender is a Defaulting Lender only to the extent allocable to its Applicable Percentage of the stated amount of Letters of Credit for which it has provided Cash Collateral pursuant to Section 2.03(g).

(C)    With respect to any fee payable under Section 2.09(a) or any Letter of Credit Fee not required to be paid to any Defaulting Lender pursuant to clause (A) or (B) above, the Borrowers shall (x) pay to each Non-Defaulting Lender that portion of any such fee otherwise payable to such Defaulting Lender with respect to such Defaulting Lender's participation in L/C Obligations or Swing Line Loans that has been reallocated to such Non-Defaulting Lender pursuant to clause (iv) below, (y) pay to the L/C Issuer and Swing Line Lender, as applicable, the amount of any such fee otherwise payable to such Defaulting Lender to the extent allocable to such L/C Issuer's or Swing Line Lender's Fronting Exposure to such Defaulting Lender, and (z) not be required to pay the remaining amount of any such fee.

(iv)    Reallocation of Applicable Percentages to Reduce Fronting Exposure. All or any part of such Defaulting Lender's participation in L/C Obligations and Swing Line Loans shall be reallocated among the Non-Defaulting Lenders in accordance with their respective Applicable Percentages (calculated without regard to such Defaulting Lender's Revolving Commitment) but only to the extent that (x) the conditions set forth in Section 4.02 are satisfied at the time of such reallocation (and, unless the Borrowers shall have

otherwise notified the Administrative Agent at such time, the Borrowers shall be deemed to have represented and warranted that such conditions are satisfied at such time), and (y) such reallocation does not cause the aggregate Outstanding Amount of Obligations of any Non-Defaulting Lender to exceed such Non-Defaulting Lender's Revolving Commitment.  No reallocation hereunder shall constitute a waiver or release of any claim of any party hereunder against a Defaulting Lender arising from that Lender having become a Defaulting Lender, including any claim of a Non-Defaulting Lender as a result of such Non-Defaulting Lender's increased exposure following such reallocation.

(v)    Cash Collateral, Repayment of Swing Line Loans.  If the reallocation described in clause (a)(iv) above cannot, or can only partially, be effected, the Borrowers shall, without prejudice to any right or remedy available to them hereunder or under applicable Law, (x) first, prepay Swing Line Loans in an amount equal to the Swing Line Lenders' Fronting Exposure and (y) second, Cash Collateralize the L/C Issuers' Fronting Exposure in accordance with the procedures set forth in Section 2.03(g).

(b)    Defaulting Lender Cure.  If the Borrower Representative, the Administrative Agent, the Swing Line Lender and the L/C Issuer agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any Cash Collateral), that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Committed Loans and funded and unfunded participations in Letters of Credit and Swing Line Loans to be held on a pro rata basis by the Lenders in accordance with their Applicable Percentages (without giving effect to Section 2.16(a)(iv)), whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrowers while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

## ARTICLE III
## TAXES, YIELD PROTECTION AND ILLEGALITY

3.01.    Taxes.

(a)    Payments Free of Taxes; Obligation to Withhold; Payments on Account of Taxes.

(i)    Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable Laws.  If any applicable Laws (as determined in the good faith discretion of the Borrowers or the Administrative Agent) require the deduction or withholding of any Tax from any such payment by the Administrative Agent or a Loan Party, then the Administrative Agent or such Loan Party shall be entitled

to make such deduction or withholding, upon the basis of the information and documentation to be delivered pursuant to subsection (e) below.

(ii)    If any Loan Party or the Administrative Agent shall be required by any applicable Laws other than the Code to withhold or deduct any Taxes from any payment by or on account of any obligation of a Loan Party under any Loan Document, then (A) such Loan Party or the Administrative Agent, as required by such Laws, shall withhold or make such deductions as are determined by it to be required based upon the information and documentation it has received pursuant to subsection (e) below, (B) such Loan Party or the Administrative Agent, to the extent required by such Laws, shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with such Laws, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the applicable Loan Party shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this Section 3.01) the applicable Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(b)    Payment of Other Taxes by the Loan Parties.  Without limiting the provisions of subsection (a) above, the Loan Parties shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)    Tax Indemnifications.

(i)    The Loan Parties shall, jointly and severally, indemnify the Administrative Agent, each Lender and the L/C Issuer, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) paid by the Administrative Agent, such Lender or the L/C Issuer, as the case may be, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower Representative by a Lender or the L/C Issuer (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender or the L/C Issuer, shall be conclusive absent manifest error.

(ii)    Each Lender and the L/C Issuer shall, and does hereby, severally indemnify, and shall make payment in respect thereof within 10 days after demand therefor, (x) the Administrative Agent against any Indemnified Taxes attributable to such Lender or the L/C Issuer (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (y) the Administrative Agent and the Loan Parties, as applicable, against any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.06(d) relating to the maintenance of a Participant Register and (z) the Administrative Agent and the Loan Parties, as applicable, against any Excluded Taxes attributable to such Lender or the L/C Issuer, in each case, that are

payable or paid by the Administrative Agent or a Loan Party in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender and the L/C Issuer hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender or the L/C Issuer, as the case may be, under this Agreement or any other Loan Document against any amount due to the Administrative Agent under this clause (ii).

(d)    <u>Evidence of Payments</u>.  As soon as practicable after any payment of Indemnified Taxes by the applicable Loan Party to a Governmental Authority, the applicable Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)    <u>Status of Lenders; Tax Documentation</u>.

(i)    Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower Representative and the Administrative Agent, at the time or times reasonably requested by the Borrower Representative or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower Representative or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower Representative or the Administrative Agent, shall deliver such other documentation prescribed by applicable Law or reasonably requested by the Borrower Representative or the Administrative Agent as will enable the Borrower Representative or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in <u>Section 3.01(e)(ii)(A)</u>, <u>(ii)(B)</u> and <u>(ii)(D)</u> below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing, in the event that the Borrower Representative is a U.S. Person,

(A)    any Lender that is a U.S. Person shall deliver to the Borrower Representative and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower Representative or the Administrative Agent), executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower Representative and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower Representative or the Administrative Agent), whichever of the following is applicable:

(I)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed originals of IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(II)     executed originals of IRS Form W-8ECI;

(III)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit L-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower Representative within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed originals of IRS Form W-8BEN; or

(IV)     to the extent a Foreign Lender is not the beneficial owner, executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, a U.S. Tax Compliance Certificate substantially in the form of Exhibit L-2 or Exhibit L-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit L-4 on behalf of each such direct and indirect partner;

(C)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower Representative and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on

which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower Representative or the Administrative Agent), executed originals of any other form prescribed by applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable Law to permit the Borrower Representative and the Administrative Agent to determine the withholding or deduction required to be made; and

(D)    if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower Representative and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower Representative or the Administrative Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower Representative or the Administrative Agent as may be necessary for the Borrower Representative and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(iii)    Each Lender agrees that if any form or certification it previously delivered pursuant to this Section 3.01 expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower Representative and the Administrative Agent in writing of its legal inability to do so.

(f)    Treatment of Certain Refunds.  Unless required by applicable Laws, at no time shall the Administrative Agent have any obligation to file for or otherwise pursue on behalf of a Lender or the L/C Issuer, or have any obligation to pay to any Lender or the L/C Issuer, any refund of Taxes withheld or deducted from funds paid for the account of such Lender or the L/C Issuer, as the case may be.  If any Recipient determines, in its sole discretion, that it has received a refund of any Taxes as to which it has been indemnified by the applicable Loan Party or with respect to which the applicable Loan Party has paid additional amounts pursuant to this Section, it shall pay to the Loan Parties an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Loan Parties under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses of the Recipient and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the applicable Loan Party, upon the request of the Recipient, agrees to repay the amount paid over to the Borrowers (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Recipient if such Recipient is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this subsection, in no event will the applicable

Recipient be required to pay any amount to the Loan Party pursuant to this subsection the payment of which would place the Recipient in a less favorable net after-Tax position than such Recipient would have been in if the indemnification payments or additional amounts giving rise to such refund had never been paid. This subsection shall not be construed to require any Recipient to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Loan Parties or any other Person.

(g)     Survival.  Each party's obligations under this <u>Section 3.01</u> shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender or the L/C Issuer, the termination of the Aggregate Revolving Commitments and the repayment, satisfaction or discharge of all other Obligations.

3.02.    <u>Illegality</u>.  If any Revolving Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Revolving Lender or its applicable Lending Office to make, maintain or fund LIBO Rate Loans, or to determine or charge interest rates based upon the LIBO Rate, or any Governmental Authority has imposed material restrictions on the authority of such Revolving Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on notice thereof by such Revolving Lender to the Borrower Representative through the Administrative Agent, any obligation of such Revolving Lender to make or continue LIBO Rate Loans or to convert Base Rate Loans to LIBO Rate Loans shall be suspended until such Revolving Lender notifies the Administrative Agent and the Borrower Representative that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, the Borrowers shall, upon demand from such Revolving Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all LIBO Rate Loans of such Revolving Lender to Base Rate Loans, either on the last day of the Interest Period therefor, if such Revolving Lender may lawfully continue to maintain such LIBO Rate Loans to such day, or immediately, if such Revolving Lender may not lawfully continue to maintain such LIBO Rate Loans.  Upon any such prepayment or conversion, the Borrowers shall also pay accrued interest on the amount so prepaid or converted.

3.03.    <u>Inability to Determine Rates</u>.

(a)     With respect to any Revolving Loan, if the Required Revolving Lenders determine that for any reason in connection with any request for a Revolving Loan or a conversion to or continuation thereof that (a) Dollar deposits are not being offered to banks in the London interbank eurodollar market for the applicable amount and Interest Period of such LIBO Rate Loan, (b) adequate and reasonable means do not exist for determining the LIBO Rate for any requested Interest Period with respect to a proposed LIBO Rate Loan, or (c) the LIBO Rate for any requested Interest Period with respect to a proposed LIBO Rate Loan does not adequately and fairly reflect the cost to such Revolving Lenders of funding such Revolving Loan, the Administrative Agent will promptly so notify the Borrower Representative and each Revolving Lender.  Thereafter, the obligation of the Revolving Lenders to make or maintain LIBO Rate Loans shall be suspended until the Administrative Agent (upon the instruction of the Required Revolving Lenders) revokes such notice.  Upon receipt of such notice, the Borrower Representative may revoke any pending request for a Borrowing of, conversion to or continuation of LIBO Rate Loans or, failing that, will be deemed to have converted such request into a request for a Committed Borrowing of Base Rate Loans in the amount specified therein.

(b)     With respect to the FILO Loan, if the Required FILO Lenders determine that for any reason in connection with the FILO Loan, that adequate and reasonable means do not exist for determining the LIBO Rate, the FILO Agent will promptly so notify the Borrower Representative, the Administrative Agent and each FILO Lender.  Thereafter, in the event of a determination described in the preceding sentence with respect to the FILO Loan, interest on such FILO Loan shall accrue at the Prime Rate plus the FILO Applicable Margin minus 1.00% until the Administrative Agent (at the direction of Required FILO Lenders) revokes the notice provided for in the previous sentence.

3.04.   <u>Increased Costs.</u>

(a)     <u>Increased Costs Generally</u>.  If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement contemplated by <u>Section 3.04(e)</u>);

(ii)     subject any Lender or the L/C Issuer to any tax of any kind whatsoever with respect to this Agreement, any Letter of Credit, any participation in a Letter of Credit or any LIBO Rate Loan made by it, or change the basis of taxation of payments to such Lender or the L/C Issuer in respect thereof (except for Indemnified Taxes covered by <u>Section 3.01</u> and the imposition of, or any change in the rate of, any Excluded Tax payable by such Lender or the L/C Issuer); or

(iii)     impose on any Lender or the London interbank market any other condition, cost or expense affecting this Agreement or LIBO Rate Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any LIBO Rate Loan (or of maintaining its obligation to make any such Loan), or to increase the cost to such Lender or the L/C Issuer of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender or the L/C Issuer hereunder (whether of principal, interest or any other amount) then, upon request of such Lender or the L/C Issuer, the Borrowers will pay to such Lender or the L/C Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or the L/C Issuer, as the case may be, for such additional costs incurred or reduction suffered.

(b)     <u>Capital Requirements</u>.  If any Lender or the L/C Issuer determines that any Change in Law affecting such Lender or the L/C Issuer or any Lending Office of such Lender or such Lender's or the L/C Issuer's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's or the L/C Issuer's capital or on the capital of such Lender's or the L/C Issuer's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by the L/C Issuer, to a level below that which such Lender or the L/C Issuer or such Lender's or the

L/C Issuer's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or the L/C Issuer's policies and the policies of such Lender's or the L/C Issuer's holding company with respect to capital adequacy or liquidity), then from time to time the Borrowers will pay to such Lender or the L/C Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or the L/C Issuer or such Lender's or the L/C Issuer's holding company for any such reduction suffered.

(c)    Certificates for Reimbursement.    A certificate of a Lender or the L/C Issuer setting forth the amount or amounts necessary to compensate such Lender or the L/C Issuer or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section, in reasonable detail sufficient to allow the Borrowers to verify such calculation, and delivered to the Borrower Representative shall be conclusive absent manifest error.    The Borrowers shall pay such Lender or the L/C Issuer, as the case may be, the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)    Delay in Requests.    Failure or delay on the part of any Lender or the L/C Issuer to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's or the L/C Issuer's right to demand such compensation, provided that the Borrowers shall not be required to compensate a Lender or the L/C Issuer pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than six months prior to the date that such Lender or the L/C Issuer, as the case may be, notifies the Borrower Representative of the Change in Law giving rise to such increased costs or reductions and of such Lender's or the L/C Issuer's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the six-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)    Reserves on LIBO Rate Loans.    The Borrowers shall pay to each Lender, as long as such Lender shall be required to maintain reserves (including any marginal, special, emergency or supplemental reserves) with respect to liabilities or assets consisting of or including Eurocurrency funds or deposits (currently known as "Eurocurrency liabilities" in FRB Regulation D)(including, without limitation, any such reserves imposed by said Regulation D), additional interest on the unpaid principal amount of each LIBO Rate Loan equal to the actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive), which shall be due and payable on each date on which interest is payable on such Loan, provided that the Borrower Representative shall have received at least 10 days' prior notice (with a copy to the Administrative Agent) of such additional interest from such Lender.    If a Lender fails to give notice 10 days prior to the relevant Interest Payment Date, such additional interest shall be due and payable 10 days from receipt of such notice.

3.05.    Compensation for Losses.    Upon demand of any Lender (with a copy to the Administrative Agent) from time to time, the Borrowers shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense actually incurred by it as a result of:

(a)    any continuation, conversion, payment or prepayment of any Loan other than a Base Rate Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)    any failure by the Borrowers (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan other than a Base Rate Loan on the date or in the amount notified by the Borrower Representative; or

(c)    any assignment of a LIBO Rate Loan on a day other than the last day of the Interest Period therefor as a result of a request by the Borrower Representative pursuant to Section 10.13;

including any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained, but excluding loss of anticipated profits.  The Borrowers shall also pay any customary administrative fees charged by such Lender in connection with the foregoing.

For purposes of calculating amounts payable by the Borrowers to the Lenders under this Section 3.05, each Lender shall be deemed to have funded each LIBO Rate Loan made by it at the LIBO Rate for such Loan by a matching deposit or other borrowing in the London interbank eurodollar market for a comparable amount and for a comparable period, whether or not such LIBO Rate Loan was in fact so funded.

3.06.    Mitigation Obligations; Replacement of Lenders.

(a)    Designation of a Different Lending Office.  If any Lender requests compensation under Section 3.04, or the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.02, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.02, as applicable, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    Replacement of Lenders.  If any Lender requests compensation under Section 3.04, or if the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, the Borrower Representative may replace such Lender in accordance with Section 10.13.

3.07.    Survival.  All of the Borrowers' obligations under this ARTICLE III shall survive termination of the Aggregate Revolving Commitments and repayment of all other Obligations hereunder.

3.08.    Designation of Borrower Representative as Borrowers' Agent.

(a)     Each Borrower hereby irrevocably designates and appoints the Borrower Representative as such Borrower's agent to obtain Credit Extensions, the proceeds of which shall be available to each Borrower for such uses as are permitted under this Agreement.  As the disclosed principal for its agent, each Borrower shall be obligated to each Credit Party on account of Credit Extensions so made as if made directly by the applicable Credit Party to such Borrower, notwithstanding the manner by which such Credit Extensions are recorded on the books and records of the Borrower Representative and of any other Borrower.  In addition, each Loan Party other than the Borrowers hereby irrevocably designates and appoints the Borrower Representative as such Loan Party's agent to represent such Loan Party in all respects under this Agreement and the other Loan Documents.

(b)     Each Borrower recognizes that credit available to it hereunder is in excess of and on better terms than it otherwise could obtain on and for its own account and that one of the reasons therefor is its joining in the credit facility contemplated herein with all other Borrowers.  Consequently, each Borrower hereby assumes and agrees to discharge all Obligations of each of the other Borrowers.

(c)     The Borrower Representative shall act as a conduit for each Borrower on whose behalf the Borrower Representative has requested a Credit Extension.  Neither the Administrative Agent nor any other Credit Party shall have any obligation to see to the application of such proceeds therefrom.

ARTICLE IV
CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

4.01.   Closing Date.  The obligation of the L/C Issuer and each Lender to make its initial Credit Extension hereunder on the Closing Date is subject to satisfaction of the following conditions precedent:

(a)     The Administrative Agent's receipt of the following:

(i)     executed counterparts of this Agreement by each of the Borrowers and Guarantors and the Lenders;

(ii)     a Note executed by the Borrowers in favor of each Lender requesting a Note;

(iii)     the Loan Documents and other instruments, documents and agreements set forth on Schedule 4.01(a)(iii) hereto;

(iv)     such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Administrative Agent may require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party;

01:18374604.1

(v)      copies of each Loan Party's Organization Documents and "long form" good standing certificates of each Loan Party in its jurisdiction of organization and, to the extent reasonably requested by the Administrative Agent, bring-down good standing certificates of the Loan Parties;

(vi)      certificates of insurance, naming the Collateral Agent, on behalf of the Lenders, as an additional insured or loss payee, as the case may be, under all insurance policies maintained with respect to the assets and properties of the Loan Parties that constitutes Collateral; and

(vii)      the Interim Order, which shall be in full force and effect and not subject to a stay or appeal.

(b)      After giving effect to (i) any funding of the Loans on the Closing Date, (ii) any charges to the Loan Account made in connection with the credit facility contemplated hereby, and (iii) all Existing Letters of Credit and all Letters of Credit to be issued at, or immediately subsequent to, the Closing Date, for the avoidance of doubt after the Availability Block, Excess Availability shall be not less than $50.0 million.  The Administrative Agent shall have received a Borrowing Base Certificate dated the Closing Date, relating to the week ended on [_____], and executed by a Responsible Officer of the Borrowers.

(c)      All fees required to be paid to the Administrative Agent, the FILO Agent and the Lenders on or before the Closing Date shall have been paid.

(d)      The Borrowers shall have paid the reasonable and documented fees and out-of-pocket disbursements of counsel to the Administrative Agent (directly to such counsel if requested by the Administrative Agent) and to the FILO Agent (directly to such counsel if requested by the FILO Agent) to the extent invoiced prior to or on the Closing Date.

(e)      The Administrative Agent and the FILO Agent shall have received the Budget and such other financial information regarding the Loan Parties as the Administrative Agent and the FILO Agent may require.

(f)      The Administrative Agent and the FILO Agent shall have received the Interim Order, as entered by the Bankruptcy Court, substantially in the form of Exhibit J hereto and otherwise acceptable to the Administrative Agent and the FILO Agent.

(g)      All "first day" motions and proposed orders to be filed with and submitted to the Bankruptcy Court shall be in form and substance reasonably satisfactory to the Lenders.

(h)      The Borrowers shall have filed a motion reasonably acceptable to the Administrative Agent and the FILO Agent seeking approval of the Agency Agreement on a "fee" basis in connection with the closing of the stores pursuant to the Initial Store Closing Sale.

(i)      The Interim Order shall have been entered on or before March 4, 2016.

(j)      The Administrative Agent and the FILO Agent shall have received copies of the engagement letters with each of the Independent Consultant and the Financial Advisor.

(k)    The Administrative Agent and the FILO Agent shall have received the consent of the Required Lenders under the Existing Credit Agreement to the credit facility evidenced hereby and the terms hereof.

Without limiting the generality of the provisions of <u>Section 9.07</u>, for purposes of determining compliance with the conditions specified in this <u>Section 4.01</u>, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

4.02.    <u>Conditions to all Credit Extensions</u>.    The obligation of each Lender to honor any Request for Credit Extension (other than a Committed Loan Notice requesting only a conversion of Committed Loans to the other Type, or a continuation of LIBO Rate Loans) is subject to the following conditions precedent:

(a)    The representations and warranties of the Borrowers and each other Loan Party contained in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the date of such Credit Extension, except (i) to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date, and (ii) in the case of any representation and warranty qualified by materiality, they shall be true and correct in all respects.

(b)    No Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds thereof.

(c)    The Administrative Agent and, if applicable, the L/C Issuer or the Swing Line Lender shall have received a Request for Credit Extension in accordance with the requirements hereof.

(d)    No Overadvance shall result from such Credit Extension.

(e)    Such Credit Extension shall be made in accordance with the Budget.

(f)    (i) There shall not have been (x) any order granted by the Bankruptcy Court sustaining any objection by any Person, nor (y) any motion, complaint, objection or other pleading filed by any party, challenging, in either case, the validity, priority, perfection, or enforceability of the Existing Loan Documents, the Existing Liabilities, or any Lien granted pursuant to the Existing Loan Documents, and (ii) no Lien granted pursuant to the Existing Loan Documents shall have been determined to be null and void, invalid or unenforceable by the Bankruptcy Court or another court of competent jurisdiction in any action commenced or asserted by any other party in interest in the Cases, including, without limitation, the Committee.

