# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SPORTS AUTHORITY HOLDINGS, INC., *et al.*,[1] | Case No. 16-_____ (___) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF BERNARD DOUTON IN SUPPORT OF DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION SECURED FINANCING PURSUANT TO 11 U.S.C. §§ 105, 362, 363, AND 364; (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS TO POST-PETITION LENDERS PURSUANT TO 11 U.S.C. §§ 364 AND 507; (III) AUTHORIZING THE USE OF CASH COLLATERAL AND PROVIDING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES AND MODIFYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. §§ 361, 362, 363, AND 364; AND (IV) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(B) AND (C) AND LOCAL RULE 4001-2**[2]

I, Bernard Douton, make this Declaration under 28 U.S.C. § 1746 and state as follows:

1. I am Managing Director at Rothschild Inc. ("Rothschild"), a financial advisory services firm with its principal office located at 1251 Avenue of the Americas, New York, New York 10020.

2. I submit this declaration in support of the *Debtors' Motion for Interim and Final Orders (I) Authorizing Debtors to Obtain Post-Petition Secured Financing Pursuant to 11 U.S.C. §§ 105, 362, 363, and 364; (II) Granting Liens and Superpriority Claims to Post-Petition Lenders Pursuant to 11 U.S.C. §§ 364 and 507; (III) Authorizing the Use of Cash Collateral and*

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Sports Authority Holdings, Inc. (9008); Slap Shot Holdings, Corp. (8209); The Sports Authority, Inc. (2802); TSA Stores, Inc. (1120); TSA Gift Card, Inc. (1918); TSA Ponce, Inc. (4817); and TSA Caribe, Inc. (5664). The headquarters for the above-captioned Debtors is located at 1050 West Hampden Avenue, Englewood, Colorado 80110.

[2] Capitalized terms used but not defined herein have the meaning given in the DIP Motion.

*Providing Adequate Protection to Prepetition Secured Parties and Modifying the Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364; and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c) and Local Rule 4001-2* (the "DIP Motion"). Unless otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with the Debtors' senior management or members of the Rothschild team, my review of relevant documents, or my opinion based upon experience, knowledge and information concerning the Debtors' operations.

## Qualifications

3. I hold a Bachelor of Arts degree from Harvard College.

4. I began my career at Lazard Freres & Co., where I was involved in a variety of merger, acquisition and divestiture assignments, public and private financings, recapitalizations and restructurings. In 1996, I moved to Peter J. Solomon as a restructuring investment banker, and then to Rothschild in March of 2000.

5. I have over 25 years' experience advising distressed companies and stakeholders of distressed companies in a variety of industries. Additionally, I have substantial experience marketing, structuring and evaluating debtor-in-possession financings, secured debt, exit financing, unsecured debt, rights offerings and preferred and common stock investments. I have previously proffered testimony and/or testified in numerous bankruptcy cases, including, among others, the chapter 11 cases of Debs Shops, Filene's Basement, The Chicago Sun Times and Friedman's Jewelers.

## The Debtors' Need for Use of Cash Collateral and DIP Financing

6. As noted in the First Day Declaration of Jeremy Aguilar, substantially all of the Debtors' cash is held in accounts at Bank of America, N.A. and Wells Fargo Bank, National

Association and is subject to first and second priority liens for the benefit of the Prepetition Revolving Lenders, the Prepetition FILO Lenders, and the Prepetition Term Loan Lenders.  In addition, substantially all of the Debtors' assets secure the obligations under the Prepetition Revolving Credit Agreement and the Prepetition Term Loan Credit Agreement.

7. The Debtors need access to the cash collateral ("Cash Collateral") and debtor in possession financing ("DIP Financing") to, among other things, (a) make payments to vendors on a current basis post-petition; (b) continue to pay employees, who are the lifeblood of the Debtors' business operations; and (c) pay ordinary operating expenses, such as rent, utilities, taxes and fees.  While the Debtors could theoretically finance their operations during the case using only the Cash Collateral of the Prepetition Secured Parties, the lack of DIP Financing would likely result in vendors refusing to ship merchandise other than on a cash in advance basis or after a pay down of their prepetition exposure.  Without access to consensual use of Cash Collateral and the funds proposed to be advanced under the proposed DIP Financing, the Debtors' estates and creditors would suffer immediate harm, including a significant decrease in liquidity and/or merchandise available for sale.

