**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SPORTS AUTHORITY HOLDINGS, INC., *et al.*,[1] | Case No. 16-10527 (MFW) |
| Debtors. | (Joint Administration Requested) |
| | **Bid Procedures Hearing Date:  March 29, 2016 at 1:00 p.m. (ET)** |
| | **Bid Procedures Objection Deadline:  March 17, 2016 at 4:00 p.m. (ET)** |
| | **Proposed Sale Hearing Date: April 26, 2016 at 11:30 a.m. (ET)** |
| | **Proposed Sale Objection Deadline:  April 19, 2016 at 4:00 p.m. (ET)** |

**DEBTORS' MOTION, PURSUANT TO SECTIONS 105, 363 AND 365 OF THE BANKRUPTCY CODE, FED. R. BANKR. P. 2002, 6003, 6004, 6006, 9007, 9008 AND 9014 AND DEL. BANKR. L.R. 2002-1, 6004-1 AND 9006-1, FOR ENTRY OF (A) AN ORDER (I) APPROVING BID PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (II) SCHEDULING AN AUCTION FOR AND HEARING TO APPROVE SALE OF ASSETS, (III) APPROVING NOTICE OF RESPECTIVE DATE, TIME AND PLACE FOR AUCTION AND FOR HEARING ON APPROVAL OF SALE, (IV) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (V) APPROVING FORM AND MANNER OF NOTICE THEREOF, AND (VI) GRANTING RELATED RELIEF; AND (B) AN ORDER AUTHORIZING AND APPROVING (I) THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, RIGHTS, ENCUMBRANCES, AND OTHER INTERESTS, (II) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (III) RELATED RELIEF**

Sports Authority Holdings, Inc. and its affiliated debtors and debtors in possession in the

above-captioned chapter 11 cases (collectively, the "Debtors") hereby move this Court (this

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  Sports Authority Holdings, Inc. (9008); Slap Shot Holdings, Corp. (8209); The Sports Authority, Inc. (2802); TSA Stores, Inc. (1120); TSA Gift Card, Inc. (1918); TSA Ponce, Inc. (4817); and TSA Caribe, Inc. (5664).  The headquarters for the above-captioned Debtors is located at 1050 West Hampden Avenue, Englewood, Colorado 80110.

"Motion") for the entry of orders, pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6003, 6004, 6006, 9007, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 2002-1, 6004-1 and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), (A) (i) authorizing and approving bid procedures in connection with the sale or disposition (the "Sale") of substantially all of the Debtors' assets (the "Assets") or any portion thereof, (ii) scheduling an auction (the "Auction") for and a hearing to approve the Sale, (iii) authorizing and approving the form and manner of notice of the respective date, time and place for the Auction and a hearing to approve the Sale, (iv) approving procedures for the assumption and assignment of certain executory contracts and unexpired leases, (v) approving the form and manner of notice of the assumption and assignment of certain executory contracts and unexpired leases, and (vi) granting related relief; and (B) authorizing and approving (i) the sale of the Assets free and clear of all claims, liens, liabilities, rights, interests and encumbrances (except certain permitted encumbrances as determined by the Debtors and any purchaser of the Assets), (ii) the Debtors to assume and assign certain executory contracts and unexpired leases, and (iii) related relief.  In support of this Motion, the Debtors rely on the *Declaration of Jeremy Aguilar in Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief* (the "First Day Declaration"), which was filed concurrently herewith, and respectfully represent as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding pursuant to 28

01:18384380.1

U.S.C. § 157(b), and pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     The statutory predicates for the relief requested herein are sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6003, 6004, 6006, 9007, 9008 and 9014, and Local Rules 2002-1, 6004-1 and 9006-1.

## BACKGROUND

### I.     General Background

3.     On the date hereof (the "Petition Date"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.  Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are continuing to manage their financial affairs as debtors in possession.

4.     Contemporaneously herewith, the Debtors filed a motion seeking joint administration of their chapter 11 cases (the "Chapter 11 Cases") pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.  No trustee, examiner, or official committee of unsecured creditors has been appointed in the Chapter 11 Cases.

5.     Information regarding the Debtors' history and business operations, capital structure and primary secured indebtedness, and the events leading up to the commencement of the Chapter 11 Cases can be found in the First Day Declaration.

### II.     Background Related to the Debtors' Business and the Plan/Sale Process

6.     The Debtors are one of the nation's largest full-line sporting goods retailers, with roots dating back to 1928.  The Debtors currently operate 464 stores and five distribution centers

across 40 U.S. states and Puerto Rico.  Nationwide, the Debtors are among the top five sporting goods retailers.  The Debtors offer a broad selection of goods from a wide array of household and specialty brands, including Adidas, Asics, Brooks, Columbia, FitBit, Hanesbrands, Icon Health and Fitness, Nike, The North Face, and Under Armour, in addition to their own private label brands.  The Debtors' target customers skew to women and families with children, and particularly in the area of family sports and fitness goods and branded fitness merchandise; indeed, approximately 20% of the Debtors' customers drive 62% of the Debtors' sales.  According to preliminary results, the Debtors recorded approximately $2.6 billion in sales during FY2015, which ended on January 30, 2016.  The Debtors' online sales alone totaled approximately $207.6 million, which represented a 41.8% year-to-year increase in online sales.  Approximately 14,000 people are employed in various capacities across the Debtors' operations.  The Debtors enjoy strong brand recognition and their customer loyalty program, which was launched in 2012, currently boasts 28.8 million members.

7.      However, the Debtors have recently accumulated substantial losses, primarily as a result of changing market trends, shifting sales from traditional brick and mortar retailers to a proliferation of online resellers.  The Debtors have also faced increased competition from other full line sporting goods retailers and specialty athleisure retailers.  In addition, the Debtors have substantial debt obligations—more than $1.1 billion in funded debt—which have resulted in significant interest expenses.  Each of these debt obligations will mature within approximately the next two years and the Debtors do not believe that they will be able to pay off or refinance all of their funded debt as it becomes due.  These headwinds and others have, over time, significantly limited the Debtors' prospects for future success absent a comprehensive

restructuring of their business operations and their debt obligations under the auspices of the Bankruptcy Code.

### A.    *Proposed Plan/Sale Process*

8.    To restructure their operations, the Debtors will run a dual-track process.  The Debtors have initiated and will run an expedited sale process.  At the same time, the Debtors will negotiate with their creditors regarding a plan of reorganization.  The Debtors believe that this bankruptcy process will maximize value for the Debtors' creditors and other parties in interest.

9.    In November 2015, the Debtors engaged Rothschild Inc. ("Rothschild") to provide investment banking services, including exploring restructuring, financing and M&A alternatives.  Upon its retention, Rothschild immediately began extensive due diligence on the Debtors' assets and operations, including frequent onsite meetings and an extensive dialogue with the Debtors' senior management team.

10.    The Debtors and their professionals also entered into negotiations with their key creditor constituencies.  The long term goal of these discussions was to ascertain the viability of, and implement, a consensual restructuring of the Debtors' capital structure (either through a sale, an out-of-court, or an in-court restructuring).  A key near-term concern was a $21.5 million interest payment scheduled to be made on January 15, 2016 on the Debtors' Subordinated Debt Obligations.  Given their desire to preserve value, the Debtors determined they would not make this interest payment on the scheduled due date, but would instead seek a forbearance from their creditor constituencies as they attempted to negotiate the contours of a consensual financial restructuring.

11.    Notwithstanding the good faith attempts of the parties, the Debtors were ultimately unable to reach an agreement on the terms of a consensual, comprehensive forbearance prior to the date of the scheduled interest payment.  The widely-reported missed

interest payment, coupled with a lack of a comprehensive forbearance, resulted in an almost immediate erosion of certain key vendor support, further exacerbating the Debtors' financial situation and threatening their ability to operate their business.

