IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SPORTS AUTHORITY HOLDINGS, INC., *et al.*,[1] | ) | Case No.: 16-10527 (MFW) |
| | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | **Re: Docket Nos. 20, 106** |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO: (I) DEBTORS' DIP FINANCING MOTION; AND
(II) DEBTORS' BID PROCEDURES MOTION**

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Sports Authority Holdings, Inc. (9008); Slap Shot Holdings, Corp. (8209); The Sports Authority, Inc. (2802); TSA Stores, Inc. (1120); TSA Gift Card, Inc. (1918); TSA Ponce, Inc. (4817); and TSA Caribe, Inc. (5664). The headquarters for the above-captioned Debtors is located at 1050 West Hampden Avenue, Englewood, Colorado 80110.

# TABLE OF CONTENTS

**Page No.**

I INTRODUCTION ................................................................................................ 2

II STATEMENT OF FACTS ................................................................................. 9

   A.   Background ............................................................................................ 9

   B.   The DIP Financing Facility .................................................................. 10

   C.   The DIP Budget ................................................................................... 12

   D.   Disproportionately High Fees/ Interest Under DIP Budget ................ 14

III OBJECTION TO DIP FINANCING MOTION AND BID PROCEDURES MOTION ....... 15

   A.   The Debtors Do Not Need DIP Financing as Distinguished from Use of Cash Collateral ..................................................................................... 17

   B.   The DIP Fees are Exorbitant Considering that No New Financing is Being Provided .................................................................................... 17

   C.   The Milestone Covenants are Objectionable ...................................... 18

   D.   No DIP or Adequate Protection Liens Should be Placed on Unencumbered Assets, Including Avoidance Actions, All of Which Should Remain Unencumbered For the Benefit of the Estates ................................ 19

   E.   The Proposed Section 506(c) and Other Waivers Are Inappropriate Where, as Here, Nearly $100 Million in Administrative Claims Are Not Provided for in the Budget ....................................................................................... 21

   F.   The FILO DIP Loan is Illusory and Indefensible .............................. 24

   G.   The Array of Adequate Protection Measures Proposed to the Prepetition Secured Creditors Is Excessive ..................................................... 25

   H.   The Lien Validation and Challenge Provisions Should be Scaled Back and Materially Modified ....................................................................... 28

   I.   Other Objections .................................................................................. 30

IV RESERVATION OF RIGHTS .......................................................................... 31

V CONCLUSION ................................................................................................... 32

# TABLE OF AUTHORITIES

**Page No.**

**Cases**

*Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship. IV*,
229 F.3d 245 (3d Cir. 2000) ..................................................................... 20

*Delbridge v. Production Credit Association and Federal Land Bank In re Delbridge*,
104 B.R. 824 (E.D. Mich. 1989) ................................................................ 26

*Hartford Fire Ins. Co. v. Nw. Bank Minn. (In re Lockwood Corp.)*,
223 B.R. 170 (8th Cir. B.A.P. 1998) ......................................................... 23

*In re 495 Central Park Ave. Corp.*,
136 B.R. 626 (Bankr. S.D.N.Y. 1992) ....................................................... 26

*In re Ames Dep't Stores, Inc.*,
115 B.R. 34 (Bankr. S.D.N.Y. 1990) .................................................... 15, 30

*In re Aqua Assocs.*,
123 B.R. 192 (Bankr. E.D. Pa. 1991) ........................................................ 15

*In re Beker Industries Corp.*,
58 B.R. 725 (Bankr. S.D.N.Y. 1986) ......................................................... 26

*In re Big Rivers Elec. Corp.*,
233 B.R. 726 (Bankr. W.D. Ky. 1998) ....................................................... 16

*In re Channel Master Holdings, Inc.*,
2004 Bankr. LEXIS 576 (Bankr. D. Del. 2004) ........................................ 31

*In re Codesco, Inc.*,
18 B.R. 225 (Bankr. S.D.N.Y. 1982) ......................................................... 22

*In re Colad Group, Inc.*,
324 B.R. 208 (Bankr. W.D.N.Y. 2005) ...................................................... 23

*In re Crouse Group, Inc.*,
71 B.R. 544 (Bankr. E.D. Pa. 1987) .......................................................... 15

*In re Dynaco Corp.*,
162 B.R. 389 (Bankr. D. N.H. 1993) ..................................................... 26, 27

*In re FCX, Inc.*,
54 B.R. 833 (Bankr. E.D.N.C. 1985) ......................................................... 16

*In re Martin*,
   761 F.2d 472 (8th Cir. 1985) ................................................................................ 26

*In re Mosello*,
   195 B.R. 277 (Bankr. S.D.N.Y. 1996) ................................................................. 26

*In re Pine Lake Vill. Apartment Co.*,
   19 B.R. 819 (Bankr. S.D.N.Y. 1982) ................................................................... 27

*In re Pursuit Athletic Footwear, Inc.*,
   193 B.R. 716 (Bankr. D. Del. 1996) .................................................................... 27

*In re Roblin Industries, Inc.*,
   52 B.R. 241 (Bankr. W.D.N.Y. 1985) ............................................................ 15, 16

*In re Sweetwater*,
   55 B.R. 724 (D. Utah 1985) ................................................................................. 20

*In re T.H.B. Corp.*,
   85 B.R. 192 (Bankr. D. Mass. 1988) ............................................................... 26, 27

*In re Tenney Village Co., Inc.*,
   104 B.R. 562 (Bankr. D. N.H. 1989) .......................................................... 15, 16, 21

*In re Vanguard Diversified, Inc.*,
   31 B.R. 364 (Bankr. E.D.N.Y. 1983) ................................................................... 15

*Matter of Kain*,
   86 B.R. 506 (Bankr. W.D. Mich. 1988) ............................................................... 26

*Mbank Dallas, N.A. v. O'Connor (In re O'Connor)*,
   808 F. 2d 1393 (10th Cir. 1987) .......................................................................... 26

*NEC Holdings Corp.*,
   Case No. 10-11890 (PJW) (Bankr. D. Del. Jul 13, 2010) ................................... 23

*Precision Steel Shearing v. Fremont Fin. Corp. (In re Visual Indus.)*,
   57 F.3d 321 (3d Cir. 1995) .................................................................................. 22

*United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*,
   484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) ......................................... 26

## **Statutes**

11 U.S.C. § 1102 .................................................................................................... 9

11 U.S.C. § 1107(a) ................................................................................................ 9

11 U.S.C. § 1108 .................................................................................................... 9

iii

11 U.S.C. § 361 ........................................................................................................... 26

11 U.S.C. § 361(2) ...................................................................................................... 26

11 U.S.C. § 363 ........................................................................................................... 27

11 U.S.C. § 363(e) ...................................................................................................... 26

11 U.S.C. § 503(b)(9) ...................................................................... 6, 13, 14, 18, 22, 23

11 U.S.C. § 506(c) ............................................................................. 7, 21, 22, 23, 25

11 U.S.C. § 507(b) ................................................................................................ 27, 28

11 U.S.C. § 552 ........................................................................................................... 21

**Other Authorities**

S. Rep. No. 95-989, 95th Cong., 2d Sess. 54 (1978) .................................................. 26

**Rules**

Fed. R. Bankr. P. 9011 ................................................................................................ 29

