**EXHIBIT A**

Store No. 239a
Fort Bend County, Texas

**SHOPPING CENTER LEASE**

**BETWEEN**

**MRPL RETAIL PARTNERS, LTD.**

**AND**

**TSA STORES, INC.**

**FOR PREMISES LOCATED IN THE**

**SHOPS AT BELLA TERRA SHOPPING CENTER**

**FORT BEND COUNTY, TEXAS**

i

1.   BASIC LEASE DEFINITIONS, EXHIBITS AND ADDITIONAL DEFINITIONS ............................ 1
     1.1   Basic Lease Definitions ................................................................................. 1
     1.2   Exhibits ..................................................................................................... 3
     1.3   Additional Definitions..................................................................................... 3

2.   DEMISE, CONSTRUCTION AND TERM.............................................................................. 6
     2.1   Demise ...................................................................................................... 6
     2.2   Construction................................................................................................ 6
     2.3   Delivery on Permitted Delivery Date............................................................... 6
     2.4   Measurement of Premises ............................................................................. 6
     2.5   Commencement Agreement ............................................................................ 7
     2.6   Options to Extend Term................................................................................ 7
     2.7   Holdover Tenancy........................................................................................ 7

3.   RENT ............................................................................................................................ 7
     .1    Commencement of Rent................................................................................. 7
     3.2   Base Rent .................................................................................................. 8
     3.3   Common Area Charges.................................................................................. 8
     3.4   Real Estate Taxes ....................................................................................... 9
     3.5   Right to Inspect Books.................................................................................. 9
     3.6   Utilities.................................................................................................... 10
     3.7   Rent Invoices; Waiver of Recovery of Certain Charges .................................... 10
     3.8   Late Payments .......................................................................................... 10

4.   COMMON AREAS ......................................................................................................... 10
     4.1   Right to Use Common Areas ........................................................................ 10
     4.2   Parking Areas............................................................................................ 11
     4.3   Maintenance of Common Areas..................................................................... 11
     4.4   Development Restrictions............................................................................. 11
     4.5   Employee Parking ...................................................................................... 12
     4.6   Minimum Clearance.................................................................................... 12

5.   INSURANCE AND INDEMNITIES.................................................................................... 12
     5.1   Tenant's Insurance ..................................................................................... 12
     5.2   Landlord's Insurance................................................................................... 12
     5.3   Indemnities............................................................................................... 13
     5.4   Waiver of Subrogation ............................................................................... 13

6.   MAINTENANCE OF PREMISES ..................................................................................... 13
     6.1   Landlord's Obligations ................................................................................ 13
     6.2   Tenant's Obligations................................................................................... 13
     6.3   Heating, Ventilating and Air Conditioning ..................................................... 14
     6.4   Surrender of Premises ................................................................................ 14

7.   SIGNS.......................................................................................................................... 14
     7.1   Exterior Signs............................................................................................ 14
     7.2   Other Signs............................................................................................... 14

8.   TITLE TO PREMISES .................................................................................................... 14
     8.1   Ownership of Premises ............................................................................... 14
     8.2   Covenant of Quiet Enjoyment....................................................................... 14
     8.3   Non-Disturbance Agreement ........................................................................ 15
     8.4   Restrictions .............................................................................................. 15

9.   COMPLIANCE ............................................................................................................... 15
     9.1   As to Premises........................................................................................... 15
     9.2   As to Common Areas................................................................................... 15
     9.3   As to Hazardous Materials........................................................................... 15

10.  ALTERATIONS AND FIXTURES..................................................................................... 16
     10.1  Alterations and Additions ........................................................................... 16
     10.2  Fixtures.................................................................................................... 17
     10.3  Liens........................................................................................................ 17

i

| | | |
|---|---|---|
| 11. | ASSIGNMENT AND SUBLETTING | 17 |
| | 11.1 Permitted Assignment and Subletting | 17 |
| | 11.2 Recognition | 17 |
| 12. | DESTRUCTION OF PREMISES | 18 |
| | 12.1 Notice of Damage and Estimated Repair Time | 18 |
| | 12.2 Tenant's Right to Terminate | 18 |
| | 12.3 Landlord's Right to Terminate | 18 |
| | 12.4 Landlord's Repair Obligation | 18 |
| | 12.5 Abatement of Rent | 18 |
| 13. | EMINENT DOMAIN | 18 |
| | 13.1 Total Taking | 18 |
| | 13.2 Tenant's Right to Terminate | 19 |
| | 13.3 Landlord's Right to Terminate | 18 |
| | 13.4 Partial Taking of Premises | 19 |
| | 13.5 Award | 19 |
| 14. | DEFAULT | 19 |
| | 14.1 Tenant's Default | 19 |
| | 14.2 Landlord's Default | 20 |
| | 14.3 No Additional Notice or Cure Period | 20 |
| | 14.4 Estoppel and Waiver | 20 |
| | 14.5 Remedies Cumulative | 20 |
| | 14.6 Litigation, Court Costs and Attorneys' Fees | 20 |
| | 14.7 Defaults by Assignees or Subtenants | 20 |
| 15. | SUBORDINATION | 21 |
| | 15.1 Landlord's Mortgages | 21 |
| | 15.2 Landlord's Liens | 21 |
| 16. | OTHER TENANCIES AND USE | 21 |
| | 16.1 On-Going Co-Tenancy Requirement | 21 |
| | 16.2 Exclusive Use | 21 |
| | 16.3 Prohibited Uses | 22 |
| | 16.4 Restricted Uses | 22 |
| | 16.5 Other Exclusives | 22 |
| | 16.6 Opening Covenant; No Operating Covenant; Landlord's Right to Recapture | 22 |
| | 16.7 Acknowledgement of Firearms | 22 |
| 17. | MISCELLANEOUS | 23 |
| | 17.1 Relationship of Parties | 23 |
| | 17.2 Heirs, Successors and Assigns | 23 |
| | 17.3 Governing Law | 23 |
| | 17.4 Rules of Construction | 23 |
| | 17.5 Materiality of Covenants | 23 |
| | 17.6 Severability | 23 |
| | 17.7 Entire Agreement; Amendment | 23 |
| | 17.8 Gender, Number | 23 |
| | 17.9 Headings | 23 |
| | 17.10 Section Numbers | 23 |
| | 17.11 Memorandum of Lease | 23 |
| | 17.12 Notices | 23 |
| | 17.13 Confidentiality of Lease Terms | 23 |
| | 17.14 Brokers | 23 |
| | 17.15 Force Majeure | 23 |
| | 17.15 Jury Trial Waiver | 24 |
| | 17.16 Specially Designated Nationals and Blocked Persons List | 24 |

Exhibit A        LEGAL DESCRIPTION OF THE SHOPPING CENTER............................................A-1

Exhibit A-1      LEGAL DESCRIPTION OF THE KOHL'S TRACT...............................................A-2

Exhibit A-2      LEGAL DESCRIPTION OF THE WAL-MART TRACT..........................................A-3

Exhibit A-3      LEGAL DESCRIPTION OF THE NORTH TRACT...............................................A-4

Exhibit B        SITE PLAN.........................................................................................................B-1

Exhibit B-1      ALTERNATIVE SITE PLAN............................................................................B-2

Exhibit B-2      SITE PLAN SHOWING SPECULATIVE SPACE................................................B-3

Exhibit C        CONSTRUCTION PROVISIONS......................................................................C-1

Exhibit C1       EXCERPTS FROM THE PROGRAM PACKAGE...............................................C1-1

Exhibit D        COMMENCEMENT AGREEMENT....................................................................D-1

Exhibit E        SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT..............E-1

Exhibit F        PERMITTED ENCUMBRANCES......................................................................F-1

Exhibit G        EXISTING LEASES NOT SUBJECT TO TENANT'S EXCLUSIVE/OTHER
                 EXCLUSIVES...................................................................................................G-1

Exhibit H        PROHIBITED USES.........................................................................................H-1

Exhibit I        MEMORANDUM OF SHOPPING CENTER LEASE............................................I-1

Exhibit J        SIGN CRITERIA..............................................................................................J-1

Exhibit K        PYLON SIGN DRAWING..................................................................................K-1

Exhibit L        STOREFRONT ELEVATION.............................................................................L-1

iii

**SHOPPING CENTER LEASE**

THIS SHOPPING CENTER LEASE ("Lease") is entered into as of the Effective Date, and by and between the Landlord and Tenant, identified in Section 1.1 below.

1.    **BASIC LEASE DEFINITIONS, EXHIBITS AND ADDITIONAL DEFINITIONS**

    1.1    **Basic Lease Definitions**. In this Lease, the following defined terms have the meanings indicated:

        (a)    "**Effective Date**" means the date of execution by the later to sign of Landlord or Tenant, provided an executed copy of this Lease is thereafter delivered to the other party, which date is ___April 14___, 2011.

        (b)    "**Landlord**" means MRPL RETAIL PARTNERS, LTD., a Texas limited partnership, whose Federal Taxpayer Identification Number is 20-8243164.

        (c)    "**Tenant**" means TSA STORES, INC., a Delaware corporation.

        (d)    "**Shopping Center**" means the land owned by Landlord that is known as The Shops at Bella Terra, Phase IV, as described on Exhibit A, together with all buildings and other improvements constructed or to be constructed thereon, together with all rights, privileges, easements, and appurtenances pertaining thereto. The Shopping Center is part of the larger development known as the Shops at Bella Terra Shopping Center (the "**Development**"), which is located in unincorporated area in the County of Fort Bend and State of Texas. The Shopping Center contains, or will contain, at least 70,000 square feet of Floor Area. As used herein, the "**Development**" means the 98 acre development which includes (i) the Shopping Center, (ii) the land and improvements located on the tract described on Exhibit "A-1" attached hereto and identified as the "**Kohl's Tract**" on Exhibit B, (iii) the land and improvements located on the tract described on Exhibit "A-2" attached hereto and identified as the "**Wal-Mart Tract**" on Exhibit B and (iv) the remaining land and improvements in the Development. As of the Effective Date, the Development contains at least 400,000 square feet of Floor Area, exclusive of: (x) all of the detention ponds shown on Exhibit B, (y) the 5.492 acre 24-Hour Fitness Site located on the "North Tract" as shown on Exhibit B and (z) the 1.217 acre pad site located on the "**North Tract**" as shown on Exhibit B, as both tracts on the North Tract are further defined on Exhibit A-3 attached hereto. The Shopping Center and Development are identified as such on Exhibit B. No later than the date that is 180 days prior to a Permitted Delivery Date (defined below), Landlord may elect to use the Site Plan attached hereto as Exhibit B-1 (the "**Alternative Site Plan**") in lieu of the Site Plan attached hereto as Exhibit B by delivering written notice to Tenant of such election. Upon such election, all references in this Lease to the Site Plan will be deemed to refer to the Alternative Site Plan. Landlord may make changes to the Site Plan and Alternative Site Plan within the areas labeled as "Conceptual" (the "**Conceptual Areas**") as long as (1) the depth of any tenant's space is not deeper than as shown on either plan, (2) Landlord constructs at least 70,000 square feet of Floor Area within the Shopping Center and (3) neither the Trash Area nor the loading dock behind the Premises will be impacted. Prior to commencing construction of the Conceptual Areas, Landlord will deliver notice to Tenant, accompanied by (A) a site plan showing the changes from the Site Plan or Alternative Site Plan, as applicable and (B) a turning radius study, which study will be subject to the approval of Tenant, in its reasonable discretion.

        (e)    "**Premises**" means that portion of the Shopping Center identified as such on Exhibit B or Exhibit B-1. There are appurtenant to the Premises those rights, privileges, easements and appurtenances that are described herein. The Premises contain, or will contain, approximately 35,069 square feet of Floor Area, with dimensions of approximately 171 feet of frontage by approximately 221 feet in depth and a minimum clear height of 18 feet.

        (f)    "**Expiration Date**" means the last day of the Initial Term, which will be January 31 of the 10th Lease Year.

        (g)    "**Permitted Delivery Date**" means January 29, 2012 or April 15, 2012.

        (h)    "**Extension**" means any of the 4 extension periods of 5 years each with respect to which Tenant may elect to extend the Term pursuant to Section 2.6.

        (i)    "**Base Rent**" means the Rent payable pursuant to Section 3.2, as follows (but subject to adjustment upon final measurement of the Premises pursuant to Section 2.3)

| Applicable Time Period | Total Annual Base Rent | Total Monthly Base Rent | Annual Base Rent Per Square Foot of Floor Area of the Premises |
|---|---|---|---|
| Rental Commencement Date through the Expiration Date | $403,293.40 | $33,607.79 | $11.50 |
| First Extension | $443,622.85 | $36,968.57 | $12.65 |
| Second Extension | $487,809.79 | $40,650.82 | $13.91 |

1

| | | | |
|---|---|---|---|
| Third Extension | $536,555.70 | $44,712.98 | $15.30 |
| Fourth Extension | $590,561.96 | $49,213.50 | $16.84 |

(j)     **"Estimated Common Area Charges"** means $2.00 per square foot of Floor Area of the Premises (excluding insurance premiums). The estimated insurance premiums means $0.25 per square foot of Floor Area of the Premises. See Section 3.3(b) and Sections 5.2(a) and (b).

(k)     **"Estimated Real Estate Taxes"** means $2.75 per square foot of Floor Area of the Premises. See Section 3.4(a).

(l)     **"Required Co-Tenants"** means (i) Wal-Mart or Kohl's, (ii) Best Buy and (iii) 2 national retailers whose premises contain at least 18,000 square feet of Floor Area (the "National Retailers"). Tenant acknowledges that Wal-Mart owns the Wal-Mart Tract and Kohl's owns the Kohl's Tract which are subject to the ECR.

(m)     **"Co-Tenancy Premises"** means the respective premises occupied by each of the Required Co-Tenants. The Co-Tenancy Premises of Wal-Mart, Kohl's and Best Buy are designated on Exhibit B hereto. The Co-Tenancy Premises of each of the National Retailers will be located in the Development.

(n)     **"Initial Co-Tenancy Requirement"** means that (i) the Required Co-Tenants are open, fully staffed and stocked and are operating in the Co-Tenancy Premises, and (ii) premises containing at least 70% of the total Floor Area of the Development (excluding the Premises and the Co-Tenancy Premises) are open, fully staffed, stocked and operating as a retail business. For a period of 12 months from the date of completion of any speculative retail space built by Landlord within the Development in the areas shown on Exhibit B-2, such speculative space will be excluded from the calculation of the total Floor Area of the Development for purposes of subsection (ii).

(o)     **"On-Going Co-Tenancy Requirement"** means that (i) the Required Co-Tenants or Comparable Replacement Tenants are open, fully staffed and stocked and are continuously operating in the Co-Tenancy Premises, and (ii) premises containing at least 70% of the total Floor Area of the Development (excluding the Premises and the Co-Tenancy Premises) are open, fully staffed, stocked and continuously operating as a retail business. For a period of 12 months from the date of completion of any speculative retail space built by Landlord within the Development in the areas shown on Exhibit B-2, such speculative space will be excluded from the calculation of the total Floor Area of the Development for purposes of subsection (ii).

(p)     "**Landlord's Notice Address**" means:

c/o Moody Rambin Interests
3003 West Alabama
Houston, Texas 77098

With a copy to:

John S. Moody, Jr., Esq.
3003 W. Alabama
Houston, Texas 77098

(q)     "**Landlord's Rent Address**" means:

c/o Moody Rambin Property Company
12830 Memorial Drive, Suite 1105
Houston, Texas 77098
Attn: Property Management

(r)     "**Tenant's Notice Address**" means:

1050 West Hampden Avenue
Englewood, Colorado 80110
Attn: Senior Vice President - Real Estate

With a copy to:

1050 West Hampden Avenue
Englewood, Colorado 80110
Attn: Legal Department

(s)     "**Tenant's Rent Invoices Address**" means:

1050 West Hampden Avenue
Englewood, Colorado 80110
Attn: Accounting

2

(t)      **"Brokers"** means Western Retail Advisors, LLC and MRH Retail, Inc., dba Moody Rambin Retail.

(u)      **"Tenant's Work Days"** means 110 days, plus the number of days, if any, that "Tenant's Work" (as defined in Article 1(iii) of Exhibit C) is delayed by "Uncontrollable Events" (as defined in Section 17.15).

**1.2      Exhibits.** The following Exhibits are attached to this Lease and made a part of this Lease for all purposes.

| | |
|---|---|
| Exhibit A: | Legal Description of the Shopping Center |
| Exhibit A-1: | Legal Description of the Kohl's Tract |
| Exhibit A-2: | Legal Description of the Wal-Mart Tract |
| Exhibit A-3: | Legal Description of the North Tract |
| Exhibit B: | Site Plan |
| Exhibit B-1: | Alternative Site Plan |
| Exhibit B-2: | Site Plan Showing Speculative Space |
| Exhibit C: | Construction Provisions |
| Exhibit C1: | Excerpts from the Program Package |
| Exhibit D: | Commencement Agreement |
| Exhibit E: | Subordination, Non-Disturbance and Attornment Agreement |
| Exhibit F: | Permitted Encumbrances |
| Exhibit G: | Existing Leases Not Subject to Tenant's Exclusive/Other Exclusives |
| Exhibit H: | Prohibited Uses |
| Exhibit I: | Memorandum of Shopping Center Lease |
| Exhibit J: | Sign Criteria |
| Exhibit K: | Pylon Sign Drawing |
| Exhibit L: | Storefront Elevation |

**1.3      Additional Definitions.** In addition to those terms defined in Section 1.1 and other sections of this Lease, the following defined terms when used in this Lease have the meanings indicated:

(a)      **"Additional Rent"** means any amount or charge due from Tenant to Landlord under this Lease in addition to Base Rent, including, without limitation, Tenant's pro rata share of Common Area Charges (including the Pylon/Monument Sign Costs, as defined in Section 7.1 below) and Real Estate Taxes.

(b)      **"Alternative Rent"** means, for any month or portion of a month during the Term for which Tenant is required or permitted to pay Alternative Rent pursuant to this Lease, an amount equal to the product of (i) the entire amount of Gross Sales made upon the Premises during such month or the portion thereof, multiplied by (ii) 3%, but in no event will Alternative Rent exceed the Base Rent that would have been payable for such period in the absence of the provision of this Lease requiring or permitting Tenant to pay Alternative Rent for such period.

(c)      **"Commencement Date"** means, subject to the provisions of Article 3.6 of Exhibit C, the earlier of (i) the date which is the number of Tenant's Work Days after the Delivery Date, or (ii) the earlier of the date of Tenant's grand opening or the 10th day after the day on which Tenant first opens the Premises for business with the public; provided, however, that if the date which is the number of Tenant's Work Days after the Delivery Date occurs during the three-day period from and including Good Friday through and including Easter Sunday, then the Commencement Date will be the earlier of (A) the Monday immediately following Easter Sunday, or (B) the earlier of the date of Tenant's grand opening or the 10th day after the day on which Tenant first opens the Premises for business with the public.

(d)      **"Common Area Charges"** means (1) the costs incurred by Landlord during the Term in operating, maintaining, securing and repairing the Common Areas, (2) the costs charged to Landlord under the terms of the ECR for maintaining and repairing certain areas of the Development pursuant to the ECR (the "ECR Expenses") and (3) to the extent not covered by the ECR, the costs incurred by Landlord during the Term in landscaping, mowing and watering any medians and rights-of-way landscaped and maintained by Landlord in connection with the Development, including, but not limited to, (a) the Ring Road (as depicted on Exhibit B) and its median, (b) the median and the north side right-of-way of Bellaire Boulevard from Grand Parkway to Canal Road, and (c) the west side right-of-way of Grand Parkway from FM 1093 to Bellaire Boulevard, all determined in accordance with generally accepted accounting principles, and in paying the premiums for the property and liability insurance required by Sections 5.2(a) and (b). Common Area Charges will not include any of the following: (i) Real Estate Taxes; (ii) costs of capital improvements, capital repairs or capital replacements, including, without limitation, repainting of buildings and total repaving of the parking areas (or partial repaving of parking areas if in the aggregate such partial repairs will result in a substantially total repair); (iii) costs of roof repairs; (iv) costs of repairing design or construction defects; (v) costs of improvements, repairs or replacements covered by insurance or reimbursed by third parties; (vi) repairs or other work (including rebuilding) occasioned by casualty or condemnation; (vii) costs of constructing leasehold improvements for any tenant of the Shopping Center; (viii) legal or brokerage fees and other costs of procuring tenants associated with any lease for space in the Shopping Center; (ix) costs of advertising; (x) management fees, whether payable to Landlord or third parties; (xi) so-called "administrative charges" or other add-ons to the total of Common Area Charges; provided however an administrative fee may be included in Common Area Charges so long as such fee does not exceed 7% of Common Area Charges (excluding insurance premiums, utilities and any single purpose expenditure that exceeds $50,000); (xii) salaries and other employment costs of any employee (A) to the extent such employee does not work on-site at the Shopping Center, (B) to the extent such employee is engaged in activities other than the direct operation or maintenance of the Common Areas, or (C) whose position is at or above the level of property manager;

3

(xiii) principal or interest on debt or amortization payments on any mortgages or deeds of trust or any other debt for borrowed money and amortization of improvements; (xiv) depreciation of Landlord's original investment in the Shopping Center; (xv) amounts paid by Landlord to affiliates of Landlord for services in connection with the Common Areas, to the extent such fees are in excess of the ordinary and reasonable fees paid in arms' length transactions; (xvi) rents and other charges payable to underlying landlords including any charges arising due to violations of such leases; (xvii) costs of enforcing leases against other tenants; (xviii) maintenance by Landlord of the items required by Landlord to be maintained under Section 6.1; (xix) expenses related to vacant space, including utility costs, security and renovation; (xx) costs of providing security services to the extent the same disproportionately benefit a particular tenant or group of tenants (e.g., the costs of security personnel to the extent they spend a disproportionate amount of their time performing crowd control or similar measures for a particular tenant); (xxi) costs related to investigation of, testing for, removal and/or clean-up of Hazardous Materials; (xxii) the purchase of art work, sculptures or other similar purchases or (xxiii) any interest, fine or penalty for late payment or non-payment by Landlord of ECR Expenses or Common Area Charges.

(e) "**Common Areas**" means those parts of the Shopping Center provided by Landlord for the common use of all tenants, including, among other facilities, parking areas, driveways, the portion of the ring road within the Shopping Center, sidewalks, landscaping, loading areas, private streets and alleys, lighting facilities, drinking fountains, identification signs and directional signs for the Shopping Center and Development, and public toilets, if any, exclusive of (i) buildings and associated truck ramps, wells and trash compactors exclusively for the use of one tenant, (ii) any outside sales area contained within an individual building area, and (iii) any future buildings, when and if same are actually constructed (except this does not exclude additional common areas associated with such future buildings).

(f) "**Comparable Replacement Tenant**" means a tenant or occupant that (i) on a regional or national basis, operates under the same trade name at least 20 high quality retail stores comparably sized to the Co-Tenancy Premises in the Development occupied by such tenant or occupant, in a manner which is consistent with a first class promotional shopping center in the metropolitan area in which the Premises are located, and (ii) operates as one of the following: books and music store, crafts store, department store, discount department store (e.g., Target or Wal-Mart), drug store, electronic equipment/appliance store, home improvements store, office supply store, pet store, soft goods store, supermarket or warehouse department store (e.g., Costco or Sam's Club).

(g) "**Delivery Date**" means, subject to the provisions of Section 2.3 below and of Articles 9.1 through 9.4 of Exhibit C, the date upon which all of the following conditions precedent have been fulfilled by Landlord: (i) the "Landlord's Work" (as defined in Article 1(i) of Exhibit C) is "Substantially Complete" (as defined in Article 9.4 of Exhibit C); (ii) Landlord and Tenant have conducted the punch list inspection of the Premises described in Article 9.4 of Exhibit C; (iii) at least 60 days have passed since Landlord delivered the "Delivery Notice" (as defined in Article 9.2 of Exhibit C) to Tenant; (iv) Landlord has constructed "Pylon Sign #3" (as defined in Section 7.1); (v) Landlord has delivered to Tenant a set aside letter (or multiple set-aside letters with one for each of the three draws against the Allowance) from Frost National Bank (Landlord's construction lender) in form acceptable to Tenant stating that the Allowance (as defined in Article 8 of Exhibit C) has been set aside in accordance with the terms of the Lease and providing for an agreement acceptable to Tenant governing draws; (vi) Landlord has delivered possession of the Premises to Tenant free and clear of all prior tenancies, with any signage, furniture, equipment or trade fixtures of any prior occupant removed and with any damage caused by such removal repaired to Tenant's reasonable satisfaction at no cost to Tenant; (vii) Landlord has delivered to Tenant a copy of the inspection reports submitted by "Landlord's Architectural Barriers Consultant" stating that Landlord's Work, including the "Site Work" (as defined in Article 5 of Exhibit C) complies with the "Texas Architectural Barriers Requirements" (as defined in Section 10[d] below); and (viii) the building identified as the Shopping Center on the Site Plan (or Alternative Site Plan) has been constructed with all walls up and the roof installed, as may be modified by Landlord per its rights in Section 1.1(d). The parties acknowledge that Tenant, as a part of Tenant's Work, is required to obtain a final certificate of occupancy for the Premises, if Fort Bend County issues a certificate of occupancy. However, if Fort Bend County issues a certificate of occupancy and Tenant is delayed in obtaining such final certificate of occupancy due to any failure of Landlord's Work to comply with the requirements of a Governmental Authority or any failure of Landlord otherwise to comply with the requirements of a Governmental Authority (excluding any such requirement the compliance with which is Tenant's responsibility pursuant to Article 3.1 of Exhibit C), then for purposes of determining the Commencement Date and the Rental Commencement Date under this Lease, the Delivery Date will be deemed extended by the number of days that Tenant is delayed in obtaining such permanent certificate of occupancy by virtue of such non-compliance.

(h) "**Environmental Laws**" means all Laws relating to (i) emissions, discharges, spills, releases or threatened releases of Hazardous Materials onto or into, or the presence of Hazardous Materials on or in, land, ambient air, surface water, groundwater, watercourses, publicly or privately owned treatment works, drains, sewer systems, wetlands, or septic systems, (ii) the use, treatment, storage, disposal, handling, manufacturing, transportation, or shipment of Hazardous Materials, or (iii) the protection of human health or the environment.

(i) "**Floor Area**" means the floor area in square feet at each level or story of buildings in the Shopping Center, including mezzanines (if same are used as retail sales area), measured from the outside surfaces of exterior walls and the center lines of party walls (but for purposes of determining the Floor Area of the Premises, no wall will be deemed to exceed 12" in width), and including the area of permanent outside sales areas and garden shops even if not under roof. Floor Area will not include the area of: temporary outside sales areas; the upper levels of any deck/platform areas used for storage of merchandise (including mezzanine areas); and loading docks and areas covered by exterior canopies or overhangs (except to the extent enclosed and used as retail sales area).

(j) "**Governmental Authority**" means any local, regional, state or federal governmental entity, agency, court, judicial or quasi-judicial body, or legislative or quasi-legislative body, present or future.

4

(k)     "**Gross Sales**" means the gross receipts from merchandise sold or services rendered upon the Premises, but excluding the following to the extent same are included:  (i) all refunds, exchanges, returns, discounts, or allowances made for damaged or returned merchandise; (ii) sales to employees; (iii) bulk sales or closeouts of merchandise sold at less than Tenant's cost; (iv) receipts from the sale of "leader items;" "leader items" will mean those items of merchandise advertised as promotional items to attract customers to the Premises and sold at either no profit or a very low profit margin not exceeding the greater of 2% of Gross Sales or $250,000 per year; (v) any taxes collected for any Governmental Authority, including, but not limited to, sales or excise taxes or similar taxes; (vi) sales of trade fixtures or store operating equipment; (vii) vending machine sales and pay telephone receipts; (viii) any intracompany transfers of merchandise; (ix) amounts in excess of Tenant's cash sale price charged for shipping or insurance or for interest or finance charges on sales made on credit or under a time payment plan or layaway plan; (x) charges paid by Tenant or its customers to credit card companies in accordance with credit card purchase plans; (xi) sale of gift certificates, provided, however, that the cash sale price of any item purchased with such a certificate at the Premises will be included in Gross Sales; (xii) receipts from the sale of hunting, fishing and/or game licenses, park permits, camp stamps or migrant bird permits; (xiii) receipts from sales of airline tickets, tickets for sporting events, ski resort lift tickets and all Datatix, Ticketmaster or other similar ticket sales; (xiv) receipts from sales of tickets for events conducted not for purposes of profit; (xv) workroom or similar charges for alterations, assembly, repairs or installation of merchandise sold, or similar "customer convenience" services rendered in connection with merchandise sold (such as tennis racquet stringing, etc.); (xvi) sales of merchandise ordered through the use of Tenant's website or mail order catalogs or filled through Tenant's website or mail order channels, regardless of the place of order or delivery, unless payment is made and accounted for at the Premises; (xvii) postage paid in connection with mail order sales; (xviii) sublease rents and licensee, concessionaire and similar fees, including fees received from the placement or use of any ATM machine within the Premises; (xix) returns to shippers, jobbers, wholesalers or manufacturers; (xx) sums or credits received for the settlement of claims for loss or damage to merchandise; (xxi) any penalties or charges imposed by Tenant on its customers for returned checks; and (xxii) Tenant's accounts receivables which have been determined to be uncollectible for federal income tax purposes; provided, however that such sums actually collected in later years will be included in Gross Sales for such later year.

