# Exhibit A

Store No. ___14___

THIS LEASE ("Lease") dated for reference purposes only this day of
____May 17_____, 1993, and is between Landlord and Tenant who
are designated in Section 1.2 hereof.

## Article 1:  BASIC LEASE TERMS

| | | |
|---|---|---|
| 1.1 | General Location: | Sportmart<br>155 E. Townline Road<br>Vernon Hills, Illinois  60061 |
| 1.2 | Parties & Notice<br>Landlord: | Vernon Hills Building<br>Limited Partnership<br>7253 W. Dempster St.<br>Niles, Illinois 60714<br>Attn:  Andrew Hochberg, Esq. |
| | Tenant: | Sportmart, Inc.,<br>a Delaware Corporation<br>7233 West Dempster Street<br>Niles, Illinois 60714<br>Attn:  Legal Dept.<br>cc: Vice President, Real<br>Estate |
| 1.3 | Size of Store: | 45,400 sq. ft. as per Exhibit<br>B. |
| 1.5 | Term: | Initial Term Commencement<br>Date; November 1, 1992.<br><br>Initial Term Expiration Date:<br>October 31, 2007. |
| 1.6 | Options: | Three (3) additional five (5)<br>year periods. |
| 1.7 | Minimum Rents: | (a)  Commencement Date through<br>October 31, 1997:  $442,650,<br>with one month free rent for<br>the first month in the first<br>year.<br><br>(b)  November 1, 1997 through<br>October 31, 2002: $442,650<br>multiplied by the lesser of |

1

(i) one hundred and twelve percent (112%) and (ii) the CPI Increase (defined in Section 2.1 (c).

(c)  November 1, 2002 through October 31, 2007:  the annual Minimum Rent payable during the preceding 5-year period, multiplied by the _lesser_ of (i) one hundred and twelve percent (112%) and (ii) the CPI Increase.

(d)  Each 5-year option period:  the annual Minimum Rent payable during the preceding 5-year period, multiplied by the _lesser_ of (i) one hundred and twelve percent (112%) and (ii) the CPI Increase.

| | | |
|---|---|---|
| 1.8 | Contents of Lease | Pages 1 through 27 Sections 1.1 through 34.15 EXHIBITS |

A.  Legal Description
B.  Site Plan
C.  Memorandum of Lease
D.  Declaration of Mutual and Reciprocal Easements, Covenants and Restrictions.

## Article 2:  DEFINITIONS

2.1   The terms defined in this Article 2 shall for all purposes of this Lease and all agreements supplemental hereto have the meanings herein specified unless expressly stated otherwise.

(a)  ALL RISK POLICY:  A policy of fire and other property insurance in the form commonly referred to in the industry as "all risk" with extended endorsement (false arrest, libel, slander, assault, battery, invasion of privacy, theft, vandalism an malicious mischief coverage) and including broad form water damage.  Landlord may elect to include coverage for flood an earthquake but Tenant shall not be required to pay any part of the premium allocable to such coverage.

(b)  COMMENCEMENT DATE:  The Delivery Date. At any time following the date Tenant begins Tenant work in the Store, Tenant shall, within fifteen (15) days after written request from Landlord, acknowledge in writing the actual Commencement Date. Upon receipt thereof, and unless such date as set forth in Tenant's notice is contested by Landlord, Landlord shall return a copy of such notice of the Commencement Date to Tenant countersigned by Landlord.

(c)  CPI INCREASE:  For purposes of Section 1.7, a fraction (but in no event less than one[1]), the numerator of which is the CPI (defined below) for the month of September preceding the annual Minimum Rent increase date in question, and the denominator of which is the CPI for the month of September preceding the immediately preceding 5-year period.  For example, the CPI Increase for purposes of Section 1.7(b) would be determined by comparing the CPI for September, 1997 to the CPI for September, 1992.  "CPI" shall mean the Consumer Price Index-United States All Items for All Urban Consumers published by the Bureau of Labor Statistics of the Department of Labor.

If the manner in which such Consumer Price Index as determined by the Bureau of Labor Statistics shall be substantially revised, an adjustment shall be made in such revised index, which would produce results equivalent, as nearly as possible, to those which would have been obtained if the Consumer Price Index had not been so revised.  If the Consumer Price Index shall become unavailable to the public, Landlord will substitute therefor a comparable index based upon changes in the cost of living or purchasing power of the consumer dollar published by any other governmental agency, a major bank or other financial institution, a university or a recognized financial publication.

(d)  DELIVERY DATE: The date upon which the last of the following occurs ("deliver" or "delivery"): (1)

3

substantial completion of Landlord's Construction Obligations, (2) receipt by Tenant of written certification thereof by the Project Architect (provided the work has in fact been completed) and (3) receipt by Tenant of a copy of the Certificate of Occupancy issued by the authority by whom the Building Permit was issued, (4) receipt by Tenant of the Nondisturbance Agreements to be delivered to Tenant pursuant to Section 24.3.  Substantial completion of Landlord's Construction Obligations means completion of all Landlord's Construction Obligations except for the punchlist as specified in Section 4.8, provided that the Landlord has completed sufficiently to permit Tenant to conduct its normal retail operations without material impediment.

(e)  GROSS SALES:  The selling price of all merchandise sold in or from the Store by Tenant, its subtenants, licensees and concessionaires, whether for cash or for credit, excluding, however, the following:  (i) the sales price of all merchandise returned and accepted for full credit or the amount of the cash refund or allowance made thereon; (ii) the sums and credits received in settlement of claims for loss of damage to merchandise; (iii) the consideration received in connection with a bulk sale of inventory or other than retail consumers; (iv) sales taxes, so called luxury taxes, excise taxes, gross receipt taxes, and other taxes now or hereafter imposed upon the sale or value of merchandise or services, whether added separately to the selling price of the merchandise or services and collected from customers or included in the retail selling price; (v) receipts from public telephones, vending machines, ticket sales, sales of money orders and the collection of public utility bills; (vi) interest, carrying charges, or other finance charges in respect of sales made on credit; (vii) sales of fixtures, trade fixtures, or personal property that are not merchandise held for sale at retail; (viii) sales to employees at discount, not exceeding three percent (3%) of total Gross Sales; (ix) services performed on a non-profit basis for the benefit of customers; (x) Tenant's accounts receivable, not to exceed two percent (2%) of Gross Sales, which have been determined to be uncollectible for federal income tax purposes during the Lease Year provided, however, that if such accounts are actually collected in a later year, the amount shall be included in the Gross Sales for such later Lease Year; (xi) rents, subrents or other consideration received in connection with an assignment, sublet; license, concession or other transfer of any portion of the store (however Gross Sales of any such transferee shall be included); (xii) sales of merchandise ordered by Catalogue regardless of place of order or delivery; and (xiii) receipts in respect of instructional programs (but not including merchandise sold in respect thereto).

(f)  LANDLORD'S PARCEL:  That certain parcel of land described in Exhibit "A", together with all appurtenances thereunto belonging.

4

(g)  LEASABLE  FLOOR  AREA:    Subject  to recorded conditions, covenants and restrictions, all areas available, or held for the exclusive use and occupancy of occupant or future occupants of the Leased Premises, measured from the exterior surface of exterior walls (and from extensions thereof in the case of openings) and from the center of interior demising partitions.  For purposes of computing Tenant's obligations based upon Leasable Floor Area, the Leasable Floor Area of the Lease Premises shall be not less than 45,000 square feet. Mezzanines, if any, shall not be included within the definition of Leasable Floor Area.

(h)  LEASED PREMISES: Those certain premises with all appurtenances located as set forth in Section 1.1. hereof and described with particularity in Exhibit "A".

(i)  LEASE YEAR: The first Lease Year shall extend from the Commencement Date to the first December 31 following commencement.  Subsequent Lease Years (other than the final Lease Year shall commence on January 1 and terminate the following December 31.  The final Lease Year shall commence on January 1 and terminate on the expiration or earlier termination of this Lease.

(j)  MINIMUM RENT:  The amounts specified in Section 1.7.

(k)  PERCENTAGE RENT:  The term "Percentage Rent" is defined in Section 8.1.

(1)  PERMITTED DELIVERY PERIOD: The follow-ing time period:  __N/A__

(m)  REDELIVERY DATE: The date, following a casualty, on which the Landlord's architect, or contractor having charge of the restoration certifies the same as having been substantially completed an Tenant receives notice thereof along with written approvals which may be required from any governmental agency.

(n)  STORE:    That portion of the Leased Premises as so delineated on the site plan attached to this Lease as Exhibit "B" having the dimensions and containing the Leasable Floor Area specified in Section 1.3 hereof.

(o)  TERM:  References to "Term" of this Lease shall include the original Term and any extension of such Term.

5

## Article 3 - PREMISES

      3.1    Landlord hereby leases to the Tenant and the Tenant hires from the Landlord, the Leased Premises, together with all appurtenances.

      3.2    The Store thus demised and leased unto the Tenant is not a separate parcel of real property.  In the event the Store is less than the size specified in Section 1.3, Minimum Rent and other charges shall not be proportionately reduced.

## Article 4 - PAYMENTS BY TENANT

      4.1    Tenant shall pay to Landlord, without demand, deductions, set-offs or counterclaims, the rent, which is hereby defined as the sum of the Minimum Rent taxes and other assessments, special assessments and charges when and as the same shall be due an payable hereunder.  Unless otherwise stated, all other sums of money or charges payable to Landlord from Tenant by this Lease are defined as "Additional Rent" and are due no later than ten (10) days after the rendering of an invoice therefor and failure to pay such charges carries the same consequences as Tenant's failure to pay rent.  For purposes of this paragraph, "Additional Rent" shall include, without limitation, sums payable by Tenant to Landlord hereunder for real estate taxes (as set forth in Article 10 hereof), insurance premiums (as set forth in Articles 11 and 12 hereof), utility charges (as set forth in Article 18 hereof) and any other costs arising from the Declaration of Mutual and Reciprocal Easements, Covenants and Restrictions (hereinafter Reciprocal Easement Agreement) as set forth in Exhibit E hereof. All payments and charges required to be made by Tenant to Landlord hereunder shall be payable in coin or currency of the United States of America, at the address indicated herein.  No payment to or receipt by Landlord of a lesser amount than the then amount required to be paid hereunder shall be deemed to be other than on account of the earliest amount of such obligation then due hereunder.  No endorsement or statement on any check or other communication accompanying a check for payment of any amounts payable hereunder shall be deemed an accord and satisfaction, and Landlord may accept such check in payment without prejudice to Landlord's right to recover the balance of any sums owed by Tenant hereunder.

## Article 5 - LEASE TERM

      5.1    The Term of this Lease shall commence on the Commencement Date and shall expire as specified in Section 1.5, subject to the Tenant options to extend the Term as provided in the following Article 6.

LEASE#14

## Article 6 - OPTION PERIODS

6.1    The Tenant may extend the original Term of this Lease for the number of separate, consecutive additional periods of five (5) years each, as designated in Section 1.6 hereof, on the terms and conditions set forth herein, except that the number of option periods remaining to be exercised under Section 1.6 shall, in each case, be reduced by one, by notifying the Landlord, in writing, not less than one hundred eighty (180) days prior to the expiration of the original Term, or each extended Term, as the case may be.  Should Tenant neglect to exercise any option by the dates specified above, Tenant's right to exercise shall not expire until fifteen (15) days after notice from Landlord of Tenant's failure to exercise the option.

## Article 7 - MINIMUM RENT

7.1    During the Term of this Lease, the Tenant shall pay Minimum Rent to the Landlord as specified in Section 1.7. Each monthly installment of rental shall be payable in advance on or before the first (1st) day of each calendar month during the Term.   If the Lease commences other than on the first day of a calendar month, the first month's Minimum Rent shall be prorated accordingly and paid within the Minimum Rent for the first full month.    All rent and other payments to be made by Tenant to Landlord shall be sent to the place to which notices are required to be sent, unless otherwise directed by the Landlord in writing.

## Article 8 - PERCENTAGE RENT

8.1    (a)  Tenant shall pay to Landlord, as additional annual rent for each Lease Year during the Term (including the option periods) which contains twelve (12) full calendar months, Percentage Rent equal to the amount, if any, by which two percent (2%) of Gross Sales in such Lease Year exceed the annual Minimum Rent payable for such Lease Year.

(b)  The Percentage Rent for any Lease Year having less than twelve (12) full months shall be based upon Gross Sales for the twelve (12) months immediately succeeding the Commencement Date (as to the first Lease Year) and for the twelve (12) month period immediately preceding the expiration or earlier termination of the Lease (as to the final Lease Year).   The Percentage Rent due for such period shall be established by multiplying the Percentage Rent which would have been due for such twelve (12) month period by a fraction, the numerator of which is the number of days in such Lease Year and the denominator of which is 365.

7

8.2    Within sixty (60) days after the close of each Lease Year, Tenant shall submit to Landlord a statement indicating the amount of its Gross Sales for the previous Lease Year. Tenant shall accompany such statement with the payment of Percentage Rent due, if any. Landlord shall keep all information regarding Tenant's Gross Sales and Percentage Rent confidential.

8.3    (a)    Tenant shall maintain adequate records including sales tax records for a period of one year after the close of each Lease Year for the purpose of allowing Landlord to verify the reported Gross Sales for such year. At any time within said one year, Landlord or its agents may audit such records during normal business hours at Tenant's offices in Niles, Illinois, after not less than fifteen (15) days' prior written notice to Tenant. Landlord shall not conduct such an audit of Tenant's records more than once in any given Lease Year. All statements of Gross Sales supplied by Tenant to Landlord shall be deemed conclusive on Landlord twelve months after the expiration of each Lease Year unless an audit conducted by Landlord within such 12-month period shall disclose that an adjustment is required due to an understatement by Tenant of its Gross Sales for such Lease Year.

(b)    In the event an inaccuracy is disclosed after any audit of Tenant's Gross Income, an adjustment shall thereupon be made. No payment by Tenant or receipt by Landlord of a lesser amount of Minimum Rent or Percentage Rent due hereunder shall be deemed to be other than on account of the earliest rent due, nor shall any endorsement or statement on any check or letter accompanying such check or payment be deemed an accord and satisfaction, and Landlord may accept such check without prejudice to Landlord's rights to recover the balance of such rent or payment or pursue any other remedy available in this Lease, at law or in equity.

(c)    Any information obtained by Landlord as a result of any audit shall be held in strict confidence by Landlord, excepting any proceeding or action to collect the amount of any deficiency or with respect to a prospective sale, mortgage, lease or sale-leaseback of the Leased Premises or when Landlord is required to comply with lawful orders of a court or governmental agency.

8.4    The Minimum Rent provided for in this Lease is acknowledged by the parties to be sufficient consideration for the leasehold granted hereby and the Percentage Rent specified herein is in addition to such adequate consideration.

## Article 9 - USE

9.1    The Store may be used and occupied initially

8

LEASE#14

for the sale, at retail, of sporting goods, sports apparel and active wear (including without limitation athletic footwear and athletic uniforms of all kinds) and, in conjunction therewith, Tenant may engage in the sale of items related to or similar to the foregoing. Thereafter, Tenant may use the premises for any lawful use or purpose, subject to the Reciprocal Easement and Operation Agreement, and any other easements, covenants and restrictions of record.

9.2    Landlord warrants to Tenant that Tenant, while operating a store for the above use(s), will not be in violation of any restrictions imposed by any governmental authority or body.  Landlord shall hold Tenant harmless from any claims or damages suffered or claimed to be suffered as a result of any such alleged violations pertaining to Tenant's use of the subject Store.

