**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SPORTS AUTHORITY HOLDINGS, INC., *et al.*,[1] | Case No. 16-10527 (MFW) |
| Debtors. | (Jointly Administered) |

**AFFIDAVIT OF PUBLICATION OF THE NOTICE OF SALE, BID PROCEDURES, AUCTION AND SALE HEARING IN THE NEW YORK TIMES**

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Sports Authority Holdings, Inc. (9008); Slap Shot Holdings, Corp. (8209); The Sports Authority, Inc. (2802); TSA Stores, Inc. (1120); TSA Gift Card, Inc. (1918); TSA Ponce, Inc. (4817); and TSA Caribe, Inc. (5664). The headquarters for the above-captioned Debtors is located at 1050 West Hampden Avenue, Englewood, Colorado 80110.



620 8TH AVENUE • NEW YORK, NY 10018

# PROOF OF PUBLICATION

April 18 2016

I, Alice Weber, in my capacity as a Principal Clerk of the Publisher of The New York Times a daily newspaper of general circulation printed and published in the City, County and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of The New York Times on the following date or dates, to wit on

APR 18 2016 B3 NATIONAL

Alice Weber

Sworn before me the 18th day of April, 2016

Michelle Mary Scibilia

Notary Public

MICHELLE MARY SCIBILIA
NOTARY PUBLIC-STATE OF NEW YORK
No. 01SC6281145
Qualified in Nassau County
My Commission Expires May 13, 2017

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| In re: SPORTS AUTHORITY HOLDINGS, INC., *et al.*,[1] Debtors. | Chapter 11<br>Case No. 16-10527 (MFW)<br>Jointly Administered |
|---|---|

**Sale Objection Deadline: May 13, 2016 at 4:00 p.m. (ET)**
**Post-Main Auction Objection Deadline: May 20, 2016 at 4:00 p.m. (ET)**
**Main Auction Sale Hearing Date: May 24, 2016 at 9:30 a.m. (ET)**
**Closing Store Lease Sale Hearing Date: May 25, 2016 at 9:30 a.m. (ET)**

**NOTICE OF SALE, BID PROCEDURES, AUCTION AND SALE HEARINGS**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1. On March 2, 2016, the affiliated debtors and debtors in possession in the above-captioned cases (each a "Debtor," and collectively, the "Debtors") filed with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") their motion [D.I. 106] (the "Motion") for the entry of: (a) an order (the "Bid Procedures Order"),[2] (i) scheduling an auction (the "Auction") and hearing (the "Sale Hearing") on approval of the proposed sale or disposition (the "Sale") of substantially all of the assets of the Debtors (the "Assets") or any portion thereof, free and clear of all liens, claims, encumbrances, and other interests, except certain permitted encumbrances as determined by the Debtors and any purchaser of the Assets (collectively, the "Encumbrances and Liabilities"), to the Successful Bidder(s) and authorizing the assumption and assignment of certain executory contracts and unexpired leases (collectively, the "Assigned Contracts") in connection therewith; (ii) authorizing and approving certain proposed bid procedures for the Sale (collectively, the "Bid Procedures"), certain proposed assumption and assignment procedures for the Assigned Contracts (collectively, the "Assignment Procedures"), and the form and manner of notice thereof; and (iii) granting related relief; and (b) an order (the "Sale Order"), (i) authorizing and approving the Debtors' entry into an agreement with the Successful Bidder(s) for all or a portion of the Assets; (ii) authorizing and approving the Sale, free and clear of all Encumbrances and Liabilities; (iii) authorizing and approving the assumption and assignment of the Assigned Contacts in connection therewith; and (iv) granting related relief.

2. Subsequent to filing the Motion, the Debtors bifurcated the sale process and tendered a revised form of Bid Procedures Order contemplating separate timelines for (a) the sale of substantially all of the Debtors' assets, and (b) the assumption, assignment and transfer of certain unexpired leases of nonresidential real property subject to the Debtors' store closing plan.

3. On April 14, 2016, the Bankruptcy Court entered the Bid Procedures Order [D.I. 1186]. Pursuant to the Bid Procedures Order, the Debtors have until **April 28, 2016 at 5:00 p.m. (ET)** (the "Stalking Horse Bid Deadline") to obtain Stalking Horse Bids for the Main Auction Assets (if any).

***Main Auction Bid Deadline***

4. Pursuant to the Bid Procedures, a Potential Bidder that desires to make a bid for the Main Auction Assets shall deliver an electronic copy of its bid to the parties identified in the Bid Procedures so as to be received on or before **May 11, 2016 at 5:00 p.m. (ET)** (the "Main Auction Bid Deadline") and otherwise comply with the Main Auction Bid Procedures. **FAILURE TO ABIDE BY THE BID PROCEDURES MAY RESULT IN A BID BEING REJECTED. ANY PARTY INTERESTED IN BIDDING ON THE MAIN AUCTION ASSETS SHOULD CONTACT BERNARD DOUTON (BERNARD.DOUTON@ROTHSCHILD.COM) AND MAHIR QURAISHI (MAHIR.QURAISHI@ROTHSCHILD.COM) WITH ROTHSCHILD INC., THE DEBTORS' INVESTMENT BANKER.**

***Closing Store Lease Bid Deadline***

5. Pursuant to the Bid Procedures, a Potential Bidder or Landlord that desires to make a bid solely for the Closing Store Leases shall deliver an electronic copy of its bid to the parties identified in the Bid Procedures so as to be received on or before **April 28, 2016 at 5:00 p.m. (ET)** (the "Closing Store Lease Bid Deadline") and otherwise comply with the Closing Store Lease Bid Procedures. **FAILURE TO ABIDE BY THE BID PROCEDURES MAY RESULT IN A BID BEING REJECTED. ANY PARTY INTERESTED IN BIDDING ON THE CLOSING STORE LEASES SHOULD CONTACT MICHAEL JERBICH (MICHAEL@AGREALTYPARTNERS.COM) WITH A&G REALTY PARTNERS, LLC, THE DEBTORS' REAL ESTATE ADVISOR.**

