IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | Case No. 16-10527 (MFW) |
| SPORTS AUTHORITY HOLDINGS, INC. ) | (Jointly Administered) |
| a/k/a SPORTS AUTHORITY, *et al.*, ) | |
| ) | **Obj. Deadline: June 15, 2016 at 4:00 p.m.** |
| Debtor. ) | **Hearing Date: June 28, 2016 at 10: 30 p.m.** |

**MOTION OF STADIUM MANAGEMENT COMPANY, LLC AND PDB SPORTS, LTD, A COLORADO LIMITED PARTNERSHIP D/B/A THE DENVER BRONCOS FOOTBALL CLUB, FOR RELIEF FROM THE AUTOMATIC STAY TO PERMIT THE TERMINATION OF A SPONSORSHIP AGREEMENT**

Stadium Management Company, LLC ("SMC") and PDB Sports, LTD, a Colorado Limited Partnership d/b/a the Denver Broncos Football Club (the "Broncos" and, together with SMC, the "Movants"), by their undersigned attorneys, move this Honorable Court (the "Motion") for the entry of an order, pursuant to Section 362(d) of the Bankruptcy Code, granting the Movants relief from the automatic stay to permit the Movants to terminate the Sponsorship Agreement (defined below). In support of the Motion, the Movants respectfully state as follows:

**JURISDICTION AND VENUE**

1. This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. The Motion is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). If it is determined, in accordance with Article III of the United States Constitution, that this Court is not empowered to enter final judgment or final order in this matter without consent of the parties, Movants do so consent. Venue for this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

2.  SMC, the Broncos and TSA Stores, Inc. ("TSA") entered into that certain Sponsorship Agreement dated August 1, 2011 (as amended, the "Sponsorship Agreement").[1] Pursuant to the Sponsorship Agreement, SMC and the Broncos granted TSA exclusive sponsorship rights in the Retail Sporting Goods Category as specified on Exhibit A to the Sponsorship Agreement. The sponsorship rights include exclusive rights with respect to, among other things, signage and other identifications at Sports Authority Field at Mile High (the "Stadium"),[2] identifications on printed materials and other advertising media, and exposure on the Bronco's website, DenverBrocos.com. In consideration for the exclusive sponsorship rights, TSA agreed to pay an annual sponsorship fee in quarterly installments pursuant to a schedule attached as Exhibit B to the Sponsorship Agreement. Sponsorship Agreement, ¶ 3.

3.  Pursuant to paragraphs 5.b and 5.c of the Sponsorship Agreement, the Broncos granted TSA a non-exclusive and royalty free licensee to use the Broncos' name, logo, emblem or insignia ("Broncos Marks") in promotional and advertising materials related to the performance of the Sponsorship Agreement. Specifically, these paragraphs provide in pertinent part as follows:

> 5.   Use of Trademarks. Service Marks or Logos.
>
> . . . . .
>
> b.   Broncos Marks. Sponsor will have the right to use the Broncos' name, logo, emblem or insignia ("Broncos Marks") on *a non-exclusive and royalty-free basis* pursuant to the provisions of this Agreement. Any and all materials submitted by Sponsor in connection with any of the Sponsorship Rights, including, without limitation, any signage or advertising copy, and any and all advertisements, publicity, promotions and other materials (in whatever form and

---

[1] A copy of the Sponsorship Agreement is attached as Exhibit A.

[2] SMC operates and manages the Stadium. The owner of the Stadium, the Metropolitan Football Stadium District ("MFSD") and TSA are parties to a separate agreement pursuant to which MFSD granted to TSA naming rights at the Stadium.

medium) that allude to, depict or reference, directly or indirectly, the Broncos Marks shall be subject to the prior written consent of Broncos as to form, copy and content as set forth in the Denver Broncos Football Club General Guidelines for the Use and Approval of Intellectual Property, Exhibit B.

. . . . .

Any right hereunder to use any of the Broncos Marks is subject to the rights, restrictions and policies of the National Football League and NFL Properties, LLC ("NFLP").

