Exhibit 141 of 7 Administrative Expense Claim
of Deno P. Dikeou/TSA Stores, Inc.

Case 14-10571-KHC Doc 238-4 Filed 06/02/16 Page 1 of 134

Waterford Lakes, FL
Second Amendment
Store #368

## SECOND AMENDMENT TO LEASE AGREEMENT

THIS SECOND AMENDMENT TO LEASE AGREEMENT ("**Amendment**") is effective as of __May 4,__ 2015 between Deno P. Dikeou ("**Landlord**") and TSA STORES, INC., a Delaware corporation ("**Tenant**").

### RECITALS

A.      Landlord and Tenant are parties to a certain Shopping Center Lease dated February 2, 2006, as amended or supplemented by the Guaranty dated January 1, 2006; Memorandum of Shopping Center Lease dated February 2, 2006 and the First Amendment to Lease Agreement dated June 9, 2006 (collectively the "**Lease**"), whereby Tenant leased from Landlord certain premises in a portion of the building located in the Towers at Waterford Lakes Shopping Center, 610 North Alafaya Trail, in the City of Orlando, in the County of Orange, State of Florida consisting of approximately 45,000 square feet as further described in the Lease.

B.      The parties desire to change the Tenant's monument sign panel location.

### AGREEMENT

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree as follows:

1. **Defined Terms**.  Capitalized terms not otherwise defined herein will have the meanings given to such terms in the Lease.

2. **Recitals Incorporated**.  The foregoing recitals are incorporated herein by this reference.

3. **Signage**.  Notwithstanding anything in the Lease to the contrary, Landlord and Tenant agree that Tenant will have the right to change Tenant's monument sign panel location from its current locations on Monument Sign 4 to the second row from the top on Monument Sign 6, as designated on the attached **Exhibit A**.  On the North and South sides of Monument 4, Tenant will remove its two (2) sign panels and install two (2) blank white, pan faced panels in their place.  On the North and South sides of Monument 6, Tenant will remove the two (2) sign panels for Brew and the two (2) sign panels for Appliance Direct, currently in the second row from the top, relocate the two (2) Appliance Direct sign panels to the bottom immediately adjacent to the Plato's Closet sign panels, install two (2) pan faced sign panels across the entire second row (two panels wide), and install its graphics on said panels.  All costs and expenses associated with the change in Tenant's monument sign panel location will be the responsibility of Tenant.

4. **Entire Agreement**.  This Amendment sets forth the entire understanding and agreement of the parties hereto in relation to the subject matter hereof and supersedes any prior negotiations and agreements among the parties relative to such subject matter.

5. **Force and Effect of Amendment**.  Except as amended hereby, the provisions of the Lease are not changed, altered or amended and remain in full force and effect, and if there is a conflict between the terms of this Amendment and the Lease, the terms of this Amendment will control. This Amendment shall inure to the benefit of and be binding upon Landlord and Tenant, and their successors and assigns.

6. **Severability**.  In the event any one or more of the provisions of this Amendment will for

any reason be held to be invalid, illegal or unenforceable, the remaining terms and provisions of this Amendment will not be affected thereby and will remain in full force and effect and be binding upon the parties hereto to the fullest extent permitted by laws, rules and regulations.

7. **Counterparts**. This Amendment may be executed in several counterparts, each of which will be deemed an original, and all of such counterparts together will constitute one and the same instrument. Signature and acknowledgment pages, if any, may be detached from the counterparts and attached to a single copy of this document to physically form one document. Executed copies hereof may be delivered by telecopy or electronic delivery, and upon receipt, will be deemed originals and binding upon the parties hereto. Without limiting or otherwise affecting the validity of executed copies hereof that have been delivered by telecopy delivery, the parties will use best efforts to deliver originals as promptly as possible after execution.

8. **Representation of the Parties**. Each party represents and warrants that, as of the date of this Amendment: (i) it has not made any assignment (except in connection with a financing transaction), sublease, transfer, conveyance or other disposition of the Lease, or interest in the Lease, or any claim, demand, obligation, liability, action or cause of action arising from the Lease; (ii) it has the unconditional and unrestricted right, power and authority to enter into this Amendment; and (iii) there are no consents which are necessary for this Amendment to be executed, delivered, performed and enforced in accordance with its terms, which consents have not been obtained, including, without limitation, the consent of Landlord's lender.

IN WITNESS WHEREOF, the parties have executed this Amendment to the Lease as of the day first above written.

LANDLORD:

By: _____

Deno P.Dikeou

Date of Execution by Landlord: __May 6__, 2015

TENANT:

TSA STORES, INC.,
a Delaware corporation

By: _____

Name: Mark Johns
Title: Vice President - Construction

Date of Execution by Tenant: __MAY 1__, 2015

Approved as to
Legal Form

## Exhibit A

## Depiction of Monument Sign 4 and Sign 6



Waterford Lakes, FL
Second Amendment
Store #368

## EXHIBIT A

**On the North and South sides of Monument Sign 4**: Sports Authority to remove its two (2) existing sign panels and install two (2) blank white, pan faced panels in their place.



**On the North and South sides of Monument Sign 6**: Sports Authority shall remove and relocate the two (2) existing "APPLIANCE DIRECT" sign panels immediately adjacent to the existing "Plato's Closet" sign panels.





**On the North and South sides of Monument Sign 6**: Sports Authority shall remove the two (2) existing "BREW" sign panels and install two (2) double-wide pan faced panels across the entire second row and apply its graphics.



FIRST AMENDMENT TO LEASE AGREEMENT

THIS FIRST AMENDMENT TO LEASE AGREEMENT ("First Amendment") is effective as of __June  9__ , 2006 between Deno P. Dikeou ("Landlord") and TSA STORES, INC., a Delaware corporation ("Tenant").

RECITALS

A.     Landlord and Tenant are parties to a certain Shopping Center Lease dated February 2, 2006 (the "Lease"), whereby Tenant leased from Landlord certain premises in a portion of the building located in the Towers at Waterford Lakes Shopping Center, 610 North Alafaya Trail, in the City of Orlando, in the County of Orange, State of Florida consisting of approximately 45,000 square feet (the "Premises").

B.     Pursuant to the terms and conditions of the Lease, Landlord has granted Tenant the exclusive right to use the Premises for the retail sale of sporting goods, sports apparel and athletic footwear.

C.     Landlord desires and Tenant has agreed to amend the Lease to allow Casual Male Retail Store, LLC d/b/a/ Casual Male XL ("Casual Male") in the location designated on **Exhibit A** attached hereto and made a part hereof (the "Casual Male Premises").

AGREEMENT

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree as follows:

1.     Notwithstanding anything in the Lease to the contrary, including Section 16.1 thereof, but subject to the provisions hereof, Landlord, and/or any affiliate will be permitted to lease approximately 3,600 square feet to Casual Male in the location designated as the Casual Male Premises on **Exhibit A**.

2.     Tenant will permit Casual Male, and any Permitted Transferee (as hereinafter defined), to sell big and tall clothing and related accessories, and sports apparel, athletic footwear, hosiery and related accessories in the Casual Male Premises. Casual Male will not be permitted to use the Casual Male Premises for any other purpose which violates any exclusive right granted to Tenant by Landlord under the Lease. As used herein, a "Permitted Transferee" shall mean (i) an entity which is a wholly-owned subsidiary, affiliate or parent of Casual Male, or (ii) any corporation or other entity with which Casual Male may merge or consolidate, or (iii) any person, corporation or other entity who acquires all or substantially all of Casual Male's securities or assets.

3.     This First Amendment shall inure to the benefit of and be binding upon Landlord and Tenant, and their successors and assigns.

4.      Except as amended hereby, the provisions of the Lease are not changed, altered or amended and remain in full force and effect, and if there is a conflict between the terms of this First Amendment and the Lease, the terms of this First Amendment will control.


        IN WITNESS WHEREOF, the parties have executed this First Amendment to the Lease as of the day first above written.


LANDLORD:

By: _____

Deno P. Dikeou


Date of Execution by Landlord:

_____


TENANT:

TSA STORE, INC.,
a Delaware corporation


By: _____

Name: Christopher S. Day

Title:   Senior Vice President of Real Estate


Date of Execution by Tenant:

Acknowledged and Agreed to:

CASUAL MALE XL


By:_____                Not required

Name: _____

Title: _____

05/16/2006 14:07 FAX 30386421C          GART SPORTS                    ☒003

EXHIBIT A





June 15, 2006

Traci M. DelReal
Property Manager
Sports Authority
1050 West Hampden Avenue
Englewood, Colorado 80110

RE:     Towers at Waterford Lakes- Orlando, Florida
        Sports Authority Lease Amendment regarding Casual Male XL

Dear Traci:

Per your request, I am enclosing the three original First Amendment to Lease Agreements (executed by Deno P. Dikeou as Landlord and TSA Store, Inc as Tenant with regard to the premises located at 610 North Alafaya Trail, in Orlando, Florida) that Deno had forwarded to me at your request.

This will confirm that we have accepted the language contained in Page 1 A of our lease with Deno for this Center that I furnished to you as an attachment to my email to you dated June 13, 2006.

As you indicated, please add the missing Exhibit A and redistribute the executed agreements.

Thanks for you assistance and cooperation in this matter.

Sincerely,

Oren N. Sigal
Real Estate Counsel

Enclosure(s)

cc: Deno Dikeou w/o enclosure(s)

Store No: 368
Waterford Lakes
Orlando, Florida

**SHOPPING CENTER LEASE**

**BETWEEN**

**DENO P. DIKEOU**

**AND**

**TSA STORES, INC.**

**FOR PREMISES LOCATED IN THE**

**WATERFORD TOWERS SHOPPING CENTER**

**ORLANDO, FLORIDA**

## TABLE OF CONTENTS

**Page**

1.  BASIC LEASE DEFINITIONS, EXHIBITS AND ADDITIONAL DEFINITIONS .................................. 1
    1.1  Basic Lease Definitions.................................................................................. 1
    1.2  Exhibits ....................................................................................................... 2
    1.3  Additional Definitions .................................................................................. 2

2.  DEMISE, CONSTRUCTION AND TERM ........................................................................ 5
    2.1  Demise ......................................................................................................... 5
    2.2  Construction ................................................................................................ 5
    2.3  Delivery During Delivery Window ................................................................ 5
    2.4  Measurement of Premises ............................................................................ 6
    2.5  Memorandum of Term ................................................................................. 6
    2.6  Options to Extend Term ............................................................................... 6
    2.7  Holdover Tenancy ....................................................................................... 6

3.  RENT ................................................................................................................... 6
    3.1  Commencement of Rent................................................................................ 6
    3.2  Base Rent .................................................................................................... 6
    3.3  Common Area Charges ................................................................................ 6
    3.4  Real Estate Taxes ........................................................................................ 8
    3.5  Utilities........................................................................................................ 9
    3.6  Rent Invoices; Waiver of Recovery of Certain Charges .................................. 9
    3.7  Late Payments ............................................................................................. 9

4.  COMMON AREAS................................................................................................... 9
    4.1  Right to Use Common Areas ........................................................................ 9
    4.2  Parking Areas ............................................................................................ 10
    4.3  Maintenance of Common Areas .................................................................. 10
    4.4  Development Restrictions ............................................................................ 11
    4.5  Employee Parking ...................................................................................... 11
    4.6  Minimum Clearance ................................................................................... 11

5.  INSURANCE AND INDEMNITIES ............................................................................. 11
    5.1  Tenant's Insurance ..................................................................................... 11
    5.2  Landlord's Insurance .................................................................................. 12
    5.3  Indemnities................................................................................................ 12
    5.4  Waiver of Subrogation ............................................................................... 12

6.  MAINTENANCE OF PREMISES ................................................................................ 13
    6.1  Landlord's Obligations................................................................................ 13
    6.2  Tenant's Obligations ................................................................................... 13
    6.3  Heating, Ventilating and Air Conditioning ................................................... 13
    6.4  Surrender of Premises ................................................................................ 13

7.  SIGNS ................................................................................................................ 13
    7.1  Exterior Signs............................................................................................. 13
    7.2  Other Signs................................................................................................ 14

8.  TITLE TO PREMISES ............................................................................................ 14
    8.1  Ownership of Premises ............................................................................... 14
    8.2  Covenant of Quiet Enjoyment ..................................................................... 14
    8.3  Non-Disturbance Agreement........................................................................ 14
    8.4  Restrictions................................................................................................ 14

9.  COMPLIANCE ...................................................................................................... 14
    9.1  As to Premises ........................................................................................... 14
    9.2  As to Common Areas .................................................................................. 14
    9.3  As to Hazardous Materials .......................................................................... 15

10. ALTERATIONS AND FIXTURES .............................................................................. 15
    10.1  Alterations and Additions............................................................................ 15
    10.2  Fixtures...................................................................................................... 15
    10.3  Liens.......................................................................................................... 16
    10.4  Definition for Purposes of Section 10.3 ....................................................... 16

11. ASSIGNMENT AND SUBLETTING .......................................................................... 16
    11.1  Permitted Assignment and Subletting .......................................................... 16
    11.2  Recognition ............................................................................................... 17

12. DESTRUCTION OF PREMISES ............................................................................... 17
    12.1  Notice of Damage and Estimated Repair Time .............................................. 17
    12.2  Tenant's Right to Terminate ........................................................................ 17
    12.3  Landlord's Right to Terminate ..................................................................... 17
    12.4  Landlord's Repair Obligation....................................................................... 18
    12.5  Abatement of Rent ..................................................................................... 18

13. EMINENT DOMAIN............................................................................................... 18

i

# TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| 13.1 | Total Taking | 18 |
| 13.2 | Tenant's Right to Terminate | 18 |
| 13.3 | Landlord's Right to Terminate | 18 |
| 13.4 | Partial Taking of Premises | 18 |
| 13.5 | Award | 18 |
| **14.** | **DEFAULT** | **18** |
| 14.1 | Tenant's Default | 18 |
| 14.2 | Landlord's Default | 19 |
| 14.3 | Estoppel and Waiver | 19 |
| 14.4 | Remedies Cumulative | 19 |
| 14.5 | Litigation, Court Costs and Attorneys' Fees | 19 |
| 14.6 | Defaults by Assignees or Subtenants | 20 |
| **15.** | **SUBORDINATION** | **20** |
| 15.1 | Landlord's Mortgagees | 20 |
| 15.2 | Landlord's Liens | 20 |
| **16.** | **OTHER TENANCIES AND USE** | **20** |
| 16.1 | Exclusive Use | 20 |
| 16.2 | Prohibited Uses | 21 |
| 16.3 | Restricted Uses | 21 |
| 16.4 | Other Exclusives | 22 |
| 16.5 | Opening Covenant; No Operating Covenant | 22 |
| 16.6 | "Go Dark" Recapture | 22 |
| **17.** | **MISCELLANEOUS** | **22** |
| 17.1 | Relationship of Parties | 22 |
| 17.2 | Heirs, Successors and Assigns | 22 |
| 17.3 | Governing Law | 22 |
| 17.4 | Rules of Construction | 22 |
| 17.5 | Materiality of Covenants | 22 |
| 17.6 | Severability | 22 |
| 17.7 | Entire Agreement; Amendment | 22 |
| 17.8 | Gender, Number | 23 |
| 17.9 | Headings | 23 |
| 17.10 | Section Numbers | 23 |
| 17.11 | Memorandum of Lease | 23 |
| 17.12 | Notices | 23 |
| 17.13 | Gross Sales Reports; Confidentiality of Gross Sales Reports and Lease Terms | 23 |
| 17.14 | Brokers | 23 |
| 17.15 | Force Majeure | 23 |
| 17.16 | Limitation of Landlord's Liability | 23 |
| 17.17 | Rent Tax | 24 |
| 17.18 | State-Mandated Radon Notice | 24 |
| 17.19 | Landlord's Access to the Premises | 24 |
| 17.20 | Transfers by Landlord | 24 |
| 17.21 | Estoppel Certificates | 24 |
| 17.22 | Tenant's Authority | 24 |

Exhibit A LEGAL DESCRIPTION OF THE SHOPPING CENTER ........................... A-1
Exhibit B SITE PLAN ........................... B-1
Exhibit C CONSTRUCTION PROVISIONS ........................... C-1
Exhibit C-1 TENANT'S PROTOTYPE PAD SPECIFICATIONS ........................... C-1-1
Exhibit D MEMORANDUM OF TERM ........................... D-1
Exhibit E SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT ........................... E-1
Exhibit F PERMITTED ENCUMBRANCES ........................... F-1
Exhibit G EXISTING LEASES NOT SUBJECT TO TENANT'S EXCLUSIVE/OTHER EXCLUSIVES ........... G-1
Exhibit H PROHIBITED USES ........................... H-1
Exhibit I MEMORANDUM OF SHOPPING CENTER LEASE ........................... I-1
Exhibit J REA ........................... J-1
Exhibit K SIGNAGE ........................... K-1
Exhibit L STOREFRONT ELEVATIONS ........................... L-1

**SHOPPING CENTER LEASE**

THIS SHOPPING CENTER LEASE ("**Lease**") is entered into as of the Effective Date, and by and between the Landlord and Tenant, identified in Section 1.1 below.

1. **BASIC LEASE DEFINITIONS, EXHIBITS AND ADDITIONAL DEFINITIONS**

    1.1    **Basic Lease Definitions**. In this Lease, the following defined terms have the meanings indicated:

    (a)    "**Effective Date**" means the date of execution by the later to sign of Landlord or Tenant, provided an executed copy of this Lease is thereafter delivered to the other party, which date is ~~January~~ _2_, 2006.
    February

    (b)    "**Landlord**" means DENO P. DIKEOU, whose Federal Taxpayer Identification Number is _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_

    (c)    "**Tenant**" means TSA STORES, INC., a Delaware corporation.

    (d)    "**Shopping Center**" means the land described on Exhibit A, together with all buildings and other improvements constructed or to be constructed thereon, together with all rights, privileges, easements, and appurtenances pertaining thereto. The Shopping Center is known as Waterford Towers Shopping Center, is located in the City of Orlando, County of Orange and State of Florida and contains, or will eventually contain, at least 420,000 square feet of Floor Area.

    (e)    "**Premises**" means that portion of the Shopping Center identified as such on Exhibit B. There are appurtenant to the Premises those rights, privileges, easements and appurtenances that are described herein. The Premises contain, or will contain, approximately 45,000 square feet of Floor Area, with dimensions of approximately 237 feet of frontage by approximately 190 feet in depth.

    (f)    "**Expiration Date**" means the last day of the Initial Term, which will be January 31 of the 15th Lease Year.

    (g)    "**Delivery Window**" means the period from and including September 3 of one calendar year to and including November 1 of the same calendar year; the period from and including January 1 of one calendar year to and including January 20 of the same calendar year; or the period from and including March 15 of one calendar year to and including April 3 of the same calendar year.

    (h)    "**Extension**" means any of the three extension periods of five years each with respect to which Tenant may elect to extend the Term pursuant to Section 2.6.

    (i)    "**Base Rent**" means the Rent payable pursuant to Section 3.2, as follows (but subject to adjustment upon final measurement of the Premises pursuant to Section 2.4):

| Applicable Time Period | Total Annual Base Rent | Total Monthly Base Rent | Annual Base Rent Per Square Foot of Floor Area of the Premises |
|---|---|---|---|
| Rental Commencement Date through the last day of the 5th Lease Year | $675,000.00 | $56,250.00 | $15.00 |
| First day of the 6th Lease Year through the last day of the 10th Lease Year | $742,500.00 | $61,875.00 | $16.50 |
| First day of the 11th Lease Year through the Expiration Date | $816,750.00 | $68,062.50 | $18.15 |
| First Extension | $898,200.00 | $74,850.00 | $19.96 |
| Second Extension | $988,200.00 | $82,350.00 | $21.96 |
| Third Extension | $1,087,200.00 | $90,600.00 | $24.16 |

    (j)    "**Estimated Common Area Charges**" means $1.50 per square foot of Floor Area of the Premises (excluding insurance premiums).

    (k)    "**Estimated Real Estate Taxes**" means $1.65 per square foot of Floor Area of the Premises.

(l)    **"Landlord's Notice Address"** means:

        c/o Dikeou Realty
        549 Wymore Road North
        Suite 206
        Maitland, Florida 32751
        Attn: Deno P. Dikeou

(m)    **"Landlord's Rent Address"** means:

        Same as above

(n)    **"Tenant's Notice Address"** means:

        1050 West Hampden Avenue
        Englewood, Colorado 80110
        Attn: Vice President—Real Estate

        With a copy to:

        1050 West Hampden Avenue
        Englewood, Colorado 80110
        Attn: Legal Department

(o)    **"Tenant's Rent Invoices Address"** means:

        1050 West Hampden Avenue
        Englewood, Colorado 80110
        Attn: Accounting

(p)    **"Broker(s)"** means: Jim Roberts of Colliers, representing Tenant.

**1.2    Exhibits**. The following Exhibits are attached to this Lease and made a part of this Lease for all purposes.

| Exhibit A: | Legal Description of the Shopping Center |
|---|---|
| Exhibit B: | Site Plan |
| Exhibit C: | Construction Provisions |
| Exhibit C1: | Excerpts from the Program Package |
| Exhibit D: | Memorandum of Term |
| Exhibit E: | Subordination, Non-Disturbance and Attornment Agreement |
| Exhibit F: | Permitted Encumbrances |
| Exhibit G: | Existing Leases Not Subject to Tenant's Exclusive/Other Exclusives |
| Exhibit H: | Prohibited Uses |
| Exhibit I: | Memorandum of Shopping Center Lease |
| Exhibit J: | REA |
| Exhibit K: | Signage |

**1.3    Additional Definitions**. In addition to those terms defined in Section 1.1 and other sections of this Lease, the following defined terms when used in this Lease have the meanings indicated:

    (a)    **"Additional Rent"** means any amount or charge due from Tenant to Landlord under this lease in addition to Base Rent, including, without limitation, Tenant's pro rata share of Common Area Charges and Real Estate Taxes.

    (b)    **"Alternative Rent"** means, for any month or portion of a month during the Term for which Tenant is required or permitted to pay Alternative Rent pursuant to this Lease, an amount equal the product of (i) the entire amount of Gross Sales made upon the Premises during such month or the portion thereof, multiplied by (ii) 3%, but in no event will Alternative Rent exceed the Base Rent that would have been payable for such period in the absence of the provision of this Lease requiring or permitting Tenant to pay Alternative Rent for such period.

    (c)    **"Commencement Date"** means, subject to the provisions of Article 3.6 of Exhibit C, the earlier of (i) the date which is 210 days after the Pad Delivery Date (as that term is defined in Section 1.3(o)), or (ii) the earlier of the date of Tenant's grand opening of the Premises, or 10 days after the date on which Tenant first opens the Premises for business with the public; provided, however, that if the date which is 210 days after the Pad Delivery Date occurs during the three-day period from and including Good Friday through and including Easter Sunday, then the Commencement Date will be the earlier of the date of Tenant's grand opening of the Premises or 10 days after the date on which Tenant first opens the Premises for business with the public or the Monday immediately following Easter Sunday.

    (d)    **"Common Area Charges"** means the costs incurred by Landlord, its agents or contractors during the Term in operating, maintaining and repairing the Common Areas, determined in accordance with generally accepted accounting principles, and in paying the premiums for the property and liability insurance

required by Sections 5.2(a) and (b). Common Area Charges will include any and all reasonable and necessary costs or expenses incurred by Landlord, its agents or contractors in accordance with generally accepted accounting principles in connection with the operations, repair or maintenance of Common Areas, including (without limitation) maintenance and repair of sidewalks, curbs, gutters, storm water drainage system, directories, directional signs and other markers, pylon and monument signs (excepting any individual sign panels of tenants, which are to be maintained by such tenants), the towers which identify the Shopping Center, bumpers and other components of the Common Area; maintenance and repair of parking areas (including without limitation the repair and patching of potholes and restriping and resealing the parking lot after the first two years), irrigation systems (including lawn sprinklers and the replacement of sprinkler heads), plantings and landscaping; repainting of exterior buildings (subject to the limitation set forth below); maintenance and repair of Common Area security cameras; fire water supply system located in and for the benefit of the Common Areas, e.g. fire hydrants and related lines; maintenance and repair of security lighting, including light poles and light fixtures, provided that such lighting benefits all tenants in the Shopping Center and is not installed to protect any particular tenant; service contracts; rubbish and trash removal and maintenance of trash receptacles; security services including, if Landlord deems necessary, the cost of security guards (subject to the limitation set forth below); all materials, supplies and services purchased or hired in connection with the operation of the Common Areas, maintaining the landscaping areas, repair and maintenance of the lift station (including the electricity and water required to operate such facility) and retention pond servicing the Shopping Center, but only to the extent that the Shopping Center utilizes such facilities; and association fees paid by Landlord under the REA, as hereafter defined, not to exceed $500 per year. Common Area Charges will not include any of the following:  (i) Real Estate Taxes; (ii) costs of capital improvements, capital repairs or capital replacements, including, without limitation, repainting of buildings and total repaving of the parking areas (or partial repaving of parking areas if in the aggregate such partial repairs will result in a substantially total repair), provided, however that Common Area Charges may include (A) the cost of repainting the exterior of buildings in the Shopping Center so long as such cost is amortized over the useful life of the repainting in accordance with generally accepted accounting principles and such cost is not incurred, or such amortization commenced, prior to the fifth anniversary of the Commencement Date or more than once every five years thereafter, and (B) the cost of total repaving of the parking areas so long as such cost is amortized over the useful life of the repaving in accordance with generally accepted accounting principles and such cost is not incurred, or such amortization commenced, prior to the second anniversary of the Commencement Date or more than once every five years thereafter; (iii) costs of roof repairs;  (iv) costs of repairing design or construction defects;  (v) costs of improvements, repairs or replacements covered by insurance or reimbursed by third parties; (vi) repairs or other work (including rebuilding) occasioned by casualty or condemnation exceeding $15,000.00 in the aggregate in any calendar year; (vii) costs of constructing leasehold improvements for any tenant of the Shopping Center; (viii) legal or brokerage fees and other costs of procuring tenants associated with any lease for space in the Shopping Center; (ix) costs of advertising; (x) management fees, whether payable to Landlord or third parties; (xi) so-called "administrative charges" or other add-ons to the total of Common Area Charges in any amount that is greater in the aggregate than 5% of all Common Area Charges excluding costs of insurance and utilities and any single purpose expenditure which exceeds ($50,000); (xii) salaries and other employment costs of any employee (A) to the extent such employee does not work on-site at the Shopping Center, (B) to the extent such employee is engaged in activities other than the direct operation or maintenance of the Common Areas, or (C) whose position is at or above the level of property manager; (xiii) principal or interest on debt or amortization payments on any mortgages or deeds of trust or any other debt for borrowed money and amortization of improvements; (xiv) depreciation of Landlord's original investment in the Shopping Center; (xv) amounts paid by Landlord to affiliates of Landlord for services in connection with the Common Areas, to the extent such fees are in excess of the ordinary and reasonable fees paid in arms' length transactions; (xvi) rents and other charges payable to underlying landlords including any charges arising due to violations of such leases; (xvii) costs of enforcing leases against other tenants; (xviii) maintenance by Landlord of the items required by Landlord to be maintained under Section 6.1; (xix) expenses related to vacant space, including utility costs, security and renovation; (xx) costs of providing security services to the extent the same disproportionately benefit a particular tenant or group of tenants (e.g., the costs of security personnel to the extent they spend a disproportionate amount of their time performing crowd control or similar measures for a particular tenant); (xxi) costs related to investigation of, testing for, removal and/or clean up of Hazardous Materials not caused by Tenant; or (xxii) the purchase of art work, sculptures or other similar purchases.

(e)     **"Common Areas"** means those parts of the Shopping Center provided by Landlord for the common use of all tenants, including, among other facilities, parking areas, driveways within the Shopping Center and to public roads adjoining the Shopping Center, sidewalks, landscaping, loading areas, private streets and alleys, lighting facilities, drinking fountains, and public toilets, if any, exclusive of (i) buildings and associated truck ramps, wells and trash compactors exclusively for the use of one tenant, (ii) any outside sales areas contained within an individual building area, and (iii) any future buildings, when and if same are actually constructed.

(f)     **"Environmental Laws"** means all Laws relating to (i) emissions, discharges, spills, releases or threatened releases of Hazardous Materials onto or into, or the presence of Hazardous Materials on or in, land, ambient air, surface water, groundwater, watercourses, publicly or privately owned treatment works, drains, sewer systems, wetlands, or septic systems, (ii) the use, treatment, storage, disposal, handling, manufacturing, transportation, or shipment of Hazardous Materials, or (iii) the protection of human health or the environment.

(g)     **"Floor Area"** means the floor area in square feet at each level or story of buildings in the Shopping Center, including mezzanines (but only to the extent the same are used as retail sales areas), measured from the outside surfaces of exterior walls and the center lines of party walls (but for purposes of determining the Floor Area of the Premises, no wall will be deemed to exceed 12" in width), and including the area of permanent outside sales areas and garden shops even if not under roof. Floor Area will not include the area of: temporary outside sales areas; the upper levels of any deck/platform areas used for storage of merchandise (including mezzanine areas); and loading docks and areas covered by exterior canopies or overhangs (except to the extent enclosed and used as retail sales area).

(h)    "**Governmental Authority**" means any local, regional, state or federal governmental entity, agency, court, judicial or quasi-judicial body, or legislative or quasi-legislative body, present or future.

(i)    "**Gross Sales**" means the gross receipts from merchandise sold or services rendered upon the Premises, but excluding the following to the extent same are included: (i) all refunds, exchanges, returns, discounts, camp allowances made for damaged or returned merchandise; (ii) sales to employees not to exceed 5% of Gross Sales per year; (iii) bulk sales or closeouts of merchandise sold at less than Tenant's cost; (iv) receipts from the sale of "leader items" not exceeding $250,000 per year; "leader items" will mean those items of merchandise advertised as promotional items to attract customers to the Premises and sold at either no profit or a very low profit margin; (v) any taxes collected for any Governmental Authority, including, but not limited to, sales or excise taxes or similar taxes; (vi) sales of trade fixtures or store operating equipment; (vii) vending machine sales and pay telephone receipts; (viii) any intracompany transfers of merchandise; (ix) amounts in excess of Tenant's cash sale price charged for shipping or insurance or for interest or finance charges on sales made on credit or under a time payment plan or layaway plan; (x) charges paid by Tenant or its customers to credit card companies in accordance with credit card purchase plans; (xi) sale of gift certificates, provided, however, that the cash sale price of any item purchased with such a certificate at the Premises will be included in Gross Sales; (xii) receipts from the sale of hunting, fishing and/or game licenses, park permits, camp stamps or migrant bird permits; (xiii) receipts from sales of airline tickets, tickets for sporting events, ski resort lift tickets and all Datatix, Ticketmaster or other similar ticket sales provided that Tenant is not making a profit on the foregoing; (xiv) receipts from sales of tickets for events conducted not for purposes of profit; (xv) workroom or similar charges for alterations, assembly, repairs or installation of merchandise sold, or similar "customer convenience" services rendered in connection with merchandise sold (such as tennis racquet stringing, etc.) provided that Tenant is not making a profit on the foregoing; (xvi) sales of merchandise ordered through the use of Tenant's website or mail order catalogs or filled through Tenant's website or mail order channels, regardless of the place of order or delivery, unless payment is made and accounted for at the Premises; (xvii) postage paid in connection with mail order sales; (xviii) sublease rents and licensee, concessionaire and similar fees, including fees received from the placement or use of any ATM machine within the Premises; (xix) returns to shippers, jobbers, wholesalers or manufacturers; (xx) sums or credits received for the settlement of claims for loss or damage to merchandise; (xxi) any penalties or charges imposed by Tenant on its customers for returned checks; and (xxii) Tenant's accounts receivables which have been determined to be uncollectible for federal income tax purposes; provided, however that such sums actually collected in later years will be included in Gross Sales for such later year.

(j)  .   "**Hazardous Materials**" means any substance (i) the presence of which requires special handling, storage, investigation, notification, monitoring, or remediation under any Environmental Laws, (ii) which is toxic, explosive, corrosive, erosive, flammable, infectious, radioactive, carcinogenic, mutagenic or otherwise hazardous, (iii) which is or becomes regulated by any Governmental Authority, or (iv) the presence of which causes or threatens to cause a bona fide risk to human health or the environment or a nuisance to the Shopping Center or Premises or to adjacent properties or premises.

(k)    "**Initial Term**" means the period commencing on the Commencement Date and ending on the Expiration Date.

(l)    "**Interest Rate**" means the lesser of (i) the prime rate of interest being quoted at such time by Wells Fargo Bank, N.A., plus 4% but never to exceed 12%.

(m)    "**Laws**" means all applicable common law, statutes, ordinances, rules, rulings, regulations, orders and interpretations of any Governmental Authority having jurisdiction.

(n)    "**Lease Year**" means each 12-month period from February 1 through January 31 during the Term, except that if the Commencement Date occurs on a date other than February 1, the first Lease Year will include both (i) the period from the Commencement Date through the next January 31, and (ii) the full 12-month period from the immediately succeeding February 1 through the next January 31 (so that, for example, if the Commencement Date occurs on November 1, 2005, the first Lease Year will be the period from November 1, 2005 through January 31, 2007 and the Expiration Date will be January 31, 2021).

(o)    "**Pad Delivery Date**" means, subject to the provisions of Section 2.3 below and Articles 12.1 through 12.4 of Exhibit C, the date upon which all of the following conditions precedent have been fulfilled by Landlord: (i) that portion of "Landlord's Work" (as defined in Article 1(i) of Exhibit C) which consists of constructing the Prepared Pad (as defined in Article 5.1 of Exhibit C) in accordance with Tenant's Prototype Pad Specifications (as defined in Article 3.5 of Exhibit C) is "Substantially Complete" (as defined in Article 12.4 of Exhibit C); (ii) Landlord and Tenant have conducted the punch list inspection of the Prepared Pad described in Article 12.4 of Exhibit C; (iii) at least 45 days have passed since Landlord delivered the "Delivery Notice" (as defined in Article 12.2 of Exhibit C) to Tenant; (iv) Landlord has delivered possession of the Prepared Pad to Tenant free and clear of all prior tenancies, with any signage, furniture, equipment or trade fixtures of any prior occupant removed and with any damage caused by such removal repaired to Tenant's reasonable satisfaction at no cost to Tenant; and (v) Tenant is in receipt of all building permits required for Tenant to construct "Tenant's Work" (as defined in Article 1(ii) of Exhibit C). The parties acknowledge that Tenant, as a part of Tenant's Work, is required to obtain a final certificate of occupancy for the Premises. However, if Tenant is delayed in obtaining such final certificate of occupancy due to any failure of Landlord's Work to comply with the requirements of a Governmental Authority or any failure of Landlord otherwise to comply with the requirements of a Governmental Authority (excluding any such requirement the compliance with which is Tenant's responsibility pursuant to Article 3.1 of Exhibit C) (Tenant hereby agreeing to diligently pursue application for and grant of such building permits subsequent to the Effective Date), then for purposes of determining the Commencement Date and the Rental

Commencement Date under this Lease, the Pad Delivery Date will be deemed extended by the number of days that Tenant is delayed in obtaining such permanent certificate of occupancy by virtue of such non-compliance.

(p)    "**Permitted Encumbrances**" means those liens, easements, restrictions and encumbrances affecting the Shopping Center that are listed on Exhibit F.

(q)    "**Prepared Pad**" means the Premises building pad constructed in accordance with Articles 3.5 and 5.1 of Exhibit C and Tenant's Prototype Pad Specifications (as defined in Article 3.5 of Exhibit C).

(r)    "**REA**" means that certain Reciprocal Easement and Operation Agreement dated September 23, 1999, and recorded on September 24, 1999, in O.R. Book 5845 at Page 1099, in the Official Records of Orange County, Florida, as amended by that certain First Amendment to Reciprocal Easement and Operation Agreement dated January 26, 2000, and recorded on December 8, 2000, in O.R. Book 5931 at Page 4466, in the Official Records of Orange County, Florida, together with that certain Declaration of Easements, Restrictions and Covenants (the "Declaration"), dated June 28, 2005, recorded in O. R. Book 08046, at Page 1183, in the Official Records of Orange County, Florida attached hereto as Exhibit J; provided, however, that the REA will no longer include the Declaration after the Declaration has expired or otherwise terminated pursuant to its terms.

(s)    "**Real Estate Taxes**" means all real property taxes and assessments that become due and payable during the Term after the Rental Commencement Date and are assessed by any taxing Governmental Authority against the entire Shopping Center Tax Parcel, reflecting the lesser of (i) the December discount available in Florida by making early payment (regardless of whether early payment is actually made) or (ii) the maximum discount if early payment at the maximum discount is actually made, and less any rebates, credits or abatements from such authorities which are granted or agreed upon with respect to the Shopping Center Tax Parcel; provided, however, that as regards any assessment which under Laws may be paid in installments, there will be included within the meaning of the term "Real Estate Taxes" with respect to any tax fiscal year only the current annual installment. Real Estate Taxes will include all taxes, levies and charges which may be assessed, levied or imposed in replacement or in lieu of, or in addition to, all or any part of ad valorem real property taxes or assessments as revenue sources, and which in whole or in part are measured or calculated by or based upon the Shopping Center. Real Estate Taxes will not include any of the following: (i) any assessments for highway, street or traffic control improvements, sanitary or storm sewers, utilities, or for other on-site or off-site improvements of any nature whatsoever made in connection with the development or improvement of the Shopping Center; (ii) any franchise, gift, estate, inheritance, conveyance, transfer, capital investment or other tax assessed against Landlord or Landlord's heirs, successors or assigns; (iii) any income, excess profits or other tax, assessment, charge, including sales tax payable by Tenant under this Lease; provided, however, that Tenant shall have the obligation to pay Florida rent tax pursuant to Section 17.17 of this Lease; (iv) any property tax applicable to any land or improvements not within the boundaries of the Shopping Center Tax Parcel; (v) any interest, fine, or penalty for late payment or nonpayment by Landlord of any Real Estate Taxes (except to the extent due to Tenant's late payment of its pro rata share of Real Estate Taxes) or any land within the Shopping Center Tax Parcel being held by Landlord for future development; or (vi) any increased assessments which result and are permissible by Laws solely as a result of transfers in ownership of the Shopping Center or any portion thereof or any increases in valuation or tax basis resulting therefrom more than once every five years.

(t)    "**Rent**" means the Base Rent, Alternative Rent and Additional Rent.

(u)    "**Rental Commencement Date**" means, subject to the provisions of Article 3.6 of Exhibit C, the later of (i) the Commencement Date, or (ii) 210 days after the date on which each of the conditions precedent to the occurrence of the Pad Delivery Date set forth in Section 1.3(o) are met.

(v)    "**Shopping Center Tax Parcel**" means the tax parcels within the Shopping Center that include the Premises, as established by the Governmental Authority that is responsible for assessing and collecting Real Estate Taxes; provided that any portion of such tax parcels that constitute land held for future development will be excluded from the Shopping Center Tax Parcel.

(w)    "**Term**" means the Initial Term and any Extension with respect to which Tenant exercises its option pursuant to Section 2.6.

2.    **DEMISE, CONSTRUCTION AND TERM**

2.1    **Demise.** Upon the terms and conditions set forth in this Lease, Landlord leases to Tenant, and Tenant leases from Landlord, the Premises, together with the nonexclusive right to use the Common Areas, for the Term. Landlord grants to Tenant and its subtenants, licensees and concessionaires and their respective customers, invitees and employees, the benefit of all easements created under the REA that are intended for the benefit of the occupants of the Premises and their respective customers, invitees and employees.

2.2    **Construction.** Construction of Shopping Center site work, the building shell for the Premises and the leasehold improvements within the Premises will be accomplished pursuant to Exhibit C.

2.3    **Delivery During Delivery Window.** In no event will Tenant be required to accept possession of the Premises on any date that is not within a Delivery Window and in the event the conditions precedent to the Pad Delivery Date set forth in Section 1.3(o) are satisfied on a date that is not within a Delivery Window, the Pad Delivery Date will, for all purposes, be delayed until the first day of the next Delivery Window, unless Tenant waives such requirement in writing (which Tenant will have the right to), in which case (a) the Pad Delivery Date will be the date on which the foregoing conditions were satisfied (regardless of the fact that one or more of such

conditions may have been satisfied outside of a Delivery Window), and (b) commencing on the Rental Commencement Date and continuing for a period of time equal to the number of days from the Pad Delivery Date to the first day of the next Delivery Window, Base Rent will be abated and in lieu thereof Tenant will pay Landlord Alternative Rent on a monthly basis, 30 days after the end of each calendar month.

**2.4    Measurement of Premises.**  The Floor Area contained (or contemplated to be contained after construction) in the Shopping Center and Premises is set forth in Sections 1.1(d) and 1.1(e) respectively.  Tenant agrees to have the Premises measured and have such measurement certified to by a licensed architect on or before the Commencement Date in accordance with the provisions of this Section 2.4.  Prior to Tenant's execution of the Memorandum of Term described in Section 2.5, Landlord may object to such certification by notice to Tenant.  If Landlord objects to Tenant's architect's measurement of the Premises, together with its notice of objection, Landlord will specify the Floor Area it believes the Premises contain.  The parties will make reasonable efforts to resolve their differences.  If, within 30 days after Landlord's objection, the parties have not resolved their differences, each will name an architect within 10 days thereafter.  Within 10 days after being named, such architects will name a third architect, who will, within 20 days, measure the Premises.  The measurement of the third architect will be averaged with either Landlord's or Tenant's architect's measurement, whichever is closer thereto, which averaged amount will be deemed the correct Floor Area of the Premises.  The party whose measurement was not averaged with that of the third architect will pay the fees and expenses of the third architect, and each party will pay the fees and expenses of its own architect.  If, upon final determination of the Floor Area of the Premises in accordance with the foregoing provisions, the actual Floor Area of the Premises is determined to be less than 100% of the Floor Area stated in Section 1.1(e) (the "**Stated Premises Size**"), then for purposes of this Lease the Floor Area of the Premises will be 45,000 square feet; provided, however, if the Floor Area of the Premises is greater than 101% of the Stated Premises Size, the amounts of Base Rent set forth in Section 1.1(i) above and any other amounts under this Lease that are calculated with reference to the Floor Area of the Premises will be adjusted accordingly, and such adjustment will apply from the Rental Commencement Date.

**2.5    Memorandum of Term.**  Landlord and Tenant agree to sign on or before the 60th day following the later of the Rental Commencement Date or the date on which Landlord delivers to Tenant the architect's certified measurement of the Floor Area of the Premises described in Section 2.4, a Memorandum of Term in the form of Exhibit D, setting forth the Commencement Date of the Initial Term, the Rental Commencement Date, the Expiration Date and the Floor Area of the Premises.  Such Memorandum of Term will thereafter be conclusive of such information.

**2.6    Options to Extend Term.**  Provided that no Event of Default by Tenant has occurred and is then continuing beyond applicable cure periods, Tenant will have options to extend the Term for the number of Extensions set forth in Section 1.1(h).  Each option will be exercisable by written notice given to Landlord at least 12 months prior to the last day of the Initial Term or then effective Extension, as the case may be.  Upon receipt of each such notice, this Lease will be extended for the period specified in Section 1.1(h) without the necessity for the execution of any further instrument and upon the same terms, conditions, covenants, and agreements as are contained in this Lease, except that the Base Rent for each Extension will be as set forth in Section 1.1(i).

**2.7    Holdover Tenancy.**  If Tenant remains in possession of the Premises after the expiration of the Term without execution of a new lease or of an agreement extending the Term, Tenant will be deemed to be occupying the Premises as a tenant from month to month, subject to all of the terms of this Lease as may be applicable to a month to month tenancy and at the monthly installment of 150% of the Base Rent set forth in Section 1.1(i) plus Tenant's pro rata share of Common Area Charges, Real Estate Taxes, and insurance premiums for the 12-month period prior to expiration of the Term, except that thereafter either Landlord or Tenant may terminate the Lease upon 30 days' notice to the other.  After the expiration of the Term without execution of a new lease or a written agreement extending the Term, Tenant will become a tenant at sufferance after 30 days written notice from Landlord.

**3.     RENT**

**3.1    Commencement of Rent.**  Notwithstanding anything to the contrary contained in this Lease, no Rent will begin to accrue until the Rental Commencement Date.  Tenant covenants and agrees to pay Landlord at Landlord's Rent Address, or such other persons or entities or at such other places as Landlord may designate by notice to Tenant, the Rent set forth below in this Section 3 without notice, demand or setoff except as specifically set forth herein.

**3.2    Base Rent.**  Tenant will pay Landlord for each month within the Term after the Rental Commencement Date, the Base Rent set forth in Section 1.1(i).  Base Rent will be payable in advance on the first day of each month in equal installments which will not be decreased, increased or abated except as set forth in this Lease.  If the Rental Commencement Date does not occur on the first day of a calendar month, the Base Rent for the first partial calendar month that the Base Rent is due will be prorated based on the actual number of days within such calendar month after the Rental Commencement Date.  If the Term expires or is terminated on a day which is not the last day of the calendar month, the Base Rent for the final partial calendar month that the Base Rent is due will be prorated based on the actual number of days within such calendar month prior to the end of the Term.

**3.3    Common Area Charges.**  Tenant will reimburse Landlord, as Additional Rent and in the manner set forth in Section 3.3(c), Tenant's pro rata share of Common Area Charges.

(a)    Computation of Tenant's Pro Rata Share.  Tenant's pro rata share of Common Area Charges will be an amount equal to the product of (i) total Common Area Charges for such calendar year, multiplied by (ii) a fraction having as its numerator the Floor Area of the Premises and as its denominator the Floor Area of the

Shopping Center; provided, however, at no time during the Term of the Lease (as may be extended) will Tenant's pro rata share of Common Area Charges exceed 10%.

(b)    Maximum Payable by Tenant. Except as otherwise provided in this Section 3.3(b), Tenant's pro rata share of all Common Area Charges excluding insurance premiums (on an annualized basis) will not, prior to the end of the first full calendar year of the Term, exceed the Estimated Common Area Charges set forth in Section 1.1(j). Tenant's pro rata share of "Controllable Common Area Charges" (as defined below), will not increase in any one calendar year thereafter by more than 7.5% of Tenant's actual or maximum share (whichever is less) of Controllable Common Area Charges for the previous full calendar year. As used herein, "**Controllable Common Area Charges**" means all Common Area Charges other than the costs of insurance and utilities. Notwithstanding the foregoing, so long as the individual named in Section 1.1(b) is the Landlord under this Lease then Tenant's pro rata share of Common Area Charges will not be subject to the limitations set forth in this Section 3.3(b).

(c)    Payment of Common Area Charges. The Common Area Charges will be paid in the manner set forth in this Section 3.3(c):

(i)    Annual Estimates. Landlord may reasonably estimate the amounts Tenant will owe for the Common Area Charges for the current full or partial calendar year of the Term such estimates will be based upon commercially reasonable market rates and competitively bid. In such event, Tenant will pay, subject to the provisions of Section 3.3(b), 1/12 of the estimated annual amounts, on a monthly basis, on the first day of each calendar month, together with Tenant's payment of Base Rent.

(ii)    Annual Statement. On or before the first day of April of each calendar year ("**Statement Deadline**"), Landlord will deliver a statement ("**CAM Statement**") to Tenant certified by Landlord's authorized representative showing: (A) the amount of the actual Common Area Charges for the preceding calendar year, with a breakdown of amounts by major categories of the Common Area Charges; (B) the amounts paid by Tenant toward the estimated Common Area Charges during the preceding calendar year; (C) any applicable limitation under Section 3.3(b); (D) Tenant's pro rata share and the detail for determining same; and (E) subject to the provisions of Section 3.3(b), any revised estimate of Tenant's obligations for the estimated Common Area Charges for the current calendar year. In the event Landlord fails to deliver the CAM Statement to Tenant on or before the Statement Deadline, and such failure continues for 30 days after written request therefor from Tenant, in addition to all other remedies available to Tenant under this Lease, at law or in equity, Tenant may elect to suspend the monthly payment of Tenant's estimated Common Area Charges, and for so long as Landlord has not delivered the CAM Statement to Tenant, Tenant will only be required to reimburse Landlord for Tenant's pro rata share of the Common Area Charges bi-monthly, in arrears, payable to Landlord within 30 days after receipt by Tenant of information similar to that to be provided in the CAM Statement and proof reasonably satisfactory to Tenant of the amount of Tenant's proportionate share of the Common Area Charges for the preceding three-month period.

(iii)    Differentials. If the CAM Statement shows that Tenant's estimated payments were less than Tenant's actual obligations for the Common Area Charges for the preceding calendar year, Tenant will pay the difference within 30 days after Tenant receives the CAM Statement. If the CAM Statement shows an increase in Tenant's estimated payments for the current calendar year, Tenant will also pay the difference between the new and former estimates for the period from January 1 of the current calendar year through the month in which the CAM Statement is sent, subject to the limitation in Section 3.3(b). If the CAM Statement shows that Tenant's estimated payments exceeded Tenant's actual obligations for the Common Area Charges, Tenant will receive a refund of such excess within 30 days after the CAM Statement is due. If Landlord fails to remit such refund to Tenant when due, then in addition to any other rights or remedies available to Tenant under Section 14.2, Tenant may offset the amount due, plus interest thereon at the Interest Rate from the date due until the date so offset, against the next accruing amounts of Rent due under this Lease.

(iv)    Partial Calendar Years. If the Rental Commencement Date commences other than on January 1, or the Term ends other than on December 31, Tenant's obligations to pay estimated and actual amounts toward the Common Area Charges for such partial calendar years will be prorated on the basis of the portion of such calendar years included in the Term following the Rental Commencement Date. Such proration will be made by multiplying the total estimated or actual (as the case may be) Common Area Charges for the partial calendar year in question, by a fraction having as its numerator the number of days of the Term following the Rental Commencement Date within the partial calendar year, and as its denominator "365."

(d)    Right to Inspect Books. Tenant or Tenant's accountants will have the right on 15 days notice, at Tenant's cost and expense (except as otherwise provided herein), to audit, copy and inspect, at reasonable times during normal business hours and in a reasonable manner, such of Landlord's books of account and records as pertain to Common Area Charges, provided that Tenant delivers such notice with respect to any calendar year's Common Area Charges within two years after Landlord's delivery of the CAM Statement for such calendar year, and provided further that Tenant may not conduct any such audit more than once per calendar year. Tenant will promptly deliver to Landlord a copy of the report issued as a result of such audit and inspection. In the event the report discloses any overpayment or underpayment of Common Area Charges due, the party owing such sums will reimburse the other party for all such sums owing within 30 days after its receipt of the audit and inspection report. If any CAM Statement is revealed by Tenant's audit to reflect an overstatement of Common Area Charges by more than 3% or an overcharge to Tenant of $1,500 or more, then Landlord will immediately pay to Tenant (a) the reasonable costs and expenses of the audit and inspection, and (b) interest at the Interest Rate on the overcharge included in each monthly estimated payment made by Tenant (calculated by dividing the total overpayment evenly over all monthly estimated payments for the subject year) from the date each such payment was made by Tenant until the date reimbursed to Tenant by Landlord. In the event Landlord fails to permit Tenant or Tenant's

accountants to audit, copy or inspect Landlord's books and records pertaining to Common Area Charges in accordance with this Section 3.3(d), and such failure continues for 30 days after notice thereof from Tenant, in addition to all other remedies available to Tenant under this Lease, at law or in equity, Tenant may elect to suspend all payments of Tenant's pro rata share of Common Area Charges until Landlord permits such auditing, copying or inspecting. Once Landlord permits Tenant or Tenant's accountants to audit, copy or inspect Landlord's books and records, any amounts suspended will be paid to Landlord. Tenant agrees to keep (and Tenant will advise its agents, contractors and employees to keep) the results of its audit confidential, except to the extent disclosure is necessary (i) to enforce Tenant's rights hereunder; (ii) to comply with Laws; or (iii) in connection with any mortgage, sale or transfer of Tenant's interests hereunder.

      **3.4**    **Real Estate Taxes.**  Tenant will reimburse Landlord, or pay directly to the taxing Governmental Authority, as Additional Rent and in the manner set forth in Section 3.4(a), Tenant's pro rata share of Real Estate Taxes. In the event Landlord's mortgagee requires Landlord to pay 1/12 of the estimated annual Real Estate Taxes each month into an escrow account from which such mortgagee causes the Real Estate Taxes to be paid, Tenant will pay, upon Landlord's written request, Tenant's pro rata share of Real Estate Taxes in monthly estimated payments equal to 1/12 of the prior year's Real Estate Taxes, and any difference between Tenant's pro rata share of the actual Real Estate Taxes and the amount of Tenant's estimated payments for any tax year will be reconciled between Landlord and Tenant within 30 days after the Real Estate Taxes for such year are paid from the escrow account.

      **(a)**    <u>Computation and Payment of Tenant's Pro Rata Share.</u>  Tenant's pro rata share of Real Estate Taxes will be an amount equal to the product of (i) all Real Estate Taxes, multiplied by (ii) a fraction having as its numerator the Floor Area of the Premises and as its denominator the Floor Area of all buildings within the Shopping Center Tax Parcel. If for any tax fiscal year within the Term the Shopping Center Tax Parcel contains Floor Area of premises in the Shopping Center in addition to the Premises, then Landlord will pay the Real Estate Taxes for such tax fiscal year and Tenant will pay its pro rata share of such Real Estate Taxes to Landlord on or before the later of (A) 30 days following Tenant's receipt from Landlord of a copy of the taxing Governmental Authority's tax bill for such Real Estate Taxes together with a detailed statement from Landlord showing Tenant's pro rata share of such Real Estate Taxes due and the calculations made for determination of the same, including at Tenant's request, any tax parcel map(s) reasonably necessary to determine the propriety of such Real Estate Taxes, or (B) 30 days before such Real Estate Taxes become delinquent or, if Landlord must pay earlier in order to receive a discount, 30 days before the date on which such Real Estate Taxes must be paid in order to receive the discount. Landlord has estimated that Tenant's pro rata share of Real Estate Taxes for the first full calendar year of the Term will be approximately the Estimated Real Estate Taxes set forth in Section 1.1(k).

      **(b)**    <u>Proration at Beginning and End of Term.</u>  All Real Estate Taxes for any tax fiscal year a portion of which falls within the Term following the Rental Commencement Date and a portion of which falls either before the Rental Commencement Date or after the end of the Term will be prorated by multiplying the amount of Real Estate Taxes for such tax fiscal year by a fraction having as its numerator the number of days in such tax fiscal year that fall within the Term following the Rental Commencement Date and having as its denominator the total number of days in such tax fiscal year.

      **(c)**    <u>Right to Contest.</u>  Landlord will, within 30 days of receiving notification thereof, send to Tenant notice of any increases in assessments for Real Estate Taxes. If Landlord fails to file a contest of the amount or validity of Real Estate Taxes for such tax fiscal year within 30 days after delivery to Landlord of a written request to do so from Tenant and other tenants and occupants of the Shopping Center Tax Parcel who, in the aggregate, occupy at least 50% of the Floor Area of the Shopping Center Tax Parcel, then Tenant will have the right, at Tenant's expense, to contest the amount or validity of Real Estate Taxes for such tax fiscal year by appropriate administrative and legal proceedings brought either in Tenant's name, Landlord's name or jointly with Landlord, as Tenant may deem appropriate, by counsel selected and engaged by Tenant. Landlord will execute and deliver to Tenant whatever documents may be necessary or proper to permit Tenant to contest Real Estate Taxes or which may be necessary to secure payment of any refund which may result from any such proceedings. Any refund resulting from a proceeding brought either by Tenant or Landlord or by them jointly will be applied first to reimburse the party or parties who brought the proceeding for the costs incurred with the proceeding, and then to reimburse Tenant for the difference between the amount Tenant paid for Real Estate Taxes for each fiscal tax year involved in the proceeding and the amount Tenant would have been required to pay if the Real Estate Taxes had been assessed in accordance with the decision rendered in the proceeding, together with interest on the amount of such difference at the annual rate allowed by the court on the overpayment of Real Estate Taxes. Any remaining balance will be paid to Landlord. Nothing in this Section shall be construed to relieve Tenant of its obligation to pay its prorata share of Real Estate Taxes in accordance with the terms of this Lease. Landlord will not be liable for any costs, interest, penalties or other charges incurred by Landlord based on the Tenant contesting the taxes (except to the extent Real Estate Taxes are reduced thereby), or for Landlord's late payment of taxes, assessments, levies or related charges if such late payment was required by Tenant for Tenant to contest the amount or validity of Real Estate Taxes.

      **(d)**    <u>Payment by Landlord.</u>  Landlord will pay or cause to be paid to the appropriate Governmental Authorities, prior to delinquency, all taxes, assessments, levies or related charges due and payable to such authorities with respect to all portions of the Shopping Center owned by Landlord; provided that if Landlord contests in good faith the amount or validity of such taxes, assessments, levies or related charges, then to the extent permitted by Laws, Landlord may defer payment of the same provided that if Landlord deposits the amount of all taxes, assessments, levies or related charges in an escrow account and provided further that no forfeiture of the Shopping Center may occur. Tenant will not be liable for any costs, interest, penalties or other charges incurred by Landlord in contesting the foregoing (except to the extent Real Estate Taxes are reduced thereby), or for Landlord's late payment of taxes, assessments, levies or related charges.

(e)    Right to Inspect Books.  Tenant or Tenant's accountants will have the right on 15 days notice at Tenant's cost and expense (except as otherwise provided herein) to audit, copy and inspect, at reasonable times during Landlord's normal business hours and in a reasonable manner (not more than once in any 12-month period), such of Landlord's books of account and records as pertain to Real Estate Taxes, provided that Tenant delivers such notice with respect to any calendar year's Real Estate Taxes within two years after the delivery to Tenant of Landlord's final statement of Real Estate Taxes for such calendar year (or if Tenant has been paying Real Estate Taxes monthly, then within two years of delivery of Landlord's reconciliation statement for Real Estate Taxes for such calendar year), and provided further that Tenant may not conduct any such audit more than once per calendar year.  Tenant will promptly deliver to Landlord a copy of the report issued as a result of such audit and inspection.  In the event the report discloses any overpayment or underpayment of Real Estate Taxes due, the party owing such sums will reimburse the other party for all such sums owing within 30 days after its receipt of the audit and inspection report.  If Landlord fails to remit any overpayment to Tenant when due, then in addition to any other rights or remedies available to Tenant under Section 14.2, Tenant may offset the amount due, plus interest thereon at the Interest Rate from the date due until the date so offset, against the next accruing amounts of Rent due under this Lease.  Tenant agrees to keep (and Tenant will advise its agents, contractors and employees to keep) the results of its audit confidential, except to the extent disclosure is necessary (i) to enforce Tenant's rights hereunder; (ii) to comply with Laws; or (iii) in connection with any mortgage, sale or transfer of Tenant's interests hereunder.

(f)    Payment by Tenant of Other Taxes.  Tenant will pay all taxes which may be lawfully charged, assessed or imposed upon all trade fixtures and Tenant's equipment in the Premises and upon the personal property in the Premises.  Tenant will also pay all license fees and other charges which may be lawfully charged upon the business of Tenant conducted in the Premises.

### 3.5    Utilities.

(a)    Separate Metering.  Landlord will furnish and install, without expense to Tenant, all electric, water, gas, telephone, sanitary and storm sewer lines stubbed to within five feet of the Building Shell line as more particularly described in Exhibit C, and all equipment required to provide service.  All hook-up, tap and similar fees payable in relation to the furnishing or installation of such utilities will be the responsibility of Tenant.  In addition, Landlord will, at Landlord's sole cost and expense, provide all facilities necessary to measure Tenant's individual consumption of utilities.  Tenant will, at Tenant's sole cost and expense, provide and install Tenant's water meter to measure Tenant's individual consumption of water and sewer.

(b)    Payment of Utility Bills.  Tenant will promptly pay all charges (based on consumption) for electricity, water, gas, telephone service, sewer service, and other utilities furnished to the Premises directly to the utility providing such service.  Tenant will be entitled to any credits, rebates or other monies payable with respect to the Premises by Governmental Authorities or utility providers for the use of particular equipment or fixtures, including, but not limited to, those rebates given for use of energy efficient lighting or air conditioning systems.

### 3.6    Rent Invoices; Waiver of Recovery of Certain Charges.  All invoices from Landlord to Tenant for any Rent due under this Lease will be sent to Tenant's Rent Invoices Address or to such other address as Tenant may designate by notice to Landlord.  If Landlord fails to seek reimbursement of Common Area Charges or Real Estate Taxes from Tenant within 18 months after the last day of the calendar year during which such expense was incurred, Landlord's right to recover such charge or expense will be deemed to have been waived.

### 3.7    Late Payments.  If, for a third or subsequent time in any calendar year Tenant fails to pay any installment of Rent when due, then such overdue amount will bear interest at the Interest Rate from the date when the payment was due until the date Tenant pays the overdue amount with interest.

## 4.    COMMON AREAS

### 4.1    Right to Use Common Areas.  Landlord hereby grants to Tenant and Tenant's customers, invitees and employees for the entire Term, a nonexclusive easement to use, in common with Landlord, Landlord's customers, invitees and employees and with the other tenants and occupants of the Shopping Center and their respective customers, invitees and employees, the Common Areas for their intended purposes. [Landlord agrees to enforce the provisions of the REA for the benefit of Tenant (but only to the extent that the violations of any such provision would have a material adverse effect on Tenant's rights under this Lease) against any party who is subject to, and is in violation of, the REA and, if Landlord fails to do so after the notice and cure period provided in Section 14.2, Landlord agrees that Tenant may do so.  Landlord further agrees:  (i) that the Common Areas will remain open at all times during the Term (provided that Landlord may temporarily close portions of the same for repairs or to prevent public dedication, but in no event will Landlord close the Protected Accessways or No Build Area (as those terms are defined below) and provided further that such repairs must be made in a manner to minimize disruption of Tenant's business and operations and may not occur during June, August, November or December, except in the case of emergency repairs); (ii) to the extent permitted by Laws, to maintain a no solicitation policy within the Common Areas, but Landlord will not have the obligation to enforce same; (iii) except to the extent required to respond to an emergency or to comply with Laws, not to cause or permit the performance of any maintenance (other than routine snow and ice removal, trash removal and cleaning), repair, replacement, improvement or alteration of the Common Areas (or any other portion of the Shopping Center, if the maintenance, repair, replacement, improvement or alteration thereof would adversely affect the availability of any portion of the Common Areas for parking or access) during the months of June, August, November or December of any year; (iv) not to allow the use of the Common Areas for carnival type shows, rides, entertainment, displays (except as similar to that allowable under Section 4.1(a) below), automobile or other product shows in the No Build Area, and (v) not to allow the use of the No Build Area or any portion of the Common Areas north of the "Center Access

Drive" from Alafaya Trail into the Shopping Center and identified on <u>Exhibit B</u> for outdoor shows or the leasing of kiosks.

(a)    <u>Sidewalk Sales and Promotional Events</u>.  Subject to the restrictions or prohibitions set forth in the REA and the Kohl's lease (which prohibitions, if any, are included in <u>Exhibit H</u> attached hereto and made a part hereof), to display merchandise and hold sidewalk sales on the sidewalks immediately in front of the Premises and to conduct promotional events and tent sales in the parking area in front of the Premises identified for such purpose on <u>Exhibit B</u>, provided that (i) Tenant will not conduct such promotional events or tent sales more than four times per year or for more than 10 days per event or sale and not during the period from Thanksgiving through New Year's day, (ii) Tenant will not conduct more than 12 sidewalk sales per year, with each such sale not lasting more than five days per sale, and the display of merchandise shall be no closer than 30 feet to any other occupant's premises; (iii) any such sales or promotional events conducted by Tenant will not unreasonably interfere with vehicular or pedestrian access; (iv) all such displays or sales and will be maintained in a neat, clean and orderly condition; (v) all sidewalk sales merchandise will be moved in-doors during non-business hours and (vi) Tenant will obtain the approval of the occupant of the Retail E-4 space designated on the Site Plan before conducting promotional events or tent sales in the parking lot in front of the Premises.

(b)    <u>Storage Trailers and Containers</u>.  Tenant will have the right in accordance with Laws to park storage trailers and/or containers (including, but not limited to, those associated with Tenant's grand opening activities) in Tenant's loading dock provided such trailers do not block the vehicular or pedestrian access, ingress and egress to and from the Shopping Center.

(c)    <u>Trash Dumpster</u>.  Tenant will have the exclusive right and easement, without payment of Additional Rent under this Lease, to install in compliance with Laws in the portion of the area identified on <u>Exhibit B</u> as "Dumpster Pad" either a trash dumpster or trash compactor and Landlord will not install, or permit anyone else to install, any dumpster, compactor or other equipment or facility within that 10-foot wide portion of the Common Areas located adjacent to the rear wall(s) of the Premises that is bounded on one side by the rear wall(s) of the Premises, on the opposite side by the line(s) parallel with, and 10 feet distant from, the rear wall(s) of the Premises and on each end by a 10-foot line that is the extension of a side wall of the Premises, except as shown on <u>Exhibit B</u>.  If Tenant installs such dumpster or compactor, thereafter Tenant will pay for collection of its own trash and Landlord will include only the cost of trash collection for the Common Areas in Tenant's pro rata share of Common Area Charges.  Costs incurred by Landlord in connection with trash collection for other tenants or occupants of the Shopping Center will not be included in Tenant's pro rata share of Common Area Charges if Tenant separately pays for its own trash collection.

(d)    <u>Generator Pad</u>.  Tenant will have the exclusive right and easement, without payment of Additional Rent under this Lease, to install in compliance with Laws in the portion of the area identified on <u>Exhibit B</u> as "Generator Pad" the generator pad and a generator.

(e)    <u>Satellite Systems</u>.  Tenant will have the right in accordance with Laws to install satellite communications dishes or antennae, together with ancillary equipment (collectively, the "Satellite Equipment"), upon the roof of the Premises.  Tenant will comply with all requirements of any roof warranty covering the building in which the Premises are located and will not take any action that voids or limits any such roof warranty.  Tenant's satellite antennae will be screened from view and will not be visible from other portions of the Shopping Center or from the streets or roadways adjacent to the Shopping Center.  The satellite antennae will be installed and maintained by Tenant (i) at its sole cost and expense in accordance with Laws and the terms of this Lease; (ii) in a manner that does not unreasonably interfere with the businesses being conducted (or satellite dishes operated) by other tenants of the Shopping Center; and (iii) so as to maintain in full force and effect any applicable roof and/or construction-related warranties, failing which Tenant will reimburse Landlord for any costs and expenses incurred by Landlord as a result of such failure.  In addition, Tenant will defend, indemnify and hold Landlord harmless from and against any claims, costs and expenses incurred by Landlord as a result of such installation by Tenant or in any other manner in connection with such Satellite Equipment including, but not limited to, all costs and expenses relating to the roof and/or wall penetrations.  Any satellite antennae installed will be used only by Tenant in connection with its use of the Premises (that is, Tenant may not permit third parties to place a satellite antennae upon the Premises for use by or for the benefit of any such third party).  Upon the termination of this Lease, Tenant will remove the Satellite Equipment at its sole cost and expense and repair any damage to the roof occasioned by such removal.

4.2    **Parking Areas**.  At Landlord's sole cost and expense, Landlord will provide parking areas for the use of the customers, invitees and employees of Tenant, consisting of paved areas immediately adjacent to the stores in the Shopping Center, as shown on <u>Exhibit B</u> to this Lease.  The number of parking spaces will never be less than the ratios of four parking spaces per 1,000 square feet of Floor Area of all premises in the Shopping Center, with a sufficient number of reserved handicap parking spaces to satisfy the requirements of Laws.  No charge will ever be made (or permitted) by Landlord to any person for the privilege of parking vehicles in the parking areas.  The parking areas will have adequate unobstructed entrances and exits to all thoroughfares adjacent to the Shopping Center.  Pick-up and delivery areas and access to such areas will be clearly delineated.  Landlord will provide illumination at all points within open parking and walking areas equal to that of first class shopping centers in the market area.  Landlord will use Landlord's best efforts to prevent unauthorized use of the parking areas by parties other than tenants of the Shopping Center and their customers, invitees and employees.

4.3    **Maintenance of Common Areas**.  At all times during the Term, Landlord will maintain the Common Areas and all mechanical and lighting equipment, the pylon and/or monument signs and drainage facilities thereon in safe and secure first class order, condition and repair and will keep the Common Areas clean and free from rubbish, ice and snow and cause the Common Areas and the pylon and/or monument signs to be well lit during

at least such hours as Tenant is open for business and for 30 minutes after Tenant's store is closed for business. Landlord will maintain and repaint any directional signs, markers and parking space lines as often as necessary. Landlord will maintain surfaces of sidewalks and parking areas, in a level and smooth condition with the type of surfacing material originally installed thereon.  Landlord will also maintain in accordance with Laws the landscaping on and about the Shopping Center in a manner which will not materially obstruct the visibility of Tenant's storefront and the storefront, pylon and monument signs permitted by Laws, including in such maintenance the trimming and thinning of trees. Landlord will also maintain or cause to be maintained all parts of the Shopping Center outside the Premises, i.e. the other buildings in the Shopping Center, in good order, condition and repair subject to reasonable wear and tear and damage resulting from Casualty or condemnation. Except to the extent required by emergency, Landlord will not undertake any major repairs or replacements of the Common Areas (such as parking lot repaving or resurfacing) during the period from November 1 through January 15.

        **4.4**      **Development Restrictions**.

        (a)      Protected Accessways.  Landlord will not cause or permit any material change in the size, location or configuration of the curb cuts (points of access), driveways, drive aisles or service drives identified as the "**Protected Accessways**" on Exhibit B from those shown on Exhibit B.

        (b)      No Build Area.  Landlord will not construct, or allow any other party to construct, any buildings or improvements in the "**No Build Area**" identified on Exhibit B, other than such buildings or improvements as may be shown in the No Build Area on Exhibit B.  In addition, Landlord will not permit the staging of construction for any other party in the No Build Area designated on Exhibit B, and such construction may only be staged in the area designated as "**Staging Area**" on Exhibit B and such Staging Area shall be enclosed with a six foot high chain link fence. No construction activity will interfere in any way with the Protected Accessways.

        (c)      Outlot Building Size and Height.  Landlord will not construct, or allow any other party to construct, any building on any of the outlots or pads identified as the "**Restricted Outlots**" on Exhibit B that exceeds 21,000 square feet on the ground floor and 21,000 on the second floor, for a total of 42,000 square feet of Floor Area in size or 42 feet in height.

        (d)      Changes to REA.  Landlord will not agree to any change to the REA that would materially and adversely affect Tenant's rights or obligations under this Lease without obtaining Tenant's prior written consent.

        (e)      Building Storefront Elevations.  Landlord will not construct, or allow any other party to construct, any building in the Shopping Center with a storefront elevation that is higher than Tenant's storefront elevation , except as shown on Exhibit L attached hereto and made a part hereof.

        **4.5**      **Employee Parking**.  Landlord will designate, and may from time to time change the designation of, the particular parking areas in the Shopping Center to be used by the employees of the various occupants of the Shopping Center ("**Employee Parking Areas**"); provided that any requirement by Landlord that employees park in the Employee Parking Areas will be uniformly imposed upon all tenants of the Shopping Center.  Landlord agrees that any designated Employee Parking Areas will impose no unreasonable burden upon the employees of Tenant and will impose no greater safety or security risk upon Tenant's employees than any other parking areas of the Shopping Center. Any employee parking behind Shopping Center buildings will not be deemed a violation of this Section 4.5. Landlord will have no obligation to enforce such employee parking requirements against individual employees, but Landlord will include and enforce the foregoing employee requirements in all leases with other tenants of the Shopping Center which are executed after the Effective Date hereof.

        **4.6**      **Minimum Clearance**.  Landlord acknowledges that Tenant's standard delivery trailers require a height clearance of not less than 13'6" ("**Minimum Clearance**").  Landlord will, at Landlord's sole cost and expense, take such action as may be necessary or appropriate to achieve the Minimum Clearance at all points within the Common Areas, at the commencement of the Term and throughout the remainder of the Term.

**5.**      **INSURANCE AND INDEMNITIES**

        **5.1**      **Tenant's Insurance**.  From the date on which Tenant commences Tenant's Work until the end of the Term, Tenant will maintain the following coverages:  (a) commercial general liability insurance on an occurrence basis against claims on account of bodily injury, death or property damage incurred on the Premises or arising from sidewalk, promotional events or tent sales conducted by Tenant hereunder.  Such insurance policy will name Landlord as an additional insured and will have a combined single limit of not less than $5,000,000 per occurrence; and (b) fire and extended coverage (also known as special form property insurance) on Tenant's furniture, trade fixtures, equipment, and merchandise in or on the Premises, in an amount acceptable to Tenant; provided, however, that (i) at any time that Tenant has a net worth of at least $100,000,000, Tenant may in its sole discretion self insure up to $500,000 per occurrence of such commercial general liability coverage, (ii) at any time that Tenant has a net worth of at least $100,000,000, Tenant may in its sole discretion self insure all or any portion of such commercial general liability coverage, and (iii) at any time Tenant may in its sole discretion self insure all or any portion of such fire and extended coverage provided Tenant complies with all requirements set forth herein.  All such insurance may be carried in a single policy or a combination of primary and excess liability policies or under a blanket policy covering the Premises and any of Tenant's other stores (provided that Tenant must furnish Landlord with evidence satisfactory to Landlord of the existence of such blanket policy and that the aforesaid minimum limits apply to each occurrence covered by such blanket policy and afford the same protection as would be provided under an individual policy meeting the requirements thereof) and be written by a company authorized to do business in the state of the location of the Premises. The liability policy will provide contractual coverage by endorsement or its



**ALL
THINGS
SPORTING
GOOD**℠

**Via UPS**

February 4, 2014

Deno P. Dikeou
c/o Dikeou Realty
543 N Wymore Road, Suite 106
Maitland, Fl 32751
Attn: Rachel Jessee

RE:    TSA Store #368 – Waterford Towers Shopping Center | 610 N. Alafaya Trail, Orlando, FL 32828

Dear Landlord:

The above-referenced location has been selected for non-structural interior alterations.  For your reference and convenience, Tenant has enclosed renderings of the interior work.  Tenant will commence the interior work in March 2014.  Tenant shall hold the Landlord and its agent harmless from and against all liability that may arise as a result of the work on the Shopping Center Property.

Please contact me directly at 720-475-2638 or jgeoffroy@sportsauthority.com if you have any questions or concerns about the upcoming work.


Sincerely,

TSA Stores, Inc.


Jennifer Geoffroy
Property Manager

Enclosure


sportsauthority.com
P 303.200.5050

1050 West Hampden Avenue
Englewood, CO 80110

equivalent in the form customarily available for commercial general liability policies. Tenant will provide to Landlord a certificate from Tenant's insurer evidencing the coverage required hereunder, which certificate with respect to property insurance will include the waiver of subrogation required by the provisions of Section 5.4.

**5.2   Landlord's Insurance.**

(a)   Property Insurance. From the date on which Landlord commences Landlord's Work until the end of the Term, Landlord will maintain fire and extended coverage insurance (also known as special form property insurance) (not excluding from coverage perils normally included within the definitions of extended coverage, vandalism and malicious mischief) insuring the buildings and other structures (including all improvements, alterations, additions and changes thereto) which are located within the Shopping Center, including, without limitation, the building in which the Premises is located, in the amount of 100% of the replacement cost (excluding excavations and foundations), with endorsements for contingent liability from operation of building laws, increased cost of construction, and demolition costs which may be necessary to comply with building laws; provided, however, that Landlord will have no obligation to insure Tenant's Satellite Equipment. The insurance required hereby will be written by a company authorized to do business in the state of the location of the Premises. Landlord's property insurance may be carried in a single policy or a combination of primary and excess policies or under a blanket policy including the Shopping Center, provided that Landlord must furnish Tenant with evidence satisfactory to Tenant of the existence of such blanket policy and that such blanket policy specifically includes the Shopping Center and that the aforesaid minimum limits apply to each occurrence covered by such blanket policy and afford the same protection as would be provided under an individual policy and will permit or include a waiver of subrogation in favor of Tenant consistent with the provisions of Section 5.4. Landlord will be responsible for determining the amount of property insurance to be maintained, but such coverage will be on an agreed value basis to eliminate the effects of co-insurance. Landlord will provide to Tenant a certificate evidencing such coverage.

(b)   Liability Insurance. From the date on which Landlord commences Landlord's Work until the end of the Term, Landlord will also maintain commercial general liability insurance on an occurrence basis against claims on account of bodily injury, death or property damage incurred upon any part of the Common Areas. Such insurance policy will name Tenant as an additional insured, have combined single limits of not less than $5,000,000 per occurrence and include contractually assumed liability coverage. The insurance required hereby will be written by a company authorized to do business in the state of the location of the Premises and may be carried in a single policy or combination of primary and excess liability including the Shopping Center, provided that Landlord must furnish Tenant with evidence satisfactory to Tenant of the existence of such blanket policy and that the aforesaid minimum limits apply to each occurrence covered by such blanket policy and afford the same protection as would be provided under an individual policy. Landlord will provide to Tenant a certificate from Landlord's insurer evidencing such coverage.

(c)   Proceeds from Property Insurance. The proceeds of Landlord's property insurance in case of loss or damage will be escrowed with Landlord's lender and applied on account of the obligation of Landlord to repair and restore the damaged or destroyed buildings and improvements in accordance with Section 12.

**5.3   Indemnities.**

(a)   Tenant's Indemnity. Subject to Section 5.4, Tenant agrees to indemnify, defend and hold Landlord and Landlord's shareholders, officers, directors, partners, members, managers and employees harmless from and against any and all claims, actions, damages, liabilities and expenses (including, without limitation, reasonable attorneys' fees and expenses) allegedly or actually (i) arising from or out of any accident or occurrence on the Premises or any part thereof, or (ii) occasioned by any act or omission of Tenant or Tenant's employees, agents, contractors, subtenants, licensees or concessionaires, except to the extent that any of the same arise from or out of the negligence or willful misconduct of Landlord or Landlord's employees, agents or contractors.

(b)   Landlord's Indemnity. Subject to Section 5.4, Landlord agrees to indemnify, defend and hold Tenant and Tenant's shareholders, officers, directors, partners, members, managers, employees, subtenants, licensees and concessionaires harmless from and against any and all claims, actions, damages, liabilities and expenses (including, without limitation, reasonable attorneys' fees and expenses) allegedly or actually (i) arising from or out of any accident or occurrence on the Common Areas or any part thereof, or (ii) occasioned by any act or omission of Landlord or Landlord's employees, agents or contractors, except to the extent that any of the same arise from or out of the negligence or willful misconduct of Tenant or Tenant's employees, agents, contractors, subtenants, licensees or concessionaires.

**5.4   Waiver of Subrogation.** Landlord and Tenant each hereby expressly waives any and every claim which arises or may arise in such party's favor against the other party and the other party's shareholders, officers, directors, partners, members, managers and employees during the Term for any and all loss of or damage to any of such party's property, located within or upon or constituting a part of, the Premises or Shopping Center, which loss or damage is caused by a peril required by this Lease to be covered by the insurance (or self-insurance) of the party incurring the loss to the extent of the required coverage or, if greater, to the extent of the actual recovery under any insurance policy covering the party incurring the loss. Landlord and Tenant each also hereby waives on behalf of any insurer providing insurance to such party, any right of subrogation which such insurer might otherwise acquire against the other party or the shareholders, officers, directors, partners, members, managers or employees of either party by virtue of losses to Landlord or Tenant the claims for which are waived by the preceding sentence.

## 6.    MAINTENANCE OF PREMISES

**6.1    Landlord's Obligations.** At Landlord's sole cost and expense, Landlord will maintain, repair and replace all structural components of the Premises (including, but not limited to, the foundation and bearing walls but excluding the roof structure), the exterior walls, floor slab (and, to the extent repair is required due to the condition of the slab or conditions under the slab, the floor coverings), all plumbing, wiring and other utility facilities beneath the floor slab of the Premises, all plumbing, wiring and other utility facilities serving the Premises up to their points of connection to the meter for such utilities serving the Premises, and such portions of the Premises required to be maintained by Landlord under Section 6.2, as necessary to keep the same in good order, condition and repair, ordinary wear and tear and damage by casualty and condemnation excepted. Tenant, and not Landlord, will make repairs otherwise required to be performed by Landlord by this Section 6.1 if such repair is necessitated by the negligence of Tenant or Tenant's employees, agents or contractors, unless the waiver provisions of Section 5.4 apply. If the performance of any repair required to be made by Landlord pursuant to this Lease precludes the normal operation of Tenant's business from all or any portion of the Premises, then Rent will equitably abate during the performance of such repair in proportion to the nature and extent of the interference with Tenant's normal operation.

**6.2    Tenant's Obligations.** At Tenant's sole cost and expense, Tenant will maintain, repair and replace the roof structure, the gutters, downspouts and canopies of the Premises, the interior of the Premises, except as set forth in Section 6.1 (including, without limitation, the plumbing, wiring, fire sprinkler systems, and other utility facilities inside of the Premises, except as set forth in Section 6.1), the windows, doors and plate glass of the Premises and, except as set forth in Section 6.3, the heating, ventilating and air conditioning system serving the Premises ("HVAC System"), as necessary to keep the same in good, clean and safe order, condition and repair, ordinary wear and tear and damage by casualty and condemnation excepted. Landlord, and not Tenant, will make repairs otherwise required to be performed by Tenant by this Section 6.2 if such repair is covered by any construction or product warranty of Landlord or is necessitated by (a) the negligence of Landlord or Landlord's employees, agents or contractors, unless the waiver provisions of Section 5.4 apply, (b) shifting or settling of the building containing the Premises, (c) a failure by Landlord to perform maintenance or make repairs required under Section 6.1, or (d) any structural problems which may arise in the Shopping Center which affect the Premises. As provided in this Section 6.2, during the Term of this Lease, as may be extended, Tenant will maintain and replace the roof of the Premises as necessary to keep the same in good order, condition and repair; provided, however, if Tenant is required to replace the roof of the Premises during any Extension of this Lease, upon the expiration or earlier termination of this Lease, the Landlord will reimburse Tenant for the unamortized portion of the costs to replace the roof using a 15-year straight line depreciation method. Accordingly, if the roof needs to be replaced at a cost of $100,000 with three years remaining in the First Extension Option, and Tenant elects not to exercise the Second Extension, Tenant may charge to Landlord $80,000.04, as such amount is the product of $100,000.00 multiplied by (i) one minus (ii) the fraction having a numerator of three (the years remaining in the then existing term) and having a denominator of 15 (the useful life of the replacement agreed to above). Such reimbursement will be made by Landlord to Tenant within six months following the expiration of the Term or the earlier termination of this Lease. Notwithstanding the foregoing, Landlord will not have an obligation to reimburse Tenant for the unamortized portion of the cost to replace the roof if Tenant, after the roof is replaced, assigns this Lease or subleases the entirety of the Premises; provided, however, that Tenant may freely assign the Lease or sublease the Premises to an affiliate, in which case Landlord shall continue to be obligated to reimburse Tenant or such affiliate for the unamortized portion of the costs to replace the roof as set forth above. The term "affiliate" as used herein shall mean any entity directly controlled by Tenant, under the direct (through one or more levels of entities) control of Tenant or under the common direct control with Tenant. Landlord's reimbursement obligations set forth in this Section 6.2 will survive the expiration of the Term or the earlier of the termination of this Lease

**6.3    Heating, Ventilating and Air Conditioning.** As provided in Section 6.2, Tenant will repair, maintain and replace the HVAC System, as necessary to keep the same in good order, condition and repair; provided, however, if the HVAC System cannot feasibly be repaired, but requires replacement during the last three (3) years of the Term, then because the same will require a substantial expenditure by Tenant, and will result in a benefit to Landlord following the expiration of the Term, the following shall govern: upon the expiration or earlier termination of this Lease, Landlord shall reimburse Tenant for the unamortized portion of the reasonable expenses incurred by Tenant in connection with the replacement of such HVAC System during the last three (3) years of the Term, based on: (i) the date of the installation of such new equipment; and (ii) the useful life of such equipment, which is deemed to be 10 years.

**6.4    Surrender of Premises.** Upon the expiration or earlier termination of this Lease, Tenant will surrender the Premises to Landlord, broom clean and in good order and condition, ordinary wear and tear and damage by casualty excepted.

## 7.    SIGNS

**7.1    Exterior Signs.** Tenant will have the exclusive right to install on the outside walls of the Premises signs of such color, size, type, or design as may be deemed desirable by Tenant, provided that any such signs are in compliance with all Laws. Should Tenant desire to seek a variance from Laws to expand or modify the signage permitted thereby, Landlord will cooperate with Tenant in seeking same, provided that any such variance will not reduce the amount of signage available to other tenants and occupants of the Shopping Center. No later than 60 days prior to Tenant's scheduled grand opening (which date is identified in Article 2.1 of Exhibit C), Landlord will construct a pylon sign in the approximate location labeled "Pylon/Monument Sign" on Exhibit B ("Pylon/Monument Sign"). Landlord will install a double-sided sign panel in the position on the Pylon/Monument Sign shown on Exhibit K, and Tenant's sign panel may be at least as large as any other sign panel faces installed or to be installed thereon, except Kohl's. Landlord will be responsible for the fabrication, installation and maintenance

of such sign panel faces; provided, however, that Tenant will reimburse Landlord for such cost, to the extent that the cost does not exceed the cost Tenant would normally pay for the panel faces. Landlord will be responsible for the cost and expense of the Pylon/Monument Sign and sign cabinets. If Landlord erects or allows to be erected any additional pylon or monument signs for the retail tenants and occupants in the Shopping Center which are in addition to those signs shown on Exhibit B, then Landlord will permit Tenant to competitively bid with such other occupants, with the largest occupants receiving the first rights, for the right to be identified on such additional monument or pylon signs. During the Term, Tenant will not be required to remove its signs unless required to do so by Laws enacted subsequent to the date hereof. Tenant may at any time remodel or replace the sign fascia to conform with Tenant's then standard signage so long as such signage does not violate any Laws.

      **7.2**    **Other Signs.** Tenant will have the right to install temporary banner signs (such as "Future Home of [one of Tenant's tradenames]," "Opening [Date]," or "Now Open" signs), on the Premises provided the same comply with Laws. Tenant will have the right to affix window or door appliques and other treatments commonly used at Tenant's store locations, including, without limitation, those identifying Tenant's hours of operation or the credit cards accepted by Tenant, reasonably sized and professionally prepared and reasonable in number. Tenant will remove all signs and appliques at the termination of this Lease, and will repair any damage caused by such removal.

## 8.   TITLE TO PREMISES

      **8.1**    **Ownership of Premises.** Landlord represents and warrants to Tenant that, subject to the terms of Exhibit C Landlord is the owner of the Premises and the Shopping Center, that there are no other individuals or entities having an ownership interest in the Premises or the Shopping Center whatsoever except as expressly stated in this Lease and that Landlord has full right, power and authority, corporate and otherwise, to execute this Lease, to lease the Premises and to perform the obligations of Landlord under this Lease. Prior to the Effective Date, Landlord delivered to Tenant a current commitment of title insurance or title report to evidence that Landlord has title to the Shopping Center, that such title is unencumbered by any matters other than the Permitted Encumbrances and that no liens for delinquent taxes exist against the Shopping Center.

      **8.2**    **Covenant of Quiet Enjoyment.** Landlord covenants that, subject to Section 14.1, Tenant will be entitled to peaceably and quietly enjoy the Premises and all rights and appurtenances thereto during the Term, without molestation or hindrance of any person whomsoever.

      **8.3**    **Non-Disturbance Agreement.** Within 60 days of the Effective Date, Landlord will deliver to Tenant agreements of non-disturbance from all lienholders or underlying landlords of the Premises in the form and substance of Exhibit E. If Landlord fails to deliver such agreements of nondisturbance to Tenant within 60 days from the Effective Date, Tenant will have the right at any time thereafter, until same is received and in addition to other remedies available to Tenant, to terminate this Lease by notice to Landlord. Tenant will also execute any such non-disturbance agreement in the form and substance of Exhibit E to assure such lienholder or underlying landlord of Tenant's attornment to such lienholder or underlying landlord in accordance with the terms hereof.

      **8.4**    **Restrictions.** Landlord represents and warrants to Tenant that (a) to Landlord's actual knowledge, Tenant's use of the Premises as a retail sporting goods store (or for any other retail use permitted under this Lease and not prohibited by Laws) in accordance with the terms of this Lease, and Tenant's use of the Common Areas for access, parking and signage purposes in accordance with the terms of this Lease, will not be prevented or materially impaired by any zoning or other Laws or restrictions, (b) Landlord's title to the Premises is subject to the Permitted Encumbrances, but none of the Permitted Encumbrances prohibits the use of the Premises as a retail sporting goods store, (c) no joinder or approval of another person is required with respect to Landlord's right and authority to enter into this Lease, (d) the terms and conditions of this Lease, including the exhibits attached hereto, are in compliance with and do not violate the provisions of the Permitted Encumbrances, (e) any approvals required pursuant to the Permitted Encumbrances have been obtained, and (f) all approvals required from any underlying landlords have been obtained.

## 9.   COMPLIANCE

      **9.1**    **As to Premises.** Tenant will, at Tenant's sole cost and expense, comply with all Laws which affect the carrying on of the business being conducted in the Premises, as distinguished from the physical facilities in which such business is being conducted. Tenant will also bear the expense of any alterations or improvements or repairs to any portion of the Premises ordered by any Governmental Authority, to the extent the portion of, or system within, the Premises that requires such alteration or improvement pursuant to Laws constitutes a portion or system of the Premises the repair and maintenance of which is Tenant's responsibility pursuant to Section 6.2. Landlord will bear the expense of any alterations or improvements or repairs to the Premises ordered by any Governmental Authority to the extent the portion of, or system within, the Premises that requires such alteration or improvement pursuant to Laws constitutes a portion or system of the Premises the maintenance and repair of which is Landlord's responsibility pursuant to Section 6.1, unless such alterations or improvements or repairs (a) would not have been required but for the specific type of business conducted in the Premises by Tenant or the specific manner in which Tenant is conducting Tenant's business in the Premises, or (b) are required solely by virtue of any alterations undertaken by Tenant pursuant to Section 10.1, which shall be Tenant's responsibility.

      **9.2**    **As to Common Areas.** Landlord will, at Landlord's sole cost and expense (subject to Tenant's obligations, if any, to reimburse Landlord as part of Common Area Charges as specifically set forth in this Lease), take such action as may be necessary or appropriate to cause the Premises at the commencement of the Term, and the Common Areas and other portions of the Shopping Center outside the Premises throughout the entire Term, to comply with all Laws of all Governmental Authorities having jurisdiction over the Shopping Center.

      14

**9.3    As to Hazardous Materials**.

(a)    Landlord's Obligations. Prior to the Effective Date, Landlord delivered to Tenant a copy of Landlord's most recent Phase I environmental assessment report dated April 2004 and prepared by Armor Environmental, Inc. concerning the Shopping Center and a reliance letter from the consultant who prepared such report entitling Tenant to rely on it ("**Environmental Report**"). Landlord represents and warrants that (i) upon the Pad Delivery Date the Prepared Pad will be in compliance with all Environmental Laws; and (ii) except as set forth in the Environmental Report, upon completion of the balance of Landlord's construction obligations under Exhibit C, there will be no Hazardous Materials in, on or about the Premises or Shopping Center. During the Term, Landlord will not use, generate, place, store, release or otherwise dispose of, or permit the use, generation, placing, storage, release or disposal of, Hazardous Materials in the Shopping Center, except in accordance with all Environmental Laws. If during the Term Hazardous Materials are discovered in any portion of the Shopping Center or the Premises, then unless Tenant is responsible for the remediation of such Hazardous Materials pursuant to Section 9.3(b), Landlord will promptly undertake or cause to be undertaken remediation or removal of the Hazardous Materials in accordance with all Environmental Laws. If the presence of any Hazardous Materials that Landlord is required to remediate or remove pursuant to this Lease or the remediation or removal thereof precludes the normal operation of Tenant's business from all or any portion of the Premises, then (A) Rent will equitably abate during the performance of such remediation or removal in proportion to the nature and extent of the interference with Tenant's normal operation, and (B) if Tenant is precluded from operating its business from 20% or more of the Premises for more than 90 days, Tenant may terminate this Lease by giving Landlord 30 days prior notice, unless Landlord completes the remediation or removal before the expiration of such 30-day period. Landlord will indemnify, defend and hold Tenant and the shareholders, officers, directors, partners, members, managers, employees, agents, contractors, subtenants, assignees, licensees, concessionaires and customers ("**Affiliated Parties**") of Tenant harmless from and against, and reimburse Tenant and Tenant's Affiliated Parties for, all "Hazardous Materials Liabilities" (as defined in Section 9.3(c)) asserted against or incurred by Tenant or Tenant's Affiliated Parties arising out of a breach of the representations, warranties or covenants set forth in this Section 9.3(a).

(b)    Tenant's Obligations. During the Term and during the performance of Tenant's Work as described in Exhibit C, Tenant will not use, generate, place, store, release or otherwise dispose of Hazardous Materials in the Premises or Shopping Center, except in accordance with all Environmental Laws. In the event of a breach of the foregoing, Tenant will promptly undertake remediation or removal in accordance with all Environmental Laws. Tenant will also remediate or remove any mold discovered on or about the Premises during the Term to the extent such mold was caused by the activities of Tenant or its employees, agents or contractors. Tenant will indemnify, defend and hold Landlord and Landlord's Affiliated Parties harmless from and against, and reimburse Landlord and Landlord's Affiliated Parties for, all Hazardous Materials Liabilities asserted against or incurred by Landlord or Landlord's Affiliated Parties as a result of a breach of Tenant's obligations and covenants under this Section 9.3(b).

(c)    Hazardous Materials Liabilities. The term "**Hazardous Materials Liabilities**" as used herein means all claims, damages, losses, forfeitures, expenses or liabilities arising from or caused in whole or in part, directly or indirectly, by a breach by the other party of its representations, warranties or covenants under Section 9.3(a) or (b), including, without limitation, all costs of defense (including reasonable attorneys' fees and other costs of litigation, at the pre-trial, trial, bankruptcy and appellate levels), all consultants' fees, and all costs of investigation, repair, remediation, restoration, cleanup, detoxification or decontamination, and/or preparation and implementation of any closure, remedial action or other required plan.

(d)    Survival. The provisions of this Section 9.3 will survive the expiration or earlier termination of this Lease.

## 10.    ALTERATIONS AND FIXTURES

**10.1    Alterations and Additions**. After completion of initial leasehold improvements, if any, Tenant will not make any exterior or structural alterations or additions to the Premises without the prior written consent of Landlord, which consent will not be unreasonably withheld. Tenant will have the right in its sole discretion to make any interior, nonstructural alterations or additions or perform any interior remodeling of a nonstructural nature, provided that (a) the same are made pursuant to all required governmental approvals, (b) the same do not materially or adversely affect the structural integrity of the building in which the Premises are located; (c) conceptual plans and specifications for such work will be provided to Landlord in advance; and (d) the same are made in substantial conformance with the final plans and specifications for such work. All alterations and additions to the Premises by Tenant must be made in accordance with all Laws and, except, as specified in Section 10.2, will remain at the end of the Term for the benefit of Landlord.

**10.2    Fixtures**. Any trade fixtures, machinery, equipment, shelving, trash compactors, cash registers, signs and other personal property of Tenant will remain the property of Tenant and Landlord agrees that Tenant will have the right, at any time and from time to time during the Term, to remove any of the same which Tenant may have stored or installed in the Premises. Any floor covering which may be cemented or otherwise adhesively affixed to the floor, any electrical and plumbing system and the HVAC System will remain upon the Premises and at the expiration or earlier termination of the Term will be surrendered with the Premises as a part thereof. Tenant, at Tenant's sole cost and expense, will immediately repair any damage occasioned to the Premises by reason of the removal of any such trade fixtures, machinery, equipment, signs and other personal property. All other improvements made by Tenant to the Premises, including, but not limited to, floor coverings, carpeting and partitions, will become the property of Landlord upon expiration or earlier termination of this Lease. In any event, any trade fixtures, equipment, furniture and other personal property which remain on the Premises following the

expiration or earlier termination of the Term, at Landlord's option, may thereafter be removed and stored at the cost of Tenant, or retained as the property of Landlord or sold or otherwise disposed of by Landlord, in any such case without any liability to or recourse by Tenant or anyone claiming by, through or under Tenant.

**10.3    Liens.**  Tenant will promptly pay for all materials supplied for Tenant and work done for Tenant with respect to the Demised Premises so as to ensure that no lien is filed against any portion of the Shopping Center or Landlord or Tenant's interest therein. If a lien is filed, Tenant will pay, discharge or otherwise secure such lien at its expense within 30 days after receipt by Tenant of notice thereof, failing which Landlord may at its option discharge the lien by paying the amount claimed to be due in court or directly to the lien claimant and the amount so paid, together with all reasonable expenses of Landlord, including reasonable legal fees and court costs, will be paid by Tenant to Landlord as Additional Rent. Nothing contained in this Lease shall be deemed or construed in any way as constituting the consent or request of Landlord, express or implied, by inference or otherwise, to any architect, engineer, surveyor, contractor, subcontractor, laborer, materialmen or mechanic for the performance of any labor or the furnishing of any materials or services requested by Tenant for or in connection with the Demised Premises of the building of which the Demised Premises are a part. Notice is hereby given that Landlord shall not be liable for any labor or materials or services furnished or to be furnished to Tenant upon credit, and that no construction or other lien for such labor, materials or services shall attach to or affect the fee or reversionary or other estate or interest of Landlord in the Demised Premises or the building of which the Demised Premises are a part or in this Lease. All persons dealing with the Demised Premises or the building of which the Demised Premises are a part and with the Tenant are hereby put on notice that Tenant does not have the power to deal with the Demised Premises or the building of which the Demised Premises are a part in such a manner as to authorize the creation of construction liens, by implication or otherwise; and all persons making improvements to the Demised Premises or the building of which the Demised Premises are a part, either by doing work or labor or services or by supplying materials thereto, at the request of Tenant or persons dealing by, through or under Tenant are hereby put upon notice that they must look solely to Tenant and not to the Demised Premises or the building of which the Demised Premises are a part, or any part thereof or to the improvements or to this Lease for the payment of all services, labor and materials performed upon or delivered to the Demised Premises or the building of which the Demised Premises are a part.

**10.4    Definition for Purposes of Section 10.3.**  For purposes of Section 10.3, Demised Premises shall mean the Premises.

**11.    ASSIGNMENT AND SUBLETTING**

**11.1    Permitted Assignment and Subletting.**  Tenant will have the right at any time during the Term, without the consent of Landlord, to sublet the Premises or any portion thereof or to transfer or assign Tenant's interest in this Lease to any person or entity, provided that the use made of the Premises by any such subtenant or assignee (a) complies with the provisions of Sections 16.2, 16.3 and 16.4 and (b) the Premises may not be divided into more than two separately demised premises. Upon any assignment of the Lease or subletting of the Premises, Tenant will remain liable for all of its obligations hereunder; provided, however, if, pursuant to Section 11.2, Landlord recaptures the entirety of the Premises, Tenant will be released from all obligations hereunder that arise from and after the termination date. Whether or not Landlord elects to recapture the Premises will be in Landlord's sole discretion.

In the event Tenant wishes to assign or sublet all or a portion of the Premises, Tenant will give Landlord notice thereof ("**Tenant's Assign/Sublet Notice**") together with (i) the name and address of the proposed assignee or subtenant; (ii) the basic terms of the proposed assignment or sublease, and (iii) any information in Tenant's possession regarding the business history and financial condition of the proposed assignee or subtenant and its proposed initial use of the Premises. Following Landlord's receipt of Tenant's Assign/Sublet Notice accompanied by the information pertaining to such assignment or subletting, Landlord shall have the right to recapture the Premises by terminating this Lease as hereinafter provided (except as its related to Permitted Transfer, as defined below). If Landlord elects to exercise its aforesaid right to recapture, it must do so by giving Tenant written notice thereof ("**Landlord's Recapture Notice**") within 30 days after its receipt of Tenant's Assign/Sublet Notice, or Landlord's recapture right will be deemed waived. The effective date of any such recapture and termination of the Lease shall be the earlier of (i) the date Tenant vacates and relinquishes possession of the Premises to Landlord, (ii) the date set forth in Landlord's Recapture Notice, or (iii) the date that is 120 days after the date of Landlord's Recapture Notice. If this Lease is terminated by Landlord pursuant to Landlord's recapture right, Tenant will have no further liability under this Lease, except for liability accruing prior to the effective date of such termination. If Landlord fails to timely exercise its right to recapture the Premises as aforesaid, Tenant will thereafter be allowed to assign this Lease or sublet the Premises to the proposed subtenant or assignee without any further consent or approval of Landlord. Notwithstanding the foregoing, if any such proposed subletting is for a portion of the Premises, Landlord's right to recapture will be limited to such proposed sublet area only, and this Lease will continue with respect to the remaining portion of the Premises, but the rental and additional rental provisions hereof will be adjusted based upon the ratio that the area of the remaining space bears to the area of the Premises prior to Landlord's recapture, and Tenant's other obligations hereunder will only be applicable to the remaining space, and the term "Premises" as used in this Lease will thereafter be defined as the remaining space. If Landlord does not elect to recapture the Premises or the portion to be transferred, if the right of recapture pertains to a portion of the Premises, then the Lease will continue in full force and effect as to the entire Premises.

Notwithstanding the foregoing, Tenant may, without triggering Landlord's recapture rights set forth above, assign the Lease, or any part thereof, or sublease the Premises, in whole or in part, to any of the following (each a "**Permitted Transfer**"): (i) a parent, subsidiary, affiliate or corporation which has the power to direct Tenant's management and operation, or any corporation whose management and operation is controlled by Tenant; or (ii) any corporation a majority of whose voting stock is owned by Tenant; or (iii) any corporation in which or with which Tenant, its corporate successors or assigns, is merged or consolidated, in accordance with applicable statutory

provision for merger or consolidation of corporations, so long as the liabilities of the corporations participating in such merger or consolidation are assumed by the corporation surviving such merger or created by such consolidation; or (iv) any corporation acquiring this Lease and all or substantially all of Tenant's assets; or (v) any corporate successor to a successor corporation becoming such by either of the methods described in subsections (iii) or (iv); or (vi) a transaction with any entity (or merger of a group of entities) which is acquiring a majority of Tenant's other stores in the State of Florida or more than three stores. The term "affiliate" as used herein shall mean any entity directly controlled by Tenant, under the direct (through one or more levels of entities) control of Tenant or under the common direct control with Tenant. In addition, notwithstanding the foregoing, Tenant may, without triggering Landlord's recapture rights set forth above, sublease or license departments or grant concessions giving other persons, firms or corporations the right to sell goods, wares, merchandise and services in and from the Premises as an integrated part of Tenant's business.

**11.2    Recognition.** If for any reason this Lease is terminated prior to the expiration of the Term, Landlord agrees such termination will not result in a termination of any "Qualified Sublease" (as defined below) and any Qualified Sublease will continue for the duration of its term and any extensions thereof as a direct lease between Landlord and the subtenant thereunder, with the same force and effect as if Landlord had originally entered into such sublease as the landlord thereunder. Landlord will execute an instrument evidencing Landlord's agreement to recognize a particular Qualified Sublease in accordance with foregoing provisions within 10 days after notice from Tenant that the subtenant thereunder has requested such an instrument. As used herein, a **"Qualified Sublease"** means a sublease entered into between Tenant and a subtenant (a) that demises a portion of the Premises that contains at least 10,000 square feet of Floor Area, (b) the term of which (including any extension options) does not extend beyond the existing Term of this Lease (including any then-exercised Extensions) at the time such sublease is signed, (c) after the execution of which there remains no portion of the Premises that has not been sublet and is not marketable due to its configuration; (d) that is a first-class nationally or regionally recognized retailer that has a net worth of not less than $25,000,000.00 at the effective date of the sublease and Tenant furnishes Landlord with evidence of such net worth; (e) the portion of the Premises being subleased will be contiguous to either side exterior wall of the Premises or to any other subleased premises and will have a rear door exit; (f) such sublease either (A) obligates the subtenant(s) to pay Base Rent and all other monetary obligations in an amount not less than a proportionate share of the Base Rent and all other monetary obligations of Tenant payable under this Lease (which proportionate share will be based upon the Floor Area of the Premises sublet by a subtenant as compared to the total Floor Area of the Premises), or (B) obligates the subtenant to agree with Landlord in the non-disturbance agreement that if the subtenant's monetary obligations to Tenant are less than that described in subsection (A) above, then upon termination of this Lease, subtenant's monetary obligations to Landlord shall equal (or, in the case of a partial sublease, equal a proportionate share of) Tenant's monetary obligations under this Lease; (g) the sublease will not impose any greater obligations upon Landlord than are set forth in this Lease; and (h) the sublease will not afford the subtenant any greater remedies against Landlord than those provided in this Lease to Tenant for a Landlord default.

## 12.    DESTRUCTION OF PREMISES

**12.1    Notice of Damage and Estimated Repair Time.** If the Premises or the Shopping Center is damaged or destroyed by fire or other casualty ("**Casualty**"), Landlord will, within 45 days after the date of the Casualty, notify Tenant ("**Landlord's Casualty Notice**") of (a) the percentage of the total Floor Area in the Shopping Center and the percentage of the total Floor Area in the Premises that were damaged or destroyed by the Casualty, and (b) the number of days, from the date of the Casualty (taking into account no more than 90 days from the date of Casualty for completion of all insurance adjustments), that an architect, engineer or contractor selected by Landlord estimates will be required to complete the repair and restoration. If neither Tenant, pursuant to Section 12.2, nor Landlord, pursuant to Section 12.3, elects to terminate this Lease, then the damage or destruction will, at the expense of Landlord, be repaired and restored. Tenant acknowledges and agrees that Landlord's lender may hold any insurance proceeds in escrow in accordance with Laws; provided, however, any such escrow will not relieve Landlord of its obligation to repair and restore the Premises set forth herein.

**12.2    Tenant's Right to Terminate.** If (a) the Premises or such portion of the Common Areas as would substantially and adversely affect access to, or parking for, the Premises is damaged or destroyed by Casualty and Landlord's Casualty Notice estimates that it will take longer than 360 days from the date of the Casualty (taking _____ 30% into account no more than 90 days from the date of Casualty for completion of all insurance adjustments) to complete the repair and restoration, or (b) during the last two years of the Term, more than 10% of the Floor Area of the Premises is damaged or destroyed by Casualty, then Tenant will have the right to terminate this Lease, effective as of the date of the Casualty, by notice given to Landlord within 15 days after Tenant's receipt of Landlord's Casualty Notice.

**12.3    Landlord's Right to Terminate.** If (a) more than 50% of the Floor Area of the Shopping Center is damaged or destroyed by Casualty, or (b) during the last two years of the Term, more than 30% of the Floor Area of the Premises is damaged or destroyed by Casualty, then Landlord may elect to terminate this Lease effective as of the date of the Casualty by notice given to Tenant not later than 15 days after Landlord delivers Landlord's Casualty Notice to Tenant, provided that (i) in the case of clause (a) above, (A) if the Premises were damaged or destroyed by the Casualty, then Landlord also terminates the leases of all premises in the Shopping Center that were damaged or destroyed, and (B) if the Premises were not damaged or destroyed by the Casualty, then Landlord also terminates the leases of all premises in the Shopping Center, and, in either case, the portion of the Shopping Center as to which Landlord must terminate all leases (as provided above) is not reconstructed or used as a retail shopping center for a period of at least three years following the date of the Casualty, and (ii) in the case of clause (b) above, if Tenant exercises its option to extend the Term for the next Extension (if one which Tenant then has the right to exercise remains unexercised) within 15 days after delivery of Landlord's termination notice, Landlord's termination notice will be deemed null and void. Landlord's covenant to refrain from reconstructing or using as a retail shopping

center the portion of the Shopping Center as to which Landlord must terminate all leases, as provided above, will survive the termination of this Lease.

**12.4   Landlord's Repair Obligation.** Landlord's obligation will be to restore all portions of the Shopping Center (including the Premises, if applicable) affected by a Casualty (exclusive of Tenant's furniture, fixtures and equipment) to their condition immediately preceding such Casualty and will not be limited to the extent allowed by available insurance proceeds; provided, however, that Landlord will not have any obligation to restore the Retail F and Retail G buildings as shown on the Site Plan or any building that Landlord is not responsible to rebuild in accordance with the terms of its lease for such building. If Landlord for any reason whatsoever fails (a) to commence the repair and restoration work required by Section 12.1 within 60 days from the date Landlord obtains applicable building permits for same, (b) to proceed diligently to pursue the necessary building permits and complete such repair and restoration work, or (c) fails to complete same within the estimated time set forth in Landlord's Casualty Notice, plus the number of days of delay caused by "Uncontrollable Events" (as defined in Section 17.15), then in addition to any other rights or remedies available to Tenant under Section 14.2, Tenant will have the option (i) to terminate this Lease by giving Landlord notice of Tenant's election to do so at any time prior to the completion of such repairs and restoration and upon the giving of such notice, this Lease will terminate and the parties will be liable for their respective obligations to the date of termination and will have no liability for obligations arising after that date, except for those obligations which expressly survive termination, or (ii) to complete the repair and restoration work itself, in which case Landlord will make the insurance proceeds available to Tenant for the completion of such work and to the extent the insurance proceeds actually received by Tenant are insufficient to pay for all costs incurred by Tenant in connection with such work, Landlord will reimburse Tenant for all such costs within 30 days after Tenant's request and if Landlord fails to reimburse Tenant within such 30-day period, Tenant may deduct all such costs from the next accruing amounts of Rent due under this Lease.

**12.5   Abatement of Rent.** From the date of a Casualty until the earlier of (i) Tenant opening for business in the Premises, or (ii) 60 days after the date the Premises or the Shopping Center, as applicable, is Substantially Complete and possession of the Premises is delivered to Tenant, Rent will equitably abate in proportion to the nature and extent of the interference with Tenant's normal operation of its business from the Premises. If Tenant has paid any Rent in advance, Landlord will immediately repay to Tenant an amount equal to that portion of any Rent paid in advance for which payment is abated.

## 13.   EMINENT DOMAIN

**13.1   Total Taking.** If the whole of the Premises or the Shopping Center is acquired or condemned by, or transferred under threat of, eminent domain for any public or quasi-public purpose (a "**Taking**"), this Lease will terminate as of the date possession of the Premises is transferred to the condemning authority. If this Lease is terminated by virtue of a Taking, all Rent will be paid up to the date of termination of this Lease.

**13.2   Tenant's Right to Terminate.** If so much of the Premises or Common Areas is subject to a Taking that the portion of the Premises and Common Areas remaining after the Taking will be insufficient to continue Tenant's business at substantially the same scope as existed prior to the Taking, then Tenant may terminate this Lease by notice to Landlord effective as of the date possession of the Premises is transferred to the condemning authority.

**13.3   Landlord's Right to Terminate.** If so much of the Shopping Center is subject to a Taking that the portion of the Shopping Center remaining after the Taking will be insufficient to operate in an economically viable manner as a retail shopping center, or if rebuilding the remaining portion of the Shopping Center is prohibited by Laws, including zoning and building codes, then Landlord may terminate this Lease by notice to Tenant effective as of the date possession of Shopping Center is transferred to the condemning authority, provided that Landlord terminates the leases of substantially all of the other premises in the Shopping Center.

**13.4   Partial Taking of Premises.** In the event a Taking occurs and this Lease is not terminated as provided above, then Landlord will promptly restore, at Landlord's sole cost and expense (but only to the extent of condemnation proceeds received by Landlord) the Premises or Shopping Center to a condition comparable to their condition at the time of the Taking, less the portion lost in the Taking. In such event, this Lease will continue in full force and effect, except that if a portion of the Premises is taken, the Base Rent and other sums due hereunder will be reduced in a fair and equitable manner with respect to the nature, value and extent of the portion of the Premises taken.

**13.5   Award.** In the event of any condemnation or taking, whether partial or total, each party will have the right to claim and recover from the condemning authority the amount of actual provable damage to such party.

## 14.   DEFAULT

**14.1   Tenant's Default.** Each of the following events will be deemed to be an event of default by Tenant under this Lease ("**Event of Default**"): (a) failure by Tenant to pay any Rent if such failure continues for 15 days after receipt by Tenant of notice from Landlord specifying such default; or (b) failure by Tenant to perform or observe any of Tenant's nonmonetary covenants contained in this Lease within 30 days after receipt by Tenant of notice from Landlord specifying the failure (or such additional period, if any, as may be reasonably required to cure the failure if the failure reasonably cannot be cured within a 30-day period, provided Tenant commences to cure such within 30 days after receipt of notice and thereafter diligently pursues such cure to completion); or (c) the commencement of any of the following actions or proceedings provided that such proceedings are not dismissed within 60 days after commencement: (i) a proceeding by execution or otherwise by Laws for the taking of the estate created herein; (ii) a judicial proceeding declaring Tenant bankrupt or insolvent in accordance with Laws; (iii) an

assignment of Tenant's property for the benefit of creditors; (iv) the appointment by a court of competent jurisdiction of a receiver, guardian, conservator, trustee in involuntary bankruptcy or other similar officer to take charge of all or a substantial part of Tenant's property; (v) the filing of a petition for the reorganization of Tenant under any provisions of the Bankruptcy Code or any other Laws now in effect or hereafter enacted; or (vi) the filing of a petition by Tenant for reorganization or for rearrangement under, or otherwise availing itself, of any provision of the Bankruptcy Code, or any other Laws now in effect or hereafter enacted which provides a plan or other means for a debtor to settle, satisfy or extend the time for the payment of its debt. On the occurrence of any Event of Default, in addition to all remedies at law or in equity (excepting the remedy of acceleration of rent which Landlord expressly waives), Landlord will have the option to terminate this Lease, terminate Tenant's right to possession without terminating this Lease, or cure the Event of Default on behalf of Tenant. If Landlord cures an Event of Default on behalf of Tenant, Tenant will, on demand and as Additional Rent, reimburse Landlord for Landlord's expenses incurred thereby, plus interest from the date incurred until paid by Tenant at the Interest Rate. If Landlord terminates either the Lease or Tenant's right to possession of the Premises, Tenant will immediately surrender the Premises to Landlord. If Tenant fails to surrender the Premises, Landlord may enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying the Premises or any part thereof including its or their personal property. Any termination only of Tenant's right to possession of the Premises will not relieve Tenant of Tenant's obligation to pay the Rent under this Lease on the days originally set forth in this Lease for payment, without acceleration. Landlord will use reasonable efforts to mitigate any damages incurred by Landlord and to relet the Premises, provided, that (i) Landlord will not be required to favor the Premises over any other space within the Shopping Center; (ii) Landlord will not be obligated to expend any efforts or any monies beyond those Landlord would expend in the ordinary course of leasing space within the Shopping Center, and (iii) in evaluating a prospective reletting of the Premises, the term, rental, use and the reputation, experience and financial standing of prospective tenants are factors which Landlord may properly consider. In determining the amount of loss which Landlord suffers by reason of termination of this Lease, allowance will be made for the expense of repossession, including reasonable and customary real estate commissions paid to licensed brokers for the remainder of the Term and any necessary repairs, but not for any remodeling undertaken by Landlord following repossession.

      **14.2**    **Landlord's Default.** In the event Landlord fails to perform on or before the required date for performance any obligation set forth in this Lease to be performed by Landlord, and such failure continues for 30 days after receipt by Landlord of notice from Tenant (or such additional period, if any, as may be reasonably required to cure the failure if the failure reasonably cannot be cured within a 30-day period, provided Landlord commences to cure within 30 days after receipt of notice and thereafter diligently pursues such cure to completion), Tenant may (a) terminate this Lease, (b) obtain such remedy or relief as may be available at law or in equity, or (c) perform such obligations on behalf of Landlord. Notwithstanding the foregoing, if the Premises are in need of emergency repair and Landlord fails to perform the same immediately upon notice from Tenant (which notice, notwithstanding the provisions of Section 17.12, may be given verbally to Landlord's managing agent for the Shopping Center promptly followed by written notice to Landlord of the same), Tenant may proceed to make such repairs as are reasonably necessary to protect persons or property. In the event Tenant performs any of such obligations of Landlord pursuant to the preceding sentence or clause (c) above, Landlord will, on demand, reimburse Tenant for Tenant's expenses incurred thereby. If Landlord fails to reimburse Tenant for such expenses within 30 days from Tenant's demand therefor, Tenant may deduct the amount of such expenses, plus interest thereon at the Interest Rate from the date incurred until the date so offset, from the next accruing amounts of Rent due under this Lease, provided that Tenant may only offset from Base Rent and in no event may Tenant deduct more than 25% of any single Base Rent payment (and if the total amount available for offset exceeds 25% of one month's Base Rent, Tenant may carry forward the excess to future months, so long as Tenant never offsets more than 25% in any one month); provided, further, however, that (i) the foregoing 25% limitation will not apply solely in the cases of: (A) a failure by Landlord to complete the initial Landlord's Work in accordance with the terms of this Lease, to perform its warranty obligations under Article 3.3 of <u>Exhibit C</u> or to pay the "Allowance" (as defined in <u>Exhibit C</u>) to Tenant in accordance with Article 11 of <u>Exhibit C</u>; or (B) Tenant's exercise of its express offset rights set forth in Section 3.3(c)(iii), 3.4(e) or 12.4 in accordance with the terms of such sections, and (ii) if the amount available for offset will not be fully recovered by offsetting 25% of Base Rent per month for the remainder of the Term, then the monthly offset may increase to the amount necessary to fully offset such amount available for offset in equal monthly installments over the remainder of the Term. No deduction from Rent or reimbursement by Tenant in accordance with this Section 14.2 will constitute a default or breach by Tenant under this Lease.

      **14.3**    **Estoppel and Waiver.** No breach under this Lease will be deemed to have been waived, nor will either party be guilty of laches, because of the failure of either party to take action pertaining to such breach. No payment by Tenant or Landlord, or acceptance by the other party, of a lesser amount than due will be treated otherwise than as a payment on account. The acceptance by a party of a check for a lesser amount than due and having an endorsement or statement thereon, or upon any letter accompanying such check, that such lesser amount is payment in full, will be given no effect, and a party may accept such check without prejudice to any other rights or remedies hereunder.

      **14.4**    **Remedies Cumulative.** The rights and remedies given to Landlord and Tenant in this Lease are distinct, separate and cumulative remedies, and the exercise of any one or more of them will not be deemed to exclude Landlord's or Tenant's rights to exercise any or all of the others which are given in this Lease, or at law or in equity, unless such remedies are expressly excluded.

      **14.5**    **Litigation, Court Costs and Attorneys' Fees.** In the event that at any time either Landlord or Tenant institutes any action or proceeding against the other relating to the provisions of this Lease or any default hereunder, the prevailing party in such action or proceeding will be entitled to recover from the other party reasonable and necessary costs and attorneys' fees including, but not limited to, attorneys' fees incurred at the pre-trial, trial and appellate levels as well as in bankruptcy court.

**14.6    Defaults by Assignees or Subtenants**. In the event this Lease is assigned or sublet by Tenant and Tenant remains liable for the performance of the obligations of "Tenant" under this Lease, and should any default occur requiring notice as provided in this Section 14, Landlord will furnish Tenant with a copy of the notice at the same time such notice is sent to the assignee or subtenant. In the event that the default is not corrected by the assignee or subtenant during the specified time periods under the Lease, Tenant will have an additional period of 10 days to correct the default, and, upon correction of the default, Tenant will have the right and option to resume actual possession of the Premises as Tenant for the unexpired Term, provided that Tenant is legally entitled to such designation vis a vis such assignee or subtenant.

## 15.    SUBORDINATION

**15.1    Landlord's Mortgagees**. Upon Landlord's written request, Tenant will execute and deliver to Landlord an agreement in the form and substance of Exhibit E subordinating Tenant's rights to the lien of any first mortgage now or hereafter encumbering the Premises. Tenant, however, will not be required to subordinate Tenant's rights hereunder to any mortgage unless and until the holder of such mortgage executes and delivers to Tenant a written non-disturbance agreement also in the form and substance of Exhibit E. As compensation for Tenant's cost of review, if Landlord requests more than one subordination agreement in any 12-month period then Landlord will pay Tenant $500 for each subsequent subordination agreement requested by Landlord during such 12-month period.

**15.2    Landlord's Liens**. Landlord hereby waives and releases any liens which Landlord may have against Tenant's personal property, trade fixtures, equipment, merchandise, cash or accounts receivable therein, whether such lien is statutory, constitutional or contractual, or arises out of operation of law or otherwise.

## 16.    OTHER TENANCIES AND USE

**16.1    Exclusive Use**.

(a)    Limitation on Use. During the Term no premises or space in, or portion of, the Shopping Center, other than the Premises, will be used for the retail sale and/or rental of sporting goods, sports apparel or athletic footwear, provided that such exclusive will not apply to the incidental sale of any of such merchandise by an occupant so long as the retail display space in such occupant's premises that is used for the display of such merchandise is of a size not greater than the lesser of 1,000 square feet of Floor Area or 10% of such occupant's total Floor Area. During the Term, no premises or space in all or any portion of any property that is adjacent or contiguous to (or separated solely by a road or right-of-way from) the Shopping Center owned or controlled now or at any time hereafter by Landlord or any affiliate of Landlord shall be operated as a full-line sporting goods, sports apparel and athletic footwear store, such as Academy Sports, Dick's Sporting Goods, Sports Chalet or Galyans. As used herein, "athletic footwear" means footwear associated with sports and sport purposes (including, without limitation, running, jogging and aerobic activity). This Section 16.1(a) will not apply to any tenant whose lease was fully executed on the Effective Date hereof and is identified on Exhibit G as an "Existing Lease Not Subject to Tenant's Exclusive/Other Exclusives;" provided, however, that this exception will not apply if (a) Landlord permits or agrees to an expansion of the premises (other than any expansion right that is specifically stated in an existing occupancy agreement) for any such permitted use which violates Tenant's exclusive, or (b) Landlord permits or agrees to the change of a permitted use (other than any change in permitted use that is specifically permitted in an existing occupancy agreement) by any such tenant or its successors or assigns, or (c) Landlord permits or agrees to an assignment or sublease of an existing lease which would violate Tenant's exclusive use herein if such existing lease provides Landlord with the right to deny such assignment or sublease, or (d) Landlord has the right, by virtue of the provisions of the existing lease, to cause such tenant to honor the exclusive granted to Tenant by giving such existing tenant notice of this exclusive or otherwise. Should Landlord acquire any property adjacent or contiguous to (or separated solely by a road or right-of-way from) the Shopping Center owned or controlled now or at any time hereafter by Landlord or any affiliate of Landlord, then Tenant's exclusive use as provided herein will be subject to the rights of existing occupants on such adjacent or contiguous property at the time of the closing of such acquisition.

Notwithstanding the foregoing, Landlord shall be permitted to lease to Famous Footwear, DSW, Broadway Shoes, Payless Shoe Stores or a similar full-line family shoe store ("Family Shoe Store") south of the Center Access Drive, provided that any such Family Shoe Store will not have more than 2,000 square feet of Floor Area dedicated to the sale of athletic footwear. In no event shall Tenant be subject to any exclusive use provision for any Family Shoe Store. Landlord shall also be permitted to lease to Pac Sun.

Notwithstanding the foregoing, a full-line off price retailer that occupies 60,000 square feet or more of floor area in the Shopping Center (such as Walmart, Kmart or Kohl's) shall not be subject to the restrictions set forth in this Section 16.1(a) provided that such retailer does not operate a store in the Shopping Center having as its primary business the retail sale and/or rental of sporting goods, sports apparel or athletic footwear.

Further, notwithstanding the foregoing, a general merchandise retailer that sells a full line of clothing and apparel (such as Marshall's, TJ Maxx, Ross Dress for Less and Mervyn's) and that occupies 20,000 square feet of space or more of floor area in the Shopping Center (a "**Qualified General Merchandise Retailer**") shall be permitted to display the following types and amounts of sports apparel or athletic apparel:

(i)    no more than 1000 square feet or 10% of the floor space (whichever is less), whether individually or in the aggregate, for the sale of technical sports apparel (i.e., apparel designed specifically for a specific sport), including, without limitation, running shorts, ski clothing, bicycle shorts, aerobic wear, golf shirts, tennis skirts and tops; and

(ii)     no more than 1000 square feet or 10% of the floor space (whichever is less), whether individually or in the aggregate, for the sale of licensed sporting goods team apparel such as NFL, NBA and NHL apparel; and

(iii)    unbranded active wear or house or store branded active wear and unbranded athletic footwear or house or store branded athletic footwear (i.e., sold under a label or brand name owned by the Qualified General Merchandise Retailer).   A Qualified General Merchandise Retailer is expressly permitted to sell unlimited amounts of such unbranded or house or store branded sports apparel and athletic footwear.

If the Premises ceases to be used as Tenant's exclusive use as set forth in this Section 16.1(a) above for a period of one year or more, then Tenant's exclusive use in the Shopping Center will terminate (**"Restriction Termination"**).  Notwithstanding the foregoing termination, the occupant of the Premises will have the right to reinstate Tenant's exclusive use in the Shopping Center if the occupant of the Premises commences operation of Tenant's exclusive use; provided, however, that the reinstatement will not affect or limit the rights of any other occupant of the Shopping Center which, following the Restriction Termination but prior to such reinstatement, had commenced operating or otherwise made a binding written commitment to operate a use which otherwise violates Tenant's exclusive use.

(b)     Remedy of Tenant.  Landlord acknowledges that the granting of the exclusive contained in Section 16.1(a) is a material inducement to Tenant's agreement to enter into this Lease and the enforcement of this exclusive is integral to the economic viability of the Shopping Center to Tenant.  Landlord agrees to enforce such exclusive and the statement of Tenant's remedies specified below will not be deemed to excuse Landlord from such enforcement.

(i)     Landlord's Fault.  If any person or entity violates the exclusive granted to Tenant in Section 16.1(a) in a situation where Landlord failed to include in such person's or entity's lease or other occupancy agreement a provision effectuating the exclusive rights granted to Tenant in Section 16.1(a), the Base Rent payable hereunder will be reduced by 50% commencing 30 days after the date Tenant gives Landlord notice of such violation and continuing for so long as such violation continues, and Tenant will have all the following remedies, as well as any other remedy given to it at law and in equity:  the right to obtain injunctive relief, to terminate this Lease or to commence and prosecute an action against Landlord for damages.

(ii)     Rogue Tenant.  If any person or entity violates the exclusive granted to Tenant in Section 16.1(a) in a situation where Landlord included in such person's or entity's lease or other occupancy agreement a provision effectuating the exclusive rights granted to Tenant in Section 16.1(a) and, despite such inclusion, such person or entity has violated the exclusive rights granted to Tenant in Section 16.1(a), or if any person or entity uses premises in the Shopping Center in violation of Section 16.2 or 16.3 below, Landlord will promptly commence appropriate legal proceedings, and vigorously prosecute the same, to enjoin and prohibit any such violation.  If Landlord fails to commence such proceedings, or fails thereafter to vigorously prosecute the same after Tenant has provided Landlord with thirty (30) days written notice, Tenant will have the right (A) to conduct and prosecute such legal proceedings (including, without limitation, an action for injunctive relief) in its own name, but at Landlord's expense, or (B) in the event the right set forth in (A) above is not permitted to be exercised under Laws, to conduct and prosecute such legal proceedings in the name of Landlord, at Landlord's expense, and Landlord agrees to cooperate with Tenant with respect to such prosecution (including, without limitation, executing any documentation or authorization reasonably required by Tenant in connection with such prosecution and by appearing at any hearing or trial with respect to such prosecution).  If the person or entity violating the exclusive granted to Tenant in Section 16.1(a) or violating Section 16.2 or 16.3 continues to do so for more than 90 days after Tenant notifies Landlord of such violation, then commencing on the 91st day, Tenant's obligation to pay Base Rent will be abated and, in lieu thereof, Tenant will pay Landlord Alternative Rent on a monthly basis, 30 days after the end of each calendar month, until such violation has terminated; provided that if such violation continues for more than one year after Tenant notifies Landlord of such violation (**"Violation Cure Period"**), then Landlord will have the right, by notice given to Tenant not earlier than (but at anytime on or after) 30 days before the end of the Violation Cure Period, to require that Tenant elect either to terminate this Lease effective as of a date selected by Tenant that is not less than 30 nor more than 60 days from the date of Landlord's notice requiring that Tenant make such election or to begin paying full Base Rent (instead of Alternative Rent) effective as of the first day of the month following the month in which Landlord's notice is delivered to Tenant; and, if Tenant fails to notify Landlord of Tenant's election to terminate within 30 days after delivery of Landlord's notice, Tenant will be deemed to have elected to resume paying full Base Rent and to have waived its right to terminate this Lease as a result of the subject violation.  Upon any such termination, the parties will be liable for their respective obligations to the date of termination and will have no liability for obligations arising after that date, except for those obligations which expressly survive termination.

**16.2     Prohibited Uses.**  Neither Tenant nor its subtenants, assignees, licensees or concessionaires will use or lease (or permit the use, lease or sublease of) the Premises or any portion thereof during the Term allowing for use as any of the "Prohibited Uses" (as defined below).  Neither Landlord nor any entity controlled by Landlord will use or lease (or permit the use, lease or sublease of) or sell any space in or portion of the Shopping Center during the Term allowing for use as any of the Prohibited Uses.  As used herein, the **"Prohibited Uses"** means those uses prohibited by Exhibit H.

**16.3     Restricted Uses.**  No portion of the Shopping Center located within 300 feet of the Premises will be used for a restaurant, a health club or any other use which would place an undue burden on parking; provided, however, a 2,000 square foot restaurant will be permitted in that portion of the Shopping Center designated as E-1/E-2 on the Site Plan and a 1,600 square foot restaurant will be permitted in that portion of the Shopping Center

designated as E-5 on the Site Plan. Furthermore, Landlord may have 8,614 square feet of restaurant use in that portion of the Shopping Center designated as Retail F on the Site Plan, 20,083 square feet of restaurant use in that portion of the Shopping Center designated as Retail G on the Site Plan and unlimited restaurant uses in the portions of the Shopping Center designated as Retail B and Retail C on the Site Plan.

16.4  **Other Exclusives.** Tenant will be subject to the exclusive use restrictions listed on <u>Exhibit G</u> for so long as such exclusive use restrictions remain effective to restrict the use of the Premises.

16.5  **Opening Covenant; No Operating Covenant.** Tenant covenants to open the Premises for business with the public, fully stocked, staffed and fixtured as a sporting goods store, for at least one day, not later than 60 days after the Rental Commencement Date; provided, however, Tenant shall not be required to open on any date which is not within the following Tenant opening windows:  April 1 through and including May 31; August 1 through and including August 21; and November 1 through and including November 14. Except for such covenant to open, nothing in this Lease will be interpreted to obligate Tenant to operate, continuously or otherwise, a business in the Premises. No implication will be made concerning the use or operation of the Premises from the manner in which Rent is paid or from the amounts of Rent paid. Subject to the first sentence of this Section 16.5 and subject to Section 16.2, if Tenant elects to operate a business in the Premises, Tenant may use the Premises for any lawful retail purpose.

16.6  **Cessation of Operations/ Recapture.** If  at any time after Tenant's initial opening in the Premises Tenant ceases operating in the Premises fixtured, stocked and staffed for a consecutive period of one hundred eighty (180) days (and such cessation is not due to Uncontrollable Events, casualty, condemnation, Landlord default, environmental remediation·or to Tenant's alterations to the Premises not to exceed 180 days), Landlord shall have the right, at its sole option, to terminate the Lease upon written notice to Tenant within thirty (30) days thereafter; the effective date of termination shall be the thirtieth (30th) day following receipt of Landlord's notice of termination (unless Tenant or any subtenant or assignee commences operating in the Premises fixtured, stocked and staffed during such thirty (30) day period. If Landlord fails to deliver a written notice of termination to Tenant prior to the expiration of the thirty (30) day period, Landlord shall not have the right to terminate this Lease for Tenant's failure to conduct business in the Premises, subject to the following sentence. Notwithstanding the foregoing, Landlord shall have the ongoing cumulative right, if Tenant has not secured an executed letter of intent or a lease for all of the Premises on the yearly anniversary of such cessation of business, then for a period of thirty (30) days thereafter Landlord shall have a right to terminate the Lease upon prior written notice to Tenant, with the effective date of termination being the thirtieth (30th) day following receipt of Landlord's notice of termination (unless Tenant commences operating in the Premises fixtured, stocked and staffed during such thirty (30) day period).  In the event that only a portion of the Premises is unoccupied or not open for business, Landlord's termination right shall be limited to the amount unoccupied or not open for business. In the event Landlord elects to terminate this Lease as above provided, Tenant shall pay to Landlord, upon such termination, an amount equal to six months of current Base Rent; provided, however, that if Landlord terminates as to a portion of the Premises, the amount of Tenant's payment shall be reduced proportionately.  Landlord (or any entity affiliated with Landlord or any principal of Landlord) shall not, for six (6) months after termination of this Lease pursuant to this Section 16.6, lease or grant any right to occupy any space within the Shopping Center for the purposes of the operation of Tenant's exclusive use as set forth in Section 16.1 hereof. Notwithstanding the foregoing, if Tenant or any subtenant or assignee in good faith commences operation of business in the Premises prior to the effective date of termination specified in Landlord's notice, such notice, and Landlord's election to terminate, shall be null and void and this Lease shall continue. The provisions of this Section 16.6 shall survive any termination of this Lease by Landlord pursuant to this Section 16.6.

## 17.  MISCELLANEOUS

17.1  **Relationship of Parties.** The amount of money provided to be paid Landlord will in no event be deemed to make Landlord a partner or an associate of Tenant in the conduct of Tenant's business, nor will either party be liable for any debts incurred by the other party in the conduct of the other party's business.  The relationship between the parties is for the entire Term that of landlord and tenant.

17.2  **Heirs, Successors and Assigns.** This Lease and the covenants and agreements herein contained will be binding upon, and inure to the benefit of, the parties hereto and their respective heirs, executors, administrators, successors, and assigns.

17.3  **Governing Law.** This Lease will be governed by, construed in accordance with and enforced under the laws of the state in which the Shopping Center is located.

17.4  **Rules of Construction.** This Lease will be construed with equal weight for the rights of both parties, the terms hereof having been determined by fair negotiation with due consideration for the rights and requirements of both parties.

17.5  **Materiality of Covenants.** Every covenant contained in this Lease will be construed to be material, whether or not the covenant expressly so provides.

17.6  **Severability.** If any term or provision of this Lease is found to be invalid, illegal or unenforceable, the remaining terms and provisions hereof will not be affected thereby; and each term and provision hereof will be valid and enforceable to the fullest extent permitted by Laws.

17.7  **Entire Agreement; Amendment.** This Lease contains the entire agreement between Landlord and Tenant with respect to the subject matter of the Lease and may be amended or modified only by subsequent

written agreement duly signed by both parties hereto. Except for those warranties, representations, contingencies, conditions and/or agreements set forth in this Lease, no warranties, representations, contingencies, conditions, and/or agreements have been made by Landlord or Tenant, one to the other or between them, with respect to the subject matter of this Lease. Landlord and Tenant acknowledge that the provisions of this Lease have been negotiated and agreed to between Landlord and Tenant and that this Lease reflects the agreement and understanding of each party. No action, verbal statement or written statement by any employee, agent or representative of either party to this Lease (other than an amendment signed by both parties) will be construed to amend or modify this Lease nor to diminish or discharge any of the rights and obligations of either party hereunder.

**17.8    Gender, Number.** Pronouns in this Lease importing any specific gender will be interpreted to refer to corporations, partnerships, men and women, as the identity of the parties referred to may require. Pronouns, verbs and/or other words in this Lease importing the singular number will be interpreted as plural words, as the identity of the parties or objects referred to may require.

**17.9    Headings.** The captions, section numbers and paragraph numbers appearing in this Lease are inserted only as a matter of convenience and in no way define, amplify, limit, construe or describe the scope or interest of any section of this Lease.

**17.10    Section Numbers.** All references to section numbers contained in this Lease are to the sections of this Lease, unless expressly provided to the contrary.

**17.11    Memorandum of Lease.** Landlord and Tenant will execute contemporaneously with the execution of this Lease, a Memorandum of Lease in the form attached hereto as **Exhibit I** for recording purposes. The party desiring to record the Memorandum of Lease, if at all, will do so at its own cost and expense.

**17.12    Notices.** All notices or requests given, sent or required to be given with respect to any matter pertaining to this Lease must be in writing and must be sent by nationally recognized overnight courier service, such as, but not limited to, Federal Express, by certified mail with return receipt requested, or by express mail, in each case with charges billed to the sender or proper postage prepaid, as applicable, and will be deemed given on the date received (or refused) when addressed to the parties at Landlord's Notice Address, in the case of notices to Landlord, or at Tenant's Notice Address, in the case of notices to Tenant, or in either case to such other addresses as Landlord or Tenant may designate to the other by notice. Any such notice, demand or communication from an attorney acting or purporting to act on behalf of a party shall be deemed to be notice from such party provided that such attorney is authorized to act on behalf of such party.

**17.13    Gross Sales Reports; Confidentiality of Gross Sales Reports and Lease Terms.** Upon 30 days prior written request from Landlord, Tenant will furnish Landlord with a copy of Tenant's annual report of gross sales from the Premises for Tenant's prior fiscal year. Landlord will treat any such gross sales report and the monetary and operating terms and conditions of this Lease as confidential and will not divulge or give copies of the same to any person other than any existing or prospective mortgagee or lender of the Shopping Center or any prospective purchaser of Landlord's interest in this Lease or as may otherwise be required by Laws or in connection with a dispute between Landlord and Tenant concerning the terms hereof. Landlord and Tenant will treat the monetary and operating terms and conditions of this Lease as confidential and will not divulge same to any person other than any existing or prospective mortgagee of the Shopping Center or any prospective purchaser of Landlord's interest in this Lease or as required by Laws. Landlord will not furnish copies of all or any part of this Lease to a person other than to a party described in the preceding sentence.

**17.14    Brokers.** Tenant agrees that Tenant will not present any broker or agent to Landlord for payment of any brokers', agents' or finders' fees or commissions due as a result of the execution of this Lease or the performance of the terms and provisions contained herein, except for fee(s) or commission(s) due to any Broker(s) named in Section 1.1(p). Landlord will be solely responsible for the payment of any fees or commissions due with respect to this Lease. Each party warrants and represents to the other that is has not dealt with any broker in connection with the negotiation of this Lease other than the Broker named in Section 1.1(p). Each party will indemnify, defend and hold the other harmless from and against the claims of any broker or salesman (other than the Broker named in Section 1.1(p)) for any commission alleged to be owed in connection with this Lease as a result of such party having engaged such broker or salesman.

**17.15    Force Majeure.** In the event that Landlord or Tenant cannot commence or complete the work or perform any other obligation of such party hereunder by the date specified therefor because of strikes, lockouts, labor disputes, acts of God, war, civil commotion, fire or other casualty, or other cause beyond the reasonable control of such party ("**Uncontrollable Events**"), the time for the commencement or the completion of the work or the performance of such obligation will be automatically extended for the period of delay due to the Uncontrollable Event, but in no event will such extension be for a period of more than 60 days. Notwithstanding anything to the contrary contained in this Lease, in no event will this Section 17.15 be construed to: (a) excuse or delay the performance of a monetary obligation by either party; (b) extend the "Pad Delivery Deadline" (as defined in **Exhibit C**) or Landlord's obligation to complete Prepared Pad and deliver possession thereof to Tenant by such date, or (c) complete the balance of Landlord's Work by the deadline for completion thereof set forth in **Exhibit C**. In order for either Landlord or Tenant to avail itself of the rights granted in this Section 17.15, that party must notify the other party within 10 days of the beginning and the end of the occurrence of an Uncontrollable Event.

**17.16    Limitation of Landlord's Liability.** Notwithstanding any provision of this Lease to the contrary, no personal liability of any kind or character whatsoever now attaches, or any time hereafter under any condition will attach, to Landlord or any partner, member or shareholder of Landlord or any of their respective officers, directors, shareholders, managers, members, partners or employees, for payment of any amounts due under this

Lease or for the performance of any obligation under this Lease. Any damages to which Tenant may be entitled for the failure of Landlord to perform any of its obligations under this Lease. Any damages to which Tenant may be entitled for the failure of Landlord to perform any of its obligations under this Lease will be collectible solely out of the equity interest of Landlord in and to the Shopping Center (including any rents or sale, insurance or condemnation proceeds thereof), it being understood that in no event will a judgment or any deficiency or monetary claim by sought, obtained or enforced against any other assets or any person or party described in this Section above.

**17.17    Rent Tax.**  Notwithstanding anything to the contrary contained in the Lease, Tenant shall pay directly to Landlord any tax or license fee measured by Tenant's gross rents receivable by Landlord, including but not limited to the Florida Rent Tax as set forth in Section 212.031 of the Florida Statutes, as heretofore and hereafter amended. That portion of such taxes attributable to each month's Rent shall be paid by Tenant to Landlord each month along with Tenant's monthly Rent payment.

**17.18    State-Mandated Radon Notice.**  Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit.

**17.19    Landlord's Access to the Premises.**  Landlord, its agents and employees, will be entitled to enter upon the Premises during reasonable business hours and upon at least 48 hours advance notice (except in the event of an emergency, in which event no advance notice will be required nor will any limitation on time of entry be in effect) for the purpose of inspecting the same, or of showing the Premises to prospective purchasers, lenders or (during the final six months of the Lease Term) prospective tenants, or of making repairs to the Premises or adjacent premises or building systems required or permitted to be made by Landlord pursuant to this Lease. Landlord will take all commercially reasonable steps to minimize any interference with Tenant's operations in the Premises during any such entry.

**17.20    Transfers by Landlord.**  Provided any transferee of Landlord's interest in the Premises assumes in writing all of Landlord's obligations under this Lease that arise from and after such transfer, and notifies Tenant of such assumption, Landlord may assign its interest in this Lease to such transferee, and Landlord will thereupon be released from all obligations under this Lease that arise from events occurring after Tenant is given notice of such transfer, assignment and assumption; provided, however, Tenant will make all payments required under this Lease to Landlord, or its successors in interest, unless and until Tenant is notified of such assignment and assumption, and Tenant will in no way be liable to any assignee for any amounts due hereunder until Tenant is so notified.

**17.21    Estoppel Certificates.**  Within no more than 30 days after receipt of written request of either party, the other will furnish to the requesting party a certificate, duly acknowledged, certifying, to the extent true: (i) that this Lease is in full force and effect; (ii) that the certifying party knows of no default hereunder on the part of the other party, or if it has reason to believe that such a default exists, the nature thereof in reasonable detail; (iii) the amount of the monthly Base Rent and estimated Common Area Charges then being paid and the last date to which such rent has been paid; (iv) that this Lease has not been modified, or if it has been modified, the terms and dates of such modifications; (v) that the Lease Term has commenced; (vi) the Commencement Date, Rental Commencement Date and Expiration Date (if the same can then be determined); (vii) whether all of Landlord's Work has been completed; (viii) whether any Extension option has been exercised; and (ix) whether there exist any claims or deductions from, or defenses to, the payment of rent.

**17.22    Tenant's Authority.**  Tenant represents and warrants to Landlord that Tenant has full right, power and authority, corporate and otherwise, to execute this Lease, to lease the Premises and to perform the obligations of Tenant under this Lease, subject to existing and future Laws and the Underlying Documents, and that the person(s) executing this Lease on behalf of Tenant has or have been fully authorized to do so.

Having read and intending to be bound by the terms hereof, the parties have signed this Lease on the date(s) set forth below.

**TENANT:**

WITNESSES:

TSA STORES, INC.,
a Delaware corporation

Print Name: *Vicky Pierce*

By: _____
Nesa E. Hassanein
Executive Vice President

Print Name: *LINDA L. ANDERSON*

By: _____
Christopher S. Day
Senior Vice President – Real Estate

Date of execution by Tenant: January 31, 2006

**(SIGNATURES ON FOLLOWING PAGE)**

**Exhibit A**

**LEGAL DESCRIPTION OF THE SHOPPING CENTER**

A PARCEL OF LAND LYING IN SECTION 22, TOWNSHIP 22 SOUTH, RANGE 31 EAST, ORANGE COUNTY, FLORIDA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE SOUTHWEST CORNER OF THE SOUTHWEST ¼ OF SECTION 22, TOWNSHIP 22 SOUTH, RANGE 31 EAST, RUN N. 89 DEGREES 21 MINUTES 32 SECONDS E., ALONG THE SOUTH LINE OF SAID SOUTHWEST ¼, A DISTANCE OF 691.35 FEET TO THE SOUTHWEST CORNER OF THE EAST ¾ OF THE SOUTHWEST ¼ OF SAID SECTION 22 FOR A POINT OF BEGINNING; THENCE DEPARTING SAID SOUTH LINE, RUN N. 00 DEGREES 26 MINUTES 35 SECONDS W. ALONG THE WEST LINE OF THE EAST ¾ OF SAID SOUTHWEST ¼, A DISTANCE OF 1252.89 FEET TO THE NORTHWEST CORNER OF THE EAST ¾ OF THE SOUTH ½ OF THE SOUTHWEST ¼ OF SAID SECTION 22; THENCE DEPARTING SAID WEST LINE, RUN N. 88 DEGREES 40 MINUTES 33 SECONDS E. ALONG THE NORTH LINE OF THE SOUTH ½ OF THE SOUTHWEST ¼ OF SAID SECTION 22, A DISTANCE OF 683.05 FEET TO A POINT ON THE WEST RIGHT OF WAY LINE OF ALAFAYA TRAIL, AS RECORDED IN OFFICIAL RECORDS BOOK 3409, PAGE 1329, PUBLIC RECORDS OF ORANGE COUNTY, FLORIDA; THENCE DEPARTING SAID NORTH LINE, RUN THE FOLLOWING COURSES AND DISTANCES ALONG SAID WEST RIGHT OF WAY LINE; THENCE S. 00 DEGREES 50 MINUTES 32 SECONDS E. A DISTANCE OF 386.13 FEET TO THE POINT OF CURVATURE OF A CURVE, CONCAVE NORTHEASTERLY, HAVING A CENTRAL ANGLE OF 27 DEGREES 57 MINUTES 17 SECONDS AND A RADIUS OF 1868.00 FEET; THENCE RUN SOUTHEASTERLY ALONG THE ARC OF SAID CURVE, A DISTANCE OF 911.40 FEET TO A POINT ON THE SOUTH LINE OF THE SOUTHWEST ¼ OF SAID SECTION 22; THENCE CONTINUE ALONG SAID RIGHT OF WAY LINE AND SAID CURVE, THROUGH A CENTRAL ANGLE OF 01 DEGREES 55 MINUTES 06 SECONDS, A DISTANCE OF 62.54 FEET TO THE POINT OF TANGENCY; THENCE S. 30 DEGREES 42 MINUTES 55 SECONDS E. A DISTANCE OF 452.89 FEET; THENCE DEPARTING SAID RIGHT OF WAY LINE RUN S. 59 DEGREES 17 MINUTES 05 SECONDS W. A DISTANCE OF 373.88 FEET; THENCE S. 30 DEGREES 42 MINUTES 55 SECONDS E. A DISTANCE OF 52.11 FEET; THENCE S. 59 DEGREES 17 MINUTES 05 SECONDS W. A DISTANCE OF 295.08 FEET; THENCE S. 30 DEGREES 42 MINUTES 55 SECONDS E. A DISTANCE OF 84.69 FEET; THENCE S. 59 DEGREES 17 MINUTES 05 SECONDS W. A DISTANCE OF 3163.94 FEET; THENCE N. 30 DEGREES 42 MINUTES 55 SECONDS W. A DISTANCE OF 686.61 FEET TO A POINT ON THE WEST LINE OF THE EAST ¾ OF SECTION 27, TOWNSHIP 22 SOUTH, RANGE 31 EAST; THENCE N. 00 DEGREES 22 MINUTES 32 SECONDS W. ALONG SAID WEST LINE, A DISTANCE OF 488.38 FEET TO THE POINT OF BEGINNING.

TOGETHER WITH THAT CERTAIN RECIPROCAL EASEMENT AND OPERATION AGREEMENT, RECORDED SEPTEMBER 24, 1999 IN OFFICIAL RECORDS BOOK 5845, PAGE 1099, PUBLIC RECORDS OF ORANGE COUNTY, FLORIDA AND FIRST AMENDMENT TO RECIPROCAL EASEMENT AND OPERATION AGREEMENT RECORDED IN OFFICIAL RECORDS BOOK 5931, PAGE 4466, PUBLIC RECORDS OF ORANGE COUNTY, FLORIDA.

**Exhibit B**

**SITE PLAN**

Site Plan must identify:

Premises (Section 1.1(e))

Center Access Drive (Section 4.1)

Promotional Event and Tent Sales Area (Section 4.1(a))

Dumpster Pad (Section 4.1(c))

Generator Pad (Section 4.1(d))

Protected Accessways (Section 4.4(a))

No Build Area (Section 4.4(b))

Staging Area (Section 4.4(b))

Restricted Outlots (Section 4.4(c))

Pylon/Monument Sign (Section 7.1)



EXHIBIT "B"

SITE PLAN

DUMPSTER PAD

GENERATOR PAD

PROMOTIONAL EVENT AND TENT SALES AREA

CENTER ACCESS DRIVE

PYLON / MONUMENT SIGN

NO BUILD AREA

RESTRICTED OUTLOT

STAGING AREA

PROTECTED ACCESS WAY

RESTRICTED OUTLOT

NO BUILD AREA

**Exhibit C**
**CONSTRUCTION PROVISIONS – WATERFORD LAKES, ORLANDO, FLORIDA**

1.    Definitions. For purposes of this Lease:

(i)    "**Landlord's Work**" means all work to be performed by Landlord for Tenant pursuant to this Exhibit C, including the "Prepared Pad" and "Site Work" (as those terms are defined below);

(ii)   "**Tenant's Work**" means all work to be performed by Tenant pursuant to this Exhibit C, including the "Building Shell" and the "Leasehold Improvements" (as those terms are defined below);

(iii)  "**Site Work Start Date**" means (work has already commenced);

(iv)   "**Building Shell Start Date**" means seven days after receipt of building permit;

(v)    "**Projected Pad Delivery Date**" means January 20, 2006;

(vi)   "**Pad Delivery Deadline**" means April 3, 2006; and

(vii)  "**Program Package**" means Tenant's New Store Program Package Version 5, which Tenant has previously delivered to Landlord.

2.    Design and Construction Schedules.

2.1    Projected Schedule. The parties intend that Landlord's design and construction of the Prepared Pad and Site Work, Tenant's design and construction of the Building Shell and the Leasehold Improvements, Tenant's fixturing and merchandising of the Premises, Tenant's opening and the grand opening (if applicable) of the Shopping Center will occur in accordance with the following schedule:

| Event | Date (if single day event) | Beginning Date | Ending Date |
|---|---|---|---|
| Pad Delivery Date | 1/20/06 | | |
| Final Plans for the Building Shell | | N/A | Completed |
| Obtain Building Shell permit | | N/A | 1/27/06 |
| Building Shell construction | | Seven days after receipt of building permit | 7/13/06 |
| Final Plans for the Leasehold Improvements | | N/A | Completed |
| Obtain Leasehold Improvements permit | | 1/27/06 | 4/20/06 |
| Leasehold Improvements construction | | 5/1/06 | 7/13/06 |
| Tenant fixturing and merchandising | | 7/14/06 | 8/3/06 |
| Site Work Completion Date (Landlord's Work Substantially Complete) | 7/1/06 | | |
| Tenant opens | 8/4/06 | | |
| Grand opening | 8/13/06 | | |

2.2    Landlord's Construction Schedule. Landlord has delivered to Tenant, and Tenant has approved, a copy of the site plan ("**Approved Site Plan**"), prepared by CPH Engineers for the Shopping Center detailing thereon all onsite and offsite improvements required by Orange County for development of the Shopping Center and the Prepared Pad (as defined below) and a copy of Landlord's civil plans and drawings prepared by CPH Engineers concerning the Shopping Center and the Prepared Pad. Within three business days after Landlord becomes aware of a need for any change in such construction schedule (including, without limitation, within five business days after notice from Tenant that the construction of Landlord's Work is no longer on schedule), Landlord will prepare and submit to Tenant a revised construction schedule. Landlord will use commercially reasonable efforts to adhere to such construction schedule.

3.    General Requirements.

3.1    Code Compliance. Landlord, at Landlord's expense, will cause all Landlord's Work to satisfy and comply with all Laws including, but not limited to, building codes, regulations and ordinances in force and adopted by the local municipality, county and state building officials and applicable city, county and state building plumbing, fire, health, pollution, electrical, safety and other codes. Landlord, at Landlord's expense, will install and deliver properly sized utilities to within five feet of Tenant's building at locations specified by Tenant. Tenant, at Tenant's expense, will be responsible for causing all items of Landlord's Work described in the Program Package (including, without limitation, the design and construction of all elements of the fire suppression and life

safety systems identified as a part of Tenant's Work therein), or any substitutes therefore or supplements thereto required by local codes to comply with code in the jurisdiction in which the Premises are located, taking into account any such substitutes or supplements that may be required as a result of (i) the Leasehold Improvements or fixtures, furnishings and equipment that will be added to the Premises by Tenant as reflected on the Commodity Classification and Hazard Analysis Report that Tenant will provide to Landlord upon Landlord's request. Tenant, at Tenant's expense (except as provided in Article 11 below), will cause all Tenant's Work to satisfy and comply with all Laws including, but not limited to, building codes, regulations and ordinances in force and adopted by the local municipality, county and state building officials and applicable city, county and state building plumbing, fire, health, pollution, electrical, safety and other codes. Neither Landlord nor Tenant will use any building materials, products, adhesives or equipment containing asbestos, PCB's, or other similar, harmful or toxic substances which are controlled by the EPA, federal, state, county, city or other governmental agencies. If Landlord discovers any such materials brought onto the Premises by Tenant, its agents or contractors, after the installation of any Tenant's Work, Tenant will immediately upon notice remove, dispose of, and replace the materials in accordance with all Laws. Landlord will immediately upon notice remove, dispose of, and replace any materials brought onto the Premises, the Prepared Pad or the Shopping Center by Landlord, its agents or contractors. This obligation for the removal of harmful building materials installed by the Tenant or the Landlord, as applicable, will survive the expiration of this Lease. The Shopping Center will comply with the provisions of the Americans With Disabilities Act (ADA) in regard to site and building accessibility and parking requirements.

3.2     General Conditions. Except as explicitly set forth herein, Landlord's Work and Tenant's Work will each include all usual and customary costs for general conditions associated with such work, including but not limited to any of the following that are applicable:

(i)     Liability and builder's risk insurance;

(ii)    Costs for permits, sewer and water connection fees, etc.;

(iii)   Sales and use taxes;

(iv)    Temporary field offices, toilet facilities, supplies and equipment; provided, however, all costs associated with such trailer, including toilet facilities, supplies and equipment will be at Tenant's expense and Tenant will defend, indemnify and hold Landlord harmless from and against any claims, costs and expenses in connection with Tenant's use of such trailer;

(v)     Miscellaneous equipment rentals;

(vi)    Trash removal and clean-up;

(vii)   Survey, staking and layout (Landlord's responsibility);

(viii)  Job site field supervision;

(ix)    Mobilization;

(x)     Landlord and Tenant will each be responsible for their own temporary utility hook-ups and expenses for consumption of water, electricity and telephone;

(xi)    Quality assurance, including materials testing, inspections and special inspections; and

(xii)   Cold weather expenses including cost of temporary protective coverings, fuel, heaters, snow removal, protective barriers, and labor and materials associated therewith.

3.3     Warranties. Landlord unconditionally guarantees all Landlord's Work against defective workmanship and materials and will remedy any such defects which appear within a period ending one year after the Rental Commencement Date. Tenant will obtain manufacturers' warranties covering the roof membrane and flashings of the Premises for at least 10 years and the storefront sliding glass doors of the Premises for at least three years.

3.4     Pad and Utilities Certification. On or before the Pad Delivery Date, Landlord, at Landlord's sole cost and expense, will obtain and deliver to Tenant certifications from qualified contractors/engineers/inspectors, as applicable, reasonably satisfactory to Tenant, certifying that the Prepared Pad has, in fact, been constructed in accordance with the specifications set forth in Exhibit C-1 and that all utilities required to be installed by Landlord pursuant to Exhibit C-1 have been installed in a good and workmanlike manner, are operable, comply with Article 5.5 of this Exhibit C and are ready for hookup and use by Tenant in the performance of Tenant's Work. Landlord will promptly cure any and all deficiencies in the Prepared Pad disclosed in any of such certifications. Any and all contractor warranties obtained by Landlord concerning the Prepared Pad will be retained by Landlord for the benefit of Tenant or, if assignable, will be assigned by Landlord to Tenant.

3.5     Engineering. All construction will be performed according to the recommendations contained in geotechnical investigation and other engineering reports specific to the site, and in accordance with good engineering and design practices using first class workmanship and materials and conforming to the "Final

Plans" (as defined in Article 4.1 and 4.2 below).  Landlord will deliver the Prepared Pad to Tenant on the Pad Delivery Date in accordance with Tenant's prototype pad specifications attached hereto as Exhibit C-1 ("**Tenant's Prototype Pad Specifications**").

       3.6     Permits.  Landlord will use commercially reasonable efforts to procure, at Landlord's sole cost and expense, all permits or licenses required for the construction of the Prepared Pad, the Site Work and the signs to be installed by Landlord pursuant to Section 7.1 of the Lease.  Tenant will use commercially reasonable efforts to procure, at Tenant's sole cost and expense (except as provided in Article 11 below), all building and other permits or licenses required for the construction and occupancy of the Building Shell and the Leasehold Improvements.  If Tenant is unable to obtain all permits and licenses required for the performance of Tenant's Work by the Pad Delivery Date, then (a) Tenant may terminate this Lease by notice given to Landlord at any time prior to the date on which Tenant obtains all of such permits and licenses, and (b) the Commencement Date and/or the Rental Commencement Date will be postponed, to the extent such date(s) would otherwise occur sooner pursuant to the terms of the Lease, until the earlier of (i) 210 days after the date on which Tenant obtains all of such permits and licenses, or (ii) the date on which Tenant first opens the Premises for business.  However, except to the extent provided in Section 1.3(o) of the Lease, Tenant's obtaining a certificate of occupancy for the Leasehold Improvements is not a condition to the occurrence of the Commencement Date or the Rental Commencement Date.

       3.7     Impact Fees.  Landlord will pay in full on or before Tenant goes to pick up its building permits all impact fees ("Impact Fees") for law enforcement, fire and road improvements; provided, however, if allowed by applicable procedures at no additional cost to Tenant and without delay to Tenant of construction of Tenant's Work, Tenant will request that the requirement to pay impact fees for road improvements be delayed until issuance of the temporary certificate of occupancy for the Premises and if such delay is approved by the applicable governmental authority, Landlord will pay such traffic impact fees at the time Tenant applies for its certificate of occupancy or on such earlier date as required by the applicable governmental authority.  Within 30 days of receipt of an invoice from Landlord, together with documentation evidencing that the Impact Fees have been paid in full, Tenant will reimburse Landlord for 50% of the Impact Fees paid for the Premises, not to exceed $175,000 in the aggregate.

      4.     Plan Preparation, Approval and Modification.

       4.1     Building Shell Plans.  Landlord acknowledges that he has approved the Preliminary Plans for the Building Shell dated November 14, 2005, prepared by Scott & Gable Architects and they have become the final construction documents ("**Final Plans**") for the Building Shell.  No alterations will be made to the Final Plans for the Building Shell without the prior written consent of Landlord, which consent will not be unreasonably withheld or delayed.

       4.2     Leasehold Improvements Plans.  Landlord acknowledges that he has approved the Tenant Improvement Plans prepared by Shremshock Architects, Inc. dated January 5, 2006, and for purposes here, the same are deemed to be the Final Plans for the Leasehold Improvements (Final Plans as used in this Lease shall refer to the Final Plans for the Building Shell and/or the Leasehold Improvements, as appropriate).  No alterations that would affect the Leasehold Improvements' compliance with local Laws or compatibility with the Building Shell will be made to the Final Plans for the Leasehold Improvements without the prior written consent of Landlord.

       4.3     Change-Orders.  Tenant will have the right to revise the Final Plans for any reason whatsoever with respect to the Leasehold Improvement Final Plans, but will only have the right to make material revisions to the Building Shell Final Plans upon review and approval of Landlord, such approval not to be unreasonably withheld or delayed.

      5.     Construction of Site Work.  Landlord will, if any of same have not already been constructed, and at Landlord's sole cost and expense, construct the Shopping Center sidewalks, service drives, parking aisles, driveways, streets, curbs, parking areas (including parking lot lines and striping and all parking lot lighting), landscaping, landscape irrigation equipment, traffic controls, signs (including the Pylon/Monument Signs and related electrical wiring to Tenant's cabinet), utilities, lighting, all on-site/off-site improvements as required by Orange County, and related improvements in substantially the configurations, locations and sizes shown for such improvements on Exhibit B, and the Approved Site Plan ("**Site Work**").  The Site Work will be constructed in accordance with the general requirements of Article 3 above and Landlord's civil drawings and plans concerning the same, and will include the following:

       5.1     Earthwork and Drainage.  Perform all earthwork, excavation, grading and preparation of the building pad for the Premises in the location therefor as shown on the Approved Site Plan, conforming to all of the requirements of Article 3.4 and this Article 5 ("**Prepared Pad**") and parking lot areas to receive final finishes.  Site to be graded to provide adequate site drainage, including storm water drainage, retention areas, culverts, catch basins, drywells and other storm water appurtenances.  Storm water retention may occur in parking areas and drives except at principal entries and access points to a maximum depth not greater than 12".  Landlord covenants that any fill dirt that Landlord causes or permits to be used at the Shopping Center site will be so-called "clean fill" that will present no health or environmental risk.  Compaction of the Prepared Pad will be in accordance with Tenant's Prototype Pad Specifications.  Landlord shall also excavate the entire truck dock area to the building elevations required pursuant to the Preliminary Plans for the Building Shell dated November 14, 2005.

       5.2     Concrete.  Install all exterior concrete, curb and gutter, vertical curbs, valley gutters, sidewalks and retaining walls.

5.3     Landscaping.  Furnish and install landscaping and automatically controlled underground sprinkler systems in planters around the perimeter of the Building Shell and parking lots where indicated on Exhibit B to this Lease and/or the Approved Site Plan.  The general character and quality of such landscape improvements will be similar to that provided at other Shopping Center buildings.  Landlord will run four 8" PVC drainage pipes from the 36" RCP storm sewer in the parking field to the planters on the east elevation of the Premises and one 3" PVC drain pipe from Tenant's vestibule roof area to the 35" RCP storm sewer in the parking field on the east elevation of the Premises; provided, however, that Tenant shall reimburse Landlord for 50% of the cost of such drainage pipes on the later to occur of (i) completion of the installation of the drainage pipes; and (ii) 30 days after the receipt of an invoice for such work.

5.4     Parking Lot Paving.  Install all parking lot improvements, asphalt paving, striping and signage substantially in accordance with Exhibit B to this Lease and the Approved Site Plan.  Parking to be laid out in a 90° configuration with designated handicapped parking stalls and signage.

5.5     Utilities.  Provide all utility mains including domestic water, fire protection, storm drainage, sanitary sewer, gas, electrical and telephone and install in accordance with the governing municipal and utility company standards.  Utility lines will be sized to meet the requirements of the intended use of the Premises and those set forth in the Final Plans for the Building Shell and Leasehold Improvements.  All utilities to be extended to within five feet of the Building Shell line, in locations that are within reasonable proximity of the points at which such utility lines are required to be stubbed into the Premises by Tenant in accordance with Article 6 below.

5.6     Power and Telephone.  Extend power and telephone mains to transformer pads and main shutoffs and CT enclosures to within five feet of the exterior of the Building Shell.  Extend empty telephone conduits from distribution points to a central location within the Premises.  Telephone wiring to such central location to be provided by utility company at no expense to Tenant upon application of service to the Premises.  Electrical transformer, pull box, main Premises shutoff, meter base and associated conduit and wiring to be provided by Landlord or local utility company at no cost to Tenant.

5.7     Exterior Lighting.  Provide parking lot lighting throughout the site which will consist of 30'-0" to 50'-0" high pole-mounted fixtures on raised concrete bases, with spacing and lamp sizes to achieve a minimum lighting level of 1.5 footcandles.

5.8     Exterior Signage.  Per Section 7 of the Lease and the Final Plans.

5.9     Cost Responsibility.  Except as expressly set forth herein, all of the Site Work described in this Article 5, including the general conditions associated therewith, will be provided and paid for exclusively by Landlord.

To the extent of any conflict between the location of improvements on the Site Plan and the civil drawings approved by Tenant for the improvements required under this Article 5, and the location of improvements set forth in this Article 5, the Approved Site Plan and civil drawings will control.

Notwithstanding the foregoing, Tenant will be responsible to construct the following Site Work, as depicted on the Final Plans, at Landlord's sole cost and expense: (a) concrete sidewalks along the front of the Premises; and (b) extension of the irrigation to the planters shown on the Final Plans (collectively, the "Additional Work").  Tenant will obtain a separate estimate from its contractor for the Additional Work and Landlord shall reimburse Tenant for the cost of the Additional Work upon the later to occur of (i) completion of the Additional Work or (ii) 30 days after receipt of an invoice from Tenant.  Tenant will also be responsible to extend the roof/rain leaders to the storm sewer below and along the west elevation of the Premises (the "Extension Work").  Landlord shall reimburse Tenant for 50 percent of the cost of the Extension Work upon the later to occur of (i) completion of the Extension Work or (ii) 30 days after receipt of an invoice from Tenant.

6.     Construction of Building Shell.  Tenant will, at Tenant's sole cost and expense (except as provided in Article 11 below), construct the shell building of the Premises with a scope of work equivalent to that described in the Program Package ("**Building Shell**"), which will include the entire superstructure, exterior enclosure, roof, loading dock, miscellaneous items such as protection bollards, and furnishings and finishes as more specifically described and detailed on the Final Plans for the Building Shell.  All work will comply with the general requirements of Article 3 above.  Landlord will ensure, at its sole cost and expense, that basic functional main utility lines and systems will be stubbed to within five feet of the Building Shell of a size and in a location designated by Tenant and where shown on the Building Shell Final Plans.  Except as set forth in this Article 6, Article 11, or as otherwise expressly set forth herein, all work for the Building Shell construction as described in this Article 6, and all general conditions associated therewith, will be provided and paid for exclusively by Tenant.  Tenant will indemnify and hold Landlord harmless from any and all actions, claims, damages, losses, liabilities or expenses which may be imposed upon or incurred by Landlord as a result of Tenant's grossly negligent or willful acts or omissions while performing the work contemplated by this Article 6, except to the extent such liabilities result from the acts or omissions of Landlord.

7.     License for Construction of Building Shell and the Leasehold Improvements.  Landlord hereby grants to Tenant a license for the express purpose of construction of the Building Shell and the Leasehold Improvements on the Prepared Pad and for access (ingress and egress) on, through, over and across the Common Areas of the Shopping Center for all necessary construction access to the Prepared Pad by Tenant and/or its agents, employees, contractors and subcontractors.  The license granted by Landlord herein will not be revocable by Landlord for so long as the Lease remains in effect, but will terminate automatically upon the Commencement Date

of the Lease. Tenant will indemnify and hold Landlord harmless from any and all actions, claims, damages, losses, liabilities or expenses which may be imposed upon or incurred by Landlord as a result of Tenant's grossly negligent or willful acts or omissions while exercising its rights under the license granted by this paragraph, except to the extent that such liabilities result from the acts or omissions of Landlord.

8.     Landlord's Right to Inspect.  Landlord hereby reserves the right to conduct periodic inspections of the construction of Tenant's Work on the Prepared Pad to observe construction and to confirm that Tenant's Work conforms to the Final Plans, and all applicable municipal and state codes and regulations provided, however, that such inspections will not in any manner unreasonably interfere with or disrupt the progress of Tenant's Work. Landlord will indemnify and hold Tenant harmless from any and all actions, claims, damages, losses, liabilities or expenses which may be imposed upon or incurred by Tenant as a result of Landlord's negligent, reckless or willful acts or omissions while conducting such inspections, except to the extent that such liabilities result from the acts or omissions of Tenant.

9.     Title to Improvements.  Upon request by Landlord and subsequent to completion of Tenant's Work, receipt by Tenant of a certificate of occupancy therefor and receipt by Tenant of lien waivers with respect to all of Tenant's Work, Tenant will convey to Landlord (via quit claim deed or other document reasonably satisfactory to both Landlord and Tenant) all of Tenant's right, title and interest in and to the Building Shell and the Leasehold Improvements.

10.     Construction of Leasehold Improvements.  Tenant will, at Tenant's sole cost and expense (except as provided in Article 11 below), construct the leasehold improvements in the Premises with a scope of work equivalent to that described in the Program Package ("**Leasehold Improvements**") in accordance with the Final Plans for the Leasehold Improvements. All work will comply with the general requirements of Article 3 above. All work for the Leasehold Improvements construction as described in this Article 10, and all general conditions associated therewith, will be provided and paid for exclusively by Tenant (except as provided in Article 11 below).

11.     Landlord's Allowance.  Landlord agrees to pay Tenant an allowance, to be applied to the cost of designing and performing Tenant's Work and the other costs described below, equal to $45.00 multiplied by the number of square feet of Floor Area of the Premises plus the amount due for the Additional Work ("**Allowance**"). Landlord will pay the amount of the Allowance to Tenant in accordance with the following provisions. The Allowance will be paid to Tenant not later than 30 days after receipt by Landlord from Tenant of (i) copies of Tenant's invoices from its architect, engineer or contractor together with a certificate from Tenant indicating that the work to which such invoices relate has been substantially completed and/or the materials to which such invoices relate have been installed in, or delivered to, the Premises and (ii) a copy of a temporary or permanent certificate of occupancy for Tenant's Work. Such payments will be made payable to Tenant and will be for the amount of the submitted invoices, less a 10% retainage. As a condition precedent to Landlord's releasing the retainage to Tenant, Tenant will deliver to Landlord an original lien waiver from its contractor waiving any claim for a mechanic's or materialman's lien with respect to the labor and materials reflected in the invoices submitted for the preceding payment. A further condition precedent to Landlord's issuing the last such payment for the amount of the retainage will be that Landlord has received from Tenant (either prior to or simultaneously with the issuance of such final payment) the following:  (a) notice from Tenant's contractor that Tenant's Work has been completed (including completion of any punch list items); (b) a final and unconditional original lien waiver from Tenant's contractor in connection with Tenant's Work; and (c) a copy of the certificate of occupancy or the temporary certificate of occupancy for the Premises issued by the appropriate Governmental Authorities. The total of all such progress payments will in no event exceed the amount of the Allowance. If the amount of the Allowance exceeds the total cost incurred by Tenant in designing and performing Tenant's Work, Tenant may use the balance of the Allowance, at Tenant's option (i) to pay for costs incurred by Tenant for obtaining and installing Tenant's fixtures, furnishings and equipment in the Premises; or (ii) as a credit against the first accruing amounts of Rent due under this Lease. If Landlord does not pay the Allowance in accordance with this Section 11, Tenant may offset the Allowance against Rent due hereunder.

12.     Construction Timing and Completion.

12.1     Inspection.  During the progress of construction of Landlord's Work, Landlord will permit, and cause Landlord's contractor to permit, Tenant access to the Premises for the purpose of observing the construction. Such entry by Tenant prior to the Pad Delivery Date will (a) be under all of the terms and conditions of this Lease, except no Rent will be payable, and (b) not be construed as an acceptance of Landlord's Work by Tenant.

12.2     Notice of the Pad Delivery Date.  Landlord will notify Tenant in writing of the date on which Landlord contemplates the actual Pad Delivery Date will occur ("**Contemplated Pad Delivery Date**") at least 45 days prior to such date ("**Delivery Notice**"). If Landlord fails to deliver the Delivery Notice at least 45 days prior to the then Contemplated Pad Delivery Date, then the Pad Delivery Date will in any event be extended to at least the 45th day following the delivery of the Delivery Notice.

12.3     Concealed Conditions.  Should Tenant or its agents or contractors encounter concealed or unknown conditions during the performance of Tenant's Work below the surface of the ground (including, without limitation, variable fill, asphalt, organic material, abandoned utility lines, garbage or debris or abandoned underground storage tanks and piping related thereto), Landlord will remove or correct (and to the extent applicable, dispose of in accordance with Environmental Laws) such concealed or unknown conditions, at its sole cost and expense, and in accordance with Laws. Landlord will perform such removal or correction within 10 days of receipt of notice from Tenant of the existence of such conditions and Landlord will further, within such period, restore the affected area(s) of the Premises to the condition which such area(s) should have been in, so as to render the area(s)

useable for Tenant's Work. If concealed or unknown conditions are encountered and must be removed or corrected, the Pad Delivery Date will be deemed extended by one day for each day of delay caused by the removal or correction of such conditions.

12.4    Tenant's Inspections. Landlord will notify Tenant in writing when Landlord considers the Prepared Pad to be "Substantially Complete" (as defined below), which notice will be referred to as the "**Notice of Inspection**." Landlord and Tenant will promptly thereafter arrange to meet at the Prepared Pad to inspect the Prepared Pad together and to produce a list of remaining items to be completed or corrected by Landlord. Landlord acknowledges that (a) Tenant will not conduct the inspection until such time as Landlord has given the Notice of Inspection, and (b) Tenant will not be obligated to accept possession of the Prepared Pad until Landlord and Tenant have conducted the inspection and the Prepared Pad is Substantially Complete and all other conditions precedent to the Pad Delivery Date set forth in Section 1.3(o) of the Lease have been satisfied. If the initial list reflects that the Prepared Pad is not Substantially Complete, Landlord will pursue completion of the incomplete items, and Landlord and Tenant will again inspect the Prepared Pad together and produce a final list of remaining construction items. Tenant will not be required to accept the Prepared Pad until it is Substantially Complete. Landlord will use reasonable diligence to complete all final incomplete items within 10 days after the Prepared Pad is determined to be Substantially Complete, but in the event such items cannot reasonably be completed within 10 days, Landlord may have up to an additional 20 days to complete all final items. Nothing contained in this Article 12.4 will be construed to require Tenant to accept the Prepared Pad prior to the Contemplated Delivery Date. Landlord will also be required to notify Tenant in writing when Landlord considers the Site Work to be Substantially Complete. On the Pad Delivery Date, Landlord must have sufficient Site Work completed to provide Tenant with: (a) adequate construction ingress and egress to the Prepared Pad reasonably necessary for Tenant to be able to construct Tenant's Work; (b) a portion of the Shopping Center located near the Prepared Pad (in a size and location mutually agreed upon by Landlord and Tenant or as shown on Exhibit B, if applicable) sufficient to allow Tenant a reasonable area for staging, materials storage and a construction trailer; all such items to be included as requirements to be completed by Landlord and accepted by Tenant in order for the Prepared Pad to be deemed Substantially Complete. Landlord will provide Tenant with a Site Work Notice of Inspection when Landlord determinates that the Site Work is Substantially Complete and Landlord and Tenant will inspect the Site Work and follow the inspection, notice, punch list and completion requirements set forth above (with respect to the Prepared Pad) in order to inspect and complete Landlord's Site Work with respect to the Shopping Center. As used in this Exhibit C with respect to the Prepared Pad, "**Substantially Complete**" means that the Prepared Pad satisfies all of the conditions for construction and delivery thereof which are set forth in Articles 3.5 and 5.1 of Exhibit C and Landlord has delivered to Tenant the pad certification in accordance with Article 3.4.    As used in the Lease and this Exhibit C with respect to the remainder of Landlord's Work and the remainder of the Site Work to be completed by Landlord subsequent to the Prepared Pad Delivery Date, "Substantially Complete" means that (i) all of Landlord's Site Work has been completed in accordance with Exhibit B, the Approved Site Plan and Landlord's civil drawings with respect thereto, in the case of the Site Work, to the point that only minor details remain to be completed or corrected, all of which work remaining to be completed or corrected would be considered minor and none of which work would in any way restrict Tenant from completing Tenant's Work, (ii) if applicable to the Site Work, Landlord has obtained and delivered to Tenant a certificate of completion (or its equivalent) issued by the Governmental Authority that issued any required permit(s) for Landlord's Site Work indicating that Landlord's Site Work has been completed to the satisfaction of such authority, (iii) Landlord has completed installation of the Pylon Signs and Tenant's sign panel faces by the date set forth in Section 7.1 and Landlord has installed at least the initial coat of pavement in Tenant's Parking Field and the Protected Accessways shown on Exhibit B of this Lease from adjoining public streets around the front and rear of the Premises at least 60 days prior to the opening of Tenant's store and, (iv) with respect to the balance of the Site Work, at least 45 days prior to the opening of Tenant's store ("**Site Work Completion Date**"), Landlord has installed the final coat of pavement and has otherwise completed the Protected Accessways and all light standards in the Parking Field shown on Exhibit B have been installed and are operating; provided, however, that Landlord may complete the final stripping and clean up of the parking areas not less than 30 days prior to the opening of Tenant's store. If all Site Work is not completed on or before the Site Work Completion Date (other than the final stripping and clean up of the parking lot, which must be completed at lease 30 days prior to the opening of Tenant's store), Tenant will not be required to open and all Rent will be abated until the Site Work is completed.

12.5    Outside Dates. If construction of the Prepared Pad and the Site Work has not commenced on the Effective Date, Landlord will commence final site grading (or other applicable Site Work) not later than the Site Work Start Date in order to achieve the Pad Delivery Date on or before the Projected Pad Delivery Date. Subject to Section 17.15, if the Pad Delivery Date does not occur on or before the Projected Pad Delivery Date, then Tenant will be entitled to a credit against the first accruing amounts of Rent due under this Lease in an amount equal to (a) two days' Base Rent (calculated based on a 30 day month) for each day of the first 30 days of the period from the Projected Pad Delivery Date until the Pad Delivery Date, and (b) one day's Base Rent (calculated based on a 30 day month) for each day of any portion after the first 30 days thereof of the period from the Projected Pad Delivery Date until the Pad Delivery Date. Both parties acknowledge that if the actual Pad Delivery Date does not occur on or before the Projected Pad Delivery Date, Tenant's damages will be difficult, if not impossible, to ascertain and the amount of liquidated damages set forth above is a reasonable estimate of the damages which would be suffered by Tenant, including, but not limited to, lost sales, lost profits, and additional costs incurred for storage, rescheduling, payroll, inventory, advertising and carrying costs. If Tenant terminates this Lease pursuant to Article 12.6 below prior to the occurrence of the Pad Delivery Date, then the liquidated damages described above will be calculated with reference to the date of termination of this Lease rather than the Pad Delivery Date and the amount so determined will be payable by Landlord to Tenant in cash, rather than as a credit against Rent, and the obligation to pay such damages will survive the termination of this Lease. If (x) Landlord stakes the pad in reliance on such drawings, and (y) Tenant subsequently changes the drawings such that Landlord must restake the pad, then the Tenant will reimburse to Landlord the reasonable costs associated with restaking the pad and the Pad Delivery Date will be extended on a day for day basis for each day that the change to Tenant's architectural drawings delays the Pad Delivery Date.    The remedies set forth in this Article 12.5 will be Tenant's exclusive remedies for Landlord's failure to meet the deadlines set forth in this Article 12.5.

12.6    Tenant's Option to Terminate.  If (a) Landlord fails to cause the Pad Delivery Date to occur on or before the Pad Delivery Deadline (provided that Tenant will deliver to Landlord written notice of Landlord's failure to cause the Pad Delivery Date to occur and 45 days to cure such failure), or (b) Landlord deviates from the Approved Site Plan or from the site plan on Exhibit B without the prior written consent of Tenant (except as specifically permitted in this Lease) and fails to cure same within 45 days of written notice by Tenant to Landlord of such deviation, then in any such event Tenant may, at Tenant's option, by notice to Landlord at any time following the date so specified or the date upon which the deviation is discovered by Tenant, terminate this Lease, whereupon Landlord will be obligated to pay Tenant liquidated damages in an amount equal to $75,000, less the amount of any liquidated damages paid to Tenant pursuant to Article 12.5 above, which obligation will survive the termination of this Lease.  The parties acknowledge that if the circumstances giving rise to such right of Tenant to terminate this Lease should occur, Tenant's damages will be difficult, if not impossible, to ascertain and the amount of liquidated damages set forth above is a reasonable estimate of the damages which would be suffered by Tenant, including, but not limited to, lost sales, lost profits, and additional costs incurred for obtaining alternative premises.  From and after such termination, the parties will be liable for their respective obligations to the date of termination and will have no liability for obligations arising after that date, except for those obligations which expressly survive termination.  Tenant may also, from time to time, extend Landlord additional time for completion. The remedies set forth in this Article 12.6 will be Tenant's exclusive remedies for Landlord's failure to meet the deadlines set forth in this Article 12.6.

12.7    Mutual Indemnities.  Landlord will indemnify and hold Tenant harmless from all claims, demands, losses, damages, and expenses arising out of Landlord's operations and the operations of Landlord's contractor or contractors and any subcontractors, laborers or materialmen in construction of the Site Work and the Pad.  Subject to Landlord's payment to Tenant of the Allowance, Tenant will indemnify and hold Landlord harmless from all claims, demands, losses, damages, and expenses arising out of Tenant's operations and the operations of Tenant's contractor or contractors and any subcontractors, laborers or materialmen in construction of the Building Shell and the Leasehold Improvements.

**Exhibit C-1**

TENANT'S PROTOTYPE PAD SPECIFICATIONS

Landlord shall provide, at Landlord's sole expense, all work described herein in accordance with generally accepted means, methods, and standards of the construction industry. All design development and engineering shall be prepared by a Registered Architect and/or Professional Engineer as approved by tenant and licensed by the state in which the demised premises are located. All construction shall be provided by trained and experienced tradesmen in a good and workmanlike manner. Landlord shall be responsible for the filing of all applications, payments of all fees, and securing of all permits, approvals, and bonds as may be required by any governmental agency having jurisdiction for said work.

Landlord shall provide the following:

I.    **General Conditions**

The following standards are intended to establish an understanding of "minimum" level of acceptance performance; however, Tenant reserves the right to amend these specifications based upon the advice of its consultants for specific project conditions. Landlord shall be solely responsible for compliance and must bear all costs should corrective measures be required. In addition to the specific requirements called for within these specifications, the design and construction of all on-site and off-site improvements shall conform to applicable federal, state and municipal governmental requirements, including, but not limited to, local zoning and highway ordinances, fire and building codes, regional planning directives and regulations pertaining to health, safety and environmental protection. In the event that any governmental agency places any restrictions or imposes any conditions relative to compliance before occupancy permits can be issued, Landlord, upon receiving such notice of restriction or condition, shall immediately notify The Sports Authority (TSA or Tenant) and shall participate in the remedy.

II.   **Phase I Demolition**

Landlord shall have all former buildings and surrounding site demolition completed by 1/10/06. The demolition shall consist of removal of all structures, concrete foundations, former utility lines, piping, and/or conduits.

III.  **Phase II Feasibility**

A.   **Soil Testing, Analysis, and Report**

Landlord shall secure the services of a reputable licensed geotechnical engineering consultant satisfactory to Tenant for the purpose of investigating subsurface conditions by analyzing and evaluating test data to make specific grading, pad preparation and foundation recommendations. This consultant shall be provided specific information regarding the development, including but not limited to, building size, location, column layout, maximum loading and proposed finish floor elevation.

The Tenant building shall be assumed to be a one story structure with a slab-on-grade. Exterior walls will be non-load bearing concrete masonry units and the superstructure will be structural steel and bar joist. Column bays are approximately 37'-0" x 37'-0"resulting in a maximum expected column load of 50,000 lbs.

Borings within the building shall be a minimum of twenty (20) feet in depth unless refusal is encountered at a shallower depth or suitable bearing material is not encountered at the twenty (20) foot depth. Borings in the parking area shall be a minimum of ten (10) feet unless refusal is encountered at a shallow depth. Samples shall be taken at intervals not to exceed five (5) feet as defined by the Standard Penetration Test (ASTM D-1586). Unless the licensed geotechnical engineering consultant, in their professional assessment requests additional borings, a minimum of twelve (12) borings shall be provided, one at each outside corner of the building and three (3) through the center of the building as well as five (5) borings in the future pad to be located by TSA.

B.   **General Site Information**

1.   Landlord shall provide Tenant with existing site information:

(a)   Calculated metes and bounds boundary data shown on the drawing with orientation, etc.

(b)   Narrative legal description as recorded in local records together with a metes and bounds boundary survey. The survey must show any items to which reference is made in the legal description.

(c)   Location, description (with any recorded data) of all easements, servitudes, right-of-ways and other encroachments, whether recorded or otherwise evident.

    (d)   Location and size of all utilities including water, electricity, gas, telephone, sanitary sewer, storm sewer, invert elevations of all utilities, etc.

    (e)   Topography and terrain feature shown on the drawing with a benchmark noted relative to local established datum.  One permanent benchmark shall be set adjacent to the site and identified on the survey for Tenant to use during construction, which will be provided with V., G.7 (b), Certificate of Grade and Location.

    (f)   Size, variety, and location of existing plantings, which will be shown.

    (g)   Adjoining property owners of record.

    (h)   Setbacks, building lines and other local or deed restrictions.

    (i)   Zoning of parcel in letter format from city indicating Tenant's use will be allowed.

    (j)   Location and nature of existing site improvements including curbs, catch basins, sidewalks, etc., which will be shown.

    (k)   Location and orientation of the building on the site.

    (l)   Do any previously recorded lot lines, servitudes, etc., that have been replatted or vacated.

    (m)   Size of lot in square feet and acres.

    (n)   Topographic map prepared from a fifty (50) foot grid survey showing on (1) foot contour intervals.  Any terrain breaks shall be shown and detailed.

    (o)   Identify subsurface hazardous/toxic materials abatement if any and provide solution

2.   In writing, verify with the appropriate public agencies that the property will be served with all necessary utilities and other services (such as fire and police protection) and that the reserve capacities of all utility lines are adequate to serve the development.

    (a)   Obtain commitments acceptable to Tenant verifying that the property will be served with all utilities.

    (b)   Locate nearest point to all utilities to which the site would connect.

    (c)   Street and other off-site improvements shall show right-of-way dedications required by governmental agencies with jurisdiction.

    (d)   Fee or Changes: advise if there are area fees or other assessments required in connection with development of the property.

    (e)   Location and extent of Flood Plain (if applicable) as established by HUD and any other governmental agencies having local jurisdiction of same.

## C.  Preliminary Premise Plan Approval

1.   Premise Site Layout Plan – Landlord will prepare the site layout based upon survey information provided and will furnish same to Tenant with a preferred finished floor elevation for Tenant's approval.

2. Development Plans – Using the Tenant layout, Landlord shall prepare preliminary development plans and specifications. Any deviations from Tenant's proposed layout shall be subject to Tenant's approval. Upon completion of design, one (1) set of reproducibles shall be submitted to Tenant for approval prior to commencing with final site development planning. Preliminary plans submitted for Tenant's approval shall include, but not limited to, site layout, traffic, striping, preliminary grading, utilities, and finished floor elevation.

3. Landlord shall provide a "Property Site Plan" for surface water retention and erosion control for reference purposes to prepare the premise site plan.

## IV.    Phase III – Site Development Planning

### A.    General

Final site development planning shall proceed only after approval of the preliminary site plan, as described in Phase II, by Tenant as evidenced by signature of its authorized representative. No modification to this approved layout shall be implemented without approval of Tenant. All site development documents shall be prepared by a qualified, licensed engineer satisfactory to Tenant with plans and specifications certified and sealed.

The following list of general information shall be included within the final site development drawings.

### B.    Premise Site Plan

1. The premise site plan shall include the location, size, invert elevations and material of all existing and proposed utilities. The limits of Landlord versus Tenant responsibility for utility and tap installations shall be clearly shown. Utilities shall include, but not limited to, storm sewers, sanitary sewers, water, gas, electric and telephone. A separate site utility plan may be submitted in lieu of locating utilities on the site plan.

2. The property site plan shall include all traffic patterns, parking layouts, striping details, signalization and directional signaling. All existing and proposed curbs, sidewalks, retaining walls, etc. shall be shown. The location of all existing and proposed monument, directional, pylon or road signs shall be shown.

3. The premise site plan shall show limits of heavy duty and standard duty pavements, concrete slabs, loading docks, etc. Limits of heavy duty versus standard duty pavements shall be as follows:

    (a)  Heavy duty pavement:  all perimeter roads, main driveways and truck thoroughfares.

    (b)  Standard duty pavement:  all automotive aisles and stalls.

### C.    Site Grading Plan

The site grading plan shall show both existing and proposed contours at one (1) foot intervals spot grade elevations at all proposed entries, receiving areas, and adjacent areas. Site grading shall be designed as practical to balance cut and fill within the parameters established by the approved preliminary site plan. Profiles of the existing and proposed grading shall be provided if deemed necessary for bidding.

D. **Site Lighting Plan**

The site lighting plan shall include location of all site lighting, photometric curves, circuiting, pole and luminare catalog cuts, detail of base, pole and luminare assembly and any other information required to evaluate the lighting plan. Power to illuminate existing or proposed monument, pylon, road and directional signs shall be shown.

E. **Landscaping and Irrigation Plan**

The landscaping plan, in the new parking fields, shall indicate all proposed planting (size, variety, and location) and seeding/sodding (turf mix, density, rate, etc.). The landscaping plan shall be designed by a registered professional in accordance with local standards and designed suitable for the climate.

F. **Approvals**

Upon completion of the final site development plans one (1) reproducible set of plans shall be submitted to Tenant for review and approval. Tenant will sign and return a blueline set noting any required revisions. After the required modifications have been implemented, documents shall be submitted by Landlord to the appropriate governmental agencies. All necessary governmental approvals shall be the sole responsibility of the Landlord.

V. **Phase IV – Premise Site and Pad Preparation Standards**

Except as amended and approved by Tenant, the following criteria shall establish the minimum acceptable standards for design and construction of the site work and pad preparation. All drawings, specifications and construction shall, as a minimum, conform to the following specifications and requirements.

A. **Grading**

1. Landlord shall grade, excavate and place structural fill on the site in conformance with the recommendations of these specifications or Landlord's geotechnical engineer, whichever is more stringent.

2. All paved areas shall be designed at a 3% maximum and 1% minimum grade (1-2% preferred), with no retaining walls or embankments forming a break in grade unless incidental to a multilevel mall in which event the location and design of such retaining walls or embankments shall be subject to Tenant approval.

3. All landscaped areas shall have a maximum slope of three (3) horizontal to one (1) vertical.

4. All grading shall be performed to a tolerance of plus or minus one-tenth (1/10) of one (1) foot within the building and paved area. This tolerance may be increased to plus or minus one-half (1/2) of one (1) foot within landscaped areas.

5. All structural fill shall be placed in accordance with the following densities, as defined by ASTM D-1557 MODIFIED PROCTOR:

   | | |
   |---|---|
   | Paved area | 95% |
   | Below foundations | 95% |
   | Below building slab | 95% |

B. **Pavement, Sidewalks, Curbs, and Signs**

1. Pavement design shall be as recommended by Landlord's geotechnical engineer and shall consider such variables as the State Bearing Ratio of the soil, anticipated traffic volume and vehicle mix (i.e.: automobiles, single axle trucks, double axle trucks, etc.). The design shall also be based on sound geotechnical practices, existing soil conditions, knowledge of local conditions, availability of material, and cost and performance.

2. Pavement design shall include both standard duty and heavy duty pavement and shall be based on the following criteria:

   Standard Duty Pavement:   Equivalent Axle Loading (EAL) design value of 0.6/day (500 automobiles per day) and general parking

Heavy Duty Pavement:  Equivalent Axle Loading (EAL) design value of 1.4/day (500 automobiles per day plus 3 tractor trailers per day with 9000 lb. Wheel loads).

3. All new paving shall be comprised of either compacted aggregate base course and hot mix asphaltic concrete surface course, asphaltic tack coat and hot mix asphaltic concrete surface course, full depth hot mix asphalt concrete pavement or compacted base course and reinforced Portland Cement with a minimum of 2000 psi. concrete mix and shall be based on a minimum design period of twenty (20) years.

   A. All new asphaltic concrete paving shall have a minimum of 4" thickness in main drives and service areas, and 2" thickness in parking areas.

   B. All new aggregate base course shall be minimum of 6" thickness for light duty and 8" thickness for heavy duty areas.

   C. Concrete paving shall have a minimum of 6" thickness (main drives and service areas) and 4" thickness light duty (parking areas).  All concrete paving must be reinforced and in compliance with America Concrete Institute guidelines.

4. Pavement shall be classified as heavy duty and standard duty as delineated in Section IV, B, 3, of these specifications.

5. Parking Module – the width of an aisle plus the depth of the parking stall on either side, measured perpendicular to the aisle shall be a minimum of sixty (60) feet for 90 degree parking or as required by the local authority.

6. Perpendicular width between center lines or between mid-points of parallel lines of adjacent stall striping shall be nine (9) feet.

7. All parking stalls shall be separated using stripes four (4) inches in width.  Striping shall have two (2) coats of paint, alkyd base synthetic resin, Fed. Pec. TTP-115 TYPE 1 in color white or traffic yellow.  If seal coat is used, it shall be compatible with the striping paint compound.

8. Special stalls shall be provided per requirements of local ordinances and the Americans with Disabilities Act (ADA).  Locate required handicap parking at the end of the parking rows immediately across the drive lane from the store entrance in accordance with local and ADA requirements.

9. Access roads, parking lot perimeters, parking lot islands, landscape enclosures and any other areas requiring adequate drainage shall have six (6) inch by eighteen (18) inch cast-in-place concrete curbs.  Asphalt curbs will be permitted at the outer perimeter roads only with the agreement of Tenant.  All integral type curb and gutters shall be concrete.  Deck curbs shall not be used.

10. All sidewalks have a slope of one-quarter (1/4) inch per foot and shall be scored concrete, minimum four (4) inches thick over a suitable granular base.  The sidewalk at the front vestibule of the Tenant building shall be ten (10) feet wide (minimum) and shall provide for flush cart access on either side of Tenant entry and one (1) near the center of entry.

C. Landlord shall obtain all permits for, provide and erect all monument, road, pylon and/or directional signs, in a timely manner.  Landlord shall endeavor to erect said signs as early as possible, but in no event later than two (2) weeks prior to completion of paving work.  In addition:

   1. Landlord shall furnish, erect and maintain a project sign, indicating Tenant is "Coming Soon", located in a prominent location.  The sign shall be erected no later than ( insert date ) or at the time tenant publicly announces its intent to open at Meehan Properties site in Milford, MA.  This sign shall be the maximum square footage allowed per code.  The sign must be removed by tenant three (3) days before the store opening date or at tenant option.

   2. Landlord shall furnish a photograph of the completed sign to the tenant construction manager assigned to the project.

   3. The sign shall be constructed of two (2) 4'0" x 8'0" sheets of ¾" exterior grade plywood and shall be properly braced and constructed to suit the project conditions.  Composition, colors of lettering and

background shall be as shown on the attached drawing. The sign shall be painted on all sides including support members.

**D.   Construction Road and Staging Areas**

A temporary crushed rock construction road, connecting to an existing roadway adjacent to the Tenant parcel and staging area shall be constructed and maintained in good condition by Landlord throughout the construction process to provide access to a and around the building site. Staging areas for workers' parking, material storage, and contractors' trailers and sheds shall be completed two (2) weeks before the start of construction of the Tenant building. The construction road shall be a minimum of sixteen (16) feet in width and the staging area a minimum of 15,000 sq. ft., both constructed of an eight (8) inch crushed rock base with rock binder course. Temporary road to function as a fire department access road and shall be kept clear and maintained for fire department. Use throughout construction process, verify requirements with local authorities.

**E.   Site Lighting**

1.   Illumination shall be measured thirty (30) inches above the adjacent ground, and shall be 1.5 foot candle minimum maintained throughout the site.

2.   Selection of fixture type and control of parking area lighting shall be subject to review and approval of Tenant.

3.   Landlord shall furnish and install a complete exterior lighting system including concrete bases, minimum 20' poles, luminaries, conduits, wiring system, complete connections and controls. Controls shall be comprised of both time clock and photocell controls.

4.   System shall achieve a minimum level of one and one-half (1-1/2) foot candles at parking lot perimeters.

5.   Poles within the main parking area shall have a minimum of two (2) luminaries per pole. Main drive roadway or perimeter standards may have a single luminary.

6.   Satisfactory security lighting as approved by Tenant shall be provided.

**F.   Traffic Signalization**

The location of traffic signals, if any require, shall be determined in coordination with governmental agencies subject to Tenant approval. For each such provided signal, Landlord shall have a traffic signal design plan prepared by a licensed engineer, which plan shall be subject to Tenant review and approval prior to final submission to the appropriate governmental agencies. The plan shall show, as a minimum, the geometrics of the entrance/exit, the location of standards, signal heads, controller, power course, detectors and conduit, as well as the suggested signal phase and wiring diagram, and shall other wise be in sufficient detail to permit obtaining bids for the installation of the signal.

**G.   Utilities**

1.   Temporary Utilities

Landlord shall provide the following temporary utility services to a point not more than twenty-five (25) feet from Tenant building pad, which point shall be approved by Tenant. Each contractor shall pay on the basis of material use for the cost of the following utility services:

(a)   Water:  as a minimum service, a two (2) inch line at a pressure suitable for use without the need for pumping.

(b)   Electricity:  service at 120/240 volts with a minimum of 200 amps three phase-four wire and terminating in a weatherproof and rainproof fused disconnect switch and subpanel. Landlord shall provide one 400 watt flood light on a temporary pole in the staging area.

(c)   Telephone:  Landlord shall coordinate with the local telephone company to assure access to the building pad and staging areas for telephone service availability.

    (d)   Storm Sewer:  In addition to the above referenced utilities, Landlord shall provide adequate soil erosion protection which shall include, but not limited to temporary ditches, hay bales, silt fences, etc. as necessary to divert surface storm water runoff from the building pad and staging areas.  If deemed necessary by Tenant's contractor and/or if requested by city officials all such soil erosion measures shall be maintained by Landlord until permanent stormwater drains have been completed and made operational.

2.   Permanent Utilities

Landlord shall provide the following permanent utility services to a point five (5) feet from the Tenant exterior building wall, which point shall be at an elevation and a specific point of entry selected by Tenant. Landlord shall provide all necessary coordination with the various utility companies to assure adequate service.  Final connections shall be made by the Tenant contractor.  Such permanent utilities shall be furnished in accordance with the following requirements:

    (a)   Sanitary sewer line invert shall be sufficiently deep as to receive all building flow by gravity.  Sewer laterals shall be a minimum of six (6) inches in diameter.

    (b)  (1)  Storm sewer line invert shall be sufficiently deep as to receive all roof drainage

         and truck dock drainage by gravity.  When site drainage conditions prohibit

         draining the truck dock by gravity, Landlord shall furnish, install and maintain

         dock pump discharges to the nearest stormwater drain.

       (2)  The stormwater drainage system shall include underground lateral connections for Tenant roof drainage, which shall be provided by Landlord at locations shown on site utility plan. All lateral connections shall be provided to within five (5) feet of the exterior building wall.

       (3)  The storm drainage system shall include all pertinent inlet and outlet structurewith an overall design based on the following (unless superseded by local codes):

          -   A minimum regional fifteen (15) year storm frequency with a fifteen (15) minute time of concentration.

          -   A minimum of eighteen (18) inches of freeboard shall be maintained between finished floor elevation and the water surface resulting from a 100 year frequency storm.

          -   Discharge velocities shall be low enough so as to prevent damage downstream.

          -   A hydraulic analysis prepared by a registered Civil Engineer which shall be submitted to Tenant for review and approval, if so requested.

          -   No storm water retention may be imposed on Tenant roof.

          -   No parking lot detention shall be permitted.

    (c)   Domestic water shall be provided at the point of entry at a location determined by Tenant. Domestic water service, which is served by a 10" main line, shall be stubbed and capped at least five (5) feet into the demised premise at a mutually agreeable location to be shown on the approved plans.  Landlord shall install a private domestic water submeter to split service for tenant use which shall be 2" diameter minimum and 45 PSI residual pressure at base of riser.  Landlord is to provide and install meter as individual metering is a requirement.

    (d)   Electrical service, which is existing, shall provide electrical service cables of the size and in the quantity customarily supplied by the utility company furnishing primary electricity, 1200 amp at 277/480 volt 3 phase in conduits and ducts connected to a pad mounted transformer in manner satisfactory to Tenant and utility company.  Landlord is responsible for coordination with utility company to pull primary conductor to transformer, set transformer, energize transformer and, if transformer is more than five (5) feet form Tenant building wall, provided conduit and pull string to within five (5) feet of the building.

    (e)   Telephone ducts, conduit, cable and manhole structures capable of supporting 50 pair cable (min.) and as required by the utility company furnishing the telephone service shall be provided.

    (f)   Natural gas shall be provided from a source in a supply of sufficient capacity to

provide 2,300 MBH with a minimum pressure of 4oz. or 7" water column. Landlord is responsible for conduit and services to building. Landlord to provide and install meter.

(g) Actual connections with stubbed out utilities at points of connection shall be made by Tenant's contractor and permits for these connections shall be obtained by that contractor. Permit fees for building connection shall be Tenant responsibility, unless fees are a contribution to the costs of public system improvement, or extension thereof, in which event the fee will be Landlord's responsibility as part of the Common Area Work.

(h) All permanent utilities required hereunder shall be available by the utility completion date.

3. Fire Protection

(a) Fire hydrants shall be located as required by the local Fire Marshal and Public Health and Safety Offices and installed prior to construction.

(b) Underground water mains shall be of sufficient size to adequately supply both fire protection and domestic demands simultaneously.

(c) Landlord shall bring an eight (8) inch minimum loop-valved stub-out to location and elevation within the building as defined by Tenant (see pg. 9 Domestic Water (c)). Six (6) inch stub-out may be acceptable—coordinate with Tenant.

(d) In the event that buildings being constructed in the Center are of different types, levels or uses other than Tenant prototype uses (i.e. UBC-IN Sprinkled Construction; Standard-Type IV Unprotected Sprinkled; BOCA-2C Unprotected Sprinkled) the Landlord shall be responsible for costs incurred to upgrade the Tenant building to meet applicable codes.

## H.  Landscaping and Retaining Walls

1. Where retaining walls are required on one or more sides of a building, the minimum requirements shall be followed:

(a) Developer shall stockpile on the site sufficient suitable fill material to completely backfill the area behind the retaining wall up to subgrade, which fill material shall be tested by Developer's geotechnical engineer selected and certified as suitable for backfill and compaction.

(b) All retaining walls on the site shall be designed in accordance with the recommendations as described in Developer's geotechnical engineer's report.

(c) The type, quality and finished appearance of all retaining walls shall be coordinated with exterior of the building.

(d) Retaining walls which are necessary for part and part of Tenant's depressed dock and trash compactor facilities shall be Tenant's responsibility, provided that screen walls will be provided by Developer for all joint loading area.

2. **Planting material shall be compatible with site climatic conditions and location on the site.**

## I.  Building Pad Preparation

The following standards shall be followed for the preparation of the Tenant building pad, except when superseded by more stringent requirements as set forth by Landlord's geotechnical engineer. The building pad shall be defined as the Tenant building footprint inclusive of adjacent concrete pads and loading docks and sidewalks as defined on the attached plan.

1. If applicable remove and install any contaminated soils and provide clean fill to building site.

2. The building pad soils shall have a minimum allowable bearing capacity of 2000 p.s.f. at 2'-6"    below building pad elevation and loading dock pad elevation which will be verified based on final soils report, for support of the Tenant building on conventional, shallow spread footings and slab-on-grade. Differential settlement shall not exceed one (1) inch. If subsurface conditions prevail such that conventional spread footings are not considered feasible (i.e.: rock, excessively expansive soils, organics, etc.) Landlord shall reimburse Tenant for any added construction costs incurred. This shall include, but not be limited to, extra costs incurred due to over-excavation of unsuitable materials, extension of footings, extra concrete and reinforcement which are over the costs of conventional spread footings and slab-on-grade.

3. Structural fill shall be placed in accordance with the following densities as defined by ASTM D-1557 Modified Proctor:

|  |  |
|---|---|
| Below Foundations | 95% |
| Below Building Slab | 95% |

Perform final testing no more than four (4) weeks prior to start of construction.

4. All structural fill shall be placed in horizontal lifts not exceeding ten (10) inches in loose measurement, before compaction.

5. All structural fill shall consist of a readily compacted borrow material, free of clay, rock or gravel larger than two (2) inches in any dimension, debris, waste, frozen material, organics or other deleterious material. All borrow material shall be inspected and certified by a licensed geotechnical engineer prior to placement for use as structural fill.

6. The building pad shall be eight (8) inches below proposed finished floor elevation to provide for a four (4) inch concrete slab and a four (4) inch granular layer. The top twelve (12) inches of subgrade shall be compacted to 95% Modified Proctor.

7. All fill shall be verified by field inspection and documented by landlord's goetechinical engineer. A minimum of one (1) field density test shall be made for each 5,000 square feet of building pad per lift of structural fill placed.

8. Certifications

   (a) Certification of Fill Material Compaction:

   A signed and sealed certificate of compliance with compaction and proper use of materials shall be submitted to Tenant by Landlord's licensed geotechnical engineer for approval prior to pad delivery. The Certification of Fill Material and Compaction shall include the following:

   I. Statement that the pad was prepared in strict accordance with the Geotechnical Report and the Tenant Site Specifications.

   II. Statement of allowable bearing capacity and anticipated total and differential settlements.

   III. All compaction test results and test location plan.

   IV. Depth of overexcavation. (if applicable)

   V. Hazardous materials abatement. (if applicable)

   (b) Certification of Grade and Location:

   A signed and sealed certificate of compliance with grade (plus or minus one-tenth (1/10) of one (1) foot shall be submitted to Tenant by Landlord's licensed surveyor. In addition, Landlord's surveyor shall provide a certification of location of the building pad with relation to adjacent property lines. Both certifications shall be submitted for approval prior to pad delivery. The Certification of Grade and Location shall include the following:

I.      Spot grades indicated on a 25' X 25' grid.

II.     Spot grades shall be indicated for the building pad and ten (10) feet beyond.  The building pad shall be defined as the Tenant building footprint inclusive of adjacent concrete pads, loading docks and sidewalks.

III.    A survey indicating the correct dimensions of the building pad and relation to adjacent property lines.

IV.     Location and elevation of permanent bench marks used for the Certification.

(c)  Tenant reserves the right to reject the pad or demand corrective measures be taken by Landlord, at no cost to Tenant, if the building pad is not prepared in accordance with these specifications or the proper certification not submitted.

## J.   Schedule

No more than ten (10) days after the commencement of construction of any portion of the site and pad preparation work, landlord shall submit to Tenant a schedule of construction, detail of which shall be satisfactory to Tenant. Landlord shall also submit copies of all construction contracts relating to all site improvements work.

**Exhibit D**

**MEMORANDUM OF TERM**

As provided by the terms of the Shopping Center Lease ("Lease") dated _____, 20__, between the undersigned parties leasing premises described as follows:

_____

_____

_____

the undersigned hereby establish and agree (i) the Initial Term of the Lease commenced on the Commencement Date which was _____, 20__, (ii) the Floor Area of the Premises is _____ square feet, (iii) the Rental Commencement Date is _____, and (iv) the Expiration Date of the Lease is _____, although the Term may be extended as provided in the Lease for the exercise of certain Extension options.

**TENANT:**

TSA STORES, INC.,
a Delaware corporation


By: _____
Name: _____
Title: _____


Date of execution by Tenant: _____, 20__


**LANDLORD:**


_____
Deno P. Dikeou


Date of execution by Landlord: _____, 20__

**Exhibit E**

**SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT**

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT (this "Agreement") is made and entered into this _____ day of _____, 20__, by and between _____, a _____ ("Landlord"), _____, a _____ ("Lender"), and TSA STORES, INC., a Delaware corporation ("Tenant").

**RECITALS:**

WHEREAS, Tenant entered into that certain Shopping Center Lease dated _____, 20__ with Landlord for retail premises ("Premises") in Waterford Towers Shopping Center ("Shopping Center"), constructed on that certain tract or parcel of land in the City of Orlando, County of Orange and State of Florida, more particularly described in Exhibit A attached to this Agreement and incorporated herein by reference, which such Shopping Center Lease and all amendments and modifications thereto are hereinafter referred to as the "Lease"; and

WHEREAS, Landlord has assigned or will assign to Lender and Lender's successors and assigns, Landlord's interest in, to and under the Lease as a portion of the collateral security for a loan in the amount of $_____ made or to be made by Lender to Landlord and to be additionally secured by a _____ lien mortgage or deed of trust ("Mortgage"); and

WHEREAS, Tenant desires to be assured of the continued use and occupancy of the Premises under the terms and conditions of the Lease.

NOW THEREFORE, for and in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby expressly acknowledged, the undersigned parties hereby agree as follows:

1.      Tenant does hereby consent to the subordination of the Lease and Tenant's rights thereunder to the lien of the Mortgage; provided, however, that the consent and subordination will be contingent upon and subject to the condition that so long as Tenant is not in default, after receipt of any written notice required to be given under the Lease and the expiration of any applicable grace and/or curative period thereunder, in the performance of any of the terms of the Lease, Tenant's possession of the Premises and Tenant's rights and privileges under the Lease or any extensions or renewals thereof will not be disturbed, diminished or interfered with by Lender or by anyone claiming by, through or under Lender, whether by purchase at foreclosure, deed in lieu of foreclosure or otherwise.

2.      In the event of a foreclosure sale under the Mortgage or deed in lieu thereof, Tenant will be bound to Lender or to any other purchaser at foreclosure or recipient of a deed in lieu of foreclosure (Lender or such other purchaser or recipient, a "Successor Landlord") under all of the terms of the Lease for the balance of the term thereof remaining, including any extensions or renewals thereof elected by Tenant with the same force and effect as if Successor Landlord were Landlord under the Lease, and Tenant hereby attorns to Successor Landlord as "Landlord" under the Lease, such attornment to be effective and self-operative without the execution of any further instrument. Notwithstanding anything to the contrary contained herein, Tenant will be under no obligation to pay rent to Successor Landlord until Tenant receives written notice from Successor Landlord that it has succeeded to the interest of "Landlord" under the Lease. Subject to the provisions of Section 3 below, the respective rights and obligations of Tenant and Successor Landlord upon such attornment will, to the extent of the then remaining balance of the term of the Lease, including, any extensions or renewals thereof elected by Tenant, be as set forth in the Lease.

3.      In the event of a foreclosure sale under the Mortgage or deed in lieu thereof, Successor Landlord will be bound to Tenant under all the terms of the Lease and Tenant will, from and after such event, have the same remedies against Successor Landlord for the breach of any covenant contained in the Lease that Tenant might have had under the Lease against Landlord; provided, however, that Successor Landlord will not be:

(a)      liable for any action or omission of any prior landlord, except with respect to any action or omission that constitutes a default in the performance of Landlord's obligations under the Lease which default continues (i) after Successor Landlord acquires title to Shopping Center, and (ii) beyond the cure period afforded to the "Landlord" under the Lease, measured from the date on which notice of such default is given to Successor Landlord (unless possession of the Shopping Center is necessary to effect the cure, in which case Successor Landlord's cure period will be measured from the later of the date on which notice of such default is given to Successor Landlord or the date Successor Landlord or a receiver obtains sufficient possessory rights in the Shopping Center to effect the cure);

(b)      subject to any credits, claims or setoffs which Tenant may have against any prior landlord, except for any credit, claim or setoff to which Tenant is expressly entitled under the Lease;

(c)      bound by any rent which Tenant intentionally paid to a prior landlord more than 30 days in advance; or

<u>TENANT</u>

STATE OF _____    )

                             ) ss.

COUNTY OF _____    )

      The foregoing instrument was acknowledged before me this _____ day of _____, 20__ by _____ as _____ of TSA Stores, Inc., a Delaware corporation.

      WITNESS my hand and official seal.

                                       _____

                                       Notary Public

      My commission expires: _____

**Exhibit F**

**PERMITTED ENCUMBRANCES**

1.  Claims of the State of Florida through the Trustees of the Internal Improvement Fund or otherwise, to an undivided ¾ interest in and title in and to an undivided ¾ interest in all the phosphate, minerals and metals that are or may be in or under the property and an undivided ½ interest in and title to an undivided ½ interest in all the petroleum that is or may be in, on or under the property described in Deed to W.K. Price, Jr. and Marjorie H. Price, his wife, dated February 7, 1945 and recorded in Deed Book 655, page 360, of the public records of Orange County, Florida, as to the East 2/3 of the West ¾ of the Northeast ¼ of the Southwest ¼ of Section 22, Township 22 South, Range 31 East and the Northeast ¼ of the Northwest ¼ of Section 27, Township 22 South, Range 31 East, without rights to the surface for exploration (see Quit Claim Deed recorded in Official Records Book 3200, page 2069; Official Records Book 3200, page 2070, and in Official Records Book 3200, page 2071, of the public records of Orange County, Florida).

2.  East Orange County Sewer MSTU Resolution No. 82-SU-13 recorded in Official Records Book 3292, Page 516.

3.  Assignment of Development Rights recorded in Official Records Book 5557, Page 2676.

4.  Alafaya Trail Development Agreement recorded in Official Records Book 4473, Page 2819.

5.  Development Order and Development Agreement by and between Guarany Properties (Florida) and Orange County, dated June 21, 1983 (unrecorded); First Amendment to the original Development Order to Huckleberry Development of Regional Impact, recorded in Official Records Book 4078, page 2557; as amended by Nonsubstantial Deviation Amendment recorded in Official Records Book 4200, page 1244; Amendment recorded in Official Records Book 4321, page 2413; Amendment recorded in Official Records Book 4323, page 2616; Amendment recorded in Official Records Book 4323, page 2621; Amendment recorded in Official Records Book 4350, page 3654; Amendment recorded in Official Records Book 4360, page 4945, Amendment recorded in Official Records Book 4481, page 3567, as amended by Amendment recorded in Official Records Book 4549, page 4048; Amendment recorded in Official Records Book 4610, page 3961; as amended by Non-Substantial Deviation Amendment to Development Order for the Waterford Lakes (f/k/a Huckleberry) Development of Regional Impact and Notice thereof recorded in Official Records Book 4899, page 2713; as amended by Non-Substantial Deviation Amendment to Development Order for the Waterford Lakes (f/k/a Huckleberry) Development of Regional Impact and Notice thereof recorded in Official Records Book 5102, page 448; and Assignment of Development Rights from Waterford Property Holdings, Inc. in favor of Waterford Commercial Land Joint Venture recorded in Official Records Book 5557, page 2676, Non-Substantial Deviation Amendment to the Waterford Lakes DRI Development Order recorded in Official Records Book 6014, page 3844.

6.  Reciprocal Easement and Operation Agreement by and between Waterford Commercial Land Joint Venture and Deno P. Dikeou recorded in Official Records Book 5845, Page 1099, as affected by First Amendment to Reciprocal Easement and Operation Agreement recorded in Official Records Book 5931, page 4466.

7.  Utility Easement in favor of Orange County, Florida recorded in Official Records Book 6459, Page 2574.

8.  Temporary Utility Easement in favor of Orange County, Florida recorded in Official Records Book 6495, Page 2590.

9.  Terms, conditions, and provisions of that certain Land Exchange Agreement by and between Deno Dikeou and Waterford Commercial Land Joint Venture, recorded in Official Records Book 5893, Page 2918.

10. Rights of tenant(s) in possession, if any, under lease(s) not recorded in the Public Records.

11. Declaration of Easements, Restrictions and Covenants, dated June 28, 2005, made by Deno P. Dikeou, recorded in Official Records Book 08046, at Page 1183 of the Public Records of Orange County, Florida.

12. Real Estate Mortgage, Security Agreement, Assignment of Rents & Leases and Fixture Filing (Florida), dated June 28, 2005, recorded in Official Records Book 08046. at Page 1212 of the Public Records of Orange County, Florida.

**Exhibit G**

**EXISTING LEASES NOT SUBJECT TO TENANT'S EXCLUSIVE/OTHER EXCLUSIVES**

I.     EXISTING LEASES NOT SUBJECT TO TENANT'S EXCLUSIVE:

A.  That certain Lease dated November 30, 2004 between Deno P. Dikeou and Kohl's Department Stores, Inc.

B.  Circuit City, except Circuit City is subject to restrictions on uses identical to Tenant's use as of the effective date of the Circuit City lease, which was executed on May 12, 2005.

II.    OTHER EXCLUSIVES:

A.  CIRCUIT CITY:  During the Term of the Circuit City Lease, no tenant or occupant of the Shopping Center shall be permitted to operate as an electronics store in premises exceeding 15,000 square feet of gross leaseable area.

B.  Tenant shall not violate the following exclusive uses (applicable to the extent Landlord enters into the leases described below within one year following the Effective Date, for uses identical to those of such retailers as of the Effective Date):

1.  A nationally recognized office supply store such as Staples and Office Depot;

2.  A nationally recognized house wares store such as Home Goods; and

3.  A nationally recognized retailer which specializes in the sale of mattresses.

C.  CHIPOTLE:  Landlord shall not rent space in the Center to any other tenant which sells burritos, tacos and/or fajitas.

D.  PANDA EXPRESS:  Landlord shall not allow any real property within the Tenant's retail Building "G" to be used as a restaurant that is primarily recognized as a Chinese or Asian food restaurant. Chinese or Asian Food shall be defined as any restaurant which sale of Asian or Chinese foods constitutes more than 5% of its gross food sales.  In addition, Landlord agrees not to lease or sell any space in the Tenant's retail building or the remainder of the Center to any of the following:  Mama Fus Noodle House, Pei Wei, China One or China Wok or any other tenant with the name "China", "Panda", or "Chinese" in its tradename, Doc Chey's Noodle House or other predominately Asian or Chinese Noodle based concept, or another Chinese or Asian Food Restaurant that serves food in a buffet format.

E.  FUJI SUSHI:  Tenant shall have an exclusive for Japanese Sushi and Steakhouse for the entire shopping center.

F.  URBAN FLATS:  Landlord gives exclusive to tenant for the following uses in the shopping center:  a restaurant predominately selling flatbreads, salads and sandwiches with the foregoing being eaten in the restaurant, taken out or delivered.  The restaurant will have a full liquor bar which offers live entertainment. The restaurant will also sell hats with Tenant's name and/or logo.

G.  JAMES BURNHAM, MASON BURNHAM AND KELLOE DESIGN LLC (BO CONCEPTS): During the term of the Lease, Landlord will not allow or lease to a competitor devoted to 100% sale of contemporary/modern furniture in the Shopping Center.

H.  SOUTH BEACH TANNING FACTORY:  Tenant to have exclusive rights to operate a tanning salon, except in the event another tenant leases in excess of 5000 square feet business and uses tanning units for its members in conjunction with its primary business.  Business may not have in excess of 6 tanning units.

I.  VERIZON WIRELESS:  Landlord will not lease space to any other tenant whose primary business is wireless communications, except Circuit City, Kohl's, Sports Authority, Office Depot and existing Cingular.

J.  VITAMIN SHOPPE:  Landlord will not permit any other premises within 400 feet of the tenant's premises on land controlled by landlord or its affiliates to be used for the sale of vitamins, mineral supplements, nutrition products or herbs (Vitamin Shoppe is located in Retail A as shown on the Site Plan of the Shopping Center).

K.  FIREHOUSE SUBS:  Landlord will not permit any other premises to be used for a sub or deli type restaurant.

**Exhibit H**

**PROHIBITED USES**

I. Tenant agrees to comply with Circuit City's prohibited uses to the extent they apply to its Premises. The Circuit City prohibited uses that may apply to Tenant's Premises are as follows:

        (A)     all those prohibited uses set forth in Section 3.01 of the REA;

        (B)     a carnival, amusement park or circus; and

        (C)     a gas station, except as permitted in the REA.

II. Tenant's Prohibited Uses:

1. Tanning (except south of the Center Access Drive of the Shopping Center), health, exercise or racquet club, spa larger than 3,000 square feet, gymnasium, bowling alley, fitness center, skating rink, or other sports or recreational facility;

2. School, library, reading room, beauty school (provided, however, that this restriction shall not prohibit any premises to be used as a beauty salon), barber college or house of worship;

3. Theater (movie or live), gallery, auditorium, meeting hall, banquet facility, dance hall or ballroom north of the Center Access Drive;

4. Hotel or motel north of the Center Access Drive;

5. Massage parlor, adult bookstore (which will include a store which sells or offers sexually explicit videos, DVDs, audiotapes, films, devices, apparel and the like), "peep show" store, or topless or strip club; provided, however, that this provision shall not prohibit the sale of so-called "adult" materials as an incidental part of a full-line DVD or audiotape rental store, similar to the operation of a Blockbuster or Hollywood Movie Gallery;

6. A so-called "second hand" or surplus store, pawn shop, flea market, swap meet or junk yard;

7. Off-track betting, gambling, gaming or check cashing facility (provided, however, that this prohibition will not be deemed to prohibit a bank or a credit union);

8. Drug paraphernalia store or so called "head" shop;

9. Car wash, automobile repair work or automotive services (provided, however, that this provision will not prohibit a Pep Boys type retail stores, , where such repair work is an incidental part of a retail store), automobile body shop or gas station, except if such gas station is permitted in the REA;

10. Automobile, boat, trailer, mobile home or truck leasing or sales;

11. Tavern, bar or other establishment whose annual gross sales (or projected annual gross sales) from the sale of alcoholic beverages for on-premises consumption exceeds 50% of the gross sales for such business in E-1, E-2, E-4 or E-5 as depicted on Exhibit B of the Site Plan;

12. The following uses will be prohibited north of the Center Access Drive:  Amusement park, carnival, fair, disco, nightclub, or other entertainment facility including video game room, pool hall, arcade, indoor children's recreational facility or other amusement  (provided, however, that incidental interactive kiosks, games and equipment related to the otherwise permitted primary use of an owner, occupant or tenant, will not be prohibited hereunder) ;

13. Any manufacturing, assembling, distribution, warehouse or office use (except as incidental to a retail operation); provided, however, the foregoing will not prohibit up to 35,000 square feet of office space in Retail F and Retail G as depicted on the Site Plan;

14. Funeral parlor;

15. Animal raising or storage (provided this prohibition shall not prohibit a tenant from operating a retail pet store such as Petco or PetsMart) or veterinary hospital north of the Center Access Drive;

16. Gun range or the sale of fireworks (except fireworks may be sold south of the Center Access Drive);

17. Central laundry, drycleaner, or Laundromat north of the Center Access Drive;

18. Drilling for or removal of subsurface substances, dumping, disposal, incineration or reduction of garbage or refuse, other than in enclosed receptacles intended for such purposes;

19.  Any use which constitutes a public or private nuisance or produces objectionable noise, smell or vibration; or

20.  Any business operated only on a seasonal or part-time basis (provided that this provision does not impose any continuous operation requirement) north of the Center Access Drive.

**Exhibit I**

**MEMORANDUM OF SHOPPING CENTER LEASE**

After recording, please return to:
TSA Stores, Inc.
1050 West Hampden Avenue
Englewood, Colorado 80110
Attention: Real Estate Department

**MEMORANDUM OF SHOPPING CENTER LEASE**

*[TO BE REVISED ACCORDINGLY UPON FINALIZATION OF LEASE]*

Demise. Pursuant to a Shopping Center Lease having the date set forth below ("Lease"), between the "Landlord" and "Tenant" named below, Landlord has leased and does hereby lease to Tenant the "Premises" described below for "Term" described below and otherwise upon the terms and conditions set forth in the Lease. Capitalized terms used but not defined herein have the meanings set forth for such terms in the Lease.

Effective Date of Lease. _____, 20__.

Name and Address of Landlord. Deno P. Dikeou, having an office at Dikeou Realty, 549 Wymore Road North, Suite 206, Maitland, Florida 32751.

Name and Address of Tenant. TSA STORES, INC., a Delaware corporation, having an office at 1050 West Hampden Avenue, Englewood, Colorado 80110, Attention: President.

Description of Premises. Approximately 45,000 (Dimensions 237' frontage x 190' depth) square feet of Floor Area and being a part of Waterford Towers Shopping Center ("Shopping Center") located in the City of Orlando, County of Orange, State of Florida, and constructed on land described in Exhibit A attached hereto. The location of the Premises within the Shopping Center is depicted on the site plan attached hereto as Exhibit B.

Term of Lease. Commencing on the Commencement Date of the Lease and ending on the last day (i.e., January 31) of the 15th Lease Year.

Options to Extend. The Lease grants to Tenant successive options to extend the Term from the date upon which the Term would otherwise expire for three additional periods of five years each.

Development Restrictions. *[TEXT FROM SECTION 4.4 OF THE LEASE TO BE ADDED]*

Prohibited Uses. There exists in the Lease various restrictions upon other uses at the Shopping Center.

Exclusive. *[TEXT FROM SECTION 16.1(a) OF THE LEASE TO BE ADDED]*

This instrument is intended to be only a Memorandum of Lease in respect to the Lease, to which Lease reference is made for the full agreement between the parties. This Memorandum is not intended to modify any term, provision or condition of the Lease and to the extent of any conflict between this Memorandum and the Lease, the Lease will control.

EXECUTED as of the Effective Date of Lease set forth above.

**TENANT:**

TSA STORES, INC.,
a Delaware corporation

By: _____
Name: _____
Title: _____

Date of execution by Tenant: _____, 20__

**LANDLORD:**

_____
Deno P. Dikeou

Date of execution by Landlord: _____, 20__

**ACKNOWLEDGMENTS**

<u>TENANT</u>

STATE OF _____ )
                                          ) ss.
COUNTY OF _____ )

    The foregoing instrument was acknowledged before me this _____ day of _____, 20__ by _____ as _____ of TSA Stores, Inc., a Delaware corporation.

    WITNESS my hand and official seal.

_____
Notary Public

My commission expires: _____

<u>LANDLORD</u>

STATE OF _____ )
                                          ) ss.
COUNTY OF _____ )

    The foregoing instrument was acknowledged before me this _____ day of _____, 20__ by Deno P. Dikeou.

    WITNESS my hand and official seal.

_____
Notary Public

My commission expires: _____

EXHIBIT "J"

REA

Prepared by
Ted R. Brown, Esq.
Akerman, Senterfitt & Eidson, P.A.
P.O. Box 231
Orlando, Florida 32802-0231

Orange Co FL 1999-0413311
092499        03:41:54pm
OR Bk 5845 Pg 1099
Rec 127.50

## RECIPROCAL EASEMENT AND OPERATION AGREEMENT

THIS RECIPROCAL EASEMENT AND OPERATION AGREEMENT (this "Agreement") made as of this 24 day of September, 1999, between WATERFORD COMMERCIAL LAND JOINT VENTURE, a Florida partnership ("Waterford"), and DENO DIKEOU, ("Developer").

### Preliminary Statement

Waterford is the owner in fee of certain real property located in Orange County, Florida consisting of an approximately 60 acre parcel more particularly described in **Exhibit A** attached hereto and incorporated herein and identified on that certain site plan (the "Site Plan") attached hereto as **Exhibit B** and incorporated herein. Developer will acquire from Waterford an approximately 20 acre parcel more particularly described in Exhibit B attached hereto and incorporated herein and identified as the ("Developer Parcel"), (ii) an approximately 3.07 acre parcel more particularly described in **Exhibit B** attached hereto and incorporated herein and identified as "Outparcel A" on the Site Plan ("Outparcel A"), (iii) an approximately 1.832 acre parcel more particularly described in **Exhibit B** attached hereto and incorporated herein and identified as "Outparcel B" on the Site Plan ("Outparcel B"), (iv) an approximately 1.975 acre parcel more particularly described in **Exhibit B** attached hereto and incorporated herein and identified as "Outparcel C" on the Site Plan ("Outparcel C"), (v) an approximately 2.548 acre parcel more particularly described in **Exhibit B** attached hereto and incorporated herein and identified as "Outparcel D" on the Site Plan ("Outparcel D"), and an approximately 22 acre parcel more particularly described in **Exhibit B** attached hereto and incorporated herein and identified as the "Adjacent Land" on the Site Plan ("Adjacent Land"). Developer intends to construct on Developer Parcel, Outparcel A, Outparcel B, Outparcel C, Outparcel D and the Adjacent Land certain retail and related service use buildings and related parking and site facilities all in accordance with the terms and conditions of this Agreement.

OR214709;1

OR Bk 5845 Pg 1100
Orange Co FL 1999-0413311

Waterford is the owner of certain real property consisting of approximately 11.63 acres (plus a 9.787 acre retention pond area) located contiguous to Developer Parcel which is more particularly described in Exhibit B attached hereto and incorporated herein and identified as the "HD Parcel" on the Site Plan (hereinafter also referred to as the "Waterford Parcel"). Waterford intends to construct or have constructed on the HD Parcel a building containing approximately 108,360 square feet of ground floor area (exclusive of mezzanine), a garden area containing approximately 25,004 square feet and truck loading docks, customer pickup and compactor facilities and related parking and site facilities in the areas indicated on the Site Plan, and a retention pond, as shown on the Site Plan (the "Retention Pond"). Developer Parcel, Outparcel A, Outparcel B, Outparcel C, Outparcel D, the Adjacent Land and the HD Parcel as more particularly shown the Site Plan and as same may be enlarged from time to time area herein collectively referred to as the "Parcels" and each individually as a "Parcel". Outparcel A and Outparcel B, Outparcel C and Outparcel D are herein collectively referred to as the "Outparcels." Developer Parcel, the Outparcels, and the HD Parcel are herein sometimes collectively referred to as the "Shopping Center".

Developer and Waterford have also entered into that certain Development Agreement of even date herewith (the "Development Agreement"), which sets forth their agreement regarding their respective rights and obligations concerning certain aspects of the development of the Shopping Center.

Developer and Waterford recognize that for the most favorable development of the Shopping Center, it is necessary that they agree and cooperate with respect to the operation and maintenance of their Parcels and the common areas and facilities to be erected thereon as indicated in the Site Plan (the "Common Areas"). Developer and Waterford therefore intend herein to grant to each other certain easements for pedestrian and vehicular ingress and egress over the common curb cuts, roadways, driveways, aisles, walkways and sidewalks for access and for delivery and to grant certain rights to install and maintain utility lines and site facilities within the Common Areas. Developer and Waterford also intend herein to provide for certain obligations and restrictions with respect to the operation and maintenance of their respective Parcels and the Common Areas and facilities constructed and to be constructed thereon. Such easements, obligations and restrictions shall run to the benefit of, and bind the respective Parcels, and the owners from time to time of the Shopping Center or the Adjacent Land or any portion thereof, as the case may be. The terms of Waterford or Developer shall be deemed to refer to such parties, and any net lessee of any Parcel or part thereof who has assumed all of the obligations of the owning party (individually the "Owner", or collectively, the Owners"). Certain approvals required or permitted under this Agreement may be granted by the Owner or Owners of the majority of the acreage of the Waterford Parcel (hereinafter referred to as the "Waterford Approving Party") and the Owner or Owners of a majority of the acreage of the Developer Parcel (hereinafter referred to as the "Developer Approving Party") (collectively the Waterford Approving Party and the Developer Approving Party are referred to as the "Approving Parties"), subject to the further terms and conditions of this Agreement, without the requirement of approval by the Owner of any of the Outparcels or the Adjacent Land.

OR234709:1                                              2

Description: Orange,FL Document-Book.Page 5845.1099 Page: 2 of 28

OR Bk 5845 Pg 1101
Orange Co FL 1999-0413311

**NOW THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth, Developer and Waterford hereby grant, covenant and agree as follows:

<u>ARTICLE I - GRANT OF EASEMENTS</u>

<u>Section 1.01. Access Easements.</u>

(a)     The Owners of the Developer Parcel, the Adjacent Land and each of the Outparcels hereby grant and convey, each to the other and to the Owner of the Waterford Parcel, for the benefit of the Waterford Parcel, the Developer Parcel, the Adjacent Land and the Outparcels, a perpetual, non-exclusive easement and right to the use of the Common Areas and the common curb cuts, accessways, roadways, driveways, aisles, walkways and sidewalks located on the Developer Parcel, the Adjacent Parcel and the Outparcels and indicated on the Site Plan (as same may be modified from time to time by the Owner of the Developer Parcel, provided that such modification may not unreasonably impair the easement rights created herein), for purposes of ingress, egress, passage and delivery, by vehicles and pedestrians.

(b)     The Owner of the Waterford Parcel hereby grants and conveys to the Owners of the Developer Parcel, the Outparcels and the Adjacent Land for the benefit of said Parcels a perpetual, non-exclusive easement over, across and through and the right to use those certain accessways and roadways on the Waterford Parcel designated on the Site Plan as "Access Easement Area" (as same may be modified from time to time by the Owner of the Waterford Parcel, provided that such modification may not unreasonably impair the easement rights created herein) for purposes of ingress, egress, passage and delivery, by vehicles and pedestrians; provided that any and all curb cuts or points of access from any portion of Developer Parcel, the Outparcels or the Adjacent Land into the Waterford Parcel for such ingress, egress, passage and delivery shall be as shown on the Site Plan. Waterford may modify such approved access points from time to time, upon the prior written approval of the Developer Approving Party, which approval shall not be unreasonably withheld or delayed.

(c)     The easements granted in this Section 1.01 and in Section 1.02 shall be for the benefit of, but not restricted solely to, the Owners of the respective Parcels described in each such easement (subject to the limitations described herein) and each such Owner may grant the benefit of such easement to the tenants and other occupants of the Parcel owned by such Owner (subject to the limitations described herein) for the duration of such occupancy, and to the customers, employees, agents and business invitees thereof; but same is not intended nor shall it be construed as creating any rights in or for the benefit of the general public nor shall it affect or benefit any real property other than the specifically designated Parcel(s). Such easement areas are reserved for said use for the term of this Agreement. The foregoing provisions to the contrary notwithstanding, the parties acknowledge and agree that no parking easements have been granted hereunder, and that it is expressly agreed and understood, that there shall be no cross-parking between or among the Parcels. Each owner shall maintain on its respective Parcel the parking ratio required pursuant to section 3.01(c) hereof.

OR214709:1                                            3

Description: Orange,FL Document-Book.Page 5845.1099 Page: 3 of 28

OR Bk 5845 Pg 1102
Orange Co FL 1999-0413311

(d)    Waterford, at its expense, shall maintain the Main Driveway in a state of good repair at all times during the term of this Agreement. Developer, at its expense, shall maintain the North Driveway (as shown on the Site Plan) in a state of good repair at all times during the term of this Agreement. Until the Owner of the Developer Parcel constructs the North Driveway, the Owner of the Developer Parcel and the Owners of the Outparcels shall reimburse Waterford for each Parcel's pro rata share of such maintenance within ten (10) days following receipt of Waterford's invoice therefor. The Developer Parcel and the Outparcels' pro rata shares shall be that fraction the numerator of which is the developed building square footage of the Developer Parcel or the Outparcels, as the case may be, and the denominator of which is the combined square footage of the developed buildings on the Waterford Parcel, the Developer Parcel and the Outparcels, all as depicted on the Site Plan. For purposes of this Section 1.01(d) developed buildings shall not be deemed to include any mezzanine, garden center, or merchandise storage areas. The Owners of the Outparcels and the Owner of the Developer Parcel shall indemnify and hold the Owner and any occupant of the Waterford Parcel harmless from any claims, damage or loss which may result from the lawful and non-negligent activities of the Owner of the Waterford Parcel in making such repairs and performing such maintenance. If the Owner of the Waterford Parcel fails to maintain the Main Driveway as required herein, then, upon thirty (30) days prior written notice to the Owner of the Waterford Parcel, the Owner of the Developer Parcel shall have the right, but not the obligation, to maintain the Main Driveway for that period of time that the Main Driveway is not being maintained by the Owner of the Waterford Parcel, and the Owner of the Waterford Parcel shall reimburse the Owner of the Developer Parcel for its pro rata share of such maintenance (which pro rata share shall be that fraction the numerator of which is the square footage of the Waterford Parcel and the denominator of which is the combined square footage of the Waterford Parcel (minus the Retention Pond), the Developer Parcel and the Outparcels within ten (10) days following receipt of the Owner of the Developer Parcel's invoice therefor; provided, however, that if the Owner of the Waterford Parcel, upon receipt of notice of failure to maintain from the Owner of the Developer Parcel, commences and diligently pursues such maintenance, then the Owner of the Developer Parcel shall have no right to maintain the Main Driveway as provided herein.

(e)    The Owners of the Waterford Parcel and the Developer Parcel shall have the right to close off the portion of its Parcel encumbered by an access easement set forth above at such intervals and for such minimum period of time as may be (i) legally necessary, in the reasonable opinion of such Owner's counsel, to prevent the acquisition of prescriptive rights by any other party, or (ii) reasonably necessary for routine maintenance and repair of such portion of the Common Areas. Notwithstanding the foregoing, the Owners of the Waterford Parcel shall not undertake to close off portions of the Access Easement herein granted, without reasonable notice to the Owner of the Developer Parcel as to the time and duration of the intended closing. In addition the Owner of the Waterford Parcel will attempt to coordinate the closure so as to have the least impact on the Developers Parcel and the tenants and business invitees utilizing the same.

Section 1.02. Utility Easements

OR214709;1

4

RECEIVED IN RECORDS MANAGEMENT
DEPARTMENT AS IS.

OR Bk 5845 Pg 1103
Orange Co FL 1999-0413311

(a)    The Owners of the Waterford Parcel, the Developer Parcel, the Adjacent Land and the Outparcels hereby grant and convey, each to the other, for the benefit of the Waterford Parcel, the Developer Parcel the Adjacent Land and the Outparcels an easement in, to, over, under and across the Common Areas of the Waterford Parcel, the Developer Parcel, the Adjacent Land and the Outparcels for the purpose of installation, operation, maintenance, repair, replacements, removal and relocation of storm sewer lines, sanitary sewer pipes, septic systems, water and gas mains, electric power lines, telephone lines, and other utility lines ("Utility Lines") to serve the facilities located on the Waterford Parcel, the Developer Parcel, the Adjacent Land and the Outparcels. The installation of any Utility Lines, other than those Utility Lines to be installed pursuant to the terms of the Development Agreement, shall be subject, as to location, to the approval of the granting Owner, which approval shall not be unreasonably withheld or delayed, and provided that any such shall be performed in a manner that minimizes to the extent reasonably possible any interference with the normal conduct of business on the granting Owner's Parcel. Notwithstanding the foregoing, all Utility Lines installed in the Waterford Parcel for the benefit of the remainder of the Shopping Center and the Adjacent Land shall be in such locations so as to allow for the development of the remainder of the Shopping Center and the Adjacent Land. Repairs and maintenance of the Utility Lines shall be governed pursuant to the terms of Section 2.01 below.

(b)    The Owners of the Waterford Parcel, the Developer Parcel and the Adjacent Land or any designee served by such Utility Lines may operate, maintain and repair (and, if it does not interfere with the use of the granting Owner's Parcel, relocate) such Utility Lines, provided such repair and maintenance is performed expeditiously and only after five business days' written notice to the granting Owner utilizing or serviced by said Utility Lines or the parking area to be affected by any construction work, except in the event of emergencies, in which event any reasonable telephonic or written notice shall be sufficient. The Party performing the repair shall, at its cost and expense, repair any damage to any improvements. Each Owner shall indemnify and hold the granting Owner and any occupant of the granting Owner's Parcel harmless from any claims, damage or loss which may result from the activities in making such repairs or relocating its facilities.

(c)    The Owner of the Waterford Parcel hereby grants, conveys, sets over and assigns to the Owners of the Outparcels for the benefit of the Outparcels, a non-exclusive, perpetual easement for the drainage of storm water from the Outparcels into the Retention Pond, as depicted on the Site Plan. Notwithstanding the foregoing, the parties acknowledge that the Owner of the Waterford Parcel will construct or cause to be constructed the Retention Pond to the maximum capacity and depth permitted by Orange County and any other governmental agency having regulatory authority over the construction and use of the Retention Pond, and with sufficient retention space to accommodate storm water drainage from at least the Waterford Parcel and the Outparcels. The parties further acknowledge that there may be additional retention space available in the Retention Pond after such construction which may accommodate additional storm water drainage from all or a portion of the Developer Parcel and/or the Adjacent Land (the "Additional Retention Space"). The Owner of the Waterford Parcel hereby grants, conveys, sets over and

OR21470R:1

5

OR Bk 5845 Pg 1104
Orange Co FL 1999-0413311

assigns to the Owners of the Developer Parcel and/or the Adjacent Land, for the benefit of the Developer Parcel and/or the Adjacent Land, a non-exclusive, perpetual easement to use the Additional Retention Space, if any, which may be available after the Retention Pond has been constructed by Waterford, including the procurement of all necessary permits therefor. The Owner of the Developer Parcel shall have the right to construct or enlarge the Retention Pond upon thirty (30) days prior written notice from Developer to Waterford in order to accommodate the additional drainage and retention needs of the Developers Parcel and the Adjacent Land; provided, however, that such expansion of the Retention Pond by Developer, including the modification of any existing permits (i) shall be at Developer's sole cost and expense, (ii) shall be subject to all necessary governmental approvals, (iii) shall not interfere with Waterford's intended use and operation of the Waterford Parcel, and (iv) unless prior to submission by Waterford, shall not occur until Waterford has completed the application process for, and has obtained, any necessary permits for the use and operation of the Retention Pond for storm water drainage from the Waterford Parcel and the Outparcels. Upon Developer's expansion of the Retention Pond as provided herein, Waterford shall, at the request of the Developer, confirm in writing the prior grant to Developer, for the benefit of the Developer's Property and the Adjacent Land, of a perpetual, non-exclusive easement for the drainage of storm water from the Developer Parcel and the Adjacent Land into the Retention Pond. In the event that the expansion of the Retention Pond by Developer necessitates the creation of an Owner's Association for the maintenance of the Retention Pond, the cost and obligation for the creation of such Owner's Association shall be borne solely by Developer.

(d)     Waterford, at its expense, shall maintain the Retention Pond in a state of good repair at all times during the term of this Agreement, including, without limitation, maintaining insurance and payment of real estate taxes on the Retention Pond. The Owners of the Outparcels shall reimburse Waterford for each Outparcel's pro rata share of such maintenance within ten (10) days following receipt of Waterford's invoice therefor. The Outparcels' pro rata shares shall be that fraction the numerator of which is the square footage of each particular Outparcel, and the denominator of which is the combined square foot of Waterford Parcel (minus the Retention Pond), and the Outparcels, all as depicted on the Site Plan. The Owners of the Outparcels shall indemnify and hold the Owner and any occupant of the Waterford Parcel harmless from any claims, damage or loss which may result from the lawful and nonnegligent activities of the Owner of the Waterford Parcel in making such repairs and performing such maintenance.

Upon the expansion of the Retention Pond by Developer for use by the Developer Parcel and the Adjacent Land, Waterford shall continue to maintain the Retention Pond at its expense, and the Owners of the Developer Parcel and the Adjacent Land shall reimburse Waterford for each Parcel's pro rata share of such maintenance within ten (10) days following receipt of Waterford's invoice therefor. The Developer Parcel's and Adjacent Land's pro rata shares shall be that fraction the numerator of which is the square footage of the Developer Parcel or the Adjacent Land, as the case may be, and the denominator of which is the combined square footage of Waterford Parcel (minus the Retention Pond), the Outparcels, the Developer Parcel and the Adjacent Land, all as depicted on the Site Plan. The Owners of the Developer Parcel and the Adjacent Land shall

OR214709;1                            6

RECEIVED IN RECORDS MANAGEMENT
DEPARTMENT AS IS.

OR Bk 5845 Pg 1105
Orange Co FL 1999-0413311

indemnify and hold the Owner and any occupant of the Waterford Parcel harmless from any lawful and nonnegligent claim, damage or loss which may result from the activities of the Owner of the Waterford Parcel in making such repairs and performing such maintenance. If, after the expansion of the Retention Pond by Developer as provided herein, the Owner of the Waterford Parcel fails to maintain the Retention Pond as required herein, upon thirty (30) days prior written notice to the Owner of the Waterford Parcel, the Owner of the Developer Parcel shall have the right, but not the obligation, to maintain the Retention Pond for that period of time that the Retention Pond is not being maintained by the Owner of the Waterford Parcel, and the Owner of the Waterford Parcel shall reimburse the Owner of the Developer Parcel for its pro rata share of such maintenance (which pro rata share shall be that fraction the numerator of which is the square footage of the Waterford Parcel and the denominator of which is the combined square footage of the Waterford Parcel (minus the Retention Pond), the Developer Parcel and the Outparcels within ten (10) days following receipt of the Owner of the Developer Parcel's invoice therefor; provided, however, that if the Owner of the Waterford Parcel, upon receipt of such notice of failure to maintain from the Owner of the Developer Parcel, commences and diligently pursues such maintenance, then the Owner of the Developer Parcel shall have no right to maintain the Retention Pond as provided herein.

### Section 1.03. Temporary Easements.

(a)    Temporary Construction Easement. Subject to the terms of Section 3.03 below, in connection with any construction work to be performed in the development of the Shopping Center, each Owner hereby grants the other temporary easements for incidental encroachments upon the party's Parcel which may occur as a result of construction, so long as such encroachments are kept within the reasonable requirements of construction work pursued and so long as customary insurance is maintained protecting the other party from the risks involved. In the event that any Owner or other occupant has opened for business to the public from premises completed on any of the Parcels, the Owner of any other Parcel on which construction activities thereafter take place shall use reasonable and diligent efforts not to interfere with or impede the use of the Common Areas or otherwise not to interfere with or impede the conduct of business by the Owner or other occupant which has so opened. Construction staging activities shall be subject to the restrictions set forth in Section 3.03 hereof.

(b)    Temporary Access Easement. Developer hereby grants to Waterford for the benefit of the Waterford Parcel an easement over and across that portion of the Developer Parcel designated on the Site Plan as "Temporary Access Easement Area", for purposes of ingress, egress, passage and delivery, by vehicles and pedestrians until such time as all associated service drives and main driveways indicated on the Site Plan have been constructed on the Developer Parcel, at which time the Temporary Access Easement Area (as same may be modified from time to time by the Owner of the Developer Parcel, provided that such modification may not unreasonably impair the easement rights created herein) shall serve as a permanent access and service drive for the benefit of the Waterford Parcel. The easement rights granted herein do not require a specific location that is consistent with the location of the Temporary Access Easement

OR214708-1

7

Description: Orange,FL Document-Book.Page 5845.1099 Page: 7 of 28

OR Bk 5845 Pg 1106
Orange Co FL 1999-0413311

Area and the parties recognize and agree that the associated service drives and main driveways contemplated here may be relocated and become part of the overall Access Easements described in Section 1.01 above at such time as the Owner of the Developer Parcel commences construction of a building or buildings on the Developer Parcel.

**Section 1.04. Pylon Sign.** The Owners hereby agree that all freestanding (pylon and/or monument) signage shall be constructed on the Parcels in accordance with the master plan for signage attached hereto as Exhibit "C"(the "Master Signage Plan"). Waterford shall be entitled to the top position on a pylon or monument sign at the Main Driveway, shall be entitled to one hundred (100) square feet of signage area on such Main Driveway pylon or monument sign and no other panel may be larger than the Waterford sign panel. The Waterford sign panel shall be maintained in good repair, including illumination, at the sole cost of Waterford. Developer shall have the right to use the remainder of the signage area of such multi-tenant pylon or monument sign at the Main Driveway, subject to the rights of Waterford described in this Section 1.04; provided, however, that the design, color, size and number of such signs shall be subject to the reasonable approval of Waterford and Developer, and any such signs shall be maintained in good repair, including illumination, at the sole expense of the Developer. Developer shall have the right to use one hundred (100%) of the signage area of the pylon or monument sign at the North Driveway, and shall be entitled to the exclusive use of any monument or pylon signs located on the Outparcels, and any such signs shall be maintained in good repair, including illumination, at the sole expense of Developer. Developer shall have reasonable access to the Main Driveway for the purposes of maintaining, repairing, replacing or illuminating Developer's signs on the pylon or monument. Waterford and Developer shall each pay for the costs of constructing, lighting, maintaining and repairing the pylon or monument sign structures on their respective Parcels. Waterford and Developer may make changes to and/or replace such pylon structure and/or monument sign, so long as all necessary governmental approvals are obtained therefor. For purposes of this section 1.04, the North Driveway is the roadway in the approximate boundary between the Developer Parcel and the Adjacent Land as shown on the Site Plan.

No Outparcel shall erect any sign or other structure which interferes with the visibility of the pylon sign constructed by Waterford, and no Outparcel may take any action with respect to its Parcel or otherwise that reduces the available signage allocated to the Waterford Parcel.

**Section 1.05. Restrictions.** The easements granted by this Article I shall be subject to the covenants and restrictions set forth in Article III.

## ARTICLE II - MAINTENANCE AND OPERATION

**Section 2.01. Maintenance and Repair.**

(a)    Each Owner shall maintain, repair and replace all improved portions of the Common Areas located on its respective Parcel, so as to keep such areas at all times in a safe,

08214709;1

8

OR Bk 5845 Pg 1107
Orange Co FL 1999-0413311

sightly, good and functional condition to standards of comparable community shopping centers in the market area.

(b)    Each Owner shall be responsible for keeping the Common Areas on its own Parcel clean and free from refuse and rubbish.  Any landscaped areas on the respective Common Areas shall be mowed and otherwise tended to by the Owner thereof.

(c)    Each Owner shall repave, re-stripe and replace markings on the surface of the parking areas and driveways in its Parcel from time to time as and when necessary so as to provide for the orderly parking of automobiles and shall place and maintain adequate exit and entrance and other traffic control signs to direct traffic in and out of said parking areas.  Any striping and other markings shall be consistent with the Site Plan, and the lighting, paving and striping materials shall be consistent with that used in the Shopping Center.

(d)    Each Owner shall service, maintain, repair and replace, and pay the cost of any fees or charges in connection with the Utility Lines located on its Parcel to the extent that such Utility Lines service the improvements on that Parcel. To the extent that any Utility Line exclusively servicing any Parcel crosses another Owner's Parcel, such Utility Line shall be so maintained by the party served by the Utility Line, subject to the provisions of Section 1.02.  Maintenance of any portion of any Utility Lines serving more than one Parcel shall be performed by the Owner of any Parcel crossed by the Utility Line, but the cost thereof shall be shared on an equitable basis based upon the relative consumption or usage of the utility furnished from such Utility Line.

(e)    Each Owner shall pay, prior to any penalty attaching thereto, all real estate taxes, assessments and personal property taxes, if any, imposed upon the land and improvements and equipment located on its respective Parcel.

(f)    Each Owner shall cause the Common Areas and all buildings and improvements located on its Parcel to comply with all applicable requirements of law and governmental regulation applicable thereto, provided however, that an Owner may contest any such law or regulation so long as such contest would not create any material danger of a loss of title to, or impairment in any way of the use of all or any portion of the Common Areas for their intended purposes.

Section 2.02.  Operation and Lighting.

(a)    Each Owner shall keep the roadways and parking areas of its respective Parcel open to the customers of the Shopping Center seven days a week at all times and lighted after dusk after 11:00 p.m. on Monday through Saturday and from dusk until 7:00 p.m. on Sunday ("Normal Lighting Hours").  Any Owner or occupant of a Parcel may require the lights on any other Parcel to be kept lighted after Normal Lighting Hours if such Owner or occupant reimburses the requested Owner for the additional electrical costs incurred thereby, which cost shall be shared

OR214799:1

9

Description: Orange,FL Document-Book.Page 5845.1099 Page: 9 of 28

on a pro rata square footage basis with any other occupant which remains open during such additional hours.

OR Bk 5845 Pg 1108
Orange Co FL 1999-0413311

(b)    The lighting facilities and fixtures for the Waterford Parcel, Developer, Outparcels and the Adjacent Land shall be designed and installed with separate meters to measure the electricity consumed on the respective Parcels. Notwithstanding the foregoing, the Owner of the Waterford Parcel and the Owner of the Developer Parcel and the Adjacent Land recognize and agree that it is in their mutual interest to have an integrated and coordinated exterior lighting system and to that end each party will reasonably cooperate with the other to the end of assuring that such agreement can be achieved so that at a minimum the light color and the intensity will be uniform between and among the various Parcels. Neither party shall have the right to compel any result on the other so long as a Party develops and installs a lighting system that is in conformity with all governmental regulations and the installation is at least uniform in color and not of less intensity than the light system to be installed on the Waterford Parcel. The meters and lighting control switches for the exterior parking and roadway lighting for each Parcel and each Owner of a Parcel and any occupant occupying more than 30,000 square feet of Building Floor Area as hereinafter defined shall be provided with keys to such controls.

### Section 2.03.  Delegation of Management.

(a)    The Owners may enter into an agreement, with the consent of the Owners of all Parcels affected thereby, appointing one of the Owners or a third party to perform all or portions of the maintenance and repair of the Common Areas and related facilities of the Shopping Center. In such event each Owner shall be responsible to pay its respective Share (as hereinafter defined) of the costs incurred by the designated party in performing such services, which costs shall include the ordinary operating and maintenance expenditures incurred as well as capital expenditures to the extent so authorized, provided however, that any expenditure in which another Owner must share for a repair or replacement of the designated party costing $5,000 or more shall require the prior approval of each such Owner. As used herein the term "Share" shall mean a fraction, the numerator of which shall be the number of square feet of floor area (exclusive of mezzanines used for storage and related office and non-sales uses) in all structures located on such Owner's Parcel as measured from the exterior base of any exterior wall and to the center line of any party wall ("Building Floor Area"), and the denominator of which shall be equal to the aggregate of the Building Floor Area (as so measured) in all buildings in the Shopping Center.

## ARTICLE III - COVENANTS AND RESTRICTIONS

### Section 3.01.  Restrictions on Shopping Center.  The Shopping Center shall be subject to the following restrictions which shall be binding on each Owner and each of its tenants, occupants, employees, agents or invitees:

OR314709r1

10

Description: Orange,FL Document-Book.Page 5845.1099 Page: 10 of 28

OR Bk 5845 Pg 1109
Orange Co FL 1999-0413311

(a)    No obstruction to the free flow of traffic and use of the parking and delivery facilities shall be permitted, except to the extent, if any, indicated on the Site Plan or herein expressly provided for.

(b)    Subject to the further restrictions on building construction set forth in Sections 3.02 and 3.03 hereof and as modified in subsection (h) below, unless otherwise approved in writing by the Waterford Approving Party, no building or other structure of any kind shall be permitted in portions of Outparcel A or Outparcel B except in the "Buildable Areas" designated on the Site Plan.

(c)    Unless otherwise approved in writing by the Waterford Approving Party, no building or other structure shall be permitted on (i) Outparcel A or Outparcel B if such building or other structure would reduce the parking ratio within either individual Outparcel to fewer than five (5) parking spaces for every 1,000 square feet of building floor area located therein or below the number of parking spaces required under applicable governmental rules, regulations and ordinances (without the issuance of any variance, special permit or similar exemption, privilege or authorization); or (ii) the remainder of the Shopping Center outside of the Waterford Parcel if such building or other structure would reduce the parking ratio within such individual Parcel to fewer than (i) 4.5 parking spaces for every 1,000 square feet of building floor area located therein, or (ii) the number of parking spaces required under applicable governmental rules, regulations and ordinance (after the issuance of any variance, special permit or similar exemption, privilege or authorization).

(d)    Any construction shall be conducted in a manner which will limit the maximum extent practicable any interference with the operation of the balance of the Shopping Center, and in compliance with those further, specific restrictions and conditions on construction activity set forth in this Agreement.

(e)    No portion of the Shopping Center shall be used for a business or use which creates strong, unusual or offensive odors, fumes, dust or vapors; is a public or private nuisance; emits noise or sounds which are objectionable due to intermittence, beat, frequency, shrillness or loudness; or creates unusual fire, explosive or other hazards.

(f)    Unless otherwise approved in writing by the Waterford Approving Party, no portion of the Shopping Center may be leased, used or occupied as a health spa or exercise facility, bar, social encounter restaurant or lounge unless such uses are at least eight hundred fifty (850) feet from the main entrance of the building on the Waterford Parcel; theater; movie theater; bowling alley; billiard parlor; funeral parlor; flea market; industrial manufacturing; automobile dealership; discotheque; skating rink; pawn shop;; teen lounge; or bingo or game parlor; as an adult bookstore or establishment selling, exhibiting or distributing pornographic or obscene materials; massage parlor; so-called "head shop"; unsupervised amusement arcade or game room; body and fender shop; car wash unless car wash is operated as an incidental part of a gas station; off-track betting parlor; establishment selling or renting trailers, vehicles or boats; or restaurant or fast-food

OR214709;1                    11

RECEIVED IN RECORDS MANAGEMENT
DEPARTMENT AS IS.

OR Bk **5845** Pg **1110**
Orange Co FL 1999-0413311

operation incorporating coin-operating amusements or showing movies to its customers thereof, other than as an incidental or immaterial part of its business. So long as the Waterford Parcel is owned and used by Waterford as a Home Depot, then unless otherwise approved in writing by the Developer Approving Party, no portion of the Waterford Parcel may be leased, used or occupied as a tire or auto parts store, mens or women's clothing store, electronics and home appliance store, eyeglass store, food store in excess of 1000 square feet, office supply store, bookstore, drug store, bedding and linens store, unless such items are of the type generally sold by other Home Depot stores.

(g)    Unless otherwise approved in writing by the Waterford Approving Party, no portion of the Shopping Center outside of the Waterford Parcel may be used for general offices in excess of 1,200 square feet; provided, however, that this Section 3.01(g) shall not prohibit professional office use (including real estate, medical, law, dentistry, or architectural professional offices) of fewer than 5,000 square feet in the cumulative.

(h)    Unless otherwise approved in writing by the Waterford Approving Party, no more than three buildings shall be erected on Outparcel A, which may not together exceed Fifteen Thousand Seven Hundred (15700) square feet of building area and no more than one building will be erected on Outparcel B, which may not exceed Ten Thousand (10000) square feet of buildable area. All buildings on Outparcel A and Outparcel B must, if constructed, provide a minimum of ninety-five (95) feet of clear space between each such building on Outparcel A and Outparcel B together. No building on Outparcel B may be erected within seventy five (75) feet of the southern edge of the Main Driveway, and no building on Outparcel C may be erected within 75 feet of the northern edge of the Main Driveway. No building on Outparcel A may be built within seventy five (75) feet of the southern property line of Outparcel A.

(i)    No buildings or improvements shall be located within the "View Corridor" more or less as depicted on the Site Plan, except as modified in subsection (h) above, so as not to interfere with the visibility of the store building to be constructed by Waterford. No building to be constructed on Outparcels A, B and C shall exceed one story, nor shall any buildings to be constructed on any of Outparcels A, B and C, inclusive of any signage or parapet, exceed 25 feet in height, except that each Outparcel building shall be permitted one spire, bell tower, clock tower or flagpole of not more than six (6) feet in width, provide that the maximum height of any such building with the permitted spire, bell tower, clock tower, or flagpole shall not exceed thirty-five (35) feet in height. No buildings to be constructed on Outparcel A and Outparcel B shall have a main entrance which is within five hundred (500') feet of the main entrance of the building to be erected on the Waterford Parcel, which 500 foot main entrance radius restriction is shown on the Site Plan.

(j)    Provided, the space allocated to the following uses does not exceed 6000 square feet, no portion of the Adjacent Land or the Shopping Center outside of the Waterford Parcel may be used for the sale of Christmas trees or as a home improvement center or for the sale of lumber, hardware items, plumbing supplies, electrical supplies, paint, wallpaper, carpeting, floor

OR214709;1                                    12

coverings, cabinets, siding, ceiling fans, gardening supplies, plants, nursery products, unless otherwise approved in writing by the Waterford Approving Party.

OR Bk 5845 Pg 1111
Orange Co FL 1999-0413311

(k)    Unless otherwise approved in writing by the Waterford Approving Party or the Developer Approving Party, as applicable, there shall be no, entertainment or amusement or other related activities in the Common Areas of the Shopping Center, exclusive of the Waterford Parcel, that would interfere with the use of the Common Areas and related facilities for their intended purposes. Notwithstanding the foregoing, Waterford may utilize the portions of the Common Areas located on the Waterford Parcel and designated as the "Seasonal Sales Area" on the Site Plan for purposes of the Christmas tree sales and other seasonal sales and may use all sidewalks on the Waterford Parcel for the display and sale of merchandise.

(l)    No portion of Outparcel A, Outparcel B or Outparcel C shall be used for the retail sale of gasoline or diesel fuel.

(m)    No sign shall be erected or posted in any portion of the Shopping Center which restricts or limits the use of parking areas on a Parcel to the Owner(s), tenant(s), occupant(s), invitees and/or licensees of that Parcel.

Section 3.02.  Special Building Restrictions.

(a)    The Owner of the Developer Parcel hereby covenants and agrees that no building or improvements shall be placed or constructed on the Developer Parcel or the Outparcels that would cause any building on the Waterford Parcel to lose its "Type-4-Unprotected Unlimited Area" classification (or its equivalent classification).  As used herein, a "Type-4-Unprotected Unlimited Area" classification or its equivalent shall refer to the classification of a building or structure, pursuant to currently applicable fire or building codes and ordinances as same are interpreted by the applicable governmental authorities, as not having a fire rating and as not having a maximum limit on floor area.  If required by any governmental authority, each Party agrees to join in a recordable declaration which confirms the existence of either (i) a sixty foot (60') clear area around the Building Areas, or (ii) no separation between the Building Areas.

Section 3.03.  Special Restrictions Regarding Construction.  The Owners acknowledge and agree that the construction of the Waterford store building (the "Waterford Construction") or the construction of the building(s) to be erected on the Developer Parcel by Developer (the "Developer Construction") may commence prior to the commencement of building construction on the remainder of the Shopping Center (collectively, the "Subsequent Construction"), and that all or portions of the Subsequent Construction may occur at times when the Waterford store or the store(s) to be constructed on the Developer Parcel may already be open for business.  Because the development of the Shopping Center will be conducted in phases, the Shopping Center shall be subject to the following additional restrictions, which shall be binding on each Owner and each of its tenants, occupants, employees, agents and invitees:

OR21470B-1

13

Description: Orange,FL Document-Book.Page 5845.1099 Page: 13 of 28

OR Bk 5845 Pg 1112
Orange Co FL 1999-0413311

(a)     All Subsequent Construction shall be performed in compliance with all applicable laws, rules, regulations, orders, and ordinances of the city, county, state, and federal government, or any department or agency thereof, and shall not: (i) cause any increase in the cost of constructing improvements upon another Owner's Parcel; (ii) materially interfere with construction work being performed on any other part of the Shopping Center by any other Owner or occupant; (iii) materially interfere with the use, occupancy or enjoyment of any part of the Shopping Center by any other Owner of occupant; or (iv) cause any building located on another Parcel to be in violation of any law, rule, regulation, order or ordinance authorized by any city, county, state, federal government, or any department or agency thereof.  Once Subsequent Construction has commenced, such construction shall be diligently and continuously pursued to completion, and all points of ingress and egress for construction traffic to and from Outparcel A and/or Outparcel B shall be subject to the prior written approval of the Waterford Approving Party, acting reasonably.

(b)     If either Waterford or Developer has opened its store(s) for business at the time of the commencement of any Subsequent Construction (or intends to open its store for business prior to the estimated completion date of any such Subsequent Construction), each Owner conducting any Subsequent Construction shall, upon the written request of Waterford and/or Developer, as the case may be, erect such fences or other devices which Waterford and/or Developer may reasonably require to ensure the safety of Waterford and/or Developer and their employees, agents, licensees, customers, invitees, sublessees, concessionaires, successors and assigns, or as may be otherwise required by applicable law, regulation, ordinance, order or decree.

(c)     Pursuant to the easements granted in Section 1.01 hereof, Waterford and Developer shall at all times have free and unobstructed access to and from the Waterford Parcel or the Developer Parcel, respectively, over, through and across such easement areas.

(d)     With respect to any Subsequent Construction, all storage of materials and the parking of construction vehicles, including vehicles of workers, shall occur only on the constructing Owner's parcel, and all laborers, suppliers, contractors and others connected with such construction shall use only those permitted access points located nearest the constructing Owner's parcel, and subject at all times to Section 3.03(a) above.  Upon completion of any such Subsequent Construction, the constructing Owner shall restore any affected access ways, parking areas and other Common Areas to a condition equal to or better than the condition thereof existing prior to the commencement of such Subsequent Construction.

(e)     Subject to the provision of Section 3.03(a), each Owner hereby grants and conveys to each other Owner and to its respective contractors, materialmen and laborers a temporary license for access and passage over and across the Common Areas of the granting Owner's Parcel as shall be reasonably necessary for the construction and maintenance of improvements on the other Owners' Parcel or Parcels (including, without limitation, Waterford's performance of the Work pursuant to the Development Agreement and the Subsequent Construction); provided, however, that (i) such license shall be in effect only during periods when construction or

OR214709;1

14



RECEIVED IN RECORDS MANAGEMENT
DEPARTMENT AS '13.

OR Bk 5845 Pg 1113
Orange Co FL 1999-0413311

maintenance is actually being performed, and (ii) the use of such license shall not unreasonably interfere with the use, operation and enjoyment of the Common Areas by those entitled thereto. Prior to exercising such license, the licensee Owner shall first provide to the licensor Owner a written statement describing the need for such exercise, accompanied by a certificate of insurance establishing that any contractors retained by the licensee Owner for the work to be performed has obtained and maintains in force the insurance coverage required by Section 4.02 hereof. The licensee Owner shall promptly pay all costs and expenses associated with the work being performed, shall diligently complete such work as quickly as possible, and shall promptly clean, restore and repair all affected portions of the Common Areas to a condition equal to or better than the condition thereof existing prior to the commencement of such work. The foregoing provisions to the contrary notwithstanding, if a dispute exists or arises between any contractors, laborers, suppliers or other sin connection with such work, each Owner shall have the right to prohibit the contractors, laborers, suppliers or others from suing those portions of the common Areas on such Owner's Parcel.

## ARTICLE IV - LIABILITY INDEMNIFICATION

**Section 4.01. Liability; Indemnification.** Each Owner, tenant, and occupant of the Shopping Center harmless (except for loss or damage other Owner, tenant, and occupant of the Shopping Center harmless (except for loss or damage resulting from the tortious acts of such other parties) from and against any damages, liability, actions, claims, and expense s(including attorneys' fees in a reasonable amount) in connection with the loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon such Owner's Parcel, or occasioned wholly or in part by any act or omission of said Owner, its tenants, agents, contractors, employees, or licensees.

**Section 4.02. Liability Insurance.** Each Owner shall maintain or cause to be maintained comprehensive general commercial liability insurance insuring against claims on account of loss of life, bodily injury or property damage that may arise from, or be occasioned by the condition, use or occupancy of the Common Areas in the Shopping Center by the Owner and its tenants, agents, contractors, employees, licensees, customers and invitees, of such Owner or the occupants of its Parcels except as herein provided. Said insurance shall be carried by a reputable insurance company or companies qualified to do business in the State in which the Shopping Center is located and have limits of not less than $1,000,000 per occurrence. Each Owner shall maintain or cause to be maintained contractual liability insurance specifically endorsed to cover said Owner's agreement to indemnify as set out in Section 4.01 above. Notwithstanding the foregoing, any Owner or Party responsible to maintain such insurance may "self insure", or provide for a deductible from said coverage related to the Parcel, to the extent of one percent (1%) of the net worth of said Owner or Party in its last annual or fiscal year as certified by an independent certified public accountant and computed in accordance with generally accepted accounting principles consistently applied. Such insurance may be carried under a "blanket" policy or policies covering other properties of the Party and its subsidiaries, controlling or affiliated corporations. Each Owner shall, upon written request from the other Owner, furnish to the party making such request certificates of insurance evidencing the existence of the insurance required to be carried

OR:2\1709;1

15

RECEIVED IN RECORDS MANAGEMENT DEPARTMENT AS IS.



OR Bk 5845 Pg 1114
Orange Co FL 1999-0413311

pursuant to this Section 4.02 or evidence of a self-insurance capacity as hereinabove provided, as the case may be. All such insurance shall include provisions denying to the insurer subrogation rights against the other Parties to the extent such rights have been waived by the insured prior to the occurrence of damage or loss. Each Owner hereby waives any rights of recovery against any other Owner, its directors, officers, employees, agents and tenants and occupants for any damage or consequential loss covered by said policies, against which such Owner is protected by insurance, to the extent of the proceeds payable under such polices, whether or not such damage or loss shall have been caused by any acts or omissions of the other Owner or its directors, officers, employees, agents, tenants or occupants.

## ARTICLE V - CASUALTY AND EMINENT DOMAIN

### Section 5.01. Casualty.

(a)    If any building located on any Parcel is damage or destroyed by fire or other cause, the Owner of such building shall promptly cause either: (i) the repair, restoration, or rebuilding of the building so damaged or destroyed, or (ii) the razing of any damaged building, the filing of any excavation, and performance of any other work necessary to put such portion of the Shopping Center in a clean, sightly and safe condition.

(b)    In the event any Common Area Improvements are damaged or destroyed, the Owner of the Parcel to which such damage has occurred shall promptly cause the repair, restoration or rebuilding of the Common Area improvements to the extent necessary to restore such area to the extent necessary to avoid interference with the remaining Common Areas of the Shopping Center and to adhere to any required parking ratios required by law and as set forth herein.

### Section 5.02. Casualty Insurance.
In order to assure performance of their respective obligations under Section 5.01, the Owners of the respective Parcels shall cause to be carried fire and extended coverage insurance on all buildings and improvements on their respective Parcels in the amount of the replacement cost of such improvements, and in amounts at least sufficient to avoid the effect of any co-insurance provisions of such policies, except if the Owner of said Parcel, or Party responsible for any required restorations, is permitted to "self insure" pursuant to Section 5.01. Any such insurance shall otherwise conform to the provisions with respect to insurance contained in Section 4.02.

### Section 5.03. Eminent Domain.
In the event the whole or any part of the Shopping Center shall be taken by right of eminent domain or any similar authority of law (a "Taking"), the entire award for the value of the land and improvements so taken shall belong to the Owner of the property so taken or to such Owner's mortgagees or tenants, as their interest may appear, and no other Owner shall have a right to claim any portion of such award by virtue of any interest created by this Agreement. Any Owner of a Parcel which is not the subject of a taking may, however, file a collateral claim with the condemning authority over and above the value of the land being

OR214709.1

16

Description: Orange,FL Document-Book.Page 5845.1099 Page: 16 of 28

RECEIVED IN RECORDS MANAGEMENT DEPARTMENT AS IS.

OR Bk **5845** Pg **1115**
Orange Co FL 1999-0413311

so taken to the extent of any damage suffered by such Owner resulting from the severance of the land or improvements so taken if such claim shall not operate to reduce the award allocable to the Parcel taken. In the event of a partial Taking, the Owner of the portion of the Shopping Center so taken shall restore the improvements located on the Common Areas of the Owner's Parcel as nearly as possible to the condition existing prior to the Taking without contribution from any other Owner and any portion of any condemnation award necessary therefor shall be held in trust and applied for such purpose.

## ARTICLE VI - REMEDIES

### Section 6.01.  Self Help; Lien Rights Disputes.

(a)      If any Owner shall default in the performance of an obligation of such Owner (such Owner being herein called a "Defaulting Owner"), which default affects the Owner of another Parcel or any occupant thereof (an "Affected party"), such Affected Party, in addition to all other remedies it may have at law or in equity, after ten days' prior written notice to the Default Owner and any first Mortgagee or SL Lessor as herein defined (or in the event of an emergency after such notice as is practicable under the circumstances), shall have the right to perform such obligation on behalf of the Defaulting Owner, subject to the dispute provisions of Section 6.06.  In such event, the Defaulting Owner shall promptly reimburse the Affected Party the cost thereof, together with interest thereon form the date of outlay at a rate equal to the greater of (i) four percent in excess of the prime lending rate charged by Citibank, N.A. for commercial loans of its most preferred commercial customers, or (ii) twelve percent (12%) (the "Interest Rate").

(b)      Any such claim for reimbursement, together with interest thereon as aforesaid, may, at the option of the Affected Party, be secured by a lien on the parcel and improvements thereon owned by the Defaulting Party, provided the Defaulting Owner has first received Notice of the Affected Party's intention to file such lien (the "Lien Notice") and the Defaulting Party has failed to cure the Default within ten (10) days of receipt of the Lien Notice.  If a lien is filed by the Affected party in accordance with this Section 6.01, the lien shall be effective upon the recording thereof in the Office of the Clerk of the County in which the Shopping Center is located.  The lien shall be subordinate to rights of any mortgagee (a "First Mortgagee") under any first mortgage or deed of trust now or hereafter affecting the subject Parcel (a "First Mortgage") which is of record prior to the date upon which notice of the lien is filed in the said Clerk's office; and any purchaser at any foreclosure or trustee's sale (as well as any grantee by deed in lieu of foreclosure or trustee's sale) under any such First Mortgage shall take title subject only to liens thereafter accruing pursuant to this Section 6.01.  The Defaulting Owner shall have the right, but not the obligation to transfer any lien filed pursuant to this Section to a bond using the same procedures and protocols for the bonding off of a Mechanic's Lien under Florida law, except the Defaulting Owner shall post such bond in an amount equal to one hundred ten (110) percent of the amount of the lien.

OR21470R:1

17

OR Bk 5845 Pg 1116
Orange Co FL 1999-0413311

**Section 6.02. Injunctive and Other Remedies.** In the event of a breach by any Owner of any obligation of this Agreement, the other Owners shall be entitled to obtain an injunction specifically enforcing the performance of such obligation; the Owners hereby acknowledge the inadequacy of legal remedies and the irreparable harm which would be caused by any such breach, and/or to relief by other available legal and equitable remedies form the consequences of such breach. Any action taken or document executed in violation of this Agreement shall be void and may be set aside upon the petition of the other Owners of portions of the Shopping Center and Adjacent Land. Any costs and expenses of any such proceeding, including attorney's fees in a reasonable amount, shall be paid by Defaulting Owner and shall constitute a lien against the Defaulting Owner's Parcel and improvements thereon, or the interests therein, until paid.

**Section 6.03. Non-Waiver.** No delay or omission of any Owner in the exercise of any right accruing upon any default of any other Owner shall impair such right or be construed to be a waiver thereof, and every such right may be exercised at any time during the continuance of such default. A waiver by any Owner of a breach of, or a default in, any of the terms and conditions of this Agreement by any other Owner shall not be construed to be a waiver of any subsequent breach of or default in the same or any other provision of this Agreement. Except as otherwise specifically provided in this Agreement, (i) no remedy provided in this Agreement shall be exclusive but each shall be cumulative with all other remedies provided in this Agreement, and (ii) all remedies at law or in equity shall be available.

**Section 6.04. Non Terminable Agreement.** No breach of the provisions of this Agreement shall entitle any Owner or party to cancel, rescind or otherwise terminate this Agreement, but such limitation shall not affect, in any manner, any other rights or remedies which any party may have hereunder by reason of any breach of the provisions of this Agreement. No breach of the provisions of this Agreement shall defeat or render invalid the lien of any mortgage or deed of trust made in good faith for value covering any part of the Shopping Center or the Adjacent Land, and any improvements thereon.

**Section 6.05. Force Majeure.** In the event any Owner or any other party shall be delayed or hindered in or prevented form the performance of any act required to be performed by such party by reason of Acts of God, strikes, lockouts, unavailability of materials, failure of power, prohibitive governmental laws or regulations, riots, insurrections, the act or failure to act of the other party, adverse weather conditions preventing the performance of work as certified to by an architect, war or other reason beyond such party's control, then the time for performance of such act shall be extended for a period equivalent to the period of such delay. Lack of adequate funds or financial inability to perform shall not be deemed to be a cause beyond the control of such party.

**Section 6.06. Dispute Resolution.** Any dispute between the parties may be litigated or pursued through Alternative Dispute Resolution Procedures in effect in the state of Florida under if appropriate, available and agreed to by the parties. The prevailing party in any dispute shall

OR214709;1

18

RECEIVED IN RECORDS MANAGEMENT
DEPARTMENT AS IS.

Description: Orange,FL Document-Book Page 5845.1099 Page: 18 of 20

OR Bk 5845 Pg 1117
Orange Co FL 1999-0413311

be reimbursed for any court charges related to the resolution of the dispute and its reasonable attorney's fees.

## ARTICLE VII - TERM

**Section 7.01.** This Agreement and the easements, rights, obligations and liabilities created hereby shall be perpetual to the extent permitted by law.

## ARTICLE VIII - EFFECT OF INSTRUMENT

**Section 8.01. Mortgage Subordination.** Any mortgage or deed of trust affecting any portion of the Shopping Center shall at all times be subject and subordinate to the terms of this Agreement, except to the extent expressly otherwise provided herein, and any party foreclosing any such mortgage or deed of trust, or acquiring title by deed in lieu of foreclosure or trustee's sale shall acquire title subject to all of the terms and provisions of this Agreement, subject to the terms of Section 6.01 hereof. Each party hereto represents and warrants to the other party that there is no presently existing mortgage or deed of trust lien on its Parcel, other than mortgage or deed of trust liens that are expressly subordinate to the lien of this Agreement.

**Section 8.02. Binding Effect.** Every agreement, covenant, promise, undertaking, condition, easement, right, privilege, option and restriction made, granted or assumed, as the case may be, by either party to this Agreement is made by such party not only personally for the benefit of the other party hereto but also as Owner of a portion of the Shopping Center and shall constitute equitable servitude on the portion of the Shopping Center owned by such party appurtenant to and for the benefit of the other portions of the Shopping Center. Any transferee of any part of the Shopping Center, to have assumed all obligations of this Agreement relating thereto to the extent of its interest in its Parcel and to have agreed with the then Owner or Owners of all other portions of the Shopping Center to execute any and all instruments and to do any and all things reasonably required to carry out the intention of this Agreement and the transferor shall upon the completion of such transfer be relieved of all further liability under this Agreement except liability with respect to matters that have arisen during its period of ownership of the portion of the Shopping Center so conveyed that remain unsatisfied.

**Section 8.03. Non-Dedication.** Nothing contained in this Agreement shall be deemed to be a gift or dedication of any portion of the Shopping Center to the general public or for any public use or purpose whatsoever, it being the intention of the parties hereto and their successors and assigns and that nothing in this Agreement, expressed or implied, shall confer upon any person, other than the parties hereto and their successors and assigns, any rights or remedies under or by reason of this Agreement.

**Section 8.04. Responsibility.** Notwithstanding anything to the contrary contained in this instrument, each party to this Agreement shall be liable and responsible for the obligations, covenants, agreements and responsibilities created by this Agreement and for any judgment

OR31470:1

19

OR Bk **5845** Pg **1118**
Orange Co FL 1999-0413311

rendered hereon only to the extent of its respective interest in the land and improvements on the Developer Parcel, the Outparcels and the Waterford Parcel, as the case may be.

## ARTICLE IX - NOTICES

**Section 9.01.** All notices, requests, demands or other communications hereunder shall be in writing and deemed given: (i) when delivered personally, (ii) when sent by confirmed facsimile transmission, (iii) on the day after said communication is sent via overnight courier, or (iv) on the fifth (5th) day after said communication is deposited in the U.S. or Canadian mail, by registered or certified mail, return receipt requested, postage prepaid, addressed as follows:

If to Waterford:    Waterford Commercial Land Joint Venture
11 Church Street, Suite 200
Toronto, Ontario M5E1W1
Attention:  Mr. Russell Jacobson
FAX No.:  (416) 861-0177

With a copy to:    Baker & Hostetler, LLP
200 South Orange Avenue
Suite 2300
Orlando, Florida 32801
Attention:  Frank Mock, Esq.
FAX No.:  (407) 841-0168

If to Developer:    Deno Dikeou
502 N. Highway 17-92
Longwood, FL 32750
FAX No. (407) 830-4502

With a copy to:    Akerman, Senterfitt & Eidson, P.A.
255 South Orange Avenue
Suite 1700
Orlando, Florida 32801
Attention: Ted R. Brown, Esq.
FAX No. (407)843-6610

or to such other address as the parties may from time to time designate by notice in writing to the other parties.

OR21470r1

20

OR Bk 5845 Pg 1119
Orange Co FL 1999-0413311

## ARTICLE X.  MISCELLANEOUS

### Section 10.01

(a)   If any provision of this Agreement, or portion thereof, or the application thereof to any person or circumstances, shall, to any extent be held invalid, inoperative or unenforceable, the remainder of this Agreement, or the application of such provision or portion thereof to any other persons or circumstances, shall not be affected thereby; it shall not be deemed that any such invalid provision affects the consideration for this Agreement; and each provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

(b)   This Agreement shall be construed in accordance with the laws of the State in which the Shopping Center is located.

(c)   The Article headings in this Agreement are for convenience only, shall in no way define or limit the scope or content of this Agreement, and shall not be considered in any construction or interpretation of this Agreement or any part hereof.

(d)   Nothing in this Agreement shall be construed to make the parties hereto partners or joint venturers or render either of said parties liable for the debts or obligations of the other.

(e)   This Agreement shall be binding upon and inure to the benefit of the successors and assigns of the parties hereto, and all of the benefits and burdens contained herein shall run with the land.

(f)   This Agreement may be amended, modified, or terminated at any time by a declaration in writing, executed and acknowledged by both of the Approving Parties; provided that if any Parcel is materially adversely affected by any proposed amendment, modification or termination, then the consent of the Owner of such Parcel shall be required for any such amendment, modification or termination to be effective. This Agreement shall not be otherwise amended, modified or terminated during the term hereof.

OR21470P:1

21

OR Bk 5845 Pg 1120
Orange Co FL 1999-0413311

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first above written.

Witnesses:

_Christina M. Lee_
Signature
CHRISTINA M. LEE
Print Name

_Adlene F. Pason_
Signature
Adlene F. Pason
Print Name

_Deno Dikeou_
Name: Deno Dikeou

Witnesses:

WATERFORD COMMERCIAL LAND
JOINT VENTURE, a Florida general partnership

By:    East Orlando Development
       Corporation, a Florida
       Corporation, as a General
       Partner

_Christina M. Lee_
Signature
CHRISTINA M. LEE
Print Name

_Adlene F. Pason_
Signature
Adlene F. Pason
Print Name

By: _____
Name: Thomas E. Powers
As its: Vice President

OR216709;1

22

OR Bk 5845 Pg 1121
Orange Co FL 1999-0413311

STATE OF _FLORIDA_ )
)  ss.
COUNTY OF _ORANGE_ )

The foregoing instrument was acknowledged before me this _24th_ day of _September_ 1999 by Thomas E. Powers as Vice President of East Orlando Development Corporation, a Florida corporation, on behalf of the corporation, as the General Partner of East Orlando Development Corporation, a Florida corporation, as a General Partner of Waterford Commercial Land Joint Venture, a Florida general partnership. He is personally known to me or has produced _____ as identification.

(NOTARY SEAL)

_____
(Notary Signature)

_____
(Notary Name Printed)
NOTARY PUBLIC
Commission No. _____

STATE OF FLORIDA )
)  ss:
COUNTY OF _ORANGE_ )

ARLENE F. PARSON
COMMISSION # CC 826515
EXPIRES MAR 05, 2000
BONDED THRU
ATLANTIC BONDING CO., INC.

Sworn to and subscribed before me this _24_ day of _September_, 1999, by Deno Dikeou, who is personally known to me or who has produced _FL Drivers License_ type of identification as identification.

_____
NOTARY PUBLIC, STATE OF FLORIDA

ARLENE F. PARSON
COMMISSION # CC 826515
EXPIRES MAR 05, 2000
BONDED THRU
ATLANTIC BONDING CO., INC.

_____
(Print, Type or Stamp Commissioned Name of Notary Public)

OR214709:1

23

RECEIVED IN RECORDS MANAGEMENT
DEPARTMENT AS IS.

Description: Orange,FL Document-Book.Page 5845.1099 Page: 23 of 28

**EXHIBIT "A" TO THE**
RECIPROCAL EASEMENT AND OPERATION AGREEMENT

OR Bk 5845 Pg 1122
Orange Co FL 1999-0413311

A PARCEL OF LAND LYING IN SECTION 22, TOWNSHIP 22 SOUTH, RANGE 31 EAST, ORANGE COUNTY, FLORIDA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE SOUTHWEST CORNER OF THE SOUTHWEST 1/4 OF SECTION 22, TOWNSHIP 22 SOUTH, RANGE 31 EAST, RUN S89°21'33"E, ALONG THE SOUTH LINE OF SAID SOUTHWEST 1/4, A DISTANCE OF 691.35 FEET TO THE SOUTHWEST CORNER OF THE EAST 3/4 OF THE SOUTHWEST 1/4 OF SAID SECTION 22 FOR A POINT OF BEGINNING; THENCE DEPARTING SAID SOUTH LINE, RUN N00°26'35"W, A DISTANCE OF 1252.89 FEET TO THE NORTHWEST CORNER OF THE EAST 3/4 OF THE SOUTH 1/2 OF THE SOUTHWEST 1/4 OF SAID SECTION 22; THENCE DEPARTING SAID WEST LINE, RUN N88°60'33"E, ALONG THE NORTH LINE OF THE SOUTH 1/2 OF THE SOUTHWEST 1/4 OF SAID SECTION 22, A DISTANCE OF 683.05 FEET TO A POINT ON THE WEST RIGHT-OF-WAY LINE OF ALAFAYA TRAIL, AS RECORDED IN O.R. BOOK 3409, PAGE 1329, PUBLIC RECORDS OF ORANGE COUNTY, FLORIDA; THENCE DEPARTING SAID NORTH LINE, RUN THE FOLLOWING COURSE AND DISTANCES ALONG SAID WEST RIGHT-OF-WAY LINE; THENCE S00°50'33"E, A DISTANCE OF 386.13 FEET TO THE POINT OF CURVATURE OF A CURVE, CONCAVE NORTHEASTERLY, HAVING A CENTRAL ANGLE OF 27°57'17" AND A RADIUS OF 1848.00 FEET; THENCE RUN SOUTHEASTERLY ALONG THE ARC OF SAID CURVE, A DISTANCE OF 911.40 FEET TO A POINT ON THE SOUTH LINE OF THE SOUTHWEST 1/4 OF SAID SECTION 22; THENCE DEPARTING SAID RIGHT-OF-WAY LINE, RUN S89°21'32"W, ALONG SAID SOUTH LINE, A DISTANCE OF 909.72 FEET TO THE POINT OF BEGINNING.

RECEIVED IN RECORDS MANAGEMENT DEPARTMENT AS IS.

Description: Orange,FL Document-Book.Page 5845.1099 Page: 24 of 28

EXHIBIT "A" TO THE
RECIPROCAL EASEMENT AND OPERATION AGREEMENT (continued)

OR Bk 5845 Pg 1123
Orange Co FL 1999-0413311

A PARCEL OF LAND LYING IN SECTION 27, TOWNSHIP 22 SOUTH, RANGE 31 EAST, ORANGE COUNTY, FLORIDA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE NORTHWEST CORNER OF THE NORTHWEST 1/4 OF SECTION 27, TOWNSHIP 22 SOUTH, RANGE 31 EAST, RUN N89°21'32"E, ALONG THE NORTH LINE OF SAID NORTHWEST 1/4, A DISTANCE OF 691.35 FEET TO THE NORTHWEST CORNER OF THE EAST 3/4 OF THE NORTHWEST 1/4 OF SAID SECTION 27 FOR A POINT OF BEGINNING; THENCE CONTINUE N89°21'32"E, ALONG THE NORTH LINE OF THE NORTHWEST 1/4 OF SAID SECTION 27, A DISTANCE OF 909.72 FEET TO A POINT ON THE WEST RIGHT-OF-WAY LINE OF ALAFAYA TRAIL, AS RECORDED IN O.R. BOOK 3409, PAGE 1329, PUBLIC RECORDS OF ORANGE COUNTY, FLORIDA, SAID POINT ALSO BEING ON A CURVE, CONCAVE NORTHEASTERLY, HAVING A CENTRAL ANGLE OF 01°55'06" AND A RADIUS OF 1868.00 FEET; THENCE FROM A TANGENT BEARING OF S28°47'50"E, RUN SOUTHEASTERLY ALONG THE ARC OF SAID CURVE AND SAID RIGHT-OF-WAY LINE, A DISTANCE OF 62.56 FEET TO THE POINT OF TANGENCY; THENCE CONTINUE ALONG SAID RIGHT-OF-WAY LINE, S30°42'55"E, A DISTANCE OF 1033.12 FEET TO THE POINT OF CURVATURE OF A CURVE, CONCAVE SOUTHWESTERLY, HAVING A CENTRAL ANGLE OF 03°38'25" AND A RADIUS OF 1732.00 FEET; THEN RUN SOUTHEASTERLY ALONG THE ARC OF SAID CURVE AND SAID RIGHT-OF-WAY LINE, A DISTANCE OF 110.05 FEET TO A POINT ON THE NORTHERLY RIGHT-OF-WAY LINE OF THE EAST-WEST EXPRESSWAY AS RECORDED IN OFFICIAL RECORDS BOOK 4061, PAGE 3445, PUBLIC RECORDS OF ORANGE COUNTY, FLORIDA; THENCE DEPARTING SAID CURVE AND SAID WEST RIGHT-OF-WAY LINE; THE FOLLOWING COURSES AND DISTANCES ALONG SAID NORTHERLY RIGHT-OF-WAY LINE, RUN S24°39'56"W, A DISTANCE OF 190.80 FEET; THENCE S59°41'25"W, A DISTANCE OF 778.45 FEET TO THE POINT OF CURVATURE OF A CURVE, CONCAVE NORTHWESTERLY, HAVING A CENTRAL ANGLE OF 18°42'23" AND A RADIUS OF 1827.86 FEET; THENCE RUN SOUTHWESTERLY ALONG THE ARC OF SAID CURVE, A DISTANCE OF 596.77 FEET TO THE POINT OF COMPOUND CURVATURE OF A CURVE, CONCAVE NORTHWESTERLY, HAVING A CENTRAL ANGLE OF 01°03'52" AND A RADIUS OF 11209.16 FEET; THENCE RUN SOUTHWESTERLY ALONG THE ARC OF SAID CURVE, A DISTANCE OF 206.81 FEET TO A POINT ON THE WEST LINE OF THE EAST 3/4 OF THE NORTHWEST 1/4 OF SAID SECTION 27; THENCE DEPARTING SAID NORTHERLY RIGHT-OF-WAY LINE, RUN N00°22'32"W ALONG SAID WEST LINE, A DISTANCE OF 1847.16 FEET TO THE POINT OF BEGINNING.



Sep-23-99 15:10   DPC ENGINEERING                    4078943693           P.01

EXHIBIT B to Reciprocal Easement Agreement
PARCEL AND EASEMENT DRAWING
22 SEP 1999     1" = 400'



OR Bk 5845 Pg 1124
Orange Co FL 1999-0413311

NOTES:
1) ONLY ONE (1) BUILDING WILL BE ALLOWED ON OUT PARCEL "B", WITH MIN. 75 FT SETBACK FROM SOUTHERN LINE OF MAIN ENTRANC
2) UP TO THREE (3) BUILDINGS WILL BE ALLOWED ON OUT PARCEL "A", WITH MIN. 75 FT SETBACK FROM EASTWEST EXPRESSWAY R/W AND MAINTAINING MIN 95 FOOT SEPARATION BETWEEN BUILDING AND THE BUILDING ON OUT-PARCEL "B".
3) BUILDINGS ON OUT PARCEL "C" WILL MAINTAIN A MIN. 75 FT SETBACK FROM THE NORTHERN LINE OF MAIN ENTRANCE.

Description: Orange,FL Document-Book.Page 5845.1099 Page: 26 of 28

OR Bk **5845** Pg **1125**
Orange Co FL 1999-0413311

## EXHIBIT C

### MASTER SIGN PLAN

| | | |
|---|---|---|
| 1. | Remaining Parcel | 150 square feet |
| 2. | Outparcel C | 110 square feet |
| 3. | Home Depot Main Driveway | 120 square feet |
| 4. | Outparcel B | 110 square feet |
| 5. | Outparcel A | 110 square feet |

100' Separation Between Signs

The numbers correspond to the numbers on Page 2 of Exhibit "C" showing the general location of the signage for the Waterford Parcel and the Outparcels A, B, C and D (here the Remaining Parcel)

OR21470P;1

24

Description: Orange,FL Document-Book.Page 5845.1099 Page: 27 of 28



## Waterford Lakes
## Parcels 6 & 7
### CONCEPTUAL LOTTING PLAN

Description: Orange,FL Document-Book.Page 5845.1099 Page: 28 of 28

(12)

This instrument prepared by,
and after recording return to:
Ashley C. Stanley, Esq.
Altman, Kritzer & Levick, P.C.
6400 Powers Ferry Road, Suite 224
Atlanta, Georgia 30339

Orange Co FL 2000-0040646
01282000  12:21:56pa
OR Bk 5931 Pg 4466
Rec 46.50

### FIRST AMENDMENT TO
### RECIPROCAL EASEMENT AND OPERATION AGREEMENT

**THIS FIRST AMENDMENT TO RECIPROCAL EASEMENT AND OPERATION AGREEMENT** (this "Agreement") made as of this ___ day of _____, 2000, between **DENO DIKEOU** ("Developer"), and **HOME DEPOT U.S.A., INC.**, a Delaware corporation ("HD").

#### Preliminary Statement

**WHEREAS**, Developer and Waterford Commercial Land Joint Venture ("Waterford") entered into that certain Reciprocal Easement and Operation Agreement dated as of September 23, 1999 and recorded on September 24, 1999 in OR Book 5845, Page 1099, Orange County, Florida Records (the "REA").

**WHEREAS**, Waterford assigned its rights under the REA to HD by virtue of an Assignment of Reciprocal Easement and Operation Agreement dated simultaneously herewith and recorded in Orange County, Florida Records as Document Number 2000-_____ (the "Assignment of REA").

**WHEREAS**, Developer and HD now desire to amend the REA.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth, Developer and HD hereby agree as follows:

1.   Reference in the REA to "Waterford" shall refer to the trade name utilized from time to time by HD (including its successors and assigns).

2.   The REA is hereby amended so that the legal description of the HD Parcel is the legal description attached hereto as Exhibit A.

1.   The REA is hereby amended so that the legal description of the Retention Pond is the legal description attached hereto as Exhibit A-1.



OR Bk 5931 Pg 4467
Orange Co FL 2000-0040646

4.     The Site Plan attached to the REA as Exhibit B is hereby deleted and replaced in its entirety with the Site Plan attached hereto as Exhibit X.

5.     Section 3.01(b) of the REA is hereby deleted in its entirety and replaced with Section 3.01(b) herein:

(b)     Subject to the further restrictions on building construction set forth in Sections 3.02 and 3.03 hereof and as modified in subsection (h) below, unless otherwise approved in writing by the HD Approving Party, no building or other structure of any kind shall be permitted in that portion of the Shopping Center designated as "No Build Area" on the Site Plan, which No Build Area is approximately Two Hundred Eighty Seven Feet and Eighty Five Inches (287.85') east to west, and Four Hundred Feet (400') north to south, as more particularly shown on the Site Plan.

6.     Section 3.01(g) is hereby deleted in its entirety and replaced with Section 3.01(g) herein:

(g)     Unless otherwise approved in writing by the HD Approving Party, no portion of the Shopping Center outside of the HD Parcel may be used for general offices in excess of 1,200 square feet; provided, however, that this Section 3.01(g) shall not prohibit professional office use (including real estate, medical, law, dentistry, or architectural professional offices) of fewer than 5,000 square feet in the cumulative. Notwithstanding anything contained in this Section 3.01(g) to the contrary, the Owner of the Developer Parcel may elect, upon ninety (90) days prior written notice to the Owner of the HD Parcel, to construct general offices in excess of 1,200 square feet (or in excess of 5,000 cumulative square feet of professional office use); provided, however, that upon such election, the access easements granted in Section 1.01(b) and 1.01(c) shall automatically terminate and be of no further force and effect and all cross-access between the HD Parcel and the Developer Parcel shall be prohibited; and provided further that prior to the construction of such offices, the Owner of the Developer Parcel shall construct, at its sole cost and expense, such barriers as may be required by the Owner of the HD Parcel in its reasonable judgment to prevent access between the HD Parcel and the Developer Parcel. In the event the Owner of the Developer Parcel fails to construct such barriers, the Owner of the HD Parcel shall have the right, but not the obligation, to construct such barriers, and the Owner of the Developer Parcel shall reimburse the Owner of the HD Parcel for the cost of such construction within thirty (30) days of receipt of invoice therefor. Notwithstanding the foregoing, the Owner of the Developer Parcel shall not be permitted to construct such general offices in excess of 1,200 square feet (or in excess of 5,000 cumulative square feet of professional office use) if such construction will in any way impact or alter HD's governmental permits, licenses, variances, approvals or classifications (or those governmental permits, licenses, variances, approvals or classifications being then sought by HD) or for which HD has applied). The foregoing permits, licenses, variances, approvals and classifications shall, include, without limitation, any such permits, licenses, variances, approvals and classifications pertaining to the platting of the HD Parcel, zoning, demolition of any existing improvements, site plan approvals, engineering permits, traffic and department of transportation permits, sewer and storm water management permits, parking variances, any required comprehensive land plan amendments, or any

03012-004/041



OR Bk 5931 Pg 4468
Orange Co FL 2000-0040646

development of regional impact plan(s), any concurrency requirements and any other permits, licenses, variances, approvals or classifications otherwise pertaining to buildings, occupancy, signs, driveways (including ingress and egress to public thoroughfares), and environmental controls.

7.    Section 3.01(h) is hereby deleted in its entirety and replaced with Section 3.01(h) herein:

(h)    Unless otherwise approved in writing by the HD Approving Party, no more than three buildings shall be erected on Outparcel A, which may not together exceed Eighteen Thousand (18,000) square feet of building area, and no one building on Outparcel A may exceed Fifteen Thousand, Seven Hundred (15,700) square feet of building area; and no more than one building shall be erected on Outparcel B, which may not exceed Twelve Thousand (12,000) square feet of building area. All buildings on Outparcel A, Outparcel B must, if constructed, provide a minimum of eighty-five (85) feet of clear space between each such building on Outparcel A and Outparcel B together. No building on Outparcel B may be erected within 75 feet of the southern Edge of the Main Driveway, and no building on Outparcel C may be erected within 75 feet of the northern edge of the Main Driveway, which "no building areas" are shown on the Site Plan as "No Build Area". No building on Outparcel A may be built within 75 feet of the southern property line of Outparcel A.

8.    Section 3.01(i) is hereby deleted in its entirety and replaced with Section 3.01(i) herein:

(i)    No buildings or improvements shall be located within the "View Corridor" as established in subsection (h) above, and more or less as depicted on the Site Plan, except as permitted by subsection (h) above, so as not to interfere with the visibility of the store building to be constructed by HD. No building to be constructed on the Outparcels shall exceed one story, nor shall any buildings to be constructed on Outparcel A, Outparcel B or Outparcel C, or that portion of Outparcel D within 100 feet of the northern property line of Outparcel C, inclusive of any signage or parapet, exceed 25 feet in height, except that each Outparcel building shall be permitted one spire, bell tower, clock tower or flagpole, of not more that 6 feet in width, provided that the maximum height of any such building with the permitted spire, bell tower, clock tower or flagpole shall not exceed 35 feet in height. No buildings to be constructed on Outparcel A and Outparcel B shall have a main entrance which is within five hundred (500') feet of the main entrance of the building to be erected on the HD Parcel, which 500 foot main entrance radius restriction is shown on the Site Plan.

9.    Section 2.01(b) - (c) are hereby added, as follows:

(b)    The Owners hereby acknowledge and agree that Orange County (the "County") has required the creation of a property owners' association for the coordination of the delivery of certain utilities to the Parcels, and the payment of fees in connection with such utilities, including, without limitation, the annual inspection and flushing of the fire protection system. To provide for the coordination of such utilities, and the performance of any and all other obligations with regard to such utility services which may be required by the County, the Owners



OR Bk 5931 Pg 4467
Orange Co FL 2000-0040646

hereby authorize HD to create an Alafaya Trail Property Owners' Association, a Florida not-for-profit corporation (the "Association"). The Owners, and their successors and assigns, shall at all times during their ownership (but only during their ownership) of any Parcel in which this Agreement, or any successor or substitute agreement, remains in effect, be required to be members of the Association, and shall cooperate with the Association in carrying out its obligations in order to ensure the delivery of such utility services.

(c)     As further determined pursuant to the Bylaws of the Association, the Association shall (i) establish an annual charge to be assessed by the Association, the payment of the utility fees actually incurred by the Association to all Owners to provide for year (an "Assessment"). The amount of any Assessment applicable to a particular Parcel shall be determined by multiplying the aggregate amount of such Assessment by a fraction, the numerator of which shall be the acreage of such Parcel, and the denominator of which shall be equal to the aggregate acreage of all Parcels.

(d)     Unless otherwise provided by the Association, each Owner shall pay to the Association each Assessment not later than thirty (30) days after receipt of an invoice therefor. Any Assessment not paid within such thirty (30) day period shall bear interest from the due date at the Interest Rate (as defined in Section 6.01 hereof).

(e)     The Owners hereby covenant and agree, and each subsequent Owner of any Parcel by acceptance of a deed therefor, whether or not it shall be so expressed in such deed, is deemed to covenant and agree, to pay to the Association: (i) the Assessment applicable to such Parcel or Parcels owned by such Owner. Each Assessment applicable to such Assessment or the enforcement of any Assessment lien, shall be a charge on such Parcel and interest, costs, and reasonable attorneys' fees incurred in connection with the collection of any shall be a continuing lien upon such Parcel. Each such Assessment, together with such interest, costs, and reasonable attorneys' fees, shall also be the obligation of the person or entity who or which was the Owner of such Parcel at the time when the Assessment fell due (subject, however, to Section 8.04 of this Agreement). The obligation for delinquent Assessments shall pass to the successors in title of such person or entity, and the lien upon such Parcel shall run with the land.

(f)     As indicated above, it shall be the responsibility of the Association, to the extent required by the County, to coordinate the delivery and payment of utility services to the Parcels; provided, however, that the County has initially required only the coordination of payment for the annual inspection and flushing of the fire protection system. The Bylaws of the Association shall provide the method for assessing and collecting Assessments, as described in Section 2.03(c) above. The Bylaws and other rules and regulations of the Association shall continue in existence for not less than twenty-five (25) years, with automatic renewal periods thereafter.





OR Bk 5931 Pg 4470
Orange Co FL 2000-0040646

10.   Any notice to be delivered to HD shall be delivered in accordance with 9.01 to:

If to HD:          Home Depot U.S.A., Inc.
                   Attention: Legal Department
                   2455 Paces Ferry Road
                   Atlanta, Georgia 30339-9998
                   FAX No.: (770) 431-2739

With a copy to:    Altman, Kritzer & Levick, P.C.
                   6400 Powers Ferry Road, N.W., Suite 224
                   Atlanta, Georgia 30339
                   Attention: Ashley C. Stanley, Esq.
                   FAX No.: (770) 858-1085

(Remainder of this Page Left Intentionally Blank)

(Signatures Commence on Following Page)



33253-2 16961271

Recording: Orange FL Document:Book Page 5931 4466 Page: 5 of 10

OR Bk 5931 Pg 4471
Orange Co FL 2000-0040646

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed as of the day and year first above written.

**Developer:**

Signed, sealed and delivered
in Our Presence:

**DENO DIKEOU**

_____        _____ [SEAL]
Witness/
Print Name: Ted R. Brown

_____        Address:    502 North Highway 17-92
Witness/                                    Longwood, fl 32750
Print Name: Nancy L. Clark

STATE OF Florida        )
                        )  SS:
COUNTY OF Orange        )

The foregoing instrument was acknowledged before me this _____ day of January, 2000, by Deno Dikeou. He personally appeared before me, and is personally known to me or produced _____ driver's license _____ as identification.

[NOTARIAL SEAL]

Notary: _____
Print Name: _____
Notary Public, State of _____
My commission expires: _____

[Signatures Continued on Following Page]



Nancy L. Clark
MY COMMISSION # CC606906 EXPIRES
December 9, 2000
BONDED THRU TROY FAIN INSURANCE, INC.

Description: Orange,FL Document-Book.Page 5931.4466 Page: 6 of 10

OR Bk 5931 Pg 4472
Orange Co FL 2000-0060616

[Signatures Continued from Previous Page]

**HD:**

**HOME DEPOT U.S.A., INC.**

Witness
Print Name: *Michele Killinger*

Witness
Print Name: BARBARA LAWRENCE

By: _____

Its: _____
VP-REAL ESTATE LAW GROUP

[CORPORATE SEAL]

SEAL
HOME DEPOT U.S.A.
CORPORATE
DELAWARE

STATE OF GEORGIA )
                      )  SS:
COUNTY OF COBB )

The foregoing instrument was acknowledged before me this ___ day of _____ 2000, by
_____, the _VP/Flagm_ of Home Depot U.S.A., Inc., on behalf of said corporation.
He/She personally appeared before me, and is personally known to me ~~or produced~~
~~_____ as identification.~~



[NOTARIAL SEAL]
CIAL SEAL
Ja M. Wiggins
ublic State of Georgia
mission Expires 12 ? '?

Notary: _____
Print Name: **GLENDA M.**
Notary Public, State of: _Georgia_
My commission expires: _12-27-03_

332521-1 10/10/1274

OR Bk 5931 Pg 4473
Orange Co FL 2000-0040846

**Exhibit A**

**HD Parcel**

A parcel of land lying in Section 27, Township 22 South, Range 31 East, Orange County, Florida, more particularly described as follows:

Commence at the northwest corner of the northwest ¼ of Section 27, Township 22 South, Range 31 East. Run N89° 21' 32" E, along the north line of said northwest ¼, a distance of 1601.07 feet to a point on the west right-of-way line of Alafaya Trail, as recorded in O.R. book 3409, page 1329, Public Records of Orange County, Florida; said point also being on a curve concave northeasterly, having a central angle of 01° 55' 06" and a radius of 1868.00 feet; thence from a tangent bearing of S28° 47' 50" E, run southeasterly along the arc of said curve and said right-of-way line, a distance of 62.54 feet to the point of tangency; thence continue along said right-of-way line, S30° 42' 55" E, a distance of 452.89 feet to the Point of Beginning; thence continue along said right-of-way line S30° 42' 55" E, a distance of 72.00 feet; thence departing said right-of-way line, run S59° 17' 05" W, a distance of 325.00 feet; thence S30°42' 55" E, a distance of 725.44 feet, to a point on the northerly right-of-way line of the East-West Expressway as recorded in official records book 4081, page 3445, Public Records of Orange County, Florida; run the following courses and distances along said northerly right-of-way line: Thence S59° 41' 25" W, a distance of 613.96 feet to the point of curvature of a curve, concave northwesterly, having a central angle of 2° 56' 49" and a radius of 1827.86 feet; thence run southwesterly along the arc of said curve, a distance of 94.02 feet; thence departing said northerly right-of-way line, run N30° 42' 55" W, a distance of 653.21 feet; thence N59° 17' 05" E, a distance of 363.94 feet; thence N30°, 42' 55" W, a distance of 84.69 feet; thence N59° 17' 05" E, a distance of 295.08 feet; thence N30° 42' 55" W, a distance of 52.11 feet; thence N59° 17' 05" E, a distance of 373.88 feet, to the Point of Beginning.

Containing 11.958 acres, or 504,759 square feet, more or less.

333220-1 16 Jul 1274



OR Bk 5931 Pg 4474
Orange Co FL 2000-0040846

**EXHIBIT A-1**

**Retention Pond**

A parcel of land lying in Section 27, Township 22 South, Range 31 East, Orange County, Florida, more particularly described as follows:

Commence at the northwest corner of the northwest ¼ of Section 27, Township 22 South, Range 31 East. Run N89° 21' 32"E, along the north line of said northwest ¼, a distance of 691.35 feet to the northwest corner of the east ¾ of the northwest ¼ of section 27-22-31; thence S00° 22' 32"E, along the west line of the east ¾ of the northwest ¼ of said section 27-22-31, a distance of 488.38 feet to the Point of Beginning; thence departing said west line , S30° 42' 55" E, a distance of 1339.81 feet, to a point on the northerly right-of-way line of the East-West Expressway as recorded in Official Records Book 4081, page 3445, Public Records of Orange County, Florida; said point being on a curve concave northwesterly, having a central angle of 15° 45' 34" E, and a radius of 1827.86 feet; thence from a tangent bearing of S62° 38' 45"W, run southwesterly along the arc of said curve and right-of-way line, a distance of 502.76 feet, to a point of compound curvature of a curve concave northwesterly having a central angle of 01° 02' 52" and a radius of 11,309.16 feet; thence from a tangent bearing of S78° 23' 48"W, run southwesterly along the arc of said curve and right-of-way line, a distance of 206.81 feet; thence departing said curve and right-of-way line, run N00° 22' 32"W, a distance of 1,358.79 feet, to the Point of Beginning.

Containing 10.863 acres or 473,192.28 square feet, more or less.

333220-1 1630.1774



Description: Orange FL Document-Book Page 5931.4466 Page: 10 of 10

Received   08-01-2005   12:31pm    From-407830450Z    To-Katz Barron Squitero    Page 003

Deno's Entro

This instrument prepared by and return direct to
Stephen L. Walker, Attorney
Moulton McEachern & Walker
5041 Bayou Boulevard, Suite 300
Pensacola, Florida 32503

INSTR # 20050432596
OR BK 08046 PG 1183 PGS=29
MARTHA O. HAYNIE, COMPTROLLER
ORANGE COUNTY, FL
06/28/2005   04:08:12 PM
REC FEE 248.00

## DECLARATION OF EASEMENTS, RESTRICTIONS AND COVENANTS

This Declaration of Easements, Restrictions and Covenants Agreement ("Declaration") is made and entered into this 28 day of June, 2005, by DENO P. DIKEOU, 502 North Highway 17-92, Suite 100, Longwood, Florida 32750 ("Dikeou").

### RECITALS

A.    Dikeou is the owner of all the property described in Exhibit A ("Shopping Center Property") attached hereto and made a part hereof.

B.    Dikeou has leased a smaller parcel totally contained within the Shopping Center Property to Kohl's Department Stores, Inc. ("Kohl's"), by lease dated November 30, 2004 ("Kohl's Lease") a memorandum of which ("Kohl's Memorandum") is recorded in O.R. Book _____, page _____ of the public records of Orange County, Florida, said parcel being described as Parcel 1 in Exhibit B attached hereto and made a part hereof. Dikeou has further leased another smaller parcel totally contained within the Shopping Center Property to Circuit City Stores, Inc. ("Circuit City"), by lease dated May 12, 2005 ("Circuit City Lease") a memorandum of which ("Circuit City Memorandum") is recorded in O.R. Book _____, page _____ of the public records of the Orange County, Florida, said parcel being described as Parcel 2 in Exhibit B. Dikeou further intends to lease a third parcel to be totally contained within the Shopping Center Property and described as Parcel 3 in Exhibit B. Parcel 1, Parcel 2 and Parcel 3 are collectively referred to herein as the "Parcels." The Kohl's Lease, the Circuit City Lease and any initial lease of Parcel 3 are collectively referred to herein as the "Leases." Kohl's, Circuit City and any tenant initially leasing Parcel 3, are collectively referred to herein as the "Tenants." The Kohl Memorandum, Circuit City Memorandum and any memorandum of lease executed and recorded for any initial lease of Parcel 3 are collectively referred to herein as the "Memorandums."

C.    Dikeou intends to develop other portions of the Shopping Center Property, other than the Parcels, for additional shopping center tenants in the locations shown on the site plan attached hereto as Exhibit C and made a part hereof ("Additional Tenant Pads"). The Shopping Center Property, less and except the Parcels and Additional Tenant Pads, is hereinafter referred to for purposes of this Declaration as the "Common Areas."

D.    Dikeou and Waterford Community Land Joint Venture ("Waterford") have entered into a Reciprocal Easement and Operations Agreement that encumbers the Shopping Center Property and the adjoining property currently owned by Home Depot U.S.A., Inc., successor to Waterford, said Reciprocal Easement and Operations Agreement being dated September 24, 1999 and recorded in O.R. Book 5845, page 1099

and amended by the First Amendment to Reciprocal Easement and Operations Agreement on January 26, 2000 and recorded in O.R. Book 5931, page 4466 all of the public records of Orange County, Florida, collectively called the "REA."

E. Dikeou intends to obtain a loan from American United Life Insurance Company ("AUL") and grant AUL a mortgage on the Parcels and on mortgagor's rights in the REA and on the easements, restrictions and covenants created under this Declaration (said mortgage, together with all amendments, extensions, modifications, restatements and future advances thereof, collectively, the "AUL Mortgage") to, in part, secure repayment of the loan to Dikeou from AUL.

F. The Leases impose or will impose certain easements, restrictions and covenants on the Shopping Center Property and the Common Areas, including without limitation the right of parking, that are not or may not be granted or covered under the REA or the Memorandums. Dikeou hereby desires to declare and establish the following easements, restrictions and covenants that will benefit the Tenants, AUL and any other lenders holding a mortgage or mortgages on the Parcels and any owner or owners of the Parcels and their respective devisees, heirs, personal representatives, successors and assigns.

NOW, THEREFORE, in consideration of the premises and covenants herein contained and other good and valuable consideration, Dikeou hereby imposes the following easements, restrictions and covenants and hereby agrees as follows:

1. **Recitals.** The foregoing recitals and all exhibits attached hereto are true and correct and are hereby incorporated into this Declaration.

2. **Grant of Easement Over the Common Areas for Parking.** Dikeou hereby grants, bargains, sells and conveys to any tenant leasing any of the Parcels, including, without limitation, the Tenants, AUL, and any owners of the Parcels (collectively the "Benefited Parties"), its customers, employees, agents and invitees, as an appurtenance to and for the benefit of the Parcels, a non-exclusive, perpetual easement over and upon the Common Areas for the purpose of vehicular parking, subject to drives, sidewalks, lighting and other uses of the Common Areas as provided for under the REA.

3. **Maintenance.** Dikeou shall maintain and keep the Common Areas to be used for parking in a good state of repair and in a clean and suitable condition for parking ("Easement Maintenance") including, without limitation paving, repaving, patching and landscaping, and pay all costs and expenses in connection therewith ("Easement Maintenance Cost"), subject to contribution therefore in accordance with the terms of the Leases. Easement Maintenance Costs will include real property taxes and assessments pertaining to the Common Areas (all assessments collectively "Taxes and Assessments"). If maintenance and repairs of the Common Areas are required in the exercise of any of the Benefited Parties reasonable discretion or if Dikeou fails to pay Taxes and Assessments before the same become delinquent and Dikeou fails to initiate such repairs or pay such Taxes and Assessments within Thirty (30) days of notice from any of the Benefited Parties specifying the necessary repair or need to pay Taxes and Assessments, then any of the Benefited Parties may undertake such repairs and maintenance and/or pay the Taxes and Assessments due and submit to Dikeou a

C:\DOCUME~1\WOODSO~1.CLK\LOCALS~1\Temp\notesC2C5CD\Declaration of Easement and Restrictions V8.doc

- 2 -

scription: Orange,FL Document-Book.Page 8046.1183 Page: 2 of 2596
der: 40240643 Comment: update copies

statement for Dikeou's share thereof and receipts and other supporting documentation as may be reasonably required, which amount shall be due upon demand. The amount due to the party performing maintenance and repairs, and such Taxes and Assessments paid by the Benefited Party on behalf of Dikeou, will begin to accrue interest at the rate of 8.75% per annum, beginning from the date expended until paid.

4.    **Additional Easements and Restrictions and Covenants under The Kohl's and Circuit City Leases.** Dikeou shall abide by and comply with all of the provisions and terms of the Kohl's Lease and Circuit City Lease that pertain to the Common Areas and the Shopping Center Property, including, without limitation the matters shown in the REA and the Memorandums and this Declaration. Dikeou hereby imposes easements, restrictions and covenants on the Common Areas which easements, restrictions and covenants are contained in the Kohl's Lease and the Circuit City Lease, which restrictions and covenants are incorporated herein and made a part hereof, including, without limitation, the specific provisions shown in Exhibit D attached hereto and made a part hereof and Exhibit E attached hereto and made a part hereof.

5.    **Future Tenants of the Parcels.** This Declaration is, in part, entered to enable the Benefited Parties to satisfy requirements for the benefit of existing and future tenants and occupants of the Parcels so that any such future tenants or occupants may use the Common Areas in the manner and to the extent the Tenants are entitled to use the Common Areas, provided that any such use shall not violate or conflict with the Leases. The easements, restrictions and covenants shall also apply for the benefit of any future tenants of the Parcels under separate new leases which leases may, but are not required to, include easements, restrictions and covenants at least as restrictive and expansive as the easements, restrictions and covenants set forth in the Leases and herein.

6.    **Development of Additional Tenant Pads.** Dikeou shall not, without the consent of the Benefited Parties, develop tenant space pads or buildings other than as shown in the approximate locations shown on the site plan attached as Exhibit C.

7.    **REA Enforcement.** Dikeou will not agree to any modification of the REA without the approval of the Benefited Parties. Dikeou is further obligated to enforce the terms of the REA for the benefit of the Benefited Parties' and exercise approval rights granted Dikeou under the REA in favor of enforcement of the terms of the Leases.

8.    **Modification of Restrictions and Covenants.** Dikeou agrees, upon request, to amend this Declaration to release and/or modify the easements, restrictions and covenants established hereunder, including, without limitation, the easements, restrictions and covenants of the contemplated lease of Parcel 3 subject to the prior written consent of the Benefited Parties, which consent will not be unreasonably withheld, denied or delayed, (provided that the modifications do not materially increase the obligations of Dikeou or conflict with the REA or any exclusive uses previously granted any other tenants in the Shopping Center) in the event AUL or a future tenant or occupant and the owner of the Parcel covered by such a tenant's Lease desire such release or modification in order to allow any such future tenant or occupant to reasonably utilize the Common Areas, provided such release or modification shall not violate or conflict with the REA, any Lease that remains in force, any other then existing lease of a Parcel or any law or

- 3 -

C:\DOCUME~1\WOODSO~1.CIR\LOCALS~1\Temp\notes32C5CD\Declaration of Easements and Restrictions V8.doc

regulation. Notwithstanding the foregoing, AUL and Dikeou may jointly terminate this Declaration in its entirety without the consent of any Benefited Party.

9. <u>AUL Cure Rights</u>. In the event of any default under (i) any of the Leases arising out of or relating to the use, operation, configuration or maintenance of the Common Areas or the Shopping Center Property; (ii) the REA; or (iii) this Declaration ("**Common Area Default(s)**"), AUL is hereby granted the right, but not the obligation, on behalf of Dikeou to cure any Common Area Defaults. Dikeou hereby irrevocably appoints AUL as Dikeou's attorney-in-fact to allow, but not obligate, AUL to enforce the provisions of the REA and this Declaration and any other action required to cure any Common Area Defaults of Dikeou under the Leases, including the right, but not the obligation, to advance any funds and take any action to cure such Common Area Defaults, including, without limitation, the right to go onto the Shopping Center Property to make necessary repairs and carry out Dikeou's obligations under the REA and this Declaration. Dikeou hereby agrees to reimburse AUL for and fully indemnify, defend and hold AUL harmless from and against any claims, actions, causes of action, damages, costs or expenses, including reasonable attorneys' fees and costs arising out of or relating to (i) AUL's expenditures to cure such Common Area Defaults and enforcement of the provisions under the REA and this Declaration, together with interest thereon at the rate of 8.75% per annum, accruing from the date expended by AUL until paid; and (ii) any claims of bodily injury or death or of property damage by any person arising from or relating to the use or occupancy of the Common Areas or AUL's enforcement of this Declaration.

10. <u>Amendment to Legal Description of Parcels after Slab Installation.</u> The legal descriptions used for <u>Parcel 1, Parcel 2 and Parcel 3</u> are currently unimproved. Dikeou will obtain surveys for Parcel 1, Parcel 2 and Parcel 3 when the slabs for them have been located and poured. Dikeou will have the surveyor certify whether or not the legal description of the actual locations of the slabs, the leased premises under the Leases and the building pads as required in the Leases for each Parcel ("**Footprint**") are totally contained within the legal description of the respective Parcels. If the Footprint for any Parcel is not totally contained within the description for that Parcel, Dikeou and any Benefited Party agree, at Dikeou's expense (including any expenses to AUL) including, without limitation AUL's attorneys' fees and costs and cost of title insurance mentioned below, to execute and record a modification of this Declaration correcting the legal description for the affected Parcel or Parcels. The modification shall be executed by Dikeou and the Benefited Parties and recorded within thirty (30) days of the slab being poured. This shall be done each time and at the time a slab is poured for a particular Parcel whether or not the slab has been poured for any of the other Parcels. When the Footprints and revised legal descriptions for any of the Parcels are identified and the Declaration modified as provided above, Dikeou will promptly notify and obtain from the Orange County Property Appraiser a revised tax parcel or parcels properly reflecting separate tax parcels with the revised legal descriptions of the new Footprints for affected parcels.

11. <u>Easements, Restrictions and Covenants to Run With the Land and Binding Effect</u>. The easements, restrictions and covenants hereby granted and imposed hereby and the agreements herein contained shall be easements, restrictions and covenants running with the land, shall touch and concern the land and be appurtenant to the lands

C:\DOCUME~1\WOODSO~1.CRI\LOCALS~1\Temp\notes02C5CD\Declaration of Easement and Restrictions V8.doc

- 4 -

affected, shall inure to the benefit of and be binding upon Dikeou and the Benefited Parties and the respective heirs, devisees, personal representatives, successors and assigns, as the case may be, including without limitation all subsequent owners, tenants and occupants of the Shopping Center Property, Common Areas and the Parcels and all persons claiming by, through or under them.

12.    **Termination upon Mortgage Payoff.** Dikeou, AUL and any other Benefited Party and any other person that may claim any benefit or rights under this Declaration hereby acknowledge and agree that notwithstanding anything in this Declaration to the contrary, this Declaration, and all easements, covenants, restrictions and other terms set forth herein, shall expire, become null and void and be of no further effect whatsoever if and only if AUL (i) receives voluntary full payment of all indebtedness secured or intended to be secured by the AUL Mortgage; and (ii) executes and records a satisfaction of the AUL Mortgage. Except as set forth in paragraph 8 above, no other event shall terminate this Declaration and the easements, restrictions, covenants and agreements hereunder including, without limitation, any foreclosure or deed in lieu of foreclosure of the AUL Mortgage or by operation of law or otherwise.

13.    **Injunctive Relief/Cumulative Remedies.** In the event of any threat and violation hereunder any of the Benefited Parties shall have the right to enjoin such violation or threat and violation in a court of competent jurisdiction. This right of injunctive relief shall be in addition to all the remedies available under statute, law or equity available to the Benefited Parties to enforce the terms hereof, including, without limitation, the right to seek a money judgment for amounts due hereunder.

14.    **Not a Public Dedication.** Nothing herein contained shall be deemed to be a gift or dedication of any portion of the properties described herein to the general public or for the general public or for any public purpose whatsoever.

15.    **Governing Law.** This Declaration shall be construed and interpreted in accordance with the laws of the State of Florida.

16.    **Notice.** All notices provided for herein to be given to Dikeou shall be given in writing to be personally delivered or mailed by registered or certified mail, postage pre-paid, return receipt requested to 502 North Highway 12-92, Suite 100, Longwood, Florida 32650, or at such other address as may be specified in written notice. Any communications so mailed shall be deemed delivered within three business days after mailing.

17.    **Attorneys' Fees.** If Dikeou or any of the Benefited Parties are required to enforce any of the terms and conditions of this Declaration or of the REA, the prevailing party shall be entitled to recover reasonable costs, charges and expenses, including their attorneys' fees and costs incurred in connection therewith and time charged by legal assistants and by other staff members operating under the supervision of an attorney, and such other legal costs as may be expended and incurred in connection therewith, whether at trial, in negotiation or on appeal, in bankruptcy, creditors' reorganization proceedings or collection.

Received   08-01-2005   12:51pm        From-40783045D2              To-Katz Barron Squitero    Page 008

18.    **Severability.** If any term or provision of this Declaration or the application thereof by any person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Declaration or the application of such term or provision to persons or circumstances other than those as to which it is invalid or unenforceable shall not be affected thereby and each term or provision of this Declaration shall be valid and shall be enforced to the fullest extent permitted by law.

19.    **Conflicts with Leases.** Nothing in this Declaration is intended to modify any of the terms of the Leases and the terms of the Leases shall govern to the extent of any conflict with this Declaration.

Witnesses:

Print Name: Allison McDermott

Print Name: Edward Holland

Deno P. Dikeou

STATE OF FLORIDA

COUNTY OF ORANGE

The foregoing instrument was acknowledged before me this 17th day of May, June 2005 by Deno P. Dikeou who:

[    ]        Is personally known to me; or

[  ✓  ]        Produced as identification: FL DR/UL/S L/C



Teri Michelle Jones
Commission # DD414798
Expires April 11, 2009
Bonded Troy Fain · Insurance, Inc. 800-385-7019

Notary Public, State of Florida
Print Name:

[NOTARY SEAL]

scription: Orange,FL Document-Book.Page 8046.1183 Page: 6 of 29
der: 40240645 Comment: update copies

The undersigned Tenant hereby consents to the terms of this Declaration. Consents by Tenants can be executed in counterparts and permission is hereby given to detach this Consent page and attach to the original Declaration executed by Dikeou to constitute one complete original that may be recorded.

Witnesses:

Kohl's Department Stores, Inc.

APPROVED
AJS

Print Name: *Shirley Lamerond*

By: _____
Print Name:  James T. McPhail
Its:  Senior V.P. of Property Development

Print Name: *Pamela Erdman*

STATE OF WISCONSIN

COUNTY OF WAUKESHA

The foregoing instrument was acknowledged before me this _16th_ day of June, 2005 by _James T. McPhail_ as _Sr. V.P. of Pro. Dev_ of Kohl's Department Stores, Inc., a _Delaware_ corporation, on behalf of the corporation who:

[ X ]        Is personally known to me; or

[   ]        Produced as identification: _____

Notary Public, State of _Wisconsin_
Print Name: _April A. Bargar_

[NOTARY SEAL]

APRIL A. BARGAR
NOTARY
PUBLIC
STATE OF WISCONSIN

- 7 -

Received    00-01-2008    12:31pm    From-4078304502    To-Katz Barron Squitero    Page 010

The undersigned Tenant hereby consents to the terms of this Declaration. Consents by Tenants can be executed in counterparts and permission is hereby given to detach this Consent page and attach to the original Declaration executed by Dikeou to constitute one complete original that may be recorded.

Witnesses:

Circuit City Stores, Inc.

Print Name: Aimee Poypster

By: _____

Print Name: Michael E. Foss

Its: EVP and Chief Financial Officer

Print Name: Monique Scott

STATE OF VIRGINIA

COUNTY OF HENRICO

The foregoing instrument was acknowledged before me this 15th day of May, 2005 by Michael E. Foss as EVP and Chief Financial Officer of Circuit City Stores, Inc., a Virginia corporation, on behalf of the corporation who:

[X]    Is personally known to me; or

[    ]    Produced as identification:

_____

Notary Public, State of Virginia

Print Name: Joyce C. Woodson

[NOTARY SEAL]

My Commission Expires May 31, 2007

- 8 -

## EXHIBIT A

A parcel of land lying in Section 22, Township 22 South, Range 31 East, and Section 27, Township 22 South, Range 31 East, Orange County, Florida, more particularly described as follows:

Commence at the Southwest Corner of the Southwest ¼ of Section 22, Township 22 South, Range 31 East; run North 89 degrees 21 minutes 32 seconds East along the South line of said Southwest ¼, a distance of 691.35 feet to the Southwest Corner of the East ¾ of the Southwest ¼ of said Section 22, said point also being the Point of Beginning; thence departing said South line, run North 00 degrees 26 minutes 35 seconds West along the West line of the East ¾ of said Southwest ¼, a distance of 1252.89 feet to the Northwest Corner of the East ¾ of the South ½ of the Southwest ¼ of said Section 22; thence departing said West line, run North 88 degrees 40 minutes 33 seconds East along the North line of the South ½ of the Southwest ¼ of said Section 22, a distance of 683.05 feet to a point on the West right of way line of Alafaya Trail, as recorded in Official Records Book 3409, page 1329, and in Plat Book 45, pages 113-114 per the public records of Orange County, Florida; thence departing said North line, run the following courses and distances along said Westerly right of way line; thence South 00 degrees 50 minutes 32 seconds East, a distance of 386.13 feet to the Point of Curvature of a curve, concave Northeasterly, having a central angle of 27 degrees 57 minutes 17 seconds and a radius of 1868.00 feet; thence run Southeasterly along the arc of said curve, a distance of 911.40 feet to a point on the South line of the Southwest ¼ of said Section 22; thence continue along said right of way line and said curve, through a central angle of 01 degrees 55 minutes 06 seconds, an arc distance of 62.54 feet to the Point of Tangency; thence run South 30 degrees 42 minutes 55 seconds East, a distance of 452.87 feet to the most Northerly Corner of Tract 1, WATERFORD LAKES HOME DEPOT as described in Plat Book 45, pages 113-114 per the public records of Orange County, Florida; thence departing said right of way line run South 59 degrees 17 minutes 05 seconds West, along the Northerly line of said Tract 1 a distance of 373.87 feet; thence run South 30 degrees 42 minutes 55 seconds East, a distance of 52.11 feet; thence run South 59 degrees 17 minutes 05 seconds West, a distance of 295.08 feet; thence run South 30 degrees 42 minutes 55 seconds East, a distance of 84.69 feet; thence run South 59 degrees 17 minutes 05 seconds West, a distance of 363.94 feet to the Northwest Corner of Tract 2, aforementioned Tract 1, said point also lying on the Easterly line of Tract 2, WATERFORD LAKES HOME DEPOT as described in Plat Book 45, pages 113-114 per the public records of Orange County, Florida ; thence run North 30 degrees 42 minutes 55 seconds West, a distance of 686.60 feet to a point on the West line of the East ¾ of the Northwest ¼ of Section 27, Township 22 South, Range 31 East; thence run North 00 degrees 22 minutes 32 seconds West along said West line, a distance of 488.37 feet to the Point of Beginning.

AND ALSO:

Commence at the Northwest Corner of the Northwest Quarter of Section 27, Township 22 South, Range 31 East; run North 89 degrees 21 minutes 32 seconds East along the North line of said Northwest Quarter a distance of 1601.08 feet to a Point on the West right of way line of Alafaya Trail, as recorded in Official Records Book 3409, page 1329

C:\DOCUME~1\WOODEO~1.CDN\LOCALS~1\Temp\notes82C72CD\Declaration of Easement and Restrictions V8.doc

- 9 -

of the public records of Orange County, Florida, said point being on a curve, concave Northeasterly, having a central angle of 01 degrees 55 minutes 06 seconds and a radius of 1868.00 feet; thence departing said North line, run the following courses and distances along said West right of way line: thence from a tangent bearing of South 28 degrees 47 minutes 50 seconds East, run Southeasterly along the arc of said curve, a distance of 62.54 feet to the point of tangency; thence South 30 degrees 42 minutes 55 seconds East, a distance of 524.897 feet to the Point of Beginning; thence continue South 30 degrees 42 minutes 55 seconds East, a distance of 508.25 feet to the point of curvature of a curve, concave southwesterly, having a central angle of 03 degrees 38 minutes 25 seconds and a radius of 1732.00 feet; thence run Southeasterly along the arc of said curve, a distance of 110.04 feet to a point on the Northerly right of way line of the East-West Expressway; thence run South 24 degrees 39 minutes 56 seconds West, along the North right of way line of the East-West Expressway as recorded in Official Records Book 4081, page 3445, a distance of 190.80 feet; thence along said right of way line South 59 degrees 41 minutes 25 seconds West for a distance of 164.49 feet; thence departing said Northerly right of way line run North 30 degrees 42 minutes 55 seconds West along the Westerly boundary line of Tract 1, WATERFORD LAKES HOME DEPOT per Plat Book 45, pages 113-114 per the aforementioned public records for a distance of 725.43 feet; thence run North 59 degrees 17 minutes 05 seconds East a distance of 325.00 feet to the Point of Beginning. Containing 5.21 acres (226,025 square feet) more or less.

TOGETHER WITH that certain Reciprocal Easement and Operating Agreement recorded September 24, 1999 in Official Records Book 5845, page 1099 of the public records of Orange County, Florida.

LESS AND EXCEPT a parcel of land lying in the Northwest Quarter of Section 27, Township 22 South, Range 31 East, Orange County, Florida, being more particularly described as follows:

Commence at the Northwest Corner of the Northwest Quarter of Section 27, Township 22 South, Range 31 East, Orange County, Florida; thence run North 89 degrees 21 minutes 32 seconds East, along the North line of said Northwest Quarter, a distance of 1601.08 feet to a point on the Westerly right of way line of Alafaya Trail, as recorded in Official Records Book 3409, page 1329 of the public records of Orange County, Florida, said point also being on a curve, concave Northeasterly, having a central angle of 01 degrees 55 minutes 06 seconds and a radius of 1868.00 feet; thence from a tangent bearing of South 28 degrees 47 minutes 50 seconds East, run Southeasterly along the arc of said curve and said right of way line, a distance of 62.54 feet to the point of tangency; thence continue along said right of way line, South 30 degrees 42 minutes 55 seconds East, a distance of 524.89 feet; thence departing said right of way line run South 59 degrees 17 minutes 05 seconds West a distance of 325.00 feet; thence South 30 degrees 42 minutes 55 seconds East a distance of 669.45 feet; thence run North 59 degrees 17 minutes 05 seconds East, a distance of 1.67 feet for a Point of Beginning; thence continue North 59 degrees 17 minutes 05 seconds East a distance of 21.00 feet; thence South 75 degrees 42 minutes 55 seconds East a distance of 8.20 feet; thence South 30 minutes 55 seconds East a distance of 23.70 feet; thence South 59 degrees 17 minutes 05 seconds West a distance of 26.80 feet; thence North 30 degrees 42 minutes 55 seconds West a distance of 29.50 feet to the Point of Beginning. Containing 0.02 acres more or less.

C:\DOCUME~1\WOOD60~1.CIR\LOCALS~1\Temp\notes92CECD\Declaration of Easement and Restrictions V8.doc

- 10 -

Received    08-01-2008    12:51pm    From-407830450Z    To-Katz Barron Squitero    Page 013

## EXHIBIT B

### Parcel #1

A parcel of land lying in Section 27, Township 22 South, Range 31 East, Orange County, Florida, more particularly described as follows:

Commence at the Northwest Corner of the Northwest ¼ of Section 27, Township 22 South, Range 31 East; run North 89 degrees 21 minutes 32 seconds East, along the North line of said Northwest ¼ a distance of 691.35 feet to the Northwest Corner of the East ¼ of the Northwest ¼ of said Section 27; thence run South 00 degrees 22 minutes 32 seconds East along the West line of the East ¼ of Northwest ¼ of said Section 27, a distance of 488.37 feet; thence departing said West line run South 30 degrees 42 minutes 55 seconds East, a distance of 127.92 feet; thence run North 59 degrees 17 minutes 05 seconds East a distance of 41.47 feet to the Point of Beginning; thence continue North 59 degrees 17 minutes 05 East, a distance of 248.00 feet; thence run South 30 degrees 42 minutes 55 seconds East, a distance of 385.00 feet; thence run South 59 degrees 17 minutes 05 seconds West, a distance of 117.00 feet; thence run North 30 degrees 42 minutes 55 seconds West, a distance of 65.00 feet; thence run South 59 degrees 17 minutes 05 seconds West, a distance of 131.00 feet; thence run North 30 degrees 42 minutes 55 seconds West, a distance of 320.00 feet to the Point of Beginning. Subject parcel contains 1.996 acres or 86,965 square feet more or less.

### Parcel #2

A parcel of land lying in Section 27, Township 22 South, Range 31 East, Orange County, Florida, more particularly described as follows:

Commence at the Northwest Corner of the Northwest ¼ of Section 27, Township 22 South, Range 31 East; run North 89 degrees 21 minutes 32 seconds East along the North line of said Northwest ¼, a distance of 691.35 feet to the Northwest Corner of the East ¼ of the Northwest ¼ of said Section 27; thence run South 00 degrees 22 minutes 32 seconds East along the West line of the East ¼ of Northwest ¼ of said Section 27, a distance of 488.37 feet; thence departing said West line run South 30 degrees 42 minutes 55 seconds East, a distance of 513.08 feet; thence run North 59 degrees 17 minutes 07 seconds East a distance of 116.14 feet to the Point of Beginning; thence continue North 59 degrees 17 minutes 07 seconds East, a distance of 185.33 feet; thence run South 30 degrees 42 minutes 53 seconds East a distance of 173.33 feet; thence run South 59 degrees 17 minutes 07 seconds West, a distance of 213.33 feet; thence run North 30 degrees 42 minutes 53 seconds East, a distance of 54.33 feet; thence run North 39 degrees 13 minutes 02 seconds East, a distance of 29.81 feet; thence run North 30 degrees 42 minutes 53 seconds West, a distance of 107.78 feet to the Point of Beginning. Subject parcel contains 0.776 acre or 33,816.50 square feet more or less.

C:\DOCUME~1\WOODMO~1.CIK\LOCALS~1\Temp\notes32C3CD\Declaration of Easement and Restrictions VE.doc

To:Katz Barron Saulcero    Page 014        From-40783040502    12:51pm    08-01-2006    Received

## Parcel #3

A parcel of land lying in Section 22, Township 22 South, Range 31 East, and Section 27, Orange County, Florida, more particularly described as follows:

Commence at the Southwest Corner of the Southwest ¼ of Section 22, Township 22 South, Range 31 East; run North 89 degrees 21 minutes 32 seconds East along the South line of said Southwest ¼, a distance of 691.35 feet to the Southwest Corner of the East ¾ of the Southwest ¼ of said Section 22; thence run North 00 degrees 26 minutes 35 seconds West along the West line of the East ¾ of Southwest ¼ of said Section 22, a distance of 455.39 feet; thence departing said West line run North 89 degrees 33 minutes 25 seconds East, a distance of 43.59 feet to the Point of Beginning; thence run North 00 degrees 50 minutes 32 seconds West, a distance of 236.84 feet; thence run North 89 degrees 09 minutes 28 seconds East, a distance of 190.00 feet; thence run South 00 degrees 50 minutes 32 seconds East, a distance of 236.84 feet; thence run South 89 degrees 09 minutes 28 seconds West, a distance of 190.00 feet to the Point of Beginning. Subject parcel contains 1.03 acres or 45,000 square feet more or less.

C:\DOCUMS~1\WOODSO~1.CIR\LOCALS~1\Temp\notesJ3CC\Declaration of Easement and Restrictions VB.doc

Description: Orange,FL Document-Book.Page 8046.1183 Page: 12 of 296
Order: 40240645 Comment: update copies

# EXHIBIT C

## [1 page – Site Plan]

- 13 -

C:\DOCUME~1\WOODED~1.CB\LOCALS~1\Temp\notes33C5CD\Declaration of Easement and Restrictions V8.doc

Description: Orange,FL Document-Book.Page 8046.1183 Page: 13 of 29
Order: 40240645 Comment: update copies



Book8046/Page1196    CFN#20050432596

scription: Orange,FL Document-Book.Page 8046.1183 Page: 14 of 29
der: 40340645 Comment: update copies

## EXHIBIT D

Following are redacted provisions of the Kohl's Lease which, together with other provisions of the Kohl's Lease affecting the Common Areas, pursuant to this Declaration, are imposed on the Shopping Center Property in accordance with this Declaration and other provisions:

**WHEREAS**, Landlord desires to lease to Tenant and Tenant desires to lease and rent from Landlord, upon the terms and conditions hereinafter set forth, the portion of the Land identified as "Tenant's Building Pad" on **EXHIBIT B** ("Tenant's Building Pad") and all appurtenant rights thereto, upon the terms and conditions hereinafter set forth; and

**WHEREAS**, Tenant's Building Pad is legally described [as Parcel ___ in Exhibit B] attached hereto and made a part hereof; and

\* \* \* \* \*

### ARTICLE I

### PREMISES AND TERM

**SECTION 1.1** Landlord hereby leases and demises unto Tenant and Tenant hereby leases and takes from Landlord, for the Term (as hereinafter defined), at the rental, and upon the terms, covenants and conditions hereinafter set forth, Tenant's Building Pad and all accessory improvements servicing Tenant's Building Pad, together with a non-exclusive right during the Term for the benefit of Tenant and Tenant's employees, customers, agents, licensees, concessionaires and invitees, to use in common with Landlord and all other occupants of the Shopping Center all of the Common Areas (as hereinafter defined) of the Shopping Center and all easements, rights, privileges and amenities otherwise appurtenant to the Land.

\* \* \* \* \*

### ARTICLE VI

### COMMON AREAS

**SECTION 6.1** At no cost or expense to Tenant (except to the extent provided in Section 6.3 hereof), Landlord shall police and maintain in good operating condition, order and repair at all times after the Premises are opened for business to the general public (and to keep in operation except as may be required to maintain in the required condition, order and repair), all Common Areas within the Shopping Center, including, but without limitation, repairing and replacing any surface paving whenever necessary, keeping the same properly drained and free of

- 14 -

C:\DOCUME~1\WDODSD~1.CIR\LOCALS~1\Temp\notes0BC3CD\Declaration of Easement and Restrictions VI.doc

snow, ice, water and rubbish and in a neat, clean, orderly and sanitary condition, providing adequate security in and for the Common Areas, maintaining suitable and adequate lighting in all Common Areas (and keeping same lighted during, and for at least one-half hour after, Tenant's business hours), maintaining such directional signs, markers and painted lines as may from time to time be necessary or proper for the control of parking and traffic in the Shopping Center and maintaining adequate access ways connecting all parking areas with the public streets abutting the Shopping Center.

SECTION 6.2  Landlord hereby grants to Tenant, during the term of this Lease, for the benefit of Tenant, Tenant's licensees and concessionaires, and their respective officers, agents and employees, and their respective customers, invitees, business guests and visitors, the non-exclusive right to use, for their intended purposes, all of the Common Areas as such areas may be constituted from time to time.  Landlord hereby reserves for the benefit of Landlord, its tenants and the licensees and concessionaires of its tenants and their respective officers, agents, employees, customers, invitees, business guests and visitors, the non-exclusive right to use, for their intended purposes, all of the Common Areas of Tenant's Tract, as such areas may be constituted from time to time.  The rights hereby granted and reserved with respect to the Common Areas shall constitute easements appurtenant to the Premises and servitude upon the Land.  The benefit and the burden of such easements shall run with and bind the Land.

\* \* \* \* \*

SECTION 7.3

(b)    In addition, Landlord shall, as part of Landlord's Work, erect internally illuminated freestanding signs at the locations set forth on EXHIBIT B, which freestanding signs may not be altered or modified by Landlord without the prior written approval of Tenant, which approval shall not be unreasonably withheld.  Except for the freestanding signs identified in EXHIBIT B, Landlord shall not erect any freestanding tenant identification signs in any other locations within Parcel 7.

\* \* \* \* \*

ARTICLE XVIII

CONDEMNATION

- 15 -

C:\DOCUME~1\WOODS O-1.CIR\LOCALS~1\Templates\32CJCD\Declaration of Easement and Restrictions VI.doc

scription: Orange,FL Document-Book.Page 8046.1123 Page: 16 of 29
:der: 40240645 Comment: update copies

Received    08-01-2006    12:51pm    From-40783045O2    To-Katz Barron Squitero    Page 018

**SECTION 18.3** Upon a Taking of a portion of the parking areas located upon Tenant's Tract which shall result in a reduction of ten percent (10%) or more of the then existing total number of parking spaces upon Tenant's Tract or upon a Taking of a portion of the parking areas located upon the Shopping Center which results in the Shopping Center having less than four (4) parking spaces per one thousand (1,000) square feet of Floor Area of all improvements in the Shopping Center, then in any such event Tenant shall have the right to terminate this Lease effective as of the date of such Taking by serving notice to that effect upon Landlord no later than thirty (30) days after the vesting of title to the condemned property; provided, however, Landlord may nullify Tenant's termination of this Lease if either (i) Landlord delivers written notice to Tenant within ten (10) days after the date of Tenant's termination notice that Landlord intends to demolish sufficient improvements or purchase additional land to meet the parking ratio required in this Section 18.3 and if Landlord promptly thereafter demolishes such improvements, or (ii) prior to the date on which the existing parking is taken by the condemning authority, Landlord is able to reconfigure Tenant's Tract or the Shopping Center in a manner that is reasonably acceptable to Tenant to provide the number of parking spaces that is required under this Section 18.3.

\* \* \* \* \*

C:\DOCUME~1\WOOD30~1.CIR\LOCALS~1\Temp\notes390ACF\Declaration of Easement and Restrictions VR.doc

scription: Orange,FL Document-Book.Page 9046.1183 Page: 17 of 29
der: 40240645 Comment: update copies

# EXHIBIT E

Following are redacted provisions of the Circuit City Lease which, together with other provisions of the Circuit City Lease affecting the Common Areas, pursuant to this Declaration, are imposed on the Shopping Center Property in accordance with this Declaration and other provisions:

2. **Development of Shopping Center by Landlord.** Landlord covenants to construct, develop and operate a first-class shopping center. The location of buildings and other tenant space will only be within the "Permissible Building Areas" designated on the Site Plan, and Landlord shall cause all improvements in the Shopping Center to be constructed in a good and workmanlike manner and lien-free (except with respect to any mortgage). Landlord hereby agrees to indemnify, defend and hold Tenant harmless from any loss or damage suffered by Tenant as a result of such construction. No construction in the Shopping Center shall interfere with the conduct of Tenant's business.

\* \* \* \* \*

The parking ratio for the Shopping Center shall be at least as shown thereon, but in no event shall said ratio be less than the greater of (i) five (5.0) spaces (no less than nine (9) feet wide and for full-sized automobiles) per 1,000 square feet of gross leasable area, or (ii) that required by applicable zoning requirements, without variance. All parking shall be at ground level. If Landlord fails to maintain the above required parking ratio within three hundred (300) feet of the Building (except for a de minimus reduction, i.e. number and location of reduced spaces inconsequential to Tenant), Tenant shall, in addition to any other remedy available to Tenant under this Lease, at law or in equity, including specific performance, have the right to pay Base Rent (as defined below) in lieu of that provided for herein at the rate of one-half (1/2) of the fixed minimum rent, together with one-half (1/2) of all other charges otherwise payable under this Lease, until such time as the above-specified parking ratio is maintained; provided, Tenant has first delivered to Landlord notice of Landlord's violation of such parking ratio requirements and Landlord has failed to cure same within ten (10) days following receipt of Tenant's notice. Landlord shall not commence construction of any buildings abutting the Building without first having obtained Tenant's approval (not to be unreasonably withheld) as to the exterior plans and specifications for such adjacent buildings, including method of connection to the Building and footings.

\* \* \* \* \*

6. **Easements.** Landlord also grants to Tenant those nonexclusive leasehold easements over Landlord's Premises as are useful and appropriate for the construction, operation and maintenance of the Premises during the Term, including but not limited to:

C:\DOCUME~1\WOODSO~1\CDR\LOCALS~1\Temp\notes32C5CD\Declaration of Easement and Restrictions V8.doc

- 17 -

Received    06-01-2006    12:51pm    From-407830450Z    To-Katz Barron Squitero    Page 021

**6.1** **Construction Easements** . Landlord hereby grants to Tenant . . . (ii) an easement to permit the Building to abut adjacent buildings, and the foundations, footings, common walls and roof projections to bear structurally upon Landlord's Premises, (iii) an easement for such additional underground, public or private utility or cable, fiber optic or other easements as Tenant deems necessary, without unreasonably interfering with the use by Landlord of the Common Areas, for the benefit of the Premises. For the purpose of exercising the rights granted in this paragraph 6, Tenant and/or the utility or other service provider shall have the right to enter upon and use the Common Areas to install the utility systems, to such extent and so long as reasonably necessary to accomplish such purpose, subject to restoration of the Common Areas following such installation, and any other reasonable conditions and requirements imposed by Landlord for the benefit of the Premises.

**6.2** **Common Area Easements**. Landlord grants to Tenant a "Common Area Easement" to use the Common Areas for their intended purposes and to permit Tenant and its employees, agents, subtenants, assignees, licensees, suppliers, customers and invitees to use the Common Areas for the purposes (without limitation) of parking and pedestrian, service and vehicular access, ingress and egress to, from and between the Premises and Landlord's Premises and the streets and highways abutting and adjacent to the Shopping Center, without payment of any fee or other charge. Tenant shall have the right (to the extent permitted by applicable laws) to install up to four (4) cart corrals within the parking area located in "Tenant's Preferred Area" shown on the Site Plan (or other mutually agreeable location), and Tenant shall be permitted to store its shopping carts outside of the Premises in such cart corrals, subject to governmental approvals for such cart corrals. Tenant agrees to use reasonable efforts to periodically remove its shopping carts from the Common Areas. Tenant shall also have the exclusive right to use the three (3) automobile loading spaces immediately adjacent to the Premises as shown on the Site Plan for customer pick up/loading purposes and those six (6) parking spaces labeled "Car Stereo Parking" located at the rear of the Building as shown on the Site Plan for parking relating to Tenant's car stereo installation service, as well as the right to use a portion of the parking spaces within Tenant's Preferred Area for seasonal and promotional demonstrations customary to Tenant's business operations, subject to the terms of the REA. Any reduction of parking spaces due to Tenant's use of cart corrals shall not constitute a violation by Landlord of the parking ratio requirement set forth in this Lease and Tenant shall be estopped from claiming such a violation.

\* \* \* \* \*

**7.** **Common Areas and Common Area Maintenance.**

**7.1    Definition of Common Areas.** The term "Common Areas" shall be defined to include the parking areas, lanes, drives, entrances, truck passageways, sidewalks, curbs, ramps, stairways, landscaped and other unpaved areas, parking lot lighting facilities and equipment, Landlord's pylon sign(s), directional, traffic and monument sign structure(s) and shared utility facilities located in all elements of the Shopping Center (including any such areas and facilities contained within outparcels and adjacent tracts but reserved for the benefit of the Shopping Center occupants) and which are intended and available for the common use of all of the tenants within the Shopping Center (including any outparcel and other adjacent occupants which contribute toward "CAM Charges" (as defined below) and which are not responsible for separate maintenance of such outparcels or tracts), their subtenants, licensees, and business invitees. Landlord shall operate, maintain, repair and replace the Common Areas in a first-class manner, including, without limitation, sweeping and cleaning, maintenance of Landlord's pylon and other sign structure(s), towers, including traffic directional signs, markers, bumpers and lines and informational signs, snow removal and ice treatment, removal of Common Area trash, debris and garbage, lighting (including lighting, maintenance and repair of pylon and monument signage and Common Areas), repairing, repaving and restriping the parking area, and maintaining, replanting and replacing landscaping and sprinkler systems, storm drains, sewers and other utility lines and facilities not dedicated to the public or owned by a private utility company, which are necessary for the operation of the Shopping Center, customary and reasonable security services provided to the Shopping Center, independent contractors providing to the Common Areas services contemplated herein, providing of utilities to the Common Areas (including electricity, water and lift station), and maintaining all insurance, including deductibles, required under this Lease to be maintained by Landlord, all such work to be referred to collectively as "Common Area Maintenance".

* * * * *

**7.4    Examination of Landlord's Records.** . Tenant shall have the right, once as to any CAM Year and no later than two (2) years after the end of such CAM Year, to examine and make copies of the records pertaining to CAM Charges for such CAM Year. If the examination discloses any overcharge by Landlord, which Landlord does not successfully refute within ten (10) days, Landlord shall reimburse Tenant within thirty (30) days for any overpayment of Tenant's Pro Rata Share of CAM Charges; and if such overpayment by Tenant is in excess of four percent (4%) of the actual Tenant's Pro Rata Share of CAM Charges, Landlord shall reimburse Tenant for the actual cost of such examination or audit, including, but not limited to, reasonable travel expenses, together with interest thereon at the Default Rate (hereinafter defined) from the date paid by Tenant until reimbursement, not to exceed $2,000.00.

- 19 -

C:\DOCUME~1\WOODSO~1.CIR\LOCALS~1\Temp\notes32C5CD\Declaration of Easement and Restrictions V6.doc

* * * * *

8.    Signs and Communications Equipment.

8.1    Signs.    No later than the date set forth in the Site Design Requirements, Landlord, at its sole cost and expense, shall construct and install upon the Common Areas substantially at the location shown on the Site Plan. a pylon sign structure (with electrical wired box installed) having sufficient space thereon in the second tenant position for inclusion of doublesided "face panels" identifying Tenant's store, which face panels shall be constructed and installed at Tenant's sole cost and expense. If at any time during the Term there becomes available a face panel on any of the Shopping Center pylon or monument signs which would permit Tenant's presence in the Shopping Center to be designated in a higher pylon or monument panel position, then Tenant shall have the right to relocate its pylon or monument sign panel to such higher sign position.    The pylon sign structure and Tenant's signage shall be constructed in accordance with the Site Design Requirements. Tenant, its successors, subtenants and assigns shall be entitled without Landlord's consent, but subject to governmental requirements. to replace all of its signs with signage consistent with Tenant's (or its successors' subtenants' or assigns') then-current prototypical sign plans.    Notwithstanding the foregoing, in the event The Sports Authority executes a lease with Landlord for premises within the Shopping Center prior to the Effective Date, The Sports Authority may elect to utilize the second tenant position for its face panels on the pylon sign, whereupon Tenant shall be entitled to utilize the third position thereon.

* * * * *

14.    Insurance.

14.1    Property Damage.    Landlord shall not construct, or permit to be constructed, any improvement in the Shopping Center, nor conduct or permit the conduct of any activity in the Shopping Center, which will prevent Tenant from being able to obtain insurance coverage at commercially reasonable rates.    Should Landlord cause or permit any insurance rate increase to occur, Landlord will reimburse Tenant for the additional premium required, subject to Tenant's right to self-insure (in which event Landlord will contribute to Tenant's self-insurance fund to cover increased actuarial risks).

14.2    Liability Insurance.    The limits of such commercial general liability policy shall be not less than $3,000,000.00 each occurrence, with a commercially reasonable deductible, which minimum amount shall be increased by Tenant upon reasonable request of Landlord at the commencement of the first Option Term to then industry standards, not to exceed ten percent (10%) of such minimum.

C:\DOCUME~1\WOODSO~1.CIR\LOCALS~1\Temp\notes32C5CD\Declaration of Easement and Restrictions V8.doc

- 20 -

* * * *

### 14.5 Common Area, Landlord's Premises and Third Party Tenant Insurance and Insurance During Landlord's Construction

During the Term, Landlord shall keep in full force and effect, in form reasonably acceptable to Tenant, policies of (1) commercial general liability insurance, and (2) property insurance insuring against loss or damage by fire and the perils insured under standard "all risk" or ISO "special causes of loss form" coverage over the Common Areas, and shall either cause to be insured or directly insure with substantially similar policies the remainder of Landlord's Premises such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever, Tenant may be assured that the Shopping Center will be reconstructed in equal or superior condition within the time frame set forth in paragraph 15. Said policies shall name Tenant, and any lender, investor or other stakeholder which is designated by Tenant from time to time, as an additional insured to the fullest extent Tenant and such stakeholder have insurable interests. The limits of such policies shall be the same as those set forth in subparagraphs 14.1 and 14.2 above, as applicable. The premiums for coverages relating to Common Areas (which coverage may include the improvements within the Shopping Center, including the Building, to the extent Landlord's policy insures same), as well as deductible amounts, shall be an element of CAM Charges, provided that Tenant shall not be liable for its pro rata share of any premium for coverage in excess of that coverage which is customary among owners of like shopping centers in the County. Any deductible amount for Common Area insurance coverage shall be reasonable in amount given the nature of the risk insured and probable frequency of claims made under such coverage, but in no event shall such deductible amount exceed $5,000 for Common Area liability coverage. During any period in which Landlord is conducting construction activities at the Shopping Center, Landlord shall keep, or cause its general contractor to keep, in full force and effect, with regard to the Shopping Center, in form reasonably acceptable to Tenant, at least the minimum insurance coverages set forth below:

(1)   Workers' Compensation - Statutory Limits; Employer's Liability - $500,000 each accident/disease;

(2)   Automobile Liability for all vehicles with limits of $3,000,000 each accident; and

(3)   Commercial General Liability to include premises operations and products/completed operations coverage with limits of $3,000,000 each occurrence.

### 14.6 Policy Provisions

All policies of insurance (other than self-insurance) shall be provided by insurance carriers with an A.M. Best rating of not less than A-VIII. Any insurance coverage may be effected by a blanket policy of insurance or under so-called "all risk" or

C:\DOCUME~1\WOODFO~1.CBA\LOCALS~1\Temp\notes32C5CD\Declaration of Easement and Restrictions V5.doc

- 21 -

"multi-peril" insurance policies, provided that the total amount of insurance available with respect to the Premises and Tenant's or Landlord's liability hereunder shall be at least the equivalent of separate policies in the amounts herein required, and provided further that in other respects any such policy shall comply with the provisions of this paragraph 14. Landlord shall not be entitled to self-insure against any of the risks recited herein, except the amount of any commercially reasonable deductible shall not be deemed to be self-insurance. An increased coverage or "umbrella" policy may be provided by either party to increase the coverage provided by individual or blanket policies in lower amounts, and the aggregate coverage provided by all such policies with respect to the limits required herein shall be satisfactory, provided that such policies otherwise comply with the provisions of this paragraph 14.

14.7    Waiver of Right of Recovery and Subrogation    To the extent that insurance proceeds are actually received in satisfaction of a loss which is required to be covered by insurance or is self-insured hereunder (with the deductible under any policy being deemed, for purposes of this paragraph only, to be self-insured), Landlord and Tenant waive any and all rights of recovery against each other for any loss or damage to the Premises or the contents contained therein, for loss of income on account of fire or other casualty, or for injury sustained on the Premises or the Common Areas, and each party's policies of insurance shall contain provisions recognizing this mutual release and waiving all rights of subrogation by the respective insurance carriers.

14.8    Evidence of Insurance    Subject to Tenant's right to self-insure, (i) upon commencement of the Main Term (as to property insurance), (ii) upon Delivery of the Land (as to liability insurance), and (iii) prior to expiration, Tenant and Landlord shall cause to be issued to each other in lieu of the original policy, a certificate of insurance executed by a duly authorized representative of each insurer and evidencing compliance with the applicable covenants of this paragraph 14. Each such certificate shall provide that coverage shall not be cancelled without thirty (30) days written notice to the certificate-holder (and any Mortgagee, if applicable).

14.9    Indemnities    Except if arising from the negligent or willful acts of Tenant or its agents or employees (to the extent that paragraph 14.7 is inapplicable), Landlord agrees to indemnify, defend and hold Tenant harmless from any and all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring in, on or around the Shopping Center, exclusive of the Premises, or other buildings within Landlord's Premises or resulting from the use by Landlord, its agents or employees.

\* \* \* \* \*

15.    Damages by Fire or Other Casualty.

- 22 -

C:\DOCUME~1\WOODSO~1.CIR\LOCALS~1\Temp\notes3B0A6D\Declaration of Easement and Restrictions V1.doc

ascription: Orange,FL Document-Book.Page 8046.1183 Page: 23 of 29
rder: 40240645 Comment: update copies

Received    08-01-2006    12:51pm    From-4078304502    To-Katz Barron Squitero    Page 026

**15.1** <u>First Thirteen Lease Years</u> In the event of an insured fire, earthquake or other casualty causing destruction or damage to the Improvements, Common Areas and/or remainder of Landlord's Premises during the first thirteen (13) Lease Years, this Lease shall not terminate except as expressly set forth herein, and Base Rent and other charges shall continue to be paid by Tenant pursuant to the terms of paragraph 4. Within a reasonable time after such casualty, subject to force majeure, applicable building codes, the procurement of building permits and the receipt of insurance proceeds (unless self-insured), Tenant shall complete reconstruction of the Building and Other Improvements, and Landlord shall complete reconstruction of the Common Areas and the remainder of Landlord's Premises (including substantially equivalent value in equipment, furniture and fixtures), to that condition existing immediately prior to such casualty, with, in event of any Tenant reconstruction, such alterations as may be permitted under paragraph 12. In the event, subject to force majeure, any of the foregoing restoration obligations are not substantially completed by the party obligated to do so within two hundred forty (240) days after receipt of any required governmental permits (for which permits and insurance proceeds the party with repair obligations shall make prompt application following such destruction or damage), then the other party at its option, by giving at least thirty (30) days' prior written notice to the party with repair obligations, may give written notice to the non-performing party after expiration of said two hundred forty (240) day period, and thereafter undertake completion of such reconstruction, in which event the non-performing party shall make available to the notifying party all insurance proceeds received by the non-performing party for such reconstruction (including any applicable deductible).

**15.2** <u>Last Two Lease Years</u>    In the event of an insured fire, earthquake or other casualty causing destruction or damage to the Improvements, Common Areas and/or the remainder of Landlord's Premises, during the last two (2) years of the Term, in the event the damage to the Premises is material (i.e. 20% or more of the Premises is damaged), or in the event of any casualty not covered by the insurance required to be maintained under this Lease, Tenant (and Landlord during any exercised Option Period) shall have the option of terminating this Lease. Tenant shall notify Landlord of its exercise of such option within sixty (60) days following the occurrence of such casualty and shall thereupon make available to Landlord (i) all insurance proceeds paid by Tenant's insurance carrier, or (ii) if self-insured, an amount equal to the reconstruction costs of the Improvements or, if the Improvements are not being reconstructed, an amount equal to the actual value of the Improvements (not to exceed, however, an amount equal to the reconstruction costs of the Improvements), to the extent such amounts would have been payable under the insurance outlined in paragraph 14.1 above. In the event Tenant (or Landlord, during any exercised Option Period) does not elect to terminate this Lease, then, subject to force majeure, within two hundred forty (240) days after receipt by Tenant of

C:\DOCUMD~I\WOODSD~I.CIR\LOCALS~I\Temp\notes32C5CD\Declaration of Easements and Restrictions V3.006

- 23 -

the required governmental permits for restoration, for which permits Tenant shall make prompt application following such destruction or damage, and insurance proceeds (if not self-insured) with regard to such damage or destruction. Tenant shall complete reconstruction of the Improvements to their condition existing immediately prior to such damage, in Tenant's reasonable discretion, with such alterations as may be permitted under paragraph 12, and shall restore the Premises (including equipment, furniture and fixtures). Should Tenant elect to maintain this Lease in full force and effect, Landlord shall reconstruct or cause to be reconstructed all Common Areas and the remainder of Landlord's Premises in the manner specified by subparagraph 15.1 above. Tenant may override any termination right exercised by Landlord as set forth above by exercising its next succeeding Renewal Option within thirty (30) days following receipt of Landlord's notice of termination.

* * * * *

16.   Condemnation.

16.1   Definition of Taking and Substantial Taking   For the purpose of this Lease, a "Taking" shall mean any condemnation or exercise of the power of eminent domain by any authority vested with such power or any other taking for public use, including a private purchase in lieu of condemnation by an authority vested with the power of eminent domain; the "Date of Taking" shall mean the earlier of the date upon which title to the Premises, the Shopping Center or any portion so taken is vested in the condemning authority or the date upon which possession of the Premises, the Shopping Center, or any portion is taken by the condemning authority; and "Substantially All of the Premises" shall mean (i) so much of the Improvements and/or Shopping Center and Common Areas as, when taken, leaves the untaken portion unsuitable, in Tenant's reasonable opinion, for the continued feasible and economic operation of the Premises by Tenant for the same purposes as immediately prior to such Taking or as contemplated herein, (ii) so many of the parking spaces within the Shopping Center as reduces the parking ratio within three hundred (300) feet of the Premises below the greater of five (5) spaces (no less than nine (9) feet wide for full-sized automobiles) per 1000 square feet of GLA or the parking ratio of the Shopping Center to be below that ratio which is required by the zoning ordinance applicable to the Shopping Center, and Landlord's failure to provide substantially equivalent alternative parking reasonably acceptable to Tenant within sixty (60) days after such Taking, or (iii) so much of the Common Area Easement described in paragraph 6 above that access to the Premises is impeded.

* * * * *

16.4   Landlord's Obligations Upon Any Taking   In the event of any Taking following which the Lease continues in effect, Landlord shall make or cause to be made all necessary restorations to all portions of the Common Areas and the remainder of Landlord's Premises

- 24 -

C:\DOCUME~1\WOODSO~1.CB\LOCALS~1\Temp\notes32C2CD\Declaration of Easement and Restrictions VR.doc

such that they constitute a complete architectural unit and serve the function originally intended, to the end the Shopping Center is reconstructed to its former condition within a reasonable time.

16.6 _Taking of the Pylon Sign(s)_ In the event of a taking, whether permanent or temporary, of any pylon or monument sign on which Tenant has installed identification panels, Landlord shall use its best efforts to provide if reasonably possible and subject to the requirements of governmental authorities with jurisdiction thereover, within ninety (90) days a substitute pylon or monument sign (reasonably acceptable to Tenant), with adequate electrical power, located so as to be visible to vehicular traffic or roadways adjacent to the Shopping Center and/or at entrances to the Shopping Center, at Landlord's sole cost, paid from the condemnation award.

* * * * *

18.3 _Prohibited Activities_ Landlord shall not operate or lease (or permit to be operated or leased) any building or tenant space in the Shopping Center for use as:

(A) all those prohibited uses set forth in Section 3.01 of the REA;

(B) a carnival, amusement park or circus;

(C) a gas station, except as permitted in the REA;

(D) service-oriented offices (such as, by way of example, medical or employment offices, travel agencies, real estate agencies or dry cleaning establishments) or other non-retail uses except for offices and storage facilities incidental to a primary retail operation within the buildings in-line with the Building (i.e. Kohl's and Retail H and their replacements);

(E) a banquet hall, auditorium or other place of public assembly within the buildings in-line with the Building (i.e. Kohl's and Retail H and their replacements);

(F) a training or educational facility (including, without limitation, a beauty school, barber college, reading room, school or other facility catering primarily to students or trainees rather than customers) within the buildings in-line with the Building (i.e. Kohl's and Retail H and their replacements);

(G) a facility for the sale or rental of used goods (including thrift shops, secondhand or consignment stores) or any facility selling new or used merchandise as a wholesale operation, a liquidation operation, odd lots, lot sales, factory close-outs or imperfect goods within the buildings in-line with the Building (i.e. Kohl's and Retail H and their replacements);

(H) residential facility within the buildings in-line with the Building (i.e. Kohl's and Retail H and their replacements).

In addition to the foregoing, Landlord shall not operate, lease or permit to be operated or leased any restaurant or bookstore within any building

- 25 -

C:\DOCUME~1\WOODSO~1.CIR\LOCALS~1\Temp\notes32C5C\Declaration of Easement and Restrictions V3.doc

Description: Orange,FL Document-Book.Page 8046.1183 Page: 26 of 29
Order: 40240645 Comment: update copies

within three hundred (300) feet of the front entrance to the Building. In addition, no auction, fire or going-out-of-business sale (other than court ordered) shall be conducted in the Shopping Center.

* * * * *

19.1.5 <u>Hazardous or Toxic Substances</u> Landlord has not used, discharged, dumped, spilled or stored any Hazardous Substances (as hereinafter defined) on or about the Shopping Center, whether accidentally or intentionally, legally or illegally, and has received no notice and has no knowledge that any such condition exists at the Shopping Center. If any claim is ever made against Tenant relating to Hazardous Substances present at or around the Shopping Center, whether or not such substances are present as of the Effective Date, or any Hazardous Substances are discovered at the Shopping Center (unless introduced by Tenant, its agents or employees), all costs of removal incurred by, all liability imposed upon, or damages suffered by, Tenant because of the same shall be borne by Landlord, and Landlord indemnifies and agrees to defend and hold Tenant harmless from and against all such costs, losses, liabilities and damages, including, without limitation, all third-party claims (including sums paid in settlement thereof, with or without legal proceedings) for personal injury or property damage and other claims, actions, administrative proceedings, judgments, compensatory and punitive damages, lost profits, penalties, fines, costs, losses, attorneys' fees and expenses (through all levels of proceedings), consultants or experts fees and all costs incurred in enforcing this indemnity. Landlord shall deliver the Land to Tenant free of any pollution or contamination from toxic or hazardous substances, asbestos or any other chemicals or substances in amounts which exceed standards for public health or welfare as established and regulated by any local governmental authority, the State or the United States Government (herein collectively referred to as "Hazardous Substances"). Landlord hereby grants Tenant and its agent access to the Premises and Shopping Center to enable Tenant to conduct such soil and environmental tests as it deems necessary.

The representation, warranty and indemnity of Landlord described in this paragraph 19.1.5 shall survive the termination or expiration of this Lease.

* * * * *

19.1.7 <u>Interference with Tenant's Reception/Transmission</u> Landlord shall not install and shall use reasonable efforts to not permit to be installed by any other tenant or other person anywhere in the Shopping Center, any structure or equipment which would cause any interference with satellite, radio, telecommunications or television reception or transmission in or from the Building. Tenant shall use reasonable efforts to not interfere with the communications equipment of other tenants of the Shopping Center.

* * * * *

20.    <u>Site Covenants</u>

C:\DOCUME~1\WOODSO~1.GTA\LOCALS~1\Temp\notes132C5CD\Declaration of Easement and Restrictions V8.doc

- 26 -

Landlord makes the following covenants (the "Site Covenants"):

20.1 <u>Building Height and Location</u>. No building adjacent to the Premises shall be taller than the top of the Building's parapet as shown on the elevations attached to the Site Design Requirements nor shall it be positioned so as to project beyond the portion of the front wall of the Building immediately adjacent. No outparcels, barriers, buildings, kiosks or other structures, either temporary or permanent, shall be located within Tenant's Preferred Area, and no building located on an outparcel in the Shopping Center shall exceed one story, twenty-five (25) feet in height (35 feet for spires, bell towers, clock towers, or flag pole which shall not be wider than 6 feet). No development shall occur within Parcel 7 of the Shopping Center and Tenant's Preferred Area (both as depicted on the Site Plan) except as shown on the Site Plan.

20.2 <u>Construction; Tenant's Preferred Area</u> Following the year 2005, no exterior construction and no construction staging shall be permitted in Parcel 7 of the Shopping Center during the months of October, November and December, except for emergency repairs and restoration following casualty. In the event of any construction within the Shopping Center, Landlord shall designate a construction access route, staging and parking areas located so as to minimize interference with customers or the operations of other occupants of the Shopping Center and shall require erection of safety barriers as necessary and fences or other devices around the site of such construction of a size and as necessary to screen such construction from ground level view within Parcel 7 and ensure the safety of all persons within the Shopping Center with respect to such construction. With regard to any construction on Landlord's Premises, Landlord shall be solely responsible for any governmentally imposed impact fees, hookup, connection, installation or tap in fees and other similar construction-related charges. Tenant's building permit fee shall be paid by Tenant (i.e. law enforcement, fire, road impact fees relative to the Premises only). Landlord shall make no changes in Tenant's Preferred Area as shown on the Site Plan (including, without limitation, changes in the location of curbcuts, drive aisles, entrances, access points, roadways, sidewalks or parking spaces or reduction of the parking ratio specified in paragraph 5) without Tenant's express consent, which Tenant may, in its sole discretion, withhold. Landlord shall not make any other changes to the Common Areas which affect Tenant's parking, visibility or access without Tenant's consent, which may be withheld in Tenant's sole discretion. Any other changes to the Common Areas may be made only upon receipt of Tenant's express written consent, which consent shall not be unreasonably withheld. Notwithstanding the foregoing, Landlord may make changes to the Common Areas not within Parcel 7 or Tenant's Preferred Area.

C:\DOCUME~1\WOODSO~1.CIR\LOCALS~1\Temp\notes32C5CD\Declaration of Easement and Restrictions V8.doc

- 27 -

Description: Orange,FL Document-Book.Page 8046.1183 Page: 28 of 29
Order: 40240645 Comment: update copies

EXHIBIT A

SIGNAGE



WATERFORD TOWERS

## STOREFRONT ELEVATIONS



SPORTS AUTHORITY

Waterford Lakes, Florida