# EXHIBIT A

SHOPPING CENTER LEASE

BETWEEN

SRI TEN CITY CENTER, LLC

AND

TSA STORES, INC.

FOR PREMISES LOCATED IN THE

CITY CENTER SHOPPING CENTER

MINNEAPOLIS, MINNESOTA

# TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| 1. | | BASIC LEASE DEFINITIONS, EXHIBITS AND ADDITIONAL DEFINITIONS ....................1 |
| | 1.1 | Basic Lease Definitions ................................................................................................1 |
| | 1.2 | Exhibits ........................................................................................................................2 |
| | 1.3 | Additional Definitions ..................................................................................................3 |
| 2. | | DEMISE, CONSTRUCTION AND TERM ..................................................................................5 |
| | 2.1 | Demise ..........................................................................................................................5 |
| | 2.2 | Construction ..................................................................................................................5 |
| | 2.3 | Delivery on Permitted Delivery Date ...........................................................................5 |
| | 2.4 | Measurement of Premises .............................................................................................5 |
| | 2.5 | Commencement Agreement ...........................................................................................5 |
| | 2.6 | Options to Extend Term ................................................................................................5 |
| | 2.7 | Holdover Tenancy .........................................................................................................6 |
| 3. | | RENT .............................................................................................................................................6 |
| | 3.1 | Commencement of Rent ................................................................................................6 |
| | 3.2 | Base Rent.......................................................................................................................7 |
| | 3.3 | Common Area Charges .................................................................................................7 |
| | 3.4 | Real Estate Taxes..........................................................................................................7 |
| | 3.5 | Insurance Premiums ......................................................................................................8 |
| | 3.6 | Utilities .........................................................................................................................8 |
| | 3.7 | Rent Invoices; Waiver of Recovery of Certain Charges...............................................8 |
| 4. | | COMMON AREAS .......................................................................................................................8 |
| | 4.1 | Right to Use Common Areas.........................................................................................8 |
| | 4.2 | Parking Areas ...............................................................................................................9 |
| | 4.3 | Maintenance of Common Areas ...................................................................................9 |
| | 4.4 | Protected Accessways...................................................................................................9 |
| | 4.5 | Intentionally Deleted ....................................................................................................9 |
| | 4.6 | Minimum Clearance .....................................................................................................9 |
| 5. | | INSURANCE AND INDEMNITIES .........................................................................................10 |
| | 5.1 | Tenant's Insurance......................................................................................................10 |
| | 5.2 | Landlord's Insurance ..................................................................................................10 |
| | 5.3 | Indemnities .................................................................................................................10 |
| | 5.4 | Waiver of Subrogation................................................................................................11 |
| 6. | | MAINTENANCE OF PREMISES..............................................................................................11 |
| | 6.1 | Landlord's Obligations ...............................................................................................11 |
| | 6.2 | Tenant's Obligations...................................................................................................11 |
| | 6.3 | Heating, Ventilating and Air Conditioning................................................................11 |
| | 6.4 | Surrender of Premises .................................................................................................11 |
| 7. | | SIGNS ..........................................................................................................................................11 |
| | 7.1 | Exterior Signs .............................................................................................................11 |
| | 7.2 | Other Signs .................................................................................................................12 |
| 8. | | TITLE TO PREMISES................................................................................................................12 |
| | 8.1 | Ownership of Premises ...............................................................................................12 |
| | 8.2 | Covenant of Quiet Enjoyment ....................................................................................12 |
| | 8.3 | Non-Disturbance Agreement ......................................................................................12 |
| | 8.4 | Restrictions .................................................................................................................12 |
| 9. | | COMPLIANCE ...........................................................................................................................12 |
| | 9.1 | As to Premises ............................................................................................................12 |
| | 9.2 | As to Common Areas ..................................................................................................12 |
| | 9.3 | As to Hazardous Materials..........................................................................................12 |
| 10. | | ALTERATIONS AND FIXTURES .............................................................................................13 |
| | 10.1 | Alterations and Additions ..........................................................................................13 |
| | 10.2 | Fixtures.......................................................................................................................13 |
| | 10.3 | Liens ...........................................................................................................................13 |
| 11. | | ASSIGNMENT AND SUBLETTING ........................................................................................14 |
| | 11.1 | Permitted Assignment and Subletting.........................................................................14 |
| | 11.2 | Recognition.................................................................................................................14 |
| | 11.3 | Consideration..............................................................................................................14 |
| | 11.4 | Right to Recapture ......................................................................................................14 |

i

**TABLE OF CONTENTS**
(continued)

Page

| | | | |
|---|---|---|---|
| 12. | | DESTRUCTION OF PREMISES | 14 |
| | 12.1 | Notice of Damage and Estimated Repair Time | 14 |
| | 12.2 | Tenant's Right to Terminate | 15 |
| | 12.3 | Landlord's Right to Terminate | 15 |
| | 12.4 | Landlord's Repair Obligation | 15 |
| | 12.5 | Abatement of Rent | 15 |
| 13. | | EMINENT DOMAIN | 15 |
| | 13.1 | Total Taking | 15 |
| | 13.2 | Tenant's Right to Terminate | 15 |
| | 13.3 | Landlord's Right to Terminate | 15 |
| | 13.4 | Partial Taking of Premises | 15 |
| | 13.5 | Award | 16 |
| 14. | | DEFAULT | 16 |
| | 14.1 | Tenant's Default | 16 |
| | 14.2 | Landlord's Default | 16 |
| | 14.3 | No Additional Notice or Cure Period | 16 |
| | 14.4 | Estoppel and Waiver | 16 |
| | 14.5 | Remedies Cumulative | 16 |
| | 14.6 | Litigation, Court Costs and Attorneys' Fees | 17 |
| | 14.7 | Defaults by Assignees or Subtenants | 17 |
| 15. | | SUBORDINATION | 17 |
| | 15.1 | Landlord's Mortgagees | 17 |
| | 15.2 | Landlord's Liens | 17 |
| 16. | | OTHER TENANCIES AND USE | 17 |
| | 16.1 | On-Going Co-Tenancy Requirement | 17 |
| | 16.2 | Exclusive Use | 17 |
| | 16.3 | Prohibited Uses | 18 |
| | 16.4 | Rules and Regulations | 18 |
| | 16.5 | Other Exclusives | 18 |
| | 16.6 | Implications as to Operation/Operating Covenant | 18 |
| | 16.7 | Acknowledgement of Firearms | 19 |
| 17. | | MISCELLANEOUS | 19 |
| | 17.1 | Relationship of Parties | 19 |
| | 17.2 | Heirs, Successors and Assigns | 19 |
| | 17.3 | Governing Law | 19 |
| | 17.4 | Rules of Construction | 19 |
| | 17.5 | Materiality of Covenants | 19 |
| | 17.6 | Severability | 19 |
| | 17.7 | Entire Agreement; Amendment | 19 |
| | 17.8 | Gender, Number | 19 |
| | 17.9 | Headings | 19 |
| | 17.10 | Section Numbers | 19 |
| | 17.11 | Memorandum of Lease | 19 |
| | 17.12 | Notices | 19 |
| | 17.13 | Confidentiality of Lease Terms | 19 |
| | 17.14 | Brokers | 20 |
| | 17.15 | Force Majeure | 20 |
| | 17.16 | Intentionally Omitted | 20 |
| | 17.17 | Specially Designated Nationals and Blocked Persons List | 20 |
| Exhibit A | | LEGAL DESCRIPTION OF THE LAND | A-1 |
| Exhibit B | | SITE PLAN | B-1 |
| Exhibit C | | CONSTRUCTION PROVISIONS | C-1 |
| Exhibit C1 | | MCC DELIVERY CONDITIONS | C1-1 |
| Exhibit D | | COMMENCEMENT AGREEMENT | D-1 |
| Exhibit E | | SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT | E-1 |
| Exhibit F | | PERMITTED ENCUMBRANCES | F-1 |
| Exhibit G | | EXISTING LEASES AND EXCLUSIVES | G-1 |
| Exhibit H | | PROHIBITED USES | H-1 |
| Exhibit I | | MEMORANDUM OF SHOPPING CENTER LEASE | I-1 |

# TABLE OF CONTENTS
## (continued)

Page

| | | |
|---|---|---|
| Exhibit J | SHOPPING CENTER RULES AND REGULATIONS | J-1 |
| Exhibit K | FORM OF ESCROW AGREEMENT | K-1 |
| Exhibit L | FLOOR AREA OF PREMISES | L-1 |
| Exhibit M | APPROVED BUILDING SIGNAGE | M-1 |

SHOPPING CENTER LEASE

THIS SHOPPING CENTER LEASE ("**Lease**") is entered into as of the Effective Date, and by and between the Landlord and Tenant, identified in Section 1.1 below.

1.    **BASIC LEASE DEFINITIONS, EXHIBITS AND ADDITIONAL DEFINITIONS**

1.1    **Basic Lease Definitions**.  In this Lease, the following defined terms have the meanings indicated:

(a)    "**Effective Date**" means the date of execution by the later to sign of Landlord or Tenant, provided an executed copy of this Lease is thereafter delivered to the other party, which date is _February 5_, 2015.

(b)    "**Landlord**" means SRI Ten City Center, LLC, a Delaware limited liability company, whose Federal Taxpayer Identification Number is 61-1692885.

(c)    "**Tenant**" means TSA STORES, INC., a Delaware corporation.

(d)    "**Project**" shall mean the improvements (excluding the hotel) from time to time constructed on the land located in the City of Minneapolis, County of Hennepin and State of Minnesota described in attached Exhibit A (the "**Land**"), which Project is known as Minneapolis City Center.  The Project includes an office tower located at 33 South Sixth Street, Minneapolis, MN 55401 (the "**Office Tower**"), areas designated by Landlord for parking for the Project (the "**Parking Facilities**") and the retail mall building known as Minneapolis City Center located at 40 South Seventh Street, Minneapolis, MN 55402 (the "**Shopping Center**"). The term Shopping Center includes approximately 249,999 square feet of Floor Area available to lease  to retail tenants in the Project, excluding, however, all space below street level (with the exception of space leased to Marshall's) and space in the Office Tower and the Parking Facilities.

(e)    "**Premises**" means that portion of the Shopping Center commonly known as Suite 165, and identified as the Premises on Exhibit B.  There are appurtenant to the Premises those rights, privileges, easements and appurtenances that are described herein.  The Premises contain, or will contain, approximately 21,877 square feet of Floor Area, with dimensions of approximately 150 feet of frontage by approximately 145 feet in depth, and deck to deck height of approximately 16 feet, with a clear height of 11 feet 6 inches in some areas.

(f)    "**Expiration Date**" means the last day of the Initial Term, which will be January 31 of the 10th Lease Year.

(g)    "**Permitted Delivery Date**" means the following dates:  June 21, 2015 and November 22, 2015, provided however, that the Permitted Delivery Date shall be subject to a day-for-day extension on account of any Tenant Delays (as defined in Exhibit C); and provided, further, that November 22, 2015 shall only be a Permitted Delivery Date to the extent Landlord provides written notice to Tenant no later than March 21, 2015 as further set forth in Section 7.3 of Exhibit C.

(h)    "**Extension**" means any of the 4 extension periods of 5 years each with respect to which Tenant may elect to extend the Term pursuant to Section 2.6.

(i)    "**Base Rent**" means the Rent payable pursuant to Section 3.2, as follows (but subject to adjustment upon final measurement of the Premises pursuant to Section 2.4):

| Applicable Time Period | Total Annual Base Rent | Total Monthly Base Rent | Annual Base Rent Per Square Foot of Floor Area of the Premises |
|---|---|---|---|
| Rental Commencement Date through the expiration of the 5th Lease Year | $306,279.92 | $25,523.16 | $14.00 |
| Lease Year 6 through Expiration Date | $328,155.00 | $27,346.25 | $15.00 |
| First Extension | $360,970.44 | $30,080.87 | $16.50 |
| Second Extension | $397,067.52 | $33,088.96 | $18.15 |
| Third Extension | FMV*** | FMV*** | FMV*** |
| Fourth Extension | FMV*** | FMV*** | FMV*** |

*** FMV shall mean the "Fair Market Value" as set forth in Section 2.6.

(j)    "**Common Area Charges**" means initially $3.28 per square foot of Floor Area of the Premises (excluding insurance premiums).  See Section 3.3(b).  Through the first full calendar year of the Term, Tenant's share of insurance costs  are estimated to be $0.73  per square foot of Floor Area (the "**Estimated Insurance Premiums**").

(k)     "**Real Estate Taxes**" means initially $3.00 per square foot of Floor Area of the Premises.  See Section 3.4(a).

(l)     "**Required Co-Tenants**" means the following:  (i) Marshall's or a Comparable Replacement, and (ii) at least one hundred and twenty five thousand (125,000) square feet of Floor Area of the total Floor Area of the Shopping Center (excluding the Premises but including the Marshall's Premises).

(m)     "**Co-Tenancy Premises**" means the respective premises occupied by each of the Required Co-Tenants.

(n)     "**Initial Co-Tenancy Requirement**" means that the Required Co-Tenants are open, fully staffed and stocked and are operating in their respective Co-Tenancy Premises.

(o)     "**On-Going Co-Tenancy Requirement**" means that the Required Co-Tenants are open, fully staffed and stocked and are operating in their respective Co-Tenancy Premises.

(p)     "**Landlord's Notice Address**" means:

> SRI Ten City Center, LLC
> c/o Shorenstein Realty Services, LP
> 235 Montgomery Street, Suite 1600
> San Francisco, CA  94104
> Attn:  Corporate Secretary

> With a copy to:

> SRI Ten City Center, LLC
> c/o Shorenstein Realty Services, LP
> 850 Third Avenue, Suite 1700
> New York, NY 10022
> Attn:  Asset Manager

(q)     "**Landlord's Rent Address**" means:

> SRI Ten City Center, LLC
> 26479 Network Place
> Chicago, IL 60673-1264

(r)     "**Tenant's Notice Address**" means:

> 1050 West Hampden Avenue
> Englewood, Colorado 80110
> Attn:  Senior Vice President - Real Estate

> With a copy to:

> 1050 West Hampden Avenue
> Englewood, Colorado 80110
> Attn:  Legal Department

(s)     "**Tenant's Rent Invoices Address**" means:

> 1050 West Hampden Avenue
> Englewood, Colorado 80110
> Attn:  Lease Accounting (Store #712)

(t)     "**Broker(s)**" means:  Western Retail Advisors, LLC, and North Central Commercial Real Estate Company, representing Tenant, and Welsh Companies LLC/Colliers International, representing Landlord.

(u)     "**Tenant's Work Days**" means 180 days, plus the number of days, if any, that "Tenant's Work" (as defined in Article 1 of Exhibit C) is delayed by "Uncontrollable Events" (as defined in Section 17.15).

    **1.2     Exhibits**.  The following Exhibits are attached to this Lease and made a part of this Lease for all purposes.

| | |
|---|---|
| Exhibit A: | Legal Description of the Shopping Center |
| Exhibit B: | Site Plan |
| Exhibit C: | Construction Provisions |
| Exhibit C1: | Excerpts from the Program Package |
| Exhibit D: | Commencement Agreement |
| Exhibit E: | Subordination, Non-Disturbance and Attornment Agreement |
| Exhibit F: | Permitted Encumbrances |

Exhibit G:         Existing Leases Not Subject to Tenant's Exclusive/Other Exclusives
Exhibit H:         Prohibited Uses
Exhibit I:         Memorandum of Shopping Center Lease
Exhibit J:         Rules and Regulations
Exhibit K:         Escrow Agreement
Exhibit L:         Floor Area of Premises

**1.3**     **Additional Definitions**. In addition to those terms defined in Section 1.1 and other sections of this Lease, the following defined terms when used in this Lease have the meanings indicated:

(a)     **"Additional Rent"** means any amount or charge due from Tenant to Landlord under this Lease in addition to Base Rent, including, without limitation, Tenant's share of Common Area Charges, Insurance Premiums and Real Estate Taxes.

(b)     **"Alternative Rent"** means, for any month or portion of a month during the Term for which Tenant is required or permitted to pay Alternative Rent pursuant to this Lease, an amount equal to the product of (i) the entire amount of Gross Sales made upon the Premises during such month or the portion thereof, multiplied by (ii) 3.25%, but in no event will Alternative Rent exceed the Base Rent that would have been payable for such period in the absence of the provision of this Lease requiring or permitting Tenant to pay Alternative Rent for such period. Any payment of Alternative Rent by Tenant shall be accompanied by a statement (**"Alternative Rent Statement"**) to Landlord certified by Tenant or Tenant's authorized representative showing: (A) the amount of the actual Gross Sales for the preceding month; and (B) the amount of Alternative Rent due from Tenant and the detail for determining same.

(c)     **"Commencement Date"** means, subject to the provisions of Article 7 of <u>Exhibit C</u>, the earlier of (i) the date which is the number of Delivery Days after the Delivery Date, or (ii) the earlier of the date of Tenant's grand opening or the 10th day after the day on which Tenant first opens the Premises for business with the public; provided, however, that if the date which is the number of Tenant's Work Days after the Delivery Date occurs during the three-day period from and including Good Friday through and including Easter Sunday, then the Commencement Date will be the earlier of (A) the Monday immediately following Easter Sunday, or (B) the earlier of the date of Tenant's grand opening or the 10th day after the day on which Tenant first opens the Premises for business with the public.

(d)     **"Common Area Charges"** means the costs incurred by Landlord during the Term in operating, maintaining and repairing the Common Areas, determined in accordance with generally accepted accounting principles.

(e)     **"Common Areas"** means those parts of the Shopping Center provided by Landlord for the common use of all tenants, including, among other facilities, hallways, elevators and escalators, loading areas, recycling and trash facilities, drinking fountains, and public toilets, if any, exclusive of truck ramps, and wells.

(f)     **"Comparable Replacement Tenant"** means a tenant or occupant that (i) on a regional or national basis, operates under the same trade name at least 20 high quality retail stores comparably sized to the Marshall's Premises, in a manner which is consistent with a first class promotional shopping center in the metropolitan area in which the Premises are located, and (ii) operates as one of the following: books and music store, crafts store, department store, discount department store (e.g., Target or Wal-Mart), drug store, electronic equipment/appliance store, home improvements store, office supply store, pet store, soft goods store, supermarket or warehouse department store (e.g., Costco or Sam's Club). The parties agree that the Shopping Center, as of the Commencement Date, constitutes an example of a "first class promotional shopping center".

(g)     **"Delivery Date"** means, subject to the provisions of Section 2.3 below and of Articles 7.1 through 7.6 of <u>Exhibit C</u>, the date upon which all of the following conditions precedent have been fulfilled by Landlord: (i) the "Landlord's Work" (as defined in Article 7.1 of <u>Exhibit C</u>) is "Substantially Complete" (as defined in Article 7.6 of <u>Exhibit C</u>); (ii) Landlord and Tenant have conducted the punch list inspection of the Premises described in Article 7.6 of <u>Exhibit C</u>; (iii) Landlord has delivered possession of the Premises to Tenant free and clear of all prior tenancies, with any signage, furniture, equipment or trade fixtures of any prior occupant removed and with any damage caused by such removal repaired to Tenant's reasonable satisfaction at no cost to Tenant; and (iv) Landlord has delivered into escrow a cash deposit accompanied by an escrow agreement in the form attached hereto as <u>Exhibit K</u> securing the obligation of Landlord to pay the Allowance to Tenant in accordance with the terms of the Lease. The parties acknowledge that Tenant, as a part of Tenant's Work, is required to obtain a certificate of occupancy or its equivalent for the Premises. However, if Tenant is delayed in obtaining such certificate of occupancy due to any failure of Landlord's Work to comply with the requirements of a Governmental Authority or any failure of Landlord otherwise to comply with the requirements of a Governmental Authority (excluding any such requirement the compliance with which is Tenant's responsibility pursuant to Article 2 of <u>Exhibit C</u>), then for purposes of determining the Commencement Date and the Rental Commencement Date under this Lease, the Delivery Date will be deemed extended by the number of days that Tenant is delayed in obtaining such certificate of occupancy or its equivalent by virtue of such non-compliance.

(h)     **"Environmental Laws"** means all Laws relating to (i) emissions, discharges, spills, releases or threatened releases of Hazardous Materials onto or into, or the presence of Hazardous Materials on or in, land, ambient air, surface water, groundwater, watercourses, publicly or privately owned treatment works, drains, sewer systems, wetlands, or septic systems, and (ii) the use, treatment, storage, disposal, handling, manufacturing, transportation, or shipment of Hazardous Materials.

(i)        "**Floor Area**" means the floor area in square feet at each level or story of buildings in the Shopping Center, measured in accordance with the ANSI/BOMA Z65.5-2010 publication, Retail Buildings: Standard Methods of Measurement. Floor Area will not include the area of: temporary outside sales areas; the upper levels of any deck/platform areas used for storage of merchandise (including mezzanine areas); and loading docks and areas covered by exterior canopies or overhangs (except to the extent enclosed and used as retail sales area).

(j)        "**Governmental Authority**" means any local, regional, state or federal governmental entity, agency, court, judicial or quasi-judicial body, or legislative or quasi-legislative body, present or future.

(k)        "**Gross Sales**" means the gross receipts from merchandise sold or services rendered upon the Premises, but excluding the following to the extent same are included: (i) all refunds, exchanges, returns, discounts, or allowances made for damaged or returned merchandise; (ii) sales to employees; (iii) bulk sales or closeouts of merchandise sold at less than Tenant's cost; (iv) receipts from the sale of "leader items;" "leader items" will mean those items of merchandise advertised as promotional items to attract customers to the Premises and sold at either no profit or a very low profit margin; (v) any taxes collected for any Governmental Authority, including, but not limited to, sales or excise taxes or similar taxes; (vi) sales of trade fixtures or store operating equipment; (vii) vending machine sales and pay telephone receipts; (viii) any intracompany transfers of merchandise; (ix) amounts in excess of Tenant's cash sale price charged for shipping or insurance or for interest or finance charges on sales made on credit or under a time payment plan or layaway plan; (x) charges paid by Tenant or its customers to credit card companies in accordance with credit card purchase plans; (xi) sale of gift certificates, provided, however, that the cash sale price of any item purchased with such a certificate at the Premises will be included in Gross Sales; (xii) receipts from the sale of hunting, fishing and/or game licenses, park permits, camp stamps or migrant bird permits; (xiii) receipts from sales of airline tickets, tickets for sporting events, ski resort lift tickets and all Datatix, Ticketmaster or other similar ticket sales; (xiv) receipts from sales of tickets for events conducted not for purposes of profit; (xv) workroom or similar charges for alterations, assembly, repairs or installation of merchandise sold, or similar "customer convenience" services rendered in connection with merchandise sold (such as tennis racquet stringing, etc.); (xvi) sales of merchandise ordered through the use of Tenant's website or mail order catalogs or filled through Tenant's website or mail order channels, regardless of the place of order or delivery, unless payment is made and accounted for at the Premises; (xvii) postage paid in connection with mail order sales; (xviii) sublease rents and licensee, concessionaire and similar fees, including fees received from the placement or use of any ATM machine within the Premises; (xix) returns to shippers, jobbers, wholesalers or manufacturers; (xx) sums or credits received for the settlement of claims for loss or damage to merchandise; (xxi) any penalties or charges imposed by Tenant on its customers for returned checks; and (xxii) Tenant's accounts receivables which have been determined to be uncollectible for federal income tax purposes; provided, however that such sums actually collected in later years will be included in Gross Sales for such later year.

(l)        "**Hazardous Materials**" means any substance (i) the presence of which requires special handling, storage, investigation, notification, monitoring, or remediation under any Environmental Laws, (ii) which is toxic, explosive, corrosive, erosive, flammable, infectious, radioactive, carcinogenic, mutagenic or otherwise hazardous, or (iii) which is or becomes regulated by any Governmental Authority.

(m)        "**Initial Term**" means the period commencing on the Commencement Date and ending on the Expiration Date.

(n)        "**Insurance Premiums**" means the costs incurred by Landlord during the term in paying the premiums for the property and liability insurance required by Sections 5.2(a) and (b).

(o)        "**Interest Rate**" means the lesser of (i) the prime rate of interest being quoted at such time by Wells Fargo Bank, N.A., plus 4%, or (ii) the highest lawful interest rate allowed by Laws.

(p)        "**Laws**" means all applicable common law, statutes, ordinances, rules, rulings, regulations, orders and interpretations of any Governmental Authority having jurisdiction.

(q)        "**Lease Year**" means each 12-month period following the Commencement Date during the Term, except that if the Commencement Date occurs on a date other than on the first day of the month, the first Lease Year will include both (i) the period from the Commencement Date through the end of the month in which the Commencement Date occurs, and (ii) the full 12 month period following that initial partial month. However, if the Term of this Lease expires on a date other than January 31 of a calendar year, and if Tenant either has no further options to extend the Term or Tenant has elected not to extend the Term, then the final Lease Year of the Term shall be automatically extended through and including January 31st of the calendar year following the year in which the Lease is otherwise scheduled to expire.

(r)        "**Permitted Encumbrances**" means those liens, easements, restrictions and encumbrances affecting the Shopping Center that are listed on Exhibit F.

(s)        "**Premises Insurance Parcel**" means those portions of the Project are, along with the Premises, insured under the insurance policies required to be maintained by Landlord under Sections 5.2(a) and (b).

(t)        "**Premises Tax Parcel**" means the tax parcel that includes the Premises, as established by the Governmental Authority that is responsible for assessing and collecting Real Estate Taxes.

(u)    "**Real Estate Taxes**" means all real property taxes and assessments that become due and payable during the Term after the Rental Commencement Date and are assessed by any taxing Governmental Authority against the Premises Tax Parcel, including any business improvement district assessments or charges (so long as such charges are assessed against the entire Project of which the Shopping Center is a part, and not limited to the Shopping Center), reflecting the maximum discount, if any, available by making early payment (regardless of whether early payment is actually made) and less any rebates, credits or abatements from such authorities which are granted or agreed upon with respect to the Premises Tax Parcel; provided, however, that as regards any assessment which under Laws may be paid in installments, there will be included within the meaning of the term "Real Estate Taxes" with respect to any tax fiscal year only the current annual installment. Real Estate Taxes will not include any of the following: (i) any franchise, gift, estate, inheritance, conveyance, transfer, capital investment or other tax assessed against Landlord or Landlord's heirs, successors or assigns; (ii) any income, excess profits or other tax, assessment, charge, or levy on the Rent payable by Tenant under this Lease; or (iii) any interest, fine, or penalty for late payment or nonpayment by Landlord of any Real Estate Taxes.

(v)    "**Rent**" means the Base Rent, Alternative Rent and Additional Rent.

(w)    "**Rental Commencement Date**" means, subject to the provisions of Article 2 of Exhibit C, the later of (i) the Commencement Date, or (ii) the date on which each of the conditions precedent to the occurrence of the Delivery Date set forth in Section 1.3(g) is met; provided, however, that the Rental Commencement Date shall be equitably adjusted on a day-for-day basis to the extent that delivery is delayed as a result of Tenant Delays.

(x)    "**Term**" means the Initial Term and any Extension with respect to which Tenant exercises its option pursuant to Section 2.6.

## 2.    DEMISE, CONSTRUCTION AND TERM

**2.1    Demise.**  Upon the terms and conditions set forth in this Lease, Landlord leases to Tenant, and Tenant leases from Landlord, the Premises, together with the nonexclusive right to use the Common Areas, for the Term.

**2.2    Construction.**  Construction of the "Landlord's Work" (as defined in Article 1 of Exhibit C) within the Premises will be accomplished pursuant to Exhibit C.

**2.3    Delivery on Permitted Delivery Date.**  In no event will Tenant be required to accept possession of the Premises on any date that is not a Permitted Delivery Date and in the event the conditions precedent to the Delivery Date set forth in Section 1.3(g) are satisfied on a date that is not a Permitted Delivery Date, the Delivery Date will, for all purposes, be delayed until the next Permitted Delivery Date, unless Tenant waives such requirement in writing (which Tenant will have the right to), in which case (a) the Delivery Date will be the date on which the foregoing conditions were satisfied (regardless of the fact that one or more of such conditions may have been satisfied on a date that was not a Permitted Delivery Date), and (b) commencing on the later of the Rental Commencement Date or the date on which Tenant is first obligated to pay Base Rent pursuant to Section 3.1(a) and continuing for a period of time equal to the number of days from the Delivery Date to the next Permitted Delivery Date, Base Rent will be abated and in lieu thereof Tenant will pay Landlord Alternative Rent on a monthly basis, 45 days after the end of each calendar month.

**2.4    Measurement of Premises.**  The Floor Area contained (or contemplated to be contained after construction) in the Shopping Center and Premises is agreed to be as set forth in Sections 1.1(d) and 1.1(e) respectively.  A copy or a letter from Landlord's architect, certifying the Floor Area of the Premises, is attached hereto as Exhibit L.

**2.5    Commencement Agreement.**  Landlord and Tenant agree to sign on or before the 60th day following the Rental Commencement Date, a Commencement Agreement in the form of Exhibit D, setting forth the Delivery Date, the Commencement Date of the Initial Term, the Rental Commencement Date, the Expiration Date, the amounts of Base Rent payable by Tenant during the Term and each Extension with respect to which Tenant exercises its option pursuant to Section 2.6 and the date by which Tenant must give notice to Landlord to exercise each Extension.  Such Commencement Agreement will thereafter be conclusive of such information.

**2.6    Options to Extend Term.**  Tenant will have options to extend the Term for the number of Extensions set forth in Section 1.1(h).  Each option will be exercisable by notice given to Landlord at least 12 months prior to the last day of the Initial Term or then effective Extension, as the case may be.  Upon receipt of each such notice, this Lease will be extended for the period specified in Section 1.1(h) without the necessity for the execution of any further instrument and upon the same terms, conditions, covenants, and agreements as are contained in this Lease, except that the Base Rent for each Extension will be as set forth in Section 1.1(i) and this Section 2.6.  If Tenant neglects to exercise timely any option to extend the Term, Tenant's right to exercise such option will not expire until 15 days after receipt by Tenant of notice from Landlord of Tenant's failure to exercise such option.

