# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TSAWD HOLDINGS, INC., et al.,[1] | Case No. 16-10527 (MFW) |
| Debtors. | (Jointly Administered) |

## DISCLOSURE STATEMENT WITH RESPECT TO
## THE CHAPTER 11 PLAN OF LIQUIDATION OF TSA CARIBE, INC.

Dated:   September 5, 2017
Wilmington, Delaware

IRELL & MANELLA LLP
Jeffrey M. Reisner (Pro Hac Vice)
Michael Strub, Jr. (Pro Hac Vice)
Kerri Lyman (Pro Hac Vice)
840 Newport Center Drive, Suite 400
Newport Beach, CA 92660
Telephone: (949) 760-0991
Facsimile: (949) 760-5200

*Special Counsel to Debtors TSAWD Holdings, Inc.,*
*TSA Ponce, Inc., and TSA Caribe, Inc.*

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Michael R. Nestor (No. 3526)
Andrew L. Magaziner (No. 5426)
Rodney Square, 1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

*Counsel to the TSA Debtors*

---

[1]   The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: TSAWD Holdings, Inc. (9008); Slap Shot Holdings, Corp. (8209); TSAWD, Inc. (2802); TSA Stores, Inc. (1120); TSA Gift Card, Inc. (1918); TSA Ponce, Inc. (4817); and TSA Caribe, Inc. (5664) (collectively, the "TSA Debtors"). The headquarters for the above-captioned TSA Debtors is located at 2305 East Arapahoe Road, Suite 234, Centennial, CO 80122.

The TSA Debtors were formerly known as: Sports Authority Holdings, Inc. (9008); Slap Shot Holdings, Corp. (8209); The Sports Authority, Inc. (2802); TSA Stores, Inc. (1120); TSA Gift Card, Inc. (1918); TSA Ponce, Inc. (4817); and TSA Caribe, Inc. (5664).

01:22327075.1

**VOTING DEADLINE:**

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M. (EASTERN TIME) ON [NOVEMBER 20, 2017].  TO BE COUNTED, THE CLAIMS AND VOTING AGENT MUST ACTUALLY RECEIVE YOUR BALLOT ON OR BEFORE THE VOTING DEADLINE.**

**CONFIRMATION HEARING AND
DEADLINE TO OBJECT TO THE PLAN:**

**THE HEARING TO CONSIDER CONFIRMATION OF THE PLAN HAS BEEN SCHEDULED FOR [DECEMBER 5, 2017 AT 10:30 A.M.] (PREVAILING EASTERN TIME).  OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED (I) ON OR BEFORE [NOVEMBER 20, 2017 AT 4:00 P.M.] (EASTERN TIME), AND (II) IN ACCORDANCE WITH PARAGRAPH ___ OF THE DISCLOSURE STATEMENT ORDER.**

**RECOMMENDATION BY DEBTOR:**

**THE DEBTOR RECOMMENDS THAT ALL CREDITORS RECEIVING A BALLOT VOTE IN FAVOR OF THE PLAN. THE DEBTOR STRONGLY URGES ALL CREDITORS TO VOTE FOR THE PLAN. THE PLAN PROVIDES A MATERIALLY LARGER, EARLIER AND MORE CERTAIN DISTRIBUTION THAN ANY ALTERNATIVE AVAILABLE TO CREDITORS.**

01:22327075.1

## DISCLAIMER

THE DEBTOR IS PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR THE CHAPTER 11 PLAN OF LIQUIDATION OF TSA CARIBE, INC., ONLY, TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN.  YOU SHOULD NOT RELY UPON OR USE THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR ANY OTHER PURPOSE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE OR PUERTO RICO SECURITIES LAWS OR OTHER SIMILAR LAWS.  THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE OR PUERTO RICO AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE OR PUERTO RICO AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY.  THE READER IS CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS.  THE LIQUIDATION ANALYSIS, DISTRIBUTION PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. THEREFORE, ANY ANALYSES, ESTIMATES OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT.  THE DEBTOR URGES EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.  FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF DISCLOSURE

CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER.  RATHER, HOLDERS OF CLAIMS AND EQUITY INTERESTS AND OTHER ENTITIES SHOULD CONSTRUE THIS DISCLOSURE STATEMENT AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR PROJECTED OBJECTION TO A PARTICULAR CLAIM IS, OR IS NOT, IDENTIFIED IN THIS DISCLOSURE STATEMENT.  THE LIQUIDATION TRUSTEE MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.  THE PLAN RESERVES FOR THE LIQUIDATION TRUSTEE THE RIGHT TO BRING CAUSES OF ACTION (DEFINED IN THE PLAN) AGAINST ANY ENTITY OR PARTY IN INTEREST EXCEPT THOSE SPECIFICALLY RELEASED.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTOR'S CHAPTER 11 CASE AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE.  ALTHOUGH THE DEBTOR BELIEVES THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.  THE DEBTOR DOES NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE DEBTOR'S MANAGEMENT AND ADVISORS HAVE REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THE DEBTOR HAS USED ITS REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, NO ENTITY HAS AUDITED THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT.

THE DEBTOR IS MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTOR MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTOR HAS NO AFFIRMATIVE DUTY TO DO SO. HOLDERS OF CLAIMS AND EQUITY INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE FILING OF THIS DISCLOSURE STATEMENT. HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTOR AND THEIR OWN ANALYSIS OF THE TERMS OF THE PLAN, INCLUDING, WITHOUT LIMITATION, ANY RISK FACTORS CITED HEREIN, IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

THE DEBTOR HAS NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTOR HAS NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTOR OR THE VALUE OF ITS PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING CLASS SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL HEREIN.

THE DEBTOR URGES ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.

# TABLE OF CONTENTS

**Page**

ARTICLE I    INTRODUCTION ................................................................. 1

ARTICLE II    BUSINESS DESCRIPTION, CORPORATE STRUCTURE AND PREPETITION INDEBTEDNESS, & EVENTS LEADING TO CHAPTER 11 ...................................................... 3

2.1.    Overview of the Debtor's Business and History. .................... 3

2.2.    Corporate Structure ................................................. 4

2.3.    Business Operations ................................................. 4

2.4.    The Debtor's Prepetition Debt Obligations. .......................... 5

2.5.    Key Assets ......................................................... 7

2.6.    Events Leading up to the Commencement of the Debtor's Chapter 11 Case ......................................................... 8

ARTICLE III    ADMINISTRATION OF THE CHAPTER 11 CASES ......................... 9

3.1.    Overview of Chapter 11 .............................................. 9

3.2.    Commencement of the Debtor's Chapter 11 Case. ...................... 10

3.3.    Retention and Employment of Professionals. .......................... 10

3.4.    Official Committee of Unsecured Creditors. .......................... 11

3.5.    Filing of Schedules and Setting of Bar Dates. ....................... 11

3.6.    The Claim Objections ............................................... 12

3.7.    Motion for Authority to Enter Into DIP Facility. ..................... 12

3.8.    The Closing Sales Agreement. ........................................ 13

3.9.    Sale of the TSA Debtors' Assets. .................................... 13

3.10.    The Consignment Vendors Settlement. ............................... 15

3.11.    The Term Loan Settlement. .......................................... 15

3.12.    The Term Loan Adequate Protection Claim. ........................... 17

10080183.8 06

## TABLE OF CONTENTS

Page

ARTICLE IV    SUMMARY OF PLAN AND CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS THEREUNDER .................................................................................. 17

    4.1.    Summary of Plan. ........................................................................ 17

    4.2.    Administrative Expense Claims ................................................. 19

    4.3.    Time for Filing Administrative Expense Claims ....................... 19

    4.4.    Waiver of Administrative Expense Claim .................................. 19

    4.5.    Professional Compensation and Fee Claims .............................. 19

    4.6.    Priority Tax Claims ..................................................................... 20

    4.7.    Class 1 – Priority Non-Tax Claims ............................................ 21

    4.8.    Class 2 – Miscellaneous Secured Claims. ................................. 21

    4.9.    Class 3 – General Unsecured Claims ......................................... 21

    4.10.    Class 4 – Subordinated Claims. ................................................. 22

    4.11.    Class 5 – Equity Interests. .......................................................... 22

ARTICLE V    IMPLEMENTATION OF THE PLAN ................................................. 22

    5.1.    Implementation of the Plan ......................................................... 22

    5.2.    Plan Funding ............................................................................... 22

    5.3.    Good Faith .................................................................................. 22

    5.4.    Compromise of Claims ............................................................... 22

    5.5.    Liquidation Trust. ....................................................................... 23

    5.6.    Approval of Plan Documents ...................................................... 25

ARTICLE VI    CORPORATE GOVERNANCE AND MANAGEMENT .................. 25

    6.1.    Post-Effective Date Corporate Existence ................................... 25

    6.2.    Corporate Action ........................................................................ 25

- ii -

# TABLE OF CONTENTS

**Page**

6.3.     Officers and Boards of Directors ...........................................................25

6.4.     Payment of Wind-Down Expenses .......................................................26

6.5.     Cancellation of Existing Securities and Agreements............................26

ARTICLE VII     PROVISIONS REGARDING VOTING AND DISTRIBUTIONS
UNDER THE PLAN ...............................................................................26

7.1.     Non-Consensual Confirmation ..............................................................26

7.2.     Elimination of Vacant Classes...............................................................26

7.3.     Voting Classes .......................................................................................26

7.4.     Distributions ..........................................................................................26

7.5.     Timing of Distributions .........................................................................27

7.6.     Holdings as of the Distribution Record Date.........................................27

7.7.     Distributions to Address of Record .......................................................27

7.8.     Minimum Distributions ..........................................................................27

7.9.     Unclaimed Distributions ........................................................................28

7.10.    Setoffs and Recoupments ......................................................................28

7.11.    Allocation of Plan Distributions Between Principal and Interest..........28

7.12.    Estimation of Claims; Certain Reserves ...............................................28

7.13.    No Recourse............................................................................................29

7.14.    Satisfaction of Claims and Equity Interests...........................................29

7.15.    Withholding and Reporting Requirements .............................................29

ARTICLE VIII     PROCEDURES RELATING TO DISPUTED CLAIMS....................30

8.1.     Objections to Administrative Expense Claims and Claims ...................30

8.2.     Late Filed Claims...................................................................................30

8.3.     Amendments to Claims...........................................................................30

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| 8.4. | Satisfied Claims | 30 |
| 8.5. | No Distributions Pending Allowance | 31 |
| 8.6. | Resolution of Disputed Claims | 31 |
| ARTICLE IX | TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 31 |
| 9.1. | Rejection or Assumption and Retention or Assignment | 31 |
| 9.2. | Cure of Defaults | 32 |
| 9.3. | Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan | 33 |
| ARTICLE X | EFFECT OF CONFIRMATION | 33 |
| 10.1. | Binding Effect | 33 |
| 10.2. | Vesting of Assets | 33 |
| 10.3. | Term of Pre-Confirmation Injunctions or Stays | 33 |
| 10.4. | Injunction Against Interference with Plan | 33 |
| 10.5. | Injunction | 33 |
| 10.6. | Exculpation and Limitation of Liability for Postpetition Conduct | 34 |
| 10.7. | Injunction Related to Exculpation | 35 |
| 10.8. | Releases of Liens and Encumbrances | 35 |
| 10.9. | Preservation and Application of Insurance | 35 |
| 10.10. | Indemnification | 36 |
| 10.11. | Satisfaction of Subordination Rights | 36 |
| ARTICLE XI | CONDITIONS PRECEDENT | 36 |
| 11.1. | Conditions to Confirmation | 36 |
| 11.2. | Effectiveness | 36 |

## TABLE OF CONTENTS

**Page**

11.3.　Waiver of Conditions......................................................................37

11.4.　Withdrawal of Plan........................................................................37

11.5.　Waiver of Bankruptcy Rule 3020(e) Stay .......................................37

ARTICLE XII　VOTING REQUIREMENTS, ACCEPTANCE AND CONFIRMATION OF THE PLAN .......................................38

12.1.　Parties in Interest Entitled to Vote...................................................38

12.2.　Classes Impaired Under the Plan.....................................................38

12.3.　Voting Procedures and Requirements. ..............................................38

12.4.　Confirmation Hearing....................................................................39

12.5.　Confirmation................................................................................40

12.6.　Acceptance of Plan. ......................................................................40

12.7.　Confirmation Without Acceptance of All Impaired Classes. ...............41

12.8.　Best Interests Test.........................................................................42

12.9.　Liquidation Analysis......................................................................43

12.10.　Feasibility. ..................................................................................43

12.11.　Compliance with the Applicable Provisions of the Bankruptcy Code....................................................................................43

ARTICLE XIII　ALTERNATIVE TO CONFIRMATION AND CONSUMMATION OF THE PLAN ........................................43

ARTICLE XIV　RISK FACTORS & CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ......................................44

14.1.　Allowed Claims May Exceed Estimates.............................................44

14.2.　Plan May Not Be Accepted or Confirmed..........................................44

14.3.　Certain Federal Income Tax Consequences of the Plan. .....................44

- v -

# TABLE OF CONTENTS

**Page**

ARTICLE XV  RETENTION OF JURISDICTION........................................................45

  15.1.  Scope of Bankruptcy Court Jurisdiction.................................................45

ARTICLE XVI  MISCELLANEOUS PROVISIONS .....................................................46

  16.1.  Critical Vendor and Other Payments .....................................................46

  16.2.  Effectuating Documents and Further Transactions ................................46

  16.3.  Exemption from Transfer Taxes .............................................................46

  16.4.  Termination of Estate Professionals .......................................................47

  16.5.  Access .....................................................................................................47

  16.6.  Payment of Statutory Fees .....................................................................47

  16.7.  Post-Effective Date Fees and Expenses..................................................47

  16.8.  Amendment or Modification of the Plan ................................................47

  16.9.  Confirmation Order ................................................................................48

  16.10.  Severability ............................................................................................48

  16.11.  Expedited Tax Determination.................................................................48

  16.12.  Governing Law .......................................................................................48

  16.13.  Binding Effect........................................................................................49

  16.14.  Exhibits/Schedules.................................................................................49

  16.15.  Dissolution of the Creditors' Committee................................................49

  16.16.  Notices ...................................................................................................49

ARTICLE XVII  CONCLUSION AND RECOMMENDATION OF DEBTOR .............50

# ARTICLE I

## INTRODUCTION

TSA Caribe, Inc. (the "Debtor" or the "Proponent") hereby transmits this disclosure statement (including all exhibits thereto and as may be amended, supplemented or otherwise modified from time to time, this "Disclosure Statement"), pursuant to section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "Bankruptcy Code"), in connection with the Debtor's solicitation of votes (the "Solicitation") to confirm the Chapter 11 Plan of Liquidation of TSA Caribe, Inc., dated as of September 5, 2017 (including all exhibits thereto and as may be amended, supplemented or otherwise modified from time to time, the "Plan").[2]  A copy of the Plan is attached hereto as Exhibit 1.

The following documents are annexed hereto as exhibits to this Disclosure Statement:

| EXHIBITS TO DISCLOSURE STATEMENT | |
|---|---|
| Exhibit 1 | Plan |
| Exhibit 2 | Liquidation Analysis |
| Exhibit 3 | Analysis of Certain Federal Income Tax Consequences of the Plan |
| Exhibit 4 | Disclosure Statement Order (without exhibits) |

On [_____ __, 2017], the Bankruptcy Court (i) entered an order approving this Disclosure Statement (the "Disclosure Statement Order") as containing "adequate information" under section 1125 of the Bankruptcy Code to enable a hypothetical, reasonable investor typical of the holders of Claims against the Debtor to make an informed judgment as to whether to accept or reject the Plan, and (ii) authorized the Debtor to use this Disclosure Statement in connection with the Solicitation.  **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

The Disclosure Statement Order sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the record date for voting purposes, and the applicable standards

---

[2] All capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

10080183.8  06

01:22327075.1

for tabulating Ballots.  In addition, detailed voting instructions accompany each Ballot. Each holder of a Claim entitled to vote on the Plan should read this Disclosure Statement (including the Exhibits hereto), the Plan, the Disclosure Statement Order, and the instructions accompanying the Ballot in their entirety before voting on the Plan.  No solicitation of votes may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code.  In voting on the Plan, holders of Claims entitled to vote should not rely on any information relating to the Debtor and its business other than the information contained in or incorporated by reference into this Disclosure Statement, the Plan, and all exhibits hereto and thereto.

THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN.  THIS DISCLOSURE STATEMENT IS INTENDED TO AID AND SUPPLEMENT THAT REVIEW.  THE DESCRIPTION OF THE PLAN HEREIN IS ONLY A SUMMARY. HOLDERS OF CLAIMS AND EQUITY INTERESTS AND OTHER PARTIES IN INTEREST ARE CAUTIONED TO REVIEW THE PLAN AND ANY RELATED ATTACHMENTS FOR A FULL UNDERSTANDING OF THE PLAN'S PROVISIONS. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN.