Each Request for Credit Extension (other than a Committed Loan Notice requesting only a conversion of Committed Loans to the other Type or a continuation of LIBO Rate Loans) submitted by the Borrowers shall be deemed to be a representation and warranty that the conditions specified in this <u>Section 4.02</u> have been satisfied on and as of the date of the applicable Credit Extension.  The conditions set forth in this <u>Section 4.02</u> are for the sole benefit

of the Credit Parties but until the Required Lenders otherwise direct the Administrative Agent to cease making Committed Loans, the Lenders will fund their Applicable Percentage of all Loans and L/C Advances and participate in all Swingline Loans and Letters of Credit whenever made or issued, which are requested by the Borrowers and which, notwithstanding the failure of the Loan Parties to comply with the provisions of this <u>Section 4.02</u>, are agreed to by the Administrative Agent, <u>provided</u>, however, the making of any such Loans or the issuance of any Letters of Credit shall not be deemed a modification or waiver by any Credit Party of the provisions of this <u>Section 4.02</u> on any future occasion or a waiver of any rights or the Credit Parties as a result of any such failure to comply.

ARTICLE V
REPRESENTATIONS AND WARRANTIES

Each of the Loan Parties represents and warrants to the Administrative Agent and the Lenders that:

5.01.  <u>Existence, Qualification and Power</u>.  Each Loan Party and each of its Subsidiaries (a) is duly organized or formed, validly existing and, as applicable, in good standing under the Laws of the jurisdiction of its incorporation or organization, (b) subject to the entry of the Interim Order or the Final Order, as applicable, has all requisite power and authority and all requisite governmental licenses, permits, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents and Related Documents to which it is a party, and (c) is duly qualified and is licensed and, as applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (b)(i) or (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.  <u>Schedule 5.01</u> annexed hereto sets forth, as of the Closing Date, each Loan Party's name as it appears in official filings in its state of incorporation or organization, its state of incorporation or organization, organization type, organization number, if any, issued by its state of incorporation or organization, its federal employer identification number or, in the case of any non-U.S. Loan Party that does not have a U.S. employer identification number, its unique identification number issued to it by the jurisdiction of its incorporation and the address of its principal place of business.

5.02.  <u>Authorization; No Contravention</u>.  The execution, delivery and performance by each Loan Party of each Loan Document and Related Document to which such Person is or is to be a party have been duly authorized by all necessary corporate or other organizational action, and, subject to entry of the Interim Order or the Final Order, as applicable, do not and will not (a) contravene the terms of any of such Person's Organization Documents; (b) conflict with or result in any breach or contravention of, or the creation of any Lien under, or require any payment to be made under (i) any Contractual Obligation or Material Indebtedness to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject, except in each case where enforcement is stayed upon the commencement of the Cases; or (c) violate any Law, except in

the case of clause (b) or (c), to the extent that such conflict, breach, contravention or violation could not reasonably be expected to have a Material Adverse Effect.

5.03.   <u>Governmental Authorization; Other Consents</u>.   Subject to the entry of the Interim Order or the Final Order, as applicable, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (a) the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document or Related Document, (b) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, (c) the perfection or maintenance of the Liens created under the Collateral Documents or (d) the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, except for the Interim Order or the Final Order, as applicable, and the authorizations, approvals, actions, notices and filings listed on <u>Schedule 5.03</u>, all of which have been duly obtained, taken, given or made and are in full force and effect.

5.04.   <u>Binding Effect</u>.   Subject to the entry of the Interim Order or the Final Order, as applicable, this Agreement has been, and each other Loan Document, when delivered hereunder, will have been, duly executed and delivered by each Loan Party that is party thereto. Subject to the entry of the Interim Order or the Final Order, as applicable, this Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

5.05.   <u>Financial Statements; No Material Adverse Effect; No Internal Control Event.</u>

(a)   Since the Closing Date, other than events leading up to and resulting from commencement of the Cases, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

(b)   To the best knowledge of the Loan Parties, no Internal Control Event exists or has occurred since the Closing Date that has resulted in or could reasonably be expected to result in a misstatement in any material respect, in any financial information delivered or to be delivered to the Administrative Agent or the Lenders, of (i) Borrowing Base Certificate computations or (ii) the assets, liabilities, financial condition or results of operations of Slap Shot and its Subsidiaries on a consolidated basis, taken as a whole.

5.06.   <u>Litigation</u>.   Except for the Cases, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Loan Parties threatened at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or any of its Subsidiaries or against any of their properties or revenues that (a) except as provided on <u>Schedule 5.06</u>, purport to affect or pertain to this Agreement, any other Loan Document or any Related Document, or (b) either individually or in the aggregate, if determined adversely, could reasonably be expected to have a Material Adverse Effect.

01:18374604.1

5.07.  <u>No Default</u>.  Except for events leading up to and as a result of filing the Cases, neither any Loan Party nor any Subsidiary thereof is in default under or with respect to, or a party to, any Contractual Obligation or Material Indebtedness that could, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Except where enforcement is stayed upon the commencement of the Cases, no Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

5.08.  <u>Ownership of Property; Liens; Investments.</u>

(a)    Each Loan Party and each of its Subsidiaries has good record and marketable title in fee simple to, or valid leasehold interests in, all Real Estate necessary or used in the ordinary conduct of its business, except for such defects in title as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Each Loan Party and each of its Subsidiaries has good record and marketable title to, or valid leasehold interests in, all personal property necessary or used in the ordinary conduct of its business, except for such defects in title as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  No Mortgage encumbers improved Real Estate that is located in an area that has been identified by the Secretary of Housing and Urban Development as an area having special flood hazards within the meaning of the National Flood Insurance Act of 1968 unless flood insurance available under such Act has been obtained in accordance with <u>Section 6.07</u>.

(b)    The property of each Loan Party and each of its Subsidiaries is subject to no Liens, other than Permitted Liens.

(c)    Schedule 5.08(c) sets forth a complete and accurate list of all Real Estate owned by each Loan Party and each of its Subsidiaries as of the Closing Date, showing as of the date hereof the street address, county or other relevant jurisdiction, state and record owner thereof.  Each Loan Party and each of its Subsidiaries has good, marketable and insurable fee simple title to the Real Estate owned by such Loan Party or such Subsidiary, free and clear of all Liens, other than Liens created or permitted by the Loan Documents.

(d)    (i) Schedule 5.08(d)(i) sets forth a complete and accurate list of all Leases under which any Loan Party or any Subsidiary of a Loan Party is the lessee as of the Closing Date, showing as of the date hereof the street address, county or other relevant jurisdiction, state, lessor, lessee, expiration date and annual rental cost thereof.  Each such lease is the legal, valid and binding obligation of the lessor thereof, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

(ii)    Schedule 5.08(d)(ii) sets forth a complete and accurate list of all leases of Real Estate under which any Loan Party or any Subsidiary of a Loan Party is the lessor as of the Closing Date, showing as of the date hereof the street address, county or other relevant jurisdiction, state, lessor, lessee, expiration date and annual rental cost thereof.  Each such lease is the legal, valid and binding obligation of the lessee thereof, enforceable in accordance with its

terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

(e)    Schedule 5.08(e) sets forth a complete and accurate list of all Investments held by any Loan Party or any Subsidiary of a Loan Party as of the Closing Date, showing as of the date hereof the amount, obligor or issuer and maturity, if any, thereof.

5.09.    Environmental Compliance.

(a)    The Loan Parties and their respective Subsidiaries conduct in the ordinary course of business a review of the effect of existing Environmental Laws and claims alleging potential liability or responsibility for violation of any Environmental Law on their respective businesses, operations and properties, and as a result thereof the Borrowers have reasonably concluded that no Loan Party or any Subsidiary thereof (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability, except, in each case, for those Environmental Laws and claims which could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    Except as would not reasonably be expected to result in a Material Adverse Effect, (i) none of the properties currently or, to the knowledge of the Loan Parties, formerly owned or operated by any Loan Party or any of its Subsidiaries is listed or proposed for listing on the NPL or on the CERCLIS or any analogous foreign, state or local list or is adjacent to any such property; (ii) there are no and never have been any underground or above-ground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently owned or operated by any Loan Party or any of its Subsidiaries or, to the knowledge of the Loan Parties, on any property formerly owned or operated by any Loan Party or any of its Subsidiaries; (iii) there is no asbestos or asbestos-containing material on any property currently owned or operated by any Loan Party or any of its Subsidiaries; and (iv) Hazardous Materials have not been released, discharged or disposed of on any property currently or, to the knowledge of the Loan Parties, formerly owned or operated by any Loan Party or any of its Subsidiaries.

(c)    (i) Neither any Loan Party nor any of its Subsidiaries is undertaking, and has not completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law, except as would not reasonably be expected to result in a Material Adverse Effect; and (ii) all Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, any property currently or, to the knowledge of the Loan Parties, formerly, owned or operated by any Loan Party or any of its Subsidiaries have been disposed of in a manner which would not reasonably expected to result in a Material Adverse Effect.

5.10.    Insurance.    Schedule 5.10 sets forth a description of all insurance maintained by or on behalf of the Loan Parties as of the Closing Date. Each insurance policy listed on Schedule 5.10 is in full force and effect and all premiums in respect thereof that are due and payable have been paid.

5.11.    Taxes.    The Loan Parties and their Subsidiaries have filed all Federal, state and other material tax returns and reports required to be filed, and have paid all Federal, state and other material taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP and which contest effectively suspends the collection of the contested obligation and the enforcement of any Lien securing such obligation and except to the extent failure to do so is permitted by the Bankruptcy Code or pursuant to the Orders.  There is no proposed tax assessment known to a Responsible Officer of Holdings against any Loan Party or any Subsidiary that would, if made, have a Material Adverse Effect.  Neither any Loan Party nor any Subsidiary thereof is party to any tax sharing agreement.

5.12.    ERISA Compliance.

(a)    Except as set forth on Schedule 5.12, each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other Federal or state Laws.  Each Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the IRS or an application for such a letter is currently being processed by the IRS with respect thereto and, to the best knowledge of the Loan Parties, nothing has occurred which could reasonably be expected to prevent, or cause the loss of, such qualification.  The Loan Parties and each ERISA Affiliate have made all required contributions to each Plan subject to Section 412 of the Code, and no application for a funding waiver or an extension of any amortization period pursuant to Section 412 of the Code has been made with respect to any Plan.

(b)    There are no pending or, to the best knowledge of the Loan Parties, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect.  There has been no non-exempt prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c)    (i) Except as would not reasonably be expected to result in a Material Adverse Effect: (i) no ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability; (iii) neither the Loan Parties nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iv) neither the Loan Parties nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (v) neither the Loan Parties nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA.

01:18374604.1

5.13.   <u>Subsidiaries; Equity Interests; Loan Parties</u>.  As of the Closing Date, no Loan Party has any Subsidiaries other than those specifically disclosed in Part (a) of <u>Schedule 5.13</u>, and all of the outstanding Equity Interests in such Subsidiaries have been validly issued, are fully paid and non-assessable and are owned by a Loan Party in the amounts specified on Part (a) of <u>Schedule 5.13</u> free and clear of all Liens except those created under the Collateral Documents and the Term Loan Documents.  As of the Closing Date no Loan Party has any equity investments in any other corporation or entity other than those specifically disclosed in Part (b) of <u>Schedule 5.13</u>.  As of the Closing Date, the copy of the charter of each Loan Party and each amendment thereto provided pursuant to <u>Section 40.1(a)(v)</u> is a true and correct copy of each such document, each of which is valid and in full force and effect.

5.14.   <u>Margin Regulations; Investment Company Act</u>.

(a)   None of the proceeds of the Loans shall be used in any manner that violates Regulations U or X of the FRB.

(b)   None of the Loan Parties, any Person Controlling the Loan Parties, or any Subsidiary is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

5.15.   <u>Disclosure</u>.  The Loan Parties have disclosed to the Administrative Agent and the Lenders all matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  The information furnished (whether in writing or orally) by or on behalf of the Loan Parties to the Administrative Agent or any Lender in connection with the transactions contemplated hereby (including, without limitation, pursuant to the Budget) and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case as modified or supplemented by other information so furnished), taken as a whole, does not contain any material misstatement of fact or omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

5.16.   <u>Compliance with Laws</u>.  Subject to the entry of the Interim Order or the Final Order, as applicable, each Loan Party and each Subsidiary thereof is in compliance in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

5.17.   <u>Intellectual Property; Licenses, Etc</u>.  Each Loan Party and each of its Subsidiaries own, or possess the right to use, all of the Intellectual Property that are reasonably necessary for the operation of their respective businesses, without conflict with the rights of any other Person, and <u>Schedule 5.17</u> sets forth a complete and accurate list of all such Intellectual Property owned or used by each Loan Party and each of its Subsidiaries which are registered with the United States Patent and Trademark Office and United States Copyright Office.  To the

01:18374604.1

best knowledge of the Borrowers, no slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by any Loan Party or any of its Subsidiaries infringes upon any rights held by any other Person. No claim or litigation regarding any of the foregoing is pending or, to the best knowledge of the Loan Parties, threatened, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

5.18.    [Reserved].

5.19.    Casualty, Etc.  Neither the businesses nor the properties of any Loan Party or any of its Subsidiaries are affected by any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty (whether or not covered by insurance) that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

5.20.    Labor Matters.    There are no strikes, lockouts, slowdowns or other material labor disputes against any Loan Party pending or, to the knowledge of any Loan Party, threatened that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect. The hours worked by and payments made to employees of the Loan Parties comply in all material respects with the Fair Labor Standards Act and any other applicable federal, state, local or foreign Law dealing with such matters. All payments due from any Loan Party, or for which any claim may be made against any Loan Party, on account of wages and employee health and welfare insurance and other benefits, have been paid or properly accrued, in all material respects, in accordance with GAAP as a liability on the books of such Loan Party. Except as set forth on Schedule 5.20 no Loan Party is a party to or bound by any collective bargaining agreement, management agreement, employment agreement, bonus, restricted stock, stock option, or stock appreciation plan or agreement or any similar plan, agreement or arrangement. There are no representation proceedings pending or, to any Loan Party's knowledge, threatened to be filed with the National Labor Relations Board, and no labor organization or group of employees of any Loan Party has made a pending demand for recognition except those that could not reasonably be expected to have a Material Adverse Effect. There are no complaints, unfair labor practice charges, grievances, arbitrations, unfair employment practices charges or any other claims or complaints against any Loan Party pending or, to the knowledge of any Loan Party, threatened to be filed with any Governmental Authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment of any employee of any Loan Party except those that could not reasonably be expected to have a Material Adverse Effect. The consummation of the transactions contemplated by the Loan Documents will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Loan Party is bound.

5.21.    Collateral Documents.  The Collateral Documents, taken together with the Interim Order and/or the Final Order, are effective to create in favor of the Collateral Agent (for the benefit of itself and the other applicable Credit Parties) a legal, valid, continuing and enforceable security interest in the Collateral pledged hereunder or thereunder, in each case subject to no Liens other than the Carve Out and Permitted Liens.  Pursuant to the terms of the Interim Order and/or Final Order, no filing or other action will be necessary to perfect or protect

such Liens and security interests. Pursuant to and to the extent provided in the Interim Order and/or the Final Order, the Obligations of the Loan Parties under this Agreement will constitute allowed super-priority administrative expense claims in the Case under Section 364(c) of the Bankruptcy Code, having priority over all administrative expense claims and unsecured claims against such Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person (excluding, for the avoidance of doubt, Avoidance Actions and the proceeds of thereof; provided that, the Obligations shall be secured by Avoidance Actions arising under Section 549 of the Bankruptcy Code and amounts necessary to reimburse the Agents and the Lenders for the amount of the Carve Out, if any, used to finance the pursuit of recovery or settlement of such other Avoidance Actions), subject only to the Carve Out and, with respect to Term Priority Collateral, the Intercreditor Agreement. Notwithstanding anything to the contrary herein, the Carve Out shall be senior to all Liens and claims (including administrative and superpriority claims) securing the Obligations, the Loan Parties' pre-petition obligations, adequate protection Liens, and all other Liens or claims (including administrative claims and DIP Superpriority Claims), including all other forms of adequate protection, Liens, or claims (including administrative claims and DIP Superpriority Claims) securing the Obligations and pre-petition obligations granted or recognized as valid, including the Liens, security interests, and claims (including administrative claims and DIP Superpriority Claims) granted to the Agents and the other Credit Parties.

5.22.    Indebtedness and Liens.    Holdings, the other Borrowers and their respective Subsidiaries have no Indebtedness (other than Permitted Indebtedness) or Liens (other than Permitted Liens) outstanding as of the Closing Date.

5.23.    Reserved.

5.24.    Licenses and Permits.  Each Loan Party and each of its Subsidiaries has all licenses, permits, authorizations, consents and approvals required by Law to carry on its business as currently conducted or proposed to be conducted, except in each case, to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

5.25.    Affiliate Transactions.  No Loan Party nor any its Subsidiaries has entered into any transaction of any kind with any Affiliate of the Loan Parties, whether or not in the ordinary course of business, except as set forth on Schedule 5.25.

5.26.    Deposit Accounts; Credit Card Arrangements.

(a)    Annexed hereto as Schedule 5.26(a) is a list of all deposit accounts maintained by the Loan Parties as of the Closing Date, which Schedule includes, with respect to each deposit account (i) the name and address of the depository; (ii) the account number(s) maintained with such depository; and (iii) a contact person at such depository.

(b)    Annexed hereto as Schedule 5.26(b) is a list describing all arrangements as of the Closing Date to which any Loan Party is a party with respect to the processing and/or

payment to such Loan Party of the proceeds of any credit card charges for sales made by such Loan Party.

5.27.    [Reserved].

5.28.    Brokers.    No broker or finder brought about the obtaining, making or closing of the Loans or transactions contemplated by the Loan Documents, and no Loan Party or Affiliate thereof has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith.

5.29.    Customer and Trade Relations.    Except for events leading up to and as a result of the commencement of the Cases, there exists no actual or, to the knowledge of any Loan Party, threatened termination or cancellation of, or any material adverse modification or change in the business relationship of any Loan Party with any supplier which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

5.30.    Anti-Corruption Laws and Sanctions.

Each Borrower has implemented and maintains procedures designed to promote and achieve compliance by such Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and each Borrower, its Subsidiaries and their respective officers and employees, and to the knowledge of each Borrower and its Subsidiaries, their directors and agents (acting in their capacity as such), are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects and are not knowingly engaged in any activity that would reasonably be expected to result in such Borrower being designated as a Sanctioned Person. None of (a) any Borrower, any Subsidiary or any of their respective directors, officers or employees, or (b) to the knowledge of any Borrower, any agent of any Borrower or any Subsidiary (acting in its capacity as such) that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person. No Loan, use of proceeds thereof or other transaction contemplated by this Agreement will violate Anti-Corruption Laws or applicable Sanctions.

5.31.    PATRIOT Act.

To the extent applicable, each Loan Party is in compliance, in all material respects, with (i) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (ii) the PATRIOT Act.

5.32.    Budget.

A true and complete copy of the Budget is attached as Schedule 1.02 hereto.

5.33.    Orders.

The Loan Parties are in compliance with the terms and conditions of the Orders.  Each of the Interim Order (to the extent necessary during the Interim Order Period) or the Final Order

(from after the Final Order Date) is in full force and effect and has not been vacated, reversed or rescinded or, without the prior written consent of the Agents and each Lender, no change, amendment or modification or any application or motion for any change, amendment or modification to any of the Orders shall be made, in each case, that is adverse to the interests of the Lenders.

ARTICLE VI
AFFIRMATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than any indemnity obligation for unasserted claims that by its terms survives the termination of this Agreement), each of the Loan Parties shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02, 6.03 and 6.12) cause each Subsidiary to:

6.01.  Financial Statements.  Deliver to the Administrative Agent and the FILO Agent, in form and detail reasonably acceptable to the Administrative Agent and the FILO Agent:

(a)      within thirty (30) days after the Petition Date, a proposed revised Budget inclusive of periods through the Maturity Date, which shall be subject to the reasonable approval of the Administrative Agent, the FILO Agent and the Required Lenders, it being further agreed that, if such proposal (or any further revision thereof) does not receive such approval, (i) the Borrower Representative shall use its commercially reasonable efforts to revise and resubmit such proposal in response to comments received thereon from the Administrative Agent, the FILO Agent or the Required Lenders and (ii) until such time as the revised Budget is approved, the then existing Budget will remain in effect as the approved Budget.

(b)      within thirty (30) days after the Petition Date, detailed financial projections, including, in each case, a consolidated income statement, balance sheet, statement of cash flow, borrowing base availability analysis and business assumptions for Slap Shot and its Subsidiaries on a monthly basis through the Maturity Date.