8. As part of the DIP Financing process, the Debtors, with the assistance of Rothschild and FTI Consulting, Inc., the Debtors' proposed financial advisor, have developed a cash flow forecast used in connection with soliciting and obtaining DIP Financing.   The Debtors therefore require access to a post-petition revolving line of credit in the form of the proposed DIP Financing to continue to fund their business operations.

## DIP Financing Negotiations

9. In late January 2015, the Debtors authorized Rothschild to initiate the process of securing DIP Financing.  Rothschild immediately sought proposals from not less than 32

potential lenders.  The potential financing parties solicited by Rothschild included traditional banks and other financial institutions familiar with the retail industry and investment funds that are sophisticated and highly skilled in providing financing in distressed situations.  The Debtors and Rothschild also discussed DIP Financing with other parties in the Debtors' capital structure (including holders of debt issued under the Prepetition Revolving Credit Agreement, Prepetition Term Loan Credit Agreement and unsecured Mezzanine Notes) who they believed might be willing to provide DIP Financing.

10.     Prior to the Petition Date, 22 parties signed confidentiality agreements enabling them to evaluate a potential financing transaction.  Each party subject to a non-disclosure agreement was provided with a presentation highlighting the Debtors' financing needs, operational performance and an estimate of the cash that the Debtors thought would be necessary to allow them to operate during the chapter 11 cases.  Each of these parties was also provided access to an electronic data room that contained public and non-public information.  Rothschild encouraged parties to submit any proposal that would achieve the Debtors' goals and emphasized the Debtors' willingness to consider a variety of creative structures and solutions, including a replacement of the existing ABL Revolving Facility, a replacement of the existing FILO Facility and/or the provision of incremental financing.

11.     The Debtors received five non-binding term sheets, which contained the material economic terms of proposed DIP financings, including the proposed amount of principal, the rate of interest, fees, security and maturity.

12.     No party indicated any willingness to provide DIP Financing on an unsecured basis or indicated any willingness to provide DIP Financing secured solely by a lien on

unencumbered property. No party indicated any willingness to provide DIP Financing secured by liens junior to the company's prepetition secured creditors.

13. After receiving term sheets, Rothschild and the Debtors continued to seek clarifications of certain terms and negotiated in good faith for better economic and structural concessions from all interested parties.

14. The Debtors ultimately determined that the proposal submitted by the Prepetition Revolving Lenders and Prepetition FILO Lenders was the best proposal. The Debtors took numerous considerations into account when making this determination, including the fact that all other proposals either (a) would require the Debtors' to engage in a contested priming fight with the Debtors' prepetition lenders (which would be costly and uncertain given the Debtors' overleveraged capital structure); (b) did not, in Rothschild's and the Debtors' view, provide the Debtors with sufficient incremental liquidity to offset the additional cost, time, risk and effort required to secure such financing; (c) contained materially worse indicative economic terms; and/or (d) were uncertain to close given outstanding material terms and conditions.

15. Even after making this determination, the Debtors' professionals and Rothschild continued to seek concessions in timing, structure and economic terms. The Debtors and the DIP Secured Parties negotiated the DIP Credit Agreement in a good faith and arm's length manner, with the advice of sophisticated counsel and advisors.

16. In short, based on Rothschild's extensive discussions with potential sources of DIP financing, as well as my familiarity and experience advising distressed companies, I believe the proposal submitted to the Debtors by the Prepetition Revolving Lenders and the Prepetition FILO Lenders represents the best and most favorable financing available to the Debtors under the circumstances.

17. In my opinion, there are other sound business reasons justifying the Debtors' entry into the DIP Credit Agreement. It includes attainable milestones and a budget consistent with the first-day relief requested by the Debtors. The agents under the DIP Loans are the agents under the Debtors' Prepetition Revolving Credit Agreement and their resulting knowledge base of the collateral and the Debtors' business operations has and should continue to result in considerable efficiencies in connection with any necessary interactions between all parties. When taken as a whole, the proposed DIP Financing reflects market terms and is the best option available to the Debtors.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

*/s/ Bernard Douton*
Bernard Douton