12.    The sudden loss of some (but not all) key vendor support required the Debtors to quickly change strategy.  Although the Debtors continued to explore a range of strategies and restructuring constructs, they intensified their efforts to locate a going-concern buyer.  Thus, the Debtors and Rothschild immediately began soliciting interest in a potential acquisition.  Certain potential buyers have already signed non-disclosure agreements and begun due diligence in consideration of a potential acquisition of a material portion of the Debtors' business operations.  In addition, an electronic data room has been made available for potential bona fide bidders subject to their entry into non-disclosure agreements.  Despite the strong interest, given the short time frame the Debtors have had to market their assets to date, no party has yet submitted a final proposal for a sale transaction and the Debtors have not yet agreed to the terms of a chapter 11 plan.

### B.    Postpetition Financing and Plan/Sale Timeline

13.    In consultation with their advisors, the Debtors negotiated with certain of their lenders regarding potential debtor-in-possession postpetition financing to support the Debtors' efforts in these Chapter 11 Cases.  Certain ABL Lenders and FILO Lenders jointly agreed to provide the Debtors with postpetition financing in the form of a senior secured, super-priority asset based revolving credit facility of up to $500 million (the "Revolving DIP Loan") and a senior secured, super-priority first in last out term loan credit facility of up to $95,285,000 in aggregate principal amount (the "FILO DIP Loan," and together with the Revolving DIP Loan, the "DIP Loans") pursuant to that certain Senior Secured, Super-Priority Revolving Debtor-in-Possession Credit Agreement dated as of March __, 2016 (the "DIP Credit Agreement").  As

01:18384380.1

described further in the Cash Collateral/DIP Motion (as defined below) and the Douton

Declaration, the financing provided by the DIP Loans is critical to obtaining ongoing vendor

support, which is necessary for the Debtors to continue their operations pending the Debtors'

proposed sale of their business operations (the "Proposed Sale Transaction") or the Debtors'

confirmation of a chapter 11 plan of reorganization.

14.     Following extensive, arms'-length negotiations, the Debtors and the DIP Lenders

(as defined below) reached agreement on a case timeline that adequately balances the Debtors'

need to execute a robust marketing process for their business with the need of their secured

lenders to have certainty on how and when Sports Authority will emerge from these Chapter 11

Cases.  In order to satisfy the requirements set forth in the DIP Credit Agreement, the Debtors

request, pursuant to a motion filed concurrently herewith  a hearing to be held on regular notice

for the approval of the Debtors' proposed bid procedures in connection with a sale.  The DIP

Credit Agreement is conditioned on the following case milestones:[2]

- **Petition Date**:  Debtors must file (i) this Motion, (ii) a motion seeking authority to close and liquidate up to 200 stores operated by the Debtors and to engage a liquidator in respect thereof (the "Store Closing Motion"), and (iii) a motion seeking to extend the time period to assume or reject leases to not less than 210 days from the Petition Date (the "Lease Designation Extension Motion").

- **March 16, 2016**:  Debtors must have obtained an order approving the Store Closing Motion on an interim basis.

- **April 1, 2016**:  Debtors must have obtained an order approving the Lease Designation Extension Motion.

---

[2]     The DIP Credit Agreement contemplates that the Debtors are currently in discussions with certain parties for a potential $25 million junior debtor-in-possession loan (an "Incremental DIP Loan"), and expressly permits the incurrence of such junior DIP loan.  In the event that the Debtors are successful in obtaining the Incremental DIP Loan by March 15, 2016, the milestones set forth in the DIP Credit Agreement and described below will be extended by approximately one month as set forth in the DIP Credit Agreement.  Any Incremental DIP Loan would be subject to the approval of the Court.

- **April 11, 2016**:  To the extent not previously delivered, the Debtors must deliver bid packages to any potential bidders for the Assets that are identified by the DIP Agent.

- **April 21, 2016**:  Deadline to receive/submit binding bids with respect to the Proposed Sale Transaction.

- **April 25, 2016**:  Auction.

- **April 27, 2016**:  Hearing for the Proposed Sale Transaction.

- **April 28, 2016**:  Deadline to close Proposed Sale Transaction.

## <u>RELIEF REQUESTED</u>

15.     By this Motion, the Debtors seek entry of an order, substantially in the form

attached hereto as <u>Exhibit A</u> (the "<u>Bid Procedures Order</u>"):

a.  authorizing and approving bid procedures in connection with the receipt and analysis of competing bids for the Assets, substantially in the form attached as <u>Exhibit 1</u> to the Bid Procedures Order (the "<u>Bid Procedures</u>");

b.  approving the form and manner of notice of the Auction and Sale and hearing thereon, substantially in the form attached to the Bid Procedures Order as <u>Exhibit 2</u> (the "<u>Notice of Auction and Sale Hearing</u>");

c.  authorizing and approving procedures for the assumption and assignment of the Assumed Contracts and Assumed Leases (defined below) in connection with the Sale;

d.  approving the form and manner of notice of the potential assumption and assignment of the Debtors' executory contracts and unexpired leases, substantially in the form attached to the Bid Procedures Order as <u>Exhibit 3</u> (the "<u>Potential Assumption and Assignment Notice</u>");

e.  establishing the following dates and deadlines, subject to modification as needed, relating to competitive bidding and approval of the Sale:

- <u>Stalking Horse Bid Deadline</u>:  April 10, 2016 at 5:00 p.m. prevailing Eastern Time, as the deadline by which all Stalking Horse Bids (defined below) must be actually received by the Debtors (the "<u>Stalking Horse Bid Deadline</u>");

- <u>Sale Objection and Cure Cost/Assignment Objection Deadline</u>:  April 19, 2016 at 4:00 p.m. prevailing Eastern Time, as the deadline to object to the Sale transactions (the "<u>Sale Objection Deadline</u>") and/or the assumption and assignment of Assumed Contracts and Assumed Leases or cure amounts related thereto, other than objections related to the specific identity of the

Successful Bidder(s) with respect to the applicable Assumed Contract or Assumed Lease (the "Cure Cost/Assignment Objection Deadline");

- Bid Deadline:  April 20, 2016 at 5:00 p.m. prevailing Eastern Time, as the deadline by which all binding bids must be actually received pursuant to the Bid Procedures (the "Bid Deadline");[3]

- Auction:  April 24, 2016 at 9:00 a.m. prevailing Eastern Time, as the date and time of the Auction if more than one competing Qualified Bid (as defined in the Bid Procedures) is received with respect to any of the Assets, which will be held at the offices of Gibson, Dunn & Crutcher, 200 Park Ave., New York, New York, 10166;

- Post-Auction Objection Deadline:  April 25, 2016 at 4:00 p.m. prevailing Eastern Time, as the deadline to object only to (i) the conduct at the Auction (if held) or (ii) solely with respect to the Non-Debtor Counterparties (defined below) to the Contracts (defined below), to the specific identity of and adequate assurance of future performance provided by the Successful Bidders with respect to the applicable Assumed Contract or Assumed Lease; and

- Sale Hearing:  April 26, 2016, as the date of the sale hearing (the "Sale Hearing") to be held before the Court, if any Qualified Bids are received by the Debtors.