The Official Committee of Unsecured Creditors (the "<u>Committee</u>") of Sports Authority Holdings, Inc., *et al.*, the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>"), hereby objects (the "<u>Objection</u>") to the (i) *Debtors' Motion for Interim and Final Orders (I) Authorizing Debtors to Obtain Post-Petition Secured Financing Pursuant to 11 U.S.C. §§ 105, 362, and 364; (II) Granting Liens and Superpriority Claims to Post-Petition Lenders Pursuant to 11 U.S.C. §§ 364 and 507; (III) Authorizing the Use of Cash Collateral and Providing Adequate Protection to Prepetition Secured Parties and Modifying the Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364; and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(B) and (C) and Local Rule 4001-2* [Docket No. 20] (the "<u>DIP Motion</u>"), and (ii) *Debtors' Motion, Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, Fed. R. Bankr. P. 2002, 6003, 6004, 6006, 9007, 9008 and 9014 and Del. Bankr. L.R. 2002-1, 6004-1 and 9006-1, for Entry of (A) an Order (I) Approving Bid Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Scheduling an Auction for and Hearing to Approve Sale of Assets, (III) Approving Notice of Respective Date, Time and Place for Auction and for Hearing on Approval of Sale, (IV) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (V) Approving Form and Manner of Notice Thereof, and (VI) Granting Related Relief; and (B) an Order Authorizing and Approving (I) the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Rights, Encumbrances, and Other Interests, (II) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (III) Related Relief* [Docket No. 106] (the "<u>Bidding Procedures Motion</u>").[2]  In support of its Objection, the Committee respectfully represents as follows:

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the DIP Motion or

# I

# INTRODUCTION

1.     The Committee opposes entry of a final order authorizing the Debtors to enter into the proposed postpetition financing facility (the "DIP Facility") extended by the prepetition ABL Lenders and FILO Lenders (as defined in the DIP Financing Motion, the "DIP Lenders") on the terms set forth in the DIP Motion.   The proposed DIP financing package is a lopsided deal that provides a litany of benefits and protections to the ABL, FILO and Term Loan Lenders (collectively, the "Prepetition Secured Creditors") while shortchanging the estate, relegating administrative creditors who are left out of the budget to non-payment, and impairing the Debtors' prospects for reorganization or a going concern sale of their assets that maximizes the recoveries of all creditors.  The Committee has the following primary objections to the DIP Motion.

2.     ***First***, as a threshold matter, the Debtors have failed to establish that they even need DIP financing – and indeed they are not obtaining any new money loans.  The Committee submits that the Debtors' projected cash flows will be sufficient for them to operate on cash collateral use, consensual or otherwise.  Given that the Debtors are conducting GOB sales at the 142 stores they are closing, there will be a rapid influx of cash into the Debtors' coffers.  Confirmation that there is ample liquidity without a new revolving credit facility is found in the two-page budget (the "Budget") attached to the DIP Motion, which shows the Debtors to be cash flow positive in each of the first nine weeks of the case, and cash flow positive by over $66 million as of the end of that period (April 30, 2016), when the milestone-mandated sale of substantially all of the Debtors' assets is to be closed and the DIP loans repaid.

---

Bidding Procedures Motion, as applicable.

This operating surplus should not be used, as the Budget contemplates, to pay enormous fees and principal repayments; instead, for these cases to operate in chapter 11, the surplus funds should be directed to payment of an estimated $94 million of incurred administrative expenses, plus any additional unpaid trade debt resulting from postpetition credit, for which there is no provision in the Budget.  Attached hereto as Exhibit A is a chart summarizing the incurred administrative expenses excluded from the Budget.

3.      Given the Debtors' financial position, the proposed DIP financing constitutes a massive overreach by the Prepetition Secured Creditors, none of whom are extending any new credit.  The DIP financing appears to have less to do with providing the Debtors with financing than with benefitting and protecting the Prepetition Secured Creditors to the detriment of the Debtors, their estates and unsecured creditors.  Under the guise of providing financing that will never be used, the ABL and FILO Lenders are asking to be paid approximately $22.3 million dollars in fees, interest payments, principal paydowns and other charges,[3] receive liens on the Debtors' valuable unencumbered assets, roll-up and thereby "cramdown-proof" their debts, and leave $94 million of unpaid administrative expenses, plus any additional unpaid trade debt resulting from postpetition credit, behind. The "DIP financing" offered by the ABL and FILO Lenders is a fiction, and a blatant effort by them to lock up all of the value of the Debtors' estates for themselves, and have them rapidly liquidated for their benefit, all to the material detriment of the Debtors and their constituencies of vendors, landlords, employees and other similarly situated creditors.

4.      **_Second_**, as mentioned above, the Debtors do not obtain any new money loans or financing under the DIP Facility.  Rather, the financing constitutes simply a rolling up of

---

[3] The approximately $22.3 million of such fees and costs referenced herein excludes any potential proposed unused commitment fee.

the entirety of the prepetition balance on the ABL Loan ($370 million) and FILO Loan ($95 million).  Despite the lack of any new money loans, the Debtors propose to pay $22.3 million in fees, interest and other charges to or for the benefit of the DIP Lenders and to lien up their remaining unencumbered assets worth tens of millions of dollars to the DIP Lenders.  The Debtors also propose to grant liens in those assets to the allegedly undersecured prepetition Term Lenders (owed $276 million), and pay over $4.6 million in fees to the professionals retained by such lenders, who likewise are extending no credit and have not even consented to the use of cash collateral beyond the sale of the Debtors' assets at the end of April. Attached hereto as <u>Exhibit B</u> is a chart itemizing the fees, interest, principal paydowns and other costs to be paid to the Prepetition Secured Creditors.  In exchange for what appears to be at best the intangible benefit flowing from the optics of having a revolving DIP loan in place, the Debtors are paying dearly in the form of massive fees, the roll-up and "cramdown-proofing" of hundreds of millions of dollars of prepetition debt, granting of liens on tens of millions of dollars worth of unencumbered assets, and sale milestones that will frustrate their ability to maximize the value of the Debtors' business and assets for the benefit of all creditor constituencies.

5.      ***Third***, the Debtors propose to grant the DIP Lenders and all of the Prepetition Secured Creditors liens on tens of millions of dollars of unencumbered assets, including the assets of entities that are not even borrowers or guarantors under the prepetition debt facilities and avoidance actions.  Thus, assets that were unencumbered on the Petition Date will be subjected to superpriority liens to the ABL and FILO Lenders, who are already overcollateralized,[4] and adequate protection liens are to be granted to the Term Loan lenders,

---

[4] At the first day hearing, counsel for the ABL and FILO Lenders represented that their clients are already significantly oversecured by their existing collateral, and Debtors' counsel made a similar representation.  *See* Mar. 3, 2016 Hearing Tr. at 56:24; 79:22-25.  Thus, granting them liens on these valuable estate assets should not be necessary to secure the same financing as before but on a postpetition basis, nor is granting a lien on those assets

who are undersecured and extending no financing.  Although the Committee was recently formed and is conducting its investigation into the scope of the Prepetition Secured Creditors' collateral, the Committee has already identified the following categories of potentially very valuable unencumbered assets:  (i) all of the assets of "New Loan Parties" Sports Authority Holdings, Inc., TSA Ponce, Inc. and TSA Caribe, Inc.; (ii) the proceeds of the Debtors' leases of 464 store locations that could be worth tens of millions of dollars; (iii) avoidance actions arising under chapter 5 of the Bankruptcy Code, which are intended for the benefit of unsecured, not secured, creditors; (iv) store-level cash that was not in controlled bank accounts at the time of the Petition Date and therefore is unencumbered; and (v) commercial tort claims, such as valuable VISA/Mastercard and Amex antitrust claims, among other items.  These assets may be the only source of recovery for unsecured creditors and they should remain unencumbered for their benefit.  Liening up these unencumbered assets is unwarranted and inappropriate.