(l)     "**Hazardous Materials**" means any substance (i) the presence of which requires special handling, storage, investigation, notification, monitoring, or remediation under any Environmental Laws, (ii) which is toxic, explosive, corrosive, erosive, flammable, infectious, radioactive, carcinogenic, mutagenic or otherwise hazardous, (iii) which is or becomes regulated by any Governmental Authority, or (iv) the presence of which causes or threatens to cause a bona fide risk to human health or the environment or a nuisance to the Shopping Center or Premises or to adjacent properties or premises.

(m)     "**Initial Term**" means the period commencing on the Commencement Date and ending on the Expiration Date.

(n)     "**Interest Rate**" means the lesser of (i) the prime rate of interest being quoted at such time by Wells Fargo Bank, N.A., plus 4%, or (ii) the highest lawful interest rate allowed by Laws.

(o)     "**Laws**" means all applicable common law, statutes, ordinances, rules, rulings, regulations, orders and interpretations of any Governmental Authority having jurisdiction.

(p)     "**Lease Year**" means each 12-month period from February 1 through January 31 during the Term, except that if the Commencement Date occurs on a date other than February 1, the first Lease Year will include both (i) the period from the Commencement Date through the next January 31, and (ii) the full 12-month period from the immediately succeeding February 1 through the next January 31 (so that, for example, if the Commencement Date occurs on May 12, 2012, the first Lease Year will be the period from May 12, 2012 through January 31, 2014 and the Expiration Date will be January 31, 2023)).

(q)     "**Permitted Encumbrances**" means those liens, easements, restrictions and encumbrances affecting the Shopping Center that are listed on Exhibit F.

(r)     "**Premises Tax Parcel**" means the tax parcel that includes the Premises, as established by the Governmental Authority that is responsible for assessing and collecting Real Estate Taxes; provided that any portion of such tax parcel that constitutes land held for future development will be excluded from the Premises Tax Parcel.

(s)     "**ECR**" collectively means that certain Easements with Covenants and Restrictions Affecting Land, dated February 8, 2007, by and among Wal-Mart Stores Texas, LP, Landlord and MRPL Retail Partners II, Ltd. ("MRPL II"), recorded under Clerk's File No. 2007017378 in the Official Records of Real Property in Fort Bend County, Texas, as supplemented by that certain Supplement to Easements with Covenants and Restrictions Affecting Land, dated August 29, 2007, by and among Landlord, MRPL II, and Kohl's Illinois, Inc. ("Kohl's'), recorded under Clerk's File No. 2007109573 in the Official Records of Real Property in Fort Bend County, Texas, as amended by that certain First Amendment to Supplement of Easements with Covenants and Restrictions Affecting Land, dated August 2008, by and among Landlord, MRPL II, and Kohl's, recorded under Clerk's File No. 2008101907 of the Official Records of Real Property in Fort Bend County, Texas.

(t)     "**Real Estate Taxes**" means all real property taxes and assessments that become due and payable during the Term after the Rental Commencement Date and are assessed by any taxing Governmental Authority against the Premises Tax Parcel, reflecting the maximum discount, if any, available by making early payment (regardless of whether early payment is actually made) and less any rebates, credits or abatements from such authorities which are granted or agreed upon with respect to the Premises Tax Parcel; provided, however, that

as regards any assessment which under Laws may be paid in installments, there will be included within the meaning of the term "Real Estate Taxes" with respect to any tax fiscal year only the current annual installment. Real Estate Taxes will not include any of the following: (i) any assessments for highway, street or traffic control improvements, sanitary or storm sewers, utilities, or for other on-site or off-site improvements of any nature whatsoever made in connection with the development or improvement of the Shopping Center; (ii) any franchise, gift, estate, inheritance, conveyance, transfer, capital investment or other tax assessed against Landlord or Landlord's heirs, successors or assigns; (iii) any income, excess profits or other tax, assessment, charge, or levy on the Rent payable by Tenant under this Lease; (iv) any property tax applicable to any land or improvements not within the boundaries of the Premises Tax Parcel; (v) any interest, fine, or penalty for late payment or nonpayment by Landlord of any Real Estate Taxes; or (vi) any increased assessments which result and are permissible by Laws solely as a result of transfers in ownership of the Shopping Center or any portion thereof or any increases in valuation or tax basis resulting therefrom.

        (u)      "**Rent**" means the Base Rent, Alternative Rent and Additional Rent.

        (v)      "**Rental Commencement Date**" means, subject to the provisions of Article 3.6 of Exhibit C, the later of (i) the Commencement Date, or (ii) the date on which each of the conditions precedent to the occurrence of the Delivery Date set forth in Section 1.3(g) is met. Notwithstanding the foregoing, if Tenant accepts delivery of the Premises in writing prior to a Permitted Delivery Date and opens for business within the Premises, the Rental Commencement Date will be the date Tenant opens for business to the public within the Premises, but the Base Rent only will be reduced by one-half from the date of the earlier opening to January 29, 2012, as an incentive for Tenant to open early in the Shopping Center.

        (w)      "**Sign Criteria**" means the criteria for signage within the Shopping Center as set forth on Exhibit J attached hereto. Any change to the Sign Criteria will be subject to the prior written approval of Tenant, which approval will not be unreasonably withheld.

        (x)      "**Term**" means the Initial Term and any Extension with respect to which Tenant exercises its option pursuant to Section 2.6.

**2.**      **DEMISE, CONSTRUCTION AND TERM**

        **2.1**      **Demise.**  Upon the terms and conditions set forth in this Lease, Landlord leases to Tenant, and Tenant leases from Landlord, the Premises, together with the nonexclusive right to use the Common Areas, for the Term. Landlord grants to Tenant and its subtenants, licensees and concessionaires and their respective customers, invitees and employees, the benefit of all easements created under the ECR that are intended for the benefit of the occupants of the Premises and their respective customers, invitees and employees.

        **2.2**      **Construction.**  Construction of Shopping Center "Site Work" (as defined in Article 5 of Exhibit C), the "Building Shell" (as defined in Article 6 of Exhibit C) for the Premises and the "Leasehold Improvements" (as defined in Article 7 of Exhibit C) within the Premises will be accomplished pursuant to Exhibit C.

        **2.3**      **Delivery on Permitted Delivery Date.**  In no event will Tenant be required to accept possession of the Premises on any date that is not a Permitted Delivery Date and in the event the conditions precedent to the Delivery Date set forth in Section 1.3(g) are satisfied on a date that is not a Permitted Delivery Date, the Delivery Date will, for all purposes, be delayed until the next Permitted Delivery Date, unless Tenant waives such requirement in writing (which Tenant will have the right to), in which case (a) the Delivery Date will be the date on which the foregoing conditions were satisfied (regardless of the fact that one or more of such conditions may have been satisfied on a date that was not a Permitted Delivery Date), and (b) commencing on the later of the Rental Commencement Date or the date on which Tenant is first obligated to pay Base Rent pursuant to Section 3.1(a) and continuing for a period of time equal to the number of days from the Delivery Date to the next Permitted Delivery Date, Base Rent will be abated and in lieu thereof Tenant will pay Landlord Alternative Rent on a monthly basis, 45 days after the end of each calendar month.

        **2.4**      **Measurement of Premises.**  The Floor Area contained (or contemplated to be contained after construction) in the Shopping Center and Premises is set forth in Sections 1.1(d) and 1.1(e) respectively. Without limiting Tenant's rights pursuant to Exhibit C to review and approve the "Preliminary Plans" (as defined in Article 4.1 of Exhibit C) for the Building Shell, Tenant will have the right to reject such Preliminary Plans if they do not call for Premises that will have at least 99% of the Floor Area stated in Section 1.1(e). Landlord agrees to have the Premises measured and have such measurement certified to by a licensed architect on or before the Delivery Date in accordance with the provisions of this Section 2.4. Prior to Tenant's execution of the Commencement Agreement described in Section 2.5, Tenant may object to such certification by notice to Landlord. If Tenant objects to Landlord's architect's measurement of the Premises, together with its notice of objection, Tenant will specify the Floor Area it believes the Premises contain. The parties will make reasonable efforts to resolve their differences. If, within 30 days after Tenant's objection, the parties have not resolved their differences, each will name an architect within 10 days thereafter. Within 10 days after being named, such architects will name a third architect, who will, within 20 days, measure the Premises. The measurement of the third architect will be averaged with either Landlord's or Tenant's architect's measurement, whichever is closer thereto, which averaged amount will be deemed the correct Floor Area of the Premises. The party whose measurement was not averaged with that of the third architect will pay the fees and expenses of the third architect, and each party will pay the fees and expenses of its own architect. Upon final determination of the Floor Area of the Premises in accordance with the foregoing provisions, the amounts of Base Rent set forth in Section 1.1(i) above and any other amounts under this Lease that are calculated with reference to the Floor Area of the Premises will be adjusted accordingly, and such adjustment

will apply from the Rental Commencement Date.  However, if the actual measurement of the Floor Area of the Premises determines that such Floor Area is in excess of the Floor Area for the Premises called for by the "Final Plans" (as defined in Article 4.1 of Exhibit C) for the Building Shell approved by Tenant, then for purposes of calculating Base Rent and any other amounts under this Lease that are calculated with reference to the Floor Area of the Premises, the Premises will be deemed to have the Floor Area called for by such Final Plans.  Irrespective of any variance in the Floor Area of the Premises, in no event will the frontage of the Premises be less than the lineal frontage set forth in Section 1.1(e), unless such variance is called for by such Final Plans.  Nothing set forth in this Section 2.4 will be deemed to modify in any respect Landlord's obligation to construct the Building Shell in accordance with the Final Plans for the Building Shell pursuant to the provisions of Exhibit C.

2.5    **Commencement Agreement.**  Landlord and Tenant agree to sign on or before the 60th day following the later of the Rental Commencement Date or the date on which Landlord delivers to Tenant the architect's certified measurement of the Floor Area of the Premises described in Section 2.3, a Commencement Agreement in the form of Exhibit D, setting forth the Delivery Date, the Commencement Date of the Initial Term, the Rental Commencement Date, the Expiration Date, the Floor Area of the Premises, the amounts of Base Rent payable by Tenant during the Term and each Extension with respect to which Tenant exercises its option pursuant to Section 2.6 and the date by which Tenant must give notice to Landlord to exercise each Extension.  Such Commencement Agreement will thereafter be conclusive of such information.

2.6    **Options to Extend Term.**  Tenant will have options to extend the Term for the number of Extensions set forth in Section 1.1(h).  Each option will be exercisable by notice given to Landlord at least 365 days prior to the last day of the Initial Term or then effective Extension, as the case may be, provided that no such notice will be deemed effective, at Landlord's option, if given at a time when a monetary Event of Default in the payment of Base Rent exists pursuant to Section 14.1(a).  Upon receipt of each such notice, this Lease will be extended for the period specified in Section 1.1(h) without the necessity for the execution of any further instrument and upon the same terms, conditions, covenants, and agreements as are contained in this Lease, except that the Base Rent for each Extension will be as set forth in Section 1.1(i).  If Tenant neglects to exercise timely any option to extend the Term, Tenant's right to exercise such option will not expire until 15 days after receipt by Tenant of notice from Landlord of Tenant's failure to exercise such option.  Time is of the essence with respect to this Section 2.6.

2.7    **Holdover Tenancy.**  If Tenant remains in possession of the Premises after the expiration of the Term without execution of a new lease or of an agreement extending the Term, Tenant will be deemed to be occupying the Premises as a tenant from month to month, subject to all of the terms of this Lease as may be applicable to a month to month tenancy, except that (a) for the first 30 days after the expiration of the Term, the monthly installment of the Base Rent will be equal to 125% of the Base Rent set forth in Section 1.1(i) for the 12-month period prior to expiration of the Term and (b) after the expiration of such 30 day period, the monthly installment of the Base Rent will be equal to 150% of the Base Rent set forth in Section 1.1(i) for the 12-month period prior to expiration of the Term, and either Landlord or Tenant may terminate this Lease upon 30 days' notice to the other.

3.    **RENT**

3.1    **Commencement of Rent.**  Notwithstanding anything to the contrary contained in this Lease, no Rent will begin to accrue until the Rental Commencement Date or such later date as may be established for the commencement of such accrual pursuant to Section 3.1(a).  Tenant covenants and agrees to pay Landlord at Landlord's Rent Address, or such other persons or entities or at such other places as Landlord may designate by notice to Tenant, the Rent set forth below in this Section 3.

(a)    Initial Co-Tenancy Requirement.  If on the Rental Commencement Date the Initial Co-Tenancy Requirement is not satisfied, then, as provided in Section 16.6, Tenant will not be obligated to open the Premises for business prior to such time as the Initial Co-Tenancy Requirement is satisfied and until the earlier of the date on which Tenant opens the Premises for business or the date on which the Initial Co-Tenancy Requirement is satisfied, Tenant's obligation to pay Rent will be abated.  If Tenant elects to open the Premises for business prior to the satisfaction of the Initial Co-Tenancy Requirement, then from the later of the Rental Commencement Date or the date of such opening until such time as the Initial Co-Tenancy Requirement is satisfied, Tenant will pay Additional Rent as otherwise required under this Lease and, in lieu of Base Rent, Tenant will pay to Landlord on a monthly basis, 30 days after the end of each calendar month, Alternative Rent.  If the Initial Co-Tenancy Requirement is not satisfied within 12 months after the Rental Commencement Date, then Tenant will have the right at any time thereafter until the Initial Co-Tenancy Requirement is satisfied to terminate this Lease by notice to Landlord; provided, however, that Landlord will have the right, by notice given to Tenant not earlier than 30 days prior to the end of such 12-month period, to require that Tenant elect either to terminate this Lease effective as of a date selected by Tenant that is not less than 30 nor more than 60 days from the date of Landlord's notice requiring that Tenant make such election or to commence paying full Base Rent (instead of Alternative Rent, if Tenant has previously become obligated to pay Alternative Rent by opening the Premises for business) and Additional Rent (if Tenant has not previously become obligated to pay Additional Rent by opening the Premises for business) effective as of the first day of the month following the month in which Landlord's notice is delivered to Tenant (and if Tenant fails to notify Landlord of Tenant's election to terminate this Lease within 30 days after delivery of Landlord's notice, Tenant will be deemed to have elected to commence paying full Base Rent and Additional Rent and to have waived its right to terminate this Lease as a result of the non-satisfaction of the Initial Co-Tenancy Requirement).  Upon any such termination, the parties will be liable for their respective obligations to the date of termination and will have no liability for obligations arising after that date, except for those obligations which expressly survive termination.

(b)   <u>Evidence of Required Co-Tenant Leases</u>.  Tenant acknowledges that Wal-Mart, Kohl's, Best Buy, Ross and PetSmart are open in the Development as of the Effective Date.  Landlord represents and warrants to Tenant that the leases or occupancy agreements with Best Buy, Ross and PetSmart provide that the initial terms of each lease are as follows:

        i.     Best Buy: August 28, 2009 to January 31, 2020

        ii.    Ross: December 29, 2009 to January 31, 2020

        iii.   PetSmart: May 1, 2010 to April 30, 2020.

**3.2**   **Base Rent**.  Tenant will pay Landlord for each month within the Term after the Rental Commencement Date, the Base Rent set forth in Section 1.1(i).  Base Rent will be payable in advance on the first day of each month in equal installments which will not be decreased, increased or abated except as set forth in this Lease.  If the Rental Commencement Date does not occur on the first day of a calendar month, the Base Rent for the first partial calendar month that the Base Rent is due will be prorated based on the actual number of days within such calendar month after the Rental Commencement Date.  If the Term expires or is terminated on a day which is not the last day of the calendar month, the Base Rent for the final partial calendar month that the Base Rent is due will be prorated based on the actual number of days within such calendar month prior to the end of the Term.

**3.3**   **Common Area Charges**.  Subject to Section 3.7, Tenant will reimburse Landlord, as Additional Rent and in the manner set forth in Section 3.3(c), Tenant's pro rata share of Common Area Charges.

(a)   <u>Computation of Tenant's Pro Rata Share</u>.  Tenant's pro rata share of Common Area Charges will be an amount equal to the product of (i) the total Common Area Charges for such calendar year applicable to the Shopping Center, multiplied by (ii) a fraction having as its numerator the Floor Area of the Premises and as its denominator the Floor Area of the Shopping Center (provided the Floor Area of the Shopping Center used in such fraction will never be less than the number stated in Section 1.1(d)).

(b)   <u>Maximum Payable by Tenant</u>.  Tenant's pro rata share of Common Area Charges excluding insurance premiums and Pylon/Monument Sign Costs (on an annualized basis) will not, prior to the end of the first full calendar year of the Term, exceed the Estimated Common Area Charges set forth in Section 1.1(j). Tenant's pro rata share of "Controllable Common Area Charges" (as defined below) will not increase in any one calendar year thereafter by more than 5% of Tenant's actual or maximum share (whichever is less) of Controllable Common Area Charges for the previous full calendar year.  As used herein, "Controllable Common Area Charges" means all Common Area Charges other than the costs of insurance premiums, utilities, security and snow removal.

(c)   <u>Payment of Common Area Charges</u>.  The Common Area Charges will be paid in the manner set forth in this Section 3.3(c):

(i)   <u>Annual Estimates</u>.  Landlord may reasonably estimate the amounts Tenant will owe for the Common Area Charges for the current full or partial calendar year of the Term.  In such event, Tenant will pay, subject to the provisions of Section 3.3(b), 1/12 of the estimated annual amounts, on a monthly basis, on the first day of each calendar month, together with Tenant's payment of Base Rent.

(ii)   <u>Annual Statement</u>.  On or before the first day of April of each calendar year ("**Statement Deadline**"), Landlord will deliver a statement ("**CAM Statement**") to Tenant certified by Landlord's authorized representative showing:  (A) the amount of the actual Common Area Charges for the preceding calendar year, with a breakdown of amounts by major categories of the Common Area Charges; (B) the amounts paid by Tenant toward the estimated Common Area Charges during the preceding calendar year; (C) any applicable limitation under Section 3.3(b); (D) Tenant's pro rata share and the detail for determining same; and (E) subject to the provisions of Section 3.3(b), any revised estimate of Tenant's obligations for the estimated Common Area Charges for the current calendar year.  In the event Landlord fails to deliver the CAM Statement to Tenant on or before the Statement Deadline, and such failure continues for 30 days after written request therefor from Tenant, in addition to all other remedies available to Tenant under this Lease, at law or in equity, Tenant may elect to suspend the monthly payment of Tenant's estimated Common Area Charges, and for so long as Landlord has not delivered the CAM Statement to Tenant, Tenant will only be required to reimburse Landlord for Tenant's pro rata share of the Common Area Charges quarter-annually, in arrears, payable to Landlord within 30 days after receipt by Tenant of information similar to that to be provided in the CAM Statement and proof reasonably satisfactory to Tenant of the amount of Tenant's pro rata share of the Common Area Charges for the preceding three-month period.

(iii)   <u>Differentials</u>.  If the CAM Statement shows that Tenant's estimated payments were less than Tenant's actual obligations for the Common Area Charges for the preceding calendar year, Tenant will pay the difference within 30 days after Tenant receives the CAM Statement.  If the CAM Statement shows an increase in Tenant's estimated payments for the current calendar year, Tenant will also pay the difference between the new and former estimates for the period from January 1 of the current calendar year through the month in which the CAM Statement is sent, subject to the limitation in Section 3.3(b).  If the CAM Statement shows that Tenant's estimated payments exceeded Tenant's actual obligations for the Common Area Charges, Tenant will receive a refund of such excess within 30 days after the CAM Statement is due.  If Landlord fails to remit such refund to Tenant when due, then in addition to any other rights or remedies available to Tenant under Section 14.2, Tenant may offset the amount due, plus interest thereon at the Interest Rate from the date due until the date so offset, against the next accruing amounts of Rent due under this Lease.

(iv)    <u>Partial Calendar Years</u>.  If the Rental Commencement Date commences other than on January 1, or the Term ends other than on December 31, Tenant's obligations to pay estimated and actual amounts toward the Common Area Charges for such partial calendar years will be prorated on the basis of the portion of such calendar years included in the Term following the Rental Commencement Date.  Such proration will be made by multiplying the total estimated or actual (as the case may be) Common Area Charges for the partial calendar year in question, by a fraction having as its numerator the number of days of the Term following the Rental Commencement Date within the partial calendar year, and as its denominator "365."

3.4    **Real Estate Taxes**.  Subject to Section 3.7, Tenant will reimburse Landlord, or pay directly to the taxing Governmental Authority, as Additional Rent and in the manner set forth in Section 3.4(a), Tenant's pro rata share of Real Estate Taxes.

(a)    <u>Computation and Payment of Tenant's Pro Rata Share</u>.  Tenant's pro rata share of Real Estate Taxes will be an amount equal to the product of (i) all Real Estate Taxes, multiplied by (ii) a fraction having as its numerator the Floor Area of the Premises and as its denominator the Floor Area of all buildings within the Premises Tax Parcel.  Landlord will pay the Real Estate Taxes for such tax fiscal year and Tenant will pay its pro rata share of such Real Estate Taxes to Landlord on or before the later of (A) 30 days following Tenant's receipt from Landlord of a copy of the taxing Governmental Authority's tax bill for such Real Estate Taxes together with a detailed statement from Landlord showing Tenant's pro rata share of such Real Estate Taxes due and the calculations made for determination of the same, including at Tenant's request, any tax parcel map(s) reasonably necessary to determine the propriety of such Real Estate Taxes, or (B) 30 days before such Real Estate Taxes become delinquent or, if Landlord must pay earlier in order to receive a discount, 30 days before the date on which such Real Estate Taxes must be paid in order to receive the maximum available discount.  Landlord has estimated that Tenant's pro rata share of Real Estate Taxes for the first full tax fiscal year of the Term will be approximately the Estimated Real Estate Taxes set forth in Section 1.1(k).

(b)    <u>Proration at Beginning and End of Term</u>.  All Real Estate Taxes for any tax fiscal year a portion of which falls within the Term following the Rental Commencement Date and a portion of which falls either before the Rental Commencement Date or after the end of the Term will be prorated by multiplying the amount of Real Estate Taxes for such tax fiscal year by a fraction having as its numerator the number of days in such tax fiscal year that fall within the Term following the Rental Commencement Date and having as its denominator the total number of days in such tax fiscal year.

(c)    <u>Right to Contest</u>.  Landlord will, within 30 days of receiving notification thereof, send to Tenant notice of all assessments for Real Estate Taxes.  If Landlord fails to file a contest of the amount or validity of Real Estate Taxes for such tax fiscal year within 30 days after Tenant's written request to Landlord to do so, then Tenant will have the right, at Tenant's expense, to contest the amount or validity of Real Estate Taxes for such tax fiscal year by appropriate administrative and legal proceedings brought either in Tenant's name, Landlord's name or jointly with Landlord, as Tenant may deem appropriate, by counsel selected and engaged by Tenant.  Landlord will execute and deliver to Tenant whatever documents may be necessary or proper to permit Tenant to contest Real Estate Taxes or which may be necessary to secure payment of any refund which may result from any such proceedings.  Any refund resulting from a proceeding brought either by Tenant or Landlord or by them jointly will be applied first to reimburse the party or parties who brought the proceeding for the costs incurred with the proceeding, and then to reimburse Tenant for the difference between the amount Tenant paid for Real Estate Taxes for each fiscal tax year involved in the proceeding and the amount Tenant would have been required to pay if the Real Estate Taxes had been assessed in accordance with the decision rendered in the proceeding, together with interest on the amount of such difference at the annual rate allowed by the court on the overpayment of Real Estate Taxes.  Any remaining balance will be paid to Landlord.

(d)    <u>Payment by Landlord</u>.  Landlord will pay or cause to be paid to the appropriate Governmental Authorities, prior to delinquency, all taxes, assessments, levies or related charges due and payable to such authorities with respect to all portions of the Shopping Center.

3.5    **Right to Inspect Books**.  Within 30 days after notice from Tenant, Landlord will deliver to Tenant, for inspection at the offices of Tenant or its auditors, copies of such back-up information as reasonably may be requested by Tenant to support or explain the amounts shown on any CAM Statement or invoice received by Tenant from Landlord for Tenant's pro rata share of Real Estate Taxes, including, without limitation, copies of applicable general ledger entries and invoices.  Landlord will keep or cause to be kept the books and records applicable to such Common Area Charges and Real Estate Taxes for a period of not less than three (3) years following the date of Tenant's receipt of any CAM Statement, but, in the event of any dispute, such books and records will be retained until the final determination of such dispute.  In addition to receiving back-up information, Tenant or Tenant's auditors will have the right on at least 10 days' notice to audit and copy, on a non-contingency fee basis, at reasonable times and in a reasonable manner at the offices where Landlord maintains the same, such of Landlord's books of account and records as pertain to Common Area Charges or Real Estate Taxes for up to three years after Tenant receives a CAM Statement, but no more than once during each calendar year and no more than once with respect to any calendar year under inspection.  Tenant will waive its right to audit any calendar year if Tenant does not elect to audit within three years of receipt of the CAM Statement for such calendar year and Tenant may not audit the CAM Statement on a contingency fee basis.  Tenant will promptly deliver to Landlord a copy of the report issued as a result of such inspection or audit.  In the event the report discloses any overpayment or underpayment of Common Area Charges or Tenant's pro rata share of Real Estate Taxes due, the party owing such sums will reimburse the other party for all such sums owing within 30 days after its receipt of the inspection or audit report.  If any inspection or audit report reveals an overstatement of Common Area Charges in any CAM Statement or an overstatement of Tenant's pro rata share of Real Estate Taxes in any invoice received by Tenant from Landlord of more than 3% or an overcharge to Tenant of $1,000 or more, then Landlord will immediately pay to

9

Tenant (a) the costs and expenses of the inspection or audit (but in no event more than $15,000 for each year inspected or audited), and (b) interest at the Interest Rate on the overcharge included in each payment made by Tenant of Tenant's pro rata share of Common Area Charges or Real Estate Taxes, as applicable (which overcharge per payment, in the case of Tenant's estimated payments of Tenant's pro rata share of Common Area Charges, will be calculated by dividing the total overpayment evenly over all monthly estimated payments for the subject year) from the date each such payment was made by Tenant until the date reimbursed to Tenant by Landlord. In the event Landlord fails to deliver such back-up information or to permit Tenant or Tenant's auditors to audit or copy Landlord's books and records pertaining to Common Area Charges or Real Estate Taxes in accordance with this Section 3.5, and such failure continues for 30 days after notice thereof from Tenant, in addition to all other remedies available to Tenant under this Lease, at law or in equity, Tenant may elect to suspend all payments of Tenant's pro rata share of Common Area Charges or Real Estate Taxes, as applicable, until Landlord permits such copying or auditing.

      **3.6**   **Utilities.**

          (a)   <u>Separate Metering</u>. Landlord will furnish and install, without expense to Tenant, all electric, water, gas, telephone, sanitary and storm sewer lines to the Premises and equipment required to provide service as described in <u>Exhibit C</u>. All hook-up, tap, impact and similar fees payable in relation to the furnishing or installation of such utilities will be the responsibility of Landlord. In addition, Landlord will, at Landlord's sole cost and expense, provide separate meters to measure Tenant's individual consumption of utilities.

          (b)   <u>Payment of Utility Bills</u>. Tenant will promptly pay all charges (based on consumption) for electricity, water, gas, telephone service, sewer service, and other utilities furnished to the Premises directly to the utility providing such service. Tenant will be entitled to any credits, rebates or other monies payable with respect to the Premises by Governmental Authorities or utility providers for the use of particular equipment or fixtures, including, but not limited to, those rebates given for use of energy efficient lighting or air conditioning systems.

      **3.7**   **Rent Invoices; Waiver of Recovery of Certain Charges.** All invoices from Landlord to Tenant for any Rent due under this Lease will be sent to Tenant's Rent Invoices Address or to such other address as Tenant may designate by notice to Landlord. If Landlord fails to invoice Tenant for any Common Area Charges or Real Estate Taxes due from Tenant within 18 months after the last day of the calendar year during which such expense was incurred, Landlord's right to recover such charge or expense will be deemed to have been waived.

      **3.8**   **Late Payments.** If Tenant does not pay any installment of Base Rent or other Rent under this Lease when due and such failure continues for more than 10 days after notice thereof from Landlord, or if for a third or subsequent time in any calendar year Tenant fails to pay any installment of Base Rent when due, then such overdue amount will bear interest at the Interest Rate from the date when the payment was due until the date Tenant pays the overdue amount with interest.