9.3    Except as provided in Section 9.4 hereof, in the event retail operations are not conducted within the Store for (a) on hundred eighty (180) continuous days or (b) a total of one hundred eighty (180) day any calendar year, Landlord may terminate this Lease upon ninety (90) days prior notice (the "Recapture Notice") to Tenant, in which event as of such ninetieth (90th) day this lease shall terminate, and the rights of the parties shall be as if such ninetieth (90th) day were the date set herein for expiration of the Term, provided, however, if not later than thirty (30) days following the effective date of the Recapture Notice, Tenant gives Landlord notice that retail operations are to be resumed within the Store (and except as provided in Section 9.6, causes such operations to be resumed within the ensuing sixty (60) day period) then the rights of the parties shall be as if the Recapture Notice had not been given.

9.4    Notwithstanding anything to the contrary in this Lease, retail operations need not be conducted within the Store (a) if the use, occupancy or operation of the Store or the Shopping Center is materially adversely affected by _force majeure_ or other causes beyond Tenant's reasonable control, (b) for reasonable periods of time in respect of the taking of inventory, alterations, assignments and sublets, and (c) during Qualified Holidays, and for purposes of the Lease, Tenant shall be deemed to have operated its Store. "Qualified Holidays" mean the following: Christmas Day, New Year's Day, Easter Sunday, and any five other days designated by Tenant.

## Article 10 - REAL ESTATE TAXES

10.1    (a)    In addition to all rental herein reserved, Tenant shall pay to Landlord as additional rent the real estate taxes and all other assessments and special assessments levied upon and assessed against the Leased Premises, for each tax

9

year of the Term.  Should the State of Illinois, or any political subdivision thereof, or other governmental authority having jurisdiction over the store, specifically impose a tax, assessment, charge or fee or specifically increase a then existing tax, assessment, charge or fee, which Landlord shall be required to pay, either by way of substitution for said real estate taxes or assessed against such land and buildings, or in addition thereto, or impose an income or franchise tax or tax on rents in substitution for a general tax levied against such land or such buildings, such taxes, assessments, charges or fees shall be deemed to constitute a real estate tax hereunder to the extent said taxes are in substitution therefor or in addition thereto.  Such real property taxes and assessments, as hereinabove defined, during the Term hereof shall be paid in monthly Installments on or before the first day of each calendar month during the Lease Term, in advance, in an amount estimated by Landlord; provided, that in the event Landlord is required under any mortgage covering part or all of the Leased Premises, to escrow real estate taxes, Landlord may, but shall not be obligated to use the amount required to be so escrowed as the basis for its estimate of the monthly installments due from Tenant hereunder.  Upon receipt of all tax bills and assessment bills attributable to any calendar year during the Lease Term, Landlord shall furnish Tenant with a written statement of the actual amount of Tenant's pro rata share of the taxes and assessments for such year.  If the total amount paid by Tenant under this Article for any calendar year during the Term of this Lease shall be less than the actual amount due from Tenant for such year as shown on such statement, Tenant shall pay to Landlord the difference between the amount paid by Tenant and the actual amount due, such deficiency to be paid within ten (10) days after demand therefor by Landlord; and if the total amount paid by Tenant hereunder for any such calendar year shall exceed such actual amount due from Tenant for such calendar year, such excess shall be credited against payments hereunder next due, or, if no payments are next due, refunded by Landlord.  All amounts due hereunder shall be payable in the manner and at such place as the rent payments provided for in Article 4 hereof.  Landlord shall notify Tenant in writing of Landlord's estimate of Tenant's monthly installments due hereunder.  Landlord's and Tenant's obligations under this Article shall survive the expiration of the Term of this Lease.  Landlord shall provide at Tenant's written request, copies of all tax bills.

(b)  Should the Tenant be in occupancy during only a portion of the first or final tax year, Tenant shall be responsible to Landlord for a pro-rata portion of its tax obligation as described herein, based on the portion of such tax year included in the Term of this Lease.

10.2   The term "taxes and assessments" shall not include any charge, such as a water meter charge and the sewer rent

LEASE#14

01/30/2013 18:44 FAX 8478743381          NICG INC                          @013

based thereon, which is measured by the consumption of the actual user of the item or service for which such charge is made.

10.3   There shall be excluded from the tax bill which Tenant is obligated to pay (a) income, excess profits, estate, single business, inheritance, succession, transfer, franchise, capital or other tax or assessment upon Landlord or the rentals payable under this Lease; and (b) assessments (not ad valorem taxes) relating to the initial construction of the Leased Premises capital improvements (but not replacements) subsequently constructed therein or with respect thereto.

10.4   Any rebates, refunds, or abatements of real estate taxes received by the Landlord subsequent to payment of taxes by the Tenant shall be refunded to Tenant on a pro rata basis within ten (10) days of receipt thereof by Landlord.   Any such rebate, refund or abatement realized by the Landlord prior to payment by the Tenant shall result in an immediate reduction in the Tenant's share of taxes then due to the Landlord.

## Article 11 - FIRE INSURANCE

11.1   Landlord will maintain at all times during the Term an All Risk Policy insuring against damage to any portion of the Store including the store front, and appurtenances thereto. Such insurance shall be in the amount of 90% of replacement value, without deduction for physical depreciation and shall provide that the proceeds of any loss shall be payable in the manner provided for in this Lease.   Landlord shall, at least ten (10) days prior to the commencement date of the Term, and thereafter upon request of Tenant, provide Tenant with a certification of such insurance coverage from an insurer licensed to do business within the state in which the Store is located, and which insurer is rated A or better in Best's Insurance Guide, which certificate shall indicate, among other things, that the Tenant is a named insured along with the Landlord and that the Store and all the improvements and Landlord's fixtures appurtenant thereto, have been insured to their full . replacement value, without deduction for physical depreciation.   The Tenant shall be responsible to reimburse the Landlord for the premium costs of the insurance described in Section 11.1 above.

11.2   In lieu of Landlord assuming the obligation specified in Section 11.1 above, subject to Tenant's reimbursement all as described in Section 11.1 hereof, Tenant may, at its option, elect to carry such Insurance on the Store including such other endorsements as the Tenant in its judgment deems prudent under the circumstances, all at Tenant's sole costs and expense in which event Tenant shall not be responsible for reimbursement under Section 11.1.

LEASE#14

## Article 12 - LIABILITY INSURANCE

12.1  Tenant shall at all times during the Term keep in force a policy or policies of public liability insurance, or an endorsement on a blanket liability insurance policy or policies, against claims for personal injuries, death or property damage, occurring on, in or about the Store, or in or about any sidewalks, passageways or space immediately adjoining the Store, including complete sign coverage, with a combined single limit of not less than TWO MILLION DOLLARS ($2,000,000) in respect of personal injury or death to any one or more persons arising out of any one or more occurrence and for injury to or destruction of property (including, but not limited to, theft, vandalism or malicious mischief perpetrated by any person including, without limitation, any servant, employee, agent, contractor, or representative of Tenant), together with insurance against all such other risks which are or shall be customarily covered with respect to buildings similar in construction, general location, use and occupancy to that in which the Store is located (and without limiting the generality of the foregoing, the permissible uses set forth in the Lease) arising out of or relating to the Tenant's use of the Store.  Said policy or policies shall contain Contractual Liability Insurance recognizing the liability assumed in Section 22.1 hereof, and include a cross-liability endorsement providing that Landlord and Tenant although named insureds may recover on account of the negligence of the other, and shall be with an insurer with a policyholder's rating of at least A and a financial rating of not less than XIII in Best's Insurance Reports.

12.2  Landlord shall at all times during the Term keep in force a policy or policies of public liability insurance or an endorsement on a blanket liability insurance policy or policies which policy, policies or endorsement shall provide that Tenant is a named insured, against any and all damages and liability on account of, or arising out of injuries to persons or property or the death of any person or for property damage resulting from acts or omissions of Landlord, its agents or representatives, or occurring in the Common Areas, in the minimum amount of ONE MILLION DOLLARS ($1,000,000) single limit in any one accident.  Said policy or policies shall include Contractual Liability Insurance recognizing the liability assumed in Section 23.2 hereof, and include a cross-liability endorsement providing that Landlord and Tenant although named insureds may recover on account of the negligence of the other, and shall be with an insurer with a policy holder's rating of at least A and a financial rating of not less than XIII in Best's Insurance Reports.

12.3  Each policy of insurance herein maintained by the parties shall provide that: (a) the same is not conflicting with the coverage and is not excess insurance coverage or overage insurance coverage and (b) the company writing said policy will

LEASE#14

give at least thirty (30) days' notice in writing of any cancellation, lapse, or failure to renew, or any material modification of coverage to the party designated on the insurance certificate as the holder thereof.

12.4   Such insurance required to be carried by Tenant shall be procured and delivered by Tenant to Landlord at least fifteen (15) days before the commencement of the Term of this Lease, or before Tenant shall enter the Store, whichever is earlier, and renewals thereof shall be procured and delivered by Tenant to Landlord at least ten (10) days prior to the expiration date of such policy or policies.   Should Tenant fail to procure such insurance within the time hereinabove specified, Landlord may, at its option, procure such insurance and pay the premiums therefor, and Tenant agrees to reimburse Landlord for the reasonable costs thereof as additional rent on the first day of the calendar month following the rendition of the bill or' bills therefor, and Landlord shall have the same rights and remedies in enforcing payment of such additional rent as in the case of Tenant's failure to pay the rent.

## Article 13 - WAIVER OF SUBROGATION

13.1   Tenant and Landlord hereby waive and release any and all right of recovery against the other, including employees and agents, arising during the Term for any and all loss or damage to any property located within or constituting a part of the Shopping Center which loss or damage arises from the perils covered by an All Risk Policy or which right of recovery arises from loss of earnings or rents resulting from damage caused by such a peril.   This mutual waiver is in addition to any other waiver or release contained in this Lease.   Landlord and Tenant shall give written notice to its insurers of the provisions of this waiver and release and have its insurance policies endorsed, if required, to prevent invalidation of insurance coverage by reason of this waiver and release.

## Article 14 - MAINTENANCE & REPAIR BY TENANT

14.1   Subject to Article 19, Tenant shall maintain the Interior of the Store (except for the Landlord's maintenance obligations under Article 15 hereof), plate glass, roof (including its replacement if necessary), windows, doors, gutters, downspouts, and sprinkler system in good repair and good condition, plus repair and maintain all building exteriors, reasonable wear and tear and damage by casualty excepted, and will so deliver the Store to the Landlord at the termination of this Lease.   Tenant shall be responsible for maintenance and replacement of the heating, ventilating, and air conditioning system (the "HVAC").   Landlord

13

LEASE#14

shall obtain a one (1) year manufacturer's warranty on all
compressors and condensers and shall provide Tenant with a copy
thereof prior to the Delivery Date.

## Article 15 - MAINTENANCE & REPAIR BY LANDLORD

15.1    (a)    The Landlord shall, at its sole cost
and expense, not subject to reimbursement from Tenant as to any
part thereof, maintain and repair the foundation and structural
portions of the store in good and sightly condition consistent with
first class shopping center facilities in the county in which the
Shopping Center is located.   Landlord shall repair any damage or
defects caused by the negligence of the Landlord, its agents or
contractors.

(b)    Tenant shall give the Landlord notice
of such repairs as may be required under the terms of this Article,
and Landlord shall proceed forthwith to effect the same with
reasonable diligence, but in no event later than thirty (30) days
after having received notice.   In event of an emergency the Tenant
shall be empowered to undertake immediate repairs of such nature as
would normally be the Landlord's responsibility, and notify the
Landlord promptly after such repairs have been undertaken.   If the
Landlord fails to repair or maintain the Store with the thirty (30)
day period imposed herein, or in the case of any emergency as above
stated, the Tenant may perform the repairs or maintenance and
deduct the costs thereof (but not exceeding one (1) month's rent)
from the rental or rentals next coming due.

## Article 16 - REPAIRS REQUIRED BY GOVERNMENTAL AUTHORITIES

16.1    Any    repairs,    alterations    or    other
improvements required by governmental authority which results from
the particular retail use of the Tenant shall be done by the Tenant
at its sole cost and expense.   Any such work, which is required of
the Leased Premises shall be done at the sole cost and expense of
the Tenant, provided, however, that any such work which is required
to the Leased Premises in order to comply with the rules or
regulations of any governmental authority as those rules or
regulations exist at the Commencement Date of this Lease shall be
done at the sole cost and expense of the Landlord.

## Article 17 - ALTERATIONS

17.1    The    Tenant    may    make    non-structural
alterations and improvements to the interior of the Store in a good
and workmanlike manner, in conformity with all law, ordinances and
regulations of public authorities having jurisdiction.   Tenant

shall not make any alterations to the foundation, roof, or any structural portions of the Store without first obtaining the written approval of the Landlord.   Such approval may not be unreasonably withheld and shall be deemed granted if Tenant is not notified in writing of a reasonable basis for withholding such approval with in ten (10) days of notifying Landlord thereof.   It is further agreed that upon termination of this Lease, Tenant may, provided no structural damage to the Store will be caused thereby, remove its furniture, fixtures and equipment provided the Tenant restores the Store to its former condition, ordinary wear and tear excepted.

## Article 18 - UTILITIES

18.1   Landlord agrees to provide that the Tenant's Store shall at all times have available to it necessary utility services including electric, water, gas, telephone and other necessary utility lines, as well as refuse collection service and sewerage lines capable of adequately providing for Tenant's needs, provided, however, that Landlord shall not be responsible for the capacity or availability of utilities actually provided by utility companies.   Tenant agrees to pay all use charges for all utilities serving the Store during the Term.

## Article 19 - CASUALTY

19.1   If the Store is damaged or destroyed by casualty, by fire or other perils covered by the insurance required to be maintained by Landlord pursuant to Section 11.1, this Lease shall not be terminated or otherwise affected; except that, if: (i) any such fire or other casualty occurs within the last two (2) years of the Term of this Lease and the cost of repairs exceeds Ten Thousand Dollars ($10,000.00) as reasonably estimated by Landlord, or (ii) if the demised premises are damaged or destroyed:

(a)   by fire or other casualty insured under Landlord's insurance policies in effect on the date of the fire or other casualty, so that fifty percent (50%) or more of the floor space contained in the demised premises and/or fifty percent (50%) or more of the floor space designed for occupancy by tenants in the Leased Premises is untenantable, or

(b)   by any casualty other than those covered by Landlord's insurance policies in effect on the date of such casualty, then, in any such event, Landlord, at Landlord's sole option, may terminate this Lease and the Term upon thirty (30) days notice to Tenant given within ninety (90) days after the fire or other casualty.   Upon the giving of any such notice the Term of the Lease shall terminate by limitation upon the giving of said notice

LEASE#14

as fully and effectively as if the date said notice is given had been the date in the Lease specifically provided for the termination of the Term of the Lease, and upon such termination, neither party shall have any further rights or obligations to the other, other than as specifically set forth in the Lease.

19.2    (a)  If Landlord does not so terminate the Lease, then Landlord shall repair and/or rebuild the demised premises and/or the damaged or destroyed building or buildings, as the case may be, the Term of the Lease shall continue without interruption, and this Lease shall remain in full force and effect. Tenant shall, using the proceeds from the insurance, repair, restore, replace or rebuild that portion of the demised premises constituting the Store as defined herein, together with any additional improvements installed by Tenant, such that the demised premises shall he restored to its condition as of immediately prior to the occurrence of such casualty.  All of the aforesaid Tenant's insurance proceeds shall be deposited in escrow and shall be disbursed as work on repair, replacement or restoration progresses upon the certification of Landlord's architect that the balance in the escrow fund is sufficient to pay the estimated costs of completing the repair and restoration.  If Tenant's insurance proceeds shall be less than Tenant's obligation hereunder, Tenant shall pay the entire excess cost.  The Minimum Rent and additional rents which are payable hereunder during the existence of such damage and until such repair or rebuilding is substantially completed shall not abate.