***Main Auction and Main Auction Sale Hearing***

6. Pursuant to the Main Auction Bid Procedures, in the event that the Debtors receive at least two Qualified Bids (or one Qualified Bid if there is also a Stalking Horse Bid) by the Main Auction Bid Deadline with regard to any the Main Auction Assets or subset thereof, the Debtors will conduct an auction which shall commence on **May 16, 2016 at 10:00 a.m. (ET)** (the "Main Auction") at the offices of counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, 1000 N. King Street, Wilmington, DE 19801, or such later time or such other place as the Debtors shall designate and notify to all Qualified Bidders who have submitted Qualified Bids. Only Qualified Bidders (including any Stalking Horse Bidder) shall be entitled to participate at the Main Auction.

7. If the Debtors do not receive any Stalking Horse Bid prior to the Stalking Horse Bid Deadline or Qualified Bids prior to the Main Auction Bid Deadline with respect to a particular portion of the Main Auction Assets (or all of the Main Auction Assets), the Debtors may, in consultation with the Consultation Parties (i) extend such Bid Deadline with respect to the subject Main Auction Assets, (ii) cancel the Main Auction and terminate the proposed Sale for the subject Main Auction Assets, or (iii) otherwise seek Bankruptcy Court relief.

8. Each Successful Bid and any Next-Highest Bid (or if no Qualified Bid other than that of a Stalking Horse Bidder or one Qualified Bidder is received with respect to a to the Main Auction Assets or subset thereof, then the Stalking Horse Bid or the Qualified Bidder, respectively) will be subject to approval by the Bankruptcy Court. The sale hearing solely as it pertains to the Successful Bidder(s) (the "Main Auction Sale Hearing") shall take place on **May 24, 2016 at 9:30 a.m. (ET)**. A subsequent hearing will be held, if necessary, on **May 27, 2016 at 10:00 a.m. (ET)** to consider approval of the Main Sale to the Next-Highest Bidder(s) in the event that the Successful Bidder(s) fails to close by the Closing Date (such hearing, the "Subsequent Main Sale Hearing"). The Main Auction Sale Hearing and/or the Subsequent Main Sale Hearing may be adjourned by the Debtors from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Main Auction Sale Hearing and/or the Subsequent Main Sale Hearing, respectively, or by filing a notice, which may be a hearing agenda, stating the adjournment, on the docket of the Debtors' chapter 11 cases.

***Closing Store Lease Auction and Closing Store Lease Sale Hearing***

9. Pursuant to the Closing Store Lease Bid Procedures, in the event that the Debtors receive at least two Qualified Bids by the Closing Store Lease Bid Deadline with regard to any Closing Store Leases, the Debtors will conduct an auction for such Closing Store Leases which shall commence on **May 4, 2016 at 10:00 a.m. (ET)** (the "Closing Store Lease Auction") at the offices of counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, 1000 N. King Street, Wilmington, DE 19801, or such later time or such other place as the Debtors shall designate and notify to all Qualified Bidders who have submitted Qualified Bids. Only Qualified Bidders shall be entitled to participate at the Closing Store Lease Auction.

10. Each Successful Bid and any Next-Highest Bid for a Closing Store Lease will be subject to approval by the Bankruptcy Court. The Closing Store Lease Sale Hearing to approve each Successful Bidder shall take place on **May 25, 2016 at 9:30 a.m. (ET)**. The Closing Store Lease Sale Hearing to approve the Next-Highest Bid, if necessary, shall be held at a later date and time to be determined, on notice to all interested parties. The Closing Store Lease Sale Hearing may be adjourned by the Debtors from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Closing Store Lease Sale Hearing or by filing a notice, which may be a hearing agenda, stating the adjournment, on the docket of the Debtors' chapter 11 cases.

***Sale Objections***

11. Any objections to the Main Auction Sale or a Closing Store Lease Sale (and with respect to the Closing Store Lease Sale, objections related to the conduct at the auction), or the relief requested in connection with the Sales, including objections to entry of a proposed order approving the Main Auction Sale or a Closing Store Lease Sale, respectively (a "Sale Objection"), other than a Post-Main Auction Objection (as defined below) must: (i) be in writing; (ii) signed by counsel or attested to by the objecting party; (iii) in conformity with the applicable provisions of the Bankruptcy Rules and the Local Rules; (iv) state with particularity the legal and factual basis for the objection and the specific grounds therefor; (v) be filed with the Clerk of the Court, 824 N. Market Street, 3rd Floor, Wilmington, DE 19801, together with proof of service, **on or before 4:00 p.m. (ET) on May 13, 2016** (the "Sale Objection Deadline"); and (vi) be served, so as to be actually received on or before the Sale Objection Deadline, upon (a) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801 (Attn: Michael R. Nestor, Esq. and Andrew L. Magaziner, Esq.), and Gibson, Dunn & Crutcher LLP, 333 South Grand Avenue, Los Angeles, California 90071, (Attn: Robert A. Klyman, Esq. and Matthew J. Williams, Esq.), counsel to the Debtors; (b) Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, 17th Floor, Wilmington, DE 1980 (Attn: Bradford J. Sandler, Esq., Robert J. Feinstein, Esq., and Jeffery N. Pomerantz, Esq.) proposed counsel to the Committee; (c) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attn: Hannah J. McCollum, Esq.); (d) Riemer & Braunstein LLP, Three Center Plaza, Boston, Massachusetts 02108 (Attn: Donald E. Rothman, Esq.) as counsel for Bank of America, N.A., in its capacity as (A) DIP Agent under the proposed Debtor-in-Possession Credit Agreement, and (B) Administrative Agent and Collateral Agent under the Second Amended and Restated Credit Agreement, dated as of May 17, 2012; (e) Brown Rudnick LLP, Seven Times Square, New York, NY 10036 (Attn: Robert J. Stark, Esq. and Bennett S. Silverberg, Esq.) as counsel for (A) Wilmington Savings Fund Society, FSB as Administrative Agent and Collateral Agent under the Amended and Restated Credit Agreement, dated as of May 3, 2006 and amended and restated as of November 16, 2010 and (B) certain Term Lenders under the Amended and Restated Credit Agreement, dated as of May 3, 2006 and amended and restated as of November 16, 2010; (f) Choate, Hall & Stewart LLP, Two International Place, Boston, Massachusetts 02110 (Attn: Kevin J. Simard, Esq.) as counsel for Wells Fargo Bank, National Association, in its capacity as FILO Agent under the Second Amendment to Second Amended and Restated Credit Agreement, dated as of November 3, 2015; and (g) O'Melveny & Meyers LLP, 7 Times Square, Broadway, New York, NY 10036 (Attn: John J. Rapisardi, Esq.), as counsel for certain holders of 11.5% Senior Subordinated Notes Due February 19, 2018 under the Securities Purchase Agreement, dated as of May 3, 2006 (collectively, the "Notice Parties").