. . . . .

The Broncos Marks will at all times remain the exclusive property of the Broncos and NFLP and Sponsor will have no ownership or other rights to the Broncos Marks except as expressly set forth herein, and any such rights shall automatically cease upon termination of this Agreement.

c.   Use of Marks. Either TSA on the one hand, and SMC and Broncos on the other hand, may use the other party's (the "Owner's") marks as set forth in subparagraph a and b above in promotional and advertising materials related to the performance of this Agreement, and in connection with the operation of the Stadium, provided that such use is

. . . . .

   (iv) in compliance with all National Football League Policies and Regulations; and

   (v) that such use shall not reflect adversely on the good name and reputation of the Owner and of the logos, trademarks, and service marks.

Sponsorship Agreement, ¶ 5.

4.   Pursuant to paragraph 15 of the Sponsorship Agreement, no party may assign the Sponsorship Agreement or any of its rights or obligations under the Sponsorship Agreement without the prior written consent of the other parties.

5.   On March 2, 2016 (the "Petition Date"), TSA and certain of its subsidiaries and affiliates (the "Debtors") filed their voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§101, et seq. (as amended, the "Bankruptcy Code"). The Debtors have continued to operate their businesses and manage their properties as debtors-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

6. TSA has not made quarterly payments due on February 1, 2016 and May 1, 2016 in the amount of $1,052,972.50 per quarter pursuant to Section 3 of the Sponsorship Agreement. Paragraph 9 of the Sponsorship Agreement permits the Movants to terminate the Sponsorship Agreement if TSA fails to comply with its material obligations thereunder. Yet, because of the protections afforded by the Bankruptcy Code, TSA continues to enjoy exclusive sponsorship rights as provided for in the Sponsorship Agreement despite its failure to make two quarterly payments totaling $2,105,945.00.

## ARGUMENT

### I. Cause Exists for Granting SMC and the Broncos Relief From the Automatic Stay.

7. Section 362(d) of the Bankruptcy Code provides in pertinent part as follows:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay ... (1) for cause, including the lack of adequate protection....

8. "Except for lack of adequate protection, 'cause' is not defined by § 362(d)(1). Cause is a flexible concept and courts often conduct a fact intensive, case-by-case balancing test, examining the totality of the circumstances to determine whether sufficient cause exists to lift the stay." *In re The SCO Group, Inc.*, 395 B.R. 852, 856 (Bankr. D. Del. 2007). Here, cause exists to grant SMC relief from the automatic stay because TSA cannot assume the Sponsorship Agreement without the consent of SMC and the Broncos pursuant to Bankruptcy Code Section 365(c)(1) and SMC and the Broncos do not consent. *See Matter of West Electronics*, 852 F.2d 79, 83 (3d Cir. 1988); *In re: Trump Entertainment Resorts, Inc.*, 526 B.R. 116, 123 (Bankr. D. Del. 2015) (finding cause to terminate the automatic stay because the debtor could not assume a contract without the consent of the movant).

4

9. Section 365(c)(1) of the Bankruptcy Code provides that

> (c) The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—
>
> (1)(A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and
>
> (B) such party does not consent to such assumption or assignment.

11 U.S.C. § 365(c)(1). In the Third Circuit, it is well settled that, absent the consent of the non-debtor party, Section 365(c)(1) prohibits a trustee or debtor in possession from assuming a contract if applicable-non-bankruptcy law would prohibit the debtor from assigning the contract without the consent of the non-debtor party to the contract. *See Matter of West Electronics*, 852 F.2d 79, 83 (3d Cir. 1988); *see also In re Access Beyond Technologies, Inc.*, 237 B.R. 32, 48-49 (Bankr. D. Del. 1999) (holding that the debtor, as licensee, could not assume or assign a non-exclusive patent license without the consent of the licensor because patent law prohibits the assignment of a non-exclusive patent license without the consent of the licensor).