With respect to the third (3rd) and fourth (4th) Extensions, the Basic Rent shall equal the "Fair Market Value" as hereinafter defined.  Fair Market Value ("FMV") shall mean the annual rental charge for new leases then being negotiated or executed for comparable retail space in the area surrounding the Premises for terms commencing on or about the commencement date of the applicable Extension and ending as of the expiration of such Extension. In determining FMV, the following shall be taken into consideration: the size, location and condition of the applicable comparable premises and shopping center, necessary tenant improvements, lease term, services provided

by the landlord, rental concessions, the creditworthiness of Tenant, and other factors. Landlord and Tenant shall in good faith attempt to agree in writing on FMV within 10 days after Landlord's receipt of Tenant's notice electing to extend the Term for the applicable Extension. If Landlord and Tenant cannot so agree, FMV shall be determined by impartial appraisers or real estate brokers, one each to be chosen by Landlord and Tenant, and, if necessary, a third to be selected as provided below (collectively, the "Arbitrators"). All appraisers shall be MAI certified, familiar with retail space, leases and rents in the area surrounding the Premises, and shall have at least 10 years' experience in making real estate appraisals in the central Minneapolis business district. All real estate brokers shall be duly licensed, with at least 10 years' experience in retail leasing brokerage in the central Minneapolis business district. Landlord and Tenant shall notify each other of its selected Arbitrator within 5 days following the expiration of such 10-day period. The initial Arbitrators shall render their written appraisals of FMV within 30 days after their appointment. If the two Arbitrators cannot agree upon FMV within thirty (30) days after the date of appointment of the second Arbitrator, then the two Arbitrators shall select a third Arbitrator meeting the qualifications stated above within fifteen (15) days thereafter and shall notify Landlord and Tenant of said choice. Each of the parties hereto shall bear one-half (1/2) the cost of appointing the third Arbitrator and of the third Arbitrator's fee. The third Arbitrator shall be a person who has not previously acted in any capacity for either party.

The third Arbitrator shall conduct his or her own investigation of FMV, and shall be instructed not to advise either party of the determination except as follows: When the third Arbitrator has made his determination, he shall so advise Landlord and Tenant and shall establish a date, at least five (5) days after the giving of his notice to Landlord and Tenant, on which he shall disclose his determination of the fair market rent. Such meeting shall take place in his office unless otherwise agreed by the parties. After having initialed a paper on which his determination of FMV is set forth, the third Arbitrator shall place his determination of FMV in a sealed envelope. Landlord's Arbitrator and Tenant's Arbitrator shall each set forth their determination of FMV on a paper, initial the same and place them in sealed envelopes. Each of the three envelopes shall be marked with the name of the party whose determination is inside the envelope.

In the presence of the third Arbitrator, the determination of FMV by Landlord's Arbitrator and Tenant's Arbitrator shall be opened and examined. If the higher of the two determinations is 105% or less of the amount set forth in the lower determination, the average of the two determinations shall be the FMV, the envelope containing the determination of the fair market rent by the third Arbitrator shall be destroyed and the third Arbitrator shall be instructed not to disclose his determination. If either party's envelope is blank, or does not set forth a determination of FMV, the determination of the other party shall prevail and be treated as the FMV. If the higher of the two determinations is more than 105% of the amount of the lower determination, the envelope containing the third Arbitrator's determination shall be opened. If the value determined by the third Arbitrator is the average of the values proposed by Landlord's Arbitrator and Tenant's Arbitrator, the third Arbitrator's determination shall be the FMV. If such is not the case, FMV shall be the rent proposed by either Landlord's Arbitrator or Tenant's Arbitrator which is closest to the determination of fair market rent by the third Arbitrator.

If the FMV is not established prior to the commencement of the renewal period, then Tenant shall continue to pay as Base Rent and Additional Rent the sums in effect as of the last day of the immediately preceding term of the Lease and, as soon as the FMV is determined, Tenant shall immediately pay to Landlord any deficiency in the amount paid by Tenant during such period, or, if Tenant paid excess Base Rent during such period, Landlord shall credit such excess payments to the Base Rent amounts next due.

Notwithstanding anything to the contrary contained in this Section 2.6, in no event shall the Base Rent for the third (3rd) and fourth (4th) Extensions be more than twelve and one-half percent (12.5%) of the Base Rent for the immediately preceding Term.

**2.7     Holdover Tenancy**. If Tenant remains in possession of the Premises after the expiration of the Term without execution of a new lease or of an agreement extending the Term, Tenant will be deemed to be occupying the Premises as a tenant from month to month, subject to all of the terms of this Lease as may be applicable to a month to month tenancy and at the monthly installment of one hundred fifty percent (150%) of the Base Rent set forth in Section 1.1(i) for the 12-month period prior to expiration of the Term, except that thereafter either Landlord or Tenant may terminate this Lease upon 30 days' notice to the other.

## 3.     RENT

**3.1     Commencement of Rent**. Notwithstanding anything to the contrary contained in this Lease, no Rent will begin to accrue until the Rental Commencement Date or such later date as may be established for the commencement of such accrual pursuant to Section 3.1(a). Tenant covenants and agrees to pay Landlord at Landlord's Rent Address, or such other persons or entities or at such other places as Landlord may designate by notice to Tenant, the Rent set forth below in this Section 3.

(a)     Initial Co-Tenancy Requirement. If on the Rental Commencement Date the Initial Co-Tenancy Requirement is not satisfied, then, as provided in Section 16.6, Tenant will not be obligated to open the Premises for business prior to such time as the Initial Co-Tenancy Requirement is satisfied and until the earlier of the date on which Tenant opens the Premises for business or the date on which the Initial Co-Tenancy Requirement is satisfied, Tenant's obligation to pay Rent will be abated. If Tenant elects to open the Premises for business prior to the satisfaction of the Initial Co-Tenancy Requirement, then from the later of the Rental Commencement Date or the date of such opening until such time as the Initial Co-Tenancy Requirement is satisfied, Tenant will pay Additional Rent as otherwise required under this Lease and, in lieu of Base Rent, Tenant will pay to Landlord on a monthly basis, 45 days after the end of each calendar month, Alternative Rent.

(b)    Evidence of Required Co-Tenant Leases. Landlord has entered into, or will on or before 120 days from the Effective Date enter into, leases or occupancy agreements with each of the Required Co-Tenants. Such leases or occupancy agreements will provide that: (i) the Co-Tenancy Premises to be operated by the Required Co-Tenants will contain at least the areas set forth for such Co-Tenancy Premises in Section 1.1(l); and (ii) the terms thereof will be for a period of time equal to or greater than the Initial Term. If on or before 120 days from the Effective Date, Landlord fails to furnish Tenant reasonable proof that such leases or occupancy agreements with the Required Co-Tenants are in effect, Tenant will have the right, at any time thereafter until Tenant is furnished such proof, to terminate this Lease by notifying Landlord of Tenant's election. Upon the giving of notice of Tenant's election to Landlord, this Lease will terminate and the parties will be liable for their respective obligations to the date of termination and will have no liability for obligations arising after that date, except for those obligations which expressly survive termination.

**3.2    Base Rent.** Tenant will pay Landlord for each month within the Term after the Rental Commencement Date, the Base Rent set forth in Section 1.1(i). Base Rent will be payable in advance on the first day of each month in equal installments which will not be decreased, increased or abated except as set forth in this Lease. If the Rental Commencement Date does not occur on the first day of a calendar month, the Base Rent for the first partial calendar month that the Base Rent is due will be prorated based on the actual number of days within such calendar month after the Rental Commencement Date. If the Term expires or is terminated on a day which is not the last day of the calendar month, the Base Rent for the final partial calendar month that the Base Rent is due will be prorated based on the actual number of days within such calendar month prior to the end of the Term.

**3.3    Common Area Charges.** Subject to Section 3.7, Tenant will reimburse Landlord, as Additional Rent and in the manner set forth in Section 3.3(c), Tenant's share of Common Area Charges.

(a)    Computation of Tenant's Share. Tenant's share of Common Area Charges will initially be an amount equal to the product of (i) $3.28 per square foot of Floor Area in the Premises, multiplied by (ii) the Floor Area of the Premises, which amount shall increase by five percent (5%) per annum effective on the anniversary of the Rent Commencement Date.

(b)    Intentionally Deleted.

(c)    Payment of Common Area Charges. Tenant will pay 1/12 of the annual amounts of Common Area Charges, on a monthly basis, on the first day of each calendar month, together with and in the same manner as Tenant's payment of Base Rent.

(i)    Partial Calendar Years. If Tenant is obligated to pay its Common Area Charges for a partial calendar year or month, Common Area Charges for such partial calendar year month will be prorated by multiplying the total Common Area Charges for such calendar year or month by a fraction having as its numerator the number of days in the partial calendar year, and as its denominator "365" or "30", respectively.

**3.4    Real Estate Taxes.** Subject to Section 3.7, Tenant will reimburse Landlord as Additional Rent and in the manner set forth in Section 3.4(a), Tenant's Real Estate Taxes.

(a)    Computation and Payment of Tenant's Share. Tenant's Real Estate Taxes will initially be an amount equal to the product of (i) $3.00 per square foot of Floor Area in the Premises, multiplied by (ii) the Floor Area of the Premises, which amount shall increase effective on January 1, 2016 and each January 1 thereafter by an amount equal to the percentage increase in Real Estate Taxes applicable to the Premises Tax Parcel for such subsequent calendar year over the Real Estate Taxes for the preceding calendar year (subject to an equitable adjustment in the event that, for any reason, there is an increase or decrease in the Floor Area of the Premises Tax Parcel).

(b)    Payment of Real Estate Taxes. Tenant will pay the annual amounts of Tenant's Real Estate Taxes within 30 days following presentation of an invoice from Landlord accompanied by a copy of the tax bill and details of Landlord's computation of Tenant's Real Estate Taxes.

(c)    Proration at Beginning and End of Term. If Tenant is obligated to pay Real Estate Taxes for a partial calendar year, Real Estate Taxes for such partial calendar year will be prorated by multiplying the amount of Real Estate Taxes for such calendar year by a fraction having as its numerator the number of days in the partial calendar year and having as its denominator "365".

(d)    Intentionally Deleted.

(e)    Payment by Landlord. Subject to the timely payment of amounts due from Tenant, Landlord will pay or cause to be paid to the appropriate Governmental Authorities, prior to delinquency, all taxes, assessments, levies or related charges due and payable to such authorities with respect to all portions of the Shopping Center owned by Landlord.

(f)    Payment by Tenant. Notwithstanding any contrary provision herein, Tenant shall pay prior to delinquency any (i) rent tax or sales tax, service tax, transfer tax or value added tax, or any other applicable tax on the rent or services herein or otherwise respecting this Lease, (ii) taxes assessed upon or with respect to the any personal property, furnishings, fixtures or other property of Tenant located in or used in connection with Tenant's use and occupancy of the Premises, and (iii) any taxes or fees payable to any Governmental Authority on account of Tenant's operations and business conducted on or from the Premises.

**3.5    Insurance Premiums.** Subject to Section 3.7, Tenant will reimburse Landlord as Additional Rent and in the manner set forth in Section 3.4(a), Tenant's pro rata share of Insurance Premiums.

(a)    Computation and Payment of Tenant's Pro Rata Share. Tenant's pro rata share of Insurance Premiums will be an amount equal to the product of (i) all Insurance Premiums, multiplied by (ii) a fraction having as its numerator the Floor Area of the Premises and as its denominator the Floor Area of the Premises Insurance Parcel.

(b)    Payment of Insurance Premiums. Tenant will pay 1/12 of the annual amounts of Tenant's share of Insurance Premiums, on a monthly basis, on the first day of each calendar month, together with and in the same manner as Tenant's payment of Base Rent. Beginning on the Rent Commencement Date, Tenant's monthly payments on account of Insurance Premiums shall be based on the Estimated Insurance Premiums described in Section 1.1(j), above.

(i)    Annual Estimates. Landlord may reasonably estimate the amounts Tenant will owe for Insurance Premiums for the current full or partial calendar year of the Term. In such event, Tenant will pay, subject to the provisions of this Section 3.3(b), 1/12 of the estimated annual amounts, on a monthly basis, on the first day of each calendar month, together with Tenant's payment of Base Rent.

(ii)    Annual Statement. On or before the first day of April of each calendar year ("**Statement Deadline**"), Landlord will deliver a statement ("**Insurance Statement**") to Tenant certified by Landlord's authorized representative showing: (A) the amount of the actual Insurance Premiums for the preceding calendar year accompanied by invoices of same; (B) the amounts paid by Tenant toward the estimated Insurance Premiums during the preceding calendar year; and (C) Tenant's share and the detail for determining same.

(iii)    Differentials. If the Insurance Statement shows that Tenant's estimated payments were less than Tenant's actual obligations for Insurance Premiums for the preceding calendar year, Tenant will pay the difference within 30 days after Tenant receives the Insurance Statement. If the Insurance Statement shows that Tenant's estimated payments for the preceding calendar year exceeded Tenant's actual obligations for Insurance Premiums, Tenant may offset the amount due against the next accruing amounts of Rent due under this Lease.

(c)    Proration at Beginning and End of Term. If Tenant is obligated to pay its pro rata share of Insurance Premiums for a partial calendar year, Insurance Premiums for such partial calendar year will be prorated by multiplying the amount of Insurance Premiums for such calendar year by a fraction having as its numerator the number of days in the partial calendar year and having as its denominator "365".

**3.6    Utilities.**

(a)    Separate Metering. Landlord will furnish and install, without expense to Tenant, all electric, water, telephone, sanitary and storm sewer lines to the Premises and equipment required to provide service. Tenant shall be responsible for all hook-up, tap, impact and similar fees payable in relation to the furnishing or installation of water or sewer capacity for the Premises; fees for other utilities will be the responsibility of Landlord. In addition, Landlord will, at Landlord's sole cost and expense, provide separate sub-meters to measure Tenant's individual consumption of all utilities provided to the Premises with the exception of telephone.

(b)    Payment of Utility Bills. Tenant will promptly pay to Landlord, within thirty (30) days following presentation of invoice (accompanied by Tenant's consumption) as Additional Rent, all charges (based on consumption) for electricity, water, sewer service, and other utilities furnished to the Premises with the exception of telephone, for which Tenant shall contract directly with the provider of that service. Tenant's obligations herein for reimbursement of utilities shall not include any profit or overhead by Landlord.

**3.7    Rent Invoices; Waiver of Recovery of Certain Charges.** All invoices from Landlord to Tenant for any Rent due under this Lease will be sent to Tenant's Rent Invoices Address or to such other address as Tenant may designate by notice to Landlord. If Landlord fails to invoice Tenant for any annual adjustments for Insurance Premiums, Real Estate Taxes or utilities due from Tenant within 18 months after the last day of the calendar year during which such expense was incurred, Landlord's right to recover  such charge or expense will be deemed to have been waived.

## 4.    COMMON AREAS

**4.1    Right to Use Common Areas.** Landlord hereby grants to Tenant and Tenant's customers, invitees and employees for the entire Term, a nonexclusive easement to use, in common with Landlord, Landlord's customers, invitees and employees and with the other tenants and occupants of the Shopping Center and their respective customers, invitees and employees, the Common Areas for their intended purposes. Landlord further agrees: (i) that the Common Areas will remain open at all times during the Term that the Shopping Center is open for business; (ii) to maintain a no solicitation policy within the Common Areas; (iii) except to the extent required to respond to an emergency, not to cause or permit the performance of any maintenance (other than routine regularly recurring items which do not materially and adversely impact the use of the Common Areas), repair, replacement, improvement or alteration of the Common Areas (or any other portion of the Shopping Center, if the maintenance, repair, replacement, improvement or alteration thereof would adversely affect the availability if any portion of the Common Areas for access) during the months of June, August, November, December or January of any year; and

(iv) not to allow the use of the Common Areas for carnival type shows, rides, entertainment, outdoor shows, displays.

(a)      <u>Trash Compactor; Loading Dock</u>.   Tenant will have the non-exclusive right and easement, without payment of Additional Rent under this Lease, to utilize the freight elevators, trash dumpster and/or trash compactor, cardboard bailer, recycling facility and loading docks in common with other tenants of the Shopping Center, in accordance with reasonable rules and regulations provided by Landlord from time to time. Landlord will operate a centralized shipping and receiving system with a dock master for the Shopping Center, which dock master shall be on duty Monday through Friday from 6 AM to 6PM, in a commercially reasonable manner entitling Tenant to have shipments received at the loading dock.

(b)      <u>Satellite and Solar Energy Systems</u>.   Tenant shall have the right, without charge, to install, maintain, repair, operate, use, replace and remove, at Tenant's expense, a wireless communications antenna, and/or other telecom equipment including, without limitation, satellite dishes, satellite poles or other communications facilities (collectively, the "**Roof Equipment**") on the roof of the Premises, including the right to connect the Roof Equipment to the interior of the Premises, with the installation of any Roof Equipment to be subject to Landlord's review and approval (not to be unreasonably withheld, conditioned or delayed) of plans for such installation. Tenant will have the right without the payment of any additional Rent but subject to Landlord's prior approval (not to be unreasonably withheld, conditioned or delayed) to use the roof of the Premises for the installation of satellite communications dishes or antennae, together with ancillary equipment, in order to provide music, video, internet or other communications to the Premises (but not to provide any communications services to anyone other than an occupant of the Premises) ( "**Rooftop Equipment**"), provided that Tenant will install any Rooftop Equipment in accordance with all Laws and, prior to installation, Tenant will submit plans and specifications for any proposed Rooftop Equipment to Landlord for Landlord's review and approval, which approval will not be unreasonably withheld or delayed.  Tenant shall have access to the roof upon reasonable notice to Landlord for the purpose of installing, operating, servicing, maintaining, repairing, replacing or removing the Roof Equipment, which access shall be subject to Landlord's reasonable policies regarding roof access and installations, including, without limitation, insurance requirements for contractors and requirements relating to penetrations in the roof structure or membrane.  Tenant shall operate the Roof Equipment in compliance with applicable legal requirements, maintain the Roof Equipment in good condition and repair and ensure that the Roof Equipment functions within industry standards and does not interfere with the signals of other communications equipment installed at the Shopping Center prior to the installation of Tenant's Roof Equipment.  To the extent required for maintenance of the Project, Landlord may require Tenant (at Tenant's cost) to temporarily or permanently relocate the Roof Equipment, provided that Landlord provides Tenant with an alternate location from which the Roof Equipment can properly operate.  Upon Landlord's request at the end of the Term or earlier termination of this Lease, Tenant will remove all Rooftop Equipment installed by Tenant and repair any damage caused by such removal. Tenant shall indemnify and hold Landlord harmless from and against any damage arising out of the erection, maintenance, existence and/or removal of the Roof Equipment.

**4.2     Parking Areas.**  Parking in the Parking Facilities will not at any time be reduced below seventy five percent (75%) of the parking available as of the Effective Date of this Lease.

**4.3     Maintenance of Common Areas.**  At all times during the Term, Landlord will maintain the Common Areas and all mechanical and lighting equipment, in safe and secure first class order, condition and repair and will keep the Common Areas clean and free from rubbish, ice and snow and cause the Common Areas to be well lit during at least such hours as Tenant is open for business and for 30 minutes after Tenant's store is closed for business.   Except to the extent required by emergency, Landlord will not undertake any major repairs or replacements of the Common Areas  during the months of June, August, November, December or January of any year.

**4.4     Protected Accessways.**   Except for normal maintenance and repair, renovations and the requirements of governmental authorities, Landlord will not cause or permit any material change in the location or configuration of access to the Premises from the Protected Accessways, the Exit Corridor, the Loading Dock Entrance or the Nicollet Mall Entrance on <u>Exhibit B</u> from those shown on <u>Exhibit B</u>. Except for normal maintenance and repair, renovations and the requirements of governmental authorities, Landlord shall not close the existing skyway connections (collectively, the "**Skyways**") from the Shopping Center to (i) Gavidae Common; (ii) 50 South 6th Street; or (iii) Macy's, as such Skyways are shown on <u>Exhibit B</u>.  In the event any one or more of the foregoing Skyways are closed for more than twelve (12) months and Tenant's year over year comparable Gross Sales decrease by twenty percent (20%) or more, Tenant shall have the right to terminate this Lease by not less than thirty (30) days advance written notice to Landlord given after the expiration of such twelve (12) month period and effective at any time prior to the date the Skyway connections are reopened for normal use.  The location of the Common Area entrances to the Premises shall not be modified without Tenant's prior written consent, which shall not be unreasonably withheld.

**4.5     Intentionally Deleted.**

**4.6     Minimum Clearance.**  Landlord acknowledges that Tenant's standard delivery trailers require a height clearance of not less than 13'6" ("**Minimum Clearance**").  Landlord will, at Landlord's sole cost and expense, take such action as may be necessary or appropriate to achieve the Minimum Clearance at all points from a neighboring public right of way to the load areas to ensure Tenant's ability to receive deliveries, at the commencement of the Term and throughout the remainder of the Term.

5.    **INSURANCE AND INDEMNITIES**

**5.1    Tenant's Insurance.**  From the date on which Tenant commences Tenant's Work until the end of the Term, Tenant will maintain the following coverages:  (a) commercial general liability insurance on an occurrence basis for the Premises, including contractual liability coverage, having a combined single limit of not less than $5,000,000 per occurrence; and (b) special form (formerly known as all risk) property insurance on Tenant's furniture, trade fixtures, equipment, and merchandise in or on the Premises, in the amount of 100% of the replacement cost; provided, however, that (i) at any time that Tenant has a net worth of at least $50,000,000, Tenant may in its sole discretion self-insure up to $500,000 per occurrence of such commercial general liability coverage, (ii) at any time that Tenant has a net worth of at least $100,000,000, Tenant may in its sole discretion self-insure up to $2,500,000.00  of such commercial general liability coverage, and (iii) at any time Tenant may in its sole discretion self-insure all or any portion of such special form property coverage.  To the extent that Tenant shall self-insure against any risk as permitted hereunder, Tenant does hereby agree to maintain adequate reserves against claims, losses and liabilities arising from causes which would otherwise have been covered by insurance and such self-insurance shall provide Landlord with the same rights and privileges to which Landlord is otherwise entitled under the terms of this Lease when there is a third-party insurer.  All such insurance may be carried in a single policy or a combination of primary and excess liability policies or under a blanket policy covering the Premises and any of Tenant's other stores and be written by a company authorized to do business in the state of the location of the Premises and shall be rated at least A- VIII by AM Best.  Any property policy obtained by Tenant must permit or include a waiver of subrogation in favor of Landlord consistent with the provisions of Section 5.4.  Tenant will provide to Landlord a certificate evidencing the coverage required hereunder and Tenant shall promptly notify Landlord of receipt of any notice of cancellation or non-renewal of the insurance policies required hereunder.

**5.2    Landlord's Insurance.**

(a)    Property Insurance.  From the date on which Landlord commences Landlord's Work until the end of the Term, Landlord will maintain special form (formerly known as all risk) property insurance (not excluding from coverage perils normally included within the definitions of extended coverage, vandalism and malicious mischief, earthquake and flood) insuring the buildings and other structures (including all improvements, alterations, additions and changes thereto) which are located within the Shopping Center, including, without limitation, the building in which the Premises is located, in the amount of 100% of the replacement cost (excluding excavations and foundations), including coverage for building ordinances, increased cost of construction, and demolition costs which may be necessary to comply with building laws.  The insurance required hereby will be written by a company authorized to do business in the state of the location of the Premises with a minimum AM Best rating of A- VIII and will permit or include a waiver of subrogation in favor of Tenant consistent with the provisions of Section 5.4.  Landlord will be responsible for determining the amount of property insurance to be maintained, but such coverage will be on an agreed value basis to eliminate the effects of co-insurance.  Landlord will provide to Tenant a certificate evidencing such coverage and Landlord shall promptly notify Tenant of receipt of any notice of cancellation or non-renewal.

(b)    Liability Insurance.  From the date on which Landlord commences Landlord's Work until the end of the Term, Landlord will also maintain commercial general liability insurance on an occurrence basis against claims on account of bodily injury, death or property damage incurred upon any part of the Common Areas.  Such insurance policy will name Tenant as an additional insured, have combined single limits of not less than $5,000,000 per occurrence and include contractual liability coverage.  The insurance required hereby will be written by a company authorized to do business in the state of the location of the Premises and shall be rated at least A- VIII by AM Best.  Landlord will provide to Tenant a certificate evidencing such coverage and Landlord shall promptly notify Tenant of receipt of any notice of cancellation or non-renewal.

(c)    Proceeds from Property Insurance.  The proceeds of Landlord's property insurance in case of loss or damage will, subject to any requirements of Landlord's mortgagees, be applied on account of the obligation of Landlord to repair and restore the damaged or destroyed buildings and improvements in accordance with Section 12.

**5.3    Indemnities.**

(a)    Tenant's Indemnity.  Subject to Section 5.4, Tenant agrees to indemnify, defend and hold Landlord and Landlord's shareholders, officers, directors, partners, members, managers and employees harmless from and against any and all claims, actions, damages, liabilities and expenses (including, without limitation, reasonable attorneys' fees and expenses) allegedly or actually (i) arising from or out of any accident or occurrence on the Premises or any part thereof, or (ii) occasioned by any act or omission of Tenant or Tenant's employees, agents, contractors, subtenants, licensees or concessionaires, except to the extent that any of the same arise from or out of the gross negligence or willful misconduct of Landlord or Landlord's employees, agents or contractors and are not covered by the commercial general liability insurance maintained by Tenant pursuant to Section 5.1.

(b)    Landlord's Indemnity.  Subject to Section 5.4, Landlord agrees to indemnify, defend and hold Tenant and Tenant's shareholders, officers, directors, partners, members, managers, employees, subtenants, licensees and concessionaires harmless from and against any and all claims, actions, damages, liabilities and expenses (including, without limitation, reasonable attorneys' fees and expenses) allegedly or actually (i) arising from or out of any accident or occurrence on the Common Areas or any part thereof, or (ii) occasioned by any act or omission of Landlord or Landlord's employees, agents or contractors, except to the extent that any of the same arise from or out of the gross negligence or willful misconduct of Tenant or Tenant's employees, agents, contractors, subtenants, licensees or concessionaires and are not covered by the commercial general liability insurance maintained by Landlord pursuant to Section 5.2(b).

5.4    **Waiver of Subrogation**. Landlord and Tenant each hereby expressly waives any and every claim which arises or may arise in such party's favor against the other party and the other party's shareholders, officers, directors, partners, members, managers and employees during the Term for any and all loss of or damage to any of such party's property, located within or upon or constituting a part of, the Premises or Shopping Center, which loss or damage is caused by a peril required by this Lease to be covered by the insurance (or self-insurance) of the party incurring the loss to the extent of the required coverage or, if greater, to the extent of the actual recovery under any insurance policy covering the party incurring the loss; provided, however, to the extent any such losses or damages are caused by the negligence or willful misconduct of the other party or the other party's shareholders, officers, directors, partners, members, managers and employees and all or any portion of such loss is "deductible" or part of a "self- insured retention", then the other party shall pay the amount of such loss to the extent of such parties' negligence or willful misconduct (not to exceed $250,000.00 per event, and hereinafter referred to in this paragraph as the "deductible loss"). Landlord and Tenant each also hereby waives on behalf of any insurer providing insurance to such party, any right of subrogation which such insurer might otherwise acquire against the other party or the shareholders, officers, directors, partners, members, managers or employees of either party by virtue of losses to Landlord or Tenant the claims for which are waived by the preceding sentence.

6.    **MAINTENANCE OF PREMISES**

6.1    **Landlord's Obligations**. At Landlord's sole cost and expense, Landlord will maintain, repair and replace all structural components of the Premises (including, but not limited to, the foundation, bearing walls and roof structure), the exterior walls, floor slab (and, to the extent repair is required due to the condition of the slab or conditions under the slab, the floor coverings), roof system (including membrane), all plumbing, wiring and other utility facilities within or under the floor slab of the Premises, all plumbing, wiring and other utility facilities serving the Premises up to their points of connection with the sub-meter for such utilities serving the Premises, and such portions of the Premises required to be maintained by Landlord under Section 6.2, as necessary to keep the same in good order, condition and repair, ordinary wear and tear and damage by casualty excepted and otherwise keep the roof free of leaks. Subject to reimbursement by Tenant which shall be made within thirty (30) days of receipt of invoices therefore, Landlord shall maintain and repair the heating, ventilating and air conditioning units serving the Premises but located outside the Premises (the "**HVAC System**"). Tenant, and not Landlord, will make repairs otherwise required to be performed by Landlord by this Section 6.1 if such repair is necessitated by the negligence of Tenant or Tenant's employees, agents or contractors, unless the waiver provisions of Section 5.4 apply.    If the performance of any repair required to be made by Landlord pursuant to this Lease precludes the normal operation of Tenant's business from all or any portion of the Premises and Tenant notifies Landlord of such preclusion and such condition continues to exist for a period of 24 hours from transmission of Tenant's notice, then (a) Rent will equitably abate during the performance of such repair in proportion to the nature and extent of the interference with Tenant's normal operation; and (b) if Tenant is precluded from operating its business from 25% or more of the Premises for more than 120 days after Tenant gives Landlord such notice concerning such preclusion, Tenant may terminate this Lease by notice given to Landlord prior to the completion of such repair.

6.2    **Tenant's Obligations**. At Tenant's sole cost and expense, Tenant will maintain, repair and replace the interior of the Premises (except as set forth in Section 6.1), the windows, doors and plate glass of the Premises, all plumbing, wiring and other utility facilities serving the Premises from and after their points of connection with the submeter for such utilities serving the Premises (except for any such facilities within or under the floor slab of the Premises), all improvements, alterations, and fixtures installed in the Premises by Tenant, and, the interior heating, ventilating and air conditioning system serving the Premises, which is limited to fan powered variable air volume units, duct work, and electric and hot water unit heaters  (the "**Interior HVAC System**"), as necessary to keep the same in good order, condition and repair, ordinary wear and tear and damage by casualty excepted. Landlord, and not Tenant, will make repairs otherwise required to be performed by Tenant by this Section 6.2 if such repair is covered by any construction or product warranty of Landlord or is necessitated by (a) the negligence of Landlord or Landlord's employees, agents or contractors, unless the waiver provisions of Section 5.4 apply, (b) shifting or settling of the building containing the Premises, (c) a design defect in the building containing the Premises, (d) a failure by Landlord to perform maintenance or make repairs required under Section 6.1, or (e) any structural defects which may arise in the Shopping Center which affect the Premises.

6.3    **Heating, Ventilating and Air Conditioning**.  The cost of any: (i) replacement of the HVAC System, and (ii) replacement of any major components of such HVAC System which costs in excess of five thousand dollars ($5,000.00), will be borne initially by Landlord and reimbursed by Tenant pursuant to this paragraph (the "**HVAC Replacement**"). Commencing on the tenth (10th) day of the month immediately following the month in which such HVAC Replacement costs are incurred, Tenant shall pay to Landlord, the actual out of pocket third part costs incurred (provided such costs shall not exceed the prevailing market rate), amortized on a straight line basis over ten (10) years (the "**HVAC Reimbursement**"). The HVAC Reimbursement will be due and payable monthly over the Term until the earlier to occur: (i) the termination of this Lease; or (ii) the last day of the one hundred and nineteenth (119th) month immediately following the first payment of the HVAC Reimbursement.