Additional copies of this Disclosure Statement can be accessed free of charge at www.kccllc.net/sportsauthority.  Additional copies of this Disclosure Statement are also available free of charge upon request made to the Sports Authority toll-free information line at (866) 967-0490 (international callers may dial (310) 751-2690) or by contacting counsel for the Debtor:

| | |
|---|---|
| Jeffrey M. Reisner<br>Michael Strub, Jr.<br>Kerri Lyman<br>Irell & Manella LLP<br>840 Newport Center Drive<br>Suite 400<br>Newport Beach, CA 92660<br>Telephone: (949) 760-0991<br>Facsimile: (949) 760-5200<br>http://www.irell.com | Michael R. Nestor<br>Andrew L. Magaziner<br>Young Conaway Stargatt & Taylor, LLP<br>Rodney Square<br>1000 North King Street<br>Wilmington, DE 19801<br>Telephone: (302) 571-6600<br>Facsimile: (302) 571-1253<br>http://www.youngconaway.com |

## ARTICLE II

### BUSINESS DESCRIPTION, CORPORATE STRUCTURE AND PREPETITION INDEBTEDNESS, & EVENTS LEADING TO CHAPTER 11

2.1.     <u>Overview of the Debtor's Business and History</u>.

Prior to filing for chapter 11 protection on March 2, 2016 (the "<u>Petition Date</u>"), the Debtor and several of its affiliates (collectively, the "<u>TSA Debtors</u>")[3] comprised one of the United States' largest full-line sporting goods retailers, with roots dating back to 1928.  The TSA Debtors were among the top five sporting goods retailers in the United States.  The TSA Debtors offered a broad selection of goods from a wide array of household and specialty brands, including Adidas, Asics, Brooks, Columbia, FitBit, Hanesbrands, Icon Health and Fitness, Nike, The North Face, and Under Armour, in addition to their own private label brands.  The TSA Debtors' target customers skewed to women and families with children, particularly in the areas of family sports and fitness goods and branded fitness merchandise.

As of the Petition Date, the TSA Debtors had accumulated substantial losses, primarily as a result of changing market trends, including a shift in sales from traditional brick and mortar retailers to online resellers.  The TSA Debtors also faced increased competition from other full line sporting goods retailers and specialty athleisure retailers.  In addition, the TSA Debtors had substantial debt obligations—more than $1.1 billion in funded debt—which resulted in significant interest expenses.  Each of these debt obligations were set to mature within approximately two years of the Petition Date, and the TSA Debtors did not believe that they would be able to pay off or refinance all of their funded debt as it became due.  Although the Debtor was not obligated directly on all of these debt obligations, the nature of the TSA Debtors' businesses and operations meant that a default on these debt obligations would have an immediate impact of the Debtor's ability to continue to do business.

As described in detail in section 3.9 of this Disclosure Statement, the TSA Debtors sold substantially all of their assets through a sale process approved by the Bankruptcy Court and are in the process of winding-up their operations.

*For additional information regarding the TSA Debtors' historical business operations, please consult the Declaration of Jeremy Aguilar in Support of the TSA Debtors' Chapter 11 Petitions and Requests for First Day Relief [Docket No. 22] (the "<u>First Day Declaration</u>"), which is incorporated herein by reference.*

---

[3]     Although the Plan and this Disclosure Statement relate only to TSA Caribe, Inc., due to the intertwined nature of the TSA Debtors' businesses, this Disclosure Statement contains information relating to all seven of the TSA Debtors.  This Disclosure Statement should not be relied upon by the creditors of any of the TSA Debtors other than the creditors of TSA Caribe, Inc., or for purposes other than the purposes stated herein.

2.2.    <u>Corporate Structure</u>.

TSAWD Holdings, Inc. (f/k/a Sports Authority Holdings, Inc.) ("<u>TSAWD Holdings</u>") is a privately held company incorporated in Delaware and headquartered in Centennial, Colorado.  TSAWD Holdings directly or indirectly owns all or substantially all of the equity in the following six active direct and indirect subsidiaries, each of which is a Chapter 11 debtor: (a) Slap Shot Holdings, Corp., a Delaware corporation ("<u>Slap Shot</u>"), which was formed in January 2006 for the sole purpose of acquiring TSAWD, Inc., a Delaware corporation ("<u>TSA</u>") and serves as an intermediate holding company; (b) TSA, a wholly owned subsidiary of Slap Shot, which was acquired on May 3, 2006 and serves as another intermediate holding company; (c) TSA Stores, Inc., a Delaware corporation ("<u>TSA Stores</u>"), a wholly owned subsidiary of TSA and the primary operating entity; (d) TSA Gift Card, Inc., a Virginia corporation ("<u>Gift Card</u>"), a wholly owned subsidiary of TSA Stores that issued the TSA Debtors' gift cards; (e) TSA Ponce, Inc., a Delaware corporation ("<u>Ponce</u>"), a wholly owned subsidiary of TSA that serves as the holding company of the Debtor; and (f) the Debtor, a wholly owned subsidiary of Ponce, which served as the primary operating entity and acted as the lessor for the TSA Debtors' stores in Puerto Rico.

2.3.    <u>Business Operations</u>

The TSA Debtors were full-line sporting goods retailers, with a focus on branded fitness and family sports and fitness.  The TSA Debtors' merchandise was broadly classified into two categories: (1) "hardlines," which included team sports, exercise equipment, golf equipment, bicycles, skis, snowboards, and outdoor gear such as camping, hunting, and fishing merchandise; and (2) "softlines," which primarily consisted of apparel, including outerwear, and footwear.

As of January 30, 2016, the TSA Debtors' preliminary consolidated financial statements reflected approximately $1.6 billion in assets, including approximately $329.9 million in property, plant, and equipment.  As of January 30, 2016, the TSA Debtors recorded in FY2015, on a consolidated basis, sales of approximately $2.6 billion and net losses, before taxes, of approximately $156.6 million.

As of January 30, 2016, the TSA Debtors operated 464 stores in 40 states and Puerto Rico, and five distribution centers located in New Jersey, California, Colorado, Georgia, and Illinois.  Prior to filing for chapter 11 protection, the TSA Debtors employed approximately 5,400 full-time employees and 9,100 part-time employees.  Additionally, the TSA Debtors had approximately 83 independent contractors and numerous temporary workers at any given time (the number of temporary workers fluctuated greatly depending on the TSA Debtors' needs throughout the calendar year, with the largest number employed during the year-end holiday selling season).  In FY2015, the TSA Debtors paid, in the aggregate, approximately $372.2 million in salaries and benefits to their employees, contractors, and temporary workers.

The Debtor served as the sole operating entity for the TSA Debtors' stores in Puerto Rico.  Specifically, the Debtor operated three retail stores located in Puerto Rico, and employed approximately 115 people.

- 4 -

2.4.    <u>The Debtor's Prepetition Debt Obligations</u>.

(a)    The ABL Loan.

Prior to filing for chapter 11 protection, certain of the TSA Debtors entered into the Second Amended and Restated Credit Agreement, dated as of May 17, 2012 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "<u>ABL Credit Agreement</u>") by and among TSA and TSA Stores, as borrowers, Slap Shot and Gift Card, as guarantors, Bank of America, N.A. as administrative agent (as may have been changed from time to time pursuant to the ABL Credit Agreement, the "<u>ABL Agent</u>"), and the lenders party thereto (the "<u>ABL Lenders</u>"), which provided up to $650 million in aggregate loans in the form of an asset-based revolving credit facility (the "<u>ABL Loan</u>") and was scheduled to mature on May 17, 2017, subject to the conditions in the ABL Credit Agreement.  The ABL Credit Agreement provided for a varying interest rate based upon the excess availability under the ABL Loan, which varied from LIBOR plus 1.50% to LIBOR plus 2.00%, or from the prime rate plus 0.50% to the prime rate plus 1.00%. Prior to the termination of the revolving commitments thereunder (as described further below) availability under the ABL Loan was limited by a borrowing base calculation.  The obligations of the TSA Debtors that are Loan Parties under the ABL Credit Agreement were secured by a first-priority security interest in and lien on the borrowers' and guarantors' accounts receivable, deposit accounts, chattel paper, and inventory (collectively, the "<u>ABL Collateral</u>") and by a second-priority interest in and lien on the Term Loan Collateral (as defined below).

On March 1, 2016, the ABL Agent sent a termination notice that terminated the ABL Lenders' obligations to advance additional funds under the ABL Credit Agreement. As of the Petition Date, the applicable TSA Debtors had drawn approximately $345.5 million in principal on the ABL Loan.  In addition, as of the Petition Date there were approximately $25.7 million in letters of credit issued and outstanding under the ABL Credit Agreement.

Although the Debtor was not a party to the ABL Loan, because of the interconnected manner in which the TSA Debtors operated, the termination of the ABL Loan impacted the Debtor, as discussed in Section 2.6 below.

(b)    FILO Loan.

On November 3, 2015, certain of the TSA Debtors entered into that certain Second Amendment to the ABL Credit Agreement (as amended, amended and restated, supplemented or otherwise modified from time to time, the "<u>FILO Agreement</u>") by and among TSA and TSA Stores, as borrowers, Slap Shot and Gift Card, as guarantors, Bank of America, N.A., as administrative agent, Wells Fargo Bank, National Association, (as may have been changed from time to time pursuant to the FILO Agreement, the "<u>FILO Agent</u>"), the ABL Lenders, and the additional lenders party thereto (the "<u>FILO Lenders</u>"), which provided for the addition to the ABL Credit Agreement of a $95 million first-in, last-out term loan tranche (the "<u>FILO Loan</u>") with an interest rate of LIBOR plus 6.40% and a maturity date of June 14, 2017.  The FILO Loan was limited by a borrowing base calculation whereby the FILO Agent could take and maintain a reserve against the

- 5 -

borrowing base for the ABL Loan in an amount equal to the difference between the outstanding amount of the FILO Loan and the borrowing base under the FILO Agreement at such time (the "FILO Reserve").  The FILO Loan was secured by a last-out first-priority security interest in and lien on the ABL Collateral and by a last-out second-priority security interest in and lien on the Term Loan Collateral (as defined below), except that, as between the ABL Loan and the FILO Loan, collateral proceeds were to be applied first to repay the ABL Lenders and, only after the ABL Lenders had been repaid in full, to repay the FILO Lenders.

On March 1, 2016, the FILO Agent sent a termination notice that terminated the ABL Lenders' obligations to advance additional funds under the ABL Credit Agreement. The termination notice also had the effect of adding a prepayment fee to the principal amount of the FILO Loan.  As of the Petition Date, the applicable TSA Debtors owed approximately $95.3 million in principal (which amount includes the capitalized prepayment fee) on the FILO Loan.

Although the Debtor was not a party to the FILO Loan, because of the interconnected manner in which the TSA Debtors operated, the termination of the FILO Loan impacted the Debtor, as discussed in Section 2.6 below.

(c)     Term Loan.

Certain of the TSA Debtors are obligated under that certain Amended and Restated Credit Agreement, dated as of November 16, 2010 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Term Loan Credit Agreement"), by and among TSA, as borrower, Slap Shot, TSA Stores, and Gift Card, as guarantors, Wilmington Savings Fund Society, FSB, as administrative agent (as may have been changed from time to time pursuant to the Term Loan Credit Agreement, the "Term Loan Administrative Agent"), and the lenders named therein (the "Term Lenders"), whereby the Term Lenders extended to TSA a term loan in the original principal amount of approximately $300 million (the "Term Loan"; collectively with the ABL Loan and the FILO Loan, the "Secured Debt Obligations") with a stated maturity date of November 16, 2017.  The Term Loan is secured by a first-priority security interest in and lien on the borrowers' and guarantors' property, plant and equipment, real property, intellectual property, investment property and general intangibles (collectively, the "Term Loan Collateral") and by a second-priority interest in and lien on the ABL Collateral.  As of the Petition Date, the applicable TSA Debtors owed approximately $276.7 million in principal on the Term Loan.

The relative rights of the ABL Lenders and FILO Lenders on the one hand, and the Term Lenders, on the other, with respect to the ABL Collateral and the Term Loan Collateral, respectively, are governed by that certain Intercreditor Agreement, dated as of May 3, 2006 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement") by and between the ABL Agent and the Term Loan Agent, as amended by those certain side letters to the Intercreditor Agreement, dated as of November 16, 2010 and May 17, 2012, respectively.

- 6 -

The Debtor was not a party to the Term Loan but, as with the ABL Loan and the FILO Loan, because of the interconnected manner in which the TSA Debtors operated, the loss of this financing would be detrimental to the Debtor, as discussed in Section 2.6 below.

(d)     Trade Debt

In the ordinary course of business, TSA sourced, ordered, and purchased inventory for all of the TSA Debtors from their preferred suppliers on credit based on standard industry terms.  By purchasing for all of the TSA Debtors in bulk, TSA was able to obtain inventory on more favorable terms.  TSA then sold the inventory to its operating subsidiaries at cost, creating an intercompany claim between TSA and the operating subsidiary for the cost of the inventory.

All purchases were handled by TSA, which relied on the Secured Debt Obligations for funding.  Therefore, any loss of the Secured Debt Obligations would have been detrimental to the Debtor's ability to restock inventory and operate in the ordinary course of its business.  Additionally, some of the TSA Debtors' trade creditors were beneficiaries of letters of credit issued pursuant to the ABL Credit Agreement.

As of the Petition Date, the TSA Debtors as a whole owed approximately $178.9 million in trade debt.  As of the Petition Date, TSA had an intercompany claim of approximately $23 million against the Debtor.  This claim is treated as a General Unsecured Claim in Class 3 of the Plan.

(e)     Consignment Goods

In addition, a substantial portion of the TSA Debtors' business involved the sale of goods that were delivered to the TSA Debtors on consignment by approximately 170 vendors and sold in the TSA Debtors' stores and online.

The Debtor estimates that, as of the Petition Date, the Debtor possessed approximately 66,304 units of consigned goods with an invoice cost to the Debtor of approximately $620,512.77 in the aggregate.

2.5.   Key Assets

(a)     Cash

Prior to the Petition Date, the majority of the Debtor's assets were inventory. Following the sale of the Debtor's inventory and other assets (primarily fixtures and equipment), and payment of certain post-petition obligations, as discussed in Section 4.5 of this Disclosure Statement, the Debtor is holding approximately $4.2 million in cash.

(b)     Owned and Leased Property

Prior to the Petition Date, the Debtor leased three locations.  Upon liquidating its inventory, the Debtor rejected the lease agreements relating to these locations.

- 7 -

2.6.    Events Leading up to the Commencement of the Debtor's Chapter 11 Case.

(a)    Diminished Operating Performance

The TSA Debtors faced declining revenues as a result of rapidly changing consumer behavior, loss of market share as a result of increased competition from traditional and internet retailers, deterioration in customer relevance, loss of cross-selling opportunities due to a higher proportion of online sales, and an online platform that was economically disadvantageous and limited in its consumer offerings.  Some of the contributing causes to this downturn include, but are not limited to, increased competition, the legacy of the TSA Debtors' history of mergers and acquisitions, which resulted in inconsistent store formats across the chain, and relatively frequent turnover within the executive leadership.  The TSA Debtors also experienced certain institutional challenges, including outdated information systems, underperforming retail locations encumbered by expensive leases, and the TSA Debtors' decision to exit the hunting and fishing markets in all new and remodeled stores, all of which resulted in losses.  Finally, major industry trends, such as the steady decline in the popularity of golf, and certain regional issues, such as the Los Angeles port labor dispute and the reduced number of South American tourists in Florida, also weighed on the TSA Debtors' operational performance.

(b)    Liquidity Enhancements

In November 2015, the TSA Debtors executed the FILO Agreement to gain access to the FILO Loan to ensure that the TSA Debtors had, among other things, sufficient liquidity to maintain operations and avoid any covenant defaults under the ABL Loan and the Term Loan.  Although the FILO Loan achieved these objectives, the TSA Debtors remained highly levered and burdened by significant cash disbursements on account of their funded debt obligations.

(c)    Prepetition Strategic, Financing, and Marketing Efforts

In November 2015, the TSA Debtors engaged Rothschild Inc. ("Rothschild") to provide investment banking services, including exploring restructuring, financing and M&A alternatives.  Upon its retention, Rothschild immediately began extensive due diligence on the TSA Debtors' assets and operations, including frequent onsite meetings and an extensive dialogue with the TSA Debtors' senior management team.