6.02.  Certificates; Other Information.  Deliver to the Administrative Agent and the FILO Agent, in form and detail reasonably satisfactory to the Administrative Agent and the FILO Agent:

(a)      Reserved;

(b)      Reserved;

(c)      on Wednesday of each week (or, if Wednesday is not a Business Day, on the next succeeding Business Day), a certificate in the form of Exhibit I (a "Borrowing Base Certificate") showing the Borrowing Base as of the close of business on the immediately preceding Friday, each Borrowing Base Certificate to be certified as complete and correct in all material respects on behalf of the Borrowers by a Responsible Officer of the Borrower Representative;

(d)    promptly after any request by the Administrative Agent, copies of any management letters submitted to the board of directors (or the audit committee of the board of directors) of any Loan Party by independent accountants in connection with the accounts or books of any Loan Party or any of its Subsidiaries, or any audit of any of them;

(e)    promptly after the same are available, copies of all annual, regular, periodic and special reports and registration statements which Holdings or the other Borrower may file or be required to file with the SEC under Section 13 or 15(d) of the Securities Exchange Act of 1934, or with any national securities exchange, and in any case not otherwise required to be delivered to the Administrative Agent pursuant hereto;

(f)    promptly, and in any event within seven (7) Business Days after receipt thereof by any Loan Party or any Subsidiary thereof, copies of each notice or other correspondence received from the SEC (or comparable agency in any applicable non-U.S. jurisdiction) concerning any investigation or possible investigation or other inquiry by such agency regarding financial or other operational results of any Loan Party or any Subsidiary thereof;

(g)    not later than seven (7) Business Days after receipt thereof by any Loan Party or any Subsidiary thereof, copies of all notices, requests and other documents (including amendments, waivers and other modifications) so received under or pursuant to any Related Document or instrument, indenture, loan or credit or similar agreement regarding or related to any breach or default by any party thereto or any other event that could have a Material Adverse Effect and, from time to time upon request by the Administrative Agent, such information and reports regarding the Related Documents and such instruments, indentures and loan and credit and similar agreements as the Administrative Agent may reasonably request;

(h)    promptly after the assertion or occurrence thereof, notice of any action or proceeding against or of any noncompliance by any Loan Party or any of its Subsidiaries with any Environmental Law or Environmental Permit that could reasonably be expected to have a Material Adverse Effect;

(i)    at least five (5) Business Days prior written notice (or such shorter period as to which the Administrative Agent in its sole discretion agrees) of any change in: (i) any Loan Party's name (ii) any Loan Party's organizational structure or jurisdiction of incorporation or formation; or (iii) any Loan Party's Federal Taxpayer Identification Number or organizational identification number assigned to it by its state of organization;

(j)    every Wednesday during the Cases, commencing on the Wednesday following the first full calendar week after the Closing Date, (i) a weekly cash flow forecast for the subsequent 13-week period prepared by a Responsible Officer of the Borrower Representative, and (ii) a variance report prepared by a Responsible Officer of the Borrower Representative (the "Variance Report") setting forth actual cash receipts and disbursements of the Loan Parties for the preceding one calendar week period and setting forth all the variances, on a line-item and aggregate basis, from the amount set forth for such calendar week as compared to the Budget and the most recent weekly cash flow forecast delivered by the Loan Parties, in each case, for each Testing Period (and each such Variance Report shall include

01:18374604.1

-100-

reasonably detailed explanations for all material variances (including Permitted Variances) and shall be certified by a Responsible Officer of the Borrower Representative);

(k)     substantially concurrently with the delivery of the weekly cash flow forecast pursuant to Section 6.02(j), a "flash" cash report detailing all cash and Cash Equivalents on-hand of each of the Borrower and its Subsidiaries (broken out by entity) as of the close of business on such date;

(l)     upon the reasonable request of the Administrative Agent or the FILO Agent, periodic estimated summaries of the then Reported Fee Accruals;

(m)     all documents and information required to be delivered pursuant to the Orders;

(n)     cause the Acceptable Liquidator to provide weekly reports in form reasonably satisfactory to the Administrative Agent and the FILO Agent regarding the results and status of the Initial Store Closing Sale, including a schedule of applicable discounts then in effect and to be established in the future; and

(o)     promptly, such additional information regarding the business, financial, legal or corporate affairs of any Loan Party or any Subsidiary thereof, or compliance with the terms of the Loan Documents, as the Administrative Agent or the FILO Agent may from time to time reasonably request.

6.03.   Notices.  Promptly notify the Administrative Agent and the FILO Agent:

(a)     of the occurrence of any Default;

(b)     of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect (other than as a result of the commencement of the Cases), including as a result of (i) breach or non-performance of, or any default under, a Contractual Obligation of any Loan Party or any Subsidiary thereof; (ii) any dispute, litigation, investigation, proceeding or suspension between any Loan Party or any Subsidiary thereof and any Governmental Authority; or (iii) the commencement of, or any material development in, any litigation or proceeding affecting any Loan Party or any Subsidiary thereof, including pursuant to any applicable Environmental Laws;

(c)     of the occurrence of any ERISA Event;

(d)     of the (i) occurrence of any Disposition of property or assets for which the Borrowers are required to make a mandatory prepayment pursuant to Section 2.05(g), (ii) occurrence of any sale of capital stock or other Equity Interests for which the Borrowers are required to make a mandatory prepayment pursuant to Section 2.05(g), (iii) incurrence or issuance of any Indebtedness for which the Borrowers are required to make a mandatory prepayment pursuant to Section 2.05(g), and (iv) receipt of any Extraordinary Receipt for which the Borrowers are required to make a mandatory prepayment pursuant to Section 2.05(g);

01:18374604.1

(e)     of (i) any casualty or other insured damage to any portion of the Collateral or (ii) the commencement of any action or proceeding for the taking of any interest in a portion of the Collateral under power of eminent domain or (iii) by condemnation or similar proceeding or if any portion of the Collateral is damaged or destroyed; provided, however, that with respect to each of clauses (i), (ii) and (iii), the amount of Collateral affected thereby shall have an aggregate fair market value in excess of $15.0 million

(f)     of any change in Holdings' or any other Borrowers' chief executive officer or chief financial officer;

(g)     of any material notice received in connection with the Initial Store Closing Sale; and

(h)     of any resignation or termination of the engagement of the Independent Consultant or Financial Advisor.

(i)     Each notice pursuant to Section 6.03(a) shall (i) be accompanied by a statement of a Responsible Officer of the Borrower Representative setting forth details of the occurrence referred to therein and stating what action the Borrowers have taken and proposes to take with respect thereto and (ii) describe with particularity any and all provisions of this Agreement and any other Loan Document that may have been breached.

6.04.   Payment of Obligations.  To the extent required by any Order or the Bankruptcy Code, pay and discharge as the same shall become due and payable, all obligations and liabilities incurred after the Petition Date consisting of (a) all tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, unless the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by Holdings or such Subsidiary and which contest effectively suspends the collection of the contested obligation and the enforcement of any Lien securing such obligation; and (b) all lawful claims which, if unpaid, would by law become a Lien upon its property (except as set forth in clause (a) above).

6.05.   Preservation of Existence, Etc.  Except for transactions permitted by Section 7.04 or 7.05, (a) preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization; (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; and (c) preserve or renew all of its registered patents, trademarks, trade names and service marks, the non-preservation of which could reasonably be expected to have a Material Adverse Effect.

6.06.   Maintenance of Properties.  (a) Maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted; and (b) make all necessary repairs thereto and renewals and replacements thereof except, in each case, where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

6.07.   <u>Maintenance of Insurance</u>.   (a)   Maintain with financially sound and reputable insurance companies not Affiliates of the Loan Parties, insurance with respect to its properties and business against loss or damage, in each case, reasonably satisfactory to the Administrative Agent (i) of the kinds or customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons or (ii) substantially similar to insurance maintained by the Borrowers on the Closing Date, in each case, subject to such changes as the Borrowers may reasonably deem appropriate in their business judgment with respect to deductibles, self-insured amounts, coverage exclusions and maximum covered losses (<u>provided</u> that none of such policies shall include a co-insurance clause), and providing for not less than 30 days' prior notice to the Administrative Agent of termination, lapse or cancellation of such insurance;

(b)   With respect to each improved Real Estate subject to a Mortgage, obtain flood insurance in an amount not less than $5.0 million for Zone A "flood hazard areas" and $10.0 million for all other "flood hazard areas", in each case, as set forth on any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), and otherwise comply with the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973, as amended from time to time.

(c)   Fire and extended coverage policies maintained with respect to any Collateral shall be endorsed or otherwise amended to include (i) a mortgage clause (regarding improvements to Real Estate) and lenders' loss payable clause (regarding personal property), in form and substance satisfactory to the Collateral Agent, which endorsements or amendments shall provide that the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies directly to the Collateral Agent, and (ii) such other provisions as the Collateral Agent may reasonably require from time to time to protect the interests of the Credit Parties. Commercial general liability policies shall be endorsed to name the Collateral Agent as an additional insured. Business interruption policies shall name the Collateral Agent as a loss payee and shall be endorsed or amended to include (i) a provision that, from and after the Closing Date, the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies directly to the Collateral Agent, and (ii) such other provisions as the Collateral Agent may reasonably require from time to time to protect the interests of the Credit Parties. Each such policy referred to in this <u>Section 6.07</u> shall also provide that it shall not be canceled or not renewed (i) by reason of nonpayment of premium except upon not less than ten (10) days' prior written notice thereof by the insurer to the Collateral Agent (giving the Collateral Agent the right to cure defaults in the payment of premiums) or (ii) for any other reason except upon not less than thirty (30) days' prior written notice thereof by the insurer to the Collateral Agent. The Borrowers shall deliver to the Collateral Agent, prior to the cancellation, modification adverse to the Lenders, or non-renewal of any such policy of insurance, a copy of a renewal or replacement policy (or other evidence of renewal of a policy previously delivered to the Collateral Agent, including an insurance binder) together with evidence satisfactory to the Collateral Agent of payment of the premium therefor.

(d)   In the event that any part of the Collateral is damaged by fire or other casualty, subject to the Intercreditor Agreement and the Orders, such proceeds, in their entirety, shall be delivered to the Administrative Agent and the Administrative Agent shall promptly

apply such proceeds to reduce the Borrowers' outstanding Credit Extensions in accordance with Sections 2.05(g) or 8.03, as applicable.

(e)     None of the Credit Parties, or their agents or employees shall be liable for any loss or damage insured by the insurance policies required to be maintained under this Section 6.07.  Each Loan Party shall look solely to its insurance companies or any other parties other than the Credit Parties for the recovery of such loss or damage and such insurance companies shall have no rights of subrogation against any Credit Party or its agents or employees.  If, however, the insurance policies do not provide waiver of subrogation rights against such parties, as required above, then the Loan Parties hereby agree, to the extent permitted by law, to waive their right of recovery, if any, against the Credit Parties and their agents and employees.  The designation of any form, type or amount of insurance coverage by any Credit Party under this Section 6.07. shall in no event be deemed a representation, warranty or advice by such Credit Party that such insurance is adequate for the purposes of the business of the Loan Parties or the protection of their properties.

6.08.   Compliance with Laws.   Comply in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves have been set aside and maintained by the Loan Parties in accordance with GAAP; or (b) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

6.09.   Books and Records.   Maintain proper books of record and account, in which entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of the Loan Parties or its Subsidiaries, as the case may be.

6.10.   Inspection Rights. (a)  Permit representatives and independent contractors of the Administrative Agent and the FILO Agent (accompanied by any Lender (with the consent of the Borrower Representative (not to be unreasonably withheld)) to visit and inspect any of its properties, to examine its corporate, financial and operating records, and insurance policies, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants, all at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower Representative; provided, however, that unless an Event of Default has occurred and is continuing, the Administrative Agent may make only one such visit in any Fiscal Year at the Borrowers' expense, provided further that when an Event of Default exists the Administrative Agent (or any of its representatives or independent contractors) may do any of the foregoing at the expense of the Borrowers at any time during normal business hours.

(b)     Upon the request of the Administrative Agent, after reasonable prior notice, permit the Administrative Agent (or, if in accordance with the proviso set forth below, the FILO Agent) or professionals (including investment bankers, consultants, accountants, lawyers and appraisers) retained by the Administrative Agent (or, if in accordance with the proviso set forth below, the FILO Agent) to conduct appraisals, commercial finance examinations and other

evaluations, including, without limitation, of (i) the Borrowers' practices in the computation of the Borrowing Base and the FILO Borrowing Base, and (ii) the assets included in the Borrowing Base and the FILO Borrowing Base and related financial information such as, but not limited to, sales, gross margins, payables, accruals and reserves.  Subject to the following sentences, the Loan Parties shall pay the fees and expenses of the Administrative Agent (or, if in accordance with the proviso set forth below, the FILO Agent) or such professionals with respect to such evaluations and appraisals.  The Loan Parties acknowledge that the Administrative Agent shall undertake up to  one (1) commercial finance examination, one (1) full inventory appraisal and monthly desktop appraisals during the term hereof at the Loan Parties' expense; provided that, in the event that the Administrative Agent has not undertaken a commercial finance examination or inventory appraisal within any immediately preceding seven (7) month period, then the FILO Agent shall be permitted to undertake such commercial finance examination or appraisal, as applicable and may direct the Administrative Agent to implement the results of any such commercial finance examination or appraisal.   Notwithstanding the foregoing, the Administrative Agent may cause additional appraisals and commercial finance examinations to be undertaken (y) as it in its discretion deems necessary or appropriate, at its own expense, or (z) if required by applicable Law or if a Default shall have occurred and be continuing, at the expense of the Loan Parties.

6.11.   Use of Proceeds.  In accordance with and subject to the Budget, and upon entry of the Interim Order, use the proceeds of the Credit Extensions to finance  (in accordance with the terms of and procedures set forth in the Interim Order): (i) the payment of transaction expenses, (ii) the payment of fees, expenses and costs incurred in connection with the  Cases, (iii) the payment of any adequate protection payments approved in the Orders and (iv) working capital, capital expenditures, and other general corporate purposes of the Borrowers and Guarantors.  Upon entry of the Final Order, in addition to the above, the proceeds of (x) Revolving Loans shall be used for the repayment of all Revolving Loans (but not, for the avoidance of doubt, Letters of Credit, which shall be deemed issued under this Agreement upon entry of the Interim Order) under the Existing Credit Agreement, and (y) the FILO Loan shall be used for the repayment of the outstanding FILO Loan under the Existing Credit Agreement.

6.12.   Covenant to Guarantee Obligations and Give Security.

(a)   Upon the formation or acquisition of any new direct or indirect Subsidiary (other than any Excluded Subsidiary) by any Loan Party, then the Borrowers shall, at the Borrowers' expense, within the time period specified below unless the Administrative Agent in its sole discretion consents to an extension thereof:

(i)   within 20 Business Days after such formation or acquisition, cause such Subsidiary, and cause each direct and indirect parent of such Subsidiary (if it has not already done so), to duly execute and deliver to the Administrative Agent, at the Administrative Agent's option, (A) a guaranty or guaranty supplement, in form and substance satisfactory to the Administrative Agent, guaranteeing the other Loan Parties' obligations under the Loan Documents, or (B) a Joinder Agreement, pursuant to which cause such Subsidiary to become a Borrower under this Agreement,

(ii)    within 20 Business Days after such formation or acquisition, furnish to the Administrative Agent a description of the real and personal properties of such Subsidiary, in detail reasonably satisfactory to the Administrative Agent,

(iii)    within 20 Business Days after such formation or acquisition, cause such Subsidiary and each direct and indirect parent of such Subsidiary (if it has not already done so) to duly execute and deliver to the Administrative Agent security and pledge agreements covering the personal property of such Subsidiaries, as specified by and in form and substance satisfactory to the Administrative Agent (including delivery of all Pledged Debt and Pledged Equity in and of such Subsidiary, and other instruments of the type specified in Section 4.01(a)(ii), but not including any Excluded Collateral), securing payment of all the Obligations of such Subsidiary or such parent, as the case may be, under the Loan Documents and constituting Liens on all such real and personal properties,

(iv)    within 20 Business Days after such formation or acquisition, cause such Subsidiary and each direct and indirect parent of such Subsidiary (if it has not already done so) to take whatever action (including the filing of Uniform Commercial Code financing statements, the giving of notices and the endorsement of notices on title documents) may be necessary or advisable in the opinion of the Administrative Agent to vest in the Administrative Agent (or in any representative of the Administrative Agent designated by it) valid and subsisting Liens on the personal property purported to be subject to the security and pledge agreements delivered pursuant to this Section 6.12, enforceable against all third parties in accordance with their terms, and

(v)    within 20 Business Days after such formation or acquisition, deliver to the Administrative Agent, upon the request of the Administrative Agent in its sole discretion, a signed copy of a favorable opinion, addressed to the Administrative Agent and the other Credit Parties, of counsel for the Loan Parties acceptable to the Administrative Agent as to the matters contained in clauses (i), (iii) and (iv) above, and as to such other matters as the Administrative Agent may reasonably request; and

(vi)    Promptly grant to the Collateral Agent, within 30 Business Days of the acquisition thereof, a security interest in and Mortgage on each Real Estate owned in fee by such Loan Party as is acquired by such Loan Party after the Closing Date and that, together with any improvements thereon, individually has a fair market value of at least $3.0 million as additional security for the Obligations (unless the subject property is already mortgaged to a third party to the extent permitted by Section 7.01).  Such Mortgages shall be granted pursuant to documentation reasonably satisfactory in form and substance to the Administrative Agent and the Collateral Agent and shall constitute valid and enforceable perfected Liens subject only to Permitted Liens or other Liens acceptable to the Collateral Agent.  The Mortgages or instruments related thereto shall be duly recorded or filed in such manner and in such places as are required by law to establish, perfect, preserve and protect the Liens in favor of the Collateral Agent required to be granted pursuant to the Mortgages and all taxes, fees and other charges payable in connection therewith shall be paid in full.  Such Loan Party shall otherwise take such actions and execute and/or deliver to the Collateral Agent such documents as the

Administrative Agent or the Collateral Agent shall require to confirm the validity, perfection and priority of the Lien of any existing Mortgage or new Mortgage against such after-acquired Real Estate (a local counsel opinion (in form and substance reasonably satisfactory to the Administrative Agent and the Collateral Agent) in respect of such Mortgage).

(b)     At any time upon request of the Administrative Agent, promptly execute and deliver any and all further instruments and documents and take all such other action as the Administrative Agent may deem reasonably necessary or desirable in obtaining the full benefits of, or (as applicable) in perfecting and preserving the Liens of, such guaranties, deeds of trust, trust deeds, deeds to secure debt, mortgages, leasehold mortgages, leasehold deeds of trust, and other security and pledge agreements.

6.13.   <u>Cash Management.</u>

(a)     Manage all cash in accordance with the provisions of the Existing Loan Documents, and as provided in the Orders and/or the Cash Management Order, in each case as entered by the Bankruptcy Court.

(b)     Without limiting the generality of clause (a) above, cause the ACH or wire transfer no less frequently than daily (and whether or not there are then any outstanding Obligations) to the concentration account maintained by the Collateral Agent at Bank of America, N.A. (the "<u>Concentration Account</u>"), of all cash receipts and collections, including, without limitation, the following:

(i)     all available cash receipts from the sale of Inventory and other assets;

(ii)    all proceeds of collections of Accounts;

(iii)   all Net Cash Proceeds, and all other cash payments received by a Loan Party from any Person or from any source or on account of any sale or other transaction or event;

(iv)    the then contents of each DDA; and

(v)     the net proceeds of all credit card charges.

(c)     The Concentration Account shall at all times be under the sole dominion and control of the Collateral Agent.  The Loan Parties hereby acknowledge and agree that (i) the Loan Parties have no right of withdrawal from the Concentration Account, (ii) the funds on deposit in the Concentration Account shall at all times be collateral security for all of the Obligations and (iii) the funds on deposit in the Concentration Account shall be applied, subject to the Orders, as provided in <u>Sections 2.05(g)</u> or <u>8.03</u>, as applicable, of this Agreement; <u>provided that</u>, between the time period of entry of the Interim Order and entry of the Final Order, the funds on deposit in the Concentration Account shall be applied to repay the Revolving Loans under the Existing Credit Agreement (but not, for the avoidance of doubt, Letters of Credit under the Existing Credit Agreement, which shall be deemed issued hereunder as of the date of entry of the Interim Order) pursuant to a "creeping roll up" (post-petition collections applied to repay

prepetition obligations with corresponding advances to be made with Revolving Loans hereunder). In the event that, notwithstanding the provisions of this Section 6.13, any Loan Party receives or otherwise has dominion and control of any such proceeds or collections, such proceeds and collections shall be held in trust by such Loan Party for the Collateral Agent, shall not be commingled with any of such Loan Party's other funds or deposited in any account of such Loan Party and shall, not later than the Business Day after receipt thereof, be deposited into the Concentration Account or dealt with in such other fashion as such Loan Party may be instructed by the Collateral Agent.

(d)     For the avoidance of doubt, it is understood and agreed that all cash, Money and proceeds set forth in the foregoing clause (b) shall at all times constitute Collateral, whether or not located in the Concentration Account.

6.14.    [Reserved].

6.15.    Compliance with Environmental Laws.  Comply in all material respects (including through the reasonable enforcement of applicable lease provisions), with all applicable Environmental Laws and Environmental Permits; obtain and renew all Environmental Permits necessary for its operations and properties; and conduct any investigation, study, sampling and testing, and undertake any cleanup, removal, remedial or other action necessary to remove and clean up all Hazardous Materials from any of its properties, in accordance with the requirements of all Environmental Laws; provided, however, that neither Holdings nor any of its Subsidiaries shall be required to undertake any such cleanup, removal, remedial or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances in accordance with GAAP.

6.16.    Preparation of Environmental Reports.    At any time during the continuance of an Event of Default, at the expense of the Borrowers, an environmental site assessment report for any of its owned Real Estate described in such request, prepared by an environmental consulting firm acceptable to the Administrative Agent, indicating the presence or absence of Hazardous Materials and the estimated cost of any compliance, removal or remedial action in connection with any Hazardous Materials on such owned Real Estate; without limiting the generality of the foregoing, if the Administrative Agent determines that a material risk exists that any such report will not be provided within the time referred to above, the Administrative Agent may retain an environmental consulting firm to prepare such report at the expense of the Borrowers, and Holdings hereby grants and agrees to cause any Subsidiary that owns any Mortgaged Property described in such request to grant at the time of such request to the Administrative Agent, the Lenders, such firm and any agents or representatives thereof an irrevocable non-exclusive license, subject to the rights of tenants, to enter onto their respective properties to undertake such an assessment.

6.17.    Further Assurances.

Promptly upon request by the Administrative Agent, or any Lender through the Administrative Agent, (a) correct any material defect or error that may be discovered in any Loan Document or in the execution, acknowledgment, filing or recordation thereof, and (b) do,

execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent, or any Lender through the Administrative Agent, may reasonably require from time to time in order to (i) carry out more effectively the purposes of the Loan Documents, (ii) to the fullest extent permitted by applicable law, subject any Loan Party's or any of its Subsidiaries' properties, assets, rights or interests to the Liens now or hereafter intended to be covered by any of the Collateral Documents, (iii) perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and any of the Liens intended to be created thereunder and (iv) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto the Credit Parties the rights granted or now or hereafter intended to be granted to the Credit Parties under any Loan Document or under any other instrument executed in connection with any Loan Document to which any Loan Party or any of its Subsidiaries is or is to be a party, and cause each of its Subsidiaries to do so.

6.18.   <u>Compliance with Terms of Leaseholds</u>.   Only to the extent required pursuant to any Order or the Bankruptcy Code, make all payments and otherwise perform all obligations becoming due following the Petition Date in respect of all leases of Real Estate to which Holdings or any of its Subsidiaries is a party, keep such leases in full force and effect and not allow such leases to lapse or be terminated or any rights to renew such leases to be forfeited or cancelled except, in any case, where the failure to do so, either individually or in the aggregate, could not be reasonably likely to have a Material Adverse Effect.

6.19.   <u>Designation as Senior Debt</u>.   Designate all Obligations as "Designated Senior Indebtedness" (or any similar term) under, and defined in, any Subordinated Indebtedness of any Loan Party which contains such designations.

6.20.   <u>Anti-Corruption Laws, PATRIOT Act and Sanctions</u>.