16.    Additionally, by this Motion, the Debtors seek entry of an order (the "Sale Order") authorizing (a) the sale of the Assets free and clear of all claims, liens, liabilities, rights, interests and encumbrances (the "Encumbrances") (except certain permitted encumbrances as determined by the Debtors), (b) the Debtors to assume and assign Assumed Contracts and Assumed Leases and (c) any and all related relief requested herein.  The Debtors propose to file a proposed form of the Sale Order no later than 14 days prior to the Sale Hearing, subject to modifications by the Debtors and the Successful Bidders following the Auction.

---

[3]    In the event that no Qualified Bids are received by the Debtors on or prior to the Bid Deadline with respect to a particular portion of the Assets (or all of the Assets), the Debtors reserve the right to, (i) extend such Bid Deadline with respect to the Assets in question, (ii) withdraw the request for relief set forth in this Motion, in whole or in part, or (iii) otherwise seek to modify the relief requested in this Motion.

## OVERVIEW OF BID PROCEDURES, NOTICE PROCEDURES
## AND ASSIGNMENT AND ASSUMPTION PROCEDURES

**I.      Bid Procedures**

17.      The Bid Procedures are intended to permit a fair and efficient competitive sale

process, consistent with the timeline of the Chapter 11 Cases, and to promptly identify the bid or

bids that constitute the highest or otherwise best offer for the Assets.  Because the Bid

Procedures are attached as <u>Exhibit 1</u> to the proposed Bid Procedures Order, they are not restated

in their entirety herein.  The Bid Procedures establish, among other things:[4]

- the requirements a Potential Bidder must satisfy to be entitled to participate in the bidding process and become a Qualified Bidder (*see* Bid Proc., at 3-7);

- the requirements for submitting bids and the method and criteria by which such bids become entitled to be a Qualified Bid (*see* Bid Proc., at 3-7);

- the availability of, access to, and conduct during due diligence by Potential Bidders (*see* Bid Proc., at 2);

- the deadline by which bids must be submitted (*see* Bid Proc., at 2-3);

- the procedures for conducting the Auction (*see* Bid Proc., at 7-8);

- the criteria by which a Successful Bidder(s) will be selected by the Debtors (*see* Bid Proc., at 7-9); and

- various other matters relating to the sale process generally, the Sale Hearing, return of any Good Faith Deposits, and designation of Next-Highest Bidders (*see* Bid Proc., at 9-10).

18.      Importantly, the Bid Procedures recognize the Debtors' fiduciary obligations to

maximize sale value, and, as such, do not impair the Debtors' ability to consider all qualified bid

proposals and preserve the Debtors' right to modify the Bid Procedures as necessary or

---

[4]    To the extent there is any conflict between this summary and the Bid Procedures, the latter governs in all respects.  Capitalized terms used but not defined in this paragraph shall have the meanings set forth in the Bid Procedures.

appropriate to maximize value for their estates in consultation with key parties set forth therein (the "Consultation Parties").

19.      The Bid Procedures contemplate that the Debtors will, prior to the Stalking Horse Bid Deadline, continue to solicit "stalking horse" bids, which bid or bids (each, a "Stalking Horse Bid," and any agreement governing the Stalking Horse Bid that memorializes the proposed transaction by and between the Stalking Horse Bidder and the Debtors for the Assets or a subset thereof, a "Stalking Horse Agreement") will be binding on such bidder (a "Stalking Horse Bidder") and will set the floor for all Qualified Bids for applicable Assets at the Auction. In the event that any Stalking Horse Bid is obtained by the Stalking Horse Bid Deadline, the Debtors will announce the designation of such Stalking Horse Bidder by filing a notice (a "Stalking Horse Bid Notice") on the Court's docket containing the identity of the Stalking Horse Bidder and the Assets that are the subject of the Stalking Horse Bid, and attaching any agreement accompanying the Stalking Horse Bid.

20.      The Bid Procedures further contemplate that the Debtors may seek Court approval, at the Bid Procedures Hearing or on shortened notice thereafter, to provide customary bid protections to a Stalking Horse Bidder, including but not limited to a break-up fee and/or expense reimbursement.

21.      In the event that a Stalking Horse Bid is submitted and selected prior to the Stalking Horse Bid Deadline, all Potential Bidders on the relevant Assets will be required to submit a bid in the amount of at least the sum of (i) the Stalking Horse Bid, (ii) any break-up fee and/or expense reimbursement, if and to the extent approved by prior order of the Court prior to the Bid Deadline, and (iii) a reasonable minimum overbid amount to be calculated in the Debtors' discretion based on the aggregate price set forth in the Stalking Horse Bid (clauses

(i) through (iii), the "Stalking Horse Overbid") in order to meet the criteria of a Qualified Bid for the relevant Assets.

22.     In the event that no Stalking Horse Bid is submitted and selected prior to the Stalking Horse Bid Deadline, the Debtors will select the highest or otherwise best Qualified Bid for substantially all of the Assets, or alternatively, a combination of the highest or otherwise best Qualified Bids for non-overlapping subsets of the Assets (collectively, the "Starting Bid").  In no event shall the Qualified Bidders that submitted the Starting Bid be entitled to seek any break-up fee or expense reimbursement.

23.     The Bid Procedures contain the following provisions that are to be highlighted pursuant to Local Rule 6004-1(c), which are more fully described in the Bid Procedures and the proposed Bid Procedures Order:

    a.    **Provisions Governing Qualification of Bidders.**  In order to become a "Potential Bidder," each person or entity must deliver to the Debtors, on or before the Bid Deadline, an executed confidentiality agreement in form and substance satisfactory to the Debtors.  Each Potential Bidder must, on or before the Bid Deadline, satisfy the "Bid Requirements" by submitting to the Debtors certain documents, including a duly executed binding agreement for the Sale of Assets and information about the Potential Bidder's financial condition and its financial capacity to consummate the proposed Sale evidencing the financial wherewithal of the Potential Bidder to consummate the Sale.  *See* Bid Proc., at 1, 4-5.

    b.    **Provisions Governing Qualified Bids.**  To participate in the Auction, each Potential Bidder must:

        i.    deliver to the Debtors by the Bid Deadline an irrevocable, good faith and bona fide offer to purchase all or a portion of the Assets, which Bid is accompanied by a letter: (A) stating with specificity the Assets such Potential Bidder wishes to bid on and the liabilities and obligations to be assumed by the Potential Bidder; (B) accompanied by a duly executed purchase agreement (the "Purchase Agreement") and, solely in the event that a Stalking Horse Bid Notice has been filed prior to the Bid Deadline with respect to the relevant Assets, a redline marked to reflect any proposed amendments and modifications to the Stalking Horse Agreement and the applicable schedules and exhibits; (C) solely in the event that a Stalking Horse Bid Notice has been filed prior to the Bid Deadline with respect to the relevant Assets, specifying Bid terms that the Potential