6.      ***Fourth,*** the Debtors propose to grant a host of excessive benefits to all three tranches of Prepetition Secured Creditors as "adequate protection" that are wholly unwarranted and prejudice the estates and unsecured creditors.  The proposed adequate protection provisions, separately and as a package, are vastly overgenerous to secured creditors who are not providing any real financing, just rolling up their existing debt and awaiting repayment in a matter of weeks.  The Committee respectfully submits that the proposed adequate protection package is unduly onerous and unwarranted, and, in some respects, affirmatively detrimental to the orderly conduct of these chapter 11 cases.

7.      ***Fifth***, although the Debtors receive no additional access to borrowing or incremental availability under the proposed DIP financing, they propose to pay a gargantuan

---

appropriate to provide adequate protection to the Term Loan Lenders who are not providing any financing under the DIP Facility.

amount of fees, interest, principal paydowns and other expenses, $22.3 million in all, for the financing package. *See* Exhibit B.

8.      ***Sixth,*** the DIP financing is objectionable because it contemplates that these cases will be run on an administratively insolvent basis and for the exclusive benefit of the secured creditors on the backs of landlords, vendors and other disfavored administrative creditors who will be owed approximately $94 million, plus any additional unpaid trade debt resulting from postpetition credit, for which there is no provision in the Budget.  Of the unpaid administrative expenses, $28 million is for March rent owed to the Debtors' landlords, and nearly $50 million is on account of section 503(b)(9) claims owed on account of goods sold and delivered to the Debtors in the twenty days prior to bankruptcy which thereby enhanced the Prepetition Secured Creditors' collateral.  Yet the Budget provides no payment for these goods, nor for the store rents for the month of March.  Given the proposed liening up of all unencumbered assets, it is likely that the claims of vendors, landlords and other disfavored administrative claims never will be paid.  Given the onerous milestones, there is a distinct possibility that the expedited sale of the Debtors' assets by the end of April will yield less than the aggregate amount of the three tranches of secured debt (approximately $743.7 million), such that administrative creditors whose claims are not provided for in the Budget will be left holding the proverbial bag.  Precedent in this jurisdiction establishes that it is not appropriate to approve DIP financing that would leave the estates administratively insolvent and consign wholesale categories of administrative creditors to a virtual certainly of non-payment.

9.      The facts of this case are particularly egregious insofar as almost a third of the "deferred" administrative claims facing non-payment, approximately $28 million, are claims

for "stub rent" for the month of March.[5]  It seems to be no accident that the Debtors chose to file

these cases at 5:30 a.m. Eastern on March 2, 2016.  The timing of the filing of these cases

strongly suggests that it was orchestrated to obtain the maximum, involuntary interest-free loan

from the Debtors' landlords as possible.

10.    **Seventh**, and related to the prior objection, the DIP financing provides all

three tranches of Prepetition Secured Creditors, including two of those (the FILO and the Term

Lenders) who are not extending **any** financing, with a permanent section 506(c) surcharge waiver

notwithstanding the failure of the proposed Budget to provide for payment for approximately

$93 million of administrative expenses.  Coupled with the inadequate budget, the section 506(c)

surcharge waivers, if approved, would impermissibly allow the Debtors, at the behest of their

secured creditors, to operate in chapter 11 on an administratively insolvent basis.  If there are no

unencumbered assets to pay administrative claims "at the end of the cases" and the secured

creditors are insulated from surcharge under section 506(c), these administrative expenses are

not being deferred, they are being denied payment on a permanent basis.

11.    **Eighth**, the essentially nonexistent yet expensive financing and the use of

cash collateral are conditioned on the Debtors' strict compliance with sale milestones that dictate

an unreasonably expedited sale of substantially all of the Debtors' assets notwithstanding the fact

that the Debtors did not conduct a robust marketing process prepetition and filed the Bid

Procedures Motion without a stalking horse bidder in place.  If the DIP Motion is granted, the

Debtors will be forced to conduct a fast-track fire sale of their assets, in that from a standing start

they must generate bids, conduct an auction and close on a sale within the next five weeks.

Specifically, if the Debtors do not obtain bids by April 21, 2016, obtain an order approving a sale

---

[5] The Debtors also failed to pay February rent.

of all of their remaining assets by April 27, 2016, and close on such sale by April 28, 2016, then

they will be in default thereby allowing the DIP Lenders to foreclose.   The Debtors are forced to

conclude a sale of all of their assets and repay the rolled-up prepetition debt well in advance of

the stated maturity date of the DIP loans, June 30, 2016, to the exclusion of other options in this

case, including reorganization, or a going-concern sale that a robust marketing period may bring.

This timetable is patently unreasonable and will impair the Debtors' prospects for reorganizing

and/or maximizing value for all constituents in a going concern sale process.  Accordingly, the

Committee objects to both the Bid Procedures Motion on that basis and the DIP Financing

Motion to the extent it unnecessarily locks the Debtors into a truncated timeline for a mandated

sale process, benefitting the DIP Lenders and no one else.  The Debtors would be better off

without DIP financing and using the secured lenders' cash collateral, conducting an orderly

process to develop a plan or going concern sale, and saving the estates millions of dollars in

commitment and other fees and expenses to obtain the cosmetics of a postpetition revolving

credit facility upon which it will never draw.

       12.    For the reasons set forth herein, the Committee urges the Court to deny the

DIP Motion as presented unless material modifications are made to address the Committee's

concerns.

       13.    Lastly, as referenced above, the Committee opposes the Bidding

Procedures Motion insofar as it proposes dates and deadlines that track the sale milestones tied to

the DIP Facility that will chill bidding and impair the realized value of the estates' assets by

precluding potential buyers from having an adequate opportunity to perform sufficient due

diligence with respect to the Debtors' assets.  Accordingly, the Committee respectfully submits

that the Bidding Procedures Motion should be denied unless the milestones are revised to reflect

a more reasonable timeline for the sale of substantially all of the Debtors' assets.  In this regard, the Committee submits that the Debtors would have sufficient time for the sale process if all of the operative dates and deadlines were extended by one month.

## II

## STATEMENT OF FACTS

**B.    Background**

14.    On March 2, 2016 (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these cases.

15.    On March 10, 2016, the Office of the United States Trustee (the "UST") appointed the Committee pursuant to section 1102 of the Bankruptcy Code.  The Committee presently consists of:  (i) TCW/Crescent Mezzanine Partners et al.; (ii) New York Life Investment Management Mezzanine Partners, LP; (iii) Nike, Inc.; (iv) Asics America Corp.; (v) GGP Limited Partnership; and (vi) Realty Income Corp.[6]

16.    The Debtors filed the DIP Financing Motion on March 2, 2016 seeking approval of the DIP Financing Facility.  The Court approved the DIP Facility on an interim basis on March 3, 2016 [Docket No. 57] (the "Interim Order").  The final hearing was adjourned to April 5, 2016 at 2:00 p.m.

---

[6] A seventh member, Stitching Pensioenfonds ABP, was originally named to the Committee but resigned shortly after the Committee was appointed.

17.     The Debtors filed the Bidding Procedures Motion on March 2, 2016 [Docket No. 106].  The hearing on that motion was adjourned as well and is now also scheduled on April 5, 2016 at 2:00 p.m.