**4.**   **COMMON AREAS**

      **4.1**   **Right to Use Common Areas.** Landlord hereby grants to Tenant and Tenant's customers, invitees and employees for the entire Term, a nonexclusive easement to use, in common with Landlord, Landlord's customers, invitees and employees and with the other tenants and occupants of the Shopping Center and their respective customers, invitees and employees, the Common Areas for their intended purposes. Landlord agrees to enforce the provisions of the ECR for the benefit of Tenant against any party who is subject to, and is in violation of, the ECR and, if Landlord fails to do so after the notice and cure period provided in Section 14.2, Landlord agrees that Tenant may do so. Landlord further agrees: (i) that the Common Areas will remain open at all times during the Term; (ii) to maintain a no solicitation policy within the Common Areas; (iii) except to the extent required to respond to an emergency, not to cause or permit the performance of any maintenance (other than routine snow and ice removal, trash removal and cleaning), repair, replacement, improvement or alteration of the Common Areas (or any other portion of the Shopping Center, if the maintenance, repair, replacement, improvement or alteration thereof would adversely affect the availability of any portion of the Common Areas for parking or access) during the months of June, August, November, December or January of any year; and (iv) not to allow the use of the Common Areas for carnival type shows, rides, entertainment, outdoor shows, displays (except as similar to that allowable under Section 4.1(a) below), automobile and other product shows, or the leasing of kiosks.

          (a)   <u>Sidewalk Sales and Promotional Events</u>. Tenant will have the right in accordance with Laws and ECR to display merchandise and hold sidewalk sales on the sidewalks immediately in front of the Premises and to conduct promotional events and tent sales in the parking area in front of the Premises.

          (b)   <u>Storage Trailers and Containers</u>. Tenant will have the right in accordance with Laws and ECR to park storage trailers and/or containers (including, but not limited to, those associated with Tenant's grand opening activities) in the Common Areas behind the Premises immediately adjacent to the Premises, provided such trailers do not block the vehicular or pedestrian access, ingress and egress to and from the rear of the Shopping Center.

          (c)   <u>Trash Compactor</u>. Tenant will have the exclusive right and easement, without payment of Additional Rent under this Lease, to install in compliance with Laws and ECR at a location behind the Premises a trash dumpster and/or trash compactor in the area shown on the Site Plan as "Trash Area" and Landlord will not install, or permit anyone else to install, any dumpster, compactor or other equipment or facility within that 10-foot wide portion of the Common Areas located adjacent to the rear wall(s) of the Premises that is bounded on one side by the rear wall(s) of the Premises, on the opposite side by the line(s) parallel with, and 10 feet distant from, the rear

10

wall(s) of the Premises and on each end by a 10-foot line that is the extension of a side wall of the Premises. Tenant will install such dumpster or compactor, thereafter Tenant will pay for collection of its own trash and Landlord will include only the cost of trash collection for the Common Areas in Tenant's pro rata share of Common Area Charges. Costs incurred by Landlord in connection with trash collection for other tenants or occupants of the Shopping Center will not be included in Tenant's pro rata share of Common Area Charges if Tenant separately pays for its own trash collection.

(d)    Satellite and Solar Energy Systems.  Tenant will have the right without the payment of any additional Rent to use the roof of the Premises for the installation of (i) satellite communications dishes or antennae, together with ancillary equipment, in order to provide music, video, internet or other communications to the Premises (but not to provide any communications services to anyone other than an occupant of the Premises), and/or (ii) photovoltaic cells or other equipment that utilizes solar energy to provide heat, air conditioning, electricity or other energy services to the Premises (collectively, "**Rooftop Equipment**"), provided that Tenant will install any Rooftop Equipment in accordance with all Laws and ECR and, prior to installation, Tenant will submit plans and specifications for any proposed Rooftop Equipment to Landlord for Landlord's review and approval, which approval will not be unreasonably withheld or delayed so long as the proposed Rooftop Equipment, its proposed location on the roof of the Premises which will be substantially shielded from visibility from the frontage of the Shopping Center and its proposed manner of installation will not overload or otherwise materially and adversely affect the structure or membrane of the roof and will comply with any requirements of the warranty covering the roof. Such installation will be performed by Landlord's roofing contractor at Tenant's sole cost and expense, provided Tenant will have the right to pre-approve the cost thereof. Upon Landlord's request at the end of the Term, Tenant will remove all Rooftop Equipment installed by Tenant and repair any damage caused by such removal.

4.2    **Parking Areas**.  At Landlord's sole cost and expense, Landlord will provide parking areas for the use of the customers, invitees and employees of Tenant, consisting of paved areas immediately adjacent to the stores in the Shopping Center, as shown on Exhibit B to this Lease.  The number of parking spaces will never be less than the ratios of 4.5 parking spaces per 1,000 square feet of Floor Area of all non-restaurant premises in the Shopping Center and 10 parking spaces per 1,000 square feet of Floor Area of all restaurant premises in the Shopping Center, with a sufficient number of reserved handicap parking spaces to satisfy the requirements of Laws.  No charge will ever be made (or permitted) by Landlord to any person for the privilege of parking vehicles in the parking areas. The parking areas will have adequate unobstructed entrances and exits to all thoroughfares adjacent to the Shopping Center.  Pick-up and delivery areas and access to such areas will be clearly delineated.  Landlord will provide illumination at all points within open parking and walking areas equal to that of first class shopping centers in the market area; however, notwithstanding anything to the contrary contained in this Lease, all lighting requirements must conform to the "Orders for Regulation of Outdoor Lighting in the Unincorporated Areas of Fort Bend County, Texas," adopted March 23, 2004, as amended, and if any conflict exists between such Orders and the lighting requirements set forth in this Lease, the Orders will control.  Landlord will use Landlord's commercially reasonable efforts to prevent unauthorized use of the parking areas by parties other than tenants of the Shopping Center and their customers, invitees and employees.

4.3    **Maintenance of Common Areas**.  At all times during the Term, Landlord will maintain the Common Areas and all mechanical and lighting equipment, the pylon and/or monument signs thereon in safe and secure first class order, condition and repair and will keep the Common Areas clean and free from rubbish, ice and snow and cause the Common Areas and the pylon and/or monument signs to be well lit during at least such hours as Tenant is open for business and for 30 minutes after Tenant's store is closed for business.  Landlord has conveyed all of the detention ponds shown on Exhibit B to Fort Bend County Municipal Utility District 50 (the "MUD") and the MUD has accepted responsibility for maintaining such detention ponds through the real property taxes it collects which are part of Real Estate Taxes. Landlord will maintain and repaint any directional signs, markers and parking space lines as often as necessary.  Landlord will maintain surfaces of sidewalks and parking areas, in a level and smooth condition with the type of surfacing material originally installed thereon. Landlord will also maintain in accordance with Laws the landscaping on and about the Shopping Center in a manner which will not materially obstruct the visibility of Tenant's storefront and the building/storefront, pylon and monument signs, including in such maintenance the trimming and thinning of trees. Landlord will also maintain or cause to be maintained all parts of the Shopping Center outside the Premises other than the Common Areas in good order, condition and repair. Except to the extent required by emergency, Landlord will not undertake any major repairs or replacements of the Common Areas (such as parking lot repaving or resurfacing) during the months of June, August, November, December or January of any year.

4.4    **Development Restrictions**.

(a)    Protected Accessways.  Landlord will not cause or permit any material change in the size, location or configuration of the curb cuts (points of access), driveways, drive aisles or service drives identified as the "**Protected Accessways**" on Exhibit B from those shown on Exhibit B.

(b)    No Build Area.  Landlord will not construct, or allow any other party to construct, any buildings or improvements in the "**No Build Area**" identified on Exhibit B, other than such buildings or improvements, and replacement thereof, as may be shown in the No Build Area on Exhibit B.

(c)    Outlot Building Size and Height.  Landlord will not construct, or allow any other party to construct, any building on any of the outlots or pads defined as the "**Restricted Outlots**" which exceeds the height or size requirements set forth in the ECR.  The "**Restricted Outlots**" are defined as the following outlots or pads shown on Exhibit B: Outlot O, Outlot P, Outlot Q, Outlot R, Outlot S and Outlot X.

11

(d)    <u>Changes to ECR</u>.  Landlord will not agree to any change to the ECR that would materially and adversely affect Tenant's rights or obligations under this Lease without obtaining Tenant's prior written consent.

(e)    <u>Easements</u>.  Notwithstanding the foregoing, Landlord may grant customary utility and development easements over, across and through the Shopping Center and Development without Tenant's consent; provided such easements do not materially and adversely interfere with Tenant's ability to use and operate from the Premises or result in any additional cost or expense to Tenant or do not violate the Development Restrictions set forth in this Section 4.4.

**4.5    Employee Parking**.  Landlord will designate, and may from time to time change the designation of, the particular parking areas in the Shopping Center to be used by the employees of the various occupants of the Shopping Center ("**Employee Parking Areas**"); provided that any requirement by Landlord that employees park in the Employee Parking Areas will be uniformly imposed upon all tenants of the Shopping Center. Landlord agrees that any designated Employee Parking Areas will impose no unreasonable burden upon the employees of Tenant and will impose no greater safety or security risk upon Tenant's employees than any other parking areas of the Shopping Center.

**4.6    Minimum Clearance**.  Landlord acknowledges that Tenant's standard delivery trailers require a height clearance of not less than 13'6" ("**Minimum Clearance**").  Landlord will, at Landlord's sole cost and expense, take such action as may be necessary or appropriate to achieve the Minimum Clearance at all points within the Common Areas, at the commencement of the Term and throughout the remainder of the Term.

**5.    INSURANCE AND INDEMNITIES**

**5.1    Tenant's Insurance**.  From the date on which Tenant commences Tenant's Work until the end of the Term, Tenant will maintain the following coverages:  (a) commercial general liability insurance on an occurrence basis for the Premises, including contractual liability coverage, having a combined single limit of not less than $5,000,000 per occurrence; and (b) special form (formerly known as all risk) property insurance on Tenant's furniture, trade fixtures, equipment, and merchandise in or on the Premises, in an amount acceptable to Tenant; provided, however, that (i) at any time that Tenant has a net worth of at least $50,000,000, Tenant may in its sole discretion self-insure up to $500,000 per occurrence of such commercial general liability coverage, (ii) at any time that Tenant has a net worth of at least $150,000,000, Tenant may in its sole discretion self-insure all or any portion of such commercial general liability coverage, and (iii) at any time Tenant may in its sole discretion self-insure all or any portion of such special form property coverage.  Upon written request, Tenant will deliver to Landlord a statement evidencing that Tenant meets the net worth requirement of (ii), provided that Landlord first executes a commercially reasonable confidentiality agreement.  All such insurance may be carried in a single policy or a combination of primary and excess liability policies or under a blanket policy covering the Premises and any of Tenant's other stores and be written by a company authorized to do business in the state of the location of the Premises.  Any property policy obtained by Tenant must permit or include a waiver of subrogation in favor of Landlord consistent with the provisions of Section 5.4.  Tenant will provide to Landlord a certificate evidencing the coverage required hereunder.

**5.2    Landlord's Insurance**.

(a)    <u>Property Insurance</u>.  From the date on which Landlord commences Landlord's Work until the end of the Term, Landlord will maintain special form (formerly known as all risk) property insurance (not excluding from coverage perils normally included within the definitions of extended coverage, vandalism and malicious mischief, earthquake and flood) insuring the buildings and other structures (including all improvements, alterations, additions and changes thereto) which are located within the Shopping Center, including, without limitation, the building in which the Premises is located, in the amount of 100% of the replacement cost (excluding excavations and foundations), with endorsements for contingent liability from operation of building laws, increased cost of construction, and demolition costs which may be necessary to comply with building laws.  The insurance required hereby will be written by a company authorized to do business in the state of the location of the Premises and will permit or include a waiver of subrogation in favor of Tenant consistent with the provisions of Section 5.4.  Landlord will be responsible for determining the amount of property insurance to be maintained, but such coverage will be on an agreed value basis to eliminate the effects of co-insurance.  Landlord will provide to Tenant a certificate evidencing such coverage.

(b)    <u>Liability Insurance</u>.  From the date on which Landlord commences Landlord's Work until the end of the Term, Landlord will also maintain commercial general liability insurance on an occurrence basis against claims on account of bodily injury, death or property damage incurred upon any part of the Common Areas.  Such insurance policy will name Tenant as an additional insured on a primary and non-contributory basis, have combined single limits of not less than $5,000,000 per occurrence and include contractual liability coverage.  The insurance required hereby will be written by a company authorized to do business in the state of the location of the Premises.  Landlord will provide to Tenant a certificate evidencing such coverage.

(c)    <u>Proceeds from Property Insurance</u>.  The proceeds of Landlord's property insurance in case of loss or damage will be applied on account of the obligation of Landlord to repair and restore the damaged or destroyed buildings and improvements in accordance with Section 12.

12

**5.3    Indemnities.**

(a)    Tenant's Indemnity. Subject to Section 5.4, Tenant agrees to indemnify, defend and hold Landlord and Landlord's shareholders, officers, directors, partners, members, managers and employees (the "**Landlord Parties**") harmless from and against any and all claims, actions, damages, liabilities and expenses (including, without limitation, reasonable attorneys' fees and expenses) allegedly or actually (i) arising from or out of any accident or occurrence on the Premises or any part thereof, or (ii) occasioned by any act or omission of Tenant or Tenant's employees, agents, contractors, subtenants, licensees or concessionaires, EVEN IF THE LOSS OR DAMAGE IS CAUSED OR ALLEDGED TO HAVE BEEN CAUSED BY THE NEGLIGENCE OF ANY OF THE LANDLORD PARTIES, except to the extent that any of the same arise from or out of the sole, or gross negligence or willful misconduct of Landlord Parties and are not covered by the commercial general liability insurance maintained by Tenant pursuant to Section 5.1.

(b)    Landlord's Indemnity. Subject to Section 5.4, Landlord agrees to indemnify, defend and hold Tenant and Tenant's shareholders, officers, directors, partners, members, managers, employees, subtenants, licensees and concessionaires (the "**Tenant Parties**") harmless from and against any and all claims, actions, damages, liabilities and expenses (including, without limitation, reasonable attorneys' fees and expenses) allegedly or actually (i) arising from or out of any accident or occurrence on the Common Areas or any part thereof, or (ii) occasioned by any act or omission of Landlord or Landlord's employees, agents or contractors, EVEN IF THE LOSS OR DAMAGE IS CAUSED OR ALLEDGED TO HAVE BEEN CAUSED BY THE NEGLIGENCE OF ANY OF THE TENANT PARTIES, except to the extent that any of the same arise from or out of the gross negligence or willful misconduct of Tenant Parties and are not covered by the commercial general liability insurance maintained by Landlord pursuant to Section 5.2(b).

**5.4    Waiver of Subrogation.** Landlord and Tenant each hereby expressly waives any and every claim which arises or may arise in such party's favor against the other party and the other party's shareholders, officers, directors, partners, members, managers and employees during the Term for any and all loss of or damage to any of such party's property, located within or upon or constituting a part of, the Premises or Shopping Center, which loss or damage is caused by a peril required by this Lease to be covered by the insurance (or a portion through self-insurance as permitted in Section 5.1 above) of the party incurring the loss to the extent of the required coverage or, if greater, to the extent of the actual recovery under any insurance policy covering the party incurring the loss EVEN IF THE LOSS OR DAMAGE IS CAUSED OR ALLEDGED TO HAVE BEEN CAUSED BY THE NEGLIGENCE OF ANY OF THE RELEASED PARTY; provided, however, that the foregoing waivers of subrogation do not invalidate any policy of insurance of the parties hereto now or hereafter issued, it being stipulated by the parties hereto that such waiver will not apply in any case which would result in the invalidation of any such policy of insurance. Each party will notify the other if such party's insurance would be so invalidated. Landlord and Tenant each also hereby waives on behalf of any insurer providing insurance to such party, any right of subrogation which such insurer might otherwise acquire against the other party or the shareholders, officers, directors, partners, members, managers or employees of either party by virtue of losses to Landlord or Tenant the claims for which are waived by the preceding sentence.

**6.    MAINTENANCE OF PREMISES**

**6.1    Landlord's Obligations.** At Landlord's sole cost and expense, Landlord will maintain, repair and replace all structural components of the Premises (including, but not limited to, the foundation, bearing walls and roof structure), the exterior walls, floor slab (and, to the extent repair is required due to the condition of the slab or conditions under the slab, the floor coverings), roof membrane, gutters, downspouts and canopies of the Premises, all plumbing, wiring and other utility facilities within or under the floor slab of the Premises, all plumbing, wiring and other utility facilities serving the Premises up to their points of connection with the meter (but not including the meter) for such utilities serving the Premises, and such portions of the Premises required to be maintained by Landlord under Section 6.2, as necessary to keep the same in good order, condition and repair, ordinary wear and tear and damage by casualty excepted and otherwise keep the roof free of leaks. Tenant, and not Landlord, will make repairs otherwise required to be performed by Landlord by this Section 6.1 if such repair is necessitated by the negligence of Tenant or Tenant's employees, agents or contractors, unless the waiver provisions of Section 5.4 apply. If the performance of any repair required to be made by Landlord pursuant to this Lease precludes the normal operation of Tenant's business from all or any portion of the Premises and Tenant notifies Landlord of such preclusion, then (a) commencing 60 days after Tenant gives Landlord such notice concerning such preclusion, Rent will equitably abate during the performance of such repair in proportion to the nature and extent of the interference with Tenant's normal operation; and (b) if Tenant is precluded from operating its business from 30% or more of the Premises for more than 270 days after Tenant gives Landlord such notice concerning such preclusion, Tenant may terminate this Lease by notice given to Landlord prior to the completion of such repair. .

**6.2    Tenant's Obligations.** At Tenant's sole cost and expense, Tenant will maintain, repair and replace the interior of the Premises (except as set forth in Section 6.1), the windows, doors and plate glass of the Premises, all plumbing, wiring and other utility facilities serving the Premises from and after their points of connection with the meter for such utilities serving the Premises (except for any such facilities within or under the floor slab of the Premises) and, except as set forth in Section 6.3, the heating, ventilating and air conditioning system serving the Premises ("HVAC System"), as necessary to keep the same in good order, condition and repair, ordinary wear and tear and damage by casualty excepted. Landlord, and not Tenant, will make repairs otherwise required to be performed by Tenant by this Section 6.2 if such repair is covered by any construction or product warranty of Landlord or is necessitated by (a) the negligence of Landlord or Landlord's employees, agents or contractors, unless the waiver provisions of Section 5.4 apply, (b) shifting or settling of the building containing the Premises, (c) a design defect in the building containing the Premises, (d) a failure by Landlord to perform maintenance or make

13

repairs required under Section 6.1, or (e) any structural problems which may arise in the Shopping Center which affect the Premises.

6.3     **Heating, Ventilating and Air Conditioning.**  As provided in Section 6.2, Tenant will repair, maintain and replace the HVAC System, as necessary to keep the same in good order, condition and repair which will include Tenant contracting with a HVAC maintenance company to provide for such ordinary seasonal preventative maintenance as may be necessary to maintain the HVAC System in accordance with industry standards; provided, however, that the cost of any repair or replacement of the HVAC System which (a) is required during the last two years of the Initial Term or during any Extension, and (b) exceeds $1,000, will be borne by Landlord and Tenant in proportion to the length of the useful life versus the length of the Term with the useful life of the repair or replacement being deemed to be 10 years with Landlord's participation capped at $25,000.  Accordingly, if any component or part of the HVAC System requires a $10,000 repair or replacement with two years remaining in the then existing Term, then Tenant will make the repair or replacement and may charge to Landlord $8,000, as such amount is the product of $10,000 multiplied by (i) one minus (ii) the fraction having a numerator of two (the years remaining in the then existing Term) and having a denominator of 10 (the useful life of all repairs and replacements as agreed above).  If Tenant later exercises any Extension of the Term, then Tenant will reimburse Landlord for those costs (or portion thereof as appropriate) applicable to such Extension and previously paid by Landlord to Tenant for Landlord's pro rata share of HVAC System repairs and replacements.

6.4     **Surrender of Premises.**  Upon the expiration or earlier termination of this Lease, Tenant will surrender the Premises to Landlord, broom-clean and in good order and condition, ordinary wear and tear and damage by casualty excepted.

7.     **SIGNS**

7.1     **Exterior Signs.**  Tenant will have the exclusive right to install on the outside walls of the Premises signs of such color, size, type, or design as may be deemed desirable by Tenant, provided that any such signs are in compliance with all Laws, the Sign Criteria, and the ECR.  Tenant will have placement on "Pylon Sign #3" shown on Exhibit B ("**Pylon Sign #3**").  Tenant will have the right to install a double-sided sign panel in the second position of Pylon Sign #3, as depicted on Exhibit K attached hereto and incorporated herein ("**Pylon Sign #3 Drawing**") and Tenant's sign panel will be at least as large as any other sign panel installed or to be installed thereon.  Tenant will have the right to use Tenant's standard pylon sign color format of white lettering on a red background on its panels on Pylon Sign #3 as long as such lettering complies with the Fort Bend County Lighting Ordinance.  Tenant will be responsible for the fabrication, installation and maintenance of such sign panel faces.  Landlord will be responsible for the cost and expense of the Pylon Sign #3 and sign cabinets.  If Landlord erects or allows to be erected any additional pylon or monument signs identifying any other occupants of the Development, Tenant will have the right to mount a sign panel thereon of the same size as the largest sign panel permitted by any other tenant.  If Landlord permits any of the occupants of the Development or the Shopping Center whose premises contain the same or less Floor Area as the Premises to be identified on more monument or pylon signs than Tenant is permitted to be identified on pursuant to the foregoing provisions, then Landlord will permit Tenant to competitively bid with such other occupants for the right to be identified on no less than the same number of sign(s).  During the Term, Tenant will not be required to remove its signs unless required to do so by Laws enacted subsequent to the date hereof.  Tenant may at any time remodel or replace the sign fascia to conform with Tenant's then standard signage so long as such signage does not violate any Laws.  Landlord will light such Pylon Sign #3 from dusk until dawn and will keep and maintain said pylon structure in good condition and repair, the cost and expense of which ("**Pylon/Monument Sign Costs**") will be allocated proportionately among all users of such pylon sign structure(s) based on the ratio that the area of their respective sign panels bear to the total area of all users' sign panels on such pylon sign structure(s).  Tenant will be obligated to bear and pay its proportionate share of such utility charges and such other charges as Additional Rent, as such costs are not part of the Common Area Charges, but allocated and charged pro-rata to the users of such signs.  The storefront elevation of the Premises is attached as Exhibit L.

7.2     **Other Signs.**  Notwithstanding anything to the contrary contained in the Sign Criteria, Tenant will have the right to install temporary banner signs (such as "Future Home of [one of Tenant's tradenames]," "Opening [Date]," or "Now Open" signs), on the Premises provided the same comply with Laws and ECR from the Effective Date to 60 days after the Commencement Date, at which all temporary banner signs will be removed.  Tenant will have the right to affix window or door appliqués and other treatments commonly used at Tenant's store locations, including, without limitation, those identifying Tenant's hours of operation or the credit cards accepted by Tenant in accordance with the Sign Criteria.  Tenant will remove all signs and appliqués at the termination of this Lease, and will repair any damage caused by such removal.

8.     **TITLE TO PREMISES**

8.1     **Ownership of Premises.**  Landlord represents and warrants to Tenant that Landlord is the owner of the Premises and the Shopping Center, that there are no other individuals or entities having an ownership interest in the Premises or the Shopping Center whatsoever except as expressly stated in this Lease and that Landlord has full right, power and authority, corporate and otherwise, to execute this Lease, to lease the Premises and to perform the obligations of Landlord under this Lease.  Prior to the Effective Date, Landlord delivered to Tenant a current commitment of title insurance or title report to evidence that Landlord has title to the Shopping Center, that such title is unencumbered by any matters other than the Permitted Encumbrances and that no liens for delinquent taxes exist against the Shopping Center.

8.2     **Covenant of Quiet Enjoyment.**  Landlord covenants that, subject to Section 14.1, Tenant will be entitled to peaceably and quietly enjoy the Premises and all rights and appurtenances thereto during the Term, without molestation or hindrance of any person whomsoever.

14

**8.3    Non-Disturbance Agreement**. Within 60 days of the Effective Date, Landlord will deliver to Tenant agreements of non-disturbance from all lienholders or underlying landlords of the Premises in substantially the form and substance of Exhibit E (provided that any changes to such form must approved by Tenant, which approval will not be unreasonably withheld so long as they would not modify the terms of this Lease or increase any of Tenant's obligations or diminish any of Tenant's rights hereunder). If Landlord fails to deliver such agreements of non-disturbance to Tenant within 60 days from the Effective Date, Tenant will have the right at any time thereafter, until same is received and in addition to other remedies available to Tenant, to terminate this Lease by notice to Landlord. Tenant will also execute any such non-disturbance agreement in the form and substance of Exhibit E to assure such lienholder or underlying landlord of Tenant's attornment to such lienholder or underlying landlord in accordance with the terms hereof.

**8.4    Restrictions**. Landlord represents and warrants to Tenant that (a) Landlord's title to the Shopping Center is subject only to the Permitted Encumbrances, and none of the Permitted Encumbrances prohibits the use of the Premises as a retail sporting goods store, (b) no joinder or approval of another person is required with respect to Landlord's right and authority to enter into this Lease, (c) the terms and conditions of this Lease, including the exhibits attached hereto, are in compliance with and do not violate the provisions of the Permitted Encumbrances, (d) any approvals required pursuant to the Permitted Encumbrances have been obtained, and (e) all approvals required from any underlying landlords have been obtained. In the event that either (i) at any time during the Term that the Premises are being operated as a retail sporting goods store, the use of the Premises as a retail sporting goods store in accordance with the terms of this Lease becomes prevented or materially impaired by any zoning or other Laws, or (ii) at any time during the Term, the use of the Premises for retail purposes in accordance with this Lease (excluding any particular retail use [such as, e.g., the sale of pornography], as opposed to retail use in general, that may be prohibited by the terms of this Lease or by Laws or other restrictions) becomes prevented or materially impaired by any zoning or other Laws, and in either such event Tenant notifies Landlord of such prevention or material impairment, then (A) Tenant's Rent will abate from the commencement of such prevention or material impairment until such prevention or material impairment is terminated, and (B) if Landlord is unable to cure such prevention or material impairment within 120 days after Tenant gives Landlord such notice concerning such prevention or material impairment, then Tenant may terminate this Lease by notice given to Landlord prior to the cessation of such prevention or material impairment, whereupon both parties will be relieved of any further obligations hereunder, except for those obligations which expressly survive any termination hereof.

**9.    COMPLIANCE**

**9.1    As to Premises**. Tenant will, at Tenant's sole cost and expense, comply with all Laws which affect the carrying on of the business being conducted in the Premises, as distinguished from the physical facilities in which such business is being conducted. Landlord will bear the expense of any alterations or improvements or repairs to the Premises ordered by any Governmental Authority, unless such alterations or improvements or repairs (a) relate solely to the type of business conducted in the Premises by Tenant or the manner in which Tenant is conducting Tenant's business in the Premises, or (b) are required solely by virtue of any alterations undertaken by Tenant pursuant to Section 10.1.

**9.2    As to Common Areas**. On the Delivery Date, Landlord will, at Landlord's sole cost and expense, take such action as may be necessary or appropriate to cause the Common Areas and other portions of the Shopping Center outside the Premises throughout the entire Term, to comply with all Laws of all Governmental Authorities having jurisdiction over the Shopping Center.

**9.3    As to Hazardous Materials.**

(a)    Landlord's Obligations. Prior to the Effective Date, Landlord delivered to Tenant a copy of Landlord's most recent Phase I environmental assessment report concerning the Shopping Center and a reliance letter from the consultant who prepared such report entitling Tenant to rely on it ("**Environmental Report**"). Landlord represents and warrants that upon completion of Landlord's construction obligations under Exhibit C (i) the Premises will be in compliance with all Environmental Laws, and (ii) except as set forth in the Environmental Report, there will be no Hazardous Materials in, on or about the Premises or Shopping Center. During the Term, Landlord will not use, generate, place, store, release or otherwise dispose of, or permit the use, generation, placing, storage, release or disposal of, Hazardous Materials in the Shopping Center, except in accordance with all Environmental Laws. If during the Term Hazardous Materials are discovered in any portion of the Shopping Center or the Premises, then unless Tenant is responsible for the remediation of such Hazardous Materials pursuant to Section 9.3(b), Landlord will promptly undertake or cause to be undertaken remediation or removal of the Hazardous Materials in accordance with all Environmental Laws. Landlord will also remediate or remove any mold discovered on or about the Premises during the Term, except to the extent such mold was caused by Tenant's activities or omissions. If the presence of any Hazardous Materials or mold that Landlord is required to remediate or remove pursuant to this Lease or the remediation or removal thereof precludes the normal operation of Tenant's business from all or any portion of the Premises and Tenant notifies Landlord of such preclusion, then (A) Rent will equitably abate during the performance of such remediation or removal in proportion to the nature and extent of the interference with Tenant's normal operation, and (B) if Tenant is precluded from operating its business from 20% or more of the Premises for more than 150 days after Tenant gives Landlord such notice concerning such preclusion, Tenant may terminate this Lease by notice given to Landlord prior to the completion of such remediation or removal or complete such remediation and offset such costs against Base Rent. Landlord will indemnify, defend and hold Tenant and the shareholders, officers, directors, partners, members, managers, employees, agents, contractors, subtenants, assignees, licensees, concessionaires and customers ("**Affiliated Parties**") of Tenant harmless from and against, and reimburse Tenant and Tenant's Affiliated Parties for, all "Hazardous Materials Liabilities" (as defined in Section 9.3(c)) asserted against or incurred by Tenant or Tenant's Affiliated Parties arising out of a breach of the representations, warranties or covenants set forth in this Section 9.3(a).