(b)    Should the estimated cost of repairs and restoration exceed ten percent (10%) of the Store's then full replacement value (the "Required Restoration Value") and should Tenant, within thirty (30) days of receipt of Landlord's written estimate of said costs, not notify Landlord that Tenant shall pay that portion of said costs which exceed the Required Restoration Value, Landlord shall have the option of terminating this Lease effective as of the date of such uninsured casualty, or of repairing and restoring at Landlord's sole cost and expense, in which event this Lease shall remain in full force and effect subject to Tenant's rights to abate and/or reduce rent as in this Article provided.  In the event of an Uninsured Casualty which is less than the Required Restoration Value, or if Tenant has timely notified Landlord that Tenant shall pay that portion of the cost of repairs and restoration exceeding the Required Restoration Value if such be the case, Landlord shall proceed forthwith to rebuild and repair such improvements to substantially the condition as existed immediately prior to the damage and shall diligently pursue such rebuilding to completion.  All of the preceding portions of this Section 19.1 with regard to renovation shall apply to situations regarding an Uninsured Casualty.

19.3    The parties waive such rights of Lease Termination as are granted to them under the laws of the state

16

wherein the Store is located, it being their agreement that the rights of termination in the event, of casualty, as set forth herein, shall be exclusive.

## Article 20 - CONDEMNATION

20.1   (a)   During the Term, if, as a result of a Taking, fifty percent (50%) of the Store, or fifty (50%) percent or more of the ground floor area of the Building on which the premises are located (not including the Store in either the numerator or denominator of such calculation), is taken, within thirty (30) days following the date of such taking, Tenant may terminate this Lease upon written notice to the Landlord.

(b)   A "Taking" means any condemnation proceeding, moratorium, initiative, referendum, or any regulation which impairs parking, or any transfer in lieu thereof.

(c)   In the event Tenant does not terminate this Lease, the Landlord shall promptly and diligently restore the Store, or other space, as the case may be, to as near their condition as existed prior to such taking as is reasonably possible, and, during the course of such restoration, Tenant's total obligation for Minimum Rent and Percentage Rent shall be adjusted as provided in Section 19.1.   Minimum Rent shall thereafter be abated in the amount of that fraction of Minimum Rent the numerator of which is the Leasable Floor Area taken, and the denominator of which is the Leasable floor Area of the Store prior to the Taking.  Further, if the parties are unable to agree as to the amount of abatement, within forty-five (45) days after the Taking the matter shall be submitted to arbitration under the rules of the American Arbitration Association. Nothing herein contained shall prevent Landlord and Tenant from prosecuting claims in any condemnation proceedings for the value of their respective interests.

(d)   The Landlord shall be entitled to the condemnation award attributed to the real property, and the Tenant for the taking of its fixtures and equipment, and leasehold improvements.  The parties waive such rights of Lease termination as may be granted them in the event of condemnation by the laws of the state wherein the Store is located, it being their agreement that the rights of termination set forth in this Lease shall be exclusive.

## Article 21 - MECHANIC'S LIENS

21.1   Neither Tenant nor Landlord shall permit any mechanic's, materialman's or other lien against the Store or the Leased Premises in connection with any labor, materials or services

17

furnished or claimed to have been furnished. If any such lien shall be filed against the Store or Leased Premises, the party charged with causing the lien will cause the same to be discharged, provided, however, that either party may contest any such lien, so long as the enforcement thereof is stayed.

## Article 22 - INDEMNIFICATION

22.1   (a)   Neither Landlord nor any of Landlord's agents nor the employees of either shall be liable for any damage to property entrusted to them or to their employees nor the loss of any property by theft or otherwise.

(b)   Neither Landlord nor Landlord's agents or the employees of either shall be liable for any injury to or death of any persons, or for loss or damage to any property of tenant or any other person during the Term of this Lease, from any cause whatsoever which arises out of, is connected with, or incidental to the use, occupancy and enjoyment of the Store by Tenant or any person thereon or holding under Tenant, including, without limitation, injury or damage sustained by the person, goods, wares, merchandise, property of Tenant, its employees, invitees, or customers, or any other person in or about the Store caused by or resulting from fire, steam, electricity, gas, or rain, which may leak or flow from or into any part of the Store, or from the breakage, leakage, obstruction or other defects of the pipes, sprinklers, wires, appliances, plumbing, air conditioning or lighting fixtures of the same, or falling plaster, whether such damages or injury results from conditions arising in the Store or upon the Leased Premises or elsewhere.

(c)   Tenant indemnifies Landlord against any and all claims, liabilities, losses, damages, costs and expenses (including, but not limited to, attorneys' fees and expenses) whatsoever, on account of any such real or claimed damage or injury as above described, and from all liens, claims and demands arising out of Tenant's use of the Store or the balance of the Leased Premises (incidental to the use of the Store), or any repairs or alterations which Tenant may make to the Store, but Tenant shall not be liable for damage or injury arising out of the intentional acts, omissions or negligence of Landlord or its designated agents, servants or employees, covered by insurance that Tenant is required to provide under the terms of this Lease.

(d)   The obligation to indemnify shall include costs arising out of the retention of legal counsel reasonably satisfactory to Landlord, all investigation costs and all other reasonable costs, expenses and liabilities from the first notice that any claim or demand is to be made or may be made. Further, Landlord shall have the option to cause Tenant or Tenant's insurance company, promptly and diligently, at their own expense,

to completely defend all claims, actions, or proceedings brought by anyone against Landlord, its agents, or the employees of either arising from the events described above. Landlord shall, upon becoming aware of such claim or damages, promptly notify Tenant. Tenant's obligation hereunder shall be limited to the amount in excess of any insurance proceeds in event of casualty damage.

22.2    With respect to the manner of design and construction of the Leased Premises, Landlord agrees at Tenant's option, to save Tenant harmless from and indemnify and defend Tenant against any and all injury, loss, damage, liability (or any claims in respect of the aforementioned), costs or expenses (including, without limitation, attorneys' fees, reasonable investigation and discovery costs), of whatever nature, to any person or property caused or claimed to be caused by or resulting from any act, omission or negligence of the Landlord or its employees or agents.

22.3    The provisions of this Article as to property damage shall be subject to the provisions of Article 1.3 regarding Waiver of Subrogation.

## Article 23 - QUIET ENJOYMENT AND NONDISTURBANCE

23.1    Landlord agrees to promptly place Tenant in possession of the Store in accordance with the time provisions of this Lease as a condition to Tenant's obligation to pay rent hereunder. Landlord further represents and warrants that it has full authority to execute and perform this Lease and to grant the subject leasehold estate to Tenant. Tenant, provided Tenant is not in default hereunder, shall have peaceful and quiet enjoyment of the premises subject to the Indenture of Restriction and Reciprocal Easement and Operation Agreement and any other easements, covenants and restrictions of record, without hindrance or disturbance by Landlord or those claiming by, through or under Landlord, or any other person or entity whatsoever.

23.2    Landlord shall, as soon as practicable, request the holder of every mortgage and encumbrance with priority over this Lease to agree in writing with Tenant that neither such holder no, anyone acting under or through the holder, will take any action to interfere with the rights of Tenant, its successors and assigns, under and pursuant to this Lease so long as Tenant, its successors and assigns, are not in default hereunder.

23.3    Landlord covenants to obtain from each lender the security for whose loan encumbers the Store or the Leased Premises (and each lessor whose interest in the Leased Premises is paramount to Landlord's ("Overlessor's") an executed nondisturbance agreement assuring Tenant that notwithstanding any default by the Landlord to the lender or Overlessor, or any foreclosure or deed in

LEASE#14

lieu thereof (or Overlessor's termination proceedings), Tenant's rights under this Lease shall continue in full force and effect and its possession of the Store shall remain undisturbed except in accordance with the provisions of this Lease so long as Tenant is not in default hereunder so as to permit Lease termination.

23.4    Tenant shall upon Landlord's request, subordinate this Lease in future to any lien placed by Landlord upon the Store, or the Leased Premises or building of which the Store forms a part, with an insurance company, bank or any other lender, provided that such lender executes a Nondisturbance Agreement as provided in Section 28.22 that this Lease shall not terminate as a result of the foreclosure of such lien, or conveyance in lien thereof, and the Tenant's rights under this Lease shall continue in full force and effect and its possession be undisturbed except in accordance with the provisions of this Lease. Tenant will, upon request of the lienholder, be a party to such an agreement, and will agree that if such lienholder succeeds to the interest of the Landlord, Tenant will recognize said lienholder (or successor in interest of the lienholder) as its Landlord under the terms of this Lease.

23.5    Within ten (10) days of a written request therefor by either party hereto, the party receiving such request shall provide to the requesting party a written statement acknowledging the commencement and termination dates of this Lease, that this Lease is in full force and effect (if the same be true), that this Lease has not been modified (or, if it has, stating such modifications) and providing such other pertinent information as requesting party reasonably requests.

## Article 24 - TENANT DEFAULT

24.1    (a) The occurrence of either of the following shall constitute a default by Tenant pursuant to this Lease: (i) a failure by Tenant to pay rent within ten (10) business days of Tenant's receipt of written notice from Landlord specifying such failure; or (ii) a failure by Tenant to perform obligations pursuant to this Lease other than as specified in .(i) above, within thirty (30) days of Tenant's receipt of written notice from Landlord specifying such failure or, if it reasonably would require more than thirty (30) days to cure such failure, within a time reasonably necessary to cure such failure after Tenant's receipt of such written notice; or (iii) the Store is deserted and abandoned by Tenant; or. (iv) the Store shall be taken or occupied or attempted to be taken or occupied by someone other than Tenant, except as otherwise permitted in this Lease.

(b) Upon Tenant's default, Landlord may, in addition to any other remedy available at law, upon written notice, terminate this Lease and upon Tenant's receipt of such notice this

LEASE#14

Lease shall expire as fully and completely as if the date set forth in Landlord's notice or the day herein definitely fixed for the expiration of the Term hereof and Tenant shall then quit and surrender the Store to Landlord, but Tenant shall remain liable as hereinafter provided. If Tenant fails to so quit and surrender the Store as aforesaid, Landlord shall have the right, to re-enter the Store and dispossess Tenant and the legal representatives of Tenant and all other occupants of the Store by unlawful detainer or summary proceedings, force or otherwise, and remove their effects and regain possession of the Store (but Landlord shall not be obligated to effect such removal).

24.2    In the event of any breach of the Lease by Tenant this Lease shall not terminate unless Landlord, at Landlord's option, elects at any time when Tenant is in breach of this Lease, to terminate Tenant's right to possession as provided, or at Landlord's option, by the giving of any notice (including, but not limited to, any notice preliminary or prerequisite to the bringing of legal proceedings in unlawful detainer) terminating Tenant's right to possession. For so long as this Lease continues in effect, Landlord may enforce Landlord's rights and remedies under this Lease, including the right to recover all rent as it becomes due hereunder.    For purposes of this paragraph, the following shall not constitute termination of Tenant's rights to possession:  acts of maintenance or preservation or efforts to relet the Store, or the appointment of a receiver upon the initiative of Landlord to protect Landlord's interest under the Lease.

24.3    In the event of termination of this Lease or termination of Tenant's right to possession as the result of Tenant's breach of this Lease, Landlord shall have the right:

(a)  To remove any and all persons and property from the Store, with proper notice and legal process, pursuant to such rights and remedies as the State of Illinois shall then provide or permit, but Landlord shall not be obligated to effect such removal.  Said property may, at Landlord's option, be stored or otherwise dealt with as such laws may then provide or permit, including but not limited to, the right of Landlord to store the same or any part thereof, anywhere else or elsewhere at the expense and risk and for the account of Tenant;

(b)  To recover from Tenant damages which shall include but not be limited to:

(1) The worth at the time of the award, of the amount by which the unpaid rent for the balance of the Term after award exceeds the amount of such rental loss that Tenant proves could reasonably be avoided for the same period; and

(2)  Such    reasonable    expenses    as

21

LEASE#14

Landlord may incur for legal expenses, attorneys' fees, court costs, for reletting, including but not limited to, advertising, brokerage, for putting the Store in good condition and repair, for preparing the same for reletting and for keeping the demised premises in good order, condition and repair (before and after Landlord has prepared the same for reletting), and all costs (including but not limited to attorneys' and receiver's fees) incurred in connection with the appointment and performance of any receiver.

    24.4   Landlord waives such liens, if any, to which it may have a right with respect to the merchandise, furniture, trade fixtures and other personal property of Tenant located on or about the Store and shall from time to time execute such documents as Tenant may reasonably request to acknowledge such waiver.

## Article 25 – LANDLORD DEFAULT

    25.1   Landlord default is defined as the failure by Landlord to perform any obligation under this Lease which default continues for a period of more than thirty (30) days after receipt of written notice from Tenant specifying such default, or if such default is of a nature to require more than thirty (30) days for remedy and continues beyond the time reasonably necessary to cure, provided Landlord shall undertake action to cure such default within such 30-day period and diligently pursue such efforts to completion within a period not to exceed a total of ninety (90) days.

    25.2   In the event of any default by Landlord which is not cured as provided in Section 25.1, Tenant shall have the right to exercise any of the following rights (which shall be in addition to any other rights or remedies available by law):

    (a)   To perform any act or contract for the performance thereof and incur any expense reasonably related thereto and thereafter bill Landlord for the costs incurred, payable within 30 days of Landlord's receipt of said bill.

    (b)   Initiate legal proceedings for damages and consequential damages resulting from such Landlord default while remaining in possession of the premises.

## Article 26 – ATTORNEY'S FEES

    26.1   If either party becomes a party to any litigation concerning this Lease, the Store or the Leased Premises by reason of any act or omission of the other party or its authorized representatives, and not by any act or omission of the party that becomes a party to that litigation or any act or

LEASE#14

omission of its authorized representatives, the party that causes the other party to become involved in the litigation shall be liable to that party for reasonable attorney's fees, court costs, investigation expenses, discovery costs and costs of appeal incurred by it in the litigation.

26.2   If either party commences an action against the other party arising out of or in connection with this Lease, the prevailing party shall be entitled to have and recover from the losing party, reasonable attorney's fees, costs of suit, investigation costs and discovery costs, including costs of appeal. When this Lease imposes upon a party an obligation to indemnify the other, the indemnification obligation shall include the obligation to pay the indemnitee's reasonable attorney's fees, costs and disbursements, whether the indemnitee be the plaintiff or defendant.

## Article 27 - ASSIGNMENT

27.1   (a)   Tenant shall have the right to assign this lease or to sublet all or any part of the premises with the consent of Landlord first obtained, which consent will not be unreasonably withheld or delayed.   Tenant shall submit written notice to Landlord of Tenant's intent to either assign or sublet and Landlord shall have ten (10) days after receipt of Tenant's written notice to give written notice to Tenant that Landlord refuses to consent to such assignment or subletting and a written statement of the reasons for Landlord withholding its consent.

(b)   No such assignment or subletting shall act to release or discharge Tenant from any obligations for the payment of rent under this Lease.   In the event any assignee of this Lease shall be in default hereunder, Landlord shall send Tenant written notice of any such default within thirty (30) days after the same shall have first occurred.

(c)   Consent by Landlord to any one assignment or subletting shall not relieve Tenant or assignee or any subtenant from obtaining the consent of Landlord, as provided herein, to any further or additional assignment or subletting.

27.2   Notwithstanding anything to the contrary contained in this Lease, in the event that Tenant's operations are transferred to another entity by way of merger, consolidation or sale of substantially all of the stock therein or assets thereof, Tenant may, without Landlord's consent, assign its rights in this Lease for the use herein permitted to such resulting or acquiring entity, provided (and it shall be a condition of the validity of any such assignment), without limitation, that: (i) such entity shall agree directly with the Landlord to be bound by all of the obligations of the Tenant hereunder, including, without limitation,

the obligations to pay the rent and other charges provided for under this Lease, and the covenant against further assignment; (ii) such assignment shall not relieve the Tenant herein named of any of its obligations hereunder, and the Tenant shall remain fully liable therefore.