***Post-Main Auction Objections***

12. Any objections solely with respect to conduct at the Main Auction and the proposed adequate assurance of future performance provided by the Successful Bidder(s) and applicable Next-Highest Bidders (a "Post-Main Auction Objection") must: (i) be in writing; (ii) signed by counsel or attested to by the objecting party; (iii) in conformity with the applicable provisions of the Bankruptcy Rules and the Local Rules; (iv) state with particularity the legal and factual basis for the objection and the specific grounds therefor; (v) be filed with the Clerk of the Court, 824 N. Market Street, 3rd Floor, Wilmington, DE 19801, together with proof of service, **on or before 4:00 p.m. (ET) on May 20, 2016** (the "Post-Main Auction Objection Deadline"); and (vi) be served, so as to be actually received on or before the Post-Main Auction Objection Deadline, upon the Notice Parties.

13. If a Sale Objection is not filed and served on or before the applicable Sale Objection Deadline or Post-Main Auction Objection is not filed and served on or before the Post-Main Auction Objection Deadline in accordance with the foregoing requirements, the Court may enter a Main Auction Sale Order and/or Closing Store Lease Sale Order(s) without further notice to such party.

14. All interested parties are advised that certain vendors (collectively, the "Consignment Vendors") provided goods to the Debtors ("Consigned Goods") pursuant to certain pay-by-scan agreements (each a "Vendor Agreement") prior to the Petition Date. A chart containing (i) the identity of each Consignment Vendor, together with a cost value of the applicable Consigned Goods as of the Petition Date, and (ii) the identity of those Consignment Vendors who assert that their Vendor Agreement terminated prepetition, shall be provided to each Potential Bidder. Certain Consignment Vendors assert (i) full legal and beneficial title to the Consigned Goods, (ii) that such Consigned Goods are not property of the Debtors' estates within the meaning of 11 U.S.C. § 541, and (iii) that pursuant to certain of the Vendor Agreements, Consigned Goods cannot be sold below certain costs, and other Consigned Goods cannot be sold at discounts without the Consignment Vendors' express consent. Certain Consignment Vendors have informed the Debtors that they do not consent to the continued sale of their Consigned Goods and/or that they intend to object to any sale contemplating the sale of such Consigned Goods. In addition, certain Consignment Vendors assert that their prepetition agreements with the Debtors authorizing the Debtors to sell applicable Consigned Goods received by the Debtors prior to March 2, 2016, terminated prior to the Petition Date. The Debtors contest the assertions by applicable Consignment Vendors, have commenced adversary proceedings against the Consignment Vendors for declaratory relief related to the Debtors' rights in the Consigned Goods, and intend to defend the sale of Consigned Goods against any objections. The Prepetition Agents and the DIP Agents claim a senior perfected lien on all goods delivered prepetition by the alleged Consignment Vendors, which vendors have signed agreements with the Debtors acknowledging that their agreements constitute a consignment under Section 9-102 of the Uniform Commercial Code ("UCC"). As such, the Prepetition Agents and the DIP Agents assert that under Article 9 of the UCC, the claimed retention of title is ineffective as against secured lenders and other creditors of the Debtors, unless and only to the extent that the Consignment Vendor has perfected its purchase money security interest in its goods in accordance with Article 9 of the UCC. The Consignment Vendors dispute the arguments put forth by the Debtors, Prepetition Agents and DIP Agents, respectively.

15. Copies of the Motion, the Main Auction Bid Procedures, the Closing Store Lease Bid Procedures, the Bid Procedures Order, and the Assignment Procedures may be obtained by parties in interest free of charge on the dedicated webpage related to the Debtors' chapter 11 cases maintained by the claims and noticing agent in these cases (http://www.kccllc.net/sportsauthority). Copies of such documents are also available for inspection during regular business hours at the Clerk of the Bankruptcy Court, 824 N. Market Street, 3rd Floor, Wilmington, DE 19801, and may be viewed for a fee on the internet at the Court's website (http://www.deb.uscourts.gov/) by following the directions for accessing the ECF system on such website.