10. In *West Electronics*, the United States Government sought relief from the automatic stay to terminate a contract with the debtor. The Government argued that cause existed for relief from stay because the debtor could not assign the contract without the Government's consent pursuant to 41 U.S.C. §15 and, as a result, Section 365(c)(1) prohibited the debtor from assuming the contract without the Government's consent. *See West Electronics*, 852 F.2d. at 83. The bankruptcy court denied the Government's request for relief from stay and the district court affirmed. *Id.* at 81.

11. The Third Circuit reversed, holding that the bankruptcy court should have lifted the stay to permit the Government to terminate the contract. *Id.* at 82. In reaching this conclusion the Third Circuit first interpreted Section 365(c)(1) to determine whether that section prohibited the debtor from assuming the contract without the Government's consent. The Court concluded that, "if non-bankruptcy law provides that the government would have to consent to an assignment of the West contract to a third party, *i.e.*, someone 'other than the debtor or the debtor in possession,' then West, as the debtor in possession, cannot assume that contract. This provision limiting assumption of contracts is applicable to any contract subject to a legal prohibition against assignment." *Id.* at 83.

12. In response to the debtor's argument that 41 U.S.C. §15 should not be construed to prohibit an assignment from a debtor to a debtor-in-possession, the *West Electronics* Court stated that

> "West's argument misses the point … for 11 U.S.C. § 365(c)(1) creates a hypothetical test-*i.e.*, under the applicable law, could the government refuse performance from 'an entity *other* than the debtor or the debtor in possession.' [Emphasis added]. Thus, the relevant inquiry is not whether 41 U.S.C. § 15 would preclude an assignment from West as a debtor to West as a debtor in possession, but whether it would foreclose an assignment by West to another defense contractor."

> The literal meaning of the words chosen by Congress clearly requires the analysis and conclusion we have just articulated and we are confident that it is what Congress intended. We think that by including the words "or the debtor in possession" in 11 U.S.C. § 365(c)(1) Congress anticipated an argument like the one here made and wanted that section to reflect its judgment that in the context of the assumption and assignment of executory contracts, a solvent contractor and an insolvent debtor in possession going through bankruptcy are materially distinct entities.

*Id.*

13.     Having found that the debtor could not assume the Government contract without the Government's consent pursuant to Section 365(c)(1) and the Government was unwilling to consent, the *West Electronics* Court found that the bankruptcy court abused its discretion in declining to lift the stay. *Id.* In so holding, the Court stated that, because in could not assume the contract, the debtor-in-possession had no legally cognizable interest in the contract. *Id.* at 84. *See also In re: Trump Entertainment Resorts, Inc.*, 526 B.R. 116, 127 (Bankr. D. Del. 2015) (holding that trademark licensor was entitled to relief from the automatic stay to pursue termination of the license because the trademark license could not be assigned under applicable non-bankruptcy law and, accordingly, was not assumable or assignable by the debtor).

## II. Cause Exists for Relief from Stay Because TSA Cannot Assume the Sponsorship Agreement Pursuant to Section 365(c)(1) of the Bankruptcy Code.

### A. The Debtors may not assume the Sponsorship Agreement without the consent of SMC and the Broncos.

14.     In applying Section 365(c)(1), the Court must first determine the applicable law. *See In re: Trump Entertainment Resorts, Inc.*, 526 B.R. 116, 123 (Bankr. D. Del. 2015). "The term 'applicable law' means any law applicable to a contract, other than bankruptcy law...." *Id.* (quoting *In re XMH Corp.*, 647 F.3d 690, 695 (7th Cir.2011). Here, because the Sponsorship Agreement includes a non-exclusive license of the Bronco's trademark, the applicable law is federal trademark law. *See Trump Entertainment*, 526 B.R. at 123.

15.     Courts have consistently held that federal trademark law prohibits the assignment of trademarks "in the absence of some express authorization from the licensor, such as a clause in the license agreement itself." *Id.; See also In re XMH Corp.*, 647 F.3d 690, 695 (7th Cir.2011) ("as far as we've been able to determine, the universal rule is that trademark licenses are not assignable in the absence of a clause expressly authorizing assignment").