6.4    **Surrender of Premises**.  Upon the expiration or earlier termination of this Lease, Tenant will surrender the Premises to Landlord, broom-clean and in good order and condition, free and clear of debris and all of Tenant's personal property and equipment, ordinary wear and tear and damage by casualty excepted.

7.    **SIGNS**

7.1    **Exterior Signs**.  Subject to the reasonable approval of Landlord and Governmental Authorities, Tenant will have the exclusive right to install on the outside walls of the Premises at the approximate location shown on Exhibit M, provided that any such signs are in compliance with all Laws and provided that Tenant is allocated: (i) 300 square feet on the Nicollet Mall side of the Shopping Center, and (ii) 300 square feet on the 7th Street side of the

Shopping Center.  Notwithstanding the foregoing, subject to approval of Governmental Authorities, Landlord hereby approves the signage drawings attached hereto as Exhibit M, and also hereby approves any future signage to be installed by Tenant that is consistent with Tenant's then typical signage and trade dress.  Should Tenant desire to seek a variance from Laws to expand or modify the signage permitted thereby, Landlord will cooperate with Tenant in seeking same.  During the Term, Tenant will not be required to remove its signs unless required to do so by Laws enacted subsequent to the date hereof.  Tenant may at any time remodel or replace the sign fascia to conform with Tenant's then standard signage so long as such signage does not violate any Laws and is approved by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed.  Tenant will remove all exterior signs (inclusive of all wiring) at the termination of this Lease, and will repair any damage caused by installation, operation or removal of such signs.

7.2    **Other Signs**.  Subject to the reasonable approval of Landlord, Tenant will have the right to install temporary banner signs (such as "Future Home of [one of Tenant's tradenames]," "Opening [Date]," or "Now Open" signs), on the Premises provided the same comply with Laws through the date which is sixty (60) days following the Rental Commencement Date.  Tenant will have the right to affix window or door appliques and other treatments commonly used at Tenant's store locations, including, without limitation, those identifying Tenant's hours of operation or the credit cards accepted by Tenant.  Tenant will remove all signs and appliques at the termination of this Lease, and will repair any damage caused by such removal.

## 8.    TITLE TO PREMISES

8.1    **Ownership of Premises**.  Landlord represents and warrants to Tenant that Landlord is the owner of the Premises and the Shopping Center, that there are no other individuals or entities having an ownership interest in the Premises or the Shopping Center whatsoever except as expressly stated in this Lease and that Landlord has full right, power and authority, corporate and otherwise, to execute this Lease, to lease the Premises and to perform the obligations of Landlord under this Lease.  Landlord has previously delivered to Tenant a commitment of title insurance or title report to evidence that Landlord has title to the Shopping Center, that such title is unencumbered by any matters other than the Permitted Encumbrances and that no liens for delinquent taxes exist against the Shopping Center.

8.2    **Covenant of Quiet Enjoyment**.  Landlord covenants that, subject to the terms of this Lease, Tenant will be entitled to peaceably and quietly enjoy the Premises and all rights and appurtenances thereto during the Term, without molestation or hindrance of any person whomsoever.

8.3    **Non-Disturbance Agreement**.  Within 60 days of the Effective Date, Landlord will deliver to Tenant agreements of non-disturbance from all lienholders or underlying landlords of the Premises in the form and substance of Exhibit E.  If Landlord fails to deliver such agreements of non-disturbance to Tenant within 60 days from the Effective Date, Tenant will have the right at any time thereafter, until same is received and in addition to other remedies available to Tenant, to terminate this Lease by notice to Landlord.  Tenant will also execute any such non-disturbance agreement in the form and substance of Exhibit E to assure such lienholder or underlying landlord of Tenant's attornment to such lienholder or underlying landlord in accordance with the terms hereof.

8.4    **Restrictions**.  Landlord represents and warrants to Tenant that (a) Landlord's title to the Shopping Center is subject only to the Permitted Encumbrances, and none of the Permitted Encumbrances prohibits the use of the Premises as a retail sporting goods store, (b) no joinder or approval of another person is required with respect to Landlord's right and authority to enter into this Lease, (c) the terms and conditions of this Lease, including the exhibits attached hereto, are in compliance with and do not violate the provisions of the Permitted Encumbrances, (d) any approvals required pursuant to the Permitted Encumbrances have been obtained, and (e) all approvals required from any underlying landlords have been obtained.  Following the Effective Date, Landlord shall oppose, and not support, any change in zoning, the conditions of approval, or any other approvals which would have a material adverse impact on Tenant's use of the Premises as a retail sporting goods store.

## 9.    COMPLIANCE

9.1    **As to Premises**.  Tenant will, at Tenant's sole cost and expense, comply in all material respects with all Laws which affect the carrying on of the business being conducted in the Premises, as distinguished from the physical facilities in which such business is being conducted.  Landlord will bear the expense of any alterations or improvements or repairs to the Premises ordered by any Governmental Authority, unless such alterations or improvements or repairs (a) relate solely to the type of business conducted in the Premises by Tenant or the manner in which Tenant is conducting Tenant's business in the Premises, or (b) are required solely by virtue of any alterations undertaken by Tenant pursuant to Section 10.1.

9.2    **As to Common Areas**.  Landlord will, at Landlord's sole cost and expense, take such action as may be necessary or appropriate to cause the Premises at the commencement of the Term, and the Common Areas and other portions of the Shopping Center outside the Premises throughout the entire Term, to comply in all material respects with all Laws of all Governmental Authorities having jurisdiction over the Shopping Center.

9.3    **As to Hazardous Materials**.

(a)    Landlord's Obligations.  Prior to the Effective Date, Landlord delivered to Tenant a copy of a Phase I environmental assessment report concerning the Shopping Center that is in Landlord's possession and was performed in 2010 for Wells Fargo Bank ("**Environmental Report**"), along with a reliance letter from the provider of such Environmental Report.  Landlord represents and warrants that upon completion of Landlord's construction obligations under Exhibit C (i) the Premises will be in compliance with all Environmental Laws, and

(ii) to the best of Landlord's knowledge, except as set forth in the Environmental Report, there will be no Hazardous Materials in, on or about the Premises or Shopping Center in violation of Environmental Laws. During the Term, Landlord will not use, generate, place, store, release or otherwise dispose of, or permit the use, generation, placing, storage, release or disposal of, Hazardous Materials in the Shopping Center, except in accordance with all Environmental Laws. If during the Term Hazardous Materials are discovered in any portion of the Shopping Center or the Premises in violation of Environmental Laws, then unless Tenant is responsible for the remediation of such Hazardous Materials pursuant to Section 9.3(c), Landlord will promptly undertake or cause to be undertaken remediation or removal of the Hazardous Materials in accordance with all Environmental Laws.

(b)     Landlord will also remediate or remove any mold discovered on or about the Premises during the Term, except to the extent such mold was caused by Tenant's activities. If the presence of any Hazardous Materials or mold that Landlord is required to remediate or remove pursuant to this Lease or the remediation or removal thereof precludes the normal operation of Tenant's business from all or any portion of the Premises and Tenant notifies Landlord of such preclusion, then (A) Rent will equitably abate during the performance of such remediation or removal in proportion to the nature and extent of the interference with Tenant's normal operation, and (B) if Tenant is precluded from operating its business from 25% or more of the Premises for more than 120 days after Tenant gives Landlord such notice concerning such preclusion, Tenant may terminate this Lease by notice given to Landlord prior to the completion of such remediation or removal. Landlord will indemnify, defend and hold Tenant and the shareholders, officers, directors, partners, members, managers, employees, agents, contractors, subtenants, assignees, licensees, concessionaires and customers ("**Affiliated Parties**") of Tenant harmless from and against, and reimburse Tenant and Tenant's Affiliated Parties for, all "Hazardous Materials Liabilities" (as defined in Section 9.3(d)) asserted against or incurred by Tenant or Tenant's Affiliated Parties arising out of the acts or omissions of Landlord.

(c)     Tenant's Obligations. During the Term, Tenant will not use, generate, place, store, release or otherwise dispose of Hazardous Materials in the Premises or Shopping Center, except in accordance with all Environmental Laws. In the event of a breach of the foregoing, Tenant will promptly undertake remediation or removal in accordance with all Environmental Laws. Tenant will also remediate or remove any mold discovered on or about the Premises during the Term to the extent such mold was caused by Tenant's activities. Tenant will indemnify, defend and hold Landlord and Landlord's Affiliated Parties harmless from and against, and reimburse Landlord and Landlord's Affiliated Parties for, all Hazardous Materials Liabilities asserted against or incurred by Landlord or Landlord's Affiliated Parties as a result of a breach of Tenant's obligations under this Section 9.3(c).

(d)     Hazardous Materials Liabilities. The term "**Hazardous Materials Liabilities**" as used herein means all claims, damages, losses, forfeitures, expenses or liabilities arising from or caused in whole or in part, directly or indirectly, by a breach by the other party of its representations, warranties or covenants under Section 9.3(a) or (c), including, without limitation, all costs of defense (including reasonable attorneys' fees and other costs of litigation), all consultants' fees, and all costs of investigation, repair, remediation, restoration, cleanup, detoxification or decontamination, and/or preparation and implementation of any closure, remedial action or other required plan.

(e)     Survival. The provisions of this Section 9.3 will survive the expiration or earlier termination of this Lease.

## 10.    ALTERATIONS AND FIXTURES

10.1    **Alterations and Additions**. After completion of initial leasehold improvements, if any, Tenant will not make any exterior or structural alterations or additions to the Premises without the prior written consent of Landlord, which consent will not be unreasonably withheld. Tenant will have the right in its sole discretion to make any interior, nonstructural alterations or additions or perform any interior remodeling of a nonstructural nature. All alterations and additions to the Premises by Tenant must be made in accordance with all Laws and, except, as specified in Section 10.2, will remain at the end of the Term for the benefit of Landlord.

10.2    **Fixtures**. Any trade fixtures, machinery, equipment, shelving, trash compactors, cash registers, signs and other personal property of Tenant will remain the property of Tenant and Landlord agrees that Tenant will have the right, at any time and from time to time during the Term, to remove any of the same which Tenant may have stored or installed in the Premises, and shall remove the same upon termination of this Lease if requested to do so by Landlord; provided, however, that in no event shall Tenant be required to remove millwork, electrical fixtures, mechanical, electrical, plumbing or heating, ventilating or air conditioning or similar permanently installed improvements to the Premises. Tenant, at Tenant's sole cost and expense, will immediately repair any damage occasioned to the Premises by reason of the removal of any such trade fixtures, machinery, equipment, signs and other personal property. All other improvements made by Tenant to the Premises, including, but not limited to, floor coverings, carpeting and partitions, will become the property of Landlord upon expiration or earlier termination of this Lease.

10.3    **Liens**. Tenant will promptly pay for all materials supplied to Tenant and work done for Tenant with respect to the Premises so as to ensure that no lien is filed against any portion of the Shopping Center or Landlord or Tenant's interest therein. If a lien is filed, Tenant will pay, discharge or otherwise secure such lien at its expense within 30 days after receipt by Tenant of notice thereof, failing which Landlord may at its option discharge the lien by paying the amount claimed to be due in court or directly to the lien claimant and the amount so paid, together with all reasonable expenses of Landlord, including reasonable legal fees, will be paid by Tenant to Landlord as Additional Rent.

11.      ASSIGNMENT AND SUBLETTING

        11.1      **Permitted Assignment and Subletting**.  With the prior written consent of Landlord, which consent will not be unreasonably withheld, conditioned or delayed, Tenant will have the right at any time during the Term to assign or sublet the Premises or any portion thereof or to transfer or assign Tenant's interest in this Lease (collectively, "Transfer") to any person or entity.  Notwithstanding the foregoing, but subject to the provisions of Section 11.4, below, Landlord's consent shall be deemed granted to the extent an assignee or subtenant: (i) operates at least 15 stores on a national or regional basis; (ii) uses the Premises in a manner generally consistent with a first class promotional shopping center; and (iii) uses the Premises (A) for a use which is not in violation of the exclusive uses set forth in Exhibit G, is not in violation of any future exclusives granted to tenants operating from 5,000 square feet or more of Floor Area, and is not in violation of any future exclusives granted to tenants for operation of a "fast food" restaurant, and (B) for a primary use which does not conflict with any primary use of the Shopping Center by any other tenant occupying 5,000 square feet or more of Floor Area.  Upon any assignment of this Lease, Tenant will remain liable for all of its obligations hereunder, except that Tenant will be released from all obligations hereunder that arise from and after the date of assignment in the event that the assignee expressly assumes Tenant's obligations hereunder arising from and after the date of assignment and the assignee has a net worth of at least $100,000,000.

        11.2      **Recognition**.  If for any reason this Lease is terminated prior to the expiration of the Term, Landlord agrees such termination will not result in a termination of any "Qualified Sublease" (as defined below) and any Qualified Sublease will continue for the duration of its term and any extensions thereof as a direct lease between Landlord and the subtenant thereunder, with the same force and effect as if Landlord had originally entered into such sublease as the landlord thereunder; provided, however, that (i) Landlord will not be bound by any provision in the Qualified Sublease which creates any rights or remedies in the Qualified Sublease which are greater than the rights and remedies of Tenant under this Lease and (ii) Landlord will not be bound by any provision in the Qualified Sublease which creates obligations upon the landlord thereunder which are greater than Landlord's obligations under this Lease or which would grant rights to the landlord thereunder which are less than the Landlord's rights under this Lease (in which event Landlord will have the rights granted to it under this Lease).  Landlord will execute an instrument evidencing Landlord's agreement to recognize a particular Qualified Sublease in accordance with foregoing provisions within 10 days after notice from Tenant that the subtenant thereunder has requested such an instrument.  As used herein, a "**Qualified Sublease**" means a sublease entered into between Tenant and a subtenant (a) that demises all, but not less than all, of the Premises, (b) the term of which is co-terminus with the then existing Term of this Lease (including any then-exercised Extensions) at the time such sublease is signed, (c) pursuant to which the subtenant is required to pay a base rent at least equal to the Base Rent that would have been payable by Tenant under this Lease, (d) after the execution of which there remains no portion of the Premises that has not been sublet, and (e) the proposed sublease and subtenant would qualify as a "Comparable Replacement Tenant" and satisfy the criteria described in Section 11.1 (i) – (iii), above.

        11.3      **Consideration**.  In the event of any assignment, whether or not requiring Landlord's consent, Landlord shall be entitled to receive, as additional rent hereunder, fifty percent (50%) of any consideration (including, without limitation, payment for leasehold improvements) paid by the assignee for the assignment, and, in the case of a sublease, fifty percent (50%) of the excess of the amount of rent paid for the sublet space by the subtenant over the Base Rent and Additional Rent attributable to the sublet space for the corresponding month. Following an uncured Event of Default by Tenant, Tenant shall assign to Landlord all amounts to be paid to Tenant by any subtenant or assignee and that belong to Landlord and shall direct such subtenant or assignee to pay the same directly to Landlord. Upon Landlord's request, Tenant shall provide Landlord with a detailed written statement of all sums payable by the assignee or subtenant to Tenant, certified to Landlord by Tenant, so that Landlord can determine the total sums, if any, due from Tenant to Landlord under this Section 11.3.

        11.4      **Right to Recapture.**  Tenant shall provide Landlord with not less than thirty (30) days' prior written notice of any proposed Transfer, along with a detailed description of the proposed subtenant and the material terms of the proposed sublease or assignment, and Landlord will have the right, by notice given to Tenant within 30 days after receipt of Tenant's notice, to elect to terminate this Lease and recapture the Premises (or, in the event of a sublease of a portion of the Premises, keep the Lease in effect and recapture the portion of the Premises specified in tenant's notice).  Landlord's election to recapture will be effective on the 60th day after Tenant's receipt of Landlord's recapture notice unless Tenant, within 10 days after receipt of Landlord's recapture notice, notifies Landlord in writing that Tenant withdraws its proposed assignment or sublease, in which case Tenant will not effect the proposed assignment or sublease and this Lease will remain in full force and effect.

        Notwithstanding the forgoing, Landlord's recapture right shall not apply to an Affiliate Transfer.  As used herein an "Affiliate Transfer" means an assignment of this Lease or subletting of all or any portion of the Premises for the Permitted Use to (i) any entity that owns or controls, is owned or controlled by, or is under common ownership or control with, Tenant; (ii) an entity that acquires all, or substantially all, of the assets of Tenant; or (iii) an entity with which, or into which, Tenant is merged or consolidated.

12.      DESTRUCTION OF PREMISES

        12.1      **Notice of Damage and Estimated Repair Time**.  If the Premises or the Shopping Center is damaged in any material respect or destroyed by fire or other casualty ("Casualty"), Landlord will, within 60 days after the date of the Casualty, notify Tenant ("**Landlord's Casualty Notice**") of (a) the percentage of the total Floor Area in the Shopping Center and the percentage of the total Floor Area in the Premises that were damaged or destroyed by the Casualty, and (b) the number of days, from the date of the Casualty, that an architect, engineer or contractor selected by Landlord estimates will be required to complete the repair and restoration.  If neither Tenant,

pursuant to Section 12.2, nor Landlord, pursuant to Section 12.3, elects to terminate this Lease, then the damage or destruction will, at the expense of Landlord, be repaired and restored.

      **12.2**    **Tenant's Right to Terminate**.  If (a) the Premises or such portion of the Common Area (including Parking Facilities to the extent required to be maintained pursuant to Section 4.2, above) as would substantially and adversely affect access to, or parking for, the Premises is damaged or destroyed by Casualty and Landlord's Casualty Notice estimates that it will take longer than 180 days from the date of the Casualty to complete the repair and restoration, or (b) during the last two years of the Term, the Premises is damaged or destroyed by Casualty and Landlord's Casualty Notice estimates that it will take longer than 30 days from the date of the Casualty to complete the repair and restoration, and the damages substantially and adversely affects Tenant's ability to operate in the Premises , then Tenant will have the right to terminate this Lease, effective as of the date of the Casualty, by notice given to Landlord within 15 days after Tenant's receipt of Landlord's Casualty Notice.

      **12.3**    **Landlord's Right to Terminate**.  If (a) more than 50% of the Floor Area of the Shopping Center is damaged or destroyed by Casualty, or (b) during the last two years of the Term, more than 30% of the Floor Area of the Premises is damaged or destroyed by Casualty, then Landlord may elect to terminate this Lease effective as of the date of the Casualty by notice given to Tenant not later than 15 days after Landlord delivers Landlord's Casualty Notice to Tenant, provided that (i) in the case of clause (a) above, (A) if the Premises were damaged or destroyed by the Casualty, then Landlord also terminates the leases of all premises in the Shopping Center that were similarly damaged or destroyed, and (B) if the Premises were not damaged or destroyed by the Casualty, then Landlord also terminates the leases of all premises in the Shopping Center, and (ii) in the case of clause (b) above, if Tenant exercises its option to extend the Term for the next Extension (if one which Tenant then has the right to exercise remains unexercised) within 15 days after delivery of Landlord's termination notice, Landlord's termination notice will be deemed null and void.

      **12.4**    **Landlord's Repair Obligation**.  Landlord's obligation will be to restore all portions of the Shopping Center (including the Premises, if applicable) affected by a Casualty (exclusive of Tenant's furniture, fixtures and equipment) to their condition immediately preceding such Casualty and will not be limited to the extent allowed by available insurance proceeds.  If Landlord for any reason whatsoever fails (a) to commence the repair and restoration work required by Section 12.1 and this Section 12.4 within 90 days from the date of the Casualty, (b) to proceed diligently to complete such repair and restoration work, or (c) to complete same within 60 days following the estimated time set forth in Landlord's Casualty Notice, plus the number of days of delay caused by Uncontrollable Events, then in addition to any other rights or remedies available to Tenant under Section 14.2, Tenant will have the option (i) to terminate this Lease by giving Landlord notice of Tenant's election to do so at any time prior to the completion of such repairs and restoration and upon the giving of such notice, this Lease will terminate and the parties will be liable for their respective obligations to the date of termination and will have no liability for obligations arising after that date, except for those obligations which expressly survive termination, or (ii) to complete the repair and restoration work itself, in which case Landlord will make the insurance proceeds available to Tenant for the completion of such work and to the extent the insurance proceeds actually received by Tenant are insufficient to pay for all costs incurred by Tenant in connection with such work, Landlord will reimburse Tenant for all such costs within 30 days after Tenant's request and if Landlord fails to reimburse Tenant within such 30 day period, Tenant may deduct all such costs from the next accruing amounts of Rent due under this Lease.

      **12.5**    **Abatement of Rent**.  From the date of a Casualty until 60 days after the later of (a) the date on which the repair and restoration required by Section 12.4 is Substantially Complete and possession of the Premises is delivered to Tenant, or (b) the expiration of the estimated repair period set forth in Landlord's Casualty Notice, Rent will equitably abate in proportion to the nature and extent of the interference with Tenant's normal operation of its business from the Premises.  If Tenant has paid any Rent in advance, Landlord will immediately repay to Tenant an amount equal to that portion of any Rent paid in advance for which payment is abated.

**13.**    **EMINENT DOMAIN**

      **13.1**    **Total Taking**.  If the whole of the Premises or the Shopping Center is acquired or condemned by, or transferred under threat of, eminent domain for any public or quasi-public purpose (a "**Taking**"), this Lease will terminate as of the date possession of the Premises is transferred to the condemning authority.  If this Lease is terminated by virtue of a Taking, all Rent will be paid up to the date of termination of this Lease.

      **13.2**    **Tenant's Right to Terminate**.  If so much of the Premises or Common Areas is subject to a Taking that, in Tenant's reasonable business judgment, the portion of the Premises and Common Areas remaining after the Taking will be insufficient to continue Tenant's business at substantially the same scope as existed prior to the Taking, then Tenant may terminate this Lease by notice to Landlord effective as of the date possession of the Premises is transferred to the condemning authority.

      **13.3**    **Landlord's Right to Terminate**.  If so much of the Shopping Center is subject to a Taking that, in Landlord's reasonable business judgment, the portion of the Shopping Center remaining after the Taking will be insufficient to operate in an economically viable manner as a retail shopping center, then Landlord may terminate this Lease by notice to Tenant effective as of the date possession of the Shopping Center is transferred to the condemning authority, provided that Landlord terminates the leases of substantially all of the other premises in the Shopping Center.

      **13.4**    **Partial Taking of Premises**.  In the event a Taking occurs and this Lease is not terminated as provided above, then Landlord will promptly restore, at Landlord's sole cost and expense, all portions of the Shopping Center (including the Premises, if applicable) affected by the Taking to a condition comparable to their

condition immediately preceding the Taking, less the portion lost in the Taking. In such event, this Lease will continue in full force and effect, except that from and after the Taking (a) Base Rent will be reduced in proportion to the reduction, if any, in the fair market value of the Premises as a result of the Taking, and (b) Additional Rent for Common Area Charges and Real Estate Taxes will be reduced in proportion to the reduction, if any, in the Floor Area of the Premises as a result of the Taking.

       **13.5**    **Award**. In the event of any condemnation or taking, whether partial or total, each party will have the right to claim and recover from the condemning authority the amount of actual provable damage to such party.

## 14.    DEFAULT

       **14.1**    **Tenant's Default**. Each of the following events will be deemed to be an event of default by Tenant under this Lease ("**Event of Default**"): (a) failure by Tenant to pay any Rent or any other amounts due and payable under this Lease, if such failure continues for 5 business days after receipt by Tenant of notice from Landlord specifying such default; or (b) failure by Tenant to perform or observe any of Tenant's nonmonetary covenants contained in this Lease within 30 days after receipt by Tenant of notice from Landlord specifying the failure (or such additional period, if any, as may be reasonably required to cure the failure if the failure reasonably cannot be cured within a 30-day period, provided Tenant commences to cure within 30 days after receipt of notice and thereafter diligently pursues such cure to completion, up to a maximum of 120 days in total); or (c) Tenant ceases doing business as a going concern on a company wide basis, makes an assignment for the benefit of creditors, is adjudicated as insolvent, files a petition (or files an answer admitting the material allegations of such petition) seeking for Tenant any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar arrangement under any state or federal bankruptcy or other law, or Tenant consents to or acquiesces in the appointment, pursuant to any state or federal bankruptcy or other law, of a trustee, receiver or liquidator for the Premises, for Tenant or for all or any substantial part of Tenant's assets; or (d) Tenant fails within sixty (60) days after the commencement of any proceedings against Tenant seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any state or federal bankruptcy or other legal requirement, to have such proceedings dismissed, or Tenant fails, within sixty (60) days after an appointment pursuant to any state or federal bankruptcy or other legal requirement without Tenant's consent or acquiescence, of any trustee, receiver or liquidator for the Premises, for Tenant or for all or any substantial part of Tenant's assets, to have such appointment vacated; or (e) Tenant is unable, or admits in writing its inability, to pay its debts as they mature. On the occurrence of any Event of Default, Landlord will have the option to terminate this Lease, terminate Tenant's right to possession without terminating this Lease, or cure the Event of Default on behalf of Tenant. If Landlord cures an Event of Default on behalf of Tenant, Tenant will, on demand and as Additional Rent, reimburse Landlord for Landlord's expenses incurred thereby, plus interest from the date incurred until paid by Tenant at the Interest Rate. If Landlord terminates either this Lease or Tenant's right to possession of the Premises, Tenant will immediately surrender the Premises to Landlord. If Tenant fails to surrender the Premises, Landlord may enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying the Premises or any part thereof. Any termination only of Tenant's right to possession of the Premises will not relieve Tenant of Tenant's obligation to pay the Rent under this Lease on the days originally set forth in this Lease for payment, without acceleration. Following any Event of Default, Landlord will use reasonable efforts to mitigate any damages incurred by Landlord and to relet the Premises but, as to Tenant shall remain liable for the equivalent of the amount of all rent reserved herein less the net proceeds, if any, of reletting. In determining the amount of loss which Landlord suffers by reason of termination of this Lease, allowance will be made for the expense of repossession and any necessary repairs, leasing commissions, and other costs of reletting. Any and all monthly deficiencies so payable by Tenant shall be paid monthly on the date herein provided for the payment of rent.

       **14.2**    **Landlord's Default**. In the event Landlord fails to perform on or before the required date for performance any obligation set forth in this Lease to be performed by Landlord, and such failure continues for 30 days after receipt by Landlord of notice from Tenant (or such additional period, if any, as may be reasonably required to cure the failure if the failure reasonably cannot be cured within a 30-day period, provided Landlord commences to cure within 30 days after receipt of notice and thereafter diligently pursues such cure to completion), Tenant may (a) obtain such remedy or relief as may be available at law or in equity, or (b) after not less than 30 days prior written notice, perform such obligations on behalf of Landlord. Notwithstanding the foregoing, if the Premises are in need of emergency repair and Landlord fails to perform the same immediately upon notice from Tenant (which notice, notwithstanding the provisions of Section 17.12, may be given verbally to Landlord's managing agent for the Shopping Center), Tenant may proceed to make such repairs as are reasonably necessary to protect persons or property. In the event Tenant performs any of such obligations of Landlord pursuant to the preceding sentence or clause (c) above, Landlord will, on demand, reimburse Tenant for Tenant's expenses incurred thereby. If Landlord fails to reimburse Tenant for such expenses within 30 days from Tenant's demand therefor, Tenant may deduct the amount of such expenses, plus interest thereon at the Interest Rate from the date incurred until the date so offset, from the next accruing amounts of Rent due under this Lease. No deduction from Rent or reimbursement by Tenant in accordance with this Section 14.2 will constitute a default or breach by Tenant under this Lease.

       **14.3**    **No Additional Notice or Cure Period**. To the extent that any rights or remedies are provided in a provision of this Lease other than Section 14.1 or 14.2, such rights or remedies will be independent of Section 14.1 or 14.2, as applicable, and will not be subject to any additional notice requirement or cure period set forth in Section 14.1 or 14.2.

       **14.4**    **Estoppel and Waiver**. No breach under this Lease will be deemed to have been waived, nor will either party be guilty of laches, because of the failure of either party to take action pertaining to such breach.

       **14.5**    **Remedies Cumulative**. The rights and remedies given to Landlord and Tenant in this Lease are distinct, separate and cumulative remedies, and the exercise of any one or more of them will not be deemed to

exclude Landlord's or Tenant's rights to exercise any or all of the others which are given in this Lease, or at law or in equity, unless such remedies are expressly excluded.

**14.6    Litigation, Court Costs and Attorneys' Fees**.  In the event that at any time either Landlord or Tenant institutes any action or proceeding against the other relating to the provisions of this Lease or any default hereunder, the prevailing party in such action or proceeding will be entitled to recover from the other party reasonable and necessary costs and attorneys' fees.

**14.7    Defaults by Assignees or Subtenants**.  In the event this Lease is assigned or sublet by Tenant and Tenant remains liable for the performance of the obligations of "Tenant" under this Lease, and should any default occur requiring notice as provided in this Section 14, Landlord will furnish Tenant with a copy of the notice at the same time such notice is sent to the assignee or subtenant.

## 15.    SUBORDINATION

**15.1    Landlord's Mortgagees**.  Within 30 days after receipt of Landlord's written request, Tenant will execute and deliver to Landlord an agreement in the form and substance of <u>Exhibit E</u> subordinating Tenant's rights to the lien of any first mortgage now or hereafter encumbering the Premises.  Tenant, however, will not be required to subordinate Tenant's rights hereunder to any mortgage unless and until the holder of such mortgage executes and delivers to Tenant a written non-disturbance agreement also in the form and substance of <u>Exhibit E</u>.  As compensation for Tenant's cost of review, Landlord will pay Tenant $500 for each subordination agreement requested by Landlord during the Term.

**15.2    Landlord's Liens**.  Landlord hereby waives and releases  any liens which Landlord may have against Tenant's owned or leased personal property, trade fixtures or equipment or against Tenant's merchandise, cash or accounts receivable, whether such lien is statutory, constitutional or contractual, or arises out of operation of law or otherwise.

## 16.    OTHER TENANCIES AND USE

**16.1    On-Going Co-Tenancy Requirement**.  If at any time after the Rental Commencement Date the On-Going Co-Tenancy Requirement is not satisfied, and Tenant's Gross Sales measured year by year decline by more than twenty percent (20%), all Base Rent will be abated until such time as the On-Going Co-Tenancy Requirement is satisfied, and in lieu thereof, Tenant will pay Alternative Rent to Landlord on a monthly basis, 45 days after the end of each calendar month.  If the non-satisfaction of the On-Going Co-Tenancy Requirement continues for a period of 12 months beyond the date that Tenant is first entitled to pay Alternative Rent instead of Base Rent ("**Co-Tenancy Cure Period**"), then Tenant will have the right at any time thereafter until the On-Going Co-Tenancy Requirement is satisfied to terminate this Lease by notice to Landlord; provided that Landlord will have the right, by notice given to Tenant not earlier than 30 days prior to the end of the Co-Tenancy Cure Period, to require that Tenant elect either to terminate this Lease effective as of a date selected by Tenant that is not less than 30 nor more than 60 days from the date of Landlord's notice requiring that Tenant make such election or to resume paying full Base Rent (instead of Alternative Rent) effective as of the first day of the month following the month in which Landlord's notice is delivered to Tenant (and if Tenant fails to notify Landlord of Tenant's election to terminate this Lease within 30 days after delivery of Landlord's notice, Tenant will be deemed to have elected to resume paying full Base Rent).  Upon any such termination, the parties will be liable for their respective obligations to the date of termination and will have no liability for obligations arising after that date, except for those obligations which expressly survive termination.