The TSA Debtors and their professionals also entered into negotiations with their key creditor constituencies.  The long term goal of these discussions was to ascertain the viability of, and implement, a consensual restructuring of the TSA Debtors' capital structure (either through a sale, an out-of-court, or an in-court restructuring).  A key near-term concern was a $21.5 million interest payment scheduled to be made in January 2016 on certain of the TSA Debtors' subordinated debt obligations.  Given their desire to preserve value, the TSA Debtors determined they would not make this interest payment on the scheduled due date, but would instead seek a forbearance from their creditor constituencies as they attempted to negotiate the contours of a consensual financial restructuring.  Although the Debtor was not a direct obligor on the subordinated debt, due to the interconnected

- 8 -

manner in which the TSA Debtors operated, the failure to make this interest payment had a negative impact on the Debtor.

Notwithstanding these efforts, the TSA Debtors were ultimately unable to reach an agreement on the terms of a consensual, comprehensive forbearance prior to the date of the scheduled interest payment. The widely-reported missed interest payment, coupled with a lack of a comprehensive forbearance, resulted in an almost immediate erosion of certain key vendor support, further exacerbating the TSA Debtors' financial situation and threatening their ability to operate their business.

The sudden loss of some (but not all) key vendor support required the TSA Debtors to quickly change strategy. Although the TSA Debtors continued to explore a range of strategies and restructuring constructs, they intensified their efforts to locate a going-concern buyer. The TSA Debtors and Rothschild immediately began soliciting indications of interest for a potential acquisition. Despite the strong indications of interest, given the short time frame the TSA Debtors had to market their assets prior to the Chapter 11 filings, no party submitted a final proposal for a sale transaction.

*For a more detailed description of the events leading up to the commencement of the TSA Debtors' Chapter 11 cases, please consult the First Day Declaration [Docket No. 22], which is incorporated herein by reference.*

## ARTICLE III

## ADMINISTRATION OF THE CHAPTER 11 CASES

3.1.    Overview of Chapter 11.

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated holders of claims and equity interests, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing of a chapter 11 petition. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan is the primary objective of a chapter 11 case. A plan sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan by the Bankruptcy Court makes the plan binding upon the debtor, any entity acquiring property under the plan, any holder of a claim against or equity interest in a debtor and all other entities as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor, to the fullest extent permitted by applicable law, from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

Pursuant to section 1125 of the Bankruptcy Code, acceptance or rejection of a plan may not be solicited after the commencement of a chapter 11 case until such time as a bankruptcy court has approved a disclosure statement as containing adequate information. Pursuant to section 1125(a) of the Bankruptcy Code, "adequate information" is information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the plan. The Debtor is submitting this Disclosure Statement in satisfaction of the applicable disclosure requirements under section 1125 of the Bankruptcy Code.

3.2.    <u>Commencement of the Debtor's Chapter 11 Case</u>.

On the Petition Date, the TSA Debtors commenced their Chapter 11 cases (collectively, the "<u>Chapter 11 Cases</u>") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Concurrently with the commencement of the Chapter 11 Cases, the TSA Debtors filed certain motions requesting typical immediate relief, including, but not limited to, authority to enter into a post-petition financing facility, the payment of prepetition wages and employee benefits, the maintenance of their existing cash management system, and the joint administration of the Chapter 11 Cases for procedural purposes.

3.3.    <u>Retention and Employment of Professionals.</u>

To assist the TSA Debtors in carrying out their duties as debtors and debtors in possession and to obtain legal representation in these Chapter 11 Cases, the TSA Debtors filed applications with the Bankruptcy Court seeking to retain, <u>inter alia</u>, Young Conaway Stargatt & Taylor, LLP ("<u>YCST</u>") and Gibson, Dunn & Crutcher LLP ("<u>GDC</u>"), as bankruptcy counsel. These engagements were approved by respective Bankruptcy Court orders dated March 24, 2016 [Docket Nos. 808 & 809].

The TSA Debtors filed an application seeking authorization to employ Kurtzman Carson Consultants LLC as administrative advisor, which was approved by order dated March 24, 2016 [Docket No. 810].

The TSA Debtors filed an application seeking authorization to employ and retain FTI Consulting, Inc. and FTI Consulting Technology LLC as financial advisors, which was approved by order dated March 24, 2016 [Docket No. 812].

The TSA Debtors filed an application seeking authorization to employ and retain Rothschild as an investment banker, which was approved by order dated March 29, 2016 [Docket No. 875].

The TSA Debtors filed an application seeking authorization to employ A&G Realty Partners, LLC as the TSA Debtors' real estate advisor, which was approved by order dated March 31, 2016 [Docket No. 910].

On March 23, 2016, the Debtor, along with affiliates TSA and Ponce, filed an application to employ Irell & Manella as counsel to the these debtors. This engagement was approved by order dated April 11, 2016 [Docket No. 1106].

- 10 -

*For additional information with respect to the first day pleadings and related relief sought by the TSA Debtors at the beginning of the Chapter 11 case, please consult the First Day Declaration [Docket No. 22], which is incorporated herein by reference.*

3.4.    Official Committee of Unsecured Creditors.

On March 10, 2016, the U.S. Trustee appointed an official committee of unsecured creditors (the "Creditors' Committee"), pursuant to section 1102 of the Bankruptcy Code.  The members of the Creditors' Committee initially included (i) TCW/Crescent Mezzanine Partners et al, (ii) New York Life Investment Management Mezzanine Partners, LP, and (iii) Stitching Pensionfunds ABP, (iv) Nike, Inc., (v) Asics America Corp, (vi) GGP Limited Partnership, and (vii) Realty Income Corp.  Stitching Pension Funds subsequently resigned from the Creditors' Committee.

By orders dated May 9 and June 12, 2016, the Bankruptcy Court approved the retention of Pachulski Stang Ziehl & Jones LLP as counsel to the Creditors' Committee, BDO Consulting as financial advisor to the Creditors' Committee, and Houlihan Lokey Capital, Inc. as investment banker to the Creditors' Committee [Docket Nos. 2044, 2071 & 2117].

3.5.    Filing of Schedules and Setting of Bar Dates.

The Debtor filed its Schedules of Assets and Liabilities, as well as its Statement of Financial Affairs, on April 22, 2016 [Docket Nos. 1368-1369].  On April 22, 2016, the Bankruptcy Court entered an order [Docket No. 41351] (the "Bar Date Order"), which established the following dates by which proofs of claim must be actually received by the Claims and Voting Agent:

| BAR DATES | |
|---|---|
| **General Bar Date** | **June 3, 2016 at 4:00 p.m. (ET)** |
| **Governmental Unit Bar Date** | **August 26, 2016 at 4:00 p.m. (ET)** |

Subject to certain limited exceptions contained in the Bankruptcy Code and the Bar Date Order, all proofs of claim were required to be submitted by the applicable Bar Date.  In accordance with the Bar Date Order, written notice of the Bar Dates, including a proof of claim form, was mailed to, among others, all known claimants holding actual or potential Claims against the Debtor and other parties listed in the Bar Date Order.

As of the General Bar Date, proofs of claim alleging approximately $79.8 million in liquidated Claims against the Debtor have been submitted, although several proofs of claim were filed against more than one TSA Debtor by the same creditor seeking the same amount from different TSA Debtors.  Because of this, the fact that certain alleged Claims are contingent and/or disputed, the amount of Claims against the Debtor that will ultimately become Allowed Claims remains uncertain.

- 11 -

On June 30, 2017 [Docket No. 3699], the Debtor filed an amended Schedule E/F (the "Amended Schedules").  Claimants affected by the Amended Schedules had until July 21, 2017 to file revised proofs of claim.  No revised proofs of claim were filed.

3.6.    The Claim Objections

On July 19, 2017, the Debtor filed two omnibus claim objections to: (i) claims for which the Debtor was not liable (many of which were claims against other of the TSA Debtors); (ii) claims that were subsequently amended; and (iii) claims that were filed in amounts that exceeded the actual amount owed by the Debtor (together, the "Claim Objections") [Docket Nos. 3729 & 3730].

On August 21, 2017, the Court entered orders sustaining the Debtor's Claim Objections [Docket Nos. 3773 & 3774].  Approximately $78.8 million in liquidated claims against the Debtor were eliminated.

3.7.    Motion for Authority to Enter Into DIP Facility.

Prior to the filing of these Chapter 11 Cases, the TSA Debtors determined that they would not be able to meet their ongoing postpetition obligations and preserve the value of their assets unless they were authorized to obtain debtor-in-possession financing. Accordingly, on the Petition Date, certain of the TSA Debtors filed a motion [Docket No. 20] (the "Original DIP Motion") seeking approval of interim and final orders authorizing the debtor-in-possession financing under a $595 million senior secured, superpriority term loan facility (the "DIP Facility") entered into between (i) TSA and TSA Stores as borrowers, (ii) Slap Shot, Gift Card, Sports Authority Holdings, Ponce, and the Debtor as guarantors, (iii) BofA as administrative agent and collateral agent, (iv) Wells Fargo Bank, national Association as FILO Agent, and (v) each Revolving Lender and each FILO Lender party thereto (the "DIP Lenders"). On May 3, 2016, the Bankruptcy Court entered an order approving the DIP Motion on a final basis (the "Final DIP Order") [Docket No. 1699].

The Debtor, as a guarantor, provided the DIP Lenders with a first-priority senior lien on all of the Debtor's unencumbered assets; provided, however, that all proceeds received from the sale or disposition of such assets were to be first applied to pay the pre-petition and post-petition obligations of the Debtor, other than intercompany obligations, and then to pay obligations arising under the DIP Facility.

Among other things, the DIP Facility provided that certain post-petition collections would be applied to pay-down the prepetition ABL Loan.  As the amount owing under the ABL Loan decreased, the availability under the DIP Facility increased.  In addition, all letters of credit issued and outstanding under the ABL Loan were deemed post-petition obligations under the DIP Facility.  Over the course of the Chapter 11 Cases, the ABL Loan was satisfied in full.

The DIP Facility has since been satisfied in full from the proceeds of the sales of the assets of the borrowers under the DIP Facility.

- 12 -

*For additional information with respect to the first day pleadings and related relief sought by the TSA Debtors at the beginning of the Chapter 11 case, please consult the First Day Declaration [Docket No. 22], which is incorporated herein by reference.*

3.8.    The Closing Sales Agreement.

Prior to the filing of the Chapter 11 Cases, the TSA Debtors developed a store closing plan, whereby they planned an orderly exit from certain underperforming or unprofitable store locations in an effort to conserve resources and maximize utility.  In connection with this plan, TSA Stores, Inc. entered into an agreement with Gordon Brothers Retail Partners, LLC ("GBRP") to liquidate and dispose of the merchandise at certain store locations in anticipation of closing those store locations (the "Closing Sales Agreement"). These stores included the three locations operated by the Debtor.

Upon filing the Chapter 11 Cases, the TSA Debtors filed a motion to approve the Closing Sales Agreement and authorizing the TSA Debtors to continue with their plan to close underperforming stores (the "Closing Sales Motion") [Docket No. 47].  On May 3, 2016, the Bankruptcy Court entered an order approving the Closing Sales Motion on a final basis (the "Closing Sale Order") [Docket No. 1700].

*For more information regarding the terms of the Closing Sale Agreement, please consult the Closing Sale Order [Docket No. 1700].*

3.9.    Sale of the TSA Debtors' Assets.

Prior to the filing of the Chapter 11 Cases, the TSA Debtors determined that the best way to maximize the value of their assets for the benefit of creditors was through one or more sales of substantially all of their assets to one or more purchasers at a public auction pursuant to section 363 of the Bankruptcy Code.  Toward that end, on the Petition Date, the Debtors filed the *Debtors' Motion, Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, Fed. R. Bankr. P. 2002, 6003, 6004, 6006, 9007, 9008 and 9014 and Del. Bankr. L.R. 2002-1, 6004-1 and 9006-1, for Entry of (A) an Order (I) Approving Bid Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Scheduling an Auction for and Hearing to Approve Sale of Assets, (III) Approving Notice of Respective Date, Time and Place for Auction and for Hearing on Approval of Sale, (IV) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (V) Approving Form and Manner of Notice Thereof and (VI) Granting Related Relief and (B) an Order Authorizing and Approving (I) the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Rights, Encumbrances, and Other Interests, (II) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (III) Related Relief* [Docket No. 106] (the "Sale Motion").  Also on the Petition Date, the TSA Debtors filed a motion seeking the approval of various sale and notice procedures and scheduling an auction, which was approved by order of the Bankruptcy Court dated April 14, 2016 [Docket No. 1186] (the "Sale Procedures Orders").

The TSA Debtors held an auction for the majority of their assets on May 16, 2016 (the "Auction").  Leading up to the auction, the TSA Debtors solicited interest in

- 13 -

substantially all of their assets, including their leasehold interests in nonresidential real property and their inventory and FF&E (the "Retail Inventory"). Unfortunately, the TSA Debtors did not receive any going concern bids for their assets on an enterprise level. At the conclusion of the Auction, the TSA Debtors accepted the bid submitted by a contractual joint venture composed of (i) Gordon Brothers Retail Partners, LLC, (ii) Hilco Merchant Resources, LLC, and (iii) Tiger Capital Group LLC (collectively, the "Agent") for their Retail Inventory. The auction for certain of the TSA Debtors' remaining assets was adjourned to June 29, 2016 (the "Adjourned Auction").

On May 24, 2016, the Court entered the *Order Pursuant to Sections 105, 363, and 365 of the Bankruptcy Code, Approving Sale of Debtors' Assets and Granting Related Relief* [Docket No. 2081] approving the agency agreement entered into by and between the Agent and the TSA Debtors (the "First Sale Order"). Consistent with the terms of the Closing Sale Order and the First Sale Order, the TSA Debtors continued to conduct "going out of business" sales at the TSA Debtors' remaining store locations through July 28, 2016. All of the Debtor's inventory has now been liquidated and all leases rejected.

While the Agent was selling the Retail Inventory, the TSA Debtors continued to market their portfolio of leasehold interests in various unexpired leases of nonresidential real property (collectively, the "Remaining Leases") and other valuable assets such as their intellectual property. At the Adjourned Auction and thereafter, the TSA Debtors sold or rejected all but one of their Remaining Leases, and also sold or abandoned a substantial majority of their other assets.

Following the Adjourned Auction, the Bankruptcy Court approved the sale of the TSA Debtors' rights with respect to various leases of non-residential real property and various related assets to Dick's Sporting Goods, Inc., and the sale of various intellectual property to other buyers identified in the Sale Order pursuant to the *[Corrected] Order, Pursuant to Sections 105, 363, and 365 of the Bankruptcy Code, (I) Approving Sale of All Acquired Assets and (II) Granting Related Relief* [Docket No. 2552] (the "Second Sale Order").

The TSA Debtors also entered into numerous assignment agreements and lease termination agreements disposing of valuable leasehold interests, which generated significant proceeds for the TSA Debtors' estates.

The DIP Facility, the ABL Loan, and the FILO Loan were satisfied in full from the proceeds of the sales of the assets of the borrowers. Approximately $213 million remained outstanding in connection with the Term Loan following the completion of the sale of substantially all of the TSA Debtors' assets.

*For more information regarding the terms of the sales, please consult the Sales Procedures Order and the Sale Order [Docket Nos. 1186, 2081 & 2552].*

3.10.    The Consignment Vendors Settlement.

As noted above, the Debtor estimates that, as of the Petition Date, the Debtor possessed approximately 66,304 units of consigned goods with an invoice cost to the Debtor

- 14 -

of approximately $620,512.77 in the aggregate.  In order to facilitate the sale of the TSA Debtors' assets and maximize the value available for distribution to the TSA Debtors' stakeholders, TSA Stores undertook significant efforts to resolve issues raised by certain vendors to the sale of prepetition consignment goods held by all of the TSA Debtors.

Following various litigation with respect to the consignment goods, the TSA Debtors, various vendors (the "Settling Vendors"), and the Term Loan Agent entered into a settlement agreement (the "TSA Settlement Agreement").  Among other things, the TSA Settlement Agreement set forth the percentage to be paid to each Settling Vendor upon the sale of the consignment goods (ranging from 25% to 50%) and provided a carve-out from the Term Loan Administrative Agent's collateral securing the Term Loan to facilitate settlement payments to the Settling Vendors.  The TSA Settlement Agreement mooted a significant number of complaints and adversary proceedings relating to the objecting vendors and permitted the TSA Debtors to proceed with the liquidation of their assets.

On June 30, 2016, the TSA Debtors filed a motion seeking authorization to enter into the TSA Settlement Agreement (the "TSA Settlement Motion") [Docket No. 2361], which was approved by order dated July 7, 2016 (the "TSA Settlement Order") [Docket No. 2434].

Subsequently, on May 2, 2017, the TSA Debtors filed a motion to enforce the TSA Settlement Order against certain of the Settling Vendors [Docket No. 3579], which was approved by order dated May 23, 2017 [Docket No. 3628].