Each Borrower will maintain procedures designed to promote and achieve compliance by the Borrowers, their Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws, the PATRIOT Act and applicable Sanctions and the Borrowers and their Subsidiaries will conduct their business in compliance, in all material respects, with Anti-Corruption Laws.

6.21.   <u>Additional Information Obligations</u>.

(a)   <u>Case Documents and Motions</u>.   As soon as practicable in advance of filing with the Bankruptcy Court of all documents, motions and pleadings related to the Sale Process, the Orders or this Agreement, deliver to the Administrative Agent, the FILO Agent and the Lenders all such documents to be filed and provide the Lenders with a reasonable opportunity to review and comment on all such documents.

(b)   <u>Other Information</u>.   Deliver to the Lenders promptly after the same are available, copies of all pleadings, applications, judicial information, financial information and other documents filed on behalf of any Borrower or Guarantor with the Bankruptcy Court in the Cases, or distributed by or on behalf of any Borrower or Guarantor to the Committee.

01:18374604.1

(c)     Access to Advisors.  Allow the Administrative Agent, the FILO Agent and the Lenders access to, upon reasonable notice during normal business hours, all financial professionals engaged by the Loan Parties (which engagement, with respect to any financial professionals engaged after the Closing Date, shall be on terms and conditions reasonably satisfactory to the Required Lenders).

6.22.   Retention of and Communication with Consultants and Financial Advisors.

(a)     Continue to retain the Independent Consultant and the Financial Advisor, the scope and terms of such engagement to be reasonably satisfactory to the Administrative Agent and the FILO Agent (subject to Bankruptcy Court approval).  Until such time as all Existing Liabilities and all Obligations have been repaid in full (or cash collateralized in accordance with the terms hereof) and all Commitments have been terminated, the Borrower Representative shall continue to retain (x) the Independent Consultant to assist the Loan Parties with the Initial Store Closing Sale, the Sale Motion, and with the preparation of the Budget and the other financial and Collateral reporting required to be delivered to the Administrative Agent, the FILO Agent and the Lenders pursuant to this Agreement and (y) the Financial Advisor to assist the Loan Parties with the Sale Process.  Notwithstanding the foregoing or anything set forth in the engagement letter by and between the Loan Parties and the Financial Advisor to the contrary, the Financial Advisor shall receive (x) the "Monthly Fee" set forth in such engagement letter and reimbursement of expenses as set forth in such engagement letter, (y) fees in an amount up to $1,250,000 to be paid on the later of (i) the date of entry of the Interim Order and (ii) the date of entry of an order authorizing the retention of the Financial Advisor, and (z) additional fees due and owing under the Financial Advisor's engagement letter upon the approval by the Bankruptcy Court of the final fee application filed in the Cases, or, if earlier, upon the payment in full of all Existing Liabilities and all Obligations.

(b)     The Borrower Representative authorizes each of the Administrative Agent and the FILO Agent to communicate directly with its independent certified public accountants, appraisers, financial advisors, investment bankers and consultants (including the Independent Consultant and the Financial Advisor), which have been engaged from time to time by the Loan Parties, and authorizes and shall instruct those accountants, appraisers, financial advisors, investment bankers and consultants to communicate to the Administrative Agent and the FILO Agent information relating to each Loan Party with respect to the business, results of operations, prospects and financial condition of such Loan Party.  Senior management of the Loan Parties and such financial and restructuring consultants shall participate in weekly telephonic calls with the Administrative Agent, the FILO Agent and Lenders (and/or their advisors and counsel) to discuss various matters, including the Budget, Permitted Variances, Sale Process and Initial Store Closing Sale.

(c)     Each Loan Party acknowledges that the Administrative Agent shall be permitted to engage such outside consultants and advisors (each, a "Lender Group Consultant"), for the sole benefit of the Administrative Agent and other Credit Parties, as the Administrative Agent may determine to be necessary or appropriate in its sole discretion.  Each Loan Party and agrees that (i) such Loan Party shall provide its complete cooperation during business hours with any Lender Group Consultant (including, without limitation, providing reasonable access to such

Loan Party's business, books and records); and (ii) all reasonable costs and expenses of any such Lender Group Consultant shall be Credit Party Expenses; and (iii) all reports, determinations and other written and verbal information provided by any Lender Group Consultant shall be confidential and no Loan Party shall be entitled to have access to same.

6.23.    Performance within Budget.

At all times following the Closing Date, strictly perform in accordance with the Budget, including having made all scheduled payments to the Existing Loan Parties and Credit Parties as applicable as and when required, subject to the following (the "Permitted Variances"):

(a)    the Borrowers' Net Cash Flow (as reflected in the Budget) shall be at least equal to 90% of the amount reflected in the Budget;

(b)    the Borrowers' revenues shall be at least 90% of the projected amounts set forth in the Budget; and

(c)    the Borrowers' cumulative Total Disbursements shall be not more than 110% of the projected amounts set forth in the Budget.

The foregoing shall be reported on Wednesday of each week (commencing with the first such date to occur after the first full calendar week following the Petition Date) (i) with respect to clause (a) above, on a cumulative basis for the first four (4) weeks after the Petition Date and thereafter on a trailing four (4) week basis, and (ii) with respect to clauses (b) – (c) above, on a cumulative basis after the end of the second (2nd) week following the Petition Date, and thereafter on a trailing four (4) week basis (clauses (i) and (ii), collectively, the "Testing Period") pursuant to the Variance Report delivered by the Lead Borrower to the Agent in accordance with Section 6.02(j).

6.24.    Additional Bankruptcy Related Affirmative Covenants.

(a)    File a motion with the Bankruptcy Court on the Petition Date approving the store closings pursuant to the Initial Store Closing Sale and the Agency Agreement, and within 14 days after the Petition Date, obtain an interim order of the Bankruptcy Court approving same.

(b)    On the Petition Date, the Loan Parties shall have filed a motion under Section 365 of the Bankruptcy Code requesting extension of the date on which the Loan Parties must assume or reject leases to 210 days after the entry of the order for relief, with an order so extending that deadline to be have been entered by the Bankruptcy Court within thirty (30) days after the Petition Date. The Loan Parties may not, without the prior written consent of the Administrative Agent, assume, assume and assign, or reject leases. The Loan Parties shall use their best efforts to obtain an order from the Bankruptcy Court granting such extension motion.

(c)    On the Petition Date, the Loan Parties shall file motion (the "Sale Motion") requesting, among other things, approval of a Section 363 sale process ("Sale Process") to sell all of the Loan Parties' business and assets ("363 Sale"), which Sale Motion

shall include a motion seeking authority to establish bidding procedures for the proposed Sale Process on terms reasonably acceptable to the Administrative Agent and the FILO Agent.  The Sale Motion, as well as the order approving the related bid procedures ("Bidding Procedures Order") shall be reasonably acceptable to the Administrative Agent and the FILO Agent.

(d)    Incidental to the filing of the Sale Motion and the entry of the Bidding Procedures Order:

(i)    Upon receipt thereof, the Loan Parties shall deliver to the Administrative Agent and the FILO Agent copies of all formal proposals, letters of interest, letters of intent, bids, agreements and any final proposed definitive documentation for any sale of any or all its assets or any other investment pursuant to which additional capital is to be received by the Loan Parties.

(ii)    From and after the Petition Date, the Borrowers shall establish and maintain an electronic data room with current information to facilitate diligence by any potential bidders with respect to such sale.

(iii)    No later than April 11, 2016, the Borrowers shall forward so-called "bid packages" to any potential bidders to whom bid packages had not already been delivered prior to the Petition Date, including, without limitation, to potential bidders identified by the Administrative Agent and the FILO Agent, provided such potential bidders have entered into confidentiality agreements reasonably acceptable to the Borrowers, with the deadline for submitting binding bids with respect to the sale of the Borrower's assets on or before April 21, 2016.

(iv)    One or more binding bids for some or all of the assets of the Loan Parties upon terms and conditions acceptable to the Administrative Agent and the FILO Agent in their reasonable discretion shall have been received by no later than April 21, 2016. Without limiting the discretion of the Administrative Agent and the FILO Agent in determining the acceptability of such a bid or bids, in no event shall any bid which contains a financing contingency be reasonably acceptable.

(v)    On or before April 25, 2016, an auction among all qualified bidders shall be conducted with the highest and best bid or combination of bids being selected, in consultation with the Administrative Agent and the FILO Agent.  To the extent that any binding bids are bids of liquidators related to store closing or going out of business sales, any such bids shall provide that such sales shall be conducted only on a so-called "equity" basis and not a commission or other basis.

(vi)    No later than April 27, 2016, the Bankruptcy Court shall have conducted a sale hearing with respect to such sale and the Borrowers shall have obtained an order of the Bankruptcy Court approving the Sale Motion.  The Borrowers shall consummate the 363 Sale described therein on or before April 28, 2016.

(e)    Notwithstanding the Sale Process set forth in clause (d) above, if the Incremental DIP Loans are received on or prior to March 15, 2016, then the milestones set forth in clause (d) shall be extended as follows:

(i)    No later than May 9, 2016, the Borrowers shall forward so-called "bid packages" to any potential bidders to whom bid packages had not already been delivered prior to the Petition Date, including, without limitation, to potential bidders identified by the Administrative Agent and the FILO Agent, provided such potential bidders have entered into confidentiality agreements reasonably acceptable to the Borrowers, with the deadline for submitting binding bids with respect to the sale of the Borrower's assets on or before May 19, 2016.

(ii)    One or more binding bids for some or all of the assets of the Loan Parties upon terms and conditions acceptable to the Administrative Agent and the FILO Agent in their reasonable discretion shall have been received by no later than May 19, 2016. Without limiting the discretion of the Administrative Agent and the FILO Agent in determining the acceptability of such a bid or bids, in no event shall any bid which contains a financing contingency be reasonably acceptable.

(iii)    On or before May 23, 2016, an auction among all qualified bidders shall be conducted with the highest and best bid or combination of bids being selected, in consultation with the Administrative Agent and the FILO Agent.  To the extent that any binding bids are bids of liquidators related to store closing or going out of business sales, any such bids shall provide that such sales shall be conducted only on a so-called "equity" basis and not a commission or other basis.

(iv)    No later than May 25, 2016, the Bankruptcy Court shall have conducted a sale hearing with respect to such sale and the Borrowers shall have obtained an order of the Bankruptcy Court approving the Sale Motion.  The Borrowers shall consummate the 363 Sale described therein on or before May 27, 2016.

(f)    The Loan Parties shall promptly, punctually, and faithfully perform all of the terms and conditions of the Orders.

(g)    On or before the date that is thirty (30) days following the Petition Date, the Bankruptcy Court shall have entered the Final Order acceptable to the Administrative Agent and the FILO Agent.

## ARTICLE VII
## NEGATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than any indemnity obligations for unasserted claims that by its terms survives the termination of this Agreement) or any Letter of Credit shall remain outstanding, the Loan Parties shall not, nor shall they permit any Subsidiary to, directly or indirectly:

7.01.    Liens.  Create, incur, assume or suffer to exist any Lien upon any of its property, other than the following Liens (Liens described below are herein referred to as "Permitted Liens"):

(a)	Liens pursuant to any Loan Document;

(b)	Permitted Prior Liens, and Liens created prior to the Petition Date and existing on the date hereof and listed on Schedule 7.01(b);

(c)	Liens for taxes not yet due or that constitute prepetition claims;

(d)	carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business which are not overdue for a period of more than 30 days or that constitute prepetition claims;

(e)	to the extent existing on the Petition Date or as otherwise contemplated by the Budget, pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by ERISA;

(f)	to the extent existing on the Petition Date or as otherwise contemplated by the Budget, deposits to secure the performance of bids, trade contracts and leases (other than Indebtedness), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(g)	easements, rights-of-way, restrictions and other similar encumbrances affecting Real Estate which, in the aggregate, are not substantial in amount, and which do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the applicable Person;

(h)	to the extent existing on the Petition Date, Liens securing judgments for the payment of money not constituting an Event of Default under Section 8.01(h);

(i)	Liens securing Indebtedness permitted under Section 7.02(g); provided that (i) such Liens do not at any time encumber any property other than the property financed by such Indebtedness, (ii) the Indebtedness secured thereby does not exceed the cost of the property being acquired on the date of acquisition, and (iii) such Lien and the Indebtedness secured thereby are incurred prior to or within one hundred eighty (180) days after the acquisition of such property;

(j)	Liens securing the Term Facility and any Permitted Refinancing Indebtedness with respect thereto;

(k)	Landlords' and lessors' Liens in respect of rent and other lease obligations that are not past due by 60 days or that constitute prepetition claims;

(l)	possessory Liens in favor of brokers and dealers arising in connection with the acquisition or disposition of Investments owned as of the date hereof and Investments permitted under Section 7.03; provided that such liens (a) attach only to such Investments and (b) secure only obligations incurred in the ordinary course and arising in connection with the acquisition or disposition of such Investments and not any obligation in connection with margin financing;

(m)    Liens arising solely by virtue of any statutory or common law provisions relating to banker's liens, liens in favor of securities intermediaries, rights of setoff or similar rights and remedies as to deposit accounts or securities accounts or other funds maintained with depository institutions or securities intermediaries;

(n)    Liens arising from precautionary UCC filings regarding "true" operating leases or the consignment of goods to a Loan Party;

(o)    Liens in favor of customs and revenues authorities imposed by applicable Law arising in the ordinary course of business in connection with the importation of goods and securing obligations that are not overdue by more than thirty (30) days, or that constitute prepetition claims; and

(p)    Liens (other than Liens securing Indebtedness) reasonably acceptable to the Collateral Agent described on a title commitment or report delivered in connection with a Mortgaged Property.

7.02.    <u>Indebtedness</u>.    Create, incur, assume, guarantee, suffer to exist or otherwise become liable with respect to any Indebtedness, except (Indebtedness described below is herein referred to as "<u>Permitted Indebtedness</u>"):

(a)    to the extent incurred prior to the Petition Date and outstanding on the Closing Date, obligations (contingent or otherwise) of the Borrowers or any of their Subsidiaries existing or arising under any Swap Contract; <u>provided that</u> (i) such obligations are (or were) entered into by such Person in the ordinary course of business for the purpose of directly mitigating risks associated with fluctuations in interest rates or foreign exchange rates or otherwise to mitigate risks associated with its assets or liabilities or business operations, and (ii) such Swap Contract does not contain any provision exonerating the non-defaulting party from its obligation to make payments on outstanding transactions to the defaulting party;

(b)    Indebtedness under the Mezzanine Facility outstanding as of the Petition Date and any Permitted Refinancing Indebtedness in respect thereof;

(c)    Indebtedness under the Existing Loan Documents and  the Loan Documents and under any agreements evidencing Bank Products and Cash Management Services which constitute both Indebtedness and Other Liabilities;

(d)    Indebtedness under the Term Facility outstanding as of the Petition Date (and any interest accrued and fees, costs and expenses incurred, in each case, thereafter) and any Permitted Refinancing Indebtedness in respect thereof;

(e)    Indebtedness incurred prior to the Petition Date which is outstanding on the date hereof and listed on <u>Schedule 7.02</u> and any Permitted Refinancing Indebtedness in respect thereof;

(f)    Guarantees of the Borrowers or any Guarantor in respect of Indebtedness otherwise permitted hereunder of the Borrowers or any other Guarantor;

(g)    to the extent incurred prior to the Petition Date and outstanding on the Closing Date, Indebtedness of the Borrowers (other than Holdings) in respect of Capitalized Leases, Synthetic Lease Obligations and purchase money obligations for fixed or capital assets within the limitations set forth in Section 7.01(i) and Permitted Refinancing Indebtedness in respect thereof; provided, however, that the aggregate amount of all such Indebtedness at any one time outstanding shall not exceed $40.0 million; provided further, however, that, as to any such Indebtedness not outstanding on the Closing Date, if requested by the Collateral Agent, the Loan Parties shall use commercially reasonable efforts to cause the holders of such Indebtedness to enter into a Collateral Access Agreement; and

(h)    Indebtedness under the Incremental DIP Loans in an amount not to exceed $25 million and any Permitted Refinancing Indebtedness in respect thereof.

7.03.    Investments.  Make or hold any Investments, except, other than in the case of clause (f) below (but not including any additional Investment on account thereof after the date hereof), to the extent permitted by the Budget:

(a)    Investments held by the Borrowers and their Subsidiaries in the form of Cash Equivalents;

(b)    to the extent provided for in the Budget, advances to officers, directors and employees of Holdings and its Subsidiaries in an aggregate amount not to exceed $5.0 million at any time outstanding, for travel, entertainment, relocation and analogous ordinary business purposes;

(c)    (i) Investments by Slap Shot and its Subsidiaries in their respective Subsidiaries outstanding on the date hereof, (ii) additional Investments by Slap Shot and its Subsidiaries in Borrowers and their Subsidiaries that are Loan Parties, and (iii) additional Investments by Subsidiaries of the Borrowers that are not Loan Parties in other Subsidiaries that are not Loan Parties;

(d)    Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

(e)    Guarantees permitted by Section 7.02;

(f)    Investments existing on the date hereof and set forth on Schedule 5.08(e);

(g)    Investments in Swap Contracts permitted under Section 7.02(a);

(h)    Investments arising from the receipt of non-cash consideration received in connection with a Disposition permitted by Section 7.05(j); and

(i)    So long as no Event of Default shall have occurred and be continuing at the time of any action described below or would result therefrom, Investments resulting from the issuance of Indebtedness of Slap Shot to Holdings or any of its Subsidiaries in an amount not to

exceed the amount necessary to permit Slap Shot to pay (i) reasonable and customary corporate and operating expenses relating to maintaining its ownership interest in the Borrowers (including reasonable out-of-pocket expenses for legal, administrative and accounting services provided by third parties, and compensation, benefits and other amounts payable to officers and employees in connection with their employment in the ordinary course of business and to board of director observers), (ii) franchise fees or similar taxes and fees required to maintain its corporate existence, and (iii) its proportionate share of the tax liability of the affiliated group of corporations that file consolidated Federal income tax returns (or that file state and local income tax returns on a consolidated basis).

7.04.    <u>Fundamental Changes.</u>

Merge, dissolve, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except that, so long as no Default exists or would result therefrom:

(a)    any Subsidiary of the Borrower Representative (i) may merge with a Borrower, <u>provided</u> <u>that</u> a Borrower shall be the continuing or surviving Person; or (ii) may merge with or into any one or more other Subsidiaries, <u>provided that</u> when any Loan Party is merging with another Subsidiary that is not a Loan Party, such Loan Party shall be the continuing or surviving Person;

(b)    any Loan Party may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to a Borrower or to another Loan Party (other than Slap Shot);

(c)    any Subsidiary that is not a Loan Party may dispose of all or substantially all its assets (including any Disposition that is in the nature of a liquidation) to the Borrower Representative or any Subsidiary;

(d)    Reserved;

(e)    so long as no Default has occurred and is continuing or would result therefrom, each of the Borrowers and any of their respective Subsidiaries may merge into or consolidate with any other Person or permit any other Person to merge into or consolidate with it; <u>provided</u>, <u>however</u>, that in each case, immediately after giving effect thereto (i) in the case of any such merger to which a Borrower is a party, a Borrower is the surviving corporation and (ii) in the case of any such merger to which any Loan Party (other than the Borrowers) is a party, such Loan Party is the surviving corporation;

(f)    Holdings may merge into Slap Shot or Slap Shot may merge into Holdings; provided that following any such merger, all references herein and in the other Loan Documents to Holdings or Slap Shot shall be to the surviving Person in such merger; and

(g)    any Subsidiary which has no assets to distribute to its equityholders may be dissolved.

7.05.    Dispositions.   Make any Disposition or enter into any agreement to make any Disposition, except:

(a)    Dispositions of obsolete or worn out property, or property that is no longer used or useful in the business of Holdings and its Subsidiaries whether now owned or hereafter acquired, in each case, in the ordinary course of business (it being understood that this clause (a) does not include the liquidation of any store or the inventory and other assets located therein);

(b)    Dispositions of (i) inventory in the ordinary course of business, and (ii) inventory and other assets in accordance with the Initial Store Closing Sale as approved by the Bankruptcy Court;

(c)    Dispositions of property by any Subsidiary to a Borrower or to a wholly-owned Subsidiary; provided that, if the transferor of such property is a Guarantor, the transferee thereof must either be a Borrower or a Guarantor;

(d)    Dispositions permitted by Section 7.04; and

(e)    Disposition of other assets pursuant to the Sale Process, as reasonably consented to by the Administrative Agent, the FILO Agent, the Required Revolving Lenders and the Required FILO Lenders, or as otherwise may be approved by the Bankruptcy Court.

7.06.    Restricted Payments.    Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, or issue or sell any Equity Interests, except that, in each case consistent with the Budget:

(a)    each Subsidiary may make Restricted Payments to a Loan Party (other than Slap Shot) and any other Person that owns a direct Equity Interest in such Subsidiary, ratably according to their respective holdings of the type of Equity Interest in respect of which such Restricted Payment is being made;

(b)    Slap Shot and each of its Subsidiaries may declare and make dividend payments or other distributions payable solely in the common or preferred stock or other common or preferred Equity Interests of such Person; provided that such stock (other than that issued by Slap Shot) shall be pledged to the Collateral Agent pursuant to Section 6.12 hereof;

(c)    except to the extent the Net Cash Proceeds thereof are required to be applied to the prepayment of the Loans pursuant to Section 2.05, Slap Shot and each Subsidiary may purchase, redeem or otherwise acquire its common or preferred Equity Interests with the proceeds received from the substantially concurrent issue of new common or preferred Equity Interests;

(d)    so long as no Event of Default described in either Section 8.01(a) shall have occurred and be continuing at the time of any action described below or would result therefrom, Holdings may declare and pay cash dividends to Slap Shot in an amount not to exceed an amount necessary to permit Slap Shot to pay (i) reasonable and customary corporate and operating expenses relating to maintaining their ownership interest in the Borrowers (including reasonable out-of-pocket expenses for legal, administrative and accounting services provided by

third parties, and compensation, benefits and other amounts payable to officers and employees in connection with their employment in the ordinary course of business and to board of director observers), (ii) franchise fees or similar taxes and fees required to maintain its corporate existence, and (iii) its proportionate share of the tax liability of the affiliated group of corporations that file consolidated Federal income tax returns (or that file state and local income tax returns on a consolidated basis); and

(e)    the Borrowers may declare and pay cash dividends to Holdings.