Bidder believes to be substantially the same or better than the terms of the Stalking Horse Agreement (it being understood that the ultimate determination of whether Bid terms are the same or better shall be made by the Debtors in the exercise of their reasonable business judgment after consultation with the Consultation Parties; (D) agreeing that the Potential Bidder's offer is binding and irrevocable until the earlier of (x) the Closing Date, or (y) ten (10) days after the Sale Hearing (unless selected as the Next-Highest Bidder (as defined below) in which case such offer will remain open until the Closing Date); (E) providing for a Closing Date that is consistent with the milestones set forth in the Debtors' post-petition financing agreement and occurs on or by April 28, 2016; (F) offering to pay a price equal to or greater than (x) the Stalking Horse Overbid in the event that a Stalking Horse Bid Notice has been filed prior to the Bid Deadline with respect to the relevant Assets, or (y) an amount that the Debtors determine in their sole discretion, after consultation with the Consultation Parties, constitutes a fair and adequate price, the acceptance of which would be in the best interests of the estates; (G) providing that such Bid is not subject to any due diligence or financing contingency; and (H) providing that the Potential Bidder agrees to serve as a backup bidder (the "Next-Highest Bidder") if the Potential Bidder's Qualified Bid is the next highest or otherwise best bid after the Successful Bid (the "Next-Highest Bid") with respect to the relevant Assets (*see* Bid Proc., at 5, 4-5);

ii.    provide any reasonable information requested by a consumer privacy ombudsman, if one is appointed pursuant to section 363(b)(1)(B) of the Bankruptcy Code (*see* Bid Proc., at 5);

iii.    provide adequate assurance of future performance information (the "Adequate Assurance Information"), including (A) information about the Potential Bidder's financial condition, such as federal tax returns for two years, a current financial statement, or bank account statements, (B) information demonstrating (in the Debtors' reasonable business judgment) that the Potential Bidder has the financial capacity to consummate the proposed Sale, (C) evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or comparable governing body) with respect to the submission of its Bid, (D) the identity and exact name of the Potential Bidder (including any equity holder or other financial backer if the Potential Bidder is an entity formed for the purpose of consummating the proposed Sale), and (E) such additional information regarding the Potential Bidder as the Potential Bidder may elect to include.  By submitting a Bid, Potential Bidders agree that the Debtors may disseminate their Adequate Assurance Information to affected landlords and contract counterparties in the event that the Debtors determine such bid to be a Qualified Bid (*see* Bid Proc., at 5);

iv.    deliver (A) a Good Faith Deposit in the form of a certified check or wire transfer, payable to the order of the Debtors, in the amount of the greater

01:18384380.1

13

of (A) $5,000,000 and (B) five percent (5%) of the Bid, which funds will be deposited into an interest bearing escrow account to be identified and established by the Debtors, and (B) written evidence, documented to the Debtors' satisfaction, that demonstrates the Potential Bidder has available cash, a commitment for financing if selected as the Successful Bidders (as defined below) with respect to the relevant Assets, and such other evidence of ability to consummate the transaction(s) as the Debtors may request, including proof that such funding commitments or other financing are not subject to any internal approvals, syndication requirements, diligence or credit committee approvals (provided that such commitments may have covenants and conditions acceptable to the Debtors) (*see* Bid Proc., at 5); and

     v.   deliver a proposed Letter of Intent sufficient for purposes of any required filing under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "HSR Act") and a statement indicating that the Potential Bidder would cover any filing fees under the HSR Act (*see* Bid Proc., at 5).

c.   **Provisions Providing Bid Protections to any Stalking Horse Bidder**. Currently none; however, the Debtors expressly reserve the right to seek Bankruptcy Court authority to request customary bid protections for a Stalking Horse Bidder.  *See* Bid Proc., at 3, 9.

d.   **Modification of Bid and Auction Procedures.**  The Debtors may, in consultation with the Consultation Parties, announce at the Auction additional procedural rules (e.g., the amount of time to make Subsequent Bids, the amount of the Incremental Overbid, or the requirement that parties submit "best and final" Bids) for conducting the Auction or otherwise modify the Bid Procedures; provided that such rules (1) are not materially inconsistent with these Bid Procedures, the Bankruptcy Code or any order of the Bankruptcy Court, and (2) disclosed to each Qualified Bidder at the Auction.  The Debtors and their estates, in consultation with the Consultation Parties, reserve the right to modify the Bid Procedures at or prior to the Auction, including, without limitation, to extend the deadlines set forth in the Bid Procedures, modify bidding increments, waive terms and conditions set forth herein with respect to any or all Potential Bidders (including, without limitation, the Bid Requirements), impose additional terms and conditions with respect to any or all potential bidders, adjourn, postpone or cancel the Auction at or prior to the Auction, and adjourn the Sale Hearing.  *See* Bid Proc., at 7-8.

e.   **Closing with Alternative Backup Bidders.**  At the Auction, the Debtors may, in their sole discretion, designate the Next-Highest Bid (and the corresponding Next-Highest Bidder) in the event that a Successful Bidder(s) does not close the Sale. In the event that a Successful Bidder(s) fails to close prior to the date designated in writing by the Debtors (the "Outside Closing Date") (or such date as may be extended by the Debtors), the Debtors, upon written notice to the Next-Highest Bidder, may designate the applicable Next-Highest Bid as the Successful Bid for

the Assets (or subset thereof), the Next-Highest Bidder will be deemed to be a Successful Bidder for such Assets, and the Debtors will be authorized, but not directed, to close the Next-Highest Bidder subject to the terms of the Next-Highest Bid without the need for further order of the Bankruptcy Court and without the need for further notice to any interested parties. *See* Bid Proc., at 8, 10.

f. **Provisions Governing the Auction.**  If at least two Qualified Bids (or one Qualified Bid if there is also a Stalking Horse Bid) are received by the Bid Deadline with regard to any particular Assets (or subset of Assets), the Debtors will conduct an auction at the offices of proposed counsel to the Debtors, Gibson, Dunn & Crutcher LLP, 200 Park Ave., New York, New York, 10166, at 9:00 a.m. (prevailing Eastern Time) on April 25, 2016 (or such later time or such other place as the Debtors shall designate and notify to all Qualified Bidders who have submitted Qualified Bids) for consideration of the Qualified Bids, each as may be increased at such Auction. *See* Bid Proc., at 7.

## II.    Notice Procedures for the Sale, Auction, and Sale Hearing

24.    The Debtors request approval of the Notice of Auction and Sale Hearing, substantially in the form attached to the Bid Procedures Order as Exhibit 2.  Within two (2) business days of entry of the Bid Procedures Order, the Debtors will serve the Notice of Auction and Sale Hearing by first-class mail upon:  (a) the Office of the United States Trustee for the District of Delaware; (b) holders of the 50 largest unsecured claims on a consolidated basis against the Debtors or counsel to the Committee, if one has been appointed; (c) Riemer & Braunstein LLP (attn: Donald Rothman) as counsel for (i) Bank of America, N.A., in its capacity as Administrative Agent and Collateral Agent under the Second Amended and Restated Credit Agreement, dated as of May 17, 2012, and (ii) certain DIP Lenders under the Debtors' proposed postpetition financing facility; (d) Brown Rudnick LLP (attn: Robert Stark and Bennett Silverberg) as counsel for (i)  Wilmington Savings Fund Society, FSB as Administrative Agent and Collateral Agent under the Amended and Restated Credit Agreement, dated as of May 3, 2006 and amended and restated as of November 16, 2010 and (ii) certain Term Lenders under the Amended and Restated Credit Agreement, dated as of May 3, 2006 and amended and restated

as of November 16, 2010; (e) Choate, Hall & Stewart LLP (attn: Kevin Simard) as counsel for (i) Wells Fargo Bank, National Association, in its capacity as FILO Agent under the Second Amendment to Second Amended and Restated Credit Agreement, dated as of November 3, 2015, and (ii) certain DIP Lenders under the Debtors' proposed postpetition financing facility; (f) O'Melveny & Meyers LLP (attn: John Rapisardi) as counsel for certain holders of 11.5% Senior Subordinated Notes Due February 19, 2018 under the Securities Purchase Agreement, dated as of May 3, 2006; (g) all holders of 11.5% Senior Subordinated Notes Due February 19, 2018 under the Securities Purchase Agreement, dated as of May 3, 2006; (h) all persons known or reasonably believed to have asserted an interest in any of the Assets; (i) the Non-Debtor Counterparties to the Contracts; (j) the Attorneys General in the State(s) where the Assets are located; (k) the Environmental Protection Agency; (l) all state and local environmental agencies in any jurisdiction where the Debtors own or have owned or used real property; and (m) all other known creditors of the Debtors.