18.     By agreement of the parties, the Committee's deadline to respond to the DIP Financing Motion and the Bidding Procedures Motion was extended to March 31, 2016 at 4:00 p.m. Eastern time.

## C.     The DIP Financing Facility

19.     Certain of the Debtors' prepetition ABL Lenders and FILO Lenders jointly agreed to provide the Debtors with postpetition financing in the form of a senior secured, superpriority asset-based revolving credit facility of up to $500 million and a senior secured, superpriority first in last out term loan credit facility (the "DIP Facility") of up to $95,285,000 in aggregate principal amount pursuant to that certain Senior Secured, Super-Priority Revolving Debtor-in- Possession Credit Agreement (the "DIP Credit Agreement").  Although the headline amount of the DIP Facility is $595 million, after taking into account the roll up, the availability blocks, and the significantly reduced collateral base due to the massive GOB sales, the Debtors are not being offered *any* new financing and *no* new liquidity.

20.     The key feature of the DIP Facility is that the entire balances of the prepetition ABL credit facility ($345.5 million plus $25.7 million of outstanding LOCs) and FILO Loan ($95.3 million) will be "rolled up."  With respect to the ABL, from the Petition Date through entry of the final DIP order, postpetition collections of collateral, other than Term Loan priority collateral proceeds, will be applied to pay down the prepetition ABL facility, and, at the same time, availability under the revolving DIP facility will also be increased by a corresponding amount, *i.e.,* a creeping rollup.  Also upon entry of the interim order, all outstanding letters of

credit issued under the prepetition ABL Loan "shall be deemed post-petition obligations issued under the DIP Credit Agreement."  Interim DIP Order ¶ 2.  Upon entry of the final DIP order, the entire outstanding balance under the prepetition ABL will be rolled up.

      21.  The structure of the Revolving DIP Facility is essentially the same as the ABL facility as far as borrowing base and availability blocks.  Therefore, the total available liquidity is the same under the DIP Facility as it was under the prepetition ABL facility, if not worse given the reduced aggregate funding commitment under the DIP Facility of $150 million as compared to the ABL facility, the increase in interest rate and the incurrence of millions of dollars in commitment fees.

|  | **Prepetition ABL** | **DIP Facility** |
| --- | --- | --- |
| **Borrowers:** | 1. The Sports Authority, Inc.<br>2. TSA Stores, Inc. | 1. The Sports Authority, Inc.<br>2. TSA Stores, Inc. |
| **Guarantors:** | 1. Slap Shot Holdings Corp.<br>2. TSA Gift Card, Inc. | 1. Slap Shot Holdings Corp.<br>2. TSA Gift Card, Inc.<br>3. The Sports Authority Holdings, Inc.;<br>4. TSA Ponce, Inc.; and<br>5. TSA Caribe, Inc. |
| **Aggregate Commitments:** | $650,000,000 | $500,000,000 |
| **ABL Interest:** | LIBOR plus 1.5% - LIBOR plus 2.0% | LIBOR plus 3.25% |
| **Commitment Fee:** | 0.25% -0.375% | 0.375% |
| **Agent's Fee:** | 0.15% of commitments<br>$75,000 per annum | $150,000 ABL Fee payable at closing (not pro-rated per annum) |
| **Closing Fee:** | 0.2% - 0.35% of commitments | 1.25% of commitments<br>Closing fee of $6.25 million |
| **Outside Maturity Date:** | May 17, 2017 | June 30, 2016 |

22.     Under the DIP Facility, as noted, all of the Debtors are required to provide a priming lien and superpriority claim on all of their existing collateral as well as all of the Debtors' valuable unencumbered assets, including: (i) the assets of the New Loan Parties;[7] (ii) lease proceeds, which given the Debtors' 464 stores, could be worth tens of millions of dollars; (iii) store-level cash that was not in bank accounts at the time of the Petition Date; (iv) commercial tort claims; and (v) avoidance action proceeds up to the Carve Out amount.  The same additional collateral is to be offered up as adequate protection liens to the prepetition Term Loan lenders on a junior basis.

23.     At the same time, the Debtors are required to close and liquidate a significant portion of their stores and, within a months' time (by April 28, 2016), sell their remaining stores, presumably also at liquidation values as no stalking horse bidder has yet been identified.

**D.     The DIP Budget**

24.     Attached to the DIP Motion is the Budget approved by the various secured creditors.  It is a testament to the Prepetition Secured Creditors feathering their own nest and creating a disfavored class of administrative creditors who are deliberately left out of the Budget.  As noted above, the Budget shows the Debtors to be cash flow positive in each week of the budget period through the end of April, when the sale is to take place, and cash flow positive by $66 million for the entire period.  And yet the Budget fails to provide for payment of known, incurred administrative expenses, include $28 million in March store rent, nearly $50 million in

---

[7] The following Debtors were not obligors or guarantors under the ABL, FILO or Term Loans:  (i) Sports Authority Holdings, Inc.; (ii) TSA Ponce, Inc.; and (iii) TSA Caribe, Inc., but are now required to guarantee the DIP Facility (the "New Loan Parties").  The book value of assets located at TSA Caribe, Inc. is $7.9 million consisting of $5.6 million of inventory at cost and $2.3 million of furniture, fixtures, and leasehold improvements.  The DIP motion contemplates the assets of these entities will be pledged to secure the DIP loans and as adequate protection, even though they will not get the benefit of any financing (as there is none).

section 503(b)(9) claims, and $16 million of budgeted professional fees.  In a note to the Budget,

the Debtors state:  "A total of $28M in March rent is assumed to be held and is payable at the

conclusion of the case." *See* Liquidity Forecast, Summary of Assumptions, at p. 3.  Similarly, the

Debtors estimate that approximately $48 million of 503(b)(9) claims exist, but the Budget does

not provide for payment of such claims.  Rather, these claims are assumed to be paid at the end

of the case outside of the budgeted period.  *See id.* at p. 2.  As set forth above, however, it is <u>not</u>

a fair assumption that landlords and vendors left out of the Budget will be paid at the end of the

case, as there will be no source of funds to pay these "deferred" administrative expenses at that

time since all of the assets will be subject to the liens and adequate protection claims of the

Prepetition Secured Creditors.  Thus, administrative creditors excluded from the Budget will be

relegated to a virtual certainty of non-payment if the DIP Motion is approved as presented.

   25. Notably, certain administrative claims are accounted for in the Budget and

do not have to wait until the end of the case to be assured of payment, including massive fees to

be paid to the secured creditors and their professionals.  As reflected on <u>Exhibit B</u>, the Debtors

propose to pay, in addition to millions of dollars in commitment fees, the following fees of the

professionals engaged by the ABL, FILO and Term Lenders:

   ABL:  $1,010,000 to Riemer Brownstein and local counsel;

   FILO:  $1,040,000 to Choate Hall, Schulte Roth & Zabel and local counsel; and

   Term:  $4,655,000 to Brown Rudnick and PJT Partners.

In contrast to the nearly $7 million in fees allocated to the seven professional firms engaged by

the Prepetition Secured Creditors, the Budget contemplates the incurrence of $2,525,000 to

Committee professionals, but only $1,525,000 is actually in the Budget, with the remainder

"deferred."  In total, $16 million of professional fees are left out of the Budget, thereby creating another large administrative hole.

26.     In all, based on the Committee's preliminary review, it appears that between $28 million in unpaid March rent, nearly $50 million of section 503(b)(9), and the $16 million professional fee shortfall, there is a total of approximately $94 million of administrative expenses that are not provide for in the Budget.  The estate will thus be administratively insolvent for the duration of these cases if the DIP Motion is approved without modification.