15

(b)    Tenant's Obligations.  During the Term, Tenant will not use, generate, place, store, release or otherwise dispose of Hazardous Materials in the Premises or Shopping Center, except in accordance with all Environmental Laws. In the event of a breach of the foregoing, Tenant will promptly undertake remediation or removal in accordance with all Environmental Laws. Tenant will also remediate or remove any mold discovered on or about the Premises during the Term to the extent such mold was caused by Tenant's activities or omissions. Tenant will indemnify, defend and hold Landlord and Landlord's Affiliated Parties harmless from and against, and reimburse Landlord and Landlord's Affiliated Parties for, all Hazardous Materials Liabilities asserted against or incurred by Landlord or Landlord's Affiliated Parties as a result of a breach of Tenant's obligations under this Section 9.3(b).

(c)    Hazardous Materials Liabilities.  The term "**Hazardous Materials Liabilities**" as used herein means all claims, damages, losses, forfeitures, expenses or liabilities arising from or caused in whole or in part, directly or indirectly, by a breach by the other party of its representations, warranties or covenants under Section 9.3(a) or (b), including, without limitation, all costs of defense (including reasonable attorneys' fees and other costs of litigation), all consultants' fees, and all costs of investigation, repair, remediation, restoration, cleanup, detoxification or decontamination, and/or preparation and implementation of any closure, remedial action or other required plan.

(d)    Survival.  The provisions of this Section 9.3 will survive the expiration or earlier termination of this Lease.

10.    **ALTERATIONS AND FIXTURES**

10.1    **Alterations and Additions.**  After completion of initial leasehold improvements, if any, Tenant will not make any exterior or structural alterations or additions to the Premises without the prior written consent of Landlord, which consent will not be unreasonably withheld.  It will be reasonable for Landlord to withhold its consent to alterations to the exterior of the Premises if such alterations would result in the Premises not being architecturally harmonious with the exteriors of other tenants in the Shopping Center.  Tenant will have the right in its sole discretion to make any interior, nonstructural alterations or additions or perform any interior remodeling of a nonstructural nature (any alterations or additions or remodeling performed by Tenant will be a "**Tenant Alteration**").

(a)    **Requirements.**  If a building permit is required in connection with making any Tenant Alterations, Tenant will obtain same.  If a Tenant Alteration would involve Texas Architectural Barriers Requirements, Tenant will submit plans and specifications therefor to Landlord's Architectural Barriers Consultant as set forth in Section 10.1(d) below.  Prior to making any Tenant Alterations requiring Landlord's consent, Tenant will give Landlord 30 days prior written notice (or such earlier notice as would be necessary pursuant to applicable law) to permit Landlord sufficient time to post appropriate notices of non-responsibility.  For any Tenant Alterations requiring Landlord's consent, Tenant will (i) furnish Landlord with the names and addresses of all contractors (but not subcontractors) performing Tenant Alterations and copies of all contracts, and (ii) cause all contractors and subcontractors to carry the insurance required under Paragraph 10 of Exhibit C.  Notwithstanding any other provision contained in this Lease, neither Tenant nor its contractors, subcontractors, employees, or agents will cause or allow the ceiling over the Premises or the roof over any part of the building to be pierced or penetrated in any manner (whether by drill, nail, screw, or otherwise) except as pre-approved by Landlord (and then only in strict compliance with any rules, terms, or conditions imposed by Landlord).

(b)    **Completion.**  All Tenant Alterations will be completed during such hours and in such manner as to minimize interference with Landlord or other tenants in the building and Shopping Center and their respective agents and contractors.

(c)    **Consent.**  Landlord may condition its consent upon Tenant furnishing to Landlord and Landlord approving prior to the commencement of any work or delivery of materials to the Premises related to any Tenant Alterations for which Landlord's prior written consent is required such as the following as specified by Landlord: architectural plans and specifications, opinions from engineers reasonably acceptable to Landlord stating the Tenant Alterations will not in any way adversely affect the building's systems, including, without limitation, the mechanical, HVAC, plumbing, security, electrical, and the fire and life safety systems in the building or Shopping Center, necessary permits and licenses, certificates of insurance, and such other documents in such form reasonably requested by Landlord.

(d)    **Texas Architectural Barriers Requirements.**  Prior to commencing any Tenant Alterations, Tenant will submit Tenant's plans and specifications therefor to "Landlord's Architectural Barriers Consultant" (defined in Exhibit "C") for submission to applicable governmental authorities pursuant to Texas Government Code Chapter 469, as amended from time to time, and all laws, rules, and regulations promulgated thereunder (collectively, the "**Texas Architectural Barriers Requirements**"), if so required by law.  Tenant will make all changes to such plans and specifications, if any, required for approval of the same under the Texas Architectural Barriers Requirements.  Once approved by Landlord's Architectural Barriers Consultant, Tenant will submit such plans and specifications to Landlord for Landlord's consent.  Within 14 days following Landlord's receipt of such plans and specifications from Tenant, Landlord will respond in writing and, to the extent such request is denied, state the reason for denial.  Within 30 days after completion of such Tenant Alterations, Tenant will notify Landlord's Architectural Barriers Consultant and allow said consultant or any other party authorized to conduct inspections under the Texas Architectural Barriers Requirements to enter the Premises at all reasonable times upon at least 48 hours notice and accompanied by a representative of Tenant to conduct any and all post-construction inspections required under the Texas Architectural Barriers Requirements.  Promptly after completion of such Tenant Alterations, Tenant will deliver to Landlord written confirmation from Landlord's Architectural

16

Barriers Consultant that such Tenant Alterations comply fully with the Texas Architectural Barriers Requirements. Tenant will be solely responsible for payment of all fees for Landlord's Architectural Barriers Consultant's services and all application and inspection fees related to the Texas Architectural Barriers Requirements.

(e)    **No Warranty.**  In no event will Landlord's supervision or right to supervise any Tenant's Work or Tenant Alterations, nor will any approvals given by Landlord under this Lease (i) constitute any warranty by Landlord to Tenant of the adequacy of the design, workmanship or quality of such work or materials for Tenant's intended use or of compliance with the requirements of this Section 10.1 or (ii) impose any liability upon Landlord in connection with the performance of such work.

10.2    **Fixtures.**  Any trade fixtures, machinery, equipment, shelving, trash compactors, cash registers, signs and other personal property of Tenant will remain the property of Tenant and Landlord agrees that Tenant will have the right, at any time and from time to time during the Term, to remove any of the same which Tenant may have stored or installed in the Premises.  Tenant, at Tenant's sole cost and expense, will immediately repair any damage occasioned to the Premises by reason of the removal of any such trade fixtures, machinery, equipment, signs and other personal property.  All other improvements made by Tenant to the Premises, including, but not limited to, floor coverings, carpeting and partitions, will become the property of Landlord upon expiration or earlier termination of this Lease.

10.3    **Liens.**  Tenant will promptly pay for all materials supplied to Tenant and work done for Tenant with respect to the Premises so as to ensure that no lien is filed against any portion of the Development or Landlord or Tenant's interest therein.  If a lien is filed, Tenant will pay, discharge or otherwise secure such lien at its expense within 30 days after receipt by Tenant of notice thereof, failing which Landlord may at its option discharge the lien by paying the amount claimed to be due in court or directly to the lien claimant and the amount so paid, together with all reasonable expenses of Landlord, including reasonable legal fees, will be paid by Tenant to Landlord as Additional Rent.

**11.    ASSIGNMENT AND SUBLETTING**

11.1    **Permitted Assignment and Subletting.**  Tenant will have the right at any time during the Term, without the consent of Landlord, to sublet the Premises or any portion thereof or to transfer or assign Tenant's interest in this Lease to any person or entity, provided that (a) the use made of the Premises by any such subtenant or assignee complies with the ECR, and the provisions of Sections 16.3 and 16.5 and (b) the Premises will be divided by sublease into no more than two separately demised spaces and one separately demised space in the Premises will contain not less than 20,000 square feet of Floor Area.  Upon any assignment or sublease of this Lease, Tenant will remain liable for all of its obligations hereunder except that Tenant will be released from all obligations hereunder that arise from and after the date of assignment in the event that the assignee expressly assumes Tenant's obligations hereunder arising from and after the date of the assignment and the assignee has a tangible net worth (exclusive of goodwill and intellectual property) of at least $150,000,000.  Notwithstanding the foregoing, if Tenant desires to effect a "Recapturable Transfer" (as defined below), Tenant will provide Landlord with at least 60 days' prior notice of same and Landlord will have the right, by notice given to Tenant within 10 days after delivery of Tenant's notice to Landlord, to elect to terminate this Lease and recapture the Premises, which termination will be effective on the 60th day after the date of Landlord's termination notice unless Tenant, within 10 days after delivery of Landlord's termination notice, notifies Landlord that Tenant will not affect the Recapturable Transfer, in which case Tenant will not affect the same and this Lease will remain in full force and effect.  If Landlord properly gives such notice of termination, this Lease will terminate on the termination date and both parties will be relieved of any obligations hereunder arising after the date of termination, except for any obligations which expressly survive termination.  As used herein (a) an "**Affiliate Transfer**" means an assignment of this Lease or subletting of all or any portion of the Premises to (i) any entity that owns or controls, is owned or controlled by, or is under common ownership or control with, Tenant; (ii) an entity that acquires all, or substantially all, of the assets of Tenant; or (iii) an entity with which, or into which, Tenant is merged or consolidated; (b) a "**Recapturable Transfer**" means any subletting of the Premises or any portion thereof or any assignment of this Lease which subletting or assignment does not constitute an Affiliate Transfer.

11.2    **Recognition.**  If for any reason this Lease is terminated prior to the expiration of the Term, Landlord agrees such termination will not result in a termination of any "Qualified Sublease" (as defined below) and any Qualified Sublease will continue for the duration of its term and any extensions thereof as a direct lease between Landlord and the subtenant thereunder, with the same force and effect as if Landlord had originally entered into such sublease as the landlord thereunder.  Landlord will execute an instrument evidencing Landlord's agreement to recognize a particular Qualified Sublease in accordance with foregoing provisions within 15 days after notice from Tenant that the subtenant thereunder has requested such an instrument.  As used herein, a "**Qualified Sublease**" means a sublease entered into between Tenant and a subtenant (a) that demises a portion of the Premises that contains at least 10,000 square feet of Floor Area, (b) the term of which (including any extension options) does not extend beyond the existing Term of this Lease (including any then-exercised Extensions) at the time such sublease is signed, (c) pursuant to which the subtenant is required to pay a base rent per square foot of Floor Area of the sublet premises at least equal to the Base Rent per square foot of Floor Area of the Premises that would have been payable by Tenant under this Lease for any portion of the sublease term that, by virtue of this Section 11.2, extends beyond the termination of this Lease, (d) after the execution of which there remains no portion of the Premises that has not been sublet and is not marketable due to its configuration, (d) where the subtenant is not an affiliate of Tenant, (e) pursuant to which Landlord will not be bound by any provision in the sublease that creates obligations (on a proportionate basis, if appropriate) on the Landlord under that sublease that are greater than Landlord's obligations under this Lease, and (f) the subtenant's tangible net worth (exclusive of goodwill and intellectual property) as of the date of such recognition is at least $10,000,000.

17

**11.3    Processing Fee.** Tenant will pay $500.00 to Landlord with each and every proposed assignment or sublease request. Such processing fee will be due prior to Landlord reviewing any proposed assignment or sublease (and the aforesaid 30-day period afforded for Landlord's review will not commence until such sum has been paid) and will be non-refundable regardless of whether Landlord approves such assignment or sublease or whether or not such assignment or sublease is ultimately fully executed.

## 12.    DESTRUCTION OF PREMISES

**12.1    Notice of Damage and Estimated Repair Time.** If the Premises or the Shopping Center is damaged or destroyed by fire or other casualty ("**Casualty**"), Landlord will, within 60 days after the date of the Casualty, notify Tenant ("**Landlord's Casualty Notice**") of (a) the percentage of the total Floor Area in the Shopping Center and the percentage of the total Floor Area in the Premises that were damaged or destroyed by the Casualty, and (b) the number of days, from the date of the Casualty, that an architect, engineer or contractor selected by Landlord estimates will be required to complete the repair and restoration. If neither Tenant, pursuant to Section 12.2, nor Landlord, pursuant to Section 12.3, elects to terminate this Lease, then the damage or destruction will, at the expense of Landlord, be repaired and restored.

**12.2    Tenant's Right to Terminate.** If (a) 20% of more of the Premises, or such portion of the Common Areas as would substantially and adversely affect access to, or parking for, the Premises is damaged or destroyed by Casualty and Landlord's Casualty Notice estimates that it will take longer than 180 days from the date of the Casualty to complete the repair and restoration, or (b) during the last two years of the Term, more than 10% of the Floor Area of the Premises is damaged or destroyed by Casualty, then Tenant will have the right to terminate this Lease, effective as of the date of the Casualty, by notice given to Landlord within 15 days after Tenant's receipt of Landlord's Casualty Notice.

**12.3    Landlord's Right to Terminate.** If (a) more than 30% of the Floor Area of the Shopping Center is damaged or destroyed by Casualty, or (b) during the last two years of the Term, more than 30% of the Floor Area of the Premises is damaged or destroyed by Casualty, then Landlord may elect to terminate this Lease effective as of the date of the Casualty by notice given to Tenant not later than 15 days after Landlord delivers Landlord's Casualty Notice to Tenant, provided that (i) in the case of clause (a) above, (A) if the Premises were damaged or destroyed by the Casualty, then Landlord also terminates the leases of all premises in the Shopping Center that were similarly damaged or destroyed, and (B) if the Premises were not damaged or destroyed by the Casualty, then Landlord also terminates the leases of all premises in the Shopping Center, and, in either case, the portion of the Shopping Center as to which Landlord must terminate all leases (as provided above) is not reconstructed or used as a retail shopping center for a period of at least three years following the date of the Casualty, and (ii) in the case of clause (b) above, if Tenant exercises its option to extend the Term for the next Extension (if one which Tenant then has the right to exercise remains unexercised) within 15 days after delivery of Landlord's termination notice, Landlord's termination notice will be deemed null and void. Landlord's covenant to refrain from reconstructing or using as a retail shopping center the portion of the Shopping Center as to which Landlord must terminate all leases, as provided above, will survive the termination of this Lease.

**12.4    Landlord's Repair Obligation.** Landlord's obligation will be to restore all portions of the Shopping Center (including the Premises, if applicable) affected by a Casualty (exclusive of Tenant's furniture, fixtures and equipment) to their condition immediately preceding such Casualty and will not be limited to the extent allowed by available insurance proceeds. If Landlord for any reason whatsoever fails (a) to commence the repair and restoration work required by Section 12.1 and this Section 12.4 within 90 days from the date of the Casualty, (b) to proceed diligently to complete such repair and restoration work, or (c) to complete same within the estimated time set forth in Landlord's Casualty Notice, plus the number of days of delay caused by Uncontrollable Events, then in addition to any other rights or remedies available to Tenant under Section 14.2, Tenant will have the option (i) to terminate this Lease by giving Landlord notice of Tenant's election to do so at any time prior to the completion of such repairs and restoration and upon the giving of such notice, this Lease will terminate and the parties will be liable for their respective obligations to the date of termination and will have no liability for obligations arising after that date, except for those obligations which expressly survive termination, or (ii) to complete the repair and restoration work itself, in which case Landlord will make the insurance proceeds available to Tenant for the completion of such work and to the extent the insurance proceeds actually received by Tenant are insufficient to pay for all costs incurred by Tenant in connection with such work, Landlord will reimburse Tenant for all such costs within 30 days after Tenant's request and if Landlord fails to reimburse Tenant within such 30 day period, Tenant may deduct all such costs from the next accruing amounts of Rent due under this Lease.

**12.5    Abatement of Rent.** From the date of a Casualty until 60 days after the later of (a) the date on which the repair and restoration required by Section 12.4 is Substantially Complete and possession of the Premises is delivered to Tenant, or (b) the expiration of the estimated repair period set forth in Landlord's Casualty Notice, Rent will equitably abate in proportion to the nature and extent of the interference with Tenant's normal operation of its business from the Premises. If Tenant has paid any Rent in advance, Landlord will immediately repay to Tenant an amount equal to that portion of any Rent paid in advance for which payment is abated.

## 13.    EMINENT DOMAIN

**13.1    Total Taking.** If the whole of the Premises or the Shopping Center is acquired or condemned by, or transferred under threat of, eminent domain for any public or quasi-public purpose (a "**Taking**"), this Lease will terminate as of the date possession of the Premises is transferred to the condemning authority. If this Lease is terminated by virtue of a Taking, all Rent will be paid up to the date of termination of this Lease.

18

**13.2    Tenant's Right to Terminate.**  If so much of the Premises or Common Areas is subject to a Taking that, in Tenant's reasonable business judgment, the portion of the Premises and Common Areas remaining after the Taking will be insufficient to continue Tenant's business at substantially the same scope as existed prior to the Taking, then Tenant may terminate this Lease by notice to Landlord effective as of the date possession of the Premises is transferred to the condemning authority.

**13.3    Landlord's Right to Terminate.**  If so much of the Shopping Center is subject to a Taking that, in Landlord's reasonable business judgment, the portion of the Shopping Center remaining after the Taking will be insufficient to operate in an economically viable manner as a retail shopping center, then Landlord may terminate this Lease by notice to Tenant effective as of the date possession of the Shopping Center is transferred to the condemning authority, provided that Landlord terminates the leases of substantially all of the other premises in the Shopping Center.

**13.4    Partial Taking of Premises.**  In the event a Taking occurs and this Lease is not terminated as provided above, then Landlord will promptly restore, at Landlord's sole cost and expense, all portions of the Shopping Center (including the Premises, if applicable) affected by the Taking to a condition comparable to their condition immediately preceding the Taking, less the portion lost in the Taking.  In such event, this Lease will continue in full force and effect, except that from and after the Taking (a) Base Rent will be reduced in proportion to the reduction, if any, in the fair market value of the Premises as a result of the Taking, and (b) Additional Rent for Common Area Charges and Real Estate Taxes will be reduced in proportion to the reduction, if any, in the Floor Area of the Premises as a result of the Taking.

**13.5    Award.**  In the event of any condemnation or taking, whether partial or total, each party will have the right to claim and recover from the condemning authority the amount of actual provable damage to such party; provided, however, that the only amount Tenant will be entitled to claim for the loss of Tenant's leasehold estate (as opposed to Tenant's claims for business interruption, loss of alterations to the Premises paid for by Tenant, loss of personal property, relocation expenses, etc.) will be the then-current present value of the positive amount, if any, obtained by subtracting (a) the then-current present value of the rent due from Tenant pursuant to this Lease for the Premises (or the applicable portion thereof) for the remainder of the Term; from (b) the then-current market rental value of the Premises (or the applicable portion thereof), adjusted for then-anticipated inflation, for the remainder of the Term.

**14.    DEFAULT**

**14.1    Tenant's Default.**  Each of the following events will be deemed to be an event of default by Tenant under this Lease ("Event of Default"): (a) failure by Tenant to pay any Rent if such failure continues for 15 days after receipt by Tenant of notice from Landlord specifying such default; or (b) failure by Tenant to perform or observe any of Tenant's nonmonetary covenants contained in this Lease within 30 days after receipt by Tenant of notice from Landlord specifying the failure (or such additional period, if any, as may be reasonably required to cure the failure if the failure reasonably cannot be cured within a 30-day period, provided Tenant commences to cure within 30 days after receipt of notice and thereafter diligently pursues such cure to completion).

On the occurrence of any Event of Default, Landlord will have the option by law or in equity to exercise any one or more of the following remedies:

(1)    to terminate this Lease by sending notice pursuant to Section 17.12 to Tenant at the address stated in Section 1.1(p) above,

(2)    terminate Tenant's right to possession without terminating this Lease, or

(3)    cure the Event of Default on behalf of Tenant.  If Landlord cures an Event of Default on behalf of Tenant, Tenant will, on demand and as Additional Rent, reimburse Landlord for Landlord's expenses incurred thereby, plus interest from the date incurred until paid by Tenant at the Interest Rate.

If Landlord terminates either this Lease or Tenant's right to possession of the Premises, Tenant will immediately surrender the Premises to Landlord.  If Tenant fails to surrender the Premises, Landlord may enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying the Premises or any part thereof.  Any termination only of Tenant's right to possession of the Premises will not relieve Tenant of Tenant's obligation to pay the Rent under this Lease on the days originally set forth in this Lease for payment, without acceleration.  Landlord will use reasonable efforts to mitigate any damages incurred by Landlord and to relet the Premises.  Landlord will be deemed to have made such efforts if Landlord shall: (a) list the Premises with a commercial broker or leasing company which may be an affiliate of Landlord, (b) consider all bona fide offers to Lease the Premises which may be presented to Landlord.  However, Landlord will not be obligated: (i) to enter into any Lease with any prospective replacement tenant who lacks adequate creditworthiness as determined by Landlord in Landlord's sole discretion or experience (which shall be defined as a tenant who has not been operating similar stores for at least 2 years), or (ii) subdivide the Premises into more than 2 spaces, although Landlord is entitled to do so if Landlord so elects, or (iii) relet the Premises at less than the prevailing market rental or prevailing market terms, although Landlord is entitled to do so if Landlord so elects, so long as Tenant is not secondarily liable under this Lease or has not filed for bankruptcy protection, (iv) to favor the Premises over any other then-vacant space in the Shopping Center or Development, or (v) to enter into a lease with any prospective replacement tenant whose use, in Landlord's discretion, would be incompatible with the Development or the tenant mix of the Development, or whose use would violate any restriction, covenant, or any requirement contained in the lease of any other tenant of the Development.  In determining the amount of loss which Landlord suffers by reason of termination of this Lease,

19

allowance will be made for the expense of repossession and any necessary repairs, but not for any remodeling undertaken by Landlord following repossession. However, costs that reasonably would need to be incurred by Landlord in connection with a reletting of the Premises subsequent to such a termination (such as brokerage commissions and tenant improvements costs) may be used to offset any credit against Landlord's damages to which Tenant is entitled under Laws for the fair rental value of the Premises, provided that such costs are amortized over the term of such reletting with Landlord only being entitled to such credit for the portion of such costs allocable to the Term remaining as of the date of termination.

Should Landlord elect to terminate this Lease, Landlord may recover from Tenant, as damages, the following: (A) the worth at the time of award of any unpaid rental which had been earned at the time of the termination, plus (B) the worth at the time of award of the amount by which the unpaid rental which would have been earned after termination until the time of award exceeds the amount of rental loss Tenant proves could have been reasonably avoided, plus (C) the worth at the time of award of the amount by which the unpaid rental for the balance of the Term after the time of award exceeds the amount of rental loss that Tenant proves could be reasonably avoided, plus (D) any other amounts necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which, in the ordinary course of things, would be likely to result therefrom plus, at Landlord's election, any other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by the laws of Texas. As used in subparagraphs (A) and (B) above, the "worth at the time of award" is computed by allowing interest at the Interest Rate. As used in subparagraph (C) above, the "worth at the time of award" is computed by discounting such amount at the discount rate of the Federal Reserve Bank situated nearest to the location of the Shopping Center at the time of the award plus 2%.

    **14.2     Landlord's Default.** In the event Landlord fails to perform on or before the required date for performance any obligation set forth in this Lease to be performed by Landlord, and such failure continues for 30 days after receipt by Landlord of notice from Tenant (or such additional period, if any, as may be reasonably required to cure the failure if the failure reasonably cannot be cured within a 30-day period, provided Landlord commences to cure within 30 days after receipt of notice and thereafter diligently pursues such cure to completion), Tenant may (a) in the event of a breach causing a material and adverse effect on Tenant's business, terminate this Lease, (b) obtain such remedy or relief as may be available at law or in equity or (c) perform such obligations on behalf of Landlord. Notwithstanding the foregoing, if the Premises are in need of emergency repair and Landlord fails to perform the same immediately upon notice from Tenant (which notice, notwithstanding the provisions of Section 17.12, may be given verbally to Landlord's managing agent for the Shopping Center), Tenant may proceed to make such repairs as are reasonably necessary to protect persons or property. In the event Tenant performs any of such obligations of Landlord pursuant to the preceding sentence or clause (c) above, Landlord will, on demand, reimburse Tenant for Tenant's expenses incurred thereby. If Landlord fails to reimburse Tenant for such expenses within 30 days from Tenant's demand therefor, Tenant may deduct the amount of such expenses, plus interest thereon at the Interest Rate from the date incurred until the date so offset, from the next accruing amounts of Rent due under this Lease. No deduction from Rent or reimbursement by Tenant in accordance with this Section 14.2 will constitute a default or breach by Tenant under this Lease. Subject to the provisions of this Lease, no reference to any specific right or remedy shall preclude Tenant from exercising any other rights or from having any other remedy or from maintaining any action to which it may otherwise be entitled at law or in equity.

    **14.3     No Additional Notice or Cure Period.** If a provision of this Lease other than Section 14.1 or 14.2 specifies that, upon the performance or nonperformance of some obligation or the occurrence or nonoccurrence of some event within a time period or by a deadline specified in such provision, one party to this Lease may pursue a specific remedy or take a specific course of action that is expressly set forth in such provision (either with or without requiring that such party give the other party notice of such performance or nonperformance or occurrence or nonoccurrence or afford the other party an opportunity to cure such performance or nonperformance or occurrence or nonoccurrence within a specified period of time), then upon the performance or nonperformance of such obligation or occurrence or nonoccurrence of such event within such period or by such deadline, the party who is given such specific remedy or course of action by such provision may pursue such remedy or take such action without giving the other party any notice or affording the other party any cure right in addition to that specifically required by such provision and the other party will not, by virtue of Section 14.1 or 14.2, as applicable, be entitled to any additional notice or cure period.

    **14.4     Estoppel and Waiver.** No breach under this Lease will be deemed to have been waived, nor will either party be guilty of laches, because of the failure of either party to take action pertaining to such breach.

    **14.5     Remedies Cumulative.** The rights and remedies given to Landlord and Tenant in this Lease are distinct, separate and cumulative remedies, and the exercise of any one or more of them will not be deemed to exclude Landlord's or Tenant's rights to exercise any or all of the others which are given in this Lease, or at law or in equity, unless such remedies are expressly excluded.

    **14.6     Litigation, Court Costs and Attorneys' Fees.** In the event that at any time either Landlord or Tenant institutes any action or proceeding against the other relating to the provisions of this Lease or any default hereunder, the prevailing party in such action or proceeding will be entitled to recover from the other party reasonable and necessary costs and attorneys' fees.

    **14.7     Defaults by Assignees or Subtenants.** In the event this Lease is assigned or sublet by Tenant and Tenant remains liable for the performance of the obligations of "Tenant" under this Lease, and should any default occur requiring notice as provided in this Section 14, Landlord will furnish Tenant with a copy of the notice at the same time such notice is sent to the assignee or subtenant. In the event that the default is not corrected by the assignee or subtenant during the specified time periods, Tenant will have an additional period of 10 days to correct

20

the default, and, upon correction of the default, Tenant will have the right and option to resume actual possession of the Premises as Tenant for the unexpired Term.

**15.    SUBORDINATION**

**15.1    Landlord's Mortgagees.** Within 45 days after receipt of Landlord's written request, Tenant will execute and deliver to Landlord an agreement in the form and substance of Exhibit E subordinating Tenant's rights to the lien of any first mortgage now or hereafter encumbering the Premises. Tenant, however, will not be required to subordinate Tenant's rights hereunder to any mortgage unless and until the holder of such mortgage executes and delivers to Tenant a written non-disturbance agreement also in the form and substance of Exhibit E. If Landlord requests more than one subordination agreement in any 12-month period during the Term, Landlord will reimburse Tenant $500.00 within 30 days after receipt of an invoice therefor for the reasonable costs incurred by Tenant in connection with the review of each such additional subordination agreement.

**15.2    Landlord's Liens.** Landlord hereby waives and releases any liens which Landlord may have against Tenant's owned or leased personal property, trade fixtures or equipment or against Tenant's merchandise, cash or accounts receivable, whether such lien is statutory, constitutional or contractual, or arises out of operation of law or otherwise.