## Article 28 - HOLDING OVER

28.1    If the Tenant shall remain in possession of the Store or any portion thereof after the expiration of the Term in the absence of an agreement in writing between the Landlord and Tenant, the party remaining in possession shall be deemed a Tenant at sufferance, until acceptance of rent by Landlord, at which time the person in possession shall become a Tenant from month-to-month at 150% of the average monthly rent and additional rent paid in the last year of the Term and under the same terms and conditions as existed immediately prior to the expiration of the Lease.    The foregoing shall not be applicable in the event Tenant shall be holding over as the result of exercise of any option to renew or extend the Term of this Lease as provided herein.

## Article 29 - SUCCESSORS IN INTEREST

29.1    The terms, conditions and covenants herein contained shall inure to the benefit of and be binding upon the heirs, assigns and other successors in interest to the parties hereto.

## Article 30 - NOTICES

30.1    Any notice to be given or served in connection with this Lease shall be in writing, and may be served by personal delivery upon the party, or upon a corporate officer thereof, or may be served by certified mail, or by air courier service, addressed as specified in Section 1.2 hereof or to such other address as requested by either party in writing.    Mail service shall be deemed effective seventy-two (72) hours after deposit in the U.S. mail in accordance herewith or twenty-four (24) hours after deposit with a reputable air courier service which provides written evidence of delivery.    Either party by written notice to the other may designate two additional parties to receive copies of notices sent to it.    Such designees may be changed by written notice.

## Article 31 - SIGNS

31.1    Subject to the Reciprocal Easement and

24

Operation Agreement, and any other easement, covenants and restrictions of record, Tenant may erect and maintain upon the exterior of the Store and upon each monument serving the Leased Premises a sign or signs which are deemed appropriate to the conduct of its business. Landlord is deemed to have consented to Tenant's standard signage plans and specifications upon execution of this Lease.

## Article 32 – MEMORANDUM OF LEASE

32.1    This Lease shall not be recorded however, a Memorandum thereof in the form attached hereto as Exhibit "D" shall be executed, in recordable form, by both parties concurrently herewith and recorded by Landlord with the official charged with recordation duties for the county in which the Leased Premises is located, with directions that it be returned to Tenant. Upon expiration or earlier termination of this Lease, Tenant shall cooperate with Landlord in executing a Memorandum, in recordable form, acknowledging Tenant's release of its leasehold interest in the Leased Premises.

## Article 33 – NET LEASE

33.1    It is specific intention of Lessor and Lessee that the rental herein specified shall be net to Lessor in each year during the Lease Term, that (except as otherwise expressly provided herein) all costs, expenses and obligations of every kind relating to the premises which may arise or become due during the Lease Term shall be paid by Lessee, and the Lessor shall be indemnified by Lessee against any and all such costs, expenses and obligations.

## Article 34 – GENERAL CONDITIONS

34.1    If any sums payable hereunder by either party are not paid when due and all required notices of such a default have been given the defaulting party, then such overdue sums shall accrue interest at the rate of ten percent (10%) per annum from the date the sum became due until paid in full.

34.2    If any term, covenant, condition or restriction of this Lease is held by a Court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated thereby.

34.3    Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent, or of partnership,

or of joint venture, or of any other association between the parties other than Landlord and Tenant, or to prevent Landlord or Tenant from entering into ventures in direct competition with the Store.

34.4    Time is of the essence of the performance of each provision of this Lease.

34.5    The waiver of performance of any covenant, term or condition of this Lease by Landlord or Tenant shall not be construed as a waiver of any subsequent breach of the same covenant, term or condition.    The various rights, options, elections, powers and remedies of the parties contained in this Lease shall be constructed as cumulative and no one of them exclusive of any other or of any legal or equitable remedy which either party might otherwise have in the event of a breach by the other, and the exercise of one right or remedy by a party shall not in any way impair its right to any other right or remedy.

34.6    For purposes of computing dates for expirations, options, rental adjustments or cancellations (except for those specifically designated in Article 5 hereof), any partial month at the commencement of the Term shall be disregarded.

34.7    Wherever in this Lease the Landlord or the Tenant is required to give its consent or approval to any action on the part of the other, such consent or approval shall not be unreasonably withheld.

34.8    All charges due from Tenant to Landlord for which the Tenant must be billed by the Landlord, must be billed within two (2) years of the date the charge is incurred by the Landlord or the Landlord will have waived its right to reimbursement which may have been established in any paragraph of this Lease.

34.9    Words of gender used in this Lease shall be deemed to include other genders, and singular and plural words shall be deemed to include the other, as the context may require.

34.10    Under no circumstances shall Tenant be liable or responsible for payment of any brokerage commission, finder's fee or any other charge or fee unless specifically contracted for in writing by Tenant.    Landlord shall indemnify and hold Tenant harmless from any such fees and charges for which Tenant did not specifically contract to pay in writing.

34.11    Paragraph headings in this lease are for convenience only, are not a part of the agreement of the parties, and shall not constitute an aid in interpreting this Lease.

34.12    This Lease shall be construed in accordance

26

LEASE#14

with and governed by the laws of the state wherein the Store is located, except as otherwise required by mandatory provisions of law.

34.13  If Landlord is other than a natural person, each individual executing this Lease on behalf of the named Landlord represents and warrants that he is duly authorized to execute this Lease on behalf of the named Landlord in accordance with a duly adopted resolution of Landlord's board of directors and Landlord's bylaws (if Landlord is a corporation) and in accordance with the agreement of partnership (if Landlord is a partnership) and by delivery hereof warrant that execution by no other signatory is required and will hold Tenant harmless from any claim to the contrary (and loss suffered by reason thereof).

34.14  The submission of this Lease for examination does not constitute a reservation for the Store, and this Lease becomes effective only upon execution and delivery thereof by Landlord and Tenant.

34.15  Tenant agrees to comply with the rules and regulations for the Leased Premises which are attached hereto or, if no such rules and regulations are attached, such future reasonable rules and regulations which may be promulgated by Landlord; provided, however, that no future rules or regulations shall be enforceable against this Tenant which impair or adversely affect any of the rights, remedies and privileges of Tenant under this Lease.  Landlord shall enforce all rules and regulations against all tenants uniformly and without discrimination against specific tenants or types of tenants.

IN WITNESS WHEREOF, Landlord and Tenant have duly executed this Lease on this 17TL day of May_____, 1993.

"LANDLORD"                          "TENANT"

VERNON HILLS BUILDING               SPORTMART, INC.,
LIMITED PARTNERSHIP                 A DELAWARE CORPORATION
By: NORTL Riverside Corp.

By: _Andrew Hochberg_       By: _____
              Title              VP Per E6b6       Title

By:_____
              Title

27

## EXHIBIT "A"

LOT 2 IN SPORTMART SUBDIVISION, BEING A RESUBDIVISION OF LOT 1 IN
CONTINENTAL EXECUTIVE PARKE - PHASE I, IN SECTION 4, TOWNSHIP 43
NORTH, RANGE 11, EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO
THE PLAT OF RESUBDIVISION RECORDED MAY 20, 1992 AS DOCUMENT
3160372, IN LAKE COUNTY, ILLINOIS.

EXHIBIT "D"

## DECLARATION OF MUTUAL AND RECIPROCAL
## EASEMENTS, COVENANTS AND RESTRICTIONS

This Declaration of Mutual and Reciprocal Easements, Covenants and Restrictions ("Declaration") is made this _2o&_ day of _MAY_____, 1992 by and between VH BUILDING LIMITED PARTNERSHIP, an Illinois limited partnership ("VHLP"), and VERNON HILLS II LIMITED PARTNERSHIP, an Illinois Limited Partnership ("VH2").

## R E C I T A L S :

A.    VHLP is the holder of record title in fee simple of certain real property legally described on Exhibit "A" attached hereto and made a part hereof (the "VHLP Parcel"); and

B.    VH2 is the holder of record title in fee simple of certain real property legally described on Exhibit "B" attached hereto and made a part hereof (the "VH2 Parcel"); and

C.    VHLP's Parcel is contiguous on the north, east and west with VH2's Parcel, as generally shown on Exhibit "C" - Site Plan, said Exhibit "C" being attached hereto and made a part of this Declaration, and VHLP and VH2 mutually acknowledge that VHLP has a substantial interest in the development and use of VH2's Parcel; and

D.    VHLP desires to develop VHLP's Parcel as depicted on Exhibit "C" and VH2 may hereinafter elect to develop, convey, lease or otherwise transfer all or certain portions of VH2's Parcel to other persons or entities; and

E.    VHLP and VH2 mutually agree that for the proper, full, highest and best development of VHLP's Parcel and VH2's Parcel certain easement rights shall be granted by each party, as grantor, to the other party, as grantee, for ingress, egress and travel to and from the VHLP's Parcel, VH2's Parcel, public access points and roadways; and

F.    As additional consideration for the sale of the VHLP Parcel by VH2 to VHLP, the parties have agreed to subject VH2's Parcel and VHLP's Parcel to the terms, conditions and provisions of this Declaration in the manner hereinafter set forth; and

G.    VHLP and VH2, and their respective legal representatives, successors and assigns are herein individually referred to interchangeably as "parties hereto"; and

H.    The VHLP Parcel and the VH2 Parcel are sometimes hereinafter individually referred to interchangeably as "Parcels"; and

I.   VHLP and VH2 desire to enter into this Declaration to provide for the construction, maintenance and operation of improvements to be situated on the VH2 Parcel and to create certain rights, privileges and easements, and to impose certain restrictions and covenants upon the Parcels, all as herein set forth.

NOW, THEREFORE, for TEN and 00/100 DOLLARS ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, VHLP and VH2 hereby declare and agree as follows:

1.   USE AND BUILDING RESTRICTIONS OF VH2'S PARCEL.   VH2 agrees to restrict the use of the VH2's Parcel as follows:

A.   No "fast food" user shall be located on any part of VH2's Parcel; and

B.   No restaurant in excess of 5,700 square feet (measured from the foundation perimeter and the square footage of which shall not include any outdoor seating area; provided, however, said outdoor seating area shall not contain more than thirty-two (32) seats and, at such times as the outdoor seating area is open, a like number of indoor seats shall be closed) shall be located on any part of VH2's Parcel; and

C.   VH2's Parcel or any portion thereof shall not be used for the sale of sporting goods, athletic footwear and/or athletic apparel, unless such use constitutes less than 5% the selling area of the building located on VH2's Parcel; and

D.   Without the express prior written consent of VHLP, there shall never be located on VH2's Parcel more than one building; and

E.   Without the express prior written consent of VHLP, which consent shall not be unreasonably withheld, the aggregate size of the building (including all outdoor seating areas) to be built on VH2's Parcel shall not exceed 10,000 square feet; and

F.   The building (including all outdoor seating areas) on VH2's Parcel shall not be greater than twenty (20) feet in height from the ground to the top of the roof. VHLP shall also have the right to approve the type of parapet on said building (VHLP acknowledges that a parapet is required by the Village of Vernon Hills.), which approval shall not be unreasonably withheld or delayed; and

G.   If the building (including all outdoor seating areas) to be built on VH2's Parcel exceeds 10,000 square feet, VHLP shall have the right to approve (which approval or

2

disapproval shall be given within five (5) business days after notice from VH2 of its intent to construct a building in excess of 10,000 square feet) the location of the building (including all outdoor seating areas) on VH2's Parcel.  If the building (including all outdoor seating areas) to be built on VH2's Parcel is 10,000 square feet or less, the eastern boundary of said building (including all outdoor seating areas) to be built on the VH2's Parcel shall not be located less than 68 feet from the eastern boundary of VH2's Parcel (The location of the building is hereby deemed approved by VHLP as long as the eastern boundary of the building (including all outdoor seating areas) is not located less than 68 feet from the eastern boundary of VH2's Parcel.); and

H.    (i)  If VH2 obtains a building permit for construction of a building (including all outdoor seating areas) in excess of 10,000 square feet, VH2 agrees to pay to VHLP a one time fee, upon receipt by VH2 of a building permit to construct the building on VH2's Parcel, equal to $32.00 for each square foot of building constructed (including all outdoor seating areas) on the VH2's Parcel in excess of 10,000 square feet.  For example, if VH2 obtains a building permit for a 12,000 square foot building, VH2 shall pay a one time fee to VHLP of $64,000.   VH2 shall not have the right to commence construction on the VH2 Parcel until such time as said fee is paid to VHLP.

(ii)  If VH2 constructs a building on the VH2's Parcel where the total square footage of the building constructed (including all outdoor seating areas) is equal to or less than 10,800 square feet, VH2 agrees to pay to VHLP an annual fee of $2,500.00.  Said fee shall be paid as follows: (i) $500.00 shall be due and payable in advance on the day prior to commencement of construction on the VH2 Parcel and thereafter on each and every anniversary of said date; and (ii) $500.00, $500.00 and $1,000.00 respectively shall be due and payable in arrears on the first day of each of the next three (3) three month periods respectively commencing on the first day of the fourth month following commencement of construction on the VH2 Parcel and thereafter the same payment shall be made on each and every anniversary of each said three (3) three month periods; and

I.    Unless otherwise approved by the Village of Vernon Hills, VHLP's Parcel shall comply with all Village of Vernon Hills parking requirements respecting its Parcel and VH2's Parcel shall comply with all Village of Vernon Hills parking requirements respecting its Parcel; and

J.    Without the express prior written consent of the owner of the other Parcel, no distress, fire, bankruptcy,

01/30/2013 16:14 FAX 8476743381       MICC INC       ☑003

close-out, "lost our lease", "going out of business" or auction sales shall be permitted on either Parcel.

2. __EASEMENTS__.

2.1 __CROSS-ACCESS AND CROSS-STORM SEWER DRAINAGE EASEMENTS__.

(a)  VHLP and VH2 each grant and convey, to each other, a perpetual, mutual, reciprocal and non-exclusive easement, appurtenant to and for the benefit of grantee's property, solely for the purpose of storm sewer drainage, passage, both pedestrian and vehicular, for ingress, egress and delivery to and from the public roadways adjoining VH2's Parcel and VHLP's Parcel, and between the business establishments occupying VH2's Parcel and VHLP's Parcel, in, to, upon, through and over VH2's Parcel and VHLP's Parcel only to the extent depicted on Exhibits "D1" and "D2" - Easement Areas, said Exhibits "D1" and "D2" being attached hereto and made a part of this Declaration.

The easements, rights and privileges granted hereby shall be for the benefit of, and be restricted solely to the title holder from time to time of, all or any portion of each grantee's property, but such owner or owners may grant the benefit of such easement, rights and privileges to its tenants, subtenants, franchisees, or affiliates, now or hereafter occupying a building or portions thereof on said Parcels for the period of such tenancy and to the customers, employees, and business invitees of said owner or owners and tenants, franchisees or affiliates, but the same if not intended, and shall not be construed as creating any rights in and for the benefit of the general public. The easements, rights and privileges herein granted shall be used and enjoyed in such a manner as to cause the least possible interference with the conduct and operations of any business at any time existing on VH2's Parcel or VHLP's Parcel.

(b)  Except for vehicles parked in the Easement Areas, VHLP and VH2 agree that no barriers, fences, curbs, walls, ditches, barricades or other structures or obstacles other than those depicted on Exhibit "C" - Site Plan and Exhibits "D1" and "D2" - Easement Areas will be erected on, along, or adjacent to the common boundary lines between VH2's Parcel and VHLP's Parcel so as to burden or interfere with, impede, slow, divert, or in any way prevent vehicular and pedestrian traffic from freely passing across VH2's Parcel to VHLP's Parcel, or from VHLP's Parcel to VH2's Parcel.