Dated: April 15, 2016, Wilmington, Delaware

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Sports Authority Holdings, Inc. (9008); Slap Shot Holdings, Corp. (8209); The Sports Authority, Inc. (2802); TSA Stores, Inc. (1120); TSA Gift Card, Inc. (1918); TSA Ponce, Inc. (4817); and TSA Caribe, Inc. (5664). The headquarters for the above-captioned Debtors is located at 1050 West Hampden Avenue, Englewood, Colorado 80110.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bid Procedures Order (including the Bid Procedures). Any summary of the Assignment Procedures and the Bid Procedures Order contained herein is qualified in its entirety by the actual terms and conditions thereof. To the extent that there is any conflict between any such summary and such actual terms and conditions, the actual terms and conditions shall control.

[3] The deadlines for filing Cure Cost Objections, Stalking Horse Assignment Objections, Main Auction Assignment objections and Closing Store Assignment Objections shall be governed by the Assignment Procedures.

# Rising Signs of Strife as Parties Quarrel Over Greek Debt Restructuring

By LANDON THOMAS Jr.

SHAWN THEW/EUROPEAN PRESSPHOTO AGENCY

Christine Lagarde, the managing director of the International Monetary Fund, at the fund's headquarters in Washington last week.

WASHINGTON — Executives of the International Monetary Fund mutter darkly about Greeks tapping their phones in Athens. Greek government officials accuse the fund of torpedoing their economy via tough austerity measures.

And both the Greeks and the fund moan about the refusal of Germany to consider any form of debt relief for Greece.

Signs of the growing tensions over Greece and its debt were evident at meetings of the I.M.F. in Washington last week. But nothing exemplifies the growing discord more than a simple chart on a draft memorandum drawn up by the fund that has been making the rounds at meetings here.

The chart depicts just how wide the gap is between Europe and the I.M.F. in terms of assessing Greece's ability to pay down its growing debt burden — currently close to 180 percent of its gross domestic product — in the coming decades.

And it highlights the danger that, just as it was last summer, Greece may be pushed to the edge of bankruptcy as a result of an inability, if not an unwillingness, of the fund, Europe and Greece to reach a compromise.

Ever skeptical of Greece's capacity to keep a lid on spending and to increase taxes over the years, the fund's economists project that the debt will approach 300 percent of G.D.P. by 2060 — an outcome depicted vividly on the chart as a line sloping sharply upward.

The stance of Europe, which is on the hook for a much larger chunk of the debt than the I.M.F., is represented by a line trending defiantly downward.

In the view of finance ministers in the euro area, Greece will meet the demands of the toughest austerity program ever imposed upon a nation and will generate enough cash to bring the debt below 100 percent of G.D.P.

The implication of the chart and the accompanying memorandum — neither of which has been made public — is that the I.M.F., as things stand, will not be able to support the next bailout agreement that Greece and Europe reach.

*A compromise is delayed by ambitious expectations and growing distrust.*

Late last week, the managing director of the I.M.F., Christine Lagarde, said publicly what many senior fund officials have said quietly for months: Europe's assumption that Greece, in the decades ahead, can annually achieve a budget surplus (minus interest payments) of 3.5 percent of G.D.P. and pay down its debt is "highly unrealistic" and would require a "heroic" sacrifice from an austerity-battered populace.

That assessment is hardly a surprise. Since the spring of 2010, the time of the first Greek bailout, I.M.F. economists have been saying that Greece would never be able to pay back such a tremendous amount of debt.

Three economists, Pierre-Olivier Gourinchas, Thomas Philippon and Dimitri Vayanos, examined the history of Greece's debt boom and bust in a new paper.

They contend that in terms of money borrowed and economic output lost, the Greek crisis has far exceeded even the classic emerging market busts in Latin America and Asia — many of which were resolved via various forms of debt restructuring.

As a result, they conclude, the very thought that Greece can pay its way out of this mess without having its debt reduced in some way is fantasy.

"There is no exit for Greece without debt relief," Mr. Gourinchas said.

Part of the problem is that the fund's role now is highly unorthodox. While the fund is owed $12 billion, it is not promising to lend any new money this year, which, at least in the view of the Greeks, reduces its credibility. Isn't it hypocritical of the fund, some Greek officials say in private, to push us so hard when it is not willing to lend new money? At least the Europeans are promising to put more money on the table, they point out.

Fund officials have responded: How can we be your enemy if we are the ones pressuring Europe to give you a break on your debt?

Matters have not been improved by the recent leak of a private exchange between the fund's lead negotiator, Delia Velculescu, and the head of the fund's European department in Washington, Poul Thomsen.

In the phone transcript, published by WikiLeaks, it was suggested that the only way to get an agreement would be to push Greece once again to the precipice of default.

"I brought this up with my Greek colleagues," said Jeroen Dijsselbloem, the finance minister from the Netherlands, who is leading Europe in the talks with Greece. "It's an issue of trust — how can the I.M.F. do its work if they have to worry all the time about having their phones tapped?"

As to the matter of Greece's debt, Mr. Dijsselbloem remained adamant: It is not being discussed.

While it remains most unlikely that the I.M.F. would walk away from the talks, that such a step is even being suggested underscores how uncertain the negotiations have become.

That is because Germany has frequently said that it requires the I.M.F. to be an active participant in the process. So if the fund does not bless an agreement, Germany will be very unlikely to embrace it.

Despite all the tensions, negotiations are continuing. Greece, unlike in past years, sent its full team of negotiators to Washington last Thursday to resume talks that had been temporarily suspended.

They include the finance minister, Euclid Tsakalotos; the debt expert Stelios Papadopoulos; the economy minister, Giorgos Stathakis; and the Greek government's longstanding financial adviser, Glenn Kim, an independent investment banker who previously worked for Moelis and Lehman Brothers.

The crux of the talks has long been Greece's bloated pension program, which still pays out about 10 percent of G.D.P. annually. Fund officials have always said that without significant pension cuts, they could not approve any new deal.

Greece has argued that, in depression-like economic conditions, Greeks cannot afford pension cuts, especially when pensioners are now the only breadwinners in many families.