16. "[F]ederal trademark law generally bans assignment of trademark licenses absent the licensor's consent because, in order to ensure that all products bearing its trademark are of uniform quality, the identity of the licensee is crucially important to the licensor." *Trump Entertainment*, 526 B.R. at 124. As the Seventh Circuit explained in *XMH Corp.*,

> Often the owner of a trademark will find that the most efficient way to exploit it is to license the production of the trademarked good to another company, which may have lower costs of production or other advantages over the trademark's owner. Normally the owner who does this will not want the licensee to be allowed to assign the license (that is, sublicense the trademark) without the owner's consent, because while the owner will have picked his licensee because of confidence that he will not degrade the quality of the trademarked product he can have no similar assurance with respect to some unknown future sublicensee.

*XMH Corp.*, 647 F.3d at 696.

17. "'The purpose of a trademark, after all, is to identify a good or service to the consumer, and identity implies consistency and a correlative duty to make sure that the good or service really is of consistent quality, i.e., really is the same good or service.' *Id* at 695. Accord 4 *McCarthy on Trademarks* § 25:33 (4th ed. 2010) ('Since the licensor-trademark owner has the duty to control the quality of goods sold under its mark, it must have the right to pass upon the abilities of new potential licensees.')." *Trump Entertainment*, 526 B.R. at 123-24. Based on the foregoing, TSA cannot assume the Sponsorship Agreement, which includes a non-exclusive license of the Bronco's trademark, without the consent of the Broncos.

### B. The Movants do not consent to the assumption of the Sponsorship Agreement.

18. Section 365(c)(1) bars the assumption of a contract where applicable law prohibits the assignment without the consent of the counter-party "whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties." 11 U.S.C § 365(c)(1). SMC and the Broncos do not consent to the assumption or assignment of the Sponsorship Agreement.

19. Some courts have held that consent to the agreement can be found in the agreement. *See, e.g., Trump Entertainment*, 526 B.R. at 123. Here, however, the Sponsorship Agreement expressly provides that no party may assign the Sponsorship Agreement or any of its rights or obligations under the Sponsorship Agreement without the prior written consent of the other parties. Sponsorship Agreement, ¶ 15. Clearly, no consent to assignment can be inferred from the terms of the Sponsorship Agreement. Accordingly, TSA cannot assume the Sponsorship Agreement.

20. Because it cannot assume the Sponsorship Agreement, TSA has no legally cognizable interest in the Sponsorship Agreement. *See West Electronics*, 852 F.2d at 84. This constitutes cause for relief from stay. Accordingly, the Court should grant the Movants relief from the automatic stay permitting the Movants to terminate the Sponsorship Agreement for pursuant to paragraph 9 thereof for, among other reasons, TSA's failure to comply with its obligation to make quarterly payments.

## CONCLUSION

WHEREFORE, the Movants respectfully request that this Honorable Court enter an order, in substantially the form attached hereto as Exhibit B, granting them relief from the automatic stay to the extent necessary to permit the Movants to terminate the Sponsorship Agreement and granting the Movants such other and further relief as is just and equitable.

Date: May 27, 2016
Wilmington, DE

SULLIVAN · HAZELTINE · ALLINSON LLC

/s/ William Sullivan

William D. Sullivan (No. 2820)
William A. Hazeltine (No. 3294)
901 North Market Street, Suite 1300
Wilmington, DE 19801
Tel: (302) 428-8191
Fax: (302) 428-8195
bsullivan@sha-llc.com
whazeltine@sha-llc.com

and

WEINMAN & ASSOCIATES, P.C.
Jeffrey A. Weinman, Esq.
730 17th Street, Suite 240
Denver, CO 80202-3506
Telephone: (303) 572-1010
Facsimile: (303) 572-1011
jweinman@epitrustee.com

*Attorneys for Stadium Management Company, LLC and PDB Sports, Ltd, a Colorado Limited Partnership d/b/a the Denver Broncos Football Club*