**16.2    Exclusive Use**.

(a)    <u>Limitation on Use</u>.  During the Term no premises or space in, or portion of, the Shopping Center, other than the Premises, will be used for the retail sale of sporting goods, sports apparel or athletic footwear, provided that such exclusive will not apply to (i) the incidental sale of any of such merchandise by an occupant so long as the retail display space in such occupant's premises that is used for the display of such merchandise (including shelf space and allocable aisle space) is of a size not greater than the lesser of 500 square feet of Floor Area or 10% of such occupant's total Floor Area, (ii) a full service department store tenant (by way of example, TJ Maxx, Kohl's, Marshall's, Nordstrom Rack, Saks Off Fifth), or (iii) a full service fitness center selling branded items.  As used herein, "**athletic footwear**" means footwear associated with sports and sport purposes (including, without limitation, running, jogging and aerobic activity).  This Section 16.2(a) will not apply to any tenant whose lease was fully executed on the Effective Date hereof and is identified on <u>Exhibit G</u> as an "**Existing Lease Not Subject to Tenant's Exclusive;**" provided, however, that this exception will not apply (i) Landlord permits or agrees to an expansion of the premises for any such permitted use which violates Tenant's exclusive if Landlord has the right, by virtue of the provisions of the existing lease or otherwise, to withhold such permission or agreement, or (ii) Landlord permits or agrees to the change of a permitted use by any such tenant or its successors or assigns to a use which violates Tenant's exclusive if Landlord has the right, by virtue of the provisions of the existing lease or otherwise, to withhold such permission or agreement, or (iii) Landlord permits or agrees to an assignment or sublease of such existing lease to an assignee or subtenant who may use the premises for a use which violates Tenant's exclusive if Landlord has the right, by virtue of the provisions of the existing lease or otherwise, to withhold such permission or agreement, or (iv) Landlord has the right, by virtue of the provisions of the existing lease or otherwise, to cause such tenant to honor the exclusive granted to Tenant by giving such existing tenant notice of this exclusive or otherwise.  Tenant's exclusive rights contained in this paragraph shall automatically cease to exist to the extent at any time during the Term, Tenant has ceased operating for business from the Premises for a continuous period of one hundred and eighty (180) days (excluding any permitted closures under this Lease, including but not limited to, remodeling, damage and destruction and condemnation).

(b) <u>Remedy of Tenant</u>. Landlord acknowledges that the granting of the exclusive contained in Section 16.2(a) is a material inducement to Tenant's agreement to enter into this Lease and the enforcement of this exclusive is integral to the economic viability of the Shopping Center to Tenant. Landlord agrees to enforce such exclusive and the statement of Tenant's remedies specified below will not be deemed to excuse Landlord from such enforcement. If any person or entity violates the exclusive granted to Tenant in Section 16.2(a), or if any person or entity uses premises in the Shopping Center in violation of Section 16.3 or 16.4 below, Landlord will promptly commence appropriate legal proceedings, and vigorously prosecute the same, to enjoin and prohibit any such violation. If Landlord fails to commence such proceedings, or fails thereafter to vigorously prosecute the same, Tenant will have the right (i) to conduct and prosecute such legal proceedings (including, without limitation, an action for injunctive relief) in its own name, but at Landlord's expense, or (ii) in the event the right set forth in (i) above is not permitted to be exercised under Laws, to conduct and prosecute such legal proceedings in the name of Landlord, at Landlord's expense, and Landlord agrees to cooperate with Tenant with respect to such prosecution (including, without limitation, executing any documentation or authorization reasonably required by Tenant in connection with such prosecution and by appearing at any hearing or trial with respect to such prosecution). In addition, if any person or entity violates the exclusive granted to Tenant in Section 16.2(a) as a result of Landlord's failure to include appropriate restrictions in leases and occupancy agreements entered into following the Effective Date, the prosecution of any legal proceedings shall be at Landlord's sole cost and expense, and the Base Rent payable hereunder will be reduced to the lesser of (1) 50% of Base Rent, or (2) Alternative Rent for the period commencing 30 days after the date Tenant gives Landlord notice of such violation and continuing for so long as such violation continues, and Tenant will have all the following remedies, as well as any other remedy given to it at law and in equity: the right to obtain injunctive relief, to terminate this Lease or to commence and prosecute an action against Landlord for damages. Upon any such termination, the parties will be liable for their respective obligations to the date of termination and will have no liability for obligations arising after that date, except for those obligations which expressly survive termination.

**16.3    Prohibited Uses**. Neither Tenant nor its subtenants, assignees, licensees or concessionaires will use or lease (or permit the use, lease or sublease of) the Premises or any portion thereof during the Term allowing for use as any of the "Prohibited Uses" (as defined below). Neither Landlord nor any entity controlled by Landlord will use or lease (or permit the use, lease or sublease of) or sell any space in or portion of the Shopping Center during the Term allowing for use as any of the Prohibited Uses. As used herein, the "**Prohibited Uses**" means those uses prohibited by <u>Exhibit H</u>. Subject to the Prohibited Uses in <u>Exhibit H</u> and the exclusive rights set forth in <u>Exhibit G</u>, Tenant may operate the Premises for any lawful purpose that is compatible with a first class promotional shopping center.

**16.4    Rules and Regulations**. Tenant shall at all times comply with the Rules and Regulations of the Shopping Center, as more particularly set forth on <u>Exhibit J</u>. In the event of a conflict between this Lease and the Rules and Regulations, the Lease shall prevail and control. Specifically, (i) Tenant shall be permitted to keep in the Premises or the building guns, firearm, explosive devices or ammunition for retail sale to its customers, and (ii) Tenant shall be permitted to access and stock the Premises at Tenant's convenience, without restriction, provided that, at certain times when the Common Areas are closed to the general public, access may only be available from the Loading Dock Entrance.

**16.5    Other Exclusives**. Tenant will be subject to the exclusive use restrictions listed on <u>Exhibit G</u> for so long as such exclusive use restrictions remain effective to restrict the use of the Premises.

**16.6    Implications as to Operation/Opening Covenant**.

(a) Nothing in this Lease will be interpreted to obligate Tenant to open or operate, continuously or otherwise, a business in the Premises, except to the extent expressly set forth in Section (b) below. No implication will be made concerning the use or operation of the Premises from the manner in which Rent is paid or from the amounts of Rent paid. Notwithstanding anything to the contrary, after initially satisfying the Opening/Operating Covenant, Tenant shall have no opening or operating obligations or covenants of any kind, provided, however, to the extent Tenant ceases operations from the Premises for a period of one hundred and eighty (180) days or more (for reasons other than casualty, remodeling or force majeure), Landlord shall have the option, as its sole and exclusive remedy, exercisable in the sole, absolute and subjective discretion of Landlord at such time as Landlord may elect, to terminate this Lease by sending written notice of termination on Tenant which shall become effective on the 30th day following its receipt or refusal by Tenant. In the event of a termination hereunder, the parties hereto shall automatically be released from any and all liability of whatever kind for the terminated portion of the unexpired term, except as otherwise expressly provided in this Lease as to obligations that survive the expiration or sooner termination of this Lease. Nothing herein shall be deemed to affect Tenant's obligation to pay Rent, or to perform any other obligations under this Lease, accruing prior to the effective date of any termination by the Landlord. Upon any termination of this Lease pursuant to this Section 16.6, Tenant shall remove so much of the alterations to the Premises as Landlord may direct, and repair all damage caused by such removal. Tenant's obligations pursuant to the provisions of this Section 16.6 shall survive any such termination of this Lease.

(b) Notwithstanding the foregoing, expressly subject to the Initial Co-Tenancy Requirement, Tenant shall open for business to the public from the Premises, fully stocked, staffed and fixtured as a "Sport's Authority" sporting goods store engaged in the retail sale of sporting goods, sports apparel or athletic footwear by no later than two hundred and forty (240) days from the Commencement Date, and to thereafter operate for a period of one(1) year from the date of such opening (the "**Opening/Operating Covenant**"). In the event of Tenant's failure to satisfy the Opening/Operating Covenant, Landlord shall have the option, exercisable in the sole, absolute and subjective discretion of Landlord as such time as Landlord may elect prior to such time as Tenant shall have complied with the provisions of this Section 16.6(b), to terminate this Lease in the manner described in Section 16.6(a), above, by sending written notice of termination to Tenant.

    **16.7**    **Acknowledgement of Firearms**. Landlord acknowledges that firearms are sold by Tenant in the ordinary course of Tenant's business as a full-line sporting goods store. Landlord agrees to execute any documents or acknowledgements required by the Bureau of Alcohol, Tobacco, Firearms and Explosive regarding Tenant's sale of firearms, at Tenant's sole cost and expense; provided however, no such document or acknowledgement will increase the obligations or liabilities of Landlord under this Lease. Tenant will devote no more than 2,500 square feet of the Floor Area of the Premises to the sale of firearms and ammunition.

## 17.    MISCELLANEOUS

    **17.1**    **Relationship of Parties**. The amount of money provided to be paid Landlord will in no event be deemed to make Landlord a partner or an associate of Tenant in the conduct of Tenant's business, nor will either party be liable for any debts incurred by the other party in the conduct of the other party's business. The relationship between the parties is for the entire Term that of landlord and tenant.

    **17.2**    **Heirs, Successors and Assigns**. This Lease and the covenants and agreements herein contained will be binding upon, and inure to the benefit of, the parties hereto and their respective heirs, executors, administrators, successors, and assigns.

    **17.3**    **Governing Law**. This Lease will be governed by, construed in accordance with and enforced under the laws of the state in which the Shopping Center is located.

    **17.4**    **Rules of Construction**. This Lease will be construed with equal weight for the rights of both parties, the terms hereof having been determined by fair negotiation with due consideration for the rights and requirements of both parties.

    **17.5**    **Materiality of Covenants**. Every covenant contained in this Lease will be construed to be material, whether or not the covenant expressly so provides.

    **17.6**    **Severability**. If any term or provision of this Lease is found to be invalid, illegal or unenforceable, the remaining terms and provisions hereof will not be affected thereby; and each term and provision hereof will be valid and enforceable to the fullest extent permitted by Laws.

    **17.7**    **Entire Agreement; Amendment**. This Lease contains the entire agreement between Landlord and Tenant with respect to the subject matter of this Lease and may be amended or modified only by subsequent written agreement duly signed by both parties hereto. Except for those warranties, representations, contingencies, conditions and/or agreements set forth in this Lease, no warranties, representations, contingencies, conditions, and/or agreements have been made by Landlord or Tenant, one to the other or between them, with respect to the subject matter of this Lease. Landlord and Tenant acknowledge that the provisions of this Lease have been negotiated and agreed to between Landlord and Tenant and that this Lease reflects the agreement and understanding of each party. No action, verbal statement or written statement by any employee, agent or representative of either party to this Lease (other than an amendment signed by both parties) will be construed to amend or modify this Lease nor to diminish or discharge any of the rights and obligations of either party hereunder.

    **17.8**    **Gender, Number**. Pronouns in this Lease importing any specific gender will be interpreted to refer to corporations, partnerships, men and women, as the identity of the parties referred to may require. Pronouns, verbs and/or other words in this Lease importing the singular number will be interpreted as plural words, as the identity of the parties or objects referred to may require.

    **17.9**    **Headings**. The captions, section numbers and paragraph numbers appearing in this Lease are inserted only as a matter of convenience and in no way define, amplify, limit, construe or describe the scope or interest of any section of this Lease.

    **17.10**    **Section Numbers**. All references to section numbers contained in this Lease are to the sections of this Lease, unless expressly provided to the contrary.

    **17.11**    **Memorandum of Lease**. Landlord and Tenant will execute contemporaneously with the execution of this Lease, a Memorandum of Lease in the form attached hereto as <u>Exhibit I</u> for recording purposes. The party desiring to record the Memorandum of Lease, if at all, will do so at its own cost and expense.

    **17.12**    **Notices**. All notices or requests given, sent or required to be given with respect to any matter pertaining to this Lease must be in writing and must be sent by nationally recognized overnight courier service, such as, but not limited to, Federal Express, by certified mail with return receipt requested, or by express mail, in each case with charges billed to the sender or proper postage prepaid, as applicable, and will be deemed given on the date received (or refused) when addressed to the parties at Landlord's Notice Address, in the case of notices to Landlord, or at Tenant's Notice Address, in the case of notices to Tenant, or in either case to such other addresses as Landlord or Tenant may designate to the other by notice.

    **17.13**    **Confidentiality of Lease Terms**. Landlord will treat the monetary and operating terms and conditions of this Lease as confidential and will not divulge same to any person other than any existing or prospective mortgagee of the Shopping Center or any prospective purchaser of Landlord's interest in this Lease or as required by Laws. Landlord will not furnish copies of all or any part of this Lease to a person other than to a party described in the preceding sentence.

**17.14    Brokers.**  Tenant agrees that Tenant will not present any broker or agent to Landlord for payment of any brokers', agents' or finders' fees or commissions due as a result of the execution of this Lease or the performance of the terms and provisions contained herein, except for fee(s) or commission(s) due to any Broker(s) named in Section 1.1(t).  Landlord will be solely responsible for the payment of any fees or commissions due with respect to this Lease.

**17.15    Force Majeure.**  In the event that Landlord or Tenant cannot commence or complete the work or perform any other obligation of such party hereunder by the date specified therefor because of strikes, lockouts, labor disputes, acts of God, war, civil commotion, fire or other casualty, or other cause beyond the reasonable control of such party ("**Uncontrollable Events**"), the time for the commencement or the completion of the work or the performance of such obligation will be automatically extended for the period of delay due to the Uncontrollable Event, but in no event will such extension be for a period of more than 60 days.  Notwithstanding anything to the contrary contained in this Lease, in no event will this Section 17.15 be construed to:  (a) excuse or delay the performance of a monetary obligation by either party; or (b) require Tenant to accept delivery of the Premises or to commence fixturing on other than a Permitted Delivery Date.  In order for either Landlord or Tenant to avail itself of the rights granted in this Section 17.15, that party must notify the other party within 10 days of the beginning and the end of the occurrence of an Uncontrollable Event.

**17.16    Intentionally Omitted.**

**17.17    Specially Designated Nationals and Blocked Persons List.**  Tenant represents and warrants to Landlord that neither Tenant nor any person or entity that owns or controls, is owned or controlled by or is under common ownership or control with Tenant, and Landlord represents and warrants to Tenant that neither Landlord nor any person or entity that owns or controls, is owned or controlled by or is under common ownership or control with Landlord (a) is listed on the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Asset Control, Department of the Treasury pursuant to Executive Order No. 13224, 66 Federal Register 49079 (September 25, 2001) or (b) has been convicted, pleaded nolo contendere, indicted, arraigned or custodially detained on charges involving money laundering or predicate crimes to money laundering.

Having read and intending to be bound by the terms hereof, the parties have signed this Lease on the date(s) set forth below.

**TENANT:**

TSA STORES, INC., a Delaware corporation

By:  _____
      Michael E. Foss
      Chief Executive Officer

Date of execution by Tenant: _February 4_, 20_15_

By:  _____
      Lon B. Novatt
      Senior Vice President - Real Estate

Date of execution by Tenant: _February 4_, 20_15_

**LANDLORD:**

SRI Ten City Center, LLC,
a Delaware limited liability company

By:  _____
      Ronnie E. Ragoff
      Vice President

Date of execution by Landlord: _February 5_, 20_15_

## Exhibit A

### LEGAL DESCRIPTION OF THE LAND

The land located in Hennepin County, Minnesota, legally described as:

Parcel 1

Tract A, Registered Land Survey No. 1573, files of the Registrar of Titles, County of Hennepin, State of Minnesota.

Parcel 2

Tracts A, B, C, D, E, F, G H, I, J, K, L, M, N, 0, P, Q, R, S, T, U, V and W, Registered Land Survey No. 1574, files of the Registrar of Titles, County of Hennepin, State of Minnesota.

## Exhibit B

### SITE PLAN

[to be provided by Landlord]

Site Plan must identify:

Premises (Section 1.1(e))

Marshall's Premises (Section 1.1(l)

Protected Accessway (Section 4.4)



33 South Sixth Street

Floor 01

FIELD VERIFICATION OF ALL DIMENSIONS AND EXISTING CONDITIONS ARE THE RESPONSIBILITY OF ALL DESIGN AND/OR CONSTRUCTION PROFESSIONALS USING THESE DOCUMENTS. NO REPRESENTATION OF THE ACCURACY OF THESE DOCUMENTS IS PROVIDED.

CAD FILE:

SCALE:
None

EXISTING WALL
PROPOSED WALL

SHORENSTEIN

Loading Dock Entrance

Nicollet Mall Entrance

Premises

Exit Corridor





33 South Sixth Street

Floor C1

CAD FILE:

SCALE:
None

Marshalls Premises

SHORENSTEIN

FIELD VERIFICATION OF ALL DIMENSIONS AND EXISTING CONDITIONS ARE THE RESPONSIBILITY OF ALL DESIGN AND/OR CONSTRUCTION PROFESSIONALS USING THESE DOCUMENTS. NO REPRESENTATION OF THE ACCURACY OF THESE DOCUMENTS IS PROVIDED.

EXISTING WALL

PROPOSED WALL

Exhibit C

CONSTRUCTION PROVISIONS

1. <u>Definitions</u>. For purposes of this Lease: (a) "**Landlord's Work**" means all work to be performed by Landlord pursuant to Article 4 of this <u>Exhibit C</u>; (b) "**Tenant's Work**" means all work to be performed by Tenant pursuant to Article 5 of this <u>Exhibit C</u>; (c) "**Projected Delivery Date**" means June 21, 2015, subject to extension to the extent delivery is delayed as a result of "Uncontrollable Events" (as defined in Section 17.15); and (d) "**Delivery Deadline**" means November 22, 2015, subject to extension to the extent of "Uncontrollable Events".

2. <u>Permits</u>. Landlord will use commercially reasonable efforts to procure, at Landlord's sole cost and expense, all building and other permits or licenses required for the construction of Landlord's Work. Tenant will use commercially reasonable efforts to procure, at Tenant's sole cost and expense (except as provided in Article 6 below), all building and other permits or licenses required for the construction and occupancy of Tenant's Work and all permits or licenses required for the installation of all signs to be installed by Tenant pursuant to Section 7.1 of the Lease (collectively, the "**Permits**"). Landlord agrees to fully cooperate and assist Tenant in obtaining all required Permits, and in obtaining an unconditional certificate of occupancy for the Premises. If any applicable governmental authorities require any alterations or changes to the Common Areas as a condition to the issuance of Tenant's Permits, Tenant will notify Landlord of the same and Landlord will, at its sole cost, promptly perform such alterations or changes to the Common Areas. If Tenant is unable to obtain all Permits (exclusive of all permits or licenses required for the installation of all signs to be installed by Tenant pursuant to Section 7.1 of the Lease) required for the performance of Tenant's Work by the date which is 90 days following Landlord's Delivery, then (a) either Landlord or Tenant may terminate this Lease by notice given to the other at any time prior to the date on which Tenant obtains all of such Permits (and in the event of such termination, Landlord and Tenant will be released from all liability under the Lease), and (b) the Commencement Date and/or the Rental Commencement Date will be postponed, to the extent such date(s) would otherwise occur sooner pursuant to the terms of this Lease, until the day on which Tenant first opens the Premises for business.

3. <u>Plan Preparation and Approval</u>.

3.1.        <u>Landlord's Work Plans</u>. Landlord, at its sole cost and expense, will cause licensed architects and engineers selected by Landlord to prepare and submit to Tenant (or to individuals or entities as directed by Tenant), two sets of Landlord's working plans and specifications ("**Preliminary Plans**"). The Preliminary Plans for Landlord's Work will be reviewed by Tenant or its representatives for approval prior to commencement of construction. After receipt of the Preliminary Plans for Landlord's Work, Tenant, within 5 business days of proper submission of same, will inform Landlord of any reasonably required revisions or corrections thereto and, within 5 business days thereof, Landlord will make such revisions or corrections and resubmit two complete sets of the Preliminary Plans for Tenant's final approval. All subsequent submissions and revisions/approvals will be made within 5 business days. If within 5 business days after delivery, Tenant fails to respond to any Preliminary Plans for Landlord's Work or any revisions thereto, and if such failure to respond continues for more than 5 days after Landlord delivers notice of such failure to Tenant, then Tenant will be deemed to have approved the Preliminary Plans as delivered. If within 5 business days after delivery, Landlord fails to respond to any written request delivered by Tenant to Landlord for revisions to any Preliminary Plans for Landlord's Work previously submitted by Landlord to Tenant, and if such failure to respond continues for more than 5 business days after Tenant delivers notice of such failure to Landlord, then Landlord will be deemed to have approved the revisions to the Preliminary Plans as requested by Tenant. Upon approval (or deemed approval), the Preliminary Plans for Landlord's Work will become the final construction documents ("**Final Plans**") for Landlord's Work. No alterations will be made to the Final Plans for Landlord's Work without the prior written consent of Tenant.

3.2.        <u>Tenant's Work Plans</u>. Tenant, at Tenant's cost and expense (except as provided in Article 6 below), will cause licensed architects and engineers selected by Tenant to prepare and submit to Landlord (or to individuals or entities as directed by Landlord) two sets of Preliminary Plans for Tenant's Work. The Preliminary Plans for Tenant's Work will be subject to review and approval by Landlord or its representatives, provided such review and approval will be limited to ensuring that the Tenant's Work called for by the Preliminary Plans comply with the requirements of Article 5 below and local Laws and are compatible with Landlord's Work. After receipt of the Preliminary Plans for Tenant's Work, Landlord, within 10 days of proper submission of same, will inform Tenant of any required revisions or corrections thereto and, within 10 business days thereof, Tenant will make such revisions or corrections and resubmit two complete sets of the Preliminary Plans for Landlord's final approval. All subsequent submissions and revisions/approvals will be made within 10 business days. Upon approval, the Preliminary Plans for Tenant's Work will become the Final Plans for Tenant's Work. No alterations that would affect the compliance of Tenant's Work with the requirements of applicable Laws, or the compatibility of Tenant's Work with Landlord's Work will be made to the Final Plans for Tenant's Work without the prior written consent of Landlord.

4. <u>Construction of Landlord's Work</u>. Landlord, at its sole cost and expense, will perform all of the work set forth in the Final Plans, which will include but not be limited to the matters set forth in Exhibit C-1 attached hereto, and as follows, by the Projected Delivery Date:

Landlord agrees to deliver the Premises to Tenant by the Projected Delivery Date in the following condition: (i) the Premises shall be structurally sound; (ii) the Premises shall be free of Hazardous Substances and asbestos containing materials; (iii) [intentionally deleted], (iv) the utilities serving the Premises will be in good working order and in

sizes and capacities specified in Exhibit C; (v) the Premises will be in broom clean condition with all of the previous tenant's fixtures removed; (vi) the floor of the Premises will be in a smooth, reasonably level condition, ready to accept Tenant's flooring; (vii) the entire floor of the Premises shall have a live load minimum of 100 pounds per square foot of Floor Area; (viii) the Landlord shall demolish and remove all of the previous tenant's improvements, including any hard or t-bar ceilings, refrigerator equipment or fixtures and delivery the Premises in broom clean condition; (ix) [existing fire protection];  and (x) the storefront shall be delivered in its existing condition and shall be reconstructed at Tenant's expense subject to Landlord and city review and approval.

Landlord's Work will be performed in accordance with the terms of the Lease, in compliance with applicable Laws, and in a good and workmanlike manner.

5.    Construction of Tenant's Work. Tenant will, at its sole cost (subject to payment of the Allowance), perform all work (other than Landlord's Work) necessary to prepare the Premises for Tenant's occupancy. All of Tenant's Work will be installed in accordance with the terms of the Lease, in compliance with applicable Laws, and in a good and workmanlike manner by union affiliated contractors reasonably approved by Landlord.  Tenant will use its reasonable efforts to employ only such labor in performing Tenant's Work in or about the Premises as will not cause any conflict or controversy with any labor organization representing building trades then performing work for Landlord or other tenants in or about the Shopping Center.

6.    Allowance. Landlord agrees to pay Tenant an allowance, to be applied to the cost of designing, constructing and performing Tenant's Work and the other costs described below, equal to sixty eight dollars ($68.00) multiplied by the number of square feet of Floor Area of the Premises ("Allowance"). Landlord will pay the amount of the Allowance to Tenant in progress payments after the Delivery Date.  Such progress payments will be made not later than 30 days after receipt by Landlord from Tenant of copies of Tenant's invoices from its architect, engineer or contractor together with a certificate from Tenant indicating that the work to which such invoices relate has been substantially completed and/or the materials to which such invoices relate have been installed in, or delivered to, the Premises.  Such progress payments will be made payable to Tenant and will be for the amount of the submitted invoices, less a 10% retainage. As a condition precedent to Landlord's issuing any such progress payment subsequent to the first such progress payment, Tenant will deliver to Landlord an original lien waiver from its contractor waiving any claim for a mechanic's or materialman's lien with respect to the labor and materials reflected in the invoices submitted for the immediately preceding progress payment.  A further condition precedent to Landlord's issuing the last such payment for the amount of the retainage will be that Landlord has received from Tenant (either prior to or simultaneously with the issuance of such final payment) the following: (a) notice from Tenant's contractor that Tenant's Work has been completed (including completion of any punch list items); (b) a final and unconditional original lien waiver from Tenant's contractor in connection with Tenant's Work; and (c) a copy of the final certificate of occupancy for the Premises issued by the appropriate Governmental Authorities.  The total of all such progress payments will in no event exceed the amount of the Allowance. If the amount of the Allowance exceeds the total cost incurred by Tenant in designing and performing Tenant's Work, Tenant may utilize an amount not to exceed twenty percent (20%) of the Allowance, at Tenant's option (i) to pay for costs incurred by Tenant for obtaining and installing Tenant's fixtures, furnishings and equipment in the Premises; or (ii) as a credit against the first accruing amounts of Rent due under this Lease.  Landlord's failure to make any payment(s) of the Allowance to Tenant when due in accordance with the foregoing provisions, if such failure continues for more than 10 days after notice thereof is given by Tenant to Landlord, will entitle Tenant, in addition to any other rights or remedies available to Tenant under Section 14.2 of the Lease, to deduct the amount of such payment(s) of the Allowance, plus interest thereon at the Interest Rate from the date due until the date so offset, from the next accruing amounts of Rent due under this Lease.

7.    Construction Timing and Completion.

7.1.          Inspection and Cooperation. During the progress of construction of Landlord's Work, Landlord will permit, and cause Landlord's contractor to permit, Tenant access to the Premises for the purpose of observing the construction.  Such entry by Tenant prior to the Delivery Date will (a) be under all of the terms and conditions of this Lease, except no Rent will be payable by Tenant, and (b) not be construed as an acceptance of Landlord's Work by Tenant. Landlord and Tenant will reasonably cooperate (and will cause their respective contractors to reasonably cooperate) in the scheduling, conduct and coordination of their respective work.

7.2.          Concealed Conditions. Should Tenant or its agents or contractors encounter concealed or unknown conditions during its punchlist inspection or during the performance of Tenant's Work either (a) below the surface of the ground (including, without limitation, variable fill, asphalt, organic material, abandoned utility lines, garbage or debris or abandoned underground storage tanks and piping related thereto), or (b) in the building shell of the Premises, and such conditions materially affect Tenant's ability to complete Tenant's Work, Landlord will remove or correct (and to the extent applicable, dispose of in accordance with Environmental Laws) such concealed or unknown conditions, at its sole cost and expense, and in accordance with Laws.  Landlord will commence performance of such removal or correction within 10 business days of receipt of notice from Tenant of the existence of such conditions and if applicable, Landlord will further, within such period, restore the affected area(s) of the Premises to the condition which such area(s) should have been in, so as to render the area(s) useable for Tenant's Work.  If concealed or unknown conditions are encountered and must be removed or corrected, the Delivery Date will be deemed extended by one day for each day of delay caused by the removal or correction of such conditions.

7.3.          Outside Dates. Landlord will diligently pursue and complete Landlord's Work in order to achieve the Projected Delivery Date.  If the Delivery Date does not occur on or before the Projected Delivery Date and the Projected Delivery Date is not deferred to the next permitted Delivery Date, then Tenant will be entitled to a credit against the first accruing amounts of Rent due under this Lease in an amount equal to (a) two

days' Base Rent (calculated based on a 30-day month) for each day of the first 90 days of the period from the Projected Delivery Date until the Delivery Date, and (b) one day's Base Rent (calculated based on a 30-day month) for each day of any portion after the first 90 days thereof of the period from the Projected Delivery Date until the Delivery Date. Both parties acknowledge that if the actual Delivery Date does not occur on or before the Projected Delivery Date, Tenant's damages will be difficult, if not impossible, to ascertain and the amount of liquidated damages set forth above is a reasonable estimate of the damages which would be suffered by Tenant, including, but not limited to, lost sales, lost profits, and additional costs incurred for storage, rescheduling, payroll, inventory, advertising and carrying costs. The remedies set forth in this Article 7.3 will be Tenant's exclusive remedies for Landlord's failure to meet the deadlines set forth in this Article 7.3. Landlord shall have the right, its election to push back the Delivery Date from the Projected Delivery Date to the Delivery Deadline by delivery of written notice to Tenant not later than March 21, 2015, and upon such notice by Landlord the Rent penalties contained herein shall be inapplicable.

7.4.        Tenant's Option to Terminate. If Landlord fails to cause the Delivery Date to occur on or before the Delivery Deadline, then Tenant may, at Tenant's option, by notice to Landlord at any time following the date so specified terminate this Lease, whereupon Landlord will be obligated to pay Tenant liquidated damages in an amount equal to $100,000.00, which obligation will survive the termination of this Lease. The parties acknowledge that if the circumstances giving rise to such right of Tenant to terminate this Lease should occur, Tenant's damages will be difficult, if not impossible, to ascertain and the amount of liquidated damages set forth above is a reasonable estimate of the damages which would be suffered by Tenant, including, but not limited to, lost sales, lost profits, and additional costs incurred for obtaining alternative premises..     From and after such termination, the parties will be liable for their respective obligations to the date of termination and will have no liability for obligations arising after that date, except for those obligations which expressly survive termination. Tenant may also, from time to time, extend Landlord additional time for completion and delivery. The remedies set forth in Articles 7.3 and 7.4 will be Tenant's exclusive remedies for Landlord's failure to meet the deadlines set forth therein.