*For more information regarding the terms of the TSA Settlement Agreement, please consult the TSA Settlement Motion and TSA Settlement Order [Docket Nos. 2361 and 2434].*

3.11.   The Term Loan Settlement.

Following the sale of substantially all of the TSA Debtors' assets, as described above, the TSA Debtors began the process of winding down their Chapter 11 Cases.  During the summer of 2016, it became clear that the TSA Debtors would soon repay the remaining amounts owed under the DIP Facility with the proceeds of the asset sales described above.  At such point, in the absence of agreement regarding the use of cash collateral going forward, the Term Loan Administrative Agent would have had the option to terminate the TSA Debtors' authority to use cash collateral going forward.  *See* Final DIP Order [Docket No. 1699] at ¶ 33.

To prevent the TSA Debtors' cases from halting, and to avoid the substantial cost of litigating various disputes with their secured lenders and others, the TSA Debtors and the Term Loan Administrative Agent engaged in extensive good faith, arm's length negotiations, aimed at reaching a global agreement of all outstanding issues implicating the pre-petition Term Loan.  Those discussions resulted in a settlement agreement (as amended, the "Term Loan Settlement") that the TSA Debtors sought approval of by motion dated July 12, 2016 [Docket No. 2484] (the "Term Loan Settlement Motion").

- 15 -

The Creditors' Committee filed an objection to the Term Loan Settlement Motion [Docket No. 2427]. However, the TSA Debtors and the Term Loan Administrative Agent engaged in further negotiations with the Creditors' Committee regarding the terms of the Term Loan Settlement and, as a result of certain modifications thereto, the Creditors' Committee ultimately supported the Term Loan Settlement. The Term Loan Settlement, as modified by the agreement with the Creditors' Committee, provided several material benefits to the TSA Debtors' estates, all of which were or will be paid from the Term Loan Administrative Agent's cash collateral:

- payment of certain ongoing administrative costs and expenses provided for under a reasonable wind-down budget (as established pursuant to the Term Loan Settlement Motion);

- funding of 85% of certain landlords' claims for stub rent pursuant to settlement procedures agreed to by a super-majority of the TSA Debtors' landlords;

- payment of ongoing budgeted fees and expenses of the estates' professionals; and

- based on discussions with the Creditors' Committee, the funding of $1.5 million to pay creditors that hold valid claims against the TSA Debtors under section 503(b)(9) of the Bankruptcy Code.

Further, as part of the negotiations with the Creditors' Committee, the TSA Debtors and the Term Loan Administrative Agent agreed to waive any preference claims that the TSA Debtors might have. In exchange, the TSA Debtors, on behalf of themselves and their estates, provided the Term Loan Administrative Agent and other prepetition secured lenders a waiver of any right to surcharge their collateral under section 506(c) of the Bankruptcy Code, and further stipulated to allow the Term Loan Administrative Agent's adequate protection claim in these Chapter 11 Cases in the amount of $71 million. The Court approved the Term Loan Settlement by order dated August 2, 2016 [Docket No. 2702] (the "Term Loan Settlement Approval Order").

On November 1, 2016, January 27, 2017, April 12, 2017, and June 29, 2017 respectively, the TSA Debtors filed notices amending the Term Loan Settlement [Docket Nos. 3159, 3377, 3547 & 3698]. Pursuant to those amendments, the Term Loan Administrative Agent consented to the TSA Debtors' continued use of cash collateral through the earlier of certain termination events (as set forth in the Term Loan Settlement) or September 30, 2017, to pay the estates' fees, costs and expenses subject to, among other things, the wind-down budget agreed to in connection with the Term Loan Settlement.

*For more information regarding the terms of the Term Loan Settlement, please consult the Term Loan Settlement Motion [Docket Nos. 2484 and 2707].*

- 16 -

3.12.    The Term Loan Adequate Protection Claim.

The Final DIP Order provided various protections to the pre-petition secured lenders, including the Term Loan Lenders, on account of the granting of the liens under the DIP Facility, the TSA Debtors' use of cash collateral, and any other diminution in value arising from the imposition of the automatic stay or the TSA Debtors' use, sale, depreciation, or disposition of the Term Loan Collateral (collectively, "Diminution in Value").  Specifically, the Final DIP Order provided that the pre-petition secured lenders, including the Term Loan Lenders, have an allowed superpriority administrative expenses claim with respect to the Diminution in Value.

The Term Loan Lenders have asserted that they have an adequate protection claim that exceeds $240 million (the "TSA Asserted Adequate Protection Claim"),[4] and that this claim is an administrative expense against all of the TSA Debtors, including the Debtor. The TSA Debtors vigorously dispute the amount of the TSA Asserted Adequate Protection Claim.

Although the Debtor was a guarantor under the DIP Facility, the Final DIP Order also provides that all proceeds received from the sale or disposition of such assets were to be first applied to pay the pre-petition and post-petition obligations of the Debtor, other than intercompany obligations, and then to pay obligations arising under the DIP Facility.  The Debtor therefore asserts that the TSA Asserted Adequate Protection Claim is subordinate to the payment of all general unsecured claims.

FOLLOWING DISCUSSIONS BETWEEN THE TERM LOAN ADMINISTRATIVE AGENT AND THE DEBTOR, THE TERM LOAN LENDERS HAVE AGREED TO WAIVE THEIR ASSERTED ADMINISTRATIVE EXPENSE CLAIM PROVIDED THAT (A) THE AGGREGATE AMOUNT OF ADMINISTRATIVE EXPENSES CLAIMS ALLOWED BY THE DEBTOR DO NOT EXCEED $1,150,000 AND (B) THE INTERDEBTOR CLAIMS ASSERTED AGAINST THE DEBTOR ARE NOT DISALLOWED.

## ARTICLE IV

## SUMMARY OF PLAN AND CLASSIFICATION AND
## TREATMENT OF CLAIMS AND EQUITY INTERESTS THEREUNDER

4.1.    Summary of Plan.

The Plan is a plan of liquidation, pursuant to which the net proceeds from the disposition of all Assets are being pooled and distributed to persons or entities holding Allowed Claims in accordance with the priorities of the Bankruptcy Code and the summary of treatment of Claims and Equity Interests set forth below.  The number and amount of Allowed Claims will not affect distributions for holders of Allowed Administrative Expense

---

[4]    The TSA Asserted Adequate Protection Claim was reduced to $71 million pursuant to the Term Loan Settlement Approval Order.

Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims.  Actual distributions may differ from those set forth in the table below depending on, among other things, the amounts of the Claims Allowed in Classes 3 and 4, the proceeds from the disposition of any remaining Assets, and the Wind-Down Expenses.

THE FOLLOWING CHART IS A SUMMARY OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS AND THE POTENTIAL DISTRIBUTIONS UNDER THE PLAN.  THE AMOUNTS SET FORTH BELOW ARE ESTIMATES ONLY.  REFERENCE SHOULD BE MADE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN FOR A COMPLETE DESCRIPTION OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS.  THE RECOVERIES SET FORTH BELOW ARE PROJECTED RECOVERIES AND ARE THEREFORE SUBJECT TO CHANGE.  THE ALLOWANCE OF CLAIMS MAY BE SUBJECT TO LITIGATION OR OTHER ADJUSTMENTS, AND ACTUAL ALLOWED CLAIM AMOUNTS MAY DIFFER MATERIALLY FROM THESE ESTIMATED AMOUNTS.  FOLLOWING THE CHART IS THE DESCRIPTION OF THE TREATMENT OF THE CLAIMS AND EQUITY INTERESTS UNDER THE PLAN.

| Class | Designation | Impairment | Entitled to Vote | Estimated Recovery |
|-------|-------------|------------|------------------|--------------------|
| Class 1 | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) | 100% |
| Class 2 | Miscellaneous Secured Claims | Unimpaired | No (deemed to accept) | 100% |
| Class 3 | General Unsecured Claims | Impaired | Yes | 11% |
| Class 4 | Subordinated Claims | Impaired | Yes | 0% |
| Class 5 | Equity Interests | Impaired | Yes | 0% |

Underlying the Estimated Percentage Recovery identified in the above-table are a number of assumptions that, although developed and considered reasonable by the Debtor, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtor.  There is no assurance that the stated Estimated Percentage Recovery will be realized, and the actual recovery percentage for holders of Claims in Classes 3 and 4 and Equity in Class 5 could vary materially from those shown here depending on the outcome of a number of variables.

- 18 -

**Treatment of Administrative Expense Claims and Priority Tax Claims**

4.2.     Administrative Expense Claims.  Except to the extent a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, on or as soon as practicable after the later of (i) the Effective Date or (ii) the first Business Day after the date that is thirty days after the date an Administrative Expense Claim becomes an Allowed Claim, each holder of an Allowed Administrative Expense Claim shall receive Cash in an amount equal to such Allowed Claim. Administrative Expense Claims are not classified in the Plan.

4.3.     Time for Filing Administrative Expense Claims.  The holder of an Administrative Expense Claim accruing on or after (i) March 2, 2016 other than: (a) a Fee Claim; (b) an Administrative Expense Claim that has been Allowed against the Debtor on or before the Effective Date; or (c) a claim for U.S. Trustee Fees, must submit to the Claims and Voting Agent and serve on the Liquidation Trustee and counsel to the Liquidation Trust a request for such Administrative Expense Claim so as to be received by 5:00 p.m. (prevailing Pacific Time) on the date that is thirty (30) days after occurrence of the Effective Date.  Such request must include at a minimum: (i) a statement that the Debtor (as opposed to the Debtor's affiliate(s)) is purported to be liable for the Administrative Expense Claim; (ii) the name of the holder of the Administrative Expense Claim; (iii) the amount of the Administrative Expense Claim; (iv) the basis of the Administrative Expense Claim; and (v) all supporting documentation for the Administrative Expense Claim.  **FAILURE TO FILE AND SERVE SUCH REQUEST TIMELY AND PROPERLY SHALL RESULT IN THE ADMINISTRATIVE EXPENSE CLAIM BEING FOREVER BARRED AND DISALLOWED.**

4.4.     Waiver of Administrative Expense Claim.  Any Administrative Expense Claim held by (i) a DIP Lender under the DIP Facility Documents, or (ii) the Term Loan Administrative Agent or any of the Term Lenders under the Term Loan Agreement, the Final DIP Order, the Term Loan Settlement, or the Term Loan Settlement Approval Order shall be waived provided that (a) the aggregate amount of Administrative Expenses Claims allowed by the Debtor do not exceed $1,150,000 and (b) the Interdebtor Claims asserted against the Debtor are not disallowed.

4.5.     Professional Compensation and Fee Claims.

(a)     All Fee Claims (as defined in the Plan) must be filed with the Bankruptcy Court and served on (i) the Debtor and its counsel (if prior to the Effective Date), (ii) the Liquidation Trustee and its counsel, and (iii) the U.S. Trustee no later than thirty (30) days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court in the Chapter 11 Case, the Allowed amounts of such Fee Claims shall be determined by the Bankruptcy Court.  **FAILURE TO FILE AND SERVE FINAL FEE APPLICATIONS**

- 19 -

**TIMELY AND PROPERLY SHALL RESULT IN THE UNDERLYING FEE CLAIMS BEING FOREVER BARRED AND DISALLOWED.[5]**

(b)      Objections to Fee Claims.  Objections to Fee Claims, if any, must be filed and served pursuant to the procedures set forth in the Confirmation Order no later than twenty-one (21) days after the filing of the Fee Claim or such other date as may be established by the Bankruptcy Court.

(c)      Treatment of Fee Claims.  Fee Claims are not classified under the Plan.  A Fee Claim in respect of which a final fee application has been timely and properly filed and served pursuant to Section 2.03(a) of the Plan shall be payable to the extent approved by order of the Bankruptcy Court.  Subject to the Holdback Amount,[6] on the Effective Date, or as soon thereafter as reasonably practicable, to the extent not otherwise paid, all Allowed Professional Fees (including estimated fees through the Effective Date) shall be Paid in Full in Cash.  To receive payment on the Effective Date for unbilled fees and expenses estimated to be incurred through the Effective Date, each Professional shall reasonably estimate fees and expenses due for unbilled fees and expenses for periods that will not have been billed as of the Effective Date and shall deliver such estimates to the Debtor, counsel to the Debtor and the U.S. Trustee prior to the Effective Date.  If the estimated payment received by such Professional exceeds the actual Allowed Professional Fees for the estimated period, such excess amount shall be deducted from the Holdback Amount for such Professional and if the Holdback Amount is insufficient, such Professional shall disgorge and return the difference to the Liquidation Trustee.  If the estimated payment received by the Professional is lower than the Allowed Professional Fees of such Professional, the difference shall be promptly paid to the Professional by the Liquidation Trustee.

(d)      Holdback Amount Reserve.  On the Effective Date, the Liquidation Trustee shall fund the Holdback Amount Reserve for payment of the Holdback Amount.  Upon final allowance by the Bankruptcy Court of the Professional Fees, or entry of an earlier order of the Bankruptcy Court granting the release of the Holdback Amount, such amount, *less* any excess paid in connection with estimated fees and expenses through the Effective Date, shall be paid promptly and directly to the Professionals.  Any amounts in the

_____

[5]      For the avoidance of doubt, fees incurred by YCST and GDC, as co-counsel to the TSA Debtors, shall not be considered "Professional Fees," as that term is defined in Section 1.69 of the Plan, and, accordingly, are not subject to the process described herein (or in the Plan) for the treatment of Professional Fees.  GDC and YCST will continue to seek payment for fees incurred and reimbursement for applicable expenses in the TSA Debtors' Chapter 11 Cases consistent with that certain *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 806].

[6]      "Holdback Amount" means, with respect to Professional Fees, amounts held back pursuant to an order or orders of the Bankruptcy Court in the Debtor's Chapter 11 Case, including the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals*, dated March 24, 2016 [Docket No. 806].

- 20 -

Holdback Amount Reserve that are not needed to pay the Allowed Professional Fees in full shall be returned to the Liquidation Trustee.

4.6.    <u>Priority Tax Claims</u>.  Priority Tax Claims are not classified under the Plan. Except to the extent a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in the discretion of the Liquidation Trustee, such holder shall receive either (a) on or as soon as practicable after the later of (i) the Effective Date or (ii) the first Business Day after the date that is thirty (30) days after the date a Priority Tax Claim becomes an Allowed Claim, Cash in an amount equal to such Allowed Claim, or (b) deferred Cash payments in a total amount equal to such Allowed Claim, over a period beginning on the Effective Date and not exceeding five years from the Petition Date.  Any Claim or demand for fines or penalties related to a Priority Tax Claim shall be disallowed and the holder of an Allowed Priority Tax Claim shall not assess or attempt to collect any such fine or penalty from the Liquidation Trustee.

## Treatment of Classified Claims and Equity Interests

4.7.    <u>Class 1 – Priority Non-Tax Claims</u>.

(a)    <u>Impairment and Voting</u>.  Class 1 is Unimpaired by the Plan.  Each holder of an Allowed Priority Non-Tax Claim is not entitled to vote to accept or reject the Plan because it is Unimpaired and conclusively deemed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code.

(b)    <u>Distribution and Treatment</u>.  Except to the extent a holder of an Allowed Priority Non-Tax Claim has been paid by the Debtor prior to the Effective Date or agrees to less favorable treatment, on or as soon as practicable after the later of (i) the Effective Date or (ii) the first Business Day after the date that is thirty (30) days after the date a Priority Non-Tax Claim becomes an Allowed Claim, each holder of an Allowed Priority Non-Tax Claim shall receive Cash in an amount equal to such Allowed Claim.

4.8.    <u>Class 2 – Miscellaneous Secured Claims</u>.

(a)    <u>Impairment and Voting</u>.  Class 2 is Unimpaired by the Plan.  Each holder of a Miscellaneous Secured Claim is not entitled to vote to accept or reject the Plan because it is Unimpaired and conclusively deemed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code.

(b)    <u>Distribution and Treatment</u>.  Except to the extent that a holder of an Allowed Miscellaneous Secured Claim has been paid by the Debtor prior to the Effective Date or agrees to less favorable treatment, each holder of an Allowed Miscellaneous Secured Claim shall be, at the option of the Liquidation Trustee: (i) reinstated in full, leaving unaffected the holder of such Claim's legal, equitable, and/or contractual rights, (ii) paid in Cash up to the Allowed amount of such Claim, (iii) satisfied in whole or in part by the transfer of all or any portion of the Assets securing such Claim, (iv) paid in deferred Cash payments having a present value on the Effective Date equal to the Allowed amount of the Claim, or (v) treated in a manner that would provide the "indubitable equivalent" of the Allowed Claim.

- 21 -

4.9.    Class 3 – General Unsecured Claims.

(a)    Impairment and Voting. Class 3 is impaired by the Plan. Each holder of an Allowed General Unsecured Claim is entitled to vote to accept or reject the Plan.