7.07.    <u>Change in Nature of Business</u>.    Engage in any material line of business substantially different from those lines of business conducted by the Borrowers and their Subsidiaries on the date hereof or any business substantially related or incidental thereto.

7.08.    <u>Transactions with Affiliates</u>.    Enter into any transaction of any kind with any Affiliate of the Loan Parties, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to the Loan Parties or such Subsidiary as would be obtainable by the Loan Parties or such Subsidiary at the time in a comparable arm's length transaction with a Person other than an Affiliate; provided that, to the extent consistent with the Budget, the foregoing restriction shall not apply to:

(a)    transactions among (i) the Loan Parties (other than Slap Shot) (ii) any Subsidiaries of Holdings that are not Loan Parties or (iii) the Loan Parties (other than Slap Shot), on the one hand, and any Subsidiary that is not a Loan Party, on the other hand, that are at least as favorable to the Loan Parties as could be obtained in an arms-length transaction from an unaffiliated party;

(b)    (i) any Investments permitted by <u>Section 7.03</u> (other than Investments in any Equity Investor or portfolio company of an Equity Investor (other than any Loan Party)); and (ii) any Restricted Payment permitted by <u>Section 7.06</u>;

(c)    so long as no Event of Default has occurred and is continuing or would result therefrom, the payment of Management Fees consistent with the Budget;

(d)    subject to the limitations of <u>Section 7.08(c)</u>, transactions pursuant to the agreements set forth on <u>Schedule 5.25</u>; and

(e)    employment and severance agreements approved by the board of directors of Slap Shot, Holdings and its Subsidiaries or the Borrowers and their Subsidiaries.

7.09.    <u>Burdensome Agreements</u>.    Enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document) that (a) limits the ability (i) of any Subsidiary to make Restricted Payments to any Loan Party or to otherwise transfer property to or invest in any Loan Party, except for any agreement in effect (A) on the date hereof and set forth on <u>Schedule 7.09</u>, including replacements thereof so long as the terms thereof are not, taken as a whole, materially less favorable to a Borrower or relevant Subsidiary, or (B) at the time any Subsidiary becomes a Subsidiary of a Borrower, so long as such agreement was not entered into solely in contemplation of such Person becoming a Subsidiary of a Borrower, (ii) of any Subsidiary to Guarantee the Indebtedness of a Borrower (iii) of any Subsidiary to make or

repay loans to a Loan Party or (iv) of the Borrowers or any Subsidiary to create, incur, assume or suffer to exist Liens on property of such Person; provided, however, that this clause (iv) shall not prohibit any negative pledge incurred or provided in favor of any holder of Indebtedness permitted under Section 7.02(h) or, to the extent secured by a Lien, Section 7.02(i), solely to the extent any such negative pledge relates to the property financed by or the subject of such Indebtedness; or (b) requires the grant of a Lien to secure an obligation of such Person if a Lien is granted to secure another obligation of such Person.  The foregoing restrictions shall not be violated by reason of (i) applicable Laws, (ii) this Agreement and the other Loan Documents, (iii) any other agreement hereafter entered into by a Loan Party that contains provisions no more restrictive than those contained in this Agreement, or (iv) customary non-assignment provisions of any contract, lease or license of the Borrowers or any Subsidiary of the Borrowers.

7.10.    Margin Stock.  Use the proceeds of any Credit Extension, whether directly or indirectly, in any manner that would violate Regulations U or X of the FRB.

7.11.    Amendments of Organization Documents, Etc.  Amend, modify or waive any of the Loan Party's rights under (a) its Organization Documents or (b) any Material Indebtedness (other than on account of any refinancing thereof otherwise permitted hereunder), in each case with respect to this clause (b), to the extent that such amendment, modification or waiver would reasonably likely have a Material Adverse Effect.

7.12.    Accounting Changes.  Make any change in (a) accounting policies or reporting practices, except as required or permitted by GAAP, or (b) Fiscal Year.

7.13.    Prepayments, Etc. of Indebtedness.  Except as required by this Agreement or permitted under the Orders, prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner any Indebtedness, or set aside any funds for such purpose (other than any payments to critical vendors to the extent permitted by the Bankruptcy Court pursuant to any first or second day motion and as expressly set forth in the Budget), or make any interest payment in respect of any Indebtedness other than payments of the Obligations, payments of interest under the Term Facility solely from the proceeds of Term Priority Collateral, and as expressly permitted by the Orders.

7.14.    Amendment, Etc. of Related Documents and Indebtedness.  (a) Amend, modify or change in any manner any term or condition of any Term Loan Document (other than as set forth in the Orders) which (i) shortens the final maturity, (ii) increases the amount of any mandatory prepayment of principal, (iii) adds additional obligors unless such additional obligors contemporaneously therewith become Loan Parties hereunder, or (iv) grants additional collateral for the obligations thereunder, unless contemporaneously therewith, the Administrative Agent obtains a Lien on such additional collateral, with the priority and subject to the terms of the Intercreditor Agreement, (b) except in connection with a refinancing of Subordinated Indebtedness in compliance with Section 7.02(b), cancel or terminate any Related Document or consent to or accept any cancellation or termination thereof; (c) amend, modify or change in any manner any term or condition of any Related Document (other than the Term Loan Documents) in any manner materially adverse to the Lenders or give any consent, waiver or approval thereunder; (d) amend, modify or change in any manner any term or condition of the Agency Agreement or any agreement entered into in connection with the Sale Process, or give any

consent, waiver or approval thereunder, without the prior written consent of the Administrative Agent, the FILO Agent, the Required Revolving Lenders and the Required FILO Lenders; (e) waive any default under or any breach of any term or condition of any Related Document (other than the Term Loan Documents) in any manner materially adverse to the Lenders; or (f) take any other action in connection with any Related Document (other than the Term Loan Documents) that would materially impair the value of the interest or rights of any Loan Party thereunder or that would materially impair the rights or interests of the Administrative Agent or any Lender; provided that this Section 7.14 shall not prohibit the exchange of notes issued under the Mezzanine Documents for Exchange Securities (as defined in the Exchange and Registration Rights Agreement) or any Loan Party's entering into any indenture and issuing Exchange Securities thereunder, in each case in accordance with the terms of the Exchange and Registration Rights Agreement; and provided further that, for purposes of this Section 7.14 (other than Section 7.14(a)), any amendment, waiver or other action (i) with respect to the subordination provisions, (ii) which shortens the final maturity, (iii) which increases the amount of any payment or mandatory prepayment of principal, interest, fees or other amounts, (iv) which increases the principal of, or the rate of interest specified therein or fees or other amounts payable thereunder, (v) which adds additional obligors, (vi) which grants additional collateral for the obligations thereunder, or (vii) which makes the covenants or events of default applicable thereto more restrictive than those contained herein, shall be deemed materially adverse to the Lenders and/or will materially impair their rights.

7.15.   <u>Holding Company</u>.   In the case of Slap Shot, engage in any business or activity other than (a) the ownership of all outstanding Equity Interests in Holdings, (b) maintaining its corporate existence and performing its obligations under agreement set forth on <u>Schedule 5.25</u>, (c) participating in tax, accounting and other administrative activities as the parent of the consolidated group of companies, including the Loan Parties, (d) the execution and delivery of the Loan Documents, the Loan Documents (as defined in the Existing Credit Agreement), the Term Loan Documents, the Mezzanine Documents and agreements governing other Indebtedness permitted to be incurred by Slap Shot hereunder, in each case, to which it is a party and the performance of its obligations thereunder, and (e) activities incidental to the businesses or activities described in clauses (a) through (d) of this Section.

7.16.   <u>Swap Contracts</u>.   Enter into any Swap Contract, other than (a) Swap Contracts permitted by <u>Section 7.02</u>.

7.17.   <u>Deposit Accounts.</u>   Open new DDAs unless permitted by the Cash Management Order.   No Loan Party shall maintain any bank accounts or enter into any agreements with credit card processors other than the ones expressly contemplated herein or in <u>Section 6.13</u> hereof and consistent with the Cash Management Order.

7.18.   <u>Reserved.</u>

7.19.   <u>Designation of Designated Senior Debt</u>.   Designate any Indebtedness (or any similar term) (other than the Indebtedness under (x) the Loan Documents, (y) the Term Loan Documents and (z) the Loan Documents (as defined in the Existing Credit Agreement)) of Holdings or any of its Subsidiaries as "Designated Senior Debt" (or any similar term) under, and

as defined in any Subordinated Indebtedness of any Loan Party which contains such designations.

### 7.20.   Anti-Corruption Laws, PATRIOT Act and Sanctions.

No Borrower will request any Loan or any other Credit Extension, and the Loan Parties shall not use, and shall procure that their Subsidiaries and its or their respective directors, officers, employees and agents shall not use, the proceeds of any Loan or any other Credit Extension (A) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person or for any purpose in violation of any Anti-Corruption Laws or the PATRIOT Act, (B) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, or (C) in any manner that would result in the violation by any individual or entity (including any individual or entity participating in the transaction, whether as a Lender, Arranger, Administrative Agent, Collateral Agent, FILO Agent or otherwise) of any Sanctions.

### 7.21.   Maintenance of FILO Reserve.

Fail to implement and to maintain the FILO Reserve.

### 7.22.   Chapter 11 Claims.

Until payment in full of the Obligations under this Agreement, except with respect to the Existing Liabilities and the Carve Out, and otherwise to the extent permitted under the Orders, directly or indirectly, incur, create, assume, suffer to exist or permit any administrative expense claim or Lien which is pari passu with or senior to the claims or Liens, as the case may be, of the Administrative Agent and the Credit Parties hereunder or under the Orders, or apply to the Bankruptcy Court for authority to do so.

### 7.23.   Compliance with Budget.

(a)      Except as otherwise provided herein or approved by the Administrative Agent and the FILO Agent, directly or indirectly (i) use any cash or the proceeds of any Loans in a manner or for a purpose other than those consistent with this Agreement, the Orders and the Budget (and Permitted Variances related thereto), (ii) permit a disbursement causing any variance other than Permitted Variances without the prior written consent of the Administrative Agent and the FILO Agent or (iii) make any payment (as adequate protection or otherwise), or application for authority to pay, on account of any claim or Indebtedness arising prior to the Petition Date other than payments set forth in the Budget and authorized by the Bankruptcy Court.

(b)      Prior to the occurrence of an Event of Default, the Borrowers shall be permitted to pay compensation and reimbursement of fees and expenses solely to the extent that such fees and expenses are in accordance with the Budget and authorized to be paid under Sections 330 and 331 of the Bankruptcy Code pursuant to an order of the Bankruptcy Court, as the same may be due and payable.  Upon the occurrence of an Event of Default and delivery of a Carve Out Trigger Notice (as defined in the Interim Order), the right of the Borrowers to pay

professional fees of Case Professionals outside the Carve Out shall terminate, and the Borrowers shall provide immediate notice to all Case Professionals informing them that the Borrowers' ability to pay such Case Professionals is subject to and limited by the Carve Out.

7.24.    Use of Collateral.

Use or permit the use of Collateral, proceeds of Loans, portion of the Carve Out or any other amounts directly or indirectly by any of the Loan Parties, the Committee, if any, or any trustee or other estate representative appointed in the Cases (or any Successor Case) or any other Person (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith):

(a)    other than as expressly permitted in the Orders, to seek authorization to obtain Liens or security interests that are senior to, or on a parity with, the Liens granted under the Loan Documents or the DIP Superpriority Claims other than in connection with any replacement debtor-in-possession financing that will pay the Lenders in "full" in cash; or

(b)    to investigate (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, against the Administrative Agent, the FILO Agent, the Lenders, the other Credit Parties or the Existing Loan Parties, and each of their respective officers, directors, controlling persons, employees, agents, attorneys, affiliates, assigns, or successors of each of the foregoing, with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (i) any Avoidance Actions; (ii) any so-called "lender liability" claims and causes of action; (iii) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the Obligations, the DIP Superpriority Claims, the Liens granted under the Loan Documents, the Loan Documents, the Existing Credit Agreement, the Existing Liabilities or the Existing Liens; (iv) any action seeking to invalidate, modify, reduce, expunge, disallow, set aside, avoid or subordinate, in whole or in part, the Obligations; or (v) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to the Agents, the FILO Agent or the Lenders hereunder or under any of the other Loan Documents (including, without limitation, claims, proceedings or actions that might prevent, hinder or delay any of their assertions, enforcements, realizations or remedies on or against the Collateral in accordance with the Loan Documents and the Orders).  Notwithstanding anything to the contrary herein, the Committee may use up to $50,000 in the aggregate amount of the Carve Out, any cash-collateral, or proceeds of the Loan to investigate the Prepetition Parties (the "Committee Investigation Budget"); provided that the Borrowers' stipulations as to validity, priority and security of the Existing Liabilities shall be binding upon each other party in interest, including the Committee, unless such party in interest commences a challenge by (x) with respect to the Committee, 60 days after the initial appointment of the Committee, and (y) with respect to any other party in interest, 75 days after the date of entry of the Interim Order.

7.25.    Bankruptcy Related Negative Covenants.

01:18374604.1

The Borrowers will not consent to or permit to exist any of the following:

(a)    Any order which authorizes the rejection or assumption of any Leases of any Loan Party without the Administrative Agent's and the FILO Agent's written consent, except as contemplated in the order relating to the Initial Store Closing Sale;

(b)    Any modification, stay, vacation or amendment to the Orders to which the Administrative Agent, the FILO Agent, the Required Revolving Lenders and the Required FILO Lenders have not consented in writing;

(c)    A priority claim or administrative expense or unsecured claim against any Borrower (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Administrative Agent in respect of the Obligations, except with respect to the Existing Liabilities, Permitted Prior Liens and the Carve Out;

(d)    Except as agreed to by the Administrative Agent and the FILO Agent, any order which authorizes the return of any of the Loan Parties' property pursuant to Section 546(h) of the Bankruptcy Code;

(e)    Any order which authorizes the payment of any Indebtedness (other than the Existing Liabilities, Indebtedness reflected in the approved Budget, and other Indebtedness approved by the Administrative Agent and the FILO Agent) incurred prior to the Petition Date or the grant of "adequate protection" (whether payment in cash or transfer of property) with respect to any such Indebtedness which is secured by a Lien (other than as expressly set forth in the Orders or the Budget); or

(f)    Any order seeking authority to take any action that is prohibited by the terms of this Agreement or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents.

## ARTICLE VIII
## EVENTS OF DEFAULT AND REMEDIES

8.01.    <u>Events of Default</u>.    Any of the following shall constitute an Event of Default:

(a)    <u>Non-Payment</u>.    The Borrowers or any other Loan Party fails to (i) pay when and as required to be paid herein, any amount of principal of any Loan or any L/C Obligation, or deposit any funds as Cash Collateral in respect of L/C Obligations, or (ii) any interest on any Loan or on any L/C Obligation, or any fee due hereunder, or (iii) pay within five days after the same becomes due, any other amount payable hereunder or under any other Loan Document; or

(b) <u>Specific Covenants</u>.  The Borrowers fail to perform or observe any term, covenant or agreement contained in any <u>Section 6.01</u>, <u>6.02</u>, (except for a five (5) day grace period for any clause in <u>Section 6.02</u> other than (c), (j), (k), (l) or (n)), <u>6.03(a)</u>, <u>6.05</u>, <u>6.07</u>, 6.10, <u>6.11</u>, <u>6.12</u>, <u>6.13</u>, <u>6.15</u>, <u>6.17</u>, <u>6.21</u>, <u>6.22</u>, <u>6.23</u>, <u>6.24</u> or <u>ARTICLE VII</u>; or

(c) <u>Other Defaults</u>.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in <u>Section 8.01(a)</u> or <u>(b)</u> above) contained in any Loan Document on its part to be performed or observed and such failure continues for 15 days or for such longer period as to which the Administrative Agent, in its sole discretion, consents; or

(d) <u>Representations and Warranties</u>.  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrowers or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith (including, without limitation, any Borrowing Base Certificate) shall be incorrect or misleading when made or deemed made; or

(e) <u>Cross-Default</u>.  Except as a result of the commencement of the Cases or unless payment, acceleration and/or the exercise of rights and remedies as a result thereof (as applicable) is stayed by the Bankruptcy Court, (i) any Loan Party or any Subsidiary thereof (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness or Guarantee (other than Indebtedness hereunder and Indebtedness under Swap Contracts) having an aggregate principal amount (including amounts owing to all creditors under any combined or syndicated credit arrangement) of more than $15.0 million, <u>provided</u> that the failure of Holdings to make the "Special Mandatory Redemption" under the Mezzanine Facility shall not constitute an Event of Default unless such failure also constitutes an event of default under the Mezzanine Facility, or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness or Guarantee or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness or the beneficiary or beneficiaries of such Guarantee (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, or such Guarantee to become payable or cash collateral in respect thereof to be demanded; <u>provided</u> <u>that</u> this paragraph (e) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness; or (ii) there occurs under any Swap Contract an Early Termination Date (as defined in such Swap Contract) resulting from (A) any event of default under such Swap Contract as to which a Loan Party or any Subsidiary thereof is the Defaulting Party (as defined in such Swap Contract) or (B) any Termination Event (as so defined) under such Swap Contract as to which a Loan Party or any Subsidiary thereof is an Affected Party (as so defined) and, in either event, the Swap Termination Value owed by such Loan Party or such Subsidiary as a result thereof is greater than $15.0 million; or

(f) <u>Reserved</u>.

(g)    Reserved.

(h)    Judgments.  There is entered against any Loan Party or any Material Subsidiary after the Petition Date and remains unpaid one or more final judgments or orders for the payment of money in an aggregate amount (as to all such judgments and orders) exceeding $15.0 million (to the extent not covered by independent third-party insurance as to which the insurer is rated at least "A" by A.M. Best Company, has been notified of the potential claim and does not dispute coverage) and (i) enforcement proceedings are commenced by any creditor upon such judgment or order, or (ii) there is a period of 30 consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect; or

(i)    ERISA.  (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of the Borrowers under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of $15.0 million, or (ii) the Borrowers or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of $15.0 million; or

(j)    Invalidity of Loan Documents.  Any provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or under the Orders or thereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect against Slap Shot, Holdings, the other Borrowers or any Material Subsidiary; or any Loan Party contests in any manner the validity or enforceability of any provision of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any provision of any Loan Document, or purports to revoke, terminate or rescind any provision of any Loan Document; or seeks to avoid, limit or otherwise adversely affect any Lien purported to be created under any Collateral Document (including, without limitation, any Order); or

(k)    Change of Control.  There occurs any Change of Control; or

(l)    Collateral Documents.  Any Collateral Document (including, without limitation, any Order) after delivery thereof pursuant to ARTICLE IV or Section 6.13 shall for any reason (other than pursuant to the terms thereof) cease (or shall be asserted by any Loan Party or any other Person not) to create a valid and perfected Lien on the Collateral purported to be covered thereby, either (i) with an aggregate fair market value for such Collateral of $5.0 million, or (ii) consisting of amounts on deposit with Blocked Account Banks or of the type included in the Borrowing Base, for any reason other than the failure of Collateral Agent to maintain control over any Collateral in its possession; or

(m)    Subordination.  (i)  The subordination provisions of the documents evidencing or governing any Subordinated Indebtedness (the "Subordinated Provisions") shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of the applicable Subordinated Indebtedness; or (ii) the Borrowers or any other Loan Party shall, directly or indirectly, disavow or contest in any manner (A) the effectiveness, validity or enforceability of any of the Subordination Provisions, (B) that the

Subordination Provisions exist for the benefit of the Administrative Agent and the Lenders or (C) that all payments of principal of or premium and interest on the applicable Subordinated Indebtedness, or realized from the liquidation of any property of any Loan Party, shall be subject to any of the Subordination Provisions; or

(n)    Criminal Indictment.  There is entered against Holdings or any Subsidiary or any officer or director of Holdings or any Subsidiary a criminal indictment for a felony which is reasonably likely to have a Material Adverse Effect; or

(o)    Suspension of Business.  Except as otherwise expressly permitted herein, any Loan Party shall take, or there shall be involuntarily taken (including without limitation as a result of any judgment or injunction against any Loan Party), any action to suspend the operation of the business of the Loan Parties, taken as a whole, in the ordinary course, including, without limitation, the liquidation of all or substantially all of the assets or store locations of the Loan Parties; or

(p)    Cases, Motions, Etc.  Any of the following shall occur in any Case:

(i)    the filing by any Borrower of a plan other than (i) a plan that provides for the payment in full in cash of the Obligations hereunder and the obligations under the Existing Credit Agreement on the effective date of such plan, or (ii) as approved by the Administrative Agent and the FILO Agent or the filing by any Borrower of any motion or pleading that is inconsistent with the prosecution of any such plan;

(ii)    any of the Borrowers shall file a pleading seeking to vacate or modify any of the Orders in a manner adverse to the Lenders and/or the Administrative Agent and/or the FILO Agent;

(iii)    entry of an order without the prior consent of the Administrative Agent, the FILO Agent, the Required Revolving Lenders and the Required FILO Lenders amending, supplementing or otherwise modifying any Order in a manner adverse to the Lenders and/or the Administrative Agent and/or the FILO Agent;

(iv)    entry of any order without the prior consent of the Administrative Agent, the FILO Agent, the Required Revolving Lenders or the Required FILO Lenders that authorizes any of the following:

(A)    a priority claim or administrative expense or unsecured claim against the Loan Parties (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in sections 105, 326, 328, 330, 331,  364(c), 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Agents and the Lenders in respect of the Obligations, except with respect to the Carve Out;

(B)    any Lien on any Collateral having a priority equal or superior to the Lien securing the Obligations, except (a) with respect to the Carve Out, or (b) Permitted Prior Liens;

01:18374604.1

(C)     except as consented to by the Administrative Agent and the FILO Agent, the return of any of the Loan Parties' property pursuant to section 546(h) of the Bankruptcy Code; or

(D)     the payment of any Indebtedness (other than Indebtedness reflected in the Approved Budget) or as permitted by the Orders.