25.     The Debtors shall also post the Notice of Auction and Sale Hearing and the Bid Procedures Order on the website of the Debtors' claims and noticing agent, Kurtzman Carson Consultants LLC.

26.     Not later than five (5) business days following the entry of the Bid Procedures Order, the Debtors shall cause the Notice of Auction and Sale Hearing to be published once in the national edition of *The New York Times*.

27.     Within 24 hours following conclusion of the Auction, the Debtors propose to file a notice on the Court's docket identifying the Successful Bidder(s) for the Assets (or subset thereof) and any applicable Next-Highest Bidder(s).

### III.    Assumption and Assignment Procedures

28.    To facilitate the Sale, the Debtors seek authority to assume and assign to the Successful Bidder(s) certain executory contracts and unexpired leases as selected by such Successful Bidder(s) in its Successful Bid(s) (respectively, the "Assumed Contracts" and the "Assumed Leases") in accordance with the Assignment Procedures.

29.    The proposed Assignment Procedures are as follows:

    a.    On April 4, 2016 the Debtors shall file with this Court and serve on each non-debtor counterparty (each a "Non-Debtor Counterparty") to each of the Debtors' executory contracts and unexpired leases (each a "Contract") the Potential Assumption and Assignment Notice.  In the event that the Debtors identify any Non-Debtor Counterparties which were not served with the Potential Assumption and Assignment Notice, the Debtors may subsequently serve such Non-Debtor Counterparty with a Potential Assumption and Assignment Notice, and the following procedures will nevertheless apply to such Non-Debtor Counterparty; provided, however, that the Cure Cost/Assignment Objection Deadline (defined below) with respect to such Non-Debtor Counterparty shall be 4:00 p.m. (prevailing Eastern Time) on the date that is the later of April 19, 2016 or fourteen (14) days following service of the Potential Assumption and Assignment Notice.

    b.    The Potential Assumption and Assignment Notice served on each Non-Debtor Counterparty shall (i) identify each Contract; (ii) list the proposed calculation of the cure amounts that the Debtors believe must be paid to cure all defaults outstanding under the Contract as of such date (the "Cure Costs"); (iii) include a statement that assumption and assignment of such Contract is not required or guaranteed; and (iv) inform such Non-Debtor Counterparty of the requirement to file any Cure Cost/Assignment Objections (defined below) by the Cure Cost/Assignment Objection Deadline (defined below).  Service of a Potential Assumption and Assignment Notice does not constitute an admission that a particular Contract is an executory contract or unexpired lease of property, or confirm that the Debtors are required to assume and/or assign such Contract.

    c.    Objections (a "Cure Cost/Assignment Objection"), if any, to (i) the scheduled Cure Costs, and/or (ii) the potential assumption, assignment and/or transfer of such Contract (including the transfer of any related rights or benefits thereunder), other than objections that relate specifically to the identity of the Successful Bidder(s), must (x) be in writing; (y) state with specificity the nature of such objection, including the amount of Cure Costs in dispute and (z) be filed with this Court and properly served on the Notice Parties (as defined in the Bid Procedures Order) so as to be received no later than 4:00 p.m. (prevailing Eastern Time) on April 19, 2016 (the "Cure Cost/Assignment Objection Deadline"), subject to the proviso in subparagraph (a) above.

01:18384380.1

d.  Objections (a "Post-Auction Objection") of any Non-Debtor Counterparty related solely to the identity of and adequate assurance of future performance provided by the Successful Bidder(s) must (x) be in writing; (y) state with specificity the nature of such objection, and (z) be filed with this Court and properly served on the Notice Parties so as to be received no later than 4:00 p.m. (prevailing Eastern Time) on April 25, 2016 (the "Post-Auction Objection Deadline"), subject to the proviso in subparagraph (a) above; provided, however, that in the event that the Debtors obtain a Stalking Horse Bid and provide notice of the identity of the Stalking Horse Bidder in the Potential Assumption and Assignment Notice, any objection of a Non-Debtor Counterparty related to the Stalking Horse Bid (including with respect to the identity of and adequate assurance of future performance provided by the Stalking Horse Bidder) must be filed as a Cure Cost/Assignment Objection by the Cure Cost/Assignment Objection Deadline.

e.  Any Non-Debtor Counterparty to a Contract who fails to timely file and properly serve a Cure Cost/Assignment Objection or Post-Auction Objection as provided herein will (i) be forever barred from objecting to the Cure Costs and from asserting any additional cure or other amounts with respect to such Contract in the event it is assumed and/or assigned by the Debtors and the Debtors shall be entitled to rely solely upon the Cure Costs, and (ii) be deemed to have consented to the assumption, assignment and/or transfer of such Contract (including the transfer of any related rights and benefits thereunder) to the relevant Successful Bidders and shall be forever barred and estopped from asserting or claiming against the Debtors or such Successful Bidder that any additional amounts are due or defaults exist, or conditions to assumption, assignment, and/or transfer must be satisfied under such Contract, or that any related right or benefit under such Contract cannot or will not be available to the relevant Successful Bidder.  If a Cure Cost/Assignment Objection is timely filed and properly served, the Resolution Procedures (as defined below) will apply.

f.  If a Non-Debtor Counterparty files a Cure Cost/Assignment Objection satisfying the requirements of these Assignment Procedures, the Debtors and the Non-Debtor Counterparty shall meet and confer in good faith to attempt to resolve any such objection without Court intervention (the "Resolution Procedures").  If the applicable parties determine that the objection cannot be resolved without judicial intervention in a timely manner, this Court shall make all necessary determinations relating to such Cure Cost/Assignment Objection at a hearing scheduled pursuant to the following paragraph.

g.  Consideration of unresolved Cure Cost/Assignment Objections and Post-Auction Objections relating to all Contracts, if any, will be held at the Sale Hearing, provided, however, that (i) any Contract that is the subject of a Cure Cost/Assignment Objection with respect solely to the amount of the Cure Cost may be assumed and assigned prior to resolution of such objection and (ii) the Debtors, in consultation with the Consultation Parties, may adjourn a Cure Cost/Assignment objection in their discretion.

h. A timely filed and properly served Cure Cost/Assignment Objection or Post-Auction Objection will reserve the filing Non-Debtor Counterparty's rights relating to the Contract, but will not be deemed to constitute an objection to the relief generally requested in the Motion with respect to the approval of the Sale.

i. The Debtors' assumption and/or assignment of a Contract is subject to approval by this Court, consummation of the Sale and receipt of a Confirmation Notice (as defined below). Absent consummation of the Sale, receipt of a Confirmation Notice and entry of a Sale Order approving the assumption and/or assignment of the Contracts, the Contracts shall be deemed neither assumed nor assigned, and shall in all respects be subject to subsequent assumption or rejection by the Debtors.

j. Within ten (10) days following the assumption and assignment of any Contract to a relevant Successful Bidder, the Debtors shall file with this Court and shall serve each Non-Debtor Counterparty whose Contract the Debtors assumed and/or assigned with a notice of assumption and assignment of such Contract (the "Confirmation Notice"). Any Contract where no Confirmation Notice was served shall be deemed neither assumed nor assigned, and shall in all respects be subject to subsequent assumption or rejection by the Debtors.

k. The Debtors' decision to assume and assign the Contracts to the relevant Successful Bidder(s) is subject to this Court's approval and the closing of the Sale. Accordingly, absent this Court's approval and the closing of the Sale, the Contracts shall not be deemed assumed or assumed and assigned, and shall in all respects be subject to further administration by the Debtors and their estates under the Bankruptcy Code in connection with the Chapter 11 Cases.