**E.     Disproportionately High Fees/ Interest Under DIP Budget**

27.     While the Budget leaves behind approximately $94 million in unpaid administrative expenses, plus any additional unpaid trade debt resulting from postpetition credit, it provides for the payment of enormous fees for the DIP financing, as well as the payment of interest, paydowns of principal, out of pocket expenses and other charges to or for the benefit of the lenders in the total amount of approximately $22.3 million as set forth on Exhibit B hereto. The foregoing does not include the "financing fee" of $2.5 million under the Budget to be paid to the Debtors' investment banker, Rothschild, for placing the DIP financing package.  Thus, the DIP Loan, which provides the Debtors with no new liquidity, is draining the estate of almost $25 million.  The Debtors could have obtained the use of cash collateral to run these cases far less expensively, both in real dollar terms and without the imposition OF onerous milestone covenants that will impair, not maximize, the value of their assets and their chances of reorganizing or otherwise achieving a going concern transaction or transactions.

# III

## OBJECTION TO DIP FINANCING MOTION AND BID PROCEDURES MOTION

28.     A court should approve a proposed debtor in possession financing only if

such financing "is in the best interest of the general creditor body." *In re Roblin Industries, Inc.,*

52 B.R. 241, 244 (Bankr. W.D.N.Y. 1985) (*citing In re Vanguard Diversified, Inc.,* 31 B.R. 364,

366 (Bankr. E.D.N.Y. 1983). *See also In re Tenney Village Co., Inc.*, 104 B.R. 562, 569 (Bankr.

D. N.H. 1989) ("The debtor's prevailing obligation is to the bankruptcy estate and, derivatively,

to the creditors who are its principal beneficiaries").  Moreover, the proposed financing must be

"fair, reasonable, and adequate." *In re Crouse Group, Inc.*, 71 B.R. 544, 546 (Bankr. E.D. Pa.

1987).

29.     Postpetition financing also should not be authorized if its primary purpose

is to benefit or improve the position of a particular secured lender.  *See, e.g., In re Aqua Assocs.,*

123 B.R. 192, 195-98 (Bankr. E.D. Pa. 1991) ("[C]redit should not be approved when it is sought

for the primary benefit of a party other than the debtor."); *In re Ames Dep't Stores, Inc.,* 115 B.R.

34, 37 (Bankr. S.D.N.Y. 1990) ("[A] proposed financing will not be approved where it is

apparent that the purpose of the financing is to benefit a creditor rather than the estate."); *Tenney*

*Village,* 104 B.R. at 568 (debtor in possession financing terms must not "pervert the

reorganizational process from one designed to accommodate all classes of creditors and equity

interests to one specially crafted for the benefit of the secured creditor").  Here, the Motion

proposes a litany of fees, superpriority liens and claims, rollups and releases that substantially

benefit the DIP Lenders and the Prepetition Secured Creditors but provide little or no benefit to

the estate and in many respects act to the material detriment of the Debtors, their estates and

creditors.

30.     The DIP Loan obviously is the product of the Debtors' near complete lack of leverage in the negotiations.  Indeed, the law has long acknowledged the unequal bargaining power inherent in negotiations between a debtor and its secured lenders relative to postpetition financing and cash collateral use, as well as the very significant harm that can befall creditors if the proposed financier is enabled to exploit its leverage position.  *See, e.g., In re FCX, Inc.,* 54 B.R. 833, 838 (Bankr. E.D.N.C. 1985) ("[T]he court should not ignore the basic injustice of an agreement in which the debtor, acting out of desperation, has compromised the rights of unsecured creditors.").  That phenomenon clearly played out in this case, as the Debtors apparently were forced to agree to a host of onerous terms and conditions, grants of security, micro-managed milestones and payments of interest, commitment and professional fees and other charges.  Perhaps the most, but certainly not the only, egregious term in the DIP Facility indicative of the Debtors' complete lack of leverage is the requirement that the Debtors pay $3 million in Closing and Prepayment Fees to the FILO lenders for the privilege of rolling up their debt and receiving no credit in return!

31.     A financing proposal this lopsided is tantamount to a delegation or compromise of the debtor's fiduciary responsibilities, and thus is especially problematic.  *Tenney Village*, 104 B.R. at 569 (denying approval of proposed debtor-in-possession financing that was so onerous as to violate the debtors' fiduciary obligations to the estate); *Roblin*, 52 B.R. at 243 (denying approval of proposed debtor-in-possession financing where, as a condition to extending the loan, the debtors were required to waive avoidance actions against the lenders in violation of their fiduciary duties); *In re Big Rivers Elec. Corp.,* 233 B.R. 726, 736 (Bankr. W.D. Ky. 1998) (agreements requiring a debtor to breach its fiduciary duties are illegal under the Bankruptcy Code and applicable state law).

32.     Here, the DIP Facility is nothing more than the foundation of a scheme by the Prepetition Secured Creditors to force the Debtors into a controlled liquidation for their benefit, on the backs of unpaid administrative claimants who will be deprived of any available assets after the DIP Lenders are repaid.  Accordingly, the Committee respectfully submits that the DIP Facility as presented is not in the best interests of the estates and should be denied unless materially modified.

A.      **The Debtors Do Not Need DIP Financing as Distinguished
        from Use of Cash Collateral**

33.     The DIP Motion should be denied because the Debtors have not demonstrated a need for DIP financing, let alone on the onerous terms proposed.  The Debtors cannot carry their burden on this Motion as their ability to survive on cash collateral usage alone is patently evident from the budget and cash flow projection they attached to the DIP Motion.   It shows that during the effective life of the DIP financing – through the end of April when the sale must take place and the DIP loans are to be repaid – the Debtors will enjoy positive cash flow in each week of the budget period, and a total of $66 million in positive cash flow over the nine-week period.   Instead of using that surplus to pay the exorbitant DIP fees, professional fees and paydowns of prepetition secured debt, the Debtors could move forward in these cases without DIP financing and pursue a plan of reorganization or going concern sale process unfettered by costs, milestones and the cramdown-proofing of hundreds of millions of dollars of prepetition secured debt mandated by the useless DIP Facility.

B.      **The DIP Fees are Exorbitant Considering that No New Financing is Being Provided**

34.     The Committee objects to the incurrence of over $26 million in fees, interest, principal paydowns and other expenses to obtain financing that is essentially illusory.

17

These expenses are itemized in <u>Exhibit B</u> attached hereto.  Particularly given the administrative insolvency posed by the exclusion of March rent and 503(b)(9) claims and other items from the Budget, payment of these fees is an inappropriate use of estate resources and therefore the DIP Motion should be denied.

**C.**    **The Milestone Covenants are Objectionable**

35.    While the incurrence of tens of millions of expense for non-existent financing is galling, by far the most pernicious aspect of this unnecessary DIP financing is the set of sale milestones the Debtors must comply with or face an Event of Default and foreclosure. Section 6.24 of the DIP Credit Agreement contains a litany of sale-related milestones that amount to a rigidly controlled liquidation of the Debtors' assets with numerous opportunities for the DIP Lenders to declare an Event of Default.

| Milestones | Original Date | Suggested New Date |
|---|---|---|
| Bid Deadline | April 21, 2016 | May 19 2016 |
| Auction | April 25, 2016 | May 25, 2016 |
| Hearing for the Proposed Sale Transaction | April 27 2016 | May 26, 2016 |
| Deadline to close Proposed Sale Transaction | April 28, 2016 | May 31, 2016 |

36.     The milestones set the Debtors on a break-neck course to sell their assets with no meaningful sale process having been conducted and no stalking horse bidder in place. The Committee objects to the DIP Motion because the milestones foreclose any possibility of confirming a plan of reorganization in this case or conducting a sale process designed to maximize value and the prospects of a going concern transaction.