**16.    OTHER TENANCIES AND USE**

**16.1    On-Going Co-Tenancy Requirement.** If at any time after the Rental Commencement Date the On-Going Co-Tenancy Requirement is not satisfied, all Base Rent will be abated until such time as the On-Going Co-Tenancy Requirement is satisfied, and in lieu thereof, Tenant will pay Alternative Rent to Landlord on a monthly basis, 45 days after the end of each calendar month. If the non-satisfaction of the On-Going Co-Tenancy Requirement continues for a period of 12 months beyond the date that Tenant is first entitled to pay Alternative Rent instead of Base Rent ("**Co-Tenancy Cure Period**"), then Tenant will have the right at any time thereafter until the On-Going Co-Tenancy Requirement is satisfied to terminate this Lease by notice to Landlord; provided that Landlord will have the right, by notice given to Tenant not earlier than 30 days prior to the end of the Co-Tenancy Cure Period, to require that Tenant elect either to terminate this Lease effective as of a date selected by Tenant that is not less than 30 nor more than 60 days from the date of Landlord's notice requiring that Tenant make such election or to resume paying full Base Rent (instead of Alternative Rent) effective as of the first day of the month following the month in which Landlord's notice is delivered to Tenant (and if Tenant fails to notify Landlord of Tenant's election to terminate this Lease within 30 days after delivery of Landlord's notice, Tenant will be deemed to have elected to resume paying full Base Rent). Upon any such termination, the parties will be liable for their respective obligations to the date of termination and will have no liability for obligations arising after that date, except for those obligations which expressly survive termination.

**16.2    Exclusive Use.**

(a)    Limitation on Use.  During the Term, no premises or space in, or portion of, the Development, the North Tract or the remaining portions of the Southeast corner of Bellaire Blvd and the Grand Parkway that are now or hereafter owned by Landlord or any affiliate of Landlord other than the Premises, will be used for the retail sale and/or rental of sporting goods, sports apparel or athletic footwear, provided that such exclusive will not apply to: (1) the incidental sale of any of such merchandise by an occupant so long as the retail display space in such occupant's premises that is used for the display of such merchandise (including shelf space and allocable aisle space) is of a size not greater than the lesser of 500 square feet of Floor Area or 10% of such occupant's total Floor Area; and (2) non national or regional general shoe store (but excluding Rack Room or Shoe Carnival) whose premises do not exceed 10,000 square feet of Floor Area, so long as the retail display space in such occupant's premises that is used for the sale of athletic footwear (including shelf space and allocable aisle space) does not exceed 20% of the Floor Area of the premises. Tenant acknowledges that the Wal-Mart Tract, Kohl's Tract and North Tract are not subject to this Section 16.2(a) unless any of such property is owned or controlled at any time hereafter by Landlord or any affiliate of Landlord, in which event this Section 16.2(a) will apply to the applicable property. As used herein, "**athletic footwear**" means footwear associated with sports and sport purposes (including, without limitation, running, jogging and aerobic activity). This Section 16.2(a) will not apply to any tenant whose lease was fully executed on the Effective Date hereof and is identified on Exhibit G as an "**Existing Lease Not Subject to Tenant's Exclusive;**" provided, however, that this exception will not apply if (i) Landlord permits or agrees to an expansion of the premises or an extension of the term for any such permitted use which violates Tenant's exclusive if Landlord has the right, by virtue of the provisions of the existing lease or otherwise, to withhold such permission or agreement, or (ii) Landlord permits or agrees to the change of a permitted use by any such tenant or its successors or assigns to a use which violates Tenant's exclusive if Landlord has the right, by virtue of the provisions of the existing lease or otherwise, to withhold such permission or agreement, or (iii) Landlord permits or agrees to an assignment or sublease of such existing lease to an assignee or subtenant who may use the premises for a use which violates Tenant's exclusive if Landlord has the right, by virtue of the provisions of the existing lease or otherwise, to withhold such permission or agreement, or (iv) Landlord has the right, by virtue of the provisions of the existing lease or otherwise, to cause such tenant to honor the exclusive granted to Tenant by giving such existing tenant notice of this exclusive or otherwise.

If, for a continuous period of 90 days, Tenant fails to operate as a sporting goods store in the Premises (other than for "Permitted Closures" defined in Section 16.6), Tenant will no longer have the exclusive rights described in this Section 16.2(a); provided, however, in the event Tenant recommences a sporting goods business in the Premises, then, upon delivery to Landlord of notice of such recommencement, the exclusive granted to Tenant hereunder will again be effective and any lease executed during the interim period during which this exclusive was

21

not effective and that does not contain a provision protecting such exclusive will be deemed to be an Existing Lease Not Subject to Tenant's Exclusive.

(b)    Remedy of Tenant.  Landlord acknowledges that the granting of the exclusive contained in Section 16.2(a) is a material inducement to Tenant's agreement to enter into this Lease and the enforcement of this exclusive is integral to the economic viability of the Shopping Center to Tenant.  Landlord agrees to enforce such exclusive and the statement of Tenant's remedies specified below will not be deemed to excuse Landlord from such enforcement.  If any person or entity violates the exclusive granted to Tenant in Section 16.3 or 16.4 below, Landlord will promptly commence appropriate legal proceedings, and vigorously prosecute the same, to enjoin and prohibit any such violation.  If Landlord fails to commence such proceedings, or fails thereafter to vigorously prosecute the same, Tenant will have the right (i) to conduct and prosecute such legal proceedings (including, without limitation, an action for injunctive relief) in its own name, but at Landlord's expense, or (ii) in the event the right set forth in (i) above is not permitted to be exercised under Laws, to conduct and prosecute such legal proceedings in the name of Landlord, at Landlord's expense, and Landlord agrees to cooperate with Tenant with respect to such prosecution (including, without limitation, executing any documentation or authorization reasonably required by Tenant in connection with such prosecution and by appearing at any hearing or trial with respect to such prosecution).  In addition, if any person or entity violates the exclusive granted to Tenant in Section 16.2(a), the Base Rent payable hereunder will be reduced by 50% commencing 30 days after the date Tenant gives Landlord notice of such violation and continuing for so long as such violation continues, and Tenant will have all the following remedies, as well as any other remedy given to it at law and in equity: (1) if such violation occurs for more than 60 days, the right to obtain injunctive relief, and (2) if such violation occurs for more than 180 days and there is an adverse and material impact on Tenant's business, to terminate this Lease or to commence and prosecute an action against Landlord for damages.  Upon any such termination, the parties will be liable for their respective obligations to the date of termination and will have no liability for obligations arising after that date, except for those obligations which expressly survive termination.

16.3    **Prohibited Uses.**  Neither Tenant nor its subtenants, assignees, licensees or concessionaires will use or lease (or permit the use, lease or sublease of) the Premises or any portion thereof during the Term allowing for use as any of the "Prohibited Uses" (as defined below).  Neither Landlord nor any entity controlled by Landlord will use or lease (or permit the use, lease or sublease of) or sell any space in or portion of the Shopping Center during the Term allowing for use as any of the Prohibited Uses.  As used herein, the "**Prohibited Uses**" means those uses prohibited by Exhibit H.

16.4    **Restricted Uses.**  No portion of the Shopping Center located within 300 feet of the Premises will be used for a restaurant, a health club or any other use which would place an undue burden on parking.

16.5    **Other Exclusives.**  Tenant will be subject to the exclusive use restrictions listed on Exhibit G for so long as such exclusive use restrictions remain effective to restrict the use of the Premises.

16.6    **Opening Covenant; No Operating Covenant; Landlord's Right to Recapture.**  Subject to Section 17.15, Tenant covenants to open the Premises for business with the public, fully stocked, staffed and fixtured as a sporting goods store, for at least one day, not later than 150 days after the Commencement Date, provided that in no event will Tenant be required so to open unless and until the Initial Co-Tenancy Requirement is satisfied.  Except for such covenant to open, nothing in this Lease will be interpreted to obligate Tenant to operate, continuously or otherwise, a business in the Premises.  No implication will be made concerning the use or operation of the Premises from the manner in which Rent is paid or from the amounts of Rent paid.  Subject to the first sentence of this Section 16.6 and to Section 16.3, if Tenant elects to operate a business in the Premises, Tenant may use the Premises for any lawful retail use that is not any of the Prohibited Uses and does not violate any exclusive uses of other tenants listed as "**Other Exclusives**" on Exhibit G.  Notwithstanding the provisions of this Section 16.6, if after first opening for business to the public no business is operated from the Premises for a continuous period of 90 days, excluding any Permitted Closures, then Landlord will have the right to terminate this Lease and recapture the Premises provided that Landlord gives notice to Tenant of Landlord's exercise of such right either (a) within 60 days after the expiration of such 90-day period, or (b) thereafter during the month of April of any year within the Term (but not before April 1 or after April 30 of any such year), provided that Landlord's annual right to terminate and recapture during the month of April will terminate if prior to any April 1 after cessation of operation of a business in the Premises Tenant has (i) executed an assignment of the Lease or sublease of the Premises, or (ii) reopened for business in the Premises.  If Landlord properly gives such notice of termination, this Lease will terminate upon the termination date stated in such notice, provided that such stated date may not be earlier than 30 days after the date of the notice.  Upon any such termination, both parties will be relieved of any obligations hereunder arising after the date of termination, except as otherwise provided in this Lease.  As used herein, "**Permitted Closures**" are any temporary closures due to repairs or restoration following damage by casualty, Uncontrollable Events or condemnation or for not more than 120 days of remodeling.

16.7    **Acknowledgement of Firearms.**  Landlord acknowledges that firearms are sold by Tenant in the ordinary course of Tenant's business as a full-line sporting goods store.  Landlord agrees to execute any documents or acknowledgements required by the Bureau of Alcohol, Tobacco, Firearms and Explosive regarding Tenant's sale of firearms, at Tenant's sole cost and expense, provided however, no such document or acknowledgement will increase the obligations or liabilities of Landlord under this Lease.  Tenant will devote no more than 2,500 square feet of the Floor Area of the Premises to the sale of firearms and ammunition.

## 17.    MISCELLANEOUS

**17.1    Relationship of Parties.** The amount of money provided to be paid Landlord will in no event be deemed to make Landlord a partner or an associate of Tenant in the conduct of Tenant's business, nor will either party be liable for any debts incurred by the other party in the conduct of the other party's business.  The relationship between the parties is for the entire Term that of landlord and tenant.

**17.2    Heirs, Successors and Assigns.** This Lease and the covenants and agreements herein contained will be binding upon, and inure to the benefit of, the parties hereto and their respective heirs, executors, administrators, successors, and assigns.

**17.3    Governing Law.** This Lease will be governed by, construed in accordance with and enforced under the laws of the state in which the Shopping Center is located.

**17.4    Rules of Construction.** This Lease will be construed with equal weight for the rights of both parties, the terms hereof having been determined by fair negotiation with due consideration for the rights and requirements of both parties.

**17.5    Materiality of Covenants.** Every covenant contained in this Lease will be construed to be material, whether or not the covenant expressly so provides.

**17.6    Severability.** If any term or provision of this Lease is found to be invalid, illegal or unenforceable, the remaining terms and provisions hereof will not be affected thereby; and each term and provision hereof will be valid and enforceable to the fullest extent permitted by Laws.

**17.7    Entire Agreement; Amendment.** This Lease contains the entire agreement between Landlord and Tenant with respect to the subject matter of this Lease and may be amended or modified only by subsequent written agreement duly signed by both parties hereto. Except for those warranties, representations, contingencies, conditions and/or agreements set forth in this Lease, no warranties, representations, contingencies, conditions, and/or agreements have been made by Landlord or Tenant, one to the other or between them, with respect to the subject matter of this Lease.  Landlord and Tenant acknowledge that the provisions of this Lease have been negotiated and agreed to between Landlord and Tenant and that this Lease reflects the agreement and understanding of each party.  No action, verbal statement or written statement by any employee, agent or representative of either party to this Lease (other than an amendment signed by both parties) will be construed to amend or modify this Lease nor to diminish or discharge any of the rights and obligations of either party hereunder.

**17.8    Gender, Number.** Pronouns in this Lease importing any specific gender will be interpreted to refer to corporations, partnerships, men and women, as the identity of the parties referred to may require. Pronouns, verbs and/or other words in this Lease importing the singular number will be interpreted as plural words, as the identity of the parties or objects referred to may require.

**17.9    Headings.** The captions, section numbers and paragraph numbers appearing in this Lease are inserted only as a matter of convenience and in no way define, amplify, limit, construe or describe the scope or interest of any section of this Lease.

**17.10    Section Numbers.** All references to section numbers contained in this Lease are to the sections of this Lease, unless expressly provided to the contrary.

**17.11    Memorandum of Lease.**  Landlord and Tenant will execute contemporaneously with the execution of this Lease, a Memorandum of Lease in the form attached hereto as Exhibit I for recording purposes. The party desiring to record the Memorandum of Lease, if at all, will do so at its own cost and expense.

**17.12    Notices.** All notices or requests given, sent or required to be given with respect to any matter pertaining to this Lease must be in writing and must be sent by nationally recognized overnight courier service, such as, but not limited to, Federal Express, by certified mail with return receipt requested, or by express mail, in each case with charges billed to the sender or proper postage prepaid, as applicable, and will be deemed given on the date received (or refused) when addressed to the parties at Landlord's Notice Address, in the case of notices to Landlord, or at Tenant's Notice Address, in the case of notices to Tenant, or in either case to such other addresses as Landlord or Tenant may designate to the other by notice.

**17.13    Confidentiality of Lease Terms.** Landlord will treat the monetary and operating terms and conditions of this Lease as confidential and will not divulge same to any person other than any existing or prospective mortgagee of the Shopping Center or any prospective purchaser of Landlord's interest in this Lease or as required by Laws.  Landlord will not furnish copies of all or any part of this Lease to a person other than to a party described in the preceding sentence.

**17.14    Brokers.** Tenant agrees that Tenant will not present any broker or agent to Landlord for payment of any brokers', agents' or finders' fees or commissions due as a result of the execution of this Lease or the performance of the terms and provisions contained herein, except for fees or commissions due to the Brokers named in Section 1.1(t).  Landlord will be solely responsible for the payment of any fees or commissions due with respect to this Lease.

**17.15    Force Majeure.** In the event that Landlord or Tenant cannot commence or complete the work or perform any other obligation of such party hereunder by the date specified therefor because of strikes, lockouts,

23

labor disputes, acts of God, war, civil commotion, fire or other casualty, or other cause beyond the reasonable control of such party ("**Uncontrollable Events**"), the time for the commencement or the completion of the work or the performance of such obligation will be automatically extended for the period of delay due to the Uncontrollable Event, but in no event will such extension be for a period of more than 60 days. Notwithstanding anything to the contrary contained in this Lease, in no event will this Section 17.15 be construed to: (a) excuse or delay the performance of a monetary obligation by either party; (b) require Tenant to accept delivery of the Premises or to commence fixturing on other than a Permitted Delivery Date; or (c) extend the "Delivery Deadline" (as defined in Exhibit C) or Landlord's obligation to complete Landlord's Work and deliver possession of the Premises to Tenant by such date. In order for either Landlord or Tenant to avail itself of the rights granted in this Section 17.15, that party must notify the other party within 10 days of the beginning and the end of the occurrence of an Uncontrollable Event.

17.16    **Jury Trial Waiver.**  THE PARTIES TO THIS LEASE EACH HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS LEASE.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.  THE PARTIES HERETO EACH ACKNOWLEDGE THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP AND THAT THE PARTIES HAVE EACH RELIED ON THE WAIVER IN ENTERING INTO THIS LEASE.  THE PARTIES HERETO EACH FURTHER WARRANT AND REPRESENT THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THE WAIVER WILL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS LEASE.  IN THE EVENT OF LITIGATION, THIS LEASE MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

17.17    **Specially Designated Nationals and Blocked Persons List.**  Tenant represents and warrants to Landlord that neither Tenant nor any person or entity that owns or controls, is owned or controlled by or is under common ownership or control with Tenant, and Landlord represents and warrants to Tenant that neither Landlord nor any person or entity that owns or controls, is owned or controlled by or is under common ownership or control with Landlord (a) is listed on the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Asset Control, Department of the Treasury pursuant to Executive Order No. 13224, 66 Federal Register 49079 (September 25, 2001) or (b) has been convicted, pleaded nolo contendere, indicted, arraigned or custodially detained on charges involving money laundering or predicate crimes to money laundering.

Having read and intending to be bound by the terms hereof, the parties have signed this Lease on the date(s) set forth below.

Having read and intending to be bound by the terms hereof, the parties have signed this Lease on the date(s) set forth below.

**TENANT:**

TSA STORES, INC.,
a Delaware corporation

By: _____

Gregory A. Waters
Executive Vice President – Store Operations
and Chief Operating Officer

By: _____

Lon Novatt
Senior Vice President - Real Estate

Date of execution by Tenant: _____4/11_____ , 20_11_

25

**LANDLORD:**

**MRPL RETAIL PARTNERS, LTD.,**
a Texas limited partnership

By: MRPL Retail GP, LLC, a Texas
limited liability company
as sole general partner

By: _____

Name: Dan M. Moody, III

Title: Manager

Date of execution by Landlord: *April 14*, 2011

26

**Exhibit A**

**LEGAL DESCRIPTION OF THE SHOPPING CENTER**

All of Restricted Reserve A in Shops At Bella Terra – Sec. 5, a Subdivision in Fort Bend County, Texas according to the map or plat thereof, recorded under Clerk's File No. 20080059 of the Official Public Records of Fort Bend County, Texas.

**Exhibit A-1**

**LEGAL DESCRIPTION OF THE KOHL'S TRACT**

All of Restricted Reserve B in Shops At Bella Terra – Sec. 3, a Subdivision in Fort Bend County, Texas according to the map or plat thereof, recorded under Clerk's File No. 2007078872 of the Official Public Records of Fort Bend County, Texas.

**Exhibit A-2**

**LEGAL DESCRIPTION OF THE WAL-MART TRACT**

All of Reserve Restricted Reserve A in the Shops at Parkway Lakes Subdivision, Fort Bend County, Texas, as recorded under County Clerk's File Number 2006158474 of the Official Public Records of Fort Bend County, Texas.

**Exhibit A-3**

**LEGAL DESCRIPTION OF THE NORTH TRACT**

Legal Description of the Two Tracts on the North Tract that are excluded from the Development:

All of Restricted Reserves D and F in Shops At Bella Terra – Sec. 8, a Subdivision in Fort Bend
    County, Texas  according to the map or plat thereof, recorded under Clerk's File No.
    2010017815 of the Official Public Records of Fort Bend County, Texas.

A-4

**Exhibit B**

**SITE PLAN**



B-1

**Exhibit B-1**

**ALTERNATIVE SITE PLAN**



B-2

**Exhibit B-2**

SITE PLAN SHOWING SPECULATIVE SPACE



B-3

**EXHIBIT C**

**CONSTRUCTION PROVISIONS**

1.    <u>Definitions</u>.  For purposes of this Lease:

(i)    **"Landlord's Work"** means all work to be performed by Landlord for Tenant pursuant to this <u>Exhibit C</u>, including the Site Work and the Building Shell;

(ii)    **"MUD"** means Fort Bend County Municipal Utility District No. 50.

(iii)    **"Tenant's Work"** means all work to be performed by Tenant pursuant to this <u>Exhibit C</u>, including the Leasehold Improvements;

(iv)    **"Site Work Start Date"** means August 15, 2011;

(v)    **"Building Shell Preliminary Plans Delivery Deadline"** means March 15, 2011.

(vi)    **"Building Shell Start Date"** means 90 days after Tenant's approval of the Final Plans (as such term is defined below in Paragraph 4.1);

(vii)    **"Projected Delivery Date"** means January 29, 2012,

(viii)    **"Delivery Deadline"** means April 15, 2012; and

(ix)    **"Program Package"** means Tenant's New Store Program Package Version 9, which Tenant has previously delivered to Landlord.  Excerpts from the Program Package detailing certain key elements of Landlord's Work with respect to the Building Shell and the fire protection system for the Premises are set forth on <u>Exhibit C1</u> hereto.

2.    <u>Design and Construction Schedules</u>.

2.1    <u>Projected Schedule</u>.  The parties intend that the design and construction of the Building Shell and the Leasehold Improvements, Tenant's fixturing and merchandising of the Premises, Tenant's opening and the grand opening (if applicable) of the Shopping Center will occur in accordance with the following schedule:

| Event | Date (if single day event) | Beginning Date | Ending Date |
|---|---|---|---|
| Landlord delivers Preliminary Plans for the Building Shell for Tenant's review and approval | March 15, 2011 | | |
| Intentionally Omitted | | | |
| Intentionally Omitted | | | |
| Intentionally Omitted | | | |
| Final Plans for the Leasehold Improvements | | September 19, 2011 | October 31, 2011 |
| Intentionally Omitted | | | |
| Delivery Date (Landlord's Work substantially complete) | January 29, 2012 | | |
| Leasehold Improvements construction | | January 30, 2012 | April 12, 2012 |
| Tenant fixturing and merchandising | | April 13, 2012 | May 3, 2012 |
| Tenant opens | May 4, 2012 | | |
| Grand opening | May 12, 2012 | | |

2.2    <u>Landlord's Construction Schedule</u>.  Within four weeks after the Final Plans for the Building Shell have been submitted to the applicable Governmental Authorities for purposes of obtaining the Fort Bend County Fire Marshall's approval and the Fort Bend County Engineer's approval (no building permits are required in unincorporated Fort Bend County, Texas, but the Fire Marshal reviews for Fire Code and the Engineer reviews for Flood Plain), Landlord will prepare and deliver to Tenant a detailed construction schedule setting forth its planned commencement and completion dates for each of the various components of Landlord's Work.  Within 10 days after Landlord becomes aware of a need for any change in such construction schedule (including, without limitation, within 10 days after notice from Tenant that the construction of Landlord's Work is no longer on schedule), Landlord will prepare and submit to Tenant a revised construction schedule.  Landlord will use commercially reasonable efforts to adhere to such construction schedule.

3.    General Requirements.

      3.1    Code Compliance.  Landlord, at Landlord's expense, will cause all Landlord's Work to satisfy and comply with all Laws including, but not limited to, building codes, regulations and ordinances in force and adopted by the local municipality, county and state building officials and applicable city, county and state building plumbing, fire, health, pollution, electrical, safety and other codes.  Landlord, at its expense, will be responsible for causing all items of Landlord's Work described in the Program Package (including, without limitation, the design and construction of all elements of the fire suppression and life safety systems identified as a part of Landlord's Work therein), or any substitutes therefor or supplements thereto required by local code, to comply with code in the jurisdiction in which the Premises are located, taking into account any such substitutes or supplements that may be required as a result of (a) the Leasehold Improvements or fixtures, furnishing and equipment that will be added to the Premises by Tenant as reflected in the Program Package, or (b) any materials that will be stored in the Premises by Tenant as reflected on the Commodity Classification and Hazard Analysis Report that will be provided by Tenant at Landlord's request.  Tenant, at Tenant's expense (except as provided in Article 8 below), will cause all Tenant's Work to satisfy and comply with all Laws including, but not limited to, building codes, regulations and ordinances in force and adopted by the local municipality, county and state building officials and applicable city, county and state building plumbing, fire, health, pollution, electrical, safety and other codes.  Neither Landlord nor Tenant will use any building materials, products, adhesives or equipment containing asbestos, PCB's, or other similar, harmful or toxic substances which are controlled by the EPA, federal, state, county, city or other governmental agencies.  If Tenant discovers any such materials after the installation of any Landlord's Work, Landlord will immediately upon notice remove, dispose of, and replace the materials in accordance with all Laws.  If Landlord discovers any such materials after the installation of any Tenant's Work, Tenant will immediately upon notice remove, dispose of, and replace the materials used by Tenant in Tenant's Work in accordance with all Laws.  This obligation for the removal of harmful building materials installed by the Landlord or the Tenant will survive the expiration of this Lease.  The Shopping Center will comply with the provisions of the Americans With Disabilities Act (ADA) in regard to site and building accessibility and parking requirements.

      3.2    General Conditions for Landlord's Work.  Landlord's Work will include all usual and customary costs for general conditions associated with Landlord's Work, including but not limited to any of the following that are applicable during Landlord's Work and end on the Delivery Date:

        (i)    Liability and builder's risk insurance;

        (ii)    Costs for permits, sewer and water connection fees, etc.;

        (iii)    Sales and use taxes;

        (iv)    Temporary field offices, toilet facilities, supplies and equipment;

        (v)    Miscellaneous equipment rentals;

        (vi)    Trash removal and clean-up;

        (vii)    Survey, staking and layout;

        (viii)    Job site field supervision;

        (ix)    Mobilization;

        (x)    Temporary utility hook-ups and expenses for water, electricity and telephone;

        (xi)    Quality assurance, including materials testing, inspections and special inspections; and

        (xii)    Cold weather expenses including cost of temporary protective coverings, fuel, heaters, snow removal, protective barriers, and labor and materials associated therewith.

      3.3    General Conditions for Tenant's Work.  Tenant's Work will include all usual and customary costs for general conditions associated with Tenant's Work, including but not limited to any of the following that are applicable during Tenant's Work:

        (i)    Liability and builder's risk insurance;

        (ii)    Costs for permits, sewer and water connection fees, etc.;

        (iii)    Sales and use taxes;

        (iv)    Temporary field offices, toilet facilities, supplies and equipment;

        (v)    Miscellaneous equipment rentals;

        (vi)    Trash removal and clean-up;

(vii)    Survey, staking and layout;

(viii)   Job site field supervision;

(ix)     Mobilization;

(x)      Temporary utility hook-ups and expenses for water, electricity and telephone;

(xi)     Quality assurance, including materials testing, inspections and special inspections; and

(xii)    Cold weather expenses including cost of temporary protective coverings, fuel, heaters, snow removal, protective barriers, and labor and materials associated therewith.

3.4    <u>Warranties</u>.  Landlord unconditionally guarantees all Landlord's Work against defective workmanship and materials and will remedy any such defects which appear within a period ending one year after the Delivery Date.  At the end of the warranty period, Landlord will upon the request of Tenant, assign to Tenant any guarantees of workmanship and materials which Landlord may receive in connection with the Premises for items Tenant is required by this Lease to maintain.  Landlord will obtain manufacturers' warranties covering the roof membrane and flashings of the Premises for at least 15 years and the storefront sliding glass doors of the Premises for at least three years.

3.5    <u>Engineering</u>.  All construction will be performed according to the recommendations contained in geotechnical report titled "Report Soils Investigation Proposed Development The Shops at Parkway Lakes at Highway 99 and Bellaire, Fort Bend County, Texas" dated December 5, 2006, Job No. 06-643s, Report Number 0611/1543, Texas prepared by Coastal Testing Laboratories, as supplemented, and good engineering and design practices using first class workmanship and materials conforming to the applicable Final Plans.  The foregoing reference to the geotechnical reports will not be an acknowledgement by Tenant of the sufficiency thereof, or release Landlord from any obligations or liability set forth in the Lease or exhibits thereto.  All water, sewer and drainage plans will be designed and approved by the engineer for the MUD in accordance with the MUD's requirements and will be constructed by the MUD.

3.6    <u>Permits</u>.  Landlord will use commercially reasonable efforts to procure, at Landlord's sole cost and expense, all building and other permits or licenses required for the construction and occupancy of the Site Work and the Building Shell, if any are required by Fort Bend County.  Tenant will use commercially reasonable efforts to procure, at Tenant's sole cost and expense (except as provided in Article 8 below), all building and other permits or licenses or approvals required for the construction and occupancy of the Leasehold Improvements and all permits or licenses required for the installation of all signs to be installed by Tenant pursuant to Section 7.1 of the Lease, if any are required by Fort Bend County.  If despite using diligent efforts to do so (including having submitted plans that are in compliance with all applicable Laws), Tenant is unable to obtain all permits, licenses and approvals required for the performance of Tenant's Work or the installation of such signs by the Delivery Date, then (a) if Landlord is unable to obtain such permits, licenses and approvals on behalf of Tenant within 90 days after Tenant notifies Landlord that Tenant has been so unable to obtain the same, Tenant may terminate this Lease by notice given to Landlord at any time prior to the date on which Tenant or Landlord obtains all of such permits, licenses and approvals, and (b) the Commencement Date and/or the Rental Commencement Date will be postponed, to the extent such date(s) would otherwise occur sooner pursuant to the terms of this Lease, until the earlier of (i) the number of Tenant's Work Days after the date on which Tenant obtains all of such permits, licenses and approvals, or (ii) the earlier of the date of Tenant's grand opening or the 10th day after the day on which Tenant first opens the Premises for business.  However, except to the extent provided in Section 1.3(g) of the Lease, Tenant's obtaining a certificate of occupancy for the Leasehold Improvements is not a condition to the occurrence of the Commencement Date or the Rental Commencement Date.

4.    <u>Plan Preparation, Approval and Modification</u>.