(c)  VH2 and VHLP each agree that they shall not alter or attempt to alter the curb cuts to Lakeview Parkway and Phillip Road or access points from VH2's Parcel to or from VHLP's Parcel as depicted on Exhibit "C" - Site Plan and

4

Exhibits "D1" and "D2" – Easement Areas, without the express written consent of the other party, the consent of the Village of Vernon Hills and any and all other parties having control over the location of said curb cuts.

(d)  Except as otherwise expressly set forth in this Declaration, VH2 agrees to maintain, at VH2's sole cost and expense, all Easement Areas which are located on VH2's Parcel, and VHLP agrees to maintain, at VHLP's sole cost and expense, all Easement Areas which are located on VHLP's Parcel.

2.2  ABANDONMENT OF EASEMENTS.  After the Expiration Date of this Declaration, the perpetual easements granted in Sections 2.1 or all or any part or parts thereof, may be abandoned and terminated, if the use thereof shall have ceased and cessation thereof continues for a continuous period of five (5) years. Thereafter the then record owner or owners of the fee of the Parcel burdened (or if such portion thereof so burdened) with such easement may give written notice by United States registered mail, return receipt requested, mailed to the then record owner or owners of the fee of the Parcels benefited (or of such portion thereof so benefited) by such easement and the then owner or owners, if any, of any leasehold interest in such benefited Parcels or of such portion thereof so benefited), stating that such easement has been abandoned and may place of record in the Recorder's Office in Lake County, Illinois, an affidavit that such abandonment has taken place and that such notice has been properly given.  If the record owner or owners of the fee of the benefited Parcel (or of such portion thereof so benefited) fails to place of record in the Recorder's Office in Lake County, Illinois, within ninety (90) days after the giving of such notice an affidavit that such easement has not ceased to be used for such continuous five (5) year period, such easement shall thereupon be conclusively deemed abandoned and any person having or thereafter acquiring an interest in the Parcel previously burdened (or if such portion thereof so burdened) shall hold and take such interest free of and unencumbered by such easement.

2.3  RESTRICTIONS ON GRANT OF EASEMENTS.  Except for easement grants required by the Village of Vernon Hills or other governmental entity or utility having jurisdiction over the Parcels, no easements may be granted on the VH2 Parcel to or for the benefit of any Person without the prior express written consent of VHLP, which consent will not be unreasonably withheld or delayed.  No dedication of any part of the VH2 Parcel for public purposes may be made without the prior written consent of VHLP, which consent will not be unreasonably withheld or delayed.  Any such attempted grant or dedication without such consent shall be null and void.

Except for easement grants required by the Village of Vernon Hills or other governmental entity or utility having jurisdiction

over the Parcels, no easements may be granted on the VHLP Parcel
to or for the benefit of any person without the prior express
written consent of VH2, which consent will not be unreasonably
withheld or delayed.  No dedication of any part of the VHLP Parcel
for public purposes may be made without the prior written consent
of VH2, which consent will not be unreasonably withheld or delayed.
Any such attempted grant or dedication without such consent shall
be null and void.

2.4  MISCELLANEOUS.   The easements granted herein are
non-exclusive, unless otherwise expressly stated, and are irrevoc-
able and run with the land and shall benefit the grantees there-
under and their respective legal representatives, successors and
assigns.  The word "in" with respect to an easement granted "in"
a particular Parcel means as the context may require, "in", "to",
"on", "over", "through", "upon", "across", and "under", or any one
or more of the foregoing.  All easements herein are easements
appurtenant and not easements in gross.

3.  CONSTRUCTION BY VH2 AND VHLP.

3.1  PLANS AND SPECIFICATIONS; GENERAL DESIGN DATA.  Prior to
commencement of any construction on the VH2 Parcel, VH2 shall have
submitted to VHLP for approval (which approval will not be
unreasonably withheld or delayed), and VHLP shall have approved or
disapproved within ten (10) business days after receipt thereof,
the plans and specifications, engineering and drainage plans,
grading plans, and utility plans therefor and all signs to be
installed on the VH2 Parcel (the "Construction Requirements").

3.2  CONSTRUCTION OF VHLP'S PARCEL.  VHLP agrees to commence
construction of improvements on VHLP's Parcel not later than one
year after the date of this Declaration.  In the event that VHLP
does not commence construction of the improvements on VHLP's Parcel
within said one year period, VHLP shall pay to VH2 $1,000 per month
until such time as VHLP commences construction.  Said payment shall
be due and payable in advance on the 1st day of each month for each
30 day period which the commencement of construction does not occur
after the one year period expires.  The first monthly payment to
be made under this provision shall also include a prorated payment
for any partial month which occurred prior to the date upon which
the first payment shall become due.  The partial payment shall be
calculated on a per diem basis of $33.33 commencing on a date of
the month even with the first anniversary of the date of the month
of the execution of this Declaration to the last day of said month.

3.3  CONSTRUCTION OF VH2'S PARCEL.  VH2 agrees that no
exterior construction work of any kind whatsoever shall be
performed on VH2's Parcel between November 1 and January 5 of any
year without the express prior written consent of VHLP, which
consent may be withheld by VHLP in its sole and absolute discretion
for any reason or no reason.  During construction, VH2 agrees to

6

erect barricades and otherwise shield the construction from VHLP's Parcel in a manner reasonably satisfactory to VHLP.

If VHLP so desires, it shall have the right to construct VH2's parking lot or any portion thereof to be located on VH2's Parcel. If VHLP elects to construct VH2's parking lot or any portion thereof, VHLP shall first deliver to VH2 estimates of the cost of said parking lot construction which VH2 shall approve or disapprove within forty-eight (48) hours of receipt thereof. Once approved, if VHLP thereafter constructs VH2's parking lot, VH2 shall be required to reimburse VHLP for the cost thereof. Said reimbursement shall be due and payable to VHLP in full on the day prior to commencement of construction by VH2 on the VH2 Parcel.

4. <u>MAINTENANCE</u>.

4.1 <u>MAINTENANCE BY VHLP AND VH2</u>.

(a) VHLP and VH2 shall at all times maintain, repair, replace and renew or cause to be maintained, repaired, replaced or renewed all improvements on its Parcel, so as to keep same in a clean, sightly, safe and first-class condition consistent with its original intended appearance ("Maintenance"). Maintenance shall include, but not be limited to: the maintenance of all visible exterior surfaces of all buildings and other improvements; the prompt removal of all paper, debris and refuse from all areas of its Parcel and all snow and ice from paved areas; the operation, maintenance, repair, replacement and removal of all storm water drainage facilities located on its Parcel; the repair, replacement, cleaning and relamping of all signs and lighting fixtures; and the mowing, watering, fertilizing, weeding, replanting and replacing of all landscaping. With respect to Maintenance, the parties hereto agree that where it would provide a cost benefit to both parties, the parties will work together to jointly hire one entity to perform certain of the Maintenance services.

(b) Subject to the requirements of the Village of Vernon Hills, as such requirements may be amended from time to time, if any improvement is damaged or destroyed, the owner thereof shall promptly restore such improvement to the condition existing prior to such damage or destruction or, in the alternative, raze and remove such improvement and landscape the Parcel pursuant to a landscaping plan approved as provided in this Declaration.

(c) Subject to the approval of the Village of Vernon Hills, the parties agree to comply with the Site, Landscape, Utility and Grading Plan (Sheets A1, E1 and EL) dated on April 24, 1992 prepared by Jensen & Fore ("Plans"). Minor changes may be made to the Plans without the approval of the parties hereto or the Village of Vernon Hills. If there are material changes made to the Plans, said changes shall be approved by the Village of Vernon Hills where and if required and copies of such revised Plans will

7

be delivered to both parties. In addition, VH2 agrees to perform in a timely fashion whatever acts (except for those acts expressly stated in this Declaration that VHLP has agreed to perform on behalf of VH2) are required by the Village of Vernon Hills in order to cause the Village of Vernon Hills to issue a certificate of occupancy to VHLP.

4.2 <u>RIGHT TO PERFORM OTHER PARTY'S MAINTENANCE</u>. If VH2 or VHLP shall fail to perform Maintenance as aforesaid or the landscaping work in accordance with the provisions hereof, the other party may give written notice to the non-performing party specifying the manner in which the non-performing party has failed to so perform. If such failure has not been corrected within ten (10) days after such notice, or if such work, if it cannot be completed within such ten (10) day period, has not been commenced within such period and thereafter diligently completed, the other party may enter upon the Parcel and perform such work. The performing party by reason of its performing such work shall not be liable or responsible to the non-performing party for any losses or damage thereby sustained by the party or anyone claiming by or under the non-performing party except for gross negligence or wanton or willful acts. The non-performing party shall be liable for the cost of such work and shall promptly reimburse the other party for such cost, together with interest calculated from the date of expenditure until repayment, at the default interest rate, as hereinafter defined. If such non-performing party shall fail to reimburse the other party within thirty (30) days after receipt of a statement for such work from the other party then said indebtedness shall constitute a lien against that Parcel on which said work was performed.

5. <u>MECHANIC'S LIENS</u>.

5.1 <u>GENERAL</u>. VH2 shall not, through its own act or through that of its or its lessee's or licensee's employees, contractors or agents cause or permit any mechanic's, materialmen's or other similar lien or claim therefor to be placed upon or filed against any or all of the VH2 Parcel, the VHLP Parcel, or any part or portions thereof. If any such lien or claim therefor is so made or filed, VH2 shall cause same to be discharged and released immediately or cause the title company handling the transaction to issue a title endorsement over said lien while said lien is being contested.

VHLP shall not, through its own act or through that of its or its lessee's or licensee's employees, contractors or agents cause or permit any mechanic's, materialmen's or other similar lien or claim therefor to be placed upon or filed against any or all of the VHLP Parcel, the VH2 Parcel, or any part or portions thereof. If any such lien or claim therefor is so made or filed, VHLP shall cause same to be discharged and released immediately or cause the

8

title company handling the transaction to issue a title endorsement over said lien while said lien is being contested.

5.2  <u>INDEMNIFICATION</u>.  VH2 shall indemnify and hold VHLP and the VHLP Parcel harmless from all mechanic's, materialmen's and laborers' liens, and all costs, expenses and liabilities in connection therewith (including attorney fees) arising out of any activities performed by VH2, its agents, employees, contractors or subcontractors.

VHLP shall indemnify and hold VH2 and the VH2 Parcel harmless from all mechanic's, materialmen's and laborers' liens, and all costs, expenses and liabilities in connection therewith (including attorney fees) arising out of any activities performed by VHLP, its agents, employees, contractors or subcontractors.

6.    <u>FAILURE OF PERFORMANCE</u>.

6.1  <u>BY VH2</u>.  If VH2 fails to pay any amounts when due from it hereunder or to promptly observe or perform any of its covenants, agreements, duties or obligations provided in this Declaration, then VHLP shall have a lien on the VH2 Parcel to secure the enforcement of its remedies therefor, and VHLP shall have any and all rights and remedies set forth herein or as otherwise provided at law or in equity in respect thereof, including without limitation the right to immediately collect from and sue VH2 for all damages suffered on account thereof and/or the right of injunction and specific performance and/or the right to seek foreclosure of such lien in the manner provided by law for foreclosure of liens against real estate.  Without limiting the generality of the foregoing, VHLP shall have the right to correct any such failure or render any such performance, and the right to enter upon the VH2 Parcel for such purpose and VH2 shall promptly pay the costs thereof.  Any amounts so expended or damages so suffered may be withheld from amounts otherwise payable to VH2 and/or collection may be sought directly against VH2 and in any event VH2 shall pay such amount with interest at the rate equal to the greater of (i) two percent (2%) per annum in excess of the prime interest rate per annum then in effect at The Northern Trust Bank, or (ii) twelve percent (12%) per annum (but in no event shall such rate of interest exceed the maximum rate of interest then permitted by law) (the "default interest rate") from the date of expenditure by VHLP until the date of reimbursement to VHLP by VH2. In addition all amounts due and owing from VH2 as set forth above shall be and become liens upon the VH2 Parcel, enforceable by foreclosure of the VH2 Parcel or otherwise in a manner permitted at law or in equity.

6.2  <u>BY VHLP</u>.  If VHLP fails to pay any amounts when due from it hereunder or to promptly observe or perform any of its covenants, agreements, duties or obligations provided in this Declaration, then VH2 shall have a lien on the VHLP Parcel to

secure the enforcement of its remedies therefor, and VH2 shall have any and all rights and remedies set forth herein or as otherwise provided at law or in equity in respect thereof, including without limitation the right to immediately collect from and sue VHLP for all damages suffered on account thereof and/or the right of injunction and specific performance and/or the right to seek foreclosure of such lien in the manner provided by law for foreclosure of liens against real estate. Without limiting the generality of the foregoing, VH2 shall have the right to correct any such failure or render any such performance, and the right to enter upon the VHLP Parcel for such purpose and VHLP shall promptly pay the costs thereof. Any amounts so expended or damages so suffered may be withheld from amounts otherwise payable to VHLP and/or collection may be sought directly against VHLP and in any event VHLP shall pay such amount with interest at the rate equal to the greater of (i) two percent (2%) per annum in excess of the prime interest rate per annum then in effect at The Northern Trust Bank, or (ii) twelve percent (12%) per annum (but in no event shall such rate of interest exceed the maximum rate of interest then permitted by law) (the "default interest rate") from the date of. expenditure by VHLP until the date of reimbursement to VH2 by VHLP. In addition all amounts due and owing from VHLP as set forth above shall be and become liens upon the VHLP Parcel, enforceable by foreclosure of the VHLP Parcel or otherwise in a manner permitted at law or in equity.

7. <u>EASEMENT AREA MAINTENANCE</u>. As stated in Sections 2.1(d) and 4.1(a) hereof, each party shall be responsible for the Maintenance of its Parcel and the maintenance of the Easement Areas located thereon. However, notwithstanding the foregoing, (i) with respect to the lighting of VHLP's parking lot, if VH2 so requires, VHLP agrees to keep VHLP's parking lot lights operating from the close of business on the VHLP Parcel until 2:00 a.m. In such event, VH2 agrees to reimburse VHLP, within ten (10) days after receipt of an invoice from VHLP, for the additional cost of lighting the parking for the period from one hour after the close of business on the VHLP Parcel until 2:00 a.m., and (ii) with respect to the storm sewer drainage cross-easement referred to in Section 2.1(a) and as depicted on Exhibit "D2" attached hereto, the parties hereto agree that the cost (including, but not limited to, soft costs, engineering costs and tap-on fees) of construction, operation and maintenance of the storm sewer drainage system located on the Parcels shall be borne 80% by VHLP and 20% by VH2. VH2's share of the foregoing shall be paid to VHLP on the day VH2 receives the building permit to construct the building on VH2's Parcel; and (iii) the cost of construction and maintenance of all curbs cuts (on Lakeview Parkway) and offsite curb improvements (on the Lakeview Parkway median) shall be borne 80% by VHLP and 20% by VH2. VH2's share of the foregoing shall be paid to VHLP on the day VH2 receives the building permit to construct the building on VH2's Parcel; and (iv) VHLP agrees to undertake the snowplowing of the Easement Areas and, to the extent it deems it necessary, to

10

institute a security program for the Easement Areas. The costs and expenses of both of the foregoing shall be borne 80% by VHLP and 20% by VH2. VH2's share (commencing on the day VH2 receives the building permit to construct the building on VH2's Parcel) shall be paid to VHLP within ten (10) days after receipt of an invoice from VHLP.

In addition, the Village of Vernon Hills is requiring a payment to it of $25,000 as a contribution to the construction of the bridge over Seavey Creek. The parties hereto agree that said $25,000 contribution shall be borne 80% by VHLP and 20% by VH2, said amount to be paid by each party at the time required by the Village of Vernon Hills.

8.    RESTRICTIONS GOVERNING IMPROVEMENTS ON THE PARCELS.

8.1    Loading Areas. Proper visual screening shall be provided between any truck loading and receiving area and any street or building on either Parcel.