Under the labor minister, Georgios Katrougalos, the Greek government is now pushing a plan that would freeze current payouts and cut future ones and that would increase contributions from employers.

Whether that will be enough to win over the I.M.F. and, ultimately, Europe regarding the debt question remains to be seen.

"No amount of pension reforms will make Greece's debt sustainable without debt relief," Mr. Thomsen, the fund's European head and overseer of the Greek talks, wrote in a recent blog post. "And no amount of debt relief will make Greece's pension system sustainable without pension reforms."

# Major Oil-Producing Nations Fail To Reach Agreement on a Freeze

From First Business Page

KARIM JAAFAR/AGENCE FRANCE-PRESSE — GETTY IMAGES

Mohammed al-Sada, Qatar's energy minister, speaking at Sunday's news conference in Doha.

amount. "You would expect the market to sell off but the downside might be limited, " said Mr. Farren-Price, who was observing the Doha meeting.

Analysts on Sunday also raised the question of how Saudi Arabia and the other countries could have scheduled the meeting if they knew it was doomed to failure. After all, the idea was to calm the markets, not roil them.

"This implies really poor communication by the lead members of the group," particularly Saudi Arabia and Russia, said Richard Mallinson, an oil analyst at Energy Aspects, a London-based market research firm. "Why even schedule this meeting if you did not have a compromise agreed over Iran."

The idea of a freeze in production emerged in February, after oil prices plunged below $30 per barrel. OPEC members had been unable to agree on production cuts to manage the market. Instead, most members pumped oil at full capacity, trying to maximize revenues in the face of falling prices.

Saudi Arabia, Russia, Qatar and Venezuela agreed in principle on a freeze at a meeting in February, but made it contingent on participation by other major producers. The idea of a freeze gained favor because it would involve little or no sacrifice for anyone.

Analysts and some OPEC officials thought that a way could be found to accommodate Iran's desire to make up ground lost under sanctions.

Either they misread the Saudis or the kingdom's leadership hardened its position. Saudi Arabia and Iran are bitter rivals in the Middle East, clashing over Yemen and Syria. The competition increasingly extends to oil, where a resurgent Iran is vying with the Saudis for market share among customers in Asia and Europe.

In the days before this meeting, a mixed message emerged from Saudi Arabia. Its oil officials, led by Ali al-Naimi, an 80-year-old veteran oil minister, evidently sought accommodation with other big producers, including Iran, while, the deputy crown prince, Mohammed bin Salman, who has become the kingdom's chief policy maker, indicated that Saudi Arabia might not go along with a freeze if Iran did not also comply.

"If all major producers don't freeze production, we will not freeze production," Prince Mohammed told Bloomberg News recently.

The deal was scuppered by Saudi Arabia's insistence that language requiring that all OPEC members participate in the freeze be inserted in the draft. There was little question that Iran, which was not represented at the meeting, would agree. After lengthy negotiations among Saudi Arabia, Russia, Venezuela and Qatar, which convened the meeting, the talks broke up on Sunday.

"The meeting concluded that we all need time for further consultation," Qatar's energy minister, Mohammed al-Sada, said at a news conference. He said that "participating countries would consult among themselves and with others" until the next OPEC meeting, which is scheduled for June in Vienna.

Saudi tactics on the freeze appear to be a part of a shift in the kingdom's oil policy, analysts say.

*Saudi Arabia appears to be charting a more independent course.*

The Saudis, analysts say, increasingly seem to accept that they can no longer control oil prices through OPEC, in part because the huge increases in supply from the United States in recent years have undercut OPEC's leverage.

"This is the new world of oil," said Jim Burkhard, head of oil markets and scenarios research at IHS, who was also observing the meeting. "The oil market is a reflection of the world. Power is more decentralized."

The Saudis are shifting instead toward producing whatever oil they need to supply their growing network of domestic refineries and petrochemical plants and their expanding body of overseas customers.

Prince Mohammed, who has authority over the Saudi oil industry, warned that the kingdom could increase production by a million barrels per day in the coming months if it chose.

With low production costs, estimated at $3.50 to $5 per barrel, Saudi Arabia can compete on price with any producer. So can Russia, which can produce oil for about $4 per barrel, according to IHS. While Saudi Arabia and its Persian Gulf allies, Kuwait and the United Arab Emirates, are feeling the pinch of lower revenues, they are in far less immediate trouble than OPEC members like Venezuela and Algeria, analysts say.

Some of the less well-off oil producers clearly wanted a deal in hopes that it would raise prices and revenues. "This is something that affects the whole oil industry whether you are in OPEC or not," Ecuador's oil minister, Carlos Pareja Yannuzzelli, told reporters on Sunday.

While plans are far from fully delineated, Prince Mohammed appears to be charting a more independent course for the Saudi oil industry. For instance, he has said he plans a public listing of the national oil company, Saudi Aramco, the world's largest oil-producing company. A public listing might require the company to pay more attention to the requirements of outside investors than to other OPEC members.

Prince Mohammed increasingly seems to see oil as a potential political instrument — an approach that Mr. Naimi eschewed.

"There is a lot of change happening in Riyadh," Mr. Mallinson said. Oil policy is becoming "less insulated from politics."

Some analysts speculate that Mr. Naimi — who has long been skeptical that other producers, including Russia, would honor production ceilings — is going along with the idea of a freeze to help insulate Saudi Arabia from criticism.

The Saudis might have been "covering their backs," said Paul Stevens, an analyst at Chatham House, a London-based research firm. "They can say, 'We tried.' "

Russia had reason to go along with a freeze. Russia's economy, which depends heavily on oil revenues, is in recession. The Kremlin's desperation for higher prices is palpable; the country is committed to two wars, in Ukraine and Syria. At home, wages are being cut, bringing signs of social unrest ahead of a parliamentary election in September.