7.5.        Mutual Indemnities. Landlord will indemnify and hold Tenant harmless from all claims, demands, losses, damages, and expenses arising out of Landlord's operations and the operations of Landlord's contractor or contractors and any subcontractors, laborers or materialmen in performance of Landlord's Work. Subject to Landlord's payment to Tenant of the Allowance, Tenant will indemnify and hold Landlord harmless from all claims, demands, losses, damages, and expenses arising out of Tenant's operations and the operations of Tenant's contractor or contractors and any subcontractors, laborers or materialmen in performance of Tenant's Work.

7.6.        Punch List Inspection. Landlord will notify Tenant in writing when Landlord considers Landlord's Work Substantially Complete, which notice will be referred to as the "Notice of Punch List Inspection." Landlord and Tenant will promptly thereafter arrange to meet at the Premises to inspect the Landlord's Work and to produce an initial punch list of remaining items to be completed or corrected by Landlord. Landlord will pursue completion of the punch list items, and Landlord and Tenant will again inspect the Premises and Landlord's Work together and produce a final punch list of remaining construction items. Landlord will use reasonable diligence to complete all final punch list items within 20 days of the punch list. As used in this Lease, including this Exhibit C, "**Substantially Complete**" means that (i) all of Landlord's Work has been completed in accordance with Exhibit C to the point that only minor details remain to be completed or corrected, all of which work remaining to be completed or corrected would be considered minor by typical retail tenant standards and none of which work would in any way restrict Tenant from performing Tenant's Work.

7.7.        Tenant Delay. All Landlord performance dates under this Exhibit C shall be extended one day for each day that Landlord is delayed by reason of: (1) any Uncontrollable Events, or (2) one or more of the following occurrences (each, a "**Tenant Delay**"): (i) Tenant's failure to comply with any deadline set forth in this Exhibit C; (ii) Tenant's failure to timely approve any matter requiring Tenant's approval; (iii) a breach by Tenant of the terms of this Lease; and (iv) any other acts or omissions of Tenant, or its agents, or employees; provided however, no Tenant Delay will be deemed to have occurred unless and until Tenant has been provided a three (3) business day written notice and opportunity to cure. In the event of any Tenant Delay, the Delivery Date and Rental Commencement Date shall be deemed to have occurred as of the date that they would have occurred but for the Tenant Delay.

**EXHIBIT C-1**

**Space 165**
**Approximately 21.877 SF**
**MCC Delivery Conditions**

**EXHIBIT C**

Below is a general description of the Delivery Condition

**Space:**

**Storefront –** Existing Exterior Storefront.  Tenant to install interior and exterior storefront based on mutually acceptable plans.  Landlord will provide interior hoarding wall.

**Floors –** Poured reinforced concrete, reasonably smooth.

**Walls –** Sheet rock.

**Ceiling –** Deck to Deck is 16'11".  Some common mechanicals cross the space; clear height is 11' 6" in some areas.

**Dock & Trash –** 24 hour loading dock accommodates a full sized semi.  Trash, grease and recycling located in loading dock.  A rear access door will be provided to the premises. Tenant will have access to Freights on 7th.

**Electrical:**

**Electrical –**One 480 volt, 400 amp service located on the southwest corner of the Premises.

**Telephone conduit –** Located in the base building electrical/phone closet.

**Data conduit –** Located in the base building electrical/phone closet.

**Cable –** None.  T/E room level C-1

**Plumbing:**

**Domestic Water –**2" line located on the southwest side of the space.

**Sanitary Sewer –** Existing 4" riser on the northeast side of the space.

**Gas Service –** No gas

**Mechanical:**

**Toilet Exhaust –**   Existing 12x10 duct with 300 cfm connected to the base building system in both the northwest and southwest corners of the space.

**Smoke Exhaust and Make Up Air –** Existing base-building smoke exhaust system.

**HVAC –** Landlord to provide base building HVAC in the amount of 1.3 CFM / PSF of cooling, or 1 ton per 427 Sq. Ft for the heating and cooling of Tenant's space.  Stubbed to Landlord's closet point of contact. Ductwork and distribution provided by tenant.

**Fire protection:**

**Fire Protection** – Existing sprinkler grid in space, Brass pendent in the up position.  Tenant to provide proprietary fire panel for connect to base building point.

**Utilities:**

**Electric** – Meter Existing.  Sub-metered by Landlord. Billed on actual usage

**Domestic Water** –Meter Existing.  Sub-metered by Landlord.  Readings are calculated in cubic feet.  Billed on actual usage.

**Chilled Water** – Meter Existing.  Sub-metered by Landlord.  Calculated in Mlbs and BTU's.  Billed on actual usage and demand.

**Steam** – Meter existing. Sub-metered by Landlord. Calculated in Mlbs and BTU's.  Billed on actual usage and demand.

**SAC/WAC** - Impact fees a Tenant Expense.

**Exhibit D**

**COMMENCEMENT AGREEMENT**
*(not to be recorded)*

THIS COMMENCEMENT AGREEMENT (this "Agreement") is made and entered into this _____ day of _____, 20__, by and between _____, a _____ ("Landlord"), and TSA STORES, INC., a Delaware corporation ("Tenant").

**RECITALS**

WHEREAS, Tenant and Landlord have entered into that certain Shopping Center Lease dated _____, 20__ (the "Lease") for certain retail Premises in the _____ Shopping Center in the City of _____, County of _____ and State of _____; and

WHEREAS, pursuant to the Lease, Landlord and Tenant now desire to confirm certain dates and amounts applicable under the Lease.

**AGREEMENT**

In consideration of the Lease and the mutual agreements set forth below, the parties agree as follows:

1.    All initially capitalized terms used but not defined in this Agreement will have the meaning set forth for such terms in the Lease.

2.    The Delivery Date occurred on _____, 20__.  The Initial Term of the Lease commenced on the Commencement Date, which was _____, 20__.  The Rental Commencement Date is _____, 20__.  The Expiration Date is _____, 20__, although the Term may be extended as provided in the Lease by Tenant's exercise of certain Extension options.

3.    [Intentionally Deleted.]

4.    The amounts of Base Rent payable by Tenant during the Initial Term and during any Extension with respect to which Tenant exercises its option under the Lease, and the date by which Tenant must give notice to Landlord to exercise its option with respect to each Extension, are as follows:

| Applicable Time Period | Total Annual Base Rent | Total Monthly Base Rent | Date by which Tenant must give Notice |
|---|---|---|---|
| Rental Commencement Date through the Expiration Date | $_____ | $_____ | not applicable |
| First Extension | $_____ | $_____ | _____ |
| Second Extension | $_____ | $_____ | _____ |
| Third Extension | $_____ | $_____ | _____ |
| Fourth Extension | $_____ | $_____ | _____ |

5.    Nothing set forth in this Agreement will be deemed an exercise by Tenant of any Extension.

6.    In accordance with Section 2.5 of the Lease, the dates and amounts set forth in this Agreement will be conclusive of such information.  Except as modified hereby, the Lease has not been amended and, as modified hereby, the parties ratify and confirm the Lease as being in full force and effect.

Having read and intending to be bound by the terms hereof, the parties have signed this Agreement on the date(s) set forth below.

TENANT:

TSA STORES, INC., a Delaware corporation

By: _____
Name: _____
Title: _____

Date of execution by Tenant: _____, 20__

LANDLORD:

_____,

a _____

By: _____
Name: _____
Title: _____

Date of execution by Landlord: _____, 20__

Exhibit E

SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT (this "**Agreement**") is made and entered into as of the __ day of _____, 2015, by and among JPMORGAN CHASE BANK, N.A., a national banking association, as Administrative Agent for itself and various other lending institutions (defined below) ("**Mortgagee**"), TSA STORES, INC., a Delaware corporation ("**Tenant**"), and SRI Ten City Center, LLC, a Delaware limited liability company, and its successors and assigns ("**Landlord**").

RECITALS:

A.    Landlord owns, leases or controls the improvements (excluding the hotel) from time to time constructed on the land located in the City of Minneapolis, County of Hennepin and State of Minnesota described in Exhibit A attached hereto ("**Land**"), commonly known as Minneapolis City Center, of which a retail mall building and related improvements located thereon is a part (the "**Shopping Center**"; the Land and Shopping Center, together with certain other improvements located on the Land (including an office building and parking facilities) are collectively referred to as the "**Property**").

B.    Under the terms of a certain lease (the "**Lease**") dated _____, between Tenant and Landlord, Tenant has leased a portion of the Shopping Center, as more particularly described in the Lease (the "**Demised Premises**").

C.    Landlord has executed a deed of trust in favor of Mortgagee (the "**Mortgage**") pursuant to which Landlord has encumbered Landlord's interest in the Land, Shopping Center and Lease to secure, among other things, the payment of certain indebtedness owing by Landlord to one or more lenders (the "**Lenders**") as described therein and in all other documents evidencing, securing or guaranteeing such indebtedness (the "**Loan Documents**").

D.    The parties hereto desire to have the Lease be subordinate to the Mortgage and the lien thereof, to establish certain rights of non-disturbance for the benefit of Tenant under the Lease, and further to define the terms, covenants and conditions precedent for such rights.

AGREEMENT:

NOW, THEREFORE, for good and valuable consideration, the parties hereto mutually agree as follows:

1.    Subordination.  The Lease, as the same may hereafter be modified, amended or extended, and all of the terms, covenants and provisions thereof and all rights, remedies and options of Tenant thereunder are and shall at all times continue to be subject and subordinate in all respects to the Mortgage, including without limitation, all renewals, increases, modifications, consolidations, extensions and amendments thereof with the same force and effect as if the Mortgage and the other Loan Documents had been executed, delivered and (in the case of the Mortgage) recorded prior to the execution and delivery of the Lease.

2.    Non-Disturbance.  So long as Tenant is not in default of the Lease beyond any applicable notice and curative periods in the payment of rent or in the performance of any terms of the Lease, Tenant's possession of the Premises and Tenant's rights and privileges under the Lease and any extensions or renewals thereof which may be exercised by Tenant in accordance with the terms of the Lease, will not be disturbed, diminished or interfered with by Lender, and Tenant's occupancy of the Premises shall not be disturbed by Lender or by anyone claiming by, through, or under Lender, whether by purchase at foreclosure, conveyance in lieu of foreclosure or otherwise (each being referred to herein as an "**Acquiring Party**"); provided, however, that Mortgagee and Tenant agree that the following provisions of the Lease (if any) shall not be binding on Mortgagee or Acquiring Party:  any option to purchase or any right of first refusal to purchase with respect to the Property, and any provision regarding the use of insurance proceeds or condemnation proceeds with respect to the Property which is inconsistent with the terms of the Mortgage.

3.    Attornment.  In the event of foreclosure of the Mortgage or conveyance in lieu of foreclosure, which foreclosure or conveyance occurs prior to the expiration date of the term of the Lease, including any extensions and renewals of such term now provided thereunder, Tenant shall attorn to and recognize the Acquiring Party as "Landlord" under the Lease, which Lease shall thereupon become a direct lease between Tenant and the Acquiring Party for the remainder of the term of the Lease (including all extension periods which have been or are hereafter exercised) upon the same terms and conditions as are set forth in the Lease with the same force and effect as if the Acquiring Party were Landlord under the Lease, and said attornment to be effective and self-operative without the execution of any further instrument.  Notwithstanding anything to the contrary contained herein, Tenant shall be under no obligation to pay rent to the Acquiring Party until Tenant receives written notice from the Acquiring Party that it has succeeded to the interest of Landlord under the Lease or that it is otherwise entitled to receive the rent pursuant to the Loan Documents.  Subject to the provisions of Section 4 below, the respective rights and obligations of Tenant and the Acquiring Party upon such attornment shall, to the extent of the then remaining balance of the term of the Lease and any extensions or renewals thereof, be as set forth in the Lease.

4.    Limitation of Liability.  Notwithstanding anything to the contrary contained herein or in the Lease, in the event of foreclosure of the Mortgage or conveyance in lieu of foreclosure, which foreclosure or

conveyance occurs prior to the expiration date of the term of the Lease, including any extensions and renewals of such term now provided thereunder, the liability of Mortgagee, its successors and assigns, or Acquiring Party, as the case may be, shall be limited to its interest in the Property (and the rents, issues and profits derived therefrom and, in the event of a sale thereof, the proceeds of any such sale) ; provided, however, that Mortgagee or Acquiring Party, as the case may be, and their respective successors and assigns, shall not:

(a) be liable to Tenant for any past act, omission or default on the part of any prior landlord (including Landlord) except with respect to any action or omission that constitutes a default in the performance of Landlord's obligations under the Lease which default continues (i) after the Mortgagee or Acquiring Party, as the case may be, acquires title to the Shopping Center and/or the Land, and (ii) beyond the cure period afforded to the "Landlord" under the Lease, measured from the date on which notice of such default is given to the Acquiring Party (unless possession of the Shopping Center is necessary to effect the cure, in which case the Acquiring Party's cure period shall be measured from the later of the date on which notice of such default is given to the Acquiring Party or the date the Acquiring Party or a receiver obtains sufficient possessory rights in the Shopping Center to effect the cure);

(b) be liable for or subject to any offsets or credits which Tenant might have against any prior landlord (including Landlord), except for any offset or credit to which Tenant is expressly entitled under the Lease;

(c) be liable for any payment of rent or additional rent which Tenant intentionally paid for more than one month in advance of the due date thereof or any deposit, rental security or any other sums deposited with any prior landlord (including Landlord), except to the extent such monies are actually received by Mortgagee or Acquiring Party, as applicable;

(d) be bound by any amendment or modification of the Lease made subsequent to the date of this Agreement that reduces the rent or shortens the term under the Lease (other than as may be expressly contemplated by the Lease), unless such amendment or modification was made or given with the prior written consent of Mortgagee, which consent shall not be unreasonably withheld or delayed, and which consent shall be deemed given if no response from Mortgagee is received within ten (10) days of Tenant's delivery of request for consent; or,

(e) be bound by any warranty or representation by any prior landlord (including Landlord) under the Lease regarding any construction work required to be performed under the Lease, use of the Demised Premises, compliance with zoning, hazardous wastes or environmental laws, habitability, fitness for purpose, title or possession, except that Tenant's rights and remedies with respect thereto, including termination, self-help and offset, remain in full force and effect and enforceable by Tenant.

5.    Rent.    Tenant hereby agrees to and with Mortgagee that, upon receipt from Mortgagee of a written notice of any default by Landlord under the Mortgage and directing that rentals under the Lease should be paid to Mortgagee, Tenant will pay to Mortgagee directly or to a payee as directed by Mortgagee all rents, additional rents and other sums then or thereafter due under the Lease. In the event of the foregoing, Landlord hereby authorizes Tenant to pay to Mortgagee directly all rents, additional rents and other sums then or thereafter due under the Lease. In addition, Landlord hereby indemnifies and holds Tenant harmless from and against any and all claims, causes of actions, demands, liabilities and losses of any kind or nature, including but not limited, to attorney's fees and expenses, sustained by Tenant as a result of any and all claims arising out of Tenant's payment of all or any portion of the rent, additional rents, and other sums due under the Lease directly to Mortgagee in accordance with the terms and conditions hereof.

6.    Further Documents.    The foregoing provisions shall be self-operative and effective without the execution of any further instruments on the part of any party hereto. Tenant agrees, however, to execute and deliver to Mortgagee or Acquiring Party, as the case may be, or such other person to whom Tenant herein agrees to attorn such other instruments as such party shall reasonably request in order to effectuate said provisions.

7.    Notice and Cure.    Tenant agrees that if there occurs a default by Landlord under the Lease:

(a) Tenant shall use commercially reasonable efforts to deliver a copy of each default notice given to Landlord pursuant to the Lease simultaneously to Mortgagee, and no such notice shall be effective as to Mortgagee for any purpose under the Lease unless so given to Mortgagee; and

(b) If Landlord shall fail to cure any default within the time prescribed by the Lease, Tenant shall give further notice of such fact to Mortgagee. Provided that Tenant shall have the same rights and remedies under the Lease, Mortgagee shall have the right (but not the obligation except to the extent Mortgagee becomes an Acquiring Party) to remedy any Landlord default under the Lease within the time period specified in the Lease, or to cause any default of Landlord under the Lease to be remedied; Mortgagee shall be allowed such additional time as may be reasonably necessary to cure a non-monetary default and so long as Mortgagee shall be proceeding diligently to cure non-monetary defaults that are reasonably susceptible of cure or, if necessary to effect such cure, to commence proceedings under the Loan Documents to obtain possession of the Property and thereafter prosecutes such cure to completion.

8.    Notices.    All notices, demands, approvals and requests given or required to be given hereunder shall be in writing and shall be deemed to have been properly given upon receipt when personally served or sent by overnight delivery service or upon the third (3rd) business day after mailing if sent by U. S. registered or certified mail, postage prepaid, addressed as follows:

Mortgagee:

> JPMorgan Chase Bank, N.A., as Administrative Agent
> 270 Park Avenue, 45th Floor
> New York, New York 10017
> Attn.: William E. Schachat

with a copy to:

> JPMorgan Chase Bank, N.A.
> 270 Park Avenue, 45th Floor
> New York, New York 10017
> Attn.: Charles J. Janoff

And:

> Morrison & Foerster LLP
> 250 West 55th Street
> New York, New York 10019
> Attn: John J. McCarthy, Esq.

Landlord:

> SRI Ten City Center, LLC
> c/o Shorenstein Realty Services, LP
> 235 Montgomery Street, Suite 1600
> San Francisco, CA 94104
> Attn: Corporate Secretary

With a copy to:

> SRI Ten City Center, LLC
> c/o Shorenstein Realty Services, LP
> 850 Third Avenue, Suite 1700
> New York, NY 10022
> Attn: Asset Manager

Tenant:

> 1050 West Hampden Avenue
> Englewood, Colorado 80110
> Attn: Senior Vice President - Real Estate

> With a copy to:

> 1050 West Hampden Avenue
> Englewood, Colorado 80110
> Attn: Legal Department

or to such other address in the United States as such party may from time to time designate by written notice to the other parties.

9.    **Binding Effect.** The terms, covenants and conditions hereof shall be binding upon and inure to the benefit of Mortgagee (for the benefit of the Lenders), Landlord and Tenant and their respective heirs, executors, administrators, successors and assigns.

10.    **No Oral Modifications.** This Agreement may not be modified in any manner or terminated except by an instrument in writing executed by all the parties hereto or their respective successors in interest.

11.    **Governing Law.** This Agreement shall be governed, construed, applied and enforced in accordance with the laws of the jurisdiction where the Property is located.

12.    **Counterparts.** This Agreement may be signed in counterparts, each of which shall be deemed an original and all of which together shall constitute one document.

13.    **Inapplicable Provisions.** If any term, covenant or condition of this Agreement is held to be invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, such provision shall be deemed modified to the extent necessary to be enforceable, or if such modification is not practicable, such provision

shall be deemed deleted from this Agreement, and the other provisions of this Agreement shall remain in full force and effect.

14.     Authority.  Each of the undersigned parties further represents and warrants to the other parties hereto that the person executing this Agreement on behalf of each such party hereto has been duly authorized to so execute this Agreement and to cause this Agreement to be binding upon such party and its successors and assigns.

15.     Tenant's Personal Property.  It is expressly agreed to between Mortgagee, Landlord and Tenant that in no event shall the Mortgage cover or encumber (and shall not be construed as subjecting in any manner to the lien thereof) any of Tenant's moveable trade fixtures, business equipment, furniture, signs or other personal property at any time placed in, on or about the Property.

16.     Subsequent Transfer.     If any Acquiring Party, by succeeding to the interest of Landlord under the Lease, should become obligated to perform the covenants of Landlord thereunder, then, upon any transfer of Landlord's interest by such Acquiring Party, all obligations shall terminate as to such Acquiring Party.

17.     Waiver of Jury Trial.     LANDLORD, TENANT AND MORTGAGEE HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATED TO THIS AGREEMENT.

18.     Number and Gender.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

IN WITNESS WHEREOF, the parties hereto have executed and sealed this Agreement as of the day and year first above written.

**LANDLORD:**

a _____,

_____

By:     _____
Name:   _____
Title:  _____

Date of execution by Landlord: _____, 20__

**LENDER:**

a _____,

_____

By:     _____
Name:   _____
Title:  _____

Date of execution by Lender: _____, 20__

**TENANT:**

TSA STORES, INC., a Delaware corporation

By:     _____
Name:   _____
Title:  _____

Date of execution by Tenant: _____, 20__

## ACKNOWLEDGMENTS

### LANDLORD

STATE OF _____ )
                           ) ss.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____, 20__ by _____ as _____ of _____, a _____.

WITNESS my hand and official seal.


_____
Notary Public

My commission expires: _____


### LENDER

STATE OF _____ )
                           ) ss.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____, 20__ by _____ as _____ of _____, a _____.

WITNESS my hand and official seal.


_____
Notary Public

My commission expires: _____


### TENANT

STATE OF _____ )
                           ) ss.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____, 20__ by _____ as _____ of TSA Stores, Inc., a Delaware corporation.

WITNESS my hand and official seal.


_____
Notary Public

My commission expires: _____

_____

## Exhibit F

## PERMITTED ENCUMBRANCES

Form No. 1068-2

Commitment No.:  **NCS-696725-MPLS**
Page Number:  8

## SCHEDULE B

### SECTION TWO

### EXCEPTIONS

Any policy we issue will have the following exceptions unless they are taken care of to our satisfaction:

1. Defects, liens, encumbrances, adverse claims or other matters, if any, created, first appearing in the public records, or attaching subsequent to the effective date hereof but prior to the date the proposed Insured acquires for value of record the estate or interest or mortgage thereon covered by this Commitment.

2. Discrepancies, conflicts in boundary lines, shortages in area, encroachments, or any other fact which a correct survey would disclose, and which are not shown by public records.

3. Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of said land or by making inquiry of persons in possession thereof.

4. Easements, claims of easement or encumbrances which are not shown by the public records.

5. Any lien, or right to a lien, for services, labor or material heretofore or hereafter furnished, imposed by law and not shown in the public records.

6. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.

7. Levied and pending special assessments, if any.

8. Real estate taxes payable in the year 2014 in the amount of $6,000,670.76 total; first half paid, second half paid except for $.08, which remains unpaid.
   Base tax:        $5,761,228.98.
   Tax Parcel No.    22-029-24-43-0120

9. Real estate taxes payable in the year 2014 in the amount of $1,666,728.96 total; first half paid, second half paid.
   Base tax:        $1,617,319.18.
   Tax Parcel No.    22-029-24-43-0119

10. Special assessments levied after the date hereof.

11. Searches for levied and pending special assessments have been ordered.

12. The following Amended, Restated and Supplemental Fee and Leasehold Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing (shown in (xx) below), and related documents:

    (a) Mortgage, from MCC Development Company, Inc., to The Toronto-Dominion Bank New York

Form No. 1068-2

Commitment No.:  NCS-696725-MPLS
Page Number:  9

Agency, dated February 23, 1982, recorded February 23, 1982, as Doc. No. 1459002, in the original amount of $96,000,000.00;

(b) Assignment of Lessor's Interest in Lease, dated Febuary 23, 1982, recorded February 23, 1982, as Doc. No. 1459003;

(c)  Mortgage, from MCC Development Company, Inc., to The Toronto-Dominion Bank New York Agency, dated February 23, 1982, recorded February 23, 1982, as Doc. No. 1459004, in the original amount of $2,000,000.00;

(d) Assignment of Lessor's Interest in Lease, dated Febuary 23, 1982, recorded February 23, 1982, as Doc. No. 1459005;

(e)  Mortgage, from MCC Development Company, Inc., to The Toronto-Dominion Bank New York Agency, dated February 23, 1982, recorded February 23, 1982, as Doc. No. 1459006, in the original amount of $2,000,000.00;

(f) Assignment of Lessor's Interest in Lease, dated February 23, 1982, recorded February 23, 1982, as Doc. No. 1459007;

(g)  Mortgage, from MCC Development Company, Inc., to The Toronto-Dominion Bank New York Agency, dated February 23, 1982, recorded February 23, 1982, as Doc. No. 1459008, in the original amount of $2,000,000.00;

(h) Assignment of Lessor's Interest in Lease, dated February 24, 1982, recorded February 23, 1982, as Doc. No. 1459009;

(i)  Mortgage, from MCC Development Company, Inc., to The Toronto-Dominion Bank New York Agency, dated February 23, 1982, recorded February 23, 1982, as Doc. No. 1459010, in the original amount of $2,000,000.00;

(j) Assignment of Lessor's Interest in Lease, dated February 23, 1982, recorded February 23, 1982, as Doc. No. 1459011;

(k)  Mortgage, from MCC Development Company, Inc., to The Toronto-Dominion Bank New York Agency, dated  February 23, 1982, recorded February 23, 1982, as Doc. No. 1459012, in the original amount of $2,000,000.00;

(l) Assignment of Lessor's Interest in Lease, dated February 23, 1982, recorded February 23, 1982, as Doc. No. 1459013;

(m)  Mortgage, from MCC Development Company, Inc., to The Toronto-Dominion Bank New York Agency, dated February 23, 1982, recorded February 23, 1982, as Doc. No. 1459014, in the original amount of $2,000,000.00;

(n) Assignment of Lessor's Interest in Lease, dated February 23, 1982, recorded February 23, 1982, as Doc. No. 1459015;

(o)  Mortgage, from MCC Development Company, Inc., to The Toronto-Dominion Bank New York Agency, dated February 23, 1982, recorded February 23, 1982, as Doc. No. 1459016, in the original amount of $2,000,000.00;

(p) Assignment of Lessor's Interest in Lease, dated February 23, 1982, recorded February 23, 1982, as Doc. No. 1459017;

(q)  Mortgage, from MCC Development Company, Inc., to The Toronto-Dominion Bank New York Agency, dated February 23, 1982, recorded February 23, 1982, as Doc. No. 1459018, in the original amount of $20,000,000.00;

(r) Assignment of Lessor's Interest in Lease, dated February 23, 1982, recorded February 23, 1982, as Doc. No. 1459019;

(s) Mortgage, from MCC Development Company, Inc., to The Toronto-Dominion Bank, New York Branch, dated July 16, 1982, recorded July 19, 1982, as Doc. No. 1474562, in the original amount of $15,000,000.00;

(t)  Mortgage, from MCC Development Company, Inc., to The Toronto-Dominion Bank, New York Branch, dated July 16, 1982, recorded July 19, 1982, as Doc. No. 1474563, in the original amount of $15,000,000.00;

(u)  Mortgage, from MCC Development Company, Inc., to The Toronto-Dominion Bank, New York Branch, dated July 16, 1982, recorded July 19, 1982, as Doc. No. 1474564, in the original amount of $15,000,000.00;

(v)  Mortgage, from MCC Development Company, Inc., to The Toronto-Dominion Bank, New York Branch, dated July 16, 1982, recorded July 19, 1982, as Doc. No. 1474565, in the original amount of $15,000,000.00;

(w)  Mortgage, from MCC Development Company, Inc., to The Toronto-Dominion Bank, New York Branch, dated July 16, 1982, recorded July 19, 1982, as Doc. No. 1474566, in the original amount of $15,000,000.00;

(x) Assignment of Lessor's Interest in Lease, dated July 16, 1982, recorded November 1, 1982, as Doc. No. 1487639;

(y) Assignment of Lessor's Interest in Lease, dated July 16, 1982, recorded November 1, 1982, as Doc. No. 1487640;

(z) Assignment of Lessor's Interest in Lease, dated July 16, 1982, recorded November 1, 1982, as Doc. No. 1487641;

(aa) Assignment of Lessor's Interest in Lease, dated July 16, 1982, recorded November 1, 1982, as Doc. No. 1487642;

(bb) Assignment of Lessor's Interest in Lease, dated July 16, 1982, recorded November 1, 1982, as Doc. No. 1487643;

(cc)  Consolidated and Modified Mortgage Deed and Security Agreement and Fixture Financing Statement, from MCC Development Company, Inc., to The Toronto-Dominion Bank, dated December 29, 1983, recorded December 29, 1983 as Doc. No. 1554279, in the original amount of $220,000,000.00, by which the above mortgages were consolidated into a single mortgage;

(dd) Assignment of Lessor's Interest in Leases, dated December 29, 1983, recorded December 29, 1983, as Doc. No. 1554280;

(ee)  First Amendment of Consolidated and Modified Mortgage Deed and Security Agreement and Fixture Financing Statement, dated March 30, 1984, recorded April 2, 1984 as Doc. No. 1570153;

(ff) First Amendment of Consolidated and Modified Assignment of Lessor's Interest in Leases, dated March 30, 1984, recorded April 2, 1984, as Doc. No. 1570154;

(gg) Assignment of Consolidated and Modified Mortgage Deed and Security Agreement and Fixture Financing Statement, dated March 30, 1984, recorded April 2, 1984 as Doc. No. 1570155, from The Toronto-Dominion Bank, to Teachers Insurance and Annuity Association of America;

(hh) Assignment of Assignment of Lessor's Interest in Lease, dated March 30, 1984, recorded

F-3

Form No. 1068-2

April 2, 1984, as Doc. No. 1570156, from The Toronto-Dominion Bank, to Teachers Insurance and Annuity Association of America;

(ii)  Collateral Assignment of Skyway Agreements, dated March 30, 1984, recorded April 2, 1984, as Doc. No. 1570157;

(jj)  Amendment of Loan Documents, dated October 25, 1991, recorded December 10, 1991 as Doc. No. 2221585;

(kk)  Agreement Regarding Increase in Loan Amount and Amendment of Loan Documents, dated July 9, 1993, recorded February 17, 1994 as Doc. No. 2481963;

(ll)  Assignment of Interest Under Mortgage and Assignment of Leases and Rents, dated December 18, 1997, recorded January 27, 1998 as Doc. No. 2882362, from Teachers Insurance and Annuity Association of America, to Carena Bancorp US, Inc.;

(mm)  Assignment of Interest Under Mortgage and Assignment of Leases and Rents, dated May 21, 1998, recorded May 21, 1998 as Doc. No. 3015854, from Carena Bancorp US, Inc., to Citicorp Real Estate, Inc.;

(nn)  Amended and Restated Mortgage Deed and Security Agreement and Fixture Financing Statement, from MCC Mortgage LP and City Center Associates Limited Partnership, to Citicorp Real Estate, Inc., dated May 21, 1998, recorded May 21, 1998 as Doc. No. 3015895, in the original amount of $108,000,000.00;

(oo)  Amended and Restated Assignment of Leases and Rents, dated May 21, 1998, recorded May 21, 1998 as Doc. No. 3015896;

(pp)  Assignment of Mortgage, dated June 29, 1998, recorded September 26, 2000 as Doc. No. 3318365, from Citicorp Real Estate, Inc., to State Street Bank and Trust Company, as trustee for the registered Holders of Mortgage Capital Funding, Inc., Multifamily/Commercial Mortgage Pass-Through Certificates, Series 1998-MC2;

(qq)  Assignment of Assignment of Leases and Rents, dated August 10, 2000, recorded September 26, 2000, as Doc. No. 3318366, from Citicorp Real Estate, Inc., to State Street Bank and Trust Company, as trustee for the registered Holders of Mortgage Capital Funding, Inc., Multifamily/Commercial Mortgage Pass-Through Certificates, Series 1998-MC2;

(rr)  Assignment of Mortgage, dated October 19, 2009, recorded August 13, 2010, as Doc. No. 4778982, from State Street Bank and Trust Company as Trustee for the Registered Holders of Mortgage Capital Funding, Inc., Multifamily/Commercial Mortgage Pass-Through Certificates, Series 1998-MC2, to U.S. Bank National Association, Successor to State Street Bank and Trust Company as Trustee for the Registered Holders of Mortgage Capital Funding, Inc., Multifamily/Commercial Mortgage Pass-Through Certificates, Series 1998-MC2;

(ss)  Assignment of Assignment of Leases and Rents, dated October 19, 2009, recorded August 13, 2010, as Doc. No. 4778983, from State Street Bank and Trust Company as Trustee for the Registered Holders of Mortgage Capital Funding, Inc., Multifamily/Commercial Mortgage Pass-Through Certificates, Series 1998-MC2, to U.S. Bank National Association, Successor to State Street Bank and Trust Company as Trustee for the Registered Holders of Mortgage Capital Funding, Inc., Multifamily/Commercial Mortgage Pass-Through Certificates, Series 1998-MC2;

(tt)  Limited Power of Attorney by U.S. Bank National Association, recorded August 13, 2010, as Doc. No. 4778985;

(uu)  Assignment of Mortgage, dated August 13, 2010, recorded August 13, 2010, as Doc. No. 4778986, from U.S. Bank National Association, Successor to State Street Bank and Trust Company as Trustee for the Registered Holders of Mortgage Capital Funding, Inc.,

Form No. 1068-2                                                    Commitment No.: NCS-696725-MPLS
                                                                  Page Number:  12

Multifamily/Commercial Mortgage Pass-Through Certificates, Series 1998-MC2, to Wells Fargo Bank, National Association, as Administrative Agent; and

(vv) Amended and Restated Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing Statement, from 33 South 6th Street LLC, as mortgagor, to Wells Fargo Bank, National Association, as Administrative Agent, as mortgagee, dated August 13, 2010, recorded August 13, 2010, as Doc. No. 4778987, in the original amount of $100,000,000.00;

(ww) Assignment of Mortgage, dated November 20, 2012, recorded November 21, 2012, as Doc. No. 5016588, from Wells Fargo Bank, National Association, as Administrative Agent, to JPMorgan Chase Bank, N.A., as Administrative Agent; and

(xx) Amended, Restated and Supplemental Fee and Leasehold Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, from SRI Ten City Center LLC, as mortgagor, to JPMorgan Chase Bank, N.A., as Administrative Agent, as mortgagee, dated November 20, 2012, recorded November 21, 2012, as Doc. No. 5016591, in the original amount of $125,000,000.00.