(b)    Distribution and Treatment. Except to the extent a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, each holder of an Allowed General Unsecured Claim shall receive such holder's Pro Rata share of the Unsecured Claim Distribution.

4.10.    Class 4 – Subordinated Claims.

(a)    Impairment and Voting. Class 4 is impaired by the Plan. Each holder of a Subordinated Claim is entitled to vote to accept or reject the Plan.

(b)    Distribution and Treatment. The holders of Subordinated Claims are not expected to receive any Distributions on account of such Claims; provided, however, in the event surplus funds remain in the Liquidation Trust after all holders of Allowed Claims in Classes 1, 2, and 3 receive Payment in Full, plus interest, on account of such Allowed Claims, holders of Subordinated Claims shall receive such holder's Pro Rata share of the surplus funds.

4.11.    Class 5 – Equity Interests.

(a)    Impairment and Voting. Class 5 is impaired by the Plan. The holder of the Equity Interest is entitled to vote to accept or reject the Plan.

(b)    Distributions. The holder of the Equity Interest is not expected to receive any Distributions on account of such interest; provided, however, in the event surplus funds remain in the Liquidation Trust after all holders of Allowed Claims in Classes 1, 2, 3, and 4 receive Payment in Full, plus interest, on account of such Allowed Claims, the holder of the Equity Interest shall receive the surplus funds.

## ARTICLE V

## IMPLEMENTATION OF THE PLAN

5.1.    Implementation of the Plan. The Plan will be implemented by the Debtor and Liquidation Trustee in a manner consistent with the terms and conditions set forth in the Plan and the Confirmation Order.

5.2.    Plan Funding. The funds utilized to make Cash payments under the Plan have been and/or will be generated from, among other things, Cash on hand, and the proceeds of sale, liquidation or other disposition of the Assets.

5.3.    Good Faith. Confirmation of the Plan shall constitute a finding that:  (i) the Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code; and (ii) the solicitation of acceptances or rejections of the Plan by all

- 22 -

Persons has been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

5.4.    Compromise of Claims.  Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor and its Estate, and is fair, equitable and reasonable.

5.5.    Liquidation Trust.

(a)    Creation of the Liquidation Trust.  On or before the Effective Date, the Liquidation Trust shall be formed pursuant to the Liquidation Trust Agreement and the filing of a certificate of trust with the Delaware Secretary of State.  The Liquidation Trustee shall administer the Liquidation Trust, and shall have the powers and duties set forth in the Liquidation Trust Agreement.  The Liquidation Trustee will have authority to retain, on behalf of the Liquidation Trust, any counsel, financial advisors, claims agent, auditors, or other such professionals as the Liquidation Trustee deems appropriate at all times.  The Liquidation Trust may select any of the foregoing professionals in its sole discretion, and prior employment in any capacity in the Chapter 11 Case on behalf of the Debtor, its Estate, or the Creditors' Committee shall not preclude the Liquidation Trust's retention of such professionals.  The Liquidation Trust Beneficiaries' interests in the Liquidation Trust shall be uncertificated and, subject to applicable law, shall only be transferable upon the death of or dissolution of the applicable Liquidation Trust Beneficiary or pursuant to applicable law.

(b)    Purpose of the Liquidation Trust.  On the Effective Date, the Debtor shall transfer, on behalf of the Liquidation Trust Beneficiaries, the Liquidation Trust Assets to the Liquidation Trust.  The Liquidation Trust shall be established as a liquidating trust for the primary purpose of monetizing and distributing the Liquidation Trust Assets to the Liquidation Trust Beneficiaries.  In connection with the vesting and transfer of the Liquidation Trust Assets, including the Causes of Action, any attorney-client privilege, work-product protection or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Liquidation Trust shall vest in the Liquidation Trust.  The Debtor and the Liquidation Trustee are authorized to take all necessary actions to effectuate the transfer of such privileges, protections and immunities.

(c)    Liability of Liquidation Trustee.  Neither the Liquidation Trustee nor any of his/her/its members or designees, agents, professionals or representatives, nor their respective employees, shall be liable for the act or omission of any other member, designee, agent, or representative of any other such person nor shall any member be liable for any act or omission to be taken or not taken in such capacity, other than acts resulting from such

- 23 -

Person's willful misconduct or gross negligence. Mr. Garrett, the proposed Liquidation Trustee, is currently the chair of the TSA Debtors' wind down committee and will continue in that role, and may take other roles with respect to the TSA Debtors, while serving as Liquidation Trustee.

(d)     <u>Management of the Liquidation Trust Assets</u>. After the Effective Date, all property of the Liquidation Trust shall be managed and administered by the Liquidation Trustee in a manner reasonably designed to maximize values. The Liquidation Trust is authorized to prosecute, compromise, settle or abandon the Causes of Action for the benefit of any holders of Allowed Claims, who shall be entitled to receive a Distribution pursuant to the terms of the Plan without further order of the Bankruptcy Court. If the Liquidation Trustee, decides not to sell any non-Cash Asset or property or if such Asset or property cannot, in the Liquidation Trustee's judgment, be sold or liquidated in a commercially reasonable manner prior to the Final Distribution Date, the Liquidation Trustee shall have the right to abandon or otherwise dispose of such property without the prior approval of the Bankruptcy Court. Absent willful misconduct, intentional misconduct, gross negligence or fraud in connection therewith, no party in interest shall have a cause of action against either the Liquidation Trustee, the Liquidation Trust, or their respective directors, officers, employees, consultants, trustees or professionals arising from or related to the disposition of non-Cash property in accordance with this subparagraph.

(e)     <u>Transfer Taxes</u>. Any transfer of the Liquidation Trust Assets to the Liquidation Trust shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax to the extent permitted under section 1146(a) of the Bankruptcy Code.

(f)     <u>Federal Income Tax Treatment of the Liquidation Trust</u>. The Liquidation Trust will be established for the sole purpose of distributing the Liquidation Trust Assets, and any proceeds therefrom, in accordance with Treasury Regulation section 301.7701-4(d) and Revenue Procedure 94-45, with no objective to continue or engage in the conduct of a trade or business. The Liquidation Trust is intended to qualify as a liquidating trust for U.S. federal income tax purposes. In general, a liquidating trust is not a separate taxable entity for U.S. federal income tax purposes, but is instead treated as a grantor trust, <u>i.e.</u>, pass-through entity for U.S. federal income tax purposes. Since it is treated as a grantor trust for U.S. federal income tax purposes, the trust will be treated as a grantor trust pursuant to the provisions of Section 1083.06 of the Puerto Rico Internal Revenue Code of 2011, as amended, for Puerto Rico income tax purposes. All parties must treat the transfer of the portion of the Liquidation Trust Assets attributable to the Liquidation Trust Beneficiaries as a transfer of such assets directly to the Liquidation Trust Beneficiaries. Consistent therewith, all parties must treat the Liquidation Trust as a grantor trust of which the Liquidation Trust Beneficiaries are the owners and grantors. Subject to the terms of the Liquidation Trust Agreement, the value of a Liquidation Trust Beneficiary's Allowed Claim shall be the value of such Liquidation Trust Beneficiary's interest in the Liquidation Trust, and the Liquidation Trust Beneficiaries and the Liquidation Trustee must consistently use this valuation for all U.S. federal income tax purposes and Puerto Rico income tax purposes, including for determining gain, loss or tax basis.

(g)    Reserve.  The Liquidation Trust shall establish an LT Reserve on account of Disputed Claims.  The Liquidation Trust may, for U.S. federal income tax purposes (and, to the extent permitted by law, for state, Puerto Rico, and local income tax purposes), (i) make an election pursuant to Treasury Regulation section 1.468B-9 to treat the LT Reserve as a "disputed ownership fund" within the meaning of that section, (ii) allocate taxable income or loss to the LT Reserve, with respect to any given taxable year (but only for the portion of the taxable year with respect to which such Claims are Disputed), and (iii) distribute assets from the LT Reserve as, when, and to the extent, such Disputed Claims cease to be Disputed, whether by virtue of becoming Allowed or otherwise resolved.  The Liquidation Trust Beneficiaries shall be bound by such election, if made by the Liquidation Trustee, and as such shall, for U.S. federal income tax purposes (and, to the extent permitted by law, for state, Puerto Rico, and local income tax purposes), report consistently therewith.

(h)    Dissolution.  The Liquidation Trust shall be dissolved no later than five (5) years from the Effective Date, unless the Bankruptcy Court, upon motion made prior to such fifth (5th) anniversary, determines that a fixed period extension, not to exceed three (3) years, together with any prior extensions, without a favorable letter ruling from the IRS that any further extension would not adversely affect the status of the Liquidation Trust as a liquidating trust for federal income tax purposes, is necessary to facilitate or complete the recovery on and liquidation of the Liquidation Trust Assets.  Upon the filing of any motion for an extension of the date of dissolution of the Liquidation Trust, such date shall be deemed automatically extended until an order of the Bankruptcy Court is entered with respect to such motion or the motion is withdrawn.

(i)    Securities Law Matters.  To the extent the interests in the Liquidation Trust are deemed to be "securities," the issuance of such interests under the Plan are exempt, pursuant to section 1145 of the Bankruptcy Code, from registration under the Securities Act of 1933, as amended, and any applicable state and local laws requiring registration of securities.

5.6.    Approval of Plan Documents.  The solicitation of votes on the Plan shall be deemed a solicitation for the approval of the Plan Documents and all transactions contemplated thereunder.  Entry of the Confirmation Order shall constitute approval of the Plan Documents and such transactions.  On the Effective Date, the Liquidation Trust shall be authorized to enter into, file, execute and/or deliver each of the Plan Documents and any other agreement or instrument issued in connection with any Plan Document without the necessity of any further corporate, board or shareholder action.

## ARTICLE VI

## CORPORATE GOVERNANCE AND MANAGEMENT

6.1.    Post-Effective Date Corporate Existence.  The Liquidation Trustee and any successor thereto is authorized and empowered to affect the dissolution of the Debtor as soon as practicable after the Effective Date.  On the Effective Date, upon cancellation of the Equity Interests as contemplated by Section 6.05 of the Plan, the Debtor shall issue a single

share of common stock to the Liquidation Trust, in accordance with the by-laws of the Debtor and applicable Puerto Rico law.

6.2.    <u>Corporate Action</u>.  On the Effective Date, or as soon thereafter as is practicable, the Debtor shall, if required, file its amended certificates of incorporation with the Secretary of State of the state or Territory in which each such entity is (or will be) incorporated, in accordance with the applicable general corporation law of each such state.

6.3.    <u>Officers and Boards of Directors</u>.  Effective as of the Effective Date, members of the board of directors of the Debtor serving in such capacities prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Debtor on or after the Effective Date.

6.4.    <u>Payment of Wind-Down Expenses</u>.  Wind-Down Expenses shall be paid by the Liquidation Trustee from the Liquidation Trust Assets prior to a final distribution to Holders of Allowed Claims or Interests.

6.5.    <u>Cancellation of Existing Securities and Agreements</u>.  On the Effective Date, the Debtor shall take appropriate action under the bylaws of the Debtor and applicable Puerto Rico law to cancel any document, agreement or instrument evidencing any Claim against or Equity Interests in the Debtor and the obligations of the Debtor under such documents, agreements, or instruments evidencing such Claims and Equity Interests, as the case may be, shall be discharged.

**ARTICLE VII**

**PROVISIONS REGARDING VOTING**
**<u>AND DISTRIBUTIONS UNDER THE PLAN</u>**

7.1.    <u>Non-Consensual Confirmation</u>.  If any impaired Class of Claims entitled to vote shall not accept the Plan by the requisite statutory majority provided in section 1126(c) of the Bankruptcy Code, the Debtor shall have the right to amend the Plan in accordance with Section 13.08 of the Plan or to ask the Bankruptcy Court to confirm the Plan under section 1129(b) of the Bankruptcy Code, or both.  With respect to impaired Classes of Claims and Equity Interests that are deemed to reject the Plan, the Debtor shall request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

7.2.    <u>Elimination of Vacant Classes</u>.  Any Class of Claims or Equity Interests that does not have a holder of an Allowed Claim or Allowed Equity Interest or a Claim or Equity Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

7.3.    <u>Voting Classes</u>.  If a Class contains Claims or Equity Interests eligible to vote and no holders of Claims or Equity Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be deemed accepted by the holders of such Claims or Equity Interests in such Class.  In the event the Bankruptcy Court determines that a Claim entitled

01:22327075.1

to vote to accept or reject the Plan was classified and voted in an improper Class, the Debtor may request that the Bankruptcy Court deem such Claim to have been voted and counted for purposes of determining acceptance or rejection of the Plan in the Class deemed proper by the Bankruptcy Court without having to resolicit the vote of the holder of such Claim.

7.4.    Distributions.  Pursuant to the terms and provisions of the Plan and the Confirmation Order the Liquidation Trustee shall make the required Distributions specified under the Plan, on the Initial Distribution Date, an Interim Distribution Date, or the Final Distribution Date, as the case may be, under the Plan.  Any payment of Cash made by the Liquidation Trustee pursuant to the Plan shall, at the Liquidation Trustee's option, be made by check or wire transfer.

7.5.    Timing of Distributions.  In the event that any payment, Distribution, or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or Distribution or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, and if so completed, shall be deemed to have been completed as of the required date.  Any requirement under the Plan that the Liquidation Trustee make a payment or Distribution on a date shall mean that such party is required to commence the process of making a payment or Distribution on such date or as soon as reasonably practicable thereafter.

7.6.    Holdings as of the Distribution Record Date.  As of the close of business on the Distribution Record Date, the claims register maintained for the Chapter 11 Case shall be closed (as it is relates to the Debtor, only).  The Debtor, the Liquidation Trustee and the Liquidation Trust shall not have any obligation to recognize any transfer of any Claim or interest therein occurring after 5:00 p.m. (prevailing Eastern Time) on the Distribution Record Date, and instead may, in their sole discretion, recognize and deal for all purposes under the Plan with only those holders of record as of 5:00 p.m. (prevailing Eastern Time) on the Distribution Record Date.  Notwithstanding the foregoing, however, any Liquidation Trust Beneficiary may transfer its right to payment from the Liquidation Trust, but not its beneficial interest in the Liquidation Trust, after the Distribution Record Date.  Subject to the foregoing, any transfer of a Liquidation Trust Beneficiary's right to payment, including both transfers for consideration and transfers by will or under the laws of descent and distribution, shall not be effective until and unless the Liquidation Trustee receives written notice of such transfer.

7.7.    Distributions to Address of Record.  Subject to Bankruptcy Rule 9010, and except as set forth in this Section 7.07 of the Plan, all distributions under the Plan to holders of Allowed Claims shall be made to the holder of each Allowed Claim at the address of such holder as listed on the Schedules as of the Distribution Record Date, unless the Debtor or the Liquidation Trustee has been notified in writing of a change of address, including, without limitation, by the timely filing of a proof of claim by such holder that provides an address for such holder different from the address reflected on the Schedules.  In the event that any Distribution to any such holder is returned as undeliverable, no Distribution to such holder shall be made unless and until the Liquidation Trustee has been notified of the then current address of such holder, at which time or as soon as reasonably practicable thereafter, such Distribution shall be made to such holder without interest; provided, however, that, at the

- 27 -

later of the expiration of one (1) year from the Effective Date and the date a Claim becomes an Allowed Claim, such Distributions shall be deemed unclaimed property and shall revest in the Liquidation Trust and be distributed to other holders of Allowed Claims, in accordance with the Plan or as otherwise ordered by the Bankruptcy Court.

7.8.    Minimum Distributions.  The Liquidation Trustee shall not be obligated to make any payment of Cash of less than fifty ($50) dollars to any holder of an Allowed Claim, unless such holder sends a timely written request to the Liquidation Trustee requesting that such payment be made on the next Distribution Date.  All such distributions shall be distributed to other holders of Allowed Claims in accordance with the Plan or as otherwise ordered by the Bankruptcy Court.  Notwithstanding anything contained in the Plan to the contrary, if, on any Distribution Date there remains $10,000 or less available for distribution to holders of Allowed Claims in Classes 3 or 4, or to the holder of the Equity Interest in Class 5, in lieu of making any further distributions to the holders of such Claims or Equity Interest, the Liquidation Trust may distribute such Cash to the charity of its choice.

7.9.    Unclaimed Distributions.  All Distributions to holders of Allowed Claims under the Plan that are unclaimed for a period of one (1) year after distribution thereof shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code, and any entitlement of any holder of any Claim to such Distributions shall be extinguished and forever barred.  All such unclaimed property shall revest in the Liquidation Trust and be distributed to other holders of Allowed Claims or donated in accordance with the Plan or otherwise ordered by the Bankruptcy Court.

7.10.    Setoffs and Recoupments.  The Liquidation Trust may, but shall not be required to, set off or recoup against any Claim (for purposes of determining the Allowed amount of such Claim on which distribution shall be made), any Causes of Action of any nature whatsoever that the Debtor may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtor or the Liquidation Trustee of any such Causes of Action that the Liquidation Trust, the Debtor may have against the holder of such Claim.