(v)     reversal, vacation or stay of the effectiveness of any Order;

(vi)     any violation of the terms of any Order;

(vii)     the dismissal of the Cases or conversion of the Cases to a case under Chapter 7 of the Bankruptcy Code, or the filing of any motion to so dismiss or convert brought by any Loan Party; or

(viii)     appointment of a Chapter 11 trustee or an examiner, or any similar insolvency official or administrator, with expanded powers, or the filing of any motion to so appoint brought by any Loan Party; or

(ix)     the filing by any Borrower of, or the consummation of any sale of all or substantially all the working capital assets of the Loan Parties pursuant to Section 363 of the Bankruptcy Code that does not conform with the Sale Motion or the Bidding Procedures;

(x)     except as provided for herein or in the Orders, granting of relief from the automatic stay in the Cases to permit foreclosure or enforcement on, or any right or remedy with respect to any material asset of any Borrower;

(xi)     the Borrowers' filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order, granting any superpriority claim or Lien (except as contemplated herein or in the Orders) that is senior to or pari passu with the Lenders' claims under the Loan Documents and the transactions contemplated thereby to the extent that, upon approval of such motion and closing of the transactions contemplated thereby, the Obligations and the Existing Liabilities would not be paid in full;

(xii)     payment of or granting adequate protection with respect to prepetition Indebtedness, other than as expressly set forth in the Orders and the Budget;

(xiii)     any of the Liens or the DIP Superpriority Claims granted hereunder cease to be valid, perfected and enforceable in any respect; or

(q)     <u>Budget</u>.  Any variance to a Budget shall occur, other than   Permitted Variances; or

(r)     <u>Subrogation</u>.  Any of the Loan Parties shall assert (other than for purposes of disclosure) any right of subrogation or contribution against any other Loan Party prior to the payment in full of the Obligations; or

(s)    <u>Chapter 11 Case Milestones</u>.  The failure to meet any of the following milestones:

(i)    file the Chapter 11 Case on the Petition Date;

(ii)    obtain entry of the Interim Order on or before [_____], 2016; or

(iii)    obtain entry of the Final Order on or before the date that is thirty (30) days after the entry of the Interim Order.

(t)    <u>Restrainment</u>.  Any Loan Party or any of its Subsidiaries is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of the business affairs of the Loan Parties and their Subsidiaries, taken as a whole; or

(u)    <u>Challenge</u>.  Any Loan Party engages in or supports any challenge to the validity, perfection, priority, extent or enforceability of any of the Existing Credit Agreement or the Existing Loan Documents or the Liens securing the Existing Credit Agreement or the Existing Loan Documents, including without limitation seeking to equitably subordinate or avoid the Liens securing the Existing Credit Agreement; or any Loan Party engages in or supports any investigation or asserts any claims or causes of action (or directly or indirectly support assertion of the same) against the Existing Loan Parties; or

(v)    <u>506(c) and 552(b)</u>.  From and after entry of the Final Order, entry of an order by the Bankruptcy Court authorizing or directing payment of any claim or claims under Section 506(c) or 552(b) of the Bankruptcy Code against or with respect to any of the Collateral.

For the avoidance of doubt, none of the existing defaults or events of default under the Existing Credit Agreement, the existing Term Loan Documents or Mezzanine Documents outstanding on the Petition Date shall constitute Events of Default hereunder.

8.02.    <u>Remedies upon Event of Default; FILO Event of Default</u>.

(a)    Notwithstanding anything in Section 362 of the Bankruptcy Code, but subject to the Orders, if any Event of Default occurs and is continuing, the Administrative Agent may (and at the request of, or with the consent of, the Required Lenders, shall) take any or all of the following actions, at the same time or different times, in each case without further order of or application to the Bankruptcy Court (provided, that with respect to the enforcement of Liens with respect to the Collateral under clause (iii) below, the Administrative Agent shall provide the Borrowers with five (5) days' written notice (with a copy to counsel for any Committee, to the United States Trustee for the District of Delaware and to counsel for the agent under the Term Facility) prior to taking the action contemplated thereby):

(i)    declare the commitment of each Lender to make Loans and any obligation of the L/C Issuer to make L/C Credit Extensions to be terminated, whereupon such commitments and obligation shall be terminated;

(ii)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under

any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties;

(iii)    whether or not the maturity of the Obligations shall have been accelerated pursuant hereto, proceed to protect, enforce and exercise all rights and remedies under this Agreement, any of the other Loan Documents or applicable Law, including, but not limited to, by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and the other Loan Documents or any instrument pursuant to which the Obligations are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the Credit Parties;

(iv)    require that the Loan Parties Cash Collateralize the L/C Obligations; and

(v)    exercise on behalf of itself, the L/C Issuer and the Lenders all rights and remedies available to it, the L/C Issuer and the Lenders under the Loan Documents.

(b)    Notwithstanding anything in Section 362 of the Bankruptcy Code, but subject to the Orders, if at any time while the FILO Loan is outstanding any FILO Event of Default occurs and is continuing (unless the FILO Agent has waived such FILO Event of Default) and the FILO Standstill Period has expired, the Administrative Agent, at the written request of the FILO Agent (or as directed by the Required FILO Lenders), shall, within a reasonable time after receipt of such request (but in any event within two (2) Business Days with respect to clause (i) below, only) take any or all of the following actions, at the same time or different times, in each case without further order of or application to the Bankruptcy Court (provided, that with respect to the enforcement of Liens with respect to the Collateral under clause (ii) below, the Administrative Agent shall provide the Borrowers with five (5) days' written notice (with a copy to counsel for any Committee, to the United States Trustee for the District of Delaware and to counsel for the agent under the Term Facility) prior to taking the action contemplated thereby):

(i)    declare the unpaid principal amount of the outstanding FILO Loan, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document with respect to the FILO Loan to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties; or

(ii)    whether or not the maturity of the FILO Loan shall have been accelerated pursuant hereto, proceed to protect, enforce and exercise all rights and remedies under this Agreement, any of the other Loan Documents or applicable Law on behalf of the FILO Agent and the FILO Lenders, including, but not limited to, by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and the other Loan Documents or any instrument pursuant to which the FILO Loan is evidenced, and, if such amount shall

have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the FILO Agent and FILO Lenders.

(c)     No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of Law.  The obligations of the Administrative Agent under this Section 8.02 shall at all times and in all circumstances be subject to, and be entitled to the benefits of, the provisions of Article IX hereof.

(d)     Neither the Loan Parties, the Committee, nor any other party-in-interest shall have the right to contest the enforcement of remedies set forth in the Orders and the Loan Documents on any basis other than an assertion that an Event of Default has not occurred or has been cured within the cure periods expressly set forth in the applicable Loan Documents.  The Loan Parties shall cooperate fully with the Administrative Agent and the Lenders in their exercise of rights and remedies, whether against the Collateral or otherwise.  The Loan Parties hereby waive any right to seek relief under the Bankruptcy Code, including under Section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the Administrative Agent and the Lenders set forth in the Orders and in the Loan Documents.

(e)     Subject to the Orders, in case any one or more of the covenants and/or agreements set forth in this Agreement or any other Loan Document shall have been breached by any Loan Party, then the Administrative Agent may proceed to protect and enforce the Lenders' rights either by suit in equity and/or by action at law, including an action for damages as a result of any such breach and/or an action for specific performance of any such covenant or agreement contained in this Agreement or such other Loan Document.  Without limitation of the foregoing, the Borrowers agree that failure to comply with any of the covenants contained herein will cause irreparable harm and that specific performance shall be available in the event of any breach thereof.  The Administrative Agent shall be indemnified by the Borrowers against all liability, loss or damage, together with all reasonable costs and expenses related thereto (including reasonable legal and accounting fees and expenses) in accordance with the terms hereof.

8.03.    Application of Funds.  Subject to the Orders, after the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable and the L/C Obligations have automatically been required to be Cash Collateralized as set forth in the proviso to Section 8.02), or after the commencement of any Liquidation, subject to the terms of the Intercreditor Agreement, any Collateral or proceeds of Collateral received shall be applied by the Administrative Agent in the following order:

First, to pay accrued and unpaid professional fees and expenses of the Case Professionals and to fund the Carve Out Account (as defined in the Interim Order), up to an aggregate amount not to exceed the Carve Out Cap (as defined in the Interim Order);

Second, to payment of outstanding "Revolving Loans" (as defined in the Existing Credit Agreement) (excluding, for the avoidance of doubt, Letters of Credit), if any, outstanding under the Existing Credit Agreement;

Third, to payment of that portion of the Obligations (excluding the Other Liabilities and the FILO Liabilities) constituting fees, indemnities, Credit Party Expenses and other amounts (including fees, charges and disbursements of counsel to the Administrative Agent and the Collateral Agent and amounts payable under ARTICLE III) payable to the Administrative Agent and the Collateral Agent, each in its capacity as such;

Fourth, to payment of that portion of the Obligations (excluding the Other Liabilities and the FILO Liabilities) constituting indemnities, Credit Party Expenses, and other amounts (other than principal, interest and fees) payable to the Lenders and the L/C Issuer (including fees, charges and disbursements of counsel to the respective Lenders and the L/C Issuer and amounts payable under ARTICLE III), ratably among them in proportion to the amounts described in this clause Fourth payable to them;

Fifth, to payment to the Swing Line Lender of that portion of the Obligations constituting accrued and unpaid interest on the Swing Line Loans;

Sixth, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Revolving Loans, L/C Borrowings and other Obligations (other than those relating to the FILO Liabilities), and fees (including Letter of Credit Fees), ratably among the Revolving Lenders and the L/C Issuer in proportion to the respective amounts described in this clause Sixth payable to them;

Seventh, to payment to the Swing Line Lender of that portion of the Obligations constituting unpaid principal of the Swing Line Loans;

Eighth, to payment of that portion of the Obligations constituting unpaid principal of the Revolving Loans and L/C Borrowings, ratably among the Revolving Lenders and the L/C Issuer in proportion to the respective amounts described in this clause Eighth held by them;

Ninth, to the Administrative Agent for the account of the L/C Issuer, to Cash Collateralize that portion of L/C Obligations comprised of the aggregate undrawn amount of Letters of Credit;

Tenth, to payment of that portion of the Obligations arising from Cash Management Services, ratably among the Credit Parties in proportion to the respective amounts described in this clause Tenth held by them;

Eleventh, to payment of that portion of the Obligations arising from (x) Bank Products for which a Bank Products Reserve has been implemented and is in effect, and (y) other Bank Products in an aggregate amount not to exceed $1,000,000;

Twelfth, to payment of outstanding "FILO Liabilities" (as defined in the Existing Credit Agreement), if any, outstanding under the Existing Credit Agreement;

Thirteenth, to payment of that portion of the Obligations constituting indemnities, Credit Party Expenses, and other amounts (including fees, charges and disbursements of counsel to the FILO Agent and amounts payable under ARTICLE III) payable to the FILO Agent in its capacity as such;

Fourteenth, to payment of that portion of the Obligations constituting indemnities, Credit Party Expenses, and other amounts (other than principal, interest and fees) payable to the FILO Lenders, ratably among them in proportion to the amounts described in this clause Fourteenth payable to them;

Fifteenth, to payment of that portion of the Obligations constituting accrued and unpaid interest on the FILO Loan, and fees, ratably among the FILO Lenders in proportion to the respective amounts described in this clause Fifteenth payable to them;

Sixteenth, to payment of that portion of the Obligations constituting unpaid principal of the FILO Loan, ratably among the FILO Lenders in proportion to the respective amounts described in this clause Sixteenth held by them;

Seventeenth, to payment of all other Obligations (including without limitation those arising from Cash Management Services and Bank Products to the extent not paid pursuant to clauses Tenth and Eleventh above), ratably among the Credit Parties in proportion to the respective amounts described in this clause Seventeenth held by them; and

Last, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Loan Parties or as otherwise required by Law or the Orders.

Subject to Section 2.03(c), amounts used to Cash Collateralize the aggregate undrawn amount of Letters of Credit pursuant to clause Eighth above shall be applied to satisfy drawings under such Letters of Credit as they occur. If any amount remains on deposit as Cash Collateral after all Letters of Credit have either been fully drawn or expired, such remaining amount shall be applied to the other Obligations, if any, in the order set forth above.

Excluded Swap Obligations with respect to any Loan Party shall not be paid with amounts received from such Loan Party, but appropriate adjustments shall be made with respect to payments from other Loan Parties to preserve the allocation to the Obligations otherwise set forth above in this Section.

ARTICLE IX
ADMINISTRATIVE AGENT

9.01.    Appointment and Authority.

(a)    Each of the Lenders and the L/C Issuer hereby irrevocably appoints Bank of America to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent and the Collateral Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. Without limiting the foregoing, each of the Lenders and the L/C Issuer hereby authorizes Bank of America, in its capacity as Administrative Agent and Collateral Agent, to amend the Intercreditor Agreement to eliminate any restrictions on pricing increases applicable to the ABL Obligations and/or the Term Obligations (each, as defined in the Intercreditor Agreement) without the further consent of the Required Lenders. The provisions of this Article are solely for the benefit of the Administrative Agent, the Lenders and the L/C Issuer, and

neither the Borrowers nor any other Loan Party shall have rights as a third party beneficiary of any of such provisions.

(b)    The Administrative Agent shall also act as the "<u>collateral agent</u>" under the Loan Documents, and each of the Lenders (in its capacities as a Lender), Swing Line Lender (if applicable) and the L/C Issuer hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Administrative Agent, as "collateral agent" and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to <u>Section 9.05</u> for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent), shall be entitled to the benefits of all provisions of this <u>ARTICLE IX</u> and <u>ARTICLE X</u> (including <u>Section 10.04(c)</u>, as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

(c)    Each of the FILO Lenders hereby irrevocably appoints Wells Fargo Bank, National Association to act on its behalf as the FILO Agent hereunder and under the other Loan Documents and authorizes the FILO Agent to take such actions on its behalf and to exercise such powers as are delegated to the FILO Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  The provisions of this <u>Article IX</u> are for the benefit of the FILO Agent and the Lenders, and no Loan Party or any Subsidiary thereof shall have rights as a third party beneficiary of any of such provisions (other than the provisions of <u>Section 9.07</u>).  All rights and obligations of the FILO Agent hereunder shall terminate on the date that the FILO Loan is paid in full.

9.02.    <u>Rights as a Lender</u>.  Each Person serving as the Administrative Agent and Collateral Agent hereunder and the Person serving as the FILO Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, Collateral Agent or FILO Agent, as applicable, and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent, Collateral Agent or FILO Agent, as applicable, hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrowers or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent, Collateral Agent or FILO Agent, as applicable, hereunder and without any duty to account therefor to the Lenders.

9.03.    <u>Exculpatory Provisions</u>.  None of the Administrative Agent, the Collateral Agent or the FILO Agent shall have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Administrative Agent, the Collateral Agent and the FILO Agent:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent, the Collateral Agent or the FILO Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), provided that the Administrative Agent, the Collateral Agent and the FILO Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent, the Collateral Agent or the FILO Agent to liability or that is contrary to any Loan Document or applicable Law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and

(c)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrowers or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent, the Collateral Agent or the FILO Agent or any of their respective Affiliates in any capacity.

None of the Administrative Agent, the Collateral Agent or the FILO Agent shall be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent, the Collateral Agent or the FILO Agent, as applicable, shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.01 and 8.02) or (ii) in the absence of its own gross negligence or willful misconduct.  Neither the Administrative Agent nor the FILO Agent shall be deemed to have knowledge of any Default unless and until notice describing such Default is given to the Administrative Agent, the Collateral Agent or the FILO Agent, as applicable, by the Borrowers, a Lender or the L/C Issuer.

None of the Administrative Agent, the Collateral Agent or the FILO Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents, (v) the value or the sufficiency of any Collateral, or (v) the satisfaction of any condition set forth in ARTICLE IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent, the Collateral Agent or the FILO Agent.

9.04.    Reliance by Administrative Agent, the Collateral Agent and FILO Agent. The Administrative Agent, the Collateral Agent and the FILO Agent shall each be entitled to rely

upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  Each of the Administrative Agent, the Collateral Agent and the FILO Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan, or the issuance of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender or the L/C Issuer, the Administrative Agent may presume that such condition is satisfactory to such Lender or the L/C Issuer unless the Administrative Agent shall have received notice to the contrary from such Lender or the L/C Issuer prior to the making of such Loan or the issuance of such Letter of Credit.  Each of the Administrative Agent, the Collateral Agent and the FILO Agent may consult with legal counsel (who may be counsel for the Borrowers), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

9.05.   Delegation of Duties.  Each of the Administrative Agent, the Collateral Agent and the FILO Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent, the Collateral Agent or the FILO Agent, as applicable. The Administrative Agent, the Collateral Agent and the FILO Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent, the Collateral Agent and the FILO Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facility provided for herein as well as activities as Administrative Agent, Collateral Agent or FILO Agent, as applicable.

9.06.   Resignation of Administrative Agent, Collateral Agent or FILO Agent.  The Administrative Agent may resign (as Administrative Agent and/or Collateral Agent) at any time upon thirty days prior notice to the Lenders, the L/C Issuer and the Borrower Representative. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Borrower Representative, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent or Collateral Agent gives notice of its resignation, then the retiring Administrative Agent or Collateral Agent may on behalf of the Lenders and the L/C Issuer, appoint a successor Administrative Agent or Collateral Agent meeting the qualifications set forth above; provided that if the Administrative Agent or the Collateral Agent shall notify the Borrower Representative and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (a) the retiring Administrative Agent and Collateral Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent or the Collateral Agent on behalf of the Lenders or the L/C Issuer under any of the Loan Documents, the retiring Administrative Agent or Collateral Agent

shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (b) all payments, communications and determinations provided to be made by, to or through the Administrative Agent or the Collateral Agent shall instead be made by or to each Lender and the L/C Issuer directly, until such time as the Required Lenders appoint a successor Administrative Agent or Collateral Agent as provided for above in this Section. Upon the acceptance of a successor's appointment as Administrative Agent or Collateral Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent or Collateral Agent, as applicable, and the retiring Administrative Agent or Collateral Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section). The fees payable by the Borrowers to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrowers and such successor. After the retiring Administrative Agent's or Collateral Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and Section 10.04 shall continue in effect for the benefit of such retiring Administrative Agent and the Collateral Agent, its respective sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent or Collateral Agent was acting as Administrative Agent or as Collateral Agent, as applicable.

(b)    The FILO Agent may resign at any time upon thirty days prior notice to the Administrative Agent, the FILO Lenders and the Borrower Representative. Upon receipt of any such notice of resignation, the FILO Lenders shall have the right, in consultation with the Administrative Agent and the Borrower Representative, to appoint a successor, which shall be a Lender or a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States and shall be reasonably acceptable to the Administrative Agent and, unless an Event of Default has occurred and is continuing at the time of such appointment, the Borrower Representative (whose consent shall not be unreasonably withheld or delayed). If no such successor shall have been so appointed by the FILO Lenders and shall have accepted such appointment within 30 days after the retiring FILO Agent gives notice of its resignation, then the retiring FILO Agent may on behalf of the FILO Lenders, appoint a successor FILO Agent meeting the qualifications set forth above; provided that if the retiring FILO Agent shall notify the Borrower Representative, the Lenders and the Administrative Agent that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (a) the retiring FILO Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents and (b) all payments, communications and determinations provided to be made by, to or through the FILO Agent shall instead be made by or to each FILO Lender directly, until such time as the FILO Lenders appoint a successor FILO Agent as provided for above in this Section 9.06(b). Upon the acceptance of a successor's appointment as FILO Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) FILO Agent and the retiring FILO Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section 9.06). The fees payable by the Borrowers to a successor FILO Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower Representative and such successor. After the retiring FILO Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and Section 10.04 shall continue

in effect for the benefit of such retiring FILO Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring FILO Agent was acting as FILO Agent hereunder.

9.07.    <u>Non-Reliance on Administrative Agent, Collateral Agent, FILO Agent and Other Lenders</u>.  Each Lender and the L/C Issuer acknowledges that it has, independently and without reliance upon the Administrative Agent, the Collateral Agent, the FILO Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender and the L/C Issuer also acknowledges that it will, independently and without reliance upon the Administrative Agent, the Collateral Agent, the FILO Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.  Except as provided in <u>Section 9.12</u>, the Agents shall not have any duty or responsibility to provide any Lender with any other credit or other information concerning the affairs, financial condition or business of any Loan Party that may come into the possession of the Agents.

9.08.    <u>No Other Duties, Etc.</u>  Anything herein to the contrary notwithstanding, none of the Joint Bookrunners, Joint Lead Arrangers, Syndication Agent or Co-Documentation Agents listed on the cover page hereof shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in their capacity, as applicable, as the Administrative Agent, a Lender or the L/C Issuer hereunder.

9.09.    <u>Reserved</u>.

9.10.    <u>Collateral and Guaranty Matters</u>.    The Lenders and the L/C Issuer irrevocably authorize the Administrative Agent, at its option and in its discretion,

(a)    to release any Lien on any property granted to or held by the Administrative Agent under any Loan Document (i) upon termination of the Aggregate Revolving Commitments and payment in full of all Obligations (other than contingent indemnification obligations) and the expiration or termination of all Letters of Credit, (ii) that is sold or to be sold as part of or in connection with any sale permitted hereunder or under any other Loan Document, or (iii) if approved, authorized or ratified in writing in accordance with <u>Section 10.01</u>; and

(b)    to release any Guarantor from its obligations under the Guaranty if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this <u>Section 9.10</u>.  In each case as specified in this <u>Section 9.10</u>, the Administrative Agent will, at the Borrowers' expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such

item of Collateral from the assignment and security interest granted under the Collateral Documents or to subordinate its interest in such item, or to release such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 9.10.

Anything contained in any of the Loan Documents to the contrary notwithstanding, the Loan Parties, the Agents, the FILO Agent and each Lender hereby agree that (1) no Lender shall have any right individually to realize upon any of the Collateral under any Collateral Document or to enforce the Guaranty, it being understood and agreed that all powers, rights and remedies under the Collateral Documents and the Guaranty may be exercised solely by the Collateral Agent acting as agent for and representative of Lenders in accordance with the terms thereof, and (2) in the event of a foreclosure by the Collateral Agent on any of the Collateral pursuant to a public or private sale or a sale under § 363 of the Bankruptcy Code, the Collateral Agent or any Lender may be the purchaser of any or all of such Collateral at any such sale and the Collateral Agent, as agent for and representative of Lenders (but not any Lender or Lenders in its or their respective individual capacities unless the Required Revolving Lenders and the Required FILO Lenders shall otherwise agree in writing) shall be entitled (at the direction of the Required Revolving Lenders and the Required FILO Lenders), for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any Collateral payable by the Collateral Agent at such sale.