## BASIS FOR RELIEF REQUESTED

I.    **The Bid Procedures are Appropriate and in the Best Interests of the Debtors, Their Estates, and Creditors**

   A.    ***The Bid Procedures are Reasonable, Appropriate and Will Maximize Value***

30.    The paramount goal in any proposed sale of property of the estate is to maximize

the proceeds received by the estate. *See In re Mushroom Transp. Co.,* 382 F.3d 325, 339 (3d Cir.

2004) (debtor in possession "had a fiduciary duty to protect and maximize the estate's assets");

*Official Comm. of Unsecured Creditors of Cybergenics, Corp v. Chinery,* 330 F.3d 548, 573 (3d

Cir. 2003) (same); *Four B. Corp. v. Food Barn Stores, Inc. (In re Barn Stores, Inc.),* 107 F.3d

558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand").

31.     To that end, courts uniformly recognize that procedures to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions. *See In re O'Brien Envtl. Energy, Inc.,* 181 F.3d 527, 537 (3d Cir. 1999); *see also Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.),* 147 B.R. 650, 659 (S.D.N.Y. 1992) (bid procedures "encourage bidding and . . . maximize the value of the debtor's assets").

32.     The Debtors believe that the Bid Procedures will provide an orderly and uniform mechanism by interested buyers and investors can submit offers for the Assets and will ensure a competitive and fair bidding process.  The Debtors also believe that the Bid Procedures will promote active bidding from seriously interested parties and will confirm the best and highest offer reasonably available for such assets.  The Bid Procedures will allow the Debtors to conduct the Auction, subject to the terms of the Bid Procedures, in a controlled, fair and open manner that will encourage participation by financially capable bidders that demonstrate the ability to close a transaction.  The Debtors believe that the Bid Procedures will encourage bidding, are consistent with other procedures routinely approved by courts in this and other districts, and are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings. *See In re O'Brien Envtl. Energy, Inc.,* 181 F.3d at 537; *see also In re Dura Auto. Sys., Inc.,* No. 06-11202 (Bankr. D. Del. July 24, 2007); *In re New Century TRS Holdings, Inc.,* No. 07-10416 (Bankr D. Del. Apr. 20, 2007); *In re Three A's Holdings, L.L.C.,* No. 06-10886 (Bankr. D. Del. Sept. 7, 2006).

**B.    The Qualified Bid Requirements are Reasonable and Appropriate**

33.    The Debtors are seeking authority to sell the Assets without, at this time, the comfort of a stalking horse bid to set the floor for bidding.  The Debtors therefore need the flexibility to disregard bids that - in the Debtors' business judgment - would result in an unreasonably low return to creditors and other stakeholders.  Accordingly, in the event the Debtors determine, after consultation with their advisors and the creditor Consultation Patients, that any particular bids are not for a fair and adequate price or the acceptance of such bids would not be in the best interests of the estates or the Auction, such bids shall not be "Qualified Bids" entitled to participation at the Auction.  As provided in the Bid Procedures, the Debtors and their estates, in consultation with the Consultation Parties, reserve the right to modify the Bid Procedures at or prior to the Auction, including, without limitation, to extend the deadlines set forth in the Bid Procedures, modify bidding increments, waive terms and conditions set forth herein with respect to any or all Potential Bidders (including, without limitation, the Bid Requirements), impose additional terms and conditions with respect to any or all potential bidders, adjourn, postpone or cancel the Auction at or prior to the Auction, and adjourn the Sale Hearing.

34.    In the event that the Debtors obtain more than one competing Qualified Bid with respect to any portion of the Assets (or all of the Assets) and the Auction is held, bidding shall commence at the amount of the highest or otherwise best bid received (the "Starting Bid") for the relevant Assets, [which determination will be communicated to Qualified Bidders no less than six (6) hours prior to the commencement of the Auction/at the outset of the Auction, and the relevant Qualified Bidders may submit successive bids in higher increments (in amounts to be determined at or prior to the Auction).  The Debtors represent that the overbid increments will be consistent with increments previously approved by courts in this District in chapter 11 cases

involving assets of comparable value.  *See In re AgFeed USA, LLC,* Case No. 13-11761 (BLS) (Bankr. D. Del. Aug. 1, 2013) (approving $250,000 increment); *In re Dura Auto. Sys., Inc.,* No. 06 11202 (Bankr. D. Del. July 24, 2007) (approving $750,000 increment); *In re New Century TRS Holdings, Inc.,* No. 07-10416 (Bankr D. Del. Apr. 20, 2007) (approving $500,000 increment); *In re Three A's Holdings, L.L.C.,* No. 06-10886 (Bankr. D. Del. Sept. 7, 2006) (approving $300,000 increment).

### C.    The Flexibility to Obtain Stalking Horse Bids is Appropriate and Warranted

35.    As discussed above, the Bid Procedures contemplate that the Debtors will continue to solicit potential bidders to serve as Stalking Horse Bidders and deliver Stalking Horse Bids prior to the Stalking Horse Bid Deadline.  Accordingly, in the event a Stalking Horse Bid is obtained prior to the Stalking Horse Bid Deadline, all bidders with respect to the relevant Assets will be required to submit a bid in the amount of at least the Stalking Horse Overbid in order to meet the criteria of a Qualified Bid.

36.    Further, the Bid Procedures contemplate that the Debtors may seek Court approval, at the Bid Procedures Hearing or on shortened notice thereafter, to provide customary bid protections to any Stalking Horse Bidder, including but not limited to a break-fee and/or expense reimbursement.

37.    The Debtors submit that (i) the flexibility to designate a Stalking Horse Bidder (or Bidders) and (ii) the Debtors' reservation of rights to seek bid protections for any such Stalking Horse Bidders are necessary and appropriate given the significant benefits that a Stalking Horse Bid may provide to the Debtors.  A Stalking Horse Bid would provide a "floor" price that is desirable for the Debtors, thereby increasing the likelihood that the ultimate price obtained for the Assets will represent the true worth of the Assets.

**D.      The Notice Procedures for the Sale, Bid Procedures, Auction and Sale Hearing are Reasonable and Appropriate**

38.      Pursuant to Bankruptcy Rules 2002(a) and (c), the Debtors are required to notify creditors of the Sale, including a disclosure of the time and place of any auction, the terms and conditions of the sale, and the deadline for filing any objections.  The Debtors submit that the notice procedures described above fully comply with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Sale, Bid Procedures, Auction, and Sale Hearing to the Debtors' creditors and all other parties in interest that are entitled to notice, as well as those parties that have expressed a bona fide interest in acquiring the Assets.

39.      Accordingly, the Debtors respectfully request that the Court approve the notice procedures set forth in this Motion, including the form and manner of service and publication of the Notice of Auction and Sale Hearing, and that no other or further notice of the Sale, Bid Procedures, Auction or Sale Hearing is necessary or required.

**E.      The Assignment Procedures are Reasonable and Appropriate**

40.      As part of this Motion, the Debtors also seek authority under sections 105(a) and 365 of the Bankruptcy Code to assume and assign the Contracts to the Successful Bidder(s).  The Bid Procedures Order specifies the process by which the Debtors will serve the Potential Assumption and Assignment Notice and the procedures and deadlines for Non-Debtor Counterparties to file Cure Cost/Assignment Objections and/or Post-Auction Objections.

41.      The Assignment Procedures ensure that each Non-Debtor Counterparty will have sufficient notice of such potential assumption and assignment, and an opportunity to contest the Cure Amount, if any, for its Contract, as well as the ability of the relevant Successful Bidder(s) to provide adequate assurance of future performance with respect to such Contract.