37.     As the milestones dictate the sale timeline that the Debtors propose under the Bidding Procedures Motion, the Committee objects to that motion as well on the same basis. As noted in the chart above, the Committee submits that thirty days' additional time is required to conduct a robust sale process.

**D.      No DIP or Adequate Protection Liens Should be Placed on Unencumbered Assets, Including Avoidance Actions, All of Which Should Remain Unencumbered For the Benefit of the Estates**

38.     This is not a case where unencumbered assets do not exist.  The Committee has preliminarily identified several valuable buckets of unencumbered assets, including:  (i) the assets of the New Loan Parties, Sports Authority Holdings, Inc., TSA Ponce, Inc. and TSA Caribe, Inc.; (iii) lease proceeds on account of 464 store locations as of the Petition Date; (iv) avoidance actions arising under chapter 5 of the Bankruptcy Code; (v) store-level cash that was not in bank accounts at the time of the Petition Date; and (vi) commercial tort claims, among other items.

39.     Under the DIP Facility, the Debtors propose to grant the DIP Lenders a lien on every previously unencumbered asset of the estates, including the assets of Debtors who were not their borrowers and proceeds of the estates' avoidance actions (up to the Carve Out), and further to grant adequate protection liens to the Prepetition Secured Creditors, including the Term Loan lenders, on all such assets.  The DIP Lenders are also granted superpriority

19

administrative claims on all unencumbered assets. Through both devices, the DIP Lender and Prepetition Secured Creditors propose to take for themselves all unencumbered assets to repay their claims.

40.     Although the DIP Lenders may be oversecured based on the book value of the Debtors' inventory, the Committee has no way to ascertain what values will actually be received upon a liquidation of such inventory.  Further, if the ABL Lenders are oversecured by as much as $70-100 million as claimed by their counsel at the first day hearing (Mar. 3, 2016 Hearing Tr. at 79:22-25) then they certainly do not need additional inducement or collateral to provide the DIP Facility, which is predominantly if not entirely a rollup.  Further, because the estates are not receiving any financing from the FILO Lenders or the Term Loan Lenders, there is no reason to subordinate unsecured creditors to those lenders' deficiency claims by granting them liens on tens of millions of dollars of unencumbered assets that were otherwise available to satisfy unsecured creditors' claims as of the Petition Date.

41.     The DIP Motion also proposes granting a lien on avoidance action proceeds, albeit to refund professional fees incurred in generating avoidance action recoveries. The Committee submits that avoidance actions should remain pristine of any liens because statutory avoidance actions are uniquely for the benefit of general creditors of the estate, not secured creditors, and are rarely encumbered in favor of secured lenders.  The intent behind avoidance powers and a debtor's power to bring causes of actions is to allow the debtor in possession to gain recoveries for the benefit of all unsecured creditors.  *See Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship. IV*, 229 F.3d 245, 250 (3d Cir. 2000); *In re Sweetwater*, 55 B.R. 724, 735 (D. Utah 1985) (avoiding powers are meant to benefit creditors generally and promote equitable distribution among all creditors).

42.     To allow the Debtors, as fiduciaries, to use their powers to effectively assign the benefits of certain causes of action and related estate claims and proceeds to the DIP Lenders and Prepetition Secured Creditors, as opposed to true representatives of the estates for the benefit of unsecured creditors, turns bankruptcy law on its head.  *See Tenney Village*, 104 B.R. at 568 (debtor in possession financing terms must not "pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit" of the secured creditor).  The Court should not condone this end-run around what could likely be one of the only sources of a meaningful recovery for unsecured creditors.  The final DIP order should make clear that the DIP Liens and Adequate Protection Liens shall not attach to avoidance actions or proceeds thereof and that no superpriority claims under section 364 or 507(a) shall be payable from such proceeds.

**E.      The Proposed Section 506(c) and Other Waivers Are Inappropriate Where, as Here, Nearly $100 Million in Administrative Claims Are Not Provided for in the Budget**

43.     The Debtors propose to grant a permanent section 506(c) surcharge waiver, as well as section 552 "equities of the case" waiver, and a no marshaling" provision to the DIP Lenders and all of the Prepetition Secured Creditors.  Interim Order ¶¶ 44-45, 57. Through the 506(c) waiver, the Debtors irrevocably waive their and the estates' rights to charge certain costs or expenses of the administration of the bankruptcy cases against not only the DIP Lenders' DIP Collateral but also the collateral of all Prepetition Secured Creditors for the duration of these chapter 11 cases.  These provisions should be stricken from the proposed Final DIP Financing Order.

44.     Section 506(c) waivers are particularly inappropriate in these cases where, as here, the Debtors filed with the intention of implementing their sale strategy, which entails the sale of the bulk of their assets on an expedited basis, with the proceeds used to pay down the

prepetition secured debt in full leaving an open question mark as to how to satisfy the estates'
remaining obligations.  Based on the inadequate budget and lack of unencumbered assets, the
estates will have no means to bear the costs of maintaining and disposing of unsold remaining
collateral, which is pledged to the Prepetition Secured Creditors, or otherwise administering the
cases, if all of the Prepetition Secured Parties are immunized from surcharge at the very outset of
these cases.

45.     The effect of the proposed section 506(c) waivers is to eliminate a further
avenue of recovery for the Debtors' estates and to guarantee that the costs of the Debtors'
reorganization will be borne by landlords, 503(b)(9) vendors, and other unsecured creditors
alone.  This contravenes the essential purpose of section 506(c).  *See Precision Steel Shearing v.
Fremont Fin. Corp. (In re Visual Indus.)*, 57 F.3d 321, 325 (3d Cir. 1995) ("[S]ection 506(c) is
designed to prevent a windfall to the secured creditor . . . The rule understandably shifts to the
secured party . . . the costs of preserving or disposing of the secured party's collateral, which
costs might otherwise be paid from the unencumbered assets of the bankruptcy estate . . .")
(internal citation omitted); *see also In re Codesco, Inc.*, 18 B.R. 225, 230 (Bankr. S.D.N.Y.
1982) ("The underlying rationale for charging a lienholder with the costs and expenses of
preserving or disposing of the secured collateral is that the general estate and unsecured creditors
should not be required to bear the cost of protecting what is not theirs.").

46.     Neither the Committee nor this Court has any assurance that there will be
sufficient DIP availability or unencumbered assets to pay all administrative claims against the
Debtors' estates.  As noted, the Committee has identified at least an approximate $94 million
shortfall in the Budget for the payment of administrative expenses.  Additionally, the costs of
disposing of any remaining collateral after the DIP Facility is paid off will be substantial and the

estates will be left with no means to pay such costs, and otherwise will be left to the mercy of the immunized secured creditors or face conversion.  The section 506(c) surcharge waiver is not appropriate if it is the Debtors' intention to remain in chapter 11 only so long as it takes to conclude a fast sale on a basis that will leave many unpaid administrative liabilities.  As other bankruptcy courts have recognized, DIP financing that contains an inadequate budget coupled with a surcharge waiver should not be approved unless modified to provide for payment of administrative claims, including 503(b)(9) claims and other costs of administration.  *See NEC Holdings Corp.*, Case No. 10-11890 (PJW) (Bankr. D. Del. Jul 13, 2010) [Docket No. 223] and Hearing Tr. at 108:1-5 [Docket No. 224] ("I need some evidence that there's a probability that admin claims are going to be paid in full, including 503(b)(9) claims or I won't approve the financing."); *Hartford Fire Ins. Co. v. Nw. Bank Minn. (In re Lockwood Corp.)*, 223 B.R. 170, 176 (8th Cir. B.A.P. 1998) (holding that provision in financing order purporting to immunize the postpetition lender from section 506(c) surcharge was unenforceable); *In re Colad Group, Inc.*, 324 B.R. 208, 224 (Bankr. W.D.N.Y. 2005) (refusing to approve postpetition financing agreement to the extent that the agreement purported to modify statutory rights and obligations created by the Bankruptcy Code by prohibiting any surcharge of collateral under section 506(c)).