4.1    <u>Building Shell Plans</u>.  On or before the Building Shell Preliminary Plans Delivery Deadline, Landlord, at its sole cost and expense, will cause licensed architects and engineers selected by Landlord to prepare and submit to Tenant (or to individuals or entities as directed by Tenant) two sets of Landlord's working plans and specifications ("**Preliminary Plans**") for the Building Shell (which plans will depict only the Building Shell and will not include any other buildings or other occupants' premises in the Shopping Center) together with a letter prepared by Landlord's architect and/or engineer specifying in detail their commercially reasonable interpretation of all discrepancies or deviations called for by such Preliminary Plans in the scope of work for the Building Shell from the scope of work for the Building Shell set forth in the Program Package ("**Deviation Letter**").  The Preliminary Plans for the Building Shell will comply with the Program Package to the extent allowable under local Laws.  If Landlord does not submit a Deviation Letter, it will be presumed that the Preliminary Plans call for the same scope of work as set forth in the Program Package (and Landlord will be responsible for such scope of work under this <u>Exhibit C</u> notwithstanding anything to the contrary set forth in the Preliminary Plans).  The Preliminary Plans for the Building Shell and any Deviation Letter will be reviewed by Tenant or its representatives for approval prior to commencement of construction.  After receipt of the Preliminary Plans for the Building Shell and any Deviation Letter, Tenant, within 10 business days of proper submission of same, will inform Landlord of any required revisions or corrections thereto and, within 10 business days thereof, Landlord will make such revisions or corrections and resubmit two complete sets of the Preliminary Plans and/or the Deviation Letter, as applicable, for Tenant's final approval.  All subsequent submissions and revisions/approvals will be made within 10 business days.  If within 10 business days after delivery, Tenant fails to respond to any Preliminary Plans for the

Building Shell or any revisions thereto that are delivered by Landlord to Tenant on or after the Building Shell Preliminary Plans Delivery Deadline, and if such failure to respond continues for more than 5 business days after Landlord delivers notice of such failure to Tenant, then Tenant will be deemed to have approved the Preliminary Plans as delivered. If within 10 business days after delivery, Landlord fails to respond to any written request delivered by Tenant to Landlord for revisions to any Preliminary Plans for the Building Shell previously submitted by Landlord to Tenant, and if such failure to respond continues for more than 5 business days after Tenant delivers notice of such failure to Landlord, then Landlord will be deemed to have approved the revisions to the Preliminary Plans as requested by Tenant. Upon approval (or deemed approval), the Preliminary Plans for the Building Shell will become the final construction documents ("**Final Plans**") for the Building Shell and any Deviation Letter approved by Tenant will constitute the "**Approved Deviation Letter**." No alterations will be made to the Final Plans for the Building Shell without the prior written consent of Tenant.

4.2     Leasehold Improvements Plans.  Tenant, at Tenant's cost and expense (except as provided in Article 8 below), will cause licensed architects and engineers selected by Tenant to prepare and submit to Landlord (or to individuals or entities as directed by Landlord) two sets of Preliminary Plans for the Leasehold Improvements. The Preliminary Plans for the Leasehold Improvements will comply with the Program Package to the extent allowable under local Laws. The Preliminary Plans for the Leasehold Improvements will be subject to review and approval by Landlord or its representatives, provided such review and approval will be limited to ensuring that the Leasehold Improvements called for by the Preliminary Plans comply with local Laws and are compatible with the Building Shell. After receipt of the Preliminary Plans for the Leasehold Improvements, Landlord, within 10 business days of proper submission of same, will inform Tenant of any required revisions or corrections thereto and, within 10 business days thereof, Tenant will make such revisions or corrections and resubmit two complete sets of the Preliminary Plans for Landlord's final approval. All subsequent submissions and revisions/approvals will be made within 10 business days. Upon approval, the Preliminary Plans for the Leasehold Improvements will become the Final Plans for the Leasehold Improvements. No alterations that would affect the Leasehold Improvements' compliance with local Laws or compatibility with the Building Shell will be made to the Final Plans for the Leasehold Improvements without the prior written consent of Landlord.

4.3     Change-Orders.  Tenant will have the right to revise the Preliminary and Final Plans for any reason whatsoever, provided any such revision to the Building Shell is not requested after Landlord has completed the work described by the portion of the Final Plans to be modified (unless such work has been completed pursuant to erroneous Final Plans that did not comply with the Program Package, as modified by any Approved Deviation Letter). Landlord will deliver to Tenant a statement ("**Revision Statement**") setting forth (a) the net change, if any, in the cost of constructing the Building Shell, including any additional architectural and engineering fees, resulting from Tenant's requested revision (i.e., the total resulting change after adding any increases and deducting any decreases), and (b) the change, if any, in the construction schedule of the Building Shell resulting from Tenant's requested revision (i.e., the total additional time required by the revision as reduced, to the extent applicable, by any time savings to be realized by the revision, all as reasonably estimated by Landlord, including a reasonable "cushion" for potential delays). Upon approval, the Preliminary Plans for the Leasehold Improvements will become the Final Plans for the Leasehold Improvements. Landlord will notify Landlord in writing whether or not Tenant elects to proceed with any or all of the revisions on the Revision Statement (any such revision so approved by Tenant being hereinafter referred to as an "**Approved Revision**"), and upon completion of the Approved Revisions by Landlord, the occurrence of the Delivery Date and Tenant's receipt of reasonably sufficient documentation for the cost of the Approved Revisions, Tenant will pay Landlord for any such completed Approved Revision. In no event will changes requested by Tenant to either the Preliminary or Final Plans as the result of (i) errors or omissions by Landlord's architect, (ii) substitutions caused by unavailability of materials or (iii) minor changes meant to conform the Preliminary Plans to the intent of the Program Package, as modified by any Approved Deviation Letter, rather than to modify Tenant's design requirements, be construed to be "revisions" for purposes of this Article 4.3. Landlord acknowledges that Tenant will not be required to pay for any revision or change-order unless such revision or change-order is an Approved Revision pursuant to this Article 4.3. If Landlord fails to seek reimbursement or payment from Tenant for the cost of the Approved Revisions within six months after the occurrence of the Delivery Date, then Landlord's right to recover such costs from Tenant will be deemed to have been waived. If any Approved Revision includes an extension of the period of time permitted to complete the Building Shell, then the Projected Delivery Date and the Delivery Deadline will each be deemed extended by the additional period set forth in such Approved Revision.

5.     Construction of Site Work.  Landlord will, if any of same have not already been constructed, and at Landlord's sole cost and expense, construct the Shopping Center sidewalks, service drives, parking aisles, driveways, streets, curbs, parking areas, landscaping, traffic controls, signs (Pylon Sign #3 and related electrical wiring to Tenant's cabinet is complete prior to the Effective Date, utilities, lighting and related improvements in substantially the configurations, locations and sizes shown for such improvements on Exhibit B ("**Site Work**"). The Site Work will be constructed in accordance with the general requirements of Article 3 above and will include the following:

5.1     Earthwork and Drainage.  Perform all earthwork, excavation, grading and preparation of building pads and parking lot areas to receive final finishes. Site to be graded to provide adequate site drainage, including storm water retention areas, culverts, catch basins, drywells and other storm water appurtenances as such drainage facilities are designed and constructed by the MUD in accordance with the requirements of the Texas Commission on Environmental Quality and Fort Bend County, Texas. Storm water retention may occur in parking areas and drives except at principal entries and access points to a maximum depth not greater than 12". Landlord covenants that any fill dirt that Landlord causes or permits to be used at the Shopping Center site will be so-called "clean fill" that will present no health or environmental risk.

5.2     Concrete.  Install all exterior concrete, curb and gutter, vertical curbs, valley gutters, sidewalks and retaining walls.

C-4

5.3    Landscaping. Furnish and install landscaping and automatically controlled underground sprinkler systems in parking lots where indicated on Exhibit B to this Lease. The general character and quality of such landscape improvements will be similar to that provided at other Shopping Center buildings.

5.4    Parking Lot Paving. Install all parking lot improvements, concrete paving, striping and signage substantially in accordance with Exhibit B to this Lease. Parking to be laid out in a 90° configuration with designated handicapped parking stalls and signage.

5.5    Utilities. Provide all utility mains including domestic water, fire protection, storm drainage, sanitary sewer, gas line (except Tenant will be required to set the gas meter and tap from the gas line to the Premises upon the establishment of service with the utility provider, which Tenant will not be able to do until Tenant has installed all of the gas lines within the Premises and all HVAC equipment that use gas and Centerpoint has inspected the lines and equipment), electrical lines (Landlord will be responsible for setting the electric meter and establishing service to the Premises per Paragraph 5.6(i) below), and telephone lines (except this will be a post-delivery item per Paragraph 5.6 as AT&T will not commence the installation of telephone lines to the Premises until power is established within the Premises) and install in accordance with the governing municipal and utility company standards. Utility lines will be sized to meet the requirements of the intended use of the Premises and those set forth in the Final Plans. All utilities to be extended to the Building Shell line, in locations that are within reasonable proximity of the points at which such utility lines are required to be stubbed into the Premises by Landlord in accordance with Article 6 below.

5.6    Power and Telephone.

(i)    Power. Extend power lines down from transformer pole underground to the main shut off and C.T. cam on the exterior of the Building Shell as set forth in the Final Plans. Landlord will cause the power provider to set the meter, set up an electricity account and establish power service to the Premises. On the Delivery Date, Landlord will transfer the electricity account to Tenant, in Tenant's name. Landlord will cooperate with Tenant as necessary to bring power to the Premises, including providing 200 amp temporary service

(ii)    Telephone. Extend telephone lines down from utility pole underground to a telephone terminal cabinet on the exterior of the Building Shell as set forth in the Final Plans. Landlord will have up to 10 days after power is available to the Building to cause AT&T to complete the work set forth in this Paragraph 5.6(ii), as AT&T will not commence their work until after power has been established to the Premises.

5.7    Exterior Lighting. Provide parking lot lighting throughout the site which will comply with the Fort Bend County Lighting Ordinance and the Final Plans, and will be similar to the parking lot lighting throughout the Development.

5.8    Exterior Signage. Per Section 7 of the Lease and the Final Plans.

5.9    Cost Responsibility. All of the Site Work described in this Article 5, including the general conditions associated therewith, will be provided and paid for exclusively by Landlord.

6.    Construction of Building Shell. Landlord will, at Landlord's sole cost and expense, construct the shell building of the Premises with a scope of work equivalent to that described in the Program Package (which scope will include, without limitation, the entire superstructure, exterior enclosure, roof, loading dock, miscellaneous items such as protection bollards, transformer pad, trash enclosure, sidewalks adjoining buildings and furnishings and finishes as more specifically described and detailed on the Final Plans for the Building Shell), as modified by any Approved Deviation Letter ("**Building Shell**"), in accordance with the Final Plans for the Building Shell and Exhibit C-1. All work will comply with the general requirements of Article 3 above. Basic functional main utility lines and systems will be stubbed into the Premises of a size and in a location designated by Tenant and where shown on the Building Shell Final Plans. All work for the Building Shell construction as described in this Article 6, and all general conditions associated therewith, will be provided and paid for exclusively by Landlord. Landlord will cause its contractor to take progress photographs of the Building Shell, in either digital or printed format, and send the same to Tenant (by email if in digital format or by overnight courier if in printed format), at least once every two weeks during construction of the Building Shell, commencing when the concrete for the foundation is poured.

7.    Construction of Leasehold Improvements. Tenant will, at Tenant's sole cost and expense (except as provided in Article 8 below), construct the leasehold improvements in the Premises with a scope of work equivalent to that described in the Program Package ("**Leasehold Improvements**") in accordance with the Final Plans for the Leasehold Improvements. All work will comply with the general requirements of Article 3 above. All work for the Leasehold Improvements construction as described in this Article 7, and all general conditions associated therewith, will be provided and paid for exclusively by Tenant (except as provided in Article 8 below).

8.    Landlord's Allowance. Landlord agrees to pay Tenant an allowance, to be applied to the cost of designing and performing Tenant's Work and the other costs described below, equal to $40.00 multiplied by the number of square feet of Floor Area of the Premises ("**Allowance**"). Landlord will pay the amount of the Allowance to Tenant in 3 progress payments after the Delivery Date. Such progress payments will be made not later than 45 days after receipt by Landlord from Tenant of copies of Tenant's invoices from its architect, engineer or contractor together with a certificate from Tenant indicating that the work to which such invoices relate has been substantially completed and/or the materials to which such invoices relate have been installed in, or delivered to, the

Premises. Such progress payments will be made payable to Tenant and will be for the amount of the submitted invoices, less a 10% retainage. As a condition precedent to Landlord's issuing any such progress payment subsequent to the first such progress payment, Tenant will deliver to Landlord an original lien waiver from its contractor waiving any claim for a mechanic's or materialman's lien with respect to the labor and materials reflected in the invoices submitted for the immediately preceding progress payment. A further condition precedent to Landlord's issuing the last such payment for the amount of the retainage will be that Landlord has received from Tenant (either prior to or simultaneously with the issuance of such final payment) the following: (a) notice from Tenant's contractor that Tenant's Work has been completed (including completion of any punch list items); (b) a final and unconditional original lien waiver from Tenant's contractor in connection with Tenant's Work; and (c) a copy of the certificate of occupancy for the Premises issued by the appropriate Governmental Authorities (if any). If the amount of the Allowance exceeds the total cost incurred by Tenant in designing and performing Tenant's Work, Tenant may use the balance of the Allowance, at Tenant's option (i) to pay for costs incurred by Tenant for obtaining and installing Tenant's fixtures, furnishings and equipment in the Premises; or (ii) as a credit against the first accruing amounts of Rent due under this Lease. Landlord's failure to make any payment(s) of the Allowance to Tenant when due in accordance with the foregoing provisions, if such failure continues for more than 10 days after notice thereof is given by Tenant to Landlord, will entitle Tenant, in addition to any other rights or remedies available to Tenant under Section 14.2 of the Lease, to deduct the amount of such payment(s) of the Allowance, plus interest thereon at the Interest Rate from the date due until the date so offset, from the next accruing amounts of Rent due under this Lease.

9.     Construction Timing and Completion.

    9.1    Inspection. During the progress of construction of Landlord's Work, Landlord will permit, and cause Landlord's contractor to permit, Tenant access to the Premises for the purpose of observing the construction. Such entry by Tenant prior to the Delivery Date will (a) be under all of the terms and conditions of this Lease, except no Rent will be payable, and (b) not be construed as an acceptance of Landlord's Work by Tenant.

    9.2    Notice of the Delivery Date. Landlord will notify Tenant in writing of the date on which Landlord contemplates the actual Delivery Date will occur ("Contemplated Delivery Date") at least 60 days prior to such date ("Delivery Notice"). If Landlord fails to deliver the Delivery Notice at least 60 days prior to the then Contemplated Delivery Date, then the Delivery Date will in any event be extended to at least the 60th day following the delivery of the Delivery Notice.

    9.3    Concealed Conditions. Should Tenant or its agents or contractors encounter concealed or unknown conditions during the performance of Tenant's Work either (a) below the surface of the ground (including, without limitation, variable fill, concrete, organic material, abandoned utility lines, garbage or debris or abandoned underground storage tanks and piping related thereto), or (b) in the Building Shell, Landlord will remove or correct (and to the extent applicable, dispose of in accordance with Environmental Laws) such concealed or unknown conditions, at its sole cost and expense, and in accordance with Laws. Landlord will perform such removal or correction within 10 days of receipt of notice from Tenant of the existence of such conditions and Landlord will further, within such period, restore the affected area(s) of the Premises to the condition which such area(s) should have been in, so as to render the area(s) useable for Tenant's Work. If concealed or unknown conditions are encountered and must be removed or corrected, the Delivery Date will be deemed extended by one day for each day of delay caused by the removal or correction of such conditions.

    9.4    Punch List Inspection. Landlord will notify Tenant in writing when Landlord considers Landlord's Work "Substantially Complete" (below defined), which notice will be referred to as the "Notice of Punch List Inspection." Landlord and Tenant will promptly thereafter (but within 14 days thereafter) arrange to meet at the Premises to inspect the Site Work and the Building Shell together and to produce an initial punch list of remaining items to be completed or corrected by Landlord. Landlord acknowledges that (a) Tenant will not conduct the punch list inspection until such time as Landlord has given the Notice of Punch List Inspection, and (b) Tenant will not be obligated to accept possession of the Premises until Landlord and Tenant have conducted the punch list inspection and Landlord's Work is Substantially Complete and all other conditions precedent to the Delivery Date set forth in Section 1.3(g) of the Lease have been satisfied; thus, failure to give the Notice of Punch List Inspection will delay the Delivery Date. If Tenant fails to complete the punch list within 14 days after said Notice of Punch List Inspection, Landlord will send Tenant a written notice of Tenant's failure. If Tenant fails to complete such punch list within 10 days after said additional notice, then Tenant will waive its right to complete the punch list and the Delivery Date will proceed without such requirement. If the initial punch list reflects that Landlord's Work is not Substantially Complete, Landlord will pursue completion of the punch list items, and Landlord and Tenant will again inspect the Premises and Site Work together within 14 days of written notice from Landlord (the "Notice of Final Punch List Inspection") and produce a final punch list of remaining construction items (the "Final Punch List"). If Tenant fails to complete the punch list within 14 days after said Notice of Final Punch List Inspection, Landlord will send Tenant a written notice of Tenant's failure. If Tenant fails to complete such Final Punch List within 10 days after said additional notice, then Tenant will waive its right to complete the Final Punch List and the Delivery Date will proceed without such requirement. Tenant will not be required to accept the Premises until Landlord's Work is Substantially Complete. Landlord will use reasonable diligence to complete all final punch list items within 10 days after Landlord's Work is determined to be Substantially Complete, but in the event such punch list items cannot reasonably be completed within 10 days, Landlord may have up to an additional 20 days to complete all final punch list items. Nothing contained in this Article 9.4 will be construed to require Tenant to accept the Premises prior to the Contemplated Delivery Date. As used in this Lease, including this Exhibit C, "Substantially Complete" means that (i) all of Landlord's Work has been completed in accordance with Exhibit B, in the case of the Site Work, or the Final Plans therefor, in the case of the Building Shell, to the point that only minor details remain to be completed or corrected, all of which work remaining to be completed or corrected would be considered minor by typical retail tenant standards and none of which work would in any way restrict Tenant

from performing Tenant's Work, (ii) the exterior perimeter of the Building Shell is secure with permanent improvements (so that, e.g., all window or door openings in the Building Shell are completed with installed windows or doors, as appropriate, and are not covered with plywood), (iii) Building Shell systems are installed and in good working order, (iv) all utility services are in place and connected to the lines of the appropriate utility company (except that (x) Tenant will be responsible for establishing gas service to the Premises after it has installed all of the interior gas lines and HVAC equipment per Article 5.6 and (y) power will be in accordance with Article 5.6(i), (v) the required pair phone cables are properly installed (subject to Article 5.6[ii] which permits up to 10 days after power is available to the Premises for Landlord to complete the installation of the telephone lines), (vi) Landlord has obtained and delivered to Tenant a certificate of substantial completion from Landlord's Architect indicating that Landlord's Work has been substantially completed, (vii) in the case of the Site Work, Landlord has completed paved driveways shown on Exhibit B from adjoining public streets around the front and rear of the Premises and all security lights on the building within which the Premises are located and all light standards in the parking areas are installed and operating, and (viii) in the case of the Building Shell, all rubbish, tools, scaffolding and surplus materials used in connection with Landlord's Work have been removed from the Premises, the Premises are "broom-clean," all exterior areas (including the roof and all glass surfaces) have been cleaned and exterior masonry surfaces are free of mortar and stains caused by construction.

9.5   Outside Dates.  If construction of the Site Work has not commenced on the Effective Date, Landlord will commence final site grading (or other applicable Site Work) not later than the Site Work Start Date.  Landlord will commence construction of the Building Shell (i.e., pour the foundation for the Building Shell) on or before the Building Shell Start Date and will diligently pursue and complete the construction of the Building Shell in order to achieve the Delivery Date on or before the Projected Delivery Date.  Landlord will notify Tenant in writing that construction has commenced on the Building Shell within one week after the commencement of such work.  Subject to Section 17.15 of the Lease, if the Delivery Date does not occur on or before the Projected Delivery Date, then Tenant will be entitled to a credit against the first accruing amounts of Rent due under this Lease in an amount equal to (a) two days' Base Rent (calculated based on a 30-day month) for each day of the first 30 days of the period from the Projected Delivery Date until the Delivery Date, and (b) one day's Base Rent (calculated based on a 30-day month) for each day of any portion after the first 30 days thereof of the period from the Projected Delivery Date until the Delivery Date.  Both parties acknowledge that if the actual Delivery Date does not occur on or before the Projected Delivery Date, Tenant's damages will be difficult, if not impossible, to ascertain and the amount of liquidated damages set forth above is a reasonable estimate of the damages which would be suffered by Tenant, including, but not limited to, lost sales, lost profits, and additional costs incurred for storage, rescheduling, payroll, inventory, advertising and carrying costs.  If Tenant terminates this Lease pursuant to Article 9.6 below prior to the occurrence of the Delivery Date, then the liquidated damages described above will be calculated with reference to the date of termination of this Lease rather than the Delivery Date and the amount so determined will be payable by Landlord to Tenant in cash, rather than as a credit against Rent, and the obligation to pay such damages will survive the termination of this Lease.  The remedies set forth in this Article 9.5 will be Tenant's exclusive remedies for Landlord's failure to meet the deadlines set forth in this Article 9.5.

9.6   Tenant's Option to Terminate.  If (a) Landlord fails to cause the Delivery Date to occur on or before the Delivery Deadline, or (b) Landlord deviates from the Program Package, as modified by any Approved Deviation Letter, the Final Plans for the Building Shell or from the site plan on Exhibit B without the prior written consent of Tenant and fails to cure same within 30 days of notice by Tenant to Landlord of such deviation, then in any such event Tenant may, at Tenant's option, by notice to Landlord at any time following the date so specified or the date upon which the deviation is discovered by Tenant, terminate this Lease whereupon Landlord will be obligated to pay Tenant liquidated damages in an amount equal to $200,000, less the amount of any liquidated damages paid to Tenant pursuant to Article 9.5 above, which obligation will survive the termination of this Lease.  The parties acknowledge that if the circumstances giving rise to such right of Tenant to terminate this Lease should occur, Tenant's damages will be difficult, if not impossible, to ascertain and the amount of liquidated damages set forth above is a reasonable estimate of the damages which would be suffered by Tenant, including, but not limited to, lost sales, lost profits, and additional costs incurred for obtaining alternative premises. From and after such termination, the parties will be liable for their respective obligations to the date of termination and will have no liability for obligations arising after that date, except for those obligations which expressly survive termination. Tenant may also, from time to time, extend Landlord additional time for completion.  The remedies set forth in this Article 9.6 will be Tenant's exclusive remedies for Landlord's failure to meet the deadlines set forth in this Article 9.6.

9.7   Deviation Correction.  Notwithstanding the terms of Article 9.4 above, during the first three months after its acceptance of the Premises, Tenant will be entitled to deliver to Landlord a written list of items which Tenant may discover were not completed in accordance with the Program Package, as modified by any Approved Deviation Letter, or in accordance with the Final Plans for the Building Shell, as modified in accordance with Article 4.3 above, whether or not Tenant has previously delivered a list of other deficiencies to be corrected by Landlord.  Landlord will commence correction of such deficiencies within 10 days after Landlord's receipt of such list and will complete the correction of such deficiencies within 30 days of Tenant's notice.  In the event that Landlord fails to commence or complete correction of such deficiencies to the satisfaction of Tenant within the time periods required for Landlord to do so, Tenant may cause such deficiencies to be corrected at Landlord's expense. Landlord will reimburse such expenses to Tenant upon demand and failure of Landlord to reimburse Tenant within 30 days of demand will entitle Tenant, in addition to any other rights or remedies available to Tenant under Section 14.2 of the Lease, to deduct such expenses from the next accruing amounts of Rent due under this Lease.

9.8   Mutual Indemnities.  Landlord will indemnify and hold Tenant harmless from all claims, demands, losses, damages, and expenses arising out of Landlord's operations and the operations of Landlord's contractor or contractors and any subcontractors, laborers or materialmen in construction of the Site Work and the Building Shell.  Tenant will indemnify and hold Landlord harmless from all claims, demands, losses, damages, and

expenses arising out of Tenant's operations and the operations of Tenant's contractor or contractors and any subcontractors, laborers or materialmen in construction of the Leasehold Improvements.

**Exhibit C1**

**EXCERPTS FROM THE PROGRAM PACKAGE**

Landlord will be responsible for providing the following as part of Landlord's Work:

**KEY BUILDING ELEMENTS FOR SHELL ARCHITECT & CONTRACTOR:**

1. Interior concrete slab will be a minimum of 3,000 psi (4,000 psi for concrete tilt wall projects), moisture emission rate not to exceed 5 lbs / 1000 sf / 24 hrs. pH range will not be above 9. Contractor to test in multiple locations (a minimum of 15 areas as directed by Sports Authority Construction Manager) 30 days prior to finish flooring installation over interior slabs. **[NOTE: These tests should not be run until after the HVAC equipment has been installed by Tenant at the Premises and has had time to run and bring the humidity level within the Premises to an indoor level][TO BE DISCUSSED BY CONSTRUCTION REPRESENTATIVES]** RE: 1/A2.1.

2. The interior of the building will be constructed to provide 18'-0" clear vertical height from finished floor to lowest side of the roof structure above without horizontal encumbrances.

3. The main entry doors (three complete sets of sliding door units, sizes as designated) will be 'Stanley' Duraglide 3000 bipart or single slider. See "Door Schedule" on A5.1.

4. Two 10'-0"H x 8'-0"W dock openings with heavy-duty manual overhead coiling doors, dock seals, and manual edge of dock leveler with integral bumpers and three (3) rain hoods will be provided by Shell General Contractor. Shell Contractor will obtain such dock doors, dock seals, leveler and rain hoods through Sports Authority national account vendor as designated on A0.2, Vendor #1. Shell Contractor must submit shop drawings for Tenant review and approval.

5. Exterior building glazing will be clear low 'E' one inch (1") insulated glazing system to include 1/4" laminated glass as the pane on the exterior side of the glazing system to 8'-0" A.F.F. minimum. Laminated glass is required for Sports Authority security which will exceed the code standard of tempered glass.

6. Shell Contractor will provide conduit for power, low voltage, data and telephone under concrete slab for new buildings or in cases where new concrete slab is to be provided, RE: MEP-U. Shell General Contractor will provide pull-cords for all power, low voltage, data and telephone conduits installed without finished wiring. Shell General Contractor will provide unique identifying labels for conduit stub-ups, and their corresponding pull-cords, at their source with matching labels at their destination. Existing buildings with existing concrete slabs that are to remain will have conduit run overhead. Provide conduit runs and saw cutting of concrete slab as prescribed in the 'Site Specific MEP-O' drawing supplied by Sports Authority's design team for each store, RE: MEP-O for example.

7. Shell Contractor will provide the openings in the roof for all future roof top mechanical units, (supplied by others), and the necessary structural reinforcement to support the additional weight of these roof top mechanical units. Shell Contractor will also supply and install all roof top mechanical unit curbs supplied by 'Trane' for these units including any flashing and other roofing tasks. The Shell Contractor is responsible for the proper placement of these roof top unit curbs in accordance with locations as designated on Sports Authority's 'Site Specific MEP' plan generated specifically for each new building. Order curbs directly from national account 'Trane' vendor, RE: A0.2 "Vendor #5". In any case the work as stated here will be reviewed and approved by Tenant prior to completion of construction documents.

8. Shell Contractor to provide temporary 208/120v, 200 amp electrical service and panel with ten 20 amp breakers, location as specified by Tenant's Construction Manager for Tenant Improvement build out before start of Tenant Improvement construction.

9. Provide roof access hatch at location as dimensioned on 'Site Specific MEP' plan. If location designated conflicts with roof structure, contact Sports Authority for resolution. Refer to MEP-U and MEP-O drawing for example.

10. Shell Contractor will provide the building roof system insulated to a minimum R-value of thirty (30) which will be comprised of single-ply roofing membrane (thermoplastic polyolefin following ASTM specifications, also known as TPO) with a reflective white surface, typically applied over rigid insulation on metal roof decking. When the use of rigid insulation is not possible, the use of R-30 white vinyl-faced batt insulation applied to the underside of the roof deck in the interior of the building with the white vinyl side showing, is permitted. The duration of the roof warranty will be not less than fifteen (15) years, RE: 1/A2.5.

11. The Shell Contractor will provide all exterior soffit, wall pack, emergency fixtures and sconce lighting with quantity and location as specified and approved by the Sports Authority for each wall lighting unit. Shell GC will install lights and provide conduit with wiring from each light through the exterior wall to inside the building. Once inside the building, the conduit will extend vertically inside the wall furring up to roof deck. Terminate conduit in an exposed j-box with 18' wiring pigtail ready for final connection by Sports Authority to T.I. panel, RE: 1/A3.1 through 4/A3.1.

12. Provide level of illumination at the building perimeter and building parking area of not less than two (2) foot candles. Provide a photometric plan for approval by Sports Authority before proceeding with work.

13. Install necessary insulated cold water piping overhead from domestic water service to two (2) automatic draining, freezeless wall hydrants with anti-siphon vacuum breakers in flush mounted wall boxes. Provide one (1) hose bibb inside building at roof hatch near opening with reachable access from roof through roof hatch. Provide size piping to preserve water flow and prevent noise, RE: M2.1.
   - Rear of building at loading dock.
   - Front of building near entry.
   - Inside roof access hatch.