8.2    Outside Storage. No materials, supplies, equipment, finished or semi-finished products or articles of any nature shall be stored or permitted to remain on any Parcel outside of any building. Waste and rubbish storage facilities shall be properly screened and shall not be installed, constructed or utilized without the prior written consent of VHLP, which consent shall not be unreasonably withheld or delayed and which consent shall be granted or withheld within ten (10) business days after the receipt by VHLP of the written request for consent from VH2.

8.3    Landscaping.

(a)    All Parcels shall be landscaped only in accordance with a plan submitted to and approved in writing by the Village of Vernon Hills prior to any development of the Parcel. Such landscaping plan shall include information regarding the type of sodding, seeding, trees, hedges and shrubs and information regarding other customary landscape treatment for the entire site, including fences, walls and screening. If required by the Village of Vernon Hills, all landscaping plans shall also include an underground lawn sprinkling system. Further, it shall be the responsibility of each owner to landscape and maintain the area between the lot lines of said owner's Parcel and the curbs of any public roadways adjacent to such Parcel. All landscaping shall be undertaken and completed in accordance with such approved plan and said plan may not be materially altered, amended or revised without submitting the revised landscaping plan to the Village of Vernon Hills for prior written approval or if otherwise required by the Village of Vernon Hills.

(b)    All landscaping required hereunder or otherwise to be provided on any Parcel shall be completed and paid for within

11

sixty (60) days after substantial completion of construction of any buildings to be constructed on said Parcel; provided, however, if weather conditions do not permit completion at such time, then such landscaping shall be completed as soon thereafter as weather conditions permit.

(c)  If any owner fails to undertake and complete its landscaping within the time limit set forth in this Section 8.3 hereof, the other owner may, at its option, after giving such owner ten (10) days' prior written notice (unless within said ten (10) day period the owner of said Parcel shall proceed and thereafter pursue with diligence the completion of such landscaping), undertake and complete the landscaping of such Parcel in accordance with the approved landscaping plan therefor.  If the other owner undertakes and completes such landscaping, the costs of such landscaping together with interest thereon at the default interest rate shall be assessed against the other party and if said assessment and interest is not paid within thirty (30) days after written notice of such assessment said assessment and interest will constitute a lien against the Parcel.

(d)  All landscaped Parcels shall be maintained by the owner thereof or any successors in interest to said owner in such a manner as to retain at least the intended standards of the initial landscaping plan approved by the Village of Vernon Hills for such Parcel.

(e)  Each party agrees to deliver to the other party copies of all landscape plans and modifications and amendments thereto respecting the VH2 Parcel.

8.4  Design.  All exterior design of and materials used for improvements on the VH2 Parcel shall be compatible and in harmony with existing or approved improvements on the VHLP Parcel. However, all landscape materials used by the parties hereto on the Parcels shall be controlled and governed by the Village of Vernon Hills.

8.5  Underground Utilities.  All utility connections, including all electrical, telephone, water and other utility lines, connections and installations shall be made as required by the Village of Vernon Hills or any utility having jurisdiction over the Parcels.  Unless otherwise expressly required by the Village of Vernon Hills, no transformer, electric, gas or other meter of any type or other apparatus shall be located on any power pole nor located on the outside of any building, but the same shall be placed on or below the surface of the Parcels and where placed on the surface shall be adequately screened and fenced.

8.6  On-Site Drainage.  All drainage of the Parcels into Seavey Creek shall be performed in accordance with engineering

12

plans approved by and in conformity with all requirements of the Village of Vernon Hills.

8.7 **Signs.** The following restrictions shall apply to any signage located upon the Parcels:

(a) All signs shall conform with the Vernon Hills Zoning Ordinance (and amendments, modifications and variances made thereto) and all other applicable statutes, ordinances, laws, rules and regulations. Any sign erected without complying with the foregoing shall be removed within five (5) days of the receipt of written notice from the other party demanding such removal. If the owner fails to remove such signs within the five (5) day period, the other owner shall have the right, but not the obligation, to enter upon the Parcel and remove such signs. The cost of such removal shall be assessed against and paid by the defaulting owner.

(b) If otherwise permitted by applicable statutes, ordinances, laws, rules and regulations, temporary signs shall be permitted during construction provided same do not interfere with the use or visibility of and access to the other owner's Parcel.

8.8 **Excavations and Rubbish.** VHLP and VH2 shall each remove at its own expense any rubbish or trash of any character which may accumulate on its Parcel. Rubbish, trash, garbage or other waste shall be kept only in sanitary containers. All equipment for the storage or disposal of such materials shall be kept in a clean and sanitary condition. No burning of rubbish or trash shall be permitted at any time.

8.9 **Maintenance Standards.** Any maintenance required to be performed pursuant to the terms of this Declaration shall result in maintenance of the improvement in a condition which is healthful, safe, clean, maintained and neat and complies with all applicable statutes, laws, ordinances, rules and regulations and substantially conforms to the condition of the improvement at the time of acceptance by the Village of Vernon Hills.

9. **INSURANCE.**

9.1 VH2 shall keep in full force and effect a policy of comprehensive general public liability insurance with respect to the VH2 Parcel, and the business operated by VH2 in the VH2 Parcel in which the primary coverage per accident or occurrence is not less than Five Hundred Thousand Dollars ($500,000.00) and the umbrella coverage per accident or occurrence is not less than Two Million Dollars ($2,000,000.00). The policies shall name VH2, VHLP and any other parties in interest from time to time designated by VHLP, as insured, and shall contain a clause that the insurer will not cancel or change the insurance without first giving VHLP thirty (30) days prior written notice. VH2 hereby releases VHLP from any and all liability VHLP otherwise might have for any loss or damage

13

for any reason, to the extent of VH2's insurance; and all such policies provided by VH2 shall contain a waiver of subrogation clause in favor of VHLP. Such insurance may be furnished by VH2 under any blanket policy carried by it or under a separate policy therefor. A copy of the paid up policies or certificates of the insurers evidencing the maintenance of such insurance policies shall be delivered to VHLP prior to commencement of the term of this Declaration or VH2's occupancy, whichever is sooner, and, upon renewals, not less than thirty (30) days prior to the expiration of a coverage period. A.M. Best's Reports Class A rated insurers shall be acceptable to VH2 and VHLP.

9.2 VH2 hereby agrees to indemnify and hold harmless VHLP, its respective beneficiaries, agents, employees, guests and invitees, and their respective heirs, legal representatives, successors and assigns (the "VHLP Protected Parties") and agrees to save them harmless from and against any and all claims, actions, damages, liability and expense in connection with loss of life, personal injury and/or damage to property or other damages arising from or out of the use, operation of the business, sale made or any occurrence in, upon or at the VH2 Parcel or on account of the act or neglect of VH2, its agents, employees, guests or invitees. In case any of the VHLP Protected Parties shall be made a party to any litigation commenced by or against VH2, then VH2 shall protect and hold the VHLP Protected Parties harmless and shall pay all costs and expenses, including attorney fees incurred or paid by any of them in connection with such litigation. VH2 shall also pay all costs, expenses and reasonable attorney fees that may be incurred or paid by any of the VHLP Protected Parties in enforcing the covenant and agreements of this Declaration.

9.3 VHLP shall keep in full force and effect a policy of comprehensive general public liability insurance with respect to the VHLP Parcel, and the business operated by VHLP in the VHLP Parcel in which the primary coverage per accident or occurrence is not less than Five Hundred Thousand Dollars ($500,000.00) and the umbrella coverage per accident or occurrence is not less than Two Million Dollars ($2,000,000.00). The policies shall name VHLP, VH2 and any other parties in interest from time to time designated by VH2, as insured, and shall contain a clause that the insurer will not cancel or change the insurance without first giving VH2 thirty (30) days prior written notice. VHLP hereby releases VH2 from any and all liability VH2 otherwise might have for any loss or damage for any reason, to the extent of VHLP's insurance; and all such policies provided by VHLP shall contain a waiver of subrogation clause in favor of VH2. Such insurance may be furnished by VHLP under any blanket policy carried by it or under a separate policy therefor. A copy of the paid up policies or certificates of the insurers evidencing the maintenance of such insurance policies shall be delivered to VH2 prior to commencement of the term of this Declaration or VHLP's occupancy, whichever is sooner, and, upon renewals, not less than thirty (30) days prior to the expiration

14

of a coverage period.  A.M. Best's Reports Class A rated insurers shall be acceptable to VHLP and VH2.

9.4  VHLP hereby agrees to indemnify and hold harmless VH2, its respective beneficiaries, agents, employees, guests and invitees, and their respective heirs, legal representatives, successors and assigns (the "VH2 Protected Parties") and agrees to save them harmless from and against any and all claims, actions, damages, liability and expense in connection with loss of life, personal injury and/or damage to property or other damages arising from or out of the use, operation of the business, sale made or any occurrence in, upon or at the VHLP Parcel or on account of the act or neglect of VHLP, its agents, employees, guests or invitees.  In case any of the VH2 Protected Parties shall be made a party to any litigation commenced by or against VHLP, then VHLP shall protect and hold the VH2 Protected Parties harmless and shall pay all costs and expenses, including attorney fees incurred or paid by any of them in connection with such litigation.  VHLP shall also pay all costs, expenses and reasonable attorney fees that may be incurred or paid by any of the VH2 Protected Parties in enforcing the covenant and agreements of this Declaration.

10.  NOTICES.  Each notice, demand, request, consent, approval, disapproval, designation or other communication (all of the foregoing are herein referred to as a "notice") that a Party gives to the other Party shall be in writing and shall be given or made or communicated by United States Mail addressed in the case of VHLP to:

    VH Building Limited Partnership
    7223 West Dempster Street
    Niles, Illinois 60648
    Attention:    Mitchell P. Kahn,
                  Vice-President, Real Estate

with duplicates to:

    VH Building Limited Partnership
    7223 West Dempster Street
    Niles, Illinois 60648
    Attention:    Legal Department

and

    Altheimer & Gray\
    10 South Wacker, Suite 3800
    Chicago, Illinois 60606
    Attention:    Robert E. Feldgreber, Esq.

15

and addressed in the case of VH2 to:

> Scott H. Gendell
> 8707 North Skokie Boulevard
> Suite 303
> Skokie, Illinois 60077

and

> James E. Levine, Esq.
> Attorney at Law
> 8707 North Skokie Boulevard
> Suite 303
> Skokie, Illinois 60077

subject to the right of a Party to designate a different address within the United States by notice similarly given at least ten (10) days in advance. Unless specifically stated to the contrary elsewhere in this Declaration, any notice shall be given, made or communicated as the case may be, by registered or certified United States Mail, return receipt (from an authorized agent) requested, properly addressed, with postage thereon fully prepaid or by telecopy; and shall be deemed given, made, communicated and received on the date shown on such return receipt as the date of delivery or first attempted delivery, whichever is earlier, or if by telecopy, on the date sent.

    11.  <u>INDEMNIFICATION</u>.  In addition to the provisions herein set forth, VH2 shall indemnify and hold harmless VHLP in connection with the act or neglect of VH2, its agents, employees, guests or invitees. VH2 shall further indemnify and hold harmless VHLP, its beneficiaries, agents, guests, invitees, and their respective heirs, legal representatives, successors and assigns from and against any and all damages, costs, expenses, attorneys' fees, suits, actions, judgments, liabilities, claims and demands, whatsoever, in law or in equity, made against or incurred or suffered by any one or more of them arising out of or in connection with the act or neglect of VH2, its agents, employees, guests or invitees.

    In addition to the provisions herein set forth, VHLP shall indemnify and hold harmless VH2 in connection with the act or neglect of VHLP, its agents, employees, guests or invitees. VHLP shall further indemnify and hold harmless VH2, its beneficiaries, agents, guests, invitees, and their respective heirs, legal representatives, successors and assigns from and against any and all damages, costs, expenses, attorneys' fees, suits, actions, judgments, liabilities, claims and demands, whatsoever, in law or in equity, made against or incurred or suffered by any one or more of them arising out of or in connection with the act or neglect of VHLP, its agents, employees, guests or invitees.

16

12.  AMENDMENT.  This Declaration may be amended or otherwise modified from time to time but only by a writing signed and acknowledged by both the parties hereto and recorded in the office of the Recorder for Lake County, Illinois.

13.  EXPIRATION DATE.  This Declaration shall in all events terminate on April 30, 2091, or at such earlier date as may be required in order that this Declaration will not be invalidated or be subject to invalidation by reason of a limitation imposed by law on the duration hereof.  The date upon which this Declaration terminates is herein referred to as the "Expiration Date".

14.  MISCELLANEOUS.

14.1 DECLARATION FOR EXCLUSIVE BENEFIT OF PARTIES.  Neither party hereto intends to confer any benefit upon or to receive any benefits for or on behalf of any person other than a party hereto, and, the provisions of this Declaration are for the exclusive benefit of the parties hereto and their respective heirs, legal representatives, successors and, subject to the provisions hereof, assigns, and not for the benefit of any third Person except as expressly provided herein and no provisions of this Declaration are intended to create or constitute any Person a third party benefic-iary hereof except as expressly provided herein.  This Declaration shall not be deemed to have conferred any rights upon any third Person, and no person, other than a party hereto, shall be entitled to make any claim against a party hereto or its Parcel under or by virtue of this Declaration or any provisions hereof.

14.2 WAIVER OF DEFAULT: RIGHTS AND REMEDIES CUMULATIVE.  A waiver by a party hereto of any provision of this Declaration or of any default by any Person must be in writing and no such waiver shall be implied from any omission by a party hereto to take any action in respect of such default if such default continues or is repeated.  No express written waiver of any default shall affect any default or cover any period of time other than the default and period of time specified in such express waiver.  One or more written waivers of any default in the performance of any term, provision, covenant or condition contained in this Declaration shall not be deemed to be a waiver of any subsequent default in the performance of the same term, provision, covenant or condition contained in this Declaration.  The consent or approval by a party hereto to or of any act or request by another party hereto requiring consent or approval shall not be deemed to waive or render unnecessary the consent or approval to or of any subsequent similar acts or requests.  No failure by a party hereto to insist upon or to enforce any provision of this Declaration shall constitute or be interpreted as a waiver thereof and no provision of this Declaration shall be interpreted as waived, modified or amended by the acts or conduct of the parties hereto except as specifically expressed to be such in writing or as specified in Article 14 hereof.  The rights and remedies given to a party hereto

17

by this Declaration shall be deemed to be cumulative and no one of such rights and remedies shall be exclusive of any of the others, or of any other right or remedy at law or in equity except as otherwise expressly limited by this Declaration) which a party hereto might otherwise have under this Declaration, and the exercise of one such right or remedy by a party hereto shall not impair such party's standing to exercise any other right or remedy.

14.3 NO PARTNERSHIP, JOINT VENTURE OR PRINCIPAL-AGENT RELATIONSHIP. Neither anything in this Declaration nor any acts of the parties hereto shall be construed or deemed by the parties hereto, or by any third person, to create the relationship of principal and agent, or of partnership, or of joint venture, or of any association between the parties hereto.

14.4 SUCCESSORS. This Declaration shall run with the land, both as respects benefits and burdens created herein, and shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors, beneficiaries, grantees, lessees, sublessees, agents, designees and, subject to the provisions hereof, assigns, and shall be binding upon and inure to the benefit all Persons having or acquiring an interest in the VH2 Parcel or the VHLP Parcel or any part thereof.

14.5 SEVERABILITY. If any term, provision, covenant or condition of this Declaration shall, to any extent, be invalid or unenforceable, the remainder of this Declaration (or the application of such term, provision, covenant or condition to persons or circumstances other than those in respect of which it is invalid or unenforceable) except those terms, provisions, covenants or conditions which are made subject to or conditioned upon such invalid or unenforceable term, provision, covenant or condition shall not be affected thereby, and each other term, provision, covenant and condition of this Declaration, unless conditioned upon such invalid or unenforceable term, provision, covenant or condition shall be valid and enforceable to the fullest extent permitted by law.