Russia's energy minister, Alexander Novak, who attended the Doha meeting, has been a crucial supporter of a freeze. A role assigned to Mr. Novak was to bring in Iran, but he has failed so far.

Russia and Saudi Arabia trade places for the top spot among oil producers. Russia has been in the lead of late, pumping 10.9 million barrels of oil a day in January compared with Saudi Arabia's 10.2 million. But because of Russia's larger population and industrial base, it consumes more oil at home, leaving Saudi Arabia the leader in exports.

Since the Soviet period, OPEC has looked on Russia as a freeloader on price-boosting production cuts: Russia benefited but never joined in.

*Stanley Reed reported from Doha, and Andrew E. Kramer from Moscow.*

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: SPORTS AUTHORITY HOLDINGS, INC., *et al.*,[1] Debtors. | Chapter 11 Case No. 16-10527 (MFW) Jointly Administered |

**Sale Objection Deadline: May 13, 2016 at 4:00 p.m. (ET)**
**Post-Main Auction Objection Deadline: May 20, 2016 at 4:00 p.m. (ET)**
**Main Auction Sale Hearing Date: May 24, 2016 at 9:30 a.m. (ET)**
**Closing Store Lease Sale Hearing Date: May 25, 2016 at 9:30 a.m. (ET)**

**NOTICE OF SALE, BID PROCEDURES, AUCTION AND SALE HEARINGS**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1. On March 2, 2016, the affiliated debtors and debtors in possession in the above-captioned cases (each a "Debtor," and collectively, the "Debtors") filed with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") their motion [D.I. 106] (the "Motion") for the entry of: (a) an order (the "Bid Procedures Order"),[2] (i) scheduling an auction (the "Auction") and a hearing (the "Sale Hearing") on approval of the proposed sale or disposition (the "Sale") of substantially all of the assets of the Debtors (the "Assets") or any portion thereof, free and clear of all liens, claims, encumbrances, and other interests, except certain permitted encumbrances as determined by the Debtors and any purchaser of the Assets (collectively, the "Encumbrances and Liabilities"), to the Successful Bidder(s) and authorizing the assumption and assignment of certain executory contracts and unexpired leases (collectively, the "Assigned Contracts") in connection therewith; (ii) authorizing and approving certain proposed bid procedures for the Sale (collectively, the "Bid Procedures"), certain proposed assumption and assignment procedures for the Assigned Contracts (collectively, the "Assignment Procedures"), and the form and manner of notice thereof; and (iii) granting related relief; and (b) an order (the "Sale Order"), (i) authorizing and approving the Debtors' entry into an agreement with the Successful Bidder(s) for all or a portion of the Assets; (ii) authorizing and approving the Sale, free and clear of all Encumbrances and Liabilities; (iii) authorizing and approving the assumption and assignment of the Assigned Contacts in connection therewith; and (iv) granting related relief.

2. Subsequent to filing the Motion, the Debtors bifurcated the sale process and tendered a revised form of Bid Procedures Order contemplating separate timelines for (a) the sale of substantially all of the Debtors' assets, and (b) the assumption, assignment and transfer of certain unexpired leases of nonresidential real property subject to the Debtors' store closing plan.

3. On April 14, 2016, the Bankruptcy Court entered the Bid Procedures Order [D.I. 1186]. Pursuant to the Bid Procedures Order, the Debtors have until **April 28, 2016 at 5:00 p.m. (ET)** (the "Stalking Horse Bid Deadline") to obtain Stalking Horse Bids for the Main Auction Assets (if any).

***Main Auction Bid Deadline***

4. Pursuant to the Bid Procedures, a Potential Bidder that desires to make a bid for the Main Auction Assets shall deliver an electronic copy of its bid to the parties identified in the Bid Procedures so as to be received on or before **May 11, 2016 at 5:00 p.m. (ET)** (the "Main Auction Bid Deadline") and otherwise comply with the Main Auction Bid Procedures. **FAILURE TO ABIDE BY THE BID PROCEDURES MAY RESULT IN A BID BEING REJECTED. ANY PARTY INTERESTED IN BIDDING ON THE MAIN AUCTION ASSETS SHOULD CONTACT BERNARD DOUTON (BERNARD.DOUTON@ROTHSCHILD.COM) AND MAHIR QURAISHI (MAHIR.QURAISHI@ROTHSCHILD.COM) WITH ROTHSCHILD INC., THE DEBTORS' INVESTMENT BANKER.**

***Closing Store Lease Bid Deadline***

5. Pursuant to the Bid Procedures, a Potential Bidder or Landlord that desires to make a bid solely for the Closing Store Leases shall deliver an electronic copy of its bid to the parties identified in the Bid Procedures so as to be received on or before **April 28, 2016 at 5:00 p.m. (ET)** (the "Closing Store Lease Bid Deadline") and otherwise comply with the Closing Store Lease Bid Procedures. **FAILURE TO ABIDE BY THE BID PROCEDURES MAY RESULT IN A BID BEING REJECTED. ANY PARTY INTERESTED IN BIDDING ON THE CLOSING STORE LEASES SHOULD CONTACT MICHAEL JERBICH (MICHAEL@AGREALTYPARTNERS.COM) WITH A&G REALTY PARTNERS, LLC, THE DEBTORS' REAL ESTATE ADVISOR.**

***Main Auction and Main Auction Sale Hearing***

6. Pursuant to the Main Auction Bid Procedures, in the event that the Debtors receive at least two Qualified Bids (or one Qualified Bid if there is also a Stalking Horse Bid) by the Main Auction Bid Deadline with regard to any the Main Auction Assets or subset thereof, the Debtors will conduct an auction which shall commence on **May 16, 2016 at 10:00 a.m. (ET)** (the "Main Auction") at the offices of counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, 1000 N. King Street, Wilmington, DE, 19801, or such later time or such other place as the Debtors shall designate and notify to all Qualified Bidders who have submitted Qualified Bids. Only Qualified Bidders (including any Stalking Horse Bidder) shall be entitled to participate at the Main Auction.