NOTE:  Any Release or Satisfaction of this Mortgage should identify all of the foregoing instruments.

13.    Assignment of Leases and Rents, from SRI Ten City Center LLC, as assignor, to JPMorgan Chase Bank, N.A., as Administrative Agent, as assignee, dated November 20, 2012, recorded November 21, 2012, as Doc. No. 5016592.

14.    UCC Financing Statement, between SRI Ten City Center LLC, as debtor, and JPMorgan Chase Bank, N.A., as secured party, recorded December 5, 2012, as Doc. No. 5020771.

15.    Terms and conditions of the following Lease (hereinafter "Hotel Lease") and related documents:

(a)  Lease between MCC Development Company, Inc., as landlord, and Amfac Hotels and Resorts, Inc., as tenant, dated May 29, 1980, which is unrecorded but which is referred to in the Memorandum of Lease, dated May 29, 1980, recorded February 23, 1980, as Doc. No. 1459001;

(b)  Amended and Restated Hotel Lease, between MCC Development Company, Inc., as landlord, and Amfac Hotels and Resorts, Inc., as tenant, dated November 19, 1982, which is attached to the Memorandum of Amended and Restated Hotel Lease, dated November 19, 1982, recorded November 19, 1982, as Doc. No. 1490344;

(c)  Assignment of Leasehold Estate and Conveyance of Buildings and Improvements, from Amfac Hotels and Resorts, Inc., to City Center Hotel Limited Partnership, a Minnesota limited partnership, dated November 19, 1982, recorded November 19, 1982, as Doc. No. 1490345;

(d) Non-Disturbance and Subordination Agreement in respect of Premises in Minneapolis City Center, between The Toronto-Dominion Bank, MCC Development Company, Inc., and City Center Hotel Limited Partnership, dated November 19, 1982, recorded November 19, 1982, as Doc. No. 1490350;

(e)  Amendment to Lease, between City Center Associates Limited partnership, as landlord, and City Center Hotel Limited Partnership, as tenant, dated March 19, 1984, which is attached to the Memorandum of Amendment to Lease, dated March 19, 1984, recorded April 2, 1984, as Doc. No. 1570152;

(f) Second Amendment to Ground Lease, dated June 25, 2007, and Thrid Amendment to Ground Lease, dated September 24, 2007, which are unrecorded but which are referred to in the Subordination Agreement, dated August 13, 2010, recorded August 13, 2010, as Doc. No. 4778990;

(g) Assignment and Assumption of Hotel Parcel Prime Lease and Hotel Lease, from 33 South 6th Street, to SRI Ten City Center LLC, dated November 20, 2012, recorded November 21, 2012, as Doc. No. 5016589; and

(h) Subordination Agreement; Acknowledgment of Lease Assignment, Estoppel, Attornment and Non-Disturbance Agreement, dated November 20, 2012, recorded December 26, 2012, as Doc. No. 5026731.

16.    Terms and conditions of the following Lease (hereinafter "Hotel Parcel Prime Lease") and related documents:

(a) Lease Agreement, between MCC Development Company, Inc., as landlord, and City Center Hotel Operations, Inc., as tenant, dated December 29, 1983, recorded December 29, 1983, as Doc. No. 1554278;

(b) Assignment of Tenant's Interest in Lease Agreement, dated December 29, 1983, recorded April 2, 1984, as Doc. No. 1570149, from City Center Hotel Operations, Inc., to City Center Properties, Inc.;

(c) Assignment of Tenant's Interest in Lease Agreement, dated December 29, 1983, recorded April 2, 1984, as Doc. No. 1570150, from City Center Properties, Inc., to City Center Associates Limited Partnership;

(d) Subordination Agreement by City Center Associates Limited Partnership, dated March 30, 1984, recorded April 2, 1984, as Doc. No. 1570158;

(e) Limited Warranty Deed, from City Center Associates Limited Partnership, to MCC Mortgage LP, a Delaware limited partnership, dated January 2, 2010, recorded January 19, 2010, as Doc. No. 4721894;

(f) Limited Warranty Deed, from MCC Mortgage LP, to 33 South 6th Street LLC, dated August ___, 2010, recorded August 13, 2010, as Doc. No. 4778984;

(g) Prime Lease Subordination Agreement, dated August 13, 2010, recorded August 13, 2010, as Doc. No. 4778991; and

(h) Assignment and Assumption of Hotel Parcel Prime Lease and Hotel Lease, dated November 20, 2012, recorded November 21, 2012, as Doc. No. 5016589.

17.    Terms and conditions of the following Lease and related documents:

(a) Lease, between MCC Development Company, Inc., as landlord, and Dayton-Hudson Corporation, as tenant, dated June 25, 1981, which is unrecorded but which is referred to in the Short Form Lease, dated June 25, 1981, recorded September 25, 1981, as Doc. No. 1441663;

(b) Memorandum of Restated and Amended Lease Agreement, dated June 25, 1981, recorded February 25, 1983, as Doc. No. 1502552;

(c) Attornment and Non-Disturbance Agreement, dated December 10, 1980, recorded April 5, 1983, as Doc. No. 1507933;

(d) Amendment of Short Form Lease, dated February 1, 2005, recorded February 25, 2005, as Doc. No. 4083017;

(e) Amendment of Short Form Lease, dated March 31, 2009, recorded April 8, 2009, as Doc. No. 4629502; and

Form No. 1068-2

Commitment No.: NCS-696725-MPLS
Page Number: 14

(f) Subordination, Non-Disturbance and Attornment Agreement, dated August 13, 2010, recorded August 13, 2010, as Doc. No. 4778992.

18.    Terms and conditions of the Lease Agreement, between City Center Associates Limited Partnership, as landlord, and the Minnesota State Bar Association, as tenant, dated October 31, 1998, which is unrecorded but which is referred to in the Memorandum of Lease, dated January 25, 1999, recorded February 11, 1999, as Doc. No. 3121130.

19.    Terms and conditions of the Lease Agreement, between City Center Associates Limited Partnership, as landlord, and the Hennepin County Bar Association, as tenant, dated November 2, 1998, which is unrecorded but which is referred to in the Memorandum of Lease, dated February 4, 1999, recorded February 11, 1999, as Doc. No. 3121131.

20.    Terms and conditions of the Lease Agreement, between City Center Associates Limited Partnership, as landlord, and Minnesota Continuing Legal Education, as tenant, dated October 30, 1998, which is unrecorded but which is referred to in the Memorandum of Lease, dated February 4, 1999, recorded February 11, 1999, as Doc. No. 3121132.

21.    Terms and conditions of the following Lease and related documents:

(a) Lease, between City Center Associates Limited Partnership, as landlord, and Office Depot, Inc., as tenant, dated June 4, 1999, which is unrecorded but which is referred to in the Memorandum of Lease, dated June 4, 1999, recorded July 20, 1999 as Doc. No. 3182767;

(b) Subordination, Non-Disturbance and Attornment Agreement, dated July 4, 1999, recorded July 20, 1999, as Doc. No. 3182768; and

(c) Subordination, Non-Disturbance and Attornment Agreement, dated June 22, 1999, recorded July 20, 1999, as Doc. No. 3182769.

22.    Lease, between 33 South 6th Street LLC, as landlord, and Iowa College Acquisition Corp., as tenant, dated November 18, 2010, as amended December 9, 2010, which is unrecorded but which is referred to in the Subordination Agreement, dated February 9, 2011, recorded March 1, 2011, as Doc. No. 4838476.

23.    Lease with Marshalls of MA, Inc., as tenant, dated June 9, 1992, a amended, which is unrecorded but which is referred to in the Memorandum of Lease, between 33 South 6th Street LLC, as landlord, and Marshalls of MA, Inc., as tenant, dated September 30, 2010, recorded April 25, 2011, as Doc. No. 4851960.

24.    Terms, conditions, and easements, as contained in the following Skyway Agreement:

(a)  Skyway Agreement, dated July 1, 1982, recorded August 22, 1983 as Doc. No. 1530919; and

(b)  Amendment to Skyway Agreement, dated August 8, 1983, recorded August 22, 1983 as Doc. No. 1530920.

25.    Terms, conditions, and easements, as contained in the Skyway Agreement, dated June 1, 1983, recorded October 5, 1983 as Doc. No. 1539116.

26.    Terms, conditions, and easements, as contained in the following Skyway Agreement:

(a)  Skyway Agreement, dated August 17, 1989, recorded December 12, 1990 as Doc. No. 2142429; and

Form No. 1068-2                                          Commitment No.:  NCS-696725-MPLS
                                                        Page Number:  15

(b)  Consent of Mortgagee, dated October 4, 1990, recorded February 20, 1991 as Doc. No. 2156217.

27.     Terms, conditions, and easements, as contained in the following Skyway Agreement:

(a)  Skyway Agreement, dated November 6, 1984, recorded November 2, 1987 as Doc. No. 1884773; and

(b)  Amended and Restated Skyway Agreement, dated October 27, 2000, recorded October 9, 2001 as Doc. No. 3442896.

28.     Terms, conditions, and easements, as contained in the following Skyway Agreement:

(a) Restated Skyway Easement and Operation Agreement, dated December 14, 1995, recorded September 4, 1997 as Doc. No. 2841241; and

(b) First Amendment to Restated Skyway Easement and Operation Agreement, dated June 17, 2014, recorded July 14, 2014, as Doc. No. 5183732.

NOTE: The foregoing Doc. No. 5183732 does not appear to have been joined in by any mortgage holders.

29.     Terms, conditions, and easements, as contained in the Skyway Agreement, dated January 18, 2002, recorded August 14, 2002 as Doc. No. 3588716.

30.     Terms and conditions, including easements, as contained in the Declaration Regarding Certain Easements, dated February 11, 1982, recorded February 22, 1982, in the office of the Registrar of Titles as Doc. No. 1458830, and recorded February 25, 1982, in the office of the County Recorder as Doc. No. 4702701.

31.     Terms and conditions, including easements, as contained in the following:

(a)  Easement dated February 26, 1981, recorded February 14, 1984 as Doc. No. 1563005; and

(b)  Consent dated January 25, 1984, recorded February 14, 1984 as Doc. No. 1563004.

32.     Terms and conditions, including easements, as contained in the following:

(a) Easement dated February 26, 1981, recorded February 14, 1984 as Doc. No. 1563006; and

(b) Consent dated January 25, 1984, recorded February 14, 1984 as Doc. No. 1563004.

33.     Terms and conditions, including easements, as contained in the Easement Agreement, dated December 1, 1993, recorded March 26, 1996 as Doc. No. 2688349.

34.     Conditional Use Permit issued by the City of Minneapolis, recorded March 29, 2011, as Doc. No. 4845439.

35.     Rights of tenants under unrecorded leases.

## Exhibit G

### EXISTING LEASES AND EXCLUSIVES

| 1. | Shorenstein – City Center (33 South 6th) Exclusive and Prohibited Uses | |
|---|---|---|
| **Tenant** | **Article/ Section Reference** | **Exclusive/Prohibited Uses** |
| Au Bon Pain (dba) | §5.01 | *Use.* The Premises shall be used and occupied primarily for the retail sale of a retail bakery café, consisting primarily of those items listed on the menu attached hereto as Exhibit F; provided Tenant shall have the right to add or delete menu items, provided such additions do not conflict with any other then-existing tenant's exclusive use. Such items shall not be deemed a violation of an exclusive use provided the sales of such items are pursuant to a change in the national menu of Tenant's franchisor, and constitutes less than ten percent (10%) of Tenant's Gross Revenue. |
| | §34.01 | *Exclusive Use.* Subject to the following and provided Tenant (a) is not in default under the terms and provisions of this Lease, and (b) is open and operating its business in the Premises in accordance with the Permitted Use as defined in Section 5.01, Landlord agrees that during the Term it will not enter into a lease agreement with respect to the Building with another party whose principal Permitted Use involves the operation of a bakery café that prepares and bakes products on-site and which offers primarily a variety of bakery café items similar to the following concepts: Panera, Camille's, Bear Rock Café, Atlanta Bread Company, Corner Bakery Café, la Madeleine Bakery, McAlister's, Just Fresh Bakery Café & Market or similar type of restaurant or successor name restaurant; and also specifically excluding Potbelly's. Notwithstanding the foregoing, such exclusive shall not apply to a grocery store including a variety of food departments; sub shops, i.e., Subway, Blimpies, Cousins, Jimmy John's; or a sit down restaurant where food is served off a menu and served at your table. |
| Greek Grill (dba) | §5.01 | *Use.* The Premises shall be used and occupied only as a fast food restaurant selling gyros and other Greek specialty items, including beverages and no other use whatsoever unless approved by Landlord in writing. |
| Allen–Edmonds Shoe | §5.01 | *Use.* Except as it relates to a permitted assignment as described in Article 11.00 below, the Premises shall be used and occupied only for the retail sale of Allen Edmonds labeled merchandise. In addition, at Tenant's option, Tenant may sell, as an incidental part of Tenant's business (in an area not to exceed 30% of the square feet in the Premises) items sold in Tenant's "Flagship" stores as well as novelty and seasonal merchandise. Tenant may also perform related services in connection with any of the foregoing. Landlord hereby represents and warrants that there are no restrictions or limitations in any agreement, recorded or unrecorded, affecting the Premises which would in any way restrict, limit, impair or prohibit Tenant's construction or operation of its store as contemplated in this Lease. |
| Whiteway Cleaners (dba) | §5.01 | *Use.* The Premises shall be used and occupied only for professional dry cleaning and laundry services with all dry cleaning and laundry services performed off the Premises. |
| The UPS Store (dba) | §5.01 | *Use.* The Premises shall be used and occupied only for parcel shipping and packaging, packaging supplies and services, postal services, metered mail, mailbox rentals, key duplication, Western Union, passport photos, electronic filing of tax returns, internet products and services, computer time rental, and other products and services generally offered by The UPS Store from time to time, provided such additional services do not conflict with any then existing exclusive. In addition, Tenant shall have the right to offer the following services, provided that such services individually or in the aggregate exceed more than 25% of Tenant's business: photocopying, facsimile for profit, printing and related services, sale of office supplies and in-store copy and print center. |
| | §31.01 | *Tenant's Exclusive Use in Building.* Provided Tenant (a) is not in default under the terms and provisions of this Lease, and (b) is open and operating its business in the Premises in accordance with the permitted Use as defined in Section 5.01, Landlord agrees that during the Term, it will not enter into any future lease agreement with another tenant in the Building whose business consists of greater than 20% of its gross revenues from the following services: packing and shipping services, overnight delivery service, postal services, mailbox rentals, facsimile for profit, copy services, stamps and meter mail service. |
| ProStaff Personnel Services (dba) | §5.01 | *Use.* The Premises shall be used and occupied only as business offices for the purpose of conducting a personnel agency and no other use whatsoever. |
| | §25.00 as amended by Second Amendment | *Exclusive.* Provided Tenant (a) is not in default under the terms and provisions of this Lease, and (b) is open and operating its business in the Premises in accordance with the Permitted Use as defined in Section 5.01, Landlord agrees that during the Term, it will not enter into a lease agreement with respect to the Building (specifically excluding the building commonly referred to as 33 South Sixth Street) with another party whose principal permitted use is for conducting business as a personnel agency.  If any other tenant or |

| | | |
|---|---|---|
| | | occupant of the Building violates the provisions of the limitation granted under this Article 25.00 without any action by Landlord permitting such a violation by signed lease or other agreement, Landlord shall have no obligation or responsibility in connection therewith, except as provided herein. |
| Fogo de Chao (dba) | §5.01 | *Use.* The Premises shall be used and occupied only as a first-class, sit-down, full service Brazilian churrascaria steakhouse, and ancillary thereto, full wine, liquor and bar service in accordance with all applicable laws and licenses for on-Premises consumption (provided Tenant obtains and maintains all necessary licenses). The menu shall be similar to the menu attached hereto as Exhibit E; provided, however, Tenant shall have the right add or delete menu items, and provided such additions do not materially conflict with any other then-existing tenant's exclusive use and subject to Landlord's prior written consent, which consent shall not be unreasonably withheld or delayed by Landlord. A conflict shall be deemed material, if the sale of any such item shall exceed 10% of Tenant's Gross Revenue as described in Section 4.09 above. |
| General Nutrition Corporation | §5.01 | *Use.* The Premises shall be used and occupied only for the retail sale of health foods, vitamins, mineral supplements, diet and weight loss products, sports nutrition supplements, natural source cosmetics and other natural source beauty aids, weight gain products, foot and back care products and all items related thereto, male and female indoor and outdoor exercise clothing and exercise wear including shirts, pants, warmup suits, jackets, hats, biking apparel, gym bags, sweat bands, belts, socks, leg warmers, unitards, leotards, racks, weight sets, home gyms and component parts, benches, and related accessories, Lite Line fitness accessories suits, shorts, trimmers, exercise vests, sports meters, sports watches, diagnostic equipment, kits and accessories, massagers, temperature packs, exercise ropes, exercise accessories, and such other items as are sold from time to time in the General Nutrition stores, and the use of coin operated machines for health check screening. |
| | §31.00 | *Other Tenants.* Provided Tenant (a) is not in default under the terms and provisions of this Lease, and (b) is open and operating its business in the Premises in accordance with the Permitted Use as defined in Article 5.01, Landlord agrees that during the Term, except for any Department Store and any existing tenant, it will not enter into a lease agreement with respect to the Building with another party whose principal Permitted Use involves the sale of health foods, vitamins, and mineral supplements. If any other tenant or occupant of the Building violates the provisions of the limitation granted under this Article 31.00 without any action by Landlord permitting such a violation by signed lease or other agreement, Landlord shall have no obligation or responsibility in connection therewith, except as provided herein. |
| Hennepin Theatre Trust | §5.01 | *Use.* The Premises shall be used and occupied only for the theatre business of Tenant, which may include theatre and other event performances, including rehearsals in preparation thereof, within the Theatre Space, the retail sale of tickets and box office merchandise related to the theatre performances, as well as beverage sales and concessions, which may include the sale of beer, wine or alcohol sold solely during any Theatre Space performance, subject to any insurance requirements described below, city license requirements or approvals which may be required. Tenant's administrative business operation associated with the Theatre Space and Tenant's other theatre enterprises outside of the Premises, or for such other purpose as Landlord may specifically authorize in writing. |
| Kaplan University (dba) | §5.01 | *Use and Exclusive Use.*<br>(a) The Premises shall be used and occupied only as a center for group or individual tutoring of classes and/or training, academic assessment, career services and/or enrichment programs (utilizing, without limitation, computers, tapes, compact discs, CD-ROMs, and other electronic equipment), test administration, sale of related materials and/or products and/or general offices and legal uses reasonably incidental thereto.<br>(b) Subject to Existing Tenants' (as described in subsection 1.01(t) above) permitted uses, and provided an Event of Default is not continuing for which Landlord has commenced an action to recover the Premises, and Tenant is then occupying and operating from the Premises, Landlord agrees not to lease any other space on the 1st, 2nd or 3rd floors of the Building to any competitor of Tenant, which shall be defined as: (i) any secondary level education school or institution, (ii) any business that provides on-site or automated instructional classes in preparation for a license or certification; (iii) any standardized test preparation for secondary or post-secondary education; or (iv) any tutoring service for groups at the K12, high school or secondary education level (collectively the "Exclusive"); provided, however, these limitations shall not limit Landlord's right to lease space to a tenant for corporate training of its employees, or to a temporary staffing or employment agency, or a business that designs or produces instructional software or materials, provided that the primary purpose of such business does not violate items (i) through (iv) above. In addition, such limitations shall not limit Landlord's right to lease space for cosmetic or culinary classes, schools or institutes (however such tenant's exterior signage shall not be any larger than Tenant's signage as described in Section 7.09 of this Lease). During the initial three (3) years of the Term, the |

| | | |
|---|---|---|
| | | Exclusive shall also apply to the Office Tower (as described in subsection 1.01(jj) above), unless the Project is sold during that time frame. If Tenant does not elect to exercise an Extension Option (as described in Article 28.00 below), the Exclusive shall be deemed null and void upon Tenant's failure to delivery its notice as required in Section 28.01(b), unless Landlord and Tenant have commenced in good faith negotiations and Landlord has confirmed in writing that the Exclusive shall survive past the notice date required in Section 28.01(b)). |
| | §5.01 | **Kiosk Restriction.** Landlord shall not construct a kiosk for the sale of any retail product in the Common Area directly in front of the Premises as of the Commencement Date which would materially affect the visibility of, or ingress or egress from, the Premises. |
| **Baja Sol Tortilla Grill (dba)** | §5.01 | **Use.** The Premises shall be used and occupied primarily for the retail sale of a casual fresh Mexican restaurant, consisting primarily of those items listed on the menu attached hereto as Exhibit F; provided Tenant shall have the right add or delete menu items, and provided such additions do not conflict with any other then-existing tenant's use and subject to Landlord's prior written consent, which consent shall not be unreasonably withheld or delayed by Landlord. |
| | §37.01 | **Tenant's Exclusive.** Provided Tenant (a) is not in default under the terms and provisions of this Lease beyond the applicable cure period, and (b) is open and operating its business in the Premises in accordance with the Permitted Use as defined in Section 5.01, Landlord agrees that during the Term, it will not enter into any future lease agreement on the skyway level in the Building whose primary use is the sale of casual fresh Mexican food. For purposes of this Article, another tenant's shall be deemed to have violated this exclusive if such tenant's gross revenues from the sale of Mexican food exceed 25% of its total gross revenue. Such exclusive use shall not apply to any full service sit down Mexican restaurant. If any other tenant or occupant located on the skyway level violates the provisions of the limitation granted under this Article 37.00 without any action by Landlord permitting such a violation by signed lease or other agreement, Landlord shall have no obligation or responsibility in connection therewith, except as provided herein. |
| **Leeann Chin, Inc.** | §5.01 | **Use.** Tenant's primary use of the Premises shall be for the operation of a quick-or-counter-service Asian café/restaurant for dine-in, carry-out or delivery (including catering) service of Asian foods. In addition, Tenant shall have the incidental right to sell Korean yogurt, non-alcoholic beverages, and other incidental non-food promotional items as are typically sold from time to time at other Tenant's stores on a national level under the same trade name (as described below), provided that the sale of such incidental products does not violate any other tenant's exclusive. Subject to Tenant obtaining the necessary permits and maintaining insurance acceptable to Landlord as it relates to the sale of alcoholic beverages, Tenant may offer for incidental sale on-Premises beer, wine and other non- hard alcoholic beverages. Landlord warrants that Tenant's primary intended use as set forth herein is not in conflict with any other leases or occupancy agreements of the Building, and Landlord shall hold Tenant harmless from any claims to the contrary by other tenants or occupants of the Building. |
| | §32.00 | **Exclusive Use.** Provided Tenant (a) is not in default under the terms and provisions of this Lease beyond any applicable notice and cure period, and (b) is open and operating its business in the Premises in accordance with its primary Use as described in Section 5.01 above, Landlord agrees that during the Term, except for any (i) Department Store, or (ii) existing tenants' permitted uses, it will not enter into a lease agreement with respect to the Building with another party whose principal Use involves a quick-or-counter-service café/restaurant in violation of Tenant's primary Use as described in Article 5.00 above. If any other tenant or occupant of the Building violates the provisions of the limitation granted under this Section without any action by Landlord permitting such a violation by signed lease or other agreement, Landlord shall have no obligation or responsibility in connection therewith, except as provided herein. |
| **Len (dba)** | §5.01 | **Use.** The Premises shall be used and occupied only for the Permitted Use (the display and sale of discounted men's and women's apparel, accessories, and other items sold at Tenant's other locations, and no other use whatsoever) and for no other use or purpose whatsoever. |
| | §5.04 | **Restrictions on Use.** Tenant (or anyone acting through, for, or in place of Tenant) shall not: <br>(a) conduct, permit or advertise on or from or pertaining to the Premises any fire, bankruptcy, liquidation, going out of business or auction, whether real or fictitious; <br>(b) use, or permit to be used, the malls or sidewalks adjacent to the Premises, or any other Common Areas for the sale or display of any merchandise or for any other business, occupation, or undertaking; <br>(c) use, or permit to be used, any sound broadcasting system or amplifying device which can be heard outside of the Premises; <br>(d) use or permit the use of any portion of the Premises as regular living quarters, sleeping apartments, lodging rooms, or for any unlawful purpose; <br>(e) use the Premises for, or conduct therein, any shooting gallery, flea circus, or similar business activity; |

| | | |
|---|---|---|
| | | (f) use, operate, or maintain such space in such manner that any of the rates for any insurance carried by Landlord or any Department Store shall thereby be increased over the rates which would otherwise be payable in a high quality, multi-use center such as the Project; or<br>(g) grant any concession, license, or permission to any third party to sell or take orders for merchandise or services in the Premises. |
| Marshall's | §5.01    as amended    by Assignment and    Second Amendment | *Use.*  The Premises shall be occupied and used by Tenant solely for the purpose of conducting therein the business of the retail sale of men's, women's and children's clothing and accessories similar to that sold in other Marshall's Stores, and Tenant shall not use or permit or suffer the use of the Premises for any other business or purpose; provided however, Tenant shall have the right to designate an area not to exceed one thousand (1,000) square feet in the Premises to be used by Tenant for its regional offices. Except as otherwise provided herein, during the Term of this Lease, or upon assignment as provided in Article 11 of this Lease, Tenant shall not use the Premises or any portion thereof or permit the Premises or any portion thereof to be used for: the conduct of a business operation which otherwise (i) regularly or with significant frequency sells merchandise of the type or qualities now commonly known as "odd lot", "cancellation", "second", "factory reject", "sample", *floor model", "demonstrator", "distressed", "bankruptcy", or "fire sale"; provided however, this clause is not intended to prohibit the conduct of stores such as those presently operated under the names of "Filene's Basement", "Marshalls", "Sym's", "TJ Maxx" or "Loehmann's"; (ii) violates any non-compete provision existing at the time of this Lease's execution with any other tenant in the Shopping Center; (iii) violates any non-compete provision with any future tenant, present at the time of such change in use or assignment in the Shopping Center or Carson Premises, provided such Shopping Center tenant occupies at least four thousand (4,000) square feet, and such Carson Premises tenant occupies at least ten thousand (10,000) square feet; (iv) includes any retail or non retail use not otherwise permitted above, including, but not limited to, office space not incidental to Tenant's retail operation or regional offices, warehouse or manufacturing; or (v) any obnoxious or offensive use. |
| | §6.01 | *Exclusive Use.*  Tenant shall have the exclusive right to operate in the Carson Premises and City Center the business of the retail sale of predominantly off-priced apparel and accessories related thereto, provided that such exclusive use does not apply to any tenant In the Carson Premises occupying less than ten thousand (10,000) square feet. This Section is specifically intended to exclude, but is not limited to, the operation of a competing business by the following type of tenants:  "Marshalls", "Sym's", "TJ Maxx", "Loehmanns", or similar retailers of similar products provided the foregoing occupy less than ten thousand (10,000) square feet in the Carson Premises of City Center. |
| Pacifier, Inc. | §5.01 | *Use.*  The Premises shall be used and occupied only for the display and sale of upscale boutique baby clothing, gifts, gear (i.e. strollers and diaper bags), including the incidental sale (defined as less than ten percent (10%) of Gross Revenue) of maternity wear, and no other use whatsoever; provided, however, such items do not conflict with any other then-existing tenant's exclusive use. |
| Brooks Brothers | §5.01 | *Use.*  The Premises shall be used and occupied only as a "Brooks Brothers Store." For purposes of this Lease, a "Brooks Brothers Store" shall mean a retail operation conducted under the tradename "Brooks Brothers" or such other tradename under which Tenant operates all or substantially all of its retail stores. Tenant shall open for business as an upscale men, women and children clothing retailer selling at full retail Brooks Brothers brand apparel and accessories. In addition, at Tenant's option, Tenant shall have the right to sell, as an incidental part of Tenant's business, including, but not limited to, "346" Brooks Brothers labeled merchandise, lingerie, household fashion accessories, decorative accessories and home furnishings, cosmetics, toiletries, fragrances and personal care products, and items sold in Tenant's "Flagship" stores as well as novelty and seasonal merchandise; provided, however, the sale of such incidental product does not exceed fifteen percent (15%) of the floor area in the Premises and does not violate the provisions of any exclusive use clause contained in any then-existing lease of another tenant in the Building. |
| | §6.04 | Landlord will not construct any structure or kiosk in the area shown on attached Exhibit F. In the event that Landlord installs, repairs or places within the Premises, pipes, ducts, conduits, wires or other mechanical equipment servicing other parts of the Building other than the Premises, Landlord shall use reasonable efforts to locate such items in storage areas, above the ceiling, below the floors or in the columns of the Premises. |
| Rosa Mexicano | §5.01 | *Use and Exclusive Use.*<br>(a) The Premises shall be used and occupied only in a manner consistent with Tenant's affiliates' then prototypical first-class, sit-down, full service restaurant and bar and brand standards of Tenant and its affiliates operating under the Trade Name. Tenant shall operate in the Premises in accordance with all applicable laws and license for on-premises consumption, including alcohol (provided Tenant obtains and maintains all necessary licenses required therein). The menu shall substantially consist of items as are |