7.11.    Allocation of Plan Distributions Between Principal and Interest.  To the extent that any Allowed Claim entitled to a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such Distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes or Puerto Rico income tax purposes, as applicable) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

7.12.    Estimation of Claims; Certain Reserves.  For purposes of calculating and making distributions under the Plan, the Liquidation Trustee shall be entitled (but not required) to estimate, in good faith and with due regard to litigation risks associated with Disputed Claims, the maximum dollar amount of Allowed Claims and Disputed Claims, inclusive of contingent and/or unliquidated Claims in a particular class, provided, however, that no interim distributions shall be made under the Plan unless all Disputed Claims alleging a liquidated amount in a timely filed proof of claim or timely filed request for

- 28 -

payment of an Administrative Expense Claim are estimated at the full liquidated amount set forth therein, absent entry of an order of the Bankruptcy Court estimating the maximum Allowed amount of any such Disputed Claim at a lower amount.  The Liquidation Trustee shall be entitled to seek one or more estimation orders from the Bankruptcy Court for purposes of calculating and making distributions under the Plan, which requests may be joined with objections to the Claims that are subject to any such request.  Appropriate Disputed Claims reserves shall be established for each category of Claims as to which estimates are utilized or sought.  Notwithstanding the foregoing or anything else in the Plan or the Confirmation Order: (i) neither the Liquidation Trust nor the Liquidation Trustee shall be obligated to physically segregate and maintain separate accounts for LT Reserves; and (ii) unless otherwise ordered by the Bankruptcy Court, no LT Reserves shall be required to be established or maintained with respect to Claims or Administrative Expense Claims filed after the applicable Bar Date.  LT Reserves may be merely bookkeeping entries or accounting methodologies, which may be revised from time to time and evergreen in nature, as appropriate.

7.13.    No Recourse.  Notwithstanding that the Allowed amount of any particular Disputed Claim is reconsidered under the applicable provisions of the Bankruptcy Code and Bankruptcy Rules or is Allowed in an amount for which after application of the payment priorities established by the Plan there is insufficient value to provide a recovery equal to that received by other holders of Allowed Claims in the respective Class, no Claim holder shall have recourse against the Liquidation Trust, the Liquidation Trustee, the Debtor, the Creditors' Committee, the Term Loan Administrative Agent, the Lender or any of their respective professionals, consultants, officers, directors, employees or their successors or assigns, or any of their respective property.  However, nothing in the Plan shall modify any right of a holder of a Claim under section 502(j) of the Bankruptcy Code, nor shall it modify or limit the ability of claimants (if any) to seek disgorgement to remedy any unequal distribution from parties other than those released under this section.  THE ESTIMATION OF CLAIMS AND THE ESTABLISHMENT OF RESERVES UNDER THE PLAN MAY LIMIT THE DISTRIBUTION TO BE MADE ON INDIVIDUAL DISPUTED CLAIMS, REGARDLESS OF THE AMOUNT FINALLY ALLOWED ON ACCOUNT OF SUCH DISPUTED CLAIMS.

7.14.    Satisfaction of Claims and Equity Interests.  Unless otherwise provided in the Plan or the Confirmation Order, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete satisfaction of such Allowed Claims.

7.15.    Withholding and Reporting Requirements.  In connection with the Plan and all distributions thereunder, the Liquidation Trustee shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all Distributions under the Plan shall be subject to any such withholding and reporting requirements.  The Liquidation Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including, without limitation, liquidating a portion of any Distribution to generate sufficient funds to pay applicable withholding taxes or establishing any other mechanisms the Liquidation Trustee believes are reasonable and appropriate, including requiring a holder of a Claim to submit appropriate tax and withholding certifications.

- 29 -

Notwithstanding any other provision of the Plan, (i) each holder of an Allowed Claim or Allowed Equity Interest that is to receive a Distribution under the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations on account of such distribution, and (ii) no Distributions shall be required to be made to or on behalf of such holder pursuant to the Plan unless and until such holder has made arrangements satisfactory to the Liquidation Trustee for the payment and satisfaction of such tax obligations or has, to the Liquidation Trustee's satisfaction, established an exemption therefrom.

## ARTICLE VIII

## PROCEDURES RELATING TO DISPUTED CLAIMS

8.1.    Objections to Administrative Expense Claims and Claims.  Following the Effective Date and excluding Fee Claims, the Liquidation Trust, through the Liquidation Trustee, shall be entitled to object to Administrative Expense Claims and Claims.  Any objections to Administrative Expense Claims and Claims shall be filed and served on or before the later of (i) one hundred and eighty (180) days after the Effective Date, and (ii) such later date as may be fixed by the Bankruptcy Court upon the filing of a motion by the Debtor or the Liquidation Trustee seeking to extend such deadline.

8.2.    Late Filed Claims.  On the Effective Date, except as otherwise agreed by the Debtor prior to the Effective Date, and thereafter the Liquidation Trustee, or unless otherwise ordered by the Bankruptcy Court, any and all Administrative Expense Claims and Claims filed twenty (20) days or more after the applicable Bar Date shall be automatically deemed disallowed in full and expunged from the claims register maintained in connection with this Chapter 11 Case (as it relates to the Debtor, only) for purposes of distribution or any other treatment under the Plan as of the Effective Date without any further notice to or action, order or approval of the Bankruptcy Court and holders of such Claims may not receive any Distribution on account of such Claims.  To the extent a party-in-interest wishes to file a late filed Administrative Expense Claim or Claim after the Effective Date, such party in interest shall either obtain written consent from the Liquidation Trustee to file such Administrative Expense Claim or Claim late or obtain an order of the Bankruptcy Court permitting the Administrative Expense Claim or Claim to be late-filed.  In the event an Administrative Expense Claim or Claim is permitted to be late-filed, the Liquidation Trustee shall have one hundred and twenty (120) days from the date the holder is permitted to file the Claim late to object to such Claim.

8.3.    Amendments to Claims.  After the Effective Date, a proof of Claim may not be amended without the authorization of the Bankruptcy Court.  On the Effective Date, except as otherwise agreed by the Debtor, and thereafter the Liquidation Trustee, or unless otherwise ordered by the Bankruptcy Court, any Administrative Expense Claim or Claim that amends or supersedes an Administrative Expense Claim or Claim shall be automatically deemed disallowed in full and expunged from the claims register maintained in these Chapter 11 Case for purposes of distribution or any other treatment under the Plan as of the Effective Date without any further notice to or action, order or approval of the Bankruptcy

- 30 -

Court and holders of such Claims may not receive any Distribution on account of such Claims.

8.4.     Satisfied Claims.  Any Administrative Expense Claim or Claim that has been paid, amended, settled, superseded or satisfied in full or in part may be adjusted or expunged on the claims register by the Debtor or the Liquidation Trustee without a claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

8.5.     No Distributions Pending Allowance.  Notwithstanding any other provision hereof, if any portion of a Claim or Administrative Expense Claim is Disputed, no payment or Distribution provided under the Plan shall be required to be made on account of such Claim or Administrative Expense Claim unless and until such Disputed Claim or Disputed Administrative Expense Claim becomes Allowed in its entirety; provided, however, that the holder of a Disputed Claim in one Class shall be entitled to payment or Distribution on account of a separate Allowed Claim in a separate Class or a separate Allowed Administrative Expense Claim in a separate Class in accordance with the provisions of the Plan.

8.6.     Resolution of Disputed Claims.  On and after the Effective Date, the Liquidation Trust, through the Liquidation Trustee, shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Disputed Claims without approval of the Bankruptcy Court.  The reasonable fees and expenses (including reasonable attorneys' fees and costs) that are incurred by the Liquidation Trust and the Liquidation Trustee when providing assistance at the request of the Liquidation Trustee, associated with the claims resolution process shall be borne by the Liquidation Trust.

## ARTICLE IX

## TREATMENT OF EXECUTORY
## CONTRACTS AND UNEXPIRED LEASES

9.1.     Rejection or Assumption and Retention or Assignment.

(a)     Assumption or Rejection of Executory Contracts and Unexpired Leases.  Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code:

(1)     all executory contracts and unexpired leases of the Debtor shall be deemed to be rejected as of the Confirmation Date, subject to the occurrence of the Effective Date, except for any executory contract or unexpired lease: (a) that previously has been assumed and/or assigned pursuant to an order of the Bankruptcy Court entered prior to the Effective Date; (b) as to which a motion for approval of the assumption and/or assignment of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date; or (c) that is specifically designated as a contract or lease to be assumed and/or assigned or retained on Schedule 9.01(a), which schedule shall be contained in the Plan Supplement and shall list corresponding Cure Amounts.  The Debtor has either previously rejected and/or intends to reject all executory contracts or unexpired leases pursuant to the Plan.

- 31 -

(2)     notwithstanding anything otherwise in the Plan to the contrary, the Debtor reserves the right, on or prior to the Confirmation Date, to amend Schedule 9.01(a) to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be, as applicable, rejected, assumed and/or assigned or retained. The Debtor shall provide notice of any amendments to Schedule 9.01(a) to the parties to the executory contracts and unexpired leases affected thereby.  The listing of a document on Schedule 9.01(a) shall not constitute an admission by the Debtor that such document is an executory contract or an unexpired lease or that the Debtor has any liability thereunder.

(b)     <u>Approval of Assumptions, Retentions and Rejections by Confirmation Order</u>.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the rejections, retentions, assumptions and/or assignments contemplated by the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code.  Each executory contract and unexpired lease assumed pursuant to Section 9.01(a) of the Plan shall vest in and be fully enforceable by the Debtor or the Liquidation Trustee, as the case may be, in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing or providing for its assumption or applicable federal law.  The Debtor reserves the right to file a motion on or before the Confirmation Date to assume, assume and assign, or reject any executory contract or unexpired lease (not including non-residential real property leases).

9.2.     <u>Cure of Defaults</u>.

(a)     <u>Generally</u>.  Except as may otherwise be agreed to by the Debtor or the Liquidation Trustee, as the case may be, and the non-Debtor party to the contract or lease, within thirty (30) days after the Effective Date, the Debtor or Liquidation Trustee shall cure any and all undisputed defaults under any executory contract or unexpired lease assumed by the Debtor pursuant to the Plan, in accordance with section 365(b) of the Bankruptcy Code. Subject to the last sentence of Section 9.02(b) of the Plan, all disputed defaults that are required to be cured shall be cured either within thirty (30) days of the entry of a Final Order determining the amount, if any, of the Debtor's liability with respect thereto, or as may otherwise be agreed to by the parties.

(b)     <u>Notice of Proposed Cure</u>.  No later than 21 days prior to the Confirmation Hearing, the Debtor shall file and serve on parties to executory contracts and unexpired leases designated on Schedule 9.01(a) a notice (the "<u>Cure Notice</u>") listing the proposed Cure Amount to be paid in connection with the executory contracts and unexpired leases that may be Assumed, retained, assumed and/or assigned pursuant to Section 9.01(a) of the Plan.  To the extent that the Debtor on or prior to the Confirmation Date amends Schedule 9.01(a) to add any executory contract or unexpired lease thereto the Debtor shall file and serve on the parties to such executory contract or unexpired lease the Cure Notice listing the proposed Cure Amount to be paid in connection with such executory contract or unexpired pursuant to Section 9.01(a) of the Plan.  The non-Debtor parties to such contracts and leases shall have until fifteen (15) days following service of the Cure Notice to object in writing to the proposed cure and to propose an alternative cure.  In the event that no objection is timely filed, the applicable party shall be deemed to have consented to the cure

- 32 -

proposed by the Debtor (including amounts of compensation for actual pecuniary loss) and shall be forever enjoined and barred from seeking from the Debtor and the Liquidation Trustee any additional amount on account of the Debtor's cure obligations under section 365 of the Bankruptcy Code.  If an objection is timely filed with respect to the Cure Amount proposed by the Debtor for an executory contract or unexpired lease, the Bankruptcy Court shall hold a hearing to determine the amount of any disputed cure amount not settled by the parties.  Notwithstanding anything otherwise to the contrary, at all times through the date that is thirty (30) days after the entry of a Final Order resolving and fixing the amount of a disputed cure amount, whether such date is before or after the Effective Date, the Debtor and the Liquidation Trust shall be authorized to reject such executory contract or unexpired lease by notice to the non-debtor party to such executory contract or unexpired lease.

9.3.    Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan.  Claims arising out of the rejection of an executory contract or unexpired lease pursuant to Section 9.01 of the Plan must be filed with the Bankruptcy Court and served upon the Debtor in accordance with the Bar Date Order. All such Claims not filed within such time will be forever barred from assertion against the Debtor and its Estate.

## ARTICLE X

## EFFECT OF CONFIRMATION

10.1.    Binding Effect.  From and after the Confirmation Date, but subject to the occurrence of the Effective Date, the Plan shall be binding and inure to the benefit of the Debtor, all present and former holders of Claims and Equity Interests, and their respective assigns.

10.2.    Vesting of Assets.  Upon the Effective Date, and upon satisfaction of the conditions precedent set forth below, and the transfer of the Liquidation Trust Assets to the Liquidation Trust, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, any Assets of the Debtor and Estate shall vest in the Liquidation Trust, in each case free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as otherwise provided in the Plan or in the Confirmation Order.  Pursuant to section 1123(b)(3) of the Bankruptcy Code and the terms of the Plan, the Liquidation Trust shall retain and shall have the exclusive right, in its discretion to enforce against any Person any and all Causes of Action.

10.3.    Term of Pre-Confirmation Injunctions or Stays.  Unless otherwise provided in the Plan, the Confirmation Order, or a separate order from the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Case in accordance with sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in such applicable order.

10.4.    Injunction Against Interference with Plan.  Upon the entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along with their respective present or former affiliates, employees, agents, officers,

- 33 -

directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

**10.5.** **<u>Injunction</u>.** **Except as otherwise expressly provided in the Plan or the Confirmation Order, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Persons who have held, hold or may hold Liens, Claims, liabilities or encumbrances against or Equity Interests in, the Debtor, along with its respective present or former employees, agents, officers, directors, or principals, attorneys or professionals, or the Debtor's Assets are permanently enjoined, with respect to any such Liens, Claims, liabilities or encumbrances or Equity Interests, as of the Confirmation Date, but subject to the occurrence of the Effective Date, from: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor, the Liquidation Trust, Liquidation Trustee, or any of their property; (b) enforcing, levying, attaching (including any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtor, the Liquidation Trust, the Liquidation Trustee, or any of their property (including, without limitation, the Liquidation Trust Assets); (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor, the Liquidation Trust, the Liquidation Trustee, or any of their property (including, without limitation, the Liquidation Trust Assets); (d) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law; (e) taking any actions to interfere with the implementation or consummation of the Plan; and (f) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan, such as commencing or continuing in any manner any action or other proceeding of any kind with respect to any Claims against the Debtor, the Liquidation Trust, or the Liquidation Trustee and/or causes of action against the Debtor, the Liquidation Trust, or the Liquidation Trustee which are extinguished or released pursuant to the Plan; provided, however, that nothing contained in the Plan shall preclude such Persons from exercising their rights arising under and consistent with the terms of the Plan.**

**10.6.** **<u>Exculpation and Limitation of Liability for Postpetition Conduct</u>.** **None of the Debtor, the Creditors' Committee, or any of their respective current or former members, partners, officers, directors, employees, advisors, professionals, or agents and advisors of any of the foregoing (including any attorneys, financial advisors, investment bankers and other professionals retained by such Persons) but solely in their capacities as such (collectively, the "<u>Exculpated Parties</u>") shall have or incur any liability to any holder of any Claim against or Equity Interest in the Debtor for any act or omission on or after the Petition Date and on or before the Effective Date in connection with, related to, or arising out of the Chapter 11 Case, the transfer of the Debtor's Assets to the Liquidation Trust, the negotiation and execution of the Plan, this Disclosure Statement, the solicitation of votes for and the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan, and the**

01:22327075.1

property to be distributed under the Plan on or before the Effective Date, including all documents ancillary thereto, all decisions, actions, inactions and alleged negligence or misconduct relating thereto and all postpetition activities leading to the promulgation and confirmation of the Plan except in case of fraud, willful misconduct, intentional misconduct or gross negligence by such Exculpated Party as determined by a Final Order.  Nothing in Section 10.06 of the Plan shall: (i) be construed as a release of any Claims against the Debtor's officers or directors for events occurring prior to the Petition Date; (ii) be construed as a release of any entity's fraud, gross negligence, intentional misconduct or willful misconduct with respect to matters set forth in this Section 10.06; (iii) limit the liability of attorneys for the Debtor or the Creditors' Committee to their respective clients pursuant to DR 6-102 of the Code of Professional Responsibility; or (iv) be construed as a release or waiver of the Exculpated Parties' right or ability to assert or raise certain claims against any party as defense to a claim or suit brought against them by such party.