9.11.   Notice of Transfer.  The Agents may deem and treat a Lender party to this Agreement as the owner of such Lender's portion of the Obligations for all purposes, unless and until, and except to the extent, an Assignment and Assumption shall have become effective as set forth in Section 10.06.

9.12.   Reports and Financial Statements.   By signing this Agreement, each Lender:

(a)     agrees to furnish the Administrative Agent on the first day of each month with a summary of all Other Liabilities, if any, due or to become due to such Lender;

(b)     is deemed to have requested that the Administrative Agent furnish such Lender, promptly after they become available, copies of all financial statements required to be delivered by the Borrowers hereunder or pursuant to the Orders and all commercial finance examinations and appraisals of the Collateral received by the Agents (collectively, the "Reports");

(c)     expressly agrees and acknowledges that the Administrative Agent (i) makes no representation or warranty as to the accuracy of the Reports, and (ii) shall not be liable for any information contained in any Report;

(d)     expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that the Agents or any other party performing any audit or examination will inspect only specific information regarding the Loan Parties

and will rely significantly upon the Loan Parties' books and records, as well as on representations of the Loan Parties' personnel;

(e)     agrees to keep all Reports confidential and strictly for its internal use, and not to distribute except to its participants, or use any Report in any other manner, except that such Reports may be disclosed to the extent permitted under Section 10.07 hereof; and

(f)     without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold the Agents and any such other Lender preparing a Report harmless from any action the indemnifying Lender may take or conclusion the indemnifying Lender may reach or draw from any Report in connection with any Credit Extensions that the indemnifying Lender has made or may make to the Borrowers, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, any Loans of the Borrowers; and (ii) to pay and protect, and indemnify, defend, and hold the Agents and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including attorney costs) incurred by the Agents and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through a breach by the indemnifying Lender of its obligations under Section 10.07.

9.13.     <u>Agency for Perfection</u>.  Each Lender hereby appoints each other Lender as agent for the purpose of perfecting Liens for the benefit of the Agents and the Lenders, in assets which, in accordance with Article 9 of the UCC or any other Applicable Law of the United States can be perfected only by possession.  Should any Lender (other than the Agents) obtain possession of any such Collateral, such Lender shall notify the Agents thereof, and, promptly upon the Collateral Agent's request therefor shall deliver such Collateral to the Collateral Agent or otherwise deal with such Collateral in accordance with the Collateral Agent's instructions.

9.14.     <u>Indemnification of Agents</u>.  The Lenders agree to indemnify the Agents (to the extent not reimbursed by the Loan Parties and without limiting the obligations of Loan Parties hereunder), ratably according to their respective pro rata shares, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against any Agent in any way relating to or arising out of this Agreement or any other Loan Document or any action taken or omitted to be taken by any Agent in connection therewith; provided, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's gross negligence or willful misconduct as determined by a final and nonappealable judgment of a court of competent jurisdiction.

9.15.     <u>Relation among Lenders</u>.  The Lenders are not partners or co-venturers, and no Lender shall be liable for the acts or omissions of, or (except as otherwise set forth herein in case of the Agents) authorized to act for, any other Lender.

9.16.     <u>Reserves</u>.

(a)    Upon the written request of the FILO Agent, the Administrative Agent shall establish an Availability Reserve with respect to Bank Products provided by any Revolving Lender or its Affiliates, at any time that (i) an Event of Default has occurred and is continuing or (ii) a Borrowing Base Certificate furnished by the Borrowers to the Administrative Agent reflects that Excess Availability is less than fifteen percent (15%) of the Line Cap (as calculated without giving effect to any FILO Reserve). The amount of the Availability Reserve shall be determined by the Administrative Agent in good faith consistent with past practices for similarly situated borrowers and shall be reviewed and adjusted by the Administrative Agent periodically (but no less frequently than with the delivery of a Borrowing Base Certificate) to reflect any material changes in the credit exposure with respect to such Bank Products for which the Availability Reserve has been established. Any Availability Reserve established pursuant to this Section 9.16(a) shall automatically be released and no longer required from and including the date of which such Event of Default is no longer continuing or, if such Availability Reserve has been imposed pursuant to clause (ii) above, the date of which the Borrowers have delivered a Borrowing Base Certificate evidencing Excess Availability equal to or in excess of the level indicated in this Section 9.16(a). The foregoing provisions are intended solely to establish circumstances in which the Administrative Agent must establish such Reserves; the provisions of this Section 9.16(a) shall not limit the right of the Administrative Agent to establish Bank Product Reserves and Cash Management Reserves at such time and in such amounts as the Administrative Agent in its reasonable discretion determines.

(b)    Notwithstanding anything to the contrary contained in this Agreement, as long as the FILO Loan remains outstanding, the Administrative Agent shall maintain Reserves (without limiting the right of the Administrative Agent to include additional Reserves or the requirement to include the FILO Reserve) of the type existing on the Closing Date, which Reserves shall be calculated by the same methodology as used prior to the Closing Date, provided that (x) the Administrative Agent may eliminate any Reserve (other than the one described in Section 9.16(a)) concurrent with, or after elimination of, the event or circumstance that gave rise to the establishment of such Reserve, and (y) the Administrative Agent may change the methodology used to calculate any Reserve if the effect of such change is to increase the amount of such Reserve. For clarity, the foregoing shall not limit the right of the Administrative Agent (i) to modify the amount of any of the Reserves based upon mathematical calculations (e.g. based on an increase or reduction in Customer Credit Liabilities at the time of calculation) or (ii) without regard to clause (i) hereof, to increase any Reserve from the level in effect at the time of the Closing Date and thereafter to reduce the amount of such Reserve to an amount not less than the amount thereof in effect on the Closing Date, in the case of each of clauses (i) and (ii), in a manner otherwise permitted by this Agreement.

ARTICLE X
MISCELLANEOUS

10.01.  Amendments, Etc.   No amendment or waiver of any provision of this Agreement or any other Loan Document, and no Consent to any departure by the Borrowers or any other Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders and the Borrowers or the applicable Loan Party, as the case may be, and acknowledged by the Administrative Agent, and each such waiver or Consent shall be effective only in the

specific instance and for the specific purpose for which given; <u>provided</u>, <u>however</u>, that no such amendment, waiver or consent shall:

(a)    extend or, increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to <u>Section 8.02</u>) without the written Consent of such Lender;

(b)    postpone any date fixed by this Agreement or any other Loan Document for (i) any payment or mandatory prepayment of principal, interest, fees or other amounts due to the Lenders (or any of them) hereunder or under any of the other Loan Documents without the written Consent of each Lender entitled to such payment, or (ii) any scheduled or mandatory reduction of the Aggregate Revolving Commitments hereunder or under any other Loan Document without the written Consent of each Revolving Lender;

(c)    reduce the principal of, or the rate of interest specified herein on, any Loan or L/C Borrowing, or (subject to clause (iv) of the second proviso to this <u>Section 10.01</u>) any fees or other amounts payable hereunder or under any other Loan Document, without the written Consent of each Lender entitled to such amount; <u>provided</u>, <u>however</u>, that only the Consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrowers to pay interest or Letter of Credit Fees at the Default Rate;

(d)    change <u>Section 2.13</u> or <u>Section 8.03</u> in a manner that would alter the pro rata sharing of payments or the order of application required thereby without the written Consent of each Lender;

(e)    change any provision of this Section or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder, without the written Consent of each Lender;

(f)    except as expressly permitted hereunder, release, or limit the liability of, any Loan Party without the written Consent of each Lender;

(g)    except for releases of Collateral in accordance with the provisions of <u>Section 9.10</u> hereof, release all or substantially all of the Collateral from the Liens of the Collateral Documents without the written Consent of each Lender;

(h)    increase the Aggregate Revolving Commitments (other than as set forth in <u>Section 2.15</u> hereof) without the written Consent of each Lender;

(i)    change the definition of the term "Borrowing Base" or any component definition thereof if as a result thereof the amounts available to be borrowed by the Borrowers would be increased; <u>provided</u> <u>that</u> the foregoing shall not limit the discretion of the Administrative Agent to change, establish or eliminate any Reserves without the Consent of any Lenders; or

(j)    modify the definition of Permitted Overadvance so as to increase the amount thereof or, except as provided in such definition, the time period for a Permitted Overadvance without the written Consent of each Lender;

(k)     subordinate the Obligations hereunder or the Liens granted hereunder or under the other Loan Documents, to any other Indebtedness or Lien, as the case may be without the written Consent of each Lender;

and, provided further, that (i) no amendment, waiver or Consent shall, unless in writing and signed by the L/C Issuer in addition to the Lenders required above, affect the rights or duties of the L/C Issuer under this Agreement or any Issuer Document relating to any Letter of Credit issued or to be issued by it; (ii) no amendment, waiver or Consent shall, unless in writing and signed by the Swing Line Lender in addition to the Lenders required above, affect the rights or duties of the Swing Line Lender under this Agreement; (iii) no amendment, waiver or Consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of the Administrative Agent under this Agreement or any other Loan Document; (iv) no amendment, waiver or Consent shall, unless in writing and signed by the Collateral Agent in addition to the Lenders required above, affect the rights or duties of the Collateral Agent under this Agreement or any other Loan Document; and (v) the Fee Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto. Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (x) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender disproportionately adversely relative to other affected Lenders shall require the consent of such Defaulting Lender.

If any Lender does not Consent to a proposed amendment, waiver, consent or release with respect to any Loan Document that requires the Consent of each Lender and that has been approved by the Required Lenders, the Borrower Representative may replace such non-consenting Lender in accordance with Section 10.13; provided that such amendment, waiver, consent or release can be effected as a result of the assignment contemplated by such Section (together with all other such assignments required by the Borrowers to be made pursuant to this paragraph).

10.02.  Notices; Effectiveness; Electronic Communications.

(a)     Notices Generally.    Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)     if to Holdings, the Borrower Representative, the Borrowers, any Loan Party, the Administrative Agent, the FILO Agent, the L/C Issuer or the Swing Line

Lender to the address, telecopier number, electronic mail address or telephone number specified for such Person on Schedule 10.02; and

(ii) if to any other Lender, to the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient). Notices delivered through electronic communications to the extent provided in subsection (b) below shall be effective as provided in such subsection (b).

(b) Electronic Communications. Notices and other communications to the Lenders and the L/C Issuer hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, provided that the foregoing shall not apply to notices to any Lender or the L/C Issuer pursuant to ARTICLE II if such Lender or the L/C Issuer, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Borrowers may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c) Change of Address, Etc. Each of Holdings, the Borrower Representative, the Borrowers, any of Loan Party, the Administrative Agent and the FILO Agent may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto. Each other Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Borrower Representative, the Administrative Agent, the L/C Issuer and the Swing Line Lender. In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

01:18374604.1

(d)    Reliance by Administrative Agent and Lenders.    The Administrative Agent, the FILO Agent, the L/C Issuer, the Swing Line Lender and the Lenders shall be entitled to rely and act upon any notices (including telephonic Committed Loan Notices. Swing Line Loan Notices, and Conversion/Continuation Notices) purportedly given by or on behalf of the Borrowers even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.    The Borrowers shall indemnify the Administrative Agent, the FILO Agent, the L/C Issuer, the Swing Line Lender, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrowers.    All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

10.03.  No Waiver; Cumulative Remedies.    No failure by any Lender, the L/C Issuer, the FILO Agent or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.    The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

10.04.  Expenses; Indemnity; Damage Waiver.

(a)    Costs and Expenses.    The Loan Parties shall pay all Credit Party Expenses within ten (10) Business Days after receipt of an invoice therefor.

(b)    Indemnification by the Loan Parties.    The Loan Parties shall indemnify the Administrative Agent (and any sub-agent thereof), the FILO Agent, the Arranger, each Lender, the L/C Issuer and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee) incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Borrowers or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or, in the case of the Administrative Agent (and any sub-agent thereof) and its Related Parties only, the administration of this Agreement and the other Loan Documents, (ii) any Loan or Letter of Credit or the use or proposed use of the proceeds therefrom (including any refusal by the L/C Issuer to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by Holdings or any of its Subsidiaries, or any Environmental Liability related in any way to Holdings or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding

relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrowers or any other Loan Party, and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (y) result from a claim brought by the Borrowers or any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if the Borrowers or such Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.

(c)     Reimbursement by Lenders.   To the extent that the Borrowers for any reason fail to indefeasibly pay any amount required under subsection (a) or (b) of this Section to be paid by it to the Administrative Agent (or any sub-agent thereof), the L/C Issuer or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent), the L/C Issuer or such Related Party, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent) or L/C Issuer in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent) in connection with such capacity.  The obligations of the Lenders under this subsection (c) are subject to the provisions of Section 2.12(d).

(d)     Waiver of Consequential Damages, Etc.   To the fullest extent permitted by applicable law, the Loan Parties shall not assert, and hereby waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or Letter of Credit or the use of the proceeds thereof.  No Indemnitee referred to in subsection (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(e)     Payments.   All amounts due under this Section shall be payable not later than ten Business Days after receipt of an invoice or demand therefor.

(f)     Survival.   The agreements in this Section shall survive the resignation of the Administrative Agent, the FILO Agent and the L/C Issuer, the replacement of any Lender, the termination of the Aggregate Revolving Commitments and the repayment, satisfaction or discharge of all the other Obligations.

10.05.  Payments Set Aside.  To the extent that any payment by or on behalf of any of the Loan Parties is made to the Administrative Agent, the FILO Agent, the L/C Issuer or any Lender, or the Administrative Agent, the FILO Agent, the L/C Issuer or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent, the FILO Agent, the L/C Issuer or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender and the L/C Issuer severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect.  The obligations of the Lenders and the L/C Issuer under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

10.06.  Successors and Assigns.

(a)    Successors and Assigns Generally.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither the Borrowers nor any other Loan Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of Section 10.06(b), (ii) by way of participation in accordance with the provisions of Section 10.06(d), or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.06(f) (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the L/C Issuer and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Assignments by Lenders.  Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment(s) and the Loans (including for purposes of this Section 10.06(b), participations in L/C Obligations and in Swing Line Loans) at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(i)    Minimum Amounts.

(A)    in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it or in the case of an

assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)      in any case not described in subsection (b)(i)(A) of this Section, (x) the aggregate amount of the Revolving Commitment (which for this purpose includes Revolving Loans outstanding thereunder) or, if the Revolving Commitment is not then in effect, the principal outstanding balance of the Revolving Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $10,000,000, unless each of the Administrative Agent and, so long as no Event of Default has occurred and is continuing, the Borrower Representative otherwise consent (each such consent not to be unreasonably withheld or delayed), and (y) the principal outstanding balance of the portion of the FILO Loan of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $5,000,000, unless the Administrative Agent and, so long as no Event of Default has occurred and is continuing, the Borrower Representative, otherwise consent (each such consent not to be unreasonably withheld or delayed); provided, however, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

(ii)      Proportionate Amounts.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned, except that this clause (ii) shall not apply to the Swing Line Lenders' rights and obligations in respect of Swing Line Loans;

(iii)      Required Consents.  No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section and, in addition:

(A)      the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of (i) any Commitment or outstanding portion of the FILO Loan if such assignment is to a Person that is not a Lender, an Affiliate of Lender or an Approved Fund with respect to such Lender or (ii) any Loan to a Person that is not a Lender, an Affiliate of a Lender or an Approved Fund;

(B)      the consent of the L/C Issuer (such consent not to be unreasonably withheld or delayed) shall be required for any assignment that increases the obligation of the assignee to participate in exposure under one or more Letters of Credit (whether or not then outstanding); and

(C)    the consent of the Swing Line Lender (such consent not to be unreasonably withheld or delayed) shall be required for any assignment in respect of the assignment of any Revolving Commitment.

(iv)    <u>Assignment and Assumption</u>.    The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee in the amount of $3,500; <u>provided</u>, <u>however</u>, that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.  The assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire;

(v)    <u>No Assignment to Borrowers</u>.  No such assignment shall be made to the Borrowers or any of the Borrowers' Affiliates or Subsidiaries; and

(vi)    <u>No Assignment to Natural Persons</u>.  No such assignment shall be made to a natural person.

(vii)    <u>No Assignment to Defaulting Lenders</u>.  No such assignment shall be made to any Defaulting Lender or any of its Subsidiaries or Affiliates, or any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (vii).

(viii)    <u>Certain Additional Payments</u>.  In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower Representative and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent, the L/C Issuer or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Loans and participations in Letters of Credit and Swing Line Loans in accordance with its Applicable Percentage.  Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the

interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05 and 10.04 with respect to facts and circumstances occurring prior to the effective date of such assignment); provided, that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.  Upon request, the Borrowers (at their expense) shall execute and deliver a Note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.06(d).

(c)    Register.  The Administrative Agent, acting solely for this purpose as an agent of the Borrowers, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, and the Borrowers, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrowers and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)    Participations.  (i) Any Lender may at any time, without the consent of, or notice to, the Borrowers or the Administrative Agent, sell participations to any Person (other than a natural person or the Borrowers or any of the Borrowers' Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrowers, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 10.01 that affects such Participant.  Subject to subsection (e) of this Section, the Borrowers agree that each Participant shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.06(b).  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender, provided such Participant agrees to be subject to Section 2.11 as though it were a Lender.

(ii)    Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrowers, maintain a register on which it enters the name and address of each

Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations or to satisfy any of the requirements under the applicable Tax law.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(e)    Limitations upon Participant Rights.  A Participant shall not be entitled to receive any greater payment under Section 3.01 or 3.04 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower Representative's prior written consent.  A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 3.01 unless the Borrower Representative is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrowers, to comply with Section 3.01(e) as though it were a Lender.

(f)    Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)    Electronic Execution of Assignments.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(h)    Resignation as L/C Issuer or Swing Line Lender after Assignment.  Notwithstanding anything to the contrary contained herein, if at any time Bank of America assigns all of its Commitment and Loans pursuant to subsection (b) above, Bank of America may, (i) upon 30 days' notice to the Borrower Representative and the Lenders, resign as L/C Issuer and/or (ii) upon 30 days' notice to the Borrower Representative, resign as Swing Line Lender.  In the event of any such resignation as L/C Issuer or Swing Line Lender, the Borrowers shall be entitled to appoint from among the Lenders a successor L/C Issuer or Swing Line Lender hereunder; provided, however, that no failure by the Borrowers to appoint any such successor

shall affect the resignation of Bank of America as L/C Issuer or Swing Line Lender, as the case may be.  If Bank of America resigns as L/C Issuer, it shall retain all the rights, powers, privileges and duties of the L/C Issuer hereunder with respect to all Letters of Credit outstanding as of the effective date of its resignation as L/C Issuer and all L/C Obligations with respect thereto (including the right to require the Lenders to make Base Rate Committed Loans or fund risk participations in Unreimbursed Amounts pursuant to Section 2.03(c)).  If Bank of America resigns as Swing Line Lender, it shall retain all the rights of the Swing Line Lender provided for hereunder with respect to Swing Line Loans made by it and outstanding as of the effective date of such resignation, including the right to require the Lenders to make Base Rate Committed Loans or fund risk participations in outstanding Swing Line Loans pursuant to Section 2.04(c).  Upon the appointment of a successor L/C Issuer and/or Swing Line Lender, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring L/C Issuer or Swing Line Lender, as the case may be, and (b) the successor L/C Issuer shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to Bank of America to effectively assume the obligations of Bank of America with respect to such Letters of Credit.

10.07.  Treatment of Certain Information; Confidentiality.    Each of the Administrative Agent, the FILO Agent, the Lenders and the L/C Issuer agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective directors, officers, employees, agents, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to its and its Affiliates' respective investors and partners a long as (i) such investor or partner is informed of the confidential nature of the information and (ii) that such information must be subject to a confidentiality agreement between such Agent or Lender and such investor or partner, (c) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (d) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (e) to any other party hereto, (f) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (g) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrowers and their obligations, (h) with the consent of the Borrower Representative or (i) to the extent such Information (A) becomes publicly available other than as a result of a breach of this Section or (B) becomes available to the Administrative Agent, the FILO Agent, any Lender, the L/C Issuer or any of their respective Affiliates on a non-confidential basis from a source other than the Borrowers.

For purposes of this Section, "Information" means all information received from any Loan Party or any Subsidiary thereof relating to any Loan Party or any Subsidiary thereof or their respective businesses, other than any such information that is available to the Administrative Agent, the FILO Agent, any Lender or the L/C Issuer on a non-confidential basis prior to disclosure by any Loan Party or any Subsidiary thereof.  Any Person required to

maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Administrative Agent, the FILO Agent, the Lenders and the L/C Issuer acknowledges that (a) the Information may include material non-public information concerning Holdings or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including Federal and state securities Laws.

10.08.  <u>Right of Setoff</u>.    Notwithstanding anything in Section 362 of the Bankruptcy Code, but subject to the Orders, if an Event of Default shall have occurred and be continuing, each Credit Party and each of its respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Credit Party or any such Affiliate to or for the credit or the account of the Borrowers or any other Loan Party against any and all of the obligations of the Borrowers or such Loan Party now or hereafter existing under this Agreement or any other Loan Document to such Credit Party, irrespective of whether or not such Credit Party shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrowers or such Loan Party may be contingent or unmatured or are owed to a branch or office of such Credit Party different from the branch or office holding such deposit or obligated on such indebtedness; provided, that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of <u>Section 2.16</u> and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent, the L/C Issuer and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  The rights of each Credit Party and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Credit Party or their respective Affiliates may have.    Each Credit Party agrees to notify the Borrower Representative and the Administrative Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application. No Lender will, or will permit its Participant to, exercise its rights under this <u>Section 10.08</u> without the consent of the Administrative Agent or the Required Lenders.  ANY AND ALL RIGHTS TO REQUIRE ANY AGENT TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES ANY OF THE OBLIGATIONS PRIOR TO THE EXERCISE BY ANY LENDER, PARTICIPANT OR AFFILIATE OF ITS RIGHT OF SETOFF UNDER THIS SECTION ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.

10.09.  <u>Interest Rate Limitation</u>.    Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan

01:18374604.1

Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate").  If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrowers.  In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

10.10.  <u>Counterparts; Integration; Effectiveness</u>.    This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in <u>Section 4.01</u>, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement.