42.    Accordingly, the Debtors submit that the Assignment Procedures are fair and reasonable, and request that the Court approve such procedures.

## II.    Approval of the Sale is Appropriate and in the Best Interests of the Debtors' Estates

### A.    The Sale is Authorized by Section 363 of the Bankruptcy Code as a Sound Exercise of the Debtors' Business Judgment.

43.    Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate[.]"  11 U.S.C. § 363(b).  Although section 363 does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate, courts routinely authorize sales of a debtor's assets if such sale is based upon the sound business judgment of the debtor.  *See Meyers v. Martin (In re Martin),* 91 F.3d 389, 395 (3d Cir. 1996); *In re Montgomery Ward Holding Corp.,* 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.,* 124 B.R. 169, 175-76 (D. Del. 1991); *In re Trans World Airlines, Inc.,* No. 01-00056 (PJW), 2001 WL 1820326, at *10 (Bankr. D. Del. Apr. 2. 2001).

44.    Courts typically consider the following factors in determining whether a proposed sale satisfies this standard:  (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was given to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith.  *See In re Decora Indus., Inc.,* 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing *In re Delaware & Hudson Ry. Co.,* 124 B.R. at 176); *In re United Healthcare Sys. Inc.,* No. 97-1159, 1997 WL 176574, at *4 & n. 2 (D.N.J. Mar. 26, 1997).

45.    A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders.  *See, e.g., In re Abbotts Dairies of Pa., Inc.,* 788

F.2d 143 (3d Cir. 1986); *In re Lionel Corp.,* 722 F.2d 1063 (2d Cir. 1983); *see also In re Food Barn Stores, Inc.,* 107 F.3d 558, 564-65 (8th Cir. 1997) (stating that the paramount goal in any proposed sale of property of the estate is to maximize value).

46.     Furthermore, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp),* 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). There is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *In re Integrated Res.,* 147 B.R. at 656 (quoting *Smith v. Van Gorkcom,* 488 A.2d 858, 872 (Del. 1985)). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code. Indeed, when applying the business judgment standard, courts show great deference to a debtor's business decisions. *See Pitt v. First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.),* 1989 WL 106838, at *3 (N.D. Ill. Sept. 8, 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

47.     Pursuant to the Bid Procedures, the Debtors, in consultation with their creditor constituencies, will reserve the right to disregard and disqualify any bid that does not contain a fair and adequate price or the acceptance of which would not be in the best interests of the estates or the Auction. In addition, the value of the Assets will be tested through the Auction and Sale process provided for in the Bid Procedures. Consequently, the fairness and reasonableness of the

consideration for the Assets to be paid by the Successful Bidder(s) ultimately will be demonstrated by adequate "market exposure" and an open and fair auction and sale process—the best means for establishing whether a fair and reasonable price is being paid. The Successful Bid(s) will constitute the highest or best offer for the Assets, and may provide a greater recovery for the Debtors' estates than is likely to be provided by any other available alternative. As a result, the Debtors' determination to sell the Assets through an auction and sale process, as provided for in the Bid Procedures, is a valid and sound exercise of the Debtors' business judgment.

48.     Accordingly, the Debtors respectfully request that the Sale be approved.

**B.      *The Sale, Free and Clear of All Encumbrances, is Authorized by Section 363(f) of the Bankruptcy Code.***

49.     In the interest of attracting the highest and best bids for the Assets, the Debtors submit that the Sale should be free and clear of all Encumbrances in accordance with section 363(f) of the Bankruptcy Code, with any such Encumbrances attaching to the net proceeds of the Sale, as and to the extent applicable.

50.     Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances if:

(a)     applicable non-bankruptcy law permits sale of such property free and clear of such interests;

(b)     such entity consents;

(c)     such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

(d)     such interest is in bona fide dispute; or

(e)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

01:18384380.1

51.    Section 363(f) is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

52.    Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Assets "free and clear" of all Encumbrances.  *See In re Kellstrom Indus., Inc.,* 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *see also Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot),* 94 B.R. 343, 345 (E.D. Pa. 1988) (same); *In re Dundee Equity Corp.,* No. 89-10233 (FGC), 1992 WL 53743, at *4 (Bankr. S.D.N.Y. Mar. 6, 1992) (same).

53.    The Debtors submit that one or more of the conditions set forth in section 363(f) of the Bankruptcy Code will be satisfied with respect to the Sale.  In particular, the Debtors believe that at least section 363(f)(2) will be satisfied because each of the parties holding liens on the Assets will consent, or absent any objection to the Sale, will be deemed to have consented to, the Sale.  Any lienholder also will be adequately protected by having its liens, if any, attach to the proceeds of the Sale, in the same order of priority, with the same validity, force and effect that such creditor had prior to such sale, subject to any claims and defenses that the Debtors and their estates may possess with respect thereto.  For the avoidance of doubt, nothing in this Motion, the Bid Procedures, or the Bid Procedures Order waives or modifies any parties' right to object to any sale proposed in connection herewith, with all such rights being expressly preserved.

01:18384380.1

54.     Accordingly, the Debtors respectfully request that the Assets be sold free and

clear of any Encumbrances pursuant to section 363(f) of the Bankruptcy Code.

      **C.     *The Successful Bidder(s) is Entitled to the Full Protection of Section 363(m)
of the Bankruptcy Code, and the Sale Does Not Violate Section 363(n) of the
Bankruptcy Code***

55.     Section 363(m) of the Bankruptcy Code protects the sale of a debtor's property to

a good faith purchaser.  Specifically, section 363(m) provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property
> does not affect the validity of a sale or lease under such
> authorization to an entity that purchased or leased such property in
> good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

11 U.S.C. § 363(m).

56.     While the Bankruptcy Code does not define "good faith," the Third Circuit in *In

re Abbotts Dairies of Pennsylvania, Inc.* held that the misconduct that would destroy a

purchaser's good faith status at a judicial sale typically involves "fraud, collusion between the

purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other

bidders." 788 F.2d at 147 (citation omitted); *see also Kabro Assocs. of West Islip, L.L.C. v.

Colony Hill Assocs. (In re Colony Hill Assocs.),* 111 F.3d 269, 276 (2d Cir. 1997) ("Typically,

the misconduct that would destroy a [buyer]'s good faith status at a judicial sale involves fraud,

collusion between the [buyer] and other bidders or the trustee or an attempt to take grossly unfair

advantage of other bidders.").

57.     The Debtors submit, and the testimony presented at the Sale Hearing will

demonstrate, that the terms and conditions of the Sale will have been negotiated by the Debtors

and the Successful Bidder(s) at arm's-length and in good faith, with the assistance of the

Debtors' professional advisors, and that the parties did not engage in any conduct that would cause or permit the Sale to be avoided under section 363(n) of the Bankruptcy Code.

58.    Accordingly, the Debtors request that the Court make a finding at the Sale Hearing that the Successful Bidder(s) purchased the Assets in good faith and is entitled to the full protections of section 363(m) of the Bankruptcy Code.

## III.    Assumption and Assignment of the Contracts Is Authorized by Section 365 of the Bankruptcy Code

### A.    The Debtors' Sound Business Judgment Supports the Assumption and Assignment of the Contracts

59.    Sections 365(a) and (b) of the Bankruptcy Code authorize a debtor in possession to assume, subject to the court's approval, executory contracts or unexpired leases of the debtor. Under section 365(a) of the Bankruptcy Code, a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a). Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

> (b)(l) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee-
>
> > (A) cures or provides adequate assurance that the trustee will promptly cure, such default . . . ;
> >
> > (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
> >
> > (C) provide adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

60.     The standard applied by the Third Circuit in determining whether an executory

contract or unexpired lease should be assumed is the "business judgment" test, which requires a

debtor to determine that the requested assumption or rejection would be beneficial to its estate.

*See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.,* 872 F.2d 36, 40 (3d Cir. 1989); *see also*

*NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 523 (1984) (describing business judgment test as

"traditional") (superseded in part by 11 U.S.C. § 1113).

61.     Courts generally will not second-guess a debtor's business judgment concerning

the assumption of an executory contract.  *See In re Decora Indus., Inc.,* 2002 WL 32332749, at

*8 (D. Del. May 20, 2002); *Official Comm. for Unsecured Creditors v. Aust (In re Network*

*Access Solutions, Corp.,* 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the

assumption of an executory contract is the business judgment rule"); *In re Exide Techs.,* 340

B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract

is governed by the business judgment standard").

62.     To determine if the business judgment standard is met, the court is "required to

examine whether a reasonable business person would make a similar decision under similar

circumstances.*"  In re AbitibiBowater Inc.,* 418 B.R. 815, 831 (Bankr. D. Del. 2009).  "This is

not a difficult standard to satisfy and requires only a showing that rejection will benefit the

estate." *Id.* (citations omitted).  Specifically, a court should find that the assumption or rejection

is elected on "an informed basis, in good faith, and with the honest belief that the assumption . . .

[is] in the best interests of [the debtor] and the estate." *In re Network Access Solutions Corp.,*

330 B.R. 67, 75 (Bankr. D. Del. 2005).  Under this standard, a court should approve a debtor's

business decision unless that decision is the product of bad faith or a gross abuse of discretion.

*See In re Federal Mogul Global, Inc.,* 293 B.R. 124, 126 (D. Del. 2003).

63.     In the present case, the Debtors' assumption and assignment of the Contracts to the relevant Successful Bidder meets the business judgment standard and satisfies the requirements of section 365 of the Bankruptcy Code.  The assumption and assignment will likely be necessary for the Successful Bidder(s) to conduct business going forward, and since no Successful Bidder(s) would take the Assets without certain executory contracts and unexpired leases, the assumption and assignment of such agreements is essential to securing the highest or best offer for the Assets.

64.     Consequently, the Debtors submit that the Assignment Procedures are fair and reasonable, and respectfully request the Court to approve such procedures and authorize the Debtors to assume and assign the Contracts in the manner provided for herein.

**B.      Adequate Assurance of Future Performance Will Be Demonstrated With Respect to the Contracts**

65.     A debtor in possession may assign an executory contract or an unexpired lease of the debtor if it assumes the agreement in accordance with section 365(a) of the Bankruptcy Code, and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement.  *See* 11 U.S.C. § 365(c)(2).

66.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *EBG Midtown South Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.),* 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), *aff'd,* 993 F.2d 300 (2d Cir. 1993); *In re Prime Motor Inns Inc.,* 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994); *In re Rachels Indus. Inc.,* 109 B.R. 797, 803 (Bankr. W.D. Tenn. 1990); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.),* 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

67.     Significantly, among other things, adequate assurance of future performance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See, e.g., In re Bygaph, Inc.,* 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (stating that adequate assurance of future performance is present when the prospective assignee of a lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

68.     Pursuant to the Bid Procedures, the Potential Bidders are required to provide to the Debtors such financial and other information providing adequate assurance of future performance under any executory contracts and unexpired leases to be assumed pursuant to section 365 of the Bankruptcy Code in connection with the Sale, in a form requested by the Debtors, in their sole discretion, to allow the Debtors to serve, within one (1) business day after such receipt, such information on any Non-Debtor Counterparty that has requested, in writing, such information.  Moreover, under the Assignment Procedures, the Non-Debtor Counterparties will have the opportunity to object to adequate assurance of future performance by the relevant Successful Bidder(s).

69.     Accordingly, the Debtors submit that the assumption and assignment of the Contracts as set forth herein should be approved pursuant to section 365 of the Bankruptcy Code.

### REQUEST FOR WAIVER OF BANKRUPTCY RULES 6004(H) AND 6006(D)

70.     Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  Similarly, Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the [debtor] to assign an executory contract or

unexpired . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

71.     The Debtors submit that cause exists to justify a waiver of the fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d), as promptly closing the Sale is of critical importance.  The Debtors therefore request that the Sale Order be effective immediately by providing that the fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d) be waived.

## RESERVATION OF RIGHTS

72.     Nothing contained herein is intended, or should be construed, as an admission of the validity of any claim against the Debtors or a waiver of the Debtors' rights to dispute any claim.  Nothing contained herein is intended, or should be construed, as an approval, assumption, or rejection of any agreement, contract, or lease under section 365 of the Bankruptcy Code.

## NOTICE

73.     The Debtors have provided notice of this Motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) holders of the 50 largest unsecured claims on a consolidated basis against the Debtors; (c) Riemer & Braunstein LLP (attn: Donald Rothman) as counsel for (i) Bank of America, N.A., in its capacity as Administrative Agent and Collateral Agent under the Second Amended and Restated Credit Agreement, dated as of May 17, 2012, and (ii) certain DIP Lenders under the Debtors' proposed postpetition financing facility; (d) Brown Rudnick LLP (attn: Robert Stark and Bennett Silverberg) as counsel for (i)  Wilmington Savings Fund Society, FSB as Administrative Agent and Collateral Agent under the Amended and Restated Credit Agreement, dated as of May 3, 2006 and amended and restated as of November 16, 2010 and (ii) certain Term Lenders under the Amended and Restated Credit Agreement, dated as of May 3, 2006 and amended and restated as of November 16, 2010;

01:18384380.1

(e) Choate, Hall & Stewart LLP (attn: Kevin Simard) as counsel for (i) Wells Fargo Bank, National Association, in its capacity as FILO Agent under the Second Amendment to Second Amended and Restated Credit Agreement, dated as of November 3, 2015, and (ii) certain DIP Lenders under the Debtors' proposed postpetition financing facility; (f) O'Melveny & Meyers LLP (attn: John Rapisardi) as counsel for certain holders of 11.5% Senior Subordinated Notes Due February 19, 2018 under the Securities Purchase Agreement, dated as of May 3, 2006; (g) all holders of 11.5% Senior Subordinated Notes Due February 19, 2018 under the Securities Purchase Agreement, dated as of May 3, 2006; (h) all persons known or reasonably believed to have asserted an interest in any of the Assets; (i) the Non-Debtor Counterparties to the Contracts; (j) the Attorneys General in the State(s) where the Assets are located; (k) the Environmental Protection Agency; (l) all state and local environmental agencies in any jurisdiction where the Debtors own or have owned or used real property; and (m) all parties that have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

*[The remainder of this page is intentionally left blank.]*

WHEREFORE, the Debtors respectfully request that the Court enter the Bid Procedures Order and the Sale Order, granting the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated: March 2, 2016
      Wilmington, Delaware

*/s/ Andrew L. Magaziner*
Michael R. Nestor (No. 3526)
Kenneth J. Enos (4544)
Andrew L. Magaziner (No. 5426)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
mnestor@ycst.com
kenos@ycst.com
amagaziner@ycst.com

- and -

Robert A. Klyman (CA No. 142723)
Matthew J. Williams (NY No. 3019106)
Jeremy L. Graves (CO No. 45522)
Sabina Jacobs (CA No. 274829)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-1512
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
rklyman@gibsondunn.com
mjwilliams@gibsondunn.com
jgraves@gibsondunn.com
sjacobs@gibsondunn.com

*Proposed Counsel to the Debtors and
Debtors in Possession*

01:18384380.1