47.     The waiver of section 506(c) rights, the equities of the case waiver, and the no-marshalling provision are inappropriate where, as here, the entire case is being run for the benefit of the Prepetition Secured Creditors on an administratively insolvent basis.  Moreover, the waiver is wholly inappropriate as to the FILO and Term Loan lenders, who are not even providing any financing.  Therefore, the surcharge and other waivers should be stricken in their entirety.

**F.    The FILO DIP Loan is Illusory and Indefensible**

48.    The proposed treatment of the FILO lenders in the context of the case -- rolling up their debt, granting them additional liens, paying them over $3 million in commitment and prepayment fees, and paying their professional fees when they are not obligated to extend any new credit -- is indefensible.  Of the $3 million in fees, $1.9 million is an "Early Termination Fee" allegedly payable under a prepetition letter agreement dated November 3, 2015, providing that if the FILO loan is paid earlier than 18 months after the date of the FILO Loan.  Of course, under the proposed DIP Facility, the Debtors are required to roll up, and thus "repay" the FILO Loan in full, purportedly triggering the Early Termination Fee.  *See* DIP Credit Agreement §§ 2.06(c); 2.07(c).  This is a contrivance; under the DIP Facility, the Debtors are forced to prepay the FILO Loan and receive no new financing or other benefit from the FILO Loan.  The FILO lenders, in contrast, benefit from all of the following:

- $1.906 million Early Termination Fee;
- $3.658 million in interest;
- $1.583 million principal repayment;
- $1.191 million closing fee (1.25% of the loan amount)
- $75,000 agent fee; plus
- $1.040 million in professional fees of the FILO Loan lenders

In total, the Debtors are required to pay over $9.4 million for no access to funding under the FILO DIP Loan.  *See* Exhibit B.

49.    The Debtors are also required to grant to the FILO Lenders a priming lien on all unencumbered assets plus a superpriority administrative claim as though the FILO Lenders were providing real DIP financing.  The FILO lenders are also granted the benefit of the

Debtors' release and challenge protections.  Under these circumstances, the entire package of the roll-up, fees, superpriority liens and claims and the overly generous adequate protection package for the FILO Loan is excessive and should not be approved.

**G.** **The Array of Adequate Protection Measures Proposed**
**to the Prepetition Secured Creditors Is Excessive**

50.      The Committee would not oppose adequate protection in the form of replacement liens to the Prepetition Secured Creditors to the same extent, priority, validity as existed on the Petition Date for these lenders that are not extending any financing under the DIP Facility.  However, the Debtors propose to grant the three tranches of Prepetition Secured Creditors – ABL, FILO and Term -- vastly more, including:

- Adequate Protection Liens on all unencumbered assets except proceeds of avoidance actions up to the Carve Out Amount, which will be accessed instead by way of potential superpriority claims under section 507(b);

- Payment of the fees of their seven professional firms,

- Validation of their prepetition debt subject to a challenge period that has a limited budget and no standing for the Committee to pursue; and

- Section 506(c) surcharge waivers for the cost of maintaining and disposing of their collateral for the duration of these cases.

- Mandatory payment of principal and interest from sale proceeds;

- A Prepayment Premium of $1.9 million for forced early repayments under the prepetition FILO Loan;

- Interest and fees at the default rate of interest for the ABL and FILO Lenders of approximately of $16.4 million;

*See* Exhibit B.

51.      The Bankruptcy Code adopts the concept of adequate protection with the goal of "safeguard[ing] the secured creditor from diminution in the value of its interest during

the Chapter 11 reorganization." *In re 495 Central Park Ave. Corp.,* 136 B.R. 626, 631 (Bankr.

S.D.N.Y. 1992).  The Code requires debtors to provide a secured creditor with adequate

protection to the extent that the automatic stay, the debtors' use of cash collateral, or a priming

lien "results in a decrease in the value of such entity's interest in such property."  11 U.S.C. §

361(1).  Determinations regarding adequate protection are fact-specific.  *See In re Mosello*, 195

B.R. 277, 289 (Bankr. S.D.N.Y. 1996); *Mbank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808

F. 2d 1393, 1396 (10th Cir. 1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985); *see also*, S. Rep.

No. 95-989, 95th Cong., 2d Sess. 54 (1978).  The focus of the requirement is to protect a secured

creditor from diminution in the value of its collateral during the use period.  *United Savings*

*Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 368, 108 S.Ct.

626, 629, 98 L.Ed.2d 740 (1988).  *See also*, *Matter of Kain*, 86 B.R. 506, 513 (Bankr. W.D.

Mich. 1988); *Delbridge v. Production Credit Association and Federal Land Bank In re*

*Delbridge*, 104 B.R. 824 (E.D. Mich. 1989); *In re Beker Industries Corp.*, 58 B.R. 725, 736

(Bankr. S.D.N.Y. 1986).

      52.     Section 361 of the Bankruptcy Code provides that periodic cash payments,

replacement liens, or relief constituting the "indubitable equivalent" of the creditor's interest

may provide adequate protection.  Provision of a replacement lien in property equal to the value

of the cash collateral used specifically complies with Section 361(2) and provides adequate

protection within the meaning of Section 363(e) of the Bankruptcy Code.  *See, e.g., In re*

*O'Connor*, 808 F.2d at 1398; *In re Dynaco Corp.*, 162 B.R. 389, 393-95 (Bankr. D. N.H. 1993);

*In re T.H.B. Corp.*, 85 B.R. 192, 195 (Bankr. D. Mass. 1988).

      53.     Where the lenders' collateral is not diminishing as a result of its use,

however, nothing further is required for adequate protection.  *In re Pursuit Athletic Footwear,*

*Inc.,* 193 B.R. 716 (Bankr. D. Del. 1996) (approving use of cash collateral where debtor agreed

to grant creditor replacement lien and there had been no diminution in the value of the

collateral); *In re T.H.B. Corp.*, 85 B.R. at 194; *In re Dynaco Corp.*, 162 B.R. at 394-95. "If the

debtors make a solid showing that their continued operation of their business during the relevant

period will pose no serious danger of such a decline, there is no need for any additional adequate

protection . . . ." *Id.* at 394.

54.     Here, what is proposed as adequate protection goes well beyond what is

necessary and appropriate under the current circumstances of these Chapter 11 Cases. The

Debtors' ongoing operations and sale process are preserving and enhancing, not diminishing, the

value of the Prepetition Secured Creditors' collateral. "Neither the legislative history nor the

[Bankruptcy] Code indicate that Congress intended the concept of adequate protection to go

beyond the scope of protecting the secured claim holder from a diminution in the value of the

collateral securing the debt." *In re Pine Lake Vill. Apartment Co.*, 19 B.R. 819, 824 (Bankr.

S.D.N.Y. 1982). The proposed package of "adequate protection" and other lender concessions

appear to greatly exceed the risk of diminution to the lenders' collateral position. Thus, such

package appears to be nothing less than a "land grab" by the Prepetition Secured Creditors of all

unencumbered assets. The adequate protection package proposed is excessive and should be

stricken from the final order.

55.     The Committee does not dispute that the secured creditors have a statutory

entitlement to appropriate adequate protection and the right to assert a claim under section 507(b)

of the Code if they can demonstrate that use of their cash collateral has resulted in a diminution

in value. The Committee respectfully submits that with the continued operation of the Debtors'

stores, a robust section 363 sale process underway, replacement liens on their existing collateral

and the right to assert a claim under section 507(b) of the Bankruptcy Code against entities that are their obligors (as distinguished from the New Loan Parties), is more than adequate to protect the ABL, FILO and Term Lenders.

56.    While the adequate protection afforded to the prepetition ABL lenders is excessive, at least the Debtors can say they have the benefit of a revolving DIP credit line extended by ABL DIP lenders. Far less defensible is the adequate protection package of liens, fees, interest, surcharge waiver, etc. afforded to the FILO and Term loan lenders, neither of whom is extending any credit and as to which the debt senior to them is projected to be steadily declining.  The adequate protection treatment proposed for these lenders, including liens on unencumbered assets, and payment of professional fees, is excessive and inappropriate.  There is no basis, in particular, to pay the Term Lenders $4.6 million in professional fees since they appear to be undersecured, and thus not eligible to recover their postpetition professionals' fees under section 506(b) of the Bankruptcy Code.[8]

**H.    The Lien Validation and Challenge Provisions
Should be Scaled Back and Materially Modified**

57.    The proposed Final DIP Order contains voluminous factual stipulations regarding the validity and priority of the Prepetition Secured Creditors' claims which will become binding upon the estate unless challenged by the Committee.  Further, the Committee is given only 60 days after its formation to investigate all three sets of the Prepetition Secured Creditors' claims and liens, at a time when the parties will be focused on the sale process.  The Committee is given an investigation budget of $50,000 but, remarkably, not given standing to bring a challenge.  Thus, within the 60-day period, if the Committee does not obtain standing and

---

[8] The Committee reserves the right to seek recharacterization of all payments made to or for the benefit of the Term Lenders as principal payments if, as is anticipated, they turn out to be undersecured.

assert a challenge by this time period, the Debtors' stipulations or admissions will be binding on

the Committee.  Interim Order at ¶ 26.  These provisions require material modification.

58.     As a threshold matter, it is questionable why the Debtors' Prepetition

Secured Creditors are even getting the benefit of a challenge period (other than that they

demanded it from the Debtors), as they are not providing any financing to the Debtors under the

DIP Facility.  Under such circumstances, there is no justifiable reason for the Debtors to validate

their prepetition claims; certainly no other creditors in the case enjoy the benefit of stipulations

as to their claims by the Debtors and an expedited period for their claims to be challenged.

Accordingly, the Committee should not be bound by any Challenge deadline or cap on its

investigation budget.  Rather, the Committee should be permitted to investigate and assert any

claims within the time period allowed under the Bankruptcy Code and applicable law.

59.     If the Court is inclined to allow the debt validation and challenge

provisions to stand, the Committee should be given standing in the Final DIP Order to bring

those challenges as it is illogical to expect any other party in interest to mount such an effort.  To

withhold standing and force the Committee as a prerequisite to commencing a challenge to file a

motion is only being done to throw roadblocks in the Committee's path, and will have the net

effect of reducing the challenge period, multiplying litigation, as the parties and the Court will

have to endure litigation over standing and then litigation over the challenges themselves, and

exacerbating the costs of administration.  Forcing the Committee to make another motion to

obtain standing is unnecessary and wasteful.  It should be more than adequate comfort to the

Court and the Prepetition Secured Creditors that the Committee will not bring any frivolous

challenge as the Committee is bound to act in good faith and within the constraints of

Bankruptcy Rule 9011.  Forcing the Committee to move for standing is a strategic move purely

to burden the party who is most likely to bring a challenge.  Given this concern and generally the

fact that the Debtors were forced to capitulate on behalf of the estates, there can be no possible

basis to deprive the Committee of standing to pursue any challenge on behalf of the estates.

Also, the 60-day time period must be subject to extension for cause, to prevent the Prepetition

Secured Creditors from "running out the clock" resisting discovery and frustrating the challenge

investigation.

## I.      Other Objections

60.     The Committee also objects to the following provisions:

a.      ***Variance Provisions Too Strict***.  The Debtors are only permitted

to use cash pursuant to an Approved Budget and will also trigger an Event of Default if Net Cash

Flow, Total Disbursements, or Revenues vary by more than 10%.  DIP Credit Agrmt. § 6.23.

Such variances are too strict and may inadvertently trigger an Event of Default.

b.      ***Committee's Consent Rights***.  The Committee is not granted

consent rights on new budgets and not provided financial reporting.  Interim Order ¶¶ 18(e);

18(g).

c.      ***Budget/Carveout for Committee Professionals***.  The Carveout for

the Committee's professionals is inadequate.  *See* Interim Order ¶ 29(c) and Budget.  As

currently proposed, the Debtors' claims agent is in the Budget for more than the Committees'

financial advisors.  The Committee respectfully submits that the Committee's budgeted line

items for its professionals be increased to a reasonable amount in proportion to the Debtors'

professionals.  *See, e.g., Ames Dep't Stores, Inc.*, 115 B.R. at 38 (Bankr. S.D.N.Y. 1990) (it is

appropriate for court to insist on reasonable carve-out designed to provide for payment of fees of

debtor and committee counsel in order to preserve adversary system; absent this protection,

collective rights and expectations of all parties-in-interest are sorely prejudiced); *In re Channel Master Holdings, Inc.*, 2004 Bankr. LEXIS 576, at *8-9 (Bankr. D. Del. 2004) (refusing to enforce a $75,000 cap on committee's professional fees under a postpetition financing facility, finding such cap unreasonable in light of the much larger caps on the other professionals in the case and after a thorough review of all actions of the committee's professionals and determining that the cap on the committee's fees was inadequate to compensate for such activities).

## IV

## RESERVATION OF RIGHTS

61.    The Committee expressly reserves all rights, claims, defenses, and remedies, including, without limitation, to supplement and amend this Objection, to raise further and other objections to the DIP Motion and the Bid Procedures Motion and the form of final order, and to introduce evidence prior to or at any hearing regarding such motions in the event that the Committee's objections are not resolved prior to such hearing.

## V

## CONCLUSION

For all of the foregoing reasons, the Committee respectfully requests that the

Court deny final approval of the DIP Motion and approval of the Bid Procedures Motion on the

terms proposed.

Dated:  March 31, 2016

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Bradford J. Sandler*

Robert J. Feinstein (NY Bar No. 1767805)
Jeffrey N. Pomerantz (CA Bar No.  143717)
Bradford J. Sandler (DE Bar No. 4142)
919 North Market Street, 17th Floor
Wilmington, DE  19801
Telephone: 302-652-4100
Facsimile:  302-652-4400
E-mail:   rfeinstein@pszjlaw.com
E-mail:   jpomerantz@pszjlaw.com
            bsandler@pszjlaw.com

[Proposed] Counsel for the Official Committee of
Unsecured Creditors