14. Shell General Contractor to provide permanent 1" galvanized metal eye-bolts (approximately 12) built into the structure in locations and quantities as specified by Sports Authority Exterior Sign Manager for display of pre-opening and future advertising banners, RE: A0.2, Vendor #19.

15. Shell General Contractor to provide a j-box and conduit with pull cords from interior roof deck to back of storefront sign. Coordinate location with Sports Authority Sign Manager/Construction Manager, RE: A0.2, vendor #19.

16. The Shell Contractor will construct the entire 'entry vestibule', interior and exterior, excluding interior gypsum board for walls and ceiling. Provide conduit under slab and/or overhead as required for future installation of vestibule lighting, electric unit heaters, burglar alarm panel, sensormatic controllers, emergency exit signs, Stanley automatic doors and fire alarm enunciator panel to be located inside vestibule. Coordinate locations and quantities of rough electrical with Sports Authority 'Site Specific MEP' plan and Supplemental Vestibule Detail drawings, RE: 1/A2.3 through 5/A2.3.

17. The Shell General Contractor will provide fire department 'knox box' on the exterior of the building at locations specified by the local jurisdiction as required.

18. Shell Architect will notify Sports Authority if National Fire Protection Association (NFPA), Section 101 - "Life Safety" will affect exiting requirements for this building (i.e. 50% or 2/3 of exits are required through the front of the building based on final occupancy).

19. Exterior walls will be insulated to an R-value of 13 using medium-density batt insulation, 5/8" gyp. bd. And 3-5/8" x 20 ga. (6" as required) metal studs with tape and mud, sanded to a level 4 finish (paint ready) unless noted otherwise by Sports Authority in the drawing set. The studs will be set off the exterior wall by 3/4" using "Dietrich Fast Clips." The gyp. bd. will have vertical control joints at a minimum of 30'-0" O.C. Install gyp. bd. vertically on walls in 8'-0" long sections from finished floor to 8'-0" A.F.F. and 12'-0" long sections from 8'-0" A.F.F. to 20'-0" A.F.F. Install gyp. bd. above 20'-0" in whole sections vertically to underside of roof deck.

20. Shell General Contractor will provide wall screening for trash dumpsters, compactor and all other exposed equipment as required by local codes and ruling authorities. Provide truck turning radius study for appropriate access and clearance for dock, dumpsters and compactor, RE: 1/A2.1. Sports Authority uses 'WB-65' (delivery truck with 65' wheel base and 73.5' long) to calculate turning radii. The clearance for dumping the trash at the dumpster location requires a 40'-0" minimum approach.

21. 24" deep metal rain hoods (painted to match adjacent exterior wall surface) will be provided above all loading dock doors and receiving (man) door as specified by Site-Specific MEP plan. All other exterior hollow metal doors will have drip edge flashing. Provide through national account vendor, RE: A0.2, Vendor #27.

22. The interior underside of roof deck, joists, girders and surrounding supporting structure will be painted white (Sherwin Williams #B42W1 package white waterborne flat acrylic dryfall) by the Shell General Contractor.

22. Provide new 277/480v electrical service with CT cabinet with exterior fused main disconnect per local utility requirements and as specified in 'Site Specific' MEP plan for location and amperage requirements.

23. Site furniture consisting of two trash/ash receptacles, one bike rack and one bench (all in-ground mounted) will be provided and installed by Shell General Contractor per Sports Authority specifications, RE: A0.2 "Site Furniture and Accessories".

24. Roof drain leaders will not be allowed on the sales floor and locations must be coordinated with Site Specific Floor Plan.

25. Trees in front of store must be kept trimmed to 18' canopy maximum. Provide landscape plan for Tenant review.

26. Existing buildings must have a live load minimum of 100 lbs/psf on the entire floor.

C1-2

27.    In addition to above, the following are requirements for the state of Florida and possible other hurricane prone areas, including the Premises:

**       <u>Storefront Door and Window Glazing System:</u>
         Entry door will be Stanley Dura-Storm 3000-sliding door system.
         Kawneer Series IR 500 aluminum glazed w/safglas - high impact wall glazing system.
         Provide reinforcing to door and window system as recommended by manufacturer.
**       Provide 10'-0"x17'-0"x8" thick concrete steel reinforced generator pad at location as specified on site-specific drawings to include electrical conduit with <u>pull-cord</u> underground from pad to inside electrical room. Coordinate location of electrical conduit with Sports Authority.
**       Building materials and supplies will comply with the State of Florida product approval listing.
**       Contact Sports Authority immediately if natural gas is not available as a utility forcing an "all electric" building.
**       Lightning protection will be provided and installed by Shell GC as detailed by Sports Authority.

**<u>Fire Protection</u>**

<u>Fire Sprinkler System:</u>

The Landlord will install a complete base building automatic fire sprinkler system and riser, as described below, that meets the requirements of the Tenant design criteria, and will as minimum comply with 'NFPA 13' and National, State and Local requirements. The system will include but not be limited to the following:

Fire and Life Safety Services, L.L.C. will be the <u>required</u> vendor for fire protection consulting and as such will be contacted to obtain a proposal for providing all services for complete bid specification package at the expense of the developer. Fire and Life Safety Services will include:

<u>Site Investigation (Existing Building Only)</u>

- Survey of existing fire protection sprinkler system.
- Provide a written report and evaluation of fire protection system conformance with the fire protection requirements of the Sports Authority.
- Provide fire protection system upgrade recommendations.

<u>Water Flow Investigation:</u>

Determine local fire department water supply requirements, capabilities of water supply system and if the available water supply will satisfy the fire protection design criteria. The scope includes the following:

- Contact the water utility and obtain pertinent information on the water system such as grid maps, planned improvements, and backflow prevention requirements.

- Review utility drawings for elevations, site water main distribution and sizes, and hydrant locations.

- Analyze water utility grid maps, prepare for a water flow test and evaluation.

- Perform one day of water flow testing. Graph and analyze flow test(s) and determine adequacy of water supplies and the possible need for a fire pump.

- Coordinate for proper fire line sizes and locations.

- Determine proper jurisdiction and applicable codes.

- Determine potential concerns of the local authority having jurisdiction.

- Prepare a water flow test report and provide recommendations.

<u>Sprinkler System - Criteria Level Design Drawings:</u>

Scope of work includes:

- Riser schematic design and layout.

- Engineered fire sprinkler criteria level design drawings and specifications.

- Plan review of fire sprinkler contractor shop drawings.

        <u>Contact Information:</u>
        Greg Rasmussen,
        Fire Protection Consultant
        Fire and Life Safety Services, L.L.C.
        6834 South University Blvd., #464

Centennial, Colorado 80122

Voice    (303) 210-0869
Fax      (720) 294-9723
gdr@firelifesafety.net

- The fire protection system will be designed by the Landlord's installing Contractor specifically for the Tenant's final use.  The design criteria will be furnished to the Landlord by Fire and Life Safety Services, L.L.C. for coordination and will be incorporated into the shell construction contract documents.  Sports Authority's minimum protection criteria will allow for sales and storage of Class I-IV and Group 'A' plastics commodities throughout the entire facility.

- Fire sprinkler drawings for the shell construction will be submitted to, reviewed and approved by the tenant's fire protection consultant (Fire and Life Safety Services, L.L.C.) concurrent with submission to authority having jurisdiction.

- Landlord's Fire Protection Contractor will be responsible for obtaining all permits and inspections from authority having jurisdiction.

- Provide electrical connections for the fire alarm control system.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

*** The fire protection system will be separate and independent from all other tenants

C1-4

**Exhibit D**

**COMMENCEMENT AGREEMENT**
*(not to be recorded)*

THIS COMMENCEMENT AGREEMENT (this "Agreement") is made and entered into this _____ day of _____, 20__, by and between MRPL RETAIL PARTNERS, LTD., a Texas limited partnership ("Landlord"), and TSA STORES, INC., a Delaware corporation ("Tenant").

**RECITALS**

WHEREAS, Tenant and Landlord have entered into that certain Shopping Center Lease dated _____, 2011 (the "Lease") for certain retail Premises located in the Shops at Bella Terra Shopping Center in the County of Fort Bend and State of Texas; and

WHEREAS, pursuant to the Lease, Landlord and Tenant now desire to confirm certain dates and amounts applicable under the Lease.

**AGREEMENT**

In consideration of the Lease and the mutual agreements set forth below, the parties agree as follows:

1.    All initially capitalized terms used but not defined in this Agreement will have the meaning set forth for such terms in the Lease.

2.    The Delivery Date occurred on _____, 20__. The Initial Term of the Lease commenced on the Commencement Date, which was _____, 20__. The Rental Commencement Date is _____, 20__. The Expiration Date is _____, 20__, although the Term may be extended as provided in the Lease by Tenant's exercise of certain Extension options.

3.    The actual measured Floor Area of the Premises as finally determined pursuant to Section 2.3 of the Lease is _____ square feet. After application of any limits set forth in Section 2.3 of the Lease on such measured Floor Area, and for purposes of calculating Base Rent, Common Area Charges, Real Estate Taxes and any other amounts that are to be calculated under the Lease with reference to the Floor Area of the Premises, and for all other purposes under the Lease, the Floor Area of the Premises is _____ square feet.

4.    The amounts of Base Rent payable by Tenant during the Initial Term and during any Extension with respect to which Tenant exercises its option under the Lease, and the date by which Tenant must give notice to Landlord to exercise its option with respect to each Extension, are as follows:

| Applicable Time Period | Total Annual Base Rent | Total Monthly Base Rent | Date by which Tenant must give Notice |
|---|---|---|---|
| Rental Commencement Date through the Expiration Date | $_____ | $_____ | not applicable |
| First Extension | $_____ | $_____ | _____ |
| Second Extension | $_____ | $_____ | _____ |
| Third Extension | $_____ | $_____ | _____ |
| Fourth Extension | $_____ | $_____ | _____ |

5.    Nothing set forth in this Agreement will be deemed an exercise by Tenant of any Extension.

6.    In accordance with Section 2.5 of the Lease, the dates and amounts set forth in this Agreement will be conclusive of such information. Except as modified hereby, the Lease has not been amended and, as modified hereby, the parties ratify and confirm the Lease as being in full force and effect.

D-1

Having read and intending to be bound by the terms hereof, the parties have signed this Agreement on the date(s) set forth below.

**TENANT:**

TSA STORES, INC., a Delaware corporation

By: _____
Name: _____
Title: _____

Date of execution by Tenant: _____, 20__

**LANDLORD:**

MRPL RETAIL PARTNERS, LTD.,
a Texas limited partnership

By: _____
Name: _____
Title: _____

Date of execution by Landlord: _____, 20__

D-2

**Exhibit E**

**SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT**

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT (this "Agreement") is made and entered into this _____ day of _____, 20___, by and between MRPL RETAIL PARTNERS, LTD., a Texas limited partnership ("Landlord"), FROST BANK, a _____ ("Lender"), and TSA STORES, INC., a Delaware corporation ("Tenant").

**RECITALS**

WHEREAS, Tenant entered into that certain Shopping Center Lease dated _____, 2011 with Landlord for retail premises ("Premises") in the Shops at Bella Terra Shopping Center ("Development"). The Premises is constructed on that certain tract or parcel of land owned by Landlord that is part of the Development (the "Shopping Center"). The Shopping Center is located in the County of Fort Bend and State of Texas, and is more particularly described in Exhibit A attached to this Agreement and incorporated herein by reference. The Shopping Center Lease and all amendments and modifications thereto are hereinafter referred to as the "Lease"; and

WHEREAS, Landlord has assigned or will assign to Lender and Lender's successors and assigns, Landlord's interest in, to and under the Lease as a portion of the collateral security for a loan in the amount of $_____ made or to be made by Lender to Landlord and to be additionally secured by a first position lien mortgage or deed of trust ("Mortgage"); and

WHEREAS, Tenant desires to be assured of the continued use and occupancy of the Premises under the terms and conditions of the Lease.

**AGREEMENT**

NOW THEREFORE, for and in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby expressly acknowledged, the undersigned parties hereby agree as follows:

1.      Tenant does hereby consent to the subordination of the Lease and Tenant's rights thereunder to the lien of the Mortgage; provided, however, that the consent and subordination will be contingent upon and subject to the condition that so long as Tenant is not in default, after receipt of any written notice required to be given under the Lease and the expiration of any applicable grace and/or curative period thereunder, in the performance of any of the terms of the Lease, Tenant's possession of the Premises and Tenant's rights and privileges under the Lease or any extensions or renewals thereof will not be disturbed, diminished or interfered with by Lender or by anyone claiming by, through or under Lender, whether by purchase at foreclosure, deed in lieu of foreclosure or otherwise.

2.      In the event of a foreclosure sale under the Mortgage or deed in lieu thereof, Tenant will be bound to Lender or to any other purchaser at foreclosure or recipient of a deed in lieu of foreclosure (Lender or such other purchaser or recipient, a "Successor Landlord") under all of the terms of the Lease for the balance of the term thereof remaining, including any extensions or renewals thereof elected by Tenant with the same force and effect as if Successor Landlord were Landlord under the Lease, and Tenant hereby attorns to Successor Landlord as "Landlord" under the Lease, such attornment to be effective and self-operative without the execution of any further instrument. Notwithstanding anything to the contrary contained herein, Tenant will be under no obligation to pay rent to Successor Landlord until Tenant receives written notice from Successor Landlord that it has succeeded to the interest of "Landlord" under the Lease. Subject to the provisions of Section 3 below, the respective rights and obligations of Tenant and Successor Landlord upon such attornment will, to the extent of the then remaining balance of the term of the Lease, including, any extensions or renewals thereof elected by Tenant, be as set forth in the Lease.

3.      In the event of a foreclosure sale under the Mortgage or deed in lieu thereof, Successor Landlord will be bound to Tenant under all the terms of the Lease and Tenant will, from and after such event, have the same remedies against Successor Landlord for the breach of any covenant contained in the Lease that Tenant might have had under the Lease against Landlord; provided, however, that Successor Landlord will not be:

(a)      liable for any action or omission of any prior landlord, except with respect to any action or omission that constitutes a default in the performance of Landlord's obligations under the Lease which default continues (i) after Successor Landlord acquires title to the Shopping Center, and (ii) beyond the cure period afforded to the "Landlord" under the Lease, measured from the date on which notice of such default is given to Successor Landlord (unless possession of the Shopping Center is necessary to effect the cure, in which case Successor Landlord's cure period will be measured from the later of the date on which notice of such default is given to Successor Landlord or the date Successor Landlord or a receiver obtains sufficient possessory rights in the Shopping Center to effect the cure);

(b)      subject to any credits, claims or setoffs which Tenant may have against any prior landlord, except for any credit, claim or setoff to which Tenant is expressly entitled under the Lease;

(c)      bound by any rent which Tenant intentionally paid to a prior landlord more than 30 days in advance; or

E-1

(d)    bound by any amendment of the Lease made subsequent to the date of this Agreement that reduces the rent or shortens the term (other than as expressly contemplated by the Lease, such as, for example, a rent reduction upon partial condemnation of the Premises), unless such amendment was made with Lender's written consent, which consent will not be unreasonably withheld or delayed and will be deemed given if no response is received within 10 days after request for consent is given to Lender.

4.    If Lender enforces any assignment of rents clause contained in the Mortgage or in any other instrument securing the loan, Lender and Landlord will hold Tenant harmless from any claims arising out of Tenant's paying rent, as required under the Lease, to Lender or by complying with the assignment of rents clause or similar right.

5.    Lender is hereby granted the right (but will have no obligation, except to the extent Lender becomes a Successor Landlord) to cure any default by Landlord under the Lease within the time period provided under the Lease for Landlord to cure the default, and Tenant agrees to accept performance of any of Landlord's obligations under the Lease from Lender. Tenant will use commercially reasonable efforts to notify Lender of any default by Landlord under the Lease at the time Tenant gives Landlord notice of such default.

6.    Landlord represents to Tenant that any and all loans secured by the Shopping Center other than the Mortgage ("Prior Financing") have been paid in full and that Tenant has no further obligations under any agreement, including, without limitation, any subordination, non-disturbance and attornment agreement, previously signed by Tenant in connection with any Prior Financing.

7.    The provisions of Section 17.12 of the Lease will govern the giving of any notice required or permitted to be given under this Agreement. Unless otherwise provided below or changed by notice, the addresses for notices to Landlord and Tenant will be as set forth in the Lease. Unless changed by notice, the address for notices to Lender will be as follows:

_____

_____

_____

_____

8.    This Agreement may not be modified orally or in any manner other than by an agreement in writing signed by the parties hereto or their respective successors in interest. This Agreement will inure to the benefit of and be binding upon the parties hereto, their successors and assigns, and any purchaser or purchasers at foreclosure of the Shopping Center and their respective heirs, personal representatives, successors and assigns.

9.    This Agreement will be governed by and construed in accordance with the laws of the State of the location of the Premises.

10.    The effective date of this Agreement will be the date of execution by the last party to sign this Agreement provided an executed copy of this Agreement is thereafter delivered to all other parties to this Agreement.

11.    IN THE EVENT THIS AGREEMENT IS NOT FULLY EXECUTED BY ALL PARTIES HERETO WITHIN 45 DAYS OF THE EARLIEST DATE OF EXECUTION BY ANY PARTY HERETO AS SHOWN BELOW, THIS AGREEMENT WILL SELF-OPERATIVELY BECOME NULL AND VOID.

IN WITNESS WHEREOF, the parties hereto have executed and sealed this Agreement as of the day and year first above written.

**LANDLORD:**

MRPL RETAIL PARTNERS, LTD.,
a Texas limited partnership


By:    _____
Name:  _____
Title: _____


Date of execution by Landlord: _____, 20__

E-2

**LENDER:**

_____,
a _____

By:      _____
Name:  _____
Title:    _____

Date of execution by Lender: _____, 20__

**TENANT:**

TSA STORES, INC., a Delaware corporation

By:      _____
Name:  _____
Title:    _____

Date of execution by Tenant: _____, 20__

**ACKNOWLEDGMENTS**

<u>LANDLORD</u>

STATE OF _____ )
                                              ) ss.
COUNTY OF _____ )

    The foregoing instrument was acknowledged before me this _____ day of _____, 20__  by _____ as _____ of MRPL RETAIL PARTNERS, LTD., a _____.

    WITNESS my hand and official seal.


_____
Notary Public

    My commission expires: _____


<u>LENDER</u>

STATE OF _____ )
                                              ) ss.
COUNTY OF _____ )

    The foregoing instrument was acknowledged before me this _____ day of _____, 20__  by _____ as _____ of _____, a _____.

    WITNESS my hand and official seal.


_____
Notary Public

    My commission expires: _____


E-3

<u>TENANT</u>

STATE OF _____ )
                          ) ss.
COUNTY OF _____ )

        The foregoing instrument was acknowledged before me this _____ day of _____, 20__ by
_____ as _____ of
TSA Stores, Inc., a Delaware corporation.

        WITNESS my hand and official seal.


                                       _____
                                       Notary Public

My commission expires: _

E-4

**Exhibit F**

**PERMITTED ENCUMBRANCES**

1. Restrictive covenants as set forth in Volume 986, Page 521 and Volume 1034, Page 751 of the Deed Records; and Volume 2217, Page 2261 of the Official Records of Fort Bend County, Texas and under that certain Easement with Covenants and Restrictions Affecting Land recorded under Fort Bend County Clerk's File No. 2007017378 and 2007109573 and that certain Easement with Covenants and Restrictions Affecting Land recorded under Fort Bend County Clerk's File No. 2007017378 and 2008101907, deleting therefrom any restrictions indicating any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status or national origin.

2. Scenic easement is restrictive for land lying within 2000 feet of Grand Parkway as set forth and located by instrument filed for record in Volume 2217, Page 2261, of the Official Public Records of Fort Bend County, Texas.

3. Limited Consent and Waiver Concerning Scenic Easement filed February 9, 2007 under Fort Bend County Clerk's File No. 2007017371.

4. Storm sewer easement granted to Fort Bend County Municipal Utility District No. 50 as set out in instrument recorded under Fort Bend County Clerk's File No. 2007134961.

5. Water line easement granted to Fort Bend County Municipal Utility District No. 50 as set out in instrument recorded under Fort Bend County Clerk's File No. 2007134963.

6. Water line easement granted to Fort Bend County Municipal Utility District No. 50 as set out in instrument recorded under Fort Bend County Clerk's File No. 2007086007.

7. Water line easement granted to Fort Bend County Municipal Utility District No. 50 as set out in instrument recorded under Fort Bend County Clerk's File No. 2007086008.

8. Storm sewer easement granted to Fort Bend County Municipal Utility District No. 50 as set out in instrument recorded under Fort Bend County Clerk's File No. 2007134964.

9. Water line easement granted to Fort Bend County Municipal Utility District No. 50 as set out in instrument recorded under Fort Bend County Clerk's File No. 2007134966.

10. Sanitary sewer easement granted to Fort Bend County Municipal Utility District No. 50 as set out in instrument recorded under Fort Bend County Clerk's File No. 2007086010.

11. Short form blanket easement for electric subdivisions granted to CenterPoint Energy Houston Electric, LLC as set out in instrument recorded under Fort Bend County Clerk's File No. 2007086660.

12. Terms and provisions contained in that certain Memorandum of Site Development Agreement by and between MRPL Retail Partners, Ltd., and Kohl's Texas, L.P. recorded under Fort Bend County Clerk's File No. 2007109574.

13. Subject property is located in the following District: Fort Bend Municipal Utility District No. 50.

14. Subject property is located in the following District: Fort Bend Levee Improvement District No. 12.

**Exhibit G**

**EXISTING LEASES NOT SUBJECT TO TENANT'S EXCLUSIVE/OTHER EXCLUSIVES**

I.    EXISTING LEASES NOT SUBJECT TO TENANT'S EXCLUSIVE:

1.    New Cingular Wireless PCS, LLC (d/b/a AT&T Mobility)

2.    Best Buy Stores, LP

3.    Brian Phan, DDS  (d/b/a Magic Dental)

4.    Blazin Wings, Inc. (trade name: Buffalo Wild Wings Grill and Bar)

5.    Brown Group Retail, Inc.   (trade name: Famous Footwear)

6.    Gamestop, Inc.

7.    General Nutrition Corporation (trade names: General Nutrition Center, GNC, GNC Live Well)

8.    M & L Work Investments, LLC (d/b/a Golf Etc. Katy)

9.    HRB Technology LLC (d/b/a H&R Block)

10.    Leslie's Poolmart, Inc.

11.    Mattress Firm Operating, Ltd. (d/b/a Mattress Firm)

12.    John's Legacy, L.L.C. (trade name: New York Pizzeria)

13.    Petsmart, Inc.

14.    Ping Huang (d/b/a Quizno's)

15.    Ross Dress for Less, Inc.

16.    Cheston C. Syma (trade name: Sport Clips)

17.    Sprintcom, Inc.

18.    Taco Bell of America, Inc.

19.    The Children's Place Retail Stores, Inc.

20.    Tran Thai Viet, Bily Nguyen and Hoat Dang Nguyen  (d/b/a The Pure Massage & Spa)

21.    Viral A. Desai (trade name:  Vision Source)

22.    Wells Fargo Successor in Interest to Wachovia Bank, National Association

23.    Whataburger Restaurants, LP

24.    YAN & NG, Inc. dba Sushi Hana

25.    Zale Delaware, Inc. (trade names:  Zales Fine Jewelry Outlet, Zales The Diamond Store Outlet)

26.    CHCA West Houston, L.P.

II.    OTHER EXCLUSIVES:

| Tenant [Status]: | Exclusive: |
|---|---|
| Whataburger | primary business (i.e., 20% or more of its gross sales) is the sale of prepared hamburgers including, but not limited to, Wendy's, McDonald's, Burger King, Sonic, Jack-in-the-Box, Dairy Queen, Steak-n-Shake, A&W or Prince's; provided, however, that the foregoing restriction shall not apply to (i) the Premises, or (ii) any restaurant exceeding two thousand five hundred (2,500) contiguous square feet and not having a drive-through, such as Fuddruckers, Prince's, Chili's and Red Robin. |
| Vision Source (Desai) | Tenant shall have the exclusive right to engage in the practice of Optometry in the **Development**. |
| Pets Mart | 1.    **Prohibited Uses**. The following uses (collectively referred to as "Prohibited Uses" and individually as a "Prohibited Use") are prohibited during the Term of the Lease in any portion of the **Development**: nuisance; any use causing loud noises or offensive odors (including any business using exterior loud speakers); manufacturing facility; dry cleaner (except facilities for drop off and pick up of clothing cleaned at another location); any facility for the sale, lease or rental of automobiles, trucks, motorcycles, recreational vehicles, boats or other vehicles; automobile repair shop or service station or any facility storing or selling gasoline or diesel fuel in or from tanks; used clothing or thrift store or liquidation outlet; massage parlor; adult book shop or adult movie house; mortuary or funeral parlor; coin operated laundry; cocktail lounge, bar or tavern or sale of alcoholic beverages, whether or not packaged, except in conjunction with a restaurant permitted hereunder; night club; cinema or theater; place of recreation (including but not limited to bowling alley, skating rink, carnival, game arcade or health spa); church; or any other use inconsistent with the operation of a high quality retail shopping center. No restaurants of any size shall be located within three hundred (300) feet of the Premises. In addition, the following uses must first be approved in writing by Tenant: drive-throughs; children's recreational, educational or day-care facility; restaurants occupying more than twenty-five hundred (2,500) square feet of Gross Floor Area; offices; professional uses; and schools of any nature except in conjunction with animal training or obedience training classes associated with Tenant's Primary Business. As used herein, "school" includes, but is not limited to, a beauty school, barber college, reading room, place of instruction or any other operation serving primarily students or trainees rather than retail customers. It is the intent of this Section that the Shopping Center shall be devoted to high quality retail uses and that the parking and the other common facilities shall not be burdened by either excessive or protracted use. Landlord acknowledges and agrees that to permit any of the Prohibited Uses within the **Development** would materially and adversely affect Tenant's business, and, in such event, if Landlord is unable or unwilling to stop any Prohibited Use within thirty (30) days after written notice thereof, and in addition to any and all other remedies available to Tenant under this Lease or at law or in equity, all Base Rent and other charges to Tenant under this Lease shall abate (and not accrue) until such time as the Prohibited Use ceases.<br><br>2.    **Tenant's Primary Business and Exclusive Rights**. As used in the Lease, the term "Tenant's Primary Business" shall mean the retail sale of (i) pets (including, but not limited to, fish, birds, reptiles, dogs, cats and other small animals, including equestrian products and apparel related thereto, (iii) services related to pets and animals, such as grooming, boarding, pet day care, animal training and obedience classes, pet adoption and veterinary services, (iv) products relating to nature and the environment, and (v) educational products and services related to any of the foregoing, and office and storage uses incidental to the foregoing. From and after the date hereof and continuing throughout the Term of the Lease and for a period of one (1) year thereafter (unless (a) Tenant has no stores operating within the metropolitan area in which the Shopping Center is located, or (b) this Lease has been terminated as a result of Tenant's default hereunder), Tenant shall have the exclusive right in the **Development** to conduct any portion of Tenant's Primary Business described in clauses (i), (ii) and (iii) of this Section 2. All other tenants or other occupants of any portion of the **Development**, and any other real property which is located within a radius of one (1) mile from the Shopping Center and which is owned and/or controlled by Landlord or by an entity which is owned and/or controlled by Landlord or an affiliate thereof, other than existing retail operations which are open and operating as of the date of this Lease (except to the extent Landlord has the right to consent to a change in use or assignment or subletting), shall be prohibited from engaging in any portion of Tenant's Primary Business described in clauses (i), (ii) and (iii) of this Section 2; provided, however, that the sale of the items listed in clause (ii) of this Section 2 shall be permitted on an incidental basis (as defined herein), but the sale of pets and the providing of the |

G-2

| | |
|---|---|
| | services listed in clause (iii) above shall not be permitted ("Tenant's Exclusive"). For purposes of this Section 2, the term "incidental" shall mean that the use occupies the lesser of (a) 250 square feet of Gross Floor Area, or (b) five percent (5%) of the sales area in the subject premises. Notwithstanding the foregoing, Tenant hereby acknowledges that neither Wal-Mart or Kohl's, or their respective successors and assigns, shall be subject to Tenant's Exclusive. Landlord acknowledges and agrees that any violation of Tenant's Exclusive would materially and adversely affect Tenant's Primary Business, and, in such event, if Landlord is unable or unwilling to stop any such violation of Tenant's Exclusive within thirty (30) days after written notice thereof, and in addition to any and all other remedies available to Tenant under this Lease or at law or in equity, all Base Rent and other charges to Tenant under this Lease shall abate (and not accrue) until such time as the violation ceases, or, in the alternative, Tenant shall have the right to terminate this Lease upon notice to Landlord.<br><br>      3.     **Exclusive Rights of Other Parties.** Landlord represents and warrants that the list attached as Exhibit G-1 is a complete list of all exclusive rights, if any, which exist as of the date hereof affecting any portion of the Development. Tenant covenants and warrants that it will not violate existing exclusive rights listed in Exhibit G-1. (For purposes hereof, the term "exclusive right" shall mean any provision which purports to restrict or prohibit, or under which the grantor agrees that it will restrict or prohibit or will not grant the right to engage in, the sale of any product or service or the conduct of any type business, except by or to the party granted such exclusive right).<br><br>      4.     **Other Prohibited Uses.** Landlord represents and warrants that the matters set forth in Exhibit G-2 attached hereto is a complete list of all restrictions or prohibitions, if any, which exist as of the date hereof under any Title Matters |
| Best Buy | Provided Tenant is not in default beyond any applicable notice and cure period, Landlord represents, warrants and covenants to and with Tenant that Tenant may lawfully use the Premises for sales, rental, service and warehousing incidental to the operation of a retail store (and if applicable, installation in motor vehicles) of the product categories listed below ("Tenant's Product Categories"). Tenant's Product Categories (regardless of whether new, used or refurbished) are the following: electronic equipment or appliances (including, without limitation, televisions, stereos, radios and dvd or video machines); major household appliances (including, without limitation, refrigerators, freezers, stoves, microwave ovens, dishwashers, washers and dryers); mobile and other telecommunications products, services and accessories (including, without limitation, cellular and other telephones, accessories, batteries and related products and services); personal computers and peripherals; computer software; digital, downloadable and streamable entertainment (including, without limitation, music, video and ring tones); car radios, stereos and tape decks; communication devices (either audio or video); entertainment software (including, without limitation, compact discs, music videos, dvds, games, gaming consoles and prerecorded tapes); accessories and connectors for products sold by Tenant (including, without limitation, cable connectors, surge protectors, cables, wires and batteries); telephones, answering machines and related accessories; telecopy, facsimile and photocopy machines; utility services; repair services and parts; photographic cameras and equipment; office equipment, supplies and furniture (including, without limitation, paper, ink cartridges and ink refills for printers); any substitutes for or items which are a technological evolution of the foregoing items; and/or any other related items carried in a majority of Tenant's stores.<br><br>In addition to the foregoing and subject to the requirements contained in the Existing ECR Agreement and existing leases in the Shopping Center, Tenant shall have the right to (a) the Incidental Sale, as defined below, of books and magazines, toys, sporting equipment and related items, (b) sell gourmet and other food items in support of and incidental to the foregoing product categories, and (c) use up to ten percent (10%) of the Premises for a non-alcoholic beverage kiosk or bar, including seating area, with food, snack and bakery items incidental thereto. "Landlord", for purposes of this Article, shall be defined to include Landlord, and (i) if Landlord is a corporation, its principal shareholders; or (ii) if Landlord is a partnership, its partners and any principal shareholders or partners of any partner which is a corporation or shareholder; or (iii) if Landlord is a trust, the beneficiaries of any such trust, including the principal shareholders or partners of any beneficiary which is a corporation or trust, all of whom shall execute an agreement to be bound to this Article. Except as provided herein, in no event shall Tenant be bound by any exclusives granted by Landlord to any other party or occupant after the date of the Lease without Tenant's prior written consent, which may be granted or withheld in Tenant's sole and absolute discretion.<br><br>Landlord shall not permit any person or entity other than Tenant (or Tenant's parent company, affiliates, assignees, sublessees and assigns) either (i) in space within the portions of the Shopping Center owned by Landlord to sell, rent, service (including diagnostic testing, maintenance and repair) and/or warehouse (and, if applicable, |

install in motor vehicles) the following product categories as its primary business: electronic equipment or appliances (including, without limitation, televisions, stereos, radios and dvd or video machines); major household appliances (including, without limitation, refrigerators, freezers, stoves, microwave ovens, dishwashers, washers and dryers); mobile and other telecommunications products, services and accessories (including, without limitation, cellular and other telephones, accessories, batteries and related products and services); personal computers and peripherals; computer software; digital, downloadable and streamable entertainment (including, without limitation, music, video and ring tones); car radios, stereos and tape decks; communication devices (either audio or video); entertainment software (including, without limitation, compact discs, music videos, dvds, games, gaming consoles and prerecorded tapes); accessories and connectors for products sold by Tenant (including, without limitation, cable connectors, surge protectors, cables, wires and batteries); telephones, answering machines and related accessories; telecopy, facsimile and photocopy machines; utility services; repair services and parts; photographic cameras and equipment, without Tenant's prior written consent, which may be granted or withheld in Tenant's sole and absolute discretion.

Further, Landlord shall not permit any person or entity other than Tenant (or Tenant's parent company, affiliates, assignees, sublessees and assigns) in space leased directly from Landlord within one (1) mile of the Shopping Center to operate primarily as a consumer electronics store, as defined in the Lease.

The Incidental Sale of Tenant's Product Categories shall be permitted by Other Tenants in the Shopping Center. Incidental Sale shall be defined as being from the lesser of the following portions of any occupant's area in the Shopping Center: (i) as to any combination of more than one of Tenant's Product Categories, the lesser of five percent (5%) of an occupant's sales area or 500 square feet of sales area, in the aggregate, or (ii) as to any one of Tenant's Product Categories, the lesser of five percent (5%) of an occupant's sales area or five hundred (500) square feet of sales area, in the aggregate. The calculation of the foregoing shall include one-half of any aisle space adjacent to the display of items within Tenant's Product Categories.

Notwithstanding anything to the contrary set forth in the foregoing, as long as Best Buy is not in default beyond applicable notice and cure periods and is operating in the Premises as Consumer Electronics Retailer, as hereinafter defined, Landlord shall not be prohibited from selling or leasing other premises in the Shopping Center to any of the following retailers, provided, and, other than as provided herein and the Existing ECR Agreements, so long as, any exclusive granted to such retailers are not applicable or enforceable against Tenant, its subtenants, successors or assigns, except as provided herein, and provided such retailers, their subtenants, successors or assigns never operate as a Consumer Electronics Retailer at the Shopping Center,:

1.  Bed Bath & Beyond, Linens N Things or Home Goods, for so long as such retailer continues to operate primarily as a home good store;

2.  Ross, T.J. Maxx or Marshall's, for so long as such retailer continues to operate primarily as a soft good retailer;

3.  Old Navy, for long as such retailer continues to operate primarily as a soft good retailer;

4.  Cost Plus, for so long as such retailer continues to operate primarily as (whatever Cost Plus is);

5.  Borders, Barnes & Nobles or Books A Million, for so long as such retailer continues to operate primarily as a bookstore,

6.  Michael's Arts & Crafts or Jo Ann Fabrics, for so long as such retailer continues to operate primarily as a arts and crafts and/or fabric store;

7.  Office Supply Stores including Staples, Office Max or Office Depot, for long as such retailer continues to operate primarily as an office supply superstore;

8.  Sporting Goods Retailers, such as Dick's, The Sports Authority or Academy, for so long as such retailer continues to operate primarily as a sporting goods store;

9.  Sam's or Costco, for long as such retailer continues to operate primarily as a wholesale club; and

10. Petco or PetsMart; and

Notwithstanding the above, as long as Best Buy is not in default beyond applicable

G-4

| | |
|---|---|
| | notice and cure period and is operating in the Premises, Landlord will never lease, sell or permit the use of any portion of the Shopping Center owned by Landlord to a "Consumer Electronics Retailer." A Consumer Electronics Retailer shall be defined as an entity which, as its principal use sells, rents or services all or a substantial combination of Tenant's Product Categories such as and by way of example, Circuit City.<br><br>Tenant agrees to use and operate the Premises in compliance with the terms of the Existing ECR Agreements and the Existing Exclusives.<br><br>Landlord shall be permitted to have not more than three (3) Cell Phone Stores in the Shopping Center; provided such stores are located not closer than 500 feet from the Premises and do not exceed three thousand five hundred (3,500) square feet each. The term "Cell Phone Store" means a retail store with its primary use being the sale of cellular telephones, services and accessories, and does not include the sale of such items by the tenants named in 11 through 12, above. However, Landlord shall not allow any Cell Phone Store operating in the Shopping Center to occupy space on any pylon or monument sign in the Shopping Center.<br><br>Notwithstanding anything contained herein to the contrary, Radio Shack shall not be permitted in the Shopping Center.<br><br>No bar, health club, entertainment facility or grocery store shall be permitted to operate within 250 feet of the Tenant's building on the Premises. (This distance shall be determined from building to building, not property line to property line). |
| **24 Hour Fitness:** | No portion of the Center (excluding the Kohl's Tract and the Wal-Mart Tract) to be used as a health and/or physical fitness club, nor for any of the following activities: aerobic classes, yoga, Pilates, indoor cycling, personal training, weight training, basketball, volleyball, swimming, racquetball, sports and rehabilitation therapy, cardiovascular and resistance machine operation, sale of nutritional supplements and related products (except by a nationally recognized chain retailer specializing in something other than the sale of nutritional and/or energy supplements/products [e.g., groceries or prescription drugs]), operation of a juice bar and/or the sale of beverages typically sold in a juice bar, sale of other nutritional beverages, and/or weight loss advising and related programs (Tenant's Exclusive Uses). Tenant's Exclusive Uses shall not apply to leases in effect as of the Execution Date (and to any extensions or renewals thereof) to the extent such leases currently permit activities that would otherwise violate Tenant's Exclusive Uses. Primary Exclusive Uses includes a health and/or physical fitness club (and all of the foregoing activities, except for the operation of a juice bar and/or the sale of beverages typically sold in a juice bar, sale of nutritional beverages), and weight loss advising and related programs (Incidental Exclusive Uses). Tenant's Exclusive Use does not prohibit (i) operation of a full-line sporting goods store (such as Academy, Dick's and/or The Sports Authority, even though such stores may offer one or more of the listed goods or services contained within Tenant's Exclusive Use), or (ii) the incidental sale of beverages typically sold in a juice bar or other nutritional beverages by other tenants in the Center whose primary business does not otherwise conflict with Tenant's Exclusive Uses |

**Exhibit H**

**PROHIBITED USES**

No portion of the Shopping Center will be used for any of the following:

1.   Tanning, health, exercise or racquet club or spa, gymnasium, bowling alley, fitness center, skating rink, or other sports or recreational facility;

2.   School, library, reading room, beauty school, barber college or house of worship;

3.   Theater (movie or live), gallery, auditorium, meeting hall, banquet facility, dance hall or ballroom;

4.   Hotel or motel;

5.   Massage parlor, adult bookstore (which will include a store which sells or offers sexually explicit videos, DVDs, audiotapes, films, devices, apparel and the like), "peep show" store, or topless or strip club;

6.   A so-called "second hand" or surplus store, pawn shop, flea market, swap meet or junk yard;

7.   Off- track betting, gambling, gaming or check cashing facility;

8.   Drug paraphernalia store or so-called "head" shop;

9.   Car wash, automobile repair work, automotive service, automobile body shop or gas station;

10.  Automobile, boat, trailer, mobile home or truck leasing or sales;

11.  Tavern, bar or other establishment whose annual gross sales (or projected annual gross sales) from the sale of alcoholic beverages for on- premises consumption exceeds 50% of the gross sales for such business;

12.  Amusement park, carnival, fair, disco, nightclub or other entertainment facility including video game room, pool hall, arcade, indoor children's recreational facility or other amusement center (provided, however, that incidental interactive kiosks, games and equipment related to the otherwise permitted primary use of an owner, occupant or tenant, will not be prohibited hereunder);

13.  Any manufacturing, assembling, distribution, warehouse or office use (except as incidental to a retail operation);

14.  Funeral parlor;

15.  Animal raising or storage or veterinary hospital;

16.  Gun range or the sale of fireworks;

17.  Central laundry, drycleaner, or laundromat;

18.  Drilling for or removal of subsurface substances, dumping, disposal, incineration or reduction of garbage or refuse, other than in enclosed receptacles intended for such purposes;

19.  Any use which constitutes a public or private nuisance or produces objectionable noise, smell or vibration; or

20.  Any business operated only on a seasonal or part-time basis (provided that this provision does not impose any continuous operation requirement).

H-1

**Exhibit I**

**MEMORANDUM OF SHOPPING CENTER LEASE**

After recording, please return to:
TSA Stores, Inc.
1050 West Hampden Avenue
Englewood, Colorado 80110
Attention: Real Estate Department

**MEMORANDUM OF SHOPPING CENTER LEASE**

Demise. Pursuant to a Shopping Center Lease having the date set forth below ("Lease"), between the "Landlord" and "Tenant" named below, Landlord has leased and does hereby lease to Tenant the "Premises" described below for the "Term" described below and otherwise upon the terms and conditions set forth in the Lease. Capitalized terms used but not defined herein have the meanings set forth for such terms in the Lease.

Effective Date of Lease. April ___, 2011.

Name and Address of Landlord. MRPL RETAIL PARTNERS, LTD., a Texas limited partnership having an office at c/o Moody Rambin Interests, 3003 West Alabama, Houston, Texas 77098.

Name and Address of Tenant. TSA STORES, INC., a Delaware corporation, having an office at 1050 West Hampden Avenue, Englewood, Colorado 80110, Attention: Senior Vice President - Real Estate.

Description of Premises. Approximately 35,069 (dimensions 171' of frontage by 221' in depth) square feet of Floor Area and being a part of the Shops at Bella Terra Shopping Center ("Development"; the Premises is constructed on that certain tract or parcel of land owned by Landlord that is part of the Development (the "Shopping Center"); the Shopping Center is located in the County of Fort Bend and State of Texas, and is more particularly described in Exhibit A attached hereto. The location of the Premises within the Shopping Center is depicted on the site plan attached hereto as Exhibit B.

Term of Lease. Commencing on the Commencement Date of the Lease and ending on the last day (i.e., January 31) of the 10th Lease Year.

Options to Extend. The Lease grants to Tenant successive options to extend the Term from the date upon which the Term would otherwise expire for 4 additional periods of 5 years each.

Development Restrictions. Landlord will not cause or permit any material change in the size, location or configuration of the curb cuts (points of access), driveways, drive aisles or service drives identified as the "Protected Accessways" on Exhibit B from those shown on Exhibit B. Landlord will not construct, or allow any other party to construct, any buildings or improvements in the "No Build Area" identified on Exhibit B, other than such buildings or improvements, and replacement thereof, as may be shown in the No Build Area on Exhibit B. Landlord will not construct, or allow any other party to construct, any building on any of the outlots or pads defined as the "Restricted Outlots" which exceeds the height or size requirements set forth in the ECR. The "Restricted Outlots" are defined as the following outlots or pads shown on Exhibit B: Outlot O, Outlot P, Outlot Q, Outlot R, Outlot S and Outlot X. Landlord will not agree to any change to the ECR that would materially and adversely affect Tenant's rights or obligations under this Lease without obtaining Tenant's prior written consent.

Prohibited Uses. There exists in the Lease various restrictions upon other uses at the Shopping Center.

Exclusive. During the Term, no premises or space in, or portion of, the Development, the North Tract or the remaining portions of the Southeast corner of Bellaire Blvd and the Grand Parkway that are now or hereafter owned by Landlord or any affiliate of Landlord other than the Premises, will be used for the retail sale and/or rental of sporting goods, sports apparel or athletic footwear, provided that such exclusive will not apply to: (1) the incidental sale of any of such merchandise by an occupant so long as the retail display space in such occupant's premises that is used for the display of such merchandise (including shelf space and allocable aisle space) is of a size not greater than the lesser of 500 square feet of Floor Area or 10% of such occupant's total Floor Area; and (2) one national or regional general shoe store (but excluding Rack Room or Shoe Carnival) whose premises do not exceed 10,000 square feet of Floor Area, so long as the retail display space in such occupant's premises that is used for the sale of athletic footwear (including shelf space and allocable aisle space) does not exceed 20% of the Floor Area of the premises. Tenant acknowledges that the Wal-Mart Tract, Kohl's Tract and North Tract are not subject to this Section 16.2(a) unless any of such property is owned or controlled at any time hereafter by Landlord or any affiliate of Landlord, in which event this Section 16.2(a) will apply to the applicable property. As used herein, "**athletic**

I-1

**footwear**" means footwear associated with sports and sport purposes (including, without limitation, running, jogging and aerobic activity). This Section 16.2(a) will not apply to any tenant whose lease was fully executed on the Effective Date hereof and is identified on <u>Exhibit G</u> as an "**Existing Lease Not Subject to Tenant's Exclusive**;" provided, however, that this exception will not apply if (i) Landlord permits or agrees to an expansion of the premises or an extension of the term for any such permitted use which violates Tenant's exclusive if Landlord has the right, by virtue of the provisions of the existing lease or otherwise, to withhold such permission or agreement, or (ii) Landlord permits or agrees to the change of a permitted use by any such tenant or its successors or assigns to a use which violates Tenant's exclusive if Landlord has the right, by virtue of the provisions of the existing lease or otherwise, to withhold such permission or agreement, or (iii) Landlord permits or agrees to an assignment or sublease of such existing lease to an assignee or subtenant who may use the premises for a use which violates Tenant's exclusive if Landlord has the right, by virtue of the provisions of the existing lease or otherwise, to withhold such permission or agreement, or (iv) Landlord has the right, by virtue of the provisions of the existing lease or otherwise, to cause such tenant to honor the exclusive granted to Tenant by giving such existing tenant notice of this exclusive or otherwise.  If, for a continuous period of 90 days, Tenant fails to operate as a sporting goods store in the Premises (other than for "Permitted Closures" defined in Section 16.6), Tenant will no longer have the exclusive rights described in this Section 16.2(a); provided, however, in the event Tenant recommences a sporting goods business in the Premises, then, upon delivery to Landlord of notice of such recommencement, the exclusive granted to Tenant hereunder will again be effective and any lease executed during the interim period during which this exclusive was not effective and that does not contain a provision protecting such exclusive will be deemed to be an Existing Lease Not Subject to Tenant's Exclusive.

<u>Restricted Uses</u>.  No portion of the Shopping Center located within 300 feet of the Premises will be used for a restaurant, a health club or any other use which would place an undue burden on parking.

This instrument is intended to be only a Memorandum of Lease in respect to the Lease, to which Lease reference is made for the full agreement between the parties.  This Memorandum is not intended to modify any term, provision or condition of the Lease and to the extent of any conflict between this Memorandum and the Lease, the Lease will control.

EXECUTED as of the Effective Date of Lease set forth above.

**TENANT:**

TSA STORES, INC., a Delaware corporation

By: _____
Name: _____
Title: _____

Date of execution by Tenant: _____, 2011

**LANDLORD:**

MRPL RETAIL PARTNERS, LTD.,
a <u>Texas limited partnership</u>

By: _____
Name: _____
Title: _____

Date of execution by Landlord: _____, 2011

I-2

**ACKNOWLEDGMENTS**

<u>TENANT</u>

STATE OF _____ )
                                 ) ss.
COUNTY OF _____ )

        The foregoing instrument was acknowledged before me this _____ day of _____, 2011 by
_____ as _____ of
TSA Stores, Inc., a Delaware corporation.

        WITNESS my hand and official seal.


                                           _____
                                           Notary Public

        My commission expires: _____

<u>LANDLORD</u>

STATE OF _____ )
                                 ) ss.
COUNTY OF _____ )

        The foregoing instrument was acknowledged before me this _____ day of _____, 2011 by
_____ as _____ of
MRPL RETAIL PARTNERS, LTD., a _____.

        WITNESS my hand and official seal.


                                           _____
                                           Notary Public

        My commission expires: _____

I-3

**Exhibit J**

**SIGN CRITERIA**

## TENANT SIGN CRITERIA

## SHOPS AT BELLA TERRA

State Hwy. 99 at Bellaire Blvd.

Ft. Bend County, Texas

## MRPL RETAIL PARTNERS, LTD
## "OWNER"

Issued:  May 16, 2007
Revised:

## INTENT

The purpose of these criteria is to outline the requirements which have been established to control the design, fabrication, and installation of tenant signs for Shops at Bella Terra. These sign guidelines serve three purposes:

1. To protect the Tenant from purchasing a sign that does not meet quality standards of material, workmanship and appearance.

2. To assure the Tenants and Owner of an attractive shopping center community, unmarred by poorly designed, badly proportioned, and inconsistent signage.

3. To clearly delineate the sign requirements, thus preventing unnecessary expenses, for errors caused by not securing approvals, permits and inspections.

## GENERAL REQUIREMENTS

1. All signs must satisfy these criteria. Special conditions will be considered on an individual case-by-case basis. Under no circumstances is any sign to be fabricated or installed without written approval of Owner/Management.

2. Signs on the exterior of the leasehold shall be permitted only where indicated by approved review. Variances will be subject to approval by the Owner/Management as outlined in the general requirements of these criteria.

3. Each tenant shall submit or cause to be submitted to the Owner/Management for written approval, three copies of detailed drawings indicating the locations, size, layout, design, and construction of the proposed signs, including all lettering and graphics. Section, elevation, and pertinent plan drawings to be at 1/2 = 1'0" scale. All drawings shall be sent to the office of:

   c/o Moody Rambin Interests
   Attn: Jim Bishop, Jr.
   3003 W. Alabama, Houston, TX 77098.
   Phone: 713.271.5900
   Fax: 713.773.5556
   Email: jim.bishop@moodyrambin.com

4. All signs and their installation shall comply with all applicable building and electrical codes.

Page 1

J-2

5.    All signs shall be designed, constructed, installed, and approved at the Tenant's expense. Permits for signs and their installation shall be obtained by the Tenant or his representative. The cost of such permits shall be at Tenant's expense.

6.    All sign companies must be licensed under their name by the City of Houston and must have property liability insurance, at a minimum of $1,000,000 coverage per occurrence. A copy of this insurance policy must be submitted with sign drawings as part of the Owner's approval process. Furthermore, the Tenant shall be held liable and bear all costs for the removal and/or correction of sign installation and damage to building by signs that do not conform to this criteria.

7.    At the termination of a Tenant's lease, if not renewed, the Tenant shall be held liable and bear the costs for the removal of sign installation and the repair of penetrations and damage to the substrate caused by the sign's attachment or its removal.

8.    Even though certain tenant signs may comply with code as well as with these criteria, the Owner reserves the right to appropriately scale and proportion the Tenant's sign to the overall design of the center.

9.    Text on signs shall not include the product sold, description of services or merchandise trade names except as part of the Tenant trade name or DBA.

10.   The use of banners, flags or pennants is prohibited. Special conditions will be reviewed and considered by the Owner/Management on an individual basis.

11.   Portable, trailer, changeable copy signs are prohibited.

12.   Visible sign company names on Tenant signage are prohibited.

13.   All signage must be in accordance with the Easements with Covenants and Restrictions (ECR), filed against the Shopping Center as determined by Landlord.

## SIGN CONFIGURATION

1.    Tenant signs shall be in the form of individual internally illuminated channel letters. Illumination shall be neon tubes. Faces of letters shall be translucent acrylic sheet with acrylic trim cap adhered to the letter's sidewalls.

2.    The maximum span of Tenants' signage shall not exceed 80% of their storefront width. However, symmetry with respect to the architectural design elements must also be considered.    Special conditions will be reviewed and considered by the Owner/ Management on an individual basis.

Page 2

J-3

3. Tenants with frontage on multiple sides of a building may have one sign per each leased frontage.

4. One horizontal line of copy is allowed unless Tenant name is too long to fit into 80% of the store width. Only under this circumstance will signs with "stacked" copy be considered. Symmetry with respect to the architectural elements must be maintained. "Stacked" signs may not exceed 36" in height.

5. For outparcel individual Tenant buildings, the maximum height of upper case letters shall be 42". Major Tenants and Tenants occupying an entire building will be reviewed by the Owner/Management on a case-by-case basis.

6. Tenants located in multi-tenant buildings shall have a maximum vertical height for capital letters of 36".

7. Major inline-tenants shall have a maximum vertical height of 6'. However, their signs shall not occupy more than 60% of their leased frontage.

8. The minimum height of any letter will be 12". Special conditions will be reviewed and/or considered by the Owner/Management on an individual basis.

9. Where possible, a single line of copy shall have a minimum height of 18".

10. Tenants may use the letter style of their choice subject to design review and approval of the Owner/Management.

11. Signs which have letters 18" to 24" in height will be a minimum of 3" deep. Special conditions will be reviewed by the Owner/Management.

12. Letter sidewalls and backs must be a minimum of .063 aluminum sheet. Letters larger than 30" shall be .090.

13. Illumination shall be 15mm 6500k white neon. Transformers to be 30MA at no more than 80% load. Each letter to be grounded individually using Greenfield connectors. Letters having a stroke width greater than 4" must utilize two tubes of neon. All letters must meet UL specifications. Non-illuminated letters are not allowed unless a variance is approved by the Owner/Management.

14. Letter colors: The acrylic face of the letters is left as a Tenant's choice. The trim cap and the sidewalls of the letters must be the same color.

15. All metal to be painted shall be primed and painted with two coats of polyurethane enamel. Pre-finished metal is acceptable.

Page 3

## SIGN MOUNTING INSTALLATION

1.  Signs on the exterior of multi tenant buildings shall be located only on the front facade of a building in the fascia sign band dedicated for each tenant.

2.  All tenant sign copy will be centered horizontally in the sign area corresponding to each tenant's lease, unless architectural constraints prohibit this.

3.  Sign letters shall attach directly to the building's facade. Letters shall thru-bolt to support elements, or lag screw into support blocking behind facade. Raceways will only be considered where the architectural design of the building makes no provision for sufficient facade mounting.

4.  Under no circumstance will any sign be allowed to project above the roofline, parapet, facade, or architectural embellishment of any building.

5.  All signs, bolts, fastenings, and clips shall be stainless steel, aluminum, brass, or bronze. No black iron materials of any type will be permitted.

6.  All penetrations of the building structure required for sign installation shall be neatly sealed in a watertight condition by means of continuous backer rod and sealant to match background.

7.  Sign contractor shall repair any damage to the fascia or any other facility part of the center caused by his work. If sign contractor defaults in any way, the Tenant will be responsible for a timely sign contractor replacement, and will bear the costs of any liquidated damages imposed by the Owner/Management relative to signage.

8.  Conduit for signs shall pass through fascia into the space above tenant's ceiling where transformers are to be located. These penetrations shall be sealed to be water tight. The penetrations for conduit shall be made below the level of the roof, and under no circumstances shall roof flashing be penetrated.

9.  No labels will be permitted on the exposed surface of signs except those required by local ordinance which shall be applied in an inconspicuous location.

10. No exposed crossovers or conduit will be permitted.

11. All conductors, transformers, and other components shall be concealed from view. Location and/or concealment methods will be subject to approval in the submitted drawings.

12. Electrical service to all signs shall be on tenant's meter. Final electrical hookup shall be performed by a licensed electrician.

Page 4

## SIGN OPERATION

1.  Tenant signs shall be illuminated from dusk until 12 AM by means of a photocell and time clock. Owner/Management reserves the right to alter hours of sign operation.

2.  Maintenance and proper operation of signs shall be the responsibility of the individual tenant. Upon notification of improperly functioning signs, the Tenant shall be responsible to complete repairs within three business days. Thereafter, the landlord shall have the right to repair improperly functioning signs at the expense of the tenant.

## STORE FRONT / DELIVERY DOOR

1.  Each Tenant will be permitted to place upon each entrance of its demised premises not more than 144 square inches of gold leaf, die cut or decal application lettering, not to exceed 2" in height, indicating hours of business, emergency telephone numbers, address, and entry/exit information.

2.  Each Tenant who has non-customer door for receiving merchandise may have uniformly applied on said door, in location as directed by the Owner/ Management, and in 2" high block letters, the Tenant name and address. Color of letters will be white.

3.  Tenant may install on the storefront, if required by the U.S. Post Office, the numbers only for the street address in exact location letter style and size stipulated by Owner/Management.

4.  Except as provided herein, no advertising placards, banners, pennants, names, insignia, trademarks, or other descriptive material shall be affixed or maintained upon the glass panes and supports of the show windows and doors or upon the exterior walls of the building or storefront.

5.  All Tenant storefront entrance and store identification will be subject to the written approval of the Owner/Management. Such signage will be reviewed by Owner/Management only with secured variances to the applicable code. Painted lettering will not be permitted. Special conditions will be reviewed and considered by the Owner/Management on an individual basis. Only hanging signs or logo approved for inside of Tenant spaces must be placed a minimum of 18" away from inside line of storefront mullions. No illuminated "open," "closed" signs are allowed.

Page 5

J-6

**Exhibit K**

**PYLON SIGN DRAWING**



PLAN

FRONT ELEVATION          SIDE ELEVATION

Landlord provided & illuminated sign cabinet. Tenant supplied faces, (2 per sign)

Letters to "glow" white when illuminated, back-grounds are opaque. Background colors are tenants choice

Sign panels clear Lexan w/colored Vinyl overlay "Kohl's" white Translusent Vinyl background Opaque "Burgandy" to match PMS 188C

PYLON SIGN #3

Revisions:
07/26/07
08/09/07
08/22/07
06/02/08



**THE SHOPS AT BELLA TERRA**
PYLON SIGN PRELIMINARY STUDY
GRAND PARKWAY & BELLAIRE BLVD.
HARRIS COUNTY, TEXAS
PYLON SIGN-03-12-07.DWG



K-1

**Exhibit L**

**Storefront Elevation**



L-1