14.6 GOVERNING LAWS. This Declaration shall be construed and governed in accordance with the laws of Illinois.

14.7 RELEASE OF PARTIES. If VHLP, or if VH2 (such party in this Section 14.7 herein referred to as the "Transferring Party") sells, transfers or otherwise conveys (other than a lease) its Parcel, or any portion thereof, so that after such sale, transfer or other conveyance the Transferring Party no longer, either alone or with other persons, owns any part of its Parcel, the Transferring Party shall be released from all liabilities under this Declaration arising thereafter and from thereafter complying with the provisions of this Declaration and provided:

18

(a)   It gives notice to the other party hereto of its sale, transfer or other conveyance after the filing for record of the instrument effecting the same;

(b)   All amounts that are then due and payable by the Transferring Party to the other party hereto have been paid to such other party hereto; and

(c)   The Transferring Party delivers to the other party hereto an instrument signed by its grantee in recordable form that acknowledges such grantee's assumption of the duties, responsibilities and obligations imposed on the Transferring Party by this Declaration and assumed by such grantee.

Notwithstanding the Transferring Party's failure to provide the other Party with the document described above in Subsection (3), the grantee of any sale, transfer or other conveyance of the Transferring Party's Parcel, or any part thereof, shall be deemed to have automatically assumed all provisions of this Declaration that the Transferring Party was theretofore obligated to perform with respect thereto.   If, however, the Transferring Party does, either alone or with other persons, retain all or part of its Parcel, then such Transferring Party shall be a party hereto and its transferee shall not; provided that VHLP may expressly in writing at any time or times assign any or all of its rights hereunder as to any or all of the VHLP Parcel.

14.8   NOT A PUBLIC DEDICATION.   Nothing herein contained shall be deemed to be a gift or dedication of any part of the Parcels to the general public, or for the general public or for any public purpose whatsoever, it being the intention of the parties that this Declaration shall be strictly limited to and for the purposes herein expressed.   At the election of VHLP, all or a part of the Easement Area may be closed from time to time to such extent as may be sufficient in the opinion of VHLP's legal counsel to prevent a dedication thereof or the accrual of rights of any person or of the public therein.

14.9   WRITTEN CONSENT REQUIRED.   Whenever a party hereto is requested to consent to or approve of any matter with respect to which its "consent" or "approval" is required by this Declaration, such consent or approval shall be given in writing.

14.10   COVENANTS RUN WITH THE LAND.   It is intended that the covenants, easements, agreements, promises and duties of each party hereto as set forth in this Declaration, shall be construed as covenants and not as conditions, and that, to the fullest extent legally possible, all such covenants shall run with the land and constitute equitable servitudes as between the Parcel of the respective covenantor, as the servient tenement, and the Parcel of the respective covenantee, as the dominant tenement, binding upon the servient tenement and benefitting the dominant tenement.

19

Unless the context indicates otherwise, every covenant, easement, agreement and promise of each party hereto as set forth in this Declaration shall be deemed a covenant, easement, agreement and promise made for the benefit of the other party hereto and every duty of each Party as set forth in this Declaration shall be deemed to run to and for the benefit of the other party hereto.

14.11 <u>DEFAULT SHALL NOT PERMIT TERMINATION OF DECLARATION</u>. No default under this Declaration shall entitle any party hereto to cancel, rescind or otherwise terminate this Declaration, provided, however, that this limitation shall not affect, in any manner, any other rights or remedies that the parties may have by reason of any default under this Declaration.

14.12 <u>RIGHTS, PRIVILEGES, AND EASEMENTS WITH RESPECT TO LIENS</u>. This Declaration and the rights, privileges and easements contained herein are subject to zoning and building laws and ordinances; covenants, conditions and restrictions of record; rights of utilities and public bodies; any utility and cable easements now or hereafter granted by VHLP or VH2.

14.13 <u>TIME OF ESSENCE</u>. Time is of the essence with respect to the performance of each of the terms, provisions, covenants and conditions contained in this Declaration.

14.14 <u>COUNTERPARTS</u>. This Declaration may be signed in several counterparts, each of which shall be deemed an original, and all such counterparts shall constitute one and the same instrument. The signature of a party hereto to any counterpart may be removed and attached to any other counterpart. Any counterpart to which is attached the signatures of all parties hereto shall constitute an original of this Declaration.

14.15 <u>PERSONS</u>. For purposes hereof, "Person" or "Persons" means individuals, partnerships, firms, associations, corporations, and any other form of business or government organizations or entity, or one or more of them, as the context may require.

14.16 <u>ESTOPPEL CERTIFICATE</u>. Upon written request by VHLP, or VHLP's mortgagee, VH2 shall execute and deliver to the requesting party a certificate stating (a) whether this Declaration is in full force and effect, (b) whether there are any defaults hereunder (and if so specifying same) and (c) the date through which all amounts required to be paid hereunder have been paid.

Upon written request by VH2, or VH2's mortgagee, VHLP shall execute and deliver to the requesting party a certificate stating (a) whether this Declaration is in full force and effect, (b) whether there are any defaults hereunder (and if so specifying same) and (c) the date through which all amounts required to be paid hereunder have been paid.

20

14.17  RULES AND REGULATIONS.    The parties hereto acting
unanimously may adopt rules and regulations pertaining to the use
of the Parcels and/or the Easement Areas, provided that all such
rules and regulations shall apply equally and without discrimina-
tion to the parties hereto, the Parcels and to all persons entitled
to use the Easement Areas and/or the Parcels.


VERNON HILLS II LIMITED
PARTNERSHIP, an Illinois
limited partnership

By: B.G.P. II, INC.,
    an Illinois corporation,
    as general partner

By: _____
        Scott H. Gendell
        Its: President

VH BUILDING LIMITED
PARTNERSHIP, an Illinois
limited partnership

By: NORTH RIVERSIDE CORP.,
    an Illinois corporation,
    as general partner

By: _____
        Larry J. Hochberg
        Its: President

21

STATE OF ILLINOIS          )
                           )  SS:
COUNTY OF ~~COOK~~ LAKE    )


    I, JUDITH  MARCH_____, a Notary Public in and for said County in the State aforesaid, do hereby certify that ____Scott  H.  GENDELL_____, the president of the general partner of VERNON HILLS II LIMITED PARTNERSHIP, an Illinois limited partnership, personally known to me to be the same person whose name is subscribed to the foregoing instrument as such president of the general partner, appeared before me this day in person and acknowledged that (s)he signed and delivered such instrument as his/her own free and voluntary act and as the free and voluntary act of said partnership, for the uses and purposes set forth therein.

    GIVEN under my hand and Notarial Seal, this 20TH day of ____MAY_____, 1992.

                                 Notary Public

My Commission Expires:

____12/20/94____

"OFFICIAL SEAL"
Judith March
Notary Public, State of Illinois
My Commission Expires 12/20/94

22

```
STATE OF ILLINOIS        )
                         )   SS:
COUNTY OF COOK           )
```

I, _Concetta Crawford_ , a Notary Public in and for said County in the State aforesaid, do hereby certify that _Larry I. Hochberg_ , the _____ president of the general partner of VH BUILDING LIMITED PARTNERSHIP, an Illinois limited partnership, personally known to me to be the same person whose name is subscribed to the foregoing instrument as such _____ president of the general partner, appeared before me this day in person and acknowledged that (s)he signed and delivered such instrument as his/her own free and voluntary act and as the free and voluntary act of said partnership, for the uses and purposes set forth therein.

GIVEN under my hand and Notarial Seal, this _19_ day of _May_ , 1992.

_Concetta Crawford_
Notary Public

My Commission Expires:

```
" OFFICIAL  SEAL "
CONCETTA CRAWFORD
NOTARY PUBLIC STATE OF ILLINOIS
MY COMMISSION EXPIRES  3/3/95
```

23

EXHIBIT "A"

VHLP PARCEL

LOT 2 IN SPOPTMART SUBDIVISION, BEING A RESUBDIVISION OF LOT 1 IN CONTINENTAL
EXECUTIVE PARKE - PHASE I, IN SECTION 4, TOWNSHIP 43 NORTH, RANGE 11, EAST OF THE
THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT OF RESUBDIVISION RECORDED
May 30 1952 AS DOCUMENT 3460371, IN LAKE COUNTY, ILLINOIS.

24

EXHIBIT "B"

VH2 PARCEL

LOT 4 IN SPORTMART SUBDIVISION, BEING A RESUBDIVISION OF LOT 1 IN CONTINENTAL
EXECUTIVE PARKS - PHASE I, IN SECTION 4, TOWNSHIP 43 NORTH, RANGE 11, EAST OF THE
THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT OF RESUBDIVISION RECORDED
May 30 1992 AS DOCUMENT 316037, IN LAKE COUNTY, ILLINOIS.

25

# Exhibit "C"
## Site Plan



SITE PLAN

# Exhibit "D1"
# Cross-Access Easement



SITE PLAN

# Exhibit "Da"
# Storm Sewer Cross Easement



UTILITY PLAN

EXHIBIT "E"

RULES AND REGULATIONS

Each party shall observe and use its best efforts to cause its respective "Permittees", as hereafter defined, to observe the Rules and Regulations of each relevant section of this Exhibit "E" as may from time to time be amended or modified. "Permittees" shall mean all occupants of the Parcels and their respective officers, directors, employees, agents, partners, contractors, customers, visitors, invitees, licensees, tenants, subtenants and concessionaires.

A.    EASEMENT AREAS

1.    Except as otherwise expressly set forth in this REA, with respect to its Parcel, each party or its Permittee shall:

(a)    Inspect, maintain, repair and replace the surface of the parking areas, curbs and sidewalks, keeping them level, smooth and evenly covered with the type of surface material originally installed thereon or such substitute therefor as shall be, in all respects, equal in quality, appearance and durability.

(b)    Maintain, replace and repair such appropriate parking area entrance, exit and directional signs, markers and lights to keep same in good, clean and legible condition, as well as repair and replace striping as required.

(c)    Clean parking area lighting fixtures and relamp, repair and replace fixtures and standards as needed.

(d)    Maintain, repair and replace landscaping in the Easement Areas and on its Parcel as necessary to keep the same in a first-class, thriving condition.

(e)    Clean any signs within the Easement Areas, including relamping and repairs as required.

(f)    Furnish pest abatement controls, as necessary.

(g)    Clean, repair, maintain and replace all utility facilities, to the extent that the same are not cleaned, repaired, maintained or replaced by public utilities.

(h)    Provide traffic control, if necessary, and security patrol.

(i)    Empty all trash and rubbish containers located in the Easement Areas for the use of Permittees at least daily and wash same at intervals sufficient to maintain them in a clean and

29

sanitary condition, and otherwise maintain and keep same in an
attractive and good working condition.

(j)  Properly water and maintain all landscaping; and
remove dead plants, weeds and foreign matter and such replanting
and replacement as the occasion may require.

(k)  Inspect all hard-surfaced markings at regular
intervals and promptly repaint same as they become unsightly or
indistinct from wear and tear or other cause.

(l)  Clean all sewer catch basins on a schedule suffi-
cient to maintain all sewer lines in a free-flowing condition, and
regularly inspect all mechanical equipment related to storm and
sanitary sewer facilities and keep same in proper working order.

(m)  Sweep all ramps and stairways, if any, at intervals
sufficient to maintain same in a clean condition; inspect same at
regular intervals; and promptly repair same upon the occurrence of
any irregularities or worn portions thereof.

(n)  Clean all glass, including skylights, plate glass
and/or glass-enclosed devices at intervals sufficient to maintain
the same in a clean condition.

(o)  Inspect all surface utility facilities servicing
the Easement Areas, including, but not limited to, hose bibbs,
standpipes, sprinklers and domestic water lines, at regular
intervals and promptly repair or replace same, as the occasion may
require, upon the occurrence of any defect or malfunctioning.

(p)  Inspect all Easement Areas amenities, benches, and
institutional, directional, traffic and other signs at regular
intervals, maintain same in a clean and attractive surface
condition, and promptly repair or replace upon the occurrence of
any defects or irregularities thereto.

(q)  Inspect all lamps at regular intervals and promptly
replace same when no longer properly functioning.

2.  The improvements on and to the Easement Areas shall be
repaired or replaced with materials, apparatus and facilities of
a quality at least equal to the original.

3.  All parties shall use their best efforts to require their
respective Permittees to comply with all regulations with respect
to the Easement Areas, including, but not limited to, posted speed
limits, directional markings and parking stall markings.

4.  With respect to all mechanical and electrical facilities
and systems, including, but not limited to, the lighting
facilities, vertical transportation facilities, plumbing,

30

ventilating, cooling and sprinkling systems, and actuated or manually operated doors, each party shall (a) inspect the same at regular intervals; and (b) promptly repair the same upon the occurrence of any failure or malfunctioning.

B.   CONDUCT OF PERSONS

Except for events and activities agreed to by the parties hereto, the parties hereto do hereby establish the following rules and regulations for the use of roadways, walkways, parking areas and Easement Areas provided for the use of Permittees:

1.    Except for specifically delineated employee parking areas as agreed to by the parties, no person shall use any parking areas except for the parking of automobiles during the period of time such Persons or the occupants of such vehicle are customers or business invitees of the retail establishments within the Parcels. All automobiles shall be parked in an orderly manner within the painted lines defining the individual parking places.

2.    Unless required by applicable law, and in the absence of the written consent of the parties hereto, no one may, in or on any part of the Easement Areas:

(a)   Vend, peddle or solicit orders for sale or distribution of any merchandise, device, service, periodical, book, pamphlet or other matter whatsoever.

(b)   Distribute any circular, booklet, handbill, placard or other material.

(c)   Solicit membership in any organization, group or association or contribution for any purpose.

(d)   Parade, rally, patrol, picket, demonstrate or engage in any conduct that might tend to interfere with or impede the use of any portion of the Easement Areas by any Permittees, use any portion of the Easement Areas in any way not consistent with the operation of the businesses on the Parcels for their intended purposes, create a disturbance, attract attention or harass, annoy, disparage or be detrimental to the interest of any of the retail establishments within the Parcels.

(e)   Throw, discard or deposit any paper, glass or extraneous matter of any kind, except in designated receptacles, or create litter or hazards of any kind.

(f)   Create or produce in any manner noise or sound that is annoying, unpleasant or distasteful to any Permittee.

(g)   Deface, damage or demolish any sign, light standard or fixture, landscaping material or other improvement within the

31

Parcels, or the property of any Permittee situated within the Parcels.

The listing of specific items as being prohibited is not intended to be exclusive, but to indicate, in general, the manner in which the right to use the Easement Areas solely as a means of access and convenience in shopping at the retail establishments on the Parcels is limited and controlled by the parties. A party shall not be deemed to be in default of this section if such party is using its best efforts to exclude or stop such act or acts on its Parcel or if it is prevented by law from excluding or stopping such act or acts on its Parcel.

Any party shall have the right to remove or exclude from or to restrain (or take legal action to do so) any unauthorized person from, or from coming upon, the Parcels or any portion thereof, and prohibit, abate and recover damages arising from any unauthorized act, whether or not such act is in express violation of the prohibitions listed above. In so acting such party is not the agent of any other party or occupant of the Parcels, unless expressly authorized or directed to do so by such other party or occupant in writing.

Prepared By And Mail To:

Robert E. Feldgreber, Esq.
Altheimer & Gray
10 South Wacker Drive
Suite 3800
Chicago, Illinois    60606

REF02613.D        mls    05/19/92   10:45am

LEASE AMENDMENT

THIS LEASE AMENDMENT AGREEMENT ("Agreement") is made and entered as of the 23rd day of June, 1993, by and between Sportmart, Inc., a Delaware corporation ("Tenant") and VH Building Limited Partnership, an Illinois limited partnership ("Landlord").

WITNESSETH:

A.   Landlord and Tenant have heretofore entered into that certain lease (the "Lease") dated May 17, 1993, for premises containing approximately 45,400 square feet in the property known as Sportmart Plaza located at 155 East Townline Road, Vernon Hills, Illinois.

B.   Certain items including the full name of Landlord were misstated in the Lease;

C.   The parties mutually desire to amend the Lease to correct those certain misstated items including the name of Landlord, and to extend the Term of the Lease.

NOW THEREFORE, in consideration of the mutual terms and conditions herein contained, the parties hereby agree as follows:

1.   Amendment.  The parties agree that the Lease shall be amended in accordance with the following terms and conditions:

(a)   Article 1, Section 1.2 is hereby deleted in its entirety and the following substituted therefor:

"Parties & Notice
Landlord:                          VH Building Limited Partnership
                                   7253 West Dempster Street
                                   Niles, Illinois 60714
                                   Attn:  Andrew Hochberg, Esq.

Tenant:                            Sportmart, Inc.
                                   7233 West Dempster Street
                                   Niles, Illinois 60714
                                   Attn:  Legal Department
                                   cc:  Vice President, Real Estate"

(b)   Article 1, Section 1.5 is hereby deleted in its entirety and the following substituted therefor:

"Term:                  Initial Term Commencement Date:
                        November 1, 1992

                        Initial Term Expiration Date:
                        July 31, 2008"

(c)   Article 1, Section 1.7(c) is hereby deleted in its entirety and the following substituted therefor:

"(c)  November 1, 2002 through July 31, 2008:  the annual Minimum Rent payable during the preceding 5-year period, multiplied by the lesser of (i) one hundred and twelve percent (112%) and (ii) the CPI Increase."

(d)   Article 1, Section 1.7(d) is hereby deleted in its entirety and the following substituted therefor:

"(d)  Each 5-year option period:  the annual Minimum Rent payable during the preceding 5-year period (except that for the first option period, the applicable period shall be November 1, 2002

through July 31, 2008), multiplied by the lesser of one hundred
and twelve percent (112%) and (ii) the CPI Increase."

(e)   The phrase "Vernon Hills Building Limited Partnership"
located on page 27 of the Lease below "Landlord" is hereby deleted in
its entirety and the following substituted therefor:

"VH Building Limited Partnership";

(f)   All references in the Lease to "Vernon Hills Building
Limited Partnership" shall be deemed to be references to VH Building
Limited Partnership.  The parties hereto understand and agree that
Vernon Hills Building Limited Partnership and VH Building Limited
Partnership are one and the same, and nothing herein shall be construed
as an assignment of the Lease by Landlord;

(g)   In Article 9, Section 9.1 of the Lease, the reference to the
"Reciprocal Easement and Operation Agreement" is hereby deemed to refer
to the Reciprocal Easement Agreement (as defined in Article 4, Section
4.1 of the Lease);

(h)   In Article 23, Section 23.1 of the Lease, the reference to
the "Indenture of Restriction and Reciprocal Easement and Operation
Agreement" is hereby deemed to refer to the Reciprocal Easement
Agreement (as defined in Article 4, Section 4.1 of the Lease).

(i)   In Article 4, Section 4.1 of the Lease, the reference to
"Exhibit E" is hereby deleted and the following substituted therefor:

"Exhibit D";

2.   **Effective Date.**  This Agreement shall become effective as of the
date of the Lease, and shall continue in effect until otherwise amended by the
parties in writing or until expiration or sooner termination of the Lease.

3.   **Whole Agreement.**  This Agreement sets forth the entire agreement
between the parties with respect to the matters set forth herein.  As amended
herein, the Lease between the parties is hereby ratified and affirmed, and
shall remain in full force and effect.  In case of any inconsistency between
the provisions of the Lease and this Agreement, this Agreement shall govern
and control.

LANDLORD:  VH Building Limited
           Partnership, an
           Illinois limited
           partnership

By:  North Riverside Corp., an
     Illinois corporation,
     as general partner

By:  _____

Its: _____

TENANT:  Sportmart, Inc., a Delaware
         corporation

By: _____

Its: _____

## SECOND AMENDMENT TO LEASE

This Second Amendment to Lease ("Amendment") is made and entered by and between VHTL Limited Liability Company, an Illinois limited liability company, successor to Eleanor Weiss Zoub, individually, Eleanor Weiss Zoub, David I. Weiss, Carey I. Weiss and Ronald Weiss, as Trustees of the Marvin A. Weiss Residuary Trust, and David I. Weiss, as successor Trustee of the Michael Weiss Declaration of Trust, dated September 6, 1995, successors to VH Building Limited Partnership ("Landlord"), and TSA Stores, Inc., a Delaware corporation, successor to Sportmart, Inc. ("Tenant"), effective as of the ___*11th*___ day of ___*FEBRUARY*___, 2013 (the "Amendment Date").

### RECITALS

A.       Landlord and Tenant are parties to the Lease, dated May 17, 1993; and the Lease Amendment (the "First Amendment"), dated June 23, 1993 (together, the "**Lease**"), relating to the lease by Landlord to Tenant of the Leased Premises as described in the Lease (the "**Premises**"), located at 155 East Townline Road, in the Village of Vernon Hills, County of Lake, State of Illinois. All initially capitalized terms used herein and not otherwise expressly defined herein have the meanings given to such terms in the Lease.

B.       The Expiration Date is currently July 31, 2013, and the annual Minimum Rent through and including the Expiration Date is $621,891.36 ($51,824.28 per month).

C.       Landlord and Tenant have agreed to extend the Term of the Lease and reduce the rent, and to otherwise amend the Lease as more particularly set forth herein.

### AMENDMENT

**THEREFORE**, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby covenant and agree as follows:

1.       **Recitals Incorporated.** The foregoing recitals are hereby incorporated by this reference.

2.       **Amendment.** Landlord and Tenant agree to amend the Lease as follows:

   a.   Tenant hereby exercises its option to extend the Term of the Lease through July 31, 2018, on the same terms and conditions set forth in the Lease, except that Minimum Rent for such period (August 1, 2013 through July 31, 2018) will be as set forth in Paragraph 2.c. below.

   b.   Pursuant to Section 1.6 of the Lease, Tenant will have one remaining option of five years.

   c.   Section 1.7(d) of the Lease and Paragraph 1(d) of the First Amendment are amended as follows:

1

(1) The annual Minimum Rent payable for the period of August 1, 2013-July 31, 2018, will be $485,780.04 ($40,481.67 per month).

(2) The annual Minimum Rent payable for the five-year option period of August 1, 2018-July 31, 2023 (the "Option Period"), will be $544,800.00 ($45,400 per month) unless annual Gross Sales for the period from August 1, 2017 through July 31, 2018 equal or exceed $205.00 per square foot of Leasable Floor Area, in which case the annual Minimum Rent payable for the Option Period will be $621,980.04 ($51,831.67 per month). Tenant and Landlord agree that the Leasable Floor Area of the Premises is 45,400 square feet.

d.  Tenant, at its election, may prepare or cause to be prepared, plans for replacement of the existing monument sign with a larger and/or taller monument or pylon sign (the "Sign Work") and/or for tree trimming or removal to increase the visibility of the Premises from the adjacent roadways (the "Tree Work") which plan(s) will be subject to Landlord's approval which will not be unreasonably withheld, conditioned or delayed. Provided that Tenant obtains all necessary approvals and consents of the Village of Vernon Hills (the "Village"), the "Association," as defined in the Amended and Restated Declaration of Protective Covenants for Continental Executive Park (the "Declaration"), dated April 25, 1991, and/or required under the Declaration of Mutual and Reciprocal Easement, Covenants and Restrictions (the "ECR"), dated May 20, 1992, (collectively, the "Required Approvals") and Landlord has approved the plans for the Sign Work and/or the Tree Work, Tenant may perform the Sign Work and/or the Tree Work and Landlord grants to Tenant all rights and easements necessary therefor. Landlord will promptly (A) provide Tenant with proof of its consent if in fact Landlord consents to the plans and (B) execute any document reasonably required for Tenant to obtain required approvals for the Tree Work and the Sign Work provided that Landlord shall not be required to incur any out-of-pocket costs or obligations under or in connection with any such document. Tenant shall perform the Tree Work and Sign Work (i) in accordance with all Required Approvals, the plans approved by Landlord and all applicable laws, ordinances, codes, rules and regulations, the Declaration and the ECR, (ii) in a good workmanlike manner and using new materials of good quality, (iii) in a lien-free manner and (iv) expeditiously and in such a manner so as to minimize interference with the use or enjoyment of the common areas of the shopping center within which the Premises is situated (the "Center"). Tenant shall, at its sole cost and expense, remove from the Center the existing monument sign if Tenant replaces the same as described above and shall restore any portion of the Center damaged or disturbed by the performance of the Sign Work, the Tree Work and/or the removal of the existing monument sign to the condition existing immediately prior to such performance or removal. Tenant shall maintain in good condition and repair the replacement sign installed by Tenant pursuant to this Section 2.d. Tenant shall indemnify and hold Landlord harmless from and against any and all damages, liabilities, losses, claims, costs and expenses (including but not limited to attorney's fees and expenses) incurred by or asserted against Landlord that arise out of or in connection with the performance of the Sign Work or Tree Work, the maintenance of the replacement sign installed by Tenant, the removal of the existing monument sign, or the performance of any restoration obligation described above.

Landlord agrees to allow Tenant to deduct from Minimum Rent and Additional Rent due under the Lease an amount equal to the sum of (1) the lesser of (i) $5,500.00 or (ii) the actual out-of-pocket permitting, application or plan review fees, paid to the Village or the Association, for Required Approvals as evidenced by reasonably

2

supporting documentation furnished by Tenant to Landlord (the "Permit Allowance") and (2) the lesser of (A) $45,500.00 or (B) the actual out-of-pocket costs paid by Tenant to perform the Tree Work and/or the Sign Work, as evidenced by reasonably supporting documentation furnished by Tenant to Landlord (the "Work Allowance"). Notwithstanding the foregoing, Tenant may not deduct the portion of the Work Allowance allocable to the Tree Work or the Sign Work unless the Tree Work or the Sign Work, as applicable, is completed on or before August 1, 2014 (subject to Landlord Delay, as hereafter defined) (the "Final Completion Date"). For instance, if the Tree Work is completed on or before the Final Completion Date and the Sign Work is not, then Tenant may only deduct from rent due under the Lease the portion of the Work Allowance allocable to the Tree Work. "Landlord Delay" means any unreasonable delay or delays in delivery by Landlord of its consent or the execution by Landlord of any document required for approval of the Tree Work or the Sign Work (as applicable). In the event of Landlord Delay, the Final Completion Date will be extended by the number of days that Tenant is delayed in obtaining necessary approvals by virtue of such Landlord Delay. Notwithstanding the foregoing, Tenant may not deduct the Permit Allowance unless the Work for which Tenant has obtained the Prior Approvals is completed on or before the Final Completion Date.

3.    **Access.** The Lease is hereby amended to provide that Tenant agrees to permit Landlord access to the Premises at all reasonable times for the purpose of: (i) examining or making repairs to the Premises that Landlord may deem necessary or desirable for the safety or preservation thereof or to fulfill its obligations under this Lease; (ii) showing the Premises to prospective purchasers, mortgagees or insurers; and, (iii) during the 180-day period preceding the expiration of the Term of this Lease, showing the Premises to potential tenants. Notwithstanding the foregoing, except in the case of an emergency, Landlord must provide reasonable prior notice to Tenant of its plans to enter the Premises for any of the foregoing activities. No non-emergency repairs may be undertaken by Landlord on the Premises during business hours. To the extent Tenant incurs any cost or expenses (including security and supervising personnel) associated with Landlord's entry, Landlord will reimburse Tenant for such costs and expenses.

4.    **Entire Agreement.** This Amendment sets forth the entire understanding and agreement of the parties hereto in relation to the subject matter hereof and supersedes any prior negotiations and agreements among the parties relative to such subject matter.

5.    **Force and Effect of Amendment.** Except as hereby specifically amended, modified or supplemented herein, the Lease is hereby confirmed and ratified in all respects and will remain in full force and effect in accordance with its terms. In the event of any conflict or inconsistency between the provisions of the Lease and this Amendment, the provisions of this Amendment will control in all instances. This Amendment will be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

6.    **Severability.** In the event any one or more of the provisions of this Amendment will for any reason be held to be invalid, illegal or unenforceable, the remaining terms and provisions of this Amendment will not be affected thereby and will remain in full force and effect and be binding upon the parties hereto to the fullest extent permitted by applicable law.

7.    **Counterparts.** This Amendment may be executed in several counterparts, each of which will be deemed an original, and all of such counterparts together will constitute one and the same instrument. Signature and acknowledgment pages, if any, may be detached from the counterparts and attached to a single copy of this document to physically form one document. Executed

3

8754989.2 09999/055850

copies hereof may be delivered by telecopy or electronic delivery, and upon receipt, will be deemed originals and binding upon the parties hereto. Without limiting or otherwise affecting the validity of executed copies hereof that have been delivered by telecopy delivery, the parties will use best efforts to deliver originals as promptly as possible after execution.

8.    **Executory Authority**.  Each party executing this Amendment hereby represents and warrants that the individual executing this Amendment on behalf of such party has full power and authority to bind such party to the terms hereof.

9.    **Representation of the Parties**. Each party represents and warrants that, as of the date of this Amendment: (i) it has not made any assignment (except in connection with a financing transaction), lease, transfer, conveyance or other disposition of the Lease, or interest in the Lease, or any claim, demand, obligation, liability, action or cause of action arising from the Lease; (ii) it has the unconditional and unrestricted right, power and authority to enter into this Amendment; (iii) there are no consents which are necessary for this Amendment to be executed, delivered, performed and enforced in accordance with its terms, which consents have not been obtained, and (iv) to its actual knowledge, the other party is not in default under the Lease beyond any applicable notice and/or cure period and there are no events or circumstances which, with giving of notice or passage of time, or both, would constitute a default by the other party under the Lease.

10.    **Brokers**.  Each party hereto represents to the other that it has not authorized any broker or finder to act on its behalf in connection with this Amendment.  Each party hereto agrees to indemnify and hold harmless the other party from and against any and all losses, liens, claims, judgments, liabilities, costs, expenses or damages (including reasonable attorneys' fees and disbursements and court costs) of any kind or character arising out of or resulting from any agreement, arrangement or understanding alleged to have been made or dealings by such party or on its behalf with any broker or finder in connection with this Amendment.

EXECUTION PAGE FOLLOWS

4

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date first above written.

LANDLORD:

VHTL Limited Liability Company,
an Illinois limited liability company

By:  _____
Name:  _DAVID J. WEISS_____
Its:  _Member_____


TENANT:

TSA Stores, Inc., a Delaware corporation

By:  _____
Lon B. Novatt,
Senior Vice President – Real Estate and
Construction

5

8754989.2 09999/055850



February 7, 2013

**VIA FEDERAL EXPRESS PRIORITY OVERNIGHT**

Mr. David Weiss
Medical Insurance Consulting Group, Inc.
6521 N. Kilbourn Avenue
Lincolnwood, IL 60712

**Re:    Second Amendment to Lease – Vernon Hills, IL #614**

Dear Mr. Weiss:

Enclosed please find four (4) partially executed originals of the **Second Amendment to Lease** for Vernon Hills, IL, Store #614 between VHTL LIMITED LIABILITY COMPANY and TSA STORES, INC.

Please execute the documents where marked, fill in the appropriate effective date and return two (2) originals to my attention.

Should you have any questions, please feel free to contact me at 720.475.2834.

Sincerely,

*emily dunn*

Emily Dunn
Legal Assistant

Enclosures