7. If the Debtors do not receive any Stalking Horse Bid prior to the Stalking Horse Bid Deadline or Qualified Bids prior to the Main Auction Bid Deadline with respect to a particular portion of the Main Auction Assets (or all of the Main Auction Assets), the Debtors may, in consultation with the Consultation Parties (i) extend such Bid Deadline with respect to the subject Main Auction Assets, (ii) cancel the Main Auction and terminate the proposed Sale for the subject Main Auction Assets, or (iii) otherwise seek Bankruptcy Court relief.

8. Each Successful Bid and any Next-Highest Bid (or if no Qualified Bid other than that of a Stalking Horse Bidder or one Qualified Bidder is received with respect to a to the Main Auction Assets or subset thereof, then the Stalking Horse Bid or the Qualified Bidder, respectively) will be subject to approval by the Bankruptcy Court. The sale hearing solely as it pertains to the Successful Bidder(s) (the "Main Auction Sale Hearing") shall take place on **May 24, 2016 at 9:30 a.m. (ET)**. A subsequent hearing will be held, if necessary, on **May 27, 2016 at 10:00 a.m. (ET)** to consider approval of the Main Sale to the Next-Highest Bidder(s) in the event that the Successful Bidder(s) fails to close by the Closing Date (such hearing, the "Subsequent Main Sale Hearing"). The Main Auction Sale Hearing and/or the Subsequent Main Sale Hearing may be adjourned by the Debtors from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Main Auction Sale Hearing and/or the Subsequent Main Sale Hearing, respectively, or by filing a notice, which may be a hearing agenda, stating the adjournment, on the docket of the Debtors' chapter 11 cases.

***Closing Store Lease Auction and Closing Store Lease Sale Hearing***

9. Pursuant to the Closing Store Lease Bid Procedures, in the event that the Debtors receive at least two Qualified Bids by the Closing Store Lease Bid Deadline with regard to any Closing Store Leases, the Debtors will conduct an auction for such Closing Store Leases which shall commence on **May 4, 2016 at 10:00 a.m. (ET)** (the "Closing Store Lease Auction") at the offices of counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, 1000 N. King Street, Wilmington, DE, 19801, or such later time or such other place as the Debtors shall designate and notify to all Qualified Bidders who have submitted Qualified Bids. Only Qualified Bidders shall be entitled to participate at the Closing Store Lease Auction.

10. Each Successful Bid and any Next-Highest Bid for a Closing Store Lease will be subject to approval by the Bankruptcy Court. The Closing Store Lease Sale Hearing to approve each Successful Bidder shall take place on **May 25, 2016 at 9:30 a.m. (ET)**. The Closing Store Lease Sale Hearing to approve the Next-Highest Bid, if necessary, shall be held at a later date and time to be determined, on notice to all interested parties. The Closing Store Lease Sale Hearing may be adjourned by the Debtors from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Closing Store Lease Sale Hearing or by filing a notice, which may be a hearing agenda, stating the adjournment, on the docket of the Debtors' chapter 11 cases.

***Sale Objections***

11. Any objections to the Main Auction Sale or a Closing Store Lease Sale (and with respect to the Closing Store Lease Sale, objections related to the conduct at the auction), or the relief requested in connection with the Sales, including objections to entry of a proposed order approving the Main Auction Sale or a Closing Store Lease Sale, respectively (a "Sale Objection"),[3] other than a Post-Main Auction Objection (as defined below) must: (i) be in writing; (ii) signed by counsel or attested to by the objecting party; (iii) in conformity with the applicable provisions of the Bankruptcy Rules and the Local Rules; (iv) state with particularity the legal and factual basis for the objection and the specific grounds therefor; (v) be filed with the Clerk of the Court, 824 N. Market Street, 3rd Floor, Wilmington, DE 19801, together with proof of service, **on or before 4:00 p.m. (ET) on May 13, 2016** (the "Sale Objection Deadline"); and (vi) be served, so as to be actually received on or before the Sale Objection Deadline, upon (a) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801 (Attn: Michael R. Nestor, Esq. and Andrew L. Magaziner, Esq.), and Gibson, Dunn & Crutcher LLP, 333 South Grand Avenue, Los Angeles, California 90071, (Attn: Robert A. Klyman, Esq. and Matthew J. Williams, Esq.), counsel to the Debtors; (b) Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, 17th Floor, Wilmington, DE 1980 (Attn: Bradford J. Sandler, Esq., Robert J. Feinstein, Esq., and Jeffery N. Pomerantz, Esq.) proposed counsel to the Committee; (c) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attn: Hannah J. McCollum, Esq.); (d) Riemer & Braunstein LLP, Three Center Plaza, Boston, Massachusetts 02108 (Attn: Donald E. Rothman, Esq.) as counsel for Bank of America, N.A., in its capacity as (A) DIP Agent under the proposed Debtor-in-Possession Credit Agreement, and (B) Administrative Agent and Collateral Agent under the Second Amended and Restated Credit Agreement, dated as of May 17, 2012; (e) Brown Rudnick LLP, Seven Times Square, New York, NY 10036 (Attn: Robert J. Stark, Esq. and Bennett S. Silverberg, Esq.) as counsel for (A) Wilmington Savings Fund Society, FSB as Administrative Agent and Collateral Agent under the Amended and Restated Credit Agreement, dated as of May 3, 2006 and amended and restated as of November 16, 2010 and (B) certain Term Lenders under the Amended and Restated Credit Agreement, dated as of May 3, 2006 and amended and restated as of November 16, 2010; (f) Choate, Hall & Stewart LLP, Two International Place, Boston, Massachusetts 02110 (Attn: Kevin J. Simard, Esq.) as counsel for Wells Fargo Bank, National Association, in its capacity as FILO Agent under the Second Amendment to Second Amended and Restated Credit Agreement, dated as of November 3, 2015; and (g) O'Melveny & Meyers LLP, 7 Times Square, Broadway, New York, NY 10036 (Attn: John J. Rapisardi, Esq.), as counsel for certain holders of 11.5% Senior Subordinated Notes Due February 19, 2018 under the Securities Purchase Agreement, dated as of May 3, 2006 (collectively, the "Notice Parties").

***Post-Main Auction Objections***

12. Any objections solely with respect to conduct at the Main Auction and the proposed adequate assurance of future performance provided by the Successful Bidder(s) and applicable Next-Highest Bidders (a "Post-Main Auction Objection") must: (i) be in writing; (ii) signed by counsel or attested to by the objecting party; (iii) in conformity with the applicable provisions of the Bankruptcy Rules and the Local Rules; (iv) state with particularity the legal and factual basis for the objection and the specific grounds therefor; (v) be filed with the Clerk of the Court, 824 N. Market Street, 3rd Floor, Wilmington, DE 19801, together with proof of service, **on or before 4:00 p.m. (ET) on May 20, 2016** (the "Post-Main Auction Objection Deadline"); and (vi) be served, so as to be actually received on or before the Post-Main Auction Objection Deadline, upon the Notice Parties.

13. If a Sale Objection is not filed and served on or before the applicable Sale Objection Deadline or Post-Main Auction Objection is not filed and served on or before the Post-Main Auction Objection Deadline in accordance with the foregoing requirements, the Court may enter a Main Auction Sale Order and/or Closing Store Lease Sale Order(s) without further notice to such party.

14. All interested parties are advised that certain vendors (collectively, the "Consignment Vendors"), provided goods to the Debtors ("Consigned Goods") pursuant to certain pay-by-scan agreements (each a "Vendor Agreement") prior to the Petition Date. A chart containing (i) the identity of each Consignment Vendor, together with a cost value of the applicable Consigned Goods as of the Petition Date, and (ii) the identity of those Consignment Vendors who assert that their Vendor Agreement terminated prepetition, shall be provided to each Potential Bidder. Certain Consignment Vendors assert (i) full legal and beneficial title to the Consigned Goods, (ii) that such Consigned Goods are not property of the Debtors' estates within the meaning of 11 U.S.C. § 541, and (iii) that pursuant to certain of the Vendor Agreements, Consigned Goods cannot be sold below certain costs, and other Consigned Goods cannot be sold at discounts without the Consignment Vendors' express consent. Certain Consignment Vendors have informed the Debtors that they do not consent to the continued sale of their Consigned Goods and/or that they intend to object to any sale contemplating the sale of such Consigned Goods. In addition, certain Consignment Vendors assert that their prepetition agreements with the Debtors authorizing the Debtors to sell applicable Consigned Goods received by the Debtors prior to March 2, 2016, terminated prior to the Petition Date. The Debtors contest the assertions by applicable Consignment Vendors, have commenced adversary proceedings against the Consignment Vendors for declaratory relief related to the Debtors' rights in the Consigned Goods, and intend to defend the sale of Consigned Goods against any objections. The Prepetition Agents and the DIP Agents claim a senior perfected lien on all goods delivered prepetition by the alleged Consignment Vendors, which vendors have signed agreements with the Debtors acknowledging that their agreements constitute a consignment under Section 9-102 of the Uniform Commercial Code ("UCC"). As such, the Prepetition Agents and the DIP Agents assert that under Article 9 of the UCC, the claimed retention of title is ineffective as against secured lenders and other creditors of the Debtors, unless and only to the extent that the Consignment Vendor has perfected its purchase money security interest in its goods in accordance with Article 9 of the UCC. The Consignment Vendors dispute the arguments put forth by the Debtors, Prepetition Agents and DIP Agents, respectively.

15. Copies of the Motion, the Main Auction Bid Procedures, the Closing Store Lease Bid Procedures, the Bid Procedures Order, and the Assignment Procedures may be obtained by parties in interest free of charge on the dedicated webpage related to the Debtors' chapter 11 cases maintained by the claims and noticing agent in these cases (http://www.kccllc.net/sportsauthority). Copies of such documents are also available for inspection during regular business hours at the Clerk of the Bankruptcy Court, 824 N. Market Street, 3rd Floor, Wilmington, DE 19801, and may be viewed for a fee on the internet at the Court's website (http://www.deb.uscourts.gov/) by following the directions for accessing the ECF system on such website.

Dated: April 15, 2016, Wilmington, Delaware

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Sports Authority Holdings, Inc. (9008); Slap Shot Holdings, Corp. (8209); The Sports Authority, Inc. (2802); TSA Stores, Inc. (1120); TSA Gift Card, Inc. (1918); TSA Ponce, Inc. (4817); and TSA Caribe, Inc. (5664). The headquarters for the above-captioned Debtors is located at 1050 West Hampden Avenue, Englewood, Colorado 80110.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bid Procedures Order (including the Bid Procedures). Any summary of the Assignment Procedures and the Bid Procedures Order contained herein is qualified in its entirety by the actual terms and conditions thereof. To the extent that there is any conflict between any such summary and such actual terms and conditions, the actual terms and conditions shall control.

[3] The deadlines for filing Cure Cost Objections, Stalking Horse Assignment Objections, Main Auction Assignment objections and Closing Store Assignment Objections shall be governed by the Assignment Procedures.