<table>
<tr><td colspan="2"></td><td>typically sold from time to time at Tenant's affiliates' other full service restaurants on a national level under the same Trade Name. Tenant may not change its Trade Name without the prior written consent of Landlord unless the trade name of all other Rosa Mexicano locations are also changed and continue thereafter under that trade name.<br>(b) Subject to the permitted uses currently granted to one (1) existing tenant (Baja Sol) of the Building ("Existing Tenant"), and an occasional regional theme menu by the existing restaurant tenant, Forum, and provided an Event of Default is not occurring for which Landlord has commenced an action to recover the Premises, and Tenant is then occupying and operating from the Premises, Landlord agrees not to lease to any other tenant in the Building areas described hereafter, whose menu consists of at least twenty-five percent (25%) of items typically identified as "Mexican", "Tex-Mex", or "Southwest U.S." cuisine (collectively "Mexican Cuisine) (i) in the entire Building for the operation of a full service restaurant or bar; or (ii) on the street level of the Building for the operation of a quick service restaurant serving Mexican Cuisine. Notwithstanding the foregoing, Tenant hereby acknowledges and agrees that Landlord shall be permitted to lease space on the skyway level of the Building to a quick service restaurant serving Mexican Cuisine (including the Existing Tenant), provided, however, such tenant shall not serve beer, wine or alcohol. Landlord is hereby expressly prohibited from leasing space in the Building for the operation of a Chipotle.</td></tr>
<tr><td>Starbucks Corporation</td><td>§5.01</td><td><em>Use.</em>  The Premises shall be used and occupied as a coffee shop for the retail sale of (a) fresh whole and ground coffee beans, (b) coffee by the cup, (c) espresso based drinks, (d) pre-packaged coffee beans, and including at Tenant's discretion (e) iced beverages (f)teas and spices, (g) coffee and tea related equipment and supplies (h) baked goods, (i) seasonal, promotional and Tenant's branded merchandise, (j) the incidental sale of frozen desserts and novelties, (k) coffee/tea related books and magazines ( including Oprah Book Club books) and three (3) daily newspapers provided in no event shall Tenant be permitted to sell any other books, newspapers or magazines; and (l) assorted salads, sandwiches and perishable food items provided the display of such incidental salads, sandwiches and food items shall be limited to no more than twelve (12) linear feet of case display and no other use whatsoever without the prior written consent of Landlord.</td></tr>
<tr><td>E-Nails & Spa (dba)</td><td>§5.01</td><td><em>Use.</em>  The Premises shall be used and occupied only for the operation of a manicure and pedicure salon, and for no other use whatsoever. Tenant shall operate and conduct its business under the trade name Nail Charm, and under no other name whatsoever.</td></tr>
<tr><td>Wells Fargo Bank</td><td>§5.01</td><td><em>Use.</em>  The Premises shall be used and occupied only as retail banking facilities, including any automatic banking equipment or instant cash machines (hereinafter collectively called "cash machines") as may from time to time be available and any and all other uses incidental to the operation of a major commercial banking operation, excepting drive- in facilities, or for such other purposes as Landlord may specifically approve in writing.</td></tr>
<tr><td></td><td>§5.01(a)</td><td><em>Exclusive.</em>  At the request of Tenant, so as to afford Tenant a reasonable opportunity to recover its investment in the Premises, Landlord agrees that, if Tenant is not in material default under this Lease, Landlord will not hereafter enter into any lease with any third party for space in the Building or Major Restaurants for any portion of the Term with any state bank or trust company, national banking association, mutual savings bank, industrial loan and thrift companies or state or federally chartered savings and loan association for use as a retail banking or savings and loan facility; provided, however, that Tenant shall indemnify and hold harmless Landlord from and against every demand, claim, cause of action, judgment and expense arising from any resulting violation of federal or state antitrust, restraint of trade, or similar law. Nothing herein shall preclude Landlord from entering into any lease for space to a mortgage banker, credit union operated by another major tenant in the Project for its employees, or securities broker. In addition, nothing herein shall preclude Landlord from entering into a lease to any kind of tenant anywhere in the Project for office use. Notwithstanding the foregoing and notwithstanding that certain lease between Landlord and Tenant, dated July 26, 1978 (the "Phase II Lease"), with respect to space to be constructed hereafter on the block in down-town Minneapolis bounded by Marquette Avenue, Nicollet Mall, 6th Street South and 7th Street South ("Phase II"), Landlord may lease location no. 205, as shown on Exhibit A-2 attached hereto and hereby made a part hereof, and such other locations in the Building and Major Restaurants upon which the parties shall mutually agree to be used for cash machines, and the right of first refusal contained in the Phase II Lease shall not apply to such use. The preceding sentence shall survive the termination of this Lease for so long as the Phase II Lease remains in effect, as the same may be renewed or extended.</td></tr>
<tr><td>Billy & Marty's (Nash of Minneapolis Inc) Convenience store</td><td>§8.a.</td><td>Use:  The Premises shall be used solely for the operation of a first class convenience store consisting of the sales items listed on attached Exhibit F and for no other purpose. Without limitation of the foregoing, in no event may Tenant sell beer, wine or liquor at the Premises. EXHIBIT F is as follows:<br>SUNDRIES:<br>•        Health and beauty aid products<br>•        Cigarettes and related tobacco products<br>•        Paper supplies</td></tr>
</table>

|  |  | • Office supplies<br>• Batteries<br>• Sunglasses, reading glasses<br>• Minor hardware<br>• School supplies<br>• Packaged specials<br>• Helium filled balloons<br>• Lottery and lotto tickets<br>• Film Processing<br>• Miscellaneous sundries<br>• Greeting cards<br>• Phone cards<br>• Automated Teller Machine ("ATM")<br><br>READING MATERIAL:<br>• Magazines (excluding "adult" magazines)<br>• Books<br>• Newspapers<br>• Maps<br>• Postcards<br><br>FOOD AND DRINK ITEMS:<br>• Sodas, juices, waters, seltzers (including fountain, canned and bottled)<br>• Milk and dairy products<br>• Coffee, espresso, tea, hot chocolate<br>• Candy, gum, mints<br>• Chips, snacks, nuts, seeds crackers<br>• Cookies, cake, and bread<br>• Pre-packaged sandwiches and salads<br>• Pastries, donuts, muffins, bagels, etc.<br>• Fresh fruit and vegetables<br>• Frozen yogurt, ice cream (soft or pre-packaged)<br>• Frozen foods, microwave items<br>• Canned goods<br>• Condiments<br><br>NO exclusive rights. |
| The Salad Bar | 8.a. | **Use:** Solely for the operation of a first class salad bar and catering services for such salad bar, and for no other use or purpose. Tenant may not serve any alcoholic beverages.<br><br>**Exclusive:** Subject to existing leases, LL will not lease space in the Project to a restaurant that primarily serves salads. A business shall not be deemed to "primarily serve salads" unless more than fifty percent (50%) of its food menu consists of salads. |
| Corrective Exercise Specialists | 8.a. | **Use:** Solely for operation of a first class fitness gym specializing in custom-tailored programs and personal training services.<br><br>T does NOT have any exclusive rights. |
| Four Sevens LLC | 8.a. | **Use:** The Premises shall be used solely for the operation of a sit down restaurant and bar, offering both lunch and dinner service, and no other use or purpose. Tenant acknowledges that Tenant does not have the exclusive right to operate a restaurant or bar in the Building or at the Project or the exclusive right to sell any item which Tenant is permitted to sell hereunder. |
| Saks & Company LLC | 9.1 – 9.2 | **Use:** Tenant will build out the Demised Premises from the "white box" condition as described herein and open its store for business with the public not later than six (6) calendar months following the Landlord Delivery Date (subject to delays caused by Landlord or its employees, contractors and agents and/or Force Majeure) for at least three (3) years as a retail store under the trade name "Saks Fifth Avenue Off Fifth", "Off 5th", "Saks 5th Avenue Off 5th", "Saks 5th", "Off 5th-Saks 5th Avenue Outlet", "Saks", "Saks Fifth Avenue" or such other trade name being used from time to time to identify the majority of the off-price retail stores operated by Tenant and/or its affiliates in the state(s) of Minnesota and Illinois that were previously operated as a Saks Fifth Avenue Off Fifth (any such store being sometimes referred to in this Lease as a "Saks Store"), with a level of inventory and level of staffing that is customary for Tenant's stores operating in the Illinois and Minnesota marketplaces.<br><br>After the expiration of the three (3) year period, Tenant shall have the right to use and occupy, if at all, the Demised Premises or any portion or portions thereof, for any and all lawful retail purposes, except for uses listed as prohibited uses on attached Exhibit C and uses that would violate an existing exclusive use restriction listed on Exhibit C and which remains in effect (collectively the "Prohibited Uses"). |

**Exhibit H**

**PROHIBITED USES**

No portion of the Shopping Center will be used for any of the following:

1.      A billiards parlor, pool hall, arcade, video or game room.

2.      A flea market or pawnshop.

3.      A training or educational facility (including without limitation, a school, college, reading room, or other facility catering primarily to students and trainees rather than to customers or employees employed on premises provided that educational or training classes as part of a permitted use shall be permitted).

4.      A medical clinic or office (which shall not preclude an optometrist's office located in a store selling eyeglasses, contact lenses and similar eye ware products or a person who may, by law, write prescriptions in connection with the operation of a pharmacy or a medical or a medically-related activity then being conducted in, and incidental to, retail drug stores).

5.      Any governmental or political operation of any kind, including without limitation post office, welfare office, motor vehicle or other licensing, testing or inspection operation, or any political or candidate office or operation.

6.      A dry cleaning plant, central laundry or laundromat (which shall not preclude a "drop off" and "pick up" dry cleaning service where all dry cleaning processes shall be located outside of such premises).

7.      A piercing pagoda or tattoo parlor or similar establishment.

8.      An adult type bookstore or other establishment selling, renting, displaying or exhibiting pornographic or obscene materials (including without limitation:  magazines, books, movies, videos, photographs or so called "sexual toys") or providing adult type entertainment or activities (including, without limitation, any displays of a variety involving, exhibiting or depicting sexual themes, nudity or lewd acts.  [This clause shall not prohibit or limit the items typically sold by a business of the type operated on the date hereof under the trade names "Barnes & Noble" or "Borders."]

9.      A massage parlor or any establishment purveying similar services.

10.     A house of worship, church, reading room, mortuary, crematorium or funeral home.

11.     A telephone call center (which shall not preclude a telephone store, cellular and otherwise).

12.     A gambling establishment of any kind including, without limitation, a casino, bingo parlor or betting parlor (but lottery tickets may be sold and government sponsored lottery and similar gaming devices may be operated incidental to non-casino and non-hotel primary business at the premises).

13.     An assembling, manufacturing, industrial, distilling, refining or smelting facility.

14.     A storage warehouse or storage facility, except for storage incidental to a permitted use.

15.     The conduct of any "fire sale," going out of business sale or bankruptcy sale (except pursuant to a court order) or any auction house operation.

16.     Any use which regularly emits a noxious odor, loud noises or sounds which can be heard or smelled outside of the occupant's premises.

17.     A "so called" head shop.

18.     A "dollar store".

19.     A nightclub or dance club.

20.     A so-called "second hand" or surplus store, swap meet or junk yard, including "goodwill" or any similar operator. [*LISTED IN ITEM 2*]

21.     Automobile repair work, automotive service, automobile body shop or gas station.

22.     Automobile, boat, trailer, mobile home or truck leasing or sales.

23.     Amusement park, carnival, fair, pool hall, arcade, or other amusement center.

24.     Any manufacturing, assembling, distribution or warehouse (except as incidental to a retail operation).

25.     Funeral parlor.

26.     Animal raising or storage or veterinary hospital (except as incidental to a pet supply store).

27.     Gun range or the sale of fireworks.

28.     Any use which constitutes a public or private nuisance or produces unreasonably objectionable noise, smell or vibration.

29.     Any business operated only on a seasonal or part-time basis except as may be consistent with a first class promotional shopping center; and provided that any such uses for a term of less than one year shall not be taken into account as Required Co-Tenants.

Exhibit I

MEMORANDUM OF SHOPPING CENTER LEASE

After recording, please return to:
TSA Stores, Inc.
1050 West Hampden Avenue
Englewood, Colorado 80110
Attention: Real Estate Department

MEMORANDUM OF SHOPPING CENTER LEASE

*[TO BE REVISED ACCORDINGLY UPON FINALIZATION OF LEASE]*

Demise.  Pursuant to a Shopping Center Lease having the date set forth below ("Lease"), between the "Landlord" and "Tenant" named below, Landlord has leased and does hereby lease to Tenant the "Premises" described below for the "Term" described below and otherwise upon the terms and conditions set forth in the Lease. Capitalized terms used but not defined herein have the meanings set forth for such terms in the Lease.

Effective Date of Lease.  _____, 20__.

Name and Address of Landlord.  _____, a _____ having an office at _____.

Name and Address of Tenant.  TSA STORES, INC., a Delaware corporation, having an office at 1050 West Hampden Avenue, Englewood, Colorado 80110, Attention:  Senior Vice President - Real Estate.

Description of Premises.  Approximately _____ (dimensions ___' of frontage by ___' in depth) square feet of Floor Area and being a part of the _____  Shopping Center ("Shopping Center") located in the City of _____, County of _____ and State of _____, and constructed on land described in Exhibit A attached hereto.  The location of the Premises within the Shopping Center is depicted on the site plan attached hereto as Exhibit B.

Term of Lease.  Commencing on the Commencement Date of the Lease and ending on the last day (i.e., January 31) of the __th Lease Year.

Options to Extend.  The Lease grants to Tenant successive options to extend the Term from the date upon which the Term would otherwise expire for _____ additional periods of _____ years each.

Development Restrictions.  *[TEXT FROM SECTION 4.4 OF THE LEASE TO BE ADDED]*

Prohibited Uses.  There exists in the Lease various restrictions upon other uses at the Shopping Center.

Exclusive.  *[TEXT FROM SECTION 16.2(a) OF THE LEASE TO BE ADDED]*

Restricted Uses.  *[TEXT FROM SECTION 16.4 OF THE LEASE TO BE ADDED]*

This instrument is intended to be only a Memorandum of Lease in respect to the Lease, to which Lease reference is made for the full agreement between the parties.  This Memorandum is not intended to modify any term, provision or condition of the Lease and to the extent of any conflict between this Memorandum and the Lease, the Lease will control.

I-1

EXECUTED as of the Effective Date of Lease set forth above.

**TENANT:**

TSA STORES, INC., a Delaware corporation

By: _____
Name: _____
Title: _____

Date of execution by Tenant: _____, 20__

**LANDLORD:**

_____,

a _____

By: _____
Name: _____
Title: _____

Date of execution by Landlord: _____, 20__

**ACKNOWLEDGMENTS**

<u>TENANT</u>

STATE OF _____ )
                    ) ss.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____, 20__ by _____ as _____ of TSA Stores, Inc., a Delaware corporation.

WITNESS my hand and official seal.

_____
Notary Public

My commission expires: _____

<u>LANDLORD</u>

STATE OF _____ )
                    ) ss.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____, 20__ by _____ as _____ of _____, a _____.

WITNESS my hand and official seal.

_____
Notary Public

My commission expires: _____

Exhibit J

## SHOPPING CENTER RULES AND REGULATIONS

1.      No barbering or bootblacking, shoeshining or shoe repair services shall be provided to the Premises, except from persons authorized by Landlord and at the hours and under regulations fixed by Landlord.

2.      The directory of the Building will be provided exclusively for the display of the name and location of tenants.

3.      The sidewalks, halls, passages, exits, entrances, elevators and stairways shall not be obstructed by any of the Tenant Parties or used by Tenant for any purpose other than for ingress to and egress from its Premises.

4.      Tenant shall be responsible for installing and maintaining locking mechanisms on all doors and entrances in or to the Premises.  If Tenant does not provide Landlord with a key to the Premises for use in an emergency, Tenant hereby releases Landlord from any losses and costs incurred by Landlord as a result of a forced entry in the event of an emergency.

5.      The toilet rooms, toilets, urinals, wash bowls and other apparatus shall not be used for any purpose other than that for which they were constructed and no foreign substance of any kind whatsoever shall be thrown therein and the reasonable expense of any breakage, stoppage or damage resulting from the violation of this rule shall be borne by the tenant who, or whose employees or invitees, shall have caused it.

6.      Tenant shall not load the floor of the Demised Premises with weight in excess of 100 pounds per rentable square foot.

7.      The elevator designated for freight by Landlord shall be available for use by all retail tenants of the Building  during the hours and pursuant to such procedures provided for in the Lease. In no event shall Tenant employ any person or company whose presence may give rise to a labor or other disturbance in the Project. A certificate or other verification of such insurance  as required by the Lease must be received by Landlord prior to the start of any moving operations.  All moving operations shall be conducted at such times and in such a manner as Landlord shall direct, and all moving shall take place during non-business hours unless Landlord agrees in writing otherwise.

8.      Signage shall be governed by the express terms of the Lease.

9.      Tenant shall not use, keep or permit to be used or kept any foul or noxious gas or substance in the Premises, or permit or suffer the Premises to be occupied or used in a manner offensive or objectionable to Landlord or other occupants of the Building by reason of noise, odors and/or vibrations, nor shall any animals (except service animals) or birds be brought in or kept in or about the Premises or the Building. In no event shall Tenant keep, use, or permit to be used in the Premises or the Building any guns, firearm, explosive devices or ammunition.

10.      Extermination Services. Tenant shall use, at its own cost and at such intervals as Tenant uses in the  geographic areas of Minnesota and Illinois, a pest extermination contractor to provide extermination services in the Premises.

11.      Tenant shall not use or keep in the Premises or the Building any kerosene, gasoline, or inflammable or combustible fluid or material (other than typical cleaning products), or use any method of heating or air conditioning other than that supplied by Landlord.

12.      Intentionally Omitted.

13.      Upon the expiration or earlier termination of the Lease, Tenant shall deliver to Landlord the keys of offices, rooms and toilet rooms which have been furnished by Landlord to Tenant.

14.      Tenant shall not lay linoleum, tile, carpet or other similar floor covering so that the same shall be affixed to the floor of the Premises, except to the extent shown on Tenant's Plans.

15.      Emergencies. Tenant shall immediately notify the business office of the Landlord at the Building of any casualty or criminal activity which comes to its attention in the Premises or in any of the Common Areas.

16.      In case of invasion, mob, riot, public excitement, or other commotion, Landlord reserves the right to prevent access to the Building during the continuance of the same by closing the doors or otherwise, for the safety of the tenants and protection of property in the Building.

17.      Tenant shall be responsible for insuring that the doors of the Premises are closed and securely locked before leaving the Building and must observe due care and caution that all water faucets or water apparatus are entirely shut off before Tenant or Tenant's employees leave the Building, and that all electricity, gas or air shall likewise be shut off, so as to prevent waste or damage.

18.     Landlord reserves the right to exclude or expel from the Building any person who, in the judgment of Landlord, is intoxicated or under the influence of liquor or drugs, or who shall in any manner do any act in violation of any of the rules and regulations of the Building.

19.     The requirements of any tenant will be attended to only upon application at the office of the Building. Employees of Landlord shall not perform any work or do anything outside of their regular duties unless under special instructions from Landlord, and no employee will admit any person (tenant or otherwise) to any office without specific instructions from Landlord.

20.     Intentionally Omitted.

21.     Subject to Tenant's right of access to the Premises in accordance with the terms of the Lease, Landlord reserves the right to close and keep locked all entrance and exit doors of the Building during hours other than Business Hours on Business Days or Regular Saturday Hours, or during such further hours as Landlord may deem advisable for the adequate protection of the Building and the property of its tenants; provided, however, Tenant shall be permitted to open and stock the Premises at least one hour before and one hour after opening and closing, as applicable.  Notwithstanding the foregoing, except in the event of force majeure and subject to the immediately following sentence, there shall be access to the mall 7 days a week during Tenant's business hours.  At the option of Landlord, the mall entrances may be closed on Thanksgiving and Christmas, in which event customers of the Premises will only be able enter the Premises on those days through the front door of the Premises.

22.     Tenant shall use commercially reasonable efforts to practice energy conservation within the Premises and shall cooperate with landlord in establishing and implementing such conservation programs as Landlord may from time to time develop, without material cost to Tenant.

23.     Tenant shall operate its heating and air conditioning so that the temperature in the Premises will be substantially the same as that in the adjoining Common Areas, and shall set Tenant's thermostat at the same temperature as the thermostat on the same level in the Common Areas which is nearest the Premises. Tenant shall operate ventilation so that the relative air pressure in the Premises will be substantially the same as or greater than that in the adjoining Common Areas as required by Landlord.

24.     Landlord reserves the right to restrict or prohibit canvassing, soliciting, or peddling in the Building. Tenant shall not distribute any handbills or other advertising or promotional materials within the Building (except within the Premises) or the adjacent sidewalks without Landlord's prior written consent in its reasonable discretion.

25.     Employees, Agents, and Invitees. In these Rules and Regulations, the term "Tenant" includes the employees, agents, invitees and licensees of Tenant.

In the event of a conflict with these rules and the express terms of this Lease, the terms of the Lease shall control.

Exhibit K

FORM OF ESCROW AGREEMENT

ESCROW AGREEMENT
INTEREST BEARING
(Escrow #NCS-7100949-SF)

THIS ESCROW AGREEMENT (the "**Agreement**"), is made and entered into as of the ___ day of _____, 2014, by and among SRI TEN CITY CENTER LLC, a Delaware limited liability company ("**Landlord**"), TSA STORES, INC., a Delaware corporation ("**Tenant**") and FIRST AMERICAN TITLE INSURANCE COMPANY ("**Escrow Agent**").

RECITALS

A.    Landlord and Tenant are parties to that certain lease, dated as of _____ __, 2014 (the "**Lease**"), pursuant to which Tenant is leasing landlord certain premises in the retail shopping center commonly known as "City Center" and located in the City of Minneapolis, County of Hennepin and State of Minnesota Minneapolis (the "**Shopping Center**").   All capitalized terms not otherwise defined herein shall have the meaning given them in the Lease.

B.     Pursuant to Section 6 of Exhibit C of the Lease, Landlord is required to pay to Tenant an "**Allowance**" of up to $1,487,636.00.  Capitalized terms not otherwise defined in this Agreement shall have the meanings ascribed to those terms in the Lease.

C.     Escrow Agent has agreed to perform as the escrow agent for the aforementioned escrow and Landlord, Tenant and Escrow Agent are entering into this  Agreement to set forth the terms of the escrow.

NOW, THEREFORE, for and in consideration of the agreements set forth in the  Lease and the mutual covenants set forth herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.     Deposit of Escrow Funds.  Concurrently with the full execution and delivery of this Escrow Agreement and the Lease, Landlord shall deposit $1,487,636.00 with Escrow.  Upon receipt of such funds by Escrow Agent, such funds shall constitute the "**Escrow Funds**" for purposes of this Agreement.  The Escrow Funds shall be submitted in United States currency, by wire transfer or check payable to Escrow Agent.  All checks must be from U.S. banks and no funds shall be released pursuant to Agreement until such time as the banking institution considers funds to be "good funds".  Escrow Agent hereby agrees to hold, administer, and disburse the Escrow Funds pursuant to this Agreement.  Escrow Agent shall invest the Escrow Funds in an interest bearing account with a federally insured financial institution.  All interest or other income accrue to Landlord and shall not be deemed a part of the Escrow Funds.  Escrow Agent's fee in the amount of $1,000.00 shall be paid by Landlord.

Escrow Agent shall not be responsible for any penalties, or loss of principal or interest or any delays in the withdrawal of the funds which may be imposed by the bank as a result of the making or redeeming of the investment pursuant to our instructions, nor shall Escrow Agent be liable for any loss or impairment of funds while those funds are in the course of collection or while those funds are on deposit in a financial institution if such a loss or impairment results from the failure, insolvency or suspension of the financial institution, so long as Escrow Agent deposited the funds with the bank referenced in the investments instructions.

2.     Disbursement of Escrow Funds.  Pursuant to the Lease, the Escrow Funds are to be disbursed to Tenant upon Tenant's written request to Landlord (the "Disbursement Request") in progress payments after the Delivery Date (as defined in the Lease).  Such progress payments will be made not later than 30 days after receipt by Landlord from Tenant of (a) a detailed description of the work performed, (b) copies of Tenant's invoices from its architect, engineer or contractor, (c) a certificate from Tenant indicating that the work to which such invoices relate has been substantially completed and/or the materials to which such invoices relate have been installed in, or delivered to, the Premises.  Such progress payments will be made payable jointly to Tenant and named contractor, unless such Disbursement Request is accompanied by lien releases or other evidence of payment, and will be for the amount of the submitted invoices, less a 10% retainage. As a condition precedent to Escrow Agent's issuing any such progress payment subsequent to the first such progress payment, Tenant will deliver to Landlord an original lien waiver from its contractor in form and substance reasonably acceptable to Escrow Agent, waiving any claim for a mechanic's or materialman's lien with respect to the labor and materials reflected in the invoices submitted for the immediately preceding progress payment.  A further condition precedent to Escrow Agent's issuing the last such payment for the amount of the retainage will be that Landlord has received from Tenant (either prior to or simultaneously with the issuance of such final payment) the following:  (a) notice from Tenant's contractor that Tenant's Work has been completed (including completion of any punch list items); (b) a final and unconditional original lien waiver from Tenant's contractor in connection with Tenant's Work; and (c) a copy of the final certificate of occupancy for the Premises issued by the appropriate Governmental Authorities.  The total of all such progress payments will in no event exceed the amount of the Escrow Funds,.  If the amount of the remaining Escrow Funds exceeds the total cost incurred by Tenant in designing and performing Tenant's Work, Tenant may utilize an amount not to exceed twenty percent (20%) of the Escrow Funds, at Tenant's option (i) to pay for costs incurred by Tenant for obtaining and installing Tenant's fixtures, furnishings and equipment in the Premises (in which event,

such funds shall be disbursed in the manner provided above); or (ii) to apply such funds to the first accruing amounts of Rent due under this Lease; following which, in either event, all remaining Escrow Funds shall be disbursed to Landlord.

Tenant shall, concurrently with Tenant's delivery of the Disbursement Request to Landlord, deliver a copy of the Disbursement Request to Escrow Agent. Within five (5) business days following Landlord's receipt of the Disbursement Request from Tenant, Landlord shall notify Escrow Agent in writing (or by email) of whether the requirement for the disbursement of the Escrow Funds, as set forth in the first sentence of this Paragraph 2, has been met. If Landlord notifies Escrow Agent that the condition for disbursement has been met, Escrow Agent shall disburse the amounts described in the Disbursement Request to Tenant. If Landlord notifies Escrow Agent in writing (or by email) that the condition for disbursement has not been met, Escrow Agent shall not disburse to Tenant any amounts from the Escrow Funds. In no event shall Escrow Agent disburse any portion of the Escrow Funds unless Escrow Agent has received written instruction (or instructions via email) from Landlord to do so pursuant to the foregoing.

After the disbursement of the Escrow Funds to Tenant in accordance with the terms hereof, Escrow Agent shall disburse any accrued interest remaining to Landlord.

In no event may Escrow Agent act on oral instructions from Landlord or Tenant for any purpose hereunder.

3.    Resolution of Dispute. Notwithstanding the provisions of Paragraph 2 above, in the event of a dispute between the parties hereto regarding whether the condition for disbursement, as set forth in the first sentence of Paragraph 2, has been met, the provisions of Paragraph 10 of the attached Escrow General Provisions shall apply.

4.    Limit on Escrow Agent Liability. In performing any of its duties hereunder, Escrow Agent shall not incur any liability to anyone for damages, losses, or expenses, except for willful default or breach of trust, and it shall accordingly not incur any such liability with respect to (i) any action taken or omitted in good faith upon advice of its legal counsel given with respect to any questions relating to the duties and responsibilities of Escrow Agent under this Agreement, or (ii) any action taken or omitted in reliance upon any instrument, including any written notice or instruction provided for in this Agreement, not only as to its due execution and the validity and effectiveness of its provisions but also as to the truth and accuracy of any information contained therein, which Escrow Agent shall in good faith believe to be genuine, to have been signed or presented by a proper person or persons, and to confirm with the provisions of this Agreement.

Escrow Agent is acting in the capacity of a mere stakeholder only, and as such, shall not be answerable, liable or accountable except for its willful misconduct or negligence in the performance of its obligations and duties as Escrow Agent. Landlord and Tenant hereby agree to indemnify and hold Escrow Agent harmless against any and all losses, claims, damages, liabilities, and expenses, including, without limitation, reasonable costs of investigation and legal counsel fees (collectively, "Claims"), which may be imposed upon Escrow Agent or incurred by Escrow Agent in connection with the performance of its duties hereunder, including, without limitation, any litigation arising from this Agreement or involving the subject matter hereof, excluding, however, Claims to the extent arising from the willful misconduct or negligence of Escrow Agent.

5.    Notices. Whenever any notice of other communication is required or permitted hereunder, such notice or other communication shall be in writing and shall be delivered by reputable overnight courier (receipt evidencing delivery required), hand delivered (including by same day courier, receipt evidencing delivery required), or sent by U.S. registered or certified mail, return receipt requested, postage prepaid (except that email is permitted in the limited circumstances expressly provided for in Paragraph 2 above), to the addresses set out below or at such other addresses as are specified by written notice delivered in accordance herewith:

LANDLORD:    Shorenstein Realty Services East LLC
235 Montgomery Street, Suite 1600
San Francisco, CA 94104
Attn: Corporate Secretary

with a copy to:

Shorenstein Realty Services East LLC
850 Third Avenue, Suite 1700
New York, NY 10022
Att'n: Ms Ronnie Ragoff
(212) 843-7226

TENANT:

1050 West Hampden Avenue
Englewood, Colorado 80110
Attn: Senior Vice President - Real Estate

With a copy to:

1050 West Hampden Avenue
Englewood, Colorado 80110
Attn: Legal Department


ESCROW AGENT:        First American Title Insurance Company
                     National Commercial Services
                     1737 N. First Street, Suite 500
                     San Jose, CA 95112
                     Att'n: Ms. Dian Blair
                     Escrow No: _____


Any notice or other communication delivered as hereinabove provided shall be deemed effectively given or received on the date of actual delivery or receipt (or, if applicable, on the date of rejection, which shall include inability to deliver due to the address on record no longer being a current address).

6.      Miscellaneous.

        a. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, personal representatives, successors, and assigns. Any and all rights granted to any of the parties hereto may be exercised by their agents or personal representatives.

        b. Time is of the essence of this Agreement.

        c. This Agreement is governed by and is to be construed under the laws of the State of Minnesota, and may be executed in several counterparts, each of which shall be deemed an original, and all such counterparts together shall constitute one and the same instrument.

        d. Landlord shall provide the Escrow Agent the wire transfer information for Landlord and Tenant shall provide the Escrow Agent with the wire transfer information for Tenant.

        e. Except to the extent inconsistent with the express terms hereof, the Escrow General Provisions attached hereto as Exhibit A shall apply to the escrow created by this Agreement. Without limitation of the foregoing, Sections 6, 8, 9, 16.B., and 16.C. of the Escrow General Instructions are expressly inapplicable to the escrow created by this Agreement.


        IN WITNESS WHEREOF, the parties hereto have signed and sealed this Agreement as of the day, month and year first above written.


                        LANDLORD:


                        SRI TEN CITY CENTER, LLC,
                        a Delaware limited liability company


                        By:_____
                                Ronnie Ragoff
                                Vice President


        TENANT:

                        TSA STORES, INC.,
                        A Delaware corporation


                        Michael E. Foss

                        Chief Executive Officer


                        Date of execution by Tenant:
                        _____, 20__

By: _____

ESCROW

Lon B. Novatt

Senior Vice President - Real Estate

AGENT:

First
Insurance Company

Date of execution by Tenant:
_____, 20__

American          Title

By:_____

Name: _____

Title: _____

<u>EXHIBIT A</u> (to escrow agreement)

Escrow General Provisions

**[see attached 2 pages]**

## Escrow General Provisions

**The parties understand and acknowledge:**

**1. SPECIAL DISCLOSURES:**

**A. DEPOSIT OF FUNDS & DISBURSEMENTS**

Unless directed in writing to establish a separate, interest-bearing account together with all necessary taxpayer reporting information, all funds shall be deposited in general accounts in a federally insured financial institution including those affiliated with Escrow Holder ("depositories"). All disbursements shall be made by Escrow Holder's check or by wire transfer unless otherwise instructed in writing. The Good Funds Law (California Insurance Code 12413.1) mandates that Escrow Holder may not disburse funds until the funds are, in fact, available in Escrow Holder's account. Wire transfers are immediately disbursable upon confirmation of receipt. Funds deposited by a cashier's or certified check are generally available on the next banking day following deposit. Funds deposited by a personal check and other types of instruments may not be available until confirmation from Escrow Holder's bank which can vary from 2 to 10 days.

**B. DISCLOSURE OF POSSIBLE BENEFITS TO ESCROW HOLDER**

As a result of Escrow Holder maintaining its general escrow accounts with the depositories, Escrow Holder may receive certain financial benefits such as an array of bank services, accommodations, loans or other business transactions from the depositories ("collateral benefits"). All collateral benefits shall accrue to the sole benefit of Escrow Holder and Escrow Holder shall have no obligation to account to the parties to this escrow for the value of any such collateral benefits.

**C. MISCELLANEOUS FEES**

Escrow Holder may incur certain additional costs on behalf of the parties for services performed, or fees charged, by third parties. The fees charged by Escrow Holder for services including, but not limited to, wire transfers, overnight delivery/courier services, recording fees, notary fees, etc. may include a mark up over the direct cost of such services to reflect the averaging of direct, administrative and overhead charges of Escrow Holder for such services which shall, in no event, exceed $10 for each markup.

**D. METHOD TO DELIVER PAYOFF TO LENDERS/LIENHOLDERS**

To minimize the amount of interest due on any existing loan or lien, Escrow Holder will deliver the payoff funds to the lender/lienholder in an expeditious manner as demanded by the lender/lienholder using (a) personal delivery, (b) wire transfer, or (c) overnight delivery service, unless otherwise directed in writing by the affected party.

**2. PRORATIONS & ADJUSTMENTS**

The term "close of escrow" means the date on which documents are recorded. All prorations and/or adjustments shall be made to the close of escrow based on the number of actual days, unless otherwise instructed in writing.

**3. CONTINGENCY PERIODS**

Escrow Holder shall not be responsible for monitoring contingency time periods between the parties. The parties shall execute such documents as may be requested by Escrow Holder to confirm the status of any such periods.

**4. REPORTS**

a. Preliminary Report
Escrow Holder has no responsibility nor liability for any title search that may be performed in connection with the issuance of a preliminary report.

b. Other Reports
As an accommodation, Escrow Holder may agree to transmit orders for inspection, termite, disclosure and other reports if requested, in writing or orally, by the parties or their agents. Escrow Holder shall deliver copies of any such reports as directed. Escrow Holder is not responsible for reviewing such reports or advising the parties of the content of same.

**5. INFORMATION FROM AFFILIATED COMPANIES**

Escrow Holder may provide the parties' information to and from its affiliates in connection with the offering of products and services from these affiliates.

**6. RECORDATION OF DOCUMENTS**

Escrow Holder is authorized to record documents delivered through escrow which are necessary or proper for the issuance of the requested title

insurance policy(ies). Buyer will provide a completed Preliminary Change of Ownership Report form ("PCOR"). If Buyer fails to provide the PCOR, Escrow Holder shall close escrow and charge Buyer any additional fee incurred for recording the documents without the PCOR. Escrow Holder is released from any liability in connection with same.

**7. PERSONAL PROPERTY TAXES**

No examination, UCC search, insurance as to personal property and/or the payment of personal property taxes is required unless otherwise instructed in writing.

**8. REAL PROPERTY TAXES**

Real property taxes are prorated based on the most current available tax statement from the tax collector's office. Supplemental taxes may be assessed as a result of a change in ownership or completion of construction. Adjustments due either party based on the actual new tax bill issued after close of escrow or a supplemental tax bill will be made by the parties outside of escrow and Escrow Holder is released of any liability in connection with such adjustments. The first installment of California real property taxes is due November 1st (delinquent December 10th) and the second installment is due February 1st (delinquent April 10th). If a tax bill is not received from the County at least 30 days prior to the due date, buyer should contact the County Tax Collector's office and request one. Escrow Holder is not responsible for same.

**9. CANCELLATION OF ESCROW**

(a) Any party desiring to cancel this escrow shall deliver written notice of cancellation to Escrow Holder. Within a reasonable time after receipt of such notice, Escrow Holder shall send by regular mail to the address on the escrow instructions, one copy of said notice to the other party(ies). Unless written objection to cancellation is delivered to Escrow Holder by a party within 10 days after date of mailing, Escrow Holder is authorized, at its option, to comply with the notice and terminate the escrow. If a written objection is received by Escrow Holder, Escrow Holder is authorized, at its option, to hold all funds and documents in escrow (subject to the funds held fee) and to take no other action until otherwise directed by either the parties' mutual written instructions or a final order of a court of competent jurisdiction. If no action is taken on this escrow within 6 months after the closing date specified in the escrow instructions, Escrow Holder's obligations shall, at its option, terminate. Upon termination of this escrow, the parties shall pay all fees, charges and reimbursements due to Escrow Holder and all documents and remaining funds held in escrow shall be returned to the parties depositing same.

(b) Notwithstanding the foregoing, upon receipt of notice of cancellation by a seller in a transaction subject to the Home Equity Sales Contract law (CC §1695 et seq.), Escrow Holder shall have the right to unilaterally cancel the escrow and may return all documents and funds without consent by or notice to the buyer.

**10. CONFLICTING INSTRUCTIONS & DISPUTES**

If Escrow Holder becomes aware of any conflicting demands or claims concerning this escrow, Escrow Holder shall have the right to discontinue all further acts on Escrow Holder's part until the conflict is resolved to Escrow Holder's satisfaction. Escrow Holder has the right at its option to file an action in interpleader requiring the parties to litigate their claims/rights. If such an action is filed, the parties jointly and severally agree (a) to pay Escrow Holder's cancellation charges, costs (including the funds held fee) and reasonable attorneys' fees, and (b) that Escrow Holder is fully released and discharged from all further obligations under the escrow. If an action is brought involving this escrow and/or Escrow Holder, the party(ies) involved in the action agree to indemnify and hold the Escrow Holder harmless against liabilities, damages and costs incurred by Escrow Holder (including reasonable attorneys' fees and costs) except to the extent that such liabilities, damages and costs are caused by the negligence or willful misconduct of Escrow Holder.

**THIS COMPANY CONDUCTS ESCROW BUSINESS UNDER CERTIFICATE OF AUTHORITY ISSUED BY THE STATE OF CALIFORNIA DEPARTMENT OF INSURANCE.**

©2010 First American Title Insurance Company
(5/1/2010)

Page 1 of 2 Pages

Form 1610

## Escrow General Provisions

**11. USURY**

Escrow Holder is not to be concerned with usury as to any loans or encumbrances in this escrow and is hereby released of any responsibility and/or liability therefore.

**12. AMENDMENTS TO ESCROW INSTRUCTIONS**

Any amendment to the escrow instructions must be in writing, executed by all parties and accepted by Escrow Holder. Escrow Holder may, at its sole option, elect to accept and act upon oral instructions from the parties. If requested by Escrow Holder the parties agree to confirm said instructions in writing as soon as practicable. The escrow instructions as amended shall constitute the entire escrow agreement between the Escrow Holder and the parties hereto with respect to the subject matter of the escrow.

**13. INSURANCE POLICIES**

In all matters relating to insurance, Escrow Holder may assume that each policy is in force and that the necessary premium has been paid. Escrow Holder is not responsible for obtaining fire, hazard or liability insurance, unless Escrow Holder has received specific written instructions to obtain such insurance prior to close of escrow from the parties or their respective lenders.

**14. COPIES OF DOCUMENTS; AUTHORIZATION TO RELEASE**

Escrow Holder is authorized to rely upon copies of documents, which include facsimile, electronic, NCR, or photocopies as if they were an originally executed document. If requested by Escrow Holder, the originals of such documents shall be delivered to Escrow Holder. Escrow Holder may withhold documents and/or funds due to the party until such originals are delivered. Documents to be recorded *MUST* contain original signatures. Escrow Holder may furnish copies of any and all documents to the lender(s), real estate broker(s), attorney(s) and/or accountant(s) involved in this transaction upon their request. Delivery of documents by escrow to a real estate broker or agent who is so designated in the purchase agreement shall be deemed delivery to the principal.

**15. EXECUTION IN COUNTERPART**

The escrow instructions and any amendments may be executed in one or more counterparts, each of which shall be deemed an original, and all of which taken together shall constitute the same instruction.

**16. TAX REPORTING, WITHHOLDING & DISCLOSURE**

The parties are advised to seek independent advice concerning the tax consequences of this transaction, including but not limited to, their withholding, reporting and disclosure obligations. Escrow Holder does not provide tax or legal advice and the parties agree to hold Escrow Holder harmless from any loss or damage that the parties may incur as a result of their failure to comply with federal and/or state tax laws. *WITHHOLDING OBLIGATIONS ARE THE EXCLUSIVE OBLIGATIONS OF THE PARTIES. ESCROW HOLDER IS NOT RESPONSIBLE TO PERFORM THESE OBLIGATIONS UNLESS ESCROW HOLDER AGREES IN WRITING.*

**A. TAXPAYER IDENTIFICATION NUMBER REPORTING**

Federal law requires Escrow Holder to report seller's social security number or tax identification number (both numbers are hereafter referred to as the "TIN"), forwarding address, and the gross sales price to the Internal Revenue Service ("IRS"). To comply with the USA PATRIOT Act, certain taxpayer identification information (including, but not limited to, the TIN) may be required by Escrow Holder from certain persons or entities involved (directly or indirectly) in the transaction prior to closing.

Escrow cannot be closed nor any documents recorded until the information is provided and certified as to its accuracy to Escrow Holder. The parties agree to promptly obtain and provide such information as requested by Escrow Holder.

**B. State Withholding & Reporting**

Under California law (Rev & Tax Code §18662), a buyer may be required to withhold and deliver to the Franchise Tax Board (FTB) an amount equal to 3.33% of the sales price ("Basic Withholding") in the case of disposition of California real property interest ("Real Property") by either: 1) a seller who is an individual, trust or estate or when the disbursement instructions authorize the proceeds to be sent to a financial intermediary of seller; OR 2) a corporate seller that has no permanent place of business in California immediately after the transfer of title to the Real Property. Buyer may be subject to a penalty (equal to the greater of 10% of the amount required to be withheld or $500) for failing to withhold and transmit the funds to FTB in the time required by law. Buyer is not required to withhold any amount and will not be subject to penalty for failure to withhold if: a) the sales price of the Real Property does not exceed $100,000; b) the seller executes a written certificate under penalty of perjury certifying that the seller is a corporation with a permanent place of business in California; OR c) the seller, who is an individual, trust, estate or a corporation without a permanent place of business in California, executes a written certificate under penalty of perjury certifying one of the following: (i) the Real Property was the seller's or decedent's principal residence (as defined in IRC §121); (ii) Real Property being conveyed was last used by the seller as sellers principal residence within the meaning of IRC §121 (even if the seller did not meet the two out of the last five years requirement or one of the special circumstances in IRC §121); (iii) the Real Property is or will be exchanged for property of like-kind (as defined in IRC §1031) and that the seller intends to acquire property similar or related in service or use so as to be eligible for nonrecognition of gain for California income tax purposes under IRC §1031; (iv) the Real Property has been compulsorily or involuntarily converted (as defined in IRC §1033) and the seller intends to acquire property similar or related in service or use so as to be eligible for nonrecognition of gain for California income tax purposes under IRC §1033; or (v) the Real Property sale will result in a loss (or net gain not required to be recognized) for California income tax purposes. Seller is subject to penalties for knowingly filing a fraudulent certificate for the purpose of avoiding the withholding laws.

**FOR CLOSINGS AFTER JANUARY 1, 2007:**

Seller may elect an alternative to Basic Withholding by certifying the amount to withhold which must be equal to the applicable maximum tax rate on the actual gain of the transferred property ("Alternative Withholding"). The written certification must be made under penalty of perjury and false certifications may result in criminal and civil penalties.

**Contact FTB:** For additional information regarding California withholding or for the Alternative Withholding, contact the Franchise Tax Board at (toll free) 888-792-4900), by e-mail WSCS.GEN@ftb.ca.gov; or visit their website at www.ftb.ca.gov.

**C. FEDERAL WITHHOLDING & REPORTING**

Certain federal reporting and withholding requirements exist for real estate transactions where the seller (transferor) is a non-resident alien, a non-domestic corporation, partnership, or limited liability company; or a domestic corporation, partnership or limited liability company controlled by non-residents; or non-resident corporations, partnerships or limited liability companies.

**D. TAXPAYER IDENTIFICATION DISCLOSURE**

Federal and state laws require that certain forms include a party's TIN and that such forms or copies of the forms be provided to the other party and to the applicable governmental authorities. Parties to a real estate transaction involving seller-provided financing are required to furnish, disclose, and include the other party's TIN in their tax returns. Escrow Holder is authorized to release a party's TINs and copies of statutory forms to the other party and to the applicable governmental authorities in the foregoing circumstances. The parties agree to hold Escrow Holder harmless against any fees, costs, or judgments incurred and/or awarded because of the release of their TIN as authorized herein.

**THIS COMPANY CONDUCTS ESCROW BUSINESS UNDER CERTIFICATE OF AUTHORITY ISSUED BY THE STATE OF CALIFORNIA DEPARTMENT OF INSURANCE.**

©2010 First American Title Insurance Company (5/1/2010)    Page 2 of 2 Pages    Form 1610

Exhibit L

**FLOOR AREA OF PREMISES**



Karen Kjos, CID, LEED AP     Karen.Kjos@AECOM.com
Senior Associate            612-376-2323    tel
Senior Interior Project Manager  612-376-2271    fax

ELLERBE BECKET, INC.
An AECOM Company
800 LaSalle Avenue
Minneapolis, MN  55402
www.ellerbebecket.com

December 11, 2014

Mr. Nathan Reed, RPA
General Manager, City Center
Shorenstein Realty Services L.P.
40 South Seventh Street, Suite 120
Minneapolis, MN  55402

Re:     City Center Suite 165

Dear Nathan,

AECOM Technical Services, Inc. performed the interior retail measurements of City Center in Minneapolis, MN in accordance with the ANSI/BOMA Z65.5-2010 publication, Retail Buildings: Standard Methods of Measurement.

Suite 165 measures 21,877 square feet.

Please let me know should you require any further clarifications.

Respectfully Submitted,

**AECOM Technical Services, Inc.**

Karen Kjos  LEED AP
Senior Associate
Senior Interior Project Manager



SCALE: 1/32"=1'-0"

## SUITE 165
CITY CENTER
21,877 SF

*not to scale*

## Exhibit M

### APPROVED BUILDING SIGNAGE

**[See attached 9 pages]**



SA0082
Minneapolis City Center

**S. 7th Street & Nicollet Mall**
**Minneapolis, MN 55403**

**B-59087**
01.19.15





| Vendor | No. | Date | Revision | | Site Information | Design: B59087 |
|---|---|---|---|---|---|---|
| PHILADELPHIASIGN | 01 | 01.20.15 | Corrected Location | JM | Site Number: SA0082 | |
| 707 WEST SPRING GARDEN ST • PALMYRA, NJ • 08065 | | | | | Site Name: Minneapolis City Center | **Cover** |
| P 856-829-1460 • F 856-829-6550 | | | | | S. 7th St. & Nicollet Mall | |
| | | | | | Minneapolis, MN 55403 | **Page 1** |



## LOCATION INFORMATION

*LOCATION*
S. 7th Street & Nicollet Mall

*ADDRESS*
S. 7th Street & Nicollet Mall
Minneapolis, MN 55403

## PRIMARY TRAFFIC INFORMATION

*STREET*
S. 7th Street
4 Lane, One Way, Inter-City Street

*STREET*
Nicollet Mall
2 Lane, Two Directions,
Inter-City Street

## SIGNAGE VISIBILITY

S. 7th Street & Nicollet Mall
Busy Downtown Intersection

All exterior signage will
have limited visibility.

| | Vendor | No. | Date | Revision | | Site Information | Design B66007 |
|---|---|---|---|---|---|---|---|
| | PHILADELPHIA SIGN | 01 | 01.2015 | Corrected Location | JM | Site Number S.A0082 | |
| | | | | | | Site Name Minneapolis City Center | Siteplan |
| | | | | | | S. 7th St. & Nicollet Mall | |
| | | | | | | Minneapolis, MN 55403 | Page 2 |

SPORTS AUTHORITY.

## EXISTING SIGN

[E1]  NO EXISTING SIGNAGE

[E2]  NO EXISTING SIGNAGE

[E3]  NO EXISTING SIGNAGE

[E4]  NO EXISTING SIGNAGE

[E5]  NO EXISTING SIGNAGE

[E6]  NO EXISTING SIGNAGE

## RECOMMENDATION

[R1]  **HW-7.0**
(2) ILLUMINATED CHANNEL LETTERS - WHITE - STACKED FORMAT SINGLE FACED WALL SIGNS
W/ RED ALUMINUM BACKGROUND PANELS MEASURING APPROXIMATELY 10' X 26'
LETTERS: 151.73 SF
RED ALUMINUM BACKGROUND PANEL: 260 SF

[R2]  **CUSTOM BLADE SIGN**
(2) CUSTOM 3' 6" X 15' VERTICAL FLAG SIGNS
LETTERS: 13.65 SF
RED ALUMINUM BACKGROUND PANEL: 52.50 SF

[R3]  **GW-1.5**
(2) ILLUMINATED CHANNEL LETTERS - WHITE - HORIZONTAL FORMAT SINGLE FACE WALL SIGNS
W/ RED ALUMINUM BACKGROUND PANELS MEASURING APPROXIMATELY 3' X 28'
LETTERS: 32 SF
RED ALUMINUM BACKGROUND PANEL: 84 SF

[R4]  **HW-3.0**
(1) ILLUMINATED CHANNEL LETTERS - WHITE - HORIZONTAL FORMAT SINGLE FACE WALL SIGN
W/ RED COMPOSITE METAL OMEGALITE WALL PANELS
LETTERS: 27.75 SF
RED OMEGALITE PANELS: 144 SF

[R5]  **HW-2.5**
(1) ILLUMINATED CHANNEL LETTERS - WHITE - HORIZONTAL FORMAT
W/ RED COMPOSITE METAL OMEGALITE PANELS
LETTERS: 19.25 SF

[R6]  **HW-2.5**
(1) ILLUMINATED CHANNEL LETTERS - WHITE - HORIZONTAL FORMAT
W/ RED COMPOSITE METAL OMEGALITE PANELS
LETTERS: 19.25 SF

| No. | Date | Revision | | Site Information | Design  BS9087 |
|---|---|---|---|---|---|
| 01 | 01.2015 | Corrected Location. | JM | Site Number  **SA0082** | **Sign Inventory** |
| | | | | Site Name  **Minneapolis City Center** | |
| | | | | S. 7th St. & Nicollet Mall | |
| | | | | Minneapolis, MN 55403 | **Page 3** |

Vendor
PHILADELPHIA SIGN
707 WEST SPRING GARDEN ST • PALMYRA, NJ • 08065
P 856.829.1460 • F 856.829.6545



Recommendation

R1 (2) HW7.0 - Illuminated Channel Letters - White - Vertical Format

10' 0"
7' 0"
2' 4-5/8"    4' 3-1/4"

SPORTS AUTHORITY

28' 0"

HW7.0 - Illuminated Channel Letters - White - Vertical Format

151.73 sq. ft. per sign

Scale: 1/4"=1'-0"

SPORTS AUTHORITY.

CROSS SECTION
SCALE: 1 1/2" = 1'-0"

Red Aluminum
Background Panel

.063" Gloss Black
Pre-Coat Aluminum
Returns

Black Trimcap

3/16" White #7328 Acrylated
Face

3/8" Ø Nutsert
& Non-Corrosive Allthread

1/2" Ø Chase Nipple
& Coupling

.090" White Pre-Coat
Aluminum Backs

GE Tetra Max White LED's
& GE Power Supplies
(Power Supplies Remote)

1/4" Thk Nylon Washer
At Each Mounting Point

Drain Slots In Backs Of
Letters As Required

External Cut Off
Switch to Cut
all Power to Sign

Low Voltage Secondary
Wiring: 3-Wire (PLTC)
14 GA Supply Wire

LED Power Supply
In Enclosure w/
Shut-off Switch

1/2" Ø Flexible Conduit
For Primary Hook-up

Primary Service to
Sign by Others

| Vendor | No. | Date | Revision | | Site Information | Design B59087 |
|---|---|---|---|---|---|---|
| PHILADELPHIA SIGN | 01 | 01.2015 | Corrected Location | JM | Site Number  SA0082 | Sign Rendering |
| 707 WEST SPRING GARDEN ST • PHILADELPHIA, NJ • 08065 P 856-829-1460 • F 856-829-8448 | | | | | Site Name  Minneapolis City Center | |
| | | | | | S. 7th St. & Nicollet Mall | |
| | | | | | Minneapolis, MN 55403 | Page 4 |



**Recommendation**

**R2** (2) Custom 3' 6" x 15' Vertical Flag Signs

52.50 sq. ft. per sign

Custom 3' 6" x 15' Vertical Flag Sign

Scale: 1/2"=1'-0"

**Custom 3' 6" x 15' Vertical Flag Sign**
Scale: 1/2"=1'-0"

SPORTS AUTHORITY





*Recommendation*

**R4** (1) HW3.0 - Illuminated Channel Letters - White - Vertical Format

3'0"
1'0" | 1' 9-7/8"

9' 3-1/16"

27.75 sq. ft.

HW3.0 - Illuminated Channel Letters - White - Vertical Format

Scale: 1/2"=1'-0"

.063" Gloss Black Pre-Coat Aluminum Returns

2" Shadow Retainer Painted To Match Returns

3/16" White #7328 Acryteed Face

3/8" Ø Nutsert & All Thread Non-Corrosive

1/2" Ø Chase Nipple & Coupling

.090" White Pre-Coat Aluminum Backs

GE Tetra Max White LED's & GE Power Supplies (Power Supplies Remote)

1/4" Thk Nylon Washer At Each Mounting Point

Drain Slots In Backs Of Letters As Required

Metal Panel Wall

Low Voltage Secondary Wireg 3-Wire (PLT/C) 14 GA Supply Wire

LED Power Supply In Enclosure w/ Shut-off Switch

1/2" Ø Flexible Conduit For Primary Hook-up

Lockable Disconnect Switch To Be Supplied By Others w/ Primary Power

**CROSS SECTION**
SCALE: 1 1/2" x 1'-0"

**SPORTS AUTHORITY**

**PHILADELPHIASIGN**

| Vendor | No. | Date | Revision |
|---|---|---|---|
| 01 | 01.2015 | Corrected Location | .JM |

Site Information
Site Number  SA0082
Site Name  Minneapolis City Center
S. 7th St. & Nicollet Mall
Minneapolis, MN 55403

Design  BS0087
Sign Rendering

Page 7





Recommendation

**R6** (1) HW2.5 - Illuminated Channel Letters - White - Vertical Format

HW2.5 - Illuminated Channel Letters - White - Vertical Format

19.25 sq. ft.

Scale: 3/4"=1'-0"

.063" Glass Black Pre-Coat Aluminum Returns

2" Sherlim Retainer Painted To Match Returns

3/16" White #7328 Acryliteel Face

3/8" Ø Nutsert & All Thread Non-Corrosive

1/2" Ø Chase Nipple & Coupling

.090" White Pre-Coat Aluminum Backs

GE Tetra Max White LED's & GE Power Supplies (Power Supplies Remote)

1/4" Thk Nylon Washer At Each Mounting Point

Drain Slots In Backs Of Letters As Required

Metal Panel Wall

**CROSS SECTION**
SCALE 1 1/2" = 1'-0"

Low Voltage Secondary Wiring 3-Wire (PLTC) 14 GA Supply Wire

LED Power Supply In Enclosure w/ Shut-off Switch

1/2" Ø Flexible Conduit For Primary Hook-up

Lockable Disconnect Switch To Be Supplied By Others w/ Primary Power

| Vendor | | No. | Date | Revision | | Site Information | Design B59067 |
|---|---|---|---|---|---|---|---|
| **PHILADELPHIASIGN** | | 01 | 01.2015 | Corrected Location | JM | Site Number: SA0092 | |
| | | | | | | Site Name: Minneapolis City Center | **Sign Rendering** |
| | | | | | | S. 7th St. & Nicollet Mall | |
| | | | | | | Minneapolis, MN 55403 | **Page 9** |

**SPORTS AUTHORITY.**

## FIRST AMENDMENT TO LEASE

THIS FIRST AMENDMENT TO LEASE (this "Amendment") is executed as of the 7 day of April, 2015 (the "Effective Date"), between SRI TEN CITY CENTER, LLC, a Delaware limited liability company ("Landlord") and TSA STORES, INC., a Delaware corporation ("Tenant").

## RECITALS

A.     Pursuant to that certain Shopping Center Lease dated as of February 5, 2015 (the "Existing Lease"), established between Landlord and Tenant, Tenant leases from Landlord approximately 21,877 rentable square feet of retail space in the building known as Minneapolis City Center with an address of 40 South Seventh Street, Minneapolis, Minnesota 55402 (the "Building"). Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Existing Lease.

B.     Landlord and Tenant desire to amend the Lease to correct a typographical error contained in the Existing Lease. Existing Lease, as amended by this Amendment, is referred to herein as the "Lease."

NOW, THEREFORE, in consideration of the foregoing, the parties hereto agree as follows:

1.     Annual Rent. The "Total Annual Base Rent" reflected in the rent schedule contained in Paragraph 1.1(i) of the Existing Lease for the period commencing on the Rental Commencement Date through the expiration of the 5th Lease Year is hereby changed from "$306,279.92" to "**$306,277.92**".

2.     Authority. If either party is a corporation, partnership, trust, association or other entity, Landlord and Tenant and each person executing this Amendment on behalf of Landlord or Tenant, hereby covenants and warrants that (a) it is duly incorporated or otherwise established or formed and validly existing under the laws of its state of incorporation, establishment or formation, (b) it has and is duly qualified to do business in the state in which the Building is located, (c) it has full corporate, partnership, trust, association or other appropriate power and authority to enter into this Amendment and to perform all obligations under the Lease, and (d) each person (and all of the persons if more than one signs) signing this Amendment on behalf of Landlord or Tenant is duly and validly authorized to do so.

3.     Lease in Full Force and Effect. Except as provided above, the Existing Lease is unmodified hereby and remains in full force and effect. In the event of a conflict between the terms of the Existing Lease and this Amendment, the terms of this Amendment shall control.

**[Signatures to follow on next page.]**

9036663.v1

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date and year first above written.

Landlord:

SRI TEN CITY CENTER, LLC,
a Delaware limited liability company

By: _____

Name: _____ RONNIE E. RAGOFF _____
                    Vice President

Title _____

Tenant:

TSA STORES, INC., a Delaware corporation

By: _____

Name: _____ MARK JOHNS _____

Title ___ VP- CONSTRUCTION ___

Approved as to
Legal Form

2