**10.7.**   **Injunction Related to Exculpation.**  The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities enjoined, exculpated, or otherwise limited or prohibited pursuant to the Plan, including the Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities against the Debtor, the Liquidation Trust, or the Liquidation Trustee that are described in Section 10.06 of the Plan.

10.8.   Releases of Liens and Encumbrances.

(a)   Each Lien or encumbrance on the Debtor's Assets, including Liens or encumbrances securing:  (w) any Miscellaneous Secured Claim or obligation arising under or related to the Debtor's DIP Facility Documents; (x) any Claim that is purportedly secured or (y) any judgment, personal property or ad valorem tax, or other tax of any kind or character, mechanic's or similar lien Claim, in each case regardless of whether such Claim is an Allowed Claim, shall, regardless of whether such Claim has been scheduled or proof of such Claim has been filed, be deemed released as set forth in Section 10.08 of the Plan;

(b)   if such Lien or encumbrance secures a Miscellaneous Secured Claim, such Lien or encumbrance shall upon payment of the consideration set forth in Article IV of the Plan, automatically, and without further action by the Debtor or Liquidation Trustee, be deemed released;

(c)   in all other cases, such Lien or encumbrance shall automatically, and without further action by the Debtor or the Liquidation Trust, be deemed released immediately upon the occurrence of the Effective Date;

(d)   the holder of any such Lien or encumbrance shall execute such documents and instruments as the Debtor or the Liquidation Trustee, as the case may be, require to evidence such Claim holder's release of such property or Lien or encumbrance, and if such holder refuses to execute appropriate documents or instruments, the Debtor or the Liquidation Trustee (as applicable) may, in their discretion, file a copy of the

- 35 -

Confirmation Order in the appropriate recording office, which shall serve to release any Claim holder's rights in such property; and

(e)     on the Effective Date, except as expressly provided in the Plan, all right, title and interest in Estate property subject to a Lien or an encumbrance immediately prior to the Effective Date shall be transferred as a Liquidation Trust Asset to the Liquidation Trust.

10.9.    Preservation and Application of Insurance.  The provisions of the Plan shall not diminish or impair in any manner the enforceability and/or coverage of any insurance policies (and any agreements, documents, or instruments relating thereto) that may cover Claims (including personal injury/workers' compensation or directors/officers Claims) against the Debtor, any directors, trustees or officers of the Debtor, or any other Person other than as expressly as set forth in the Plan.  For the avoidance of doubt, and as set forth in the Plan, all of the Debtor's insurance policies, or third party policies naming the Debtor as an additional insured party, and the proceeds thereof shall be available to satisfy any Claims to the extent such insurance policies cover such Claims.  In addition, such insurance policies and proceeds thereof shall be available to satisfy Claims estimated pursuant to section 502(c) of the Bankruptcy Code or in accordance with the Plan.

10.10.    Indemnification.  The Liquidation Trustee shall be indemnified and receive reimbursement against and from all loss, liability, expense (including counsel fees) or damage which the Liquidation Trustee may incur or sustain in the exercise and performance of any of its powers and duties under the Plan, to the fullest extent permitted by law, except if such loss, liability, expense or damage is finally determined by a court of competent jurisdiction to result solely from such party's willful misconduct, fraud, intentional misconduct or gross negligence.  The amounts necessary for such indemnification and reimbursement shall be paid by the Liquidation Trust out of the available Cash.  The Liquidation Trustee shall not be personally liable for this indemnification obligation or the payment of any expense of administering the Plan or any other liability incurred in connection with the Plan, and no Person shall look to the Liquidation Trustee personally for the payment of any such expense or liability.  This indemnification shall survive the death, resignation or removal, as may be applicable, of the Liquidation Trustee and shall inure to the benefit of the Liquidation Trustee's successors, heirs and assigns, as applicable.

10.11.    Satisfaction of Subordination Rights.  All Claims against the Debtor and all rights and Claims between or among claimholders relating in any manner whatsoever to Claims against the Debtor, based upon any claimed subordination and/or subrogation rights (if any), shall be deemed satisfied by the distributions under the Plan, and such subordination and/or subrogation rights shall be deemed waived, released, and terminated as of the Effective Date.

## ARTICLE XI

## CONDITIONS PRECEDENT

11.1.    Conditions to Confirmation.  The following are conditions precedent to confirmation of the Plan that may be satisfied or waived in accordance with Section 11.03 of

- 36 -

the Plan:

        (a)     the Bankruptcy Court shall have approved this Disclosure Statement with respect to the Plan in an order in form and substance reasonably acceptable to the Debtor; and

        (b)     the Confirmation Order and Plan Documents shall be in form and substance reasonably acceptable to the Debtor.

     11.2.   <u>Effectiveness</u>.  Subject to the Debtor's rights to waive conditions as provided in Section 11.03 of the Plan, the Plan shall not become effective unless and until: (i) the Confirmation Order shall have become a Final Order; and (ii) the Plan Documents, including the Liquidation Trust Agreement, to be entered into by the Debtor, shall have been entered and delivered, all actions, documents, and agreements necessary to implement the Plan shall have been effected or executed and the Debtor shall have received all material authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions, or documents that are reasonably necessary to implement the Plan and that are required by law, regulation, or order.

     11.3.   <u>Waiver of Conditions</u>.  The Debtor, to the extent not prohibited by applicable law, may waive one or more of the conditions precedent: (i) to effectiveness of the Plan set forth in Section 11.02 of the Plan in whole or part, upon five (5) Business Days' notice to the Bankruptcy Court without a hearing; or (ii) to confirmation of the Plan set forth in Section 11.01 of the Plan prior to the Confirmation Date without any hearing.  The failure to satisfy or waive any condition to the Confirmation Date or the Effective Date may be asserted by the Debtor regardless of the circumstances giving rise to the failure of such conditions to be satisfied (including any action or inaction by the Debtor in its sole discretion).  The failure of the Debtor to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

     11.4.   <u>Withdrawal of Plan</u>.

        (a)     <u>Right to Revoke or Withdraw</u>.  The Debtor reserves the right to revoke or withdraw the Plan at any time prior to the Effective Date.

        (b)     <u>Effect of Withdrawal, Revocation or Non-Consummation</u>.  If the Debtor revokes or withdraws the Plan prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, the Plan, any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Equity Interest or Class of Claims or Equity Interests), the assumption or rejection of executory contracts, unexpired leases, any release, exculpation or indemnification provided for in the Plan, and any document or agreement executed pursuant to the Plan shall be null and void; <u>provided</u>, <u>however</u>, any settlements or compromises embodied in the Plan that have been otherwise approved by separate order of the Bankruptcy Court shall remain in full force in effect notwithstanding withdrawal or revocation of the Plan or the Confirmation Date or Effective Date to occur.  In such event, nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan shall be deemed to constitute

- 37 -

a waiver or release of any Claims by or against or Equity Interest in the Debtor or any other Person, to prejudice in any manner the rights of the Debtor or any Person in any further proceedings involving the Debtor, or to constitute an admission of any sort by the Debtor or any other Person.

11.5.   Waiver of Bankruptcy Rule 3020(e) Stay.  Pursuant to Bankruptcy Rule 3020(e), the Confirmation Order shall be immediately effective upon its entry and shall not be subject to the stay provided in Bankruptcy Rule 3020(e).

## ARTICLE XII

## VOTING REQUIREMENTS, ACCEPTANCE AND CONFIRMATION OF THE PLAN

12.1.   Parties in Interest Entitled to Vote.

Pursuant to the Bankruptcy Code, only Classes of Claims and Equity Interests that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under the Plan are entitled to vote to accept or reject the Plan.  A Class is impaired if the legal, equitable or contractual rights to which the Claims or Equity Interests of that Class are entitled are modified, other than by curing defaults and reinstating the debt.  Classes of Claims and Equity Interests that are not impaired are not entitled to vote on the Plan and are conclusively presumed to have accepted the Plan.  In addition, Classes of Claims and Equity Interests that receive no distributions under the Plan are not entitled to vote on the Plan and are deemed to not have accepted the Plan.

12.2.   Classes Impaired Under the Plan.

The following Classes of Claims are or may be impaired under the Plan and are entitled to vote on the Plan (the "Voting Classes"):

| IMPAIRED CREDITORS ENTITLED TO VOTE | |
|---|---|
| **Class** | **Designation** |
| Class 3 | General Unsecured Claim |
| Class 4 | Subordinated Claims |
| Class 5 | Equity Interests |

Acceptances of the Plan are being solicited only from those holders of Claims in impaired Classes that will or may receive a distribution under the Plan.  Accordingly, the Debtor is soliciting acceptances from holders of Claims in Class 3, Class 4, and Class 5, only.

- 38 -

12.3.    <u>Voting Procedures and Requirements</u>.

**VOTING ON THE PLAN BY EACH HOLDER OF AN IMPAIRED CLAIM OR EQUITY INTEREST ENTITLED TO VOTE ON THE PLAN IS IMPORTANT.  IF YOU HOLD CLAIMS IN MORE THAN ONE CLASS, YOU MAY RECEIVE MORE THAN ONE BALLOT.  YOU SHOULD COMPLETE, SIGN AND RETURN EACH BALLOT YOU RECEIVE.**

(a)    <u>Ballots</u>.  In voting for or against the Plan, please use only the Ballot or Ballots sent to you with this Disclosure Statement.  If you are a member of a Voting Class and did not receive a Ballot, if your Ballot is damaged or lost or if you have any questions concerning voting procedures, please call the Claims and Voting Agent, Kurtzman Carson Consultants LLC.  Each Ballot enclosed with this Disclosure Statement has been encoded with the amount of your Claim for voting purposes and the Class in which your Claim has been classified.  If your Claim is a Disputed Claim this amount may not be the amount ultimately allowed for purposes of distributions under the Plan, **PLEASE FOLLOW THE DIRECTIONS CONTAINED ON THE ENCLOSED BALLOT CAREFULLY.**

(b)    <u>Returning Ballots</u>.

**IF YOU ARE A HOLDER OF A CLASS 3, CLASS 4 OR CLASS 5 CLAIM OR EQUITY INTEREST ENTITLED TO VOTE, YOU SHOULD COMPLETE AND SIGN YOUR BALLOT AND RETURN IT IN THE ENCLOSED ENVELOPE VIA FIRST CLASS MAIL, OVERNIGHT COURIER OR HAND DELIVERY TO:**

> **Sports Authority Processing Center**
> **c/o KCC**
> **2335 Alaska Avenue**
> **El Segundo, CA 90245**

**IF YOU HAVE ANY QUESTIONS ON THE PROCEDURES FOR VOTING ON THE PLAN, PLEASE CALL THE CLAIMS AND VOTING AGENT AT THE FOLLOWING TELEPHONE NUMBER: (866) 967-0490 (international callers may dial (310) 751-2690).**

TO BE COUNTED, YOUR ORIGINAL BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE ACTUALLY RECEIVED BY THE CLAIMS AND VOTING AGENT NO LATER THAN **5:00 P.M. (PACIFIC TIME) ON [NOVEMBER 20, 2017]**, UNLESS EXTENDED BY THE DEBTOR.  YOUR BALLOT MAY BE SENT VIA U.S.  FIRST CLASS MAIL, OVERNIGHT COURIER OR HAND DELIVERY.  ALL BALLOTS MUST BE SIGNED.

Prior to deciding whether and how to vote on the Plan, each holder in a Voting Class should consider carefully all of the information in this Disclosure Statement.

12.4.  Confirmation Hearing.

Section 1128 of the Bankruptcy Code requires that the Bankruptcy Court, after notice, conduct a hearing with respect to whether the Plan and the Debtor has fulfilled the confirmation requirements of section 1129 of the Bankruptcy Code.  The Confirmation Hearing has been scheduled for [**December 5, 2017 at 10:30 a.m.] (Eastern Time)** before the Honorable Mary Walrath, United States Bankruptcy Judge, United States Bankruptcy Court, 824 N. Market Street, 6th Floor, Wilmington, Delaware 19801.  Objections, if any, to confirmation of the Plan must be served and filed so that they are received on or before [**November 20, 2017, at 4:00 p.m.] (Eastern Time)**, in the manner set forth in the Disclosure Statement Order.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice.

12.5.  Confirmation.

The Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must make a series of findings concerning the Plan and the Debtor, including that (i) the Plan has classified Claims and Equity Interests in a permissible manner; (ii) the Plan complies with applicable provisions of the Bankruptcy Code; (iii) the Debtor has complied with applicable provisions of the Bankruptcy Code; (iv) the Debtor has proposed the Plan in good faith and not by any means forbidden by law; (v) the disclosure required by section 1125 of the Bankruptcy Code has been made; (vi) the Plan has been accepted by the requisite votes of creditors (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code); (vii) the Plan is feasible and confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor under the Plan except as proposed in the Plan; (viii) the Plan is in the "best interests" of all holders of Claims or Equity Interests in an impaired Class by providing to such holders on account of their Claims or Equity Interests property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain in a chapter 7 liquidation, unless each holder of a Claim or Equity Interest in such Class has accepted the Plan; (ix) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on confirmation, have been paid or the Plan provides for the payment of such fees on the Effective Date; and (x) the Plan does not alter any obligation of the Debtor to, after the Effective Date, provide for the continuance of all retiree benefits, as defined in section 1114 of the Bankruptcy Code, at the level established at any time prior to confirmation pursuant to sections 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code, for the duration of the period that the Debtor has obligated itself to provide such benefits (provided, however, that upon motion by the Debtor, the Bankruptcy Court may enter an order pursuant to sections 1114(e)(1) and 1114(g) providing for the modification of the payment of retiree benefits, under certain circumstances).

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of the Bankruptcy Code are met.

12.6.  Acceptance of Plan.

As a condition to confirmation, the Bankruptcy Code requires that each class of impaired claims or interests vote to accept a plan, except under certain circumstances.

- 40 -

<u>See</u> "Confirmation Without Acceptance of All Impaired Classes" below.  A plan is accepted by an impaired class of claims if holders of at least two thirds in dollar amount and more than one half in number of claims of that class vote to accept the plan, without including the votes of insiders.  Only those holders of claims or interests who actually vote count in these tabulations.  Holders of claims who fail to vote are counted as accepting the plan.

In addition to this voting requirement, section 1129 of the Bankruptcy Code requires that a plan be accepted by each holder of a claim or interest in an impaired class or that the plan otherwise be found by the Bankruptcy Court to be in the best interests of each holder of a claim or interest in such class.  <u>See</u> "Best Interests Test" below.  In addition, each impaired class must accept the plan for the plan to be confirmed without application of the "fair and equitable" and "unfair discrimination" tests in section 1129(b) of the Bankruptcy Code discussed below.  <u>See</u> "Confirmation Without Acceptance of All Impaired Classes" below.

12.7.    <u>Confirmation Without Acceptance of All Impaired Classes</u>.

The Bankruptcy Code contains provisions for confirmation of a plan even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it.  These so-called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code.

A plan may be confirmed under the cramdown provisions if, in addition to satisfying all other requirements of section 1129(a) of the Bankruptcy Code, it (a) "does not discriminate unfairly," and (b) is "fair and equitable," with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.  As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have specific meanings unique to bankruptcy law.

In general, the cramdown standard requires that a dissenting class receive full compensation for its allowed claim or interests before any junior class receives any distribution.  More specifically, section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed under that section if: (a) with respect to a secured class, (i) the holders of such claims retain the liens securing such claims to the extent of the allowed amount of such claims and that each holder of a claim of such class receive deferred cash payments equaling the allowed amount of such claim as of the plan's effective date or (ii) such holders realize the indubitable equivalent of such claims; (b) with respect to an unsecured claim, either (i) the impaired unsecured creditor must receive property of a value equal to the amount of its allowed claim, or (ii) the holders of claims and interests that are junior to the claims of the dissenting class may not receive any property under the plan; or (c) with respect to a class of interests, either (i) each holder of an interest of such class must receive or retain on account of such interest property of a value, equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such interest, or (ii) the holder of any interest that is junior to the interest of such class may not receive or retain any property on account of such junior interest.

- 41 -

The "fair and equitable" standard, also known as the "absolute priority rule," requires, among other things, that unless a dissenting unsecured class of claims or a class of interests receives full compensation for its allowed claims or allowed interests, no holder of claims or interests in any junior class may receive or retain any property on account of such claims or interests. With respect to a dissenting class of secured claims, the "fair and equitable" standard requires, among other things, that holders either (i) retain their liens and receive deferred cash payments with a value as of the plan's effective date equal to the value of their interest in property of the estate, or (ii) otherwise receive the indubitable equivalent of these secured claims. The "fair and equitable" standard has also been interpreted to prohibit any class senior to a dissenting class from receiving under a plan more than 100% of its allowed claims. The requirement that a plan not "discriminate unfairly" means, among other things, that a dissenting class must be treated substantially equally with respect to other classes of equal rank.

The Debtor will seek confirmation of the Plan over the objection of individual holders of Claims who are members of an accepting Class, and may seek confirmation of the Plan over the rejection of one or more Voting Classes under the "cramdown" provisions of section 1129(b) of the Bankruptcy Code.

The Debtor reserves the right to alter, amend, modify, revoke or withdraw the Plan, any exhibit or schedules thereto, or any Plan Document in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary. The Debtor believes that the Plan will satisfy the "cramdown" requirements of section 1129(b) of the Bankruptcy Code. However, there can be no assurance that the Bankruptcy Court will determine that the Plan meets the requirements of section 1129(b) of the Bankruptcy Code.

12.8.   Best Interests Test.

In order to confirm a plan, a bankruptcy court must independently determine that the plan is in the best interests of each holder of a claim or interest in any such impaired class who has not voted to accept the plan. Accordingly, if an impaired class does not unanimously accept the plan, the best interests test requires the bankruptcy court to find that the plan provides to each member of such impaired class a recovery on account of the class member's claim or interest that has a value, as of the effective date, at least equal to the value of the distribution that each such member would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code on such date.

To determine which holders of Claims and Equity Interests in each impaired Class would receive if the Debtor was liquidated under chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code. The Cash amount that would be available for satisfaction of Claims and Equity Interests would consist of the proceeds resulting from the disposition of the assets and properties of the Debtor, augmented by the sale of any Assets held by the Debtor at the time of the commencement of the liquidation case. Such Cash amount would be reduced by the costs and expenses of liquidation and such additional administrative claims that might result from the use of chapter 7 for the purposes of liquidation, including the fees payable to

- 42 -

a trustee in bankruptcy, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Chapter 11 Case, including the costs and expenses of a liquidation under chapter 7 arising from fees payable to a chapter 7 trustee in bankruptcy, the Debtor has determined that confirmation of the Plan will provide each holder of an Allowed Claim with a recovery that is not less than such holder would receive pursuant to the liquidation of the Debtor under chapter 7.

12.9.   Liquidation Analysis.

The Debtor could be liquidated under chapter 7 of the Bankruptcy Code.  A discussion of the effect that a chapter 7 liquidation would have on the recoveries of the holders of Claims is set forth in the hypothetical liquidation analysis (the "Liquidation Analysis") annexed hereto as Exhibit 2.

Underlying the Liquidation Analysis are a number of estimates and assumptions that, although developed and considered reasonable by the Debtor, are inherently subject to significant uncertainties and contingencies beyond the control of the Debtor.  The Liquidation Analysis also is based on assumptions with regard to liquidation decisions that are subject to change.  Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the results of a liquidation of the Debtor. Accordingly, the values reflected might not be realized if the Debtor was, in fact, to be liquidated.  All holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Liquidation Analysis is based in connection with their evaluation of the Plan.

12.10.   Feasibility.

Under section 1129(a)(11) of the Bankruptcy Code, the Debtor must demonstrate that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor (except as proposed in the Plan).  The Plan clearly complies with this requirement because on the Effective Date, the Debtor will transfer the Liquidation Trust Assets to the Liquidation Trust.  The Liquidation Trust will distribute the Liquidation Trust Assets to holders of Allowed Claims and Equity Interests pursuant to the terms of the Plan and, provided that the Plan is confirmed and consummated, the Debtor will no longer be subject to future reorganization or liquidation.

12.11.   Compliance with the Applicable Provisions of the Bankruptcy Code.

Section 1129(a)(1) of the Bankruptcy Code requires that the Plan comply with the applicable provisions of the Bankruptcy Code.  The Debtor has considered each of these issues in the development of the Plan and believes that the Plan complies with all applicable provisions of the Bankruptcy Code.

# ARTICLE XIII

## ALTERNATIVE TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

The Debtor believes the Plan affords holders of Claims and Equity Interests the potential for the greatest realization on the Debtor's remaining assets and, therefore, is in the best interests of such holders.  If a plan is not confirmed, the only viable alternatives are dismissal of the Chapter 11 Case or conversion to chapter 7 of the Bankruptcy Code.  Neither of these alternatives is preferable to confirmation and consummation of the Plan.

If the Chapter 11 Case was dismissed, holders of Claims would revert to a "race to the courthouse," the result being that claimants would not receive a fair and equitable distribution as contemplated by the Plan and agreement with the lenders under the Senior Secured Obligations.  As set forth in the Liquidation Analysis, the Plan provides a greater recovery to holders of Claims than would be achieved in a case under Chapter 7 of the Bankruptcy Code.  Therefore, a chapter 7 case is not an attractive or superior alternative to the Plan.  Thus, the Plan represents the best available alternative for maximizing returns to creditors.

# ARTICLE XIV

## RISK FACTORS & CERTAIN FEDERAL
## INCOME TAX CONSEQUENCES OF THE PLAN

14.1.    <u>Allowed Claims May Exceed Estimates</u>.

The projected Distributions set forth in this Disclosure Statement are based upon the Debtor's good faith estimate of, among other things, the amount of Wind-Down Expenses that will be incurred and total amount of Claims ultimately Allowed.  The actual amount of the Wind Down Expenses could be greater than expected for a variety of reasons, including greater than anticipated administrative and litigation costs associated with resolving Disputed Claims.  Additionally, the actual amount of Allowed Claims in any Class could be greater than anticipated, which will impact the distributions to be made to holders of Claims.

The Debtor and the Liquidation Trust reserve the right to object to the amount or classification of any Claim not previously allowed by order of the Bankruptcy Court.  Thus, the estimates set forth in this Disclosure Statement cannot be relied upon by any creditor whose Claim is subject to a successful objection.  Any such creditor may not receive the estimated Distributions set forth in the Plan.

14.2.    <u>Plan May Not Be Accepted or Confirmed</u>.

While the Debtor believes the Plan is confirmable under the standards set forth in section 1129 of the Bankruptcy Court, there can be no guarantee that the Bankruptcy Court will agree.

- 44 -

14.3.   Certain Federal Income Tax Consequences of the Plan.

A detailed discussion of the potential federal income tax consequences of the plan can be found in the Analysis of Certain Federal Income Tax Consequences of the Plan annexed hereto as Exhibit 3.

## ARTICLE XV

## RETENTION OF JURISDICTION

15.1.   Scope of Bankruptcy Court Jurisdiction.  The Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Case and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a)      To hear and determine pending applications for the assumption, assumption and assignment or rejection of executory contracts or unexpired leases and the allowance of cure amounts and Claims resulting therefrom or from the assumption, assumption and assignment or rejection of executory contracts or unexpired leases pursuant to the Plan;

(b)      To hear and determine any and all adversary proceedings, applications, and contested matters, and to order appropriate relief in connection therewith (including issuance and/or enforcement of releases);

(c)      To hear and determine any objection to Administrative Expense Claims, Claims or Equity Interests;

(d)      To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(e)      To issue such orders in aid of execution and consummation of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(f)      To consider any amendments to, or modifications of, the Plan and the Plan Supplement, and any dispute or controversy relating to execution, delivery or compliance with any document included in the Plan Supplement, and to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

(g)      To hear and determine all applications for compensation and reimbursement of expenses of Professionals under sections 330, 331, and 503(b) of the Bankruptcy Code;

(h)      To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan;

- 45 -

(i)     To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan, any transaction to be consummated in accordance herewith, the Liquidation Trust Agreement, the Confirmation Order, or any other order of the Bankruptcy Court;

(j)     To recover all Assets of the Debtor and property of the Debtor and Liquidation Trust, wherever located;

(k)     To hear and determine matters concerning state, local, and federal taxes, including as provided by sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of tax under section 505(b) of the Bankruptcy Code);

(l)     To resolve any Disputed Claims or Equity Interests;

(m)     To hear any other matter consistent with the Bankruptcy Code; and

(n)     To enter a final decree closing the Chapter 11 Case; provided, however, with respect to a governmental unit's exercise of its police or regulatory powers other than the enforcement of a money judgment, the jurisdiction of any other tribunal shall not be reduced or impaired from that as set forth in any applicable, valid statutory grant of jurisdiction.

## ARTICLE XVI

## MISCELLANEOUS PROVISIONS

16.1.   Critical Vendor and Other Payments.  Notwithstanding the contents of the Schedules, Claims listed therein as undisputed, liquidated and not contingent shall be reduced by the amount, if any, that was paid pursuant to an order of the Bankruptcy Court. To the extent such payments are not reflected in the Schedules, such Schedules are hereby amended and reduced to reflect that such payments were made.  Nothing in the Plan shall preclude the Debtor or the Liquidation Trustee from paying Claims that the Debtor or the TSA Debtors were authorized to pay pursuant to any Final Order entered by the Bankruptcy Court prior to the Confirmation Date.

16.2.   Effectuating Documents and Further Transactions.  Each of the Debtor and the Liquidation Trustee is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any securities issued pursuant to the Plan.

16.3.   Exemption from Transfer Taxes.  Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including any

- 46 -

merger agreements or agreements of consolidation, deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan, shall constitute a "transfer under a plan" and shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.  All sale transactions consummated by the Debtor and approved by the Bankruptcy Court on and after the Petition Date through and including the Effective Date, including the transfers effectuated under the Plan and the assumption, assignment, and sale by the Debtor of unexpired leases of non-residential real property pursuant to section 365(a) of the Bankruptcy Code, shall be deemed to have been made under, in furtherance of, or in connection with the Plan and, thus, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

16.4.   <u>Termination of Estate Professionals</u>.  On the Effective Date, the engagement of each Professional retained by the Estate shall be terminated (solely as to the Estate of the Debtor) without further order of the Bankruptcy Court or act of the parties.  Notwithstanding the foregoing, the Liquidation Trust shall be entitled to engage Estate Professionals and representatives of the Debtor as provided in the Liquidation Trust Agreement.

16.5.   <u>Access</u>.  From and after the Effective Date, the Debtor and the Liquidation Trust shall cooperate with any Person that served as a director or officer of a Debtor at any time prior to the Effective Date, and make available to any such party such documents, books, records or information relating to the Debtor's activities prior to the Effective Date that such party may reasonably require relating to any action taken in connection with such party's role as a director or officer of the Debtor, any action taken in connection with the negotiation, execution and implementation of the Plan, and the Chapter 11 Case, provided, however that the Liquidation Trustee may require, in its sole and absolute discretion, that any given documents, books, records or information sought for the purposes of prosecuting or defending pending, threatened or asserted litigation must be requested and provided in accordance with the Bankruptcy Rules and the Federal Rules of Civil Procedure.

16.6.   <u>Payment of Statutory Fees</u>.  All fees payable pursuant to section 1930 of title 28 of the United States Code (solely as such fees relate to this Chapter 11 Case) shall be paid on the earlier of when due or the Effective Date, or as soon thereafter as practicable. From and after the Effective Date, the Debtor and the Liquidation Trust shall be jointly liable for and shall pay the fees under 28 U.S.C. § 1930 assessed against the Debtor's Estates under 28 U.S.C. § 1930 until entry of a final decree closing the Debtor's Chapter 11 Case.  In addition, the Debtor and/or the Liquidation Trustee shall file post-confirmation quarterly reports or any pre-confirmation monthly operating reports not filed as of the Confirmation Hearing in conformity with the U.S. Trustee guidelines (as may be modified through agreement with the Office of the United States Trustee), until entry of an order closing or converting the Chapter 11 Case.  The U.S. Trustee shall not be required to file a request for payment of the U.S. Trustee Fees, which shall be deemed an Administrative Expense Claim against the Debtor and its Estate.

16.7.   <u>Post-Effective Date Fees and Expenses</u>.  From and after the Effective Date, the Liquidation Trust shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of professional Persons thereafter incurred by the Debtor, including those fees and expenses incurred in

- 47 -

connection with the implementation and consummation of the Plan, which fees and expenses shall constitute Wind-Down Expenses.

16.8.   <u>Amendment or Modification of the Plan</u>.  Alterations, amendments, or modifications of or to the Plan (including to provide for treatment different than that set forth therein with respect to any class of Claim or Equity Interest, including establishment of subclasses of Classes of Claims or Equity Interests to the extent required if so elected by the Debtor, the unimpairment of Classes that are impaired by the Plan, and the impairment of Classes that are unimpaired thereunder) may be proposed in writing by the Debtor at any time prior to the Confirmation Date, provided that the Plan, as altered, amended, or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code, and the Debtor shall have complied with section 1125 of the Bankruptcy Code.  The Plan may be altered, amended, or modified at any time after the Confirmation Date and before substantial consummation, provided that the Plan, as altered, amended, or modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, amended, or modified, under section 1129 of the Bankruptcy Code and the circumstances warrant such alterations, amendments, or modifications.  A holder of a Claim or Equity Interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, or modified, if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim or Equity Interest of such holder.

16.9.   <u>Confirmation Order</u>.  The Confirmation Order shall, and is hereby deemed to, ratify all transactions effected by the Debtor during the period commencing on the Petition Date and ending on the Confirmation Date, except for any acts constituting willful misconduct, intentional misconduct, gross negligence or fraud.

16.10.   <u>Severability</u>.  If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

16.11.   <u>Expedited Tax Determination</u>.  The Liquidation Trustee may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Debtor for all taxable periods beginning on or before the Effective Date.

16.12.   <u>Governing Law</u>.  Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit or schedule hereto or in the Plan

- 48 -

Supplement provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to any contrary result otherwise required under applicable choice or conflict of law rules.

16.13.  <u>Binding Effect</u>.  The Plan shall be binding upon and inure to the benefit of the Debtor, the holders of Claims and Equity Interests, and their respective successors and assigns.

16.14.  <u>Exhibits/Schedules</u>.  The Plan and all exhibits and schedules to the Plan and the Confirmation Order, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full herein.

16.15.  <u>Dissolution of the Creditors' Committee</u>.  The functions of the Creditors' Committee, as to the Debtor's Chapter 11 Case, alone, shall terminate on the Effective Date; *provided, however*, that following the Effective Date, the attorneys to the Creditors' Committee shall be entitled to assert any claims for compensation for services rendered or reimbursement for expenses incurred after the Effective Date directly and exclusively related to the Debtor and the Chapter 11 Case, which fees and expenses shall be paid in the ordinary course of business upon submission to the Liquidation Trustee of appropriate documentation.  Notwithstanding anything in the Plan to the contrary, the Liquidation Trustee is authorized to prosecute any objection, action or proceeding filed by the Creditors' Committee that is not resolved prior to the dissolution of the Creditors' Committee.

16.16.  <u>Notices</u>.  All notices, requests, and demands to or upon the Debtor, the Liquidation Trust, or the Creditors' Committee to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein or in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Michael R. Nestor
Andrew L. Magaziner

Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 576-3312

*Counsel for the TSA Debtors*

IRELL & MANELLA LLP
Jeffrey M. Reisner
Michael Strub
Kerri A. Lyman

840 Newport Center Drive, Suite 400
Newport Beach, CA  92660
Telephone: (949) 760-0991

Facsimile: (949) 760-5200

*Special Counsel to Debtors TSAWD Holdings, Inc., TSA Ponce, Inc., and TSA Caribe, Inc.*

01:22327075.1

TSA CARIBE, INC.,                              LIQUIDATION TRUST
c/o Douglas Garrett                            c/o _____
TSAWD, Inc.                                    _____
2305 East Arapahoe Road
Suite 234
Centennial, Colorado 80122

*Debtor*


## ARTICLE XVII

## <u>CONCLUSION AND RECOMMENDATION OF DEBTOR</u>

**THE DEBTOR BELIEVES THAT CONFIRMATION AND CONSUMMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS AND HOLDERS OF EQUITY INTERESTS AND THAT THE PLAN SHOULD BE CONFIRMED.  THE DEBTOR ALSO BELIEVES THAT CONFIRMATION OF THE PLAN IS PREFERABLE TO ALL OTHER ALTERNATIVES BECAUSE IT WILL PROVIDE RECOVERIES TO CREDITORS IN EXCESS OF THOSE WHICH WOULD OTHERWISE BE AVAILABLE IF THE CHAPTER 11 CASE WAS DISMISSED OR CONVERTED TO A CASE UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.  THE DEBTOR STRONGLY RECOMMENDS THAT ALL CREDITORS RECEIVING A BALLOT VOTE IN FAVOR OF THE PLAN.**


Dated: Wilmington, Delaware
      September 5, 2017

                    Respectfully submitted,

                    **TSA CARIBE, INC.**

                    */s/ Douglas Garrett*_____
                    Douglas Garrett
                    President of TSA Caribe, Inc.
                    Chairman of Wind Down Committee for TSA
                    Debtors

01:22327075.1