10.11.  <u>Survival of Representations and Warranties</u>.    All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Obligation (other than any indemnity obligation for unasserted claims that by its terms survives the termination of this Agreement) shall remain unpaid or unsatisfied or any Letter of Credit shall remain outstanding. In connection with the termination of this Agreement and the release and termination of the security interests in the Collateral, the Administrative Agent on behalf of itself and the other Credit Parties, may require such indemnities as it shall reasonably deem necessary or appropriate to protect the Credit Parties against loss on account of such release and termination, including, without limitation, with respect to credits previously applied to the Obligations that may subsequently be reversed or revoked, and any Obligations that may thereafter arise, including without limitation under SECTION 10.04.

10.12.  <u>Severability</u>.    If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or

unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. Without limiting the foregoing provisions of this Section 10.12, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent, the L/C Issuer or the Swing Line Lender, as applicable, then such provisions shall be deemed to be in effect only to the extent not so limited.

10.13.  Replacement of Lenders.  (A) If any Lender requests compensation under Section 3.04, or if the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or (B) if any Lender is a Defaulting Lender, or (C) if in connection with a proposed amendment, modification, waiver, or consent with respect to any of the provisions hereof as contemplated by Section 10.01, the consent of the Required Lenders shall have been obtained but the consent of one or more of such other Lenders whose consent is required shall not have been obtained, or (D) if any other circumstance exists hereunder that gives the Borrower Representative the right to replace a Lender as a party hereto, or then the Borrower Representative may, at the Borrowers' sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.06), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), provided that:

(a)     the Borrowers shall have paid to the Administrative Agent the assignment fee specified in Section 10.06(b);

(b)     such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and L/C Advances, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 3.05) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts);

(c)     in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter; and

(d)     such assignment does not conflict with applicable Laws.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply.

10.14.  Governing Law; Jurisdiction; Etc.

(a)     GOVERNING LAW.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW

YORK, WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES AND THE BANKRUPTCY CODE.

(b)    SUBMISSION TO JURISDICTION.  EACH OF THE BORROWER REPRESENTATIVE, THE BORROWERS AND EACH OTHER LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND, TO THE EXTENT THE BANKRUPTCY COURT DECLINES OR IS OTHERWISE UNABLE TO EXERCISE JURISDICTION, THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH COURTS.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT ANY CREDIT PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST THE BORROWER REPRESENTATIVE, THE BORROWERS OR ANY OTHER LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.  NOTHING CONTAINED HEREIN SHALL BE DEEMED TO CONSTITUTE A LENDER'S OR PARTICIPANT'S CONSENT TO JURISDICTION OF THE BANKRUPTCY COURT FOR ANY PURPOSES OTHER THAN THE ENFORCEMENT OF THIS AGREEMENT AND THE ORDERS.  NOTHING CONTAINED HEREIN SHALL BE DEEMED CONSENT TO JURISDICTION BEFORE ANY BANKRUPTCY COURT IN THE CASES.

(c)    WAIVER OF VENUE.  EACH OF THE BORROWER REPRESENTATIVE, THE BORROWERS AND EACH OTHER LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)    SERVICE OF PROCESS.  EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.02, EXCEPT THAT WITH RESPECT TO ANY OF HOLDINGS, THE BORROWER REPRESENTATIVE, THE BORROWERS, OR ANY OTHER LOAN PARTY,

SERVICE SHALL BE MADE UPON SUCH PERSON AS THE BORROWER REPRESENTATIVE NOTIFIES THE AGENTS IN WRITING IS THE BORROWER REPRESENTATIVE'S REGISTERED AGENT IN THE STATE OF NEW YORK (CURRENTLY CT CORPORATION SYSTEM, 111 EIGHTH AVENUE, NEW YORK NEW YORK). NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW

10.15. <u>WAIVER OF JURY TRIAL</u>. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.16. <u>No Advisory or Fiduciary Responsibility</u>. In connection with all aspects of each transaction contemplated hereby, the Loan Parties each acknowledge and agree, and acknowledge their respective Affiliates' understanding, that: (i) the credit facility provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Loan Parties and their respective Affiliates, on the one hand, and the Administrative Agent and the Arranger, on the other hand, and each of the Loan Parties is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, the Administrative Agent and the Arranger each is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Loan Parties or any of their respective Affiliates, stockholders, creditors or employees or any other Person; (iii) neither the Administrative Agent nor the Arranger has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Loan Parties with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document (irrespective of whether the Administrative Agent or the Arranger has advised or is currently advising the Loan Parties or any of their respective Affiliates on other matters) and neither the Administrative Agent nor the Arranger has any obligation to the Loan Parties or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (iv) the Administrative Agent and the Arranger and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from

those of the Loan Parties and their respective Affiliates, and neither the Administrative Agent nor the Arranger has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) the Administrative Agent and the Arranger have not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and each of the Loan Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate. Each of the Loan Parties hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against the Administrative Agent and the Arranger with respect to any breach or alleged breach of agency or fiduciary duty.

10.17. <u>USA PATRIOT Act Notice</u>. Each Lender that is subject to the Act (as hereinafter defined) and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrowers that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the PATRIOT Act. No part of the proceeds of the Loans will be used by the Loan Parties, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

10.18. <u>Press Releases</u>. Except in connection with the Cases, each Credit Party executing this Agreement agrees that neither it nor its Affiliates will in the future issue any press releases or other public disclosure using the name of Administrative Agent, the FILO Agent, the Lenders or their respective Affiliates or referring to this Agreement or the other Loan Documents without at least two (2) Business Days' prior notice to Administrative Agent and the FILO Agent and without the prior written consent of Administrative Agent, the FILO Agent and the Borrower Representative unless (and only to the extent that) such Credit Party or Affiliate is required to do so under law and then, in any event, such Credit Party or Affiliate will consult with Administrative Agent, the FILO Agent and the Borrower Representative before issuing such press release or other public disclosure. Each Loan Party executing this Agreement agrees that neither it nor its Affiliates will in the future issue any press releases or other public disclosure using the name of any Lender without the prior written consent of such Lender. Each Loan Party consents to the publication by Administrative Agent, the FILO Agent or any Lender of advertising material relating to the financing transactions contemplated by this Agreement using any Borrower's name, product photographs, logo or trademark. The Administrative Agent, the FILO Agent or such Lender shall provide a draft reasonably in advance of any advertising material to the Borrower Representative for review and comment prior to the publication thereof. Each of the Administrative Agent and the FILO Agent reserves the right to provide to industry trade organizations information necessary and customary for inclusion in league table measurements.

10.19. <u>No Strict Construction</u>. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto

and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

10.20. <u>Attachments</u>.   The exhibits, schedules and annexes attached to this Agreement are incorporated herein and shall be considered a part of this Agreement for the purposes stated herein, except that in the event of any conflict between any of the provisions of such exhibits and the provisions of this Agreement, the provisions of this Agreement shall prevail.

10.21. <u>Additional Rights of FILO Lenders</u>. Notwithstanding anything herein to the contrary,

(a)    With respect to the Default Rate applicable to the FILO Loan, the Consent of only the Required FILO Lenders shall be required to amend the definition of "Default Rate" applicable thereto or to waive any obligation of the Borrowers to pay interest on the FILO Loans at the Default Rate;

(b)    With respect to the Default Rate applicable to the Revolving Loans, the Consent of the FILO Lenders shall not be required to amend the definition of "Default Rate" applicable thereto or to waive any obligation of the Borrowers to pay interest on the Revolving Loans or Letter of Credit Fees at the Default Rate;

(c)    Any change to <u>Section 2.13</u> or <u>Section 8.03</u> shall require the written Consent of each Lender, and any change to <u>Section 2.05(g)</u> shall require, in addition to any other Consents, the consent of the Required FILO Lenders;

(d)    Any change to any provision of this <u>Section 10.21</u> or the definition of "Required FILO Lenders" or any other provision hereof specifying the number or percentage of FILO Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder, without the written Consent of each Lender;

(e)    Any change to the definition of the term "FILO Borrowing Base" or any component definition thereof if as a result thereof the amounts available to be borrowed by the Borrowers would be increased shall require the written Consent of the FILO Agent, the Administrative Agent, each FILO Lender and the Required Lenders, or (ii) any modification, reduction, elimination or failure to maintain the FILO Reserve shall require the written Consent of the FILO Agent and each FILO Lender; <u>provided that</u> the FILO Agent and the FILO Lenders may agree to reduce or waive such FILO Reserve;

(f)    Any amendment, waiver or consent to any of the following shall, in addition to any other Consents required by this Agreement, require the consent of the Required FILO Lenders:

(i)    any modification to the definitions of Appraised Value, Availability Reserves, Availability Block, Bank Products, Bank Product Reserves, Borrowing Base, Budget, Carve Out, Carve Out Reserve, Cash Management Reserves, Cash Management Services, Change of Control, Eligible Assignee, Excess Availability, Eligible Credit Card Receivables, Eligible In-Transit Inventory, Eligible Inventory, Eligible Letter of Credit,

01:18374604.1

Event of Default, FILO Event of Default, FILO Applicable Margin, FILO Reserve, FILO Standstill Period, Final Order, Initial Store Closing Sale, Interim Order, Inventory Reserves, LIBO Rate as it relates to the FILO Loan, Line Cap, Material Subsidiary, Maturity Date, Net Cash Proceeds, Orders, Overadvance, Permitted Overadvance, Permitted Variances, Reserves, Restricted Payments, Revolving Excess Availability, Revolving Line Cap, Termination Date, Term Priority Collateral, Testing Period or Total Revolving Outstandings (and any of the component definitions of any of the foregoing terms);

(ii)    any modification of the provisions of Sections 2.01(a), 2.03(a)(i)(x) or 2.04(a)(i) to the extent that such modification provides that the Borrowing Base may be exceeded (other than with respect to Permitted Overadvances), Section 2.05(c), (d), (e), (f), (g) and (h), Section 2.15 (but only to the extent such modification increases the amount by which the Aggregate Revolving Commitments may be increased), Section 3.03(b), Section 6.02, Section 6.07, Section 6.10, Section 6.12, Section 6.13, Section 6.14, Section 6.21, Section 6.22, Section 6.23, Section 6.24, Section 7.03, Section 7.05(j), Section 7.06, Section 7.08, Section 7.17, Section 7.18 and all component definitions contained therein, Section 7.22, Section 7.23, Section 7.25, Section 8.01, Section 8.02, Section 9.16, Section 10.04 (but only to the extent such modification relates to the FILO Loan) and Section 10.06(b) (but only to the extent such modification related to the FILO Loan) of this Agreement;

(iii)    the modification of the time upon which the Administrative Agent must institute the FILO Reserve; and

(iv)    the increase of the rates of interest set forth in the definition of "Applicable Margin" at any level of the pricing grid applicable thereto, or of the "Default Rate" with respect to the Revolving Loans or Letter of Credit Fees unless the "FILO Applicable Margin" and "Default Rate" with respect to the FILO Loan is increased by the same amount; provided that the foregoing shall not include any increase occurring because of fluctuations in underlying rate indices or the imposition of the "Default Rate";

(g)    no amendment, waiver or Consent shall, unless in writing and signed by the FILO Agent in addition to the Lenders otherwise required by this Agreement, shall affect the rights or duties of the FILO Agent under this Agreement or any other Loan Document; and

(h)    notwithstanding the foregoing, any amendment, waiver or Consent that reduces the rate of interest specified herein on the FILO Loan or postpones any date fixed by this Agreement or any other Loan Document for any payment or mandatory prepayment of principal, interest or fees due to the FILO Lenders hereunder shall require only the written Consent of each FILO Lender entitled to such payment and the Borrowers (and the Consent of the Required Lenders shall not be required).

In the event of any conflict between the provisions of this Section 10.21 and any other provisions of this Agreement, the provisions of this Section 10.21 shall control.

01:18374604.1

10.22. <u>Intercreditor Agreement</u>.  Notwithstanding anything herein to the contrary, the lien and security interest granted to the Collateral Agent pursuant to the Collateral Documents and this Agreement and the exercise of any right or remedy by the Collateral Agent thereunder or hereunder are subject to the provisions of the Intercreditor Agreement.  In the event of any conflict between the terms of the Intercreditor Agreement and the Collateral Documents or this Agreement, the terms of the Intercreditor Agreement shall govern and control; <u>provided</u>, <u>however</u>, that all proceeds of the Collateral and any other amounts received on account of the Obligations shall, as between the Loan Parties and the Credit Parties, be applied as provided in <u>Section 8.03</u> of this Agreement, notwithstanding anything to the contrary contained in the Intercreditor Agreement.

10.23. <u>Reserved.</u>

10.24. <u>Keepwell</u>.

Each Loan Party that is a Qualified ECP Guarantor at the time the Guaranty or the grant of a security interest under the Loan Documents, in each case, by any Specified Loan Party becomes effective with respect to any Swap Obligation, hereby jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide such funds or other support to each Specified Loan Party with respect to such Swap Obligation as may be needed by such Specified Loan Party from time to time to honor all of its obligations under the Loan Documents in respect of such Swap Obligation (but, in each case, only up to the maximum amount of such liability that can be hereby incurred without rendering such Qualified ECP Guarantor's obligations and undertakings under the Guaranty voidable under applicable Laws relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  The obligations and undertakings of each Qualified ECP Guarantor under this Section shall remain in full force and effect until the Obligations have been indefeasibly paid and performed in full.  Each Loan Party intends this Section to constitute, and this Section shall be deemed to constitute, a guarantee of the obligations of, and a "keepwell, support, or other agreement" for the benefit of, each Specified Loan Party for all purposes of the Commodity Exchange Act.

01:18374604.1

*IN WITNESS WHEREOF,* the parties hereto have caused this Agreement to be duly executed as of the date first above written.

THE SPORTS AUTHORITY, INC., as Borrower Representative, as Borrower and as Guarantor

By: _____

Name: _____

Title: _____

TSA STORES, INC., as Borrower and as Guarantor

By: _____

Name: _____

Title: _____

THE SPORTS AUTHORITY HOLDINGS, INC., as Guarantor

By: _____

Name: _____

Title: _____

TSA GIFT CARD, INC., as Guarantor

By: _____

Name: _____

Title: _____

SLAP SHOT HOLDINGS CORP., as Guarantor

By: _____

Name: _____

Title: _____

01:18374604.1

Signature Page to DIP Credit Agreement

TSA PONCE, INC., as Guarantor

By: _____
Name: _____
Title: _____

TSA CARIBE, INC., as Guarantor

By: _____
Name: _____
Title: _____

Signature Page to DIP Credit Agreement

BANK OF AMERICA, N.A., as
Administrative Agent and Collateral Agent


By: _____
Name: _____
Title: _____

BANK OF AMERICA, N.A., as Lender


By: _____
Name: _____
Title: _____

Signature Page to DIP Credit Agreement

WELLS FARGO BANK, NATIONAL
ASSOCIATION, as Lender and Syndication Agent

By: _____
Name: _____
Title: _____

WELLS FARGO BANK, NATIONAL
ASSOCIATION, as FILO Agent and as FILO
Lender


By: _____
Name: _____
Title: _____

Signature Page to DIP Credit Agreement

JPMORGAN CHASE BANK, N.A, as
Lender and Co-Documentation Agent

By: _____
Name: _____
Title: _____

Signature Page to DIP Credit Agreement

SUNTRUST BANK, as
Lender and Co-Documentation Agent

By: _____

Name: _____

Title: _____

Signature Page to DIP Credit Agreement

PNC BANK, NATIONAL ASSOCIATION, as Lender

By: _____

Name: _____

Title: _____

Signature Page to DIP Credit Agreement

U.S. BANK NATIONAL ASSOCIATION, as
Lender and Co-Documentation Agent

By: _____
Name: _____
Title: _____

Signature Page to DIP Credit Agreement

CITIZENS BUSINESS CAPITAL, f/k/a
RBS BUSINESS CAPITAL, a division of
CITIZENS ASSET FINANCE., INC.,
f/k/a RBS ASSET FINANCE, INC., as Lender


By: _____

Name: _____

Title: _____

CIT BANK, as Lender

By: _____

Name: _____

Title: _____

Signature Page to DIP Credit Agreement

CAPITAL ONE LEVERAGE FINANCE CORP.,
as Lender

By: _____

Name: _____

Title: _____

01:18374604.1

Signature Page to DIP Credit Agreement

ROYAL BANK OF CANADA, as Lender

By: _____

Name: _____

Title: _____

Signature Page to DIP Credit Agreement

TAO TALENTS, LLC, as FILO Lender

By: _____

Name: _____

Title: _____

01:18374604.1

Signature Page to DIP Credit Agreement

TPG SPECIALTY LENDING, INC., as FILO
Lender


By: _____
Name: _____
Title: _____

1938069.8

Signature Page to DIP Credit Agreement

**EXHIBIT C**

**APPROVED BUDGET**

**The Sports Authority**
**Summary Approved Budget**
**($ in 000's)**

| 4-5-4 Month | Mar | Mar | Mar | Mar | Mar | Apr | Apr | Apr | Apr | 9 Weeks |
| Week Ending | 3/5/16 | 3/12/16 | 3/19/16 | 3/26/16 | 4/2/16 | 4/9/16 | 4/16/16 | 4/23/16 | 4/30/16 | Total |
| Fiscal Week # | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | |
| Store Count | 462 | 462 | 462 | 462 | 462 | 462 | 462 | 462 | 462 | 462 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1) Cash Receipts | 47,285 | 53,766 | 56,849 | 57,323 | 57,435 | 56,269 | 58,581 | 55,455 | 52,432 | 495,395 |
| Cash Disbursements | | | | | | | | | | |
| 2) Operating Disbursements | (28,391) | (47,903) | (62,304) | (57,227) | (53,399) | (32,687) | (41,704) | (34,850) | (55,354) | (413,820) |
| 3) Financing Disbursements | (4,019) | (336) | (313) | (311) | (1,071) | (314) | (305) | (287) | (274) | (7,232) |
| 4) Professional Fees | (3,000) | - | - | (1,250) | - | - | - | - | - | (4,250) |
| 5) Bankruptcy Related Disbursements | (2,150) | (1,430) | - | - | - | - | - | - | - | (3,580) |
| 6) Total Cash Disbursements | (37,561) | (49,670) | (62,617) | (58,789) | (54,470) | (33,001) | (42,009) | (35,138) | (55,628) | (428,882) |
| 7) Net Cash Flow Before Revolver Borrowing / (Paydown) | 9,724 | 4,096 | (5,768) | (1,465) | 2,964 | 23,268 | 16,572 | 20,317 | (3,197) | 66,512 |
| 8) Revolver Principal Borrowing / (Paydown) | (954) | (28,138) | (2,872) | 4,511 | (667) | (10,841) | (21,982) | (16,205) | (9,106) | (86,254) |
| 9) Net Cash Flow | 8,770 | (24,042) | (8,640) | 3,046 | 2,297 | 12,427 | (5,410) | 4,112 | (12,302) | (19,742) |
| 10) Beginning Book Available Cash | (12,470) | (3,700) | (27,742) | (36,382) | (33,336) | (31,040) | (18,612) | (24,022) | (19,910) | (12,470) |
| 11) Net Cash Flow | 8,770 | (24,042) | (8,640) | 3,046 | 2,297 | 12,427 | (5,410) | 4,112 | (12,302) | (19,742) |
| 12) Ending Book Available Cash | (3,700) | (27,742) | (36,382) | (33,336) | (31,040) | (18,612) | (24,022) | (19,910) | (32,212) | (32,212) |
| 13) Add: Outstanding Checks | 4,700 | 28,742 | 37,382 | 34,336 | 32,040 | 19,612 | 25,022 | 20,910 | 33,212 | 33,212 |
| 14) Ending Bank Available Cash | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |

**The Sports Authority**
**Summary Approved Budget**
**($ in 000's)**

| 4-5-4 Month<br>Week Ending<br>Fiscal Week #<br>Store Count | May<br>5/7/16<br>10<br>462 | May<br>5/14/16<br>11<br>462 | May<br>5/21/16<br>12<br>462 | May<br>5/28/16<br>13<br>462 | Jun<br>6/4/16<br>14<br>321 | Jun<br>6/11/16<br>15<br>321 | Jun<br>6/18/16<br>16<br>321 | Jun<br>6/25/16<br>17<br>321 | Jun<br>7/2/16<br>18<br>321 | 9 Weeks<br>Total<br><br>321 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1) Cash Receipts | 51,057 | 47,069 | 43,597 | 46,623 | 42,022 | 39,884 | 47,284 | 46,079 | 40,106 | 403,721 |
| Cash Disbursements | | | | | | | | | | |
| 2) Operating Disbursements | (29,657) | (44,084) | (36,594) | (41,224) | (60,959) | (33,945) | (35,360) | (37,383) | (55,802) | (375,008) |
| 3) Financing Disbursements | (2,606) | (264) | (260) | (262) | (975) | (262) | (275) | (265) | (976) | (6,144) |
| 4) Professional Fees | - | (6,130) | - | - | - | (5,430) | - | - | - | (11,560) |
| 5) Bankruptcy Related Disbursements | - | - | (4,520) | - | - | - | - | - | - | (4,520) |
| 6) Total Cash Disbursements | (32,263) | (50,478) | (41,374) | (41,486) | (61,934) | (39,637) | (35,635) | (37,647) | (56,778) | (397,232) |
| 7) Net Cash Flow Before Revolver Borrowing / (Paydown) | 18,794 | (3,409) | 2,222 | 5,137 | (19,912) | 248 | 11,649 | 8,432 | (16,672) | 6,489 |
| 8) Revolver Principal Borrowing / (Paydown) | (3,376) | (5,247) | 2,271 | (7,915) | 8,071 | 15,961 | (12,498) | (9,645) | 5,620 | (6,758) |
| 9) Net Cash Flow | 15,418 | (8,656) | 4,494 | (2,778) | (11,841) | 16,209 | (849) | (1,214) | (11,051) | (269) |
| 10) Beginning Book Available Cash | (32,212) | (16,794) | (25,450) | (20,957) | (23,734) | (35,576) | (19,367) | (20,216) | (21,430) | (32,212) |
| 11) Net Cash Flow | 15,418 | (8,656) | 4,494 | (2,778) | (11,841) | 16,209 | (849) | (1,214) | (11,051) | (269) |
| 12) Ending Book Available Cash | (16,794) | (25,450) | (20,957) | (23,734) | (35,576) | (19,367) | (20,216) | (21,430) | (32,481) | (32,481) |
| 13) Add: Outstanding Checks | 17,794 | 26,450 | 21,957 | 24,734 | 36,576 | 20,367 | 21,216 | 22,430 | 33,481 | 33,481 |
| 14) Ending Bank Available Cash | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |